IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-272

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK, by his next friends and parents, JASON FLECK and ALEXIS THONEN; JULIA MCKEOWN; MICHAL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; and SAM SILVAINE, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY TREASURER DALE FOLWELL, EXECUTIVE ADMINISTRATOR DEE JONES, AND THE NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES        iii

I.    NATURE OF THE MATTER BEFORE THE COURT    2

II.   STATEMENT OF FACTS—INTRODUCTION TO THE HEALTH PLAN   3

III.  QUESTIONS PRESENTED    6

IV.  SUMMARY OF ARGUMENT    7

V.   ARGUMENT    11

    A.  Only facially discriminatory classifications receive heightened scrutiny under the Equal Protection Clause, and no such classifications exist here. Plaintiffs' allegation that the failure to pay for gender transformation has a discriminatory effect receives only rational basis review.  The decision to conserve financial resources is rational, so the Court should dismiss Count I.

      1.  Complaints about discriminatory effect receive rational basis review, not heightened scrutiny, under the Equal Protection Clause.    11

      2.  Plaintiffs do not allege intentional discrimination by the Health Plan.    14

      3.  The Health Plan's coverage exclusions are rational because they save money.    15

    B.  Plaintiffs' claim under Section 1557 of the Affordable Care Act fails because no waiver of sovereign immunity allows jurisdiction in this Court and because Plaintiffs fail to state a claim for relief.    18

      1.  The Eleventh Amendment bars federal jurisdiction over the Health Plan.    18

        a.  No waiver of sovereign immunity allows enforcement of Section 1557 of the ACA against the Health Plan.    18

        b.  Even if this Court finds a waiver of sovereign immunity for some Section 1557 claims, nothing in the ACA waives sovereign immunity for claims of discrimination based on transgender status.    21

Case 1:19-cv-00272-LCB-LPA   Document 33   Filed 07/08/19   Page 2 of 34

2. Section 1557 authorizes only claims based on discriminatory intent, not 23
disparate impact.

3. Title IX does not require a health insurer to cover treatment of gender 24
dysphoria, as Plaintiffs claim.

VI.   CONCLUSION                                                          27

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate*, 469 U.S. 287 (1985) ............................................................................ 13,15

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291 (2006) ................................... 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 15

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234 (1985) ......................................................... 20

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,* 458 U.S. 176 (1982) ............................................................................................................................. 22

*Boyd v. Bulala*, 877 F.2d 1191 (4th Cir.1989) ............................................................................ 17

*Boyden v. Conlin*, 341 F.Supp.3d 979 (W.D.Wis. 2018) ............................................................ 20

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ............................................. 13

*Cannon v. Univ. of Chicago*, 648 F.2d 1104 (7th Cir. 1981) ..................................................... 23

*Coal. for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997) ................................................ 11

*Coleman v. Md. Ct. of App.*, 626 F.3d 187 (4th Cir.2010) ......................................................... 18

*Crawford v. Board of Ed. of Los Angeles,* 458 U.S. 527 (1982) ............................................... 12

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ................................ 11

*Doe 2 v. Shanahan*, 917 F.3d 694 (D.C.Cir. 2019) ................................................................. 2,16

*Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, 2017 WL 4791185, at *6 (E.D.La. Oct.24, 2017) ...... 20

*Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007) ................................................... 23

*Franciscan All. v. Burwell,* 227 F.Supp.3d 660 (N.D.Tex.2016) ............................................ 4,24

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709 (4th Cir. 2016) ........................ 25

*Geduldig v. Aiello*. 417 U.S. 484 (1974) ......................................................................... 12,13,16,17

*Giarratano v. Johnson*, 521 F.3d 298 (4th Cir. 2008) ................................................................. 8

*Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582 (1983) ............................................... 24

*Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96 (1989) ................................................ 19

*In re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936 (8th Cir.2007) ............................... 13

*Levy v. Ks. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164 (10th Cir. 2015) .............................. 21

*Litman v. George Mason Univ.*, 186 F.3d 544 (4th Cir.1999) ..................................................... 21

*Madison v. Virginia*, 474 F.3d 118 (4th Cir.2006) ...................................................................... 20

*Maher v. Roe*, 432 U.S. 464 (1977) .................................................................................... 9,11,13

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998) ....................................................... 26

iii

*Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1 (1981) ....................................... 19,22,23

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ................................................. 8

*Peters v. Jenney*, 327 F.3d 307 (4th Cir. 2003) ...................................................... 14

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ................................................... 26

*R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, 139 S. Ct. 1599 (2019) .......................... 25

*Rogers v. Dep't of Health & Envtl. Control*, 174 F.3d 431 (4th Cir.1999) .............................. 18

*Saah v. Contel Corp.*, 978 F.2d 1256 (4th Cir.1992)................................................... 17

*Sandifer v. U.S. Steel*, 571 U.S. 220 (2014)......................................................... 25

*Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004) .......................................... 23

*Sossamon v. Texas*, 563 U.S. 277 (2011)............................................................. 9,18,19

*Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810 (4th Cir. 1995)...................................... 12

*Ulane v. E. Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984)............................................ 23

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .......................... 7

