IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK, by his next friends and parents, JASON FLECK and ALEXIS THONEN; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; and SAM SILVAINE, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:19CV272 |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

North Carolina offers healthcare coverage to its employees through a State Health Plan

(the "State Health Plan" or the "Plan"). N.C. Gen. Stat. § 135-48.2. While enrollees can access

a wide array of medical benefits, the Plan categorically excludes coverage for treatment sought

"in conjunction with proposed gender transformation" or "in connection with sex changes or

modifications" (the "Exclusion").  (ECF No. 1 ¶ 155.)  Plaintiffs allege that the Exclusion violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;[1] Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*; and Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116.  (*Id.* ¶¶ 124–157.)

Before the Court are two motions to dismiss:  Defendants University of North Carolina at Chapel Hill, North Carolina State University, and University of North Carolina at Greensboro (together, the "University Defendants") move to dismiss Plaintiffs' Title IX claim (ECF No. 30), whereas Defendants Dale Folwell, Dee Jones, and the North Carolina State Health Plan for Teachers and State Employees ("NCSHP") (together, the "State Defendants") seek dismissal of Plaintiffs' Equal Protection and ACA claims, (ECF No. 32).  For the reasons that follow, both motions will be denied.

## I.    BACKGROUND

Plaintiffs are all current or former employees of University Defendants, or the dependents of said employees.  (ECF No. 1 ¶¶ 7–11.)  All are enrolled, or were enrolled, in the State Health Plan.  (*Id.* ¶ 1.)  Further, all are, or are the parents of, transgender individuals with a condition called gender dysphoria.  (*See id.* ¶¶ 3, 61, 69, 82, 98, 115.)

According to Plaintiffs' complaint, each of us has an internal sense of being a particular gender; a gender identity.  (*Id.* ¶ 24.)  For most people, gender identity is consistent with the sex we are assigned at birth.  However, transgender men and women have gender identities which differ from their assigned sexes.  This incongruence can result in gender dysphoria—

---

[1] Plaintiffs bring their Equal Protection claim pursuant to 42 U.S.C. § 1983.  (ECF No. 1 ¶ 125.)

"a feeling of clinically significant stress and discomfort born out of experiencing that something is fundamentally wrong." (*Id.* ¶ 27.) Gender dysphoria is a recognized medical condition which, if left untreated, may result in severe anxiety, depression, or suicidal ideation. (*See id.* ¶¶ 27–29.)

Further, the complaint alleges that treatment for gender dysphoria includes gender transition, which is the process of "com[ing] to live in a manner consistent with . . . gender identity." (*Id.* ¶ 31.) For some people, medical intervention is "a critical part" of gender transition. (*Id.* ¶ 35.) Obtaining a psychological diagnosis of gender dysphoria is a first step. (*Id.*) Later, certain secondary sex characteristics (for example, hair-growth patterns and body fat distribution) can be masculinized or feminized through hormone replacement therapy. (*Id.* ¶ 36.) In some cases, gender-confirming surgery is ultimately needed to "better align . . . primary or secondary sex characteristics with . . . gender identity." (*Id.* ¶¶ 37–38.) These treatments are not "cosmetic, elective, or experimental"; rather, they are "safe, effective, and medically necessary treatments for a serious health condition." (*Id.* ¶ 39 (quotations omitted).)

With the exception of the 2017 plan year, the State Health Plan has categorically excluded coverage for transition-related healthcare since the 1990s. (*Id.* ¶ 45; ECF No. 33 at 8.) The Plan's third-party administrators—Blue Cross Blue Shield of North Carolina ("BCBSNC"), which administers claims, and CVS Caremark ("CVS"), which administers pharmaceuticals—maintain coverage policies for the treatment of gender dysphoria outside of the Plan. (ECF No. 1 ¶¶ 43, 48.) This means that, absent the Exclusion, "claims for gender-confirming care would be evaluated under the BCBSNC and CVS criteria for individual medical necessity" and covered in the same manner as other claims. (*Id.* ¶ 49.) However, as

it now stands, the Plan denies coverage for medically necessary treatment if the need stems from gender dysphoria, as opposed to some other condition.  (*See id.* ¶ 46.)  For example, a cisgender[2] woman's medically necessary mastectomy would be covered; a transgender man's would, too, so long as the reason for surgery was not related to gender transition; however, the same procedure would not be covered if needed to treat gender dysphoria.

In this way, Plaintiffs allege, the Plan "single[s] out employees who are transgender, or who have transgender dependents, for unequal treatment."  (*Id.* ¶ 56.)  On March 11, 2019, they initiated this action against their employers and the Plan's administrators for declaratory and injunctive relief, as well as damages.  (*Id.* at 38.)  Their three-count complaint asserts the following claims: (1) that by maintaining the Exclusion, Defendants Folwell and Jones discriminate on the bases of both sex and transgender status in violation of the Fourteenth Amendment's Equal Protection Clause; (2) that by offering the Plan to their employees, the University Defendants discriminate on the basis of sex in violation of Title IX; and (3) that by administering the Plan, Defendant NCSHP discriminates on the basis of sex in violation of Section 1557 of the ACA.  (*Id.* ¶¶ 124–57.)  Defendants now move to dismiss all three claims pursuant to Federal Rules of Civil Procedure 12(b)(1), (6), and (7).[3]  (ECF Nos. 30; 32.)

