# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:19-CV-272-LCB-LPA

| | |
|---|---|
| MAXWELL KADEL, JASON FLECK, CONNOR THONEN-FLECK, by his next friends and parents, JASON FLECK AND ALEXIS THONEN, JULIA MCKEOWN, MICHAEL D. BUNTING, JR., C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING, and SAM SILVAINE,<br><br>     Plaintiffs,<br><br>     v.<br><br>DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, NORTH CAROLINA STATE UNIVERSITY, UNIVERSITY OF NORTH CAROLINA AT GREENSBORO, and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES,<br><br>     Defendants. | **DEFENDANTS UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, NORTH CAROLINA STATE UNIVERSITY, AND UNIVERSITY OF NORTH CAROLINA AT GREENSBORO'S ANSWER TO PLAINTIFFS' COMPLAINT** |

NOW COME Defendants the University of North Carolina at Chapel Hill ("UNC-Chapel Hill"), North Carolina State University ("NC State") and the University of North Carolina at Greensboro ("UNC Greensboro"), collectively referenced herein as the

"University Defendants," and hereby respond to Plaintiffs' Complaint for Declaratory, Injunctive, and Other Relief, as follows:

## FIRST DEFENSE

The University Defendants answer the allegations of the Complaint as follows:

## INTRODUCTION[1]

1.    Plaintiffs are current or former enrollees in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP"). As part of compensation for employment, the State of North Carolina provides its employees with health care coverage for them and their dependents through the NCSHP, a self-funded plan. However, by categorically depriving transgender enrollees of coverage for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth—Defendants unlawfully discriminate against people like Plaintiffs, who either are transgender or have transgender family members who depend on them for health care coverage. In doing so, Defendants deny equal compensation for equal work to employees who are transgender or have transgender dependents, as well as harm employees' transgender family members who depend on them for health care coverage.

**ANSWER:** The University Defendants admit that Plaintiffs are current or former

---

[1]    For clarity and ease of review, the University Defendants adopt Plaintiffs' topic headings for purposes of their Answer. By adopting Plaintiffs' topic headings, the University Defendants do not admit any allegation contained therein. Except as expressly admitted in their Answer, the University Defendants deny each and every allegation of the Complaint.

2

enrollees in the North Carolina State Health Plan for Teachers and State Employees. The University Defendants further admit that the State of North Carolina provides its employees with the option to enroll in health care coverage for themselves and their dependents. Except as otherwise admitted, the allegations in paragraph 1 of the Complaint are denied.

2. The sweeping exclusion contained within the NCSHP denies coverage for health care, including counseling, hormone therapy, surgical care, and any other health care provided in relation to a person's transgender status and/or gender transition. This exclusion contravenes the well-established medical consensus that gender-confirming health care can be medically necessary and even life-saving. Other NCSHP enrollees who are not transgender do not face a categorical exclusion barring coverage for health care that is medically necessary for them based on their sex and receive coverage for the same care that is denied to transgender enrollees.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 2 of the Complaint, and cannot, therefore, admit or deny these allegations.

3. Plaintiffs have all been denied coverage for medically necessary gender-confirming health care because they or their dependents are transgender, based on the categorical exclusion of gender-confirming health care in the NCSHP. Some Plaintiffs have forgone medically necessary gender-confirming health care, while others have been forced to incur financial hardship without the financial protection afforded by coverage

3

through the NCSHP. Plaintiffs have also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of the NCSHP's targeted discrimination against transgender enrollees, which wrongly deems their health care needs as unworthy of equal coverage.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 3 of the Complaint, and cannot, therefore, admit or deny these allegations.

4. The NCSHP covers more than 720,000 teachers, state employees, retirees, current and former lawmakers, state university and community college personnel, state hospital staff members, and their dependents. The NCSHP's mission is "to improve the health and health care of North Carolina teachers, state employees, retirees, and their dependents, in a financially sustainable manner, thereby serving as a model to the people of North Carolina for improving their health and well-being"—but when it comes to transgender enrollees, the NCSHP is not fulfilling that mission.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 4 of the Complaint, and cannot, therefore, admit or deny these allegations.

5. This targeted discrimination against transgender people violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), and Section 1557 of the Patient Protection and Affordable Care Act (the "ACA").

4

**ANSWER:** Paragraph 5 of the Complaint alleges legal conclusions to which no response is required.

6. Plaintiffs bring this lawsuit to challenge the categorical exclusion of gender-confirming health care contained within the NCSHP and to obtain a judgment to redress their individual injuries and to have the exclusion declared unlawful, thereby preventing its enforcement.

**ANSWER:** Paragraph 6 of the Complaint contains characterizations of Plaintiffs' claims to which no response is required. Moreover, the University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations regarding Plaintiffs' intent in filing this lawsuit, and cannot, therefore, admit or deny those allegations.

## PARTIES

### A. Plaintiffs

7. Plaintiff Maxwell Kadel is a 36-year-old transgender man. Mr. Kadel is an employee of the University of North Carolina at Chapel Hill. Mr. Kadel lives in Carrboro, North Carolina.

**ANSWER:** The University Defendants deny that Kadel is a current employee of UNC-Chapel Hill, but admit that Kadel is a former employee of UNC-Chapel Hill. Upon information and belief, the University Defendants admit that Plaintiff Kadel lives in Carrboro, North Carolina. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in

5

paragraph 7 of the Complaint, and cannot, therefore, admit or deny those allegations.

8.     Plaintiff Jason Fleck is the father of Connor Thonen-Fleck ("Connor"), a 16-year-old transgender young man.  Mr. Fleck is an employee of the University of North Carolina at Greensboro, and Connor receives health coverage as a dependent of Mr. Fleck. Alexis Thonen is Connor's mother. Connor sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friends and parents, Mr. Fleck and Ms. Thonen. Mr. Fleck, Ms. Thonen, and Connor all live in High Point, North Carolina.

**ANSWER:**   The University Defendants admit that Plaintiff Jason Fleck is an employee of UNC Greensboro.  The University Defendants further admit that Plaintiff Connor Thonen-Fleck is enrolled in the State Health Plan as a dependent of Plaintiff Jason Fleck. Upon information and belief, the University Defendants admit that Plaintiff Jason Fleck lives in High Point, North Carolina.  The remainder of paragraph 8, including Footnote 1, alleges legal conclusions and characterizations of Plaintiffs' claims to which no response is required.  Except as expressly admitted herein, the University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 8 of the Complaint, and cannot, therefore, admit or deny those allegations.

9.     Plaintiff Julia McKeown is a 43-year-old transgender woman. Ms. McKeown is employed by North Carolina State University. Ms. McKeown lives in Apex, North Carolina.

**ANSWER:**  The University Defendants admit that Plaintiff Julia McKeown is an

employee of NC State.  Upon information and belief, the University Defendants admit that Plaintiff McKeown lives in Apex, North Carolina.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 9 of the Complaint, and cannot, therefore, admit or deny those allegations.

10.    Plaintiff Michael D. Bunting, Jr. is the father of C.B., a 13-year-old transgender boy. Mr. Bunting is an employee of the University of North Carolina at Chapel Hill, and C.B. receives health coverage as a dependent of Mr. Bunting. Shelley K. Bunting is C.B.'s mother. C.B. sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friends and parents, Mr. Bunting and Ms. Bunting. Mr. Bunting, Ms. Bunting, and C.B. all live in Chapel Hill, North Carolina.

**ANSWER:** The University Defendants deny that Plaintiff Michael D. Bunting, Jr., is currently an employee of UNC-Chapel Hill, but admit that Plaintiff Bunting is a former employee of UNC-Chapel Hill. The University Defendants further admit that as a North Carolina state retiree, Plaintiff Bunting is eligible to enroll in the NCSHP, elected to participate in the NCSHP and currently receives health care benefits from the NCHSC as an eligible retiree.  The University Defendants also admit that Plaintiff Bunting elected to obtain dependent care coverage for C.B. under the NCSHP as an eligible retiree.  Upon information and belief, it is admitted that Plaintiff Bunting lives in Chapel Hill, North Carolina.  To the extent paragraph 10 contains characterizations of Plaintiffs' claims, those allegations do not require admission or denial by the University Defendants. The

7

University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 10 of the Complaint, and cannot, therefore, admit or deny those allegations.

