# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE; and DANA CARAWAY,<br><br>*Plaintiffs*,<br><br>v.<br><br>DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; and STATE OF NORTH CAROLINA, DEPARTMENT OF PUBLIC SAFETY,<br><br>*Defendants*. | No. 1:19-cv-00272-LCB-LPA<br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF** |

## INTRODUCTION

1.      Plaintiffs are current or former enrollees in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP").   As part of compensation for employment, the State of North Carolina provides its employees with health care coverage

1

for them and their dependents through the NCSHP, a self-funded plan. However, by categorically depriving transgender enrollees of coverage for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth—Defendants unlawfully discriminate against people like Plaintiffs, who either are transgender or have transgender family members who depend on them for health care coverage. In doing so, Defendants deny equal compensation for equal work to employees who are transgender or have transgender dependents, as well as harm employees' transgender family members who depend on them for health care coverage.

2. The sweeping exclusion contained within the NCSHP denies coverage for health care, including counseling, hormone therapy, surgical care, and any other health care provided in relation to a person's transgender status and/or gender transition. This exclusion contravenes the well-established medical consensus that gender-confirming health care can be medically necessary and even life-saving. Other NCSHP enrollees who are not transgender do not face a categorical exclusion barring coverage for health care that is medically necessary for them based on their sex and receive coverage for the same care that is denied to transgender enrollees.

3. Plaintiffs have all been denied coverage for medically necessary gender-confirming health care because they or their dependents are transgender, based on the categorical exclusion of gender-confirming health care in the NCSHP. Some Plaintiffs have forgone medically necessary gender-confirming health care, while others have been

2

forced to incur financial hardship without the financial protection afforded by coverage through the NCSHP. Plaintiffs have also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of the NCSHP's targeted discrimination against transgender enrollees, which wrongly deems their health care needs as unworthy of equal coverage.

4. The NCSHP covers more than 720,000 teachers, state employees, retirees, current and former lawmakers, state university and community college personnel, state hospital staff members, and their dependents. The NCSHP's mission is "to improve the health and health care of North Carolina teachers, state employees, retirees, and their dependents, in a financially sustainable manner, thereby serving as a model to the people of North Carolina for improving their health and well-being"—but when it comes to transgender enrollees, the NCSHP is not fulfilling that mission.

5. This targeted discrimination against transgender people violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IX of the Education Amendments of 1972 ("Title IX"), Section 1557 of the Patient Protection and Affordable Care Act (the "ACA"), and Title VII of the Civil Rights Act of 1964 ("Title VII").

6. Plaintiffs bring this lawsuit to challenge the categorical exclusion of gender-confirming health care contained within the NCSHP, to obtain a judgment to redress their individual injuries, and to have the exclusion declared unlawful, thereby preventing its enforcement.

## PARTIES

### A.  Plaintiffs

7.      Plaintiff Maxwell Kadel is a 37-year-old transgender man.  Mr. Kadel was formerly employed by the University of North Carolina at Chapel Hill from October 2016 to November 2019.  Mr. Kadel lives in Carrboro, North Carolina.

8.      Plaintiff Jason Fleck is the father of Plaintiff Connor Thonen-Fleck ("Connor"), an 18-year-old transgender young man.  Mr. Fleck is an employee of the University of North Carolina at Greensboro, and Connor receives health coverage as a dependent of Mr. Fleck.  Mr. Fleck and Connor live in High Point, North Carolina.

9.      Plaintiff Julia McKeown is a 44-year-old transgender woman.  Ms. McKeown is employed by North Carolina State University.  Ms. McKeown lives in Apex, North Carolina.

10.     Plaintiff Michael D. Bunting, Jr. is the father of C.B., a 15-year-old transgender boy.  Mr. Bunting was a long-term employee of the University of North Carolina at Chapel Hill.  He continues to receive health coverage as a retiree, and C.B. receives health coverage as a dependent of Mr. Bunting.  Shelley K. Bunting is C.B.'s mother.  C.B. sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friends and parents, Mr. Bunting and Ms. Bunting.  Mr. Bunting, Ms. Bunting, and C.B. all live in Chapel Hill, North Carolina.

11.     Plaintiff Sam Silvaine is 31 years old, transgender, and has a male affirmed sex.  Mr. Silvaine was formerly employed by the North Carolina State University

4

Counseling Center from August 2016 until July 2018.  Mr. Silvaine resides in Raleigh, North Carolina.

12.     Plaintiff Dana Caraway is a 50-year-old transgender woman.  Ms. Caraway is employed by the State of North Carolina, Department of Public Safety.  Ms. Caraway lives in Morganton, North Carolina.

**B.     Defendants**

13.     Defendant Dale Folwell is sued in his official capacity as the North Carolina State Treasurer.  As Treasurer, Mr. Folwell serves as Chair of the Board of Trustees of the State Health Plan for Teacher and State Employees and is responsible for designing, operating, and/or administering the NCSHP.  Pursuant to N.C. Gen. Stat. § 135-48.30, the State Treasurer has the power and duty to: administer and operate the NCSHP and to set benefits, subject to approval by the majority of the Board of Trustees; design and implement coordination of benefits policies; and set administrative and medical policies. N.C. Gen. Stat. § 135-48.30 provides that the State Treasurer may delegate his powers and duties under this section to the Executive Administrator, the Board of Trustees, and employees of the Plan, but nonetheless maintains responsibility for the performance of those powers or duties.   Additionally, as described below, Mr. Folwell has publicly announced that until he is ordered or required to do otherwise, he will maintain the discriminatory exclusion in the NCSHP.  Mr. Folwell is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this Complaint.

5

14.     Defendant Dee Jones is sued in her official capacity as Executive Administrator of the NCSHP.  As Executive Administrator, Ms. Jones is statutorily authorized to negotiate, renegotiate, and execute contracts with third parties in the performance of her duties and responsibilities, pursuant to N.C. Gen. Stat. § 135-48.23.  Ms. Jones is a "person" within the meaning of 42 U.S.C. § 1983 and is, and was, acting under the color of state law at all times relevant to this Complaint.

15.     Defendant University of North Carolina at Chapel Hill ("UNC") is the flagship institution for the University of North Carolina system.  UNC is an education program or activity receiving federal financial assistance.  UNC also is an employer within the meaning of Title VII because as a university, UNC is engaged in an industry affecting commerce and has 15 or more employees.  As an employer, UNC provides health care coverage to its employees through the NCSHP.

16.     Defendant University of North Carolina at Greensboro ("UNCG") is a constituent institution of the University of North Carolina.  UNCG is an education program or activity receiving federal financial assistance.

