IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,          )
                                )
          Plaintiffs,           )
                                )
     v.                         )          1:19cv272
                                )
DALE FOLWELL, et al.,           )
                                )
          Defendants.           )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Plaintiff's Motion for Leave to File First Amended Complaint" (Docket Entry 62) (the "Motion to Amend").  For the reasons that follow, the Court will grant the Motion to Amend.[1]

## BACKGROUND

Asserting several violations of their federal constitutional and statutory rights, Maxwell Kadel, Jason Fleck, Connor Thonen-

---

1 For reasons stated in Deberry v. Davis, No. 1:08cv582, 2010 WL 1610430, at *7 n.8 (M.D.N.C. Apr. 19, 2010), the undersigned Magistrate Judge will enter an order, rather than a recommendation, as to the Motion to Amend. See also Everett v. Prison Health Servs., 412 F. App'x 604, 605 & n.2 (4th Cir. 2011) (explaining that, where the plaintiff "moved for leave to amend her complaint[] . . . to add a state-law claim of medical malpractice," "the magistrate judge denied [that] motion," and the plaintiff "timely objected, thereby preserving the issue for review by the district court," the district court "could not modify or set aside any portion of the magistrate judge's order unless the magistrate judge's decision was 'clearly erroneous or contrary to law'" (citing 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a))).

Fleck,[2] Julia McKeown, Michael D. Bunting, Jr., C.B.,[3] and Sam Silvaine (collectively, "Plaintiffs") initiated this action against Dale Folwell, in his official capacity as State Treasurer of North Carolina; Dee Jones, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; University of North Carolina at Chapel Hill ("Defendant UNC"); North Carolina State University ("Defendant NCSU"); University of North Carolina at Greensboro ("Defendant UNCG"); and North Carolina State Health Plan for Teachers and State Employees ("Defendant NCSHP") (collectively, "Defendants"). (Docket Entry 1 (the "Original Complaint"), ¶¶ 1-18.) In particular, the Original Complaint alleges:

Plaintiffs are all transgender individuals, or the parent(s) of a transgender child. (Id., ¶¶ 7-11.) Plaintiffs (to exclude Plaintiff Fleck and Plaintiff Bunting)[4] have experienced gender dysphoria, "the clinically significant distress that can result

---

2 By virtue of his minority, Plaintiff Thonen-Fleck "sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his next friends and parents[.]" (Docket Entry 1, ¶ 8.) The Court discloses his full name because he "waive[d] the privacy protections afforded by Fed. R. Civ. P. 5.2(a)." (Id., ¶ 8 n.1.)

3 Like Plaintiff Thonen-Fleck, Plaintiff C.B. brings suit "by and through his next friends and parents[.]" (Docket Entry 1, ¶ 10.)

4 As explained more fully below, Plaintiff Fleck and Plaintiff Bunting brought suit on behalf of their minor children and on their own behalf, as subscribers to employer-sponsored health insurance that denied treatment for their dependent children's gender dysphoria. (See Docket Entry 1, ¶¶ 1, 8, 10.)

2

from the dissonance between an individual's gender identity and sex assigned at birth" (id., ¶ 1). (Id., ¶¶ 61, 69, 82, 98, 115.) "Gender identity refers to an individual's fundamental, internal sense of being a particular gender." (Id., ¶ 24.) Both "the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition" and "the World Health Organization's International Classification of Diseases" recognize gender dysphoria as a medical condition. (Id., ¶ 27.) Without adequate treatment, gender dysphoria may "result in severe anxiety, depression, and suicidal ideation or suicide." (Id., ¶ 28.)

As current or former employees of Defendant UNC, Defendant NCSU, or Defendant UNCG (or dependents of such employees), Plaintiffs have received health care coverage through plans (the "Health Plans") offered by Defendant NCSHP. (Id., ¶¶ 59, 74, 85, 101, 114.) "Defendant NCSHP, a corporation, administers comprehensive group health insurance to eligible teachers and other North Carolina state employees, pursuant to N.C. Gen. Stat. § 135-48.2. [Defendant] NCSHP is self-funded and empowered to determine, define, adopt, and remove health care benefits and exclusions . . . ." (Docket Entry 1, ¶ 17.) Defendant Folwell, as North Carolina State Treasurer and "Chair of the Board of Trustees of [Defendant NCSHP]," bears responsibility "for designing, operating, and/or administering [the Health Plans]." (Id., ¶ 12.) Defendant Jones, the Executive Administrator of Defendant NCSHP,

3

possesses "authori[ty] to negotiate, renegotiate, and execute contracts with third parties in the performance of her duties and responsibilities." (Id., ¶ 13.)

