# EXHIBIT 2

# Deposition of State Health Plan
# Executive Administrator
# Dee Jones

EXHIBIT 2



Deposition of:
## Dee Jones

*August 3, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

EXHIBIT 2

1          IN THE UNITED STATES DISTRICT COURT FOR

2           THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5    MAXWELL KADEL, et al.,     )
                              )

6            Plaintiffs,   )
                              )   No. 1:19-cv-272-LCB-LPA

7          V.               )
                              )

8    DALE FOLWELL, et al.,     )
                              )

9            Defendants.   )
    _____  )

10

11

12

13                    DEPOSITION
                        OF
                   DEE JONES

14

15         IN HER INDIVIDUAL CAPACITY
                    and
      30(b)(6) DESIGNEE FOR NC STATE HEALTH PLAN

16

17              AUGUST 3, 2021

18        THIS TRANSCRIPT IS NOT COMPLETE
       PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS

19    MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
    AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30

20    DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

21

22

23             PNC PLAZA DOWNTOWN
        301 Fayetteville Street, Suite 1700
           Raleigh, North Carolina

24

25    Reported by: Michelle Maar, RDR, RMR, FCRR

EXHIBIT 2

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 APPEARANCES:
2 On behalf of the Plaintiffs:
3   HARRIS, WILTSHIRE & GRANNIS
      By: Deepika H. Ravi
4   1919 M Street NW, 8th Floor
    Washington, DC 20036
5   Dravi@hwglaw.com
6   HARRIS, WILTSHIRE & GRANNIS
      By: Amy E. Richardson
7   1033 Wade Avenue, Suite 100
    Raleigh, NC 27605
8   Arichardson@hwglaw.com
9   Lambda Legal Defense and Education Fund
      By: Tara Borelli
10  730 Peachtree Street NE, Suite 640
    Atlanta, GA 30318
11  Tborelli@lambdalegal.org
12
    On behalf of Defendants Dale Folwell, Dee Jones, and the NC
13  State Health Plan for Teachers and State Employees:
14  BELL, DAVIS & PITT
      By: Alan M. Ruley
15    Mark A. Jones
    100 N. Cherry Street, Suite 600
16  Winton-Salem, NC 27101
    Aruley@belldavispitt.com
17  Mjones@belldavispitt.com
18  LAW OFFICE OF JOHN G. KNEPPER
      By: John G. Knepper
19  1720 Carey Avenue, Suite 590
    Cheyenne, WY 82001
20  John@knepperLLC.com
21  NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
    DEPARTMENT OF THE STATE TREASURER
22    By: James Benjamin Garner
        Kendall M. Bourdon
23      Joel Heimbach
      3200 Atlantic Avenue
24    Raleigh, NC 27604
      Ben.garner@nctreasurer.com
25    Kendall.bourdon@nctreasurer.com
      Joel.heimbach@nctreasurer.com

1 APPEARANCES CONTINUED:
2 On behalf of Defendant State of North Carolina Department
    of Public Safety:
3
      NORTH CAROLINA DEPARTMENT OF JUSTICE
4     By: Alan McInnes (via teleconference)
      114 W. Edenton Street
5     Raleigh, NC 27603
      Amcinnes@ncdoj.gov
6
    On behalf of Defendants UNC at Chapel Hill, NC State
7   University, and UNC at Greensboro:
8     NORTH CAROLINA DEPARTMENT OF JUSTICE
      By: Zachary A. Padget(via teleconference)
9     114 W. Edenton Street
      Raleigh, NC 27603
10    Zpadget@ncdoj.gov
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1             INDEX
2 Examination by Ms. Ravi.................... 5
    Examination by Mr. Ruley................. 117
3 Examination by Mr. McInnes............... 120
4        DEPOSITION EXHIBITS
5 Plaintiffs' Exhibit No.    Description        Page
6 Exhibit 1    State Health Plan for Teachers and
               State Employees Enhanced 80/20 PPO
7              Plan Benefits Booklet
               January 1 - December 31, 2016......... 15
8
    Exhibit 2    11-29-16 Segal Consulting Memorandum... 23
9
    Exhibit 3    12-8-16 Young E-Mail String............ 29
10
    Exhibit 4    8-24-17 Smart E-Mail w/Attachments..... 30
11
    Exhibit 5    Objections and Responses of Defendant
12             North Carolina State Health Plan for
               Teachers and State Employees to
13             Plaintiffs' First Request for
               Admissions, Interrogatories, and
14             Requests for Production of Documents
               and Things............................. 45
15
    Exhibit 6    3-5-17 Murray E-Mail String............ 50
16
    Exhibit 7    11-3-17 Murray E-Mail w/Attachments.... 52
17
    Exhibit 8    1-23-17f Crabtree E-Mail String w/
18             Attachments............................ 56
19  Exhibit 9    10-25-18 Munk E-Mail/Message from
               Treasurer Folwell...................... 67
20
    Exhibit 10   Disclosure of Expert Witnesses Who Do
21             Not Provide a Written Report Pursuant
               to Fed. R. Civ.P.26(A)(2) by Defendants
22             Dale Folwell, Dee Jones, and the North
               Carolina State Health Plan for Teachers
23             and State Employees.................... 82
24
25

1          P R O C E E D I N G S
2             DEE JONES,
3     called as a witness and having been first duly sworn,
4       was examined and testified as follows:
5                 * * *
6       MS. RAVI:  All right.  Before we begin, will
7  counsel for the State Health Plan Defendants stipulate that
8  Ms. Jones' answers during today's deposition will be
9  binding on the State Health Plan?
10      MR. JONES:  So stipulated.
11      MS. RAVI:  And will counsel for the State Health
12 Plan Defendants stipulate to the authenticity of all
13 documents produced by Ms. Jones, the State Health Plan, and
14 Mr. Folwell?
15      MR. JONES:  So stipulated as to authenticity.
16      MS. RAVI:  Thank you.
17
18             EXAMINATION
19 BY MS. RAVI:
20   Q.  Good morning, Ms. Jones.  My name is Deepika
21 Ravi.  I represent the plaintiffs in this matter.
22      Have you ever had your deposition taken before?
23   A.  Yes.
24   Q.  And are you able to hear me okay --
25   A.  Yes.

EXHIBIT 2

2 (Pages 2 - 5)

1    Q.   -- with this mask?
2    A.   Yes.
3    Q.   I would like to go over a few ground rules -- you
4  may have heard these before -- so we're on the same page.
5         As you know, the court reporter is taking down
6  your answers today.  So I'll ask that you give verbal
7  answers to my questions because she can't record a nod of
8  the head, for example.  Is that fair?
9    A.   Yes.
10    Q.   I'll ask that you try to wait until my questions
11  are finished before you start your answer -- again, because
12  the court reporter will have trouble transcribing if we
13  talk over each other.  Is that fair?
14    A.   Yes.
15    Q.   I may ask you a question today that you don't
16  understand.  If that's the case, please tell me.  And I'll
17  try to rephrase.  Will you do that?
18    A.   Yes.
19    Q.   And if you don't ask me to rephrase, I'll assume
20  that you understood the question.  Is that fair?
21    A.   Yes.
22         MR. RULEY:  Objection, form.
23  BY MS. RAVI:
24    Q.   We're going to take a few breaks today.  If you
25  need a break sooner, please let me know.  I'll finish my

1  line of questioning, and we'll take a break when you need
2  one.  Okay?
3    A.   Yes.
4    Q.   If it happens to be the case that later today you
5  remember some additional information or different
6  information in response to a question I asked earlier,
7  please just let me know.  And we can give you the
8  opportunity to add to or clarify your answer.
9         Will you do that?
10    A.   Yes.
11    Q.   All right.  Do you understand that you've taken
12  on oath to tell the truth today?
13    A.   Yes.
14    Q.   And do you understand that that's the same oath
15  that you would take if you were testifying in court?
16    A.   Yes.
17    Q.   All right.  Is there anything inhibiting your
18  ability today to give full, honest, and complete answers?
19    A.   No.
20    Q.   All right.  What did you do to prepare for your
21  deposition today?
22    A.   I reviewed documentation that had been produced
23  and worked with counsel on prepping for questions.
24    Q.   All right.  What documents did you review?
25    A.   The e-mails and general Plan information.

1    Q.   Okay.  Anything else?
2    A.   That's pretty broad.
3    Q.   What did you do to prepare for your deposition
4  today in your role as the Plan's 30(b)(6) designee?
5    A.   Same.
6    Q.   Same?  Nothing further in preparation?
7    A.   Nothing further.
8    Q.   Did you review the topics listed in the
9  Plaintiffs' Deposition Notice to the Plan's 30(b)(6)
10  Designee?
11    A.   Yes.
12    Q.   You did?  And did you speak with anyone to
13  develop your knowledge on these topics?
14    A.   No.
15    Q.   You did not?
16    A.   Just counsel and the review process.
17    Q.   All right.
18    A.   And I would say one more is CVS, there was a
19  question that I had for CVS.
20    Q.   CVS?
21    A.   Uh-huh.
22    Q.   Where did you go to school?
23    A.   I graduated from North Carolina State University.
24    Q.   And what did you study there?
25    A.   Accounting and Business Management.

1    Q.   Okay.  What year did you graduate?
2    A.   1986 and 1987.
3    Q.   Did you attend any grad school?
4    A.   Yes.
5    Q.   Where did you go for that?
6    A.   University of Phoenix Online.
7    Q.   Okay.  And what did you study there?
8    A.   MBA with an Accounting Concentration.
9    Q.   What year did you graduate?
10    A.   2007.
11    Q.   Okay.  Do you have any other degrees?
12    A.   No.
13    Q.   Do you have any other certifications?
14    A.   No.
15    Q.   Okay.  Where did you work after you received your
16  MBA from the University of Phoenix?
17    A.   I was working at Time Warner Cable at the time.
18    Q.   What was your role there?
19    A.   I had numerous roles there, mostly financial,
20  back-office operations, and real estate and facilities.
21  And I was a controller at one point.
22    Q.   Okay.  Anything else?
23    A.   No.
24    Q.   Okay.  And what was your title there at Time
25  Warner?

EXHIBIT 2                                                    3 (Pages 6 - 9)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 5 of 63

1    A.   Controller, Senior Director of Support
2    Operations, Senior Director of Real Estate and Facilities.
3    Q.   And how long did you work at Time Warner?
4    A.   Eleven and a half years.
5    Q.   Okay.   Where did you work after that?
6    A.   Department of Administration.
7    Q.   Okay.   Was that the North Carolina Department of
8    Administration?
9    A.   Yes.
10   Q.   What was your title there?
11   A.   Chief Operating Officer.
12   Q.   Okay.   And what were your responsibilities?
13   A.   To oversee all the advocacy groups, there were
14   four or five, maybe six advocacy groups, and to oversee the
15   operations, to include real estate, facilities,
16   maintenance, the Eugenics Program, which was a different
17   issue, and other operational activities.
18   Q.   What were those other operational activities?
19   A.   Let me check my memory here.   Procurement -- I'll
20   have to think on that.
21   Q.   All right.   How long did you work at the North
22   Carolina Department of Administration?
23   A.   Eighteen, nineteen months.
24   Q.   All right.   And where did you work after that?
25   A.   North Carolina Department of Health and Human

1    Services.
2    Q.   Okay.   And what was your title there?
3    A.   I started off as a Special Assistant to the
4    Secretary, Special Projects.
5    Q.   Okay.   Any other titles in that job?
6    A.   Director of Medicaid Operations, and then COO for
7    the Division of Health Benefits.
8    Q.   All right.   Any other titles in that job?
9    A.   No.
10   Q.   Let's start with your role as Special Assistant.
11   What were your responsibilities in that role?
12   A.   I was in that role for a short period of time
13   before I went to Medicaid, basically some operational
14   projects, so evaluation of the Controller's Office, to
15   evaluate the organizational structure and the business
16   processes.
17        I also evaluated the use and participation of
18   DocuSign, to see if the organization could implement that.
19   And then there was a postage and mail project that was
20   relatively small.
21   Q.   What about in your role as Director of Medicaid
22   Operations, what were your responsibilities there?
23   A.   Under my umbrella was Provider Relations,
24   Membership, so the appeals for providers and appeals for
25   membership.   That was probably it.

1    Q.   Okay.   And what about in your role as COO?
2    A.   It started off the operation for Division of
3    Health Benefits.   And my primary responsibility was the
4    1115 Waiver production, which was a statutory requirement.
5    Q.   All right.
6    A.   So building the organization, finding places to
7    sit, things like that.
8    Q.   And any other responsibilities as COO?
9    A.   No.
10   Q.   How long in total did you work at the Department
11   of Health and Human Services for North Carolina?
12   A.   Two years.
13   Q.   Where did you work after that?
14   A.   Department of State Treasurer -- oh, well, sorry,
15   Cansler Collaborative Resources.
16   Q.   What was your title there?
17   A.   Consultant.
18   Q.   And your responsibilities in that role?
19   A.   I had a couple of clients, basically assist in
20   whatever projects they wanted me to look into.   So I looked
21   into some contracts, evaluated business processes, and made
22   recommendations.
23   Q.   Okay.   Anything else?
24   A.   No.
25   Q.   All right.   And how long did you work there?

1    A.   Seven months.
2    Q.   Where did you work after that?
3    A.   Department of State Treasurer.
4    Q.   Is that where you currently work?
5    A.   Yes.
6    Q.   What is your current title?
7    A.   Executive Administrator or Executive Director,
8    used interchangeably.
9    Q.   All right.   If I refer to the North Carolina
10   State Health Plan for Teachers and State Employees as the
11   Plan today, will you know what I'm talking about?
12   A.   Yes.
13   Q.   Apart from the title of Executive Administrator,
14   used interchangeably with Executive Director, have you held
15   any other roles in this current job?
16   A.   No.
17   Q.   And how long have you held the role of Executive
18   Administrator?
19   A.   Four years and one month.
20   Q.   Okay.   What are your responsibilities in that
21   role?
22   A.   At a high level, it's to operationalize the
23   policies as directed by the Treasurer and the Board of
24   Directors or Board of Trustees.
25   Q.   Okay.   That's at a high level?

EXHIBIT 2                                          4 (Pages 10 - 13)

1    A.  Uh-huh.
2    Q.  Any other responsibilities at a high level?
3    A.  No.
4    Q.  Okay.  What does it mean for you to
5 operationalize those policies at a more granular level?
6    A.  So under my responsibility, I have the Plan
7 Integration, which is all the technology integration
8 between our vendors.
9    And then we have a Finance and Data Analytics
10 Group.  We have a Contracting and Compliance Group,
11 Communications.  We have Legal.
12    And let's see, who am I missing here?  I think
13 that's it.
14    Q.  Are you familiar with the operation of the Plan?
15    A.  Yes.
16    Q.  Are you familiar with the design of the Plan?
17    A.  Yes.
18    Q.  Are you responsible for management of the Plan?
19    A.  Please define management of the Plan.  It's a
20 broad term.
21    Q.  Is it fair to say, would you describe yourself as
22 responsible for management of the Plan?
23    A.  Yes.
24    Q.  All right.  Is the Plan self-funding?
25    A.  Yes.

1    Q.  And in 2016, did the Plan's benefits coverage
2 provide for blanket exclusions for treatment of gender
3 dysphoria?
4    A.  Yes.
5    Q.  I would like to show you what I'm marking as
6 Plaintiffs' Exhibit 1.
7    (Exhibit 1 is marked for identification.)
8    MS. RAVI:  I'll give you a moment to review the
9 document.  I know it's lengthy.
10    MR. RULEY:  You've seen it before.
11    THE WITNESS:  I've seen it once or twice.
12 BY MS. RAVI:
13    Q.  Do you recognize this document?
14    A.  I do.
15    Q.  What is this?
16    A.  It is the 80/20 PPO Plan Benefits Booklet for the
17 period January 1 through December 31 of 2016.
18    Q.  Would you turn to the page marked as PLAN
19 DEF2711.
20    In the 2016 Plan Year, did the Plan exclude from
21 coverage treatment or studies leading to or in connection
22 with sex changes or modifications and related care?
23    A.  Yes.
24    Q.  If you could turn to the page marked PLAN
25 DEF2699.

1    In the 2016 Plan Year, did the Plan exclude from
2 coverage psychological assessment and psychotherapy
3 treatment in conjunction with proposed gender
4 transformation?
5    A.  Yes.
6    Q.  If I refer to these two exclusions from coverage
7 today as the exclusions, will you know what I'm talking
8 about?
9    A.  Yes.
10    Q.  All right.  When was this exclusion language
11 added to the Plan documents?
12    A.  As I understand it, back into the '90s in some
13 capacity.
14    Q.  And with the exception of Plan Year 2017, has the
15 exclusion been in place continuously since it was
16 introduced?
17    A.  As I understand it, yes.
18    Q.  And is that correct for the 80/20 PPO Plan?
19    A.  Yes.
20    Q.  Is that also correct for the 70/30 PPO Plan?
21    A.  Yes.
22    Q.  And for the High-Deductible Health Plan?
23    A.  Yes.
24    Q.  Who is eligible to enroll in the State Health
25 Plan?

1    A.  State employees, teachers, public school
2 teachers, employees of the University Systems of North
3 Carolina, employees of the Community College System,
4 lawmakers, and former lawmakers, some charter schools, some
5 municipalities, and, of course, state agencies.
6    Q.  Okay.  And by that, you mean employees of charter
7 schools, municipalities, and state agencies?
8    A.  Yes.
9    Q.  Anyone else?
10    A.  No.
11    Q.  And what is the plan year?
12    A.  January 1 through December 31st.
13    Q.  All right.  Can you generally describe the
14 process by which the Plan determines benefits for a
15 subsequent plan year?
16    A.  We start with the existing benefits.  And unless
17 there are any material, or changes that the Plan has
18 decided to add, it will be the same booklet or same
19 benefits going forward.
20    Q.  How does the Plan decide whether to make changes
21 going forward?
22    A.  Starting with the overarching goal of providing
23 healthcare for its members, and recognizing that we are a
24 government plan, and recognizing that we have limited
25 funding all provided by taxpayers, we start with that.

EXHIBIT 2                                          5 (Pages 14 - 17)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 7 of 63

1    And then if there are requests for changes, then
2  we evaluate them in a different, in a manner that is in
3  keeping with those overarching goals.
4    Q.  Where do those requests for changes come from?
5    A.  Members of the public.  It can come from a board
6  member.  And it can come from Blue Cross, our TPA.  And it
7  can come from a staffer.
8    Q.  Anyone else?
9    A.  That's generally where it comes from.
10   Q.  How are those requests evaluated?
11   A.  Again, it starts with the overarching goal of
12  providing public health for the most number, the biggest
13  number of people.
14    We serve 740,000 plus members.  And we don't take
15  that responsibility lightly.
16    I'm a fiduciary.  So when I walk through the
17  door, I don't get to pick and choose who I cover.  I cover
18  everybody.  And we evaluate those benefits in that light.
19   Q.  What criteria are used to evaluate proposed
20  benefit changes?
21   A.  We'll look at the cost of the benefit, what is
22  the size of the population that the benefit might cover,
23  and what is the efficacy of the benefit, how much, how much
24  success is there with the treatment or how much health does
25  it improve.

1    And, again, we don't have a big clinical staff.
2  We use a lot of research from Blue Cross or CVS or our
3  actuary or our board.  And we'll get information from a
4  variety of sources.  Then we'll propose a
5  recommendation.
6    Q.  Okay.  Any other criteria used to evaluate
7  proposed changes?
8    A.  Those are the primary criteria.  But if something
9  else were to come up and be relevant, then we would use
10  that criteria as well.
11   Q.  Can you think of an example of a time when
12  something else has come up and been relevant?
13   A.  Yes.  I think probably the easiest to explain
14  would be digital mammography.  That was instituted I
15  believe in early '17.  And digital mammography was not
16  covered without a member having to pay out of pocket for it
17  prior to that.
18    And the efficacy with digital mammography is it
19  serves -- women make up more than 50 percent of the Plan's
20  population.  So, therefore, a benefit that serves that many
21  people and has a long-term trajectory of lowering costs
22  because of catching breast cancer earlier -- which it does
23  because it's targeted at women with dense breast issue and
24  it can catch that, that millimeter size much earlier than
25  the traditional mammography -- and so that's a benefit that

1  is something that we have implemented.
2    And, again, it serves the vast majority of the
3  membership.  And it's, now it's recognized as preventative
4  care.  And it is, again, proven to save costs on the back
5  end.
6    Q.  How often does the Plan decide what benefits to
7  cover for a subsequent plan year?
8    A.  We make the decision in February of a, of the
9  previous year because it takes like 10 months to get it
10  implemented for the next plan year.
11   Q.  So does that occur on an annual basis?
12   A.  We, we hear from the public every month as to
13  potential, whatever they want to say.  We have a public
14  comment period at every board meeting.  So whatever we
15  hear, we accumulate.  And some things we've heard many
16  times.  Some things are brand new, so we have to go and
17  reevaluate.
18   Q.  So you said you typically make the decision in
19  February for the subsequent plan year?
20   A.  Yes.
21   Q.  When does the process begin for the subsequent
22  plan year?
23   A.  We present in November, typically to the board,
24  and say, you know, these are the recommendations.  But
25  that's typical.  It doesn't have to be that way.

1    It depends on when we have the information we need
2  and what our timeline for different board meetings may be.
3    But we have to present it in advance of the
4  decisionmaking meeting.  So that's, hence, the November time
5  frame.  And then we typically would have a February board
6  meeting for finalization.
7    Q.  So the February board meeting is the
8  decisionmaking meeting?
9    A.  Yes, typically.
10   Q.  And what is your role in this process as the
11  Plan's Executive Administrator?
12   A.  My job is to work with the Treasurer to set an
13  agenda.  And then depending on what we've decided to put on
14  the agenda, we prepare the materials for that, for that
15  agenda.
16   Q.  When you say we prepare the materials, who
17  prepares those?
18   A.  My staff.
19   Q.  How often does the Plan's Board of Trustees meet?
20   A.  We're required to meet four times per year.  But
21  oftentimes we meet more than that.
22   Q.  Does the Plan's Executive Administrator attend
23  all board meetings?
24   A.  I do.  Me, personally, I do.
25   Q.  And in the past, has that also been the case?

EXHIBIT 2

1      A.  I believe that would be generally the case.  But
2   I can't say for certain if my predecessors through the
3   years have attended all board meetings.
4      Q.  Are certain coverage exclusions mandated by North
5   Carolina law?
6      A.  There are a couple.
7      Q.  Okay.  In December of 2016, did the Plan's Board
8   of Trustees vote to suspend the exclusion for the 2017 Plan
9   Year?
10     A.  Yes.
11     Q.  And when did the Plan begin those discussions to
12  lift that exclusion?
13     A.  It was August of that year.
14     Q.  What prompted those discussions to start?
15     A.  The 1557 Rule that was put out related to ACA in
16  May of 2016.
17     Q.  Okay.  Any other factors that prompted that
18  discussion to start?
19     A.  That was the starting point.  And then the
20  downstream of that was if you, the feeling or understanding
21  that if you don't implement it, then you have, you put your
22  federal funding at risk, if there is any federal funding.
23     Q.  Are you familiar with the Segal company?
24     A.  Yes.
25     Q.  What is Segal?

1      A.  They're an actuary and consulting firm.
2      Q.  And was Segal retained by the Plan?
3      A.  Yes.
4      Q.  When was that?
5      A.  Segal has worked for the Plan for quite a number
6   of years.  I'm not -- certainly back in 2016 they were.
7   And prior to that, I'm not sure how many years.
8      Q.  Okay.  In 2016, did the Plan ask Segal for a
9   financial estimate for the annual cost to the Plan of
10  covering treatment and services for gender dysphoria
11  beginning with Plan Year 2017?
12     A.  Yes.
13     Q.  And to whom did the Plan make that request at
14  Segal?
15     A.  It would have been to the leading, the
16  management, Segal management.
17     Q.  Do you know who was in Segal management at the
18  time?
19     A.  I do not.  Currently, it's Stu Wall.  He might
20  have been the person back then as well.
21     Q.  When did the Plan make that request of Segal?
22     A.  I would imagine in June or July of 2016.
23     Q.  I'm handing you what has been marked as
24  Plaintiffs' Exhibit 2.
25          (Exhibit 2 is marked for identification.)

1          MS. RAVI:  I'll give you a moment to review.
2          (Brief pause in the proceeding)
3   BY MS. RAVI:
4      Q.  Have you had a chance to review the document?
5      A.  Yes.
6      Q.  Are you familiar with this document?
7      A.  I am.
8      Q.  What is this?
9      A.  This is a memo from Segal to the Plan's previous
10  executive administrator as the request for the transgender
11  cost estimate.
12     Q.  What is the date on this memo?
13     A.  November 29, 2016.
14     Q.  Who received this memo?
15     A.  I'm sorry?
16     Q.  Who received this memo?
17     A.  My assumption would be Mona Moon because of who
18  the memo is written to.
19     Q.  Did anyone else receive this memo at the Plan?
20     A.  I can't say.
21     Q.  Do you know?
22     A.  I don't know.
23     Q.  Did anyone outside the Plan receive this memo?
24     A.  Not according to the memo.
25     Q.  Do you know if anyone else did outside the Plan?

1      A.  No.
2      Q.  Was anyone else at the Plan asked to analyze
3   Segal's cost estimate in this memo?
4      A.  The Plan had a financial analyst at the time.
5   And he would have worked with Segal to try to understand
6   their estimate.
7      Q.  Who was that person?
8      A.  Mark Collins.
9      Q.  Would anyone else have worked with Segal to try
10  to understand this estimate?
11     A.  Certainly Mona Moon would have, and I assume
12  Lotta Crabtree, as they worked on this project through that
13  summertime.
14     Q.  Anyone else?
15     A.  I don't know.
16     Q.  To your knowledge, did anyone at the Plan analyze
17  Segal's cost estimate?
18     A.  Rephrase the question.
19     Q.  Do you know if anyone else at the Plan in 2016
20  analyzed the estimate provided by Segal?
21          MR. RULEY:  Objection, form.
22          THE WITNESS:  I believe I said earlier Mark
23  Collins was part of the analysts, the analysis of this
24  discussion.
25  /////

EXHIBIT 2

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  BY MS. RAVI:
2      Q.  All right.  Anyone else?
3      A.  I don't know.
4      Q.  I'm on the first page of the memo, which is
5  marked PLAN DEF6964.
6          And under the second paragraph, the memo states
7  that past experience from various counties that have
8  provided coverage long enough to have data to review have
9  shown the prior estimates to be overstated.
10         Is that right?
11     A.  I'm sorry -- where are you?
12     Q.  The bottom of the second paragraph.
13     A.  Oh.  Okay.
14     Q.  Do you see that language there?
15     A.  I do.
16     Q.  Okay.  What were those prior estimates?
17     A.  I do not know.
18     Q.  Did the Plan ask Segal about this statement?
19     A.  I do not know.
20     Q.  Did the Plan challenge Segal's statement?
21     A.  I don't know.
22     Q.  All right.  I'm under Key Assumptions now.  And I
23  am in the second paragraph, Prevalence, under Key
24  Assumptions.
25         The memo states that approximately .58 percent of

1  adults in the United States self-identify as transgender.
2          Is that correct?
3      A.  That's what it says.
4      Q.  And in the next paragraph, it states a prevalence
5  range of .35 percent to 1.03 percent for North Carolina.
6          Is that right?
7      A.  Yes.
8      Q.  Is that Segal's estimated prevalence of adults in
9  North Carolina who identify as transgender?
10     A.  According to their statement yes, there.
11     Q.  And it states at the very bottom of this page, of
12  those who identify as transgender, between .1 percent and
13  .5 percent have taken some steps to transition from one
14  gender to another.
15         Is that right?
16     A.  Based on the study from 2007, yes.
17     Q.  Turning over to the next page, PLAN DEF6965, so
18  it states we would expect 8 to 24 members to use
19  transgender benefits.
20         Is that right?
21     MR. RULEY:  Sorry, where are you?
22     MS. RAVI:  The top of the page.
23     THE WITNESS:  Yes.
24  BY MS. RAVI:
25     Q.  Okay.  Is that Segal's estimate for the number of

1  Plan members whom Segal expects to use what it refers to as
2  transgender benefits?
3      A.  Yes.
4      Q.  Okay.  Did the Plan challenge Segal's estimate of
5  the number of Plan members who Segal expected to use
6  transgender benefits?
7      A.  I don't believe so.
8      Q.  And I'm now under Financial Impact on the same
9  page.  The memo states we have estimated the annual cost to
10  range from 350,000 to 850,000.
11         Is that right?
12     A.  Yes.
13     Q.  Okay.  So looking now at the Total Using Benefits
14  Cost in this chart, is it correct that the cost range
15  provided is 344,000 dollars, I'm sorry, 344,013 dollars to
16  862,292 dollars?
17     A.  Yes.
18     Q.  Does PMPM refer to per member per month?
19     A.  Yes.
20     Q.  So the total cost per member per month is between
21  6 cents and 15 cents.  Is that right?
22     A.  Yes.
23     Q.  And the memo states based on approximately 3.2
24  billion dollars of premiums, the cost for the North
25  Carolina State Health Plan is estimated to be .011 percent

1  to .027 percent of premium.
2          Is that right?
3      A.  Yes.
4      Q.  Did the Plan assess how coverage of gender
5  dysphoria treatment would affect premium amounts?
6      A.  Rephrase.
7      Q.  Did the Plan ask Segal to clarify or provide
8  additional detail on this estimate?
9      A.  I believe what we have is what we have.
10     Q.  I'm handing you what has been marked as
11  Plaintiffs' Exhibit 3.
12         (Exhibit 3 is marked for identification.)
13         MS. RAVI:  And I'll give you a moment to review.
14         (Brief pause in the proceeding.)
15         THE WITNESS:  Okay.
16  BY MS. RAVI:
17     Q.  Have you had a chance to review it?
18     A.  Yes.
19     Q.  Are you familiar with this document?
20     A.  Yes.
21     Q.  What is this?
22     A.  It's a memo from someone at WUNC asking about the
23  cost of gender dysphoria treatments.  And it talks about
24  Segal's report.
25         And then my predecessor explained that not

EXHIBIT 2                                                                8 (Pages 26 - 29)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1  covering would put at risk substantial funding, federal

2  funding that the Plan receives, stated here between 15 and

3  20 million dollars in federal retiree drug subsidy.

