# EXHIBIT 4A

# Expert Report of Wayne Goodwin

MAXWELL KADEL, et al.,

                *Plaintiffs*,

        v.

DALE FOLWELL, et al.,

                *Defendants*.

No. 1:19-cv-00272-LCB-LPA

## EXPERT DISCLOSURE REPORT OF
## GEORGE WAYNE GOODWIN

## I.      PRELIMINARY STATEMENT

1.      I, George Wayne Goodwin, more commonly known as Wayne Goodwin, have been retained by counsel for the North Carolina Department of Public Safety ("Defendant DPS" or "DPS") as an expert in connection with the above-captioned litigation.

2.      I have actual knowledge of the matters stated and would testify as such if called as a witness. I reserve the right to supplement or amend this report based on any future information that is provided to me, including but not limited to information produced by Plaintiffs or Defendants in discovery or in response to Plaintiffs' and Defendants' expert disclosures.

3.      This report contains my opinions and conclusions, including that: As currently interpreted by the Attorney General of North Carolina, North Carolina law prohibits State agencies, including Defendant DPS, from providing any general health insurance policies or health insurance coverage other than what is offered through the State Health Plan, including supplemental health insurance policies for gender confirming care. Further, that those State

EXHIBIT 4A

agencies of the North Carolina government, including Defendant DPS, are unable to provide the options identified in the Expert Disclosure Report from Jamison Green, Ph.D. for coverage of gender conforming care to transgender employees and their eligible dependents who are transgender and other persons eligible for coverage.

## II. QUALIFICATIONS AND BACKGROUND

### A. Qualifications

4.     I am the owner and founding member of Seaboard Strategic Consulting, LLC, a limited liability company registered in the State of North Carolina. Through this business and beginning in 2017, I regularly consult with individuals, corporations of all sizes, small and large businesses, and professional organizations pertaining to matters of insurance regulation.

5.     I served as the 10th elected Commissioner of Insurance for the State of North Carolina, elected statewide in 2008 and 2012. My service as Insurance Commissioner spanned eight (8) years. Prior to that role I served as the Assistant Commissioner of Insurance and the Assistant General Counsel for the North Carolina Department of Insurance. In total I worked and was employed by the State of North Carolina as a state insurance regulator within the North Carolina Department of Insurance for twelve (12) years. During that time and as a member of the Council of State (North Carolina's highest-level Executive Branch constitutional officers), I developed familiarity with the relationship between State agencies and the North Carolina State Health Plan, more specifically the interaction between the Department of Insurance and Defendant DPS and other Defendants. More generally through my years of activity and leadership within the National Association of Insurance Commissioners (NAIC), I also learned about insurance matters (including health insurance) between and among the States and also the states with the federal

2

EXHIBIT 4A

government – including but not limited to accessibility, affordability, and the insurance marketplace – and was an active member and participant on the NAIC's Health Insurance and Managed Care (B) Committee and the Market Regulation and Consumer Affairs (D) Committee, among other committees interested in health insurance matters and health insurance products for consumers. Further, during that time and thereafter I was involved in the implementation of and the State's response to ratification of the federal Affordable Care Act and its interplay with North Carolina's health insurance market.

6.     Further, I also served four terms – eight (8) years – as an elected Member of the North Carolina General Assembly and had the occasion from the vantage point of that platform to follow the interplay between the North Carolina State Health Plan and State agencies, including the subject of the State Health Plan for State employees and other persons eligible for coverage.

7.     In addition to my private consultant work and public service in two branches of State government, I have been a licensed member of the North Carolina State Bar and practicing attorney in good standing since 1992 (presently 29 years).  Much of that work has involved insurance law in one aspect or another.

8.     In 1992, I received my J.D. (Juris Doctor) from the University of North Carolina School of Law and that same year received my law license from the State of North Carolina after passage of the State Bar exam. In 1989, I received my B.A. with Honors from the University of North Carolina, graduating as both a Morehead Scholar and a U.S. Senate/William Randolph Hearst Scholar.

9.     For a greater in-depth description of my professional work – most specifically a more granular overview of my duties and accomplishments as North Carolina's Insurance

3

EXHIBIT 4A

Commissioner and recognition as an insurance expert by North Carolina case law while serving in that office – I hereby incorporate by reference a true and correct copy of my Curriculum Vitae, which is attached hereto as Exhibit A.

### B. Materials Considered in Preparing This Report

10. I have specifically reviewed the Complaint; the Amended Complaint; Defendant NC Department of Public Safety's Responses to Plaintiffs' First Requests for Admission; Defendant NC Department of Public Safety's Responses to Plaintiffs' First Set of Interrogatories; Defendants University of North Carolina at Chapel Hill, North Carolina State University, and University of North Carolina at Greensboro's (the "University Defendants") Memorandum in Support of the Motion to Dismiss; the Memorandum Opinion and Order (denial of Motion to Dismiss)(regarding University Defendants); and the Expert Disclosure Report of Jamison Green, Ph.D.

11. Further, I have reviewed relevant portions of Chapters 58 and 135 of the North Carolina General Statutes. In particular, I have reviewed N.C. Gen. Stat. 116-17.2, which provides in relevant part:

> Notwithstanding any other provisions of law relating to the salaries of employees of The University of North Carolina, the Board of Governors of the University of North Carolina is authorized to provide a plan of flexible compensation to eligible employees of constituent institutions for benefits available under Section 125 and related sections of the Internal Revenue Code of 1986 as amended. **This plan shall not include those benefits provided to employees under Articles 1, 3B, and 6 of Chapter 135 of the General Statutes nor any vacation leave, sick leave, or any other leave that may be carried forward from year to year by employees as a form of deferred compensation.**

(Emphasis added).

4

EXHIBIT 4A

12.     I have also reviewed the advisory opinions from North Carolina's Attorney General dated November 2, 1995,[1] October 3, 2001, and March 26, 2002. All three opinions are attached hereto as Attachments B, C, and D. In the November 2, 1995 opinion, the Attorney General opined that N.C.G.S. 116-17.2 prohibits the Flexible Benefits Plan for State Employees ("NC Flex") from duplicating benefits provided by the Teachers' and State Employees' Comprehensive Major Medical Plan ("the State Health Plan"). In the October 3, 2001 opinion, the Attorney General opined that certain types of voluntary indemnity plans for State employees were not duplicative and were therefore permitted under this statute. In the March 26, 2002 opinion, the Attorney General opined that a cafeteria plan for the University that allowed pre-tax premiums for dependent health coverage would be duplicative and was therefore prohibited by the statute. In that opinion, the Attorney General reasoned that providing such benefits to University employees "would impair the object of the statute, which was to establish a single statewide plan that did not compete with existing benefits."

13.     In preparation for this report, I have also generally reviewed a few recent reports pertaining either to updates on the dual subjects of health insurance and gender-confirming healthcare or the status of government jurisdictions that prohibit transgender insurance exclusions. These reports and documents are:

> "Can you help me find a plan that covers gender reassignment surgery?", Slade (2019). https://support.stridehealth.com/hc/en-us/articles/360056563234-Can-you-help-me-find-a-plan-that-covers-gender-reassignment-surgery-

> Cohen, Wess A et al. "Navigating Insurance Policies in the United States for Gender-affirming Surgery." *Plastic and reconstructive surgery. Global open* vol. 7,12 e2564. 11 Dec. 2019, doi:10.1097/GOX.0000000000002564

---

[1] The November 2, 1995 opinion is mistakenly referenced as November 3, 1995 in the October 3, 2001 opinion.

"Health insurance coverage for gender-affirming care of transgender patients."
American Medical Association (2019).

