IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., *by his next friends and parents*, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE, and DANA CARAWAY.<br><br>Plaintiffs,<br><br>v.<br><br>DALE FOLWELL*, in his official capacity as State Treasurer of North Carolina*; DEE JONES, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*; NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**STATE HEALTH PLAN DEFENDANTS' MEMORANDUM
IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

NATURE OF THE MATTER BEFORE THIS COURT .................................... 1

FACTS IN EVIDENCE ................................................................ 4

   1.  The State Health Plan .................................................... 4

   2.  Plan Implementation .................................................... 5

      A.  Plan Benefits .......................................................... 5

      B.  Gender Dysphoria .................................................. 7

      C.  Plan Exclusions ...................................................... 8

      D.  Plan Exclusions in Practice ..................................... 9

   3.  Dana Caraway's Title VII Claim ................................. 13

STANDARD OF REVIEW ........................................................... 19

ARGUMENT .......................................................................... 20

   1.  The State Health Plan is Not Liable as Plaintiff Caraway's "Employer" under the Fourth Circuit's Agency and Control Test.................................. 20

      A.  The State Health Plan can only be liable to Caraway under Title VII if the Plan and DPS are "joint employers." .................................... 20

      B.  Caraway has failed to show that DPS and the Plan are "joint employers" under the Fourth Circuit's hybrid test. .................................... 21

   2.  The State Health Plan is not liable under Section 1557 of the Affordable Care Act because it is explicitly excluded from Section 1557 liability by the current U.S. Department of Health and Human Services Regulation. ....... 28

CONCLUSION ......................................................................... 32

CERTIFICATE OF WORD COUNT ............................................... 34

# TABLE OF AUTHORITIES

**CASES**

Birkbeck v. Marvel Lighting Corp.,
  30 F.3d 507 (4th Cir. 1994) .............................................................. 21

Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of
  Health & Hum. Servs.,
  No.20-11297-PBS, 2021 WL 3667760 (D.Mass. Aug. 18, 2021).................... 29

Bray v. Alexandria Women's Health Clinic,
  506 U.S. 263 (1993) ........................................................................... 1

Butler v. Drive Auto. Indus. of Am.,
  793 F.3d 404 (4th Cir. 2015) ...................................................passim

Callum v. CVS Health Corp.,
  137 F.Supp.3d 817 (D.S.C. 2015).................................................... 30

Chevron v. NRDC,
  467 U.S. 837 (1984) ................................................................ 30, 31

Crowder v. Fieldcrest Mills Inc.,
  569 F. Supp 825 (M.D.N.C. 1983)................................................... 22

Currie v. Grp. Ins. Comm'n,
  290 F.3d 1 (1st Cir. 2002).............................................................. 31

Fain v. Crouch,
  No. CV 3:20-740,2021 WL 2657274 (S.D.W.Va. June 28, 2021).................. 30

Geduldig v. Aiello,
  417 U.S. 484 (1974) ...................................................................... 1, 3

Jacobs v. N.C. Administrative Office of the Courts,
  780 F.3d 562 (4th Cir. 2015) .......................................................... 19

Lange v. Houston Cnty.,
  499 F.Supp.3d 1258 (M.D.Ga. 2020) ................................................ 2

Case 1:19-cv-00272-LCB-LPA   Document 137   Filed 11/30/21   Page 3 of 40

Lissau v. Southern Food Service, Inc.,
      159 F.3d 177 (4th Cir. 1998) ................................................................... 20, 21

Nat'l Collegiate Athletic Ass'n v. Smith,
      525 U.S. 459 (1999) ...................................................................... 31

New York v. U.S. Dep't of Health & Hum. Servs.,
      No.1:20-cv-05583 (S.D.N.Y. Doc. No. 145, Aug. 23, 2021) ........................... 30

Othi v. Holder,
      734 F.3d 259 (4th Cir. 2013) ........................................................... 30

Religious Sisters of Mercy v. Azar,
      513 F.Supp.3d 1113 (D.N.D.2021) ..................................................... 30

Schafer v. Astrue,
      641 F.3d 49  (4th Cir. 2011) ........................................................... 30

Union Pac. R.R. Employment Practices Litig.,
      479 F.3d 936 (8th Cir. 2007) ............................................................. 3

Victim Rts. L. Ctr. v. Cardona,
      2021 WL 3185743 (CV 20-11104, D.Mass. July 28, 2021) ........................... 31

Walker v. Azar,
      No.20-cv-2834, 2020 WL 6363970  (E.D.N.Y. Oct. 29, 2020) ....................... 29

Wash. v. U.S. Dep't of Health & Hum. Servs.,
      482 F.Supp.3d 1104 (W.D.Wash. 2020)............................................... 29

Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.,
      485 F.Supp.3d 1 (D.D.C.2020) ......................................................... 29

Williams v. Griffin,
      952 F.2d 820 (4th Cir. 1991) ............................................................. 4

Williams v. Hansen,
      326 F.3d 569 (4th Cir. 2003) ............................................................. 3

## STATUTES

42 U.S.C. §18116 (§1557 of the Affordable Care Act) .................................. 2, 28

42 U.S.C. §18116(c) (§1557 of the Affordable Care Act) ........................... 28, 31

42 U.S.C. §2000e(b)(Title VII) .............................................................................. 20

42 U.S.C. §2000e-2(a)(1)(Title VII) .................................................................... 20

## OTHER AUTHORITIES

FEDERAL TRADE COMMISSION, PHARMACY BENEFIT MANAGERS: OWNERSHIP OF
    MAIL-ORDER PHARMACIES (2005) at (i), available at https://bit.ly/3d2fIGE .. 6

Tricia Lee Wilkins, Prior Authorization and Utilization Management
    Concepts in Managed Care Pharmacy, 25 J. MANAGED CARE & SPECIALTY
    PHARMACY 641, 641 (2019) ................................................................................ 6

