IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,          )
                                )
            Plaintiffs,          )
                                )    No. 1:19-cv-272-LCB-LPA
        V.                       )
                                )
DALE FOLWELL, et al.,            )
                                )
            Defendants.          )
_____  )

DEPOSITION
OF
DEE JONES

IN HER INDIVIDUAL CAPACITY
and
30(b)(6) DESIGNEE FOR NC STATE HEALTH PLAN

AUGUST 3, 2021

THIS TRANSCRIPT IS NOT COMPLETE
PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

PNC PLAZA DOWNTOWN
301 Fayetteville Street, Suite 1700
Raleigh, North Carolina

Reported by: Michelle Maar, RDR, RMR, FCRR

```
 1        Q.   And in 2016, did the Plan's benefits coverage
 2   provide for blanket exclusions for treatment of gender
 3   dysphoria?
 4        A.   Yes.
 5        Q.   I would like to show you what I'm marking as
 6   Plaintiffs' Exhibit 1.
 7             (Exhibit 1 is marked for identification.)
 8             MS. RAVI:  I'll give you a moment to review the
 9   document.  I know it's lengthy.
10             MR. RULEY:  You've seen it before.
11             THE WITNESS:  I've seen it once or twice.
12   BY MS. RAVI:
13        Q.   Do you recognize this document?
14        A.   I do.
15        Q.   What is this?
16        A.   It is the 80/20 PPO Plan Benefits Booklet for the
17   period January 1 through December 31 of 2016.
18        Q.   Would you turn to the page marked as PLAN
19   DEF2711.
20             In the 2016 Plan Year, did the Plan exclude from
21   coverage treatment or studies leading to or in connection
22   with sex changes or modifications and related care?
23        A.   Yes.
24        Q.   If you could turn to the page marked PLAN
25   DEF2699.
```

```
 1              In the 2016 Plan Year, did the Plan exclude from
 2     coverage psychological assessment and psychotherapy
 3     treatment in conjunction with proposed gender
 4     transformation?
 5          A.   Yes.
 6          Q.   If I refer to these two exclusions from coverage
 7     today as the exclusions, will you know what I'm talking
 8     about?
 9          A.   Yes.
10          Q.   All right.  When was this exclusion language
11     added to the Plan documents?
12          A.   As I understand it, back into the '90s in some
13     capacity.
14          Q.   And with the exception of Plan Year 2017, has the
15     exclusion been in place continuously since it was
16     introduced?
17          A.   As I understand it, yes.
18          Q.   And is that correct for the 80/20 PPO Plan?
19          A.   Yes.
20          Q.   Is that also correct for the 70/30 PPO Plan?
21          A.   Yes.
22          Q.   And for the High-Deductible Health Plan?
23          A.   Yes.
24          Q.   Who is eligible to enroll in the State Health
25     Plan?
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Case 1:19-cv-00272-LCB-LPA   Document 137-2   Filed 11/30/21   Page 3 of 20


```
 1              In the 2016 Plan Year, did the Plan exclude from
 2     coverage psychological assessment and psychotherapy
 3     treatment in conjunction with proposed gender
 4     transformation?
 5          A.   Yes.
 6          Q.   If I refer to these two exclusions from coverage
 7     today as the exclusions, will you know what I'm talking
 8     about?
 9          A.   Yes.
10          Q.   All right.  When was this exclusion language
11     added to the Plan documents?
12          A.   As I understand it, back into the '90s in some
13     capacity.
14          Q.   And with the exception of Plan Year 2017, has the
15     exclusion been in place continuously since it was
16     introduced?
17          A.   As I understand it, yes.
18          Q.   And is that correct for the 80/20 PPO Plan?
19          A.   Yes.
20          Q.   Is that also correct for the 70/30 PPO Plan?
21          A.   Yes.
22          Q.   And for the High-Deductible Health Plan?
23          A.   Yes.
24          Q.   Who is eligible to enroll in the State Health
25     Plan?
```

