1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2    Civil Action No. 1:19-cv-00272
3
4    MAXWELL KADEL, et al.,
5                 Plaintiffs,
6        vs.
7    DALE FOLWELL, in his official
     capacity as State Treasurer of
8    North Carolina, et al.,
9                 Defendants.
10
11
12
13
           * CONFIDENTIAL ATTORNEY EYES ONLY *
14
15         VIRTUAL ZOOM VIDEOTAPED DEPOSITION OF
                  SERGEANT DANA CARAWAY
16              (Taken by Defendants)
17             Morganton, North Carolina
18             Friday, September 17, 2021
19
20
21
22
23    Reported by Andrea L. Kingsley, RPR
24
25

1          Q.    What were you studying at Piedmont

2    Community College?

3          A.    Business law.

4          Q.    You mentioned odd jobs.  Just can you

5    describe those generally?

6          A.    I worked for MDI Merchant Distributors,

7    Incorporated, filled orders for grocery stores.

8    Valdese Manufacturing and Lowes Hardware.

9          Q.    When did you decide to apply to be a

10   correctional officer?

11         A.    Sometime in 1993 I started applying.

12         Q.    Why did you start applying?

13         A.    For a career job.

14         Q.    Do you know when you were hired?

15         A.    My first day on duty was November 8,

16   1994.  So it would have been retroactive dated back

17   to -- official hire date would be November 1, 1994.

18         Q.    What was your first duty assignment as a

19   correctional officer?

20         A.    Marion Correctional Institution, 3730 F

21   unit, second shift.

22         Q.    What is F unit?

23         A.    It was a housing unit for regular

24   population and a DART unit.

25         Q.    DART, what is that?

1          A.    My last assignment at Marion would have

2     been on segregation, restrictive housing.

3          Q.    Where were you assigned after being

4     assigned to Marion?

5          A.    Lateral transfer to Western Youth

6     Institution.

7          Q.    Western what?

8          A.    Western Youth Institution.

9          Q.    Which I assume housed youth offenders?

10         A.    We had youthful offenders from 14 and

11    inmates up to 24, 25 years old.

12         Q.    What did you do there?

13         A.    Correctional officer.

14         Q.    Were you assigned to a particular unit?

15         A.    Over my five plus, six years there,

16    there wasn't much that I didn't do.  I've done from

17    regular housing to gang floors, new processing,

18    segregation, intake and processing of new inmates,

19    transportation.  Everything.  Western taught us to

20    do everything.  And worked as an acting sergeant

21    when they was short on supervisors.

22         Q.    Is it safe to say that at Western Youth

23    Institution there were not quite as defined roles

24    for correctional officers as at other facilities?

25         A.    You had defined roles as being assigned

1    to floors.  It's been so long I couldn't tell you

2    how long I spent on each floor, but I can tell you

3    there was not too many posts at that facility that

4    I did not work.

5          Q.    How long did you work at Western Youth

6    Institution?

7          A.    I left Western Youth in January of 2006.

8          Q.    Why did you leave?

9          A.    I was promoted to correctional sergeant

10    and transferred to Alexander Correctional.

11          Q.    Where were you assigned at Alexander

12    Correctional?

13          A.    I started on first shift blue unit.

14          Q.    What is blue unit?

15          A.    It was housing for close maximum custody

16    inmates and we had physically handicapped inmates

17    on part of the units that had wheelchairs or

18    physical disabilities or ailments.

19          Q.    Can you describe generally how your

20    duties changed from being a correctional officer to

21    being a sergeant?

22          A.    I went from correctional officer of

23    following state policy and procedures,

24    institutional standard operating procedures and

25    post assignment post orders to supervising inmates

Page 27

1        A.      I transferred to green unit.

2        Q.      What is green unit?

3        A.       It housed our woodworking inmates,

4    Alexander has a woodworking factory that builds

5    furniture for state industry and facilities and

6    kitchen workers.

7        Q.      How long did you do that?

8        A.      Until I transferred out in May or June,

9    April, May, June of 2010.

10        Q.      Where did you go when you transferred

11    out?

12        A.      I transferred back to Western Youth

13    Institution as a sergeant, just lateral.

14        Q.      How long were you at Western Youth

15    Institution?

16        A.      Until it's closure in 2013.

17        Q.      Then what did you do?

18        A.      When it closed, I was rifted back to

19    Alexander.

20        Q.      When you say rifted, your position was

21    terminated as a part of a reduction in force; is

22    that correct?

