# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

               *Plaintiffs*,

        v.

DALE FOLWELL, et al.,

               *Defendants*.

No. 1:19-cv-00272-LCB-LPA

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THEIR CONSTITUTIONAL CLAIMS

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

NATURE OF THE CASE ............................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 2

I.      THE PARTIES................................................................................................. 2

      A.    Plaintiffs ............................................................................................ 2

      B.    Defendants ........................................................................................ 5

II.     NCSHP'S HEALTH PLANS ........................................................................ 6

      A.    The State Health Plan Structure ...................................................... 6

      B.    NCSHP Staff's Efforts to Comply with the Affordable Care Act ............................ 7

III.   THE STANDARD OF CARE FOR GENDER-AFFIRMING CARE ............................ 10

ARGUMENT ............................................................................................................. 14

I.      THE EXCLUSION VIOLATES THE EQUAL PROTECTION CLAUSE..................... 14

      A.    The Exclusion Constitutes Impermissible Discrimination Based on Sex............... 14

      B.    The Exclusion Constitutes Impermissible Discrimination Based on Transgender Status. ............................................................................. 16

      C.    The Exclusion Fails Heightened Scrutiny............................................... 16

            1.    Purported cost savings cannot excuse invidious discrimination. ................ 18

            2.    Medical consensus and FDA approval ........................................................ 19

II.     PLAINTIFFS SATISFY THE REQUIREMENTS FOR DECLARATORY AND INJUNCTIVE RELIEF............................................................................. 24

CONCLUSION ........................................................................................................ 24

i

Plaintiffs Maxwell Kadel; Jason Fleck; Connor Thonen-Fleck; Julia McKeown; Michael D. Bunting, Jr.; C.B.; and Dana Caraway (collectively, "Plaintiffs"),[1] respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment on their Equal Protection claims against Defendants Dale Folwell and Dee Jones, seeking declaratory and permanent injunctive relief.[2]

## NATURE OF THE CASE

Plaintiffs are participants in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP"). As part of compensation for employment, the State of North Carolina (the "State") provides health coverage to employees and their dependents through NCSHP. Some employees and their dependents, including Plaintiffs, however, receive less compensation than others: those who are denied coverage for the gender-affirming care that transgender people require. NCSHP contains sweeping exclusions of such care, while covering the same kinds of treatments for cisgender employees who require the treatments for other reasons. Defendants thus deny equal treatment under the law to employees who are transgender or have transgender dependents, and harm transgender family members who depend on employees for health care coverage.

---

[1] Mr. Silvaine's Equal Protection claim is moot because he no longer works for the state.

[2] Unless otherwise indicated, all exhibits are attached to the Declaration of Amy Richardson.

1

## STATEMENT OF FACTS

## I.    THE PARTIES.

### A.    Plaintiffs.

Plaintiffs are enrolled in NCSHP for health coverage.  ECF No. 85 ¶ 1.  Two

Plaintiffs are parents whose children are denied gender-affirming care, and the others are

transgender employees or dependents who are denied coverage solely because they are

transgender.  All transgender Plaintiffs have been diagnosed with gender dysphoria.  Mot.

to Seal, Brown Rep. ¶¶ 50-68; Supp. Brown Rep. ¶¶ 9-14.  Plaintiffs have been denied

care for their gender dysphoria under NCSHP's exclusions of coverage for

"[p]sychological assessment and psychotherapy treatment in conjunction with proposed

gender transformation"[3] and "[t]reatment or studies leading to or in connection with sex

changes or modifications and related care" (collectively, the "Exclusion").  Exs. 8-9.

**Plaintiff Maxwell Kadel** is enrolled in NCSHP as a University of North Carolina

("UNC") at Chapel Hill employee.  Kadel Decl. ¶¶ 2, 4, 16.  He is a 38-year-old

transgender man.  *Id.* ¶ 2.  Before his transition, Mr. Kadel experienced significant

distress as a result of his gender dysphoria.  Ex. 15, 117:2-11; Kadel Decl. ¶¶ 6, 8.  He

began hormone therapy in 2016, but because of the Exclusion, Mr. Kadel has been forced

to pay out-of-pocket.  Kadel Decl. ¶¶ 7, 9.  The Exclusion also prevented Mr. Kadel from

obtaining the chest surgery when he needed it, leading to a years-long delay while he

---

[3] While the health plans exclude coverage for psychological treatment, NCSHP's Rule
30(b)(6) designee testified that NCSHP does not enforce that exclusion.  Ex. 12, 49:8-23.

2

saved up to pay at his own expense. *Id.* ¶¶ 12-15. Mr. Kadel has an ongoing need for hormone therapy, and may seek additional surgical care in the future. *Id.* ¶ 16.

