# DECLARATION OF MICHAEL D. BUNTING, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MAXWELL KADEL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DALE FOLWELL, in his official capacity as State Treasurer of North Carolina, *et al.*, <br><br> *Defendants*. | No. 1:19-cv-00272-LCB-LPA <br><br> **DECLARATION OF MICHAEL D. BUNTING, JR.** |

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I am a plaintiff in the above-captioned action. I have actual knowledge of the matters stated in this declaration.

2. I am the father of Plaintiff C.B., a 16-year-old boy. I live in Chapel Hill, North Carolina.

3. I was a long-term employee of the University of North Carolina at Chapel Hill ("UNC"). I retired from UNC in April 2019.

4. I was employed fulltime by UNC for 28 and a half years, beginning in September 1990 until my retirement in April 2019. My last position with UNC was Associate Athletic Director for Facilities Planning.

1

5. As a retired North Carolina state employee, I am enrolled for health coverage through the North Carolina State Health Plan. I enrolled in the NCSHP effective October 1, 1990 as a state employee. As my dependent, C.B. is also enrolled in health coverage through NCSHP.

6. C.B., my son, is a boy. He is also transgender. C.B. was designated "female" at birth but has a male gender identity. C.B. is a junior in high school.

7. As I look back, I believe that C.B. has always understood himself to be a boy.

8. Ever since he was a young child, even when he was as young as six years old, C.B. would reject stereotypically female clothing and would dress in a more masculine manner. In late 2016, he began wearing a short, typically masculine haircut.

9. Though C.B. always got along with people and has many friends, he exhibited high levels of anxiety and depressive behaviors that concerned me as his father. C.B. exhibited low grade anger and a short temper over innocuous things, as well as a general unhappiness. His mother and I later came to understand that these behaviors were associated with C.B.'s untreated gender dysphoria.

10. In early 2017, C.B. informed us that he was transgender. It was evident that the knowledge of his true identity was a burden he had carried for many years, causing his anxiety and depressive behavior. C.B.'s openness about his gender appeared to be very freeing for him.

11. Soon after, C.B., his mother, and I, met with a therapist in April 2017. After consultation with the therapist, C.B. asked to be placed on treatment to delay the onset of puberty, which was causing him anxiety.

12. In April of 2017, C.B., Ms. Bunting and I, sought an appointment with the Duke Child and Adolescent Gender Care Clinic ("Duke"), ultimately scheduled for August 2017.

13. During the summer of 2017, C.B. socially transitioned to living as his true self, informing friends and family of his male gender identity, wearing more masculine clothes, and living openly as the boy he is. However, as his breasts began to develop during the summer, C.B. began to experience additional anxiety.

14. As a result of the distress associated with his birth-designated sex, C.B. was diagnosed with gender dysphoria. In August 2017, C.B. began obtaining care from medical and mental health professionals and was prescribed puberty-delaying treatment, in the form of an implant, as part of his treatment for gender dysphoria.

15. Following the beginning of C.B.'s treatment, we noticed that the anxiety he had been experiencing diminished and that he was now a more happy, outgoing, and personable teenage boy.

16. C.B. is treated and known as a boy at school and in all other aspects of his life. He legally changed his name to his current more typically male name in the Spring of 2018.

17. Because in 2017 the NCSHP did not contain an exclusion for gender-confirming health care, C.B.'s puberty-delaying treatment was covered by the NCSHP.

18. C.B.'s puberty-delaying implant only lasted 12 to 18 months. Accordingly, C.B. needed the implant to be removed and replaced in early 2019.

19. However, in mid-2018, Ms. Bunting learned of the reinstitution of the Exclusion of coverage for gender-confirming care within the NCSHP.

20. Worried that we could not afford out-of-pocket the puberty-delaying treatment that C.B. needed, Ms. Bunting and I communicated with the NCSHP Board of Trustees, urging them to once again eliminate the Exclusion of gender-confirming health care within the NCSHP, with no success.

21. Without coverage, the puberty-delaying implant for C.B. would have cost thousands of dollars.

22. In mid-December 2018, following the lack of action by the NCSHP Board of Trustees at their December 2018 meeting to eliminate the Exclusion, Ms. Bunting and I decided to purchase an additional health insurance plan with that would cover puberty-delaying treatment for C.B. Through the federally run ACA health care exchange we purchased a separate insurance plan for C.B. from Blue Cross Blue Shield of North Carolina. Though C.B. and I remained enrolled in the NCSHP and will continue to do so, purchasing additional coverage for C.B. was necessary in order for my family to

4

be able to afford C.B.'s gender-confirming care. As a result, Ms. Bunting and I had to pay an additional monthly premium and a $6,750.00 deductible for C.B., separate and apart from C.B.'s existing coverage under the NCSHP.

23. In early 2019, C.B. began obtaining puberty-delaying treatment via injection, rather than a longer-lasting implant, because that was the only puberty-delaying treatment on the formulary of the additional health insurance purchased to supplement the coverage under the NCSHP. In March 2019, C.B. also began obtaining hormone therapy as treatment for his gender dysphoria.

24. The additional costs associated with C.B.'s gender-confirming care and the lack of coverage under the NCSHP due to the discriminatory Exclusion were a significant contributing factor in my decision to retire from UNC in 2019.

25. At the time of my decision to retire, Ms. Bunting and I had just learned of the Exclusion and were faced with a potential medical bill for hormone blockers in excess of $29,000 that we did not know how we could afford. I retired and took another job in an effort to increase my income sufficiently to better afford C.B.'s gender-confirming care.

26. C.B. and I remain enrolled in the NCSHP as a dependent and retiree, respectively, following my retirement on April 1, 2019. C.B. now receives masculinizing hormone therapy as part of his gender-confirming care, which he began in 2019. While

the family no longer purchases separate ACA coverage for C.B., C.B.'s hormone therapy is not covered by the NCSHP and we must pay for that care out-of-pocket.

27. As a retired North Carolina state employee, I am enrolled in the NCSHP and receive health care benefits from this plan as part of my compensation. As a dependent of mine, C.B. is also enrolled in the NCSHP. I contributed $700 each month to the plan this past year. Even though I receive inferior coverage because of the Exclusion for gender-affirming care, I pay the same amount towards coverage as other members of the NCSHP.

28. The lack of access to coverage through the state health plan has been a serious barrier at different points to helping C.B. be happy and healthy, and has imposed significant stress on our family.

29. The Exclusion discriminates against and stigmatizes C.B. as a transgender person which has impacted me and my family financially and emotionally, causing us to experience ongoing stress, anxiety, and uncertainty. I lost countless hours of sleep worrying for my son, who I love and support, and how we would pay for his gender-confirming care. Further, the uncertainty caused by the Exclusion contributed in large part to me, a lifelong Tar Heel, leaving my dream job at UNC.

I declare under the penalty of perjury that the foregoing is true and correct.

6

DATED: November 22, 2021          *Michael D. Bunting, Jr.* (signature)

                                  Michael D. Bunting, Jr.

Subscribed and sworn before me, a Notary Public in and for the Orange County, State of North Carolina, this 22ⁿᵈ day of November, 2021.

[Notary Seal: KATIE E NEUMANN, NOTARY PUBLIC, ORANGE COUNTY, NC]

*Katie G Neumann* (signature)

Signature of Notary