**Statutes and Regulations**

20 U.S.C. §1681(a) .................................................................................. 23

42 U.S.C. §1983 ..................................................................................... 14

42 U.S.C. §12201(c)(1) .............................................................................. 17

42 U.S.C. §18116(a) ................................................................................. 9,19,23

42 U.S.C. §18116(c) ................................................................................. 24

42 U.S.C. §2000d-7 .................................................................................. 20,21

42 U.S.C. §2000d-7(a)(1) ............................................................................ 20

45 C.F.R. §92.207(b)(5)............................................................................. 4

N.C. Gen. Stat. §115C-341.1 ......................................................................... 5

N.C. Gen. Stat. §115D-25. 2 ......................................................................... 5

N.C. Gen. Stat. §116-17. 2 .......................................................................... 5

N.C. Gen. Stat. §126-95 ............................................................................. 5

N.C. Gen. Stat. §135-48.2(a) ........................................................................ 17

N.C. Gen. Stat. §135-48.20(a) ....................................................................... 3

N.C. Gen. Stat. §135-48.30(a)(2)..................................................................... 3

N.C. Gen. Stat. §135-48.50(1) ....................................................................... 11

Case 1:19-cv-00272-LCB-LPA   Document 33   Filed 07/08/19   Page 5 of 34

## I.    NATURE OF THE MATTER BEFORE THE COURT

Plaintiffs (or their children) are transgender individuals. Complaint ¶1. Transgender individuals "have a gender identity—an internalized, felt sense of who they are as male or female—that does not align with their assigned sex at birth." *Doe 2 v. Shanahan*, 917 F.3d 694, 708 (D.C.Cir. 2019) (Williams, J., concurring). Plaintiffs also suffer from gender dysphoria, which is "a mental health condition from which only a subset of transgender people suffer." *Doe 2*, 917 F.3d at 708.

The North Carolina State Health Plan for Teachers and State Employees ("the Health Plan" or "the Plan") does not distinguish between transgender individuals and other participants. Health Plan benefits do not, however, include hormone therapy or surgical gender reassignment to treat gender dysphoria. Plaintiffs argue that because transgender individuals are disproportionately affected by this lack of coverage, this Court should order payment for the medical treatment they seek pursuant to the Equal Protection Clause and a non-discrimination provision enacted as part of the Affordable Care Act (usually referenced by its location in that Act: Section 1557).

Plaintiffs' constitutional claim should be dismissed because the Equal Protection Clause requires only that the Health Plan provide the same coverage for every beneficiary; it does not require a Plan design that is equally helpful for every beneficiary's specific medical needs. Plaintiffs' statutory claim should be dismissed for this same reason and because no waiver of sovereign immunity allows federal court jurisdiction over this claim against the State of North Carolina.

2

## II. STATEMENT OF FACTS—INTRODUCTION TO THE HEALTH PLAN

North Carolina's Health Plan insures more than 727,000 members, including teachers, state employees, retirees, and their eligible dependents. Complaint ¶4. As a self-insurer, the Plan uses employee premiums, combined with employer contributions appropriated by the North Carolina General Assembly, to pay over $3.2 billion annually for health care. *Release on 2019 Premiums*, N.C. Treasurer, *available at* bit.ly/2LtEpPK (July 12, 2018).

The Plan's long-term unfunded liability is staggering: $34.4 billion for medical care for future retirees. Medical and pharmaceutical costs rise 5-9% annually, and the Plan is projected to be insolvent by 2023 unless premiums rise, benefits fall, or additional funding appears. *Release on S&P Global Report*, N.C. Treasurer *available at* bit.ly/300LA5Z (Dec. 6, 2018).

Until 2011, the North Carolina General Assembly administered the Health Plan; now the North Carolina Treasurer does. 2011 N.C. Sess. Laws 119, 132. The Treasurer determines Plan benefits "subject to approval by" the Plan's ten-member Board of Trustees. N.C. Gen. Stat. §135-48.30(a)(2); N.C. Gen. Stat. §135-48.20(a).

The Health Plan provides an array of benefits for members but also excludes coverage for numerous medical treatments that its members want (*e.g.* acupuncture, psychoanalysis). Members can petition the Board to add health coverage. *See*, *e.g.*, *Minutes of February 25, 2019 Board Mtg.*, at 1-2, *available at* https://bit.ly/3286QsA (requests for

3

coverage of certain wellness exams, hearing aids, and nutritional formula). Relevant to this case, since the 1990s the Health Plan has excluded coverage for:

- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.

- Treatment or studies leading to or in connection with sex changes or modifications and related care.

2019 Employee Benefit Booklets *available at* https://bit.ly/2JiG2gr (70/30 Plan at 55,67; 80/20 Plan at 42,52; High-deductible Plan at 40,50); Complaint ¶43,55.

In 2016, a U.S. Department of Health and Human Services regulation declared that coverage exclusions for gender transformation were discriminatory, and the prior Treasurer and the Board of Trustees suspended the coverage exclusions at issue here. Complaint ¶50,51; 45 C.F.R. §92.207(b)(5). Because of pending lawsuits against the HHS regulation, however, the Board and the prior Treasurer limited this suspension to the 2017 Plan year. *Minutes of December 1-2, 2016 Board Meeting* at 6-8, *available at* https://bit.ly/2KVkhqr. A federal court subsequently invalidated the HHS regulation and issued a nationwide injunction; HHS recently proposed a new rule that does not require coverage for gender transformation. *Franciscan All. v. Burwell,* 227 F.Supp.3d 660, 696 (N.D.Tex.2016); 84 Fed. Reg. 27846 (June 14, 2019). The Board has taken no further action since the federal court's injunction. Complaint ¶53.