---

[2] A cisgender individual is "a person whose gender identity corresponds with the sex the person had or was identified as having at birth."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/cisgender (last visited Mar. 9, 2020).

[3] University Defendants reference Rule 12(b)(2) as an alternative ground for dismissal in their motion and accompanying support brief.  (ECF Nos. 30; 31 at 2, 4–5, 18.)  However, University Defendants do not actually argue that this Court lacks personal jurisdiction over them.  Although traceability concerns—which University Defendants do express, (*see* ECF No. 31 at 7–11)—can have a personal-jurisdiction-like quality to them, those arguments are appropriately analyzed as part of standing.

## II.     LEGAL STANDARDS

Under Rule 12(b)(1), a party may seek dismissal based on the court's "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Subject matter jurisdiction is a threshold issue that relates to the court's power to hear a case and must be decided before a determination on the merits of the case. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005). A motion under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). The burden of proving subject matter jurisdiction rests with the plaintiff, and the trial court may "consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Furthermore, when evaluating a Rule 12(b)(1) motion to dismiss, the court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

A motion to dismiss filed pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing a claim's plausibility, a court must draw all reasonable inferences in the plaintiff's favor. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013). However, "mere conclusory and speculative allegations" are insufficient

to withstand dismissal, *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013), and a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments," *Vitol*, 708 F.3d at 548 (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006)).

Finally, Rule 12(b)(7) provides that an action may be dismissed for failure to join a required party under Rule 19. *See* Fed. R. Civ. P. 12(b)(7). "The inquiry contemplated by Rule 19 is a practical one" which is left "to the sound discretion of the trial court." *Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102, 1108 (4th Cir. 1980). First, the court must determine whether an absent party is "necessary" to the action, as detailed in Rule 19(a). *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005). If joinder is necessary, but infeasible, the court must then determine whether the party is "indispensable" under Rule 19(b), such that the action cannot continue in that party's absence. *See id.* "In general, federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder, and dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result." *RPR & Assocs. v. O'Brien/Atkins Assocs., P.A.*, 921 F. Supp. 1457, 1463 (M.D.N.C. 1995), *aff'd*, 103 F.3d 120 (4th Cir. 1996).

## III. DISCUSSION

The Court's analysis will proceed as follows. Objections to the two statutory claims (Title IX and ACA) will be evaluated first. Next, the Court will analyze whether Plaintiffs have sufficiently pleaded an Equal Protection claim. Last, the Court will address joinder and Defendants' suggestion that, barring dismissal, this Court should stay proceedings during the pendency of *R.G. & G.R. Harris Funeral Homes*, which is now before the Supreme Court.

### A. Title IX Claim

#### i. Article III Standing

University Defendants challenge Plaintiffs' Title IX claim on three fronts. The first is standing. Parties invoking federal jurisdiction bear the burden of establishing that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). As it relates to the Title IX claim, University Defendants contend that the second and third elements—traceability and redressability—are lacking. (*See* ECF No. 31 at 6–13.)

The State Health Plan's structure and core operating procedures are dictated by statute. NCSHP is the Plan's corporate body, and the State Treasurer "administer[s]" the Plan by setting benefits and rates—subject to approval by a Board of Trustees—with the aid of an Executive Administrator. N.C. Gen. Stat. §§ 135-48.2; 135-48.22; 135-48.23; 135-48.30. All new state employees "must be given the opportunity to enroll or decline enrollment [in the Plan] for themselves and their dependents." *Id.* § 135-48.42(a). This is true whether someone's "employing unit" is a state agency, a state department, or, as relevant here, a state university. *See id.* §§ 135-48.1, 135-48.40.

University Defendants argue that Plaintiffs' alleged injuries are not "fairly traceable" to their conduct because, under the statutory framework detailed above, they cannot dictate the Plan's terms, benefits, or exclusions. (*See* ECF No. 31 at 7–11.) However, Article III traceability is not so rigid. As the Fourth Circuit has explained, "the fairly traceable standard is not equivalent to a requirement of tort causation." *See Hutton v. Nat'l Bd. of Exam'rs in*

*Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018) (quotations omitted); *see also Lexmark Int'l, Inc.*

*v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a

requirement of Article III standing, which requires only that the plaintiff's injury be fairly

traceable to the defendant's conduct.").  Rather, traceability merely requires a causal

connection between the defendant's conduct and the plaintiff's injury, such that "there is a

genuine nexus" between the two.  *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,

204 F.3d 149, 161 (4th Cir. 2000).  Moreover, at the pleading stage, "general factual allegations

of injury resulting from the defendant's conduct may suffice" to establish traceability, as "each

element [of standing] must be supported . . . with the manner and degree of evidence required

at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561; *see also Bennett v. Spear*, 520

U.S. 154, 171 (1997) (acknowledging that, at the pleading stage, the traceability burden is

"relatively modest").