11.     Plaintiff Sam Silvanie is 30 years old, transgender, and has a male affirmed sex. Mr. Silvaine was formerly employed by the North Carolina State University Counseling Center from August 2016 until July 2018. Mr. Silvaine resides in Syracuse, New York.

**ANSWER:**  The University Defendants admit that Plaintiff Sam Silvaine was employed in NC State's Counseling Center from August 2016 through July 2018. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 11 of the Complaint, and cannot, therefore, admit or deny those allegations.

## B.     Defendants

12.     Defendant Dale Folwell is sued in his official capacity as the North Carolina State Treasurer. As Treasurer, Mr. Folwell serves as Chair of the Board of Trustees of the State Health Plan for Teacher and State Employees and is responsible for designing, operating, and/or administering the NCSHP. Pursuant to N.C. Gen. Stat. § 135-48.30, the State Treasurer has the power and duty to: administer and operate the NCSHP and to set benefits, subject to approval by the majority of the Board of Trustees; design and implement coordination of benefits policies; and set administrative and medical policies. N.C. Gen. Stat. § 135-48.30 provides that the State Treasurer may delegate his powers and

duties under this section to the Executive Administrator, the Board of Trustees, and employees of the Plan, but nonetheless maintains responsibility for the performance of those powers or duties. Additionally, as described below, Mr. Folwell has publicly announced that until he is ordered or required to do otherwise, he will maintain the discriminatory exclusion in the NCSHP. Mr. Folwell is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this Complaint.

**ANSWER:** The University Defendants admit that Defendant Dale Folwell is the North Carolina State Treasurer. The University Defendants further admit, upon information and belief, that Defendant Folwell serves as Chair of the Board of Trustees of the State Health Plan for Teacher and State Employees and is involved with administering the North Carolina State Health Plan. To the extent paragraph 12 of the Complaint states the capacity in which Defendant Folwell is sued, those allegations contain characterizations of Plaintiffs' claims to which no response is required. To the extent paragraph 12 quotes any provision of the North Carolina General Statutes or the United States Code, the University Defendants state that those statutes speak for themselves. To the extent paragraph 12 interprets or construes any provision of the North Carolina General Statutes or the United States Code, the allegations state legal conclusions to which no response is required. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations of paragraph 12, and cannot, therefore, admit or deny those allegations.

13.     Defendant Dee Jones is sued in her official capacity as Executive Administrator of the NCSHP. As Executive Administrator, Ms. Jones is statutorily authorized to negotiate, renegotiate, and execute contracts with third parties in the performance of her duties and responsibilities, pursuant to N.C. Gen. Stat. § 135-48.23. Ms. Jones is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this Complaint.

**ANSWER:**  The University Defendants admit, upon information and belief, that that Defendant Dee Jones is the Executive Administrator of the North Carolina State Health Plan.  To the extent paragraph 13 of the Complaint states the capacity in which Defendant Jones is sued, those allegations contain characterizations of Plaintiffs' claims to which no response is required.  To the extent paragraph 13 quotes any provision of the North Carolina General Statutes or the United States Code, the University Defendants state that those statutes speak for themselves.  To the extent paragraph 13 interprets or construes any provision of the North Carolina General Statutes or the United States Code, the allegations state legal conclusions to which no response is required.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations of paragraph 13, and cannot, therefore, admit or deny those allegations.

14.     Defendant University of North Carolina at Chapel Hill ("UNC") is the flagship institution for the University of North Carolina system. UNC is an education program or activity receiving federal financial assistance.

10

**ANSWER:** The allegations in paragraph 14 of the Complaint are admitted.

15.     Defendant University of North Carolina at Greensboro ("UNCG") is a constituent institution of the University of North Carolina. UNCG is an education program or activity receiving federal financial assistance.

**ANSWER:** The allegations in paragraph 15 of the Complaint are admitted.

16.     Defendant North Carolina State University ("NCSU") is a constituent institution of the University of North Carolina. NCSU is an education program or activity receiving federal financial assistance.

**ANSWER:** The allegations in paragraph 16 of the Complaint are admitted.

17.     Defendant NCSHP, a corporation, administers comprehensive group health insurance to eligible teachers and other North Carolina state employees, pursuant to N.C. Gen. Stat. § 135-48.2. The NCSHP is self-funded and empowered to determine, define, adopt, and remove health care benefits and exclusions, such as the categorical exclusion of gender-confirming health care that targets transgender enrollees for discriminatory treatment.

**ANSWER:** To the extent paragraph 17 quotes any provision of the North Carolina General Statutes, the University Defendants state that those statutes speak for themselves. To the extent paragraph 17 interprets or construes any provision of the North Carolina General Statutes, the allegations state legal conclusions to which no response is required. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations of paragraph 17, and cannot, therefore,

admit or deny those allegations.

18.    Defendants, through their respective duties and obligations, are responsible for the discriminatory exclusion of gender-confirming health care in the NCSHP.  Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure the plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant and their successors, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

**ANSWER:**  To the extent paragraph 18 of the Complaint states the relief requested in Plaintiffs' Complaint, those allegations contain characterizations of Plaintiffs' claims to which no response is required.   The University Defendants deny the allegations of paragraph 18 as to the University Defendants.  The remaining allegations of paragraph 18 are legal conclusions to which no response is required.

## JURISDICTION AND VENUE

19.    This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution, under Title IX, 20 U.S.C. § 1681, *et seq.*, and under Section 1557 of the ACA, 42 U.S.C. § 18116.

**ANSWER:**  Paragraph 19 of the Complaint alleges legal conclusions regarding jurisdiction that are not subject to admission or denial by the University Defendants.

20.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; and pursuant to 28 U.S.C. §1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, or rights, privileges, and immunities secured by the U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

**ANSWER:**  Paragraph 20 of the Complaint alleges legal conclusions regarding jurisdiction that are not subject to admission or denial by the University Defendants.

21.     Declaratory relief is authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by 28 U.S.C. §§ 2201 and 2202.

**ANSWER:**  Paragraph 21 of the Complaint construes provisions of the United States Code, and therefore alleges legal conclusions that are not subject to admission or denial by the University Defendants.

22.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendants UNC and UNCG reside within the District, and all Defendants reside within the State of North Carolina; and because a substantial part of the events that gave rise to Plaintiffs' claims took place within the District.

**ANSWER:**  Paragraph 22 of the Complaint alleges legal conclusions regarding venue and jurisdiction that are not subject to admission or denial by the University Defendants.

13

23.     This Court has personal jurisdiction over Defendants because they are all domiciled in the State of North Carolina.

**ANSWER:**  Paragraph 23 of the Complaint alleges legal conclusions regarding jurisdiction that are not subject to admission or denial by the University Defendants.

### FACTUAL ALLEGATIONS

A.     **Sex, Gender Identity, and Gender Dysphoria**

24.     Gender identity refers to an individual's fundamental, internal sense of being a particular gender.  It is an essential element of human identity that everyone possesses. Gender identity is innate, has biological underpinnings, and is fixed at an early age.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 24 of the Complaint, and cannot, therefore, admit or deny these allegations.  However, Section 103 of *The Code of the Board of Governors of the University of North Carolina* as well as the policies of UNCG, UNC-CH, and NC State prohibit discrimination on the basis of gender identity.

25.     An individual's sex is generally assigned solely on the basis of external genitalia at the time of birth.  External genitalia are but one of several sex-related characteristics and are not always indicative of a person's sex.  Other sex-related characteristics, such as chromosomes, hormone levels, internal reproductive organs, secondary sex characteristics, and gender identity, are typically not assessed or considered during the assignment of sex at birth

**ANSWER:**  The University Defendants lack sufficient information or knowledge

to form a belief as to the truth or falsity of the allegations in paragraph 25 of the Complaint, and cannot, therefore, admit or deny these allegations.

26. Where an individual's gender identity does not match that individual's sex assigned at birth, gender identity is the critical determinant of sex. A scientific consensus recognizes that attempts to change an individual's gender identity to bring it into alignment with the sex assigned at birth are ineffective and harmful.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 26 of the Complaint, and cannot, therefore, admit or deny these allegations.

27. For transgender people, an incongruence between gender identity and the body's other sex characteristics can result in gender dysphoria—i.e., a feeling of clinically significant stress and discomfort born out of experiencing that something is fundamentally wrong. Gender dysphoria is a medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; the World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

**ANSWER:** Any statements contained in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition: The World Health Organization's International Classification of Diseases speak for themselves and do not

require admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 27 of the Complaint, and cannot, therefore, admit or deny these allegations.