17.     Defendant North Carolina State University ("NCSU") is a constituent institution of the University of North Carolina.  NCSU is an education program or activity receiving federal financial assistance.  NCSU also is an employer within the meaning of Title VII because as a university, NCSU is engaged in an industry affecting commerce, and has 15 or more employees.  As an employer, NCSU provides health care coverage to its employees through the NCSHP.

6

18.     Defendant State of North Carolina, Department of Public Safety (also, the "Department of Public Safety") is an employer within the meaning of Title VII because as a government law enforcement agency, the Department of Public Safety is engaged in an industry affecting commerce and has 15 or more employees.  As an employer, the Department of Public Safety provides health care coverage to its employees through the NCSHP.

19.     Defendant NCSHP, a corporation, administers comprehensive group health insurance to eligible teachers and other North Carolina state employees, pursuant to N.C. Gen. Stat. § 135-48.2.  The NCSHP is self-funded and empowered to determine, define, adopt, and remove health care benefits and exclusions, such as the categorical exclusion of gender-confirming health care that targets transgender enrollees for discriminatory treatment.  Defendant NCSHP has knowingly and intentionally offered health care coverage to Plaintiffs that discriminates on the basis of sex.

20.     In establishing the scope of health insurance coverage for state employees, the NCSHP acts as an agent for North Carolina government employers who participate in NCSHP, including but not limited to the Department of Public Safety, for purposes of determining components of state employees' "compensation, terms, conditions, or privileges of employment" under Title VII.  The NCSHP exists solely so that participating employers can delegate responsibility for the benefits provided to their employees, as its enacting statute makes clear.  N.C. Gen. Stat. Ann. § 135-48.2(a) provides for creation of the NCSHP "exclusively for the benefit of" state employees, retirees, and eligible

7

dependents, to "administer one or more group health plans that are comprehensive in coverage." Government employers that participate in the NCSHP, including the Department of Public Safety, delegate significant control over employee health benefits to the NCSHP.

21. The NCSHP also acts as an agent of participating government employers, including the Department of Public Safety, because it provides benefits in the form of health care coverage to those employees and thus exercises control over an important aspect of Plaintiffs' employment, their health benefits. The NCSHP exercises this control by, for example, choosing whether to include or exclude gender-confirming health care. The NCSHP's discriminatory denial of access to gender-confirming health care has thus significantly affected Plaintiffs' access to equal employment opportunities.

22. Additionally, the NCSHP is a joint employer with participating government employers under Title VII. Those government employers contract with NCSHP for the provision of health coverage to the employees and, by determining whether to exclude gender-confirming health care, the NCSHP shares responsibility for essential terms and conditions of employment for those employees. The NCSHP thus exercises significant control over the same employees who are employed by state agencies, such as the Department of Public Safety, by determining components of those employees' "compensation, terms, conditions, or privileges of employment" under Title VII, including but not limited to determining their access to gender-confirming health care.

23.     Defendants, through their respective duties and obligations, are responsible for the discriminatory exclusion of gender-confirming health care in the NCSHP.  Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure the plaintiffs irreparably if not enjoined.  Accordingly, the relief requested herein is sought against each Defendant and their successors, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

## JURISDICTION AND VENUE

24.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution, under Title IX, 20 U.S.C. § 1681, *et seq.*, under Section 1557 of the ACA, 42 U.S.C. § 18116, and under Title VII, 42 U.S.C. § 2000e, *et seq*.

25.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, or rights, privileges, and immunities secured by the U.S. Constitution and seeks to secure damages and equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

9

26.     Declaratory relief is authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by 28 U.S.C. §§ 2201 and 2202.

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendants UNC and UNCG reside within the District, and all Defendants reside within the State of North Carolina; and because a substantial part of the events that gave rise to Plaintiffs' claims took place within the District.

28.     This Court has personal jurisdiction over Defendants because they are all domiciled in the State of North Carolina.

## FACTUAL ALLEGATIONS

### A.     Sex, Gender Identity, and Gender Dysphoria

29.     Gender identity refers to an individual's fundamental, internal sense of being a particular gender.  It is an essential element of human identity that everyone possesses. Gender identity is innate, has biological underpinnings, and is fixed at an early age.

30.     An individual's sex is generally assigned solely on the basis of external genitalia at the time of birth.  External genitalia are but one of several sex-related characteristics and are not always indicative of a person's sex.   Other sex-related characteristics, such as chromosomes, hormone levels, internal reproductive organs, secondary sex characteristics, and gender identity, are typically not assessed or considered during the assignment of sex at birth.

31.     Where an individual's gender identity does not match that individual's sex assigned at birth, gender identity is the critical determinant of sex.  A scientific consensus

10

recognizes that attempts to change an individual's gender identity to bring it into alignment with the sex assigned at birth are ineffective and harmful.

32.     For transgender people, an incongruence between gender identity and the body's other sex characteristics can result in gender dysphoria—i.e., a feeling of clinically significant stress and discomfort born out of experiencing that something is fundamentally wrong.  Gender dysphoria is a medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; the World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

33.     In addition to clinically significant distress, gender dysphoria can also result in severe anxiety, depression, and suicidal ideation or suicide without adequate treatment.

34.     Untreated gender dysphoria often intensifies with time.  The longer an individual goes without adequate treatment, the greater the risk of severe harms to the individual's health.

35.     Gender dysphoria can be treated in accordance with internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH").  These Standards of Care are recognized as authoritative by national medical and behavioral health organizations such as the AMA and APA, which have called for an end to exclusions of gender-confirming care from health insurance plans.

11

36.     The process by which transgender individuals come to live in a manner consistent with their gender identity, rather than the sex they were designated at birth, is known as gender transition. The ability to live in a manner consistent with one's gender identity is critical to the health and well-being of transgender individuals and is a key aspect in the treatment of gender dysphoria.

37.     The steps that transgender individuals take to transition are individualized, but typically include social, legal, and medical transition.

38.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life.  For example, for a man who is transgender (designated female at birth), social transition can include wearing typically male attire, using male pronouns, and otherwise living openly as a man in all aspects of everyday life.

39.     Legal transition involves steps to formally align a transgender individual's legal identity with their gender identity, such as legally changing one's name and updating the name and gender marker on their driver's license, birth certificate, and other forms of identification.

40.     Medical transition, a critical part of transitioning for many transgender individuals, includes treatments that bring the sex-specific characteristics of a transgender individual's body into alignment with their gender identity, such as counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, or surgical care.