"[W]ith the exception of the 2017 plan year . . . the Health Plans have contained a categorical exclusion" such that transgender enrollees (or the transgender dependent of an enrollee) may not receive "coverage for transition-related health care." (Id., ¶ 45.) Such exclusion "denies coverage for . . . counseling, hormone therapy, surgical care, and any other health care provided in relation to a person's transgender status and/or gender transition." (Id., ¶ 2.) However, other "enrollees [in the Health Plans] who are not transgender do not face a categorical exclusion barring coverage for health care that is medically necessary for them based on their sex and receive coverage for the same care that is denied to transgender enrollees." (Id.) "Plaintiffs have all been denied coverage for medically necessary gender-confirming health care because they or their dependents are transgender, based on the categorical exclusion of [such care] in the [Health Plans]." (Id., ¶ 3; see also id., ¶¶ 57–122 (describing denial of coverage as to each Plaintiff, as well as foregone medical treatment and/or payments out-of-pocket for hormone therapy or surgical care for their (or their dependent's) gender dysphoria).) As a result, "all Plaintiffs have suffered emotional distress, humiliation, degradation, embarrassment, emotional pain and anguish, violation

4

of their dignity, loss of enjoyment of life, and other compensatory damages, in an amount to be established at trial." (Id., ¶ 123.)

In connection with the foregoing allegations, the Original Complaint asserts the following claims:

(1) that Defendant Folwell and Defendant Jones, by "adopti[ng and enforc[ing ]the discriminatory sex-based classifications in the [] Health Plans" (id., ¶ 126), discriminated against all Plaintiffs on the basis of sex and transgender status, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983 (Docket Entry 1, ¶¶ 124-38 ("Equal-Protection Claims"));

(2) that Defendant UNC, Defendant NCSU, and Defendant UNCG (collectively, "University Defendants"), by offering the Health Plans to their employees, intentionally discriminated against Plaintiffs[5] on the basis of sex, in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688 (Docket Entry 1, ¶¶ 139-47 ("Title IX Claims")); and

(3) that Defendant NCSHP "provid[ed] or administer[ed] health care insurance coverage" that discriminates against all Plaintiffs on the basis of sex in violation of Title IX, all in violation of

_____

5    Each Plaintiff asserted a Title IX Claim against their current or former employer (or, in the case of Plaintiff Thonen-Fleck and Plaintiff C.B., the employer of one or both of their parents), as follows: Plaintiff Kadel, Plaintiff Bunting, and Plaintiff C.B. against Defendant UNC; Plaintiff McKeown and Plaintiff Silvaine against Defendant NCSU; and Plaintiff Fleck and Plaintiff Thonen-Fleck against UNCG. (See Docket Entry 1, ¶¶ 139-47.)

Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 (Docket Entry 1, ¶¶ 148-57 ("ACA Claims")).

Instead of answering the Original Complaint, University Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (See Docket Entry 30 (the "University Defendants' Motion"); see also Docket Entry 31 (supporting memorandum).) According to University Defendants, as concerns the Title IX Claims, Plaintiffs (i) lack standing, and (ii) failed to state a viable claim. (See Docket Entry 31 at 6-18.) Defendant Folwell, Defendant Jones, and Defendant NCSHP (collectively, "State Defendants") likewise moved to dismiss the Equal-Protection Claims and the ACA Claims. (See Docket Entry 32 (the "State Defendants' Motion"); see also Docket Entry 33 (supporting memorandum).) State Defendants challenged the Equal-Protection Claims as alleging disparate impact (rather than intentional discrimination) and asserted that the exclusion of gender-confirming health care satisfied the applicable rational-basis standard of review. (See Docket Entry 33 at 15-22.) With respect to the ACA Claims, State Defendants invoked sovereign immunity and contended that, in any event, Plaintiffs have failed to state a claim under Title IX or the ACA. (See id. at 22-31.) Plaintiffs responded in opposition to the University Defendants' Motion and the State Defendants' Motion (Docket Entries 34, 35),

6

and University Defendants and State Defendants replied (Docket Entries 37, 39).