4      Q.  I'm on the page marked as PLAN DEF29555, do you

5  have that in front of you?

6      A.  Yes.

7      Q.  In the last paragraph, Ms. Moon states that the

8  estimated 350,000 to 850,000 cost associated with the

9  benefit change is approximately .011 to .027 percent of the

10  Plan's total premiums.

11      Is that right?

12      A.  That is correct.

13      Q.  And based on this, she estimates the premiums

14  would increase by less than .03 percent.

15      Is that right?

16      A.  Yes.

17      Q.  Did the Plan challenge Ms. Moon's statement here?

18      A.  I do not believe so.

19      Q.  Okay.  Did anyone at the Plan further discuss

20  this statement with Ms. Moon?

21      A.  No.

22      Q.  All right.  I'm handing you what has been marked

23  as Plaintiffs' Exhibit 4.

24      (Exhibit 4 is marked for identification.)

25      MS. RAVI:  I'll give you a moment to review.

1      (Brief pause in the proceeding)

2  BY MS. RAVI:

3      Q.  Have you had a chance to review it?

4      A.  I have.

5      Q.  Are you familiar with this document?

6      A.  Yes.

7      Q.  What is this?

8      A.  This is a memo to myself and a couple of my

9  direct reports providing notification that there was a

10  board meeting in December of 2016 where the exclusion was

11  removed.  And it was basically for one year.

12      And so we needed to evaluate for the upcoming

13  2017, the 2018 Plan Year.  And it included some basic

14  materials.

15      Q.  And what are those basic materials that are

16  included?

17      A.  The Segal consulting memo that we just reviewed,

18  the presentation from the board meeting in December of

19  2016, the Blue Cross Corporate Medical Policy for Gender

20  Confirmation Surgery and Hormone Therapy, the Minutes from

21  the December 1, 2016 Board of Trustees meeting.  That

22  appears to be all.

23      Q.  All right.  Did you request that Ms. Smart send

24  you these materials in August of 2017?

25      A.  I did not.

1      Q.  Why did she send them to you?

2      A.  She was at the Plan in December of 2016 and was

3  aware of the decision at the time and knew that it was

4  going to be, that the exclusion removal was going to sunset

5  in December or January 1, 2018.  And she wanted to make me

6  aware of it, as I had been at the Plan for just over a

7  couple of months at that time.

8      Q.  Who is David Cozart?

9      A.  He's a former Plan staffer.

10      Q.  And Ms. Caroline Smart, at the time, was the

11  Interim Senior Director of Plan Integration.  Is that

12  right?

13      A.  She is now the Senior Director of Plan

14  Integration.

15      Q.  Let's turn to the pages marked PLAN DEF6966 to

16  6989.  Do you recognize this document?

17      A.  I do.

18      Q.  What is this?

19      A.  This is a PowerPoint presentation that would have

20  been presented at the December 2, 2016 Board of Trustees

21  meeting.

22      Q.  Who prepared this presentation deck?

23      A.  Plan leadership.

24      Q.  Who are they?

25      A.  At the time, I would imagine Caroline Smart, Beth

1  Horner, Lotta Crabtree.  Mona Moon would have had

2  substantial influence on this.  Mark Collins probably had

3  substantial influence on this document.

4      Q.  Anyone else?

5      A.  Beyond that, I don't know.

6      Q.  And who received a copy of this presentation deck

7  at the time, around the December 2016 board meeting?

8      A.  At the time, the board members would have

9  received a copy of it.

10      Q.  Anyone else?

11      A.  Plan staff.

12      Q.  Who in Plan staff would have gotten a copy?

13      A.  The leaders.  Beyond that, I wouldn't know.

14      Q.  And when you say the leaders, the individuals you

15  just mentioned as having influence over this document?

16      A.  Yes.

17      Q.  Did the Plan's Board of Trustees meet on December

18  1, 2016?

19      A.  The 1st and 2nd.

20      Q.  All right.  And was the Plan's Executive

21  Administrator at the time present at those board meetings?

22      A.  I don't know for sure.  But, yes, I believe she

23  was.

24      Q.  Could you flip to the end, which is PLAN DEF6988.

25      Is it correct that Plan staff recommended removing

1   the blanket exclusions for coverage of gender dysphoria
2   treatment?
3       A.   Yes, for the Plan Year 2017.
4       Q.   And is it correct that Plan staff stated that
5   removing those blanket exclusions would result in provision
6   of medically necessary services for treatment of gender
7   dysphoria?
8       A.   That's what the document says.
9       Q.   Is that what Plan staff recommended?
10      A.   Yes.
11      Q.   Did Plan staff ever retract that position
12  regarding medical necessity?
13      A.   Not that I'm aware of.
14      Q.   If you could flip back to Page PLAN DEF6968.
15          This slide sets forth the DSM-5 criteria for a
16  diagnosis of Gender Dysphoria.
17          Is that right?
18      A.   Yes.
19      Q.   Is the Plan familiar with the DSM-5?
20      A.   Yes.
21      Q.   Is it right that Plan staff relied on the DSM-5
22  in making its recommendation to the Board of Trustees?
23      A.   It appears that was what was used for this
24  presentation.
25      Q.   Does the Plan challenge the DSM-5 criteria for a

1   diagnosis of Gender Dysphoria?
2       A.   It doesn't appear so.
3       Q.   It doesn't appear so from this document?
4       A.   From this document, yes.
5       Q.   Today, does the Plan challenge those criteria?
6       A.   No.
7       Q.   Does the Plan today have a position on the
8   validity of the DSM-5?
9       A.   No.
10      Q.   Has the Plan ever withdrawn its reliance on the
11  DSM-5 set forth in this presentation?
12      A.   No.
13      Q.   If you could turn to the next page, which is PLAN
14  DEF6969.
15          This slide references the World Professional
16  Association for Transgender Health Standards of Care for
17  Medical Treatment of Gender Identification Disorder.
18          Is that right?
19      A.   That is correct.
20      Q.   And if I refer to this as the WPATH Standards of
21  Care, will you know what I'm talking about?
22      A.   I will.
23      Q.   So this slide sets forth the WPATH Standards of
24  Care criteria for gender confirmation surgery.
25          Is that right?

1       A.   Yes.
2       Q.   And turning to the next page, PLAN DEF6970, does
3   this set forth the WPATH Standards of Care criteria for
4   gender confirmation surgery?
5       A.   Yes.
6       Q.   Is the Plan familiar with the WPATH Standards of
7   Care?
8       A.   Yes.
9       Q.   And is it correct that the Plan staff relied on
10  the WPATH Standards of Care in making its recommendation to
11  lift the exclusion?
12      A.   Yes.
13      Q.   Does the Plan challenge the WPATH Standards of
14  Care?
15      A.   No.
16      Q.   And today does the Plan have a position on the
17  validity of the WPATH Standards of Care?
18      A.   No.
19      Q.   Has the Plan ever withdrawn its reliance on the
20  WPATH Standards of Care?
21      A.   No.
22      Q.   If you could turn to the next slide, which is
23  PLAN DEF6971.  This slide describes the American Medical
24  Association Resolution 122.
25          Is that right?

1       A.   Yes.
2       Q.   And the slide states that the AMA Resolution was
3   issued in 2008.
4       A.   Yes.
5       Q.   And it states that the AMA Resolution describes
6   the WPATH Standards of Care, elements of care for
7   transgender people as a medical necessity.
8           Is that right?
9       A.   Yes.
10      Q.   Okay.  Is the Plan familiar with AMA Resolution
11  122?
12      A.   To the extent it's listed here for gender
13  dysphoria, yes.
14      Q.   Is the Plan otherwise familiar with the AMA
15  Resolution 122 outside of this presentation?
16      A.   Not that I'm aware of.
17      Q.   And Plan staff relied on AMA Resolution 122 in
18  making its recommendation to lift the exclusion.
19          Is that right?
20      A.   It's clear that it was part of a recommendation.
21      Q.   Did they rely on it in making their
22  recommendation?
23      A.   I can't say for sure.
24      Q.   And it's cited in this presentation to the board?
25      A.   Yes.

EXHIBIT 2                                    10 (Pages 34 - 37)

1     Q. Does the Plan challenge AMA Resolution 122?

2     A. No.

3     Q. Does the Plan have a position on its validity?

4     A. No.

5     Q. And has the Plan ever withdrawn its reliance on

6 AMA Resolution 122?

7     A. No.

8     Q. If you could turn to the page marked PLAN

9 DEF6985.

10     Does this slide accurately describe the State

11 Health Plan's blanket exclusions for coverage of gender

12 dysphoria in effect for the 2016 Plan Year?

13     A. Yes.

14     Q. And if you turn to the next slide, this slide

15 reflects the Segal company's estimate that adding coverage

16 for gender dysphoria will cost approximately 350,000 to

17 850,000 annually.

18     Is that right?

19     A. Yes.

20     MS. RAVI: Can we go off the record?

21     (Off the record)

22     MS. RAVI: Back on the record.

23 BY MS. RAVI:

24     Q. Other than your attorney, did you speak with

25 anyone during the break?

1     A. No.

2     Q. We're still on Exhibit Number 4.

3     If you could turn to the pages marked PLAN

4 DEF12810 through 12813.

5     Do you recognize this document?

6     A. Yes.

7     Q. What is it?

8     A. This is the Minutes from the Board of Trustees

9 meeting on December 1, 2016.

10     Q. About the middle of the page, DEF12810, where it

11 says State Health Plan and Department of State Treasurer

12 Staff, does that list other attendees at this meaning?

13     A. Yes.

14     Q. Who is Mark Collins?

15     A. The Plan's Financial Analyst at the time.

16     Q. Did Mr. Collins present to the board at its

17 December 1st meeting?

18     A. He normally does -- yes, he did.

19     Q. And I'm now on PLAN DEF12811, under October 2016

20 Financial Report.

21     Did Mr. Collins report to the board that a higher

22 than expected membership increase accounted for an increase

23 in Plan revenue?

24     A. Yes.

25     Q. And did he report to the board that the October

1 2016 Financial Report followed a pattern similar to prior

2 reports, with the ending cash balance 220 million higher

3 than the budgeted amount?

4     A. Yes.

5     Q. Did he report that Plan expenses were below

6 projection and that income was higher than expected?

7     A. Yes.

8     Q. And did he report that, in summary, the Plan's

9 financials are currently outperforming the budget?

10     A. Yes.

11     Q. If you could turn to document PLAN DEF12814 to

12 12822. Do you recognize this document?

13     A. Yes.

14     Q. What is this?

15     A. It's the Meeting Minutes from the Board of

16 Trustees meeting on December 2, 2016.

17     Q. And I'm now on Page PLAN DEF12815, under the

18 heading Gender Dysphoria Condition and Treatment.

19     Who is Patti Forest?

20     A. She was the Plan's Medical Director.

21     Q. And did she present to the board at its December

22 2, 2016 meeting?

23     A. Yes.

24     Q. Did Dr. Forest report that AMA Resolution 122

25 issued in 2008 removes the financial barriers of care for

1 transgender patients?

2     A. Yes.

3     Q. And did she report to the board that the American

4 College of Physicians and American College of Obstetricians

5 and Gynecologists Committee have also endorsed coverage for

6 transgender healthcare services?

7     A. Yes.

8     Q. I'm now at the bottom of PLAN DEF12815 to 12816,

9 under Proposed Benefit Change.

10     Who is Lotta Crabtree?

11     A. She was the Plan's Deputy Executive Administrator

12 and Legal Counsel at the time.

13     Q. Did Ms. Crabtree present to the board at its

14 December 2nd meeting?

15     A. Yes.

16     Q. Did she report that the Plan's current benefit

17 provides blanket exclusions for the treatment of gender

18 dysphoria, including treatment or studies regarding sex

19 changes or modifications, psychological assessments, and

20 psychotherapy treatment?

21     A. Where are you?

22     Q. If you turn to PLAN DEF12816, at the top of the

23 page.

24     A. Can you repeat the question?

25     Q. Yes. Did Ms. Crabtree report that the Plan's

EXHIBIT 2

1  current benefit provides blanket exclusions for the
2  treatment of gender dysphoria, including treatment or
3  studies regarding sex changes or modifications,
4  psychological assessments, and psychotherapy treatment?
5      A.  Yes.
6      Q.  And did she report that the annual cost of
7  coverage provided by the Plan's actuarial consultant is
8  approximately 350,000 to 850,000?
9      A.  Yes.
10     Q.  And is that the Segal company's estimate?
11     A.  Yes.
12     Q.  Did she report that the Plan would adopt the Blue
13 Cross Blue Shield of North Carolina's medical policy, which
14 includes the requirement in support of medical necessity?
15     A.  She did.
16     Q.  And did Ms. Crabtree report that the Plan
17 recommend approval of coverage for the treatment of gender
18 dysphoria by removing the blanket exclusions resulting in
19 the provision of medically necessary services for the
20 treatment of gender dysphoria?
21     A.  Yes.
22     Q.  How did the board act on the Plan's
23 recommendation to approve coverage for treatment of gender
24 dysphoria?
25     A.  The board removed the exclusion for one year, for

1  Plan Year 2017.
2      Q.  Who is Dr. Paul Cunningham?
3      A.  He's a former board member and physician.
4      Q.  Did Dr. Cunningham move to recommend that the
5  State Health Plan remove the blanket exclusions?
6      A.  Yes.
7      Q.  And who is Dr. Aaron McKethan?
8      A.  He is an actuary, a data-analytics person, a
9  former board member.
10     Q.  Did Dr. McKethan offer a resolution to Dr.
11 Cunningham's motion?
12     A.  Yes.
13     Q.  I'm now on PLAN DEF12817, the second full
14 paragraph.
15         Does this paragraph accurately reflect Dr.
16 McKethan's proposed resolution, the paragraph starting Dr.
17 McKethan offered a resolution to?
18     A.  Sorry, what was the question?
19     Q.  Does this text here -- starting with paragraph
20 Dr. McKethan offered a resolution to -- does this
21 accurately reflect the text of that proposed resolution?
22     A.  Yes.
23     Q.  And does this accurately reflect the reason that
24 Dr. McKethan requested that the exclusion be suspended for
25 Plan Year 2017 only?

1      A.  Yes.
2      Q.  Was this resolution the reason that the exclusion
3  was suspended for the 2017 Plan Year only?
4      A.  Can you repeat, rephrase your question?
5      Q.  Was this resolution the reason that the exclusion
6  was lifted for only the 2017 Plan Year?
7      A.  Yes.  The board voted on this resolution
8  language.
9      Q.  Okay.  And what was the outcome of that vote?
10     A.  The outcome was in favor of removing the
11 exclusion for the Plan Year 2017.
12     Q.  And following this recommendation from Plan
13 staff, were Plan staff ever subsequently asked to make a
14 recommendation as to coverage for treatment of gender
15 dysphoria?
16     A.  No.
17     Q.  Why not?
18     A.  Staff did not -- they notified me that it was
19 supposed to come up, right, per the previous document.  And
20 that was their reminder that we should look at it for 2018.
21     Q.  Did Plan staff ever make another recommendation
22 as to coverage for treatment of gender dysphoria?
23     A.  No.
24     Q.  And did Plan staff ever retract their
25 recommendation reflected in this Crabtree presentation at

1  the December 2nd board meeting?
2      A.  No.
3      Q.  How much did the Plan spend in 2017 as a result
4  of lifting the exclusion?
5      A.  If I'm not mistaken, it was around 400,000
6  dollars.
7      Q.  Okay.  I'm handing you what has been marked as
8  Exhibit 5.
9          (Exhibit 5 is marked for identification.)
10         MS. RAVI:  And I'll give you a moment to review.
11         (Brief pause in the proceeding)
12 BY MS. RAVI:
13     Q.  Have you had a chance to review?
14     A.  A part of it, yeah.
15     Q.  Do you recognize this document?
16     A.  I do.
17     Q.  What is this?
18     A.  It's the Objections and Responses of Defendant
19 North Carolina State Health Plan for Teachers and State
20 Employees to Plaintiffs' First Request for Admissions,
21 Interrogatories, and Requests for Production of Documents
22 and Things.
23     Q.  And did you verify the answers to the Plaintiffs'
24 First Set of Interrogatories to the State Health Plan?
25     A.  I did.

EXHIBIT 2                                                12 (Pages 42 - 45)

1    Q.   Turn to Page 15 of the document.
2        Is that your signature there under the
3    verification?
4    A.   It is.
5    Q.   Please turn to Pages 4 to 5.  I'm looking at the
6    Request for Admission Number 6 and its Response.
7        So this request asks whether the cost of gender
8    confirming healthcare for Calendar Year 2017 did not exceed
9    the cost estimate provided by Segal Consulting in its
10   November 29, 2016 memo.
11       Is that correct?
12   A.   That's correct.
13   Q.   And the Plan states in response that it's unclear
14   what the Segal cost estimates refer to.
15       Is that right?
16   A.   That is correct.
17   Q.   And it refers to, the response refers to payment
18   requests from medical providers, the allowed payments
19   authorized after discounts negotiated with medical
20   providers, or the amounts paid by the State Health Plan
21   after other deductibles and co-insurance payments are
22   applied.
23       Is that right?
24   A.   Yes.
25   Q.   I'm looking now at Page 5, the second full

1    paragraph.
2        As to payment requests from medical providers, the
3    Plan states that information provided from Blue Cross Blue
4    Shield of North Carolina for the 2017 Plan Year indicates
5    that 784,923.28 was billed to the State Health Plan for
6    medical treatment that Blue Cross Blue Shield indicated
7    would have been excluded had the coverage exclusion remained
8    in effect.
9        Is that right?
10   A.   Yes.
11   Q.   So is it correct that in Plan Year 2017, the Plan
12   received this amount, 784,923.28, in payment requests from
13   medical providers?
14   A.   No.
15   Q.   What does this statement mean?
16   A.   It means the provider charges were 785,000
17   dollars.
18   Q.   And how do provider charges differ from provider
19   requests?
20   A.   Provider charges have no basis particularly
21   because they're always well overstated.
22       The Plan incurred 504,000 dollars, rounded, in
23   allowed expenses.
24   Q.   What is the difference between allowed expenses
25   and the amount listed above, 784,000?

1    A.   The discount that Blue Cross provides.
2    Q.   So after discounts negotiated, the amount in
3    allowed expenses was 504,406.04?
4    A.   Yes.
5    Q.   And that was for treatment that would have been
6    excluded had the coverage exclusion remained in effect?
7    A.   Yes.
8    Q.   And after reductions, I'm sorry, after Plan
9    participants or other insureds paid their portion, the Plan
10   paid 404,609.26.
11       Is that right?
12   A.   That is correct.
13   Q.   All right.  And other Plan participants and other
14   insurers paid the balance of that difference between
15   404,000 and 504,000?
16   A.   Yes.
17   Q.   To the Plan's knowledge, other than this amount
18   of 404,609.26, did it incur any other costs for coverage of
19   treatment of gender dysphoria in 2017?
20   A.   I think that could be difficult to assess because
21   there were some coverages that have been covered all along,
22   like counseling, that may or may not have been incorporated
23   into these numbers, which could have been, so that would
24   inflate the cost if they were, you know, using diagnosis
25   codes, et cetera.  But counseling has generally not been

1    prohibited.
2    Q.   As a result of lifting the exclusion for the 2017
3    Plan Year, are there any other costs that were incurred
4    that the Plan is aware of?
5    A.   No.
6    Q.   Okay.
7    A.   Other than what I just mentioned.
8    Q.   Was counseling covered before the Plan lifted the
9    exclusion for the 2017 Plan Year?
10   A.   Yes.
11   Q.   So as a result of lifting the exclusion for the
12   2017 Plan Year, was approximately 404,000 dollars what the
13   Plan incurred in costs as a result of lifting that
14   exclusion?
15   A.   That which was specifically designated for gender
16   dysphoria, yes.  But there were counseling, probably there
17   were counseling charges that were not listed as gender
18   dysphoria.  So there could have been a higher cost.
19   Q.   Were those counseling charges covered prior to
20   the lifting of the exclusion?
21   A.   Yes.
22   Q.   Okay.
23   A.   And they are still covered today.
24   Q.   Was Blue Cross Blue Shield of North Carolina
25   tracking gender dysphoria claim activity in 2017?

EXHIBIT 2

13 (Pages 46 - 49)

1      A.   They removed the exclusion at our request.  And
2  then it depends on how providers coded their claims.
3      Q.   And was Blue Cross Blue Shield of North Carolina
4  tracking that claim activity?
5      A.   Through coding, yes.
6      Q.   Was Blue Cross Blue Shield of North Carolina
7  tracking gender dysphoria call activity?
8      A.   Call activity?  Please describe or --
9      Q.   Is the Plan aware of what call activity is?
10      A.   You're talking about to their Customer Call
11  Center?
12      Q.   Correct.
13      A.   Yeah -- I don't know.
14      Q.   You don't know if they were tracking that?
15      A.   No.  I don't, we don't tell them how to do their
16  business.
17      Q.   I'm handing you what I've marked as Plaintiffs'
18  Exhibit 6.
19          (Exhibit 6 is marked for identification.)
20          MS. RAVI:  I'll give you a moment to review.
21          (Brief pause in the proceeding)
22  BY MS. RAVI:
23      Q.   Do you recognize this document?
24      A.   I do.
25      Q.   What is this?

1      A.   It's an e-mail from Susan Murray to Mona and
2  Lotta at the Plan describing the call activity.
3          So they were, in fact, in some way able to track,
4  specifically for gender dysphoria, who was calling and how
5  much had been billed to date.
6      Q.   And is the how much had been billed to date the
7  claim activity?
8      A.   Yes.
9      Q.   Turning to the page marked PLAN DEF61647, as of
10  January 22, 2017, what was the total amount that Blue Cross
11  Blue Shield reported as paid for gender dysphoria claim
12  activity?
13      A.   287.57.
14      Q.   And turning to the subsequent Page PLAN DEF61646,
15  as of February 16, 2017, what was the amount that Blue
16  Cross Blue Shield reported as paid for gender dysphoria
17  claim activity?
18      A.   1733.66.
19      Q.   And turning to the next page, PLAN DEF61645, what
20  was the amount paid as of February 27, 2017?
21      A.   2172.41.
22      Q.   All right.  At a certain point, did you start
23  receiving these claim reports directly from Blue Cross Blue
24  Shield?
25      A.   I don't recall.

1      Q.   I'm handing you what I've marked as Plaintiffs'
2  Exhibit 7.
3          (Exhibit 7 is marked for identification.)
4          MS. RAVI:  I'll give you a moment to review.
5          (Brief pause in the proceeding)
6  BY MS. RAVI:
7      Q.   Are you familiar with this document?
8      A.   Yes.
9      Q.   What is this?
10      A.   It's an e-mail from Susan Murray to me and staff
11  about gender dysphoria claims and activity and volume of
12  members for the Plan Year to Date 2017.
13      Q.   And does it have an attachment?
14      A.   It does.
15      Q.   Okay.  Turning to PLAN DEF9070, is this the
16  attachment to the e-mail you received?
17      A.   Yes.
18      Q.   Does the right most column on this page, PLAN
19  DEF9070, indicate the Plan Paid Amount for gender dysphoria
20  claims?
21      A.   Yes.
22      Q.   What is this amount?
23      A.   194,739.74.
24      Q.   And what does that amount reflect?  What does the
25  column indicate?

1      A.   The total amount that the Plan paid after the
2  discounts and member coverage.
3      Q.   And the column Total Covered After Discount, how
4  is that different from the Plan Paid Amount?
5      A.   The difference would be the member share, cost
6  share.
7      Q.   And turning to PLAN DEF9071, does that column,
8  Member Liability/COB/Other, indicate the member share?
9      A.   Yes.
10      Q.   In January of 2017, is it correct that the Plan
11  Paid Amount for gender dysphoria claims was 2628.84?
12      A.   Yes.
13      Q.   Okay.  And does this chart show payments on
14  claims paid through October 31, 2017?
15      A.   Correct.
16      Q.   And the total amount listed through October 31,
17  2017 you said was 194,739.74.
18          Is that correct?
19      A.   Correct.
20      Q.   Does the Plan receive reports from Blue Cross
21  Blue Shield tracking claim activity for all its covered
22  benefits?
23      A.   Only when asked.  We get claims data.  And we can
24  run our own reports, depending on what we're trying to
25  analyze.

EXHIBIT 2                                            14 (Pages 50 - 53)

1    Q.  When does the Plan ask?

2    A.  When we need to look, review something.

3    Q.  What are some examples of something that would be

4 typically reviewed such that the Plan would request a

5 report for claim activity?

6    A.  Well, 85 percent of our costs come from 15

7 percent of our membership.  So we would maybe run reports

8 on, you know, what is the incidence of diabetes.  It's one

9 of our highest cost and affecting the most number of

10 members.

11    So, again, it's less about individual niche

12 groups.  It's not about that at all.  It's about where is

13 our high costs.  And the Plan is a health benefit, that we

14 need to serve all members.

15    So we would be evaluating maybe diabetes and

16 where that incidence of coverage is.  Is it, are they in

17 the hospitals?  Are they not adhering to medications?

18    We would evaluate, you know, who needs, how is

19 insulin being adhered to.  That's a big focus.

20    We've run an opioid analysis to make sure that,

21 for example, to see if North Carolina has an opioid problem

22 within the State Health Plan membership, you know, relative

23 to the Governor's Stop Act, or DOJ, Attorney General's Stop

24 Act, and to see if that's, again, an incidence or a problem

25 within the State Health Plan.

1    We look at adherence to medications in general.

2 That's maybe more CVS.

3    So whatever we need to analyze at a particular

4 point in time.

5    Q.  Turning to reinstatement of the exclusion for the

6 2018 Plan Year next, did anyone at the Plan discuss whether

7 to permit the coverage of gender dysphoria treatment to

8 sunset at the end of the 2017 Plan Year?

9    A.  Repeat the question.

10    Q.  Did anyone at the Plan discuss whether to let the

11 coverage of gender dysphoria treatment, to let it sunset at

12 the end of the 2017 Plan Year?

13    A.  What we discussed was it's a board decision.  And

14 it's either going to go, it's either going to be sunset or,

15 if the board brings it up, then it will be evaluated,

16 whatever that motion they bring up.

17    Q.  Did anyone at the Plan discuss whether to let it

18 sunset or to bring it up before the board?

19    A.  Anyone -- can you repeat the question?

20    Q.  Sure.  Did anyone at the Plan discuss whether to

21 let the gender dysphoria coverage sunset versus bringing

22 the issue before the board?

23    A.  Not as an action.

24    Q.  When you say not as an action, could you clarify

25 what that means?

1    A.  There was nobody that said oh, we should let it

2 sunset, oh, we should push it forward and bring it up for

3 vote.

4    Q.  I'll hand you what I've marked as Plaintiffs'

5 Exhibit 8.

6    (Exhibit 8 is marked for identification.)

7 BY MS. RAVI:

8    Q.  Do you recognize this document?

9    A.  Generally, yes.

10    Q.  Have you seen it before?

11    A.  I have not seen it with the track changes.

12    Q.  What is this document?

13    A.  It appears to be a draft of a resolution relative

14 to the coverage that suggests that the state will follow

15 the law and, if the, there's any repeal of the law or

16 notice by the Department of Health and Human Services that

17 this benefit will no longer be required to be provided

18 under federal law.