"Healthcare Laws and Policies: Medicaid Coverage for Transition-Related Care."
Movement Advancement Project (MAP). (6 Apr 2021)

Keith, Katie. "15 States and DC Now Prohibit Transgender Insurance
Exclusions." Georgetown University Health Policy Institute (30 March 2016).
Chirblog.org/15-states-and-dc-now-prohibit-transgender-insurance-exclusions/

Killian, Joe. "In North Carolina, the battle for transgender people's medical
coverage heads to court." NC Policy Watch. (12 March 2019)
http://www.ncpolicywatch.com/2019/03/12/in-north-carolina-the-battle-for-
transgender-peoples-medical-coverage-heads-to-court/print/

Landman, Keren. "Fresh Challenges to State Exclusions on Transgender Health
Coverage." National Public Radio (NPR). 12 March 2019.
https://www.npr.org/sections/health-shots/2019/03/12/701510605/fresh-
challenges-to-state-exclusions-on-transgender-health-coverage

Further, I also reviewed contemporary updates on the focused subject of transgender health

care access and insurance coverage. Those updates are:

BlueCross BlueShield of North Carolina. "Corporate Medical Policy. Gender
Affirmation Surgery and Hormone Therapy." (Last Review of policy by
BCBSNC: March 2021) gender_affirmation_surgery_and_hormone-therapy

Cecil, Adam. "How to Shop for Health Insurance as a Transgender Person."
PolicyGenius.com. 24 Sept 2015. https://www.policygenius.com/blog/how-to-
shop-for-health-insurance-as-a-transgender-person/

Dawson, Lonna. "Should insurers cover gender reassignment surgery?", The
Week (Apr. 9, 2017)
https://theweek.com/articles/687877/should-insurers-cover-gender-reassignment-
surgery

"Finding Insurance for Transgender-Related Healthcare," Human Rights
Campaign. (Accessed 21 Apr 2021) https://www.hrc.org/resources/finding-
insurance-for-transgender-related-healthcare

Johnson, Emily. "Does Medicare cover gender reassignment surgery?" Medical
News Today (5 Aug 2020).
https://www.medicalnewstoday.com/articles/medicare-gender-
reassignment#types-of-surgery

6

EXHIBIT 4A

Mosser, Dr. Scott. Gender Confirmation Center. "Dr. Mosser's Guide: How to get your MTF/N or FTM/N surgery covered by insurance." https://www.genderconfirmation.com/get-insurance-approval/

Padula, William V., et al. "Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis." J Gen Intern Med 31(4):394-401 (19 Oct 2015).

Spade, Dean. "Medicaid Policy & Gender-Confirming Healthcare for Trans People: An Interview with Advocates." Seattle Journal for Social Justice, Vol. 8, Issue 2 (2010).

I also reviewed several articles related to the PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42 U.S.C. § 18001 *et seq.* (2010) (referenced hereinafter as either "the Affordable Care Act" or "ACA"), particularly as it may interplay with employers generally. To that end, in addition to specific portions of the ACA, I further reviewed and relied upon the following:

Cauchi, Richard. "ACA Requirements for Medium and Large Employers to Offer Health Coverage – Applicable in part to states, state legislatures and local governments as employers." National Conference of State Legislatures (NCSL). 22 June 2016. https://www.ncsl.org/documents/health/aca_requirements_for_employers.pdf

Congress.gov. H.R. 34 – 21st Century Cures Act. Published December 2016.

"Individual Coverage Health Reimbursement Arrangements (HRAs)." Healthcare.gov. (downloaded 27 April 2021) https://www.healthcare.gov/small-businesses/learn-more/individual-coverage-hra/

Norris, Louise. "Can My Employer Reimburse My Individual Health Insurance Premiums? Both Small and Large Employers are Allowed to Reimburse Employees for Premiums." VeryWellHealth. (11 December 2020) https://www.verywellhealth.com/employer-reimbursal-of-individual-premiums-4065150?print

Proctor, Patrick. "Can Employers Reimburse Employees for Health Insurance?" Business News Daily. (27 Nov. 2020) https://www.businessnewsdaily.com/15934-reimburse-employees-for-health-insurance.html

EXHIBIT 4A

14.     In preparation of this report, I relied on my education and training, my lengthy experience as a state insurance regulator and most specifically as North Carolina's Commissioner of Insurance, and my twenty-nine (29) years of experience as an attorney and public official (both elected and appointed) engaged in matters involving insurance law in North Carolina.

15.     The knowledge I have relied upon in preparing this report is the same type of knowledge that experts in my field of practice and study regularly rely upon when forming opinions.  I may wish to supplement these opinions or the bases for them because of new publications or additional presently-unknown or presently non-recollected facts, or in response to statements and issues that may arise in my area of expertise.

**C.     Prior Testimony**

16.     To the best of my recollection, I most recently testified in two federal trials and in two State court trials *unrelated to the field of insurance regulation* but pertaining to (a) North Carolina's Congressional and legislative redistricting, and (b) North Carolina judicial partisan primaries. Those trial appearances occurred between 2017 and 2020. In addition to appearing in those trials, I also participated in the related pre-trial depositions. *On the intertwined subjects of insurance and state insurance regulation*, I was previously identified as an expert witness by University Defendants in the instant Kadel case and provided a report with exhibits but at the present time have not been deposed or otherwise testified.  Also, I testified in approximately 2018 as a combination fact witness and expert witness in a separate matter. For that case, I was deposed during the discovery phase of a federal trial pertaining to litigation between a hospital system and a health insurance carrier (and perhaps the North Carolina Department of Justice), but I did not appear at trial.  Further, to the best of my knowledge, during approximately 2017-2018, I testified in the State criminal trial of a former bail bondsman, in that instance in my sole capacity as the

8

EXHIBIT 4A

former Insurance Commissioner during the time of that person's licensure. To the best of my knowledge, any and all other prior depositions or hearing/trial testimony by me occurred more than four years ago during my time, and in the regular course and scope of my service, as Insurance Commissioner.

### D.    Compensation

17.    I am being compensated at an hourly rate for actual time devoted, at a rate of $350 per hour, billed in 15-minute increments, and a rate of $375 per hour, also billed in 15-minute increments, for that time, if any, participating in a deposition, court hearing, or trial pertaining to the present case.

18.    My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

## III.    EXPERT OPINIONS

### A. Defendant DPS – like other State agencies in North Carolina – at the time in question did not have either the option or authority to provide health insurance coverage for gender-confirming care.

19.    Based upon my review of the pleadings and other court documents, the Plaintiffs' expert witness report (Jamison Green, Ph.D.) and materials referenced above in Section B of my report, including my review of the applicable sections of Chapter 58 and Chapter 135 of the North Carolina General Statutes (namely, Article 3B, § 135-48 *et seq*.); and my own experiences (twelve years as a state insurance regulator, eight of those years as NC Insurance Commissioner; four years as an insurance regulatory consultant; and 29 years as a North Carolina attorney with eight years

9

EXHIBIT 4A

in the North Carolina legislature), it is my opinion that Defendant DPS has no authority or control over the State Health Plan or its terms or exclusions.

20.    Specifically, the North Carolina State Health Plan offers and administers comprehensive group health insurance to eligible teachers and other North Carolina state employees. *See, e.g.*, N.C. Gen. Stat. § 135-45.2. Because the State Health Plan is self-funded and empowered by statute to determine, define, adopt, and remove healthcare benefits and exclusions – as also alleged in the Plaintiffs' Complaint -- Defendant DPS is required to act within the confines of the State Health Plan's authority and control.  In forming my opinions herein, it is imperative that I consider *High Rock Lake Partners, LLC v. N.C. Dep't of Transp.*, 366 N.C. 315, 318, 735 S.E.2d 300, 303 (2012). "Its form, shape, and authority are defined by the Act by which it was created." *Id.* "It is as powerless to exceed its authority as is a robot to act beyond the limitations imposed by its own mechanism." *Id.* at 318-19, 735 S.E.2d at 303 (citation omitted). Moreover, that case holds that a state agency "possesses only those powers expressly granted to it by our legislature or those which exist by necessary implication in a statutory grant of authority." *Id.* at 319, 735 S.E.2d at 303 (citing *Lee v. Gore*, 365 N.C. 227, 230, 717 S.E.2d 356, 359 (2011)).