## REGULATIONS

§1557. 85 Fed. Reg. 37172-74 ............................................................................. 31

45 C.F.R. §92.3(b),(c) (2021) ........................................................................... 2, 29

85 Fed. Reg. 37160 (June 19, 2020) Nondiscrimination in Health and Health
    Education Programs or Activities, Delegation of Authority ......................... 29

81 Fed. Reg. 31376, 31467 (May 18, 2016Nondiscrimination in Health
    Programs and Activities) ................................................................................. 28

Case 1:19-cv-00272-LCB-LPA   Document 137   Filed 11/30/21   Page 5 of 40

## NATURE OF THE MATTER BEFORE THIS COURT

The Equal Protection Clause does not allow individuals to sue for more generous state-sponsored insurance. State-run benefit programs must protect all members against the same risks. But the "asserted underinclusiveness of the set of risks that the State has selected to insure," *Geduldig v. Aiello*, 417 U.S. 484, 494 (1974), does not violate equal protection even when an excluded risk falls disproportionately upon a protected class, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 & n.3(1993)(discussing *Aiello*). To prove a constitutional violation, plaintiffs must show a "[d]iscriminatory purpose" underlying the program's operation. *Bray*, 506 U.S. at 271-72.

The North Carolina State Health Plan (the "Plan") Defendants seek partial summary judgment, dismissing two of Plaintiffs' claims. First, Title VII claims may only be brought against a plaintiff's employer. Acts by an employer's agent can create liability for the employer, but relief is generally not available against the agent. A plaintiff can sue multiple defendants under Title VII only when they are 'joint employers.' The Fourth Circuit applies its 'hybrid test' in such circumstances. Plaintiff Dana Caraway, a 27-year employee of the Department of Public Safety ("DPS"), provides no evidence to satisfy the Fourth Circuit's 'hybrid test' for joint employers. Under this test,

the State Health Plan is not Caraway's joint employer and her Title VII claim should be dismissed.

Second, Plaintiffs' claims under §1557 of the Affordable Care Act, 42 U.S.C. §18116, should be dismissed because the federal rule interpreting §1557 explicitly excludes the State Health Plan from the provision's scope. In 2020, the U.S. Department of Health and Human Services ("HHS") concluded §1557 *does not* reach "an entity principally or otherwise engaged in the business *of providing health insurance.*" 45 C.F.R. §92.3(c)(2021) (emphasis added). Although the 2020 rule has been challenged in court, and other provisions of the rule are enjoined, this specific portion of the rule remains in effect. The Court should defer to HHS's interpretation and dismiss Plaintiffs' §1557 claim.

In contrast, Plaintiffs' equal protection claims remain for trial. The Plan protects against the risk of certain medical conditions, but it is not required to and has chosen not to protect against the risk of every medical condition. That the Plaintiffs seek treatment that is outside of the Plan's coverage does not constitute discrimination. The lack of facial discrimination remains true even if one assumes, incorrectly, that only transgender individuals suffer from gender dysphoria. Plaintiffs cannot prevail only with assertions that gender dysphoria disproportionately affects members of a protected class. *See Lange v. Houston Cnty.*, 499 F.Supp.3d 1258, 1275-77 (M.D.Ga.2020) (insurance

exclusion for gender dysphoria not facially discriminatory). The Supreme Court held in *Aiello* that the exclusion of pregnancy from a state insurance program was not a "sex-based" classification even though only natal females can become pregnant. 417 U.S. at 496 n.20. "The proper comparator is the provision of the medical benefit in question," not each beneficiary's medical needs. *In re Union Pac. R.R. Employment Practices Litig.*, 479 F.3d 936,944 (8th Cir.2007).

Plaintiffs could still prevail by showing that the "facially neutral" benefits plan, even "neutrally applied," is motivated by "discriminatory animus." *Williams v. Hansen*, 326 F.3d 569,584 (4th Cir.2003). But the Plan's coverage decisions result from changing federal regulations. When a 2016 federal rule required the Plan to expand benefits, the Plan did so. When the 2016 rule was enjoined nationwide, the Plan allowed the federally-required coverage to lapse. Plaintiffs allege that this lapse stemmed from discriminatory animus against transgender individuals. The Plan Defendants are confident that the factfinder will conclude otherwise. Nevertheless, summary judgment "is seldom appropriate in cases wherein particular states of mind are decisive

Case 1:19-cv-00272-LCB-LPA   Document 137   Filed 11/30/21   Page 8 of 40

as elements of a claim or defense," *Williams v. Griffin*, 952 F.2d 820, 826 (4th Cir.1991), so Plaintiffs' claim should proceed to trial.[1]

## FACTS IN EVIDENCE

1. <u>The State Health Plan</u>

The Plan is the largest purchaser of healthcare and pharmaceuticals in North Carolina, (Ex.1.Folwell.Dep.35:9-12), funding healthcare for more than 740,000 teachers, legislators, state and local government employees, retirees, and their dependents. (Ex.2.Jones.Dep.74:3-5;16:24-17:9). Until 2018, Plan members paid *no* premiums for their own health coverage, and enacting the current premium scheme "was a herculean effort." (Ex.2.Jones.105:25-106:5). The North Carolina General Assembly appropriates money for the remaining costs, but the appropriation currently increases by only 4% per year while healthcare costs rise 7% per year. (Ex.2.Jones.102:22-24).

Members can purchase coverage for spouses and children, but this benefit is not subsidized by the General Assembly. For the 80/20 Plan, adding children raises the premium to $305/month, adding a spouse costs $700/month,

---

[1] The Count I claims of Maxwell Kadel and Sam Silvaine must be dismissed. Count I seeks prospective relief only and these Plaintiffs have left State employment. Amd.Comp.¶¶7,11. Neither has presented evidence of future plans to be a state employee or participate in the State Health Plan. These individuals therefore lack standing to assert Count I.

and adding a spouse and children costs $720/month. (Ex.3.PLANDEF.154817). For the 70/30 Plan, adding children costs $218/month, adding a spouse is $590/month, and adding a spouse and children costs $598/month. *Id.* For employees who elect family coverage, "a whole lot of" them must "work one week out of a month just to cover their Health Plan for their family." (Ex.2.Jones.105:22-24).