```
 1        A.   State employees, teachers, public school
 2   teachers, employees of the University Systems of North
 3   Carolina, employees of the Community College System,
 4   lawmakers, and former lawmakers, some charter schools, some
 5   municipalities, and, of course, state agencies.
 6        Q.   Okay.  And by that, you mean employees of charter
 7   schools, municipalities, and state agencies?
 8        A.   Yes.
 9        Q.   Anyone else?
10        A.   No.
11        Q.   And what is the plan year?
12        A.   January 1 through December 31st.
13        Q.   All right.  Can you generally describe the
14   process by which the Plan determines benefits for a
15   subsequent plan year?
16        A.   We start with the existing benefits.  And unless
17   there are any material, or changes that the Plan has
18   decided to add, it will be the same booklet or same
19   benefits going forward.
20        Q.   How does the Plan decide whether to make changes
21   going forward?
22        A.   Starting with the overarching goal of providing
23   healthcare for its members, and recognizing that we are a
24   government plan, and recognizing that we have limited
25   funding all provided by taxpayers, we start with that.
```

1    Q.   Did you discuss this recommendation with the
2    State Treasurer?
3    A.   No.
4    Q.   Is it correct that care must be medically
5    necessary to be covered by your Plan?
6    A.   Yes.  But the Plan does not cover all medically
7    necessary treatment.
8    Q.   At the time of this draft resolution, was it the
9    Plan's position that gender transition services were
10   medically necessary care?
11            MR. RULEY:  Objection, form.
12            THE WITNESS:  Again, a lot of things are
13   medically necessary that the Plan doesn't cover.  And a lot
14   is not, it's maybe a little bit of a loaded word.  But that
15   is what it says here.
16   BY MS. RAVI:
17   Q.   I'm sorry -- could you clarify when you say that
18   is what it says here?
19   A.   It says here in the resolution that the board
20   approve medically necessary coverage.
21   Q.   Medically necessary coverage of gender transition
22   services?
23   A.   Yes.
24   Q.   Regarding the position on whether or not gender
25   transition services are medically necessary coverage, has

```
                                                              Page 69
 1          A.   That is correct.
 2          Q.   What was the basis for that reference?
 3          A.   This is the Treasurer's words.  I'm not aware of
 4    what he was referring to.  I don't disagree with it.  But
 5    these are his words.
 6          Q.   All right.  Are you aware of the Treasurer's
 7    basis for this statement?
 8          A.   No.
 9          Q.   Does the Plan believe the treatment for gender
10    dysphoria is medically uncertain?
11          A.   Yes.
12          Q.   When did this view develop?
13          A.   Please repeat.
14          Q.   When did this view develop?
15          A.   I would say over several years.  In 2016, it's
16    very clear that while the presentations had a lot of
17    supporting documentation, the basis of the sunsetting or
18    the removal of the exclusion was based on the 1557 Rule and
19    the need to keep the federal funding.
20               And the Plan at the time, the staff used and put
21    forth all sorts of other information when we just went
22    through.
23               But since that time, we have new staff, we have a
24    small staff, we manage contracts, and we have limited
25    clinical staff.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Case 1:19-cv-00272-LCB-LPA   Document 137-2   Filed 11/30/21   Page 6 of 20

1      But the people we work with, and as I already
2   mentioned the journals or whatever that I have reviewed and
3   discussions we've had with current and former board
4   members, there's a lot of uncertainty on whether or not the
5   treatments are effective.  And in some cases, maybe they
6   are.  But there's discussion in the space of the, more the
7   psychological effects and how much it's important there
8   versus the surgery, the transition surgery.
9      Q.   And what was the basis for Treasurer Folwell's
10  statement regarding the medical uncertainty?
11           MR. RULEY:  Objection, form.
12           THE WITNESS:  I don't know.
13  BY MS. RAVI:
14      Q.   Did Treasurer Folwell discuss this statement with
15  you?
16      A.   No.
17      Q.   Did Treasurer Folwell discuss this statement with
18  anyone at the Plan?
19      A.   I'm not aware of any conversations he had with
20  anybody at the Plan.
21      Q.   And does this statement from October 25th reflect
22  the views of the State Health Plan?
23      A.   Parts of it might, such as the legal and medical
24  uncertainty.
25           The Franciscan Alliance opinion came out in

1	December of 2016.  And we know there were various cases in
2	Texas I believe.
3	          So, again, I think there's legal uncertainty.  I
4	think there's medical uncertainty.  And our thoughts kind
5	of went down that direction.
6	          Plus the fact that this is such, as we already
7	went through, the Blue Cross spreadsheet that was part of
8	the record, where it's such a small part of the Plan
9	membership that this benefit would apply to.  It's a niche.
10	I call that a niche, a small population of people.
11	          And the Plan can't cover every requested benefit
12	for every single niche that comes forward, niche
13	population.  It happens all the time.
14	          You know, I have to turn down parents who want a
15	special feeding benefit for their infant children who can't
16	process food normally.
17	          I have to turn down hearing aids for a much
18	larger population of people because they're so expensive.
19	There's plenty of efficacy there, right?  It helps people
20	hear.  But the fact that they have to change hearing aids
21	every five to six years or more frequently, I can't afford
22	that as a Plan.
23	          Because if I -- I have to serve a whole entire
24	population with a very finite amount of money.  And so the
25	only thing I can really cover is the current state of