23        A.       No, sir.  The facility was closed and I

24    was rifted, I kept the same position and was

25    transferred into a position of same rank at

 1    Alexander and given my rift rights.

 2         Q.    What were your rift rights --

 3         A.    Rift rights was there wasn't a job

 4    closer to my home and I had one year to use the

 5    rift rights so that if a position would become

 6    available, I could use the rift rights and I would

 7    be given first priority to have a chance at the

 8    position -- facility of my choosing.

 9         Q.    Was there ever a period that you were

10    not employed by DPS?

11         A.    No.

12         Q.    So in 2013 you went back to Alexander;

13    correct?

14         A.    In 2013, yes.

15         Q.    Where were you assigned when you were

16    assigned to Alexander?

17         A.    I went back to red unit.

18         Q.    How long were you in red unit?

19         A.    I was on red unit until I used my rift

20    rights in July of 2014 and transferred to

21    Foothills.

22         Q.    Why did you transfer to Foothills?

23         A.    Foothills was a mile and a half from my

24    home.

25         Q.    What position were you assigned to at

1    you let me know?

2         A.    I'm sorry, one more time?

3         Q.    If you see a document with someone with

4    the last name Caraway that you believe does not

5    refer to you, to a relative or someone else, will

6    you let me know?

7         A.    I will.

8         Q.    The question I have, if you look down

9    here where my cursor is, it says September 23, 1994.

10        A.    Yes.

11        Q.    Other records indicate you began your

12   service as a correctional officer in November 1994,

13   and I guess I'm curious why you would sign paperwork

14   in September of that year.

15        A.    Can you roll back to the top?

16        Q.    Um-hmm.

17        A.    If you go back to the bottom.

18        Q.    Sure.

19        A.    I'm not sure.  We was opening a new

20   prison, and I was getting hired on at Marion

21   Correctional Institution and -- I don't know if

22   there's a conditional alter that I signed, but I do

23   know that my initial employment date, even within

24   the state system, shows November 8 which was

25   retroactivate back to November 1, that is to my

1    understanding.  I would say that this has something

2    to do when we're going through all the processing

3    paperwork for the months that it took or year that

4    it took to get on with the department at that time.

5         Q.    Could you describe that hiring process?

6    That was going to be my next question.  Because it

7    sounds like you -- there were meetings and the like

8    prior to your November 1994 start date.  Is that

9    correct?

10        A.    Yes.

11        Q.    So how did you find out that there were

12   positions available with the Department of Public

13   Safety?

14        A.    The department's always had vacancies.

15   That would be the easiest thing.  But I was working

16   a job and I had been trying to get on with the

17   department, and a lady by the name of Jean Walker

18   had came into the business I was working at and we

19   began talking and I found out her husband was

20   Warden Walker at Marion Correctional -- was going

21   to be Warden Walker.  And so I applied at Marion.

22   And some months later I got called up and they

23   scheduled an interview and then I got an interview,

24   and then an executive interview, and then later on

25   I was called and advised I got hired and got a job

1    within the department.

2         Q.    You said you had an interview.  Was the

3    interview with employees of Department of

4    Corrections?

5         A.    With the Department of Corrections, yes.

6         Q.    Then it was the Department of

7    Corrections.  Was the executive interview with the

8    Department of Corrections?

9         A.    The first interview was probably with an

10   administrative assistant who I don't know.  And

11   then we got an executive interview with who was

12   going to be the assistant warden, Mr. Ricky

13   Anderson, and the warden Mr. Dean Walker.

14        Q.    Were those two individuals in charge of

15   supervising the Marion Correctional Institute?

16        A.    They were in charge of the facility and

17   opening it, seeing that it was employed and

18   staffed.

19        Q.    There are some other documents here.

20   This is -- is that your signature on this page 2 of

21   this exhibit Sergeant Caraway?

22        A.    Yes.

23        Q.    Is your signature dated September 23,

24   1994?

25        A.    That would be.

Page 93

1        Q.      Where is Torrid located?

2        A.      My store is located in Hickory, North

3   Carolina, Valley Hills Mall.

4        Q.      Have you long have you worked at Torrid?

5        A.      Roughly a year and a half.  Maybe a

6   little longer.

7        Q.      Do you have any other employers that you

8   have reported to the Department of Public Safety?