**Plaintiff Connor Thonen-Fleck** is enrolled in NCSHP as a dependent of **Plaintiff Jason Fleck**, a UNC-Greensboro employee. ECF No. 85 ¶¶ 83-84; ECF No. 96 ¶ 8. Mr. Thonen-Fleck is a 19-year-old transgender man. Thonen-Fleck Decl. ¶¶ 2-3. Until he began to transition, he experienced increasing anguish. *Id.* ¶ 5. Beginning hormone therapy and obtaining chest reconstruction surgery to masculinize his chest was life changing. Ex. 16, 102:8-19, 116:16-25; Ex. 17, 64:2-21; Thonen-Fleck Decl. ¶¶ 7, 16. Based on the Exclusion, Mr. Thonen-Fleck has been denied coverage for endocrinologist appointments, testosterone, and chest reconstruction surgery. Ex. 16, 6:23-7:11; Fleck Decl. ¶¶ 10-14. The denials invoked only the Exclusion for treatment of gender dysphoria, and no other exclusions. Fleck Decl. ¶¶ 11-12. Mr. Thonen-Fleck has an ongoing need for hormone therapy and anticipates seeking additional surgical care in the future. Thonen-Fleck Decl. ¶ 17.

**Plaintiff Julia McKeown** is enrolled in NCSHP as an employee of North Carolina State University. ECF No. 85 ¶ 94; ECF No. 96 ¶ 9. Dr. McKeown is a 45-year-old transgender woman. McKeown Decl. ¶ 2. Until she began her transition, she experienced significant distress. *Id.* ¶¶ 4-5, 9; Ex. 18, 150:11-151:4. By 2018, Dr. McKeown's medical provider referred her for vaginoplasty, and she requested preauthorization for the surgery. McKeown Decl. ¶ 9. The request was denied based only on the Exclusion for treatment of gender dysphoria and no other exclusions. *Id.* ¶¶

3

10-11. Dr. McKeown appealed that decision to Blue Cross and Blue Shield of North Carolina ("BCBSNC") but was informed that they only administer the Plan and could not resolve the issue. *Id.* ¶ 11; ECF No. 85 ¶ 96. Dr. McKeown has an ongoing need for hormone therapy and may seek additional surgical care in the future. McKeown Decl. ¶ 14.

**Plaintiff C.B.** is enrolled in NCSHP as a dependent of **Plaintiff Michael D. Bunting, Jr.**, a retiree of UNC–Chapel Hill. ECF No. 85 ¶¶ 109, 117; C.B. Decl. ¶ 19; M. Bunting Decl. ¶ 26; S. Bunting Decl. ¶ 16. C.B. is a 16-year-old transgender young man. C.B. Decl. ¶¶ 2-4. Before his transition, C.B. experienced distress associated with his birth-designated sex. Ex. 19, 35:8-22; C.B. Decl. ¶¶ 11, 13, 24; Ex. 20, 82:2-9; M. Bunting Decl. ¶ 9; S. Bunting Decl. ¶¶ 7, 12. In 2017, C.B. was diagnosed with gender dysphoria and was later prescribed puberty-delaying medication. C.B. Decl. ¶ 14; M. Bunting Decl. ¶ 14; S. Bunting Decl. ¶ 13. Because of the Exclusion, C.B.'s parents were forced to obtain additional coverage for C.B. for 2019 in order to be able to afford C.B.'s puberty-delaying medication that year. Ex. 20, 105:20-106:12; M. Bunting Decl. ¶¶ 22-23; S. Bunting Decl. ¶ 27. C.B. has also been prescribed testosterone, but coverage has been denied on multiple occasions. C.B. Decl. ¶¶ 21-22; M. Bunting Decl. ¶ 26; S. Bunting Decl. ¶¶ 30-32. C.B. has an ongoing need for hormone therapy. Ex. 20, 132:21-133:1; M. Bunting Decl. ¶ 26; S. Bunting Decl. ¶ 35. C.B.'s gender-conforming treatment has helped reduce his anxiety and brought him a great deal of relief. Ex. 19, 36:1-3; C.B. Decl. ¶¶ 15, 21, 24; M. Bunting Decl. ¶ 15; S. Bunting Decl. ¶ 14.

4

**Plaintiff Dana Caraway** is a transgender woman and Department of Public Safety employee. Caraway Decl. ¶¶ 2-3, 8; ECF No. 96 ¶ 12. She pays the same monthly premium as other State employees to enroll in the 80/20 plan. Caraway Decl. ¶¶ 16-17; ECF No. 96 ¶ 133. Until she began to transition in 2018, she had grown increasingly isolated and distressed. Ex. 22, 78:15-79:4, 79:18-80:1, 152:12-20; Caraway Decl. ¶¶ 9-14. Treating her gender dysphoria was so important that she obtained surgery in 2020 by paying for it largely out of her retirement savings. Caraway Decl. ¶¶ 23-25. BCBSNC denied coverage, citing the Exclusion as the only reason. Ex. 22, 64:6-10; Caraway Decl. ¶ 24. She paid for a second surgery and needs one more procedure to feminize her facial features, which she cannot afford on her own. Caraway Decl. ¶¶ 25-26. She also takes hormone therapy, which the Plan has covered inconsistently—both as to the medication and related visits to her practitioner. *Id.* ¶¶ 20, 28.

### B. Defendants.

**Defendant Dale Folwell** is sued in his official capacity as the North Carolina State Treasurer. ECF No. 85 ¶ 13; Ex. 11, 30:23-31:5. Defendant Folwell is Chair of NCSHP Board of Trustees (the "Board"). Ex. 11, 44:18-20; Ex. 10 at 2. His statutory duties include administering and operating NCSHP, setting benefits with Board approval, and designing and implementing coordination of benefits policies. N.C. Gen. Stat. § 135-48.30(a); Ex. 4 Admis. 4. He approves the final agenda for each Board meeting as part of the process by which NCSHP determines which benefits the plan will cover each year. Ex. 11, 44:21-45:2, 46:1-47:1; Ex. 3 Interrog. 7.