Treasurer Dale Folwell released a statement when the suspension expired:

The State Health Plan's policy of not covering sex change operations as a benefit is the same now as it was during the entire eight years of Treasurer Janet Cowell's administration and all previous North Carolina Treasurers.

4

> The legal and medical uncertainty of this elective procedure has never been greater.
>
> Until the court system, a legislative body or voters tell us that we "have to," "when to," and "how to" spend taxpayers money on sex change operations, I'm reluctant to make a decision that has the potential to discriminate against those who desire other currently uncovered elective procedures.
>
> We empathize with all members' desires but cannot provide them all with every service they want.

Rose Hoban, *Transgender People Protest Lost Access to Medical Therapies*, N.C. Health News (Oct. 25, 2018) *available at* https://bit.ly/2q71Oea (quoting entire statement); Complaint ¶54 (quoting part of statement).

To be clear, the Health Plan exclusion does not restrict medical treatment. Plaintiffs can seek treatment or insurance elsewhere, and some have. Complaint ¶¶65,78,88,106,108, 121. Moreover, North Carolina allows public employers to provide *additional* health coverage to employees at their own cost. Under N.C. Gen. Stat. §116-17.2, Universities can cover treatments *not* included under the Health Plan, such as treatment for gender dysphoria. *See also* N.C. Gen. Stat. §126.95 (state agencies); N.C. Gen. Stat. §115D-25.2 (community colleges); N.C. Gen. Stat. §115C-341.1 (school boards). The Health Plan provides baseline coverage; it does not prevent employers from offering additional benefits.

5

## III.    QUESTIONS PRESENTED

Courts apply heightened scrutiny when the government classifies people by race, gender or certain other characteristics; actions without a facial classification, but with a disparate impact, receive rational-basis review. Plaintiffs allege only that transgender individuals are disproportionately affected by the benefits exclusions for gender transformation. Should the Court dismiss Plaintiffs' constitutional claim because officials could rationally decide not to incur the cost of expanding Plan coverage?

Congress must clearly demand that States waive their sovereign immunity as a condition of federal funding. Section 1557 of the ACA does not mention sovereign immunity or transgender discrimination. Has North Carolina waived its sovereign immunity against Plaintiffs' claims? If so, have Plaintiffs stated a claim for relief?

6

# IV. SUMMARY OF ARGUMENT

The Court should dismiss Plaintiffs' claims against Treasurer Dale Folwell, Executive Administrator Dee Jones, and the Health Plan for failure to state a claim, for lack of jurisdiction, and for failure to join necessary parties under Rule 19.[1] F.R.Civ.P. 12(b)(1),(6),&(7).

Count I alleges that the Equal Protection Clause requires coverage of gender transformation. Plaintiffs assert that because the Plan provides medically necessary treatment for other illnesses—but does not cover gender transformation—the Plan imposes a "discriminatory sex-based classification" that harms transgender individuals. Complaint ¶¶124-38.

Plaintiffs confuse allegations of *discriminatory intent* with allegations of *disparate impact*. Discriminatory intent can be shown through facial classifications, which receive heightened scrutiny, but the Health Plan does not classify beneficiaries. The Plan does not cover "gender transformation" or "sex changes or modifications" for anyone. Plaintiffs allege this exclusion affects transgender individuals more than others but that is an allegation about *effect*, not a classification.

Without a facial classification, Plaintiffs must allege "discriminatory intent or purpose…to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). To make an allegation of

---

[1] The Treasurer and the Board of Trustees must agree to alter Plan benefits, so the Court must join the Board members or dismiss Count I pursuant to Rule 12(b)(7). Fed.R.Civ.P.19(a)(1)(A). Administrator Jones does not determine Plan benefits, so she should be dismissed from this suit.

7

discriminatory intent, Plaintiffs must allege that officials exclude coverage for gender transformation at least in part "because of" the adverse effect on transgender individuals, not merely "in spite of" or "with indifference to" this effect. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The Complaint, however, includes only allegations of disparate impact: lack of coverage "necessarily discriminates" "[b]ecause the only people who require treatments related to gender-conforming health care are transgender people." Complaint ¶46; *id.* ¶¶1,2,3,18,46,56,126,130,131,132,133, 136,137,150,155,157. *Feeney* requires more, so Plaintiffs' Equal Protection challenge receives only rational-basis review.

Under rational-basis review, the coverage exclusions enjoy a "strong presumption of validity" that they are "rationally related to a legitimate state interest." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008). Even on a motion to dismiss, defendants need provide only "rational speculation unsupported by any evidence or empirical data," while Plaintiffs must "negate every conceivable basis which might support" the coverage exclusions. *Id.*

Plaintiffs cannot meet their burden because treatment for gender dysphoria costs money. Complaint ¶¶52,78,88,106,121. Plaintiffs allege this cost is low when spread across all Plan members, Complaint ¶52, but this is irrelevant. The Health Plan pays billions each year for medical treatment, and officials can rationally decide against new benefits when trying to control the cost of current ones. The Constitution does not second-guess coverage decisions, even when a plaintiff has a fundamental right to the medical procedure and

8

failure to pay for it will harm that plaintiff. *Maher v. Roe*, 432 U.S. 464 (1977) (Medicaid need not cover abortion). Count I should be dismissed.[2]

Count III asserts that the coverage exclusions violate Section 1557 of the Affordable Care Act ("ACA"), which states "an individual shall not, on the ground prohibited under…title IX…be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance…." 42 U.S.C. §18116(a).