    As alleged in the complaint, University Defendants "offer[ ]" (or offered) the Plan to

Plaintiffs, and "participate" (or participated) in its availability.  (ECF No. 1 ¶¶ 18, 143.)  Indeed,

had University Defendants not hired Plaintiffs, they would not have been permitted to enroll

in the Plan at all.  The Court finds that, at this stage, those facts provide a sufficient nexus

between the alleged injuries and University Defendants.  However, the case for traceability is

further bolstered by other aspects of the statutory scheme governing the Plan.[4]  For example,

---

[4] It also appears that the plan is funded, in part, via direct contributions from the University
Defendants.  *See, e.g.*, NC State University, *Employee Wellness and Work Life*,
https://benefits.hr.ncsu.edu/employer-benefits-contributions/ ("NC State pays $518.64 per month
towards the State Health Plan insurance coverage for each full-time non-temporary employee . . . .");
UNC-Chapel Hill, *Benefits at UNC-Chapel Hill*, https://hr.unc.edu/benefits/plans/health/ ("The
University contributes toward the monthly cost of coverage for regular full-time employees.").

as "employing units," University Defendants play an active role in collecting erroneous payments, N.C. Gen. Stat. § 135-48.37A(b), and settling claims regarding health benefits, *id.* § 135-48.46. *Cf. Tovar v. Essentia Health*, 857 F.3d 771, 778 (8th Cir. 2017) (concluding that two entities—one designated as plan administrator, the other named as claim recipient—were both appropriately named as defendants at the pleading stage because neither was "wholly uninvolved" in operation of the healthcare plan). In short, Plaintiffs' allegations are "plausible on their face with respect to traceability." *Hutton*, 892 F.3d at 624.

University Defendants also argue that a judgment against them would be unlikely to redress Plaintiffs' alleged injuries. (*See* ECF No. 31 at 11–13.) To satisfy the redressability prong, a plaintiff must show that it is "likely, and not merely speculative, that a favorable decision will remedy the injury." *Friends of the Earth*, 204 F.3d at 154 (citing *Lujan*, 504 U.S. at 561). University Defendants contend that they are incapable of remedying Plaintiffs' alleged injuries because only State Defendants have the ability to formally lift the Exclusion. (*See* ECF No. 31 at 12–13.) Be that as it may, there are other ways in which a favorable ruling on Plaintiffs' Title IX claim could give them the relief they seek. First, Plaintiffs have asked for— and "personally would benefit in a tangible way" from—an award of damages. *See Friends of the Earth*, 204 F.3d at 162 (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)); (ECF No. 1 at 38). Second, it appears that University Defendants could offer supplemental healthcare coverage, beyond what the Plan provides, for the treatment of gender dysphoria. The parties disagree as to whether University Defendants actually have such power under state law; University Defendants insist they do not,[5] (*see* ECF No. 31 at 10), while Plaintiffs and State

---

[5] In support of their position, University Defendants call the Court's attention to two North Carolina Attorney General Advisory Letters which concluded that certain state agencies could not purchase

Defendants insist they do, (*see* ECF Nos. 33 at 9; 35 at 13). Regardless, it is clear that a favorable decision by this Court has the potential to redress Plaintiffs' injuries. Thus, Plaintiffs have plausibly alleged sufficient facts to support standing at this stage of the litigation and may pursue their Title IX claim against University Defendants.

### ii. Zone of Interests

Next, University Defendants argue that Plaintiffs Connor Thonen-Fleck and C.B. (the "minor plaintiffs"), as well as their respective parents, Plaintiffs Jason Fleck and Michael Bunting Jr. (the "parent plaintiffs"), lack a statutory cause of action under Title IX. (*See* ECF Nos. 31 at 15–17; 39 at 7–9). A plaintiff who seeks relief for violation of a statute must fall "within the class of plaintiffs whom Congress has authorized to sue" under that statute—the "zone of interests." *Lexmark*, 572 U.S. at 128–29. "To determine if a plaintiff is within the 'zone of interests,' we simply look to the statute itself." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019). The test is therefore straightforward, "requir[ing] nothing more than [the application of] 'traditional principles of statutory interpretation.'" *Id.* (quoting *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 708 (4th Cir. 2016)).