28. In addition to clinically significant distress, gender dysphoria can also result in severe anxiety, depression, and suicidal ideation or suicide without adequate treatment.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 28 of the Complaint, and cannot, therefore, admit or deny these allegations.

29. Untreated gender dysphoria often intensifies with time. The longer an individual goes without adequate treatment, the greater the risk of severe harms to the individual's health.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 29 of the Complaint, and cannot, therefore, admit or deny these allegations.

30. Gender dysphoria can be treated in accordance with internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH"). These Standards of Care are recognized as authoritative by national medical and behavioral health organizations such as the AMA and APA, which have called for an end to exclusions of gender-confirming care from health insurance plans.

**ANSWER:** The Standards of Care formulated by the World Professional

16

Association for Transgender Health ("WPATH") speak for themselves and do not require admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 30 of the Complaint, and cannot, therefore, admit or deny these allegations.

31. The process by which transgender individuals come to live in a manner consistent with their gender identity, rather than the sex they were designated at birth, is known as gender transition. The ability to live in a manner consistent with one's gender identity is critical to the health and well-being of transgender individuals and is a key aspect in the treatment of gender dysphoria.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 31 of the Complaint, and cannot, therefore, admit or deny these allegations.

32. The steps that transgender individuals take to transition are individualized, but typically include social, legal, and medical transition.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 32 of the Complaint, and cannot, therefore, admit or deny these allegations.

33. Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, for a man who is transgender

(designated female at birth), social transition can include wearing typically male attire, using male pronouns, and otherwise living openly as a man in all aspects of everyday life.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 33 of the Complaint, and cannot, therefore, admit or deny these allegations.

34.     Legal transition involves steps to formally align a transgender individual's legal identity with their gender identity, such as legally changing one's name and updating the name and gender marker on their driver's license, birth certificate, and other forms of identification.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 34 of the Complaint, and cannot, therefore, admit or deny these allegations.

35.     Medical transition, a critical part of transitioning for many transgender individuals, includes treatments that bring the sex-specific characteristics of a transgender individual's body into alignment with their gender identity, such as counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, or surgical care.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 35 of the Complaint, and cannot, therefore, admit or deny these allegations.

36.     Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender

identity. Secondary sex characteristics are bodily features not associated with external and internal reproductive genitalia (primary sex characteristics). Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development. Hormone replacement therapy can have significant masculinizing or feminizing effects and can assist in bringing a transgender individual's secondary sex characteristics into alignment with their true sex, as determined by their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 36 of the Complaint, and cannot, therefore, admit or deny these allegations.

37. Gender-confirming surgical care or treatment—also known as gender confirmation surgery or "sex reassignment" surgery—refers to any surgical procedure undergone by a transgender individual to better align their primary or secondary sex characteristics with their gender identity. Such surgical care can include but is not limited to vaginoplasty, phalloplasty, hysterectomy, gonadectomy, mammoplasty, and mastectomy. These treatments deliberately change sex characteristics for the purpose of treating gender dysphoria.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 37 of the Complaint, and cannot, therefore, admit or deny these allegations.

38.     Surgical care is medically necessary for transgender people who need it to treat their gender dysphoria.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 38 of the Complaint, and cannot, therefore, admit or deny these allegations.

39.     An established body of medical research demonstrates the effectiveness and medical necessity of gender dysphoria treatment, including counseling, hormone therapy, and surgical treatment. Health care experts have recognized that such treatments are not "cosmetic," "elective," or "experimental." Rather, they are safe, effective, and medically necessary treatments for a serious health condition.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 39 of the Complaint, and cannot, therefore, admit or deny these allegations.

40.     For example, WPATH has explained that, like hormone therapy and other gender-confirming treatments, "[t]he medical procedures attendant to gender affirming/confirming surgeries are not 'cosmetic' or 'elective' or 'for the mere convenience of the patient.' These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition. In some cases, such surgery is the only effective treatment for the condition, and for some people genital surgery is essential and life-saving."

**ANSWER:**  Paragraph 40 of the Complaint purports to quote statements from

WPATH. Any statements of WPATH speak for themselves and do not require admission or denial. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 40 of the Complaint, and cannot, therefore, admit or deny those allegations.

41. Similarly, in 2014, the federal Department of Health and Human Services Departmental Appeals Board confirmed that surgical treatment is safe and effective treatment for gender dysphoria. After reviewing expert medical testimony and published studies, the Appeals Board concluded that the Medicare program's then-existing exclusion of such treatment from coverage was "not reasonable."

**ANSWER:** Any statements of the federal Department of Health and Human Services Departmental Appeals Board speak for themselves and do not require admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 41 of the Complaint, and cannot, therefore, admit or deny these allegations.

42. These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, as that is already established by gender identity, but instead bring the individual's appearance, legal identity, and sex-related characteristics into greater typical alignment with the individual's gender identity and lived experience.

**ANSWER:** The University Defendants lack sufficient information or knowledge

to form a belief as to the truth or falsity of the allegations in paragraph 42 of the Complaint, and cannot, therefore, admit or deny these allegations.

**B.    The State's Targeted and Discriminatory Exclusion of Gender-Confirming Health care**

43.    The NCSHP offers three health care plans to eligible state employees: the (1) 80/20 PPO Plan, the (2) 70/30 PPO Plan, and the (3) High Deductible Health Plan (collectively referred to as the "Health Plans").  Across all three plans, Blue Cross and Blue Shield of North Carolina ("BCBSNC") serves as the claims administrator, and CVS Caremark ("CVS") administers pharmacy benefits.

**ANSWER:**  The allegations of paragraph 43 of the Complaint are admitted.

44.    Covered services under the NCSHP include medically necessary pharmacy benefits, mental health benefits, and medical care such as surgical benefits at inpatient and outpatient facilities.

**ANSWER:**  Upon information and belief, the allegations of Paragraph 44 of the Complaint are admitted.

45.    The NCSHP Health Plans are distinguished primarily by coverage ratios, deductible amounts, and general costs to the insured employee and their dependent-enrollees.  The Health Plans do however have at least one feature in common.  At all relevant times, the Health Plans have contained a categorical exclusion of coverage for transition-related health care, with the exception of the 2017 plan year.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 45 of the Complaint,

and cannot, therefore, admit or deny these allegations.

46.    Because the only people who require treatments related to gender-confirming health care are transgender people, denying coverage for such health care necessarily discriminates against transgender people. As a result of the exclusion in the Health Plans, non-transgender enrollees receive coverage for medically necessary mental health, prescription drug, and surgical needs that, because of their sex, transgender enrollees do not.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 46 of the Complaint, and cannot, therefore, admit or deny these allegations.

47.    The medical consensus recognizes that discriminatory exclusions of gender-confirming health care in health insurance plans have no basis in medical science. Preeminent medical and behavioral health organizations, such as the AMA and the APA, have called for an end to these exclusions.

**ANSWER:**  The AMA and APA public statements regarding exclusions of gender-confirming care in health insurance plans speak for themselves and do not require admission or denial by the University Defendants.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 47 of the Complaint, and cannot, therefore, admit or deny these allegations.

48.    In keeping with such medical consensus, BCBSNC has maintained a Corporate Medical Policy on Gender Confirmation Surgery and Hormone Therapy that acknowledges the general medical necessity of this care since 2011, and CVS similarly maintains coverage criteria policies for hormone replacement therapy as it pertains to the treatment of gender dysphoria.

**ANSWER:**  The BCBSNC Corporate Medical Policy on Gender Confirmation Surgery and Hormone Therapy speaks for itself and does not require admission or denial by the University Defendants.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of remaining allegations in paragraph 48 of the Complaint, and cannot, therefore, admit or deny these allegations.

49.    Absent a categorical plan exclusion, claims for gender-confirming care would be evaluated under the BCBSNC and CVS criteria for individual medical necessity and covered under the plan in the same manner any other claims for medical, mental health, or pharmacy benefits.

**ANSWER:**  The BCBSNC Corporate Medical Policy on Gender Confirmation Surgery and Hormone Therapy speaks for itself and does not require admission or denial by the University Defendants.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 49 of the Complaint, and cannot, therefore, admit or deny these allegations.