41.     Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender

12

identity.  Secondary sex characteristics are bodily features not associated with external and internal reproductive genitalia (primary sex characteristics).  Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development.  Hormone replacement therapy can have significant masculinizing or feminizing effects and can assist in bringing a transgender individual's secondary sex characteristics into alignment with their true sex, as determined by their gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

42.    Gender-confirming surgical care or treatment—also known as gender confirmation surgery or "sex reassignment" surgery—refers to any surgical procedure undergone by a transgender individual to better align their primary or secondary sex characteristics with their gender identity.  Such surgical care can include but is not limited to vaginoplasty, phalloplasty, hysterectomy, gonadectomy, mammoplasty, and mastectomy.  These treatments deliberately change sex characteristics for the purpose of treating gender dysphoria.

43.    Surgical care is medically necessary for transgender people who need it to treat their gender dysphoria.

44.    An established body of medical research demonstrates the effectiveness and medical necessity of gender dysphoria treatment, including counseling, hormone therapy, and surgical treatment.  Health care experts have recognized that such treatments are not

"cosmetic," "elective," or "experimental." Rather, they are safe, effective, and medically necessary treatments for a serious health condition.

45.     For example, WPATH has explained that, like hormone therapy and other gender-confirming treatments, "[t]he medical procedures attendant to gender affirming/confirming surgeries are not 'cosmetic' or 'elective' or 'for the mere convenience of the patient.' These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition. In some cases, such surgery is the only effective treatment for the condition, and for some people genital surgery is essential and life-saving."

46.     Similarly, in 2014, the federal Department of Health and Human Services Departmental Appeals Board confirmed that surgical treatment is safe and effective treatment for gender dysphoria. After reviewing expert medical testimony and published studies, the Appeals Board concluded that the Medicare program's then-existing exclusion of such treatment from coverage was "not reasonable."

47.     These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, as that is already established by gender identity, but instead bring the individual's appearance, legal identity, and sex-related characteristics into greater typical alignment with the individual's gender identity and lived experience.

### B.     The State's Targeted and Discriminatory Exclusion of Gender-Confirming Health Care

48.     The NCSHP offers three health care plans to eligible state employees: the (1)

14

80/20 PPO Plan, the (2) 70/30 PPO Plan, and the (3) High Deductible Health Plan (collectively referred to as the "Health Plans"). Across all three plans, Blue Cross and Blue Shield of North Carolina ("BCBSNC") serves as the claims administrator, and CVS Caremark ("CVS") administers pharmacy benefits.

49. Covered services under the NCSHP include medically necessary pharmacy benefits, mental health benefits, and medical care such as surgical benefits at inpatient and outpatient facilities.

50. The NCSHP Health Plans are distinguished primarily by coverage ratios, deductible amounts, and general costs to the insured employee and their dependent-enrollees. The Health Plans do however have at least one feature in common. At all relevant times, the Health Plans have contained a categorical exclusion of coverage for transition-related health care, with the exception of the 2017 plan year.

51. Because the only people who require treatments related to gender-confirming health care are transgender people, denying coverage for such health care necessarily discriminates against transgender people. As a result of the exclusion in the Health Plans, non-transgender enrollees receive coverage for medically necessary mental health, prescription drug, and surgical needs that, because of their sex, transgender enrollees do not.

52. The medical consensus recognizes that discriminatory exclusions of gender-confirming health care in health insurance plans have no basis in medical science.

15

Preeminent medical and behavioral health organizations, such as the AMA and the APA, have called for an end to these exclusions.

53. In keeping with such medical consensus, BCBSNC has maintained a Corporate Medical Policy on Gender Confirmation Surgery and Hormone Therapy that acknowledges the general medical necessity of this care since 2011, and CVS similarly maintains coverage criteria policies for hormone replacement therapy as it pertains to the treatment of gender dysphoria.

54. Absent a categorical plan exclusion, claims for gender-confirming care would be evaluated under the BCBSNC and CVS criteria for individual medical necessity and covered under the plan in the same manner any other claims for medical, mental health, or pharmacy benefits.

55. In 2016–2017, the North Carolina State Treasurer's Office ("Treasurer's Office") and the NCSHP Board of Trustees seemingly came to the same conclusion as many other states. Documents obtained through public records requests show that the NCSHP's staff was aware at least as early as summer 2016 that the plan would need to be amended to comply with the ACA.

56. In late 2016, the then-North Carolina State Treasurer and a majority of the NCSHP Board of Trustees voted to remove the exclusion of gender-confirming health care for the 2017 Health Plans. A "Board of Trustees December 2016 Meeting Preview" prepared by the NCSHP staff advised that under the ACA, the NCSHP "[c]annot categorically exclude all health services related to gender identity," and "[c]annot

16

categorically exclude all health services related to gender transition." That document warned that individuals aggrieved by violations of the ACA "have a private right of action to sue" for such violations.

57.     Minutes from the Board of Trustees' proceedings to eliminate the exclusion indicate that it was advised by legal counsel that "[i]f the Plan continues to receive federal funding without including coverage for the treatment of gender dysphoria, the Plan will be considered non-compliant [with the ACA] as of January 1, 2017. This could result in the suspension or termination of the [federal Retiree Drug Subsidy] funding and/or the possibility of civil action by someone challenging the violation."

58.     In an email about the vote to remove the exclusion, then-Press Secretary for the Treasurer's Office Brad Young explained, "If the [Health] Plan[s] did not take action to comply with federal law and federal regulation, the [Health] Plan[s] would have risked losing millions of dollars in federal funding and faced discrimination lawsuits for non-compliance." The resolution that removed the exclusion was only applicable to the 2017 Health Plans.

59.     Prior to the removal of the categorical exclusion, the Treasurer's Office engaged a consulting firm to analyze the applicability of Section 1557 of the ACA to the NCSHP, and to estimate the fiscal impact of removing the gender-confirming health care exclusion. The consulting firm's November 2016 analysis concluded that the NCSHP is likely a covered entity within the meaning of the ACA and thus needed to comply with the statute's non-discrimination provisions.

17

60. Ultimately the report concluded that, "[b]ased on approximately $3.2 billion of premiums, the cost for the NCSHP is estimated to be between .011% and .027% of premium." Accordingly, the cost of removing the exclusion of gender-confirming health care in the NCSHP would be minimal.

61. Defendant Dale Folwell, Treasurer-elect at the time and now Treasurer of North Carolina, and Defendant Dee Jones, nevertheless failed to take any action to block the reinstatement of the exclusion of gender-confirming health care in the 2018 Health Plans, and negotiated contracts to ensure the NCSHP would be administered to exclude coverage of such medical care. Defendants Folwell and Jones took the same steps for the 2019 and 2020 Health Plans, which continue to exclude coverage for gender-confirming health care. At a NCSHP Board of Trustees meeting, affected state employees and their dependents testified about the devastating impact the loss of gender-confirming health care benefits has had on them and their families.