Plaintiffs then moved for the entry of a tolling stipulation as to their claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. (Docket Entry 41 (the "Stipulation Motion") at 1.)  In that regard, the memorandum supporting the Stipulation Motion explains that, when Plaintiffs filed the Original Complaint, Plaintiff Kadel, Plaintiff McKeown, and Plaintiff Silvaine had "timely filed charges alleging violations of [] Title VII" but had not yet exhausted their administrative remedies with the United States Equal Employment Opportunity Commission ("EEOC"). (Docket Entry 42 at 2.)  At the same time, R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC, No. 18-107 (U.S. argued Oct. 8, 2019), remained pending. (See Docket Entry 42 at 1–3.)  Plaintiff Kadel, Plaintiff McKeown, and Plaintiff Silvaine entered into a tolling agreement with University Defendants "to preserve Plaintiffs' prospective Title VII claims against University Defendants — and to allow Plaintiffs to plead those claims, and University Defendants to formulate a responsive pleading — with the benefit of the Supreme Court's ruling in *Harris Funeral Homes*." (Id. at 3.)  State Defendants took no position on the Stipulation Motion and declined to join the tolling agreement. (See id. at 1–2.)  The Court (per United States District Judge Loretta C. Biggs) granted the Stipulation Motion, thereby

7

permitting Plaintiff Kadel, Plaintiff McKeown, and Plaintiff Silvaine to assert Title VII claims against University Defendants within 50 days of the Supreme Court's ruling in <u>Harris Funeral Homes</u>. (<u>See</u> Docket Entry 42-1 at 3–5; Docket Entry 43 at 1.)

Thereafter, the Court (per Judge Biggs) denied the University Defendants' Motion and the State Defendants' Motion. (<u>See</u> Docket Entry 45 at 2.) More specifically, Judge Biggs concluded that the Original Complaint "stated cognizable claims under [Title] IX, the ACA, and the Equal Protection Clause" (<u>id.</u> at 25), rejected University Defendants' standing-based argument for dismissal of the Title IX Claims (<u>see</u> <u>id.</u> at 7–12), and found that Defendant NCSHP had waived its sovereign immunity for purposes of the ACA Claims (<u>see</u> <u>id.</u> at 16–20). In response to that ruling, Defendant NCSHP gave notice of its interlocutory appeal to the United States Court of Appeals for the Fourth Circuit. (<u>See</u> Docket Entry 50 at 1.) That appeal remains pending. (<u>See</u> Docket Entries dated Apr. 9, 2020, to present (lacking Fourth Circuit decision on appeal).)

Plaintiffs, pursuant to Federal Rule of Civil Procedure 15 ("Rule 15"), subsequently filed the Motion to Amend (Docket Entry 62), attaching a proposed amended complaint (Docket Entry 62-1) (the "Amended Complaint"). (Docket Entry 62 at 1.) The Amended Complaint proposes to add Dana Caraway ("Plaintiff Caraway"), an employee of the State of North Carolina, Department of Public Safety ("DPS") (<u>see</u> Docket Entry 62-1, ¶ 12; <u>see also</u> <u>id.</u>,

8

¶¶ 130–38), who would join the existing Plaintiffs in asserting (i) an Equal-Protection Claim against Defendant Folwell and Defendant Jones (see id., ¶¶ 139–53 (describing such claim brought by "[a]ll Plaintiffs")), and (ii) an ACA Claim against Defendant NCSHP (see id., ¶¶ 165–74 (same, as to ACA Claim)). The Amended Complaint further lodges new Title VII claims: on behalf of Plaintiff Kadel against Defendant UNC; on behalf of Plaintiff McKeown and Plaintiff Silvaine against Defendant NCSU; and on behalf of Plaintiff Caraway against Defendant DPS and Defendant NCSHP. (See id., ¶¶ 175–88.)

University Defendants "[took] no position on [the Motion to Amend]" (Docket Entry 62, ¶ 8) and declined to file a response (see Docket Entries dated Aug. 3, 2020, to present). State Defendants, however, responded in opposition, asserting that (i) the Court lacks jurisdiction to grant the Motion to Amend in light of the pending interlocutory appeal, and (ii) the Amended Complaint fails for futility and prejudices Defendants. (See Docket Entry 64 (the "Response") at 6–10.) Plaintiffs replied, characterizing the Response as inaccurate as to the applicable standard for complaint amendment, incorrect as to the effect of the interlocutory appeal, and premature as to the viability of Plaintiff Caraway's Title VII claim against Defendant NCSHP. (See Docket Entry 65 (the "Reply") at 2–8.)