19    Q.  And looking at the document marked PLAN DEF35963,

20 does this appear to be the cover e-mail attaching that

21 document?

22    A.  It does.

23    Q.  What is the date on the cover e-mail?

24    A.  January 23, 2017.

25    Q.  So turning to the attachment PLAN DEF44771, who

1 drafted this document?

2    A.  I do not know.  But based on the e-mail, it would

3 appear that some combination of Blake Thomas and Lotta

4 Crabtree.

5    Q.  And why was this resolution drafted?

6    A.  My guess is there is -- well, it's not really a

7 guess -- it's based on following the law and whether or not

8 the coverage is mandated or not.  That was the general

9 reason for covering it in the first place was because of

10 the risk of losing federal funding.

11    Q.  And the resolution states that the Board of

12 Trustees approve medically necessary coverage of gender

13 transition services for the 2017 Benefit Year.

14    Is that right?

15    A.  That's what it says, yes.

16    Q.  And it states that that was in response to a

17 final rule issued by the Department of Health and Human

18 Services?

19    A.  Yes.

20    Q.  Turning to the fourth WHEREAS clause, it states

21 that the State Treasurer recommends that this benefit only

22 be offered so long as it is required to be offered under

23 federal law.

24    Is that correct?

25    A.  Yes.

1     Q.   Did you discuss this recommendation with the
2   State Treasurer?
3     A.   No.
4     Q.   Is it correct that care must be medically
5   necessary to be covered by your Plan?
6     A.   Yes.  But the Plan does not cover all medically
7   necessary treatment.
8     Q.   At the time of this draft resolution, was it the
9   Plan's position that gender transition services were
10   medically necessary care?
11     MR. RULEY:  Objection, form.
12     THE WITNESS:  Again, a lot of things are
13   medically necessary that the Plan doesn't cover.  And a lot
14   is not, it's maybe a little bit of a loaded word.  But that
15   is what it says here.
16   BY MS. RAVI:
17     Q.   I'm sorry -- could you clarify when you say that
18   is what it says here?
19     A.   It says here in the resolution that the board
20   approve medically necessary coverage.
21     Q.   Medically necessary coverage of gender transition
22   services?
23     A.   Yes.
24     Q.   Regarding the position on whether or not gender
25   transition services are medically necessary coverage, has

1   the Plan revised that position since the date of this draft
2   resolution?
3     A.   I wouldn't say the Plan has revised that
4   position.  I think the Plan just has other opinions about
5   whether or not all those, the WPATH and the other studies
6   are accurate.
7         And having seen through research myself, albeit
8   not saved, just looking into gender transformation care, it
9   has not been, it's been clear to me that there are
10   different opinions widely stated.
11     Q.   You said looking into the WPATH Standards and
12   other studies, what are those other studies?
13     A.   The DM one you mentioned and the, whatever the
14   other one was we talked about earlier, the American
15   Psychological Association.
16     Q.   Any other studies you're referring to?
17     A.   No.  The three you've mentioned.
18     Q.   And when you say the research you've done
19   yourself, what was that research?
20     A.   I looked through appropriate medical journals
21   online to see for my own knowledge, as I'm new to the
22   Plan, for my own knowledge about transition surgery and
23   coverage and medical necessity.
24         And it was very difficult for me to find a
25   blanket statement in any of the coverage, in any of the

1   documents that I looked at or the online sites that I
2   looked at.
3     Q.   What medical journals and online sites did you
4   look at?
5     A.   I looked at Kaiser, I looked at Milliman, looked
6   at the New England Journal of Medicine to name a few that I
7   can think of.
8     Q.   Any others?
9     A.   Not that I remember.
10     Q.   And turning to the second WHEREAS clause of this
11   draft resolution, it states that the estimated annual cost
12   for the coverage of gender dysphoria treatment is between
13   350,000 and 850,000 dollars.
14         Is that right?
15     A.   Uh-huh.  Yes.
16     Q.   Did the Plan's Board of Trustees hold a meeting
17   in January of 2017?
18     A.   Yes.
19     Q.   And at that meeting, did the board take up a vote
20   to continue lifting the exclusion for the 2018 Plan Year?
21     A.   No.
22     Q.   Did the board discuss the issue?
23     A.   I do not know.
24     Q.   Were any materials presented to the board on this
25   issue?

1     A.   I don't know.
2     Q.   Did the Board of Trustees hold a meeting in March
3   of 2017?
4     A.   I believe so.  I don't remember all the dates
5   right off the top of my head since I wasn't there.
6     Q.   At that meeting, did the board take up a vote to
7   continue lifting the exclusion for the subsequent plan
8   year?
9     A.   I do not believe so.
10     Q.   Did the board discuss the issue?
11     A.   I do not believe so.
12     Q.   And were any materials presented to the board?
13     A.   I don't believe so.
14     Q.   Did the Board of Trustees hold a meeting in June
15   of 2017?
16     A.   Possibly.
17     Q.   What about in July of 2017?
18     A.   No.
19     Q.   When was the next board meeting after the March
20   2017 board meeting for 2017?
21     A.   It was in September.
22     Q.   So January 2017, March, and then September?
23     A.   Yes.
24     Q.   And at the September 2017 board meeting, did the
25   board take up a vote to continue lifting the exclusion for

EXHIBIT 2

1  the 2018 Plan Year?
2      A.  No.
3      Q.  Did the board discuss the issue?
4      A.  There were public comments.
5      Q.  Were any materials presented to the board on this
6  issue?
7      A.  No.
8      Q.  Did the board receive a request to continue
9  lifting the exclusion for the subsequent plan year?
10     A.  I believe Ames Simmons made the request.  He's a
11 public, through public comment.
12     Q.  After the 2017 board meeting, when was the next
13 Board of Trustees meeting?
14     A.  Which 2017 meeting are you referring to?
15     Q.  After the September 2017 board meeting, when was
16 the next one?
17     A.  I believe it was in November 2017.
18     Q.  Okay.  And did the board take up a vote to
19 continue lifting the exclusion at that meeting?
20     A.  No.
21     Q.  Did it discuss the issue?
22     A.  It was discussed in public comments, similarly to
23 September.
24     Q.  And were any materials presented to the board on
25 that issue?

1      A.  No.
2      Q.  Other than the ones we've talked about, did the
3  Plan's Board of Trustees hold any other meetings in 2017?
4      A.  No.
5      Q.  Did the Board of Trustees ever take up a vote in
6  2017 to continue lifting the exclusion for the 2018 Plan
7  Year?
8      A.  No.
9      Q.  Okay.  Was there any board meeting from January
10 2018 to the present where this issue has been discussed?
11     A.  It's been discussed in public comment numerous
12 times, along with people who want hearing aids and other
13 such benefits.
14     Q.  Is Blue Cross Blue Shield of North Carolina the
15 Plan's third-party administrator?
16     A.  Yes.
17     Q.  In anticipation of the sunsetting of the gender
18 dysphoria coverage at the end of 2017, did the Plan provide
19 Blue Cross Blue Shield with revisions to the 2018 Plan
20 Benefits Booklets?
21     A.  The Plan updated its own benefits booklets and
22 provided Blue Cross with a decision memo on the fact that
23 they needed to put the exclusions back in play.
24     Q.  What was that decision memo?
25     A.  It's an called an ADM.

1      Q.  What does ADM stand for?
2      A.  Administrative Decision Memo.
3      Q.  What was the date of that memo?
4      A.  I do not know.
5      Q.  Approximately what month would it have been
6  provided to Blue Cross?
7      A.  It would have had to have been provided in
8  December, so that it would be ready for the -- let me
9  rephrase that.
10         It would likely have been in December for the
11 January Plan, for the January '18 Plan Year.  But it is
12 possible that it was in January because you can re-process
13 claims.
14     Q.  So likely around December 2018, January?
15     A.  Yes.
16     Q.  I apologize -- December 2017, January 2018?
17     A.  Correct.
18     Q.  All right.
19         MS. RAVI:  Could we go off the record?
20         (Off the record)
21 BY MS. RAVI:
22     Q.  We were discussing Blue Cross Blue Shield of
23 North Carolina and the Plan's instruction to Blue Cross
24 Blue Shield regarding the reinstated exclusion for the 2018
25 Plan Year.

1          Did Blue Cross Blue Shield of North Carolina state
2  that it would need the Plan to hold it harmless if the Plan
3  did not continue coverage for the 2018 Plan Year?
4      A.  Yes.
5      Q.  And did the Plan discuss this with Blue Cross
6  Blue Shield?
7      A.  Oh, yes.
8      Q.  What was discussed?
9      A.  Whether or not we felt it was necessary to I
10 guess worry about it or not.  We chose -- we just didn't
11 think -- they're our third-party administrator.  They're
12 just, they were just kind of doing what they needed to do
13 business, to cover their business processes.  And we chose
14 to not worry about it.
15     Q.  When you say we chose to not worry about it, what
16 does that mean?
17     A.  We're going to, they're going to, we're going to
18 hold them harmless if someone were to raise issue, and we
19 would own that.
20     Q.  So did the Plan sign the requested
21 indemnification agreement?
22     A.  I don't remember.
23     Q.  Who at the Plan was discussing Blue Cross Blue
24 Shield's request?
25     A.  Can you repeat that?

EXHIBIT 2

1    Q.  Who at the Plan was discussing Blue Cross Blue
2  Shield's request to be held harmless?
3    A.  Plan staff.  And I'm sure that would require the
4  input from the Treasurer and probably legal counsel.
5    Q.  Who was legal counsel?
6    A.  At the time, that would have been Sam Hayes,
7  General Counsel, Andrew Norton, as Plan Counsel.
8    Q.  Anyone else in terms of local counsel?
9    A.  There could have been others involved that I
10  wasn't aware of.
11    Q.  In terms of Plan staff who discussed this, who
12  all was that?
13    A.  It would have been, besides myself, Caroline
14  Smart, Ted Enarson.  I don't remember who was there.  Beth
15  Horner.
16    Q.  Anyone else?
17    A.  That's probably it.
18    Q.  All right.  And to the Plan's knowledge, did it
19  agree to hold Blue Cross Blue Shield of North Carolina
20  harmless?
21    A.  I believe so, yes.
22    Q.  All right.
23    MS. RAVI:  Can we go off the record?
24    (Off the record)
25    MS. RAVI:  Back on the record.

1    THE WITNESS:  If I could make a clarifying
2  statement from the previous discussions?
3    I misspoke when I said that we actually did sign
4  the hold harmless or indemnification for Blue Cross Blue
5  Shield.  We did not and cannot.  State law prohibits us from
6  doing that.
7    MS. RAVI:  All right.  Thank you.
8  BY MS. RAVI:
9    Q.  I'll hand you what I've marked as Plaintiffs'
10  Exhibit 9.
11    (Exhibit 9 is marked for identification.)
12  BY MS. RAVI:
13    Q.  Are you familiar with this document?
14    A.  I am.
15    Q.  What is it?
16    A.  It's an e-mail sent, it's essentially a press
17  release from the Treasurer.  And I'm obligated to send it
18  to our board members, as I do all press releases.
19    Q.  Who is Lorraine Munk?
20    A.  My Executive Assistant.
21    Q.  Did you request that Ms. Munk send this e-mail on
22  your behalf?
23    A.  Yes.
24    Q.  Had you seen a copy of this statement previous to
25  this e-mail?

1    A.  As I said, it was a press release.  So yes, I had
2  seen it.  And it's our obligation to send it to the board,
3  all press releases.
4    Q.  Did you edit the statement before it went out?
5    A.  No.
6    Q.  Did anyone else edit this statement?
7    A.  We copy it straight, we put forward the press
8  release.
9    Q.  Who drafted the press release?
10    A.  It would have been in the Treasurer's Office.
11    Q.  Who in the Treasurer's Office?
12    A.  I'm not aware.  I know who is in the Treasurer's
13  Office, but I'm not aware who drafted the statement.
14  Probably the Communications Director.
15    Q.  Who is the Communications Director?
16    A.  Frank Lester.
17    Q.  Is the Plan aware of anyone having edited this
18  statement?
19    A.  No.
20    Q.  And the statement was sent on your behalf.  Is
21  that right?
22    A.  Yes.
23    Q.  And the statement makes reference to the medical
24  uncertainty of the procedure it references.
25    Is that right?

1    A.  That is correct.
2    Q.  What was the basis for that reference?
3    A.  This is the Treasurer's words.  I'm not aware of
4  what he was referring to.  I don't disagree with it.  But
5  these are his words.
6    Q.  All right.  Are you aware of the Treasurer's
7  basis for this statement?
8    A.  No.
9    Q.  Does the Plan believe the treatment for gender
10  dysphoria is medically uncertain?
11    A.  Yes.
12    Q.  When did this view develop?
13    A.  Please repeat.
14    Q.  When did this view develop?
15    A.  I would say over several years.  In 2016, it's
16  very clear that while the presentations had a lot of
17  supporting documentation, the basis of the sunsetting or
18  the removal of the exclusion was based on the 1557 Rule and
19  the need to keep the federal funding.
20    And the Plan at the time, the staff used and put
21  forth all sorts of other information when we just went
22  through.
23    But since that time, we have new staff, we have a
24  small staff, we manage contracts, and we have limited
25  clinical staff.

EXHIBIT 2

18 (Pages 66 - 69)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 20 of 63

1      But the people we work with, and as I already
2   mentioned the journals or whatever that I have reviewed and
3   discussions we've had with current and former board
4   members, there's a lot of uncertainty on whether or not the
5   treatments are effective.  And in some cases, maybe they
6   are.  But there's discussion in the space of the, more the
7   psychological effects and how much it's important there
8   versus the surgery, the transition surgery.
9      Q.  And what was the basis for Treasurer Folwell's
10  statement regarding the medical uncertainty?
11     MR. RULEY:  Objection, form.
12     THE WITNESS:  I don't know.
13  BY MS. RAVI:
14     Q.  Did Treasurer Folwell discuss this statement with
15  you?
16     A.  No.
17     Q.  Did Treasurer Folwell discuss this statement with
18  anyone at the Plan?
19     A.  I'm not aware of any conversations he had with
20  anybody at the Plan.
21     Q.  And does this statement from October 25th reflect
22  the views of the State Health Plan?
23     A.  Parts of it might, such as the legal and medical
24  uncertainty.
25     The Franciscan Alliance opinion came out in

1   December of 2016.  And we know there were various cases in
2   Texas I believe.
3      So, again, I think there's legal uncertainty.  I
4   think there's medical uncertainty.  And our thoughts kind
5   of went down that direction.
6      Plus the fact that this is such, as we already
7   went through, the Blue Cross spreadsheet that was part of
8   the record, where it's such a small part of the Plan
9   membership that this benefit would apply to.  It's a niche.
10  I call that a niche, a small population of people.
11     And the Plan can't cover every requested benefit
12  for every single niche that comes forward, niche
13  population.  It happens all the time.
14     You know, I have to turn down parents who want a
15  special feeding benefit for their infant children who can't
16  process food normally.
17     I have to turn down hearing aids for a much
18  larger population of people because they're so expensive.
19  There's plenty of efficacy there, right?  It helps people
20  hear.  But the fact that they have to change hearing aids
21  every five to six years or more frequently, I can't afford
22  that as a Plan.
23     Because if I -- I have to serve a whole entire
24  population with a very finite amount of money.  And so the
25  only thing I can really cover is the current state of

1   benefits and any benefits that might apply to a broad swath
2   of the population with a not guaranteed but a strong
3   proponent of lower costs in the future.
4      And so that's where legal and medical uncertainty
5   -- I don't have to cover medically necessary treatment.  We
6   cover a lot of it.  But in this case, we don't.
7      Q.  Prior to this statement coming out on October 25,
8   2018, did Plan staff discuss the legal uncertainty that's
9   referenced here?
10     A.  Yes.
11     Q.  Did Plan staff discuss the medical uncertainty
12  that's referenced here?
13     A.  Yes.
14     Q.  Let's turn back to Exhibit 5.  And if you can
15  turn to Page 10 of this document.
16     Plaintiffs' Interrogatory Number 3 asks the Plan
17  to discuss the factual basis for each governmental interest
18  that the Plan contends supports the exclusion.
19     Is that right?
20     A.  Yes.
21     Q.  And is it correct, turning to the next page, the
22  Plan states that the Plan has not identified any valid,
23  reliable, peer-reviewed longitudinal studies that support
24  the efficacy of the plaintiffs' desired treatment?
25     A.  I'm sorry -- where are you?

1      Q.  I am at the bottom of Page 11, last paragraph.
2      A.  Okay.
3      That would be true.
4      Q.  Is a peer-reviewed, longitudinal study that
5   supports the efficacy of treatment a prerequisite for the
6   Plan to cover a proposed benefit?
7      A.  Not necessarily.  When we evaluate, as I think we
8   said earlier, it's a holistic review.  There's no single
9   pathway to coverage.  It has to be a broad swath of
10  membership, that there's a benefit for multiple people.
11     There's a cost component to it.  There's a
12  downstream cost component to it.  There's got to be some
13  common -- not experimental for sure.
14     There's got to be some common understanding in
15  the medical community that it is a treatment that will
16  produce a downstream effect that's positive.
17     So, you know, it's very difficult to come back
18  and say well, peer-reviewed, longitudinal studies -- I'm
19  not a clinician and I'm not a researcher, so it's, you
20  know -- but to the extent that we have not found any real
21  evidence that it's absolutely black and white, this
22  particular issue.
23     You know, I think it goes, well, it should go
24  without saying this is not a personal issue for me.  I
25  don't get, I have no personal opinion about this.

EXHIBIT 2

1  Because I walk through the front door at the
2  office, and I'm a fiduciary. This is all about the cost
3  and maintaining this benefit for 740,000 people who expect
4  it every single day and the retirees that have an
5  expectation of the benefit when they retire.
6  And so every decision I make -- and I'm speaking
7  for myself -- is about that. It's all about that every
8  day.
9  It breaks my heart 9 times out of 10 when I have
10 to decline a benefit, 9 times out of 10.
11 When I see people that need hearing aids, I would
12 love to give them a hearing aid, I would love to.
13 I have nothing against transgender people. I
14 would be more than happy to provide the benefit. But it's
15 not my decision. I'm a fiduciary first. And I'm
16 responsible for 740,000 people. This is not personal.
17 This is all about money very simply put.
18 I've been charged with reducing the costs of the
19 Plan to operate since the day I started. And we have done
20 just that.
21 You know, there's some discussions about how much
22 money the Plan has saved. Well, it's because we've worked
23 really hard to do that. We've taken out all extraneous
24 benefits.
25 We used to cover benefits for a small population

1  of really healthy people for an app that was, I think we
2  paid 4000 dollars a person. It was the healthy people who
3  were doing it. It wasn't achieving anything for health.
4  So we canceled the benefit. It was a small, very small
5  population, health management benefit.
6  But that is what we do every day. And I have to
7  make choices that are awful sometimes. And it gives me no
8  great pleasure, but it is my responsibility.
9  Q. Turning back to the peer-reviewed studies we
10 discussed, did the Plan conduct a search for those studies?
11 A. I did not. I don't believe the Plan did.
12 Q. Okay. The Plan's response also states that
13 during the pendency of this case, the American Journal of
14 Psychiatry issued a correction to an article.
15 Do you see that here?
16 A. I do.
17 Q. What was that article?
18 A. I don't know -- not right this moment.
19 Q. To the Plan's knowledge, has Treasurer Folwell
20 reviewed that article and the correction referenced here?
21 A. I do not know.
22 Q. Has Plan staff reviewed the article?
23 A. Possibly, but I do not know.
24 Q. And has the Board of Trustees reviewed that
25 article?

1  A. Possibly, but I do not know.
2  Q. All right.
3  A. If you'll recall, though, this says the Plan has
4  not identified any valid or reliable -- so to the extent
5  that we are reviewing articles, as I mentioned earlier,
6  when I'm reviewing the journal, the New England Journal of
7  Medicine and Kaiser and Milliman, those types of reviews,
8  there's been nothing that makes this in my mind 100 percent
9  clear.
10 Q. Going back to the paragraph that starts with
11 Second on the same page, the Plan states that it remains
12 unaware of any objective test to identify individuals
13 suffering from gender dysphoria who will benefit from the
14 hormonal and surgical treatments sought here.
15 Is that right?
16 A. That is correct. The Plan remains unaware of any
17 objective test -- yes.
18 Q. Is an objective test to identify individuals who
19 will benefit from the proposed treatment a prerequisite for
20 the Plan to cover a proposed benefit?
21 A. As I've stated before, it's a holistic review.
22 And so if there are, in fact, objective tests,
23 then that might be taken into consideration.
24 Q. Has the Plan conducted a search for such
25 objective tests?

1  A. If it were to become necessary, then the Plan
2  would make a search.
3  But we do not find it necessary because of the
4  things I've already discussed -- about the small volume of
5  patients being a niche group, that we wouldn't be able to
6  afford to offer the benefit.
7  Q. So to the Plan's knowledge today, has the Plan
8  conducted a search in the past for such tests?
9  A. No.
10 Q. And the Plan states that for minors, the Plan is
11 unaware of any methodology to reliably distinguish between
12 children for whom gender dysphoria will resolve without
13 hormonal therapy or surgical intervention and those for
14 whom it will not.
15 Is that right?
16 A. Yes.
17 Q. Was the Plan's unawareness of this methodology
18 for children also its justification for excluding this care
19 for adults?
20 A. I can't say.
21 Q. Is the Plan aware?
22 A. Of?
23 Q. Of this methodology.
24 A. For minors?
25 Q. Uh-huh.

EXHIBIT 2                                                    20 (Pages 74 - 77)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 22 of 63

1    A.  No.

2    Q.  Okay.  Does the Plan contend that this concern

3  it's identified regarding minors apply to withholding the

4  same care for individuals who are in late adolescence?

5    A.  It generally becomes a moot point because the

6  Plan is not considering to offer the benefit.

7        The Plan does not offer the benefit, so we're not

8  distinguishing between, right now, at this point, between

9  minors and adults.

10    Q.  Is the Plan's unawareness of methodology to

11  reliably distinguish between children for whom gender

12  dysphoria will resolve without hormonal therapy or surgical

13  intervention and those for whom it will not, is the Plan's

14  unawareness of that methodology one of the reasons for

15  which it excludes coverage?

16    A.  I think I just said no.

17    Q.  And the Plan states that the FDA has not approved

18  any drugs for treatment of gender dysphoria.

19        Is that right?

20    A.  That is correct.

21    Q.  Do the Plan documents specify that the FDA must

22  approve medical drugs as a prerequisite for coverage?

23    A.  The Plan does not -- only -- the Plan does not

24  cover non-FDA approved drugs except for in the case of

25  cancer.  And I think that's probably the only, only space.

1    Q.  And the FDA does not regulate surgical

2  procedures.  Is that right?

3    A.  I'm not a clinician, so I don't know that -- I'm

4  not sure that that's correct.  But I believe that -- I

5  don't know the answer to that.

6    Q.  Other that the statements made in response to

7  Plaintiffs' Interrogatory 3, are there any other

8  governmental interests that the Plan contends support the

9  exclusion?

10    A.  Any other -- can you rephrase that?

11    Q.  Yes.  So Plaintiffs' Interrogatory Number 3 asks

12  the Plan to identify the governmental interests that the

13  Plan contends support the exclusion.

14        Other than those identified in its response, are

15  there any other governmental interests that the Plan

16  contends supports the exclusion?

17        MR. RULEY:  Objection, form.

18        THE WITNESS:  I'm still not real clear -- I mean

19  -- where -- is that in here?

20  BY MS. RAVI:

21    Q.  So Interrogatory Number 3 asks the Plan to

22  describe the factual basis for each governmental interest

23  that you contend supports the exclusion.

24    A.  I think I'm struggling a little bit with the

25  definition of governmental interest.

1    Q.  Are there any governmental interests identified

2  in response to this interrogatory?

3    A.  So other than FDA, is that what you're asking

4  for?

5    Q.  Other than the statement made in response to

6  Interrogatory Number 3.

7    A.  Then --

8        MR. RULEY:  Objection, form.

9        THE WITNESS:  Again, I don't -- no, I don't know.

10  BY MS. RAVI:

11    Q.  Okay.  Let's turn back to Page 10, actually Pages

12  9 to 10 of this document.

13        Plaintiffs' Interrogatory 2 asks the Plan to

14  describe the financial sustainability of the State Health

15  Plan.

16        Is that right?

17    A.  Yes.

18    Q.  And turning over to Page 10, the Plan references

19  several policies or decisions to improve the Plan's

20  long-term sustainability that have been proposed, adopted,

21  or implemented since 2017.

22        Is that right?

23    A.  That is correct.

24    Q.  Listed under Response (a), the Plan references an

25  increased use of a Medicare Advantage plan.

1    A.  Yes.

2    Q.  And it states that this change is expected to

3  generate 590 million dollars in savings over three years.

4        Is that right?

5    A.  I don't see the 590 -- oh, right there.  Thank

6  you.  Appreciate that.

7        Yes, that is correct.

8    Q.  And under (b), it states elimination of the

9  subsidy for retiree healthcare benefits for members hired

10  after January 2021.

11        Is that right?

12    A.  Yes.

13    Q.  How much is that expected to save?

14    A.  Well, out of the OPEB liability, it will be

15  billions.  But it is not calculable without that.

16        It's probably in the 300, for the retirees,

17  again, probably 300 dollars per member per month.  But,

18  again, it's pretty difficult to calculate that.

19    Q.  Under (c), the Plan references competitive

20  bidding for third-party administration services for the

21  Plan.

22        Is that right?

23    A.  Correct.

24    Q.  And the Plan estimates that this will save at

25  least 20 million dollars per year.

EXHIBIT 2

Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 23 of 63

1  Is that right?
2  A.  Correct.
3  Q.  And under (d), the Plan references the Clear
4  Pricing Project.
5  Is that correct?
6  A.  Correct.
7  Q.  How much is that expected to save?
8  A.  In its full state of, of action, if we were to
9  achieve the full goal, we would save probably 300 million
10  dollars.
11  Q.  All right.  I'll hand you what I've marked as
12  Exhibit 10.
13  (Exhibit 10 is marked for identification.)
14  BY MS. RAVI:
15  Q.  Are you familiar with this document?
16  A.  I am.
17  Q.  What is this?
18  A.  It is a Disclosure of Expert Witnesses Who Do Not
19  Provide a Written Report Pursuant to -- a citation -- by
20  Defendants Dale Folwell, Dee Jones, and the North Carolina
21  State Health Plan for Teachers and State Employees.
22  Q.  As of December 2017, what was the amount of the
23  Plan's unfunded liability?
24  A.  December 2017?  It's not calculated as of the end
25  of the year.  It's more as of 6-30.  I want to say that was

1  probably 42 billion.
2  Q.  And what is that amount today?
3  A.  28.8 as of 6-30-20.  And there will be a new
4  calculation for 6-30-21.
5  Q.  Okay.
6  A.  Expected to go up.
7  Q.  And as of December 2017, what was the amount of
8  the Plan's cash reserves?
9  A.  Probably around, it was about a billion dollars.
10  We've tried to keep it around that level -- although it has
11  grown up a little bit.
12  Q.  And what is that amount today?
13  A.  It's still around a billion.
14  Q.  Does the Plan have an annual budget?
15  A.  Yes.
16  Q.  What are the major components of that budget?
17  A.  Plan revenues, employer and employee components,
18  claims costs, which are both medical and pharmacy, pharmacy
19  netted by refunds, Medicare Advantage costs, fully insured
20  costs, and then the admin costs.
21  Q.  Is it fair to say that the major components of
22  the Plan's annual budget are revenues, the money coming in,
23  and costs, the money going out?
24  A.  Very much so.
25  Q.  Are there any other major components of the

1  Plan's annual budget?
2  A.  The Plan has an opportunity for a, in statute, an
3  opportunity to transition money back to the Retired Health
4  Benefit Trust Fund if the balance warrants.
5  Q.  Is the Plan's unfunded liability a component of
6  its annual budget?
7  A.  Can you rephrase?
8  Q.  Does the Plan's unfunded liability factor into
9  its annual budget?
10  A.  It's sort of the opposite.  The unfunded
11  liability is a calculation based on the 100-year run-out of
12  claims costs.
13  So, yes, so the budget or the actual numbers, not
14  the budget, but the actual numbers inform the unfunded
15  liability calculation.  But it also has a trend rate.  It's
16  got a discount rate component.  It's got a migration
17  component to it, movement between Plans.  And it's got an
18  age component.  And it's got then, again, the volume of
19  retirees.
20  Q.  Okay.  And your disclosure states, and I recall
21  you testified earlier, that approximately 15 percent of
22  Plan participants incur 85 percent of the cost of
23  treatment?
24  A.  Uh-huh.
25  Q.  Does that figure apply to all Plan participants?