21.    Moreover, the State Treasurer, <u>not</u> Defendant DPS, administers and operates the State Health Plan and sets benefits for all State employees and their qualifying dependents, subject to approval by the State Health Plan Board of Trustees. N.C. Gen. Stat. §§ 135-48.30; 135-48.20 ("Board of Trustees established."); *see also*, N.C. Gen. Stat. §§ 135-48.1 (4,5,14) The State Health Plan Board of Trustees – not Defendant DPS or other State agencies – has the duties and powers to approve benefit programs; approve premium rates, co-pays, deductibles, etc.; develop a strategic plan for the State Health Plan; *et al.* N.C. Gen. Stat. §135-42.22.  Further, State Health Plan

10

EXHIBIT 4A

benefits are provided pursuant to contracts between the State Health Plan and claims processors, not between Defendant DPS (or other State agencies). *See,* N.C. Gen. Stat. § 135-48.32.

22.     It is my additional opinion that Defendant DPS has no independent authority or control over the pharmacy benefits, mental health benefits, and medical care offered to covered individuals under the State Health Plan – including teachers, other North Carolina state employees, and their qualified dependents.   More specifically, the lack of authority or control over these benefits by Defendant DPS is derivative of the State Health Plan's offer of and power over these health care plans. *See,* N.C. Gen. Stat. §§ 135-1 *et seq.*

23.     Further, in addition to the above, and based on my experiences and recollections during my service as North Carolina Insurance Commissioner, Defendant DPS is precluded from offering any health plan alternatives. *See,* N.C. Gen. Stat. §§ 116-117.2, 150B-51(b)(2); NC Const. Art. III, § 11; N.C.Gen. Stat. §§ 135-48.2(a), 48.22, 48.23, 48.30(a), 48.42(a).   More directly, it appears no statute provides requisite authority for Defendant DPS to offer any other health plan other than the State Health Plan, even if Defendant DPS desired to do so – including for medical treatments related to gender, gender identity, nonconformity with sex stereotypes, transgender status, and gender transition.

24.     It is also my opinion that Defendant DPS cannot provide health insurance coverage for gender-conforming health care.   The authority to provide such is within the purview of the State Treasurer, the Executive Administrator of the State Health Plan, and the Plan's Board of Trustees.

25.     It is my understanding that the private third party administrator (TPA) for the State Health Plan does offer coverage for gender confirming care as part of other plans not associated

with the State Health Plan. However, the State Health Plan includes a categorical exclusion prohibiting that coverage in the Plan. The State Treasurer, the Executive Administrator of the State Health Plan, and the Plan's Board of Trustees – not Defendant DPS – and the State legislature have the formal authority and ability to lift that exclusion. *See, supra*, and N.C. Gen. Stat. §§ 135-48.2(a); 135-48.3

26.     On information and belief, persons seeking health insurance coverage for gender dysphoria-related or gender-conforming care (including surgery) in states that do not prohibit the exclusion often voluntarily purchase separate, high-deductible, full coverage health insurance plans from the *private* health insurance market to supplement their employer-sponsored health insurance plan that does not provide coverage for gender dysphoria and gender-conforming care. To the best of my knowledge, there are no standalone health insurance plans *solely* offering health insurance coverage for gender dysphoria, etc. Persons seeking that coverage often obtain it by acquiring a secondary, full health insurance care plan of their own choosing and expense.[2] In any event, the Defendant DPS would not be able under the current interpretation of North Carolina statute to provide either sort of coverage for gender conforming care. While the 2001 memorandum from North Carolina's Attorney General concludes that State employers can offer voluntary indemnity health plans to State employees insofar as they do not duplicate the State Health Plan's benefits, based upon my experience and recollection, that conclusion refers to supplemental policy coverages such as accidental death and dismemberment, cancer, critical illness, disability, heart attack, and long-term care insurance, for example -- again so long as those

---

[2] Theoretically and subject to other applicable rules and requirements, and on information and belief, Plaintiffs herein could have declined coverage by the State Health Plan during open enrollment after becoming aware of the exclusion so that whatever separate plan they found and paid for on their own was their only health insurance plan. That would not alter the prohibition faced by Defendant DPS.

EXHIBIT 4A

coverage plans do not compete with the State Health Plan. *See, e.g.*, N.C. Gen. Stat. §§ 116-17.2 ["This (flexible compensation) plan shall not include those benefits provided to employees under Articles 1, 3B, and 6 of Chapter 135 of the General Statutes."]

27.     As part of the analysis of the "non-compete" components of North Carolina law vis-à-vis the State Health Plan and the question about the DPS's ability to offer dependent health insurance coverage separate and apart from the State Health Plan, the 26 March 2002 Attorney General memorandum states plainly and directly that "[t]his competition would impair the object of the statute, which was to establish a single statewide plan that did not compete with existing benefits." That declaration in tandem with existing North Carolina statutes referenced above support my opinion that Defendant DPS does not have the authority to go outside the State Health Plan in providing health coverage. That authority rests with others, but ultimately the North Carolina General Assembly. *See, supra*, and N.C. Gen. Stat. §§ 135-48.2(a); 135-48.3

**B.     Although multiple private health insurance plans and some public State health insurance plans nationally do allow health insurance coverage for gender-confirming services and treatments, North Carolina's State Health Plan does not. Notwithstanding, the North Carolina General Assembly has within its authority to prohibit transgender health insurance exclusions.**

28.     There are private health insurance options that do provide coverage for medically-necessary transition-related care, including gender-confirming surgeries and treatments. Major *private* insurers have designed insurance products that do not contain transgender exclusions in response to private sector demand for inclusive coverage and the determination that such coverage is cost-effective and affordable when spread out over large pools of policyholders.

29.     Further, on information and belief the governing legislative entities of fifteen (15) States and the District of Columbia prohibited transgender insurance exclusions as of 2016. North Carolina is not one of those States – in other words, North Carolina allows health insurance policies

13

EXHIBIT 4A

in the private and public sectors to exclude coverage for gender dysphoria and health care specifically related to transgender persons. Unless carved out specifically, North Carolina General Assembly enactment of a prohibition of transgender insurance exclusions would affect the State Health Plan covering North Carolina state employees and qualified dependents. *See*, N.C. Gen. Stat. § 135-48.3 ("The General Assembly reserves the right to alter, amend, or repeal this Article.")

  **C. Dr. Green's reference in Section III, A. of Green's report to "employer options when health insurance plan maintains exclusion for gender confirming care" does not appear to consider a health plan solely administered by a State government nor are these actual options that Defendant DPS can implement lawfully according to State law. Some of Dr. Green's proposed "employer options" could conceivably place Defendant DPS in violation of state law if acted upon or federal law if not acted upon.**

  30. As it relates to Dr. Green's expert report, the specific strategies referred to as "employer options" on information and belief are prohibited for State agencies by North Carolina state law or are not contemplated by the State of North Carolina. *See,* Green Report, Paragraphs 22-24.