2. <u>Plan Implementation</u>

       A.    Plan Benefits

The Plan does not cover every medically necessary procedure, and no law has ever required the Plan to do so. (Ex.2.Jones.58:6-7;72:4-6). For each Plan coverage option, a benefit booklet describes the covered and non-covered services. (Ex.2.Jones.104:7-8). For services covered by the Plan, Blue Cross/Blue Shield of North Carolina ("BCBS")—the Plan's Third-Party Administrator—implements the booklet using the national billing practices and medical coding system of the healthcare industry. (Ex.4.BCBS.Decl.¶¶6-7,11).

Every provider submits a claim using a standardized form, which requires at least one diagnosis code, at least one procedure code, the insured's name, the provider's name, and the patient's age and sex. A diagnosis code identifies the reason for medical treatment. (Ex.4.BCBS.Decl.¶7).

International Classification of Diseases ("ICD") diagnosis codes used by BCBS are uniform across the healthcare industry. Each medical service or procedure also has a unique Current Procedural Terminology ("CPT") code. When BCBS receives a claim, it reviews whether the claim is for a Plan member with a covered diagnosis and covered procedure. If so, Blue Cross pays for the treatment. If a claim does not include a covered ICD code and a covered CPT code, or one code is missing entirely, the claim is denied. (Ex.4.BCBS.Decl.¶9).

CVS/Caremark is the Plan's pharmacy benefit manager ("PBM"). (Ex.1.Folwell.119:9-10). PBMs manage prescription drug benefits. FEDERAL TRADE COMMISSION, PHARMACY BENEFIT MANAGERS: OWNERSHIP OF MAIL-ORDER PHARMACIES (2005) at (i), *available at* https://bit.ly/3d2fIGE. PBMs reduce costs by using networks of retail pharmacies, identifying which drugs will be used to treat each medical condition, and providing incentives to use specific drugs. *Id.* PBMs also offer prior authorization and other protocols to manage and potentially reduce use of unnecessary high-risk or high-cost drugs. Tricia Lee Wilkins, *Prior Authorization and Utilization Management Concepts in Managed Care Pharmacy*, 25 J. MANAGED CARE & SPECIALTY PHARMACY 641, 641 (2019) (noting that prior authorization helps "optimiz[e] patient outcomes and reduc[e] waste, error, unnecessary drug use, and cost")(Ex.5).

## B. Gender Dysphoria

Plaintiffs allege that the Plan denies "coverage for treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender identity and sex assigned at birth," and that the failure to provide this coverage is unlawful discrimination. Amd.Comp.¶1. According to the Plaintiffs' expert testimony, medical professionals distinguish between gender dysphoria as a symptom and the diagnosed psychiatric illness of gender dysphoria. (Ex.6.Karasic.Dep.18:5-15). The medical diagnosis of the psychiatric illness requires not only the symptom of 'gender dysphoria' ("distress about the difference between one's identified or lived gender and one's assigned gender") but also the provider's conclusion that this symptom causes "impairment of social occupational functioning or clinically significant distress." (Ex.6.Karasic.18:19-19:2).

Critically, not all transgender individuals suffer from gender dysphoria. (Ex.7.Ettner.Dep.28:11-13;Ex.8.Levine.Dep.241:24-242:14). In addition, "there may be people who have symptoms of gender dysphoria, but they personally don't identify as transgender." (Ex.6.Karasic.27:25-28:17;Ex.8.Levine.242:15-243:20). Plaintiffs have not provided any evidence that would allow a factfinder to determine what proportion of transgender individuals suffer from gender

dysphoria: "no one knows the answer to that [question]." (Ex.9.Brown.Dep.92:17-25).

### C. Plan Exclusions

The Plan does not and is not required to cover all medical treatments. The benefit booklet accordingly alerts and advises participants that the Plan does not cover "[a]nything specifically listed in this benefits booklet as not covered or excluded, regardless of medical necessity." *See*, *e.g.*, 2020 Booklet for 80/20 Plan (Ex.3.PLANDEF-120625). The Plan excludes coverage in four circumstances that potentially affect treatment for gender dysphoria. (Ex.2.Jones.15:20-16:9;117:10-118:5).

> Cosmetic services, which include the removal of excess skin from the abdomen, arms or thighs, skin tag excisions, cryotherapy or chemical exfoliation for active acne scarring, superficial dermabrasion, injection of dermal fillers, services for hair transplants, electrolysis and surgery for psychological or emotional reasons, except as specifically covered by the *Plan*. (Ex.3.PLANDEF-120627).

> Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation. (Ex.3.PLANDEF-120632).[2]

---

[2]  While the benefit booklets indicate that the Plan does not cover counseling related to gender dysphoria, the Plan's behavioral health program does not consider a patient's diagnosis. Therefore, since at least 1990, this language in the booklet has had no effect on the benefits actually available to Plan participants. (Ex.4.BCBS.Decl.¶27). The Board of Trustees of the State Health Plan has eliminated this language from Plan benefit booklets, effective January 1, 2022.

Treatment or studies leading to or in connection with sex changes or modifications and related care. (Ex.3.PLANDEF-120636).