1  benefits and any benefits that might apply to a broad swath
2  of the population with a not guaranteed but a strong
3  proponent of lower costs in the future.
4      And so that's where legal and medical uncertainty
5  -- I don't have to cover medically necessary treatment.  We
6  cover a lot of it.  But in this case, we don't.
7      Q.  Prior to this statement coming out on October 25,
8  2018, did Plan staff discuss the legal uncertainty that's
9  referenced here?
10     A.  Yes.
11     Q.  Did Plan staff discuss the medical uncertainty
12  that's referenced here?
13     A.  Yes.
14     Q.  Let's turn back to Exhibit 5.  And if you can
15  turn to Page 10 of this document.
16         Plaintiffs' Interrogatory Number 3 asks the Plan
17  to discuss the factual basis for each governmental interest
18  that the Plan contends supports the exclusion.
19         Is that right?
20     A.  Yes.
21     Q.  And is it correct, turning to the next page, the
22  Plan states that the Plan has not identified any valid,
23  reliable, peer-reviewed longitudinal studies that support
24  the efficacy of the plaintiffs' desired treatment?
25     A.  I'm sorry -- where are you?

1    Q.   I am at the bottom of Page 11, last paragraph.
2    A.   Okay.
3         That would be true.
4    Q.   Is a peer-reviewed, longitudinal study that
5    supports the efficacy of treatment a prerequisite for the
6    Plan to cover a proposed benefit?
7    A.   Not necessarily.  When we evaluate, as I think we
8    said earlier, it's a holistic review.  There's no single
9    pathway to coverage.  It has to be a broad swath of
10   membership, that there's a benefit for multiple people.
11        There's a cost component to it.  There's a
12   downstream cost component to it.  There's got to be some
13   common -- not experimental for sure.
14        There's got to be some common understanding in
15   the medical community that it is a treatment that will
16   produce a downstream effect that's positive.
17        So, you know, it's very difficult to come back
18   and say well, peer-reviewed, longitudinal studies -- I'm
19   not a clinician and I'm not a researcher, so it's, you
20   know -- but to the extent that we have not found any real
21   evidence that it's absolutely black and white, this
22   particular issue.
23        You know, I think it goes, well, it should go
24   without saying this is not a personal issue for me.  I
25   don't get, I have no personal opinion about this.

1                Because I walk through the front door at the
2       office, and I'm a fiduciary.  This is all about the cost
3       and maintaining this benefit for 740,000 people who expect
4       it every single day and the retirees that have an
5       expectation of the benefit when they retire.
6                And so every decision I make -- and I'm speaking
7       for myself -- is about that.  It's all about that every
8       day.
9                It breaks my heart 9 times out of 10 when I have
10      to decline a benefit, 9 times out of 10.
11               When I see people that need hearing aids, I would
12      love to give them a hearing aid, I would love to.
13               I have nothing against transgender people.  I
14      would be more than happy to provide the benefit.  But it's
15      not my decision.  I'm a fiduciary first.  And I'm
16      responsible for 740,000 people.  This is not personal.
17      This is all about money very simply put.
18               I've been charged with reducing the costs of the
19      Plan to operate since the day I started.  And we have done
20      just that.
21               You know, there's some discussions about how much
22      money the Plan has saved.  Well, it's because we've worked
23      really hard to do that.  We've taken out all extraneous
24      benefits.
25               We used to cover benefits for a small population

```
 1        A.   Yes.
 2        Q.   So looking at all enrollees in the Plan, 15
 3   percent of those enrollees account for 85 percent of the
 4   cost of treatment?
 5        A.   Correct.
 6        Q.   Can an individual enrolled in the State Health
 7   Plan request that the State Health Plan change the pronoun
 8   associated with that enrollee?
 9        A.   Please rephrase.
10        Q.   Can an individual that's enrolled in the State
11   Health Plan request that the Plan change in its records the
12   pronoun that's associated with that individual?
13        A.   The member can change his or her own pronoun.
14        Q.   How does that process occur?
15        A.   The member logs in to eBenefits or calls into the
16   call center, benefit-focused call center, and either
17   changes it him or herself, or requests that it be changed.
18        Q.   Okay.
19        A.   It's not validated.
20        Q.   What does that mean for it not to be validated?
21        A.   You could put in whatever you want.  There's two
22   options, male or female.
23             And if I were female and put in female, I could
24   do that.  Or if I wanted to put in male, I can do that.  If
25   I make an error, I can do that too.
```