9        A.      I have no other employers that you work

10  for, no.

11       Q.      Prior to your employment at Torrid, did

12  you have another employer that you reported to the

13  Department of Public Safety?

14       A.      The only employer I worked for in the

15  last 27 years other than Torrid was the Department

16  of Corrections, Department of Public Safety.

17       Q.      I will ask you again to look at the

18  exhibit or another document that appears to have

19  been signed by you on September 23, 1994.  Is that

20  correct?

21       A.      I see that, yes.

22       Q.      It acknowledges receipt of an

23  administrative memorandum entitled, "Conditions of

24  continued employment."  Do you know what memorandum

25  that refers to?

1    haven't looked at an updated policy for years.  I

2    just know that I don't take favors, honorariums,

3    donations or gifts of any type because I work with

4    the prison system.

5         Q.    I'm going to try to show you another

6    document.  I'm going to ask if you can explain this

7    document to me and its purpose.

8                   (SHP Exhibit 5, Salary Adjustment

9         Request, marked for identification, as of this

10        date.)

11        Q.    Sergeant Caraway, is this a document

12   that reflects an increase in pay for you?

13        A.    Can you scroll down please.

14        Q.    Absolutely.

15        A.    I don't know.  I don't see any increase

16   in pay on there at all so I'm not sure.

17        Q.    Do you see the language of salary

18   adjustment request?

19        A.    I see a request.  I'm not sure whether I

20   got any money out of it or not.  That may be a

21   request but that doesn't mean I got anything.

22        Q.    As a corrections officer, Sergeant

23   Caraway, are you required to maintain certification

24   with the State of North Carolina?

25        A.    Yes.

Page 96

1    Q.    What's the agency that certifies you?

2    A.    Criminal Justice Standard Commissions.

3    Q.    Do you understand that that

4    certification from the Criminal Justice Standards

5    Commission is a requirement with the Department of

6    Public Safety?

7    A.    Absolutely.

8    Q.    Does that have an annual training

9    requirement?

10    A.    It's supposed to, yes.

11    Q.    You said it's supposed to.  What does

12    that mean?

13    A.    So we actually have a leeway of two

14    years, and with COVID, the Criminal Justice

15    Standard Commission gave everybody a waiver.  So

16    there will be people that go up to three years

17    possibly without having been to their annual

18    training.  But in normal years, yes, you're

19    supposed to go yearly.

20    Q.    Who provides that training?

21    A.    The department supplies the training and

22    it's overseen in our facility by Mr. Avery, and he

23    schedules your training yearly, and then the

24    training is conducted by OSDT and our local college

25    system and they supply instructors.

1      Q.     And you participate in this training,

2    Sergeant Caraway, is that correct?

3      A.     I'm required to, yes.

4      Q.     Let's see if I can find the document I

5    want to show you next.

6                   (SHP Exhibit 6, STS History Report,

7          marked for identification, as of this date.)

8      Q.     Sergeant Caraway, can you see the

9    document on your screen marked Exhibit 6?

10     A.     Yes.  It's all real tiny.

11     Q.     I will zoom in.

12     A.     I do know what the form is, yes.

13     Q.     What is this form?

14     A.     That's a history of my training and

15   education record.

16     Q.     These are the training that we were just

17   speaking of; is that correct?

18     A.     Correct.

19     Q.     So you are required as a member -- as a

20   corrections officer in the State of North Carolina

21   to attend training; is that correct?

22     A.     I was required as a correctional officer

23   and I'm still required as a correctional sergeant

24   and front line supervisor to attend annual

25   training, yes.

1    Q.    So these are training from 2013.  But

2    these -- you testified these would have been

3    trainings arranged and provided through the

4    leadership at the institution you were at at the

5    time?

6    A.    They would have been scheduled by the

7    institution, yes, but supplied by the officer of

8    staff development training.

9    Q.    Did you have to pay for these training?

10   A.    No.  The department pays for this stuff.

11   Q.    This record, the department keeps track

12   of these trainings?

13   A.    Yes.  There should be a record all the

14   way back to 1994 to currently.

15   Q.    This record I can get as far back as --

16   1994.  So it appears your first training was blood

17   borne pathogens.

18   A.    That would have been my very first day

19   on November 8, 1994, at the incubation training

20   unit at Marion correctional.