5

**Defendant Dee Jones** is sued in her official capacity as Executive Administrator of NCSHP. ECF No. 85 ¶ 14; Ex. 12, 13:6-8. She is responsible for management of the plan, Ex. 12, 14:21-23, and is statutorily authorized to negotiate, renegotiate, and execute contracts for NCSHP pursuant to N.C. Gen. Stat. § 135-48.23. Ms. Jones testified as NCSHP's 30(b)(6) designee. Ex. 12, 5:6-10.

## II.    NCSHP'S HEALTH PLANS.

### A.    The State Health Plan Structure.

NCSHP covers more than 740,000 teachers, state employees, retirees, current and former lawmakers, state university and community college personnel, state hospital staff members, and their dependents. Ex. 10 at 2; Ex. 12, 18:14; ECF No. 85 ¶ 4. NCSHP offers an 80/20 PPO Plan and a 70/30 PPO Plan that are generally available to enrollees. ECF No. 85 ¶ 48; ECF No. 96 ¶ 48. Covered services include medically necessary pharmacy benefits, mental health benefits, and medical care such as surgical benefits at inpatient and outpatient facilities. Exs. 8-9; ECF No. 85 ¶ 49; ECF No. 96 ¶ 49. Blue Cross and Blue Shield of North Carolina ("BCBSNC") serves as the third-party administrator and CVS Caremark ("CVS") administers pharmacy benefits for these plans. ECF No. 85 ¶ 48.

NCSHP's health plans all share one feature: a categorical Exclusion of coverage for gender-affirming care. Exs. 8-9. The Exclusion applies even to the very same treatments that are covered when they are medically necessary for cisgender participants, including hormone therapy, Ex. 2 Admis. 1, Ex. 5 Admis. 2; puberty-delaying hormone

6

treatment, Ex. 5 Admis. 2; mammoplasty and breast reconstruction, Ex. 2 Admis. 2, Ex. 5 Admis. 3; vaginoplasty, Ex. 2 Admis. 3; and hysterectomy, Ex. 2 Admis. 4. Because of the categorical Exclusion, transgender people are denied the opportunity to make the same individualized showing of medical necessity for treatments covered by the plan as cisgender people are permitted. Exs. 8-9.

**B.    NCSHP Staff's Efforts to Comply with the Affordable Care Act.**

In 2010, Congress enacted, as part of the Patient Protection and Affordable Care Act ("ACA"), Section 1557, 42 U.S.C. § 18116, a broad civil rights remedy meant to protect patients and other health care consumers from discrimination on the basis of race, ethnicity, sex, disability, and age. NCSHP was aware as early as summer 2016 that it needed to eliminate the Exclusion to comply with the ACA. Ex. 31; Ex. 32; Ex. 30. NCSHP retained Segal Consulting ("Segal") for guidance regarding the ACA's requirements. Ex. 35; Ex. 12, 23:8-12.

On November 29, 2016, Segal delivered a memo to Mona Moon, then-Executive Administrator of NCSHP, advising that NCSHP is "likely" a covered entity "subject to" the ACA, and that covered entities "must provide coverage for transgender health care … beginning on or after 1-1-17." Ex. 36. Segal also estimated that the new coverage would cost NCSHP between $350,000 and $850,000, or 0.011% to 0.027% of the plan's total premium. Ex. 36, PLANDEF0006965. Segal's estimate would prove to be highly accurate; NCSHP's costs for gender-affirming care for the 2017 plan year were $404,609.26, at the lower end of Segal's estimate. Ex. 3 Interrog. 10; Ex. 5 Admis. 6.

7

Beyond compliance with the ACA, NCSHP staff recommended that the Board remove the Exclusion during its December 1-2, 2016, meeting to provide "medically necessary services for the treatment of gender dysphoria." Ex. 39, PLANDEF006988; Ex. 12, 33:25-34:3. State Health Plan Medical Director Patti Forest, M.D. educated the Board about "gender dysphoria diagnostic criteria and standards of care," noting that the American Medical Association ("AMA"), American College of Physicians, and American College of Obstetricians and Gynecologists have endorsed coverage for this care. Ex. 40, PLANDEF0012825; *see also* Br. of Amicus Curiae Am. Med. Ass'n, et al. Dr. Forest also explained that "elements of care for transgender people [are] a 'medical necessity'" and "[d]elaying treatment for GID can cause and/or aggravate additional serious and expensive health problems, such as stress-related physical illnesses, depression, and substance abuse problems, which further endanger patients' health and strain the health care system." Ex. 39, PLANDEF0006971. Dr. Forest explained that the World Professional Association for Transgender Health ("WPATH") has "established internationally accepted Standards of Care" for this treatment, noting that the AMA recognizes it as a "medical necessity." *Id.* PLANDEF0006969-71.