Plaintiffs' Section 1557 claim should be dismissed for three reasons.

First, no statute waives North Carolina's sovereign immunity for a Section 1557 claim. To waive sovereign immunity as a condition of "Federal financial assistance," 42 U.SC. §18116(a), the trade-off must be "unequivocally expressed in the text" of the relevant statute. *Sossamon v. Texas*, 563 U.S. 277, 284 (2011). Section 1557 says only that the "enforcement mechanisms" of other anti-discrimination statutes apply; it does not present the required choice between funding and lawsuits asserting discrimination against transgender individuals.

Second, Section 1557 has the same operative text as Title VI and Title IX, so it prohibits only intentional discrimination, not actions with a disparate impact. While Title VI and Title IX have implementing *regulations* that prohibit actions with a disparate impact, Section 1557 does not. A federal court has permanently enjoined the 2016 HHS

---

[2] Undersigned counsel represent Treasurer Folwell, Administrator Jones and the Health Plan, not Plaintiffs' University employers, so this memorandum does not discuss Count II.

9

regulation that would have allowed Plaintiffs' claim of discrimination. Moreover, Congress has not authorized a private right of action to enforce Section 1557 regulations, even if a regulation were to exist.

Finally, even if Plaintiffs identify a waiver of sovereign immunity and show they have authority to bring a Section 1557 disparate impact claim, they have not stated a claim for relief under that provision. Section 1557 references Title IX, but discrimination against transgender individuals is not discrimination on the basis of sex. Title IX prohibits discrimination based on biological sex, not gender identity.

# V. ARGUMENT

**A.** **Only facially discriminatory classifications receive heightened scrutiny under the Equal Protection Clause, and no such classifications exist here. Plaintiffs' allegation that the failure to pay for gender transformation has a discriminatory effect receives only rational basis review. The decision to conserve financial resources is rational, so the Court should dismiss Count I.**

### 1. Complaints about discriminatory effect receive rational basis review, not heightened scrutiny, under the Equal Protection Clause.

The U.S. Constitution does not prescribe health insurance benefits. In fact, the Constitution confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Thus, for example, State health insurance need not cover abortion. *Maher*, 432 U.S. at 469; N.C. Gen. Stat. §135-48.50(1) (coverage exclusion for abortion).

The Health Plan cannot, of course, selectively deny health insurance coverage, *Deshaney*, 489 U.S. at 197 n.3, but the Health Plan does not provide different health insurance *benefits* to transgender individuals. Plaintiffs challenge a coverage exclusion that applies to *everyone*, arguing their health insurance is less valuable because an excluded treatment is "medically necessary" for them. Complaint ¶133.

For heightened scrutiny, however, the Plaintiffs must show the Health Plan divides beneficiaries into categories. "A denial of equal protection entails, at a minimum, a classification that treats individuals unequally." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 707–08 (9th Cir. 1997). Nowhere do Plaintiffs allege the Health Plan classifies on the basis of gender or transgender status, because the Plan does not. The challenged benefits

11

exclusions do not mention transgender individuals; no person—regardless of gender or gender identity—receives assistance with "gender transformation" or "sex changes or modifications."

Plaintiffs' Equal Protection claim is that the coverage exclusions discriminate because they treat Plaintiffs "differently from other persons who are similarly situated" by covering "medically necessary care" for others but not "gender-confirming care" for Plaintiffs. Complaint ¶¶132-33.

"[A] showing of disproportionate impact" alone does not establish an equal protection violation. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 825 (4th Cir. 1995). A facially neutral policy with a "disproportionately adverse effect" violates the "the Fourteenth Amendment … only if a discriminatory purpose can be shown." *Crawford v. Board of Ed. of Los Angeles,* 458 U.S. 527, 537-38 (1982).

The Health Plan's exclusions are legally identical to the exclusion upheld in *Geduldig v. Aiello*. 417 U.S. 484 (1974). In *Geduldig*, California's disability insurance program excluded pregnancy as a covered disability, and the plaintiff argued she "suffered discrimination because she encountered a risk that was outside the program's protection," and that risk only affected a protected class (women). *Id.* at 497. This is Plaintiffs' argument: "Because the only people who require treatments related to gender-conforming health care are transgender people, denying coverage for such health care necessarily discriminates against transgender people." Complaint ¶46.

The Supreme Court upheld the California's plan because—like this Health Plan—the challenged policy "does not discriminate with respect to the persons or groups which are eligible for … insurance protection under the program." *Id.* at 494. "While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification[.]" *Id.* at 497 n.20. So long as the Plaintiffs "receive[] insurance protection equivalent to that provided all other participating employees," and "[t]here is no risk from which men are protected and women are not," coverage exclusions need only be rational. *Id.* at 496-97.[3]

"The proper comparator is the provision of the medical benefit in question," not each policyholder's medical needs. *In re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 944 (8th Cir.2007) (upholding exclusion for contraception). *See also Alexander v. Choate*, 469 U.S. 287, 303 (1985) (Medicaid's "package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered—not 'adequate health care.'"). The plaintiff's need for a particular medical procedure does not affect this legal analysis. Even when (1) an individual has a fundamental right to a medical procedure and (2) the individual cannot afford to pay for that treatment, the Constitution does not require a State to provide it. *Maher*, 432 U.S. at 470-71.