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This sweeping language has long been understood as creating a private

---

excess liability insurance policies for their employees. (*See* ECF Nos. 31-1 at 3; 31-2 at 7.) However, the Court notes that, in a separate Advisory Opinion, the Attorney General's office concluded that state employers *can* offer voluntary indemnity health plans, so long as said plans do not "duplicate the benefits offered by the State Health Plan." *See* N.C. Att'y Gen. Op. Re: N.C. Gen. Stat. §§ 116-17.2 and 143-34.1(d), 2001 WL 1821361, at *1–2 (N.C.A.G. Oct. 3, 2001).

cause of action for victims of discrimination by institutes of higher learning, including university employees. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982). However, the minor and parent plaintiffs' alleged injuries are somewhat indirect. The minor plaintiffs' only ties to University Defendants are through their parents' employment. Meanwhile, the parent plaintiffs' claims spring not from their own gender status, but from the gender status of their children.

University Defendants argue that these connections are too tenuous to put Plaintiffs within the zone of interests. The language of Title IX says otherwise. The minor plaintiffs are "person[s] in the United States" who, as dependents, are entitled to the "benefits of" their parents' employment, and they allege that University Defendants have "denied" them said benefits on the "basis of [their] sex."[6] *See* 20 U.S.C. § 1681(a). The parent plaintiffs, too, are persons who have been denied benefits on the basis of sex—the sex in question just happens to be that of their children, rather than their own. Title IX is typically accorded "a sweep as broad as its language" so as to best fulfill its anti-discriminatory purpose. *See N. Haven Bd.*, 456 U.S. at 521 ("Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the [statute's] scope."). The parent and minor plaintiffs fall within its wide purview.

As explained above, "the breadth of the zone of interests" hinges on the statute at issue. *See Lexmark*, 572 U.S. at 130 (citation omitted). Nevertheless, University Defendants argue that another statute—Title VII of the Civil Rights Act of 1964—should bear on the

---

[6] University Defendants do not address whether discrimination against a person for being transgender amounts to discrimination "on the basis of sex" for Title IX purposes. However, as explained below, the Court concludes that such discrimination does fall under Title IX's protections. *See infra* at III.A.iii.

Court's determination as to whether the parent plaintiffs may bring claims on their children's behalf. (*See* ECF No. 31 at 16.) It is true that courts sometimes look to Title VII for guidance in interpreting Title IX. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). However, in key respects, the two are "vastly different statute[s]." *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title IX is a broadly written general prohibition on discrimination . . . [while] Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute."). As is relevant here, Title VII's text limits its scope to discrimination against an individual "because of *such individual's* . . . sex." 42 U.S.C. § 2000e-2(a) (emphasis added). In contrast, Title IX reaches claims of discrimination "*on the basis of* sex." 20 U.S.C. § 1681(a) (emphasis added). Thus, while Title VII plaintiffs may only allege discrimination due to their *own* sex, *see, e.g., Tovar*, 857 F.3d at 775–76, "Title IX contains no such limitation," *see Jackson*, 544 U.S. at 179. Accordingly, the parent plaintiffs, like their children, are within the class of plaintiffs protected under Title IX and may press their claim.

### iii. 12(b)(6)

The last objection University Defendants make is that Plaintiffs have failed to state a cognizable claim for relief against them. (ECF No. 31 at 13.) To state a claim under Title IX, a plaintiff must allege: "(1) that he was [denied the benefits of] an education program because of his sex; (2) that the educational institution was receiving federal financial assistance at the time of his exclusion;[7] and (3) that the improper discrimination caused [him] harm." *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 718 (4th Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1239 (2017).

---

[7] Plaintiffs have alleged, and University Defendants have not denied, that all three university employers were receiving federal financial assistance during the relevant times. (*See* ECF No. 1 ¶ 142.)

The Supreme Court recently heard arguments in *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*. *See* No. 18-107, 139 S. Ct. 1599 (Mem) (2019). A decision is expected this term. The central question in that case is whether Title VII's sex discrimination provisions cover discrimination against transgender individuals based on (1) their status as transgender, or (2) sex stereotyping under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See id.* Because courts in this circuit often look to Title VII when construing like terms in Title IX, *see Jennings*, 482 F.3d at 695, the Supreme Court's decision could potentially impact the viability of the Title IX claim in this case.

At this time, however, this Court is left to make its own determination as to whether discrimination "on the basis of sex" encompasses discrimination on the basis of transgender status. While the Fourth Circuit has not ruled on the question, two district courts in this circuit have concluded that claims of discrimination on the basis of transgender status are per se actionable under Title VII (and, by extension, Title IX). *See Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 746–47 (E.D. Va. 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 715 (D. Md. 2018). This Court agrees with their reasoning and follows it here.

In *Price Waterhouse*, six Justices agreed that Title VII bars discrimination not just on the basis of gender, but on the basis of gender stereotyping as well. 490 U.S. at 250–51; *id.* at 259 (White, J. concurring); *id.* at 272–73 (O'Connor, J., concurring). In that case, a woman was denied partnership in an accounting firm for acting too masculine. *See id.* at 235 ("[I]n order to improve her chances for partnership . . . Hopkins [was advised to] "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."). Noting that "we are beyond the day when an employer could evaluate employees

by assuming or insisting that they matched the stereotype associated with their group," the *Price Waterhouse* Court recognized that discrimination "because of sex" includes discrimination based on nonconformity with the norms and behaviors typically associated with a given sex. *See id.* at 251.