50.    In 2016-2017, the North Carolina State Treasurer's Office ("Treasurer's Office") and the NCSHP Board of Trustees seemingly came to the same conclusion as

many other states. The then-North Carolina State Treasurer and a majority of the NCSHP Board of Trustees voted to remove the exclusion of gender-confirming health care for the 2017 Health Plans. In an email about the removal, then-Press Secretary for the Treasurer's Office Brad Young explained, "If the [Health] Plan[s] did not take action to comply with federal law and federal regulation, the [Health] Plan[s] would have risked losing millions of dollars in federal funding and faced discrimination lawsuits for non-compliance." The resolution that removed the exclusion was only applicable to the 2017 Health Plans.

**ANSWER:** The University Defendants admit that the NCSHP Board of Trustees voted to remove the exclusion of gender-confirming health care for the 2017 Health Plans. The statement of the former press-secretary for the Treasurer's Office speaks for itself and does not require admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 50 of the Complaint, and cannot, therefore, admit or deny these allegations.

51. Prior to the removal of the categorical exclusion, the Treasurer's Office engaged a consulting firm to analyze the applicability of Section 1557 of the ACA to the NCSHP, and to estimate the fiscal impact of removing the gender-confirming health care exclusion. The consulting firm's November 2016 analysis concluded that the NCSHP is likely a covered entity within the meaning of the ACA and thus needed to comply with the statute's non-discrimination provisions.

**ANSWER:** The November 2016 consultant report provided to the NCSHP speaks

for itself and does not require admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 51 of the Complaint, and cannot, therefore, admit or deny these allegations.

52.     Ultimately the report concluded that, "[b]ased on approximately $3.2 billion of premiums, the cost for the NCSHP is estimated to be between .011% and .027% of premium." Accordingly, the cost of removing the exclusion of gender-confirming health care in the NCSHP would be minimal.

**ANSWER:** The November 2016 consultant report provided to the NCSHP speaks for itself and does not require admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 52 of the Complaint, and cannot, therefore, admit or deny these allegations.

53.     Defendant Dale Folwell, Treasurer-elect at the time and now Treasurer of North Carolina, and Defendant Dee Jones, nevertheless failed to take action to block the reinstatement of the exclusion of gender-confirming health care in the 2018 Health Plans, and negotiated contracts to ensure the NCSHP would be administered to exclude coverage of such medical care. Defendants Folwell and Jones took the same steps for the 2019 Health Plans, which continue to exclude coverage for gender-confirming health care. At a NCSHP Board of Trustees meeting, affected state employees and their dependents testified

26

about the devastating impact the loss of gender-confirming health care benefits has had on them and their families.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 53 of the Complaint, and cannot, therefore, admit or deny these allegations.

54.     In a public statement, Treasurer Folwell stated, "Until the court system, a legislative body or voters tell us that we 'have to,' 'when to,' and 'how to' spend taxpayers' money on sex change operations, I will not make a decision" to treat gender-confirming health care equally in the NCSHP.

**ANSWER:** Paragraph 54 of the Complaint purports to quote public statements of Defendant Folwell. Any statements made by Defendant Folwell speak for themselves and do not require admission or denial by the University Defendants.

55.     Accordingly, the 2018 and 2019 Health Plans categorically exclude coverage for all gender-confirming health care for the purpose of treating gender dysphoria. Specifically, the 2018 and 2019 Health Plans exclude "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation" and "[t]reatment or studies leading to or in connection with sex changes or modifications and related care," (hereinafter, the "Exclusion").

**ANSWER:** Paragraph 55 of the Complaint purports to quote provisions of the 2018 and 2019 North Carolina State Health Plans. The State Health Plans speak for themselves and do not require admission or denial by the University Defendants. The University

27

Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 55 of the Complaint, and cannot, therefore, admit or deny those allegations.

56.     As a result of this sweeping Exclusion of medically necessary health care coverage, the Health Plans single out employees who are transgender, or who have transgender dependents, for unequal treatment by excluding coverage of medically necessary care for the treatment of gender dysphoria.

**ANSWER:**  Paragraph 56 of the Complaint alleges legal conclusions to which no response is required.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 56 of the Complaint, and cannot, therefore, admit or deny those allegations.

### C.     The State's Denial of Medically Necessary Care to Plaintiffs

#### 1.     Plaintiff Maxwell Kadel

57.     Plaintiff Maxwell Kadel ("Max") is a transgender man.  Max was designated female at birth but has a male gender identity.  Max lives all aspects of his life in accordance with his male gender identity.  Originally born in Nebraska, Max grew up in New Jersey and attended college in Indiana.  Max moved to North Carolina over six years ago.

**ANSWER:**  It is admitted upon information and belief that Plaintiff Kadel attended college in Indiana.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 57 of the Complaint, and cannot, therefore, admit or deny these allegations.

28

58.     Max is an employee of the UNC School of Government. Max began working at UNC in August of 2014 through a temporary job placement agency. Max obtained a permanent position with the UNC School of Government in October 2016, working as an Administrative Support Associate.

**ANSWER:**  The University Defendants admit that Plaintiff Kadel is a former employee of the UNC School of Government and obtained a permanent position with the UNC School of Government in October 2016 as an Administrative Support Associate. Except as expressly admitted herein, University Defendants deny the allegations of Paragraph 58.

59.     As a North Carolina state employee, Max is enrolled in the NCSHP, and receives health care benefits from this plan as part of his compensation.  He contributes each month to the plan via a paycheck deduction.

**ANSWER:**  The University Defendants deny that Plaintiff Kadel is currently an employee of UNC-Chapel Hill, but admit that Plaintiff Kadel is a former employee of UNC-Chapel Hill.  The University Defendants further admit that Plaintiff Kadel elected to participate in the State Health Plan and contributed to the State Health Plan via monthly payroll deductions from November 1, 2016, through November 30, 2019.  Except as expressly admitted herein, University Defendants deny the allegations of Paragraph 59.

60.     Max has been a model employee, even winning a 2018 "Star Heel Award" for his job performance.  This annual award program allows departments across UNC to recognize and reward employee excellence.

29

**ANSWER:** It is admitted upon information and belief that Plaintiff Max Kadel received a 2017 "Star Heel Award," which is an employee appreciation award. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 60 of the Complaint, and cannot, therefore, admit or deny these allegations.

61.     While doing his best to excel in his position, Max lives with significant distress caused by gender dysphoria. Max has struggled with gender dysphoria since childhood and was formally diagnosed with gender dysphoria at the age of 33. As part of his prescribed treatment, Max began hormone therapy in June 2016.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 61 of the Complaint, and cannot, therefore, admit or deny these allegations.

62.     Max has also obtained a legal name change and has corrected his name and gender marker on his North Carolina state driver's license, Social Security Card, and U.S. Passport.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 62 of the Complaint, and cannot, therefore, admit or deny these allegations.

63.     In 2017, Max considered pursuing chest surgery to create a more typically masculine chest, but he decided to wait and see whether hormone therapy would be sufficient to relieve his gender dysphoria.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 63 of the Complaint, and cannot, therefore, admit or deny these allegations.

64. In 2018, Max, in consultation with his health care providers, determined that chest surgery was necessary to alleviate his gender dysphoria, and was ready to move forward with further consultations leading to surgery. Max then discovered that the NCSHP had reinstated its categorical Exclusion of gender-confirming health care, effective January 1, 2018, in all of its Health Plans.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 64 of the Complaint, and cannot, therefore, admit or deny these allegations.

65. Since 2018, Max has been unable to obtain insurance coverage for medically necessary hormone therapy or gender-confirming surgical care. Max pays out-of-pocket for hormone therapy. To lessen the financial burden of paying out-of-pocket for testosterone every month, Max will often ration and use a vial of testosterone past the expiration date.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 65 of the Complaint, and cannot, therefore, admit or deny these allegations.

66. Having to forgo chest surgery, Max still experiences significant gender dysphoria-related distress on a daily basis. Max wears a binder to compress his chest, but

31

it causes him physical discomfort and breathing difficulties. Max also has asthma, which is exacerbated by having to bind his chest because he cannot obtain a permanent medically necessary solution.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 66 of the Complaint, and cannot, therefore, admit or deny these allegations.