62. In a public statement, Treasurer Folwell stated, "Until the court system, a legislative body or voters tell us that we 'have to,' 'when to,' and 'how to' spend taxpayers' money on sex change operations, I will not make a decision" to treat gender-confirming health care equally in the NCSHP.

63. Accordingly, the 2018, 2019, and 2020 Health Plans categorically exclude coverage for all gender-confirming health care for the purpose of treating gender dysphoria. Specifically, the 2018, 2019, and 2020 Health Plans exclude "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation" and

18

"[t]reatment or studies leading to or in connection with sex changes or modifications and related care" (hereinafter, the "Exclusion").

64.     Upon information and belief, each year after the NCSHP reinstated the Exclusion, it has been required to execute an agreement indemnifying BCBSNC for any liability BCBSNC incurs in connection with the Exclusion.

65.     As a result of this sweeping Exclusion of medically necessary health care coverage, the Health Plans single out employees who are transgender, or who have transgender dependents, for unequal treatment by excluding coverage of medically necessary care for the treatment of gender dysphoria.

### C.     The State's Denial of Medically Necessary Care to Plaintiffs

#### 1.     Plaintiff Maxwell Kadel

66.     Plaintiff Maxwell Kadel ("Max") is a transgender man.  Max was designated female at birth but has a male gender identity.  Max lives all aspects of his life in accordance with his male gender identity.  Originally born in Nebraska, Max grew up in New Jersey and attended college in Indiana.  Max moved to North Carolina almost eight years ago.

67.     Max is a former employee of the UNC School of Government.  Max began working at UNC in August of 2014 through a temporary job placement agency.  Max obtained a permanent position with the UNC School of Government in October 2016, where he worked as an Administrative Support Associate until he accepted another job opportunity outside of state government in November 2019.

68.     As a North Carolina state employee, Max was enrolled in the NCSHP, and received health care benefits from this plan as part of his compensation.  He contributed each month to the plan via a paycheck deduction.

69.     Max was a model employee, even winning a 2018 "Star Heel Award" for his job performance.  This annual award program allows departments across UNC to recognize and reward employee excellence.

70.     While Max did his best to excel in his position at UNC, Max lives with significant distress caused by gender dysphoria.  Max has struggled with gender dysphoria since childhood and was formally diagnosed with gender dysphoria at the age of 33.  As part of his prescribed treatment, Max began hormone therapy in June 2016.

71.     Max has also obtained a legal name change and has corrected his name and gender marker on his North Carolina state driver's license, Social Security Card, and U.S. Passport.

72.     In 2017, Max considered pursuing chest surgery to create a more typically masculine chest, but he decided to wait and see whether hormone therapy would be sufficient to relieve his gender dysphoria.

73.     In 2018, Max, in consultation with his health care providers, determined that chest surgery was necessary to alleviate his gender dysphoria, and he was ready to move forward with further consultations leading to surgery.  Max then discovered that the NCSHP had reinstated its categorical Exclusion of gender-confirming health care, effective January 1, 2018, in all of its Health Plans.

74. After the Exclusion was reinstated in 2018, Max was deprived of insurance coverage for medically necessary hormone therapy and gender-confirming surgical care. Max paid out-of-pocket for hormone therapy. During that time, to lessen the financial burden of paying out-of-pocket for testosterone every month, Max often rationed and used vials of testosterone past the expiration date.

75. Max also had to forgo chest surgery, which caused him to experience significant gender dysphoria-related distress on a daily basis. Max wears a binder to compress his chest, but it causes him physical discomfort and breathing difficulties. Max also has asthma, which is exacerbated by having to bind his chest because he could not obtain a permanent medically necessary solution through surgery.

### 2. Plaintiffs Jason Fleck and Connor Thonen-Fleck

76. Jason Fleck has been employed by UNCG since 1997 and currently works as a Business Application Analyst. Connor Thonen-Fleck ("Connor"), his son, is a transgender young man. Connor was designated female at birth but has a male gender identity.

77. Connor has long excelled academically and is a college freshman. In addition to his rigorous academic responsibilities, Connor also works at a veterinary clinic. Connor is passionate about veterinary medicine and plans to pursue studies and a career in the veterinary field.

78. Connor struggled with gender dysphoria since childhood. His parents realized that Connor demonstrated stereotypically masculine tendencies and characteristics

21

from a young age. But until Connor began to transition, he was in serious and increasing distress. Ultimately, Connor came out as transgender to his parents and explained his need to transition.

79.    Connor and his family developed a plan to secure treatment for his gender dysphoria. Connor initially began seeing a psychiatrist and therapist. By the time he was 15 years old, he had socially transitioned and was living in his authentic male gender identity in all aspects of his life.

80.    In January of 2018, Connor began hormone therapy as part of treatment for his gender dysphoria. In March of 2018, Connor obtained a legal name and gender marker change and subsequently obtained a corrected birth certificate and driver's license.

81.    Counseling, hormone therapy, and social transition significantly improved Connor's quality of life by reducing his gender dysphoria. However, Connor still experienced significant gender dysphoria on a daily basis because he is a male and had a typically female chest.

82.    As part of treatment for his gender dysphoria, Connor's health care providers recommended chest surgery that would give Connor a more typical male chest. This surgery was medically necessary, including to bring Connor's body into better alignment with his gender identity and lived experience and further reduce his gender dysphoria.

83.    As a North Carolina state employee, Plaintiff Jason Fleck is enrolled in the NCSHP and receives health care benefits from this plan as part of his compensation. As a

dependent of Mr. Fleck, Connor is also enrolled in the NCSHP. Mr. Fleck contributes each month to the plan via a paycheck deduction.

84.     In 2017, Connor was enrolled in the 80/20 Health Plan. His visits with his psychiatrist and therapist were covered then because the categorical Exclusion of gender-confirming health care had been removed from the plan. During the fall of 2017, Connor's father re-enrolled himself and Connor in the 80/20 plan for the 2018 plan year.

85.     Mr. Fleck and Connor struggled after that point to obtain coverage of Connor's required office visits to his endocrinologist, who prescribes and monitors Connor's masculinizing hormone therapy. Because Connor has received that care in connection with his gender dysphoria, insurance coverage for those visits has been inconsistent, and in some instances denied. Where coverage has been denied, Mr. Fleck and Connor have been left with full financial responsibility for the cost of the care.

86.     On April 9, 2018, CVS issued a Notice of Determination ("ND") denying prior authorization for coverage of Connor's testosterone prescription. The ND explained that the diagnosis code submitted, F64.0 "Transsexualism," was not a covered diagnosis code for prescription testosterone under the NCSHP covering Connor. The ND explained that the prescription would be covered for males with "primary or hypogonadotropic hypogonadism," but not for Connor.