## DISCUSSION

### I. Preliminary Matters

The Court begins by addressing State Defendants' contention, in its Response, that the Court lacks jurisdiction to rule on the Motion to Amend. In particular, the Response states that, because the pending interlocutory appeal concerns Defendant NCSHP's invocation of sovereign immunity and because sovereign immunity constitutes "an immunity from suit rather than a mere defense to liability" (Docket Entry 64 at 8 (quoting Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993))), the Court must wait "until the Fourth Circuit has reached its decision or given permission to proceed" (id. at 6). Consistent with that reasoning, the Response concludes that "[t]he [Original] Complaint must remain intact for purposes of the appeal, and new legal theories of recovery against [Defendant NCSHP] must wait." (Id. at 8.)

"Federal law . . . limits [appellate] jurisdiction to appeals from 'final decisions of the district courts.'" Davis v. City of Greensboro, 770 F.3d 278, 281 (4th Cir. 2014) (citing 28 U.S.C. § 1291). "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233 (1945), superseded on other grounds by statute, Judicial Improvements and Access to Justice Act, Pub. L. No. 100-702, 102

Stat. 4642 (1988) (codified at 9 U.S.C. § 16). However, appellate jurisdiction under Section 1291 "encompasses not only judgments that 'terminate an action,' but also a 'small class' of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'" Mohawk Indus. v. Carpenter, 558 U.S. 100, 106 (2009) (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545–46 (1949)). "That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 42 (1995) (discussing Cohen's "collateral order doctrine").

"Generally, the denial of a motion to dismiss does not constitute a 'final decision,' and thus does not provide the proper basis for an appeal." Davis, 770 F.3d at 281. Notwithstanding that general rule, "orders denying certain kinds of immunity fall within the collateral order doctrine." Id. Consistent with the foregoing principles, "[s]tates and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." Puerto Rico Aqueduct & Sewer Auth., 506 U.S. at 147.

"[A] timely filed notice of appeal transfers jurisdiction of a case to the court of appeals and strips a district court of

jurisdiction to rule on any matters involved in the appeal." Company Doe v. Public Citizen, 749 F.3d 246, 258 (4th Cir. 2014); see also Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance [that] confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."), superseded on other grounds by statute, Fed. R. App. P. 4(a)(4) (as amended Dec. 1, 1993). Adherence to that "rule fosters judicial economy and guards against the confusion and inefficiency that would result if two courts simultaneously were considering the same issues." Company Doe, 749 F.3d at 258. As concerns interlocutory appeals, "[t]he divestiture of jurisdiction occasioned by the filing of a notice of appeal is especially significant . . . . Unlike an appeal from a final judgment, an interlocutory appeal disrupts ongoing proceedings in the district court." Stewart v. Donges, 915 F.2d 572, 575 (10th Cir. 1990).

When a litigant properly seeks an interlocutory appeal, "[a] district court does not have the power to 'alter the status of the case as it rests before the [appellate court.]'" Dayton Indep. Sch. Dist. v. United States Mineral Prods. Co., 906 F.2d 1059, 1063 (5th Cir. 1990) (quoting Coastal Corp. v. Texas E. Corp., 869 F.2d 817, 820-21 (5th Cir. 1989)). For example, when "an interlocutory appeal from an order refusing to dismiss on . . . qualified

12

immunity grounds relates to the entire action[,] . . . it divests the district court of jurisdiction to proceed with any part of the action against an appealing defendant." Stewart, 915 F.2d at 576 (emphasis added). However, "interlocutory review of a denial of qualified immunity does not automatically confer [appellate] jurisdiction over other issues in a case." Livingston v. Kehagias, 803 F. App'x 673, 686 n.5 (4th Cir. 2020) (emphasis added); see also Alice L. v. Dusek, 492 F.3d 563, 564 (5th Cir. 2007) ("A notice of appeal from an interlocutory order . . . only divests the district court of jurisdiction over those aspects of the case on appeal.").