1  A.  Yes.
2  Q.  So looking at all enrollees in the Plan, 15
3  percent of those enrollees account for 85 percent of the
4  cost of treatment?
5  A.  Correct.
6  Q.  Can an individual enrolled in the State Health
7  Plan request that the State Health Plan change the pronoun
8  associated with that enrollee?
9  A.  Please rephrase.
10  Q.  Can an individual that's enrolled in the State
11  Health Plan request that the Plan change in its records the
12  pronoun that's associated with that individual?
13  A.  The member can change his or her own pronoun.
14  Q.  How does that process occur?
15  A.  The member logs in to eBenefits or calls into the
16  call center, benefit-focused call center, and either
17  changes it him or herself, or requests that it be changed.
18  Q.  Okay.
19  A.  It's not validated.
20  Q.  What does that mean for it not to be validated?
21  A.  You could put in whatever you want.  There's two
22  options, male or female.
23  And if I were female and put in female, I could
24  do that.  Or if I wanted to put in male, I can do that.  If
25  I make an error, I can do that too.

1    Q.  And you said an individual can either log in and

2  change that themselves or they can make a request that the

3  Plan make that change?

4    A.  No.  They call into the call center, talk to a

5  call center rep who will record the call.  And then they

6  can be requested to make that change.

7    Q.  To whom is that request made?

8    A.  The call center rep.

9    Q.  If a call center rep gets that kind of request,

10  what happens next?

11    A.  They comply with the request.

12    Q.  And how does that process occur?

13    A.  They go into the system and check yes or no or

14  male or female or exactly -- I guess it's male or female.

15    Q.  And prior to going into the system, is any

16  validation requested?

17    A.  Absolutely.  Whatever -- like the member would

18  call in, and there would be validation questions from the

19  call center rep back to the member to confirm any number of

20  demographic statistics.

21    Q.  What are those validation questions?

22    A.  I don't know them specifically.  But it's

23  something that would be similar to what we all do, which is

24  your address, your full name, possibly your Social Security

25  number, you know, phone numbers, whatever, to try to --

1  they're a vendor.  I don't tell them how to do their job.

2  I just tell them they have to validate it.  It's not my

3  obligation how to exactly do it.

4    Q.  So is it fair to say that validation is with

5  respect to making sure that the person calling in and

6  making this request is who they say they are?

7    A.  Yes.

8    Q.  Does the Plan require proof of any enrollee's

9  chromosomes before it goes into the system and complies

10  with that question?

11    A.  No.

12    Q.  Does it require proof of an enrollee's anatomy?

13    A.  No.

14    Q.  And does it require proof of an enrollee's DNA?

15    A.  No.

16    Q.  Everything we just talked about with regard to

17  changing the pronoun in the system, does that also apply to

18  a request to change an individual enrollee's gender marker

19  in the system?

20    A.  We don't track gender markers in the system other

21  than male or female.  We only have but two options right

22  now.

23    Q.  Is participation in the Plan required for state

24  agency employees?

25    A.  No.  They have a choice.  I mean the benefit

1  booklet is laid out and given to every new employee.  And

2  they can make a choice as to whether or not they want the

3  benefit, can afford the benefit, or if the benefit covers

4  what they need to have covered.

5    Q.  Is it correct that individuals cannot receive

6  coverage under the Plan unless they are employed by a state

7  agency or participating local agency?

8    A.  They could be a dependent of someone on the State

9  Health Plan.

10    Q.  So an individual to receive coverage must either

11  be employed by a state agency or be a dependent of somebody

12  who is?

13    A.  Correct.  And that dependency would be validated

14  through a qualifying documentation.

15    Q.  How is an individual's eligibility for

16  participating in the Plan determined?

17    A.  First of all, it's laid out in statute.  But,

18  again, it's just be an employee of an employing unit that

19  is participating in the Plan is the simplest way to put it.

20    Q.  And who makes that determination?

21    A.  General Assembly.

22    Q.  Does someone review an enrollee's request to

23  participate in the Plan to confirm that they are, in fact,

24  employed by a state agency?

25    A.  Yes.  We have what we call Health Benefit

1  Representatives that are at every employing unit and/or

2  agency office.  And they assist any new member, new

3  employee with the benefits enrollment.

4    Q.  And how are eligible employees enrolled in the

5  Plan?

6    A.  Again, they can go into the system either on

7  their own or call in and be enrolled by a call center

8  representative.

9    Q.  Do participating employers play a role in getting

10  eligible employees enrolled in the Plan?

11    A.  Yes.  The HBR is very much responsible for

12  helping the member.  But it's still on the member or the

13  employee to enroll in a timely fashion.  There's a 30-day

14  window for which a new employee has to be enrolled.  That's

15  the window.  And that's in statute.

16    Q.  And you said that a Health Benefits

17  Representative can provide assistance in that process.

18    A.  Correct.

19    Q.  What about participating employers, do they play

20  a role in this process?

21    A.  In what way?

22    Q.  Do participating employers play a role in the

23  process of getting an eligible --

24    A.  Only through the fact that they have an HBR

25  available.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    Q.  Do participating employers have any role in
2    determining eligibility?
3    A.  To the extent that it's either a new hire and
4    they're working more than 30 hours a week as a full-time
5    employee, but other than that, no.
6    Q.  Do participating employers provide enrollment
7    forms?
8    A.  Yes.
9    Q.  Do they transmit those enrollment forms to the
10   Plan?
11   A.  If there's, if it's -- first of all, we do mostly
12   electronic enrollment.  So they might provide a computer
13   for someone to enroll.  I'm not -- we don't manage what the
14   employers do as to how exactly they do it.
15       But I know of some that will provide a computer
16   for an employee who does not necessarily work in a desk
17   job.  But they are, they help them get enrolled.  But
18   that's, again, on the HBR and the agency or the employer.
19   Q.  Okay.  And do participating employers deduct
20   premiums from their employees' salary?
21   A.  The State Controller deducts the premiums from
22   the salary.  But it's the local HR people who are
23   responsible for getting it right into the system, the HR
24   payroll system.
25       There are 408 employing units, for example, that

1    constitutes, like 108 are local education authorities, so
2    all the public school systems.  Each one of them has a
3    payroll system.  So we have integration from 408 different
4    locations into our system.  And they're all different.
5        We have the Beacon agencies, which represent the
6    state agencies if you will.  The educational systems are
7    just very different.  General Assembly has their own
8    payroll system.
9        And so all of that comes in.  And each employing
10   unit is responsible for getting the accurate information
11   into their own payroll system.
12       And then Blue Cross does the billing.  We'll send
13   them an aggregated bill to know how much, how many active
14   members are on the payroll, on the Plan for a particular
15   month.  We bill in advance.  And then the money gets moved
16   around electronically.
17   Q.  And who determines whether the exclusion remains
18   in the Plan?
19   A.  Say that again please.
20   Q.  Who determines whether the exclusion remains in
21   the Plan?
22   A.  The board.
23       MS. RAVI:  Can we go off the record?
24       (Off the record.)
25       MS. RAVI:  Back on the record.

1    BY MS. RAVI:
2    Q.  You testified earlier that Plan staff discussed
3    the statement regarding the legal and medical uncertainty
4    of coverage for gender dysphoria treatment.
5        Is that right?
6    A.  Yes.
7    Q.  When was this discussed among Plan staff?
8    A.  When?
9    Q.  Yes.
10   A.  We discuss all kinds of things every single day
11   about coverage for everything we offer.  And so to pinpoint
12   a day, I couldn't possibly do it.
13   Q.  Are you aware of any specific day on which Plan
14   staff discussed the medical uncertainty of coverage for
15   gender dysphoria treatment?
16   A.  Not at all.
17   Q.  Are you aware of who would have discussed this
18   issue?
19   A.  It may have been like Caroline Smart and I might
20   have talked about it.  As I mentioned, I think I mentioned
21   these same names earlier, Ted Enarson, Caroline Smart,
22   either Andrew or Kendall, again, just general
23   conversations, what we've heard, what we know.
24       We're not clinicians.  I have a very, very, very
25   small staff.  And we mostly manage contracts.  And so we do

1    a lot of research.  We have, you know, a big engine, but we
2    still don't have a lot of expertise.  And so we rely on our
3    own thought.
4        And then we research what we find out, you know,
5    what we need to research, we reach out to resources --
6    because we have Blue Cross to reach out to, we have CVS to
7    reach out to -- to gain knowledge.  So, again, that's what
8    we do every single day.
9    Q.  What year would you have discussed with Caroline
10   and Ted and the other Plan staff you mentioned, what year
11   would you have discussed the legal and medical uncertainty
12   of gender dysphoria treatment?
13   A.  It would have had to have been no earlier than
14   2017, June forward if you will.  And then it would have
15   probably been into 2018.
16   Q.  Okay.  Was this discussed after 2018?
17   A.  Possibly.
18   Q.  When would that have been?
19   A.  No particular time.
20   Q.  Is the Plan aware of whether after 2018 this
21   issue would have been discussed?
22   A.  As I said before, we discuss everything.  We
23   discuss all sorts of issues every single day.
24       So there's just no possible way I can respond to
25   a particular issue -- no matter the fact that it is your

EXHIBIT 2                                                    24 (Pages 90 - 93)

1 important issue.
2     But I have important issues that come up every
3 single day with populations after, especially during board
4 meetings, when different populations want to come and ask
5 for another treatment. So we have them come up every board
6 meeting.
7     And so it is not possible to talk about which day
8 did we talk about what topic. It's just not going to
9 happen.
10    Q. So the Plan is aware that in, starting June 2017
11 into 2018, the statement regarding legal and medical
12 uncertainty of gender dysphoria treatment was discussed --
13    A. Absolutely.
14    Q. -- in that period?
15    A. So I will say more specifically, you know, again,
16 after this, one of the very first e-mails I got from former
17 counsel to Lotta Crabtree was from Ashley Gellahan.
18     And while he's an attorney, so I can't divulge
19 some of the information, we all became very much aware of
20 the Franciscan Alliance opinion. And we've been aware of
21 opinions throughout. And so -- Bostock last year.
22     So believe me, this comes up a lot in a lot of
23 settings, in a variety of settings. And it's just not
24 possible to talk about specific ones.
25    Q. So is it fair to say that, speaking in the period

1 after 2018, the Plan is not aware of any specific time when
2 the medical uncertainty of gender dysphoria treatment was
3 discussed?
4    A. That may be fair.
5    Q. And you mentioned that the Plan has resources
6 that it can reach out to for information on this topic.
7 You said that Blue Cross Blue Shield is one of those
8 resources and CVS.
9     Are there any other resources?
10    A. Those are our main go-tos. Segal, we talk to
11 Segal. They have consulting staff that includes
12 clinicians.
13    Q. Any other resources for the topic of gender
14 dysphoria treatment?
15    A. No.
16    Q. All right. And you testified earlier that you,
17 yourself, did some research into the medical necessity of
18 gender dysphoria treatment.
19     Is that right?
20    A. Yes.
21    Q. You said that you researched Kaiser, Milliman,
22 and the New England Journal of Medicine.
23     Is that right?
24    A. Yes.
25    Q. How did you decide to look at those resources?

1    A. Having been at the state for a while, I'm very
2 much aware of Kaiser being kind of a go-to resource, as
3 well as Milliman, and the New England Journal of Medicine.
4     Again, there's articles published. Again, once
5 you get started on some of those distribution lists, you
6 get stuff all the time. And there's no possible way to
7 read all of it.
8    Q. When did you do this research?
9    A. I don't know. It could have been any day, any
10 time of day, any week over the last several years.
11    Q. So between June of 2017, when you started at the
12 Plan, and today, can you pinpoint any specific time when
13 you did this research?
14    A. Probably in the fall, I would say in the fall of
15 2017. Because, quite frankly, the topic had never entered
16 my mind. So that would, I would say that was a good time
17 for it, and then maybe during 2018, again, as we're
18 learning about more of the activities around it -- but, no.
19    Q. Let's start with fall of 2017. Did you speak
20 with anyone about what resources would be helpful to look
21 into regarding the medical necessity of gender dysphoria
22 treatment?
23    A. We talked to Blue Cross and CVS and Segal during
24 that time frame.
25    Q. How did you find the resources that you reviewed?

1    A. I reached out to Segal, Blue Cross, and CVS.
2 They are our partners. They all have clinical staff. And
3 that's where we get our, a lot of our clinical feedback.
4    Q. Did you save your research?
5    A. What's that?
6    Q. Did you save your research?
7    A. No.
8    Q. Why not?
9    A. Because I wasn't researching to write a white
10 paper.
11    Q. So is it correct that that research has not been
12 produced to the plaintiffs at this point?
13    A. Right. General curiosity.
14    Q. In the fall of 2017, how long did you spend
15 researching these issues?
16    A. Several hours maybe.
17    Q. And you said maybe again in 2018. How long did
18 you spend in 2018?
19    A. Probably less.
20    Q. Did you share your research with anyone?
21    A. The staff discussed it. They may have researched
22 as well. And, again, it was more general conversation.
23    Q. Who at the, in the staff did you share your
24 research with?
25    A. Caroline, Ted, Beth. It's my leadership team, we

1   talk about everything.
2       Q.  And you said they may also have researched?
3       A.  Uh-huh.
4       Q.  Are you aware of what research they did?
5       A.  No.  I said they may have also researched.  So I
6   don't know if they did or didn't.
7       Q.  Speaking of Kaiser, what resources did you look
8   at for Kaiser?
9       A.  I just searched gender dysphoria, transition
10  surgery.
11      Q.  Did you review articles?
12      A.  Uh-huh.
13      Q.  From Kaiser?
14      A.  Uh-huh.
15      Q.  Okay.  What were those articles?
16      A.  I don't know.
17      Q.  Do you remember the date of the articles?
18      A.  Time range that we've already established.  And
19  it would have been current because I'm also aware of the
20  changing atmosphere or landscape.  I've seen articles that
21  are from -- so, for example, in that PowerPoint
22  presentation, there was references to 2008, which is quite
23  some time ago.  So I was looking for something more
24  current.  So I would have looked for more current articles.
25      But there's nothing that I have or remember or

1   produced in that space.
2       Q.  So with regard to your research for Kaiser, you
3   reviewed articles --
4       A.  Uh-huh.
5       Q.  -- from Kaiser?  Do you recall the names of those
6   articles?
7       A.  No.
8       Q.  Do you recall the date of any of them?
9       A.  No.
10      Q.  What were the key points made in those articles?
11      A.  Everybody has got an opinion about the validity
12  and the efficacy of the treatment, whether or not it should
13  be warranted for people under 18, for kids, if you will.
14      It was a question of whether or not people would
15  want to, did it help the emotional and mental illness
16  issues that surround gender transformation or gender
17  dysphoria rather.
18      And there is, of course, evidence of those who
19  have transitioned and then went back and, or didn't go back
20  but regretted it rather.
21      Q.  Who from Kaiser made those statements?
22          MR. RULEY:  Objection to form.
23          THE WITNESS:  I said I don't know.
24  BY MS. RAVI:
25      Q.  Did you look at anything other than articles

1   related to Kaiser?
2       A.  No.
3       Q.  Did what you looked at discuss the DSM-5?
4       A.  No.
5       Q.  Did it discuss the WPATH Standards of Care?
6       A.  No.  And, you know, the Plan doesn't necessarily,
7   the Plan staff today does not necessarily hold with the
8   same conclusions that were made by Plan staff back in 2016.
9   It's a different group of people.
10      And so I would say that we don't necessarily have
11  the same opinion, not to mention the fact that the basis
12  for the argument back in 2016 was the 1557 Rule and the
13  fear of or concern of losing federal dollars.
14      So it, from looking through all of the e-mails,
15  it, that was the crux of the issue, of the coverage.
16      And it appeared that there were varying, well,
17  through the document that we already looked through, that
18  there were just several pages of information that supported
19  the conclusion to add the benefit, to remove the exclusion.
20      So, again, the crux of the issue was the 1557
21  Rule.
22      So at this point, you know, the team back at that
23  time went down the path of supporting the 1557 Rule and
24  removing the exclusion using some of those other sources.
25      But I don't -- the Plan staff today, I'm not sure

1   that we have the same view of WPATH and DSM.
2       And I'm not a clinician, so I can't offer anything
3   further.  But, again, that's them and then.  And today it's
4   a different day.
5       Q.  Who on Plan staff is different from Plan staff in
6   December of 2016?
7       A.  So key people.  Key people were Mona Moon is no
8   longer part of the Plan staff.  Lotta Crabtree is no longer
9   part of the Plan staff.  Blake Thomas, who is, he's one of
10  the attorneys, he's not at the department anymore.  Mark
11  Collins is not there anymore.
12      And we have structured, the Plan is structured
13  differently.  There was a small group that did everything
14  back in those, in the 2016 time frame.  And now there's a
15  much broader perspective.
16      Q.  Who replaced Mona Moon?
17      A.  Me.
18      Q.  Who replaced Lotta?
19      A.  We didn't directly replace Lotta.  We did it
20  differently.
21      Q.  Who replaced Blake?
22      A.  Kendall.  It was Andrew Norton first and then
23  Kendall.
24      Q.  And Mark Collins?
25      A.  Slightly different but her, slightly different

EXHIBIT 2

26 (Pages 98 - 101)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 28 of 63

1 role, but I would say we have two people, we have a real
2 actuary, Charles Seifert. And we have a financial analyst,
3 Tamera McNeal.
4    Q. And you said it's a different perspective with
5 regard to how issues are approached with current Plan
6 staff --
7    A. Uh-huh.
8    Q. -- as opposed to Plan staff in 2016.
9    A. Uh-huh.
10    Q. Can you clarify that?
11    A. In 2016, there was Mona and Lotta and Caroline.
12 And they seemed to make all the decisions and were
13 supported by staff and maybe some of the clinical
14 perspective that -- they actually had more clinicians back
15 in those days.
16      Today, we are a flatter staff. And we have a very
17 diverse group of experience and background and skill sets.
18 And so we bring them all to the table.
19      And we work through -- again, our focus, at the
20 direction of the Treasurer, is about making sure the Plan is
21 in existence tomorrow, in five years, in ten years.
22      And that's really hard to do when we're being
23 funded at a 4 percent or better or less level, and our trend
24 rates are at 7 percent. The math just doesn't work.
25    Q. With regard to the Plan's current staff, is there

1 anyone on the Plan's current staff who would be involved in
2 discussions regarding legal or medical uncertainty about
3 treatment for gender dysphoria who is a doctor?
4    A. No. Nobody on Plan staff is a doctor.
5    Q. Is there anyone on Plan staff discussing these
6 issues who is a clinician?
7    A. We have a nurse and a pharmacist.
8    Q. Who are they?
9    A. The nurse is Sonja Dunn. And the pharmacist is
10 Stephanie Craycroft-Andrews.
11    Q. Are either Stephanie or Sonja experts in the
12 field of transgender healthcare?
13    A. No.
14    Q. Is anyone on the Plan staff today an expert in
15 that field?
16    A. No. We would not ever, we would not hire someone
17 that is -- we would need -- if we were hiring someone that
18 is an expert in a field, it's not going to be someone who
19 is an expert in a very small field that we don't cover.
20      And because of the fact that I'm not covering
21 niche groups, I'm unlikely to cover in the current, today
22 or tomorrow or next week -- as long as I'm part of the Plan
23 and we're still trying to focus on costs, then that's just
24 not going to, it's not going to be my focus.
25      As I said before and I'll say it again, this is

1 not personal. This is not something that I get to make a
2 choice about. Because if I had every single group that
3 comes in to ask for a benefit, if I covered that, then I
4 would be completely, completely avoiding my fiduciary
5 responsibility to cover basic health. That's what the Plan
6 Benefits Booklet says, right?
7      The Plan Benefits Booklet identifies every single
8 thing I cover. And it provides healthcare. We want every
9 member of the Plan to have good healthcare. We want the --
10 and the reality is we have a lot of members who have
11 diabetes. We have a lot of members who have orthopedic
12 issues. We have a lot of members who have RA. We have
13 really a lot of members who have cancer. And they want to
14 be, they want to be covered.
15      And so it's really difficult for me to just say,
16 you know, I can take this group of 25 and this group of 10
17 and these -- if you add all that up -- I'll, I'll totally
18 admit that the cost of this benefit is not going to break
19 the Plan, never was, never will.
20      But it -- I can't do it for that group and not do
21 it for the group that wants it for their infants, for, you
22 know, for a certain feeding formula for that infant group,
23 and I can't do it for the hearing aid group, and I can't do
24 it for the group that really wants acupuncture.
25      Because once you start adding those, then I have

1 to keep going. Everybody who comes in and wants a benefit,
2 I'll have to do it because I can't discriminate.
3      I'm not discriminating. This is about what the
4 Plan can afford in the environment that we're in today --
5 which is I have a General Assembly that's funding me at 4
6 percent when my trend rate is 7 plus. And that's not even
7 absolutely certain.
8      I have a 28.8 billion unfunded liability for
9 retiree healthcare that I, myself, am ready to have in a few
10 years.
11      And so, you know, this is all about being a
12 government plan. And I don't get to, I don't get to pick
13 and choose. I'm not a commercial plan.
14      So let's start with that. A commercial plan, they
15 have revenues, right? You go out and sell widgets, and you
16 sell a lot of widgets, and then you decide how much you want
17 to put into the benefit. And you can have your member, your
18 staff, your employees pay.
19      I would bet most employers -- I was paying 100
20 bucks when I was at Time Warner. I was paying for the
21 family, and I wasn't fully subsidized.
22      At the State Health Plan, we've got people who, a
23 whole lot of employees have to work one week out of a month
24 just to cover their Health Plan for their family.
25      And the effort to just institute a 25 dollar

1  premium for the 70/30 Plan and a 50 dollar premium for the
2  80/20 Plan was a herculean effort. They had never paid
3  anything until 2018. Employees had never paid anything
4  until 2018 -- which is crazy. I mean I get that.
5       But we can't just keep adding costs to the Plan.
6       And the General Assembly, in the 2016 budget, I
7  think it's 2016-94, something like that, said you got to
8  stop, you've got to control your costs, you're not getting
9  more than 4 percent, and you can't go over.
10      So what happens when I spend more than I've got?
11  I've got to charge employees. And I got to charge employees
12  who, you know, read the, you know employees don't make
13  market rates. They just don't.
14      And so it is a very tight -- I mean I live in a
15  box. And there's not a lot of room in the box to move
16  because I have the General Assembly describing what I can
17  do. You know, it's all -- eligibility, it's all in statute.
18  My funding is all in statute, in the budget bill. And
19  that's one box.
20      I work with vendors who I have to make them work
21  together. And, quite frankly, as big as we are, I got at
22  least one vendor that's not real cooperative. And it's
23  really annoying. But it doesn't matter -- apparently, to
24  some vendors, it doesn't matter that we're the biggest
25  Health Plan, you know, one of the biggest in the nation.

1       And it may sound big and like we can get all this
2  buying power. We don't have all the buying power. The
3  hospitals and the providers that work in the hospitals are
4  killing us all from a cost standpoint.
5       And so it's, you know, my focus is to be able to
6  reduce family premiums 100 bucks. That's my, that is one of
7  my biggest goals right now. And that is the only way I'm
8  going to get an uptick -- to bill 100 dollars -- I'm paying
9  right now 720 dollars for three people. That's a lot of
10  money. And I am grateful that I can afford it. But for
11  your average teacher, they can't afford that.
12      And I'm going to have to reduce the family premium
13  100 bucks at a minimum to make somebody take it up.
14      And so until I can take that kind of money out of
15  the Plan and at the same time shore up the Retiree Health
16  Benefit Trust Fund for the unfunded liability and make up
17  trend -- oh, by the way, they're not covering COVID costs
18  right now. The General Assembly is not interested in giving
19  us back our money for COVID.
20      So people ask me why carry a billion dollar
21  budget, cash, cash balance? It's to make up for things like
22  that. Like a bad flu season, which we're going to have,
23  we're going to have it if we're not careful about vaccines
24  and COVID's still raging.
25      I mean that's what I have to live with every day

1  I walk in the door. And it is, like I said before, it
2  breaks my heart that I can't cover everybody.
3       I mean I have to deny people who enrolled 10 days
4  later than the deadline. Sorry, can't do it. Statute says
5  30 days, can't do it.
6       I have to deny people that, that have no money to
7  cover their spouse, who then got a job, who forgot to take
8  themselves off the Plan within the 30 day window, made it 45
9  days, and I can't, and I can't let them go.
10      So this is, this is not about doing -- I am not in
11  a position to do what I would like to do or anybody I work
12  with to do what I want to do.
13      This is about I work for the taxpayers of North
14  Carolina. And I work for the Treasurer. And I work for
15  every single member, 740,000 plus members and their
16  dependents, every single day. And that's some weight.
17  That's some weight.
18      And I empathize with everybody who comes in the
19  door all day long. I just can't do everything for
20  everybody.
21      And so if someone wants to sign up for the Health
22  Plan to get good healthcare, to cover their diabetes, to
23  cover their cancer, to cover their primary care visits,
24  we're a great Health Plan. But we're not going to be the
25  Health Plan for everybody. And that's just not how we were

1  ever set up. It's never been set up to do that.
2       Sorry, that was a long-winded answer.
3       Q.  Since you started at the Plan, what benefits has
4  the Plan added to its Plan booklets?
5       A.  We have added some insignificant benefits,
6  generally speaking. We have made, we've moved forward with
7  some mental health parity, a couple of mental health parity
8  benefits that we needed to make sure we were in compliance.
9       Which every now and again -- I think, as I
10  mentioned already, that we use the previous benefit roster,
11  if you will, as we move into the next benefit year --
12  sometimes, we, the Plan and Blue Cross get a little
13  off-kilter.
14      As I've already said, we intentionally differ on
15  some benefits, but not on all of them. And so we will do a
16  somewhat routine righting of the ship.
17      And there are small things that we have added,
18  but I wouldn't necessarily call many of them substantial
19  benefits. It may be coverage for a, you know, a water
20  bottle, hot water bottle. That would be something small.
21      We're definitely focused on mental health parity.
22  Right now, those are really important for us to make sure
23  we're aligned with.
24      I think I already mentioned the digital
25  mammography, but that was before I started.

EXHIBIT 2                                    28 (Pages 106 - 109)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 30 of 63

1    We are considering continuous glucose monitors.
2  Again, it has not been approved, so I'm just, it's
3  considered.  But that would be to try a different mechanism
4  for payment.
5    Again, we have a lot of diabetics.  So a
6  continuous glucose monitor is already covered under the
7  medical benefits.  We're not adding it, we're just
8  changing, we're adding a different mechanism for payment,
9  putting it under the pharmacy benefit, to see where we get
10  the greatest adherence.
11    Q.  And any others that you recall?
12    A.  Not that I can -- I feel like I'm forgetting one.
13  But if it comes to me, I will -- I can't think of it,
14  anything else right now.
15    Q.  And since you have joined the Plan, is there
16  anywhere where Plan staff have documented the Plan's
17  position as to the medical necessity of treatment for
18  gender dysphoria?
19    A.  Since I've been at the Plan, no.
20    Q.  So turning back to the research you did in 2017,
21  maybe 2018, regarding Kaiser, are you aware of whether
22  Kaiser covers treatment for gender dysphoria as medically
23  necessary?
24    A.  I don't know.  And it would not be top of my
25  mind.

1    Q.  Is that something you looked into in your
2  research?
3    A.  I don't recall.
4    Q.  What resources did you look at from Milliman in
5  late 2017 into 2018?
6    A.  Same thing, same as I did with Kaiser.  I just
7  researched, I searched for gender dysphoria and see what
8  articles come up.
9    And, again, I have -- I'm sure it doesn't matter
10  to you -- but my day is very challenging.  And I've got
11  like 10 minutes to do stuff.  I have very small amounts of
12  time.
13    And I'm not trying to diminish the importance,
14  but I've got to find stuff quick.  And I've got to find it
15  and it's got to be quick and get to the point.  Not a lot
16  of medical journals do that.  So you have to kind of read
17  the executive, the excerpt.
18    So, again, it's got to be quick and dirty.  I'm
19  doing it very fast.  And I'm trying to get as much in my
20  head.
21    Q.  And you said you searched for articles regarding
22  Milliman, where were you researching?
23    A.  On the Milliman website.
24    Q.  Do you recall the dates of what you looked at?
25    A.  No.