  31. More specifically regarding Paragraph 22 in Dr. Green's report, Green asserts that "A strategy that several employers have used is to purchase a separate, inclusive plan in which their transgender employees or their dependents may enroll as a coverage option." That Green strategy is neither viable nor legal for Defendant DPS to consider because of the existing restrictions placed on all State agencies – including the Defendant DPS – prohibiting the offer of any other health insurance plan for State employees, their dependents, and State retirees other than the State Health Plan. *See, inter alia,* N.C. Gen. Stat. § 150B-51(b)(2); NC Const. Art. III, § 11; §§ 135-48.2(a), 48.22, 48.23, 48.30(a), 48.42(a); 2002 WL 1018929 (N.C.A.G.). Further, to the best of my knowledge and as stated previously in this report -- the undersigned is not aware of and

14

EXHIBIT 4A

does not recall any health insurance plan that *only* covers gender-confirming healthcare. In my opinion, accordingly, this is <u>not</u> an "employer option" for Defendant DPS.

32.     Paragraph 23 in Dr. Green's report faces a similar hurdle. Dr. Green assert that "[a]nother strategy ... is to establish a fund administered by the employer's Human Resources/Benefits department to which transgender employees or covered dependents submit their receipts to receive reimbursement of uncovered medical expenses." (Dr. Green goes on to say the City of Berkeley, California and health sector organizations and nonprofit corporations have utilized that employer strategy.)   In addition to North Carolina's statutory prohibitions referenced above and elsewhere in the undersigned's present report, in my opinion and to the best of my knowledge there is no allowance for this as an option by Defendant DPS as an employer. It seems that this alleged employer option posited by Dr. Green would violate the State of North Carolina's non-compete provisions vis-à-vis the State Health Plan, underscored and magnified by the fact that in Dr. Green's strategy seemingly relies upon the same State funding source as the State Health Plan.  If Defendant DPS provided their agency employees a reimbursement option from a standalone fund for persons diagnosed with gender dysphoria (or a similar fund established for any other covered person for any other diagnosis for that matter) – a fund created *separately* from the State Health Plan which is offered to every state employee -- then a reasonable interpretation is that Defendant DPS would be providing a coverage option or benefits *in competition with* the State Health Plan and not contemplated by either the legislature or persons administering the State Health Plan. In my opinion, accordingly, this is <u>not</u> an "employer option" for Defendant DPS.

33.     Paragraph 24 in Dr. Green's report – which proposes an option much like those already discussed above – faces a similar wall as well, a wall constructed by State statute and

15

EXHIBIT 4A

outside the authority or ability of Defendant DPS to choose differently. Dr. Green asserts that a "third solution also available to employers is to provide an affected employee with a stipend for the purpose of purchasing an individual plan in the marketplace that does not contain exclusions for gender confirming care." Providing a stipend for the purpose of covering medical expenses not otherwise covered by the State Health Plan could also reasonably be interpreted as providing coverage options or benefits in competition with the State Health Plan. Accordingly, and for the reasons stated previously in my report, this is not an "employer option" for Defendant DPS.

34.    As it further relates to Paragraphs 23 and 24 of Dr. Green's report and its remedies proposed therein, the undersigned would be remiss in not recognizing the potential interaction with both the federal Affordable Care Act (ACA) and the 21st Century Cures Act. Dr. Green's opinion that the Defendant DPS could either establish a fund for reimbursement of employees' uncovered medical expenses or provide them with a stipend to cover such expenses is contemplated by the federal Affordable Care Act. In particular, as of January 1, 2020 and pursuant to federal law, employers can offer an Individual Coverage Health Reimbursement Arrangement (ICHRA). However, if Defendant DPS were to request that employees document medical expenses relating to gender confirming care in order to provide them with funds for that coverage (either as a stipend or as a reimbursement), such an arrangement would constitute an ICHRA or a Health Reimbursement Arrangement ("HRA"). As a result, the ACA would require those arrangements to be offered as part of an integrated health plan. IRS Notice 2013-54. As explained above, the only group health plan Defendant DPS is permitted to offer is the State Health Plan, which specifically excludes such gender-confirming coverage. Thus, Defendant DPS would have to offer the stipend or expense reimbursements without tying them to an integrated health plan, thus not only violating the interpretation of North Carolina's non-compete provisions but also violating the

16

EXHIBIT 4A

ACA and subjecting them to penalties (of up to $100 per employee per day that the offering is in place). 26 U.S.C. § 4980D.

35.     As for Dr. Green's proposed option in Paragraph 25 for an employer to purchase a policy extension or "rider," Dr. Green's report does not apparently identify any public State agency in that Green's experience that utilizes such an option nor does it identify any such riders available to Defendant DPS (and I am aware of none). Further, Defendant DPS is prohibited from purchasing a rider or extension because Defendant DPS is precluded from offering any health plan alternatives. (The undersigned is also not aware of any health insurance policy that singly and solely covers for gender dysphoria and gender-confirming health care.) In my opinion, if Defendant DPS chose to act in furtherance of Dr. Green's recommendations, then the Defendant DPS would be acting in excess of its statutory authority or jurisdiction of the agency. *See, supra,* N.C. Gen. Stat. § 150B-51(b)(2); NC Const. Art. III, § 11; §§ 135-48.2(a), 48.22, 48.23, 48.30(a), 48.42(a); et al.

36.     The solutions provided by Dr. Green within Green's report do not appear to contemplate an employer who is controlled by or subject to full oversight by another entity (other than the health insurance plan itself) regarding provision of health insurance to employees and dependents. In this instance, the North Carolina General Assembly and other Defendants ultimately control the health insurance coverages offered by Defendant DPS.

37.     In my opinion, based on relevant State statutes and the herein referenced memoranda from the Attorney General, as well as my long-time experience as North Carolina's Commissioner of Insurance (and Assistant Insurance Commissioner, legislator, and attorney), and other reasons outlined above, and to the best of my knowledge, Defendant DPS is not able to adopt

17

EXHIBIT 4A

any of the employer strategies that Dr. Green says are presently available to Defendant DPS because Defendant DPS is not authorized to adopt them.

## IV.    CONCLUSION

38.    In summary, given the statutory and other limitations applicable to Defendant DPS and current interpretations of law by the Attorney General, on information and belief there do not appear to be any allowed solutions or strategies that Defendant DPS can avail itself of to provide insurance coverage of gender confirming care for transgender employees and qualified dependents without either potentially violating North Carolina state law if acted upon or potentially violating federal law if not acted upon. In my opinion, Defendant DPS has no control over or ability to override the State Defendants' actions vis-à-vis the State Health Plan offered to the Plaintiffs and similarly-situated State employees.   I may supplement these opinions in response to future information that is provided to me, including but not limited to information produced by Plaintiffs in discovery or in response to Plaintiffs' expert disclosures or further research and analysis.

39.    I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this the ___11^Th___ day of July 2021.

George Wayne Goodwin

George Wayne Goodwin

18

EXHIBIT 4A

**EXHIBIT A**

EXHIBIT 4A

# WAYNE GOODWIN

*Attorney / former NC Insurance Commissioner / former state insurance regulator & legislator*
Home address: 8306 Wycombe Lane North Raleigh, Raleigh, NC 27615
Business address: P.O. Box 27841, Raleigh NC 27611
seaboardstrategicconsulting@gmail.com / cell phone (910) 997-1301 / Twitter @WayneGoodwinNC

## EXECUTIVE SUMMARY

**Attorney** (1992-present; active and licensed throughout; Juris Doctor and B.A. with Honors)

**CEO / President / Legal, Insurance, and Regulatory Consultant / Small Business Owner** (1998-present)

**Chairman**, NC Democratic Party (2017-2021, two terms); other NCDP executive and/or policymaking leadership positions (1982-present)

**Elected Official** (Legislature, 1996-2004; Statewide / **NC Insurance Commissioner** + Council of State, 2008-2016)

**Various positions at NC Department of Insurance** (2005-2016)

**Appointed Official on miscellaneous NC Boards, Commissions, Councils** (1992-2016)

**Director**: Service and/or leadership positions on multiple Boards of Directors of private, non-profit, for-profit, and/or philanthropic Boards of Directors (1992-present)