The following drugs or medications: … *Experimental* medication or any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment. (Ex.3.PLANDEF-120628).[3]

    D.     Plan Exclusions in Practice.

    1.     Surgical Claims

Neither the Plan nor BCBS identifies whether a participant is transgender. (Ex.2.Jones.87:20-22;Ex.4.BCBS.Decl.¶¶14,28). The Plan asks each member whether he or she is male or female, but that person decides what information to provide and can change his or her sex at any time. (Ex.2.Jones 85:10-87:22). When a claim is submitted to BCBS, the provider submits only the name of the plan participant, the name of the provider, the age and sex of the participant, the ICD diagnosis code, and the CPT procedure code. BCBS does not consider a patient's sex when reviewing claims connected to gender dysphoria, and BCBS does not code or track whether a Plan participant is transgender, cisgender, non-binary or otherwise. (Ex.4.BCBS.Decl.¶¶22,28). BCBS identifies the following procedures as not covered by the Plan, regardless

---

[3]   The fourth limitation does not apply to (1) prescription medication used in covered clinical trials or (2) medication approved by the FDA for cancer treatment when prescribed to treat a different form of cancer than that approved by FDA. (Ex.3.PLANDEF-120628).

of diagnosis code, because industry coding indicates these procedures are used only for treatment of gender dysphoria:

| CPT Code | Description of Surgery |
| --- | --- |
| 55970 | Intersex Surgery, Male to Female |
| 55980 | Intersex Surgery, Female to Male |
| 57335 | Vaginoplasty for Intersex State |
| 56805 | Clitoroplasty for Intersex State |

(Ex.4.BCBS.Decl.¶20). The following CPT codes are not covered when their procedures are performed to treat one of two diagnosis codes: F64.0 (Transsexualism) or Z87.890 (Personal history of sex reassignment). These ICD codes are not created by the Plan, and BCBS identifies them as the diagnosis codes for treatment of the psychiatric diagnosis of gender dysphoria.

## CPT Code and Description of Surgery

| | |
| --- | --- |
| 54400 | Insertion of Penile Prosthesis; non-inflatable (semi-rigid) |
| C1813 | Prosthesis, Penile, Inflatable |
| 54401 | Insertion of Penile Prosthesis; inflatable (self-contained) |
| 54405 | Insertion of multi-component, inflatable penile prosthesis, including placement of pump, cylinders, and reservoir |
| 54406 | Removal of multi-component Inflatable Penile |

| | |
|---|---|
| 54408 | Repair Components(s) multi-component, Inflatable Penile |
| 54410 | Removal and replacement of all components(s) of a multi-component, inflatable penile prosthesis at the same operative session |
| 54411 | Removal and replacement of all components of a multi-component inflatable penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54415 | Removal non-inflatable (semi-rigid) /inflatable |
| 54416 | Removal and replacement of non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis at the same operative session |
| 54417 | Removal and replacement of a non-inflatable (semi-rigid) or inflatable (self-contained) penile prosthesis through an infected field at the same operative session, including irrigation and debridement of infected tissue |
| 54660 | Insertion of Testicular Prosthesis (separate procedure) |
| 55175 | Scrotoplasty (simple) |
| 55180 | Scrotoplasty (complicated) |
| 56800 | Plastic Repair of Introitus |
| 57291 | Construction of artificial vagina (without graft) |
| 57292 | Construction of artificial vagina (with graft) |
| 19316 | Mastopexy |
| 19318 | Breast Reduction |

| 57295 | Revision (including removal) of prosthetic vaginal graft |
| 57296 | Revision (including removal) of prosthetic vagina graft |
| 19325 | Breast Augmentation with implant |
| 17380 | Electrolysis Epilation, each .5 hour |

(Ex.4.BCBS.Decl.¶21). If an otherwise proper claim included either diagnosis code above with a different CPT code, the Plan would pay it. The Plan's exclusion of certain surgeries that Plaintiffs might seek is based on diagnosis and medical coding and not transgender identity. (Ex.4.BCBS.Decl.¶28). Further, BCBS does not approve cosmetic procedures for any Plan participant, regardless of diagnostic code. (Ex.4.BCBS.Decl.¶25).

2.     Prescription Medication

For prescription drugs, CVS/Caremark reviews claims on the Plan's behalf. When a prescription drug is not subject to prior authorization, CVS reviews four questions: whether the beneficiary is an eligible Plan participant, whether the drug is covered for any purpose in the Plan formulary, whether the pharmacy is in-network, and whether the prescription is within quantity limits. CVS never inquires, for any participant, whether the individual is transgender. If a drug is not subject to prior authorization, CVS never learns the patient's diagnosis. (Ex.10.Korn Decl.¶¶ 4-5;PLANDEF-205466-67). CVS

and the Plan do not know whether a prescription is to treat gender dysphoria or another condition and accordingly, some medications Plaintiffs seek (*e.g.* estrogen or spironolactone) are covered by the Plan.

Some medications, however, are expensive or subject to abuse. For these medicines, CVS requires prior approval before filling a prescription. The treating physician must initiate the prior authorization process, and CVS approval is based on the diagnosis that justifies the prescription. Seven medications used for treatment of gender dysphoria require prior authorization. None of the medications are FDA-approved for treatment of gender dysphoria, and CVS denies coverage for these medications when prescribed for this purpose. (Ex.11.Neuberger.Decl.¶¶4-5;PLANDEF-205468).

3. <u>Dana Caraway's Title VII Claim</u>

In 1994, Caraway applied to be a corrections officer at Marion Correctional Institute, a Department of Public Safety facility. (Ex.12.Caraway.Dep.90:15-21). Caraway interviewed with multiple DPS employees, including an administrative assistant, the assistant warden, and the warden. (Ex.12.Caraway.91:9-13). These DPS employees "were in charge of the facility" and "seeing that it was employed and staffed." (Ex.12.Caraway.91:14-18). Within DPS, the "hiring process is handled by each individual DPS facility[,]" (Ex.13.DPS.Dep.39:16-18), and each prison facility

has a regional employment office where it submits its hiring paperwork. (Ex.13.DPS.40:1-4). The regional DPS employment offices report to DPS's Central Human Resources department. (Ex.13.DPS.40:5-14).