1   Q.   And you said an individual can either log in and
2   change that themselves or they can make a request that the
3   Plan make that change?
4   A.   No.  They call into the call center, talk to a
5   call center rep who will record the call.  And then they
6   can be requested to make that change.
7   Q.   To whom is that request made?
8   A.   The call center rep.
9   Q.   If a call center rep gets that kind of request,
10  what happens next?
11  A.   They comply with the request.
12  Q.   And how does that process occur?
13  A.   They go into the system and check yes or no or
14  male or female or exactly -- I guess it's male or female.
15  Q.   And prior to going into the system, is any
16  validation requested?
17  A.   Absolutely.  Whatever -- like the member would
18  call in, and there would be validation questions from the
19  call center rep back to the member to confirm any number of
20  demographic statistics.
21  Q.   What are those validation questions?
22  A.   I don't know them specifically.  But it's
23  something that would be similar to what we all do, which is
24  your address, your full name, possibly your Social Security
25  number, you know, phone numbers, whatever, to try to --

```
 1    they're a vendor.  I don't tell them how to do their job.
 2    I just tell them they have to validate it.  It's not my
 3    obligation how to exactly do it.
 4         Q.   So is it fair to say that validation is with
 5    respect to making sure that the person calling in and
 6    making this request is who they say they are?
 7         A.   Yes.
 8         Q.   Does the Plan require proof of any enrollee's
 9    chromosomes before it goes into the system and complies
10    with that question?
11         A.   No.
12         Q.   Does it require proof of an enrollee's anatomy?
13         A.   No.
14         Q.   And does it require proof of an enrollee's DNA?
15         A.   No.
16         Q.   Everything we just talked about with regard to
17    changing the pronoun in the system, does that also apply to
18    a request to change an individual enrollee's gender marker
19    in the system?
20         A.   We don't track gender markers in the system other
21    than male or female.  We only have but two options right
22    now.
23         Q.   Is participation in the Plan required for state
24    agency employees?
25         A.   No.  They have a choice.  I mean the benefit
```

1  role, but I would say we have two people, we have a real
2  actuary, Charles Seifert. And we have a financial analyst,
3  Tamera McNeal.
4     Q.  And you said it's a different perspective with
5  regard to how issues are approached with current Plan
6  staff --
7     A.  Uh-huh.
8     Q.  -- as opposed to Plan staff in 2016.
9     A.  Uh-huh.
10    Q.  Can you clarify that?
11    A.  In 2016, there was Mona and Lotta and Caroline.
12  And they seemed to make all the decisions and were
13  supported by staff and maybe some of the clinical
14  perspective that -- they actually had more clinicians back
15  in those days.
16         Today, we are a flatter staff. And we have a very
17  diverse group of experience and background and skill sets.
18  And so we bring them all to the table.
19         And we work through -- again, our focus, at the
20  direction of the Treasurer, is about making sure the Plan is
21  in existence tomorrow, in five years, in ten years.
22         And that's really hard to do when we're being
23  funded at a 4 percent or better or less level, and our trend
24  rates are at 7 percent. The math just doesn't work.
25    Q.  With regard to the Plan's current staff, is there

1    not personal.  This is not something that I get to make a
2    choice about.  Because if I had every single group that
3    comes in to ask for a benefit, if I covered that, then I
4    would be completely, completely avoiding my fiduciary
5    responsibility to cover basic health.  That's what the Plan
6    Benefits Booklet says, right?
7              The Plan Benefits Booklet identifies every single
8    thing I cover.  And it provides healthcare.  We want every
9    member of the Plan to have good healthcare.  We want the --
10   and the reality is we have a lot of members who have
11   diabetes.  We have a lot of members who have orthopedic
12   issues.  We have a lot of members who have RA.  We have
13   really a lot of members who have cancer.  And they want to
14   be, they want to be covered.
15             And so it's really difficult for me to just say,
16   you know, I can take this group of 25 and this group of 10
17   and these -- if you add all that up -- I'll, I'll totally
18   admit that the cost of this benefit is not going to break
19   the Plan, never was, never will.
20             But it -- I can't do it for that group and not do
21   it for the group that wants it for their infants, for, you
22   know, for a certain feeding formula for that infant group,
23   and I can't do it for the hearing aid group, and I can't do
24   it for the group that really wants acupuncture.
25             Because once you start adding those, then I have