21   Q.    That identifies -- this document which

22   only goes through 2013 identifies over a thousand

23   hours of training provided by the Department of

24   Public Safety; is that correct?

25   A.    Well, the one above it would have

Page 99

1  covered -- up through 2013, I would have
2  received -- whatever date that was on the very
3  first would have been 1,075, but that particular
4  blood borne, I received three hours of certified
5  training for.  But that 1,075 would have ended on
6  March 21, 2013, yes.
7       Q.    Sergeant Caraway, do you recognize this
8  record?
9       A.    Could you enlarge it please?  Okay, hold
10 up there.  Yeah, that would have been on training
11 that would have been completed towards the end of
12 May.
13      Q.    Would this include additional training
14 that you received that was not reflected on the
15 prior exhibit?
16      A.    Yes.
17      Q.    Again, these are trainings provided by
18 the Department of Public Safety at no expense to
19 you?
20      A.    Yes.
21      Q.    And these are requirements of
22 maintaining your employment at the Department of
23 Public Safety?
24      A.    Correct.
25      Q.    Sergeant Caraway, who is your

1    supervisor?

2         A.    Phillip Badgett.

3         Q.    What is Mr. Badgett's title?

4         A.    Correctional housing unit manager number

5    2.

6         Q.    Does Mr. Badgett provide you with an

7    annual performance evaluation?

8         A.    He's supposed to be placing in monthly

9    entries and every six months making an evaluation

10   and yearly evaluations, yes.

11        Q.    You said he's supposed to.  Has he been

12   doing that?

13        A.    I'm sure you've got my records from my

14   evaluations.  So probably not.

15        Q.    Is anybody else responsible for doing

16   performance evaluations?

17        A.    His supervisor above him is required to

18   see that he does his job.

19        Q.    If you were to be recommended for an

20   increase in pay, Sergeant Caraway, would Mr. Badgett

21   have to sign off on that?

22        A.    We haven't been given the merit-based

23   pay raises in year so the pay raises that we

24   receive would be given to us from the general

25   assembly or across the board.  Unless I have a

1    negative rating overall, I don't know if it would

2    affect my pay or not, but to the best of my

3    recollection, Mr. Badgett has made one or two total

4    monthly entries in my evaluations in the last three

5    years.

6         Q.    Does the Department of Public Safety

7    have a process to discipline employees?

8         A.    They do.

9         Q.    What is that process called?

10        A.    There is an investigation process.

11        Q.    What is Mr. Badgett's role in the

12   investigation process?

13        A.    If there's wrongdoing, he's supposed to

14   report it up.  He could actually give you a

15   coaching session or something within those

16   guidelines, but with actual disciplinary action, it

17   would go to our facility head, to region, then to

18   DPS headquarters in Raleigh, and then come back

19   down the chain and everybody would have to be in

20   agreement that that was a just punishment handed

21   out.

22        Q.    You mentioned a number of individuals or

23   institutions involved in that decision.  Are all the

24   individuals involved in that decision employees of

25   the Department of Public Safety?

1      A.      Absolutely.

2      Q.      Does anyone at the State Health Plan

3   have any role in that disciplinary process?

4      A.      I don't know.

5      Q.      Do you have any reason to believe that

6   someone at the State Health Plan does have a role in

7   that process?

8      A.      I'm going to be honest with you, I don't

9   have no idea.  I don't work in Raleigh.  I just

10  work in my facility.  So I just don't know if

11  anybody does.

12     Q.      Who is LaDonna Browning?

13     A.      She is our current Western Regional

14  manager.

15     Q.      What does LaDonna Browning do in that

16  role?

17     A.      She's over all the facilities in the

18  western half of the state.

19     Q.      So is she the supervisor of the wardens

20  for the facilities in the western half of the state?

21     A.      She is over it all.

22     Q.      Has she been in that position since

23  2014?

24     A.      No.

25     Q.      What were her prior positions?

1      A.    She was warden at Foothills Correctional

2   where I'm located at currently.

3      Q.    Was she the warden when you were

4   transferred to Foothills Correctional Institution?

5      A.    She was.

6      Q.    Does she make the final decision about

7   whether to recommend that you be transferred to

8   Foothills?

9      A.    She would have had input into whether or

10  not I was allowed to the come to the facility, but

11  I did have rift rights so I think I would have got

12  to come regardless.

13     Q.    Sergeant Caraway, what are post orders?

14     A.    Post orders are if -- I have an officer

15  assigned to work a control room, there's certain

16  responsibilities that that staff member would carry

17  out in that one post and those orders in that

18  specific post, each post would have different

19  orders so that specific post for that control room,

20  he would have orders for that spot, that's a post

21  order.