NCSHP's then-Legal Counsel, Lotta Crabtree, further advised that if NCSHP covered this care, it would "adopt the [BCBSNC] medical policy, included in the Board material, which includes the requirements in support of medical necessity." Ex. 40, PLANDEF0012816; Ex. 12, 41:25-42:15; *see also* Ex. 43 (BCBSNC "Corporate Medical Policy, Gender Confirmation Surgery and Hormone Therapy"). NCSHP staff accordingly

8

recommended to the Board that it "remov[e] the blanket exclusions" to provide "medically necessary services for the treatment of gender dysphoria."  Ex. 39, PLANDEF006988.

Board member Dr. Cunningham subsequently moved to eliminate the Exclusion to facilitate "the provision of medically necessary services for the treatment of gender dysphoria."  Ex. 40, PLANDEF0012816.  Board member Dr. McKethan offered an amendment to eliminate the Exclusion for plan year 2017 because the ACA regulations were "the subject of litigation and may change over time."  Ex. 40, PLANDEF0012817; Ex. 12, 43:7-44:8.  The amended motion, which stated that the Exclusion would be "revisited in advance of the 2018 plan year," was approved.  Ex. 40, PLANDEF0012817.  But the Board never revisited it.  Ex. 12, 63:5-8.  The Exclusion was "reinstated on January 1, 2018" by "operation of law."  Ex. 3 Interrog. 6.

Several Plaintiffs and members of the public addressed the Board at its October 22, 2018, Board meeting and asked that the Exclusion be eliminated.  Ex. 11, 144:2-145:21.  The Board declined.  Exs. 8-9.  Three days later, on October 25, 2018, Mr. Folwell released a statement providing in relevant part:

> The legal and medical uncertainty of this elective, non-emergency procedure has never been greater.  Until the court system, a legislative body or voters tell us that we "have to," "when to," and "how to" spend taxpayers money on sex change operations, I will not make a decision that has the potential to discriminate against those who desire other currently uncovered elective, non-emergency procedures.

Ex. 48.

Defendants Folwell and Jones negotiated and approved contracts for the 2018, 2019, 2020, and 2021 health plans, which continued to exclude coverage for gender-confirming health care. ECF No. 85 ¶ 63; Exs. 8-9.

As NCSHP participants began appealing denials of coverage for hormone therapy under the Exclusion after 2017, BCBSNC—which handled the appeals—emailed NCSHP staff to complain that CVS was inaccurately denying the coverage in the first instance based on a lack of medical necessity, when it should instead be denied "based on the Plan's benefits, not based on lack of medical necessity." Ex. 49. The email noted that "the services associated with the treatment of gender dysphoria generally meet the statutory definition of medical necessity" in N.C. Gen. Stat. § 58-3-200(b), and the "pharmacy denials should be handled as lack of benefits, rather than lack of medical necessity." Ex. 49.

## III.   THE STANDARD OF CARE FOR GENDER-AFFIRMING CARE.

Gender identity is a person's internal sense of one's sex, such as male or female. Ex. 23(a) ¶ 20; Ex. 24(a) ¶ 17; Ex. 25(a) ¶ 24; Ex. 27(a) ¶ 22; Ex. 26(a) ¶ 18. Although most people are cisgender, meaning their gender identity is the same as their birth-assigned sex, transgender people have a gender identity that differs from their birth-assigned sex. Ex. 23(a) ¶ 19; Ex. 25(a) ¶ 25; *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020). Left untreated, the dissonance between one's gender identity and birth-assigned sex can be associated with clinically significant distress or significant impairment of functioning. Ex. 23, 84:16-85:7; Ex. 24, 18:12-16; Ex. 25,

10

17:18-22; Ex. 26, 18:25-19:6; Ex. 27, 18:5-19:4; Ex. 23(a) ¶ 24; Ex. 24(a) ¶ 18; Ex. 25(a) ¶¶ 29, 35; Ex. 27(a) ¶¶ 23, 38; Ex. 26(a) ¶ 62. The medical diagnosis for that incongruence and the attendant distress or impairment is gender dysphoria. Ex. 23, 84:16-85:7; Ex. 25, 18:4-6; Ex. 26, 19:12-17; Ex. 27, 18:5-19:4; Ex. 25(a) ¶¶ 29, 32; Ex. 27(a) ¶¶ 23-25; *Grimm*, 972 F.3d at 594-95. Being transgender is a normal variation of human development and "gender identity and gender incongruity … are not a matter of choice." Ex. 25(a) ¶ 69; Ex. 26(a) ¶ 21; *Grimm*, 972 F.3d at 594; *Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021) (same).

The diagnosis of gender dysphoria is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders-5th edition* ("DSM-5"). Ex. 23, 86:25-87:7; Ex. 27, 18:17-19:2; Ex. 23(a) ¶ 24; Ex. 25(a) ¶ 29; Ex. 27(a) ¶¶ 24-25; Ex. 26(a) ¶ 24. "Gender incongruence" also is codified as a diagnosis in the *International Classification of Diseases* (World Health Org. 11th revision). Ex. 26, 23:4; Ex. 25(a) ¶ 29; Ex. 26(a) ¶ 25.