---

[3] A Federal statute now prohibits "sex discrimination on the basis of pregnancy," 42 U.S.C. §2000(k), but *Geduldig* remains good law. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993).

13

Because the Health Plan's coverage exclusions for gender transformation apply to everyone, regardless of gender or transgender status, rational basis review applies.

## 2. Plaintiffs do not allege intentional discrimination by the Health Plan.

The Equal Protection Clause forbids actions motivated by discriminatory intent, but—to show discriminatory intent—Plaintiffs must prove the Health Plan does not cover gender transformation "at least in part 'because of'" the harmful effect of the coverage exclusions on transgender individuals, not merely "in spite of" or "with indifference to" that effect. *Feeney*, 442 U.S. at 279.

Plaintiffs do not allege the additional "circumstantial and direct evidence of intent" that must supplement any allegation of disparate impact. *Peters v. Jenney*, 327 F.3d 307, 321 n.18 (4th Cir. 2003). Complaint ¶46 ("denying coverage for such health care *necessarily* discriminates against transgender people"); Complaint ¶56 (The exclusions "single out employees who are transgender, or who have transgender dependents, for unequal treatment by excluding coverage of medically necessary care for the treatment of gender dysphoria.").

Plaintiffs allege Treasurer Folwell and Administrator Jones are each "a person acting under color of state law for purposes of 42 U.S.C. § 1983 and [each] has acted intentionally in denying Plaintiffs equal protection of the law." Complaint ¶127. This is not an allegation of discriminatory intent. It is, at most, an allegation of intentional conduct: Treasurer Folwell and Administrator Jones have not *accidentally* failed to provide coverage under the Health Plan. Further, this allegation is just the sort of "naked assertion devoid of

14

further factual enhancement" that cannot overcome Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff's selective quotation of Treasurer Folwell does not show discriminatory intent either. Complaint ¶54. Plaintiffs allege that Treasurer Folwell does not support expanding benefits; the Complaint says nothing about his reasoning. The Treasurer's full statement—not Plaintiffs' warped excerpt—does not reflect animus. His statement indicates his awareness that, like every insurance program, the Health Plan must provide some benefits and exclude others: "[w]e empathize with all members' desires but cannot provide them all with every service they want." While Plaintiffs no doubt disagree that the "legal and medical uncertainty of [surgical gender modification] has never been greater," this is a debate for "a legislative body" or the "voters," not the courts. Plaintiffs cannot evade Rule 12(b)(6) by selectively quoting the public statement of a government official.

Because the Plaintiffs allege only discriminatory effect, and because the Health Plan can rationally limit its expenditures, Plaintiffs fail to allege a violation of the Equal Protection Clause.

### 3. The Health Plan's coverage exclusions are rational because they save money.

Health care is not free. If Plan leaders could rationally conclude that the Plan cannot afford to cover all possible medical treatment, the coverage exclusions must be upheld.

These trade-offs are the essence of insurance, as the Supreme Court has acknowledged. In *Alexander v. Choate*, plaintiffs argued that Tennessee's Medicaid plan discriminated against the disabled because Medicaid covered only 14 days of inpatient

15

hospital care; disabled Medicaid beneficiaries disproportionately require more time. 469 U.S. 287 (1985). Writing for the Court, Justice Marshall rejected this argument. Even though disabled individuals have a greater *need* for certain services, the suggestion that equal treatment requires additional benefits is "simply unsound." *Id.* at 303.[4]

Insurance premiums and employer contributions pay for medical treatment, so "the underinclusiveness of the set of risks that the State has selected [to] insure" is "reflected in the level of annual contributions exacted from participating employees." *Geduldig*, 417 U.S. at 494-95.

All Plan members, including Plaintiffs, receive this actuarial benefit. Just as not all women are pregnant, not all transgender individuals require treatment for gender dysphoria. *Doe 2*, 917 F.3d at 708. Plaintiffs' Complaint subtly acknowledges this "lack of identity." *Geduldig*, 417 U.S. at 496 n.20. Complaint ¶32 (Gender transition is "individualized"); *Id.* ¶27 (Incongruence between gender identity and the body's other sex characteristics "can result" in gender dysphoria.). *See also* American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (DSM-5) (Transgender "identity per se" is **not** a mental illness requiring treatment; gender dysphoria, the diagnosed "clinical problem," reflects the "distress" that many but "not all [transgender] individuals" experience.).

---

[4] Plaintiffs in *Alexander* sued under Section 504 of the Rehabilitation Act, which prohibits both discriminatory intent and disparate impact. 469 U.S. at 294. Even under disparate impact analysis, the Court rejected "the boundless notion that all disparate-impact showings constitute prima facie cases," *id.* at 299, holding nothing in Section 504 requires treatment of certain "illnesses, *i.e.,* those particularly affecting the handicapped, as more important than others and more worthy of cure through government subsidization," *id.* at 303-04.

16

Moreover, it is a "legitimate purpose" to "limit[] health care costs." *Saah v. Contel Corp.*, 978 F.2d 1256 (4th Cir.1992) (per curiam). *See also Boyd v. Bulala*, 877 F.2d 1191, 1197 (4th Cir.1989) ("[C]ap on [malpractice] liability bears a reasonable relation to a valid legislative purpose—the maintenance of adequate health care services.") *Geduldig* holds that "so long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point" even though members of a protected class are disproportionately affected by the lack of coverage. 417 U.S. at 495.