Over the last two decades, courts across the country have followed the logic of *Price Waterhouse* in allowing claims of sex discrimination brought by transgender individuals, who, by definition, do not adhere to the stereotypes associated with their assigned sexes. *See, e.g.*, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048–50 (7th Cir. 2017); *Glenn v. Brumby*, 663 F.3d 1312, 1316–19 (11th Cir. 2011); *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000); *see also G.G. ex rel Grimm v. Gloucester Cty. Sch. Bd.*, 654 F. App'x 606, 607 (4th Cir. 2016) (Davis, J., concurring in denial of stay) (agreeing "that discrimination . . . based on . . . transgender status is discrimination because of sex under federal civil rights statutes").

More recently, in *Boyden v. Conlin*, the Western District of Wisconsin applied the principles outlined in *Price Waterhouse* to a case with facts extraordinarily similar to those here. *See* 341 F. Supp. 3d 979 (W.D. Wis. 2018). Like North Carolina, Wisconsin's health insurance plan for state employees excluded medical services "associated with gender reassignment." *Id.* at 988. Siding with the transgender employees challenging the state's plan, the court reasoned that the exclusion unavoidably "implicate[d] sex stereotyping by limiting the availability of medical transitioning . . . thus requiring individuals to maintain the physical characteristics of their natal sex." *Id.* at 997. This amounted to differential treatment "on the basis of sex," the

court held, and triggered the protections of both Title VII and the ACA's anti-discrimination provision. *Id.*

The same is true here. By denying coverage for gender-confirming treatment, the Exclusion tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject. *See id.* ("[T]he Exclusion entrenches the belief that transgender individuals must preserve the . . . attributes of their natal sex."). This Court therefore finds that, under the reasoning outlined in *Price Waterhouse*, Plaintiffs have properly alleged discrimination "on the basis of sex."

The Exclusion also discriminates on the basis of natal sex—that is, the sex one was assigned at birth—by denying equal access to certain medical procedures, depending on whether an individual's assigned sex is male or female. For example, a cisgender woman born without vagina may qualify for a vaginoplasty (the surgical creation of a vagina) to correct that congenital defect; however, a transgender woman (whose natal sex is male) would not be able to seek the same procedure, even if deemed medically necessary to treat gender dysphoria. Likewise, while a cisgender woman may opt to undergo breast reconstruction after a cancer-related mastectomy, a person whose assigned sex is male cannot receive coverage for breast augmentation to aid in gender transition. In this way, the Exclusion discriminates not just based on nonconformance with sex stereotypes, but based on employee's physical sex characteristics as well.

University Defendants do not seriously contest that discrimination because of transgender status is discrimination because of sex (though State Defendants do). Rather, in moving to dismiss for failure to state a claim, they simply rephrase their arguments related to

standing. (*See* ECF No. 31 at 13–15.) There is no dispute that "a recipient of federal funds may be liable in damages under Title IX *only for its own misconduct*," *see Davis v. Monroe Cty. Bd. of Ed.*, 526 U.S. 629, 640 (1999) (emphasis added); the parties just disagree over whether University Defendants' conduct is sufficiently implicated in this case, (*compare* ECF No. 31 at 14, *with* ECF No. 35 at 16). Plaintiffs have alleged that, as employing units, University Defendants offer the Plan and play a role in its operation. At this stage, those allegations are enough—both to plausibly allege standing and to support a Title IX claim against the universities. Accordingly, University Defendants' motion to dismiss must be denied.

### B. ACA Claim

Plaintiffs' second statutory claim is brought under Section 1557 of the ACA, which provides, in relevant parts, (1) that "an individual shall not, on the ground prohibited under . . . [T]itle IX . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance," and (2) that "[t]he enforcement mechanisms provided for and available under . . . Title IX . . . shall apply for purposes of violations of this subsection." 42 U.S.C. § 18116(a). The parties do not appear to dispute that the Plan is a "health program or activity . . . receiving Federal financial assistance" within the meaning of Section 1557. However, State Defendants argue that Section 1557 cannot reach the Plan because, as an "agency of the State of North Carolina," the Plan is shielded by sovereign immunity. (*See* ECF No. 33 at 22–27.)