### 2. Plaintiffs Jason Fleck and Connor Thonen-Fleck

67.    Jason Fleck has been employed by UNCG since 1997 and currently works as a Business Application Analyst. Connor Thonen-Fleck ("Connor"), his son, is a transgender young man. Connor was designated female at birth but has a male gender identity. Connor's mother, Alexis Thonen, is also a UNCG employee. Mr. Fleck and Ms. Thonen bring this suit on their son's behalf.

**ANSWER:** The University Defendants admit that Plaintiff Jason Fleck has been employed by UNC Greensboro since 1998 and currently works as a Business Application Analyst. The University Defendants further admit that Plaintiff Alexis Thonen is an employee of UNC Greensboro. To the extent paragraph 67 contains characterizations of Plaintiffs' claims, those allegations are not subject to admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 67 of the Complaint, and cannot, therefore, admit or deny these allegations.

68.     Connor is a high school student, and he is involved in several extracurricular activities. Connor has excelled academically and attends Early College at Guilford College in Greensboro, North Carolina.  In addition to his rigorous academic responsibilities, Connor also works at a veterinary clinic.  Connor is passionate about veterinary medicine and plans to pursue studies and a career in the veterinary field.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 68 of the Complaint, and cannot, therefore, admit or deny these allegations.

69.     Connor lives with gender dysphoria, which he has struggled with since childhood. Mr. Fleck and Ms. Thonen realized that Connor demonstrated stereotypically masculine tendencies and characteristics from a young age.  But until Connor began to transition, he was in serious and increasing distress.  Ultimately, Connor came out as transgender to his parents and explained his need to transition.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 69 of the Complaint, and cannot, therefore, admit or deny these allegations.

70.     Connor and his family developed a plan to secure treatment for his gender dysphoria. Connor initially began seeing a psychiatrist and therapist.  By the time he was 15 years old, he had socially transitioned and was living in his authentic male gender identity in all aspects of his life.

**ANSWER:**  The University Defendants lack sufficient information or knowledge

to form a belief as to the truth or falsity of the allegations in paragraph 70 of the Complaint, and cannot, therefore, admit or deny these allegations.

71.     In January of 2018, Connor began hormone therapy as part of treatment for his gender dysphoria. In March of 2018, Connor obtained a legal name and gender marker change and subsequently obtained a corrected birth certificate and driver's license.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 71 of the Complaint, and cannot, therefore, admit or deny these allegations.

72.     Counseling, hormone therapy, and social transition have significantly improved Connor's quality of life by reducing his gender dysphoria.  However, Connor still experiences significant gender dysphoria on a daily basis because he is a male with a typically female chest.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 72 of the Complaint, and cannot, therefore, admit or deny these allegations.

73.     As part of treatment for his gender dysphoria, Connor's health care providers have recommended chest surgery that would give Connor a more typical male chest. This medically necessary surgery will bring Connor's body into better alignment with his gender identity and lived experience, and will further reduce his gender dysphoria.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 73 of the Complaint,

and cannot, therefore, admit or deny these allegations.

74.    As a North Carolina state employee, Plaintiff Jason Fleck is enrolled in the NCSHP, and receives health care benefits from this plan as part of his compensation.  As a dependent of Mr. Fleck, Connor is also enrolled in the NCSHP.  Mr. Fleck contributes each month to the plan via a paycheck deduction.

**ANSWER:**  The allegations of paragraph 74 of the Complaint are admitted.

75.    In 2017, Connor was enrolled in the 80/20 Health Plan. His visits with his psychiatrist and therapist were covered that because the categorical Exclusion of gender-confirming health care had been removed from the plan. During the fall of 2017, Connor's father re-enrolled himself and Connor in the 80/20 plan for the 2018 plan year.

**ANSWER:**  The University Defendants admit that in 2017 Connor was enrolled in the 80/20 plan. The University Defendants further admit that during the fall of 2017 Connor's father re-enrolled himself and Connor in the 80/20 plan for the 2018 plan year. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 75 of the Complaint, and cannot, therefore, admit or deny these allegations.

76.    Mr. Fleck and Connor have struggled since then to obtain coverage of Connor's required office visits to his endocrinologist, who prescribes and monitors Connor's masculinizing hormone therapy.  Because Connor has received that care in connection with his gender dysphoria, insurance coverage for those visits has been

inconsistent, and in some instances denied. Where coverage has been denied, Mr. Fleck and Connor have been left with full financial responsibility for the cost of the care.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 76 of the Complaint, and cannot, therefore, admit or deny these allegations.

77. On April 9, 2018, CVS issued a Notice of Determination ("ND") denying prior authorization for coverage of Connor's testosterone prescription. The ND explained that the diagnosis code submitted, F64.0 "Transsexualism," was not a covered diagnosis code for prescription testosterone under the NCSHP covering Connor. The ND explained that the prescription would be covered for males with "primary or hypogonadotropic hypogonadism," but not for Connor.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 77 of the Complaint, and cannot, therefore, admit or deny these allegations.

78. Like any person with a medical condition, Connor and his family are doing their best to access medically necessary health care. Paying out-of-pocket for health care that has been denied under the plan has been an emotional and financial burden on Connor and his parents.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 78 of the Complaint, and cannot, therefore, admit or deny these allegations.

36

79.     Connor lives with daily distress caused by having a typically female chest, and urgently requires gender-confirming surgery to treat his gender dysphoria.  Connor and his parents cannot easily afford to pay for the surgery out of pocket, as it imposes a financial hardship on his family.  Indeed, notwithstanding his full academic workload, Connor works in an effort to earn and save money so that he may contribute to the out-of-pocket costs for his surgery.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 79 of the Complaint, and cannot, therefore, admit or deny these allegations.

80.     Connor's parents witness his daily distress due to his inability to access health insurance coverage for medically necessary care and are worried about the effects his untreated gender dysphoria is having on his mental and physical health, his education, and his future plans.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 80 of the Complaint, and cannot, therefore, admit or deny these allegations.

### 3.     Plaintiff Julia McKeown

81.     Plaintiff Julia McKeown ("Julia") is a transgender woman.  Julia was designated male at birth, but her gender identity is female.  Julia lives in accordance with her female gender identity in all aspects of her life.

**ANSWER:**  The University Defendants lack sufficient information or knowledge

to form a belief as to the truth or falsity of the allegations in paragraph 81 of the Complaint, and cannot, therefore, admit or deny these allegations.

82.     Originally from Florida, Julia has struggled with gender dysphoria since childhood.  Julia had to suppress her gender identity for much of her early life into adulthood.  During her time in Florida, Julia completed her higher education, including a bachelor's degree, two master's degrees, and a doctoral degree.  During this time, Julia was also battling severe, untreated gender dysphoria.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 82 of the Complaint, and cannot, therefore, admit or deny these allegations.

83.     In 2010, while pursuing her doctorate, Julia could no longer suppress who she really was. Julia made the life-saving decision to live authentically, in accordance with her gender identity. In 2013, Julia began the medical part of her transition and started hormone therapy. Between 2010 and 2016, Julia was progressing in her career, life, and transition.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 83 of the Complaint, and cannot, therefore, admit or deny these allegations.

84.     In 2016, Julia accepted a position with NCSU and moved to North Carolina from Florida.  Since 2016, Julia has been employed as a Teaching Assistant Professor in the Teaching Education and Learning Design Department of the NCSU College of

Education. She currently teaches in the Learning, Design, and Technology Program. Julia also serves as the Graduate Coordinator for the Learning, Design, and Technology Program.

**ANSWER:** The University Defendants admit that Plaintiff McKeown has been employed as a Teaching Assistant Professor in the Teaching Education and Learning Sciences ("TELS") Department of the NCSU College of Education since 2016. The University Defendants admit that Plaintiff McKeown currently teaches in the Learning, Design, and Technology Program. The University Defendants admit that Defendant McKeown also serves as the Graduate Coordinator for the Learning, Design, and Technology Program. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of any remaining allegations in paragraph 84 of the Complaint, and cannot, therefore, admit or deny those allegations.

85.     As a North Carolina state employee, Julia is enrolled in the NCSHP, and receives health care benefits from this plan as part of her compensation. She contributes each month to the plan via a paycheck deduction.