87.     Like any person with a medical condition, Connor and his family have done their best to access medically necessary health care. Paying out-of-pocket for health care that has been denied under the plan has been an emotional and financial burden on Connor

and his parents. This became even more acute after the family had to pay out-of-pocket for chest reconstructive surgery for Connor, since living indefinitely without it had become unbearable for him.

88. Before obtaining that surgery, Connor lived with daily distress caused by having a typically female chest, and urgently required gender-confirming surgery to treat his gender dysphoria. Connor and his parents could not easily afford to pay for the surgery out of pocket, as it imposed a financial hardship on his family. Indeed, notwithstanding his full academic workload, Connor worked during high school in an effort to earn and save money so that he could contribute to the out-of-pocket costs for his surgery.

89. Connor's parents witnessed his daily distress due to his inability to access health insurance coverage for medically necessary care and were worried about the effects his untreated gender dysphoria had on his mental and physical health, his education, and his future plans. They finally saved enough for Connor to undergo surgery on May 28, 2018. Although shouldering that expense was stressful for Connor and his family, the relief the surgery provided Connor from his gender dysphoria was critical for his ongoing development and functioning as a young adult.

### 3. Plaintiff Julia McKeown

90. Plaintiff Julia McKeown ("Julia") is a transgender woman. Julia was designated male at birth, but her gender identity is female. Julia lives in accordance with her female gender identity in all aspects of her life.

24

91.     Originally from Florida, Julia has struggled with gender dysphoria since childhood. Julia had to suppress her gender identity for much of her early life into adulthood.  During her time in Florida, Julia completed her higher education, including a bachelor's degree, two master's degrees, and a doctoral degree.  During this time, Julia was also battling severe, untreated gender dysphoria.

92.     After completing her doctorate, Julia reached the point in 2010 where she could no longer suppress who she really was.  Julia made the life-saving decision to live authentically, in accordance with her gender identity.  In 2013, Julia began the medical part of her transition and started hormone therapy.   Between 2010 and 2016, Julia was progressing in her career, life, and transition.

93.     In 2016, Julia accepted a position with NCSU and moved to North Carolina from Florida.  Since 2016, Julia has been employed by NCSU as a Teaching Assistant Professor in the Teaching Education and Learning Design Department of the NCSU College of Education.  She currently teaches in the Learning, Design, and Technology Program.  Julia also serves as the Graduate Coordinator for the Learning, Design, and Technology Program.

94.     As a North Carolina state employee, Julia is enrolled in the NCSHP, and receives health care benefits from this plan as part of her compensation.  She contributes each month to the plan via a paycheck deduction.

95.     While hormone therapy and social transition have been important aspects of Julia's transition, Julia was still dealing with significant distress related to gender

25

dysphoria.  By 2017-2018, Julia's medical provider referred her for vaginoplasty, as part of treatment for her gender dysphoria.  After consulting with a surgeon, Julia and her surgeon requested preauthorization for vaginoplasty in or around July 2018.  Towards the end of July, the preauthorization was denied because of the reinstatement of the Exclusion of gender-confirming health care in the NCSHP.

96.  Julia appealed that decision to BCBSNC, but was informed that they only administer the plan and could not resolve the issue.  Julia also filed a grievance with the NCSHP Section 1557 Coordinator after the denial of preauthorization.  The grievance was denied in or around August 2018.

97.  At that point in her life, Julia could no longer wait for surgery.  Left with no other options, Julia made the difficult decision to withdraw funds from her retirement and savings accounts, in order to pay for her medically necessary surgery.  Julia's surgical costs totaled over $14,000.00.

98.  Julia is also prescribed hormone therapy as part of treatment for her gender dysphoria, which is also excluded under the NCSHP.  The Exclusion also prohibits Julia from seeking future medically necessary gender-confirming health care.

### 4.  Plaintiffs Michael D. Bunting, Jr. and C.B.

99.  Michael D. Bunting, Jr. was employed by UNC beginning in 1990 until his retirement nearly 30 years later.  C.B., his son, is a transgender boy.  C.B. was designated female at birth but has a male gender identity.  C.B.'s mother, Shelley K. Bunting, is a

nurse practitioner in private practice. Mr. Bunting and Ms. Bunting bring this suit on their son's behalf.

100. C.B. is a high school student. He likes swimming, skateboarding, and playing video games. His favorite subjects in school are math and science.

101. Ever since he was a young child, C.B. would reject stereotypically female clothing and would dress in a more masculine manner. Beginning at a young age, C.B. would refuse to wear stereotypically female swimming suits, opting instead for board shorts and a shirt. In late 2016, he began wearing a short, typically masculine haircut.

102. Though C.B. always got along with people and has many friends, he exhibited high levels of anxiety, which his parents later came to understand was associated with his untreated gender dysphoria.

103. In early 2017, C.B. informed his parents that he was transgender. Soon after, C.B. and his parents met with a therapist in April 2017. After consultation with his family and therapist, C.B. asked to be placed on treatment to delay female puberty.

104. In April of 2017, C.B. and his parents sought an appointment with the Duke Child and Adolescent Gender Care Clinic ("Duke"), ultimately scheduled for August 2017.

105. During the summer of 2017, C.B. socially transitioned to living as his true self, informing friends and family of his male gender identity, wearing more masculine clothes, and living openly as the boy he is. However, as his breasts began to develop during the summer, C.B. began to experience additional anxiety.

27

106. As a result of the distress associated with his birth-designated sex (female), C.B. was diagnosed with gender dysphoria. In August 2017, C.B. began obtaining care from medical and mental health professionals and was prescribed puberty-delaying treatment, in the form of an implant, as part of his treatment for gender dysphoria.

107. Following the beginning of C.B.'s treatment, C.B.'s parents noticed that the anxiety he had been experiencing diminished and that he was now a happy, outgoing, and personable teenage boy.

108. C.B. is treated and known as a boy at school and in all other aspects of his life. He legally changed his name to a more typically male name in the Spring of 2018.

109. Plaintiff Michael D. Bunting, Jr. enrolled in the NCSHP as a North Carolina state employee, and he remains enrolled and continues to receive health care benefits as a retiree. As a dependent of Mr. Bunting, C.B. is also enrolled in the NCSHP. Mr. Bunting contributes a premium each month to the plan.

110. Because in 2017 the NCSHP did not contain an Exclusion for gender-confirming health care, C.B.'s puberty-delaying treatment was covered by the NCSHP.

111. C.B.'s puberty-delaying implant only lasted 12 to 18 months. Accordingly, C.B. needed the implant to be removed and replaced in early 2019.

112. However, in mid-2018, Ms. Bunting learned of the reinstitution of the Exclusion of gender-confirming care within the NCSHP.