Here, although State Defendants properly have invoked the collateral order doctrine with respect to the Court's denial of sovereign immunity, see Puerto Rico Aqueduct & Sewer Auth., 506 U.S. at 147, the resulting interlocutory appeal poses no absolute jurisdictional bar in light of the scope of the appeal and the substance of the Amended Complaint. The Court possesses jurisdiction to resolve the Motion to Amend because the changes Plaintiffs have proposed in the Amended Complaint bear no meaningful relation to "any matters involved in the appeal," Company Doe, 749 F.3d at 258.

As far as the nature of the appeal, State Defendants' Motion previously suggested that sovereign immunity defeats Plaintiffs' ACA Claims. (See Docket Entry 32 at 2 (asserting lack of subject

13

matter jurisdiction as defense); Docket Entry 33 at 22-27 (developing argument that "[t]he Eleventh Amendment bars federal jurisdiction over [Defendant NCSHP]").) The Court (per Judge Biggs) rejected that contention, concluding that Defendant NCSHP had waived its sovereign immunity. (See Docket Entry 45 at 16-20 (holding "that Section 1557 [of the ACA], when read in conjunction with [the Civil Rights Remedies Equalization Act of 1986, 42 U.S.C. § 2000d-7(a)(1)], effectuates a valid waiver of sovereign immunity").) Defendant NCSHP appealed that ruling. (See Docket Entry 50 at 1.) Consequently, the appeal concerns whether sovereign immunity bars Plaintiffs' ACA Claims against Defendant NCSHP.

Turning to the substance of the Amended Complaint, Plaintiff Caraway has sought to add a Title VII claim against Defendant DPS and Defendant NCSHP. (See Docket Entry 62-1, ¶¶ 175-88; see also Docket Entry 64 at 5 ("Plaintiffs also allege that [Defendant NCSHP] has violated Title VII.").) As Plaintiffs correctly have observed, "states do not have sovereign immunity [against suit for claims] under Title VII" (Docket Entry 65 at 4 (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976))). See Savage v. Maryland, 896 F.3d 260, 275 (4th Cir. 2018) ("Title VII . . . abrogates [eleventh-amendment sovereign] immunity for suits against a state in its capacity 'as employer.'"). As a result, even if the Fourth Circuit decides the sovereign immunity issue in Defendant NCSHP's

favor, that ruling cannot foreclose Plaintiff Caraway's Title VII claim. Stated differently, the issue on appeal does not bear on the viability of Plaintiff Caraway's Title VII theory.

Furthermore, no other aspect of the Amended Complaint "alter[s] the status of the case as it rests before the [Fourth Circuit]," Dayton Indep. Sch. Dist., 906 F.2d at 1063 (internal quotation marks omitted). The ACA Claims in the Amended Complaint effectively mirror such claims in the Original Complaint, except for the Amended Complaint's addition of Plaintiff Caraway. (Compare Docket Entry 1, ¶¶ 148–57, with Docket Entry 62-1, ¶¶ 165–74.) That change in no way impacts the question on appeal. To the extent Plaintiff Caraway seeks to join existing Plaintiffs in asserting an ACA Claim against Defendant NCSHP, that claim will not proceed until the Fourth Circuit resolves the sovereign immunity question. Moreover, the Amended Complaint's inclusion of factual matter pertaining to Plaintiff Caraway does not affect the issue before the Fourth Circuit. Consequently, the Response's jurisdictional argument lacks merit; the Court retains jurisdiction to rule on the Motion to Amend despite the interlocutory appeal.

## II. Motion to Amend

### A. Relevant Standards

#### 1. Complaint Amendment

"Under [Rule 15], leave to amend a pleading 'shall be freely given when justice so requires.'" Edwards v. City of Goldsboro,

Case 1:19-cv-00272-LCB-LPA  Document 74  Filed 03/05/21  Page 15 of 26

178 F.3d 231, 242 (4th Cir. 1999) (quoting Fed. R. Civ. P. 15(a)). "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986). "An amendment is futile if the amended claim would fail to survive a motion to dismiss pursuant to [Rule] 12(b)(6)." Hall v. Greystar Mgmt. Servs., L.P., 637 F. App'x 93, 97 (4th Cir. 2016).

A Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, in reviewing a motion to dismiss, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of App., 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom. Coleman v. Court of App. of Md., 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct.  <u>See id.</u> (citing <u>Twombly</u>, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).  "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  <u>Francis v. Giacomelli</u>, 588 F.3d 186, 193 (4th Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at 679).