1    Q.  Do you recall if what you looked at discussed the
2  WPATH Standards of Care --
3    A.  No.
4    Q.  -- for gender dysphoria?
5    You said you reviewed articles from Milliman's
6  website.  Is that right?
7    A.  Articles, writings, white papers -- again,
8  probably at a high level.
9    Q.  Could you clarify what you mean by high level?
10    A.  Not in depth.
11    Q.  So is it the case that you were researching at a
12  high level or reviewing at a high level?
13    A.  Reviewing would be a good word.
14    Q.  Okay.  Anything else that you looked at from
15  Milliman?
16    A.  No.
17    Q.  What is Milliman?
18    A.  Think tank, healthcare think tank.
19    Q.  Do they provide analysis of medical certainty
20  regarding certain treatment?
21    A.  Maybe.
22    Q.  Did you look into that when you were doing this
23  research?
24    A.  Maybe.
25    Q.  Do you recall?

1    A.  I don't know.
2    Q.  Is the Plan aware of Milliman's position on
3  blanket exclusions on coverage for gender dysphoria
4  treatment?
5    A.  I'm not.  I can't speak for the Plan on that
6  particular thing.  Meaning I know what I -- I'm not -- it's
7  -- not me personally, I'm not familiar.
8    Q.  Okay.  And speaking as the Plan's 30(b)(6)
9  designee, you are not aware if the Plan is aware --
10    A.  I'm not aware.
11    Q.  What resources did you look at for the New
12  England Journal of Medicine?
13    A.  What I have access to -- which is not a lot.  You
14  have to pay big bucks for that.
15    Q.  What do you have access to?
16    A.  Just high level, what, when you search the New
17  England Journal of Medicine, you get the abstracts
18  generally speaking.
19    Q.  So you have access to the Journal's abstracts of
20  its articles?
21    A.  Yes.
22    Q.  Did you review anything beyond the abstracts?
23    A.  No.  You've got to pay for that.  We've got to
24  watch our costs.
25    Q.  Which abstracts did you review?

EXHIBIT 2

29 (Pages 110 - 113)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 31 of 63

1    A. I don't know.
2    Q. Do you remember the date on any of them?
3    A. No.
4    Q. Do you remember who wrote any of them?
5    A. No. At the time, I was just looking for personal
6  knowledge, not for preparing for a deposition.
7    Q. Do you recall if those, if the abstracts you
8  reviewed made any mention of DSM-5?
9    A. No. I didn't know what it was at the time.
10   Q. Did they make any mention of the WPATH Standards
11 of Care?
12   A. I wouldn't have known at the time.
13   Q. Have you read the section of the DSM-5 relating
14 to gender dysphoria?
15   A. No. I don't think so.
16   Q. Have you read the WPATH Standards of Care?
17   A. I don't think so.
18   Q. What about AMA Resolution 122?
19   A. I don't believe so.
20   Q. And are you familiar with the Endocrine Society's
21 Clinical Practice Guidelines for Endocrine Treatment of
22 Gender Dysphoric Persons?
23   A. No.
24   Q. Other than the research you mentioned in you said
25 late 2017, possibly into 2018, have you since researched

1  the issue of medical necessity of gender dysphoria
2  treatment?
3    A. No.
4    Q. Have you done any research on what the medical
5  community has to say about this issue since that time?
6    A. No.
7    Q. And you testified this morning about your
8  education and your work background. Do you recall that?
9    A. Yes.
10   Q. Is it correct that you are not an expert in
11 treatment protocols for transgender individuals?
12   A. I'm not an expert. I'm not a clinician.
13   Q. So is it correct that you're not an expert in
14 treatment protocols for transgender individuals?
15   A. That is correct.
16   Q. Have you ever published on this issue?
17   A. No.
18   Q. And have you ever provided any kind of medical
19 treatment to transgender patients?
20   A. Have I personally ever provided medical
21 treatment? Please rephrase that question.
22   Q. Have you ever been involved in the treatment of
23 an individual who self-identifies as transgender?
24   A. Me personally?
25   Q. Yes.

1    A. That would -- I can't fathom the question. I'm
2  not a clinician.
3    Q. Other than Kaiser, the New England Journal of
4  Medicine, and Milliman, were there any other resources that
5  you looked at in 2017, going into 2018?
6    A. I'll say no.
7    Q. Okay. All right.
8    MS. RAVI: Could we go off the record?
9    (Off the record)
10   MS. RAVI: I have no further questions at this
11 point.
12   Thank you, Ms. Jones.
13   MR. RULEY: Okay. Can we take like 5 or 10
14 minutes? Let me look back over my notes. I didn't know
15 you were going to finish.
16   MS. RAVI: We'll reserve if we have any redirect
17 after.
18   MR. RULEY: It won't take more than 10 minutes.
19   Are you going to have any questions, Alan?
20   MR. MCINNES: I don't know.
21   I'm going to defer to Zach, if he has --
22   MR. PADGET: I don't. I'm not going to have any.
23   MR. MCINNES: Okay. All right. Then I won't
24 either.
25   Actually, I take that back. I may have a couple

1  -- if that's okay.
2    MS. RAVI: Alan, I think we're taking another 5
3  to 10 minute break, and then we'll be back.
4    (Off the record)
5    MR. RULEY: I have just a few follow-up questions
6  for you.
7
8            EXAMINATION
9  BY MR. RULEY:
10   Q. Would you find Exhibit 1 please. Would you turn
11 to Page 50 please.
12   Page 50 is titled What Is Not Covered? Is that
13 right?
14   A. That is correct.
15   Q. And are these basically exclusions, a list of
16 exclusions?
17   A. Yes.
18   Q. And would you look at the fourth bullet point.
19   A. Yes.
20   Q. What is that exclusion?
21   A. Any experimental drug or any drug or device not
22 approved by the Food and Drug Administration (FDA) for the
23 applicable diagnosis or treatment.
24   Q. Then turning the page to Page 51, the fourth
25 bullet point from the bottom, what is that exclusion?

EXHIBIT 2

1    A.  Surgical procedures for psychological or
2  emotional reasons.
3    Q.  And would those exclusions also potentially apply
4  to coverage for gender dysphoria?
5    A.  Yes.
6    Q.  Earlier, you mentioned HBRs.  What are they again
7  please?
8    A.  Health Benefit Representatives.  They are
9  actually defined in statute.  And they work at the various
10  employing units.  I mentioned there are 408.  They are
11  liaisons to the Plan.  So the Plan teaches them, keeps them
12  apprised of the benefits being offered.  But they're
13  responsible for their employer's employees and getting them
14  enrolled and making sure they understand the processes.
15    Q.  So are they employed by the State Health Plan or
16  by others?
17    A.  By the others.
18    Q.  All right.  Thank you.
19      On costs -- would you get Exhibits 6 and 7 please.
20      Looking at Exhibit 6, for example, look at the
21  first e-mail on Exhibit 6, Page DEF61647, the January 22,
22  2017 e-mail.
23    A.  Yes.
24    Q.  And that reports, as of 1-21, a total paid of
25  287.57.

1    A.  Yes.
2    Q.  And then if you look on Exhibit 7, for the month
3  of January 2017, the Plan Paid Amount is 2628.84, correct?
4    A.  Correct.
5    Q.  So a discrepancy.  Do you know or does the Plan
6  have information on what the actual numbers were?
7    A.  I think in a word, no.  It's very difficult for
8  the Plan to understand these costs simply because it
9  depends on whether a provider provided the coding and
10  diagnosis codes of gender dysphoria.
11      CVS' numbers are not included in this, so that we
12  don't know.
13      So, again, we don't have visibility or access to
14  some of this information that Blue Cross has.  We don't have
15  access to provider contracts, et cetera.  So I think there's
16  some fundamental discrepancies.
17      But there are also some timing discrepancies.  So
18  a, this, on the e-mail, 61647, the amount of 287.57 might
19  have been for one claim.
20      The January 2017 number of 2628.84 might have been
21  the full January compliment of Plan Paid Amount, but it was
22  run somewhere around 90 days later.
23      So the timing of all this -- I mean to look at
24  something on January 22, 2017, on 61647, is meaningless
25  because of the timing.

1      MR. RULEY:  No further questions.
2    Thank you very much.
3
4        EXAMINATION
5  BY MR. MCINNES:
6    Q.  Ms. Jones, my name is Alan McInnes.  I represent
7  the North Carolina Department of Public Safety in this
8  matter.  I have just a couple questions for you.
9      First question, are you aware of any state
10  agencies that offer healthcare insurance to their employees
11  outside of the State Health Plan?
12    A.  No.  I'm not.
13    Q.  Okay.  And would you be aware of any state
14  agencies that were offering healthcare insurance to its
15  employees outside of the State Health Plan?
16    A.  So if I might clarify -- each of the state
17  agencies have the ability to offer supplemental plans.
18      And so if an agency is offering a supplemental
19  plan, there's cancer insurance, there's accident insurance,
20  of course, the supplemental fully, you know, dental and
21  vision.
22      But from a comprehensive health plan, I'm not
23  aware of any state agency offering such.  I don't believe
24  they can.
25    Q.  Comprehensive healthcare insurance and

1  prospectus, are the state agencies required by statute to
2  provide them through the State Health Plan?
3    A.  Yes.
4    Q.  Okay.  In, in your research, are you aware of any
5  supplemental healthcare insurance that is offered only for
6  gender dysphoria treatment?
7    A.  No.  I'm not aware of any.
8      MR. MCINNES:  That's all the questions I have.
9      MR. PADGET:  Nothing from me.
10      MS. RAVI:  Could we go off the record?
11      (Off the record)
12      MS. RAVI:  I have no further questions today.
13    Thank you very much for your time, Ms. Jones.
14      THE WITNESS:  Thank you.  Appreciate it.
15      (Deposition concluded at 2:58 p.m.)
16
17
18
19
20
21
22
23
24
25

EXHIBIT 2

31 (Pages 118 - 121)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 1:19-cv-00272-LCB-LPA   Document 134-2   Filed 11/30/21   Page 33 of 63

```
1
2              CERTIFICATE OF REPORTER
3
4    STATE OF NORTH CAROLINA AT LARGE, to wit:
5
6        I, Michelle Maar, RDR, RMR, FCRR, the officer before
7    whom the foregoing deposition was taken, do hereby certify
8    that the witness whose testimony appears in the foregoing
9    deposition was duly sworn by me, that the testimony of said
10   witness was taken by me to the best of my ability and
11   thereafter reduced to writing under my direction;
12       That I am neither counsel for, related to, nor
13   employed by any of the parties to the action in which this
14   deposition was taken, and further that I am not a relative
15   or employee of any attorney or counsel employed by the
16   parties thereto, nor financially or otherwise interested in
17   the outcome of the action.
18
19
20       _Michelle Maar_
21
22           Michelle Maar, Court Reporter
23
24   Notary Public #201628400102
25   My Commission expires October 4, 2021
```

```
1    Alan M. Ruley, Esq.
2    Aruley@belldavispitt.com
3              August 16, 2021
4    RE:   Kadel, Et Al v. Folwell
5    8/3/2021, Dee Jones (#4714238)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25
```

```
1    Kadel, Et Al v. Folwell
2    Dee Jones (#4714238)
3          E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Dee Jones                Date
25
```

```
1    Kadel, Et Al v. Folwell
2    Dee Jones (#4714238)
3         ACKNOWLEDGEMENT OF DEPONENT
4        I, Dee Jones, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____  _____
12   Dee Jones                Date
13   *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19       NOTARY PUBLIC
20
21
22
23
24
25
```

EXHIBIT 2                                              32 (Pages 122 - 125)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

| & |
| --- |
| **&**   2:3,6,14 |

| 0 |
| --- |
| **011**   28:25 30:9 |
| **027**   29:1 30:9 |
| **03**   30:14 |

| 1 |
| --- |
| **1**   4:6,7 15:6,7,17 |
|      17:12 27:12 31:21 |
|      32:5 33:18 39:9 |
|      117:10 |
| **1-21**   118:24 |
| **1-23-17f**   4:17 |
| **1.03**   27:5 |
| **10**   4:20 20:9 72:15 |
|      74:9,10 80:11,12 |
|      80:18 82:12,13 |
|      104:16 108:3 |
|      111:11 116:13,18 |
|      117:3 |
| **10-25-18**   4:19 |
| **100**   2:7,15 76:8 |
|      84:11 105:19 |
|      107:6,8,13 |
| **1033**   2:7 |
| **108**   91:1 |
| **11**   73:1 |
| **11-29-16**   4:8 |
| **11-3-17**   4:16 |
| **1115**   12:4 |
| **114**   3:4,9 |
| **117**   4:2 |
| **12-8-16**   4:9 |
| **120**   4:3 |
| **122**   36:24 37:11,15 |
|      37:17 38:1,6 |
|      40:24 114:18 |
| **12813**   39:4 |
| **12816**   41:8 |
| **12822**   40:12 |
| **15**   4:7 28:21 30:2 |
|      46:1 54:6 84:21 |
|      85:2 |
| **1557**   22:15 69:18 |
|      100:12,20,23 |
| **16**   51:15 123:3 |
| **17**   19:15 |
| **1700**   1:23 |
| **1720**   2:19 |
| **1733.66.**   51:18 |
| **18**   64:11 99:13 |
| **1919**   2:4 |
| **194,739.74.**   52:23 |
|      53:17 |
| **1986**   9:2 |
| **1987**   9:2 |
| **1:19**   1:6 |
| **1st**   33:19 39:17 |

| 2 |
| --- |
| **2**   4:8,21 23:24,25 |
|      32:20 40:16,22 |
|      80:13 |
| **20**   30:3 81:25 |
|      125:15 |
| **20036**   2:4 |
| **2007**   9:10 27:16 |
| **2008**   37:3 40:25 |
|      98:22 |
| **2016**   4:7 15:1,17 |
|      15:20 16:1 22:7 |
|      22:16 23:6,8,22 |
|      24:13 25:19 31:10 |
|      31:19,21 32:2,20 |
|      33:7,18 38:12 |
|      39:9,19 40:1,16,22 |
|      46:10 69:15 71:1 |
|      100:8,12 101:6,14 |
|      102:8,11 106:6 |
| **2016-94**   106:7 |
| **201628400102** |
|      122:24 |
| **2017**   16:14 22:8 |
|      23:11 31:13,24 |
|      34:3 43:1,25 44:3 |
|      44:6,11 45:3 46:8 |
|      47:4,11 48:19 |
|      49:2,9,12,25 51:10 |
|      51:15,20 52:12 |
|      53:10,14,17 55:8 |
|      55:12 56:24 57:13 |
|      60:17 61:3,15,17 |
|      61:20,20,22,24 |
|      62:12,14,15,17 |
|      63:3,6,18 64:16 |
|      80:21 82:22,24 |
|      83:7 93:14 94:10 |
|      96:11,15,19 97:14 |
|      110:20 111:5 |
|      114:25 116:5 |
|      118:22 119:3,20 |
|      119:24 |
| **2018**   31:13 32:5 |
|      44:20 55:6 60:20 |
|      62:1 63:6,10,19 |
|      64:14,16,24 65:3 |
|      72:8 93:15,16,20 |
|      94:11 95:1 96:17 |
|      97:17,18 106:3,4 |
|      110:21 111:5 |
|      114:25 116:5 |
| **2021**   1:16 81:10 |
|      122:25 123:3 |
| **2172.41.**   51:21 |
| **21741**   122:21 |
| **22**   51:10 118:21 |
|      119:24 |
| **220**   40:2 |
| **23**   4:8 56:24 |
| **24**   27:18 |
| **25**   72:7 104:16 |
|      105:25 |
| **25th**   70:21 |
| **2628.84**   53:11 |
|      119:3,20 |
| **27**   51:20 |
| **27101**   2:16 |
| **272**   1:6 |
| **27603**   3:5,9 |
| **27604**   2:24 |
| **27605**   2:7 |
| **28.8**   83:3 105:8 |
| **287.57**   119:18 |
| **287.57.**   51:13 |
|      118:25 |
| **29**   4:9 24:13 46:10 |
| **2:58**   121:15 |
| **2nd**   33:19 41:14 |
|      45:1 |

| 3 |
| --- |
| **3**   1:16 4:9 29:11 |
|      29:12 72:16 79:7 |
|      79:11,21 80:6 |
| **3-5-17**   4:15 |
| **3.2**   28:23 |
| **30**   1:15,19 4:10 |
|      8:4,9 89:13 90:4 |
|      108:5,8 113:8 |
|      123:17 |
| **300**   81:16,17 82:9 |
| **301**   1:23 |
| **30318**   2:10 |
| **31**   4:7 15:17 53:14 |
|      53:16 |
| **31st**   17:12 |
| **3200**   2:23 |
| **344,000**   28:15 |
| **344,013**   28:15 |
| **35**   27:5 |
| **350,000**   28:10 30:8 |
|      38:16 42:8 60:13 |

## 4

**4** 4:10 30:23,24
39:2 46:5 102:23
105:5 106:9
122:25
**400,000** 45:5
**4000** 75:2
**404,000** 48:15
49:12
**404,609.26** 48:18
**404,609.26.** 48:10
**408** 90:25 91:3
118:10
**42** 83:1
**45** 4:14 108:8
**4714238** 123:5
124:2 125:2

## 5

**5** 4:2,11 27:13
34:15,19,21,25
35:8,11 45:8,9
46:5,25 72:14
100:3 114:8,13
116:13 117:2
**50** 4:15 19:19
106:1 117:11,12
**504,000** 47:22
48:15
**504,406.04** 48:3
**51** 117:24
**52** 4:16
**56** 4:18
**58** 26:25
**590** 2:19 81:3,5

## 6

**6** 1:15 4:15 8:4,9
28:21 46:6 50:18
50:19 113:8
118:19,20,21

**6-30** 82:25
**6-30-20** 83:3
**6-30-21** 83:4
**600** 2:15
**61647** 119:18,24
**640** 2:10
**67** 4:19
**6989** 32:16

## 7

**7** 4:16 52:2,3
102:24 105:6
118:19 119:2
**70/30** 16:20 106:1
**720** 107:9
**730** 2:10
**740,000** 18:14 74:3
74:16 108:15
**784,000** 47:25
**784,923.28** 47:5,12
**785,000** 47:16

## 8

**8** 4:17 27:18 56:5
56:6
**8-24-17** 4:10
**8/3/2021** 123:5
**80/20** 4:6 15:16
16:18 106:2
**82** 4:23
**82001** 2:19
**85** 54:6 84:22 85:3
**850,000** 28:10 30:8
38:17 42:8 60:13
**862,292** 28:16
**8th** 2:4

## 9

**9** 4:19 67:10,11
74:9,10 80:12
**90** 119:22
**90s** 16:12

## a

**aaron** 43:7
**ability** 7:18 120:17
122:10
**able** 5:24 51:3
77:5 107:5
**absolutely** 73:21
86:17 94:13 105:7
**abstracts** 113:17
113:19,22,25
114:7
**aca** 22:15
**access** 113:13,15
113:19 119:13,15
**accident** 120:19
**account** 85:3
**accounted** 39:22
**accounting** 8:25
9:8
**accumulate** 20:15
**accuracy** 123:9
**accurate** 59:6
91:10
**accurately** 38:10
43:15,21,23
**achieve** 82:9
**achieving** 75:3
**acknowledgement**
125:3
**acknowledgment**
123:12
**act** 42:22 54:23,24
**action** 55:23,24
82:8 122:13,17
**active** 91:13
**activities** 10:17,18
96:18
**activity** 49:25 50:4
50:7,8,9 51:2,7,12
51:17 52:11 53:21
54:5

**actual** 84:13,14
119:6
**actuarial** 42:7
**actuary** 19:3 23:1
43:8 102:2
**acupuncture**
104:24
**add** 7:8 17:18
100:19 104:17
**added** 16:11 109:4
109:5,17
**adding** 38:15
104:25 106:5
110:7,8
**additional** 7:5
29:8
**additions** 125:6
**address** 86:24
**adhered** 54:19
**adherence** 55:1
110:10
**adhering** 54:17
**adm** 63:25 64:1
**admin** 83:20
**administration**
10:6,8,22 81:20
117:22
**administrative**
64:2
**administrator**
13:7,13,18 21:11
21:22 24:10 33:21
41:11 63:15 65:11
**admission** 46:6
**admissions** 4:13
45:20
**admit** 104:18
**adolescence** 78:4
**adopt** 42:12
**adopted** 80:20

adults  27:1,8
  77:19 78:9
advance  21:3
  91:15
advantage  80:25
  83:19
advocacy  10:13,14
affect  29:5
afford  71:21 77:6
  88:3 105:4 107:10
  107:11
age  84:18
agencies  17:5,7
  91:5,6 120:10,14
  120:17 121:1
agency  87:24 88:7
  88:7,11,24 89:2
  90:18 120:18,23
agenda  21:13,14
  21:15
aggregated  91:13
ago  98:23
agree  66:19
agreement  65:21
aid  74:12 104:23
aids  63:12 71:17
  71:20 74:11
al  1:5,8 123:4
  124:1 125:1
alan  2:14 3:4
  116:19 117:2
  120:6 123:1
albeit  59:7
aligned  109:23
alliance  70:25
  94:20
allotted  123:20
allowed  46:18
  47:23,24 48:3
ama  37:2,5,10,14
  37:17 38:1,6

40:24 114:18
amcinnes  3:5
american  36:23
  41:3,4 59:14
  75:13
ames  62:10
amount  40:3
  47:12,25 48:2,17
  51:10,15,20 52:19
  52:22,24 53:1,4,11
  53:16 71:24 82:22
  83:2,7,12 119:3,18
  119:21
amounts  29:5
  46:20 111:11
amy  2:6
analysis  25:23
  54:20 112:19
analyst  25:4 39:15
  102:2
analysts  25:23
analytics  14:9
  43:8
analyze  25:2,16
  53:25 55:3
analyzed  25:20
anatomy  87:12
andrew  66:7 92:22
  101:22
andrews  103:10
annoying  106:23
annual  20:11 23:9
  28:9 42:6 60:11
  83:14,22 84:1,6,9
annually  38:17
answer  6:11 7:8
  79:5 109:2
answers  5:8 6:6,7
  7:18 45:23
anticipation  63:17

anybody  70:20
  108:11
anymore  101:10
  101:11
apart  13:13
apologize  64:16
app  75:1
apparently  106:23
appeals  11:24,24
appear  35:2,3
  56:20 57:3
appearances  2:1
  3:1
appeared  100:16
appears  31:22
  34:23 56:13 122:8
appended  125:7
applicable  117:23
  123:8
applied  46:22
apply  71:9 72:1
  78:3 84:25 87:17
  118:3
appreciate  81:6
  121:14
apprised  118:12
approached  102:5
appropriate  59:20
approval  42:17
approve  42:23
  57:12 58:20 78:22
approved  78:17
  78:24 110:2
  117:22
approximately
  26:25 28:23 30:9
  38:16 42:8 49:12
  64:5 84:21
argument  100:12
arichardson  2:8

article  75:14,17,20
  75:22,25
articles  76:5 96:4
  98:11,15,17,20,24
  99:3,6,10,25 111:8
  111:21 112:5,7
  113:20
aruley  2:16 123:2
ashley  94:17
asked  7:6 25:2
  44:13 53:23
asking  29:22 80:3
asks  46:7 72:16
  79:11,21 80:13
assembly  88:21
  91:7 105:5 106:6
  106:16 107:18
assess  29:4 48:20
assessment  16:2
assessments  41:19
  42:4
assist  12:19 89:2
assistance  89:17
assistant  11:3,10
  67:20
associated  30:8
  85:8,12
association  35:16
  36:24 59:15
assume  6:19 25:11
assumption  24:17
assumptions  26:22
  26:24
atlanta  2:10
atlantic  2:23
atmosphere  98:20
attached  123:11
attaching  56:20
attachment  52:13
  52:16 56:25

attachments 4:10
4:16,18
attend 9:3 21:22
attended 22:3
attendees 39:12
attorney 38:24
54:23 94:18
122:15 123:13
attorneys 1:19,19
101:10
august 1:16 22:13
31:24 123:3
authenticity 5:12
5:15
authorities 91:1
authorized 46:19
available 89:25
123:6
avenue 2:7,19,23
average 107:11
avoiding 104:4
aware 32:3,6
34:13 37:16 49:4
50:9 66:10 68:12
68:13,17 69:3,6
70:19 77:21 92:13
92:17 93:20 94:10
94:19,20 95:1
96:2 98:4,19
110:21 113:2,9,9
113:10 120:9,13
120:23 121:4,7
awful 75:7

**b**

b 1:15 8:4,9 81:8
113:8
back 9:20 16:12
20:4 23:6,20
34:14 38:22 63:23
66:25 72:14 73:17
75:9 76:10 80:11

84:3 86:19 91:25
99:19,19 100:8,12
100:22 101:14
102:14 107:19
110:20 116:14,25
117:3
background
102:17 115:8
bad 107:22
balance 40:2
48:14 84:4 107:21
barriers 40:25
based 27:16 28:23
30:13 57:2,7
69:18 84:11
basic 31:13,15
104:5
basically 11:13
12:19 31:11
117:15
basis 20:11 47:20
69:2,7,17 70:9
72:17 79:22
100:11
beacon 91:5
beginning 23:11
behalf 2:2,12 3:2,6
67:22 68:20
believe 19:15 22:1
25:22 28:7 29:9
30:18 33:22 61:4
61:9,11,13 62:10
62:17 66:21 69:9
71:2 75:11 79:4
94:22 114:19
120:23
bell 2:14
belldavispitt.com
2:16,17 123:2
ben.garner 2:24

benefit 18:20,21
18:22,23 19:20,25
30:9 41:9,16 42:1
54:13 56:17 57:13
57:21 71:9,11,15
73:6,10 74:3,5,10
74:14 75:4,5
76:13,19,20 77:6
78:6,7 84:4 85:16
87:25 88:3,3,3,25
100:19 104:3,18
105:1,17 107:16
109:10,11 110:9
118:8
benefits 4:7 11:7
12:3 15:1,16
17:14,16,19 18:18
20:6 27:19 28:2,6
28:13 53:22 63:13
63:20,21 72:1,1
74:24,25 81:9
89:3,16 104:6,7
109:3,5,8,15,19
110:7 118:12
benjamin 2:22
best 122:10
bet 105:19
beth 32:25 66:14
97:25
better 102:23
beyond 33:5,13
113:22
bidding 81:20
big 19:1 54:19
93:1 106:21 107:1
113:14
biggest 18:12
106:24,25 107:7
bill 91:13,15
106:18 107:8

billed 47:5 51:5,6
billing 91:12
billion 28:24 83:1
83:9,13 105:8
107:20
billions 81:15
binding 5:9
bit 58:14 79:24
83:11
black 73:21
blake 57:3 101:9
101:21
blanket 15:2 34:1
34:5 38:11 41:17
42:1,18 43:5
59:25 113:3
blue 18:6 19:2
31:19 42:12,13
47:3,3,6,6 48:1
49:24,24 50:3,3,6
50:6 51:6,10,11,15
51:16,23,23 53:20
53:21 63:14,14,19
63:19,22 64:6,22
64:22,23,24 65:1,1
65:5,6,23,23 66:1
66:1,19,19 67:4,4
71:7 91:12 93:6
95:7,7 96:23 97:1
109:12 119:14
board 13:23,24
18:5 19:3 20:14
20:23 21:2,5,7,19
21:23 22:3,7
31:10,18,21 32:20
33:7,8,17,21 34:22
37:24 39:8,16,21
39:25 40:15,21
41:3,13 42:22,25
43:3,9 44:7 45:1
55:13,15,18,22

57:11 58:19 60:16
60:19,22,24 61:2,6
61:10,12,14,19,20
61:24,25 62:3,5,8
62:12,13,15,18,24
63:3,5,9 67:18
68:2 70:3 75:24
91:22 94:3,5
**booklet** 4:7 15:16
17:18 88:1 104:6
104:7
**booklets** 63:20,21
109:4
**borelli** 2:9
**bostock** 94:21
**bottle** 109:20,20
**bottom** 26:12
27:11 41:8 73:1
117:25
**bourdon** 2:22
**box** 106:15,15,19
**brand** 20:16
**break** 6:25 7:1
38:25 104:18
117:3
**breaks** 6:24 74:9
108:2
**breast** 19:22,23
**brief** 24:2 29:14
31:1 45:11 50:21
52:5
**bring** 55:16,18
56:2 102:18
**bringing** 55:21
**brings** 55:15
**broad** 8:2 14:20
72:1 73:9
**broader** 101:15
**bucks** 105:20
107:6,13 113:14

**budget** 40:9 83:14
83:16,22 84:1,6,9
84:13,14 106:6,18
107:21
**budgeted** 40:3
**building** 12:6
**bullet** 117:18,25
**business** 8:25
11:15 12:21 50:16
65:13,13
**buying** 107:2,2