## WORK HISTORY (partial)

| | |
|---|---|
| 03/2017 to Present | **President and Chief Executive Officer**<br>**Seaboard Strategic Consulting, LLC** – Raleigh, NC<br>Small consulting business founded by Goodwin after serving 12 years as a state insurance regulator, 8 years as a legislator, and 25 years as an attorney<br>• Provided legal, regulatory, compliance, and/or political consultation services for insurance, finance, and related industries for clients in NC, regionally, and nationally<br>• Recruited business partnerships for non-insurance businesses with insurance companies<br>• Provided legal services – including legal research, document drafting, legal opinions, and participation as an expert witness in insurance-related cases<br>• Attended National Association of Insurance Commissioners (NAIC) meetings and other national, regional, state-based or business-hosted conferences, seminars for a multitude of professional associations (e.g., accounting, actuarial, insurance agents and brokers, legal, medical) on numerous occasions throughout each year, and produced reports and memoranda for clients<br>• Moderated seminars, panels, and programs throughout the year for national insurance, legal, and non-profit clients; fellow panelists included national and state elected or appointed government officials, as well as insurance regulatory experts<br>• Prepared and taught CLE and CE courses on insurance, government, legal, legislative, political, and regulatory topics |

EXHIBIT 4A

| | |
|---|---|
| 11/2020 to Present | **Managing Director**<br>**National Trusted Group (NTG Consultants)** – West Palm Beach, FL<br>*Independent contractor/not employee*<br>• Tracked and managed insurance consulting services provided by 15+ other independent contractor/directors and professionals associated with NTG Consultants located across the United States; participated in varied management and strategic decisions and conference calls/meetings for NTG and its clients<br>• Provided consultation services for insurance, finance, and related industries for clients regionally and nationally<br>• Moderated seminars, panels, and programs throughout the year for national insurance, legal, and non-profit clients; fellow panelists included national and state elected or appointed government officials, as well as insurance regulatory experts<br>• Provided legal services – including legal research, document drafting<br>• Attended National Association of Insurance Commissioners (NAIC) meetings and other national, regional, and state-based conferences, seminars for a multitude of professional associations (e.g., accounting, actuarial, insurance agents and brokers, legal, medical) numerous times throughout each year |
| 01/2017 to Present | **Director (advisory board of directors)**<br>**National Trusted Group (NTG Consultants)** – West Palm Beach, FL<br>*independent contractor, not employee*<br>• Provided consultation services for insurance, finance, and related industries for clients regionally and nationally<br>• Provided legal, regulatory, compliance, and/or political consultation services for insurance, finance, and related industries for clients in NC, regionally, and nationally<br>• Moderated seminars, panels, and programs throughout the year for national insurance, legal, and non-profit clients; fellow panelists included national and state elected or appointed government officials, as well as insurance regulatory experts<br>• Provided legal services – including legal research, legal analysis, document drafting<br>• Attended National Association of Insurance Commissioners (NAIC) meetings and other national, regional, and state-based conferences, seminars for a multitude of professional associations (e.g., accounting, actuarial, insurance agents and brokers, legal, medical) numerous times throughout each year |
| 02/2017 to 02/2021<br>(2nd term ended<br>27 Feb 2021) | **Chairman**<br>**North Carolina Democratic Party**<br>Elected to two terms, and simultaneously served as a member of the Democratic National Committee (DNC); *full-time, volunteer position*<br>• Helped raise $56+ Million for NCDP activities and operations in North Carolina<br>• Organized 100 counties and various caucuses in each county |

2

EXHIBIT 4A

- Recruited candidates to run for legislative, judicial, and executive branch offices statewide – including the most diverse slate of candidates for any political party in North Carolina history and the first time a North Carolina political party had candidates running in every legislative district
- Managed the Executive Director of the NC Democratic Party, and assisted in ongoing Party operations at state headquarters in Raleigh, hiring staff; $1.8 Million annual operational budget
- Assisted in oversight, renovation, and preservation of the historic 100+ year old building
- Presided over statewide executive committee meetings and state conventions with between 500 and 2000 attendees multiple times each year
- Served as one of two Co-Chairs of the NC delegation to the 2020 Democratic National Convention
- Served as an active member of the Association of State Democratic Committees (ASDC)
- Held regular press conferences and participated in myriad global, national, state, and local news media interviews over a 4-year period -- including multiple interviews for CNN, Charlotte Observer, Fox News, MSNBC, National Public Radio (NPR), the New York Times, Raleigh News & Observer, Spectrum News, Wall Street Journal, Washington Post, WRAL-TV, et al.
- Strategized with elected officials and candidates in all three branches of government at state level and two branches of government at the federal level
- Delivered (and wrote) speeches of varying lengths to groups of all sizes – subject matter often inspirational or motivational, educational
- Participated as a petitioner, plaintiff, and/or witness in many federal election law cases or administrative filings for the Federal Elections Commission and the NC State Board of Elections, and more often than that helped attorneys in NC and nationally develop legal strategies

01/2019 to 11/2019   **Director (Advisory Board of Directors) – independent contractor**
**e-Maxx Assurance Group** – Peabody, MA
e-Maxx provides captive insurance solutions – where members take control of their own destiny with coverages and achieve lower costs through risk technology platforms, proactive loss prevention and safety programs, claims oversight and litigation management.

01/2017 to 05/2019   **Director (Advisory Board of Directors) - independent contractor**
**Insurance Care Direct** – Deerfield Beach, FL
Insurance Care Direct is one of the nation's largest health and life insurance agencies, and the largest privately held health and life insurance firm. Goodwin was the first member of its Advisory Board of Directors.

3

EXHIBIT 4A

01/2009 to 01/2017 **NC Commissioner of Insurance**
**NC Department of Insurance (NC DOI)** – Raleigh, NC
Served eight years and two terms as the statewide-elected Insurance
Commissioner

- Regulated 1500 insurance companies and other entities, and 500,000+ licenses
- Managed and re-organized a state agency of 415 employees with a wide array of responsibilities (including lawyers, actuaries, accountants, consumer specialists, experts in property & casualty and life & health insurance, medical experts, government relations liaisons, law enforcement officers, engineers, firefighters, and approximately 1000 volunteers)
- Managed an annual budget of $37 Million for a state agency of over $500 Million in revenue generated annually
- Created, crafted, and co-developed public policy regarding health insurance, property & casualty insurance, workers comp insurance, captive insurance, Medicare Part D/Seniors Health Insurance Information Program (SHIIP) outreach, etc.
- Made decisions, issued orders, and negotiated matters regarding insurance rates, refunds, rebates, restitution that saved NC individuals, families, and businesses at least $2.4 Billion; issued orders and made decisions affecting Billions of dollars in interstate commerce annually
- Created North Carolina's first captive insurance program – which resulted in hundreds of new businesses and hundreds of millions of dollars in new revenue for the State; under Goodwin's leadership, North Carolina was first recognized as the new leader in captive insurance programs and in providing private, commercial businesses additional insurance coverage options
- Assisted consumers, patients, doctors, hospitals, and other providers regarding insurance coverage disputes, etc.
- Created the Smart NC program that provided health insurance guidance for new consumers of health insurance up to and after passage of the Affordable Care Act
- Chaired the national Anti-Fraud Task Force of the National Association of Insurance Commissioners for several years, and bolstered the fight against insurance fraud within North Carolina and seeking tools to enhance prevention, investigation, and prosecution of fraud cases
- Provided guidance to state and federal lawmakers
- Served on the Executive Committee of the National Association of Insurance Commissioners (NAIC), with a focus on transparency, fair ratemaking, consumer protection, reasonable state-based regulation, competition, and interstate relations; frequently presented state positions on insurance matters to Governors, Members of Congress, and the President of the United States
- Received special individual recognition from the President of the United States in the White House Oval Office for helping recover