Exhibit 4 to Caraway's deposition includes documents related to her DPS onboarding, including her acknowledgment of the DPS policy on secondary employment; tax forms; acknowledgment of DPS memoranda titled "Conditions of Continued Employment" and "Department of Corrections Disciplinary and Grievance Policy and Procedure;" and acknowledgment that DPS prohibits employees from soliciting donations or receiving gifts or favors. (Ex.12.Caraway.Dep.Ex.4).

Caraway served as a Corrections Officer ("CO") at Marion Correctional for five years. (Ex.12.Caraway.19:18-21:2). DPS then employed Caraway as a CO at its Western Youth Institute. (Ex.12.Caraway.21:3-8). In 2006, DPS promoted Caraway to Correctional Sergeant and transferred her to Alexander Correctional Institute. (Ex.12.Caraway.22:7-10). In 2010, Caraway returned to Western Youth until DPS closed the facility in 2013, at which point she served again at Alexander Correctional. (Ex.12.Caraway.27:8-19, 28:12-14). In 2014, DPS transferred Caraway to Foothills CI, where she is currently employed. (Ex.12.Caraway.28:19-21).

All DPS "employees are expected to participate in" mandatory DPS training—which is conducted at DPS facilities—or face discipline. (Ex.13.DPS.37:12-23;48:8-13; Ex.12.Caraway.97:13-25). Caraway has received more than a thousand hours of DPS training in her career, (Ex.12.Caraway.98:21-99:6), but has not identified any training she has received from the State Health Plan.

As of 2021, Mr. Badgett, a DPS "[c]orrectional housing unit manager," monitors and supervises Caraway's job performance. (Ex.12.Caraway.99:25-100:14). DPS employee discipline is handled by DPS's "investigation process." (Ex.12.Caraway.101:6-10). "If there's wrongdoing," Caraway's DPS supervisor "could actually give you a coaching session or something within those guidelines, but with actual disciplinary action, it would go to our facility head, to region, then to DPS headquarters in Raleigh." (Ex.12.Caraway.101:13-21). The disciplinary process involves DPS employees exclusively; the Plan has no role in DPS discipline. (Ex.12.Caraway.101:22-102:11).

The decision to fire a DPS employee starts with the employee's DPS supervisor and "then go[es] up through the chain of command through the warden and superintendent." (Ex.13.DPS.34:4-8). Final approval for a termination comes from the Employee Relations Section of DPS's Central Human Resources. (Ex.13.DPS.34:1-24).

"Post orders" list specific duties that each DPS employee is "expected to carry out on a daily basis in your position." (Ex.12.Caraway.103:22-104:4). Post orders are established by DPS correctional management (*e.g.*, warden or assistant warden) and failure to follow post orders "could be a basis for discipline." (Ex.12.Caraway.104:6-15.) Since 2014, Caraway has followed the post orders describing her "responsibilities as a sergeant at Foothills Correctional Institution." (Ex.12.Caraway.104:21-24). Caraway has not identified any orders or directives that she has received from the State Health Plan.

If Caraway experiences an issue with her paycheck, which has happened "several times in [her] career," she contacts the DPS "personnel in human resources in our facility." (Ex.12.Caraway.107:3-12). Her pay stubs reflect employment by DPS. (Ex.12.Caraway.109:6-14).

Correctional Sergeants and COs must wear DPS uniforms, which are issued by and are the property of DPS. (Ex.13.DPS.44:23-45:8;Ex.12.Caraway.110:23-111:3). Correctional Sergeants and COs must also use DPS equipment: handcuffs, handcuff holster, pepper spray, pepper spray holster, baton, baton holster … firearm, firearm holster, ammunition." (Ex.13.DPS.45:9-23). (Ex.12.Caraway.111:4-14). DPS supplies Caraway's

equipment; she is not allowed to use equipment from other sources. (Ex.12.Caraway.111:16-23).

DPS provides health coverage to approximately 90% of its employees through the State Health Plan. (Ex.13.DPS.9:20-11:2). DPS employees choose whether to sign-up for coverage. They are not required to do so, and some employees are ineligible. (Ex.13.DPS.17:15-17,10:19-24). The Plan determines the amount it charges per employee each year, and the Office of the State Comptroller pays that amount. (Ex.13.DPS.10:4-11:8). DPS does not determine the health risks that the Plan will protect against or the benefits available to those who elect to participate. (Ex.13.DPS.29:22-24). DPS has had no "communications with the State Health Plan regarding" exclusion of certain gender dysphoria treatments. (Ex.13.DPS.30:14-17).

DPS requires its employees to obtain pre-approval before accepting secondary employment, and failure to do so can result in discipline. (Ex.13.DPS.51:9-22) Caraway confirmed that she understands this policy and has followed it since 1994. (Ex.12.Caraway.93:7-16). Caraway testified that, other than a recent secondary job with a clothing store, "[t]he only employer I worked for in the last 27 was … the Department of Corrections, Department of Public Safety." (Ex.12.Caraway.93:7-16). DPS further testified about the degree of control the State Health Plan exercises over Caraway:

Q.   Does the Department of Public Safety employ Sergeant Caraway?

A.   Yes -- to my knowledge.

Q.   Does the State Health Plan employ Sergeant Caraway?

A.   Not that I'm aware of.

Q.   Does the State Health Plan have the authority to hire or fire Sergeant Caraway?

A.   Not that I'm aware of.

Q.   Does the State Health Plan have the authority to supervise Sergeant Caraway?

A.   Not that I'm aware of.

Q.   Does the State Health Plan have the authority to discipline Sergeant Caraway?

A.   Not that I'm aware of.

Q.   Does the State Health Plan furnish the equipment or the place of work for Sergeant Caraway?

A.   Not that I'm aware of.

Q.   Does the State Health Plan have custody over Sergeant Caraway's personnel file?

A.   No. Not that I'm aware of.

     …

Q.   Does DPS provide corrections officers with formal and informal training?

A.   Yes.

     …

Q. And to the best of your knowledge, Sergeant Caraway only provides services to the Department of Public Safety?

A. Yes -- to the best of my knowledge.

Q. And if Sergeant Caraway provided, had a second employer, the department's policy is that she needed to get that approved prior to assuming that second task or second job?