1  to keep going.  Everybody who comes in and wants a benefit,
2  I'll have to do it because I can't discriminate.
3           I'm not discriminating.  This is about what the
4  Plan can afford in the environment that we're in today --
5  which is I have a General Assembly that's funding me at 4
6  percent when my trend rate is 7 plus.  And that's not even
7  absolutely certain.
8           I have a 28.8 billion unfunded liability for
9  retiree healthcare that I, myself, am ready to have in a few
10 years.
11          And so, you know, this is all about being a
12 government plan.  And I don't get to, I don't get to pick
13 and choose.  I'm not a commercial plan.
14          So let's start with that.  A commercial plan, they
15 have revenues, right?  You go out and sell widgets, and you
16 sell a lot of widgets, and then you decide how much you want
17 to put into the benefit.  And you can have your member, your
18 staff, your employees pay.
19          I would bet most employers -- I was paying 100
20 bucks when I was at Time Warner.  I was paying for the
21 family, and I wasn't fully subsidized.
22          At the State Health Plan, we've got people who, a
23 whole lot of employees have to work one week out of a month
24 just to cover their Health Plan for their family.
25          And the effort to just institute a 25 dollar

1  premium for the 70/30 Plan and a 50 dollar premium for the
2  80/20 Plan was a herculean effort.  They had never paid
3  anything until 2018.  Employees had never paid anything
4  until 2018 -- which is crazy.  I mean I get that.
5           But we can't just keep adding costs to the Plan.
6           And the General Assembly, in the 2016 budget, I
7  think it's 2016-94, something like that, said you got to
8  stop, you've got to control your costs, you're not getting
9  more than 4 percent, and you can't go over.
10          So what happens when I spend more than I've got?
11 I've got to charge employees.  And I got to charge employees
12 who, you know, read the, you know employees don't make
13 market rates.  They just don't.
14          And so it is a very tight -- I mean I live in a
15 box.  And there's not a lot of room in the box to move
16 because I have the General Assembly describing what I can
17 do.  You know, it's all -- eligibility, it's all in statute.
18 My funding is all in statute, in the budget bill.  And
19 that's one box.
20          I work with vendors who I have to make them work
21 together.  And, quite frankly, as big as we are, I got at
22 least one vendor that's not real cooperative.  And it's
23 really annoying.  But it doesn't matter -- apparently, to
24 some vendors, it doesn't matter that we're the biggest
25 Health Plan, you know, one of the biggest in the nation.

1      -- if that's okay.
2              MS. RAVI:  Alan, I think we're taking another 5
3      to 10 minute break, and then we'll be back.
4              (Off the record)
5              MR. RULEY:  I have just a few follow-up questions
6      for you.
7
8                           EXAMINATION
9      BY MR. RULEY:
10         Q.   Would you find Exhibit 1 please.  Would you turn
11     to Page 50 please.
12              Page 50 is titled What Is Not Covered?  Is that
13     right?
14         A.   That is correct.
15         Q.   And are these basically exclusions, a list of
16     exclusions?
17         A.   Yes.
18         Q.   And would you look at the fourth bullet point.
19         A.   Yes.
20         Q.   What is that exclusion?
21         A.   Any experimental drug or any drug or device not
22     approved by the Food and Drug Administration (FDA) for the
23     applicable diagnosis or treatment.
24         Q.   Then turning the page to Page 51, the fourth
25     bullet point from the bottom, what is that exclusion?

1   A.  Surgical procedures for psychological or
2   emotional reasons.
3       Q.  And would those exclusions also potentially apply
4   to coverage for gender dysphoria?
5       A.  Yes.
6       Q.  Earlier, you mentioned HBRs.  What are they again
7   please?
8       A.  Health Benefit Representatives.  They are
9   actually defined in statute.  And they work at the various
10  employing units.  I mentioned there are 408.  They are
11  liaisons to the Plan.  So the Plan teaches them, keeps them
12  apprised of the benefits being offered.  But they're
13  responsible for their employer's employees and getting them
14  enrolled and making sure they understand the processes.
15      Q.  So are they employed by the State Health Plan or
16  by others?
17      A.  By the others.
18      Q.  All right.  Thank you.
19          On costs -- would you get Exhibits 6 and 7 please.
20          Looking at Exhibit 6, for example, look at the
21  first e-mail on Exhibit 6, Page DEF61647, the January 22,
22  2017 e-mail.
23      A.  Yes.
24      Q.  And that reports, as of 1-21, a total paid of
25  287.57.