22     Q.    Do you have post orders for your

23  position?

24     A.    Yes.

25     Q.    Those are -- I want to see if I can make

1    sure I understand.  Those are the duties that you

2    are expected to carry out on a daily basis in your

3    position?

4         A.    Right.

5         Q.    Who issues post orders?

6         A.    They're set forth by the facility.  So

7    unit management would be involved, facility

8    management would be involved, and it would all have

9    to fall in guidelines with institutional standard

10   operating procedures, departmental policy and

11   procedures and state and federal laws.

12        Q.    Is failure to follow post orders a basis

13   for discipline?

14        A.    It could be a basis for discipline, it

15   could be.

16        Q.    Sergeant Caraway, can you see my screen?

17        A.    I do.

18        Q.    Is this the post order that applies to

19   your position at the Department of Public Safety?

20        A.    It appears so, yes.

21        Q.    Your testimony is that this document

22   describes your responsibilities as a sergeant at

23   Foothills Correctional Institution; is that correct?

24        A.    Correct.

25        Q.    This document is -- as you can see up

1   there, it has an issue date of July 21, 2020?

2       A.   I do see that, yes.

3       Q.   Do you believe that's the most current

4   post order?

5       A.   I'm not sure, I'm going to be honest, I

6   don't know if there's been an update since then or

7   not.

8       Q.   But that's updated by the Department of

9   Public Safety; is that correct?

10      A.   No.  If you will scroll up all the way

11  to the bottom, that would have been signed off by

12  our current warden Theresa Jordan.  So she signed

13  that one off at 7/21.  So that post order would

14  have been written in-house and had to have followed

15  all the other procedures and then signed off by our

16  institutional warden.

17      Q.   So the final signature on a post order

18  is the warden of the institution?

19      A.   At that level for that post order, yes.

20      Q.   For a post order that applies to your

21  position, it has to be signed off on by the warden?

22      A.   And it could be it was the assistant

23  warden.  I have occasionally seen assistant

24  wardens, it just depends who they're designated to

25  at the time.  But this one appears Ms. Jordan, that

1    Q.    How about the letters HBR?

2    A.    No.  Not that I can recall.

3    Q.    Sergeant Caraway, have you ever had a

4    circumstance in which there was an error in your

5    pay?

6    A.    I'm sure that's happened several times

7    in my career.

8    Q.    If there were an error in your pay

9    today, who would be the person you would go to about

10   that?

11   A.    Our personnel in human resources in our

12   facility.

13   Q.    Is there a specific person in that job?

14   A.    Well, there's four people involved.  The

15   supervisor would be Mary Carter, but she has been

16   out with -- on medical leave.  So in her place it's

17   been Ginger Murphy and maybe Bertie Bland which

18   would be her assistant.

19   Q.    What was it --

20   A.    B-E-R-T-I-E B-L-A-N-D.  And Virginia

21   Murphy would be the proper name.

22   Q.    If you had questions about whether you

23   had been paid for the hours you worked, you would

24   speak with one of those three individuals?

25   A.    Yes.

1    break because I think we've been going for quite a

2    while.

3                        (SHP Exhibit 7, Caraway Payment

4         Advice, marked for identification, as of this

5         date.)

6         Q.    Sergeant Caraway, have you seen a

7    document like this before?

8         A.    Yes.

9         Q.    Would you refer to this as your pay

10   advice?

11        A.    That would be a monthly pay stub, yes.

12        Q.    Does that include various deductions for

13   benefits; is that correct?

14        A.    Correct.

15        Q.    You mentioned SEANC dues.  Is that one

16   of the deductions there?

17        A.    That is one of the deductions.

18        Q.    It looks like at the top there is says

19   BYUP 8020 PT.  Is that the deduction for the State

20   Health Plan?

21        A.    No.  That is my monthly out-of-pocket

22   expense for the State Health Plan.

23        Q.    The deduction from your pay for the cost

24   of the State Health Plan?

25        A.    Yes.

1      Q.    SEANC insurance, what is that?

2      A.    I think I have dental insurance or

3  something through SEANC, I can't rightly remember,

4  but I have some insurance through SEANC or dental

5  or vision or something, I don't remember.