The WPATH has continuously maintained *Standards of Care for the Health of Transgender, Transsexual, and Gender-Nonconforming People* (hereinafter "WPATH Standards") since 1979, publishing its most recent update, Version 7, in 2012. Ex. 23(a) ¶ 33; Ex. 24(a) ¶ 21; Ex. 25(a) ¶ 36; Ex. 27(a) ¶ 26. The WPATH Standards "represent the consensus approach of the medical and mental health community . . . and *have been recognized by various courts, including this one, as the authoritative standards of care*." *Grimm*, 972 F.3d at 595 (emphasis added; collecting authorities); Ex. 25, 99:9-15; Ex.

11

23(d) ¶¶ 80, 101; Ex. 24(a) ¶ 21; Ex. 25(a) ¶¶ 36-37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27.  In addition, the Endocrine Society has published Guidelines for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, which are consistent with the WPATH Standards.  Ex. 23(a) ¶ 33; Ex. 27(a) ¶ 28; Ex. 26(a) ¶ 28.

The AMA and other major health organizations recognize the WPATH Standards and Endocrine Society Guidelines as authoritative.  Br. of Amicus Curiae Am. Med. Ass'n, et al.; Ex. 23(d) ¶¶ 80, 101; Ex. 25(a) ¶ 37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27. BCBSNC relies on the WPATH Standards and the Endocrine Society Guidelines in its Corporate Medical Policy.  Ex. 50, KADEL00316792.  "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups."  *Grimm*, 972 F.3d at 595-96 (quote omitted).

Under the WPATH Standards, treatment for gender dysphoria may involve counseling, hormone therapy, and surgery.  Ex. 23(a) ¶ 34; Ex. 25(a) ¶ 38; Ex. 27(a) ¶ 29. Medically necessary surgical procedures treat gender dysphoria by bringing a person's body into better alignment with their gender identity, Ex. 24(a) ¶ 19; Ex. 24(b) ¶ 28; Ex. 26(a) ¶ 45, and are similar to surgical procedures performed for other diagnoses.  Ex. 24(a) ¶¶ 27, 30-31; Ex. 24(b) ¶¶ 11, 21; *see also* Ex. 49 (citing N.C. Gen. Stat. § 58-3-200(b)) (BCBSNC advised NCSHP that "the services associated with the treatment of gender dysphoria generally meet the statutory definition of medical necessity" under North Carolina law).  Hormone therapy specifically for transgender adolescents may include puberty-delaying treatment.  The beginning of puberty in transgender adolescents

12

"is often a painful and sometimes traumatic experience" as their body develops sex characteristics that are incongruent with their gender identity. Ex. 26(a) ¶ 40; *see also* Ex. 27, 82:4-22; *Grimm*, 972 F.3d at 595. Puberty-delaying treatment "essentially pauses puberty," so that an adolescent can undergo "a single, correct pubertal process" consistent with their gender identity. Ex. 26(a) ¶¶ 40, 43; Ex. 26, 63:1-4; Ex. 27, 82:4-22. "No medical care is initiated until *after* the onset of puberty," and care is provided based on "the youth's unique cognitive and emotional maturation and ability to provide a knowing and informed consent." Ex. 25(a) ¶ 74; Ex. 26(a) ¶¶ 36, 44; *see also* Ex. 26, 42:23-43:3; Ex. 27(a) ¶ 31; *Grimm*, 972 F.3d at 596 ("special considerations are taken before adolescents are provided with physical transition treatments such as hormone therapy").

"The American Medical Association [], the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that medical treatment for gender dysphoria is medically necessary and effective." Ex. 23(a) ¶ 32; Ex. 25(a) ¶¶ 42, 49, 106; Ex. 24(a) ¶ 41; Ex. 24(b) ¶ 52; Br. of Amicus Curiae Am. Med. Ass'n, et al. On the other hand, the "denial of gender affirming care is harmful to transgender people, as it exacerbates gender dysphoria and leads to negative health outcomes." Ex. 25(a) ¶¶ 57, 106; Ex. 27(a) ¶ 38.

## ARGUMENT

## I. THE EXCLUSION VIOLATES THE EQUAL PROTECTION CLAUSE.

To state an Equal Protection claim, a plaintiff must demonstrate that "he has been treated differently from others with whom he is similarly situated," either facially or as

13

"the result of intentional . . . discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). The undisputed facts show that the Exclusion—which prohibits coverage "in conjunction with proposed *gender* transformation" and "*sex* changes"—facially discriminates, obviating the need to show intent. Exs. 8-9; *see Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1027, 1030 (D. Alaska 2020) (finding "facially discriminatory policy" where state health plan excluded coverage for treatment "related to changing sex or sexual characteristics").

A.     **The Exclusion Constitutes Impermissible Discrimination Based on Sex.**

As described above, the Exclusion's explicitly sex-based terms make plain that the discrimination here is based on sex. In addition, *Bostock v. Clayton County, Georgia,* 140 S.Ct. 1731 (2020), confirms that if an employer takes an adverse action against "a transgender person who was identified as a male at birth but who now identifies as a female," but treats more favorably "an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 1741-42. This is what the Exclusion does.

Considering a similar exclusion in the Alaska state employee health plan, another U.S. District Court granted the plaintiff summary judgment, finding that where the plan "covers vaginoplasty and mammoplasty surgery if it reaffirms an individual's natal sex, but denies coverage for the same surgery if it diverges from an individual's natal sex," that constitutes "discrimination because of sex." *Fletcher v. Alaska*, 443 F. Supp. 3d

14

1024, 1030 (D. Alaska 2020); *see also Boyden v. Conlin*, 341 F. Supp. 3d 979, 995 (W.D. Wisc. 2018) (discrimination in coverage for vaginoplasty based on one's birth-assigned sex is a "straightforward" case of sex discrimination).