Plaintiffs suggest that this rationale weakens if the cost for additional coverage is low. Complaint ¶52. First, Plaintiffs cannot allege they suffer a "financial burden" from health care costs and then dismiss these same costs as insignificant. Complaint ¶65; *id.* ¶¶78,88,106,121. The Health Plan has greater assets, but it also has greater liabilities, and Plan officials must "carry out their duties and responsibilities," including coverage decisions, "as fiduciaries for the Plan." N.C. Gen. Stat. §135-48.2(a). Moreover, rational-basis review has no *de minimus* exception permitting Court supervision if only "moderate alterations" to premium "variables" are needed. *Geduldig*, 417 U.S. at 495-96. "The State has a legitimate interest in maintaining the self-supporting nature of its insurance program" and nothing in the Constitution requires a "more comprehensive" program. *Id.* at 496.

This same logic underlies courts' reluctance to mandate health care coverage under the Americans with Disabilities Act. Health insurance plans do not discriminate when "underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law." 42 U.S.C. §12201(c)(1). "The ADA's 'safe harbor' provision

17

and the related legislative history suggest that Congress did not intend for the ADA to force a change in the way insurers do business." *Rogers v. Dep't of Health & Envtl. Control*, 174 F.3d 431, 435 (4th Cir.1999). [5]

**B. Plaintiffs' claim under Section 1557 of the Affordable Care Act fails because no waiver of sovereign immunity allows jurisdiction in this Court and because Plaintiffs fail to state a claim for relief.**

### 1. The Eleventh Amendment bars federal jurisdiction over the Health Plan.

The Health Plan is an agency of the State of North Carolina, and "[t]he Eleventh Amendment bars suit in federal court against an unconsenting state and any governmental units that are arms of the state unless Congress has abrogated the immunity." *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 191 (4th Cir.2010), *aff'd* 566 U.S. 30 (2012). No waiver of sovereign immunity allows a claim against a State under Section 1557 of the ACA. Count III should be dismissed.

#### a. No waiver of sovereign immunity allows enforcement of Section 1557 of the ACA against the Health Plan.

Congress can require States to waive sovereign immunity as a condition of receiving federal funds. Section 1557's application to "any health program or activity" receiving "Federal financial assistance" suggests a Spending Clause nexus, but to require waiver of North Carolina's sovereign immunity, Congress must demand the waiver "expressly and unequivocally in the text of the relevant statute." *Sossamon*, 563 U.S. at 290. The ACA is

---

[5] Plaintiff Sam Silvaine no longer lives or works in North Carolina. Complaint ¶114 (Silvaine "was enrolled" in the Health Plan). He therefore lacks standing to seek injunctive and declaratory relief, and his claim under Count I should be dismissed.

the "relevant statute," as its provisions provide the federal question underlying Count III. This Court lacks jurisdiction because Section 1557 says nothing about sovereign immunity or lawsuits or States at all:

> [A]n individual shall not, on the ground prohibited under title VI…title IX…the Age Discrimination Act…or [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance…. The enforcement mechanisms provided for and available under such title VI, title IX, [Section 504], or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. §18116(a).

Spending Clause conditions are "in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981). Congress must "unequivocally" demand that a State waive its immunity from suit "in the **text of the relevant statute**." *Sossamon*, 563 U.S. at 284 (emphasis added).

As noted above, neither Section 1557 nor any other provision in the ACA's 906 pages mentions "sovereign immunity" or "immunity." 124 Stat. 119 at 119-1049 (2010). If Congressional authorization of "appropriate relief against a government" does not clearly demand a waiver of sovereign immunity, *Sossamon*, 563 U.S. at 285-86, then reference to "enforcement mechanisms" fails as well.

This should end the inquiry: only statutory text can demand a waiver of sovereign immunity; other legislative materials are irrelevant. *Hoffman v. Conn. Dep't of Income Maint.*, 492 U.S. 96, 104 (1989). Despite the absence of any reference to sovereign

immunity, however, two federal district courts have found a waiver of sovereign immunity for Section 1557 by doing what the Supreme Court forbids: *inferring* a waiver from the reference to "enforcement mechanisms" for various civil rights statutes. *Boyden v. Conlin*, 341 F.Supp.3d 979, 998 (W.D.Wis. 2018); *Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, 2017 WL 4791185, at *6 (E.D.La. Oct.24, 2017).

Both district courts cited the Civil Rights Remedies Act of 1986, which was enacted more than 20 years before the ACA:

> A State shall not be immune…from suit in Federal court for a violation of section 504…,title IX….,the Age Discrimination Act of 1975, title VI…, **or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.**

42 U.S.C. §2000d-7(a)(1) (emphasis added).

These district courts incorrectly concluded that §2000d-7 creates a perpetual waiver even though "mere receipt of federal funds cannot establish that a State has consented to suit in federal court." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246-47 (1985). More significantly, the Fourth Circuit has considered 42 U.S.C. §2000d-7 and specifically requires language that "clearly and unambiguously appl[ies]" a §2000d-7 waiver to the other statute. *Madison v. Virginia*, 474 F.3d 118,132 (4th Cir.2006). As in *Madison*, §2000d-7 "makes no mention" of the ACA. *Id.* Therefore, "[e]ven if a catch-all provision could suffice as an 'unequivocal textual waiver,'" this Court must find the ACA is "like the statutes expressly listed" in §2000d-7. *Id.* Section 1557 does not meet this test.