In our federalist system, Article III judicial power is constrained by principles of dual sovereignty. The Eleventh Amendment guarantees that, in the ordinary course, a private party may not sue an unconsenting state (or its governmental units) in federal court. *See Bd. of Trs.*

*of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *Madison v. Virginia*, 474 F.3d 118, 129 (4th Cir. 2006). However, nothing prevents a state from choosing to waive its immunity. *See Sossamon v. Texas*, 563 U.S. 277, 284 (2011). For instance, Congress often conditions participation in federal spending programs on a waiver of sovereign immunity. *See Madison*, 474 F.3d at 124 ("The Spending Clause is a permissible method of encouraging a State to conform to federal policy choices, because the [State] . . . can always decline the federal grant." (quotations omitted)). A state may waive its immunity by participating in such programs, so long as Congress has expressed "a clear intent to condition participation . . . on a State's consent to waive its constitutional immunity." *Litman v. George Mason Univ.*, 186 F.3d 544, 550 (4th Cir. 1999) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 247 (1985)). Waiver may never be implied under these circumstances; rather, the requirement of consent must be "unmistakably clear in the language of the statute." *Sossamon*, 563 U.S. at 284–85 (citation omitted).

Section 1557 does not purport to condition a state's acceptance of federal funding on a waiver of sovereign immunity. Nor does any other provision of the ACA. However, in the Civil Rights Remedies Equalization Act of 1986 ("CRREA"), Congress explicitly stated that a state shall not be immune from suit in federal court "for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, *or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance*." 42 U.S.C. § 2000d-7(a)(1) (emphasis added). The Fourth Circuit has explained that, in passing CRREA, "Congress succeeded in its effort to codify a clear, unambiguous, and unequivocal condition

of waiver of [sovereign] immunity," such that "any state reading [CRREA] in conjunction with" an applicable nondiscrimination provision "would clearly understand" that it consents to suit for violations of the statute in question. *See Litman*, 186 F.3d at 554; *see also Lane v. Pena*, 518 U.S. 187, 198, 200 (1996). Importantly, CRREA does not apply to every federal program. To fit within CRREA's catch-all language as a "a provision[ ] of any other Federal statute prohibiting discrimination," a provision must "be like the statutes expressly listed."[8] *See Madison*, 474 F.3d at 133. The question, then, is whether Section 1557 is sufficiently similar to the four nondiscrimination statutes named in CRREA, such that a state "would clearly understand" that the acceptance of federal funds would subject it to suit.

Like the four statutes named in CRREA, Section 1557 is a nondiscrimination provision which is directly aimed at recipients of federal funding. *See id.* (reasoning that, "[a]t a minimum" a provision must "be aimed at discrimination" and "require identical treatment of similarly situated individuals" to fit within CRREA's catch-all language). In fact, the kinds of discrimination prohibited by Section 1557 coincide with those referenced in CCREA. *Compare* 42 U.S.C. § 18116(a) (barring discrimination "on the ground prohibited under [T]itle VI . . .

---

[8] Defendants do not dispute that Section 1557 is a nondiscrimination provision. Rather, they argue that the ACA *as a whole* "is most assuredly not a[n] . . . anti-discrimination statute" similar to those named in CRREA. (*See* ECF No. 33 at 24–25.) This frames the inquiry too broadly. CCREA's catch-all applies to "*the provisions* of any other Federal statute" which, like Section 1557, tie nondiscrimination to federal funding. 42 U.S.C. § 2000d-7(a)(1) (emphasis added). Defendants cite to an out-of-circuit case, *Levy v. Kansas Department of Social and Rehabilitation Services*, 789 F.3d 1164 (10th Cir. 2015), for the proposition that "[a] single provision in a large bill does not suffice." (ECF No. 33 at 25.) However, the provision analyzed by the Tenth Circuit in that case—Section 12203 of the Americans with Disabilities Act—neither mentions federal funding nor the statutes named in CRREA, and therefore could not have provided the link necessary to effectuate a waiver. Section 1557, by contrast, is applicable only to recipients of federal funding and incorporates the grounds and enforcement mechanisms of the statutes named in CRREA.

[T]itle IX . . . the Age Discrimination Act. . . or [Section 504 of the Rehabilitation Act]"), *with* 42 U.S.C. §2000d-7(a)(1) (waiving immunity for violations of "[Section 504] . . . [T]itle IX . . . the Age Discrimination Act . . . [and] [T]itle VI"). Further, the enforcement mechanisms provided for in Section 1557 are exactly those "provided for and available under" the statutes expressly named in CRREA. 42 U.S.C. § 18116(a). In short, it is hard to see how Section 1557 could be any more "like the statutes expressly listed."[9] The two district courts to have directly considered this question agree. *See Boyden*, 341 F. Supp. 3d at 998; *Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, No. 17-4803, 2017 WL 4791185, at *8 (E.D. La. Oct. 24, 2017) ("[CRREA] is an example of a valid waiver . . . and the plain text of § 1557 fits within the four corners of that waiver.").

Nevertheless, State Defendants argue that North Carolina could not have waived its immunity with respect to *this particular lawsuit*, as "[n]othing in the text of Section 1557 [or CRREA] references discrimination on the basis of gender identity or transgender status." (*See* ECF No. 33 at 26.) Of course, "[s]tates cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). However, North Carolina's potential exposure to suits brought by transgender individuals for discrimination on the basis of sex should not have been "surprising." *See*

---

[9] In their reply brief, State Defendants also argue that CRREA's catch-all provision was never meant to apply to statutes passed after its enactment. (*See* ECF No. 37 at 12–13.) State Defendants do not provide, and the Court cannot locate, any case which addresses this particular argument. However, a straightforward reading of the catch-all provision strongly suggests that its scope is not limited to past statutes. Instead, it appears that Congress intended to effectuate a waiver of sovereign immunity not just under the four named nondiscrimination statutes, but for all statutory provisions sufficiently like them, regardless of their date of origin.