**ANSWER:** The allegations of paragraph 85 of the Complaint are admitted.

86.     While hormone therapy and social transition have been important aspects of Julia's transition, Julia was still dealing with significant distress related to gender dysphoria. By 2017-2018, Julia's medical provider referred her for vaginoplasty, as part of treatment for her gender dysphoria. After consulting with a surgeon, Julia and her surgeon requested preauthorization for vaginoplasty in or around July 2018. Towards the end of

39

July, the preauthorization was denied because of the reinstatement of the Exclusion of gender-confirming health care in the NCSHP.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 86 of the Complaint, and cannot, therefore, admit or deny these allegations.

87. Julia filed a grievance with the NCSHP Section 1557 Coordinator after the denial of preauthorization. The grievance was denied in or around August 2018.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 87 of the Complaint, and cannot, therefore, admit or deny these allegations.

88. At that point in her life, Julia could no longer wait for surgery. Left with no other options, Julia made the difficult decision to withdraw funds from her retirement and savings accounts, in order to pay for her medically necessary surgery. Julia's surgical costs totaled over $14,000.00.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 88 of the Complaint, and cannot, therefore, admit or deny these allegations.

89. Julia is also prescribed hormone therapy as part of treatment for her gender dysphoria, which is also excluded under the NCSHP. The Exclusion also prohibits Julia from seeking future medically necessary gender-confirming health care.

**ANSWER:** The University Defendants lack sufficient information or knowledge

to form a belief as to the truth or falsity of the allegations in paragraph 89 of the Complaint, and cannot, therefore, admit or deny these allegations.

### 4. Plaintiffs Michael D. Bunting, Jr. and C.B.

90. Michael D. Bunting, Jr. is employed by UNC. C.B., his son, is a transgender boy. C.B. was designated female at birth but has a male gender identity. C.B.'s mother, Shelley K. Bunting, is a nurse practitioner in private practice. Mr. Bunting and Ms. Bunting bring this suit on their son's behalf.

**ANSWER:** The University Defendants deny that Plaintiff Michael D. Bunting, Jr., currently is an employee of UNC-Chapel Hill, but admit that he was formerly an employee of UNC-Chapel Hill. To the extent paragraph 90 of the Complaint contains characterizations of Plaintiffs' claims, those allegations are not subject to admission or denial by the University Defendants. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 90 of the Complaint, and cannot, therefore, admit or deny those allegations.

91. Mr. Bunting has worked for UNC since 1990.

**ANSWER:** The University Defendants admit that Plaintiff Michael D. Bunting, Jr., was an employee of UNC-Chapel Hill beginning in 1990.

92. C.B. is a middle school student. He likes swimming, parkour, and really enjoys playing lacrosse. His favorite subjects in school are math and science.

**ANSWER:** The University Defendants lack sufficient information or knowledge

41

to form a belief as to the truth or falsity of the allegations in paragraph 92 of the Complaint, and cannot, therefore, admit or deny these allegations.

93. Ever since he was a young child, C.B. would reject stereotypically female clothing and would dress in a more masculine manner. Beginning at a young age, C.B. would refuse to wear stereotypically female swimming suits, opting instead for board shorts and a shirt. In late 2016, he began wearing a short, typically masculine haircut.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 93 of the Complaint, and cannot, therefore, admit or deny these allegations.

94. Though C.B. always got along with people and has many friends, he exhibited high levels of anxiety, which his parents later came to understand was associated with his untreated gender dysphoria.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 94 of the Complaint, and cannot, therefore, admit or deny these allegations.

95. In early 2017, C.B. informed his parents that he was transgender. Soon after, C.B. and his parents met with a therapist in April 2017. After consultation with his family and therapist, C.B. asked to be placed on treatment to delay female puberty.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 95 of the Complaint, and cannot, therefore, admit or deny these allegations.

42

96.     In April of 2017, C.B. and his parents sought an appointment with the Duke Child and Adolescent Gender Care Clinic ("Duke"), ultimately scheduled for August 2017.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 96 of the Complaint, and cannot, therefore, admit or deny these allegations.

97.     During the summer of 2017, C.B. socially transitioned to living as his true self, informing friends and family of his male gender identity, wearing more masculine clothes, and living openly as the boy he is.  However, as his breasts began to develop during the summer, C.B. began to experience additional anxiety.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 97 of the Complaint, and cannot, therefore, admit or deny these allegations.

98.     As a result of the distress associated with his birth-designated sex (female), C.B. was diagnosed with gender dysphoria. In August 2017, C.B. began obtaining care from medical and mental health professionals and was prescribed puberty-delaying treatment, in the form of an implant, as part of his treatment for gender dysphoria.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 98 of the Complaint, and cannot, therefore, admit or deny these allegations.

99. Following the beginning of C.B.'s treatment, C.B.'s parents noticed that the anxiety he had been experiencing diminished and that he was now a happy, outgoing, and personable teenage boy.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 99 of the Complaint, and cannot, therefore, admit or deny these allegations.

100. C.B. is treated and known as a boy at school and in all other aspects of his life. He legally changed his name to a more typically male name in the Spring of 2018.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 100 of the Complaint, and cannot, therefore, admit or deny these allegations.

101. As a North Carolina state employee, Plaintiff Michael D. Bunting, Jr. is enrolled in the NCSHP, and receives health care benefits from this plan as part of his compensation. As a dependent of Mr. Bunting, C.B. is also enrolled in the NCSHP. Mr. Bunting contributes each month to the plan via a paycheck deduction.

**ANSWER:** The University Defendants admit that as a North Carolina state retiree, Plaintiff Michael D. Bunting, Jr., is eligible to enroll in the NCSHP, elected to participate in the NCSHP and currently receives health care benefits from the NCHSC as an eligible retiree. The University Defendants further admit that Plaintiff Bunting elected to obtain dependent care coverage for C.B. under the NCSHP as an eligible retiree. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or

falsity of the remaining allegations in paragraph 101 of the Complaint, and cannot, therefore, admit or deny those allegations.

102. Because in 2017 the NCSHP did not contain an Exclusion for gender-confirming health care, C.B.'s puberty-delaying treatment was covered by the NCSHP.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 102 of the Complaint, and cannot, therefore, admit or deny these allegations.

103. C.B.'s puberty-delaying implant only lasts 12 to 18 months. Accordingly, C.B. needed the implant to be removed and replaced in early 2019.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 103 of the Complaint, and cannot, therefore, admit or deny these allegations.

104. However, in mid-2018, Ms. Bunting learned of the reinstitution of the Exclusion of gender-confirming care within the NCSHP.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 104 of the Complaint, and cannot, therefore, admit or deny these allegations.

105. Worried that they could not afford out-of-pocket the puberty-delaying treatment that C.B. needs, Mr. Bunting and Ms. Bunting communicated with the NCSHP Board of Trustees, urging them to once again eliminate the Exclusion of gender-confirming health care within the NCSHP, with no success.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 105 of the Complaint, and cannot, therefore, admit or deny these allegations.

106.    In mid-December 2018, following the lack of action by the NCSHP Board of Trustees at their December 2018 meeting to eliminate the Exclusion, Mr. Bunting and Ms. Bunting decided to purchase an additional health insurance plan that would cover puberty-delaying treatment for C.B.  Through the federally-run ACA health care exchange they purchased an insurance plan from BCBSNC.  Though Mr. Bunting and C.B. remain enrolled in the NCSHP and will continue to do so, purchasing additional coverage for C.B. was necessary in order for the Bunting family to be able to afford C.B.'s gender-confirming care.  As a result, Mr. Bunting and Ms. Bunting have had to pay an additional monthly premium and a $6,750.00 deductible for C.B., separate and apart from C.B.'s existing coverage under the NCSHP.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 106 of the Complaint, and cannot, therefore, admit or deny these allegations.

107.    In early 2019, C.B. began obtaining puberty-delaying treatment via injection, rather than a longer-lasting implant, because that is the only puberty-delaying treatment on the formulary of the additional health insurance purchased to supplement the coverage under the NCSHP.

**ANSWER:**  The University Defendants lack sufficient information or knowledge

46

to form a belief as to the truth or falsity of the allegations in paragraph 107 of the Complaint, and cannot, therefore, admit or deny these allegations.

108.    Aside from the additional high deductible and extra monthly premiums, Mr. Bunting and Ms. Bunting must now pay out-of-pocket costs each time C.B. receives a round of puberty-delaying medication via injection instead of the longer lasting implant, until the extra annual deductible is met.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 108 of the Complaint, and cannot, therefore, admit or deny these allegations.