113. Worried that they could not afford out-of-pocket the puberty-delaying treatment that C.B. needed, Mr. Bunting and Ms. Bunting communicated with the NCSHP

28

Board of Trustees, urging them to once again eliminate the Exclusion of gender-confirming health care within the NCSHP, with no success.

114.    In mid-December 2018, following the lack of action by the NCSHP Board of Trustees at their December 2018 meeting to eliminate the Exclusion, Mr. Bunting and Ms. Bunting decided to purchase an additional health insurance plan that would cover puberty-delaying treatment for C.B.  Through the federally-run ACA health care exchange they purchased an insurance plan from BCBSNC.  Though Mr. Bunting and C.B. remained enrolled in the NCSHP and will continue to do so, purchasing additional coverage for C.B. was necessary in order for the Bunting family to be able to afford C.B.'s gender-confirming care.  As a result, Mr. Bunting and Ms. Bunting had to pay an additional monthly premium and a $6,750.00 deductible for C.B., separate and apart from C.B.'s existing coverage under the NCSHP.

115.    In early 2019, C.B. began obtaining puberty-delaying treatment via injection, rather than a longer-lasting implant, because that was the only puberty-delaying treatment on the formulary of the additional health insurance purchased to supplement the coverage under the NCSHP.

116.    The additional costs associated with C.B.'s gender-confirming care and the lack of coverage under the NCSHP due to the discriminatory Exclusion contributed to Mr. Bunting's decision in early January 2019 to retire from UNC.  By the date of his retirement, Mr. Bunting had dedicated nearly 30 years of service to UNC and the North Carolina Tar Heels.

117.   Mr. Bunting and C.B. remain enrolled in the NCSHP as a retiree and dependent, respectively, following Mr. Bunting's retirement on April 1, 2019.  C.B. now receives masculinizing hormone therapy as part of his gender-confirming care.  While the family no longer purchases separate ACA coverage, C.B.'s hormone therapy is not covered by NCSHP and they must pay for that care out-of-pocket.

118.   The Exclusion stigmatizes C.B. as a transgender person and has caused pain, anger, and distress to C.B., Mr. Bunting, and the rest of the Bunting family.

### 5.   Plaintiff Sam Silvaine

119.   Plaintiff Sam Silvaine ("Sam") is transgender.  Sam was designated female at birth but has a male affirmed sex.  Sam lives all aspect of his life in accordance with his gender identity.

120.   Sam moved to North Carolina in 2012 to pursue a master's degree.  After obtaining his master's degree, Sam accepted a two-year fellowship with NCSU as a post-master's counseling fellow and was an employee of NCSU.

121.   As a North Carolina state employee, Sam was enrolled in the NCSHP, and received health care benefits from this plan as part of his compensation.  Sam was enrolled in the 80/20 NCSHP for plan years 2016, 2017, and 2018.

122.   In January 2017, Sam began therapy as treatment for his gender dysphoria.  Sam began hormone therapy in April 2017.  Hormone therapy masculinized Sam's voice, some of his secondary sex characteristics, and physical appearance.  As his body became more masculine and in greater alignment with his gender identity, his typically female chest

30

began to be even more noticeable to Sam. The marked incongruence increased Sam's gender dysphoria.

123. Sam used a binder daily to compress his chest. While binding lessened his gender dysphoria to an extent, it was not a permanent solution and caused Sam physical discomfort and restricted his physical activities. Sam's ability to do the things he loved, like hiking, backpacking, and climbing, were limited because of the need to wear the binder. The appearance of Sam's chest also presented a safety issue for Sam. Sam lives and is generally recognized as male in all aspects of his life. Being visibly male with a typically female chest invited undesired, invasive, and dangerous attention.

124. Eventually Sam, in consultation with and support from his health care providers, made the decision to seek chest surgery as part of treatment for his gender dysphoria.

125. In 2017, Sam's NCSHP plan did not contain a categorical Exclusion for gender-confirming health care. Sam's counseling and hormone therapy were covered. In August 2017, Sam and his surgeon sought prior authorization for reconstructive chest surgery. The prior authorization process took until October 2017 and at that time, the earliest available surgery date that Sam could obtain was in March 2018. Sam accepted the March 2018 date in order to avoid an even greater delay in the treatment he required.

126. After the categorical Exclusion of gender-confirming care was reinstated on January 1, 2018, the prior authorization for Sam's surgery was rendered invalid.

127.  When Sam found out that his health insurance was no longer going to cover the surgery he desperately needed, he was devastated mentally and emotionally. Like other transgender North Carolina state employees who suddenly found themselves without health insurance coverage for their medically necessary health care, Sam was placed in a difficult position.

128.  Sam was living with severe gender dysphoria and ultimately, he could not delay the surgery. Sam paid for the surgery out of pocket and underwent chest surgery on March 1, 2018.

129.  The surgery proved life-changing for Sam and has significantly reduced the distress caused by his gender dysphoria. Sam has not been reimbursed by Defendants for his surgery costs or other out-of-pocket costs he incurred due to the Exclusion of gender-confirming health care in the 2018 plan.

### 6.  Plaintiff Dana Caraway

130.  Plaintiff Dana Caraway ("Dana") is a transgender woman. Dana was designated male at birth, but her gender identity is female. Dana lives in accordance with her female gender identity in all aspects of her life.

131.  Dana is in the process of seeking a court-ordered change of name to ensure that her government identity documents and records accurately reflect the name she assumed  as part of her social transition, but that process has been delayed due to the COVID-19 pandemic.[1]

---

[1] Ms. Caraway's employee records thus still reflect her former name of Dowd Caraway.

32

132.    Dana is employed by the State of North Carolina, Department of Public Safety, where she has worked as an officer since 1994.  When she began her employment, the agency was called the Department of Correction; it was merged with several other agencies to make up the current Department of Public Safety in 2012.  She has been very successful in her position.  She was promoted to the position of supervisor in the Division of Adult Correction and Juvenile Justice, and currently holds the rank of Sergeant.

133.    As a North Carolina state employee, Dana is enrolled in the NCSHP, and receives health care benefits from this plan as part of her compensation.  She contributes each month to the plan via a paycheck deduction.

134.    Dana was diagnosed with gender dysphoria in 2017, and began a process of social, legal, and medical transition.  As part of her treatment, she has received hormone replacement therapy for several years, which feminized her appearance, up to a point.

135.    As Dana's appearance has changed, it has caused her more distress to continue to have a typically male chest, genitalia, and voice.  It also creates a safety issue to appear female but to have a typically male-sounding voice, especially given the prison environment in which Dana works.