   2. Title VII

  Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Supreme Court recently held that, within the meaning of Title VII, the terms "because of 'sex'" prohibit employment discrimination on the basis of an individual's transgender status.  <u>Bostock v. Clayton Cnty.</u>, ___ U.S. ___, ___, 140 S. Ct. 1731, 1754 (2020).

Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ." 42 U.S.C. § 2000e(b). As concerns Title VII, the Fourth Circuit has recognized that "Title VII should be liberally construed in light of its remedial purpose," Butler v. Drive Auto. Indus. of Am., 793 F.3d 404, 409 (4th Cir. 2015), and "such liberal construction is also to be given to the definition of 'employer,'" id. (brackets and some internal quotation marks omitted). In that regard, the Fourth Circuit has adopted the "joint employment doctrine [a]s the law of this Circuit," id., such that "multiple entities may simultaneously be considered employers for the purposes of Title VII," id. at 410 (noting that doctrine "prevents those who effectively employ a worker from evading liability by hiding behind another entity"). Additionally, Title VII's inclusion of "agent" within its definition of "employer" reinforces the principle that "an employer can[not] avoid his responsibilities by delegating discriminatory programs to corporate shells." City of Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 718 n.33 (1978).

However, Title VII generally does not impose individual liability on employees as agents of their employer. See Lissau v. Southern Food Serv., 159 F.3d 177, 180–81 (4th Cir. 1998)

18

(collecting cases); see also, e.g., Wathen v. General Elec. Co., 115 F.3d 400, 405 (6th Cir. 1997) ("Congress did not intend to provide for individual employee/supervisor liability under Title VII."). Courts have limited agent liability under Title VII to "ensur[e] that individuals who were employees could not be held individually liable for violations of Title VII simply because their employment status also qualified them as agents of their employer." Nealey v. University Health Servs., 114 F. Supp. 2d 1358, 1369 (S.D. Ga. 2000) (discussing Equal Emp. Opportunity Comm'n v. AIC Sec. Investigations, Ltd., 55 F.3d 1276 (7th Cir. 1995), and Mason v. Stallings, 82 F.3d 1007 (11th Cir. 1996)). Consistent with the foregoing principles, some courts have allowed Title VII claims to proceed on an agency theory when such claims target entities beyond the scope of the traditional employment relationship that nonetheless control an aspect of the plaintiff's employment. See Jimenez v. Laborer's Welfare Fund of Health & Welfare Dep't of Constr. & Gen. Laborers' Dist. Council of Chi. & Vicinity, ___ F. Supp. 3d ___, ___, 2020 WL 5979653, at *4-5 (N.D. Ill. Oct. 8, 2020); Boyden v. Conlin, No. 17-cv-264, 2018 WL 2191733, at *8 (W.D. Wis. May 11, 2018) (unpublished); see also Pappas v. Bethesda Hosp. Ass'n, 861 F. Supp. 616, 617-19 (S.D. Ohio 1994) (rejecting American with Disabilities Act claim against administrator of health insurance plan after noting lack of allegation that employer "delegated any of its duties regarding

19

employee benefits" to administrator); <u>Crowder v. Fieldcrest Mills,</u>
<u>Inc.</u>, 569 F. Supp. 825, 827–29 (M.D.N.C. 1983) (dismissing Title
VII claim against administrator of group insurance programs because
administrator lacked "any significant control over the insurance
program, a fringe benefit which [the employer] extend[ed] to its
employees").

Finally, as a matter of procedure, Title VII imposes various
requirements before a plaintiff may file a civil suit alleging such
claim. For example, a complainant must file a charge with the EEOC
in order to secure the ability to sue. <u>See</u> 42 U.S.C. § 2000e-5(f).
A complainant may initiate a civil suit within 90 days of receiving
a right-to-sue notice from the EEOC. <u>Id.</u> § 2000e-5(f)(1).

### B. Analysis

State Defendants have urged the Court to deny the Motion to
Amend, arguing that the Amended Complaint fails for futility and
prejudices Defendants. (<u>See</u> Docket Entry 64 at 8.) The Response
observes that Defendant NCSHP declined to join the tolling
agreement, suggests that Plaintiff Caraway has not yet exhausted
administrative remedies (for purposes of Title VII), and maintains
that her Title VII theory against Defendant NCSHP fails to satisfy
Rule 12(b)(6) standards. (<u>See</u> <u>id.</u> at 8–9.) In particular, the
Response contends that Defendant NCSHP qualifies as neither an
"agent" of Defendant DPS nor a "joint employer" and thus can bear
no Title VII liability. (<u>Id.</u> at 9–10.)