**c**

**c** 5:1 81:19
**cable** 9:17
**calculable** 81:15
**calculate** 81:18
**calculated** 82:24
**calculation** 83:4
84:11,15
**calendar** 46:8
**call** 50:7,8,9,10
51:2 71:10 85:16
85:16 86:4,4,5,5,8
86:9,18,19 88:25
89:7,7 109:18
**called** 5:3 63:25
**calling** 51:4 87:5
**calls** 85:15
**canceled** 75:4
**cancer** 19:22
78:25 104:13
108:23 120:19
**cansler** 12:15
**capacity** 1:14
16:13
**care** 15:22 20:4
35:16,21,24 36:3,7
36:10,14,17,20
37:6,6 40:25 58:4
58:10 59:8 77:18
78:4 100:5 108:23

112:2 114:11,16
**careful** 107:23
**carey** 2:19
**carolina** 1:2,23
2:21,21 3:2,3,8
4:12,22 8:23 10:7
10:22,25 12:11
13:9 17:3 22:5
27:5,9 28:25
45:19 47:4 49:24
50:3,6 54:21
63:14 64:23 65:1
66:19 82:20
108:14 120:7
122:4
**carolina's** 42:13
**caroline** 32:10,25
66:13 92:19,21
93:9 97:25 102:11
**carry** 107:20
**case** 6:16 7:4
21:25 22:1 72:6
75:13 78:24
112:11
**cases** 70:5 71:1
**cash** 40:2 83:8
107:21,21
**catch** 19:24
**catching** 19:22
**center** 50:11 85:16
85:16 86:4,5,8,9
86:19 89:7
**cents** 28:21,21
**certain** 22:2,4
51:22 104:22
105:7 112:20
**certainly** 23:6
25:11
**certainty** 112:19
**certificate** 122:2

**certifications** 9:13
**certify** 122:7
**cetera** 48:25
119:15
**challenge** 26:20
28:4 30:17 34:25
35:5 36:13 38:1
**challenging**
111:10
**chance** 24:4 29:17
31:3 45:13
**change** 30:9 41:9
71:20 81:2 85:7
85:11,13 86:2,3,6
87:18 124:4,7,10
124:13,16,19
**changed** 85:17
**changes** 15:22
17:17,20 18:1,4,20
19:7 41:19 42:3
56:11 85:17
123:10 125:6
**changing** 87:17
98:20 110:8
**chapel** 3:6
**charge** 106:11,11
**charged** 74:18
**charges** 47:16,18
47:20 49:17,19
**charles** 102:2
**chart** 28:14 53:13
**charter** 17:4,6
**check** 10:19 86:13
**cherry** 2:15
**cheyenne** 2:19
**chief** 10:11
**children** 71:15
77:12,18 78:11
**choice** 87:25 88:2
104:2

**choices** 75:7
**choose** 18:17
  105:13
**chose** 65:10,13,15
**chromosomes**
  87:9
**citation** 82:19
**cited** 37:24
**civ.p.26** 4:21
**claim** 49:25 50:4
  51:7,11,17,23
  53:21 54:5 119:19
**claims** 50:2 52:11
  52:20 53:11,14,23
  64:13 83:18 84:12
**clarify** 7:8 29:7
  55:24 58:17
  102:10 112:9
  120:16
**clarifying** 67:1
**clause** 57:20 60:10
**clear** 37:20 59:9
  69:16 76:9 79:18
  82:3
**clients** 12:19
**clinical** 19:1 69:25
  97:2,3 102:13
  114:21
**clinician** 73:19
  79:3 101:2 103:6
  115:12 116:2
**clinicians** 92:24
  95:12 102:14
**cob** 53:8
**coded** 50:2
**codes** 48:25
  119:10
**coding** 50:5 119:9
**collaborative**
  12:15

**college** 17:3 41:4,4
**collins** 25:8,23
  33:2 39:14,16,21
  101:11,24
**column** 52:18,25
  53:3,7
**combination** 57:3
**come** 18:4,5,6,7
  19:9,12 44:19
  54:6 73:17 94:2,4
  94:5 111:8
**comes** 18:9 71:12
  91:9 94:22 104:3
  105:1 108:18
  110:13
**coming** 72:7 83:22
**comment** 20:14
  62:11 63:11
**comments** 62:4,22
**commercial**
  105:13,14
**commission**
  122:25
**committee** 41:5
**common** 73:13,14
**communications**
  14:11 68:14,15
**community** 17:3
  73:15 115:5
**company** 22:23
**company's** 38:15
  42:10
**competitive** 81:19
**complete** 1:18
  7:18 125:8
**completed** 123:17
**completely** 104:4
  104:4
**compliance** 14:10
  109:8

**complies** 87:9
**compliment**
  119:21
**comply** 86:11
**component** 73:11
  73:12 84:5,16,17
  84:18
**components** 83:16
  83:17,21,25
**comprehensive**
  120:22,25
**computer** 90:12
  90:15
**concentration** 9:8
**concern** 78:2
  100:13
**concluded** 121:15
**conclusion** 100:19
**conclusions** 100:8
**condition** 40:18
**conduct** 75:10
**conducted** 76:24
  77:8
**confidential** 1:19
**confirm** 86:19
  88:23
**confirmation**
  31:20 35:24 36:4
**confirming** 46:8
**conjunction** 16:3
**connection** 15:21
**consideration**
  76:23
**considered** 110:3
**considering** 78:6
  110:1
**constitutes** 91:1
**consultant** 12:17
  42:7
**consulting** 4:8
  23:1 31:17 46:9

  95:11
**contend** 78:2
  79:23
**contends** 72:18
  79:8,13,16
**continue** 60:20
  61:7,25 62:8,19
  63:6 65:3
**continued** 3:1
**continuous** 110:1
  110:6
**continuously**
  16:15
**contracting** 14:10
**contracts** 12:21
  69:24 92:25
  119:15
**control** 106:8
**controller** 9:21
  10:1 90:21
**controller's** 11:14
**conversation**
  97:22
**conversations**
  70:19 92:23
**coo** 11:6 12:1,8
**cooperative**
  106:22
**copies** 123:14
**copy** 33:6,9,12
  67:24 68:7
**corporate** 31:19
**correct** 16:18,20
  27:2 28:14 30:12
  33:25 34:4 35:19
  36:9 46:11,12,16
  47:11 48:12 50:12
  53:10,15,18,19
  57:24 58:4 64:17
  69:1 72:21 76:16
  78:20 79:4 80:23

81:7,23 82:2,5,6
85:5 88:5,13
89:18 97:11
115:10,13,15
117:14 119:3,4
125:8
**correction**  75:14
75:20
**corrections**  125:6
**cost**  18:21 23:9
24:11 25:3,17
28:9,14,14,20,24
29:23 30:8 38:16
42:6 46:7,9,14
48:24 49:18 53:5
54:9 60:11 73:11
73:12 74:2 84:22
85:4 104:18 107:4
**costs**  19:21 20:4
48:18 49:3,13
54:6,13 72:3
74:18 83:18,19,20
83:20,23 84:12
103:23 106:5,8
107:17 113:24
118:19 119:8
**counsel**  5:7,11
7:23 8:16 41:12
66:4,5,7,7,8 94:17
122:12,15 123:14
**counseling**  48:22
48:25 49:8,16,17
49:19
**counties**  26:7
**couple**  12:19 22:6
31:8 32:7 109:7
116:25 120:8
**course**  17:5 99:18
120:20
**court**  1:6 6:5,12
7:15 122:22

**cover**  18:17,17,22
20:7 56:20,23
58:6,13 65:13
71:11,25 72:5,6
73:6 74:25 76:20
78:24 103:19,21
104:5,8 105:24
108:2,7,22,23,23
**coverage**  15:1,21
16:2,6 22:4 26:8
29:4 34:1 38:11
38:15 41:5 42:7
42:17,23 44:14,22
47:7 48:6,18 53:2
54:16 55:7,11,21
56:14 57:8,12
58:20,21,25 59:23
59:25 60:12 63:18
65:3 73:9 78:15
78:22 88:6,10
92:4,11,14 100:15
109:19 113:3
118:4
**coverages**  48:21
**covered**  19:16
48:21 49:8,19,23
53:3,21 58:5 88:4
104:3,14 110:6
117:12
**covering**  23:10
30:1 57:9 103:20
107:17
**covers**  88:3 110:22
**covid**  107:17,19
**covid's**  107:24
**cozart**  32:8
**crabtree**  4:17
25:12 33:1 41:10
41:13,25 42:16
44:25 57:4 94:17
101:8

**craycroft**  103:10
**crazy**  106:4
**criteria**  18:19 19:6
19:8,10 34:15,25
35:5,24 36:3
**cross**  18:6 19:2
31:19 42:13 47:3
47:6 48:1 49:24
50:3,6 51:10,16,23
53:20 63:14,19,22
64:6,22,23 65:1,5
65:23 66:1,19
67:4 71:7 91:12
93:6 95:7 96:23
97:1 109:12
119:14
**crux**  100:15,20
**cs**  123:15
**cunningham**  43:2
43:4
**cunningham's**
43:11
**curiosity**  97:13
**current**  13:6,15
41:16 42:1 70:3
71:25 98:19,24,24
102:5,25 103:1,21
**currently**  13:4
23:19 40:9
**customer**  50:10
**cv**  1:6
**cvs**  8:18,19,20
19:2 55:2 93:6
95:8 96:23 97:1
119:11

                 **d**

**d**  5:1 82:3
**dale**  1:8 2:12 4:22
82:20
**data**  14:9 26:8
43:8 53:23

**date**  1:20 24:12
51:5,6 52:12
56:23 59:1 64:3
98:17 99:8 114:2
124:24 125:12
**dates**  61:4 111:24
**david**  32:8
**davis**  2:14
**day**  74:4,8,19 75:6
89:13 92:10,12,13
93:8,23 94:3,7
96:9,10 101:4
107:25 108:8,16
108:19 111:10
125:15
**days**  1:20 102:15
108:3,5,9 119:22
123:17
**dc**  2:4
**deadline**  108:4
**december**  4:7
15:17 17:12 22:7
31:10,18,21 32:2,5
32:20 33:7,17
39:9,17 40:16,21
41:14 45:1 64:8
64:10,14,16 71:1
82:22,24 83:7
101:6
**decide**  17:20 20:6
95:25 105:16
**decided**  17:18
21:13
**decision**  20:8,18
32:3 55:13 63:22
63:24 64:2 74:6
74:15
**decisionmaking**
21:4,8
**decisions**  80:19
102:12

**deck** 32:22 33:6
**declare** 125:4
**decline** 74:10
**deduct** 90:19
**deductible** 16:22
**deductibles** 46:21
**deducts** 90:21
**dee** 1:13 2:12 4:22
5:2 82:20 123:5
124:2,24 125:2,4
125:12
**deemed** 125:6
**deepika** 2:3 5:20
**def12810** 39:4,10
**def12811** 39:19
**def12814** 40:11
**def12815** 40:17
41:8
**def12816** 41:22
**def12817** 43:13
**def2699** 15:25
**def2711** 15:19
**def29555** 30:4
**def35963** 56:19
**def44771** 56:25
**def61645** 51:19
**def61646** 51:14
**def61647** 51:9
118:21
**def6964** 26:5
**def6965** 27:17
**def6966** 32:15
**def6968** 34:14
**def6969** 35:14
**def6970** 36:2
**def6971** 36:23
**def6985** 38:9
**def6988** 33:24
**def9070** 52:15,19
**def9071** 53:7

**defendant** 3:2
4:11 45:18
**defendants** 1:9
2:12 3:6 4:21 5:7
5:12 82:20
**defense** 2:9
**defer** 116:21
**define** 14:19
**defined** 118:9
**definitely** 109:21
**definition** 79:25
**degrees** 9:11
**demographic**
86:20
**dense** 19:23
**dental** 120:20
**deny** 108:3,6
**department** 2:21
3:2,3,8 10:6,7,22
10:25 12:10,14
13:3 39:11 56:16
57:17 101:10
120:7
**dependency** 88:13
**dependent** 88:8,11
**dependents**
108:16
**depending** 21:13
53:24
**depends** 21:1 50:2
119:9
**deponent** 123:13
125:3
**deposing** 123:13
**deposition** 1:12,20
4:4 5:8,22 7:21
8:3,9 114:6
121:15 122:7,9,14
**depth** 112:10
**deputy** 41:11

**describe** 14:21
17:13 38:10 50:8
79:22 80:14
**describes** 36:23
37:5
**describing** 51:2
106:16
**description** 4:5
**design** 14:16
**designated** 1:19
49:15
**designee** 1:15 8:4
8:10 113:9
**desired** 72:24
**desk** 90:16
**detail** 29:8
**determination**
88:20
**determined** 88:16
**determines** 17:14
91:17,20
**determining** 90:2
**develop** 8:13
69:12,14
**device** 117:21
**diabetes** 54:8,15
104:11 108:22
**diabetics** 110:5
**diagnosis** 34:16
35:1 48:24 117:23
119:10
**differ** 47:18
109:14
**difference** 47:24
48:14 53:5
**different** 7:5 10:16
18:2 21:2 53:4
59:10 91:3,4,7
94:4 100:9 101:4
101:5,25,25 102:4
110:3,8

**differently** 101:13
101:20
**difficult** 48:20
59:24 73:17 81:18
104:15 119:7
**digital** 19:14,15,18
109:24
**diminish** 111:13
**direct** 31:9
**directed** 13:23
**direction** 71:5
102:20 122:11
**directly** 51:23
101:19
**director** 10:1,2
11:6,21 13:7,14
32:11,13 40:20
68:14,15
**directors** 13:24
**dirty** 111:18
**disagree** 69:4
**disclosure** 4:20
82:18 84:20
**discount** 48:1 53:3
84:16
**discounts** 46:19
48:2 53:2
**discrepancies**
119:16,17
**discrepancy** 119:5
**discriminate**
105:2
**discriminating**
105:3
**discuss** 30:19 55:6
55:10,17,20 58:1
60:22 61:10 62:3
62:21 65:5 70:14
70:17 72:8,11,17
92:10 93:22,23
100:3,5

**discussed**  55:13
  62:22 63:10,11
  65:8 66:11 75:10
  77:4 92:2,7,14,17
  93:9,11,16,21
  94:12 95:3 97:21
  112:1
**discussing**  64:22
  65:23 66:1 103:5
**discussion**  22:18
  25:24 70:6
**discussions**  22:11
  22:14 67:2 70:3
  74:21 103:2
**disorder**  35:17
**distinguish**  77:11
  78:11
**distinguishing**
  78:8
**distribution**  96:5
**district**  1:1,2
**diverse**  102:17
**division**  11:7 12:2
**divulge**  94:18
**dm**  59:13
**dna**  87:14
**doctor**  103:3,4
**document**  15:9,13
  24:4,6 29:19 31:5
  32:16 33:3,15
  34:8 35:3,4 39:5
  40:11,12 44:19
  45:15 46:1 50:23
  52:7 56:8,12,19,21
  57:1 67:13 72:15
  80:12 82:15
  100:17
**documentation**
  7:22 69:17 88:14
**documented**
  110:16

**documents**  4:14
  5:13 7:24 16:11
  45:21 60:1 78:21
**docusign**  11:18
**doing**  65:12 67:6
  75:3 108:10
  111:19 112:22
**doj**  54:23
**dollar**  105:25
  106:1 107:20
**dollars**  28:15,15
  28:16,24 30:3
  45:6 47:17,22
  49:12 60:13 75:2
  81:3,17,25 82:10
  83:9 100:13 107:8
  107:9
**door**  18:17 74:1
  108:1,19
**downstream**
  22:20 73:12,16
**downtown**  1:22
**dr**  40:24 43:2,4,7
  43:10,10,15,16,20
  43:24
**draft**  56:13 58:8
  59:1 60:11
**drafted**  57:1,5
  68:9,13
**dravi**  2:5
**drug**  30:3 117:21
  117:21,22
**drugs**  78:18,22,24
**dsm**  34:15,19,21
  34:25 35:8,11
  100:3 101:1 114:8
  114:13
**duly**  5:3 122:9
**dunn**  103:9
**dysphoria**  15:3
  23:10 29:5,23

34:1,7,16 35:1
37:13 38:12,16
40:18 41:18 42:2
42:18,20,24 44:15
44:22 48:19 49:16
49:18,25 50:7
51:4,11,16 52:11
52:19 53:11 55:7
55:11,21 60:12
63:18 69:10 76:13
77:12 78:12,18
92:4,15 93:12
94:12 95:2,14,18
96:21 98:9 99:17
103:3 110:18,22
111:7 112:4 113:3
114:14 115:1
118:4 119:10
121:6
**dysphoric**  114:22

**e**

**e**  2:6 4:9,10,15,16
  4:17,19 5:1,1 7:25
  51:1 52:10,16
  56:20,23 57:2
  67:16,21,25 94:16
  100:14 118:21,22
  119:18 124:3,3,3
**earlier**  7:6 19:22
  19:24 25:22 59:14
  73:8 76:5 84:21
  92:2,21 93:13
  95:16 118:6
**early**  19:15
**easiest**  19:13
**ebenefits**  85:15
**edenton**  3:4,9
**edit**  68:4,6
**edited**  68:17
**education**  2:9 91:1
  115:8

**educational**  91:6
**effect**  38:12 47:8
  48:6 73:16
**effective**  70:5
**effects**  70:7
**efficacy**  18:23
  19:18 71:19 72:24
  73:5 99:12
**effort**  105:25
  106:2
**eighteen**  10:23
**either**  55:14,14
  85:16 86:1 88:10
  89:6 90:3 92:22
  103:11 116:24
**electronic**  90:12
**electronically**
  91:16
**elements**  37:6
**eleven**  10:4
**eligibility**  88:15
  90:2 106:17
**eligible**  16:24 89:4
  89:10,23
**elimination**  81:8
**emotional**  99:15
  118:2
**empathize**  108:18
**employed**  88:6,11
  88:24 118:15
  122:13,15
**employee**  83:17
  88:1,18 89:3,13,14
  90:5,16 122:15
**employees**  2:13
  4:6,12,23 13:10
  17:1,2,3,6 45:20
  82:21 87:24 89:4
  89:10 90:20
  105:18,23 106:3
  106:11,11,12

118:13 120:10,15
**employer** 83:17
90:18
**employer's** 118:13
**employers** 89:9,19
89:22 90:1,6,14,19
105:19
**employing** 88:18
89:1 90:25 91:9
118:10
**enarson** 66:14
92:21
**endocrine** 114:20
114:21
**endorsed** 41:5
**engine** 93:1
**england** 60:6 76:6
95:22 96:3 113:12
113:17 116:3
**enhanced** 4:6
**enroll** 16:24 89:13
90:13
**enrolled** 85:6,10
89:4,7,10,14 90:17
108:3 118:14
**enrollee** 85:8
**enrollee's** 87:8,12
87:14,18 88:22
**enrollees** 85:2,3
**enrollment** 89:3
90:6,9,12
**entered** 96:15
**entire** 71:23
**environment**
105:4
**errata** 123:11,13
123:17
**erratas** 123:15
**error** 85:25
**especially** 94:3

**esq** 123:1
**essentially** 67:16
**established** 98:18
**estate** 9:20 10:2,15
**estimate** 23:9
24:11 25:3,6,10,17
25:20 27:25 28:4
29:8 38:15 42:10
46:9
**estimated** 27:8
28:9,25 30:8
60:11
**estimates** 26:9,16
30:13 46:14 81:24
**et** 1:5,8 48:25
119:15 123:4
124:1 125:1
**eugenics** 10:16
**evaluate** 11:15
18:2,18,19 19:6
31:12 54:18 73:7
**evaluated** 11:17
12:21 18:10 55:15
**evaluating** 54:15
**evaluation** 11:14
**everybody** 18:18
99:11 105:1 108:2
108:18,20,25
**evidence** 73:21
99:18
**exactly** 86:14 87:3
90:14
**examination** 4:2,2
4:3 5:18 117:8
120:4
**examined** 5:4
**example** 6:8 19:11
54:21 90:25 98:21
118:20
**examples** 54:3

**exceed** 46:8
**exception** 16:14
**excerpt** 111:17
**exclude** 15:20 16:1
**excluded** 47:7
48:6
**excludes** 78:15
**excluding** 77:18
**exclusion** 16:10,15
22:8,12 31:10
32:4 36:11 37:18
42:25 43:24 44:2
44:5,11 45:4 47:7
48:6 49:2,9,11,14
49:20 50:1 55:5
60:20 61:7,25
62:9,19 63:6
64:24 69:18 72:18
79:9,13,16,23
91:17,20 100:19
100:24 117:20,25
**exclusions** 15:2
16:6,7 22:4 34:1,5
38:11 41:17 42:1
42:18 43:5 63:23
113:3 117:15,16
118:3
**executive** 13:7,7
13:13,14,17 21:11
21:22 24:10 33:20
41:11 67:20
111:17
**exhibit** 4:5,6,8,9
4:10,11,15,16,17
4:19,20 15:6,7
23:24,25 29:11,12
30:23,24 39:2
45:8,9 50:18,19
52:2,3 56:5,6
67:10,11 72:14
82:12,13 117:10

118:20,21 119:2
**exhibits** 1:18 4:4
118:19
**existence** 102:21
**existing** 17:16
**expect** 27:18 74:3
**expectation** 74:5
**expected** 28:5
39:22 40:6 81:2
81:13 82:7 83:6
**expects** 28:1
**expenses** 40:5
47:23,24 48:3
**expensive** 71:18
**experience** 26:7
102:17
**experimental**
73:13 117:21
**expert** 4:20 82:18
103:14,18,19
115:10,12,13
**expertise** 93:2
**experts** 103:11
**expires** 122:25
**explain** 19:13
**explained** 29:25
**extent** 37:12 73:20
76:4 90:3
**extraneous** 74:23
**eyes** 1:19

**f**

**facilities** 9:20 10:2
10:15
**fact** 51:3 63:22
71:6,20 76:22
88:23 89:24 93:25
100:11 103:20
**factor** 84:8
**factors** 22:17
**factual** 72:17
79:22

EXHIBIT 2

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**fails** 123:19
**fair** 6:8,13,20
  14:21 83:21 87:4
  94:25 95:4
**fall** 96:14,14,19
  97:14
**familiar** 14:14,16
  22:23 24:6 29:19
  31:5 34:19 36:6
  37:10,14 52:7
  67:13 82:15 113:7
  114:20
**family** 105:21,24
  107:6,12
**fashion** 89:13
**fast** 111:19
**fathom** 116:1
**favor** 44:10
**fayetteville** 1:23
**fcrr** 1:25 122:6
**fda** 78:17,21,24
  79:1 80:3 117:22
**fear** 100:13
**february** 20:8,19
  21:5,7 51:15,20
**fed** 4:21
**federal** 22:22,22
  30:1,3 56:18
  57:10,23 69:19
  100:13
**feedback** 97:3
**feeding** 71:15
  104:22
**feel** 110:12
**feeling** 22:20
**felt** 65:9
**female** 85:22,23
  85:23 86:14,14
  87:21
**fiduciary** 18:16
  74:2,15 104:4

**field** 103:12,15,18
  103:19
**figure** 84:25
**final** 57:17
**finalization** 21:6
**finance** 14:9
**financial** 9:19 23:9
  25:4 28:8 39:15
  39:20 40:1,25
  80:14 102:2
**financially** 122:16
**financials** 40:9
**find** 59:24 77:3
  93:4 96:25 111:14
  111:14 117:10
**finding** 12:6
**finish** 6:25 116:15
**finished** 6:11
**finite** 71:24
**firm** 23:1
**first** 4:13 5:3 26:4
  45:20,24 57:9
  74:15 88:17 90:11
  94:16 101:22
  118:21 120:9
**five** 10:14 71:21
  102:21
**flatter** 102:16
**flip** 33:24 34:14
**floor** 2:4
**flu** 107:22
**focus** 54:19 102:19
  103:23,24 107:5
**focused** 85:16
  109:21
**follow** 56:14 117:5
**followed** 40:1
**following** 44:12
  57:7
**follows** 5:4

**folwell** 1:8 2:12
  4:19,22 5:14
  70:14,17 75:19
  82:20 123:4 124:1
  125:1
**folwell's** 70:9
**food** 71:16 117:22
**foregoing** 122:7,8
  125:5
**forest** 40:19,24
**forgetting** 110:12
**forgot** 108:7
**form** 6:22 25:21
  58:11 70:11 79:17
  80:8 99:22
**former** 17:4 32:9
  43:3,9 70:3 94:16
**forms** 90:7,9
**formula** 104:22
**forth** 34:15 35:11
  35:23 36:3 69:21
**forward** 17:19,21
  56:2 68:7 71:12
  93:14 109:6
**found** 73:20
**four** 10:14 13:19
  21:20
**fourth** 57:20
  117:18,24
**frame** 21:5 96:24
  101:14
**franciscan** 70:25
  94:20
**frank** 68:16
**frankly** 96:15
  106:21
**frequently** 71:21
**front** 30:5 74:1
**full** 7:18 43:13
  46:25 82:8,9
  86:24 90:4 119:21

**fully** 83:19 105:21
  120:20
**fund** 2:9 84:4
  107:16
**fundamental**
  119:16
**funded** 102:23
**funding** 14:24
  17:25 22:22,22
  30:1,2 57:10
  69:19 105:5
  106:18
**further** 8:6,7
  30:19 101:3
  116:10 120:1
  121:12 122:14
**future** 72:3

**g**

**g** 2:18,18 5:1
**ga** 2:10
**gain** 93:7
**garner** 2:22
**gellahan** 94:17
**gender** 15:2 16:3
  23:10 27:14 29:4
  29:23 31:19 34:1
  34:6,16 35:1,17,24
  36:4 37:12 38:11
  38:16 40:18 41:17
  42:2,17,20,23
  44:14,22 46:7
  48:19 49:15,17,25
  50:7 51:4,11,16
  52:11,19 53:11
  55:7,11,21 57:12
  58:9,21,24 59:8
  60:12 63:17 69:9
  76:13 77:12 78:11
  78:18 87:18,20
  92:4,15 93:12
  94:12 95:2,13,18

96:21 98:9 99:16
99:16 103:3
110:18,22 111:7
112:4 113:3
114:14,22 115:1
118:4 119:10
121:6
**general** 7:25 55:1
57:8 66:7 88:21
91:7 92:22 97:13
97:22 105:5 106:6
106:16 107:18
**general's** 54:23
**generally** 17:13
18:9 22:1 48:25
56:9 78:5 109:6
113:18
**generate** 81:3
**getting** 89:9,23
90:23 91:10 106:8
118:13
**give** 6:6 7:7,18
15:8 24:1 29:13
30:25 45:10 50:20
52:4 74:12
**given** 88:1 125:9
**gives** 75:7
**giving** 107:18
**glucose** 110:1,6
**go** 6:3 8:22 9:5
20:16 38:20 55:14
64:19 66:23 73:23
83:6 86:13 89:6
91:23 95:10 96:2
99:19 105:15
106:9 108:9 116:8
121:10
**goal** 17:22 18:11
82:9
**goals** 18:3 107:7

**goes** 73:23 87:9
**going** 6:24 17:19
17:21 32:4,4
55:14,14 65:17,17
65:17 76:10 83:23
86:15 94:8 103:18
103:24,24 104:18
105:1 107:8,12,22
107:23 108:24
116:5,15,19,21,22
**good** 5:20 96:16
104:9 108:22
112:13
**gotten** 33:12
**government** 17:24
105:12
**governmental**
72:17 79:8,12,15
79:22,25 80:1
**governor's** 54:23
**grad** 9:3
**graduate** 9:1,9
**graduated** 8:23
**grannis** 2:3,6
**granular** 14:5
**grateful** 107:10
**great** 75:8 108:24
**greatest** 110:10
**greensboro** 3:7
**ground** 6:3
**group** 14:10,10
77:5 100:9 101:13
102:17 104:2,16
104:16,20,21,22
104:23,24
**groups** 10:13,14
54:12 103:21
**grown** 83:11
**guaranteed** 72:2
**guess** 57:6,7 65:10
86:14

**guidelines** 114:21
**gynecologists** 41:5

**h**

**h** 2:3 124:3
**half** 10:4
**hand** 56:4 67:9
82:11
**handing** 23:23
29:10 30:22 45:7
50:17 52:1
**happen** 94:9
**happens** 7:4 71:13
86:10 106:10
**happy** 74:14
**hard** 74:23 102:22
**harmless** 65:2,18
66:2,20 67:4
**harris** 2:3,6
**hayes** 66:6
**hbr** 89:11,24
90:18
**hbrs** 118:6
**head** 6:8 61:5
111:20
**heading** 40:18
**health** 1:15 2:13
2:21 4:6,12,22 5:7
5:9,11,13 10:25
11:7 12:3,11
13:10 16:22,24
18:12,24 28:25
35:16 38:11 39:11
43:5 45:19,24
46:20 47:5 54:13
54:22,25 56:16
57:17 70:22 75:3
75:5 80:14 82:21
84:3 85:6,7,11
88:9,25 89:16
104:5 105:22,24
106:25 107:15