4

EXHIBIT 4A

$156 Million for certain North Carolina health insurance consumers, a record amount at the time for the statutory provisions involved

- Served as NAIC-appointed member of the Board of Directors for the *Interstate Insurance Product Regulation Commission*, (approx. 2010-2012) The Interstate Insurance Product Regulation Commission is an organization that promotes standards for life insurance products in the United States. The Commission was created in 2000 by members of the National Association of Insurance Commissioners
- Deliberated and helped decide - as one of 10 members of the Council of State - the direction of State property purchases, leases, and sales valued at hundreds of Millions of dollars annually
- Participated in high-level business recruitment and regulatory discussions with companies (not just insurance businesses, but also financial institutions, manufacturers, high-tech enterprises, software designers, etc.) in New York City, Chicago, Atlanta, Austin, Dallas, Miami, Charlotte, Washington DC, etc.
- Achieved among the lowest average auto insurance premiums in the USA and maximized competition among auto insurance carriers; on Goodwin's watch his decisions resulted in North Carolina being recognized as having the lowest average auto insurance premiums in the nation for the very first time
- Presided as hearing officer or judge that held court on insurance company/industry rate filings – including two hearings on major homeowners' insurance filings; Goodwin presided over the first homeowners' insurance hearing in North Carolina in 22 years
- Provided input, approvals, research, and opinions on certain legal filings
- Held the dual post of State Fire Marshal, worked with 54,000 firefighters, law enforcement, etc. on matters of public safety, building codes, etc.
- Received the "Defender of Justice Award" from the NC Justice Center; the "Jim Long/SHIIP Award", etc.

09/2005 to 12/2008     **Assistant Commissioner of Insurance**
**NC Department of Insurance** – Raleigh, NC
- Assisted my predecessor by directly managing 125 employees, including regional offices across the State, and providing general management of all 415 employees of the Department of Insurance
- Assisted and advised on Council of State matters
- Presented to various legislative committees and task forces of the Governor, and to stakeholder groups and associations interacting with the Department
- Drafted legislation across an array of Department responsibilities
- Provided government relations counsel to the Insurance Commissioner
- Presided over administrative hearings involving insurance regulatory matters, interacted with private sector attorneys, issued rulings both on motions and also orders and related decisions as hearing officer

5

EXHIBIT 4A

- Served as Assistant State Fire Marshal, interacting with 1200 fire departments and myriad stakeholders

**04/2005 to 09/2005**　**Assistant General Counsel**
**NC Department of Insurance** – Raleigh, NC
- Interpreted laws, rulings and regulations, and reviewed contracts for the NC Insurance Commissioner
- Served as a Hearing Officer regarding issues like licensing, rebating
- Developed strategies and arguments in preparation for presentation of cases.
- Answered legal discovery
- Gathered responses to public records requests, reviewed them, suggested redactions where legally necessary
- Drafted legislation

**01/1997 to 12/2004**　**State Representative**
**North Carolina General Assembly** – Raleigh, NC
- Elected to four terms, serving multiple counties
- Served as Chairman or Vice Chairman of various committees and study commissions, including a Judiciary Committee
- Sponsored legislation regarding economic development, public education, public safety, infrastructure, government reforms, insurance regulatory matters, access to courts, etc.
- Received many awards and recognition for my work, including the NCAE A+ Legislator Award

**09/1992 to 04/2005**　**Attorney** (private practice)
**Goodwin Law Offices, P.A. (and predecessor firms, and Law Offices of Woodrow W. Gunter, II)** – Rockingham and Hamlet, NC
- Interpreted laws, rulings and regulations for individuals and businesses
- Represented individuals, families, businesses and the local domestic violence shelter on civil legal matters, particularly vis-a-vis insurance companies; primarily focused on torts, workers compensation disputes, contracts, business law, mediation, grant applications, government matters
- Appeared before District and Superior Courts, NC Court of Appeals, federal district courts, and various administrative law hearings, including the NC Industrial Commission
- Served as a (then-)certified mediator and court-appointed arbitrator

**09/1992 to 01/2000**　**Adjunct Professor**
**Richmond Community College** – Hamlet, NC
- Taught classes in Business Law, Criminal Procedure, and American Government
- Maintained office hours to help students with questions and educational support
- Developed and implemented lesson plans, quizzes, tests, and projects that covered all required topics

6

EXHIBIT 4A

- Distributed course syllabus and answered student questions regarding standards, material, grading, and progression

## PUBLICATIONS AND SCHOLARLY WORKS

Since 1989, Goodwin has authored, co-authored, or co-edited many published works of an academic, scholarly, legal, or journalistic nature. They include an award-winning honors thesis at the University of North Carolina-Chapel Hill regarding the 1988 U.S. Presidential election; a limited edition book honoring North Carolina constitutional scholar and historian John Sanders; an entry in the *Congressional Record* sponsored by then-U.S. Senator and former Governor Terry Sanford; an award-winning multi-part newspaper series about early-20th century North Carolina Governor Cameron Morrison; a multi-part newspaper series about the American Council of Young Political Leaders conference in the Philippines; a multi-part newspaper series about the 1996 Democratic National Convention; an in-depth essay about young lawyer-legislators in the *Lawyers Weekly*; and many regulatory articles and op-ed columns between 2009 and 2016 in insurance and professional journals, including one published by the NC Institute of Medicine; and quarterly publications for North Carolina independent insurance agents and North Carolina firefighters; and in other associations that interact (or interacted) with the North Carolina Department of Insurance. Goodwin has also authored educational materials for CLE courses he taught.

## EDUCATION

| | |
|---|---|
| 1992 | **J.D.: Law**<br>**University of North Carolina School of Law** - Chapel Hill, NC |
| 1989 | **B.A. with Honors: Political Science**<br>**University of North Carolina at Chapel Hill** - Chapel Hill, NC |

- Morehead Scholar (now called Morehead-Cain Scholars)
- William Randolph Hearst/U.S. Senate Youth Scholar (only 2 awarded per state)
- Won the Wiley Mangum Gold Medal for Oratory (best orator in the senior class)
- Received the Governor Terry Sanford Award for Best Political Science Honors Thesis
- Senator/Member, The Dialectic and Philanthropic Literary Societies
- Attended as special-invited guest of a NATO conference at the U.S. Air Force Academy

## PROFESSIONAL LICENSES

North Carolina State Bar, continuously since 1992

## FAMILY AND MISCELLANEOUS PERSONAL FACTS (SHORT VERSION)

- Native of Hamlet, Richmond County, NC
- Father was a farmer, grocer, and disabled, and Anson County native; Mother was textile worker and teacher's assistant, and Richmond County native
- Graduated Valedictorian of Richmond Senior High School Class of 1985

7

EXHIBIT 4A

- Student Body President, Richmond Senior High School (1984-85)
- Attended Governor's School (West) in Mathematics (1984)
- Worked for UNC School of Government (1989-1992)
- Intern and assistant to then-Director of the State Bureau of Investigation (1989)
- Served as an appointee on miscellaneous State boards, councils, study commissions
- President, Richmond County Bar Association (multiple terms, 1990s)
- Member, I-73 Committee – which helped with strategies and successful approval of the NC leg of Interstate 73/74 in the 1990s, a tremendous economic and commercial boost to the central part of the State, including socio-economically depressed areas
- Honorary degree from Pfeiffer University (after leading the 2003 legislative effort to incorporate Misenheimer, NC, location of the main campus)
- First statewide-elected official from Hamlet, NC
- Member, NC Bar Association (1992-present)
- Member, Tenth Judicial District Bar and Wake County Bar Associations (2010-present)
- Married 22 years to former State Representative Melanie Wade Goodwin until her passing from a long battle with cancer in Sept 2020
- Two children: Madison (college freshman) and Jackson (7th grader)

## REFERENCES _____

Provided upon request.