A. Yes. That's correct.

Q. And a failure to do so is a basis for discipline by the Department of Public Safety?

A. Yes. That's correct.

(Ex.13.DPS.63:12-66:7).

## STANDARD OF REVIEW

"A district court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562,568 (4th Cir.2015)(quoting Fed.R.Civ.P.56(a)). "A dispute is genuine if a [factfinder] could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (citations and quotations omitted).

**ARGUMENT**

1.  <u>The State Health Plan is Not Liable as Plaintiff Caraway's "Employer" under the Fourth Circuit's Agency and Control Test.</u>

Title VII, 42 U.S.C. §2000e-2(a)(1), provides that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to … compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. §2000e(b). "The statute[, however,] does not define the term 'agent.'" *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177,180 (4th Cir.1998).

   A.  The State Health Plan can only be liable to Caraway under Title VII if the Plan and DPS are "joint employers."

The State Health Plan is not independently and individually liable as an "agent" of DPS. In the Fourth Circuit, agents do not incur Title VII liability because "an entity can be held liable in a Title VII action **only if it is an 'employer' of the complainant**." *Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404,408 (4th Cir.2015) (emphasis added). This unequivocal holding is in accord with the Fourth Circuit's prior decisions in *Lissau v. Southern Food*

*Service, Inc.*, 159 F.3d 177 (4th Cir.1998) and *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507,510 (4th Cir.1994).

In *Birkbeck*, the Fourth Circuit interpreted an ADEA provision that is identical to the relevant Title VII language and explicitly rejected liability for an agent of an employer. Rather, the reference to 'agent' in the Title VII definition of employer is "an unremarkable expression of *respondeat superior*—that discriminatory personnel actions taken by an employer's agent may create liability **for the employer**." *Birkbeck*, 30 F.3d at 510 (emphasis added).

In *Lissau*, the Fourth Circuit applied *Birkbeck* to reject efforts to hold "agents" separately and independently liable under Title VII. *Lissau*, 159 F.3d at 180-81. Congress's inclusion of the word "agent" in Title VII's definition of "employer" did not signal an intent to make the agent separately liable. Rather, the word was included "simply to establish a limit on an employer's liability for its employees' actions." *Lissau*, 30 F.3d at 180 (quoting *Birkbeck*, 30 F.3d at 510-11). *Lissau* reiterated that "Congress only intended **employers** to be liable for Title VII violations." *Id.* at 181 (emphasis added).

B. Caraway has failed to show that DPS and the Plan are "joint employers" under the Fourth Circuit's hybrid test.

In *Butler*, the Fourth Circuit observed that "[o]ther courts have found that two parties can be considered joint employers and therefore both be liable

under Title VII if they share or co-determine those matters governing the essential terms and conditions of employment." *Butler*, 793 F.3d at 408 (quotation omitted). The "joint employment doctrine captures instances in which multiple entities control an employee." *Id.* at 409. "Given Title VII's remedial intent, employers should not be able to avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship[,]" and "[t]he joint employment doctrine thus prevents those who effectively employ a worker from evading liability by hiding behind another entity." *Id.* at 410 (punctuation omitted). *Butler* conclusively established that "the joint employment doctrine is the law of this Circuit" and "the doctrine's emphasis on determining which entities actually exercise control over an employee is consistent with Supreme Court precedent interpreting Title VII's definitions. The "the common law element of control, drawn from the law of agency, is the principal guidepost."[4] *Id.* at 409 (citations and quotations omitted).[5]

---

[4] Whether DPS is independently liable under Title VII is irrelevant.

[5] This Court's nearly forty-year-old decision in *Crowder v. Fieldcrest Mills Inc.,* 569 F. Supp 825,827-29 (M.D.N.C.1983) considered, in dicta, the hypothetical application of the economic realities test to an insurance provider. *Butler* subsequently merged the "economic realities test" with the "control test" to form the "hybrid test," and thus *Crowder* is inapplicable. Nor are cases from circuits without the "hybrid test."

Courts within the Fourth Circuit apply the *Butler* test when, as here, it is alleged that multiple entities "exercise significant control over the same employees." *Butler*, 793 F.3d at 408; *see* Amd.Comp.¶¶178-81. To analyze when an agency relationship creates Title VII liability as a "joint employer," the Fourth Circuit combined the "control test" with the "economic realities test," instructing district courts to use a "hybrid test." *Id.* at 412-14. The hybrid test factors for the district court to consider in this case are:

(1) Whether the State Health Plan has "authority to hire and fire [Caraway];"

(2) Whether the State Health Plan has "day-to-day supervision of [Caraway]including employee discipline;"

(3) "[W]hether the putative employer [the State Health Plan] furnishes the equipment used and the place of work;"

(4) Whether the State Health Plan has "possession of and responsibility over [Caraway's] employment records, including payroll, insurance, and taxes;"

(5) "[T]he length of time during which [Caraway] has worked for the putative employer [the State Health Plan];"

(6) "[W]hether the putative employer [the State Health Plan] provides [Caraway] with formal or informal training;

(7) "[W]hether [Caraway's] duties are akin to" the regular duties of a State Health Plan employee;

(8) "[W]hether [Caraway] is assigned solely to [work for the State Health Plan];" and finally,

(9) "[W]hether [Caraway] and [the State Health Plan] intended to enter into an employment relationship."

*Butler*, 793 F.3d at 414. Though "none of these factors are dispositive" and "the common-law element of control remains the principal guidepost in the analysis," the first three factors are the "most important." *Id.*

Caraway, a 27-year veteran of DPS, presents no facts to suggest she has ever been employed by the Plan.