6      Q.    There is American Heritage Insurance

7  Company.  Do you know what that is, Sergeant

8  Caraway?

9      A.    I will be honest with you, I don't know

10  what that is.  I did sign up for it but I don't

11  remember what it is.

12             MR. MCINNES:  David, I think

13         Sergeant Caraway needs a break, I need a

14         break.  Should we --

15             MR. KNEPPER:  How long would you

16         like the break to be, Sergeant Caraway?  Come

17         back at 2:45?

18             THE VIDEOGRAPHER:  We're off the

19         record at 2:33 p.m.

20             (Recess taken.)

21             THE VIDEOGRAPHER:  Back on the

22         record at 2:45 p.m.

23      Q.    Sergeant Caraway, are you required to

24  wear a uniform during the performance of your duties

25  for the Department of Public Safety?

Page 111

1    A.    Yes.

2    Q.    Do you provide that uniform yourself?

3    A.    No, the department provides it.

4    Q.    Is there equipment that you are required

5    to possess as an officer with the Department of

6    Public Safety?

7    A.    Yes.

8    Q.    What is that equipment?

9    A.    Handcuffs, they give me a belt --

10   handcuffs, handcuff holster, pepper spray, pepper

11   spray holster, baton, baton holster.  If I have to

12   go out on an escape or something, transport,

13   firearm, firearm holster, ammunition.  Clothing and

14   boots.  The only thing they don't supply is socks

15   and undergarments.

16   Q.    You anticipated my second question.  The

17   Department of Public Safety supplies you with that

18   equipment; correct?

19   A.    Yes.

20   Q.    You were not free to use your own

21   equipment in lieu of that supplied by the Department

22   of Public Safety?

23   A.    No.

24   Q.    Sergeant Caraway, how long have you been

25   enrolled in the State Health Plan?

Page 126

1        A.      Correct.

2        Q.      What is your basis for that belief?

3        A.      I read the news articles and seen

4   comments that he had made on the television and

5   read his comments directly out of the News &

6   Observer, out of Raleigh, they'd been posted or

7   pasted on the internet.

8        Q.      Did you attend any meetings of the board

9   of trustees of the State Health Plan?

10       A.      No.  But I do recall that was a closed

11  door session when they decided to place -- he

12  decided to place an exclusionary rule on

13  transgender services, so had I went to Raleigh

14  regardless I wouldn't have been allowed into that

15  room to have my voice heard.

16       Q.      You believe that was the end of 2017?

17       A.      I believe that was sometime in the year

18  2017 that he would have placed the exclusionary

19  rule to go into affect in January 1, 2018.

20       Q.      Have you ever reviewed the minutes of

21  the State Board of Trustees for the North Carolina

22  State Health Plan?

23       A.      No.

24       Q.      So your belief that it was a closed

25  session where this matter was discussed is based on

**Department of State Treasurer, Retirement Systems Division**
325 North Salisbury Street, Raleigh, North Carolina 27603-1388

Exhibit
0004 SHP
Caraway

__XX__ TEACHERS' AND STATE EMPLOYEES' RETIREMENT SYSTEM
_____ LOCAL GOVERNMENTAL EMPLOYEES' RETIREMENT SYSTEM

PLEASE PRINT OR TYPE FORM AND ATTACH A PHOTOCOPY OF YOUR SOCIAL SECURITY CARD.

Name ██████ Active Register Number (To be provided by Retirement System) _____ S.S. # ██████

Address ██████ (First) ██████ (M.I.) ██████ (Last) Birthdate ██████

City ██████ State _____ Zip Code ██████ Sex: Male _____ Female ██

**CERTIFICATION BY EMPLOYER:** We certify that the above-named person is currently serving in a position which is eligible for membership in the Retirement System previously indicated.

Employer ___DEPARTMENT OF CORRECTIONS___ Employer Code _____

Membership Date _____ Position ___CORRECTIONAL OFFICER___

Authorized Signature _____ Date _____

**BENEFICIARY DESIGNATION:** (Please read carefully the information on the reverse.) I request the Board of Trustees to pay, in the event of my death prior to retirement:

A. The total amount of accumulated contributions standing to my credit in the Retirement System:

| COMPLETE NAME | ADDRESS | RELATIONSHIP | DATE OF BIRTH |
|---|---|---|---|
| Principal: ██████ | ██████ | ██████ | ██████ |
| | ██████ | | |
| Contingent: ██████ | ██████ | ██████ | ██████ |