"[D]iscrimination against transgender people" also "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608; *see id.* at 608-09 (collecting authorities). District Courts throughout the country have found that healthcare discrimination against transgender people is rooted in impermissible stereotyping. *See, e.g.*, *Toomey v. Arizona*, No. 19-cv-00035, 2019 WL 7172144, at *5-6 (D. Ariz. Dec. 23, 2019) ("Discrimination based on the incongruence between natal sex and gender identity—which transgender individuals, by definition, experience and display—implicates the gender stereotyping prohibited by Title VII."); *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015). As *Boyden* explained, a health plan exclusion for gender-confirming care "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [birth-assigned] sex over not just personal preference, but specific medical and psychological recommendations to the contrary." 341 F. Supp. 3d at 997; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951 (W.D. Wisc. 2018).

Additionally, discrimination based on gender transition is necessarily discrimination *because of* sex. *Schroer v. Billington*, 577 F. Supp. 2d 293, 306-308 (D.D.C. 2008) (employer's "refusal to hire [plaintiff] after being advised that she planned

15

to . . . undergo[] sex reassignment surgery was literally discrimination because of . . . sex"); *accord Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016). The same is true here, because the Exclusion expressly prohibits coverage for "treatment in conjunction with proposed gender *transformation*" and "sex *changes*." Exs. 8-9 (emphasis added); *see also Flack*, 328 F. Supp. 3d at 949.

**B.    The Exclusion Constitutes Impermissible Discrimination Based on Transgender Status.**

In the Fourth Circuit, government classifications based on transgender status bear all the hallmarks of heightened scrutiny and are "at least quasi-suspect." *Grimm*, 972 F.3d at 610; *see also id.* at 611-13. Here, there is no dispute that the Exclusion discriminates based on transgender status. *See Toomey*, 2019 WL 7172144, at *6 (exclusion "singles out transgender individuals for different treatment" because "transgender individuals are the only people who would ever seek gender reassignment surgery").

**C.    The Exclusion Fails Heightened Scrutiny.**

Because the Exclusion is subject to heightened scrutiny, the burden shifts to Defendants to show that it is substantially related to an important governmental interest. *Virginia*, 518 U.S. at 533. Defendants argue that the Exclusion is justified for two reasons: as a cost-saving measure and because there is a supposed uncertainty about whether gender-affirming care is effective. Ex. 1 Interrog. 1; Ex. 5 Interrog. 3. But neither point comes close to carrying Defendants' burden under heightened scrutiny. To start, these are post-hoc justifications on which Defendants did not actually rely upon

16

when permitting the Exclusion to remain, so they are irrelevant. *Virginia*, 518 U.S. at 533 (justifications must be "genuine, not hypothesized or invented post hoc in response to litigation"). And Defendants are wrong on both points on the substance.

NCSHP's cost for gender-affirming care in 2017 was $404,609, which—compared to NCSHP's cash balance of over $1 billion in August 2018—is not even a drop in the bucket. Ex. 3 Interrog. 10; Ex. 5 Admis. 6; Ex. 11, 148:21-149:20; Ex. 11(a), PLANDEF0154481-82. Not surprisingly, NCSHP's Rule 30(b)(6) representative admitted that "the cost of this benefit is not going to break the Plan, never was, never will." Ex. 12, 104:17-19. And in any event, it is settled law that saving money does not justify discrimination, since a state may not "protect the public fisc by drawing an invidious distinction." *Mem'l Hosp. v. Maricopa* Cty., 415 U.S. 250, 263 (1974).

Defendants' "medical uncertainty" argument is also a post-hoc rationale—because NCSHP *did* provide coverage for gender-affirming care in 2017 based on medical necessity—and it is wrong on the merits too. Every legitimate professional medical organization agrees that treatment for gender dysphoria is medically necessary and effective, as evidenced by (among other things) the amicus brief filed by many of those organizations in this case. Br. of Amicus Curiae Am. Med. Ass'n, et al. Courts have recognized this as well, as recently as this year. *See*, *e.g.*, *Brandt v. Rutledge*, 2021 WL 3292057, at *4 (E.D. Ark. Aug. 2, 2021) (enjoining ban on gender-affirming medical care for adolescents, concluding that "gender-affirming treatment is supported by medical

17

evidence that has been subject to rigorous study," and noting that this is the view of "*every* major expert medical association").

### 1. Purported cost savings cannot excuse invidious discrimination.

When NCSHP eliminated the Exclusion in 2016, it knew what the care would cost, decided to eliminate the Exclusion on that basis, and ultimately incurred costs precisely as predicted—in fact, at the lower end of Segal's prediction, which represented less than 0.027% of the premium. Ex. 3 Interrog. 10; Ex. 5, Admis. 6; Ex. 36, PLANDEF006965. The cost-saving rationale also is implausible given that any savings would be negligible, if not "illusory." *See Mem'l Hosp.*, 415 U.S. at 265 (delayed medical care can cause a patient needless deterioration, requiring more expensive future care and possibly causing disability, which can strain state social services).