Section 1557 of the ACA prohibits discrimination, but the ACA—the 'Federal statute' enacted by Congress—is most assuredly not a similar anti-discrimination statute.

The ACA was historic reform of the health care industry, not a "**statute** [that is] aimed at discrimination" by those who receive federal funds. *Id.* (emphasis added); *see*, *e.g.*, Remarks on the Patient Protection and Affordable Care Act, 2010 Daily Comp.Pres.Doc. 197 (March 23, 2010) (ACA is "health care reform"). A single provision in a large bill does not suffice. *Levy v. Ks. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1171 (10th Cir. 2015) (ADA not similar because statute "has a much broader focus than discrimination by recipients of federal financial assistance."). Moreover, the Age Discrimination Act, Section 504 of the Rehabilitation Act, Title IX and Title VI are each "antidiscrimination statutes" that broadly prohibit a specific type of discrimination for recipients of federal funding. Section 1557, in contrast, prohibits multiple types of discrimination by *specific* recipients of federal funding.[6]

> **b.     Even if this Court finds a waiver of sovereign immunity for some Section 1557 claims, nothing in the ACA waives sovereign immunity for claims of discrimination based on transgender status.**

Congress has never demanded a waiver of sovereign immunity for claims of discrimination on the basis of transgender status. Without such a clear statement, the Plaintiffs cannot use a general waiver of sovereign immunity to bring suit against the Health Plan.

---

[6] This interpretation of §2000d-7 does not leave the Plaintiffs without a federal forum. North Carolina has waived its sovereign immunity for Title IX claims. *Litman v. George Mason Univ.*, 186 F.3d 544 (4th Cir.1999). These claims are only against the University employers, not the Health Plan defendants, so the waiver does not preserve Count III.

21

Even if this Court finds a general waiver for Title IX claims in Section 1557, the Court would still have to conclude—given the contractual nature of a Spending Clause waiver—that in Section 1557 "Congress spoke so clearly that [the court] can fairly say that the State could make an informed choice" to expect federal lawsuits alleging discrimination by transgender individuals rather than being "surpris[ed]" "with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25.

Congress does not "unambiguously" require waiver with vague terms that place "upon the States a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication in the courts." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,* 458 U.S. 176, 190 n.11 (1982). The clarity of the demand for a waiver is viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,* 548 U.S. 291, 296 (2006).

Nothing in the text of Section 1557 references discrimination on the basis of gender identity or transgender status. More importantly, when the ACA was passed in 2010, federal courts did not "unambiguously" or "clearly" conclude that civil rights laws prohibited discrimination against transgender individuals. *See*, *e.g.*, Edward J. Reeves & Lainie D. Decker, *Before Enda: Sexual Orientation and Gender Identity Protections in the Workplace Under Federal Law*, 20 Law & Sexuality 61, 75 (2011) ("Federal courts have conclusively held that transgender individuals are not afforded protection under Title VII

22

when the discrimination is based on transsexuality itself."); *see also Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007); *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) ("The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder.").

To be sure, some courts had reached the opposite conclusion, *Smith v. City of Salem, Ohio*, 378 F.3d 566, 572 (6th Cir. 2004), but this disagreement reinforces the lack of a knowing waiver for Plaintiffs' claims. State officials do not give "knowing acceptance" of grant conditions when the "State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17. Even if this Court finds a waiver for some Title IX claims under Section 1557, this waiver cannot expand to Plaintiffs' allegations here.

### 2.     Section 1557 authorizes only claims based on discriminatory intent, not disparate impact.

Section 1557 of the ACA does not authorize disparate impact claims. Even were this Court to find a waiver of sovereign immunity for Section 1557 claims, Plaintiffs' allegations of disparate impact do not state a claim for relief.

The prohibited acts under Section 1557 are identical to Title VI and Title IX: an individual shall not be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under" any health program or activity. 42 U.S.C. §18116(a); 42 U.S.C. §2000d; 20 U.S.C. §1681(a). The courts have held that Title VI and Title IX prohibit only *intentional* acts of discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (Title VI); *Cannon v. Univ. of Chicago*, 648 F.2d 1104, 1109 (7th Cir. 1981) (Title

23

IX). It is the implementing regulations for these antidiscrimination statutes—not the statutes themselves—that authorize claims based on disparate impact alone. *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582, 584 n.2 (1983).

Plaintiffs must therefore identify regulations that authorize disparate impact claims by transgender individuals under Section 1557, but none exist. While an HHS regulation in 2016 put forth such an interpretation, 81 Fed. Reg. 31376 (May 18, 2016), a federal court has enjoined its enforcement on a nationwide basis to the extent the regulation prohibits "discrimination on the basis of gender identity." *Franciscan All.*, 227 F.Supp.3d at 696.

Further, a Section 1557 regulation cannot authorize suit by private individuals for disparate impact. While the Secretary of HHS can promulgate regulations, 42 U.S.C. §18116(c), this authorization lacks the "rights-creating language" needed to authorize a right of action for private plaintiffs to enforce the Secretary's regulation. *Alexander v. Sandoval*, 532 U.S. 275, 288-899 (2001).