*Pennhurst*, 451 U.S. at 25. As explained above, *see supra* at III.a.iii, courts across the country have acknowledged for decades that sex discrimination can encompass discrimination against transgender plaintiffs. Further, as a general matter, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils." *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). That is particularly true for the nondiscrimination statutes at issue here—in their drafting, the "Federal Government simply [could not] prospectively resolve every possible ambiguity concerning particular applications" of their prohibitions. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). Surely State Defendants would agree that Title IX (and, by implication, Section 1557) effectuates a waiver of sovereign immunity for sexual harassment claims, despite the fact that the word "harassment" never appears in the statute. *See Davis*, 526 U.S. at 649–50. By the same token, Section 1557 need not include the precise phrasing State Defendants demand to provide sufficient notice of a condition of waiver.

In sum, the Court concludes that Section 1557, when read in conjunction with CRREA, effectuates a valid waiver of sovereign immunity. In light of that waiver, and because Plaintiffs have plausibly alleged a claim of sex discrimination under Title IX, *see supra* at III.A.iii, they have likewise succeeded in stating a plausible claim of discrimination under Section 1557. *See* 42 U.S.C. § 18116(a). Accordingly, State Defendants' motion to dismiss Plaintiffs' ACA claim will be denied.

## C. Equal Protection Claim

In addition to their Title IX and ACA claims, Plaintiffs bring an Equal Protection claim against Defendants Folwell and Jones[10] in their official capacities. (ECF No. 1 ¶¶ 124–38.)

---

[10] In a single sentence, State Defendants argue that Defendant Jones "should be dismissed from this suit" because she "does not determine Plan benefits." (ECF No. 33 at 11 n.1.) However, by statute,

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This principle "is not and cannot be absolute because it is a 'practical necessity that most legislation classify for one purpose or another, with resulting disadvantage to various groups or persons.'" *Wilkins v. Gaddy*, 734 F.3d 344, 347 (4th Cir. 2013) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). State action is therefore "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). "The general rule gives way," however, when the government targets a suspect or quasi-suspect class. *See id.* at 440. State classifications based on race, national origin, or, as relevant here, gender, are subject to heightened scrutiny, as those factors "generally provide[ ] no sensible ground for differential treatment." *Id.*

Discrimination is not always obvious. A policy may appear facially neutral, but nonetheless be discriminatory by design or applied in a discriminatory fashion. *See generally Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). Sometimes, however, the government's chosen classification will be clear from the text of the law or policy itself. Plaintiffs argue that that is the case here, (*see* ECF No. 34 at 14), and the Court agrees.

On its face, the Exclusion bars coverage for "treatment in conjunction with proposed *gender* transformation" and "*sex* changes or modifications." (ECF No. 1 ¶ 55 (emphasis

---

the Plan's Executive Administrator is empowered to "negotiate, renegotiate and execute contracts with third parties," thereby playing a primary role in the operation of the Plan. *See* N.C. Gen. Stat. § 135-48.23. This statutory "*proximity to* and *responsibility for*" the Plan makes Jones a proper defendant in this case. *See S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333–33 (4th Cir. 2008) (explaining that an official is a proper defendant under *Ex parte Young*, 209 U.S. 123 (1908), when the office bears a "special relation" to the challenged state action).

added).)  The characteristics of sex and gender are directly implicated; it is impossible to refer to the Exclusion without referring to them.  State Defendants attempt to frame the Exclusion as one focused on "medical diagnoses, not . . . gender."  (ECF No. 37 at 6.)  However, the diagnosis at issue—gender dysphoria—only results from a discrepancy between assigned *sex* and *gender* identity.  *Cf. McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) ("[A]n employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination," such as "gray hair as a proxy for age.").  In short, the Exclusion facially discriminates on the basis of gender, and heightened scrutiny applies.[11]

A policy that classifies on the basis of gender violates the Equal Protection Clause unless the state can provide an "exceedingly persuasive justification" for the classification.  *See United States v. Virginia*, 518 U.S. 515, 531 (1996).  "The burden of justification is demanding," and the state must show "at least that the challenged classification [1] serves important governmental objectives and [2] that the discriminatory means employed are substantially related to the achievement of those objectives."  *Id.* at 533 (citation omitted).  At this early stage, State Defendants have failed to satisfy this demanding standard.  In fact, the only