109.    The additional costs associated with C.B.'s gender-confirming care and the lack of coverage under the NCSHP due to the discriminatory Exclusion contributed to Mr. Bunting's decision in early January to retire from UNC.  By the date of his retirement, Mr. Bunting will have dedicated nearly 30 years of service to UNC and the North Carolina Tar Heels.

**ANSWER:**   It is admitted upon information and belief that Plaintiff Michael Bunting, Jr., has 28 years and 7 months of creditable state service.   The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 109 of the Complaint, and cannot, therefore, admit or deny these allegations.

110.    Mr. Bunting and C.B. will continue to be enrolled in the NCSHP as a retiree and dependent, respectively, following Mr. Bunting's retirement on April 1, 2019.

**ANSWER:** University Defendants admit that as a North Carolina state retiree, Plaintiff Michael D. Bunting, Jr., is eligible to enroll in the NCSHP, elected to participate in the NCSHP effective May 1, 2019, and currently receives health care benefits from the NCHSC as an eligible retiree. The University Defendants further admit that Plaintiff Bunting elected to obtain dependent care coverage for C.B. under the NCSHP as an eligible retiree effective May 1, 2019. Except as expressly admitted herein, the allegations in Paragraph 110 of the Complaint are denied.

111. The Exclusion also serves to stigmatize C.B. as a transgender person and has caused pain, anger, and distress to C.B., Mr. Bunting, and the rest of the Bunting family.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 111 of the Complaint, and cannot, therefore, admit or deny these allegations.

### 5. Plaintiff Sam Silvaine

112. Plaintiff Sam Silvaine ("Sam") is transgender. Sam was designated female at birth but has a male affirmed sex. Sam lives all aspect of his life in accordance with his gender identity.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 112 of the Complaint, and cannot, therefore, admit or deny these allegations.

113.   Sam moved to North Carolina in 2012 to pursue a master's degree.  After obtaining his master's degree, Sam accepted a two-year fellowship with NCSU as a postmaster's counseling fellow.

**ANSWER:**  The University Defendants admit that Plaintiff Sam Silvaine accepted a two-year fellowship with NC State as a post-master's counseling fellow.  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 113 of the Complaint, and cannot, therefore, admit or deny those allegations.

114.   As a North Carolina state employee, Sam was enrolled in the NCSHP, and received health care benefits from this plan as part of his compensation.  Sam was enrolled in the 80/20 NCSHP for plan years 2016, 2017, and 2018.

**ANSWER:**  The allegations of paragraph 114 of the Complaint are admitted.

115.   In January 2017, Sam began therapy as treatment for his gender dysphoria. Sam began hormone therapy in April 2017.  Hormone therapy masculinized Sam's voice, some of his secondary sex characteristics, and physical appearance.  As his body became more masculine and in greater alignment with his gender identity, his typically female chest began to be even more noticeable to Sam.  The marked incongruence increased Sam's gender dysphoria.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 115 of the Complaint, and cannot, therefore, admit or deny these allegations.

116.     Sam used a binder daily to compress his chest.  While binding lessened his gender dysphoria to an extent, it was not a permanent solution and caused Sam physical discomfort and restricted his physical activities.  Sam's ability to do the things he loved, like hiking, backpacking, and climbing, were limited because of the need to wear the binder.  The appearance of Sam's chest also presented a safety issue for Sam.  Sam lives and is generally recognized as male in all aspects of his life.  Being visibly male with a typically female chest invited undesired, invasive, and dangerous attention.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 116 of the Complaint, and cannot, therefore, admit or deny these allegations.

117.     Eventually Sam, in consultation with and support from his health care providers, made the decision to seek chest surgery as part of treatment for his gender dysphoria.

**ANSWER:**  The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 117 of the Complaint, and cannot, therefore, admit or deny these allegations.

118.     In 2017, Sam's NCSHP did not contain a categorical Exclusion for gender-confirming health care. Sam's counseling and hormone therapy were covered.  In August 2017, Sam and his surgeon sought prior authorization for reconstructive chest surgery.  The prior authorization process took until October 2017 and at that time, the earliest available

surgery date that Sam could obtain was March 1, 2018. Sam accepted the March 2018 date in order to avoid an even greater delay in the treatment he required.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 118 of the Complaint, and cannot, therefore, admit or deny these allegations.

119. After the categorical Exclusion of gender-confirming care was reinstated on January 1, 2018, the prior authorization for Sam's surgery was rendered invalid.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 119 of the Complaint, and cannot, therefore, admit or deny these allegations.

120. When Sam found out that his health insurance was no longer going to cover the surgery he desperately needed, he was devastated mentally and emotionally. Like other transgender North Carolina state employees who suddenly found themselves without health insurance coverage for their medically necessary health care, Sam was placed in a difficult position.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 120 of the Complaint, and cannot, therefore, admit or deny these allegations.

121. Sam was living with severe gender dysphoria and ultimately, he could not delay the surgery. Sam paid for the surgery out of pocket and underwent chest surgery on March 6, 2018.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 121 of the Complaint, and cannot, therefore, admit or deny these allegations.

122.    The surgery proved life-changing for Sam and has significantly reduced the distress caused by his gender dysphoria.  Sam has not been reimbursed by Defendants for his surgery costs or other out-of-pocket costs he incurred due to the Exclusion of gender-confirming health care in the 2018 plan.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 122 of the Complaint, and cannot, therefore, admit or deny these allegations.

123.    Because of the Exclusion of gender-confirming health care from the Health Plans, all Plaintiffs have suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation of their dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial.

**ANSWER:** The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the allegations in paragraph 123 of the Complaint, and cannot, therefore, admit or deny these allegations.

**CLAIMS FOR RELIEF**
**COUNT I**
**Deprivation of Equal Protection**
**U.S. Const. amend. XIV**
**(All Plaintiffs Against Defendants Dale Folwell and Dee Jones)**

124.    Plaintiffs re-allege and incorporate each and every foregoing allegation contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

**ANSWER:**  The University Defendants incorporate their responses to paragraphs ¶¶ 1 through 123 by reference as though fully set forth herein.

125.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

**ANSWER:**  This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

126.    Plaintiffs state this cause of action against Defendants Dale Folwell and Dee Jones, in their official capacities, for purposes of seeking declaratory and injunctive relief, and challenge their adoption and enforcement of the discriminatory sex-based classifications in the NCSHP Health Plans both facially and as applied to Plaintiffs.

**ANSWER:**  This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

53

127.    Each Defendant is a person acting under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs equal protection of the law.

**ANSWER:**    This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

### A.    Discrimination on the Basis of Sex

128.    Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

**ANSWER:**    This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

129.    Discrimination on the basis of sex characteristics, gender, gender identity, nonconformity with sex stereotypes, transgender status, and gender transition is discrimination on the basis of sex.

**ANSWER:**    This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

130.    By categorically excluding, "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and "[t]reatments or

studies to or in connection with sex changes and modifications and related care," Defendants are engaging in constitutionally impermissible sex-based discrimination.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

131. Through their duties and actions to design, negotiate, administer, and implement the NCSHP's categorical Exclusion, Defendants Folwell and Jones have unlawfully discriminated—and continue to unlawfully discriminate—against Plaintiffs based on sex-related considerations.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

132. The NCSHP's categorical Exclusion treats Plaintiffs differently from other persons who are similarly situated.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

133. Under the NCSHP's categorical Exclusion, health plan participants who require gender-confirming care, or whose dependents require gender-confirming care, are denied coverage for that medically necessary care, while other health plan participants can access the same care as long as it is not required for gender transition.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

**B.    Discrimination on the Basis of Transgender Status**

134.    By categorically excluding coverage for gender-confirming health care in the NCSHP Health Plans, Defendants are engaging in constitutionally impermissible discrimination on the basis of transgender status.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

135.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened, scrutiny.

    a.    Transgender people have suffered a long history of discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

    b.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination.