136.    To treat her gender dysphoria, Dana urgently requires gender reassignment surgery for her chest, genitalia, face, and voice.  Dana is currently scheduled to have gender-confirming chest and genital surgery this year, as well as voice feminization surgery.  She expects to have facial gender transition surgery next year.  Because of the

33

Exclusion, Dana will have no choice but to pay out-of-pocket for these surgeries, which will impose financial hardship on her.

137. Dana's surgeon sought preauthorization for Dana's upcoming chest and genital surgeries. On June 19, 2020, BCBSNC denied coverage, for the stated reason that "the requested service is not a covered benefit" because of the Exclusion for "treatments … in connection with sex changes or modifications."

138. Because of the Exclusion of gender-confirming health care from the Health Plans, all Plaintiffs have suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation of their dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection
### U.S. Const. Amend. XIV

**(All Plaintiffs Against Defendants Dale Folwell and Dee Jones)**

139. Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein.

140. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

141. Plaintiffs state this cause of action against Defendants Dale Folwell and Dee Jones, in their official capacities, for purposes of seeking declaratory and injunctive relief,

34

and challenge their adoption and enforcement of the discriminatory sex-based classifications in the NCSHP Health Plans both facially and as applied to Plaintiffs.

142. Each Defendant is a person acting under color of state law for purposes of 42 U.S.C. § 1983 and has acted intentionally in denying Plaintiffs equal protection of the law.

## A. Discrimination on the Basis of Sex

143. Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

144. Discrimination on the basis of sex characteristics, gender, gender identity, nonconformity with sex stereotypes, transgender status, and gender transition is discrimination on the basis of sex.

145. By categorically excluding, "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and "[t]reatments or studies to or in connection with sex changes and modifications and related care," Defendants are engaging in constitutionally impermissible sex-based discrimination.

146. Through their duties and actions to design, negotiate, administer, and implement the NCSHP's categorical Exclusion, Defendants Folwell and Jones have unlawfully discriminated—and continue to unlawfully discriminate—against Plaintiffs based on sex-related considerations.

147. The NCSHP's categorical Exclusion treats Plaintiffs differently from other persons who are similarly situated.

35

148.   Under the NCSHP's categorical Exclusion, health plan participants who require gender-confirming care, or whose dependents require gender-confirming care, are denied coverage for that medically necessary care, while other health plan participants can access the same care as long as it is not required for gender transition.

**B.      Discrimination on the Basis of Transgender Status**

149.   By categorically excluding coverage for gender-confirming health care in the NCSHP Health Plans, Defendants are engaging in constitutionally impermissible discrimination on the basis of transgender status.

150.   Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened, scrutiny.

a.      Transgender people have suffered a long history of discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

b.      Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit state and federal protections to protect them against discrimination.

c.      A person's transgender status bears no relation to a person's ability to contribute to society.

36

d.     Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

e.     Gender identity generally is fixed at an early age and highly resistant to change through intervention.

151.   Because the NCSHP's categorical Exclusion on its face and as applied to Plaintiffs deprives transgender enrollees of their right to equal dignity, liberty, and autonomy by stigmatizing them and branding them as second-class citizens, it denies transgender persons equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.  The NCSHP's categorical Exclusion similarly serves to stigmatize NCSHP enrollees whose dependents are transgender; it brands them as second-class citizens and deprives them of their equal treatment and dignity.

152.   Defendants' discriminatory Exclusion of gender-confirming care is not narrowly tailored or substantially related to any compelling or important government interest.  Indeed, it is not even rationally related to any legitimate government interest.

153.   Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**COUNT II**
**Violation of Title IX of the Education Amendments of 1972**
**20 U.S.C. § 1681, *et seq*.**

**(Plaintiffs Maxwell Kadel, Michael D. Bunting, Jr., and C.B. against Defendant University of North Carolina at Chapel Hill; Plaintiffs Julia McKeown and Sam**

37

**Silvaine against Defendant North Carolina State University; Plaintiffs Jason Fleck and Connor Thonen-Fleck against Defendant University of North Carolina at Greensboro)**

154.   Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein.

155.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

156.   Under Title IX, discrimination on the basis of sex includes, but is not limited to, discrimination based on sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition.

157.   Defendants UNC, NCSU, and UNCG are recipients of federal financial assistance from the Department of Health and Human Services, the Department of Agriculture, and the Department of Education, and are therefore subject to Title IX.

158.   By offering Health Plans to their employees with categorical exclusions for gender-confirming care, Defendants UNC, NCSU, and UNCG have and continue to discriminate on the basis of sex against NCSHP enrollees who require gender-confirming care, or whose dependents require gender-confirming care.

159.   In offering Health Plans that categorically exclude coverage of gender-confirming health care on the basis of sex, Defendants UNC, NCSU, and UNCG deny enrollees who require gender-confirming care, or whose dependents require gender-

38

confirming care, the benefits of and subject them to discrimination in educational programs and activities. This impermissible discrimination based on sex, including sex characteristics, nonconformity with sex stereotypes, transgender status, and gender transition, violates Title IX.

160. By knowingly and intentionally offering health insurance that denies coverage to Plaintiffs on the basis of sex, Defendants UNC, NCSU, and UNCG harm Plaintiffs by: stigmatizing them; treating them as a secondary class compared to other non-transgender enrollees who have access to the same care for themselves or their non-transgender dependents; and causing the transgender health plan participants mental and physical health complications due to their inability to access medically necessary health care.

161. By knowingly and intentionally offering a compensation package that denies fringe benefits to Plaintiffs on the basis of sex, Defendants UNC, NCSU, and UNCG have intentionally violated Title IX, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

162. Defendants UNC, NCSU, and UNCG fund the health plans offered through the NCSHP by making direct financial contributions for covered employees.

163. As "employing units," Defendants UNC, NCSU, and UNCG play an active role in collecting payments owed to the NCSHP, N.C. Gen. Stat. § 135-48.37A(b), and in settling claims regarding health benefits, *id.* § 135-48.46.

39

164. Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

## COUNT III
## Violation of the Patient Protection and Affordable Care Act
## 42 U.S.C. § 18116

**(All Plaintiffs Against Defendant North Carolina State Health Plan for Teachers and State Employees)**

165. Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein.

166. Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part that, "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681, et seq.)"—which prohibits discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

167. Discrimination on the basis of sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

168. Upon information and belief, Defendant NCSHP receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA. Indeed, Defendant NCSHP has acknowledged in its publicly available Policies and Procedures, effective July 15, 2016, that it "receives funding from the [federal] Department

40

of Health and Human Services" and "is subject to Section 1557 of the Affordable Care Act (42 U.S.C. [§] 18116) and its implementing regulations at 45 CFR Part 92."