20

Turning first to the Rule 12(b)(6) issue, the Amended Complaint alleges that Defendant NCSHP acted as the "agent" of Defendant DPS within the meaning of Title VII. In relevant part, the Amended Complaint states:

> In establishing the scope of health insurance coverage for state employees, [Defendant] NCSHP acts as an agent for North Carolina government employers who participate in [the Health Plans], including but not limited to [Defendant DPS], for purposes of determining components of state employees' "compensation, terms, conditions, or privileges of employment" under Title VII. [Defendant] NCSHP exists solely so that participating employers can delegate responsibility for the benefits provided to their employees, as its enacting statute makes clear. N.C. Gen. Stat. Ann. § 135-48.2(a) provides for creation of [Defendant] NCSHP "exclusively for the benefit of" state employees, retirees, and eligible dependents, to "administer one or more group health plans that are comprehensive in coverage." <u>Government employers that participate in [the Health Plans], including [Defendant DPS], delegate significant control over employee health benefits to [Defendant] NCSHP.</u>

(Docket Entry 62-1, ¶ 20 (emphasis added); <u>see also</u> <u>id.</u>, ¶ 180 ("In establishing the scope of insurance coverage and administering that coverage, [Defendant] NCSHP is an agent of all employers under Title VII who participate in [the Health Plans], including but not limited to [Defendant DPS].").) As Plaintiffs have pointed out, another district court (albeit outside the Fourth Circuit) deemed an employer's "agent" liable under Title VII under similar circumstances. (<u>See</u> Docket Entry 65 at 7-8 (discussing <u>Boyden v. Conlin</u>, 341 F. Supp. 3d 979, 998 (W.D. Wis. 2018)).) Additionally, when other courts have assessed such claims against multiple putative employers, they generally have considered the extent of

21

control to determine whether an entity (other than the traditional "employer") may bear Title VII liability. See, e.g., Crowder, 569 F. Supp. at 828 ("[D]elegation of [an employer's] authority [can] result[] in [a third party] having control of an aspect of the terms and conditions of employment." (distinguishing Spirt v. Teachers Ins. & Annuity Ass'n, 475 F. Supp. 1298 (S.D.N.Y. 1979), aff'd in part and rev'd in part, 691 F.2d 1054 (2d Cir. 1982), judg't vacated and remanded, 463 U.S. 1223 (1983))).

The Response seemingly acknowledges such delegation but nonetheless insists that the "employer" (here, Defendant DPS) remains solely liable under Title VII. (See Docket Entry 64 at 9 ("Liability for delegated decisions remains with the employer.").) In support of that proposition, the Response invokes Birkbeck v. Marvel Lighting Corp., 30 F.3d 507 (4th Cir. 1994), which held that "the [Age Discrimination in Employment Act ('ADEA')] limits civil liability to the employer," id. at 510–11. (See Docket Entry 64 at 9.) However, in context, Birkbeck merely concluded that no liability could attach to an individual employee for his allegedly discriminatory action, see Birkbeck, 30 F.3d at 509–11, a ruling consistent with the many courts that have rejected employment discrimination claims against individuals, see Lissau, 159 F.3d at 181 ("[A] large number of circuit courts have held that individual

supervisors are not liable under Title VII.").[6] <u>Birkbeck</u> neither foreclosed nor endorsed an agency theory under which more than one <u>entity</u> may bear Title VII liability. <u>See</u> <u>Birkbeck</u>, 30 F.3d at 509-11 (deeming company vice president not subject to suit, on agency theory, for allegedly discriminatory layoff decisions).