108:21,24,25
109:7,7,21 118:8
118:15 120:11,15
120:22 121:2
**healthcare** 17:23
41:6 46:8 81:9
103:12 104:8,9
105:9 108:22
112:18 120:10,14
120:25 121:5
**healthy** 75:1,2
**hear** 5:24 20:12,15
71:20
**heard** 6:4 20:15
92:23
**hearing** 63:12
71:17,20 74:11,12
104:23
**heart** 74:9 108:2
**heimbach** 2:23
**held** 13:14,17 66:2
**help** 90:17 99:15
**helpful** 96:20
**helping** 89:12
**helps** 71:19
**herculean** 106:2
**hereto** 125:7
**high** 13:22,25 14:2
16:22 54:13 112:8
112:9,12,12
113:16
**higher** 39:21 40:2
40:6 49:18
**highest** 54:9
**hill** 3:6
**hire** 90:3 103:16
**hired** 81:9
**hiring** 103:17
**hold** 60:16 61:2,14
63:3 65:2,18
66:19 67:4 100:7

**holistic** 73:8 76:21
**honest** 7:18
**hormonal** 76:14
  77:13 78:12
**hormone** 31:20
**horner** 33:1 66:15
**hospitals** 54:17
  107:3,3
**hot** 109:20
**hours** 90:4 97:16
**hr** 90:22,23
**huh** 8:21 14:1
  60:15 77:25 84:24
  98:3,12,14 99:4
  102:7,9
**human** 10:25
  12:11 56:16 57:17
**hwglaw.com** 2:5,8

**i**

**identification** 15:7
  23:25 29:12 30:24
  35:17 45:9 50:19
  52:3 56:6 67:11
  82:13
**identified** 72:22
  76:4 78:3 79:14
  80:1
**identifies** 104:7
  115:23
**identify** 27:1,9,12
  76:12,18 79:12
**illness** 99:15
**imagine** 23:22
  32:25
**impact** 28:8
**implement** 11:18
  22:21
**implemented** 20:1
  20:10 80:21
**importance**
  111:13

**important** 70:7
  94:1,2 109:22
**improve** 18:25
  80:19
**incidence** 54:8,16
  54:24
**include** 10:15
**included** 31:13,16
  119:11
**includes** 42:14
  95:11
**including** 41:18
  42:2
**income** 40:6
**incorporated**
  48:22
**increase** 30:14
  39:22,22
**increased** 80:25
**incur** 48:18 84:22
**incurred** 47:22
  49:3,13
**indemnification**
  65:21 67:4
**index** 4:1
**indicate** 52:19,25
  53:8
**indicated** 47:6
**indicates** 47:4
**individual** 1:14
  54:11 85:6,10,12
  86:1 87:18 88:10
  115:23
**individual's** 88:15
**individuals** 33:14
  76:12,18 78:4
  88:5 115:11,14
**infant** 71:15
  104:22
**infants** 104:21

**inflate** 48:24
**influence** 33:2,3
  33:15
**inform** 84:14
**information** 7:5,6
  7:25 19:3 21:1
  47:3 69:21 91:10
  94:19 95:6 100:18
  119:6,14
**inhibiting** 7:17
**input** 66:4
**insignificant** 109:5
**institute** 105:25
**instituted** 19:14
**instruction** 64:23
**insulin** 54:19
**insurance** 46:21
  120:10,14,19,19
  120:25 121:5
**insured** 83:19
**insureds** 48:9
**insurers** 48:14
**integration** 14:7,7
  32:11,14 91:3
**intentionally**
  109:14
**interchangeably**
  13:8,14
**interest** 72:17
  79:22,25
**interested** 107:18
  122:16
**interests** 79:8,12
  79:15 80:1
**interim** 32:11
**interrogatories**
  4:13 45:21,24
**interrogatory**
  72:16 79:7,11,21
  80:2,6,13

**intervention** 77:13
  78:13
**introduced** 16:16
**involved** 66:9
  103:1 115:22
**issue** 10:17 19:23
  55:22 60:22,25
  61:10 62:3,6,21,25
  63:10 65:18 73:22
  73:24 92:18 93:21
  93:25 94:1 100:15
  100:20 115:1,5,16
**issued** 37:3 40:25
  57:17 75:14
**issues** 93:23 94:2
  97:15 99:16 102:5
  103:6 104:12

**j**

**james** 2:22
**january** 4:7 15:17
  17:12 32:5 51:10
  53:10 56:24 60:17
  61:22 63:9 64:11
  64:11,12,14,16
  81:10 118:21
  119:3,20,21,24
**job** 11:5,8 13:15
  21:12 87:1 90:17
  108:7
**joel** 2:23
**joel.heimbach**
  2:25
**john** 2:18,18,20
**joined** 110:15
**jones** 1:13 2:12,15
  4:22 5:2,8,10,13
  5:15,20 82:20
  116:12 120:6
  121:13 123:5
  124:2,24 125:2,4
  125:12

**journal** 60:6 75:13 76:6,6 95:22 96:3 113:12,17 116:3
**journal's** 113:19
**journals** 59:20 60:3 70:2 111:16
**july** 23:22 61:17
**june** 23:22 61:14 93:14 94:10 96:11
**justice** 3:3,8
**justification** 77:18

**k**

**kadel** 1:5 123:4 124:1 125:1
**kaiser** 60:5 76:7 95:21 96:2 98:7,8 98:13 99:2,5,21 100:1 110:21,22 111:6 116:3
**keep** 69:19 83:10 105:1 106:5
**keeping** 18:3
**keeps** 118:11
**kendall** 2:22 92:22 101:22,23
**kendall.bourdon** 2:25
**key** 26:22,23 99:10 101:7,7
**kids** 99:13
**killing** 107:4
**kilter** 109:13
**kind** 65:12 71:4 86:9 96:2 107:14 111:16 115:18
**kinds** 92:10
**knepper** 2:18,18
**knepperllc.com** 2:20
**knew** 32:3

**know** 6:5,25 7:7 13:11 15:9 16:7 20:24 23:17 24:21 24:22,25 25:15,19 26:3,17,19,21 33:5 33:13,22 35:21 48:24 50:13,14 54:8,18,22 57:2 60:23 61:1 64:4 68:12 70:12 71:1 71:14 73:17,20,23 74:21 75:18,21,23 76:1 79:3,5 80:9 86:22,25 90:15 91:13 92:23 93:1 93:4 94:15 96:9 98:6,16 99:23 100:6,22 104:16 104:22 105:11 106:12,12,17,25 107:5 109:19 110:24 113:1,6 114:1,9 116:14,20 119:5,12 120:20
**knowledge** 8:13 25:16 48:17 59:21 59:22 66:18 75:19 77:7 93:7 114:6
**known** 114:12

**l**

**laid** 88:1,17
**lambda** 2:9
**lambdalegal.org** 2:11
**landscape** 98:20
**language** 16:10 26:14 44:8
**large** 122:4
**larger** 71:18
**late** 78:4 111:5 114:25

**law** 2:18 22:5 56:15,15,18 57:7 57:23 67:5
**lawmakers** 17:4,4
**lcb** 1:6
**leaders** 33:13,14
**leadership** 32:23 97:25
**leading** 15:21 23:15
**learning** 96:18
**legal** 2:9 14:11 41:12 66:4,5 70:23 71:3 72:4,8 92:3 93:11 94:11 103:2 123:23
**lengthy** 15:9
**lester** 68:16
**level** 13:22,25 14:2 14:5 83:10 102:23 112:8,9,12,12 113:16
**liability** 53:8 81:14 82:23 84:5 84:8,11,15 105:8 107:16
**liaisons** 118:11
**lift** 22:12 36:11 37:18
**lifted** 44:6 49:8
**lifting** 45:4 49:2 49:11,13,20 60:20 61:7,25 62:9,19 63:6
**light** 18:18
**lightly** 18:15
**limited** 17:24 69:24
**line** 7:1 124:4,7,10 124:13,16,19

**list** 39:12 117:15
**listed** 8:8 37:12 47:25 49:17 53:16 80:24
**lists** 96:5
**little** 58:14 79:24 83:11 109:12
**live** 106:14 107:25
**loaded** 58:14
**local** 66:8 88:7 90:22 91:1
**locations** 91:4
**log** 86:1
**logs** 85:15
**long** 10:3,21 12:10 12:25 13:17 19:21 26:8 57:22 80:20 97:14,17 103:22 108:19 109:2
**longer** 56:17 101:8 101:8
**longitudinal** 72:23 73:4,18
**look** 12:20 18:21 44:20 54:2 55:1 60:4 95:25 96:20 98:7 99:25 111:4 112:22 113:11 116:14 117:18 118:20 119:2,23
**looked** 12:20 59:20 60:1,2,5,5,5 98:24 100:3,17 111:1,24 112:1,14 116:5
**looking** 28:13 46:5 46:25 56:19 59:8 59:11 85:2 98:23 100:14 114:5 118:20

**lorraine** 67:19
**losing** 57:10
 100:13
**lot** 19:2 58:12,13
 69:16 70:4 72:6
 93:1,2 94:22,22
 97:3 104:10,11,12
 104:13 105:16,23
 106:15 107:9
 110:5 111:15
 113:13
**lotta** 25:12 33:1
 41:10 51:2 57:3
 94:17 101:8,18,19
 102:11
**love** 74:12,12
**lower** 72:3
**lowering** 19:21
**lpa** 1:6

**m**

**m** 2:4,14,22 123:1
**maar** 1:25 122:6
 122:22
**mail** 4:9,10,15,16
 4:17,19 11:19
 51:1 52:10,16
 56:20,23 57:2
 67:16,21,25
 118:21,22 119:18
**mails** 7:25 94:16
 100:14
**main** 95:10
**maintaining** 74:3
**maintenance**
 10:16
**major** 83:16,21,25
**majority** 20:2
**making** 34:22
 36:10 37:18,21
 87:5,6 102:20
 118:14

**male** 85:22,24
 86:14,14 87:21
**mammography**
 19:14,15,18,25
 109:25
**manage** 69:24
 90:13 92:25
**management** 8:25
 14:18,19,22 23:16
 23:16,17 75:5
**mandated** 22:4
 57:8
**manner** 18:2
**march** 61:2,19,22
**mark** 2:15 25:8,22
 33:2 39:14 101:10
 101:24
**marked** 15:7,18
 15:24 23:23,25
 26:5 29:10,12
 30:4,22,24 32:15
 38:8 39:3 45:7,9
 50:17,19 51:9
 52:1,3 56:4,6,19
 67:9,11 82:11,13
**marker** 87:18
**markers** 87:20
**market** 106:13
**marking** 15:5
**mask** 6:1
**material** 17:17
**materials** 21:14,16
 31:14,15,24 60:24
 61:12 62:5,24
**math** 102:24
**matter** 5:21 93:25
 106:23,24 111:9
 120:8
**maxwell** 1:5
**mba** 9:8,16

**mcinnes** 3:4 4:3
 116:20,23 120:5,6
 121:8
**mckethan** 43:7,10
 43:17,20,24
**mckethan's** 43:16
**mcneal** 102:3
**mean** 14:4 17:6
 47:15 65:16 79:18
 85:20 87:25 106:4
 106:14 107:25
 108:3 112:9
 119:23
**meaning** 39:12
 113:6
**meaningless**
 119:24
**means** 47:16 55:25
**mechanism** 110:3
 110:8
**medicaid** 11:6,13
 11:21
**medical** 31:19
 34:12 35:17 36:23
 37:7 40:20 42:13
 42:14 46:18,19
 47:2,6,13 59:20,23
 60:3 68:23 70:10
 70:23 71:4 72:4
 72:11 73:15 78:22
 83:18 92:3,14
 93:11 94:11 95:2
 95:17 96:21 103:2
 110:7,17 111:16
 112:19 115:1,4,18
 115:20
**medically** 34:6
 42:19 57:12 58:4
 58:6,10,13,20,21
 58:25 69:10 72:5
 110:22

**medicare** 80:25
 83:19
**medications** 54:17
 55:1
**medicine** 60:6
 76:7 95:22 96:3
 113:12,17 116:4
**meet** 21:19,20,21
 33:17
**meeting** 20:14
 21:4,6,7,8 31:10
 31:18,21 32:21
 33:7 39:9,17
 40:15,16,22 41:14
 45:1 60:16,19
 61:2,6,14,19,20,24
 62:12,13,14,15,19
 63:9 94:6
**meetings** 21:2,23
 22:3 33:21 63:3
 94:4
**member** 18:6
 19:16 28:18,20
 43:3,9 53:2,5,8,8
 81:17 85:13,15
 86:17,19 89:2,12
 89:12 104:9
 105:17 108:15
**members** 17:23
 18:5,14 27:18
 28:1,5 33:8 52:12
 54:10,14 67:18
 70:4 81:9 91:14
 104:10,11,12,13
 108:15
**membership**
 11:24,25 20:3
 39:22 54:7,22
 71:9 73:10
**memo** 24:9,12,14
 24:16,18,19,23,24

25:3 26:4,6,25
28:9,23 29:22
31:8,17 46:10
63:22,24 64:2,3
**memorandum** 4:8
**memory** 10:19
**mental** 99:15
109:7,21
**mention** 100:11
114:8,10
**mentioned** 33:15
49:7 59:13,17
70:2 76:5 92:20
92:20 93:10 95:5
109:10,24 114:24
118:6,10
**message** 4:19
**methodology**
77:11,17,23 78:10
78:14
**michelle** 1:25
122:6,22
**middle** 1:2 39:10
**migration** 84:16
**milliman** 60:5
76:7 95:21 96:3
111:4,22,23
112:15,17 116:4
**milliman's** 112:5
113:2
**millimeter** 19:24
**million** 30:3 40:2
81:3,25 82:9
**mind** 76:8 96:16
110:25
**minimum** 107:13
**minors** 77:10,24
78:3,9
**minute** 117:3
**minutes** 31:20
39:8 40:15 111:11

116:14,18
**missing** 14:12
**misspoke** 67:3
**mistaken** 45:5
**mjones** 2:17
**modifications**
15:22 41:19 42:3
**moment** 15:8 24:1
29:13 30:25 45:10
50:20 52:4 75:18
**mona** 24:17 25:11
33:1 51:1 101:7
101:16 102:11
**money** 71:24
74:17,22 83:22,23
84:3 91:15 107:10
107:14,19 108:6
**monitor** 110:6
**monitors** 110:1
**month** 13:19
20:12 28:18,20
64:5 81:17 91:15
105:23 119:2
**months** 10:23 13:1
20:9 32:7
**moon** 24:17 25:11
30:7,20 33:1
101:7,16
**moon's** 30:17
**moot** 78:5
**morning** 5:20
115:7
**motion** 43:11
55:16
**move** 43:4 106:15
109:11
**moved** 91:15
109:6
**movement** 84:17
**multiple** 73:10

**municipalities**
17:5,7
**munk** 4:19 67:19
67:21
**murray** 4:15,16
51:1 52:10

**n**

**n** 2:15 5:1
**name** 5:20 60:6
86:24 120:6
**names** 92:21 99:5
**nation** 106:25
**nc** 1:15 2:7,12,16
2:24 3:5,6,9
**ncdoj.gov** 3:5,10
**nctreasurer.com**
2:24,25,25
**ne** 2:10
**necessarily** 73:7
90:16 100:6,7,10
109:18
**necessary** 34:6
42:19 57:12 58:5
58:7,10,13,20,21
58:25 65:9 72:5
77:1,3 110:23
125:6
**necessity** 34:12
37:7 42:14 59:23
95:17 96:21
110:17 115:1
**need** 6:25 7:1 21:1
54:2,14 55:3 65:2
69:19 74:11 88:4
93:5 103:17
**needed** 31:12
63:23 65:12 109:8
**needs** 54:18
**negotiated** 46:19
48:2

**neither** 122:12
**netted** 83:19
**never** 96:15
104:19,19 106:2,3
109:1
**new** 20:16 59:21
60:6 69:23 76:6
83:3 88:1 89:2,2
89:14 90:3 95:22
96:3 113:11,16
116:3
**niche** 54:11 71:9
71:10,12,12 77:5
103:21
**nineteen** 10:23
**nod** 6:7
**non** 78:24
**normally** 39:18
71:16
**north** 1:2,23 2:21
2:21 3:2,3,8 4:12
4:22 8:23 10:7,21
10:25 12:11 13:9
17:2 22:4 27:5,9
28:24 42:13 45:19
47:4 49:24 50:3,6
54:21 63:14 64:23
65:1 66:19 82:20
108:13 120:7
122:4
**norton** 66:7
101:22
**notary** 122:24
125:13,19
**note** 123:10
**noted** 125:7
**notes** 116:14
**notice** 8:9 56:16
**notification** 31:9
**notified** 44:18

**november** 20:23
21:4 24:13 46:10
62:17
**number** 18:12,13
23:5 27:25 28:5
39:2 46:6 54:9
72:16 79:11,21
80:6 86:19,25
119:20
**numbers** 48:23
84:13,14 86:25
119:6,11
**numerous** 9:19
63:11
**nurse** 103:7,9
**nw** 2:4

**o**

**o** 5:1
**oath** 7:12,14
**objection** 6:22
25:21 58:11 70:11
79:17 80:8 99:22
**objections** 4:11
45:18
**objective** 76:12,17
76:18,22,25
**obligated** 67:17
**obligation** 68:2
87:3
**obstetricians** 41:4
**occur** 20:11 85:14
86:12
**october** 39:19,25
53:14,16 70:21
72:7 122:25
**offer** 43:10 77:6
78:6,7 92:11
101:2 120:10,17
**offered** 43:17,20
57:22,22 118:12
121:5

**offering** 120:14,18
120:23
**office** 2:18 9:20
11:14 68:10,11,13
74:2 89:2
**officer** 10:11
122:6
**oftentimes** 21:21
**oh** 12:14 26:13
56:1,2 65:7 81:5
107:17
**okay** 5:24 7:2 8:1
9:1,7,11,15,22,24
10:5,7,12 11:2,5
12:1,23 13:20,25
14:4 17:6 19:6
22:7,17 23:8
26:13,16 27:25
28:4,13 29:15
30:19 37:10 44:9
45:7 49:6,22
52:15 53:13 62:18
63:9 73:2 75:12
78:2 80:11 83:5
84:20 85:18 90:19
93:16 98:15
112:14 113:8
116:7,13,23 117:1
120:13 121:4
**once** 15:11 96:4
104:25
**ones** 63:2 94:24
**online** 9:6 59:21
60:1,3
**opeb** 81:14
**operate** 74:19
**operating** 10:11
**operation** 12:2
14:14
**operational** 10:17
10:18 11:13

**operationalize**
13:22 14:5
**operations** 9:20
10:2,15 11:6,22
**opinion** 70:25
73:25 94:20 99:11
100:11
**opinions** 59:4,10
94:21
**opioid** 54:20,21
**opportunity** 7:8
84:2,3
**opposed** 102:8
**opposite** 84:10
**options** 85:22
87:21
**order** 1:20
**organization**
11:18 12:6
**organizational**
11:15
**orthopedic** 104:11
**outcome** 44:9,10
122:17
**outperforming**
40:9
**outside** 24:23,25
37:15 120:11,15
**overarching** 17:22
18:3,11
**oversee** 10:13,14
**overstated** 26:9
47:21

**p**

**p** 5:1
**p.m.** 121:15
**padget** 3:8 116:22
121:9
**page** 4:5 6:4 15:18
15:24 26:4 27:11
27:17,22 28:9

30:4 34:14 35:13
36:2 38:8 39:10
40:17 41:23 46:1
46:25 51:9,14,19
52:18 72:15,21
73:1 76:11 80:11
80:18 117:11,12
117:24,24 118:21
124:4,7,10,13,16
124:19
**pages** 32:15 39:3
46:5 80:11 100:18
**paid** 46:20 48:9,10
48:14 51:11,16,20
52:19 53:1,4,11,14
75:2 106:2,3
118:24 119:3,21
**paper** 97:10
**papers** 112:7
**paragraph** 26:6
26:12,23 27:4
30:7 43:14,15,16
43:19 47:1 73:1
76:10
**parents** 71:14
**parity** 109:7,7,21
**part** 25:23 37:20
45:14 71:7,8
101:8,9 103:22
**participants** 48:9
48:13 84:22,25
**participate** 88:23
**participating** 88:7
88:16,19 89:9,19
89:22 90:1,6,19
**participation**
11:17 87:23
**particular** 55:3
73:22 91:14 93:19
93:25 113:6

particularly 47:20
parties 122:13,16
partners 97:2
parts 70:23
party 63:15 65:11
  81:20
path 100:23
pathway 73:9
patients 41:1 77:5
  115:19
pattern 40:1
patti 40:19
paul 43:2
pause 24:2 29:14
  31:1 45:11 50:21
  52:5
pay 19:16 105:18
  113:14,23
paying 105:19,20
  107:8
payment 46:17
  47:2,12 110:4,8
payments 46:18
  46:21 53:13
payroll 90:24 91:3
  91:8,11,14
peachtree 2:10
peer 72:23 73:4,18
  75:9
pendency 75:13
people 18:13
  19:21 37:7 63:12
  70:1 71:10,18,19
  73:10 74:3,11,13
  74:16 75:1,2
  90:22 99:13,14
  100:9 101:7,7
  102:1 105:22
  107:9,20 108:3,6
percent 19:19
  26:25 27:5,5,12,13

28:25 29:1 30:9
  30:14 54:6,7 76:8
  84:21,22 85:3,3
  102:23,24 105:6
  106:9
period 11:12
  15:17 20:14 94:14
  94:25
permit 55:7
person 23:20 25:7
  43:8 75:2 87:5
personal 73:24,25
  74:16 104:1 114:5
personally 21:24
  113:7 115:20,24
persons 114:22
perspective
  101:15 102:4,14
pharmacist 103:7
  103:9
pharmacy 83:18
  83:18 110:9
phoenix 9:6,16
phone 86:25
physician 43:3
physicians 41:4
pick 18:17 105:12
pinpoint 92:11
  96:12
pitt 2:14
place 16:15 57:9
places 12:6
plaintiffs 1:6 2:2
  4:5,13 5:21 8:9
  15:6 23:24 29:11
  30:23 45:20,23
  50:17 52:1 56:4
  67:9 72:16,24
  79:7,11 80:13
  97:12

plan 1:15 2:13,21
  4:6,7,12,22 5:7,9
  5:12,13 7:25
  13:10,11 14:6,14
  14:16,18,19,22,24
  15:16,18,20,20,24
  16:1,1,11,14,18,20
  16:22,25 17:11,14
  17:15,17,20,24
  20:6,7,10,19,22
  22:8,11 23:2,5,8,9
  23:11,13,21 24:19
  24:23,25 25:2,4,16
  25:19 26:5,18,20
  27:17 28:1,4,5,25
  29:4,7 30:2,4,17
  30:19 31:13 32:2
  32:6,9,11,13,15,23
  33:11,12,24,25
  34:3,4,9,11,14,19
  34:21,25 35:5,7,10
  35:13 36:2,6,9,15
  36:16,19,23 37:10
  37:14,17 38:1,3,5
  38:8,12 39:3,11,19
  39:23 40:5,11,17
  41:8,22 42:12,16
  43:1,5,13,25 44:3
  44:6,11,12,13,21
  44:24 45:3,19,24
  46:13,20 47:3,4,5
  47:11,11,22 48:8,9
  48:13 49:3,4,8,9
  49:12,13 50:9
  51:2,9,14,19 52:12
  52:15,18,19 53:1,4
  53:7,10,20 54:1,4
  54:13,22,25 55:6,6
  55:8,10,12,17,20
  56:19,25 58:5,6,13
  59:1,3,4,22 60:20

61:7 62:1,9 63:6
  63:18,19,21 64:11
  64:11,25 65:2,2,3
  65:5,20,23 66:1,3
  66:7,11 68:17
  69:9,20 70:18,20
  70:22 71:8,11,22
  72:8,11,16,18,22
  72:22 73:6 74:19
  74:22 75:10,11,22
  76:3,11,16,20,24
  77:1,7,10,10,21
  78:2,6,7,17,21,23
  78:23 79:8,12,13
  79:15,21 80:13,15
  80:18,24,25 81:19
  81:21,24 82:3,21
  83:14,17 84:2,22
  84:25 85:2,7,7,11
  85:11 86:3 87:8
  87:23 88:6,9,16,19
  88:23 89:5,10
  90:10 91:14,18,21
  92:2,7,13 93:10,20
  94:10 95:1,5
  96:12 100:6,7,8,25
  101:5,5,8,9,12
  102:5,8,20 103:4,5
  103:14,22 104:5,7
  104:9,19 105:4,12
  105:13,14,22,24
  106:1,2,5,25
  107:15 108:8,22
  108:24,25 109:3,4
  109:4,12 110:15
  110:16,19 113:2,5
  113:9 118:11,11
  118:15 119:3,5,8
  119:21 120:11,15
  120:19,22 121:2

plan's 8:4,9 15:1
  19:19 21:11,19,22
  22:7 24:9 30:10
  33:17,20 38:11
  39:15 40:8,20
  41:11,16,25 42:7
  42:22 48:17 58:9
  60:16 63:3,15
  64:23 66:18 75:12
  75:19 77:7,17
  78:10,13 80:19
  82:23 83:8,22
  84:1,5,8 102:25
  103:1 110:16
  113:8
plans 84:17
  120:17
play 63:23 89:9,19
  89:22
plaza 1:22
please 6:16,25 7:7
  14:19 46:5 50:8
  69:13 85:9 91:19
  115:21 117:10,11
  118:7,19
pleasure 75:8
plenty 71:19
plus 18:14 71:6
  105:6 108:15
pmpm 28:18
pnc 1:22
pocket 19:16
point 9:21 22:19
  51:22 55:4 78:5,8
  97:12 100:22
  111:15 116:11
  117:18,25
points 99:10
policies 13:23 14:5
  80:19

policy 31:19 42:13
population 18:22
  19:20 71:10,13,18
  71:24 72:2 74:25
  75:5
populations 94:3,4
portion 48:9
portions 1:18
position 34:11
  35:7 36:16 38:3
  58:9,24 59:1,4
  108:11 110:17
  113:2
positive 73:16
possible 64:12
  93:24 94:7,24
  96:6
possibly 61:16
  75:23 76:1 86:24
  92:12 93:17
  114:25
postage 11:19
potential 20:13
potentially 118:3
power 107:2,2
powerpoint 32:19
  98:21
ppo 4:6 15:16
  16:18,20
practice 114:21
predecessor 29:25
predecessors 22:2
premium 29:1,5
  106:1,1 107:12
premiums 28:24
  30:10,13 90:20,21
  107:6
preparation 8:6
prepare 7:20 8:3
  21:14,16

prepared 32:22
prepares 21:17
preparing 114:6
prepping 7:23
prerequisite 73:5
  76:19 78:22
present 20:23 21:3
  33:21 39:16 40:21
  41:13 63:10
presentation
  31:18 32:19,22
  33:6 34:24 35:11
  37:15,24 44:25
  98:22
presentations
  69:16
presented 32:20
  60:24 61:12 62:5
  62:24
press 67:16,18
  68:1,3,7,9
pretty 8:2 81:18
prevalence 26:23
  27:4,8
preventative 20:3
previous 20:9 24:9
  44:19 67:2,24
  109:10
pricing 82:4
primary 12:3 19:8
  108:23
prior 19:17 23:7
  26:9,16 40:1
  49:19 72:7 86:15
probably 11:25
  19:13 33:2 49:16
  66:4,17 68:14
  78:25 81:16,17
  82:9 83:1,9 93:15
  96:14 97:19 112:8

problem 54:21,24
procedure 68:24
procedures 79:2
  118:1
proceeding 24:2
  29:14 31:1 45:11
  50:21 52:5
process 8:16 17:14
  20:21 21:10 64:12
  71:16 85:14 86:12
  89:17,20,23
processes 11:16
  12:21 65:13
  118:14
procurement
  10:19
produce 73:16
produced 5:13
  7:22 97:12 99:1
production 4:14
  12:4 45:21
professional 35:15
program 10:16
prohibited 49:1
prohibits 67:5
project 11:19
  25:12 82:4
projection 40:6
projects 11:4,14
  12:20
prompted 22:14
  22:17
pronoun 85:7,12
  85:13 87:17
proof 87:8,12,14
proponent 72:3
propose 19:4
proposed 16:3
  18:19 19:7 41:9
  43:16,21 73:6
  76:19,20 80:20