- *Current as of 1 April 2021*

8

EXHIBIT 4A

**EXHIBIT B**

EXHIBIT 4A


# Application of Certain Prohibitions Contained in §§ 116-17.2 & 143-34.1(d)

November 3, 1995

Mr. Dennis Ducker Director Retirement Systems Division Department of State Treasurer 325 North Salisbury Street Raleigh, North Carolina 27603-1385

Re: Advisory Opinion to Dennis Ducker, Deputy State Treasurer, from the Office of the Attorney General, Administrative Division, Service to State Agency Section, Concerning the Application of Certain Prohibitions Contained in N.C. Gen. Stat. §§ 116-17.2 and 143-34.1(d) to the Proposal to Include Supplemental Life Insurance, Accidental Death and Dismemberment Insurance, and Supplemental Disability Insurance in the Statewide Flexible Benefits Program Created by Executive Order No. 66.

Dear Mr. Ducker:

We are writing in response to your letter of October 11, 1995, to Attorney General Michael F. Easley. In that letter, you noted that Executive Order No. 66 created within the Office of State Personnel an Employee Flexible Benefits Program for all State Employees, including employees of the University of North Carolina. The program created by Executive Order No. 66, called "NC Flex," is designed to implement the provisions of N.C. Gen. Stat. §§ 116-17.2 and 143-34.1(d), and will become effective of January 1, 1996. You also noted that N.C. Gen. Stat. §§ 116-17.2 and 143-34.1(d) both expressly exclude from coverage under the flexible benefits plan "those benefits provided to employees [and officers] under [Article 1A of Chapter 120 of the General Statutes, and] Articles 1, 3, and 6 of Chapter 135 of the General Statutes." [The provisions in brackets are contained in N.C. Gen. Stat. § 143-34.1(d) only.] You asked for an opinion as to whether the inclusion of supplemental life insurance, accidental death and dismemberment insurance, and supplemental disability insurance in NC Flex will violate the prohibitions contained in these two statutes.

The quoted provisions of N.C. Gen. Stat. §§ 116-17.2 and 143-34.1(d) prohibit NC Flex from duplicating the benefits provided by the Legislative Retirement System of North Carolina, the Teachers' and State Employees' Retirement System of North Carolina, the Teachers' and State Employees' Comprehensive Major Medical Plan, and the Disability Income Plan of North Carolina. The reason for this prohibition is readily apparent: each of these plans is designed to provide basic benefits of uniform design to the employees covered by it. Moreover, participation in each of the plans is mandatory (except to the extent that N.C. Gen. Stat. § 135-39.5B allows for employees to enroll in an alternative prepaid hospital and medical benefit plan approved by the Executive Administrator and Board of Trustees of the Major Medical Plan in consultation with the Committee on Employee Hospital and Medical Benefits). Additionally, each of the plans is funded, in whole or in part, by employer contributions made by the State of North Carolina, through its various departments and agencies. It is certainly in the State's best interest not to have optional employee benefit plans that duplicate or compete with the benefits offered by these plans. Nor is it in the best interests of employees to contribute to flexible compensation and benefit options that merely duplicate the benefits they already receive from the State-sponsored plans.

The question remains, then, whether the supplemental life insurance, accidental death and dismemberment insurance, and supplemental disability insurance that are planned for inclusion in NC Flex will duplicate the benefits offered by the Legislative Retirement System of North Carolina, the Teachers' and State Employees' Retirement System of North Carolina, or the Disability Income Plan of North Carolina. In our opinion, they will not. As you have described them, the group life insurance, the group accidental death and dismemberment insurance, and the group supplementa English  to

EXHIBIT 4A

be included in NC Flex will provide benefits over and above rather than duplicate those benefits provided by the State-sponsored retirement systems and disability income plans. This being so, inclusion of these benefit options in NC Flex will not, in our opinion, violate the prohibitions contained in N.C. Gen. Stat. §§ 116-17.2 and 143-34.1(d)

We trust that this fully answers your questions on this matter. Please do not hesitate to contact us if we can be of any further assistance.

Ann Reed Senior Deputy Attorney General

Alexander McC. Peters

Special Deputy Attorney General

**EXHIBIT C**

EXHIBIT 4A

2001 WL 1783598 (N.C.A.G.)

Office of the Attorney General

State of North Carolina
October 3, 2001

*1  Mr. Carl Goodwin
Director
Risk Control Services
Office of State Personnel
116 West Jones Street
Raleigh, North Carolina 27603-8004

**Re: Advisory Opinion:** N.C. GEN. STAT. §§ 116-17.2 **and** 143-34.1(d) **Ability of NC Flex to Offer a Voluntary Indemnity Plan and Voluntary Alternative Indemnity Plans for Dependant Health Care Coverage.**

Dear Mr. Goodwin:
You have asked, by letter dated July 26, 2001, for our opinion regarding whether the statutes that govern the Teachers' and State Employees' Comprehensive Major Medical Plan ("the State Health Plan") and the Statewide Flexible Benefits Program ("NC Flex") would permit NC Flex to offer the following types of plans for State employees:
(1) A voluntary indemnity plan that provides hospital confinement, short-stay, rehabilitation unit, surgical, heart attack, stroke, coma, paralysis, ambulance, and wellness benefits; and

(2) A voluntary indemnity health plan that provides health benefit alternatives to employees for dependant health care coverage.

For reasons set out below, it is our opinion that NC Flex may offer the voluntary indemnity plan described in (1) above. Whether NC Flex could offer a voluntary indemnity health plan that provides health benefit alternatives to employees for dependant health care coverage would depend on the specific provisions of the plan in question.

N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d), which authorize the creation of a flexible benefits program for employees of the University of North Carolina and for State employees, expressly provides:
This plan shall not include those benefits provided to employees [and officers] under [Article 1A of Chapter 120 of the General Statutes and] Articles 1, 3, 4, and 6 of Chapter 135 of the General Statutes.

(The provisions in brackets are contained in N.C. GEN. STAT. § 143-34.1(d) only.) As we noted in our November 3, 1995, advisory opinion to Ronald G. Penny, former State Personnel Director, these provisions prohibit NC Flex from duplicating the benefits offered by the Legislative Retirement System of North Carolina, the Teachers' and State Employees' Retirement System of North Carolina, the State Health Plan, and the Disability Income Plan of North Carolina. We further noted that the reasons for this are readily apparent: it is in the State's best interest not to have optional employee benefit plans that duplicate or compete with the benefits offered by these plans, each of which is designed to provide basic benefits of uniform design to the employees covered by it. Similarly, it is not in the best interests of employees to contribute to flexible compensation and benefit options that merely duplicate the benefits already received from State-sponsored plans.

The question remains, then, whether the proposed plans you have described in your letter will duplicate the benefits offered by the State Health Plan pursuant to Chapter 135, Article 3, of the North Carolina General Statutes. With regard to the first proposal you described Æ offering indemnity coverage Æ you provided information on the plan description submitted to your office in response to Request for Proposal #100908. These materials show schedules of payments that would be provided under the plan.

EXHIBIT 4A

Upon review of these materials, it appears that the benefits offered under this plan, which are provided as set dollar amounts rather than as indemnification of a participant's actual deductible, coinsurance and copayment expenses, do not duplicate the benefits offered by the State Health Plan. Rather, this plan would simply provide for payments of set amounts upon certain occurrences, such as hospitalization, heart attacks, etc. The benefit offered by this plan, then, are not unlike the benefits offered by the accidental death and dismemberment plans that NC Flex has offered. In our opinion, then, NC Flex is not prohibited by N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d) from offering the voluntary indemnity plan that provides hospital confinement, short-stay, rehabilitation unit, surgical, heart attack, stroke, coma, paralysis, ambulance, and wellness benefits described in the materials you sent with your letter.