First, Caraway has no evidence the Plan has ever had authority to hire or fire her. As both she and DPS testified, Caraway was hired by DPS after interviewing with the warden and assistant warden at Marion Correctional Institute (two DPS employees). (Ex.12.Caraway.91:9-13;Ex.13.DPS.39:16-18). The Plan played no role in hiring, and Caraway presents no evidence the Plan could have a role in her termination if that ever were to happen. (Ex.13.DPS.34:4-21). As the Fourth Circuit explained, "which entity or entities have the power to hire and fire the putative employee, is important to determining ultimate control." *Butler*, 793 F.3d at 414. The State Health Plan exercises no control over whether DPS hires, retains, promotes, demotes, or fires Caraway. The absence of any evidence to prove this "important" hybrid-test factor demonstrates that the Plan does not exercise sufficient control over Caraway's employment. *Id.*

Second, Caraway has no evidence the Plan exercises control over her employment by supervising her in any way. Caraway's "post orders" describe the duties she "is expected to carry out on a daily basis," and these are issued by DPS managers (*e.g.* the warden or assistant warden). (Ex.12.Caraway.104:1-11;105:20-25). There is no evidence Caraway has ever been supervised by, or reported to, anyone at the State Health Plan. Further, Caraway testified that failure to follow DPS "post orders" "could be a basis for discipline." (Ex.12.Caraway.104:12-15). Yet she offered no evidence suggesting the Plan plays any role in DPS discipline. (Ex.12.Caraway.101:22-102:11) Discipline is handled by DPS's "investigation process." (Ex.12.Caraway.101:6-10). The second factor—"to what extent [Caraway] is supervised [by the State Health Plan—]is useful for determining the day-to-day, practical control of the employee." *Butler*, 793 F.3d at 414-15. The absence of any evidence for this second "important" hybrid-test factor further demonstrates the Plan does not significantly control Caraway's employment and is not her "employer," joint or otherwise.

Third, Caraway has no evidence that she ever performed work at the Plan offices, nor has she used Plan equipment to accomplish her job duties as a Correctional Sergeant. To the contrary, Caraway testified: "I don't work in Raleigh. I just work in my facility." (Ex.12.Caraway.102:9-10). Nor did she

identify any resource furnished by the Plan that she has ever used to perform her job duties. At each facility, DPS supplies her uniform and equipment. (Ex.12.Caraway.111:4-23;Ex.12.DPS.45:9-23). "The third factor, where and how the work takes place, is valuable for determining how similar the work functions are compared to those of an ordinary employee." *Butler*, 793 F.3d at 414-15. Caraway's failure to produce evidence of this "important" hybrid-test factor further proves the State Health Plan does not have "ultimate control" over Caraway and is thus not her "employer," joint or otherwise. *Id.* at 414.

Though *Butler* holds the first "[t]hree factors are the most important" in the hybrid test, *id.,* and Caraway has no evidence in support of any of them, the remaining six *Butler* factors reinforce that Caraway is not, and never has been, employed by the Plan. There is no evidence the Plan possesses any of Caraway' employment records nor that it has ever provided her job training. (Ex.12.Caraway.95:22-96:7;99:21-24;Ex.13.DPS.48:8-13;37:12-23). Caraway thus has no evidence to support the fourth and sixth hybrid-test factor.

Regarding the seventh hybrid-test factor, Caraway offers no evidence that her duties are similar to the duties of actual Plan employee. Caraway follows "post orders" prepared by the warden and management of her correctional facility. (Ex.12.Caraway104:6-11;105:20-25). In contrast, Plan employees manage implementation of the State Health Plan.

(Ex.2.Jones.69:23-25). None of Caraway's orders, nor anything she does while at work, benefits the State Health Plan. This factor weighs in favor of the Plan.

Regarding the eighth hybrid-test factor, Caraway has never been assigned to perform work for the Plan. (Ex.12.Caraway.93:7-16). There is no evidence that Caraway ever performed work to help the State Health Plan accomplish its mission of providing specific and defined health benefits to mitigate against certain health risks. This hybrid-test factor weighs against Caraway.

Finally, there is no evidence the Plan or Caraway "intended to enter into an employment relationship." *Butler*, 793 F.3d at 414. None of Caraway's initial employment documents refer to the Plan. (Ex.12.Caraway.19:15-17;89:21-25). Her monthly salary statement only shows employment with DPS. (Ex.12.Caraway.109:9-11). DPS has no evidence, regarding the fifth and ninth hybrid-test factors, that Caraway is now, or has been, employed by the Plan. (Ex.13.DPS.63:12-66:7). As Caraway explained, other than a secondary job with a clothing store, "[t]he only employer I worked for in the last 27 years was…the Department of Corrections, Department of Public Safety." (Ex.12.Caraway.93:7-16.)

Caraway fails to offer any evidence that would satisfy the Fourth Circuit's hybrid test and show that the State Health Plan exercises sufficient

control over her employment such that the Plan could be liable as a "joint employer" under Title VII. Instead, Caraway asserts that DPS has delegated "significant control over [DPS] employee health benefits" to the Plan, and the Plan's exercise of "significant control over those employees by determining" Plan benefits creates Title VII liability. Amd.Comp.¶¶178-81. This is not the law in the Fourth Circuit. Under controlling precedent, summary judgment should be granted for the Plan, and Caraway's Title VII claim should be dismissed.

2. <u>The State Health Plan is not liable under Section 1557 of the Affordable Care Act because it is explicitly excluded from Section 1557 liability by the current U.S. Department of Health and Human Services Regulation.</u>

When Plaintiffs brought suit in 2019, the U.S. Department of Health and Human Services (HHS) interpreted the statutory term "health program or activity" in §1557 to include third-party health care payors, such as the State Health Plan. *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31376, 31467 (May 18, 2016) (promulgating 45 C.F.R. §92.4). HHS has authority to promulgate regulations to implement §1557, *see* 42 U.S.C. §18116(c), and the 2016 definition included all operations of an entity "principally engaged" in "the provision or administration of … health-related coverage." 81 Fed. Reg. 31467.