B. The total amount of the death benefit provided under G.S. 135-5 or 128-27 to which I may be entitled.

| COMPLETE NAME | ADDRESS | RELATIONSHIP | DATE OF BIRTH |
|---|---|---|---|
| Principal: ██████ | ██████ | ██████ | ██████ |
| Contingent: ██████ | ██████ | ██████ | ██████ |

I hereby authorize the Board of Trustees to make payment to the beneficiary(ies) whom I have nominated above and agree on behalf of myself and my heirs and assigns, that payment so made shall be a complete discharge of the claim and shall constitute a release of the Retirement System from any further obligation on account of the benefit. In completing and signing this form, I acknowledge having read the information printed on the reverse. I reserve the right to change the beneficiary(ies) designated above as prescribed in the Rules and Regulations.

Signature ██████ _Caraway_ Date _Sept 23 94_

**NOTARY PUBLIC CERTIFICATION:** State of _North Carolina_ County of _McDowell_

I, as a Notary Public of the said State and County, do hereby certify that ██████ _Caraway_ personally appeared before me and executed the foregoing instrument.

Witness my hand and seal this _3rd_ day of _September_, 199_4_ (Notary Public Seal)

Signature of Notary _Ann Renee Hawkins_ My commission expires _Nov 14, 1998_

Confidential --Attorneys' Eyes Only

NCDPS 000040

```
                    ACKNOWLEDGEMENT
                  SECONDARY EMPLOYMENT
```

This is to acknowledge that I have read and understand the Department of

Correction policy of Secondary Employment.  I have also been provided with a

form in which to request approval for secondary employment

_9-23-94_

(Date)

███████████████   *Cacaw Day*

(Employee Signature)

*Robert S.*

   Witness

Confidential --Attorneys' Eyes Only

NCDPS 000043

DC-4

Unit: 3730

| FOR PAYROLL OFFICER USE ONLY | Agency Name: | | Retirement Number: |
|---|---|---|---|
| | If the answer to the question below is 'YES', please furnish the following information | | |
| | Last Date Employed by State | Wages Paid by State Subject to Soc. Sec. Withholding | Social Security Tax Withheld: |

| If a new employee, have you been employed by the state of North Carolina during the current calendar year? ☐ YES ☑ NO | Name of Previous Agency |
|---|---|

---

| Form **W-4** | **Employee's Withholding Allowance Certificate** | OMB No. 1545-0010 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | | |

| 1 Type or print your first and middle initial | Last name *Caraway* | 2 Your social security number |
|---|---|---|

Home address (number and street or rural route)

City or town, state, and ZIP code

| 4 Total number of allowances you are claiming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
|---|---|---|
| 5 Additional amount, if any, you want deducted from each pay . . . . . . . . . . . . . . . . . . . . . | 5 | $ |

6 I claim exemption from withholding and I certify that I meet **ALL** of the following conditions for exemption:
- Last year I had a right to a refund of ALL Federal income tax withheld because I had **NO** tax liability; **AND**
- This year I expect a refund of ALL Federal income tax withheld because I expect to have **NO** tax liability; **AND**
- This year if my income exceeds $500 and includes nonwage income, another person cannot claim me as a dependent.

If you meet all of the above conditions, enter the year effective and "EXEMPT" here . . . . . . . . . . . . . . . . . . . . . . ▶ | 6 | 19

7 Are you a full-time student? (**Note:** *Full-time students are not automatically exempt.*) . . . . . . . . . . . . . . . | 7 | ☐ Yes ☑ No

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate or entitled to claim the exempt status.

| Employee's signature ▶ *Caraway* | Date ▶ Sept. 23 , 19 94 |
|---|---|

| 8 Employer's name and address (**Employer:** Complete 8 and 10 only if sending to IRS) | 9 Office code (optional) | 10 Employer identification number |
|---|---|---|
| OFFICE OF THE STATE CONTROLLER, RALEIGH, N.C. 27603-8003 | | 56-6023166 |

---

| Form **NC-4** | **NORTH CAROLINA DEPARTMENT OF REVENUE** **Employee's Withholding Allowance Certificate** |
|---|---|

| 1 Type or print your first and middle initial | Last name *Caraway* | 2 Your social security number |
|---|---|---|

Home address (number and street or rural route)

City or town, state, and ZIP code

| 4 Total number of allowances you are claiming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
|---|---|---|
| 5 Additional amount, if any, you want deducted from each pay . . . . . . . . . . . . . . . . . . . . . | 5 | $ |

6 I claim exemption from withholding and I certify that I meet **ALL** of the following conditions for exemption:
- Last year I had a right to a refund of ALL State income tax withheld because I had **NO** tax liability; **AND**
- This year I expect a refund of ALL State income tax withheld because I expect to have **NO** tax liability.
- If claiming exempt, the statement is effective for one calender year only and a new statement must be completed by next February 15 and given to your employer.