Defendants' witnesses did not contradict these facts. Testifying as NCSHP's 30(b)(6) designee, Ms. Jones offered: "I'll totally admit that the cost of this benefit is not going to break the Plan, never was, never will." Ex. 12, 104:17-19. Mr. Folwell was disclosed as a Rule 26(a)(2)(C) expert to testify about the Plan's "unfunded liability," and the general concerns of the plan's financial sustainability. Ex. 10 at 2-3. Nonetheless, even he admitted that he was "not sure there's a direct correlation between the unfunded liability and the exclusion." Ex. 11, 192:9-10. Additionally, minutes from the Board's December 1, 2016 meeting reflect that Financial Analyst Mark Collins advised the Board "that the State Health Plan Board is *not responsible* for the retiree health benefits liability . . . . He reiterated that while some of the Plan's programs can affect the

unfunded liability, the Board *doesn't have a responsibility* for the results." Ex. 40, PLANDEF0012812 (emphasis added). NCSHP has also undertaken initiatives to address its unfunded liability that—in contrast to the minimal cost of gender-affirming care— save in some cases hundreds of millions of dollars. Ex. 5 Interrog. 2; Ex. 12, 80:13-82:10.

Moreover, even if cost was a factor—and it is not—a state may not "protect the public fisc by drawing an invidious distinction." *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974); *see also Graham v. Richardson*, 403 U.S. 365, 374-75 (1971) (same); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974) (same). Defendants must "do more than show" that denying equal coverage to transgender people "saves money," *Shapiro*, 394 U.S. at 633—otherwise, this does nothing "more than justify [the] classification with a concise expression of an intention to discriminate." *Plyler v. Doe*, 457 U.S. 202, 227 (1982).

## 2. Medical consensus and FDA approval.

Gender-confirming medical care is both medically necessary and beneficial for transgender people with gender dysphoria. Ex. 29 at 12-10;[4] Ex. 23(a) ¶ 32; Ex. 25(a) ¶¶ 42, 49, 106; Ex. 24(a) ¶ 41; Ex. 24(b) ¶ 52. Nonetheless, NCSHP has identified "medical uncertainty" as a governmental interest, raising several purported justifications for the

---

[4] Exhibit 29 is self-authenticating as a publication issued by a public authority, Fed. R. Evid. 902(5), and is appropriate for judicial notice, *United States v. Doe*, 962 F.3d 139, 147 n.6 (4th Cir. 2020).

19

"uncertainty." Ex. 5 Interrog. 3.

First, NCSHP claims that it "has not identified any valid, reliable, peer-reviewed longitudinal studies that support the efficacy" of this care. Ex. 5 Interrog. 3. The Fourth Circuit has already accepted the WPATH Standards as "the authoritative standards of care." *Grimm*, 972 F.3d at 595. So have medical and mental health organizations across the United States. Ex. 23(d) ¶¶ 80, 101; Ex. 25(a) ¶ 37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27. And in 2016, NCSHP itself determined that enough medical certainty existed to remove the Exclusion and cover treatment for gender dysphoria. Even now, under a new administration, NCSHP's Rule 30(b)(6) designee, Ms. Jones, admitted that such studies are "[n]ot necessarily" required because NCSHP takes a "holistic view" and there is "no single pathway to coverage." Ex. 12, 72:21-73:10. Nor does Ms. Jones believe NCSHP has searched for such studies. Ex. 12, 75:9-11. When Treasurer Folwell was asked about the basis for his October 25, 2018 statement claiming "medical uncertainty" about this care, he admitted that he is not a doctor or a subject matter expert. Ex. 11, 47:15, 64:1, 66:13-14, 167:8-13. Mr. Folwell "most relied on" Board member (and his personal physician) Dr. Peter Robie to form this view, Ex. 11, 167:20-168:2, 170:8-17, but could not recall what Dr. Robie told him on this topic. *Id.* 170:24-171:2.

Dr. Robie admits he is not an expert in the diagnosis of gender dysphoria or its treatment, and has never diagnosed a patient with or treated a patient for gender dysphoria. Ex. 13, 11:12-23; *see also* Ex. 10 at 6 (disclosing that Dr. Robie "is not a specialist in the treatment of gender dysphoria, and the Defendants do not seek to qualify

him as such").  Dr. Robie testified that the medical necessity of this care is a decision

made by the patient and provider, and did not know whether this care can be medically

necessary.  Ex. 13, 36:11-37:2.

In her capacity as NCSHP's Rule 30(b)(6) designee, Ms. Jones alluded to

"uncertainty on whether or not the treatments are effective," but admitted that "in some

cases, maybe they are."  Ex. 12, 70:4-6.  Ms. Jones testified that in evaluating benefit

changes, NCSHP "use[s] a lot of research from Blue Cross or CVS or our actuary," in

addition to other sources.  Ex. 12, 18:19-19:5.  Ms. Jones also testified that she conducted

her own research on medical necessity for "[s]everal hours" in 2017, and "[p]robably

less" in 2018, but the "main go-tos" for information on this subject are BCBSNC, CVS,

and Segal.  Ex. 12, 95:5-12, 97:14-19.  BCBSNC, however, has advised Ms. Jones and

NCSHP repeatedly that this care is medically necessary. *See, e.g.*, Ex. 50 (BCBSNC

Corporate Medical Policy covers excluded care); Ex. 49 (email correspondence from

BCBSNC to NCSHP explaining that excluded care meets the statutory definition of

medical necessity); Ex. 46 (BCBSNC provided Ms. Jones with numerous "Scientific

Background and Reference Sources" relied upon by BCBSNC when it decided to cover

the excluded care).