Therefore, even were Title IX's waiver of sovereign immunity to apply, the plain text of Section 1557 prohibits only claims of discriminatory intent, and Plaintiffs cannot raise their disparate impact claims against the Health Plan.

### 3.    Title IX does not require a health insurer to cover treatment of gender dysphoria, as Plaintiffs claim.

Even were this Court to find a waiver of sovereign immunity, and authority under Section 1557 for a disparate impact claim, enforceable by a private right of action, Plaintiffs do not present a viable claim for relief.

24

Plaintiffs argue that Title IX's prohibition against discrimination "on the basis of sex" includes discrimination based on gender identity, not just biological sex. This is incorrect. Those courts that have allowed Title IX and Title VII claims for transgender discrimination have done so based upon a theory of sex stereotyping. *See EEOC v. R.G. &. G.R. Harris Funeral Homes*, 884 F.3d 560, 571 (6th Cir.2018), *cert. granted in part sub nom. R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, 139 S. Ct. 1599 (2019) (set for argument Oct. 8, 2019).

As an initial matter, these courts misread the text of these statutes, neither of which define the term "sex." Undefined statutory words should have "their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel*, 571 U.S. 220, 227 (2014). In 1972, when Title IX was enacted, "sex" was linked to an individual's biological sex: "the physiological distinctions between males and females, particularly with respect to their reproductive functions." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 736 (4th Cir. 2016) (Niemeyer, J., dissenting) (collecting definitions), *vacated and remanded* 137 S. Ct. 1239 (2017). *Cf.* DSM-5 at 451 (term "sex" "refer[s] to biological indicators of male and female").

Moreover, Plaintiffs' theory of sex stereotyping omits the requirement that an individual *suffer discrimination* on the basis of a sex stereotype. As the Supreme Court explained in the Title VII context, "[t]he critical issue" for identifying discrimination, "is whether members of one sex are exposed to disadvantageous terms or conditions of

employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998).

Neither the *Price Waterhouse* plurality nor concurring opinions hold that sex stereotypes alone *are* discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-252 (1989) (plurality opinion). Rather, "sex stereotyping" is evidence a plaintiff can use to prove "the employer actually relied on [plaintiff's] gender in making its decision." *Id.* at 251. *Price Waterhouse* is about the burden and standard to prove an employment decision was motivated by an employee's sex. 490 U.S. at 232 (plurality opinion); *id.* at 237-258; *id.* at 258-261 (White, J., concurring in judgment); *id.* at 261-279 (O'Connor, J., concurring in judgment).

The oft-cited language of the plurality, concluding "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes" refers to employers who *reward* behavior consistent with a particular sex stereotype and *punish* those of the opposite gender who engage in the same behavior. "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not." *Id.*

Plaintiffs must still identify—as in *Price Waterhouse*—a discriminatory action that disadvantages them on the basis of sex. "The critical issue" is whether "members of one sex" suffer disadvantages "which members of the other sex" do not. *Oncale*, 523 U.S. at 80. This does not happen when a policy imposes the same burden on similarly situated

26

members of both sexes as the Health Plan coverage exclusions do. Plaintiffs have not stated a claim for relief from discrimination on the basis of sex under Title IX.

## VI.  CONCLUSION

Plaintiffs seek coverage for medical treatment of their gender dysphoria, a condition that can lead to "severe anxiety, depression, and suicidal ideation or suicide." Complaint ¶¶28-29. Plaintiffs are not, unfortunately, unique. Every day, the Health Plan denies medical treatment requested by its 727,000 beneficiaries, understanding that each denial could result in suffering or even death. This is not from malice, but because North Carolina cannot afford unlimited health care. Decisions about the scope of health coverage are complex and tremendously important, and federal law does not allow Plaintiffs to adjust these coverage decisions for their benefit.

For the foregoing reasons, Count I against Treasurer Folwell and Administrator Jones and Count III against the Health Plan should be dismissed.

27

Dated this 8th day of July, 2019.

Respectfully submitted by,

*/s/ Sam M. Hayes*
Sam M. Hayes
N.C. Bar. No. 25552
General Counsel
North Carolina Department of
     the State Treasurer
3200 Atlantic Avenue
Raleigh, North Carolina 27604
Telephone: (919) 814-4000
Facsimile:  (919) 855-5805
Sam.Hayes@nctreasurer.com

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
Facsimile: (307) 432-0310
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N. C. Bar No. 25760

*/s/ Mark A. Jones*
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 North Cherry St., Suite 600
Winston-Salem, NC  27120-1029
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

28

# CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the word limit contained in L.R. 7.3(d)(1), using the word count feature of the word processing software in making this certification.

*/s/ Sam M. Hayes*
Sam M. Hayes
N.C. Bar. No. 25552
General Counsel
North Carolina Department of
    the State Treasurer
3200 Atlantic Avenue
Raleigh, North Carolina 27604
Telephone: (919) 814-4000
Facsimile: (919) 855-5805
Sam.Hayes@nctreasurer.com

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
Facsimile: (307) 432-0310
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N. C. Bar No. 25760

*/s/ Mark A. Jones*
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 North Cherry St., Suite 600
Winston-Salem, NC 27120-1029
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

29

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

This the 8th day of July, 2019.

*/s/ Kevin G. Williams*