---

[11] Plaintiffs separately argue for heightened scrutiny on "the basis of transgender status," as distinct from the basis of sex.  (*See* ECF Nos. 1 ¶¶ 134–38; 34 at 20–21.)  The Supreme Court has been reluctant to recognize new suspect or quasi-suspect classifications.  *See, e.g., City of Cleburne*, 473 U.S. at 445–46 (refusing to recognize "mental retardation" as a quasi-suspect classification, as "it would be difficult to find a principled way to distinguish" that classification from "a variety of other groups"); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (determining that age classifications get rational-basis review).  However, multiple lower courts, including some in this circuit, have concluded that "transgender status" is a distinct classification deserving of heightened scrutiny.  *See, e.g., Grimm*, 302 F. Supp 3d. at 749 ("[T]ransgender individuals constitute at least a quasi-suspect class."); *M.A.B.*, 286 F. Supp. 3d at 719 (same).  Here, Plaintiffs allege that "transgender status" satisfies the factors typically used to identify suspect and quasi-suspect classifications.  *Compare M.A.B.*, 286 F. Supp. 3d at 719–20 (outlining four such factors)*, with* (ECF No. 1 ¶ 135).  However, having already determined that the Exclusion discriminates on the basis of sex, and that Plaintiffs' Equal Protection claim withstands State Defendants' motion to dismiss, the Court declines to reach the issue at this time.

justification presented thus far is that the Exclusion "save[s] money." (ECF No. 33 at 19.) Under ordinary rational-basis review, that could potentially be enough to thwart Plaintiffs' claim. *See, e.g.*, *Armour v. City of Indianapolis*, 566 U.S. 673, 682 (2012) (holding that concerns about administrative expense provided a rational basis for classification). However, when heightened scrutiny applies, "a State may not protect the public fisc by drawing an invidious distinction between classes of its citizens." *Mem. Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974). Accordingly, at this juncture, Plaintiffs' Equal Protection claim must be permitted to move forward.

### D. Joinder

As its final ground for dismissal, State Defendants assert that Plaintiffs have failed to join the Plan's Board of Trustees as a required party. (*See* ECF No. 33 at 11 n.1.) State Defendants are correct that, under North Carolina law, "[t]he Treasurer and the Board of trustees must agree to alter Plan benefits." *Id.* However, that does not mean that the Board's absence would prevent this Court from "accord[ing] complete relief among [the] *existing* parties." *See* Fed. R. Civ. P. 19(a)(1)(A) (emphasis added). State Defendants share primary responsibility for the operation and administration of the Plan; an award of declaratory, injunctive, and monetary remedies against them would give plaintiffs all the relief they seek. As complete resolution of the dispute between Plaintiffs and State Defendants does not require joinder of the Plan's Board of Trustees, State Defendants' motion will be denied on this ground as well. *See United States v. Cty. of Arlington*, 669 F.2d 925, 929 (4th Cir. 1982).

### E. Request for Stay

The Court will now consider Defendants' alternative request that this action be stayed pending the Supreme Court's resolution of *Harris Funeral Homes*, 139 S. Ct. 1599 (2019). (*See* ECF Nos. 31 at 17–18; 37 at 6 n.1.) As acknowledged above, *Harris* could have a significant effect on this case. *See Hickey v. Baxter*, 833 F.2d 1005 (4th Cir. 1987) (unpublished table decision) (affirming district court's discretionary stay pending Supreme Court resolution of relevant issues). Nevertheless, "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). A party seeking a stay must therefore "justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983). Accepting their allegations as true, the potential harm to Plaintiffs resulting from even a mild delay is significant, as they will continue to be denied healthcare coverage for medically necessary procedures. In contrast, the "harm" to Defendants of not staying this case appears to be nothing more than the inconvenience of having to begin discovery.

Judicial economy is, of course, a consideration. However, this case is in its infancy, and it may be months before a decision is issued in *Harris*—a substantial delay for those seeking to vindicate their civil rights. *See, e.g.*, *Sehler v. Prospect Mortg., LLC*, No. 1:13cv473(JCC/TRJ), 2013 WL 5184216, at *3 (E.D. Va. Sept. 16, 2013) (denying stay because four to six months represented a "significant period of delay"). Given the ongoing harm to Plaintiffs, and Defendants' failure to present "clear and convincing circumstances" outweighing that harm, this Court declines to exercise its discretion to stay the proceedings.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motions to dismiss and alternative request for stay. Plaintiffs have stated cognizable claims under Tile IX, the ACA, and the Equal Protection Clause. They have sufficiently alleged both Article III standing and entitlement to pursue statutory causes of action under Title IX and the ACA. State Defendants' claim of sovereign immunity also fails here, as does its argument that the absence of the Plan's Board of Trustees would preclude complete relief among the parties.

## ORDER

IT IS THEREFORE ORDERED that University Defendants' Motion to Dismiss, (ECF No. 30), and State Defendants' Motion to Dismiss, (ECF No. 32), are each DENIED in their entirety.

This, the 10th day of March 2020.

/s/ Loretta C. Biggs
United States District Judge