56

c. A person's transgender status bears no relation to a person's ability to contribute to society.

d. Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

e. Gender identity generally is fixed at an early age and highly resistant to change through intervention.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

136. Because the NCSHP's categorical Exclusion on its face and as applied to Plaintiffs deprives transgender enrollees of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as second-class citizens, it denies transgender persons of the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment. The NCSHP's categorical Exclusion similarly serves to stigmatize NCSHP enrollees whose dependents are transgender; it brands them as second-class citizens and deprives them of their equal treatment and dignity.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

137.    Defendants' discriminatory Exclusion of gender-confirming care is not narrowly tailored or substantially related to any compelling or important government interest. Indeed, it is not even rationally related to any legitimate government interest.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

138.    Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

## COUNT II
### Violation of Title IX of the Education Amendments of 1972
### 20 U.S.C. § 1681, et seq.

**(Plaintiffs Maxwell Kadel, Michael D. Bunting, Jr. and C.B. against Defendant University of North Carolina at Chapel Hill; Plaintiffs Julia McKeown and Sam Silvaine against Defendant North Carolina State University; Plaintiffs Jason Fleck and Conor Thonen-Fleck against Defendant University of North Carolina at Greensboro)**

139.    Plaintiffs re-allege and incorporate the allegations in paragraphs 1 through 123 of this Complaint, as though fully set forth herein.

**ANSWER:**  The University Defendants incorporate their responses to paragraphs ¶¶ 1 through 138 as though fully set forth herein.

58

140.   Title IX provides that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

**ANSWER:**  Paragraph 140 of the Complaint purports to paraphrase Title IX of the Education Amendments Act of 1972.  The language of Title IX speaks for itself and is not subject to admission or denial by the University Defendants.

141.   Under Title IX, discrimination on the basis of sex includes, but is not limited to, discrimination based on sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition.

**ANSWER:**  Paragraph 141 of the Complaint alleges legal conclusions to which no response is required.

142.   Defendants UNC, NCSU, and UNCG are recipients of federal financial assistance from the Department of Health and Human Services, the Department of Agriculture, and the Department of Education, and are therefore subject to Title IX.

**ANSWER:**  The University Defendants admit the allegations in paragraph 142 of the Complaint.

143.   By offering Health Plans to their employees with categorical exclusions for gender-confirming care, Defendants UNC, NCSU, and UNCG have and continue to discriminate on the basis of sex against NCSHP enrollees who require gender-confirming care, or whose dependents require gender-confirming care.

59

**ANSWER:** The allegations in paragraph 143 of the Complaint are denied.

144. In offering Health Plans that categorically exclude coverage of gender-confirming health care on the basis of sex, Defendants UNC, NCSU, and UNCG deny enrollees who require gender-confirming care, or whose dependents require gender-confirming care, the benefits of and subject them to discrimination in educational programs and activities. This impermissible discrimination based on sex, including sex characteristics, nonconformity with sex stereotypes, transgender status, and gender transition, violates Title IX.

**ANSWER:** The allegations in paragraph 144 of the Complaint are denied.

145. By knowingly and intentionally offering health insurance that denies coverage to Plaintiffs on the basis of sex, Defendants UNC, NCSU, and UNCG harm Plaintiffs by: stigmatizing them; treating them as a secondary class compared to other non-transgender enrollees who have access to the same care for themselves or their non-transgender dependents; and causing the transgender health plan participants mental and physical health complications due to their inability to access medically necessary health care.

**ANSWER:** The allegations in paragraph 145 of the Complaint are denied.

146. By knowingly and intentionally offering a compensation package that denies fringe benefits to Plaintiffs on the basis of sex, Defendants UNC, NCSU, and UNCG have intentionally violated Title IX, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

**ANSWER:** The allegations in paragraph 146 of the Complaint are denied.

147. Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**ANSWER:** Paragraph 147 of the Complaint alleges legal conclusions to which no response is required. The University Defendants lack sufficient information or knowledge to form a belief as to the truth or falsity of the remaining allegations in paragraph 147, and cannot, therefore, admit or deny those allegations.

## COUNT III
### Violation of the Patient Protection and Affordable Care Act
### 42 U.S.C. § 18116

**(All Plaintiffs Against Defendant North Carolina State Health Plan for Teachers and State Employees)**

148. Plaintiffs re-allege and incorporate the allegations in paragraphs 1 through 123 of this Complaint, as though fully set forth herein.

**ANSWER:** The University Defendants incorporate their responses to paragraphs ¶¶ 1 through 147 as though fully set forth herein.

149. Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part that, "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681, et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be

61

subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

150. Discrimination on the basis of sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

151. Upon information and belief, Defendant NCSHP receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA. Indeed, Defendant NCSHP has acknowledged in its publicly available Policies and Procedures, effective July 15, 2016, that it "receives funding from the [federal] Department of Health and Human Services" and "is subject to Section 1557 of the Affordable Care Act (42 U.S.C. [§] 18116) and its implementing regulations at 45 CFR Part 92."

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

152.    A covered entity, such as Defendant NCSHP, cannot provide or administer health care insurance coverage which contains a categorical Exclusion from coverage for gender-confirming health care, or otherwise impose limitations or restrictions on coverage for specific health services related to gender transition if such limitation or restriction results in discrimination against a transgender individual.

**ANSWER:**    This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

153.    Because Defendant NCSHP receives federal funding that flows to health programs or activities, Plaintiffs have a right under Section 1557 to receive health insurance through the NCSHP free from discrimination on the basis of sex, sex characteristics, gender, nonconformity with sex stereotypes, transgender status, or gender transition.

**ANSWER:**    This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

154.    Defendant NCSHP has discriminated against Plaintiffs on the basis of sex in violation of Section 1557 and has thereby denied Plaintiffs the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

**ANSWER:**    This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is

denied.

155. By categorically excluding all coverage for medically necessary "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and "[t]reatments or studies to or in connection with sex changes or modifications and related care," Defendant NCSHP has drawn a classification that has unlawfully discriminated—and continues to discriminate—against Plaintiffs based on sex, in violation of Section 1557.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

156. As a result of the Exclusion, Plaintiffs have suffered harm, including but not limited to financial harm. By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates on the basis of sex, Defendant NCSHP has intentionally violated the ACA, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

157. Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**ANSWER:** This allegation is not asserted against the University Defendants. Therefore, no response is required. To the extent a response is required, the allegation is denied.

**SECOND DEFENSE**

The Complaint fails, in part or in whole, to state a claim upon which relief can be granted and should therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

**THIRD DEFENSE**

The Complaint fails, in part or in whole, because Plaintiffs lack standing to sue the University Defendants on the facts alleged.

**FOURTH DEFENSE**

Plaintiffs have failed to allege continuing, irreparable harm traceable to or redressable by the University Defendants or any other basis upon which to receive any form of injunctive relief by the University Defendants.

**FIFTH DEFENSE**

Plaintiffs' Title IX claim against University Defendants fails, in part or in whole, as it fails to specifically plead that the University Defendants took any tangible adverse employment action to support a Title IX claim.

**SIXTH DEFENSE**

The Complaint fails, in part or in whole, because of sovereign immunity and should therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(1), Fed. R. Civ. P. 12(b)(2), and Fed. Civ. P. 12(b)(6).

## SEVENTH DEFENSE

The Complaint fails, in part or in whole, because of the statute of limitations and should therefore be dismissed. To the extent Plaintiffs' claims are based on any acts that occurred prior to any applicable statute of limitations, Plaintiffs' claims are time-barred.

## EIGHTH DEFENSE

At all times, the University Defendants acted in good faith. Any acts by the University Defendants were taken for legitimate, non-discriminatory reasons.

The University Defendants reserve the right to plead additional affirmative defenses at a later time if such defenses are appropriate based on information then available.

WHEREFORE the University Defendants request that the Court:

1.  Deny all relief requested in the Complaint as against the University Defendants;

2.  Enter judgment in favor of the University Defendants on all claims alleged against them;

3.  Tax all costs of this action and attorneys' fees against Plaintiff;

4.  Grant a trial by jury; and

5.  Grant the University Defendants all other and further relief the Court considers appropriate.

This 9th day of June, 2020.

JOSHUA H. STEIN
Attorney General

/s/Nora F. Sullivan
Nora F. Sullivan
Assistant Attorney General
NC State Bar No. 43284
nsullivan@ncdoj.gov

/s/Zach Padget
Zach Padget
Assistant Attorney General
NC State Bar No. 46610
zpadget@ncdoj.gov

NC Department of Justice
PO Box 629
Raleigh, NC  27602
Tel: 919.716.6920
Fax: 919.716.6764

*Counsel for Defendants University of North Carolina at Chapel Hill, North Carolina State University, and University of North Carolina at Greensboro*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

This the 9th day of June, 2020.

<u>/s/Nora F. Sullivan</u>
Nora F. Sullivan
Assistant Attorney General