169.    A covered entity, such as Defendant NCSHP, cannot provide or administer health care insurance coverage which contains a categorical Exclusion from coverage for gender-confirming health care, or otherwise impose limitations or restrictions on coverage for specific health services related to gender transition if such limitation or restriction results in discrimination against a transgender individual.

170.    Because Defendant NCSHP receives federal funding that flows to health programs or activities, Plaintiffs have a right under Section 1557 to receive health insurance through the NCSHP free from discrimination on the basis of sex, sex characteristics, gender, nonconformity with sex stereotypes, transgender status, or gender transition.

171.    Defendant NCSHP has discriminated against Plaintiffs on the basis of sex in violation of Section 1557 and has thereby denied Plaintiffs the full and equal participation in, benefits of, and right to be free from discrimination in a health program or activity.

172.    By categorically excluding all coverage for medically necessary "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and "[t]reatments or studies to or in connection with sex changes or modifications and related care," Defendant NCSHP has drawn a classification that has unlawfully discriminated—and continues to discriminate—against Plaintiffs based on sex, in violation of Section 1557.

41

173.     As a result of the Exclusion, Plaintiffs have suffered harm, including but not limited to financial harm.  By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates on the basis of sex, Defendant NCSHP has intentionally violated the ACA, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

174.     Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs will continue to suffer irreparable harm in the future.

**COUNT IV**
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e,** *et seq.*

**(Plaintiff Maxwell Kadel against Defendant University of North Carolina at Chapel Hill; Plaintiffs Julia McKeown and Sam Silvaine against Defendant North Carolina State University; Plaintiff Dana Caraway against Defendant State of North Carolina, Department of Public Safety; Plaintiff Dana Caraway against Defendant North Carolina State Health Plan for Teachers and State Employees)**

175.     Plaintiffs re-allege and incorporate by reference each allegation of the prior paragraphs as though fully set forth herein

176.     Title VII provides that it is "an unlawful employment practice for an employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex" or to "limit, segregate, or classify [its] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise

42

adversely affect his status as an employee, because of such individual's … sex." 42 U.S.C. § 2000e-2(a).

177. Plaintiffs Kadel, McKeown, Silvaine, and Caraway are, or were, each an "employee" within the meaning of Title VII. Plaintiffs Kadel, McKeown, Silvaine, and Caraway timely bring this claim after exhausting administrative remedies with the U.S. Equal Employment Opportunity Commission and receiving notices of their right to sue.

178. Defendants University of North Carolina at Chapel Hill; North Carolina State University; and State of North Carolina, Department of Public Safety are each an "employer" within the meaning of Title VII.

179. Government entities that participate in the NCSHP, including the Department of Public Safety, have delegated significant control over employee health benefits to the NCSHP.

180. In establishing the scope of insurance coverage and administering that coverage, the NCSHP is an agent of all employers under Title VII who participate in NCSHP, including but not limited to the Department of Public Safety.

181. Additionally, the NCSHP is a joint employer with participating government employers under Title VII, including but not limited to the Department of Public Safety. Those government employers contract with NCSHP for the provision of health coverage to their employees. By determining whether to exclude gender-confirming health care, the NCSHP shares responsibility for essential terms and conditions of employment for those employees, and exercises significant control over those employees by determining

43

components of their "compensation, terms, conditions, or privileges of employment" under Title VII.

182.   An employer-sponsored health plan is part of the "compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a)(1).

183.   The denial of medically necessary health care coverage also "adversely affects [one's] status as an employee." 42 U.S.C. § 2000e-2(a)(2).

184.   Under Title VII, discrimination "because of … sex" includes discrimination on the basis of transgender status, gender nonconformity, gender identity, and gender transition.

185.   Plaintiffs have a right under Title VII to compensation, terms, conditions, or privileges of employment, including an employer-sponsored health plan, free from discrimination because of their sex, transgender status, gender nonconformity, gender identity, or gender transition.

186.   By offering coverage that excludes "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation" and "[t]reatment or studies leading to or in connection with sex changes or modifications and related care," Defendants subject Plaintiffs to discrimination because of their sex in the compensation, terms, conditions, and privileges of their employment.

187.   As a result of the Exclusion, Plaintiffs have suffered harm, including but not limited to financial and emotional harm.  By knowingly and intentionally offering health care coverage to Plaintiffs that discriminates because of their sex, Defendants have

44

intentionally violated Title VII, for which Plaintiffs are entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

188. Without injunctive relief from Defendants' discriminatory Exclusion of coverage for gender-confirming care, Plaintiffs who continue to receive health coverage through NCSHP will continue to suffer irreparable harm in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants on all claims, as follows:

A. Enter a declaratory judgement that Defendants, including through enforcement of the North Carolina State Health Plan for Teachers and State Employees' categorical Exclusion of treatment for gender-confirming care, violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, Title IX, the ACA, and Title VII; and that the North Carolina State Health Plan for Teachers and State Employees' categorical Exclusion of gender-confirming health care discriminates on its face and as applied against transgender state employees and enrollees because of sex and transgender status in violation of the Equal Protection Clause of the Fourteenth Amendment, and on the basis of sex in violation of Title IX, the ACA, and Title VII;

B. Preliminarily and permanently enjoin Defendants, their agents, employees, successors, and all others acting in concert with them, from administering or offering health coverage that categorically excludes coverage for gender-confirming health care;

45

C.     Award compensatory and consequential damages in an amount that would fully compensate Plaintiffs for their financial harm, emotional distress and suffering, embarrassment, humiliation, pain and anguish, violations of their dignity, and other damages that have been caused by Defendant's conduct in violation of Title IX, the ACA, and Title VII;

D.     Award pre- and post-judgement interest;

E.     Award of Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in this action pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), and any other applicable laws;

F.     Other legal and equitable or injunctive relief as this Court deems just and appropriate; and

G.     The declaratory relief requested in this action is also sought against Defendants' officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them.

* * *

46

Dated: August 3, 2020

Respectfully submitted,

/s/ Amy E. Richardson

Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
HARRIS, WILTSHIRE & GRANNIS LLP
919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Telephone: 202-730-1300
Facsimile: 202-730-1301
dravi@hwglaw.com

David Brown*
Alejandra Caraballo*
Noah E. Lewis*
TRANSGENDER LEGAL DEFENSE
  AND EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

Tara Borelli*
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
Telephone: 404-897-1880
Facsimile: 404-897-1884
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs*

* Appearing by special appearance pursuant to L.R. 83.1(d).

Case 1:19-cv-00272-LCB-LPA   Document 62-1   Filed 08/03/20   Page 47 of 48

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically with the Clerk of Court

using the CM/ECF system which will send notification of such filing to all registered users.

Dated: August 3, 2020

/s/ Amy E. Richardson

Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

*Counsel for Plaintiffs*