Here, the issue of individual Title VII liability (and <u>Birkbeck</u>'s holding to that effect) remains irrelevant because the Amended Complaint does not lodge a Title VII claim against anyone in an individual capacity. (<u>See</u> Docket Entry 62-1, ¶¶ 175-88.) Instead, Plaintiff Caraway's Title VII claim targets two entities, one (Defendant DPS) which controlled most aspects of her employment (<u>see</u> <u>id.</u> ¶ 178 (identifying Defendant DPS as Title VII "employer")), and another (Defendant NCSHP) which allegedly "exercise[d] significant control over [her] by determining components of [her] 'compensation, terms, conditions, or privileges of employment'" (<u>id.</u>, ¶ 181). State Defendants have identified no authority demonstrating that such theory necessarily fails. (<u>See</u> Docket Entry 64 at 9.) To the contrary, some case law (including from this Court) supports the notion that an entity like Defendant NCSHP may bear Title VII liability under certain circumstances.

_____

6 Although <u>Lissau</u> involved a Title VII claim rather than an ADEA claim as in <u>Birkbeck</u>, <u>Lissau</u> explained that, in light of the similarity between the two statutes, "[t]he Title VII definition of employer must be read in the same fashion as the ADEA definition of employer." <u>Lissau</u>, 159 F.3d at 180 (viewing <u>Birkbeck</u> as analogous).

See, e.g., Manhart, 435 U.S. 702, 718 n.33; Crowder, 569 F. Supp. at 828.  As a result, the Amended Complaint does not suffer from futility in that regard.[7]

_____

7    State Defendants separately have argued that Defendant NCSHP fails to qualify as a "joint employer" such that Title VII liability cannot attach.  (See Docket Entry 64 at 9-10 (citing Butler, 793 F.3d at 408, 415).)  In Butler, the Fourth Circuit adopted a hybrid test (combining the "control test" and the "economic realities test") to determine whether multiple entities qualify as "joint employers" under Title VII.  Butler, 793 F.3d at 412-14.  The hybrid test involves the consideration of, among other factors,
      (1) authority to hire and fire the individual;
      (2) day-to-day supervision of the individual, including employee discipline;
      (3) whether the putative employer furnishes the equipment used and the place of work;
      (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
      (5) the length of time during which the individual has worked for the putative employer;
      (6) whether the putative employer provides the individual with formal or informal training;
      (7) whether the individual's duties are akin to a regular employee's duties;
      (8) whether the individual is assigned solely to the putative employer; and
      (9) whether the individual and putative employer intended to enter into an employment relationship.
Id. at 414.  The Response neither identifies nor analyzes those factors but nonetheless concludes that Defendant NCSHP (which the Response characterizes as a "health insurance provider" (Docket Entry 64 at 10)) can bear no Title VII liability.  (See id. at 9-10.)  Because the Response declines to afford full treatment to the "joint employer" issue and because the Amended Complaint elsewhere plausibly alleges that Defendant NCSHP acted as Defendant DPS's agent with respect to an aspect of the employment relationship between Plaintiff Caraway and Defendant DPS, the Court declines to deny the Motion to Amend on the Response's undeveloped "joint employer" argument.

The Response's remaining arguments do not justify denial of the Motion to Amend. First, to the extent the Response suggests that amendment would prejudice Defendants (see Docket Entry 64 at 8), it offers no support for that conclusion (see id. at 5-10). Second, although the Response correctly observes that State Defendants formed no part of the tolling agreement between some existing Plaintiffs and University Defendants (id. at 8), no "delay in bringing suit" (id.) bars Plaintiff Caraway's Title VII claim against Defendant DPS and Defendant NCSHP. As Plaintiffs have explained in their Reply, Plaintiff Caraway sought relief under Title VII (via the Amended Complaint) four days after receiving a right-to-sue notice from the EEOC. (See Docket Entry 65 at 6-7; see also Docket Entry 62-1 (Amended Complaint filed Aug. 3, 2020); Docket Entry 65-1 at 2-5 (Notices of Right to Sue Within 90 Days, each dated July 30, 2020).) Her Title VII claims therefore fall within the 90-day statute of limitations, 42 U.S.C. § 2000e-5(f)(1), without regard for the tolling agreement that Plaintiff Caraway, Defendant DPS, and Defendant NCSHP never signed. Lastly, the Reply refutes the Response's supposition that Plaintiff Caraway has not exhausted administrative remedies. (Compare Docket Entry 64 at 8-9, with Docket Entry 65 at 6-7.)

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion to Amend (Docket Entry 62) is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs shall file their amended complaint in the form of Exhibit A (Docket Entry 62-1) by March 12, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 5, 2021

Case 1:19-cv-00272-LCB-LPA   Document 74   Filed 03/05/21   Page 26 of 26