**prospectus** 121:1
**protective** 1:20
**protocols** 115:11
  115:14
**proven** 20:4
**provide** 4:21 15:2
  29:7 63:17 74:14
  82:19 89:17 90:6
  90:12,15 112:19
  121:2
**provided** 17:25
  25:20 26:8 28:15
  42:7 46:9 47:3
  56:17 63:22 64:6
  64:7 115:18,20
  119:9
**provider** 11:23
  47:16,18,18,20
  119:9,15
**providers** 11:24
  46:18,20 47:2,13
  50:2 107:3
**provides** 41:17
  42:1 48:1 104:8
**providing** 17:22
  18:12 31:9
**provision** 34:5
  42:19
**psychiatry** 75:14
**psychological** 16:2
  41:19 42:4 59:15
  70:7 118:1
**psychotherapy**
  16:2 41:20 42:4
**public** 3:2 17:1
  18:5,12 20:12,13
  62:4,11,11,22
  63:11 91:2 120:7
  122:24 125:19
**published** 96:4
  115:16

**pursuant** 4:21
  82:19
**push** 56:2
**put** 21:13 22:15,21
  30:1 63:23 68:7
  69:20 74:17 85:21
  85:23,24 88:19
  105:17
**putting** 110:9

**q**

**qualifying** 88:14
**question** 6:15,20
  7:6 8:19 25:18
  41:24 43:18 44:4
  55:9,19 87:10
  99:14 115:21
  116:1 120:9
**questioning** 7:1
**questions** 6:7,10
  7:23 86:18,21
  116:10,19 117:5
  120:1,8 121:8,12
**quick** 111:14,15
  111:18
**quite** 23:5 96:15
  98:22 106:21

**r**

**r** 4:21 5:1 124:3,3
**ra** 104:12
**raging** 107:24
**raise** 65:18
**raleigh** 1:23 2:7,24
  3:5,9
**range** 27:5 28:10
  28:14 98:18
**rate** 84:15,16
  105:6
**rates** 102:24
  106:13

**ravi** 2:3 4:2 5:6,11
  5:16,19,21 6:23
  15:8,12 24:1,3
  26:1 27:22,24
  29:13,16 30:25
  31:2 38:20,22,23
  45:10,12 50:20,22
  52:4,6 56:7 58:16
  64:19,21 66:23,25
  67:7,8,12 70:13
  79:20 80:10 82:14
  91:23,25 92:1
  99:24 116:8,10,16
  117:2 121:10,12
**rdr** 1:25 122:6
**reach** 93:5,6,7
  95:6
**reached** 97:1
**read** 96:7 106:12
  111:16 114:13,16
  123:9 125:5
**ready** 64:8 105:9
**real** 9:20 10:2,15
  73:20 79:18 102:1
  106:22
**reality** 104:10
**really** 57:6 71:25
  74:23 75:1 102:22
  104:13,15,24
  106:23 109:22
**reason** 43:23 44:2
  44:5 57:9 123:11
  124:6,9,12,15,18
  124:21
**reasons** 78:14
  118:2
**recall** 51:25 76:3
  84:20 99:5,8
  110:11 111:3,24
  112:1,25 114:7
  115:8

**receipt** 123:18
**receive** 24:19,23
  53:20 62:8 88:5
  88:10
**received** 9:15
  24:14,16 33:6,9
  47:12 52:16
**receives** 30:2
**receiving** 51:23
**recognize** 15:13
  32:16 39:5 40:12
  45:15 50:23 56:8
**recognized** 20:3
**recognizing** 17:23
  17:24
**recommend** 42:17
  43:4
**recommendation**
  19:5 34:22 36:10
  37:18,20,22 42:23
  44:12,14,21,25
  58:1
**recommendations**
  12:22 20:24
**recommended**
  33:25 34:9
**recommends**
  57:21
**record** 6:7 38:20
  38:21,22 64:19,20
  66:23,24,25 71:8
  86:5 91:23,24,25
  116:8,9 117:4
  121:10,11
**records** 85:11
**redirect** 116:16
**reduce** 107:6,12
**reduced** 122:11
**reducing** 74:18
**reductions** 48:8

reevaluate  20:17
refer  13:9 16:6
  28:18 35:20 46:14
reference  68:23
  69:2
referenced  72:9
  72:12 75:20 123:6
references  35:15
  68:24 80:18,24
  81:19 82:3 98:22
referring  59:16
  62:14 69:4
refers  28:1 46:17
  46:17
reflect  43:15,21,23
  52:24 70:21
reflected  44:25
reflects  38:15
refunds  83:19
regard  87:16 99:2
  102:5,25
regarding  34:12
  41:18 42:3 58:24
  64:24 70:10 78:3
  92:3 94:11 96:21
  103:2 110:21
  111:21 112:20
regretted  99:20
regulate  79:1
reinstated  64:24
reinstatement
  55:5
related  15:22
  22:15 100:1
  122:12
relating  114:13
relations  11:23
relative  54:22
  56:13 122:14
relatively  11:20

release  67:17 68:1
  68:8,9
releases  67:18
  68:3
relevant  19:9,12
reliable  72:23 76:4
reliably  77:11
  78:11
reliance  35:10
  36:19 38:5
relied  34:21 36:9
  37:17
rely  37:21 93:2
remained  47:7
  48:6
remains  76:11,16
  91:17,20
remember  7:5
  60:9 61:4 65:22
  66:14 98:17,25
  114:2,4
reminder  44:20
removal  32:4
  69:18
remove  43:5
  100:19
removed  31:11
  42:25 50:1
removes  40:25
removing  33:25
  34:5 42:18 44:10
  100:24
rep  86:5,8,9,19
repeal  56:15
repeat  41:24 44:4
  55:9,19 65:25
  69:13
rephrase  6:17,19
  25:18 29:6 44:4
  64:9 79:10 84:7
  85:9 115:21

replace  101:19
replaced  101:16
  101:18,21
report  4:21 29:24
  39:20,21,25 40:1,5
  40:8,24 41:3,16,25
  42:6,12,16 54:5
  82:19
reported  1:25
  51:11,16
reporter  6:5,12
  122:2,22
reports  31:9 40:2
  51:23 53:20,24
  54:7 118:24
represent  5:21
  91:5 120:6
representative
  89:8,17
representatives
  89:1 118:8
request  4:13 23:13
  23:21 24:10 31:23
  45:20 46:6,7 50:1
  54:4 62:8,10
  65:24 66:2 67:21
  85:7,11 86:2,7,9
  86:11 87:6,18
  88:22
requested  43:24
  65:20 71:11 86:6
  86:16
requests  4:14 18:1
  18:4,10 45:21
  46:18 47:2,12,19
  85:17
require  66:3 87:8
  87:12,14
required  21:20
  56:17 57:22 87:23
  121:1 125:13

requirement  12:4
  42:14
research  19:2 59:7
  59:18,19 93:1,4,5
  95:17 96:8,13
  97:4,6,11,20,24
  98:4 99:2 110:20
  111:2 112:23
  114:24 115:4
  121:4
researched  95:21
  97:21 98:2,5
  111:7 114:25
researcher  73:19
researching  97:9
  97:15 111:22
  112:11
reserve  116:16
reserves  83:8
resolution  36:24
  37:2,5,10,15,17
  38:1,6 40:24
  43:10,16,17,20,21
  44:2,5,7 56:13
  57:5,11 58:8,19
  59:2 60:11 114:18
resolve  77:12
  78:12
resource  96:2
resources  12:15
  93:5 95:5,8,9,13
  95:25 96:20,25
  98:7 111:4 113:11
  116:4
respect  87:5
respond  93:24
response  7:6 46:6
  46:13,17 57:16
  75:12 79:6,14
  80:2,5,24

**responses** 4:11
  45:18
**responsibilities**
  10:12 11:11,22
  12:8,18 13:20
  14:2
**responsibility**
  12:3 14:6 18:15
  75:8 104:5
**responsible** 14:18
  14:22 74:16 89:11
  90:23 91:10
  118:13
**result** 34:5 45:3
  49:2,11,13
**resulting** 42:18
**retained** 23:2
**retire** 74:5
**retired** 84:3
**retiree** 30:3 81:9
  105:9 107:15
**retirees** 74:4 81:16
  84:19
**retract** 34:11
  44:24
**return** 123:13,17
**revenue** 39:23
**revenues** 83:17,22
  105:15
**review** 1:19 7:24
  8:8,16 15:8 24:1,4
  26:8 29:13,17
  30:25 31:3 45:10
  45:13 50:20 52:4
  54:2 73:8 76:21
  88:22 98:11
  113:22,25 123:7
**reviewed** 7:22
  31:17 54:4 70:2
  72:23 73:4,18
  75:9,20,22,24

96:25 99:3 112:5
  114:8
**reviewing** 76:5,6
  112:12,13
**reviews** 76:7
**revised** 59:1,3
**revisions** 63:19
**richardson** 2:6
**right** 5:6 7:11,17
  7:20,24 8:17
  10:21,24 11:8
  12:5,25 13:9
  14:24 16:10 17:13
  26:2,10,22 27:6,15
  27:20 28:11,21
  29:2 30:11,15,22
  31:23 32:12 33:20
  34:17,21 35:18,25
  36:25 37:8,19
  38:18 44:19 46:15
  46:23 47:9 48:11
  48:13 51:22 52:18
  57:14 60:14 61:5
  64:18 66:18,22
  67:7 68:21,25
  69:6 71:19 72:19
  75:18 76:2,15
  77:15 78:8,19
  79:2 80:16,22
  81:4,5,11,22 82:1
  82:11 87:21 90:23
  92:5 95:16,19,23
  97:13 104:6
  105:15 107:7,9,18
  109:22 110:14
  112:6 116:7,23
  117:13 118:18
**righting** 109:16
**risk** 22:22 30:1
  57:10

**rmr** 1:25 122:6
**role** 8:4 9:18 11:10
  11:11,12,21 12:1
  12:18 13:17,21
  21:10 89:9,20,22
  90:1 102:1
**roles** 9:19 13:15
**room** 106:15
**roster** 109:10
**rounded** 47:22
**routine** 109:16
**rule** 22:15 57:17
  69:18 100:12,21
  100:23
**rules** 6:3
**ruley** 2:14 4:2
  6:22 15:10 25:21
  27:21 58:11 70:11
  79:17 80:8 99:22
  116:13,18 117:5,9
  120:1 123:1
**run** 53:24 54:7,20
  84:11 119:22

**s**

**s** 5:1 124:3
**safety** 3:2 120:7
**salary** 90:20,22
**salem** 2:16
**sam** 66:6
**save** 20:4 81:13,24
  82:7,9 97:4,6
**saved** 59:8 74:22
**savings** 81:3
**saying** 73:24
**says** 27:3 34:8
  39:11 57:15 58:15
  58:18,19 76:3
  104:6 108:4
**school** 8:22 9:3
  17:1 91:2

**schools** 17:4,7
**search** 75:10
  76:24 77:2,8
  113:16
**searched** 98:9
  111:7,21
**season** 107:22
**second** 26:6,12,23
  43:13 46:25 60:10
  76:11
**secretary** 11:4
**section** 114:13
**security** 86:24
**see** 11:18 14:12
  26:14 54:21,24
  59:21 74:11 75:15
  81:5 110:9 111:7
**seen** 15:10,11
  56:10,11 59:7
  67:24 68:2 98:20
**segal** 4:8 22:23,25
  23:2,5,8,14,16,17
  23:21 24:9 25:5,9
  25:20 26:18 28:1
  28:5 29:7 31:17
  38:15 42:10 46:9
  46:14 95:10,11
  96:23 97:1
**segal's** 25:3,17
  26:20 27:8,25
  28:4 29:24
**seifert** 102:2
**self** 14:24 27:1
  115:23
**sell** 105:15,16
**send** 31:23 32:1
  67:17,21 68:2
  91:12
**senior** 10:1,2
  32:11,13

**sent** 67:16 68:20
  123:14
**september** 61:21
  61:22,24 62:15,23
**serve** 18:14 54:14
  71:23
**serves** 19:19,20
  20:2
**services** 11:1
  12:11 23:10 34:6
  41:6 42:19 56:16
  57:13,18 58:9,22
  58:25 81:20
**set** 21:12 35:11
  36:3 45:24 109:1
  109:1
**sets** 34:15 35:23
  102:17
**settings** 94:23,23
**seven** 13:1
**sex** 15:22 41:18
  42:3
**share** 53:5,6,8
  97:20,23
**sheet** 123:11
**shield** 42:13 47:4,6
  49:24 50:3,6
  51:11,16,24 53:21
  63:14,19 64:22,24
  65:1,6 66:19 67:5
  95:7
**shield's** 65:24 66:2
**ship** 109:16
**shore** 107:15
**short** 11:12
**show** 15:5 53:13
**shown** 26:9
**sign** 65:20 67:3
  108:21 123:12
**signature** 46:2
  122:21

**signed** 123:20
**similar** 40:1 86:23
**similarly** 62:22
**simmons** 62:10
**simplest** 88:19
**simply** 74:17
  119:8
**single** 71:12 73:8
  74:4 92:10 93:8
  93:23 94:3 104:2
  104:7 108:15,16
**sit** 12:7
**sites** 60:1,3
**six** 10:14 71:21
**size** 18:22 19:24
**skill** 102:17
**slide** 34:15 35:15
  35:23 36:22,23
  37:2 38:10,14,14
**slightly** 101:25,25
**small** 11:20 69:24
  71:8,10 74:25
  75:4,4 77:4 92:25
  101:13 103:19
  109:17,20 111:11
**smart** 4:10 31:23
  32:10,25 66:14
  92:19,21
**social** 86:24
**society's** 114:20
**solutions** 123:23
**somebody** 88:11
  107:13
**somewhat** 109:16
**sonja** 103:9,11
**sooner** 6:25
**sorry** 12:14 24:15
  26:11 27:21 28:15
  43:18 48:8 58:17
  72:25 108:4 109:2

**sort** 84:10
**sorts** 69:21 93:23
**sought** 76:14
**sound** 107:1
**sources** 19:4
  100:24
**space** 70:6 78:25
  99:1
**speak** 8:12 38:24
  96:19 113:5
**speaking** 74:6
  94:25 98:7 109:6
  113:8,18
**special** 11:3,4,10
  71:15
**specific** 92:13
  94:24 95:1 96:12
**specifically** 49:15
  51:4 86:22 94:15
**specify** 78:21
**spend** 45:3 97:14
  97:18 106:10
**spouse** 108:7
**spreadsheet** 71:7
**staff** 19:1 21:18
  33:11,12,25 34:4,9
  34:11,21 36:9
  37:17 39:12 44:13
  44:13,18,21,24
  52:10 66:3,11
  69:20,23,24,25
  72:8,11 75:22
  92:2,7,14,25 93:10
  95:11 97:2,21,23
  100:7,8,25 101:5,5
  101:8,9 102:6,8,13
  102:16,25 103:1,4
  103:5,14 105:18
  110:16
**staffer** 18:7 32:9

**stand** 64:1
**standards** 35:16
  35:20,23 36:3,6,10
  36:13,17,20 37:6
  59:11 100:5 112:2
  114:10,16
**standpoint** 107:4
**start** 6:11 11:10
  17:16,25 22:14,18
  51:22 96:19
  104:25 105:14
**started** 11:3 12:2
  74:19 96:5,11
  109:3,25
**starting** 17:22
  22:19 43:16,19
  94:10
**starts** 18:11 76:10
**state** 1:15 2:13,13
  2:21,21 3:2,6 4:6
  4:6,12,12,22,23
  5:7,9,11,13 8:23
  12:14 13:3,10,10
  16:24 17:1,5,7
  28:25 38:10 39:11
  39:11 43:5 45:19
  45:19,24 46:20
  47:5 54:22,25
  56:14 57:21 58:2
  65:1 67:5 70:22
  71:25 80:14 82:8
  82:21,21 85:6,7,10
  87:23 88:6,8,11,24
  90:21 91:6 96:1
  105:22 118:15
  120:9,11,13,15,16
  120:23 121:1,2
  122:4
**stated** 30:2 34:4
  59:10 76:21

statement 26:18
26:20 27:10 30:17
30:20 47:15 59:25
67:2,24 68:4,6,13
68:18,20,23 69:7
70:10,14,17,21
72:7 80:5 92:3
94:11
statements 79:6
99:21
states 1:1 26:6,25
27:1,4,11,18 28:9
28:23 30:7 37:2,5
46:13 47:3 57:11
57:16,20 60:11
72:22 75:12 76:11
77:10 78:17 81:2
81:8 84:20
statistics 86:20
statute 84:2 88:17
89:15 106:17,18
108:4 118:9 121:1
statutory 12:4
stephanie 103:10
103:11
steps 27:13
stipulate 5:7,12
stipulated 5:10,15
stop 54:23,23
106:8
straight 68:7
street 1:23 2:4,10
2:15 3:4,9
string 4:9,15,17
strong 72:2
structure 11:15
structured 101:12
101:12
struggling 79:24
stu 23:19

studies 15:21
41:18 42:3 59:5
59:12,12,16 72:23
73:18 75:9,10
study 8:24 9:7
27:16 73:4
stuff 96:6 111:11
111:14
subscribed 125:14
subsequent 17:15
20:7,19,21 51:14
61:7 62:9
subsequently
44:13
subsidized 105:21
subsidy 30:3 81:9
substantial 30:1
33:2,3 109:18
success 18:24
suffering 76:13
suggests 56:14
suite 1:23 2:7,10
2:15,19
summary 40:8
summertime
25:13
sunset 32:4 55:8
55:11,14,18,21
56:2
sunsetting 63:17
69:17
supplemental
120:17,18,20
121:5
support 10:1
42:14 72:23 79:8
79:13
supported 100:18
102:13
supporting 69:17
100:23

supports 72:18
73:5 79:16,23
supposed 44:19
sure 23:7 33:22
37:23 54:20 55:20
66:3 73:13 79:4
87:5 100:25
102:20 109:8,22
111:9 118:14
surgery 31:20
35:24 36:4 59:22
70:8,8 98:10
surgical 76:14
77:13 78:12 79:1
118:1
surround 99:16
susan 51:1 52:10
suspend 22:8
suspended 43:24
44:3
sustainability
80:14,20
swath 72:1 73:9
sworn 5:3 122:9
125:14
system 17:3 86:13
86:15 87:9,17,19
87:20 89:6 90:23
90:24 91:3,4,8,11
systems 17:2 91:2
91:6

| t |
| --- |

t 124:3,3
table 102:18
take 6:24 7:1,15
18:14 60:19 61:6
61:25 62:18 63:5
104:16 107:13,14
108:7 116:13,18
116:25

taken 5:22 7:11
27:13 74:23 76:23
122:7,10,14
takes 20:9
talk 6:13 86:4 94:7
94:8,24 95:10
98:1
talked 59:14 63:2
87:16 92:20 96:23
talking 13:11 16:7
35:21 50:10
talks 29:23
tamera 102:3
tank 112:18,18
tara 2:9
targeted 19:23
taxpayers 17:25
108:13
tborelli 2:11
teacher 107:11
teachers 2:13 4:6
4:12,22 13:10
17:1,2 45:19
82:21
teaches 118:11
team 97:25 100:22
technology 14:7
ted 66:14 92:21
93:10 97:25
teleconference 3:4
3:8
tell 6:16 7:12
50:15 87:1,2
ten 102:21
term 14:20 19:21
80:20
terms 66:8,11
test 76:12,17,18
testified 5:4 84:21
92:2 95:16 115:7

EXHIBIT 2

**testifying** 7:15
**testimony** 122:8,9
  123:9,18 125:8
**tests** 76:22,25 77:8
**texas** 71:2
**text** 43:19,21
**thank** 5:16 67:7
  81:5 116:12
  118:18 120:2
  121:13,14
**therapy** 31:20
  77:13 78:12
**thereto** 122:16
**thing** 71:25 104:8
  111:6 113:6
**things** 4:14 12:7
  20:15,16 45:22
  58:12 77:4 92:10
  107:21 109:17
**think** 10:20 14:12
  19:11,13 48:20
  59:4 60:7 65:11
  71:3,4 73:7,23
  75:1 78:16,25
  79:24 92:20 106:7
  109:9,24 110:13
  112:18,18 114:15
  114:17 117:2
  119:7,15
**third** 63:15 65:11
  81:20
**thomas** 57:3 101:9
**thought** 93:3
**thoughts** 71:4
**three** 59:17 81:3
  107:9
**tight** 106:14
**time** 9:17,17,24
  10:3 11:12 19:11
  21:4 23:18 25:4
  32:3,7,10,25 33:7

33:8,21 39:15
41:12 55:4 58:8
66:6 69:20,23
71:13 90:4 93:19
95:1 96:6,10,12,16
96:24 98:18,23
100:23 101:14
105:20 107:15
111:12 114:5,9,12
115:5 121:13
123:19
**timeframe** 123:8
**timeline** 21:2
**timely** 89:13
**times** 20:16 21:20
  63:12 74:9,10
**timing** 119:17,23
  119:25
**title** 9:24 10:10
  11:2 12:16 13:6
  13:13
**titled** 117:12
**titles** 11:5,8
**today** 6:6,15,24
  7:4,12,18,21 8:4
  13:11 16:7 35:5,7
  36:16 49:23 77:7
  83:2,12 96:12
  100:7,25 101:3
  102:16 103:14,21
  105:4 121:12
**today's** 5:8
**tomorrow** 102:21
  103:22
**top** 27:22 41:22
  61:5 110:24
**topic** 94:8 95:6,13
  96:15
**topics** 8:8,13
**tos** 95:10

**total** 12:10 28:13
  28:20 30:10 51:10
  53:1,3,16 118:24
**totally** 104:17
**tpa** 18:6
**track** 51:3 56:11
  87:20
**tracking** 49:25
  50:4,7,14 53:21
**traditional** 19:25
**trajectory** 19:21
**transcribing** 6:12
**transcript** 1:18,18
  1:19 123:6,20
  125:5,8
**transformation**
  16:4 59:8 99:16
**transgender** 24:10
  27:1,9,12,19 28:2
  28:6 35:16 37:7
  41:1,6 74:13
  103:12 115:11,14
  115:19,23
**transition** 27:13
  57:13 58:9,21,25
  59:22 70:8 84:3
  98:9
**transitioned** 99:19
**transmit** 90:9
**treasurer** 2:21
  4:19 12:14 13:3
  13:23 21:12 39:11
  57:21 58:2 66:4
  67:17 70:9,14,17
  75:19 102:20
  108:14
**treasurer's** 68:10
  68:11,12 69:3,6
**treatment** 15:2,21
  16:3 18:24 23:10
  29:5 34:2,6 35:17

40:18 41:17,18,20
42:2,2,4,17,20,23
44:14,22 47:6
48:5,19 55:7,11
58:7 60:12 69:9
72:5,24 73:5,15
76:19 78:18 84:23
85:4 92:4,15
93:12 94:5,12
95:2,14,18 96:22
99:12 103:3
110:17,22 112:20
113:4 114:21
115:2,11,14,19,21
115:22 117:23
121:6
**treatments** 29:23
  70:5 76:14
**trend** 84:15
  102:23 105:6
  107:17
**tried** 83:10
**trouble** 6:12
**true** 73:3 125:8
**trust** 84:4 107:16
**trustees** 13:24
  21:19 22:8 31:21
  32:20 33:17 34:22
  39:8 40:16 57:12
  60:16 61:2,14
  62:13 63:3,5
  75:24
**truth** 7:12
**try** 6:10,17 25:5,9
  86:25 110:3
**trying** 53:24
  103:23 111:13,19
**turn** 15:18,24
  32:15 35:13 36:22
  38:8,14 39:3
  40:11 41:22 46:1

| | | | |
|---|---|---|---|
| 46:5 71:14,17 72:14,15 80:11 117:10 | **understood** 6:20 **unfunded** 82:23 84:5,8,10,14 105:8 107:16 | **veritext** 123:14,23 **veritext.com** 123:15 | **way** 20:25 51:3 88:19 89:21 93:24 96:6 107:7,17 |

**turning** 27:17 36:2 51:9,14,19 52:15 53:7 55:5 56:25 57:20 60:10 72:21 75:9 80:18 110:20 117:24
**twice** 15:11
**two** 12:12 16:6 85:21 87:21 102:1
**types** 76:7
**typical** 20:25
**typically** 20:18,23 21:5,9 54:4

**unit** 88:18 89:1 91:10
**united** 1:1 27:1
**units** 90:25 118:10
**university** 3:7 8:23 9:6,16 17:2
**upcoming** 31:12
**updated** 63:21
**uptick** 107:8
**use** 11:17 19:2,9 27:18 28:1,5 80:25 109:10

**versus** 55:21 70:8
**view** 69:12,14 101:1
**views** 70:22
**visibility** 119:13
**vision** 120:21
**visits** 108:23
**volume** 52:11 77:4 84:18
**vote** 22:8 44:9 56:3 60:19 61:6 61:25 62:18 63:5
**voted** 44:7

**we've** 20:15 21:13 54:20 63:2 70:3 74:22,23 83:10 92:23 94:20 98:18 105:22 109:6 113:23
**website** 111:23 112:6
**week** 90:4 96:10 103:22 105:23
**weight** 108:16,17
**went** 11:13 68:4 69:21 71:5,7 99:19 100:23
**white** 73:21 97:9 112:7
**widely** 59:10
**widgets** 105:15,16
**wiltshire** 2:3,6
**winded** 109:2
**window** 89:14,15 108:8
**winton** 2:16
**wit** 122:4
**withdrawn** 35:10 36:19 38:5
**withholding** 78:3
**witness** 5:3 15:11 25:22 27:23 29:15 58:12 67:1 70:12 79:18 80:9 99:23 121:14 122:8,10 123:8,10,12,19
**witnesses** 4:20 82:18
**women** 19:19,23
**word** 58:14 112:13 119:7

### u

**uh** 8:21 14:1 60:15 77:25 84:24 98:3 98:12,14 99:4 102:7,9
**umbrella** 11:23
**unaware** 76:12,16 77:11
**unawareness** 77:17 78:10,14
**unc** 3:6,7
**uncertain** 69:10
**uncertainty** 68:24 70:4,10,24 71:3,4 72:4,8,11 92:3,14 93:11 94:12 95:2 103:2
**unclear** 46:13
**understand** 6:16 7:11,14 16:12,17 25:5,10 118:14 119:8
**understanding** 22:20 73:14

### v

**v** 1:7 123:4 124:1 125:1
**vaccines** 107:23
**valid** 72:22 76:4
**validate** 87:2
**validated** 85:19,20 88:13
**validation** 86:16 86:18,21 87:4
**validity** 35:8 36:17 38:3 99:11
**variety** 19:4 94:23
**various** 26:7 71:1 118:9
**varying** 100:16
**vast** 20:2
**vendor** 87:1 106:22
**vendors** 14:8 106:20,24
**verbal** 6:6
**verification** 46:3
**verify** 45:23 123:9

### w

**w** 3:4,9 4:10,16,17
**wade** 2:7
**wait** 6:10
**waiver** 12:4
**walk** 18:16 74:1 108:1
**wall** 23:19
**want** 20:13 63:12 71:14 82:25 85:21 88:2 94:4 99:15 104:8,9,13,14 105:16 108:12
**wanted** 12:20 32:5 85:24
**wants** 104:21,24 105:1 108:21
**warner** 9:17,25 10:3 105:20
**warranted** 99:13
**warrants** 84:4
**washington** 2:4
**watch** 113:24
**water** 109:19,20

**words**   69:3,5
**work**   9:15 10:3,5
   10:21,24 12:10,13
   12:25 13:2,4
   21:12 70:1 90:16
   102:19,24 105:23
   106:20,20 107:3
   108:11,13,14,14
   115:8 118:9
**worked**   7:23 23:5
   25:5,9,12 74:22
**working**   9:17 90:4
**world**   35:15
**worry**   65:10,14,15
**wpath**   35:20,23
   36:3,6,10,13,17,20
   37:6 59:5,11
   100:5 101:1 112:2
   114:10,16
**write**   97:9
**writing**   122:11
**writings**   112:7
**written**   4:21 24:18
   82:19
**wrote**   114:4
**wunc**   29:22
**wy**   2:19

|   y   |
| --- |

**yeah**   45:14 50:13
**year**   9:1,9 15:20
   16:1,14 17:11,15
   20:7,9,10,19,22
   21:20 22:9,13
   23:11 31:11,13
   34:3 38:12 42:25
   43:1,25 44:3,6,11
   46:8 47:4,11 49:3
   49:9,12 52:12
   55:6,8,12 57:13
   60:20 61:8 62:1,9
   63:7 64:11,25

   65:3 81:25 82:25
   84:11 93:9,10
   94:21 109:11
**years**   10:4 12:12
   13:19 22:3 23:6,7
   69:15 71:21 81:3
   96:10 102:21,21
   105:10
**young**   4:9

|   z   |
| --- |

**zach**   116:21
**zachary**   3:8
**zpadget**   3:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 2

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

EXHIBIT 2