**\*2** With regard to your other question Æ whether NC Flex can offer a voluntary indemnity health plan that provides health benefit alternatives to employees for dependant health care coverage Æ we have not been provided with a specific description of any proposed plan or plans. It is my understanding that there is not, in fact, any specific plan under consideration. We are not in a position, then, to offer an opinion as to whether any possible plan might be prohibited by N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d). We can only note that NC Flex cannot offer any plan that duplicates benefits offered to employees by the State Health Plan. This, of course, raises the issue, which we understand to be a part of your question, of whether dependant health care benefits are "benefits provided to employees" within the meaning of N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d). It is our opinion that they are.

It is true that dependant coverage is optional under the State Health Plan. That is, an employee can elect to cover or not cover his or her dependants through the State Health Plan. It is also true that dependant coverage is paid for solely by the employee premiums, without any contribution from the State. Nevertheless, we believe that dependant coverage is still a benefit provided to employees within the meaning of N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d). Clearly, it is a benefit to employees to make dependant coverage available in the same plan in which the employee participates and on the same terms.

Moreover, as we have noted, N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d) prohibit competition with the State Health Plan. Without question, dependant health care coverage offered by NC Flex would compete with the State Health Plan. It would decrease the number of dependant participants in the State Health Plan. Because the benefits offered by NC Flex would be available only to active State employees and not retirees, the smaller pool of participants remaining in the State Health Plan would most likely also be a less-healthy pool. This is particularly true if pre-existing condition restrictions enabled only the employees with healthier dependants to take advantage of a plan offered by NC Flex. This would almost certainly have the effect of driving up dependant care premiums for those who remain in the State Health Plan. In our opinion, this is precisely the type of competition that the General Assembly intended to prohibit in N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d). Accordingly, we believe that dependant health care benefits are "benefits provided to employees" within the meaning of N.C. GEN. STAT. §§ 116-17.2 and 143-34.1(d).

For the foregoing reasons, it is our opinion that NC Flex may offer the indemnity plan described in materials sent with your July 26, 2001, letter. Further, we cannot offer an opinion as to whether NC Flex can offer a voluntary indemnity health plan that provides health benefit alternatives to employees for dependant health care coverage without seeing the specific provisions of any such plan.
Very truly yours,

**\*3** Ann Reed
Senior Deputy Attorney General
Alexander McC. Peters
Special Deputy Attorney General

2001 WL 1783598 (N.C.A.G.)

**EXHIBIT D**

EXHIBIT 4A

2002 WL 1018929 (N.C.A.G.)

Office of the Attorney General

State of North Carolina
March 26, 2002

**Re:Advisory Opinion;** N.C. Gen. Stat. § 116-17.2 **and** § 143-34.1(d)**; ability of the University System to offer dependant health coverage**

\*1  Leslie Winner
Vice President and General Counsel
University of North Carolina
Post Office Box 2688
Chapel Hill, North Carolina 27515

Dear Leslie:
This letter is in response to your inquiry in which you ask whether the University, or some of its campuses, may offer a cafeteria plan which allows pre-tax premiums for dependent health coverage. You ask that we review this issue in light of our opinion to Carl Goodwin of the Office of State Personnel dated October 3, 2001, which discusses whether a pre-tax dependent health coverage plan violates the non-compete mandate of N.C. Gen. Stat. § 116-17.2 **and** § 143-34.1(d). You also asked that we research the legislative rationale for this non-compete restriction.

As you are aware, in our opinion to Mr. Goodwin we opined that a flexible benefit plan "cannot offer a plan that duplicates benefits offered to employees by the State Health Plan." We went on to indicate that Mr. Goodwin's inquiry raised the issue of whether dependent health care benefits are subject to the non-compete restrictions set out in N.C. Gen. Stat. § 116-17.2 and § 143-34.1(d). We indicated that in our opinion they are.

In interpreting the non-compete restrictions contained in N.C. Gen. Stat. § 116-17.2 and § 143-34.1(d), we focused on the prohibition against a cafeteria plan including those benefits provided to employees under various Articles of Chapter 135, including Article 3 of that chapter, which covers providing employee and family healthcare coverage. It has been suggested that the word "provided" limits the non-compete restrictions to those benefits which the State pays for. We disagree. We believe it is clear from the language of the statutes that the word "provide" Leslie Winner means making the benefit available to the employee. The benefit is provided under the Comprehensive Major Medical Plan even when the employee fully funds the cost of the benefit. G.S. § 135-40(b), the undertaking section for the Major Medical Plan, also refers to "providing" benefits for the State's employees and certain of their dependants, and it is clear the State does not pay for all of the benefits. For example, long-term care benefits are authorized as an optional program for qualified employees, retired employees and their dependants. The State pays nothing towards these costs. Nonetheless, G.S. § 135-40(b) refers to benefits provided and made available through the Plan. Established case law counsels us not to interpolate or superimpose restrictions not contained in a statute on the statute. State ex. rel Utilities Com. v. Edmisten, 291 N.C. 451, 232 S.E.2d 184 (1977). Interpreting "provide" to mean "make available on a fully funded basis" is a restriction not contained in the statute. Additionally, a construction of a statute which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done. State v. Hart, 287 N.C. 76, 213 S.E.2d 291 (1975). Our review of the legislative interactions surrounding the non-compete provisions of G.S. § 143-34.1(d) supports the conclusion that a cafeteria plan for the University or some of its constituent campuses that allows pre-tax premiums for dependant health coverage impairs the object of the statute.

\*2  In the course of researching the origins and legislative history of these statutes, we did not locate any legislative minutes directly discussing the non-compete restrictions. However, in reviewing the events surrounding the establishment of the State's flexible benefits plan we did discover documents which we believe are relevant. As you are aware, the initial responsibility

EXHIBIT 4A

for studying the feasibility of establishing and maintaining a flexible benefits plan for State employees was assigned to the Office of State Budget and Management. The Office of State Budget contracted with the accounting firm of Coopers and Lybrand to provide recommendations concerning structure and plan design. Coopers and Lybrand's final report, issued August 20, 1993, recommended a single statewide plan encompassing all employees and utilizing a central administration. The Office of State Budget moved forward with this design concept, and the Governor formalized the statewide, centrally-administered coordination effort with Executive Order #66, issued December 5, 1994.

During the debate over removing the sunset provision from the NC Flex bill, the Director of the State Health Plan and the lead fiscal analyst staffing the legislative committee to which the bill was assigned emphasized the need for the non-compete provision. Additionally, they produced figures which showed that the dependent coverage cost is indirectly subsidized by the amount saved on the employee - only claims. *Since the employee-only claims paid are less than the premiums paid by the State, the rate for dependent coverage is reduced by the surplus.* Furthermore, siphoning off younger, healthier dependents from the pool that includes retirees and their dependents would almost certainly drive up the cost of dependent coverage. As we previously stated, and as the legislative interactions confirm, this is precisely the type of competition the General Assembly intended to prohibit. Accordingly, based on the clear Leslie Winner language of N.C. Gen. Stat. § 116-17.2 and § 143-34.1(d) and our research into their history, we conclude that the University, or some of its constituent campuses, cannot offer a cafeteria plan that allows pre-tax premiums for dependent health coverage. This competition would impair the object of the statute, which was to establish a single statewide plan that did not compete with existing benefits.

We trust this information has been helpful and answers your inquiry. Do not hesitate to contact us if you have any additional questions.
 Very truly yours,

Ann Reed
Senior Deputy Attorney General
Alexander McC. Peters
Special Deputy Attorney General

2002 WL 1018929 (N.C.A.G.)

EXHIBIT 4A