In June 2020, the Department revised its rules, effective August 18, 2020. *Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority*, 85 Fed. Reg. 37160 (June 19, 2020). The Department re-defined "health program or activity" to explicitly exclude entities such as the State Health Plan. The phrase "health care program or activity" currently includes only those entities "engaged in the business of providing healthcare" and, further, "an entity principally or otherwise engaged in the business of providing health insurance **shall not**, by virtue of such provision, be considered to be principally engaged in the business of providing healthcare." 45 C.F.R. §92.3(b),(c)(2021)(emphasis added).

While the 2020 rule has been challenged in five federal district courts, and other provisions of that have been enjoined, **this provision remains in effect.** Of the district courts considering the 2020 rule, three courts concluded the plaintiffs lacked standing to challenge this portion of the regulation. *Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1,31-33 (D.D.C.2020); *Walker v. Azar*, No.20-cv-2834, 2020 WL 6363970, at *3 (E.D.N.Y. Oct. 29, 2020); *Wash. v. U.S. Dep't of Health & Hum. Servs.*, 482 F.Supp.3d 1104,1121 (W.D.Wash.2020). Two courts have allowed a challenge, but neither court has issued an injunction and both cases are stayed. *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health &*

*Hum. Servs.*, No.20-11297-PBS, 2021 WL 3667760, at \*9 (D.Mass. Aug. 18, 2021); *Boston Alliance v. HHS*, No.20-11297-PBS (Oct. 29, 2021) (denying Motion to Remand but staying further proceedings). *See also New York v. U.S. Dep't of Health & Hum. Servs.*, No.1:20-cv-05583 (S.D.N.Y. Doc. No.145, Aug. 23, 2021). *But see Religious Sisters of Mercy v. Azar*, 513 F.Supp.3d 1113,1149 (D.N.D.2021) (granting injunction to *prevent* changes to 2020 rule that are irrelevant here).

The interpretation in the HHS rule is entitled to deference under the familiar *Chevron* test. *Chevron v. NRDC*, 467 U.S. 837 (1984). Under *Chevron* step one, this court must determine whether Congress "has directly spoken to the precise question at issue" or whether, instead, the statutory term is ambiguous. *Othi v. Holder,* 734 F.3d 259,265 n.4 (4th Cir.2013). When a statutory phrase is ambiguous, *Chevron* step two asks only whether the interpretation "is based on a permissible construction of the statute." *Schafer v. Astrue,* 641 F.3d 49,54 (4th Cir.2011).

Section 1557 does not define "health program or activity," and two district courts in the Fourth Circuit have reached differing conclusions. *Compare Callum v. CVS Health Corp.*, 137 F.Supp.3d 817,849-50 (D.S.C.2015)(ambiguous) *with Fain v. Crouch*, No. CV 3:20-740,2021 WL 2657274, at \*2-4 (S.D.W.Va. June 28, 2021)(unambiguous). This disagreement

alone demonstrates the term's ambiguity. Moreover, other courts have deferred to agency interpretations that define the term 'program or activity' in other civil rights statutes. *See Victim Rts. L. Ctr. v. Cardona*, CV 20-11104, 2021 WL 3185743, at *12 (D.Mass. July 28, 2021)(agency has authority to interpret "education program or activity" under Title IX); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459,467-68 (1999)(citing regulations defining scope of Title IX).[6]

Noting the complexity of the health insurance market, and recognizing the agency's distinction elsewhere between "health insurance" and "healthcare," HHS concluded in 2020 that entities like the Plan are not subject to §1557. 85 Fed. Reg. 37172-74. Under *Chevron,* "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844. Section 1557 explicitly gave authority to HHS to "promulgate regulations to implement this section," 42 U.S.C.

---

[6] A court cannot find the same statutory term ambiguous in one case and not another. If this Court concludes "health program or activity" is unambiguous, it is also holding that HHS can never interpret that phrase, and the agency was wrong to do so in both 2016 and 2020. Moreover, any future rulemaking on the subject would be invalid. Agency regulations can limit the reach of a statute, as here, but they can also expand the statutory scheme. *Currie v. Grp. Ins. Comm'n*, 290 F.3d 1,6-7 (1st Cir.2002) (DOJ rule extending Title II of the ADA to include employment within the scope of "public services, programs, activities").

§18116(c), and this Court should defer to the current regulation and grant summary judgment, dismissing Plaintiffs' §1557 claims.

## CONCLUSION

The Fourth Circuit has repeatedly and conclusively held that Title VII claims can only be brought against a plaintiff's employer, though multiple entities can be liable as joint employers. Here, however, there is no genuine dispute as to any material fact when the Fourth Circuit's hybrid test is applied, and summary judgment for the State Health Plan on Count IV is required. Further, the current and controlling rule from the U.S. Department of Health and Human Services explicitly excludes the State Health Plan from liability under §1557. Summary judgment and the dismissal of Count III is therefore required.

Respectfully submitted, this the 30th day of November, 2021.


/s/ *John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ *Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

/s/ *Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

*- 33 -*

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the Court's word limit as calculated using the word count feature of the word processing software. Specifically, this Brief contains less than 6,250 words. This count includes the body of the brief and headings, but does not include the caption, signature lines, this certificate or the certificate of service.

This the 30th day of November, 2021.

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

mjones@belldavispitt.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will provide electronic notification to all counsel of records in this matter.

This the 30th day of November, 2021.


*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Avenue, Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
John@KnepperLLC.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A
100 N. Cherry St., Suite 600
Winston-Salem, NC 27101
T(336)722-3700;F 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com