If you meet all of the above conditions, the year effective and "EXEMPT" here . . . . . . . . . . . . . . . . . . . . . . . ▶ | 6 | 19

7 Are you a full-time student? (**Note:** *Full-time students are not automatically exempt.*) . . . . . . . . . . . . . . . | 7 |

I certify, under penalties provided by law, that the withholding allowance on this certificate do not exceed the amount to which I am entitled.

| Employee's signature ▶ *Caraway* | Date ▶ SAME AS ABOVE , 19 |
|---|---|

| 8 Employer's name and address (**Employer:** Complete 8 and 9 only if sending to NCDR) | 9 Employer identification number |
|---|---|
| SAME AS ABOVE | 092-100081 |

Confidential --Attorneys' Eyes Only

NCDPS 000044

MARION CORRECTIONAL INSTITUTION
# 3730

I hereby acknowledge receipt of a copy of Administrative
Memorandum: 1.07.27-88 entitled "Conditions of Continued
Employment."

I understand that it is my responsibility to become familiar with
and abide by these policies.

Also, I understand that a complete copy of the Department of
Correction Disciplinary and Grievance Policy and Procedures are
posted in the Assembly room and are available for my review.

██████████████  *Caraway*  Name (Print)

██████████████  *Caraway*  Employee's Signature

9 - 23 - 94  Date

Confidential --Attorneys' Eyes Only

REQUIREMENTS OF THE DIVISION OF PRISONS REGARDING THE ACCEPTANCE
OF COURT SUBPOENAS

I have read, understand, and have received a copy of the directive
dated October 13, 1992 issued by the Division of Prison's Deputy
Director for Operations regarding the requirements of the Division
of Prisons regarding the acceptance of court subpoenas by staff.
I understand that if I have further questions about these require-
ments, that I may contact my supervisor.

EMPLOYEE SIGNATURE: ▮▮▮▮▮▮▮▮ *Caraway*

PRINT NAME AS IT APPEARS ABOVE: ▮▮▮▮▮▮▮ *Caraway*

POSITION: ▮▮▮▮▮▮    DATE: 9-23-1994

Confidential --Attorneys' Eyes Only

NCDPS 000278



# DIVISION OF PRISONS POLICY ON GIFTS, FAVORS, HONORARIUMS AND SOLICITATION OF DONATIONS

It is the policy of the Division of Prisons to generally prohibit the acceptance or solicitation of gifts, favors or donations for personal use from individuals or other entities who are, or plan to be, conducting business with the Department of Correction.  The details of this policy may be found in Department of Correction Administrative Memorandum 1.01.03-92.  This rule applies to employees of the Division of Prisons and their immediate family.

The Department prohibits any employee from accepting honorariums for participating in activities while the employee is on duty.  The Department prohibits employees who arrange or manage contracts from soliciting or accepting donations from any source, under any circumstances.

It is the responsibility of the employee to decline offers of gifts, favors, or honorariums.  But in the event that refusal is unsuccessful and a gift, favor, or honorariums is received, the employee must report immediately in writing the facts of the matter to his/her supervisor.

Failure to comply with this policy will be considered unacceptable personal conduct as defined in the State Personnel Manual and subject to the sanctions contained therein.

I have read and understand this statement of the Department of Correction, Division of Prisons Policy on Gifts, Favors, Honorariums and Solicitation of Donations.  I understand that specific details of the above rules are described in Department of Correction Administrative Memorandum 1.01.03-92.*  If I have further questions about the policy, I understand that I may contact my supervisor or the Secretary's office directly.

*By signing below, I acknowledge receipt of a copy of this referenced memorandum.

EMPLOYEE SIGNATURE: ███████████  *Caraway*

PRINT NAME AS IT APPEARS ABOVE: ███████████  *Caraway*

POSITION #: ██████  DATE: 9-23-94

Confidential --Attorneys' Eyes Only