Second, Defendants identified the lack of an "objective test" to determine who

would benefit from treatment as a justification.  Ex. 5 Interrog. 3.  But when asked about

the necessity of an objective test, Ms. Jones clarified that this would simply be "taken

into consideration" as part of NCSHP's "holistic review," and conceded that NCSHP has

not searched for any such test. Ex. 12, 76:18-77:9. Additionally, the Fourth Circuit has recognized that "transgender people constitute a discrete group with immutable characteristics," defined by a gender identity different from their birth-assigned sex, and has recounted in detail the diagnostic criteria used to diagnose gender dysphoria. *Grimm*, 972 F.3d at 594-95, 612.

NCSHP's similar concern about accurately identifying minors who are transgender is unsupported. Under heightened scrutiny, only NCSHP's actual motivations matter to the analysis, and NCSHP's admitted lack of expertise in the area and scant "research" on the Internet cannot support this claim. Ms. Jones' own sources of preferred guidance cover this care for transgender adolescents. Ex. 12, 18:19-19:5, 95:5-12, 97:14-19; Ex. 43, PLANDEF0008648 (BCBSNC's policy on coverage for puberty-delaying medication). And binding authority in this Circuit recognized the Standards of Care as authoritative in the context of an adolescent who had received gender-affirming care for gender dysphoria. *Grimm*, 972 F.3d at 595-96, 598.

Third, Defendants cited a lack of FDA approval for hormonal treatment of gender dysphoria. Ex. 5 Interrog. 3. But not only is it "common for medications to be used 'off label' across all domains of medicine," Ex. 26(a) ¶ 96, the lack of FDA approval did not prevent NCSHP from covering care during plan year 2017, and NCSHP's Rule 30(b)(6) designee admitted the Plan has covered other non-approved applications of medications.

*See* Ex. 12, 107:17-19 (testifying that the Plan covered COVID care).[5]  Moreover, as

Defendants' proffered experts admitted, it has been the FDA's position for at least three

decades that physicians may prescribe drugs on an off-label basis.  *See*, *e.g.*, Ex. 28,

223:14-232:6; *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001) ("off-

label use is generally accepted").

 Finally, NCSHP invoked as a justification the inability "to identify a reasonable

metric to distinguish the benefits sought by Plaintiffs from other uncovered medical

treatments that affect small groups within the overall Plan's population."  Ex. 5 Interrog.

3.  But clearly the metric that distinguishes the benefits at issue here is that they are

chosen for exclusion on the basis of sex.  *Grimm*, 972 F.3d at 607; *Bostock*, 140 S. Ct. at

1737 (when an employer takes an adverse action against an employee for being

transgender "[s]ex plays a necessary and undisguisable role in the decision").  The

Exclusion does not treat all plan participants the same, but instead denies coverage based

on sex and transgender status for medically necessary care while cisgender participants

receive coverage for the same care.

### 3. PLAINTIFFS SATISFY THE REQUIREMENTS FOR DECLARATORY AND INJUNCTIVE RELIEF.

 Plaintiffs satisfy the requirements for declaratory relief.  This case presents an

---

[5] *See Coronavirus Updates,* NCSHP (Mar. 23, 2021), https://perma.cc/F33T-K6UQ
(indicating NCSHP coverage for COVID vaccines as early as March 2021); *and FDA
Approves First COVID-19 Vaccine*, FDA (Aug. 23, 2021), https://perma.cc/Z9UP-RK8M
(announcing first FDA approval of a COVID vaccine in August 2021).  A "publication
purporting to be issued by a public authority" is self-authenticating.  Fed. R. Evid.
902(5).

"actual controversy," allowing the Court to declare the rights of the parties. 28 U.S.C. § 2201(a).

Plaintiffs also satisfy the four criteria for permanent injunctive relief. First, the denial of Plaintiffs' constitutional rights constitutes irreparable harm. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). Second, no monetary damages can restore Plaintiffs to their rightful position of being able to access medical care at the time they need it or undo the deprivation of equal treatment under law. Third, the balance of the hardships tips sharply in Plaintiffs' favor. NCSHP negotiates reduced rates and covering Plaintiffs at those lower rates would save NCSHP and taxpayers money, instead of compensating Plaintiffs for the full price charged by providers without those negotiated discounts. Ex. 12, 47:11-48:4. Finally, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

## CONCLUSION

The Exclusion is discriminatory on its face and it denies Plaintiffs equal treatment under the law. The Court should grant summary judgment, declare that the Exclusion violates Equal Protection, and permanently enjoin Defendants from enforcing it.

24

Dated: November 30, 2021                    Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
TRANSGENDER LEGAL DEFENSE AND
    EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

Lauren H. Evans*
McDermott Will & Emery
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1) because the body of this brief, including headings and footnotes, does not exceed 6,250 words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com