# DECLARATION OF AMY RICHARDSON

## PART I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

*Plaintiffs*,

v.

DALE FOLWELL, et al.,

*Defendants*.

No. 1:19-cv-00272-LCB-LPA

## DECLARATION OF AMY RICHARDSON

I, Amy Richardson, do hereby declare as follows:

1.      I am more than 18 years of age, have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the matters set forth herein.

2.      I am a partner with Harris, Wiltshire & Grannis LLP, and counsel for Plaintiffs in this matter.  I submit this declaration in support of Plaintiffs' Motions for Summary Judgment.

3.      Attached to this declaration are true and correct copies of the documents listed in the table below.  Entries in the table indicate where documents have been excerpted, or have had highlighting applied to indicate the relevant portions of the document.

1

4.      Sensitive, protected, and/or irrelevant information has been redacted on certain pages of the attached exhibits in accordance with Federal Rule of Civil Procedure 5.2(a) and Local Rule 5.4(a)(3), with black boxes placed over the redacted text.

| Exhibit | Description |
|---|---|
| 1 | Excerpt of Objs. and Resps. of Defs. Dale Fowell and Dee Jones to Pls.' First Set of Interrogs., Sept. 3, 2020 |
| 2 | Am. Objs. and Resps. of Defs. Dale Folwell and Dee Jones to Pls.' Am. First Set of Requests for Admis., Sept. 29, 2020 |
| 3 | Excerpt of Am. Resps. and Objs. of Defs. Dale Folwell and Dee Jones to Pls.' First Set of Interrogs., Oct. 9, 2020 |
| 4 | Excerpt of Objs. and Resps. of Defs. Dale Folwell and Dee Jones to University Defs' First Set of Reqs. for Admis. and Interrogs., Feb. 10, 2021 |
| 5 | Excerpt of Objs. and Resps. of Def. North Carolina State Health Plan for the Teachers and State Employees to Pls.' First Reqs. for Admis., Interrogs., and Reqs. for Produc. of Docs. and Things, July 9, 2021 |
| 6 | Excerpt of Def. North Carolina Department of Public Safety's Resp. to Pls'. First Set of Interrogs., June 18, 2021 |
| 7 | Excerpt of Def. North Carolina Department of Public Safety's Resp. to Pls'. First Set of Req. for Admis., June 18, 2021[1] |
| 8 | Composite of excerpts from 70/30 PPO Plan Benefits Booklets, 2016-2021, with yellow highlighting applied to relevant portions |
| 9 | Composite of excerpts from 80/20 PPO Plan Benefits Booklets, 2016-2021, with yellow highlighting applied to relevant portions |

---

[1] The title of this document appears to mistakenly refer to "Interrogatories" instead of "Requests for Admission."

| Exhibit | Description |
|---|---|
| 10 | Disclosure of Expert Witnesses Who Do Not Provide a Written Report Pursuant to Fed. R. Civ. P. 26(a)(2) by Defs. Dale Folwell, Dee Jones and the North Carolina State Health Plan for Teachers and State Employees, May 1, 2021 |
| 11 | Excerpt of Dep. Tr. of Dale Folwell |
| 11(a) | Excerpt of Ex. 14 to Dep. Tr. of Dale Folwell, "Financials Update," Oct. 22, 2018, PLANDEF0154431, 0154481-82 |
| 12 | Excerpt of Dep. Tr. of Dee Jones, Rule 30(b)(6) Designee of NCSHP |
| 13 | Excerpt of Dep. Tr. of Dr. Peter Robie, M.D. |
| 14 | Excerpt of Dep. Tr. of Becki Johnson, Rule 30(b)(6) Designee of N.C. Dept. of Public Safety |
| 15 | Excerpt of Dep. Tr. of Pltf. Maxwell Kadel |
| 16 | Excerpt of Dep. Tr. of Pltf. Connor Thonen-Fleck |
| 17 | Excerpt of Dep. Tr. of Pltf. Jason Fleck |
| 18 | Excerpt of Dep. Tr. of Pltf. Julia McKeown |
| 19 | Excerpt of Dep. Tr. of Pltf. C.B. |
| 20 | Excerpt of Dep. Tr. of Pltf. Michael D. Bunting, Jr. |
| 21 | Excerpt of Dep. Tr. of Pltf. Sam Silvaine |
| 22 | Excerpt of Dep. Tr. of Pltf. Dana Caraway |
| 23 | Excerpt of Dep. Tr. of Dr. George R. Brown, M.D. |
| 23(a) | Expert Report of Dr. George R. Brown, M.D., DFAPA, entered as Ex. 1 to Dep. Tr. of Dr. George R. Brown, M.D., DFAPA |

| Exhibit | Description |
|---------|-------------|
| 23(b) | Bibliography to Expert Report of Dr. George R. Brown, M.D., DFAPA, entered as Ex. 14 to Dep. Tr. of Dr. George R. Brown, M.D., DFAPA |
| 23(c) | Supp. Expert Report of Dr. George R. Brown, M.D., DFAPA, entered as Ex. 2 to Dep. Tr. of Dr. George R. Brown, M.D., DFAPA |
| 23(d) | Expert Rebuttal Report of Dr. George R. Brown, M.D., DFAPA, entered as Ex. 3 to Dep. Tr. of Dr. George R. Brown, M.D., DFAPA |
| 23(e) | C.V. of Dr. George R. Brown, M.D., DFAPA, entered as Ex. 5 to Dep. Tr. of Dr. George R. Brown, M.D., DFAPA |
| 23(f) | Corrected bibliography to Dr. Brown's expert rebuttal report, served on Defendants on July 1, 2021 |
| 24 | Excerpt of Dep. Tr. of Dr. Loren S. Schechter, M.D. |
| 24(a) | Expert Report of Dr. Loren S. Schechter, M.D. (including attached bibliography), entered as Ex. 4 to Dep. Tr. of Dr. Loren S. Schechter, M.D. |
| 24(b) | Expert Rebuttal Report of Dr. Loren S. Schechter, M.D. (including attached bibliography), entered as Ex. 7 to Dep. Tr. of Dr. Loren S. Schechter, M.D. |
| 24(c) | C.V. of Dr. Loren S. Schechter, entered as Ex. 2 to Dep. Tr. of Dr. Loren S. Schechter, M.D. |
| 25 | Excerpt of Dep. Tr. of Dr. Randi C. Ettner, Ph.D. |
| 25(a) | Expert Rebuttal Report of Dr. Randi C. Ettner, Ph.D., entered as Ex. 1 to Dep. Tr. of Dr. Randi C. Ettner, Ph.D. |
| 25(b) | C.V. of Dr. Randi C. Ettner, Ph.D., entered as Ex. 2 to Dep. Tr. of Dr. Randi C. Ettner, Ph.D. |
| 25(c) | Bibliography to Dr. Ettner's expert rebuttal report, entered as Ex. 3 to Dep. Tr. of Dr. Randi C. Ettner, Ph.D. |

| Exhibit | Description |
|---|---|
| 26 | Excerpt of Dep. Tr. of Dr. Johanna Olson-Kennedy, M.D., M.S. |
| 26(a) | Expert Rebuttal Report of Dr. Johanna Olson-Kennedy, M.D., M.S., entered as Ex. 1 to Dep. Tr. of Dr. Johanna Olson-Kennedy, M.D., M.S. |
| 26(b) | C.V. of Dr. Johanna Olson-Kennedy, M.D., M.S., entered as Ex. 2 to Dep. Tr. of Dr. Johanna Olson-Kennedy, M.D., M.S. |
| 26(c) | Corrected bibliography to Dr. Olson-Kennedy's expert rebuttal report, served on Defendants on September 24, 2021 |
| 27 | Excerpt of Dep. Tr. of Dr. Dan H. Karasic, M.D. |
| 27(a) | Expert Rebuttal Report of Dr. Dan H. Karasic, M.D., entered as Ex. 2 to Dep. Tr. of Dr. Dan H. Karasic, M.D. |
| 27(b) | C.V. of Dr. Dan H. Karasic, M.D., entered as Ex. 1 to Dep. Tr. of Dr. Dan H. Karasic, M.D. |
| 27(c) | Corrected bibliography to Dr. Karasic's expert rebuttal report, served on Defendants on September 24, 2021 |
| 28 | Excerpt of Dep. Tr. of Patrick Lappert, M.D. |
| 29 | National Academies of Sciences, Engineering, and Medicine, *Understanding the Well-Being of LGBTQI+ Populations* (2020), introduced as Ex. 12 to Dep. Tr. of Paul W. Hruz, M.D. |
| 30 | Email chain re: "time to talk on Tuesday?," May 27, 2016, PLANDEF0136562-63 |
| 31 | Email from Lotta Crabtree re: "Coverage for gender dysphoria," July 5, 2016, PLANDEF000076540-41 |
| 32 | Email chain re: "1557," July 14, 2016, KADEL00152143-44 |
| 33 | "DST POLICIES AND PROCEDURES, Section 1557 Grievance Procedure," July 15, 2016, PLANDEF0012787-92 |

| Exhibit | Description |
|---|---|
| 34 | Email chain re: "Bullet points for the BOT," July 27, 2016, KADEL00136645-46; attachment titled, "Affordable Care Act – Section 1557 Final Rule," KADEL00136650 |
| 35 | Letter of Agreement with the Segal Company for assistance related to compliance with Sect. 1557, Nov. 1, 2016, PLANDEF0008908-10 |
| 36 | Memo. to Mona Moon from Segal Consulting re: "Transgender Cost Estimate," Nov. 29, 2016, PLANDEF0006964-65 |
| 37 | Email chain re: "1557 draft statement" Nov. 29, 2016, PLANDEF0016424-26 |
| 38 | Email chain re: "Inclusion of Sex Change Surgery on Plan?," Dec. 1, 2016, PLANDEF0007946-48 |
| 39 | Slides presented to Board of Trustees entitled, "Affordable Care Act – Section 1557 Requirements, Coverage for Gender Dysphoria," Dec. 2, 2016, PLANDEF0006966-89 |
| 40 | Minutes for meeting of Board of Trustees, Dec. 1-2, 2016, PLANDEF0012810-22 |
| 41 | Email chain re: "State Health Plan board to cover gender reassignment surgery," Dec. 6, 2016, PLANDEF0007133-40 |
| 42 | Email chain re: "WUNC: Gender Dysphoria Coverage (noon deadline)," Dec. 8, 2016, PLANDEF0029555-57, email chain with Mona Moon and Brad Young |
| 43 | BlueCross BlueShield of North Carolina Corporate Medical Policy, "Gender Affirmation Surgery and Hormone Therapy," Jan. 1, 2017, PLANDEF0008644-52 |
| 44 | Email from Chris Almberg re: "ACA Section 1557 Compliance Questionnaire," March 30, 2017, with attachment, KADEL00223708-13 |
| 45 | Email chain re: "Hold Harmless," Aug. 4, 2017, PLANDEF0069016 |

6

| Exhibit | Description |
|---------|-------------|
| 46 | Email chain re: "Medical Policy Development," Sept. 28, 2017, PLANDEF0073378-81 |
| 47 | Email chain re: "Gender Transition Services Amendment," Dec. 6, 2017, PLANDEF0071731-32; attachment, "Amendment to Third Party Administration Services Contract," PLANDEF0030342 |
| 48 | Email from Lorraine Munk re: "Message from Treasurer Folwell," Oct. 25, 2018, PLANDEF0028665-66 |
| 49 | Email from Susan Murray re: "Pharmacy appeals related to gender dysphoria or transgender services," Oct. 25, 2018, PLANDEF0120919-20 |
| 50 | BlueCross BlueShield of North Carolina Corporate Medical Policy, "Gender Affirmation Surgery and Hormone Therapy," June 2021, KADEL00316786-96 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Amy Richardson
Amy Richardson

7

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

| | |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK, by his next friends and parents, JASON FLECK and ALEXIS THONEN; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; and SAM SILVAINE, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**OBJECTIONS AND RESPONSES OF DEFENDANTS DALE FOLWELL
AND DEE JONES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Dale Folwell and Dee Jones respond to the Plaintiffs' First Set of Interrogatories as

follows:

The Plaintiffs have served eleven contention interrogatories upon the Defendants at the beginning of the discovery process. "[M]ost courts agree that due to the nature of contention interrogatories, they are more appropriately used after a substantial amount of discovery has been conducted—typically at the end of the discovery period." *Sigman v. CSX Corp.*, No. 3:15-CV-13328, 2016 WL 7444947, at *2 (S.D.W. Va. Dec. 27, 2016). As the parties move forward with discovery, the Defendants have every expectation these interrogatories will be supplemented. Currently, however, the Defendants are reviewing more than 11,000 documents that may be responsive to the Plaintiffs' request for production of documents. Until this process has moved forward somewhat, any answers below are necessarily preliminary. In addition, as discovery proceeds, there may be privileged and confidential information that is responsive to the Plaintiffs' request, although this cannot be fully discerned at this early stage.

1.     Describe in detail the factual basis for each governmental interest that you contend supports the Exclusion.

The Defendants object that this interrogatory is overly broad, premature and calls for privileged and confidential information. The Defendants expect to supplement this answer as discovery proceeds. Health benefit coverage decisions for the State Health Plan must consider the actuarial soundness of the plan along with the health composition of Plan members. For an entity such as the State Health Plan, officials must also consider the effect of funding on plan premiums and the taxpayer subsidies. The decision whether to provide coverage for specific conditions also has a predictive component. Medical treatment sought must be cost-effective and likely to lead to a positive result for the member.

Upon information and belief, the coverage exclusions appear to have been considered at least three times by leadership of the State Health Plan. The Defendants are still conducting discovery as to the basis for the original decision to adopt the coverage exclusion in the 1990s. The Defendants are also still conducting discovery into the decision to suspend the coverage exclusion for the 2017 Plan Year, but, upon information and belief, this decision appears to have been made in order to comply with a 2016 federal regulation. While further discovery will provide clarity, at the time the one-year suspension ended, the

2

Defendants reviewed the ongoing litigation about the 2016 federal regulation and concluded that this regulation was no longer in effect.

2.    Describe in detail the factual basis for each governmental interest that actually motivated the decision to no longer suspend the application of the Exclusion for calendar year 2018.

    The Defendants object that this interrogatory is overly broad, premature and calls for privileged and confidential information. The Defendants expect to supplement this answer as discovery proceeds. The Defendants did not act to "no longer suspend application of the Exclusion." While further discovery will provide clarity, at the time the one-year suspension of the coverage exclusion ended, the Defendants reviewed litigation involving the 2016 federal regulation and concluded that the regulation no longer required adoption of a second suspension by the Board of Trustees for the 2018 Plan year.

3.    Describe in detail all evidence demonstrating that the government interests identified in Interrogatory 2 actually motivated the decision to no longer suspend the application of the Exclusion for calendar year 2018.

    The Defendants object that this interrogatory is overly broad, premature and calls for privileged and confidential information. The Defendants expect to supplement this answer as discovery proceeds.

4.    Identify each person involved in the decision to suspend the application of the Exclusion for the calendar year 2017.

    The Defendants object that this interrogatory is overly broad, premature and calls for privileged and confidential information. The Defendants expect to supplement this answer as discovery proceeds.

Individuals who may have information about this suspension include:

Members of the Board of Trustees of the State Health Plan in 2016. These individuals include Paul Cunningham, Neal Alexander, Donald Martin, Warren Newton, Elizabeth Poole, David Rubin, Margaret Way, Bill Medlin, Charles Johnson, Andrew Heath, and Aaron McKethan.

Former North Carolina Treasurer Janet Cowell.

Employees and former employees of Treasurer Cowell and the State Health Plan. Lotta Crabtree, Mona Moon, Beth Horner, Chris Almberg, Mark Collins, Caroline Smart, Blake Thomas, and Patti Forest.

3

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK, by his next friends and parents, JASON FLECK and ALEXIS THONEN; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; and SAM SILVAINE, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**AMENDED OBJECTIONS AND RESPONSES OF DEFENDANTS DALE FOLWELL AND DEE JONES TO PLAINTIFFS' AMENDED FIRST SET OF REQUESTS FOR ADMISSION**

Dale Folwell and Dee Jones amend their response to the Plaintiffs' Amended First Set of Requests for Admission as follows:

In discussions between the parties, the Plaintiffs have agreed to modify, in part, their requests for admission to avoid any ambiguity over the definition of which procedures are, or are not, encompassed within the Plaintiffs' definition of Gender-Confirming Healthcare. With these modifications, Defendants Folwell and Jones have modified their responses to requests for admission #1 through #4, as reflected below.

Request for Admission #1

1.      Admit that NCSHP partially or fully covers hormone therapy for some diagnoses.

Response

Admit.

Request for Admission #2

2.      Admit that NCSHP partially or fully covers mammoplasty and/or breast reconstruction surgery for some diagnoses.

Response

Admit.

Request for Admission #3

3.      Admit that NCSHP partially or fully covers vaginoplasty for some diagnoses.

Response

Admit.

Request for Admission #4

4.     Admit that NCSHP partially or fully covers hysterectomy for some diagnoses.

Response:

Admit.

Dated this 29th day of September, 2020.

Respectfully submitted by,

/s/ James Benjamin Garner
James Benjamin Garner
N.C. Bar. No. 41257
General Counsel
North Carolina Department of
    the State Treasurer
3200 Atlantic Avenue
Raleigh, North Carolina 27604
Telephone: (919) 814-4000
Ben.Garner@nctreasurer.com

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
Facsimile: (307) 432-0310
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N. C. Bar No. 25760

/s/ Mark A. Jones
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 North Cherry St., Suite 600
Winston-Salem, NC  27120-1029
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

3

# CERTIFICATE OF SERVICE

On September 29, 2020, I certify that I served this document via email on the following:

Amy E. Richardson
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
arichardson@hwglaw.com

Tara Borelli
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 640
Atlanta, GA 30318-1210
tborelli@lambdalegal.org

Deepika H. Ravi
HARRIS, WILTSHIRE & GRANNIS LLP
919 M Street N.W., 8th Floor
Washington, D.C. 20036
dravi@hwglaw.com

David Brown
Alejandra Caraballo
Noah E. Lewis
TRANSGENDER LEGAL DEFENSE AND EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
dbrown@transgenderlegal.org

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
ogonzalez-pagan@lambdalegal.org

*Counsel for Plaintiffs*

Nora F. Sullivan
Assistant Attorney General
nsullivan@ncdoj.gov

Zach Padget
Assistant Attorney General
zpadget@ncdoj.gov

*Counsel for Defendants University of North Carolina at Chapel Hill, North Carolina State University, and University of North Carolina at Greensboro*

*/s/ John G. Knepper*

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK, by his next friends and parents, JASON FLECK and ALEXIS THONEN; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; and SAM SILVAINE,<br><br>Plaintiffs,<br><br>v.<br><br>DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED RESPONSES AND OBJECTIONS OF DEFENDANTS DALE FOLWELL AND DEE JONES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Consistent with the obligations of Federal Rule of Civil Procedure 26(e), Dale Folwell and Dee Jones amend their responses to Interrogatories 6, 7, 8, 9, & 10 of the Plaintiffs' First Set of Interrogatories as follows:

6.     Identify each person involved in the decision to no longer suspend the application of the Exclusion for the calendar year 2018.

The Defendants renew their objection that this interrogatory is overly broad and calls for privileged and confidential information.

The Board of Trustees for the State Health Plan did not make a decision to "no longer suspend the application of the Exclusion" in 2017. In December 2016, the Board of Trustees for the State Health Plan voted to suspend the coverage exclusion for the 2017 Plan year only. At the Board's meeting in September 2017, members of the public asked the Board to expand coverage under the 2018 plan to include gender transition treatment. No member of the Board made a motion to implement this request at either the September 2017 or November 2017 meetings. By operation of law, pursuant to the 2016 decision by the Board, the Plan's coverage exclusion was reinstated on January 1, 2018.

As a member of the Board of Trustees for the State Health Plan, Defendant Folwell will have information about the 2017 meetings of the Board of Trustees for the State Health Plan. Defendant Jones, who became the Administrator of the State Health Plan in June 2017, will also have relevant information from that point forward. Other individuals with relevant information would include members of the Board of Trustees in 2017: Peter Chauncey, Kim Hargett, Donald Martin, Aaron McKethan, Elizabeth Poole, David Rubin, Margaret Way, and Paul Cunningham, MD.

Employees of the Office of the State Treasurer who may have information about the 2017 process to determine benefits for the 2018 Plan year would include Andrew Norton (former Deputy General Counsel for the State Health Plan), Sam Hayes (former General Counsel for the Office of the State Treasurer), Chris Farr (Chief of Staff for the Office of the State Treasurer), and Frank Lester (Deputy Treasurer, Communications and Government Affairs for the Office of the State Treasurer).

Finally, to the extent the application of the exclusion beyond the 2017 plan year was discussed prior to Defendant Jones joining the Plan in June 2017, such discussions would have included Mona Moon (former Executive Administrator of the State Health Plan), Lotta Crabtree (former Deputy Executive Administrator and Deputy General Counsel for the State Health Plan), and Caroline Smart (Senior Director of Plan Integration for the State Health Plan).

2

7.     For each person identified in response to Interrogatory 6, describe in detail that person's involvement in the decision to no longer suspend the application of the Exclusion for the calendar year 2018.

The Defendants object that this interrogatory is overly broad and calls for privileged and confidential information.

The State Health Plan's Board of Trustees makes decisions about the benefits offered by the Plan for each Plan year. The Board of Trustees did not decide to "no longer suspend the application of the Exclusion" after the 2017 Plan year. Rather, no member of the Board of Trustees brought forward a motion to suspend the coverage exclusion and thereby offer coverage for gender transition for the 2018 Plan year. The Board did not, therefore, vote on this issue. Each member of the Board of Trustees would have information about why he or she did not make a motion to expand the Plan's benefits as requested by members of the public.

Defendant Folwell, as the Chair of the Board of Trustees, approves the final agenda for each meeting of the Board of Trustees. Defendant Jones, as the Administrator of the State Health Plan, is responsible for developing each agenda and presenting it, along with supporting material, to Board members. Defendant Jones also supervises the Plan employees who notified members of the public about the opportunity to advocate for expanded Plan benefits at the September 2017 Board meeting. These Plan employees gathered material from individuals who wished to provide written information for Board members to review.

Andrew Norton provided legal advice to the Treasurer about the Plan's obligations under Section 1557 of the Affordable Care Act. As the General Counsel for the Office of the State Treasurer, Sam Hayes discussed this legal advice with Mr. Norton.

Ms. Farr and Mr. Lester do not have a direct policy role with regard to the State Health Plan. Ms. Farr was present at 2017 meetings involving Treasurer Folwell and State Health Plan employees as an observer, and Mr. Lester may have discussed policy matters as an advisor to Treasurer Folwell.

Ms. Moon, Ms. Crabtree, and Ms. Smart were responsible for managing plan benefits under the prior administration and may have discussed application of the exclusion beyond the 2017 plan year prior to the transition in the leadership of the State Health Plan.

8.     Describe in detail the factual basis for the assertion in the "Statement from Treasurer Dale R. Folwell, CPA, on State Health Plan Coverage of Sex Change Operations," dated October 25, 2018 (Bates stamped KADEL 004060-61), that "[t]he legal and medical uncertainty of this elective, non-emergency procedure has never been greater."

3

specifically discussing the coverage exclusion with particular individuals, but he believes it is probable this was one of many issues he discussed informally.

10.     For calendar year 2017, separately identify the cost of counseling and/or therapy, hormone-related therapy, and surgery for Gender-Confirming Healthcare.

The Defendants object that this interrogatory is overly broad and calls for privileged and confidential information. The Defendants further object to this interrogatory because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is otherwise vague, ambiguous, and confusing. The full extent of the benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendants. The Defendants can only provide information related to expenses incurred by the State Health Plan in 2017.

Blue Cross and Blue Shield of North Carolina has identified $784,923.28 in billed claims during calendar year 2017 that would have been excluded had the coverage exclusion remained in effect. After reductions for the allowed amount for each charge, and exclusion of non-covered expenses, Blue Cross and Blue Shield reports that gender transition treatment resulted in medical charges of $504,406.04. Of these charges, the Plan paid $404,609.26, and other payers (the insured participant or, if applicable, a co-insurer of the participant) paid $99,796.78.

These figures do not include payments by the Plan's pharmacy benefit manager, CVS/Caremark, for medications related to gender transition. CVS/Caremark is still working to identify prescription costs that would have been excluded in 2017 had the coverage exclusion been in effect. The Plan will supplement its answer to this Interrogatory when this information is available.

These figures also do not include any costs incurred for coverage of State Health Plan members enrolled in a Medicare Advantage plan. For 2017, United Healthcare administered the State Health Plan's Medicare Advantage plans, which are fully insured plans. That is, the State Health Plan purchases this insurance coverage for eligible Plan members, but the State Health Plan does not have access to claim information.

Dated this 9th day of October, 2020.

Respectfully submitted by,

/s/ James Benjamin Garner
James Benjamin Garner
N.C. Bar. No. 41257
General Counsel
North Carolina Department of
    the State Treasurer
3200 Atlantic Avenue
Raleigh, North Carolina 27604
Telephone: (919) 814-4000
Ben.Garner@nctreasurer.com

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
John@KnepperLLC.com

/s/ Kevin G. Williams
Kevin G. Williams
N. C. Bar No. 25760

/s/ Mark A. Jones
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 North Cherry St., Suite 600
Winston-Salem, NC  27120-1029
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

6

**VERIFICATION**

I, Dale Folwell, state that I have read Plaintiffs' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

7

## VERIFICATION

I, Dee Jones, state that I have read Plaintiffs' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

_Dee J_____

8

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

| | |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK, by his next friends and parents, JASON FLECK and ALEXIS THONEN; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; and SAM SILVAINE, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**OBJECTIONS AND RESPONSES OF DEFENDANTS DALE FOLWELL AND DEE JONES TO UNIVERSITY DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION AND INTERROGATORIES**

Dale Folwell and Dee Jones respond to the University Defendants' First Set of Requests for Admission and Interrogatories as follows:

## REQUESTS FOR ADMISSION

1. Admit that pursuant to state law, the State Treasurer, the Executive Administrator, and the Board of Trustees of the State Health Plan must administer one or more group health plans for eligible State employees, eligible retired employees, and certain of their eligible dependents that are comprehensive in coverage.

ANSWER: The University Defendants' Request for Admission appears to restate, without change, state law codified at N.C. Gen. Stat. § 135-48.2(a). The Plan Defendants assume that this Request for Admission does not imply a particular interpretation of state law, only that the Plan Defendants admit that North Carolina law imposes such a requirement upon the Plan Defendants. With this clarification, this request is admitted.

2. Admit that the State Treasurer has the responsibility and duty to administer and operate the State Health Plan.

ANSWER: The University Defendants' Request for Admission appears to restate, without change, a portion of state law codified at N.C. Gen. Stat. § 135-48.30(a)(1). The Plan Defendants assume that this Request for Admission does not imply a particular interpretation of state law, only that the Plan Defendants admit that North Carolina law imposes such a requirement upon the Treasurer. With this clarification, this request is admitted.

3. Admit that the State Treasurer, the Executive Administrator, and the Board of Trustees of the State Health Plan are fiduciaries to the State Health Plan.

ANSWER: The University Defendants' Request for Admission appears to refer to the duties imposed by state law upon the Treasurer, the Executive Administrator of the Plan, and the Board of Trustees as codified at N.C. Gen. Stat. § 135-48.2(a). This request may also refer to N.C. Gen. Stat. § 147-69.7, which requires that the Treasurer act as a fiduciary for the funds under his management. The Plan Defendants assume that this Request for Admission does not imply a particular interpretation of state law, only that the Plan Defendants admit that North Carolina law imposes such a requirement upon the Treasurer. With this clarification, this request is admitted.

2

4.      Admit that the State Treasurer has the power and duty to set benefits, premium rates, co-pays, deductibles, and coinsurance percentages and maximums, subject to approval by the Board of Trustees of the State Health Plan.

ANSWER: The University Defendants' Request for Admission appears to restate, without change, a portion of state law codified at N.C. Gen. Stat. § 135-48.30(a)(2). The Plan Defendants assume that this Request for Admission does not imply a particular interpretation of state law, only that the Plan Defendants admit that North Carolina law imposes such responsibility upon the Treasurer. With this clarification, this request is admitted.

5.      Admit that state law requires that all eligible new University employees must be given the opportunity to enroll or decline enrollment in the State Health Plan for themselves and their dependents within 30 days from the date of employment or from first becoming eligible.

ANSWER: The University Defendants' Request for Admission appears to restate several discrete requirements of state law. Under N.C. Gen. Stat. § 135-48.43(a)(2), new employees apply for coverage "to be effective on the first day of the month following employment." The provision allowing employees to file their application for health insurance within 30 days after beginning employment is N.C. Gen. Stat. § 135.48.42(a). The authority for University employees to participate in the State Health Plan is N.C. Gen. Stat. § 135-48.40(b). The Plan Defendants assume that this Request for Admission does not imply a particular interpretation of state law, only that the Plan Defendants admit that enrollment in the State Health Plan operates in the manner described. The Plan Defendants further assume that this Request for Admission recognizes that, while 30 days is the requirement under state law, this same law incorporates such exceptions to this requirement as are required by federal law. N.C. Gen. Stat. § 135-48.42. With these clarifications, this request is admitted.

6.      Admit that the North Carolina General Statutes do not authorize or empower the University of North Carolina or its constituent universities to purchase at Employer-Cost employee health insurance supplemental to, alternative to, or otherwise differing from to the coverage provided by the State Health Plan.

ANSWER: Denied. N.C. Gen. Stat. § 116-17.2 provides authority to the University Defendants for a "plan of flexible compensation to eligible employees of constituent

institutions for benefits available under Section 125 and related sections of the Internal Revenue Code of 1986 as amended." This authority exists when a benefit is not available under the State Health Plan. The Plan Defendants concede that treatment for gender dysphoria is not available under the State Health Plan, so the University Defendants can use this authority to provide such a benefit to Plaintiffs and others similarly situated. The opportunity to enroll in the State Health Plan is a part of the compensation package provided to state employees. The General Statutes of North Carolina permit the University Defendants to set compensation for employees, so long as this compensation does not provide benefits that are available under the State Health Plan. Treatment for gender dysphoria is not such a benefit, and the Plan Defendants assert that the University Defendants can use existing employment authorities to provide for payment for such services.

7.     Admit that neither the University of North Carolina nor its constituent universities have any role or participation in determining plan design of the State Health Plan, the benefits offered, the amount of copays and deductibles, the amount of employer contributions to be paid to the State Health Plan for each covered State employee, or the amount of premiums to be paid by State employees to the State Health Plan for their coverage.

ANSWER: Denied. The University Defendants are both authorized and encouraged to participate in the consideration of State Health Plan benefits by the Board of Trustees at its meetings. Indeed, employees of the University Defendants have communicated to the Board of Trustees about expanding plan benefits, including the benefits at issue in this case. *See*, *e.g.*, PLAN DEF 49734 (Letter to Board of Trustees from Andy DeRoin, Program Coordinator for the GLBT Center at NC State University).

8.     Admit that the neither the University of North Carolina nor its constituent universities have any discretion or ability to determine eligibility and coverage under the State Health Plan.

ANSWER: Denied. The University Defendants sweeping assertion that they lack "any discretion or ability" reflects a view that the University Defendants have no role in the benefit process. As noted in the response to Request for Admission #7, this is incorrect. To the extent that the University Defendants make the more limited assertion that plan benefits and plan premiums are determined by the State Treasurer, subject to approval by the Board of Trustees for the State Health Plan, this more limited assertion is admitted.

4

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

|  |  |
|---|---|
| MAXWELL KADEL, *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| DALE FOLWELL, in his official | ) |
| capacity as State Treasurer of North | ) |
| Carolina, *et al.*, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**OBJECTIONS AND RESPONSES OF DEFENDANT NORTH CAROLINA
STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES TO
PLAINTIFFS' FIRST REQUESTS FOR ADMISSION, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

The North Carolina State Health Plan for Teachers and State Employees responds

to the Plaintiffs as follows:

**<u>REQUESTS FOR ADMISSION</u>**

1.     Admit that NCSHP receives federal financial assistance from the U.S.
Department of Health and Human Services, including any of its component agencies.

<u>Response:</u> The Plaintiffs' request does not include a definition of "federal financial
assistance," which is a legal term used in § 1557 (42 U.S.C. 18116). The U.S. Department
of Health and Human Services has interpreted this phrase twice, in 2016 and in 2020. The
validity of these rulemakings is before other federal courts. Whether, and to what extent,
the Plan receives federal financial assistance within the meaning of § 1557 is not
discernable at this time.

With that qualification, the Plan admits that it receives quarterly payments under the
Retiree Drug Subsidy from the U.S. Department of Health and Human Services.

2. Admit that NCSHP partially or fully covers hormone therapy for some diagnoses not related to Gender-Confirming Healthcare.

<u>Response:</u> The Defendant objects to this request because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. This term is also not a legal term or a term of art used by the Plan when determining whether a healthcare provider will be reimbursed for the cost of covered benefits. At this time, the specific benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendant, and the Plaintiffs' definition in this request includes "any healthcare, physical, mental, or otherwise, administered or prescribed for the treatment of gender dysphoria, related diagnoses, or gender transition." Subject to and without waiving the foregoing objections, after reasonable inquiry, the information known or that can be reasonably obtained by Defendant is insufficient to enable Defendant to admit or deny this request from the Plaintiffs.

With greater particularity, the Plan admits that, under some circumstances, it covers prescription testosterone products for certain FDA-approved treatments. These FDA-approved uses are treatment of chromosomal males diagnosed with primary hypogonadism (congenital or acquired) and hypogonadotropic hypogonadism (congenital or acquired). The Plan also covers "brief treatment with conservative doses" of testosterone for "carefully selected [chromosomal] males with clearly delayed puberty." Finally, under certain circumstances, the Plan covers prescription testosterone for chromosomal females diagnosed with breast cancer.

The Plan admits that, under some circumstances, it covers prescription Supprelin for the FDA-approved treatment of the diagnosis of central precocious puberty in chromosomal females up to age 12 and chromosomal males up to age 13.

The Plan admits that, under some circumstances, it covers prescription Triptodur for the FDA-approved treatment of the diagnosis of central precocious puberty in chromosomal females up to age 12 and chromosomal males up to age 13.

Upon information and belief after reasonable inquiry, the Plan admits that it covers prescriptions for estrogen for beneficiaries. After reasonable inquiry and upon information and belief, the Plan's coverage for prescription estrogen does not depend on the member's diagnosis. Therefore, after reasonable inquiry and upon information and belief, the Plan cannot admit or deny whether it covers the prescription of estrogen for diagnoses related to—or not related to—gender-confirming healthcare.

3. Admit that NCSHP partially or fully covers mammoplasty and/or breast reconstruction surgery for some diagnoses not related to Gender-Confirming Healthcare.

2

Response: The Defendant objects to this request because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. This term is also not a legal term or a term of art used by the Plan when determining whether a healthcare provider will be reimbursed for the cost of covered benefits. At this time, the specific benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendant, and the Plaintiffs' definition in this request includes "any healthcare, physical, mental, or otherwise, administered or prescribed for the treatment of gender dysphoria, related diagnoses, or gender transition." Subject to and without waiving the foregoing objections, after reasonable inquiry, the information known or that can be reasonably obtained by Defendant is insufficient to enable Defendant to admit or deny this request as provided by the Plaintiffs.

Upon information and belief, the Plan admits that it covers mastectomies as a treatment for individuals diagnosed with breast cancer. Further, the Plan notes that under the federal Women's Health and Cancer Rights Act of 1998, certain health plans that provide coverage for a mastectomy must also cover breast reconstruction for that beneficiary. 29 U.S.C. 1185b. The Plan has not identified any statement or other decision to opt out of this federal requirement. Therefore, upon information and belief, the Plan admits that it covers breast reconstruction consistent with the Women's Health and Cancer Rights Act.

4. Admit that NCSHP partially or fully covers vaginoplasty for some diagnoses not related to Gender-Confirming Healthcare.

Response: The Defendant objects to this request because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. This term is also not a legal term or a term of art used by the Plan when determining whether a healthcare provider will be reimbursed for the cost of covered benefits. At this time, the specific benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendant, and the Plaintiffs' definition in this request includes "any healthcare, physical, mental, or otherwise, administered or prescribed for the treatment of gender dysphoria, related diagnoses, or gender transition." Subject to and without waiving the foregoing objections, after reasonable inquiry, the information known or that can be reasonably obtained by Defendant is insufficient to enable Defendant to admit or deny this request as provided by the Plaintiffs.

5. Admit that NCSHP partially or fully covers hysterectomy for some diagnoses not related to Gender-Confirming Healthcare.

3

Response: The Defendant objects to this request because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. This term is also not a legal term or a term of art used by the Plan when determining whether a healthcare provider will be reimbursed for the cost of covered benefits. At this time, the specific benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendant, and the Plaintiffs' definition in this request includes "any healthcare, physical, mental, or otherwise, administered or prescribed for the treatment of gender dysphoria, related diagnoses, or gender transition." Subject to and without waiving the foregoing objections, after reasonable inquiry, the information known or that can be reasonably obtained by Defendant is insufficient to enable Defendant to admit or deny this request as provided by the Plaintiffs.

6. Admit that the cost of Gender-Confirming Healthcare for calendar year 2017 did not exceed the cost estimate provided by Segal Consulting in its "Transgender Cost Estimate" memorandum addressed to Mona Moon, dated November 29, 2016 (Bates stamped KADEL 000036-37).

Response: The Defendant objects to this request because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. This term is also not a legal term or a term of art used by the Plan when determining whether a healthcare provider will be reimbursed for cost of a covered benefit. At this time, the specific benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendant, and the Plaintiffs' definition in this request includes "any healthcare, physical, mental, or otherwise, administered or prescribed for the treatment of gender dysphoria, related diagnoses, or gender transition." Subject to and without waiving the foregoing objections, after reasonable inquiry, the information known or that can be reasonably obtained by Defendant is insufficient to enable Defendant to admit or deny this request as provided by the Plaintiffs.

Further, the Segal Consulting memorandum does not define the "cost of treatment," which it notes was "provided at a very high level" by Blue Cross and Blue Shield of North Carolina. The Plan's experience has been that Blue Cross and Blue Shield of North Carolina is unwilling to disclose publicly the specific per-procedure costs it has negotiated with providers. Therefore, it is unclear whether the Segal cost estimates refer to (1) the payment requests from medical providers; (2) the allowed payments authorized after discounts negotiated with the medical providers; or (3) the amount paid by the State Health Plan after other deductibles and co-insurance payments are applied. Finally, Segal Consulting provided a range of potential cost: between $344,013 and $862,292. There is not a single "cost estimate" value.

4

In addition, the Defendant cannot identify the costs incurred for coverage of State Health Plan members enrolled in a Medicare Advantage plan. For 2017, United Healthcare administered the State Health Plan's Medicare Advantage plans, which are fully insured plans. That is, the State Health Plan purchases this insurance coverage for eligible Plan members, but the State Health Plan does not have access to claim information.

Information provided from Blue Cross and Blue Shield of North Carolina for the 2017 Plan year indicates that $784,923.28 was billed to the State Health Plan for medical treatment that BCBS indicated would have been excluded had the coverage exclusion remained in effect. After reductions, the Plan incurred $504,406.04 in allowed expenses. After Plan participants or other insurers paid their portion, the Plan paid $404,609.26.

7. Admit that Gender-Confirming Healthcare can be medically necessary treatment for gender dysphoria in at least some patients.

<u>Response:</u> The Defendant objects to this request because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. This term is also not a legal term or a term of art used by the Plan when determining whether a healthcare provider will be reimbursed for cost of a covered benefit. At this time, the specific benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendant, and the Plaintiffs' definition in this request includes "any healthcare, physical, mental, or otherwise, administered or prescribed for the treatment of gender dysphoria, related diagnoses, or gender transition." Subject to and without waiving the foregoing objections, after reasonable inquiry, the information known or that can be reasonably obtained by Defendant is insufficient to enable Defendant to admit or deny this request as provided by the Plaintiffs. Defendant further objects to this request because the term "medically necessary treatment" is vague, ambiguous, and confusing.

After reasonable inquiry, the Defendant is unable to admit or deny the Plaintiffs' request for admission. The Defendant cannot admit or deny a hypothetical question about medical treatment for an unknown patient with an unknown medical history and unknown medical needs. The Plaintiffs' request provides no information about whether biological disorders of sex development are present or the individual has only a psychiatric diagnosis of gender dysphoria. Moreover, the term "medically necessary" is used by insurance companies to determine whether medical treatment (and insurance coverage) should be provided. That is, whether a treatment is "medically necessary" is decided before treatment occurs. Medical necessity determinations do not necessarily correlate to or guarantee effective outcomes.

8. Admit that NCSHP acts as an agent for North Carolina government employers who participate in NCSHP.

5

Response: The Defendant objects to this request because the term "agent" is vague, ambiguous, and confusing. Further, it is unclear whether Plaintiffs' request seeks an admission regarding the undefined term "agent" as it appears in Title VII (42 U.S.C. 2000e(b)) or "agent" as defined and interpreted in some other legal context. Subject to the foregoing objections, denied.

9. Admit that NCSHP acts as a joint employer with participating North Carolina government employers.

Response: The Defendant objects to this request because the term "joint employer" is vague, ambiguous, and confusing. Further, it is unclear whether Plaintiffs' request seeks an admission with regard to the Fourth Circuit's caselaw regarding the liability of joint employers under Title VII (*see, e.g.*, *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404 (4th Cir. 2015)) or as defined and interpreted in some other legal context. Subject to the foregoing objections, denied.

10. Admit that participating North Carolina government employers delegate control over employee health benefits to NCSHP.

Response: The Defendant objects to this request because the term "delegate[s] control" is vague, ambiguous, and confusing. Subject to the foregoing objections, denied.

11. Admit that NCSHP has significant control over the terms of coverage in the health plans offered through NCSHP, including but not limited to control over the exclusions in those health plans.

Response: The Defendant objects to this request because the term "significant control" is vague, ambiguous, and confusing. The Defendant denies that the Plan has control over all coverage exclusions involving benefits in the health plans offered through the Plan. Some coverage exclusions are mandated by North Carolina law. Further, the request for admission does not address the more general limits on coverage created by the General Assembly's appropriations as well as the cap on the employer premium that can be charged by the Plan. The Defendant notes that certain federal requirements also influence coverage available under the Plan. Subject to these qualifications, the Defendant admits that, under North Carolina General Statute 135-48.30(a)(2), the Treasurer—subject to the approval of the Plan Board of Trustees—has the power and duty to set benefits, premium rates, co-pays, deductibles, and coinsurance percentages and maximums.

12. Admit that NCSHP determines the terms of coverage in the health plans offered through NCSHP.

<u>Response:</u> The Defendant objects to this request to the extent that the phrase "terms of coverage" is vague, ambiguous, and confusing. The Defendant has an understanding of how this phrase is used within its operations, but it is unclear whether the Plaintiffs share this definition or have a different one.

The Defendant denies that the Plan determines the terms of coverage of the Plan, without qualification. This request for admission does not address the limits on coverage created by the General Assembly's appropriations or the cap on the premium that can be charged to employers by the Plan. The Defendant notes that certain federal laws also influence the coverage available under the Plan.

In addition, the Plan has contracted with Blue Cross and Blue Shield of North Carolina to act as the Plan's third-party administrator and CVS/Caremark to act as the Plan's Pharmacy Benefit Manager. Both contractors are responsible for administering the Plan benefits as described in the Plan Benefit Book. Upon information and belief, to the extent that the Plan Benefit Book is silent about whether a specific procedure or medication is covered, the third-party administrator generally defaults to the terms of coverage used by that contractor in other plans. After reasonable inquiry and upon information and belief, however, the Plan cannot admit or deny whether this is the case for all treatment for all diagnoses.

Finally, the Plan does not determine the terms of coverage for the Medicare Advantage Plan offered to the Plan's Medicare-eligible employees and retirees. These Plans (which have been provided since 2016 by Humana or United Healthcare, depending on the Plan year), are fully insured health plans. To the extent that the Plan makes a decision about the terms of coverage for Medicare Advantage participants, that determination takes place in the selection of a particular insurance company as the Medicare Advantage plan provider.

Subject to these qualifications, the Defendant admits that, under North Carolina General Statute 135-48.30(a)(2), the Treasurer—subject to the approval of the Plan Board of Trustees—has the power and duty to set benefits, premium rates, co-pays, deductibles, and coinsurance percentages and maximums.

13.   Admit that NCSHP determines the services that are excluded from coverage through NCSHP's health plans.

<u>Response:</u> The Defendant objects to this request to the extent that the phrase "terms of coverage" is vague, ambiguous, and confusing. The Defendant has an understanding of how this phrase is used within its operations, but it is unclear whether the Plaintiffs share this definition or have a different one.

7

The Defendant denies that the Plan determines all coverage exclusions involving Plan benefits. Some coverage exclusions are mandated by North Carolina law. Further, the request for admission does not address the more general limits on coverage created by the General Assembly's appropriations as well as the cap on the premium that can be charged by the Plan. The Defendant notes that federal requirements also influence the coverage available under the Plan.

In addition, the Plan has contracted with Blue Cross and Blue Shield of North Carolina to act as the Plan's third-party administrator and CVS/Caremark to act as the Plan's Pharmacy Benefit Manager. Both contractors are responsible for administering the Plan benefits as described in the Plan Benefit Book. Upon information and belief, to the extent that the Plan Benefit Book is silent about whether a specific procedure or medication is covered, the third-party administrator generally defaults to the terms of coverage used by that contractor in other plans. After reasonable inquiry and upon information and belief, however, the Plan cannot admit or deny whether this is the case for the treatment of all diagnoses applicable to all diagnoses.

Finally, the Plan does not determine the terms of coverage for the Medicare Advantage Plan offered to the Plan's Medicare-eligible employees and retirees. These Plans (which have been provided since 2016 by Humana or United Healthcare, depending on the Plan year), are fully insured health plans. To the extent that the Plan makes a decision about the terms of coverage for Medicare Advantage participants, that determination takes place in the selection of a particular insurance company as the Medicare Advantage plan provider.

Subject to these qualifications, the Defendant admits that, under North Carolina General Statute 135-48.30(a)(2), the Treasurer—subject to the approval of the Plan Board of Trustees—has the power and duty to set benefits, premium rates, co-pays, deductibles, and coinsurance percentages and maximums.

14.    Admit that NCSHP is responsible for administering the insurance coverage offered to participating employees.

Response: The Defendant objects to the request because the phrase "administering" is vague, ambiguous, and confusing, and the phrase could be interpreted to include actions that are not conducted by the Plan. This includes face-to-face interactions with new employees, which is administered by the employers of each new employee. Further, significant administrative responsibilities are carried out by Plan contractors, including Blue Cross and Blue Shield of North Carolina (the Plan's Third-Party Administrator), CVS/Caremark (the Plan's Pharmacy Benefit Manager), and the Plan's fully-insured

8

Medicare Advantage plan administrator (currently Humana beginning January 1, 2021, previously United Healthcare).

Subject to these qualifications, the Plan admits that North Carolina law requires the Plan to administer one or more group health plans that are comprehensive in coverage. N.C. Gen Stat. § 135-48.2(a).

## INTERROGATORIES

1. Describe in detail any sources of federal funding Defendant NCSHP has received since 2014, including but not limited to any grants, contracts, or other forms of federal financial assistance.

Response: The Defendant objects that this interrogatory is overly broad and burdensome. The Plan receives funding each year through the Retiree Drug Subsidy. The Plan receives no other federal funding.

2. Describe in detail the fiscal sustainability of NCSHP including the basis for Treasurer Folwell's estimates that NCSHP has a $28 billion unfunded liability, and any policies (those adopted and not yet adopted) to address this unfunded liability.

Response: The Defendant objects that this interrogatory is overly broad, burdensome, and to the extent that it purports to seek the views of a separate defendant, Treasurer Folwell, it is misdirected.

For several decades, while retirees from North Carolina state and local government were eligible for health care coverage under the Plan, there was no money set aside to pay for the cost of this health care. The State Health Plan is funded by annual appropriations by the North Carolina General Assembly. In recent years, the North Carolina General Assembly has appropriated for an increase in health care costs of about 4% on average over the fiscal biennium. At the same time, the annual rate of inflation for health care costs has been significantly higher (approximately 7% annually) than that appropriation or the rate of inflation for the economy as a whole.

The most recent estimate of the Plan's unfunded liability by The Segal Group, which conducts an annual actuarial evaluation, is $27.7 billion as of June 30, 2020. The Plan, and its leadership, have been actively seeking to reduce this overall liability since 2017. Some policy initiatives have required the approval of the General Assembly, but the policies listed below have been sought and supported by the Plan and its leadership.

High-profile policies or decisions to improve the Plan's long-term sustainability that have been proposed, adopted, or implemented since 2017 have included:

9

(a) Increased use of a Medicare Advantage plan for Medicare-eligible retirees. In the open enrollment in October 2017, the Plan automatically enrolled eligible retirees in its Medicare Advantage plan, rather than asking these members to select a health plan option. Members still have the ability to leave the Medicare Advantage plan and choose a different Plan option, but this policy decision has resulted in approximately $35 million in savings. In addition, the Plan has moved to a competitive bidding process for the Medicare Advantage Plan. In 2020, Humana was selected. In January 2021, the Plan transitioned its retirees to the Humana plan from the United Healthcare plan. This change is expected to generate $590 million in savings over three years.

(b) Elimination of the subsidy for retiree health care benefits for members hired after January 1, 2021. This reform was enacted by the General Assembly in 2017.

(c) Competitive bidding for Third-Party Administration services for the Plan. In 2020, the Plan awarded a new contract to Blue Cross and Blue Shield of North Carolina for its administrative support to the Plan. Under this new contract, the Plan estimates administrative cost savings of at least $20 million per year.

(d) The Clear Pricing Project. The Plan has aggressively sought to link Plan payments for health care services to the Medicare payment rate for the same services. While this policy has not been fully adopted by all providers, the Plan created the "N.C. State Health Plan Network" effective January 1, 2020. Plan beneficiaries who select a provider from this network will have no co-pay for primary care visits and the co-pay for visits to specialist providers is also reduced. In return, the providers in this network agreed to be reimbursed for services at the Medicare rate plus approximately 60%.

(e) Since 2017, the Plan has generally avoided increasing benefits for Plan participants. The minutes of the Board of Trustees reflect all instances in which adjustments to coverage were made after a routine review of current benefit offerings or specific medical recommendations for clinically effective treatments. A review of the Plan's coverage benefits since 2017 demonstrates that Plan benefits have remained relatively static, year-over-year.

    3.  Describe in detail the factual basis for each governmental interest that you contend supports the Exclusion.

Response: The Defendants object that this interrogatory is overly broad, burdensome, and calls for privileged and confidential information.

    Decisions about new benefits for the Plan, and the permanent removal of an exclusion that has the effect of creating a new benefit, are reviewed within the overall goals of the Board of Trustees and the Plan leadership. In 2016, the Treasurer identified goals for the Plan: reducing the Plan's unfunded liability, providing a more affordable family

10

premium for participants, and providing transparency to taxpayers about spending decisions.

In 2018, when the Board of Trustees declined to adopt the benefit proposed by the Plaintiffs, the Treasurer put forward several government interests. The Plan asserts that each reason justifies the decision not to permanently eliminate the existing coverage exclusion.

First, as noted by the Treasurer, legal uncertainty surrounds the federal requirement that the Plan eliminate its coverage exclusion. In December 2016, the Plan was advised that a federal regulation mandated elimination of the coverage exclusion as a condition of federal funding. This regulatory requirement was enjoined by a federal court later that same month, and, upon information and belief, that injunction remains in effect in 2021. In 2020, the Department of Health and Human Services amended its regulations and removed the federal requirement. Legal challenges to this 2020 regulation are also currently pending. At this time, it is unclear whether the 2016 regulation, the 2020 regulation or no regulation speaks to the coverage exclusion.

Second, as the Treasurer noted, medical uncertainty exists about the treatments sought by the Plaintiffs. The Plan remains unaware of any objective test to identify individuals suffering from gender dysphoria who will benefit from the hormonal and surgical treatments sought by the Plaintiffs. For minors, the Plan is unaware of any methodology to reliably distinguish between children for whom gender dysphoria will resolve without hormonal therapy or surgical intervention and those for whom it will not. (The Plan does not limit counseling or other mental health care for individuals suffering from gender dysphoria. Upon information and belief, the coverage exclusion affects only pharmacological and surgical treatment of gender dysphoria. Services such as counseling for a patient with gender dysphoria are limited only by the generally applicable Plan restrictions on mental health services.)

The Plan lacks a definite understanding of which prescription drugs, and which surgeries, the Plaintiffs believe should be covered for treatment of gender dysphoria. As noted in the Defendant's expert reports, the FDA has not approved any drugs for treatment of gender dysphoria.

The Plan has not identified any valid, reliable, peer-reviewed longitudinal studies that support the efficacy of the Plaintiffs' desired treatments. The Plan notes that during the pendency of this case, the American Journal of Psychiatry issued a correction to an article that claimed to find such evidence. The correction, after review by third-party experts, indicates that article's statistical analysis does not support its hypothesis that surgical intervention for transgender individuals reduces the need for mental health care.

11

In 2021, clinics in the United Kingdom, Sweden, and Finland ceased hormonal and surgical intervention for minors with gender dysphoria.

Finally, the Treasurer stated that he did not support addition of this benefit when many other plan participants have sought, but have not received, coverage for services that they desire. The members of the Board of Trustees have spoken to their understanding that they have a duty to use the Plan's limited resources in a manner that provides the best use of health care payments for the overall health of the Plan population. In the context of the Plan's overall fiscal condition, the Plan has been unable to identify a reasonable metric to distinguish the benefits sought by Plaintiffs from other uncovered medical treatments that affect small groups within the overall Plan's population.

4. For calendar year 2017, separately identify the cost of counseling and/or therapy, hormone-related therapy, and surgery for Gender-Confirming Healthcare.

Response: The Defendant objects that this interrogatory is overly broad, burdensome, and calls for privileged and confidential information. The Defendant further objects to this interrogatory because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. The full extent of the benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case remains unknown. The Defendant can only provide information related to expenses incurred by the State Health Plan in 2017, recognizing that this information was gathered by third parties and provided to Plan employees.

Blue Cross and Blue Shield of North Carolina identified $784,923.28 in billed claims during calendar year 2017 that would have been excluded had the coverage exclusion remained in effect. After reductions for the allowed amount for each charge, and exclusion of non-covered expenses, Blue Cross and Blue Shield reports that gender transition treatment resulted in medical charges of incurred $504,406.04 in allowed expenses. After Plan participants or other insurers paid their portion, the Plan paid $404,609.26, and other payers (the insured participant or, if applicable, a co-insurer of the participant) paid $99,796.78.

These figures do not include payments by the Plan's pharmacy benefit manager, CVS/Caremark, for medications related to gender transition. After reasonable inquiry, the Plan has not been able to identify a reliable estimate of the cost of prescription drugs that were potentially covered in 2017 but were not covered after the suspension of the coverage exclusion lapsed.

Finally, the Plan does not have access to information about the costs incurred by State Health Plan members enrolled in a Medicare Advantage plan. The State Health Plan's

12

Medicare Advantage plan is fully insured. That is, the State Health Plan purchases insurance coverage for Medicare-eligible retirees and pays the premium for these Plan members. Humana, the current insurance provider (as well as United Healthcare, the prior provider) ensures that premiums are sufficient to cover expected claims. Moreover, the private insurance company, not the Plan, is responsible for payment if these premiums are insufficient. The State Health Plan therefore does not have access to claim information.

     5.  For calendar year 2017, separately identify the cost of counseling and/or therapy, hormone-related therapy, and surgery not relating to Gender-Confirming Healthcare.

<u>Response:</u> The Defendants object that this interrogatory is overly broad, burdensome, and calls for privileged and confidential information. The Defendants further object to this interrogatory because "Gender-Confirming Healthcare" is not a medical term and because Plaintiffs' use and definition of the term "Gender-Confirming Healthcare" is vague, ambiguous, and confusing. The full extent of the benefits denominated as "gender-confirming healthcare" under the Plaintiffs' theory of the case is not known by the Defendants.

     Because, after reasonable inquiry, the Plan has not been able to develop a precise estimate of the cost of Gender-Confirming Healthcare, the Defendant cannot accurately provide the cost information that the Plaintiffs seek.

     6.  Describe in detail NCSHP's role in determining components of state employees' compensation, terms, conditions, or privileges of employment.

<u>Response:</u> The Defendants object that this interrogatory is overly broad, burdensome, and calls for privileged and confidential information.

     The decision by an employee to participate in the Plan is voluntary and is available to all full-time employees on an equal basis. (The same premium is charged to each member who selects a specific coverage option.)

     The Plan does not determine the compensation, terms, conditions, or privileges of employment for state employees, other than the approximately fifty employees of the Plan itself. Other full-time state employees, and the employees of non-state entities such as school districts and local governments, are offered the opportunity to participate in the State Health Plan by their employers. As noted in the Response to Request for Admission No. 13 (above), the North Carolina General Assembly determines the maximum amount that the Plan can charge to employers as a premium for coverage of an employee. Under North Carolina General Statute 135-48.30(a)(2), the Treasurer—subject to the approval of the Board of Trustees—sets benefits, premium rates, co-pays, deductibles, and coinsurance percentages and maximums when not otherwise set by law.

13

7.   Describe in detail NCSHP's role in providing benefits in the form of health care coverage to state employees.

<u>Response:</u> The Defendant objects that this interrogatory is overly broad, burdensome and calls for privileged and confidential information.

The Plaintiffs' interrogatory misstates the role of the Plan and the health care coverage it provides. The Plan offers four coverage options to eligible participants. Enrollment is voluntary in the 80/20 Plan, the 70/30 Plan, the High Deductible Health Plan, or the Medicare Advantage Plan (for eligible retirees).

The North Carolina General Assembly appropriates funds and imposes, among other requirements and limitations, a maximum premium that may be charged to the employer for provision of health coverage to a Plan participant. In the immediate day-to-day operation of the plans listed above, the Plan staff ensure that state employees receive timely communication about the Plan, that Plan contractors implement the Plan policies, and that the resources allocated to the Plan are sufficient to meet current expected costs and ensure the statutorily-required reserve balance for unpaid claims. On a more long-term basis, the Plan and its staff are responsible for planning to ensure that the Plan remains financially sustainable within the larger context of significant health care inflation.

8.   Describe in detail NCSHP's role in determining the terms of coverage in the health plans offered through NCSHP, including but not limited to the extent of control over the terms of those health plans and their exclusions.

<u>Response:</u> The Defendants object that this interrogatory is overly broad, burdensome, and calls for privileged and confidential information. As noted above, the General Assembly has statutorily mandated specific coverage exclusions. In addition, certain coverage requirements are imposed by federal law. The Treasurer and the Board of Trustees are responsible for ensuring that the remaining benefits provided by the Plan are financially sustainable in the short-term and into the future.

9.   Describe in detail participating North Carolina government employers' delegation of control over employee health benefits to NCSHP.

<u>Response:</u> The Defendants object that this interrogatory is overly broad, burdensome, and calls for privileged and confidential information. The Plan disagrees with the Plaintiffs' view that North Carolina government employers have delegated control of employee health benefits to the Plan. Enrollment in the Plan is not required for state or local government employees. Enrollment in the Plan, at the determined premium costs, is an option that is made available to these individuals.

14

## VERIFICATION

I, Dee Jones, state that I have read Plaintiffs' First Set of Interrogatories to the North Carolina State Health Plan for Teachers and State Employees and the answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

15

# Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION
FILE No. 1:19-CV-00272-LCB-LPA

| | | |
|---|---|---|
| MAXWELL KADEL, *et al.* | ) | **DEFENDANT** |
| | ) | **N. C. DEPARTMENT OF** |
| Plaintiffs, | ) | **PUBLIC SAFETY'S RESPONSES TO** |
| v. | ) | **PLAINTIFF'S FIRST SET OF** |
| | ) | **INTERROGATORIES** |
| DALE FOLWELL, in his official capacity as | ) | |
| State Treasurer of North Carolina, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW COMES Defendant the North Carolina Department of Public Safety, and hereby respond to Plaintiff's First Set of Interrogatories, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure as follows:

**<u>GENERAL RESPONSE AND OBJECTIONS</u>**

Each of The Department's responses, in addition to any specifically stated objections, is subject to and incorporates the following general responses and objections. The assertion of the same, similar, or additional objections or a partial response to any individual request does not waive any of The Department's general responses and objections.

1. The Department objects to every Interrogatory that calls for privileged information, including, without limitation, information protected by the attorney-client privilege.

2. The Department objects to every Interrogatory that calls for information prepared in anticipation of litigation or for trial absent a showing of substantial need by the Plaintiff

3. The Department objects to every Interrogatory that calls for information containing or reflecting the mental impressions, conclusions, opinions and/or legal theories of any

1

148-74.  The records of prisoners in the custody of the Department of Public Safety ("DPS"), Division of Adult Correction ("DAC") are confidential and are not subject to inspection by the public or the inmate or those acting on behalf of the inmate.  *Goble v. Bounds*, 13 N.C. App. 579, 186 S.E.2d 638, *aff'd* 281 N.C. 307, 188 S.E.2d 347 (1972).  Except as otherwise noted, all documents referenced herein or provided herein are not in The Department possession or control, but have been provided to the undersigned Assistant Attorneys General at the direction of the Secretary for the limited purpose of the defense of this action under the Defense of State Employees Act, N.C.G.S. § 143-300.2 et seq.  All such documents remain classified, confidential, privileged and under the control and direction of the Secretary.

1.  Describe in detail all reasons for which Defendant has not made available employee healthcare coverage that is different from or supplemental to the NCSHP and which does not contain an Exclusion.

     **ANSWER: It's the State Treasury Department's responsibility to provide the same coverage to all state employees.**

2.  Identify any person who is directly responsible for ensuring or coordinating the provision of NCSHP benefits to the employees of Defendant.

     **ANSWER:  Defendant objects to use of the phrase "ensuring or coordinating the provision of NCSHP benefits to the employees" as vague, not defined and imprecise.  Without waiving, and subject to the foregoing objection, Defendant states that upon hiring, and annually during the open enrollment period, Health Benefit Representatives provide the benefits information to the employees to give them the information they need to determine if they would like to join the SHP.**

3.  Describe in detail all processes by which Defendant:

     a.     registers its employees for coverage under the NCSHP, and maintain and end such registrations; and

            **ANSWER:  Upon hiring, and annually during the open enrollment period, Health Benefit Representatives provide the information to the employees to give them the information they need to determine if they**

3

would like to join the SHP. Employees can enroll online through the Integrated HR payroll system. (formerly known as Beacon)

b.     is involved, if at all, with employees' coverage under NCSHP. This includes, but is not limited to, any claims made for coverage under the NCSHP, processing employees' and Defendant's contributions to NCSHP, dealing with employees' under- or over-payments to NCSHP, and/or entering settlement agreements with employees regarding health benefits covered under NCSHP.

**ANSWER: DPS would only be involved if an employee loses coverage of the State Health Plan due to non-payment of the employee's premium. This would only occur if an employee goes on leave without pay and there is no monthly paycheck from which the employee's monthly premium is able to be deducted. If the employee wants the coverage to be reinstated before the annual enrollment period, DPS will work with the employee to submit an exception request to the State Health Plan. The State Health Plan is responsible for approving the exception request and reinstating the coverage. DPS has no authority to reinstate the coverage.**

4. Identify which steps, if any, in your answer to Interrogatory No. 3, require involvement by personnel of NCSHP and/or the Office of the State Treasurer.

**ANSWER: DPS would work with the State Health Plan which is a part of the State Treasurer's Office to submit the exception request as described in 3b and await for the approval or denial to be made by the State Health Plan.**

5. Identify any person with whom you consulted and any documents you reviewed in order to provide your answer to Interrogatory Nos. 1, 2, 3, and 4.

**ANSWER: Charlene Shabazz Charlene Shabazz, CPM, SPHR, SHRM-SCP HR Deputy Director for Safety, Health, WC, Benefits, Time/Leave and IBHS NC Department of Public Safety**

4

6. To the extent that you deny any Request for Admission, describe in detail the bases for each denial; and identify any person with whom you needed to consult and any documents you needed to review in order to provide your answer.

**ANSWER: NCDPS did not deny any of the Requests for Admissions. See response to Request for Admission No. 4 for the response regarding the inability to admit or deny.**

This the 18th day of June, 2021.

**JOSHUA H. STEIN**
**ATTORNEY GENERAL**

/s/ *Alan McInnes*
Alan McInnes
Assistant Attorney General
N.C. State Bar No. 20938
N.C. Department of Justice
Public Safety Section
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone:     (919) 716-6529
Fax:               (919) 716-6761
E-mail:          amcinnes@ncdoj.gov

5

# Exhibit 7

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION
FILE No. 1:19-CV-00272-LCB-LPA

| | | |
|---|---|---|
| MAXWELL KADEL, *et al.* | ) | **DEFENDANT** |
| | ) | **N. C. DEPARTMENT OF** |
| Plaintiffs, | ) | **PUBLIC SAFETY'S RESPONSES TO** |
| v. | ) | **PLAINTIFF'S FIRST SET OF** |
| | ) | **INTERROGATORIES** |
| DALE FOLWELL, in his official capacity as | ) | |
| State Treasurer of North Carolina, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW COMES Defendant the North Carolina Department of Public Safety, and hereby respond to Plaintiff's First Requests for Admission, pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure as follows:

## REQUESTS FOR ADMISSION

1.  Admit that Defendant is engaged in industry affecting commerce, has fifteen or more employees for each working day of twenty or more calendar weeks, and is not a corporation wholly owned by the United States, an Indian Tribe, or the District of Columbia.

    **RESPONSE:   Admitted.**

2.  Admit that Defendant contributes funding to NCSHP to help cover the health insurance cost of at least some of its employees.

    **RESPONSE: Admitted.   NCDPS pays $521.96 per month per employee.**

1

This the 18th day of June, 2021.

JOSHUA H. STEIN
ATTORNEY GENERAL

/s/ *Alan McInnes*

Alan McInnes
Assistant Attorney General
N.C. State Bar No. 20938
N.C. Department of Justice
Public Safety Section
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone:     (919) 716-6529
Fax:                (919) 716-6761
E-mail:          amcinnes@ncdoj.gov

3

# Exhibit 8



State Health Plan for Teachers and State Employees

# Traditional 70/30 PPO Plan

# Benefits Booklet

**January 1 – December 31, 2016**





An initiative of the State Health Plan

**Revised: August 3, 2016**

PLAN DEF0010649

| | | | |
|---|---|---|---|
| **Hospital** | | | |
| **Inpatient Medical Detoxification** | X | | X |
| **Psychiatric** **Residential Treatment Center** | | X | X |
| **Chemical Dependency** **Residential Treatment Center** | | X | X |
| **Psychiatric** **Partial Hospitalization Program** | | X | X |
| **Chemical Dependency Partial** **Hospitalization Program** | | X | X |
| **Psychiatric** **Intensive Outpatient Program** | | X | X |
| **Chemical Dependency Intensive** **Outpatient Program** | | X | X |

\*Continuing treatment certifications must be requested by the last date of any previously certified period. Otherwise, certification decisions by the Mental Health Case Manager are effective as of the date the request for certification is received by the Mental Health Case Manager.

\*The following notice applies only when you are responsible for obtaining certification. NOTICE: Your actual expenses for covered services may exceed the stated coinsurance percentage or copayment amount because actual provider charges may not be used to determine the plan's and member's payment obligations. For out-of-network benefits, you may be required to pay for charges over the allowed amount in addition to any copayment or coinsurance amount. In addition, certain services require prior review and certification. You are responsible for obtaining or having your provider obtain certification on your behalf if you go to an out-of-network, or out-of-state provider. Failure to obtain certification will result in a full denial of benefits.

**Mental Health and Chemical Dependency Services Exclusions and Limitations**
- Care for conditions not classified as psychiatric, emotional, or substance abuse illnesses
- Psychoanalysis
- Counseling with relatives about a patient with mental illness, alcoholism, drug addiction or substance abuse
- Inpatient confinements that are primarily intended as a change of environment
- Mental health services received in psychiatric residential treatment facilities when age 18 or older. Chemical dependency residential treatment facilities are covered for all ages.
- Marriage Counseling
- Inpatient psychiatric care rendered in a hospital not accredited by JCAHO
- Inpatient chemical dependency care rendered in a facility which is not currently accredited by a national health care organization approved by the Mental Health Case Manager
- Inpatient hospital care for medical detoxification rendered in a facility which is not licensed as a hospital and currently accredited by a national health care organization approved by the Mental Health Case Manager
- Outdoor components of a residential chemical dependency treatment program, when such program is licensed as a chemical dependency treatment program in the state in which services are provided, are covered only if facility based services are available as a part of the same program
- Primary treatment of a psychiatric disorder in a residential treatment center (RTC) unless the RTC is licensed as a psychiatric RTC

36

PLAN DEF0010694

- Primary treatment of a *chemical dependency* or substance abuse disorder in a residential treatment center (RTC) unless the RTC is licensed as a *chemical dependency* or substance abuse RTC
- Services by *providers* not currently licensed in the state in which services are provided
- Psychotherapy as part of artificial means of conception
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation
- Psychological testing for those persons with a *chemical dependency* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*
- Therapeutic boarding schools as a *chemical dependency* or substance abuse residential treatment center (RTC) unless the program is licensed as a *chemical dependency* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*
- Wilderness camps and stand-along outdoor treatment programs are not covered as *chemical dependency* or substance abuse RTC programs
- Academic education during residential treatment when charged separately
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings
- Training analysis
- Treatment for personal or professional growth, development, training or professional *certification*
- Aversive Treatment
- Treatment programs based solely on the 12-step Model
- Erhard Seminar Training (EST) or similar motivational services
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies
- Expressive therapies (art, poetry, movement, psychodrama), guided imagery, or stress and relaxation therapy when billed separately
- Telephonic crisis management as a separate charge
- Sedative action, electro stimulation therapy
- Z therapy, also known as "holding therapy"
- Narcotherapy with LSD
- Environmental ecology treatments
- Hemodialysis for schizophrenia
- Rolfing
- Sensitivity training

37

- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination
- For telephone consultations or web-based, online or other electronic evaluations, charges for failure to keep a scheduled visit, charges for completion of a claim form, charges for obtaining medical records, and late payment charges
- *Incurred* more than 18 months prior to the *member's* submission of a claim
- For *cosmetic* purposes for any reason, including but not limited to excess skin from the abdomen, arms or thighs, except as specifically covered by your health benefit plan
- For camisoles, or other clothing, post-mastectomy
- For any services that would not be necessary if a non-covered service had not been received, except for *emergency services* in the case of an *emergency*
- For benefits that are provided by any governmental unit except as required by law
- For services that are ordered by a court that are otherwise excluded from benefits under this health benefit plan
- For care that the *provider* cannot legally provide or legally charge or is outside the scope of license or *certification*
- Provided and billed by a licensed health care professional who is in training
- For any services provided and billed by a lactation consultant
- For breast pumps
- Available to a *member* without charge and/or care given to a *member* by a *provider* who is in a *member's* immediate family
- For any condition suffered as a result of any act of war or while on active or reserve military duty
- In excess of the *allowed amount* for services usually provided by one *doctor*, when those services are provided by multiple *doctors*
- For palliative, *cosmetic* or *routine foot care*
- For dental care, dentures, dental implants, oral orthotic devices, palatal expanders and orthodontics except as specifically covered by the Plan
- *Dental services* provided in a *hospital*, except when a hazardous condition exists at the same time or covered oral *surgery* services are required at the same time as a result of a bodily injury
- For any treatment or regimen, medical or surgical, for the purpose of reducing or controlling the weight of a *member* or for treatment of obesity, except for nutritional visits or surgical treatment of morbid obesity, or as specifically covered by your health benefit plan
- Bariatric surgery, except when provided at a Blue Distinction Center (BDC).
- Wigs, hair pieces and hair implants for any reason
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group
- For prescribed *sexual dysfunction* medications
- Treatment or studies leading to or in connection with sex changes or modifications and related care
- Music therapy, remedial reading, recreational or activity therapy, alternative therapy services, all forms of special education and supplies or equipment used similarly
- Hypnosis except when used for control of acute or chronic pain
- Acupuncture and acupressure
- *Surgery* for psychological or emotional reasons
- Travel, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by your health benefit plan
- For heating pads, hot water bottles, ice packs and personal hygiene and convenience items such as, but not limited to, devices and equipment used for environmental control, incontinence products (including briefs, diapers, underwear, underpads), and urinary incontinence devices (including bed wetting devices) and equipment
- For devices and equipment used for environmental accommodation requiring vehicle and/or building modifications such as, but not limited to, positioning seats, chair lifts, stair lifts, home elevators, and ramps

48

PLAN DEF0010706





State Health Plan for Teachers and State Employees

# TRADITIONAL 70/30 PPO PLAN
# BENEFITS BOOKLET

January 1 – December 31, 2017





October 1, 2016

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 61 of 284   PLAN DEF0072540

# COVERED SERVICES

*Covered services* described on the following pages are available at both the *in-network* and *out-of-network* benefit levels, when *medically necessary*, unless otherwise noted. If you have a question about whether a certain health care service is covered, and you cannot find the information in "*Covered Services*," see "Summary of Benefits" or call *State Health Plan* Customer Service at the number listed in "Who to Contact."

Also keep in mind as you read this section:

- Certain services require *prior authorization* and *certification* in order for you to avoid a denial of your services. General categories or services are noted in the sections below as requiring *prior authorization*, please see *"Prior Authorization*/Pre-Service" in "*Utilization Management*" for information about the review process, and visit our website at **www.shpnc.org** or call *State Health Plan* Customer Service to ask whether a specific service requires *prior authorization* and *certification.*
- Exclusions and limitations may apply to your coverage. Service-specific exclusions are stated along with the benefit description in "*Covered Services*." Exclusions that apply to many services are listed in "What Is Not Covered?" To understand the exclusions and limitations that apply to each service, read "*Covered Services*," "Summary of Benefits" and "What Is Not Covered?"
- Certain services are covered pursuant to *BCBSNC* medical policies, which are updated throughout the plan year. These policies lay out the procedure and criteria to determine whether a procedure, treatment, facility, equipment, medication or device is *medically necessary* and eligible for coverage, *investigational or experimental*, *cosmetic*, a convenience item, or requires *prior authorization* and *certification* by *BCBSNC*. The most up-to-date medical policies are available at **www.shpnc.org**, or call *State Health Plan* Customer Service at the number listed in "Who to Contact."

## *Office Services*

Care you receive from a *doctor*, physician's assistant, nurse practitioner or nurse midwife as part of an *office visit* or house call is covered with a *copayment*, except as otherwise noted in this benefits booklet. Some *providers* may get *ancillary services*, such as laboratory services, medical equipment, supplies or *specialty medications* from third parties. In these cases, you may be billed directly by the *ancillary provider*. Benefit payments for these services will be based on the type of *ancillary provider*, its network status, and how the services are billed.

Some *doctors* or *other providers* may practice in *outpatient clinics* or provide *hospital*-based services in their offices. In these cases, the services received may be billed as *Outpatient* Services and may be subject to your *benefit period deductible* and *coinsurance*. See *Outpatient Clinic* Services in the "Summary of Benefits." These *providers* are identified in the *provider* directory, which is available on our website at **www.shpnc.org** or by calling *State Health Plan* Customer Service at the number in "Who to Contact."

A *copayment* will not apply if you only receive services such as allergy shots or other injections and are not charged for an *office visit*.

### *Office Services Exclusions*

Services not covered when billed as an office service include:

- Services in free-standing surgical facilities, independent laboratories, therapy facilities or *outpatient hospital* departments
- Certain self-injectable *prescription medications* that can be self-administered. The list of these excluded medications may change from time to time. See our website at **www.shpnc.org** or call *State Health Plan* Customer Service for a list of these medications excluded in the office. Also see "*Pharmacy* Benefits" for information about purchasing *prescription medications* at the pharmacy.

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 62 of 284   PLAN DEF0072564

### ➢ *Office Visit* Services

*Prior authorization* by your *Mental Health Case Manager* is not required for mental health and *substance abuse office visit* services. The following professional services are covered when provided in an office setting:

- Evaluation and diagnosis
- Preventive *office visits*
- *Medically necessary* biofeedback and neuropsychological testing
- Individual and family counseling
- Group therapy
- *Medically necessary* services for the treatment of gender dysphoria

### ➢ *Outpatient* Services

Covered *outpatient* treatment services when provided in a mental health or *substance abuse* treatment facility include:

- Each service listed in the section under *office visit* services
- Partial-day/night hospitalization services (minimum of four hours per day and 20 hours per week)
- Intensive *Outpatient* Program Services (less than four hours per day and minimum of nine hours per week)
- Certain *in-network* and *out-of-network outpatient* services, such as partial hospitalization and intensive therapy, require *prior authorization* and *certification* or services will not be covered. The timeframe for receiving *prior authorization* and treatment *certification* are set forth in the table below. The list of services that require *prior authorization* may change from time to time

### ➢ *Inpatient* Services

Covered *inpatient* treatment services also include:

- Each service listed under *office visit* services
- Semi-private room and board
- Detoxification to treat *substance abuse*

*Prior Authorization* must be requested and *certification* must be obtained in advance for *inpatient* services or services will not be covered, except for *emergencies*. *In-network providers* in North Carolina are responsible for requesting *prior review* and obtaining *certification*. If *prior review* is not requested and *certification* is not obtained for covered *out-of-network inpatient* admissions, services will be denied.

### ➢ **Residential Treatment Facility Services**

*Prior authorization* must be requested and *certification* must be obtained in advance for mental health and *substance abuse* services received in a *residential treatment facility*. *In-network providers* in North Carolina are responsible for requesting *prior authorization* and obtaining *certification*. If *prior authorization* is not requested and *certification* is not obtained for covered *out-of-network residential treatment facility* services, services will be denied.

### ➢ **Applied Behavior Analysis**

Coverage is provided for *Applied Behavior Analysis* when all of the following conditions are met:

- The *member* is younger than age 26
- Diagnosed with Autism Spectrum Disorder by a licensed physician (MD or DO) or a licensed doctoral level clinical psychologist (PhD or PsyD) utilizing results from a face-to-face evaluation and a clinically recognized, validated tool endorsed by the *Mental Health Case Manager*
- Treatment is determined by the *Mental Health Case Manager* to be *medically necessary*

Other than those listed in the second bullet above, no *other providers* are eligible for reimbursement of the diagnostic evaluation. Licensure of the MD, DO, PhD or PsyD must be in the state in which the diagnostic evaluation is performed.

The diagnostic evaluation does not require prior approval. However, the results of the diagnostic evaluation may be requested by the *Mental Health Case Manager* when authorization for ABA (Applied Behavior Analysis) is requested.

Clinically recognized, validated tools endorsed by the *Mental Health Case Manager* can be found at http://www.cdc.gov/ncbddd/autism/screening.html.

Return to Table of Contents

PLAN DEF0072580




State Health Plan for Teachers and State Employees

# 70/30 PPO Plan

# Benefits Booklet

**January 1, 2018 – December 31, 2018**





Revised: Sept. 26, 2018

PLAN DEF0051471

**Outside of North Carolina**

Although *prior authorization* is not required in an *emergency,* you may contact the *Mental Health Case Manager* for assistance in locating a *provider.*

If you need urgent *inpatient* or *outpatient* mental health or *substance abuse* services while outside North Carolina, contact Customer Service at the number listed in "Who to Contact" for assistance in locating a *provider.* You must request *prior authorization* and receive *certification* from the *Mental Health Case Manager* for mental health and *substance abuse* services other than *office visits* or in *emergencies.* The numbers for *Mental Health Case Manager* are provided in "Who to Contact" and on the back of your *ID card.* For more information on these services, see "*Covered Services.*"

➢ **Timeframe Requirements for *Prior Authorization* and Treatment *Certification* of *Covered Services***

| Covered Service | Within Two (2) Business Days of Admission | Prior to Admission to the Program | Continuing Treatment Certifications* |
|---|---|---|---|
| **Crisis Evaluation & Stabilization** | X | | X |
| **Psychiatric *Inpatient Hospital*** | X | | X |
| ***Substance Abuse Inpatient Hospital*** | X | | X |
| ***Inpatient* Medical Detoxification** | X | | X |
| **Psychiatric Residential Treatment Center** | | X | X |
| ***Substance Abuse* Residential Treatment Center** | | X | X |
| **Psychiatric Partial Hospitalization Program** | | X | X |
| ***Substance Abuse* Partial Hospitalization Program** | | X | X |
| **Psychiatric Intensive *Outpatient* Program** | | X | X |
| ***Substance Abuse* Intensive *Outpatient* Program** | | X | X |

*Continuing treatment certifications must be requested by the last date of any previously certified period. Otherwise, certification decisions by the* Mental Health Case Manager *are effective as of the date the request for certification is received by the* Mental Health Case Manager.

*The following notice applies only when you are responsible for obtaining *certification.* NOTICE: Your actual expenses for *covered services* may exceed the stated *coinsurance* percentage or *copayment* amount because actual *provider* charges may not be used to determine the *Plan's* and *member's* payment obligations. For *out-of-network* benefits, you may be required to pay for charges over the *allowed amount* in addition to any *copayment* or *coinsurance* amount. In addition, certain services require *prior authorization* and *certification.* You are responsible for obtaining or having your *provider* obtain *certification* on your behalf if you go to an *out-of-network,* or out-of-state *provider.* Failure to obtain *certification* will result in a full denial of benefits.

**Mental Health and Substance Abuse Services Exclusions and Limitations**
- Care for conditions not classified as psychiatric, emotional, or *substance abuse* illnesses
- Psychoanalysis
- Counseling with relatives about a patient with *mental illness,* alcoholism, drug addiction or *substance abuse*
- *Inpatient* confinements that are primarily intended as a change of environment
- Mental health services received in psychiatric residential treatment facilities when age 18 or older
- *Substance abuse* residential treatment facilities are covered for all ages.
- Marriage Counseling

Return to Table of Contents

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 65 of 284
PLAN DEF0051516

- *Inpatient* psychiatric care rendered in a *hospital* not accredited by JCAHO
- *Inpatient substance abuse* care rendered in a facility which is not currently accredited by a national health care organization approved by the *Mental Health Case Manager*
- *Inpatient hospital* care for medical detoxification rendered in a facility which is not licensed as a *hospital* and currently accredited by a national health care organization approved by the *Mental Health Case Manager*
- Outdoor components of a residential *substance abuse* treatment program, when such program is licensed as a *substance abuse* treatment program in the state in which services are provided, are covered only if facility based services are available as a part of the same program
- Primary treatment of a psychiatric disorder in a residential treatment center (RTC) unless the RTC is licensed as a psychiatric RTC
- Primary treatment of a *substance abuse* or *substance abuse* disorder in a residential treatment center (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC
- Services by *providers* not currently licensed in the state in which services are provided
- Psychotherapy as part of artificial means of conception
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation
- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse* or *substance abuse* RTC programs
- Academic education during residential treatment when charged separately
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings
- Training analysis
- Treatment for personal or professional growth, development, training or professional *certification*
- Aversive Treatment
- Treatment programs based solely on the 12-step Model
- Erhard Seminar Training (EST) or similar motivational services
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies
- Expressive therapies (art, poetry, movement, psychodrama), guided imagery, or stress and relaxation therapy when billed separately
- Telephonic crisis management as a separate charge
- Sedative action, electro stimulation therapy
- Z therapy, also known as "holding therapy"

## What is not Covered?

- **Travel**, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*.

- Treatment or studies leading to or in connection with sex changes or modifications and related care



- The following **vision** services:

  - Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens.

  - Routine eye examination services except as specifically covered by the *Plan*

  - Eyeglasses or contact lenses, except as specifically covered in "*Prosthetic appliances.*

  - Orthoptics, vision training, and low vision aids.

- For over-the-counter and non-federal legend **Vitamins**, food supplements or replacements, nutritional or dietary supplements, formulas or special foods of any kind, except for *prescription* prenatal vitamins or *prescription* vitamin B-12 injections for anemias, neuropathies or dementias secondary to a vitamin B-12 deficiency, or certain over-the-counter medications that may be available under your *preventive care* benefits for certain individuals.



- **Wigs**, hair pieces and services for hair implants and electrolysis for any reason.

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 67 of 284

PLAN DEF0051528



State Health Plan for Teachers and State Employees

# 70/30 *PPO Plan*

# **Benefits Booklet**

**January 1, 2019 – December 31, 2019**



Revised: October 2, 2018

PLAN DEF0026287

| | | | |
|---|:---:|:---:|:---:|
| Psychiatric *Inpatient Hospital* | X | | X |
| *Substance Abuse Inpatient Hospital* | X | | X |
| *Inpatient* Medical Detoxification | X | | X |
| Psychiatric Residential Treatment Center | | X | X |
| *Substance Abuse* Residential Treatment Center | | X | X |
| Psychiatric Partial *Hospital*ization Program | | X | X |
| *Substance Abuse* Partial *Hospital*ization Program | | X | X |
| Psychiatric Intensive *Outpatient* Program | | X | X |
| *Substance Abuse* Intensive *Outpatient* Program | | X | X |

*Continuing treatment certifications must be requested by the last date of any previously certified period. Otherwise, certification decisions by the Mental Health Case Manager are effective as of the date the request for certification is received by the Mental Health Case Manager.*

*The following notice applies only when you are responsible for obtaining *certification*. NOTICE: Your actual expenses for *covered services* may exceed the stated *coinsurance* percentage or *copayment* amount because actual *provider* charges may not be used to determine the *Plan's* and *member's* payment obligations. For *out-of-network* benefits, you may be required to pay for charges over the *allowed amount* in addition to any *copayment* or *coinsurance* amount. In addition, certain services require *prior authorization* and *certification*. You are responsible for obtaining or having your *provider* obtain *certification* on your behalf if you go to an *out-of-network*, or out-of-state *provider*. Failure to obtain *certification* will result in a full denial of benefits.

**Mental Health and *Substance Abuse* Services Exclusions and Limitations:**

- Care for conditions not classified as psychiatric, emotional, or *substance abuse* illnesses.
- Psychoanalysis.
- Counseling with relatives about a patient with *mental illness*, alcoholism, drug addiction or *substance abuse.*
- *Inpatient* confinements that are primarily intended as a change of environment.
- Mental health services received in psychiatric residential treatment facilities when age 18 or older.
- *Substance abuse* residential treatment facilities are covered for all ages.
- Marriage Counseling.
- *Inpatient* psychiatric care rendered in a *hospital* not accredited by JCAHO.
- *Inpatient substance abuse* care rendered in a facility which is not currently accredited by a national health care organization approved by the *Mental Health Case Manager.*

Table of Contents

PLAN DEF0026341

- *Inpatient hospital* care for medical detoxification rendered in a facility which is not licensed as a *hospital* and currently accredited by a national health care organization approved by the *Mental Health Case Manager.*
- Outdoor components of a residential *substance abuse* treatment program, when such program is licensed as a *substance abuse* treatment program in the state in which services are provided, are covered only if facility based services are available as a part of the same program.
- Primary treatment of a psychiatric disorder in a residential treatment center (RTC) unless the RTC is licensed as a psychiatric RTC.
- Primary treatment of a *substance abuse* or *substance abuse* disorder in a residential treatment center (RTC) unless the RTC is licensed as a *substance abuse* or *substance abuse* RTC.
- Services by *providers* not currently licensed in the state in which services are provided.
- Psychotherapy as part of artificial means of conception.
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.
- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week.
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse or substance abuse RTC programs.*
- Academic education during residential treatment when charged separately.
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases.
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings.
- Training analysis.
- Treatment for personal or professional growth, development, training or professional *certification.*
- Aversive Treatment.
- Treatment programs based solely on the 12-step Model.
- Erhard Seminar Training (EST) or similar motivational services.

Table of Contents

PLAN DEF0026342

## Medicare Part D

<table>
<tr><td>

**IMPORTANT INFORMATION REGARDING**
**YOUR _PRESCRIPTION MEDICATION_ COVERAGE AND MEDICARE**

---

**Effective January 1, 2006, Medicare began offering _prescription medication_ coverage for all persons enrolled in Medicare. The _State Health Plan_ will continue to provide _prescription medication coverage_ for all _members on this plan_.**

**When _members_ become eligible for Medicare Part D, they will receive a notice of _creditable coverage_ from the _State Health Plan_. "_Creditable Coverage_" means that your _prescription medication_ coverage is at least as good as Part D coverage.**

**If your current _prescription medication_ coverage qualifies as "_creditable coverage_," you should not need Part D coverage, unless you are Medicaid eligible or eligible for low- income assistance. _Members_ of the _State Health Plan_ should evaluate their own coverage needs prior to purchasing a Medicare _Prescription Medication Plan_.**

</td></tr>
</table>

Part D: Is provided* by the _State Health Plan_ and pays for _prescription medication_ coverage.

*_High income members may be subject to an income-related monthly adjustment amount by Social Security._

## What Is Not Covered?

Exclusions for a specific type of service are stated along with the benefit description in "_Covered Services_." Exclusions that apply to many services are listed in this section, starting with general exclusions and then the remaining exclusions are listed in alphabetical order. To understand all of the exclusions that apply, read "_Covered Services_," "Summary of Benefits" and "What Is Not Covered?" The _Plan_ does not cover services, supplies, medications or charges for:

- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of _medical necessity._
- Any condition, disease, ailment, injury or diagnostic service to the extent that benefits are provided or persons are eligible for coverage under Title XVIII of the Social Security Act of 1965, including amendments, except as otherwise required by federal law.
- Conditions that federal, state or local law requires to be treated in a public facility.
- Any condition, disease, illness or injury that occurs in the course of employment, if the _member_, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a state Industrial Commission or other applicable regulatory agency approving a settlement agreement.
- Basic life or work-related or medical disability examinations.
- Benefits that are provided by any governmental unit except as required by law.
- Services that are ordered by a court that are otherwise excluded from benefits under this _Plan._
- Any condition suffered as a result of any act of war or while on active or reserve military duty.
- Services in excess of any _benefit period maximum_ or _lifetime maximum._
- Received prior to the _member's effective date._
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.

Table of Contents

PLAN_DEF0026348

| | |
|---|---|
| | equipment used similarly, except as specifically covered by the *Plan.* |
| |     o   Maintenance therapy. |
| |     o   Massage therapy. |
| |     o   Alternative therapy. |
| |     o   Hypothermia therapy. |
| | • **Thermography** or **thermograph** examination. |
| | • **Travel,** whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*. |
| | • **Treatment** or studies leading to or in connection with sex changes or modifications and related care. |
| **V** | • The following **vision** services: |
| |     o   Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens. |
| |     o   Routine eye examination services except as specifically covered by the *Plan*. |
| |     o   Eyeglasses or contact lenses, except as specifically covered in "*Prosthetic appliances*. |
| | • Orthoptics, vision training, and low vision aids. For over-the-counter and non-federal legend **Vitamins**, food supplements or replacements, nutritional or dietary supplements, formulas or special foods of any kind, except for *prescription* prenatal vitamins or *prescription* vitamin B-12 injections for anemias, neuropathies or dementias secondary to a vitamin B-12 deficiency, or certain over-the-counter medications that may be available under your *preventive care* benefits for certain individuals. |
| **W** | • **Wigs**, hair pieces and services for hair im*plants* and electrolysis for any reason. |

## Utilization Management

To make sure you have access to high quality, cost effective health care, the *State Health Plan* has a *Utilization Management* (*UM*) program. The *UM* program requires that certain health care services be reviewed and approved by the *State Health Plan* or its representative in order to receive benefits. As part of this process, the

Table of Contents

PLAN DEF0026354



# State Health Plan for Teachers and State Employees

## 70/30 PPO Plan

# Benefits Booklet

## January 1, 2020 - December 31, 2020



Revised: November 5, 2019

PLAN DEF0120461

# WHAT IS NOT COVERED?

Exclusions for a specific type of service are stated along with the benefit description in "*Covered Services*." Exclusions that apply to many services are listed in this section, starting with general exclusions and then the remaining exclusions are listed in alphabetical order. To understand all of the exclusions that apply, read "*Covered Services*," "Summary of Benefits" and "What Is Not Covered?" The *Plan* does not cover services, supplies, medications or charges for:

- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of *medical necessity*.
- Any condition, disease, ailment, injury, or diagnostic service to the extent that benefits are provided or persons are eligible for coverage under Title XVIII of the Social Security Act of 1965, including amendments, except as otherwise required by federal law.
- Conditions that federal, state or local law requires to be treated in a public facility.
- Any condition, disease, illness, or injury that occurs in the course of employment, if the *member*, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a state Industrial Commission or other applicable regulatory agency approving a settlement agreement.
- Basic life or work-related or medical disability examinations.
- Benefits that are provided by any governmental unit except as required by law.
- Services that are ordered by a court that are otherwise excluded from benefits under this Plan.
- Any condition suffered as a result of any act of war or while on active or reserve military duty.
- Services in excess of any *benefit period maximum* or *lifetime maximum*.
- Received prior to the *member's effective date*.
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group.
- Services provided at request of patient in a location other than physician's office which are normally provided in the physician's office.
- Day care services, chore services, attendant care services, homemaker services, companion care services, foster care services.
- Hair analysis, excluding arsenic.
- Transportation of portable X-ray equipment and personnel to home or nursing home, transportation of portable EKG to facility or other location.
- *Emergency* response systems.
- *Alternative medicine* services, which are unproven preventive or treatment modalities, also described as alternative, integrative, or complementary medicine, whether performed by a physician or any *other provider*.

**In addition, the *Plan* does not cover the following services, supplies, medications or charges:**



- **Acupuncture** and **acupressure**.
- **Administrative** charges billed by a *provider*, including, but not limited to charges for failure to keep a scheduled visit, completion of a claim form, obtaining medical records, late payments, shipping and handling, taxes and telephone charges.
- Costs in excess of the ***allowed amount*** for services usually provided by one *doctor*, when those services are provided by multiple *doctors* or *medical care* provided by more than one *doctor* for treatment of the same condition.

Return to Table of Contents

PLAN DEF0120509

- Primary treatment of a psychiatric disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a psychiatric RTC.
- Primary treatment of a *substance abuse* or *substance abuse* disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC.
- Services by *providers* not currently licensed in the state in which services are provided.
- Psychotherapy as part of artificial means of conception.
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.
- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week.
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse* or *substance abuse* RTC programs.
- Academic education during *residential treatment* when charged separately.
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases.
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings.
- Training analysis.
- Treatment for personal or professional growth, development, training or professional *certification.*
- Aversive Treatment.
- Treatment programs based solely on the 12-step Model.
- Erhard Seminar Training (EST) or similar motivational services.
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies.
- Expressive therapies (art, poetry, movement, psychodrama), guided imagery, or stress and relaxation therapy when billed separately.

Return to Table of Contents

PLAN DEF0120516
Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 75 of 284

- Occlusal (bite) adjustments.
- Extractions.

- The following types of **therapy:**
    - Applied Behavior Analysis (ABA) therapy except as specifically identified by the *Plan*.
    - Music therapy, recreational or activity therapy, and all types of animal therapy. Remedial reading and all forms of special education and supplies or equipment used similarly, except as specifically covered by the *Plan*.
    - Massage therapy.
    - Alternative therapy.
    - Hypothermia therapy.
    - Cognitive therapy.
    - Speech therapy for stammering, stuttering, or developmental delay.
    - Treatment of speech, language, voice, communication and/or auditory processing disorder.
    - Pulmonary rehabilitation group sessions.
    - Peripheral arterial disease rehabilitation.
    - Community or work integration training, work hardening or conditioning.

- **Thermography** or **thermograph** examination.
- **Transplant** exclusions include:
    - The purchase price of the organ or tissue if any organ or tissue is sold rather than donated to the recipient *member*.
    - The procurement of organs, tissue, bone marrow or peripheral blood stem cells or any other donor services if the recipient is not a *member*.
    - *Transplants*, including high dose chemotherapy, considered *experimental* or *investigational*.
    - Services for or related to the transplantation of animal or artificial organs or tissues.

- **Travel**, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*.

- **Treatment** or studies leading to or in connection with sex changes or modifications and related care.



- The following **vision** services:

    - Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens.
    - Routine eye examination services except as specifically covered by the *Plan*.
    - Eyeglasses or contact lenses, except as specifically covered in "*Prosthetic appliances*."
    - Orthoptics, vision training, and low vision aids.

- For over-the-counter and non-federal legend **Vitamins**, food supplements or replacements, nutritional or dietary supplements, formulas, or special foods of any

Return to Table of Contents

PLAN DEF0120520




## State Health Plan for Teachers and State Employees

# 70/30 PPO Plan

# Benefits Booklet

### January 1, 2021 - December 31, 2021



PLAN DEF0191637

# WHAT IS NOT COVERED?

Exclusions for a specific type of service are stated along with the benefit description in "*Covered Services*." Exclusions that apply to many services are listed in this section, starting with general exclusions and then the remaining exclusions are listed in alphabetical order. To understand all of the exclusions that apply, read "*Covered Services*," "Summary of Benefits" and "What Is Not Covered?" The *Plan* does not cover services, supplies, medications or charges for:

- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of *medical necessity*.
- Any condition, disease, ailment, injury, or diagnostic service to the extent that benefits are provided or persons are eligible for coverage under Title XVIII of the Social Security Act of 1965, including amendments, except as otherwise required by federal law.
- Conditions that federal, state or local law requires to be treated in a public facility.
- Any condition, disease, illness, or injury that occurs in the course of employment, if the *member*, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a state Industrial Commission or other applicable regulatory agency approving a settlement agreement.
- Basic life or work-related or medical disability examinations.
- Benefits that are provided by any governmental unit except as required by law.
- Services that are ordered by a court that are otherwise excluded from benefits under this Plan.
- Any condition suffered as a result of any act of war or while on active or reserve military duty.
- Services in excess of any *benefit period maximum* or *lifetime maximum*.
- Received prior to the *member's effective date*.
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group.
- Day care services, chore services, attendant care services, homemaker services, companion care services, foster care services.
- Hair analysis, excluding arsenic.
- Transportation of portable X-ray equipment and personnel to home or nursing home, transportation of portable EKG to facility or other location.
- *Emergency* response systems.
- *Alternative medicine* services, which are unproven preventive or treatment modalities, also described as alternative, integrative, or complementary medicine, whether performed by a physician or any *other provider*.

**In addition, the *Plan* does not cover the following services, supplies, medications or charges:**



- **Acupuncture** and **acupressure.**
- **Administrative** charges billed by a *provider*, including, but not limited to charges for failure to keep a scheduled visit, completion of a claim form, obtaining medical records, late payments, shipping and handling, taxes and telephone charges.
- Costs in excess of the **allowed amount** for services usually provided by one *doctor*, when those services are provided by multiple *doctors* or *medical care* provided by more than one *doctor* for treatment of the same condition.
- **Ambulance services:**
  - No benefits are provided primarily for the convenience of travel or where not *medically necessary*.
  - Transportation for the purpose of receiving services that are not considered *covered services*, even if the destination is an appropriate facility.

PLAN DEF0191686

- Over-the-counter compression or elastic knee-high or other stocking products for *Lymphedema.*



- Certain **Medical Supplies**
  - *Medical supplies* not ordered by a *doctor* for treatment of a specific diagnosis or procedure.
  - Thermometers.
  - Over-the-counter gauze, tape, adhesive first-aid bandages.
  - Spirometers and all related accessories.
  - Lubricants except when used in conjunction with specialized self-care procedures such as intermittent catheterization and insulin pumps.
  - Chemical or antiseptic solutions except when used in conjunction with specialized self-care procedures such as intermittent catheterization and insulin pumps.
  - Mucus traps.
  - Pocket nebulizers.
  - Replacement bulbs or lamps for therapeutic light

- **Medical testimony.**

- Services or supplies deemed not *medically necessary* or ordered by a provider.

- **Mental Nervous and Substance Abuse** exclusions and limitations:
  - Care for conditions not classified as psychiatric, emotional, or *substance abuse* illnesses.
  - Psychoanalysis.
  - Counseling with relatives about a patient with *mental illness*, alcoholism, drug addiction or *substance abuse.*
  - *Inpatient* confinements that are primarily intended as a change of environment.
  - Mental health services received in psychiatric residential treatment facilities when age 18 or older.
  - *Substance Abuse* residential treatment facilities are covered for all ages.
  - Marriage counseling.
  - *Inpatient* psychiatric care rendered in a *hospital* not accredited by JCAHO.
  - *Inpatient Substance Abuse* care rendered in a facility which is not currently accredited by a national health care organization approved by the *Mental Health Case Manager.*
  - *Inpatient hospital* care for medical detoxification rendered in a facility which is not licensed as a *hospital* and currently accredited by a nationally recognized organization approved by the *Mental Health Case Manager.*
  - Outdoor components of a residential *substance abuse* treatment program, when such program is licensed as a *substance abuse* treatment program in the state in which services are provided, are covered only if facility-based services are available as a part of the same program.
  - Primary treatment of a psychiatric disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a psychiatric RTC.
  - Primary treatment of a *substance abuse* or *substance abuse* disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC.
  - Services by *providers* not currently licensed in the state in which services are provided.
  - Psychotherapy as part of artificial means of conception.
  - Psychological assessment and psychotherapy treatment in conjunction with

PLAN DEF0191692

proposed gender transformation.

- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*.
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week.
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*.
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse* or *substance abuse* RTC programs.
- Academic education during *residential treatment* when charged separately.
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases.
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings.
- Training analysis.
- Treatment for personal or professional growth, development, training or professional *certification*.
- Aversive Treatment.
- Treatment programs based solely on the 12-step Model.
- Erhard Seminar Training (EST) or similar motivational services.
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies.
- Expressive therapies (art, poetry, movement, psychodrama), guided imagery, or stress and relaxation therapy when billed separately.
- Telephonic crisis management as a separate charge.
- Sedative action, electro stimulation therapy.
- Z therapy, also known as "holding therapy."
- Narcotherapy with LSD.
- Environmental ecology treatments.
- Hemodialysis for schizophrenia.
- Rolfing.
- Sensitivity training.
- Room and Board costs for patients admitted to a partial *hospital* or intensive *outpatient* program are not covered.

49

Return to Table of Contents

PLAN DEF0191693

- **Thermography** or **thermograph** examination.
- **Transplant** exclusions include:
  - The purchase price of the organ or tissue if any organ or tissue is sold rather than donated to the recipient *member*.
  - The procurement of organs, tissue, bone marrow or peripheral blood stem cells or any other donor services if the recipient is not a *member*.
  - *Transplants*, including high dose chemotherapy, considered *experimental* or *investigational*.
  - Services for or related to the transplantation of animal or artificial organs or tissues.

- **Travel**, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*.

- **Treatment** or studies leading to or in connection with sex changes or modifications and related care.



- The following **vision** services:

  - Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens.
  - Routine eye examination services except as specifically covered by the *Plan*.
  - Eyeglasses or contact lenses, except as specifically covered in "*Prosthetic appliances.*"
  - Orthoptics, vision training, and low vision aids.

- For over-the-counter and non-federal legend **Vitamins**, food supplements or replacements, nutritional or dietary supplements, formulas, or special foods of any kind, except for *prescription* prenatal vitamins or *prescription* vitamin B-12 injections for anemias, neuropathies, or dementias secondary to a vitamin B-12 deficiency, or certain over-the-counter medications that may be available under your *preventive care* benefits for certain individuals.



- **Wigs**, hair pieces and services for hair implants and electrolysis for any reason.

PLAN DEF0191697
Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 81 of 284

# Exhibit 9



State Health Plan for Teachers and State Employees

# Enhanced 80/20 PPO Plan

# Benefits Booklet

**January 1 – December 31, 2016**





**Revised: August 3, 2016**

PLAN DEF0019352

**Mental Health and Chemical Dependency Services Exclusions and Limitations**

- Care for conditions not classified as psychiatric, emotional, or substance abuse illnesses
- Psychoanalysis
- Counseling with relatives about a patient with *mental illness*, alcoholism, drug addiction or substance abuse
- *Inpatient* confinements that are primarily intended as a change of environment
- Mental health services received in psychiatric residential treatment facilities when age 18 or older. Chemical Dependency residential treatment facilities are covered for all ages.
- Marriage counseling
- Inpatient psychiatric care rendered in a hospital not accredited by JCAHO
- Inpatient chemical dependency care rendered in a facility which is not currently accredited by a national health care organization approved by the Mental Health Case Manager.
- Inpatient hospital care for medical detoxification rendered in a facility which is not licensed as a hospital and currently accredited by a nationally recognized organization approved by the Mental Health Case Manager.
- Outdoor components of a residential chemical dependency treatment program, when such program is licensed as a chemical dependency treatment program in the state in which services are provided, are covered only if facility based services are available as a part of the same program
- Primary treatment of a psychiatric disorder in a residential treatment center (RTC) unless the RTC is licensed as a psychiatric RTC
- Primary treatment of a chemical dependency or substance abuse disorder in a residential treatment center (RTC) unless the RTC is licensed as a chemical dependency or substance abuse RTC
- Services by providers not currently licensed in the state in which services are provided
- Psychotherapy as part of artificial means of conception
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation
- Psychological testing for those persons with a chemical dependency diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has registered nurses who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the Mental Health Case Manager
- Therapeutic boarding schools as a chemical dependency or substance abuse residential treatment center (RTC) unless the program is licensed as a chemical dependency RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has registered nurses who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the Mental Health Case Manager
- Wilderness camps and stand-along outdoor treatment programs are not covered as chemical dependency or substance abuse RTC programs
- Academic education during residential treatment when charged separately
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)

39

- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination
- For telephone consultations or web-based, online or other electronic evaluations, charges for failure to keep a scheduled visit, charges for completion of a claim form, charges for obtaining medical records, and late payment charges
- *Incurred* more than 18 months prior to the *member's* submission of a claim
- For *cosmetic* purposes for any reason, including but not limited to removal of excess skin from the abdomen, arms or thighs, except as specifically covered by your health benefit plan
- For camisoles, or other clothing, post-mastectomy
- For any services that would not be necessary if a non-*covered service* had not been received, except for *emergency services* in the case of an *emergency*
- For benefits that are provided by any governmental unit except as required by law
- For services that are ordered by a court that are otherwise excluded from benefits under this health benefit plan
- For care that the *provider* cannot legally provide or legally charge or is outside the scope of license or *certification*
- Provided and billed by a licensed health care professional who is in training
- Available to a *member* without charge and/or for care given to a *member* by a *provider* who is in a *member's* immediate family
- For any condition suffered as a result of any act of war or while on active or reserve military duty
- In excess of the *allowed amount* for services usually provided by one doctor, when those services are provided by multiple doctors
- For palliative, *cosmetic* or *routine foot care*
- For dental care, dentures, dental implants, oral orthotic devices, palatal expanders and orthodontics except as specifically covered by the Plan
- Considered to be dental services provided in a *hospital*, except when a hazardous condition exists at the same time or covered oral *surgery* services are required at the same time as a result of a bodily injury
- For any treatment or regimen, medical or surgical, for the purpose of reducing or controlling the weight of a *member* or for treatment of obesity, except for nutritional visits or surgical treatment of morbid obesity, or as specifically covered by your health benefit plan
- Bariatric *surgery*, except when provided at a Blue Distinction Center (BDC).
- Wigs, hair pieces and hair implants for any reason
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group
- For prescribed *sexual dysfunction* medications
- Treatment or studies leading to or in connection with sex changes or modifications and related care
- Music therapy, remedial reading, recreational or activity therapy, alternative therapy services, all forms of special education and supplies or equipment used similarly
- Hypnosis except when used for control of acute or chronic pain
- Acupuncture and acupressure
- Surgical procedures for psychological or emotional reasons
- For travel, whether or not recommended or prescribed by a doctor or other licensed health care professional, except as specifically covered by your health benefit plan
- For heating pads, hot water bottles, ice packs and personal hygiene and convenience items such as, but not limited to, devices and equipment used for environmental control, incontinence products (including briefs, diapers, underwear, underpads), and urinary incontinence devices (including bed wetting devices) and equipment
- For devices and equipment used for environmental accommodation requiring vehicle and/or building modifications such as, but not limited to, positioning seats, chair lifts, stair lifts, home elevators, and ramps

51

PLAN DEF0019413





State Health Plan for Teachers and State Employees

# ENHANCED 80/20 PPO PLAN
# BENEFITS BOOKLET

January 1 – December 31, 2017





Revised: September 3, 2016

1

PLAN DEF0050758



- Medically necessary services for the treatment of gender dysphoria.

### Outpatient Services

Covered *outpatient* treatment services when provided in a mental health or *chemical dependency* treatment facility include:
- Each service listed in the section under *office visit* services
- Partial-day/night hospitalization services (minimum of four hours per day and 20 hours per week)
- Intensive Outpatient Program services (less than four hours per day and minimum of nine hours per week).
- Certain *in-network* and out-of-network outpatient services, such as partial hospitalization and intensive therapy, require prior authorization and *certification* or services will not be covered. The timeframe for receiving prior authorization and treatment certification are set forth in the table below. The list of services that require prior authorization may change from time to time.

### Inpatient Services

Covered *inpatient* treatment services also include:
- Each service listed under *office visit* services
- Semi-private room and board
- Detoxification to treat *chemical dependency*.

### Applied Behavior Analysis

Coverage is provided for *Applied Behavior Analysis* when all of the following conditions are met:
- The *member* is younger than age 26, and

- Diagnosed with Autism Spectrum Disorder by a licensed physician (MD or DO) or a licensed doctoral level clinical psychologist (PhD or PsyD) utilizing results from a face-to-face evaluation and a clinically recognized, validated tool endorsed by the Mental Health Case Manager, and
- Treatment is determined by the Mental Health Case Manager to be medically necessary

Other than those listed in the second bullet above, no other providers are eligible for reimbursement of the diagnostic evaluation. Licensure of the MD, DO, PhD or PsyD must be in the state in which the diagnostic evaluation is performed.

The diagnostic evaluation does not require prior approval. However, the results of the diagnostic evaluation may be requested by the Mental Health Case Manager when authorization for ABA (Applied Behavior Analysis) is requested.

Clinically recognized, validated tools endorsed by the Mental Health Case Manager can be found at **http://www.cdc.gov/ncbddd/autism/screening.html**.

ABA medical necessity criteria are available on the Mental Health Case Manager's web site at **https://www.beaconhealthoptions.com/providers/beacon/handbook/clinical-criteria/.**

Prior approval by the Mental Health Case Manager is required for the initiation of ABA treatment services. ABA therapy for which prior approval is not obtained will not be covered.

Coverage for *Applied Behavior Analysis (ABA)* is limited to a maximum of $36,000 per benefit year and is only available in-network, both in-state and out-of-state.

  Return to Table of Contents

PLAN DEF0050800



State Health Plan for Teachers and State Employees

80/20 PPO Plan

# Benefits Booklet

January 1, 2018-December 31, 2018





Revised: Sept. 26, 2018

PLAN DEF0039444

| | | | |
|---|---|---|---|
| **Psychiatric Intensive *Outpatient* Program** | | X | X |
| ***Substance Abuse* Intensive *Outpatient* Program** | | X | X |

\*Continuing treatment certifications must be requested by the last date of any previously certified period. Otherwise, certification decisions by the Mental Health Case Manager are effective as of the date the request for certification is received by the Mental Health Case Manager.

\*The following notice applies only when you are responsible for obtaining *certification*. NOTICE: Your actual expenses for *covered services* may exceed the stated *coinsurance* percentage or *copayment* amount because actual *provider* charges may not be used to determine the *Plan's* and *member's* payment obligations. For *out-of-network* benefits, you may be required to pay for charges over the *allowed amount* in addition to any *copayment* or *coinsurance* amount. In addition, certain services require *prior authorization* and *certification*. You are responsible for obtaining or having your *provider* obtain *certification* on your behalf if you go to an *out-of-network*, or out-of-state *provider*. Failure to obtain *certification* will result in a full denial of benefits.

## *Mental Health and Substance Abuse Services Exclusions and Limitations*

- Care for conditions not classified as psychiatric, emotional, or *substance abuse* illnesses
- Psychoanalysis
- Counseling with relatives about a patient with *mental illness*, alcoholism, drug addiction or *substance abuse*
- *Inpatient* confinements that are primarily intended as a change of environment
- Mental health services received in psychiatric residential treatment facilities when age 18 or older.
- *Substance Abuse* residential treatment facilities are covered for all ages.
- Marriage counseling
- *Inpatient* psychiatric care rendered in a *hospital* not accredited by JCAHO
- *Inpatient Substance Abuse* care rendered in a facility which is not currently accredited by a national health care organization approved by the *Mental Health Case Manager*
- *Inpatient hospital* care for medical detoxification rendered in a facility which is not licensed as a *hospital* and currently accredited by a nationally recognized organization approved by the *Mental Health Case Manager*
- Outdoor components of a residential *substance abuse* treatment program, when such program is licensed as a *substance abuse* treatment program in the state in which services are provided, are covered only if facility based services are available as a part of the same program
- Primary treatment of a psychiatric disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a psychiatric RTC
- Primary treatment of a *substance abuse* or *substance abuse* disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC
- Services by *providers* not currently licensed in the state in which services are provided
- Psychotherapy as part of artificial means of conception
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation
- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurse*s who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*

Return to Table of Contents

PLAN DEF0039491

- Is not recognized by the *Plan* as an eligible *provider*



**R**

- The following **residential care** services:

    - Care in a self-care unit, apartment or similar facility operated by or connected with a *hospital*
    - Domiciliary care or rest cures, care provided and billed for by a hotel, health resort, convalescent home, rest home, nursing home or other extended care facility, home for the aged, infirmary, school infirmary, institution providing education in special environments, in residential treatment facilities (except for *substance abuse* and mental health treatment) or any similar facility or institution.

- ***Respite care***, whether in the home or in a facility or *inpatient* setting, except as specifically covered by the *Plan*.

**S**

- **Services** or **supplies** that are:

    o Not performed by or upon the direction of a *doctor* or *other provider*
    o Compression stockings, garter belts, except as specifically covered by your health benefit plan
    o Available to a *member* with charge.

- ***Sexual dysfunction*** unrelated to organic disease.

- **Shoe** lifts, shoe accessories, attachment, equipment, inserts and other modifications, and shoes of any type unless part of a brace, and except as specifically covered by your health benefit plan

- Services, supplies, medications or equipment used for the control or treatment of **stammering or stuttering.**

- **Safety** equipment, devices or accessories, including but limited to helmets with face guards and soft interfaces and any type of restraints

**T**

- **Telehealth** services originating site facility fees
- The following types of **therapy:**

    - Applied Behavior Analysis (ABA) therapy except as specifically identified by the *Plan*
    - Music therapy, recreational or activity therapy, and all types of animal therapy. Remedial reading and all forms of special education and supplies or equipment used similarly, except as specifically covered by the *Plan*
    - Maintenance therapy
    - Massage therapy
    - Alternative therapy
    - Hypothermia therapy

- **Thermography** or **thermograph** examination
- **Travel**, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*.

- Treatment or studies leading to or in connection with sex changes or modifications and related care



**V**

- The following **vision** services:

    - Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of

51

Return to Table of Contents

PLAN DEF0039501



**State Health Plan for Teachers and State Employees**

# 80/20 PPO Plan

# Benefits Booklet

**January 1, 2019-December 31, 2019**





Revised: April 4, 2019

PLAN DEF0001785

order to meet the *Plan's* requirements for *prior authorization* and continuing treatment *certification*s of *covered services*.

You should work with your *doctor* or *other professional provider* to make sure that *certification* has been obtained for partial-day/night, intensive therapy, or *inpatient* services. See "*Utilization Management.*" Contact the *Mental Health Case Manager* at the number given in "Who to Contact" for *certification.*

### Outside of North Carolina

Although *prior authorization* is not required in an *emergency,* you may contact the *Mental Health Case Manager* for assistance in locating a *provider.*

If you need urgent *inpatient* or *outpatient* mental health or *substance abuse* services while outside North Carolina, contact Customer Service at the number listed in "Who to Contact" for assistance in locating a *provider*. You must request *prior authorization* and receive *certification* from the *Mental Health Case Manager* for mental health and *substance abuse* services other than *office visits* or in *emergencies*. The numbers for *Mental Health Case Manager* are provided in "Who to Contact" and on the back of your *ID card*. For more information on these services, see "*Covered Services.*"

### Timeframe Requirements for Prior Authorization and Treatment Certification of Covered Services*

| Covered Service | Within Two (2) Business Days of Admission | Prior to Admission to the Program | Continuing Treatment Certifications* |
|---|---|---|---|
| Crisis Evaluation & Stabilization | X | | X |
| Psychiatric *Inpatient Hospital* | X | | X |
| *Substance Abuse Inpatient Hospital* | X | | X |
| *Inpatient* Medical Detoxification | X | | X |
| Psychiatric Residential Treatment Center | | X | X |
| *Substance Abuse* Residential Treatment Center | | X | X |
| Psychiatric Partial Hospitalization Program | | X | X |
| *Substance Abuse* Partial Hospitalization Program | | X | X |
| Psychiatric Intensive *Outpatient* Program | | X | X |
| *Substance Abuse* Intensive *Outpatient* Program | | X | X |

*Continuing treatment certifications must be requested by the last date of any previously certified period. Otherwise, certification decisions by the Mental Health Case Manager are effective as of the date the request for certification is received by the Mental Health Case Manager.*

**The following notice applies only when you are responsible for obtaining *certification*. NOTICE: Your actual expenses for *covered services* may exceed the stated *coinsurance* percentage or *copayment* amount because actual *provider* charges may not be used to determine the *Plan's* and *member's* payment obligations. For *out-of-network* benefits, you may be required to pay for charges over the *allowed amount* in addition to any *copayment* or *coinsurance* amount. In addition, certain services require *prior authorization* and *certification*. You are responsible for obtaining or having your *provider* obtain *certification* on your behalf if you go to an *out-of-network*, or out-of-state *provider*. Failure to obtain *certification* will result in a full denial of benefits.

### Mental Health and Substance Abuse Services Exclusions and Limitations:
- Care for conditions not classified as psychiatric, emotional, or *substance abuse* illnesses.
- Psychoanalysis.

PLAN DEF0001833
Case 1:19-cv-00272-LCB-LPA Document 141 Filed 11/30/21 Page 92 of 284

- Counseling with relatives about a patient with *mental illness*, alcoholism, drug addiction or *substance abuse*.
- *Inpatient* confinements that are primarily intended as a change of environment.
- Mental health services received in psychiatric residential treatment facilities when age 18 or older.
- *Substance Abuse* residential treatment facilities are covered for all ages.
- Marriage counseling.
- *Inpatient* psychiatric care rendered in a *hospital* not accredited by JCAHO.
- *Inpatient Substance Abuse* care rendered in a facility which is not currently accredited by a national health care organization approved by the *Mental Health Case Manager*.
- *Inpatient hospital* care for medical detoxification rendered in a facility which is not licensed as a *hospital* and currently accredited by a nationally recognized organization approved by the *Mental Health Case Manager*.
- Outdoor components of a residential *substance abuse* treatment program, when such program is licensed as a *substance abuse* treatment program in the state in which services are provided, are covered only if facility based services are available as a part of the same program.
- Primary treatment of a psychiatric disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a psychiatric RTC.
- Primary treatment of a *substance abuse* or *substance abuse* disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC.
- Services by *providers* not currently licensed in the state in which services are provided.
- Psychotherapy as part of artificial means of conception.
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.
- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*.
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week.
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*.
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse* or *substance abuse* RTC programs.
- Academic education during *residential treatment* when charged separately.
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases.
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings.
- Training analysis.
- Treatment for personal or professional growth, development, training or professional *certification*.
- Aversive Treatment.
- Treatment programs based solely on the 12-step Model.
- Erhard Seminar Training (EST) or similar motivational services.
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies.

Return to Table of Contents

PLAN DEF0001834

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 93 of 284

# WHAT IS NOT COVERED?

Exclusions for a specific type of service are stated along with the benefit description in "*Covered Services*." Exclusions that apply to many services are listed in this section, starting with general exclusions and then the remaining exclusions are listed in alphabetical order. To understand all of the exclusions that apply, read "*Covered Services*," "Summary of Benefits" and "What Is Not Covered?" The *Plan* does not cover services, supplies, medications or charges for:

- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of *medical necessity*.
- Any condition, disease, ailment, injury or diagnostic service to the extent that benefits are provided or persons are eligible for coverage under Title XVIII of the Social Security Act of 1965, including amendments, except as otherwise required by federal law.
- Conditions that federal, state or local law requires to be treated in a public facility.
- Any condition, disease, illness or injury that occurs in the course of employment, if the *member*, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a state Industrial Commission or other applicable regulatory agency approving a settlement agreement.
- Basic life or work-related or medical disability examinations.
- Benefits that are provided by any governmental unit except as required by law.
- Services that are ordered by a court that are otherwise excluded from benefits under this Plan.
- Any condition suffered as a result of any act of war or while on active or reserve military duty.
- Services in excess of any *benefit period maximum* or *lifetime maximum*.
- Received prior to the *member's effective date*.
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group.
- Services provided at request of patient in a location other than physician's office which are normally provided in the physician's office.
- Day care services, chore services, attendant care services, homemaker services, companion care services, foster care services.
- Hair analysis, excluding arsenic.
- Transportation of portable X-ray equipment and personnel to home or nursing home, transportation of portable EKG to facility or other location.
- *Emergency* response systems.
- *Alternative medicine* services, which are unproven preventive or treatment modalities, also described as alternative, integrative, or complementary medicine, whether performed by a physician or any *other provider*.

**In addition, the *Plan* does not cover the following services, supplies, medications or charges:**



- **Acupuncture** and **acupressure.**
- **Administrative** charges billed by a *provider*, including charges for failure to keep a scheduled visit, completion of a claim form, obtaining medical records, late payments and telephone charges.
- Costs in excess of the *allowed amount* for services usually provided by one *doctor*, when those services are provided by multiple *doctors* or *medical care* provided by more than one *doctor* for treatment of the same condition.
- **Athletic** training evaluations or re-evaluations.
- **Audiometric** testing of groups, Bekesy audiometry, ear protector attenuation measurements.

PLAN DEF0001840

- Care in a self-care unit, apartment or similar facility operated by or connected with a *hospital*.
- Domiciliary care or rest cures, care provided and billed for by a hotel, health resort, convalescent home, rest home, nursing home or other extended care facility, home for the aged, infirmary, school infirmary, institution providing education in special environments, in residential treatment facilities (except for *substance abuse* and mental health treatment) or any similar facility or institution.

- **Respite care**, whether in the home or in a facility or *inpatient* setting, except as specifically covered by the *Plan*.

**S**

- **Services** or **supplies** that are:
  - Not performed by or upon the direction of a *doctor* or *other provider*.
  - Compression stockings, garter belts, except as specifically covered by your health benefit plan.
  - Available to a *member* without charge.

- **Sexual dysfunction** unrelated to organic disease.

- **Shoe** lifts, shoe accessories, attachment, equipment, inserts and other modifications, and shoes of any type unless part of a brace, and except as specifically covered by your health benefit plan.

- Services, supplies, medications or equipment used for the control or treatment of **stammering or stuttering**.

- **Safety** equipment, devices or accessories, including but limited to helmets with face guards and soft interfaces and any type of restraints.

**T**

- **Telehealth** services originating site facility fees.
- The following types of **therapy:**

  - Applied Behavior Analysis (ABA) therapy except as specifically identified by the *Plan*.
  - Music therapy, recreational or activity therapy, and all types of animal therapy. Remedial reading and all forms of special education and supplies or equipment used similarly, except as specifically covered by the *Plan*.
  - Maintenance therapy.
  - Massage therapy.
  - Alternative therapy.
  - Hypothermia therapy.

- **Thermography** or **thermograph** examination.
- **Travel**, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*.

- **Treatment** or studies leading to or in connection with sex changes or modifications and related care.

**V** 

- The following **vision** services:

  - Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens.
  - Routine eye examination services except as specifically covered by the *Plan*.

 Return to Table of Contents

PLAN DEF0001844



**State Health Plan for Teachers and State Employees**

80/20 PPO Plan

# Benefits Booklet

**January 1, 2020 - December 31, 2020**



Revised: October 22, 2019

PLAN DEF0120577

# WHAT IS NOT COVERED?

Exclusions for a specific type of service are stated along with the benefit description in "*Covered Services*." Exclusions that apply to many services are listed in this section, starting with general exclusions and then the remaining exclusions are listed in alphabetical order. To understand all of the exclusions that apply, read "*Covered Services*," "Summary of Benefits" and "What Is Not Covered?" The *Plan* does not cover services, supplies, medications or charges for:

- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of *medical necessity*.
- Any condition, disease, ailment, injury, or diagnostic service to the extent that benefits are provided or persons are eligible for coverage under Title XVIII of the Social Security Act of 1965, including amendments, except as otherwise required by federal law.
- Conditions that federal, state or local law requires to be treated in a public facility.
- Any condition, disease, illness, or injury that occurs in the course of employment, if the *member*, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a state Industrial Commission or other applicable regulatory agency approving a settlement agreement.
- Basic life or work-related or medical disability examinations.
- Benefits that are provided by any governmental unit except as required by law.
- Services that are ordered by a court that are otherwise excluded from benefits under this Plan.
- Any condition suffered as a result of any act of war or while on active or reserve military duty.
- Services in excess of any *benefit period maximum* or *lifetime maximum*.
- Received prior to the *member's effective date*.
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group.
- Services provided at request of patient in a location other than physician's office which are normally provided in the physician's office.
- Day care services, chore services, attendant care services, homemaker services, companion care services, foster care services.
- Hair analysis, excluding arsenic.
- Transportation of portable X-ray equipment and personnel to home or nursing home, transportation of portable EKG to facility or other location.
- *Emergency* response systems.
- *Alternative medicine* services, which are unproven preventive or treatment modalities, also described as alternative, integrative, or complementary medicine, whether performed by a physician or any *other provider*.

**In addition, the *Plan* does not cover the following services, supplies, medications or charges:**



- **Acupuncture** and **acupressure**.
- **Administrative** charges billed by a *provider*, including, but not limited to charges for failure to keep a scheduled visit, completion of a claim form, obtaining medical records, late payments, shipping and handling, taxes and telephone charges.
- Costs in excess of the ***allowed amount*** for services usually provided by one *doctor*, when those services are provided by multiple *doctors* or *medical care* provided by more than one *doctor* for treatment of the same condition.

Return to Table of Contents

PLAN DEF0120625

- Primary treatment of a psychiatric disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a psychiatric RTC.
- Primary treatment of a *substance abuse* or *substance abuse* disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC.
- Services by *providers* not currently licensed in the state in which services are provided.
- Psychotherapy as part of artificial means of conception.
- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.
- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week.
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager.*
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse* or *substance abuse* RTC programs.
- Academic education during *residential treatment* when charged separately.
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases.
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings.
- Training analysis.
- Treatment for personal or professional growth, development, training or professional *certification.*
- Aversive Treatment.
- Treatment programs based solely on the 12-step Model.
- Erhard Seminar Training (EST) or similar motivational services.
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies.
- Expressive therapies (art, poetry, movement, psychodrama), guided imagery, or stress and relaxation therapy when billed separately.

Return to Table of Contents

PLAN DEF0120632

- ▪ Occlusal (bite) adjustments.
- ▪ Extractions.
- The following types of **therapy:**
  - ▪ Applied Behavior Analysis (ABA) therapy except as specifically identified by the *Plan*.
  - ▪ Music therapy, recreational or activity therapy, and all types of animal therapy. Remedial reading and all forms of special education and supplies or equipment used similarly, except as specifically covered by the *Plan*.
  - ▪ Massage therapy.
  - ▪ Alternative therapy.
  - ▪ Hypothermia therapy.
  - ▪ Cognitive therapy.
  - ▪ Speech therapy for stammering, stuttering, or developmental delay.
  - ▪ Treatment of speech, language, voice, communication and/or auditory processing disorder.
  - ▪ Pulmonary rehabilitation group sessions.
  - ▪ Peripheral arterial disease rehabilitation.
  - ▪ Community or work integration training, work hardening or conditioning.
- **Thermography** or **thermograph** examination.
- **Transplant** exclusions include:
  - The purchase price of the organ or tissue if any organ or tissue is sold rather than donated to the recipient *member*.
  - The procurement of organs, tissue, bone marrow or peripheral blood stem cells or any other donor services if the recipient is not a *member*.
  - *Transplants*, including high dose chemotherapy, considered *experimental* or *investigational*.
  - Services for or related to the transplantation of animal or artificial organs or tissues.

- **Travel**, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*.
- **Treatment** or studies leading to or in connection with sex changes or modifications and related care.



- The following **vision** services:

  - ▪ Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury. Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens.
  - ▪ Routine eye examination services except as specifically covered by the *Plan*.
  - ▪ Eyeglasses or contact lenses, except as specifically covered in "*Prosthetic appliances*."
  - ▪ Orthoptics, vision training, and low vision aids.

- For over-the-counter and non-federal legend **Vitamins**, food supplements or replacements, nutritional or dietary supplements, formulas, or special foods of any

53

Return to Table of Contents

PLAN DEF0120636



# State Health Plan for Teachers and State Employees

## 80/20 PPO Plan

# Benefits Booklet

### January 1, 2021 - December 31, 2021



Revised:

PLAN DEF0191518

# WHAT IS NOT COVERED?

Exclusions for a specific type of service are stated along with the benefit description in "*Covered Services.*" Exclusions that apply to many services are listed in this section, starting with general exclusions and then the remaining exclusions are listed in alphabetical order. To understand all of the exclusions that apply, read "*Covered Services,*" "Summary of Benefits" and "What Is Not Covered?" The *Plan* does not cover services, supplies, medications or charges for:

- Anything specifically listed in this benefits booklet as not covered or excluded, regardless of *medical necessity.*
- Any condition, disease, ailment, injury, or diagnostic service to the extent that benefits are provided or persons are eligible for coverage under Title XVIII of the Social Security Act of 1965, including amendments, except as otherwise required by federal law.
- Conditions that federal, state or local law requires to be treated in a public facility.
- Any condition, disease, illness, or injury that occurs in the course of employment, if the *member*, employer or carrier is liable or responsible for the specific medical charge (1) according to a final adjudication of the claim under a state's workers' compensation laws, or (2) by an order of a state Industrial Commission or other applicable regulatory agency approving a settlement agreement.
- Basic life or work-related or medical disability examinations.
- Benefits that are provided by any governmental unit except as required by law.
- Services that are ordered by a court that are otherwise excluded from benefits under this Plan.
- Any condition suffered as a result of any act of war or while on active or reserve military duty.
- Services in excess of any *benefit period maximum* or *lifetime maximum.*
- Received prior to the *member's effective date.*
- Received after the coverage termination date, regardless of when the treated condition occurred, and regardless of whether the care is a continuation of care received prior to the termination.
- Received from a dental or medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust or similar person or group.
- Day care services, chore services, attendant care services, homemaker services, companion care services, foster care services.
- Hair analysis, excluding arsenic.
- Transportation of portable X-ray equipment and personnel to home or nursing home, transportation of portable EKG to facility or other location.
- *Emergency* response systems.
- *Alternative medicine* services, which are unproven preventive or treatment modalities, also described as alternative, integrative, or complementary medicine, whether performed by a physician or any *other provider.*

**In addition, the *Plan* does not cover the following services, supplies, medications or charges:**



- **Acupuncture** and **acupressure.**
- **Administrative** charges billed by a *provider*, including, but not limited to charges for failure to keep a scheduled visit, completion of a claim form, obtaining medical records, late payments, shipping and handling, taxes and telephone charges.
- Costs in excess of the **allowed amount** for services usually provided by one *doctor*, when those services are provided by multiple *doctors* or *medical care* provided by more than one *doctor* for treatment of the same condition.
- **Ambulance services:**
  - No benefits are provided primarily for the convenience of travel or where not *medically necessary.*
  - Transportation for the purpose of receiving services that are not considered *covered services*, even if the destination is an appropriate facility.

PLAN DEF0191570

- Over-the-counter compression or elastic knee-high or other stocking products for *Lymphedema.*
- Certain **Medical Supplies**



  **M**

    - *Medical supplies* not ordered by a *doctor* for treatment of a specific diagnosis or procedure.
    - Thermometers.
    - Over-the-counter gauze, tape, adhesive first-aid bandages.
    - Spirometers and all related accessories.
    - Lubricants except when used in conjunction with specialized self-care procedures such as intermittent catheterization and insulin pumps .
    - Chemical or antiseptic solutions except when used in conjunction with specialized self-care procedures such as intermittent catheterization and insulin pumps. .
    - Mucus traps.
    - Pocket nebulizers.
    - Replacement bulbs or lamps for therapeutic light

- **Medical testimony.**

- Services or supplies deemed not **medically necessary** or ordered by a provider.

- **Mental Nervous and Substance Abuse** exclusions and limitations:

    - Care for conditions not classified as psychiatric, emotional, or *substance abuse* illnesses.
    - Psychoanalysis.
    - Counseling with relatives about a patient with *mental illness*, alcoholism, drug addiction or *substance abuse.*
    - *Inpatient* confinements that are primarily intended as a change of environment.
    - Mental health services received in psychiatric residential treatment facilities when age 18 or older.
    - *Substance Abuse* residential treatment facilities are covered for all ages.
    - Marriage counseling.
    - *Inpatient* psychiatric care rendered in a *hospital* not accredited by JCAHO.
    - *Inpatient Substance Abuse* care rendered in a facility which is not currently accredited by a national health care organization approved by the *Mental Health Case Manager.*
    - *Inpatient hospital* care for medical detoxification rendered in a facility which is not licensed as a *hospital* and currently accredited by a nationally recognized organization approved by the *Mental Health Case Manager.*
    - Outdoor components of a residential *substance abuse* treatment program, when such program is licensed as a *substance abuse* treatment program in the state in which services are provided, are covered only if facility-based services are available as a part of the same program.
    - Primary treatment of a psychiatric disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a psychiatric RTC.
    - Primary treatment of a *substance abuse* or *substance abuse* disorder in a *residential treatment center* (RTC) unless the RTC is licensed as a *substance abuse* or substance abuse RTC.
    - Services by *providers* not currently licensed in the state in which services are provided.
    - Psychotherapy as part of artificial means of conception.
    - Psychological assessment and psychotherapy treatment in conjunction with

51       Return to Table of Contents

PLAN DEF0191576
Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 102 of 284

proposed gender transformation.

- Psychological testing for those persons with a *substance abuse* diagnosis until 30 consecutive days of abstinence are obtained.
- Therapeutic boarding schools as a psychiatric residential treatment center (RTC) unless the program is licensed for psychiatric RTC in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*.
- Therapeutic boarding schools as a *substance abuse* or *substance abuse* residential treatment center (RTC) unless the program is licensed as a *substance abuse* RTC in the state in which services are provided and has licensed supervision of all residents 24 hours per day, seven days per week.
- Wilderness camps, wilderness "step-down" components of a residential program, and stand-alone outdoor treatment programs or outdoor "step-down" components of a residential program are not covered as a psychiatric RTC unless the program is licensed for psychiatric residential treatment in the state in which services are provided, has *registered nurses* who are present on-site 24-hours per day, and holds current national accreditation by a national health care accrediting body approved by the *Mental Health Case Manager*.
- Wilderness camps and stand-along outdoor treatment programs are not covered as *substance abuse* or *substance abuse* RTC programs.
- Academic education during *residential treatment* when charged separately.
- Administrative psychiatric services (e.g., expert testimony, report writing, medical records review and maintenance, case management or case coordination, chart review, etc.)
- Consultation with a mental health professional for adjudication of marital, child support, and custody cases.
- Evaluations, consultations, testing or therapy for educational, professional training, or for investigation purposes relating to employment, insurance, judicial or administrative proceedings.
- Training analysis.
- Treatment for personal or professional growth, development, training or professional *certification*.
- Aversive Treatment.
- Treatment programs based solely on the 12-step Model.
- Erhard Seminar Training (EST) or similar motivational services.
- Bioenergetic, carbon dioxide, confrontational, hyperbaric or normobaric oxygen, marathon, megavitamin, orthomolecular, primal, rebirthing, or sleep therapies.
- Expressive therapies (art, poetry, movement, psychodrama), guided imagery, or stress and relaxation therapy when billed separately.
- Telephonic crisis management as a separate charge.
- Sedative action, electro stimulation therapy.
- Z therapy, also known as "holding therapy."
- Narcotherapy with LSD.
- Environmental ecology treatments.
- Hemodialysis for schizophrenia.
- Rolfing.
- Sensitivity training.
- Room and Board costs for patients admitted to a partial *hospital* or intensive *outpatient* program are not covered.

Return to Table of Contents

PLAN DEF0191577

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 103 of 284

- **Thermography** or **thermograph** examination.
- **Transplant** exclusions include:
  - The purchase price of the organ or tissue if any organ or tissue is sold rather than donated to the recipient *member*.
  - The procurement of organs, tissue, bone marrow or peripheral blood stem cells or any other donor services if the recipient is not a *member*.
  - *Transplants*, including high dose chemotherapy, considered *experimental* or *investigational*.
  - Services for or related to the transplantation of animal or artificial organs or tissues.

- **Travel**, whether or not recommended or prescribed by a *doctor* or other licensed health care professional, except as specifically covered by the *Plan*.

- **Treatment** or studies leading to or in connection with sex changes or modifications and related care.



- The following **vision** services:

  - Radial keratotomy and other refractive eye *surgery*, and related services to correct vision except for surgical correction of an eye injury.  Also excluded are premium intraocular lenses or the services related to the insertion of premium lenses beyond what is required for insertion of conventional intraocular lenses, which are small, lightweight, clear disks that replace the distance-focusing power of the eye's natural crystalline lens.
  - Routine eye examination services except as specifically covered by the *Plan*.
  - Eyeglasses or contact lenses, except as specifically covered in "*Prosthetic appliances.*"
  - Orthoptics, vision training, and low vision aids.

- For over-the-counter and non-federal legend **Vitamins**, food supplements or replacements, nutritional or dietary supplements, formulas, or special foods of any kind, except for *prescription* prenatal vitamins or *prescription* vitamin B-12 injections for anemias, neuropathies, or dementias secondary to a vitamin B-12 deficiency, or certain over-the-counter medications that may be available under your *preventive care* benefits for certain individuals.



- **Wigs**, hair pieces and services for hair implants and electrolysis for any reason.

PLAN DEF0191581

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-00272

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE; and DANA CARAWAY, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) ) |

**DISCLOSURE OF EXPERT WITNESSES WHO DO NOT PROVIDE A
WRITTEN REPORT PURSUANT TO FED. R. CIV. P. 26(A)(2) BY
DEFENDANTS DALE FOLWELL, DEE JONES, AND THE NORTH CAROLINA
STATE HEALTH PLAN FOR TREACHERS AND STATE EMPLOYEES**



PLAINTIFF'S
EXHIBIT
tabbies*
21
8.12.21

The Rules of Civil Procedure require the Defendants to disclose witnesses who are qualified to provide expert testimony, and are expected to do so, but who are also not retained or specially employed to do so. Fed. R. Civ. P. 26(a)(2). Pursuant to the rule, the Plan Defendants disclosure that the following three individuals will present testimony within their areas of learning and expertise:

(1) <u>Treasurer Dale R. Folwell, CPA:</u>

Treasurer Folwell is the State Treasurer of North Carolina. Prior to his election to this office in 2016, he served as the Assistant Secretary for Employment Security of the North Carolina Department of Commerce from 2013 through 2015. From 2004 through 2011, Treasurer Folwell served in the North Carolina General Assembly. Treasurer Folwell has also earned a Bachelor's degree and a Master's degree in Accounting, and he is a Certified Public Accountant.

In his current role, Treasurer Folwell serves as Chair of the Board of Trustees for the State Health Plan. He has overall supervision of the employees who work for the Plan. In addition to testimony about his actions as Treasurer and his decisions involving the State Health Plan, Treasurer Folwell will present expert opinion testimony about the fiscal issues facing the State Health Plan.

Treasurer Folwell will testify about the role of the State Health Plan in North Carolina. The Plan provides health benefit coverage to more than 740,000 individuals and is one of the largest purchasers of health care in the State. Treasurer Folwell will testify that concerns about the fiscal sustainability of the State Health Plan have existed for

2

decades. Currently, Treasurer Folwell estimates that the Plan has a $28 billion unfunded liability.

Treasurer Folwell will testify about policies (both those adopted and those not yet adopted) to address this unfunded liability. These measures include premium adjustments, changes in eligibility for future retirees, and ongoing efforts to increase the transparency of health care costs. The Treasurer will contrast the lack of transparency and benchmarks for the State Health Plan with the structure of North Carolina's unemployment insurance program, which he supervised when he was an Assistant Secretary for the North Carolina Department of Commerce. The Treasurer will also testify to the inflation in health care costs resulting from the consolidation of hospital systems in North Carolina.

Finally, the Treasurer will testify to the adverse effect of the current premium structure for the Plan, which imposes significant unsubsidized costs for coverage of dependents. These costs have, for some time, discouraged younger, healthier employees from enrolling their families in the State Health Plan. Further, these costs – when combined with the rising healthcare costs experienced by North Carolina residents – have increased the economic uncertainty for all residents of North Carolina.

(2) Dee Jones, Executive Director of the State Health Plan

Dee Jones is the Executive Administrator of the State Health Plan, a position in which she has served for four years. Ms. Jones previously served as the Chief Operating Officer for North Carolina's Medicaid program. She has expertise in the administration of health benefits programs as well as operational and financial strategy and customer service within other industries. Ms. Jones has earned a Bachelor's degree in accounting and

3

business management from North Carolina State University and a Master's degree in Accounting and Business Management from the University of Phoenix.

Ms. Jones will testify about the operation of the State Health Plan. She is the Administrator of the Plan, responsible for implementation of policy and management of the State Health Plan, its employees, its contractors, and its vendors. She is also the individual designated by the Plan to testify on its behalf. Fed. R. Civ. P. 30(b)(6). Her testimony will include factual detail about Plan design and operation, including the coverage Exclusion challenged by the Plaintiffs.

The Defendants have also designated Ms. Jones as an expert witness to ensure that her knowledge and experience about how to operate an actuarially sound health plan are within the scope of her allowed testimony.

A portion of Ms. Jones's testimony will include opinion testimony related to the operation of the Plan. Ms. Jones will testify to the rate of increase for appropriations from the North Carolina General Assembly, the Plan's medical costs, and the Plan's pharmaceutical costs.

Ms. Jones will also testify about the cash reserves of the Plan, both the statutorily required reserves as well as the reserves necessary to ensure that the Plan can make timely payment for healthcare. She will testify as to the Plan's tracking of utilization by beneficiaries, and the analysis underlying the Plan's conclusion that a $1 billion reserve is necessary to ensure the Plan's financial soundness.

Ms. Jones will testify about the loss ratio for different age cohorts of Plan beneficiaries. She will also testify that a small portion (approximately 15% of the Plan

4

participants) incur 85% of the costs of medical treatment. She will testify that the maximum premium for the Plan is set by state law on a two-year cycle, limiting the ability of the Plan to adjust to changing health care costs. Further, Ms. Jones will testify that the statutory structure of the Plan – with caps on premiums for state employees and state employers and unsubsidized premiums for dependents – has skewed the Plan's population to become more elderly and more costly. This heightened cost has led to further diminution of younger participants, which negatively affects the Plan's overall loss ratio.

To ensure long-term sustainability, the State Health Plan's primary goal under her management has been to reduce the individual unit cost of healthcare. For example, the Plan has held family premiums constant even as medical costs have risen. Ms. Jones will testify to the actuarial analysis supporting the need for this policy as well as the feasibility of rejected alternatives, such as reliance on increased appropriations.

Ms. Jones will testify about the analysis performed when beneficiaries request new or augmented benefits from the Plan. Ms. Jones will testify that the Board's fiduciary obligation to the Plan beneficiaries, and concerns about overall Plan soundness, require the Board to review additional coverage benefits within the context of the effect of this additional benefit on the overall health of the Plan population. She will testify that overall cost of the new benefit is considered but that the cost of a new benefit cannot, consistent with prudential financial management, be considered in isolation. Ms. Jones will also testify about the analyses performed over the past five years, including requests that the Plan provide new or increased benefits, including coverage of gender transition costs, acupuncture, hearing aids, Colo-guard, and special dietary supplements.

5

(3)    Peter W. Robie, M.D., FACP

Dr. Robie has served on the Board of Trustees for the State Health Plan since 2017. He also serves on the Pharmacy and Therapeutics Committee for the Plan. Dr. Robie will testify about the Board's consideration of requests that the Plan eliminate the current coverage exclusion for gender transition surgery and related hormone treatment.

Dr. Robie is not a specialist in the treatment of gender dysphoria, and the Defendants do not seek to qualify him as such. Dr. Robie is, however, a primary care physician with more than forty-seven years of experience. As a member of the Board of Trustees, and a physician, Dr. Robie has contributed his medical knowledge to Board deliberations. Dr. Robie will testify to the medical knowledge he has shared with other Board members. He will also testify that, in order to provide diagnostic and medical treatment that meets a professional standard of care, primary care physicians must know the chromosomal sex of patients.

Dr. Robie has served as a primary care physician for more than forty-seven years. He has treated patients as a physician in a small group/solo practice and as a member of a large primary care practice group affiliated with Wake Forest Medical Center. Dr. Robie earned his M.D. with honors from the Baylor College of Medicine in 1976. He has served as an Assistant Professor and Clinical Associate Professor at the Department of Internal Medicine for the Wake Forest School of Medicine since 1981.

Dated this 1st day of May, 2021.

6

Respectfully submitted by,

James Benjamin Garner
N.C. Bar. No. 41257
General Counsel
North Carolina Department of
    the State Treasurer
3200 Atlantic Avenue
Raleigh, North Carolina 27604
Telephone: (919) 814-4000
Ben.Garner@nctreasurer.com

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
Facsimile: (307) 432-0310
John@KnepperLLC.com

Kevin G. Williams
N. C. Bar No. 25760
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 North Cherry St., Suite 600
Winston-Salem, NC  27120-1029
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this document was served upon the following individuals through electronic mail on the 1st day of May, 2021.

| NAME | METHOD | |
|---|---|---|
| Amy E. Richardson<br>N.C. State Bar No. 28768<br>HARRIS, WILTSHIRE & GRANNIS LLP<br>1033 Wade Avenue, Suite 100<br>Raleigh, NC 27605-1155<br>Telephone: 919-429-7386<br>arichardson@hwglaw.com | Hand Delivery ☐<br>Facsimile ☐<br>U.S. Mail ☐<br>Email ☒ | |
| Tara Borelli<br>LAMBDA LEGAL DEFENSE AND<br>EDUCATION FUND, INC.<br>730 Peachtree Street NE, Suite 640<br>Atlanta, GA 30318-1210<br>tborelli@lambdalegal.org | Hand Delivery ☐<br>Facsimile ☐<br>U.S. Mail ☐<br>Email ☒ | |
| Deepika H. Ravi<br>HARRIS, WILTSHIRE & GRANNIS LLP<br>919 M Street N.W., 8th Floor<br>Washington, D.C. 20036<br>dravi@hwglaw.com | Hand Delivery ☐<br>Facsimile ☐<br>U.S. Mail ☐<br>Email ☒ | |
| David Brown<br>Alejandra Caraballo<br>TRANSGENDER LEGAL DEFENSE<br>AND EDUCATION FUND, INC.<br>520 8th Ave, Ste. 2204<br>New York, NY 10018<br>Telephone: 646-993-1680<br>dbrown@transgenderlegal.org<br>acaraballo@transgenderlegal.org | Hand Delivery ☐<br>Facsimile ☐<br>U.S. Mail ☐<br>Email ☒ | |
| Carl S. Charles<br>Omar Gonzalez-Pagan<br>LAMBDA LEGAL DEFENSE AND<br>EDUCATION FUND, INC.<br>120 Wall Street, 19th Floor<br>New York, NY 10005 | Hand Delivery ☐<br>Facsimile ☐<br>U.S. Mail ☐<br>Email ☒ | |

8

| | |
|---|---|
| Telephone: 212-809-8585<br>ccharles@lambdalegal.org<br>ogonzalez-pagan@lambdalegal.org | |
| Zach Padget<br>NC State Bar No. 46610<br>Alan McInnes<br>NC State Bar No. 20938<br>Assistant Attorneys General<br>NC Department of Justice<br>PO Box 629<br>Raleigh, NC 27602<br>Tel: 919-716-6920<br>zpadget@ncdoj.gov<br>amcinnes@ncdoj.gov | Hand Delivery ☐<br>Facsimile ☐<br>U.S. Mail ☐<br>Email ☒ |

*/s/ John G. Knepper*

# Exhibit 11



Deposition of:
## Dale Folwell

*August 12, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

1          IN THE UNITED STATES DISTRICT COURT FOR

2           THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5     MAXWELL KADEL, et al.,        )
                                    )
6               Plaintiffs,         )
                                    )   No. 1:19-cv-272-LCB-LPA
7          V.                       )
                                    )
8     DALE FOLWELL, et al.,         )
                                    )
9               Defendants.         )
      _____     )

10

11

12

                        DEPOSITION

13                          OF

                       DALE FOLWELL

14

15                   AUGUST 12, 2021

16

17          THIS TRANSCRIPT IS NOT COMPLETE

       PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS

18     MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY

       AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30

19      DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

20

21

22           NORTH CAROLINA STATE HEALTH PLAN

             3200 Atlantic Avenue, First Floor

23               Raleigh, North Carolina

24

25     Reported by: Michelle Maar, RDR, RMR, FCRR

```
 1      APPEARANCES:
 2      On behalf of the Plaintiffs:
 3           MCDERMOTT WILL & EMERY
             By: Michael W. Weaver
 4           444 W. Lake Street, Suite 4000
             Chicago, IL 60606
 5           Mweaver@mwe.com
 6           Lambda Legal Defense and Education Fund
             By: Tara Borelli
 7           730 Peachtree Street NE, Suite 640
             Atlanta, GA 30318
 8           Tborelli@lambdalegal.org
 9           HARRIS, WILTSHIRE & GRANNIS
             By: Amy E. Richardson
10           1033 Wade Avenue, Suite 100
             Raleigh, NC 27605
11           Arichardson@hwglaw.com
12
        On behalf of Defendants Dale Folwell, Dee Jones, and the NC
13      State Health Plan for Teachers and State Employees:
14           BELL, DAVIS & PITT
             By: Kevin G. Williams
15               Mark A. Jones
             100 N. Cherry Street, Suite 600
16           Winton-Salem, NC 27101
             Kwilliams@belldavispitt.com
17           Mjones@belldavispitt.com
18           NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
             DEPARTMENT OF THE STATE TREASURER
19           By: James Benjamin Garner
                 Joel Heimbach
20           3200 Atlantic Avenue
             Raleigh, NC 27604
21           Ben.garner@nctreasurer.com
             Joel.heimbach@nctreasurer.com
22
             LAW OFFICE OF JOHN G. KNEPPER
23           By: John G. Knepper
             1720 Carey Avenue, Suite 590
24           Cheyenne, WY 82001
             John@knepperLLC.com
25
```

1          On behalf of Defendant State of North Carolina
           Department of Public Safety:

2
           NORTH CAROLINA DEPARTMENT OF JUSTICE

3          By: Alan McInnes (via teleconference)
           114 W. Edenton Street

4          Raleigh, NC 27603
           Amcinnes@ncdoj.gov

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              And so according to the United States Department

 2     of Labor, not only were we broke and those, the brokeness

 3     resulted in every employer in this state having to pay FUTA,

 4     federal and state unemployment surcharges for the entire

 5     century -- because the plan had gone into deficit after 911.

 6              As it was crawling its way back, it hit the Great

 7     Financial Crisis.

 8              So the two major responsibilities were to fix the

 9     broke and the brokenness.

10        Q.    Okay.  How long did you serve as Assistant

11     Secretary?

12        A.    Until December 1, 2015.

13        Q.    And did you resign from that role?

14        A.    I did.

15        Q.    Okay.  Why?

16        A.    Because I don't think that I should be the

17     Assistant Secretary of Commerce and applying for the job to

18     be the keeper of the public purse.  So I resigned that

19     morning, and I filed that afternoon.

20        Q.    And when you say filed, filed for the job as

21     State Treasurer of North Carolina?

22        A.    Correct.

23        Q.    My understanding is you were elected on November

24     8, 2016 for State Treasurer of North Carolina?

25        A.    Yes.

1          Q.   And sworn in January 1, 2017?

2          A.   Correct.

3          Q.   And then you were recently reelected on November

4     3, 2020?

5          A.   Yes.

6          Q.   Do you still believe that the North Carolina

7     State Treasurer has more constitutional and statutory

8     responsibilities and duties than any other elected official

9     in the state except for the governor?

10         A.   That is a quote from Page 143 of Harlan Boyles'

11    book Keeper of the Public Purse, who is by many people

12    considered to be the best state treasurer of the 20th

13    Century, not just in North Carolina but the entire United

14    States.

15         Q.   Do you still believe that, what I just read to

16    you?

17         A.   Yes.

18         Q.   How long did he serve as North Carolina

19    treasurer, do you know?

20         A.   You can look at the name plates outside.  But he

21    was Assistant Treasurer under Edwin Gill and then became

22    the Treasurer of North Carolina.  And then he did not seek

23    reelection.

24              So in January of 2001, Treasurer Moore took over

25    from Treasurer Boyles.

1          And so that is what my definition of unfunded

2     liabilities are.

3          I will say to you that the people of this state

4     probably really don't know who the treasurer is or a lot of

5     other elected officials, but I know who they are.  They

6     don't have to know who I am, I know who they are.

7          And the fact is when you earn a benefit from the

8     State of North Carolina, either on the pension or healthcare

9     side -- that you may not understand OPEB, GasB, life

10    expectancies, you may not understand any of that stuff --

11    what you do understand is that you want the ability to

12    ensure your family, both as an active employee and a retired

13    employee, you want the ability to take that insurance card

14    and you want the ability to access healthcare.

15         And the fact is when these liabilities are ramping

16    up like this, as they get steeper and steeper and steeper,

17    the ability for that not to happen is a real threat.

18    Q.   I think you mentioned that you serve as the Chair

19    of the Board of Trustees for the State Health Plan?

20    A.   Correct.

21    Q.   And is part of your role that you approve the

22    final agenda for each meeting of the Board of Trustees?

23    A.   Yes.

24    Q.   Okay.  As State Treasurer, what is your role in

25    the process by which the Plan determines each year what

1    benefits the plan will cover?

2         A.   My role is that, is that I approve the agenda.

3              The process for benefits that are covered and not

4    covered has been sort of a work in progress.

5              I can't tell you what the, what went on before I

6    was here in any way, shape, or form.

7              But at the end of the day, the, the benefit

8    structure is determined which, somewhat in terms of Plan

9    design.

10             And we were on a course for the State Health Plan

11   to run out of money when I became the State Treasurer in

12   North Carolina.

13             And when our healthcare costs are going up at

14   double digits, our pharmaceutical costs are going up at

15   double digits, and then the General Assembly has decided

16   that they're only going to fund us at a 4 percent increase,

17   you don't have to be a CPA to understand that if your costs

18   are going up double digits and your funding is only coming

19   in at 4 percent, eventually you're going to run out of

20   reserves.

21             And that's why the need to really change the

22   culture and the mindset of where we need to focus as a State

23   Health Plan in order to ensure the solvency on behalf of

24   those who teach, protect, and serve.  That has always really

25   been my number one focus.

1        Q.    Okay.  So what is your role in that process?

2        A.    The role in the process is that an agenda -- like

3    in many other parts of my duties and responsibilities that

4    I mentioned to you -- an agenda is presented to me.

5              And then in the process of that, you have the

6    agendas, it's presented to me by the executive director of

7    the Plan, and I ultimately approve it.

8        Q.    Do you have input on what goes on the final

9    agenda?

10       A.    I think the, that the chair of most boards has

11   input on what goes on the final agenda.

12             Especially in a COVID world, I've tried to be as

13   sensitive to what is discussed in closed session and what

14   isn't.

15             It's not a concern of yours, but going in and out

16   of open meetings into closed meetings with the technology

17   challenges that we're facing, and some of the technology

18   challenges that some of our board members face when they try

19   to dial in, I try to keep that as less fussy as possible.

20             And then I try to make announcements, when that

21   occurs, that when we come back into open session, all we're

22   going to do is gavel out -- just to be courteous of other

23   people's times.

24       Q.    So was that a yes, that you do have input into

25   the agenda for the State Health Plan board meetings?

1          A.   Yes.

2               MR. WEAVER:  Okay.  We've been going probably a

3          little over an hour, would now be a good time for a break?

4               (Off the record)

5     BY MR. WEAVER:

6          Q.   Treasurer Folwell, I want to talk a little bit

7     about the State Health Plan and sort of get into what

8     brings us here today.

9               So can you, in your words, define for me your

10    understanding of what gender dysphoria is?

11         A.   Gender dysphoria is a term that's used to

12    describe individuals who want to change their sexual

13    orientation.

14         Q.   Okay.  What do you mean by sexual orientation?

15         A.   I'm not a medical doctor.

16         Q.   Understood.  I'm just asking your thoughts and

17    your view based on --

18         A.   People who, who, individuals who want to go from

19    being identified as one sex to another.

20         Q.   Okay.  And I know you weren't treasurer at the

21    time, but in, at least in 2016, was it your understanding

22    that the Plan had a blanket exclusion for the treatment of

23    gender dysphoria?

24         A.   It's my understanding that for not, that for

25    possibly years and decades, that there had been several

1         A.   I'm not a medical doctor, so I don't know.

2         Q.   I'm not asking a medical opinion.  I'm trying to

3    figure out -- you mentioned those three exclusions.

4              And I'm trying to figure out in your mind do

5    those three exclusions match either of the two exclusions

6    that I just read to you on Exhibit 2?

7         A.   I cannot foresee how the second exclusion

8    regarding experimental drugs would be completely connected

9    to the topic that you asked me about.

10        Q.   Okay.

11        A.   And I would say that I would need more

12   information to say that the first one was completely

13   connected, but I can't say that it wasn't.

14             And I would say that if any one of those three

15   exclusions more closely matched what you're asking me

16   about, it would be the third one.

17        Q.   Okay.  If you could look back at Exhibit 2, at

18   the second to the last bullet point, under Implications for

19   the State Health Plan, where that reads cannot deny or

20   limit coverage based solely on the fact that the person

21   identifies as belonging to a gender different from the sex

22   assigned at birth.

23             Do you see that, sir?

24        A.   I do.

25        Q.   Was it your understanding in November of 2016

1    whether the Health Plan was denying or limiting coverage

2    based solely on the fact that the person identifies as

3    belonging to a gender different from the sex assigned at

4    birth?

5         A.   I became aware of that somewhere toward the end

6    of November or on the first day of December.

7         Q.   And we'll get to it in a moment -- my

8    understanding for the 2017 Health Plan is that the, what I

9    refer to as the exclusions were lifted for that Health

10   Plan, but then they came back into force starting with the

11   2018 State Health Plan.

12              Is that your understanding?

13        A.   My understanding is that the previous treasurer

14   and the previous board on a tie vote broken by the

15   treasurer elected to remove the exclusion for just one

16   calendar year.

17        Q.   Okay.  Is it your understanding today, in 2021,

18   whether the Health Plan is denying or limiting coverage

19   based solely on the fact that the person identifies as

20   belonging to a gender different from the sex assigned at

21   birth?

22              MR. WILLIAMS:  Objection to the form of the

23   question.

24              THE WITNESS:  Could you restate the question?

25              MR. WEAVER:  Of course.

1     BY MR. WEAVER:

2          Q.   In, in 2021, the Health Plan that's in effect for

3     the 2021 year, is it your understanding that the Plan is

4     denying or limiting coverage based solely on the fact that

5     the person identifies as belonging to a gender different

6     from the sex assigned at birth?

7                    MR. WILLIAMS:  Same objection.

8                    THE WITNESS:  What you asked me is if I'm aware

9     in 2021, if the State Health Plan is denying medical

10    coverage or treatment based on a gender identity different

11    than what they were born with?

12                   MR. WEAVER:  Correct.

13                   THE WITNESS:  I would say that I'm not a medical

14    doctor.  But I'm not sure that for some types of treatments

15    that people of both genders are afflicted with, that we're

16    denying any coverage for, based on the fact that somebody

17    wants to identify as a sex other than what they were born

18    with.

19                   So an example of that would be if a person needs

20    their gallbladder removed, and just because they want to be

21    chosen or identified as a person of a different sex than

22    what they were born with, we do not deny that coverage.

23                   If a person needed a hysterectomy and that need is

24    necessary, we do not deny the medical treatment -- period --

25    based on the fact that somebody just wants to identify as a

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 128 of 284

1       BY MR. WEAVER:

2            Q.   I'm going to show you Exhibit 14.

3                 (Exhibit 14 is marked for identification.)

4       BY MR. WEAVER:

5            Q.   And these are -- this is PLAN DEF0154431.

6                 It's titled Board of Trustees Meeting, Monday,

7       October 22, 2018.

8                 Do you see that, sir?

9            A.   I do.

10           Q.   Okay.  And feel free to look through this and --

11           A.   Okay.

12           Q.   And just to, go to the back, I think it's --

13                (Brief pause in the proceeding)

14      BY MR. WEAVER:

15           Q.   So if we can turn to, I think it's the third to

16      last page in this packet, and it starts with the bates

17      154491, and it's Board of Trustees Meeting, October 22,

18      2018 Minutes.

19           A.   Okay.  I see that.

20           Q.   And if we go to the last page, Page 5 of this

21      document, of the Minutes, that's your signature, right,

22      sir?

23           A.   It is.

24           Q.   Okay.  So these are the official minutes from the

25      October 22, 2018 Board Meeting, right?

1    A.    To the best of our minute-taking ability.

2    Q.    Okay.  Do you remember this board meeting?

3    A.    Not specifically.

4    Q.    Okay.  Is it still the case that the Board of

5    Trustees meets approximately four times a year?

6    A.    Except when we need to go into closed session to

7    discuss contract negotiations or other issues.

8    Q.    Now, if we look at the first page here, the Board

9    of Trustees Meeting, and the second bolded I'll say agenda

10   item, first one is Board Approval and the second one is

11   Public Comments.

12   A.    I see that.

13   Q.    Do you see that?

14        And then do you recall a number of Plan members

15   or their dependents talking at this board meeting about the

16   request to lift the exclusion for the 2019 Plan Year?

17   A.    I recall in the latter half of 2018 having folks

18   come in asking for the lifting of the exclusion, and

19   remember hearing those comments at the public hearing, and

20   then walking out with those individuals and personally

21   greeting each one of them, thanking them for coming.

22   Q.    Okay.  And if we turn the page -- and it's

23   double-sided -- so if we just turn to 154433, and the top

24   is Testimony of Max Kadel.

25   A.    Yes.

1      letters, did you have an opportunity to read those?

2            A.   Generally.

3            Q.   Do you remember anything from, from those written

4      comments or letters?

5            A.   I don't.

6            Q.   At the Public Comment section, session, do you

7      remember anyone speaking against lifting the exclusion?

8            A.   Against lifting the exclusion?  I do not.  But

9      that doesn't mean it didn't happen.

10           Q.   Okay.  You just don't have a memory right now?

11           A.   Of somebody opposing reinstating the exclusion?

12     Would that be a -- excuse me, I'm sorry.

13           Q.   No, no, you're right.  You're right.  You're

14     good.

15                If you're not understanding what I'm saying and

16     if you need to clarify it in your words, please do so, sir.

17           A.   At some point in this process, I have a vague

18     recollection of somebody speaking against lifting the

19     exclusion, but I can't tell you when or where that

20     happened.

21           Q.   Okay.  If we can stick with Exhibit 14, and if we

22     go to, it looks like a PowerPoint presentation, Financials

23     Update, Board of Trustees Meeting, October 22, 2018.  The

24     bates is 154481.

25           A.   Got it.

1    Q.    So you have this front page?

2    A.    I do.

3    Q.    If we could turn over to where it says Financial

4    Results: Actual vs. Budgeted, Calendar Year to Date August

5    2018.

6    A.    Correct.

7    Q.    Can you explain to me what this chart shows?

8    A.    This chart represents what people my age would

9    refer to as a Polaroid.  It's a shot in time of the

10   financial condition of the State Health Plan versus what

11   our forecast of what our budgets were.

12   Q.    And what does this Polaroid shot show in terms of

13   how the Plan was performing against its expected budget?

14   A.    Document ending in 83 or 81?

15   Q.    82.

16   A.    82, okay.  What this shows is that the Plan

17   variance was .79 million dollars to the good versus budget.

18   Q.    And so the, as of through August 2018, the ending

19   cash balance was what for the plan?

20   A.    1 billion.

21   Q.    Do you know at the end of December 2018, you

22   probably wouldn't have gotten the numbers until January

23   2019, what the, was the ending cash balance around 1

24   billion?

25   A.    I can't recall that.  What I would add is that

1      exclusions.  But I would say that they more mirror this

2      language than they do gender transition or gender

3      dysphoria.

4              Q.    Okay.  And when you say sex change operations,

5      are you only talking about physical surgery?  Or are you

6      talking about other medical practices such as hormone

7      therapy?

8              A.    I'm not a doctor.

9              Q.    Uh-huh.

10             A.    I'm not a subject matter expert in what all these

11     terms mean.  I don't have a deep understanding of those

12     therapies in relation to these other surgeries and what the

13     timelines of those are.  So --

14             Q.    The second paragraph says the legal and medical

15     uncertainty of this elective procedure has never been

16     greater.

17                   What did you mean by medical uncertainty?

18             A.    I think just the word uncertainty is what I'm

19     keying in on.

20                   The person that I've most relied on for decades

21     on issues related to medicine is Dr. Peter Robie, who is

22     also a member of this board.

23                   And I think that is his relaying to me his

24     concerns about the uncertainty about the permanency of these

25     operations and the ultimate impact that it could or would

1      have on the health and well-being of these members or their

2      dependents is what I meant by that.

3              Q.    You mentioned Dr. Robie, right?

4              A.    Correct.

5              Q.    Dr. Robie, you've known him for decades?

6              A.    Correct.

7              Q.    How did you first meet Dr. Robie?

8              A.    As a primary care physician.

9              Q.    Was he your primary care physician?

10             A.    He was.

11             Q.    Okay.  When did you first start seeing Dr. Robie?

12             A.    When the other guy retired.  I'm sorry, it's just

13     the answer.

14             Q.    Let me ask you this way to try to --

15             A.    1988, '90.

16             Q.    Okay.  So you were at --

17             A.    I was at Alex. Brown.

18             Q.    Okay.  And Dr. Robie is in the Winston-Salem

19     area?

20             A.    Correct.

21             Q.    Okay.  Is Dr. Robie's primary practice as a

22     primary care physician?

23             A.    That is his official title.  But it does not

24     begin to describe his medical common sense.

25             Q.    Okay.  Tell me about his medical common sense.

1          A.   Without notes or without charts, when you go in

2     and you're getting a physical, he says do you still have

3     that dog?  And are you changing the filters on your

4     furnace?

5               This is all [fingers snap snap snap].

6               You know, I saw you going down Robin Hood Road

7     the other day and you didn't have the helmet strapped on

8     your motorcycle, what's that all about?

9               Just -- have there been any additional medical

10    conditions that you have become aware of with any of your

11    parents -- just that intuition that we would hope that every

12    primary care physician would have as we focus, as they try

13    to focus on the health of their patient.

14         Q.   Is Dr. Robie still your primary care physician?

15         A.   No.

16         Q.   Has he retired from the practice?

17         A.   Yes.

18         Q.   How long ago did he stop being your primary care

19    physician?

20         A.   I would say five to seven years ago.

21               He is still very much involved in the, in our

22    Winston-Salem Physicians, which provides healthcare to needy

23    folks in parts of our community.  I think he still does some

24    part-time work for the VA Hospital in Salisbury.

25         Q.   Has he ever treated a transgender individual?

1        A.    I don't have specific knowledge of that.

2        Q.    Okay.  Have you and Dr. Robie ever talked about

3    him treating a transgender individual?

4        A.    I don't have any specific knowledge of that.

5        Q.    Do you know if Dr. Robie has any specialized

6    training in treating transgender individuals?

7        A.    I do not have any knowledge of that.

8        Q.    So getting back to the medical uncertainty in the

9    statement --

10       A.    Sure.

11       Q.    -- my understanding, and correct me if I'm wrong,

12   that your belief that there was medical uncertainty of this

13   elective procedure was based on conversation you had with

14   Dr. Robie?

15       A.    Generally speaking.  And obviously other types

16   of, not, you know, specific conversations, but just trying

17   to be generally aware of the topic.

18            And the, as I said in the earlier remarks, the

19   people who desire these type of procedures, this is very

20   important to them.

21            And I am constantly trying to pick up new

22   information and a better way of looking at information

23   regarding any of these topics.

24       Q.    Do you recall what Dr. Robie specifically told

25   you about the medical uncertainty of this elective

1      procedure?

2           A.   I don't specifically, no.

3           Q.   And you mentioned other folks.  And were those

4      other medical professionals?

5           A.   Not folks, just, you know, reading magazines and

6      listening to the news and watching, you know, shows on PBS

7      about all kinds of subjects, that type of, what I refer to

8      as mental stimulation on this topic.

9           Q.   Okay.  And it says, in the second paragraph, it

10     says medical uncertainty of this elective procedure.

11          Do you know why -- why did you use this elective

12     procedure as opposed to another terminology?

13          Because it seems like you're narrowing it to a

14     procedure which implies a surgery.

15          Again, I know you're not a medical doctor.  So

16     I'm just trying to understand the phraseology that you used

17     in that sentence.

18          A.   Versus what happened a few hours ago, this is a

19     distinction without a difference.  I didn't mean anything

20     by that.

21          I think that actually when it says the word

22     elective, I think that I, that the word uncovered could have

23     been a better choice of words.

24          We have lots of uncovered procedures, some of

25     which happen to be elective, in the State Health Plan.

1       the future and trying to estimate an inflation rate, part of

2       that is based on the risk-free rate that is quoted in the

3       Wall Street Journal on June 30th of every year.

4              And the other aspect of that is that the -- that's

5       it.

6          Q.   How does the unfunded liability impact, if it

7       does, the Board of Trustees' decision to maintain the

8       exclusion?

9          A.   I'm not sure there's a direct correlation between

10      the unfunded liability and the exclusion.

11             There's a direct correlation between the unfunded

12      liability and the overall solvency of the plan for all

13      members.

14         Q.   The next topic -- I'm basically going sentence by

15      sentence is sort of how I visualize your disclosure -- it

16      says that you will testify about policies, both those

17      adopted and those not yet adopted, to address this unfunded

18      liability.

19             Anything else you want to add as an expert on this

20      area?

21         A.   Just to recap -- started years ago with the

22      change in the vesting period, so that people had to work

23      longer than five years and one day to get lifetime

24      benefits.  And I was responsible for that in the General

25      Assembly, and carry forward to getting the plan on the

# Exhibit 11(a)




STATE TREASURER OF NORTH CAROLINA
DALE R. FOLWELL, CPA

3200 Atlantic Avenue    •    Raleigh, NC 27604    •    Phone: 919-814-4400    •    Fax: 919-814-5817    •    www.shpnc.org

**Board of Trustees Meeting**
**Monday, October 22, 2018**
**10:00 a.m. – 1:00 p.m.**

| | |
|---|---|
| 1. Welcome | Dale R. Folwell, Chair |
| 2. Conflict of Interest Statement | Dale R. Folwell, Chair |

**Board Approval**

| | |
|---|---|
| 1. Minutes August 30, 2018 Meeting *(Requires Vote)* | Dale R. Folwell, Chair |

**Public Comment**          Dale R. Folwell, Chair

**Recognition of Departing Board Member**      Dale R. Folwell, Chair

**Operations Updates**

| | |
|---|---|
| 1. Health Information Exchange | Dee Jones<br>*Executive Director* |
| 2. Provider Reimbursement Strategy Resolution | Dee Jones |
| 3. Financial Update - CYTD 1/1/2018 – 8/31/2018 | Matthew Rish<br>*Sr. Dir., Finance, Planning &<br>Analytics* |
| 4. Open Enrollment Update | Beth Horner<br>*Dir., Customer Experience/<br>Communications* |

**Executive Session (*Board members and required staff only*)**    Dale R. Folwell, Chair
        *Pursuant to: G.S. 143-318.11 and Chapter 132*

| | |
|---|---|
| 1. RFP Recommendation – Pharmacy Benefit Manager Auditing Services<br>**(Requires Vote)** *G.S. 143-318.11(a)(1), G.S. 132-1.2* | Sharon Smith<br>*Manager, Contracts* |
| 2. Consultation with Legal Counsel<br>G.S. 143-318.11(a)(1), (3), G.S. 132-1.1, G.S. 132-1.9, G.S. 135-48.10<br>G.S. 132-1.9 | Andrew Norton<br>*Deputy General Counsel* |

**Return to Open Session**

| | |
|---|---|
| 1. Next Board Meeting | Dee Jones |
| 2. Adjournment | Dale R. Folwell, Chair |



*Our mission is to improve the health and health care of North Carolina teachers, state employees, retirees, and their dependents, in a financially sustainable manner, thereby serving as a model to the people of North Carolina for improving their health and well-being.*

PLAN DEF0154431




*North Carolina*
# State Health Plan
FOR TEACHERS AND STATE EMPLOYEES

*A Division of the Department of State Treasurer*

STATE TREASURER OF NORTH CAROLINA
DALE R. FOLWELL, CPA





## Financials Update

*Board of Trustees Meeting*

**October 22, 2018**

*A Division of the Department of State Treasurer*

PLAN DEF0154481

# Financial Results: Actual vs. Budgeted Calendar Year to Date August 2018

| Calendar Year 2018 | Actual thru AUG 2018 | Authorized Budget (per Segal 5-30-18) | Variance Fav/(Unfav) Budget |
|---|---|---|---|
| Beginning Cash Balance | $1.010 b | $1.010 b | - |
| Plan Revenue | $2.382 b | $2.361 b | $0.021 b |
| Net Claims Payments | $2.034 b | $2.039 b | $0.005 b |
| Medicare Advantage Premiums | $0.151 b | $0.151 b | $0.000 b |
| Net Administrative Expenses | $0.089 b | $0.142 b | $0.053 b |
| Total Plan Expenses | $2.274 b | $2.332 b | $0.058 b |
| Net Income/(Loss) | $108.4 m | $29.2m | $0.79 m |
| Ending Cash Balance | $1.118 b | $1.039 b | $0.79 m |



North Carolina
State Health Plan
FOR TEACHERS AND STATE EMPLOYEES
A Division of the Department of State Treasurer

STATE TREASURER OF NORTH CAROLINA
DALE R. FOLWELL, CPA

A Division of the Department of State Treasurer

2

PLAN DEF0154482

# Exhibit 12



Deposition of:
## Dee Jones

*August 3, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

```
1              IN THE UNITED STATES DISTRICT COURT FOR
2               THE MIDDLE DISTRICT OF NORTH CAROLINA
3

4

5        MAXWELL KADEL, et al.,      )
                                     )
6                  Plaintiffs,       )
                                     )   No. 1:19-cv-272-LCB-LPA
7             V.                     )
                                     )
8        DALE FOLWELL, et al.,       )
                                     )
9                  Defendants.       )
         _____   )
10

11

12

                           DEPOSITION
13                             OF
                            DEE JONES
14

                   IN HER INDIVIDUAL CAPACITY
15                            and
            30(b)(6) DESIGNEE FOR NC STATE HEALTH PLAN
16

                        AUGUST 3, 2021
17

18            THIS TRANSCRIPT IS NOT COMPLETE
         PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
19       MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
         AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
20        DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER
21

22

                      PNC PLAZA DOWNTOWN
23          301 Fayetteville Street, Suite 1700
                    Raleigh, North Carolina
24

25      Reported by: Michelle Maar, RDR, RMR, FCRR
```

```
 1       APPEARANCES:
 2       On behalf of the Plaintiffs:
 3            HARRIS, WILTSHIRE & GRANNIS
              By: Deepika H. Ravi
 4            1919 M Street NW, 8th Floor
              Washington, DC 20036
 5            Dravi@hwglaw.com
 6            HARRIS, WILTSHIRE & GRANNIS
              By: Amy E. Richardson
 7            1033 Wade Avenue, Suite 100
              Raleigh, NC 27605
 8            Arichardson@hwglaw.com
 9            Lambda Legal Defense and Education Fund
              By: Tara Borelli
10            730 Peachtree Street NE, Suite 640
              Atlanta, GA 30318
11            Tborelli@lambdalegal.org
12
         On behalf of Defendants Dale Folwell, Dee Jones, and the NC
13       State Health Plan for Teachers and State Employees:
14            BELL, DAVIS & PITT
              By: Alan M. Ruley
15                Mark A. Jones
              100 N. Cherry Street, Suite 600
16            Winton-Salem, NC 27101
              Aruley@belldavispitt.com
17            Mjones@belldavispitt.com
18            LAW OFFICE OF JOHN G. KNEPPER
              By: John G. Knepper
19            1720 Carey Avenue, Suite 590
              Cheyenne, WY 82001
20            John@knepperLLC.com
21            NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
              DEPARTMENT OF THE STATE TREASURER
22            By: James Benjamin Garner
                  Kendall M. Bourdon
23                Joel Heimbach
              3200 Atlantic Avenue
24            Raleigh, NC 27604
              Ben.garner@nctreasurer.com
25            Kendall.bourdon@nctreasurer.com
              Joel.heimbach@nctreasurer.com
```

1    APPEARANCES CONTINUED:

2    On behalf of Defendant State of North Carolina Department
     of Public Safety:

3
          NORTH CAROLINA DEPARTMENT OF JUSTICE

4         By: Alan McInnes (via teleconference)
          114 W. Edenton Street

5         Raleigh, NC 27603
          Amcinnes@ncdoj.gov

6

     On behalf of Defendants UNC at Chapel Hill, NC State

7    University, and UNC at Greensboro:

8         NORTH CAROLINA DEPARTMENT OF JUSTICE
          By: Zachary A. Padget(via teleconference)

9         114 W. Edenton Street
          Raleigh, NC 27603

10        Zpadget@ncdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                         DEE JONES,

3        called as a witness and having been first duly sworn,

4               was examined and testified as follows:

5                          * * *

6               MS. RAVI:  All right.  Before we begin, will

7       counsel for the State Health Plan Defendants stipulate that

8       Ms. Jones' answers during today's deposition will be

9       binding on the State Health Plan?

10              MR. JONES:  So stipulated.

11              MS. RAVI:  And will counsel for the State Health

12      Plan Defendants stipulate to the authenticity of all

13      documents produced by Ms. Jones, the State Health Plan, and

14      Mr. Folwell?

15              MR. JONES:  So stipulated as to authenticity.

16              MS. RAVI:  Thank you.

17

18                        EXAMINATION

19      BY MS. RAVI:

20          Q.   Good morning, Ms. Jones.  My name is Deepika

21      Ravi.  I represent the plaintiffs in this matter.

22               Have you ever had your deposition taken before?

23          A.   Yes.

24          Q.   And are you able to hear me okay --

25          A.   Yes.

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 148 of 284

1          A.   Seven months.

2          Q.   Where did you work after that?

3          A.   Department of State Treasurer.

4          Q.   Is that where you currently work?

5          A.   Yes.

6          Q.   What is your current title?

7          A.   Executive Administrator or Executive Director,

8    used interchangeably.

9          Q.   All right.  If I refer to the North Carolina

10   State Health Plan for Teachers and State Employees as the

11   Plan today, will you know what I'm talking about?

12         A.   Yes.

13         Q.   Apart from the title of Executive Administrator,

14   used interchangeably with Executive Director, have you held

15   any other roles in this current job?

16         A.   No.

17         Q.   And how long have you held the role of Executive

18   Administrator?

19         A.   Four years and one month.

20         Q.   Okay.  What are your responsibilities in that

21   role?

22         A.   At a high level, it's to operationalize the

23   policies as directed by the Treasurer and the Board of

24   Directors or Board of Trustees.

25         Q.   Okay.  That's at a high level?

```
 1          A.   Uh-huh.

 2          Q.   Any other responsibilities at a high level?

 3          A.   No.

 4          Q.   Okay.  What does it mean for you to

 5     operationalize those policies at a more granular level?

 6          A.   So under my responsibility, I have the Plan

 7     Integration, which is all the technology integration

 8     between our vendors.

 9               And then we have a Finance and Data Analytics

10     Group.  We have a Contracting and Compliance Group,

11     Communications.  We have Legal.

12               And let's see, who am I missing here?  I think

13     that's it.

14          Q.   Are you familiar with the operation of the Plan?

15          A.   Yes.

16          Q.   Are you familiar with the design of the Plan?

17          A.   Yes.

18          Q.   Are you responsible for management of the Plan?

19          A.   Please define management of the Plan.  It's a

20     broad term.

21          Q.   Is it fair to say, would you describe yourself as

22     responsible for management of the Plan?

23          A.   Yes.

24          Q.   All right.  Is the Plan self-funding?

25          A.   Yes.
```

1          And then if there are requests for changes, then

2     we evaluate them in a different, in a manner that is in

3     keeping with those overarching goals.

4          Q.   Where do those requests for changes come from?

5          A.   Members of the public.  It can come from a board

6     member.  And it can come from Blue Cross, our TPA.  And it

7     can come from a staffer.

8          Q.   Anyone else?

9          A.   That's generally where it comes from.

10         Q.   How are those requests evaluated?

11         A.   Again, it starts with the overarching goal of

12    providing public health for the most number, the biggest

13    number of people.

14         We serve 740,000 plus members.  And we don't take

15    that responsibility lightly.

16         I'm a fiduciary.  So when I walk through the

17    door, I don't get to pick and choose who I cover.  I cover

18    everybody.  And we evaluate those benefits in that light.

19         Q.   What criteria are used to evaluate proposed

20    benefit changes?

21         A.   We'll look at the cost of the benefit, what is

22    the size of the population that the benefit might cover,

23    and what is the efficacy of the benefit, how much, how much

24    success is there with the treatment or how much health does

25    it improve.

1                   And, again, we don't have a big clinical staff.

2        We use a lot of research from Blue Cross or CVS or our

3        actuary or our board.  And we'll get information from a

4        variety of sources.  And then we'll propose a

5        recommendation.

6              Q.    Okay.  Any other criteria used to evaluate

7        proposed changes?

8              A.    Those are the primary criteria.  But if something

9        else were to come up and be relevant, then we would use

10       that criteria as well.

11             Q.    Can you think of an example of a time when

12       something else has come up and been relevant?

13             A.    Yes.  I think probably the easiest to explain

14       would be digital mammography.  That was instituted I

15       believe in early '17.  And digital mammography was not

16       covered without a member having to pay out of pocket for it

17       prior to that.

18                   And the efficacy with digital mammography is it

19       serves -- women make up more than 50 percent of the Plan's

20       population.  So, therefore, a benefit that serves that many

21       people and has a long-term trajectory of lowering costs

22       because of catching breast cancer earlier -- which it does

23       because it's targeted at women with dense breast issue and

24       it can catch that, that millimeter size much earlier than

25       the traditional mammography -- and so that's a benefit that

1          A.    They're an actuary and consulting firm.

2          Q.    And was Segal retained by the Plan?

3          A.    Yes.

4          Q.    When was that?

5          A.    Segal has worked for the Plan for quite a number

6     of years.  I'm not -- certainly back in 2016 they were.

7     And prior to that, I'm not sure how many years.

8          Q.    Okay.  In 2016, did the Plan ask Segal for a

9     financial estimate for the annual cost to the Plan of

10    covering treatment and services for gender dysphoria

11    beginning with Plan Year 2017?

12         A.    Yes.

13         Q.    And to whom did the Plan make that request at

14    Segal?

15         A.    It would have been to the leading, the

16    management, Segal management.

17         Q.    Do you know who was in Segal management at the

18    time?

19         A.    I do not.  Currently, it's Stu Wall.  He might

20    have been the person back then as well.

21         Q.    When did the Plan make that request of Segal?

22         A.    I would imagine in June or July of 2016.

23         Q.    I'm handing you what has been marked as

24    Plaintiffs' Exhibit 2.

25                (Exhibit 2 is marked for identification.)

1    Horner, Lotta Crabtree.  Mona Moon would have had

2    substantial influence on this.  Mark Collins probably had

3    substantial influence on this document.

4         Q.   Anyone else?

5         A.   Beyond that, I don't know.

6         Q.   And who received a copy of this presentation deck

7    at the time, around the December 2016 board meeting?

8         A.   At the time, the board members would have

9    received a copy of it.

10        Q.   Anyone else?

11        A.   Plan staff.

12        Q.   Who in Plan staff would have gotten a copy?

13        A.   The leaders.  Beyond that, I wouldn't know.

14        Q.   And when you say the leaders, the individuals you

15   just mentioned as having influence over this document?

16        A.   Yes.

17        Q.   Did the Plan's Board of Trustees meet on December

18   1, 2016?

19        A.   The 1st and 2nd.

20        Q.   All right.  And was the Plan's Executive

21   Administrator at the time present at those board meetings?

22        A.   I don't know for sure.  But, yes, I believe she

23   was.

24        Q.   Could you flip to the end, which is PLAN DEF6988.

25             Is it correct that Plan staff recommended removing

1    the blanket exclusions for coverage of gender dysphoria

2    treatment?

3         A.   Yes, for the Plan Year 2017.

4         Q.   And is it correct that Plan staff stated that

5    removing those blanket exclusions would result in provision

6    of medically necessary services for treatment of gender

7    dysphoria?

8         A.   That's what the document says.

9         Q.   Is that what Plan staff recommended?

10        A.   Yes.

11        Q.   Did Plan staff ever retract that position

12   regarding medical necessity?

13        A.   Not that I'm aware of.

14        Q.   If you could flip back to Page PLAN DEF6968.

15             This slide sets forth the DSM-5 criteria for a

16   diagnosis of Gender Dysphoria.

17             Is that right?

18        A.   Yes.

19        Q.   Is the Plan familiar with the DSM-5?

20        A.   Yes.

21        Q.   Is it right that Plan staff relied on the DSM-5

22   in making its recommendation to the Board of Trustees?

23        A.   It appears that was what was used for this

24   presentation.

25        Q.   Does the Plan challenge the DSM-5 criteria for a

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 155 of 284

1      diagnosis of Gender Dysphoria?

2           A.   It doesn't appear so.

3           Q.   It doesn't appear so from this document?

4           A.   From this document, yes.

5           Q.   Today, does the Plan challenge those criteria?

6           A.   No.

7           Q.   Does the Plan today have a position on the

8      validity of the DSM-5?

9           A.   No.

10          Q.   Has the Plan ever withdrawn its reliance on the

11     DSM-5 set forth in this presentation?

12          A.   No.

13          Q.   If you could turn to the next page, which is PLAN

14     DEF6969.

15               This slide references the World Professional

16     Association for Transgender Health Standards of Care for

17     Medical Treatment of Gender Identification Disorder.

18               Is that right?

19          A.   That is correct.

20          Q.   And if I refer to this as the WPATH Standards of

21     Care, will you know what I'm talking about?

22          A.   I will.

23          Q.   So this slide sets forth the WPATH Standards of

24     Care criteria for gender confirmation surgery.

25               Is that right?

1          A.    Yes.

2          Q.    And turning to the next page, PLAN DEF6970, does

3     this set forth the WPATH Standards of Care criteria for

4     gender confirmation surgery?

5          A.    Yes.

6          Q.    Is the Plan familiar with the WPATH Standards of

7     Care?

8          A.    Yes.

9          Q.    And is it correct that the Plan staff relied on

10    the WPATH Standards of Care in making its recommendation to

11    lift the exclusion?

12         A.    Yes.

13         Q.    Does the Plan challenge the WPATH Standards of

14    Care?

15         A.    No.

16         Q.    And today does the Plan have a position on the

17    validity of the WPATH Standards of Care?

18         A.    No.

19         Q.    Has the Plan ever withdrawn its reliance on the

20    WPATH Standards of Care?

21         A.    No.

22         Q.    If you could turn to the next slide, which is

23    PLAN DEF6971.  This slide describes the American Medical

24    Association Resolution 122.

25               Is that right?

1          A.   Yes.

2          Q.   And the slide states that the AMA Resolution was

3     issued in 2008.

4          A.   Yes.

5          Q.   And it states that the AMA Resolution describes

6     the WPATH Standards of Care, elements of care for

7     transgender people as a medical necessity.

8               Is that right?

9          A.   Yes.

10          Q.   Okay.  Is the Plan familiar with AMA Resolution

11     122?

12          A.   To the extent it's listed here for gender

13     dysphoria, yes.

14          Q.   Is the Plan otherwise familiar with the AMA

15     Resolution 122 outside of this presentation?

16          A.   Not that I'm aware of.

17          Q.   And Plan staff relied on AMA Resolution 122 in

18     making its recommendation to lift the exclusion.

19               Is that right?

20          A.   It's clear that it was part of a recommendation.

21          Q.   Did they rely on it in making their

22     recommendation?

23          A.   I can't say for sure.

24          Q.   And it's cited in this presentation to the board?

25          A.   Yes.

1         Q.   Does the Plan challenge AMA Resolution 122?

2         A.   No.

3         Q.   Does the Plan have a position on its validity?

4         A.   No.

5         Q.   And has the Plan ever withdrawn its reliance on

6  AMA Resolution 122?

7         A.   No.

8         Q.   If you could turn to the page marked PLAN

9  DEF6985.

10         Does this slide accurately describe the State

11  Health Plan's blanket exclusions for coverage of gender

12  dysphoria in effect for the 2016 Plan Year?

13         A.   Yes.

14         Q.   And if you turn to the next slide, this slide

15  reflects the Segal company's estimate that adding coverage

16  for gender dysphoria will cost approximately 350,000 to

17  850,000 annually.

18         Is that right?

19         A.   Yes.

20         MS. RAVI:  Can we go off the record?

21         (Off the record)

22         MS. RAVI:  Back on the record.

23  BY MS. RAVI:

24         Q.   Other than your attorney, did you speak with

25  anyone during the break?

1    transgender patients?

2         A.   Yes.

3         Q.   And did she report to the board that the American

4    College of Physicians and American College of Obstetricians

5    and Gynecologists Committee have also endorsed coverage for

6    transgender healthcare services?

7         A.   Yes.

8         Q.   I'm now at the bottom of PLAN DEF12815 to 12816,

9    under Proposed Benefit Change.

10             Who is Lotta Crabtree?

11        A.   She was the Plan's Deputy Executive Administrator

12   and Legal Counsel at the time.

13        Q.   Did Ms. Crabtree present to the board at its

14   December 2nd meeting?

15        A.   Yes.

16        Q.   Did she report that the Plan's current benefit

17   provides blanket exclusions for the treatment of gender

18   dysphoria, including treatment or studies regarding sex

19   changes or modifications, psychological assessments, and

20   psychotherapy treatment?

21        A.   Where are you?

22        Q.   If you turn to PLAN DEF12816, at the top of the

23   page.

24        A.   Can you repeat the question?

25        Q.   Yes.  Did Ms. Crabtree report that the Plan's

1          current benefit provides blanket exclusions for the

2          treatment of gender dysphoria, including treatment or

3          studies regarding sex changes or modifications,

4          psychological assessments, and psychotherapy treatment?

5               A.   Yes.

6               Q.   And did she report that the annual cost of

7          coverage provided by the Plan's actuarial consultant is

8          approximately 350,000 to 850,000?

9               A.   Yes.

10              Q.   And is that the Segal company's estimate?

11              A.   Yes.

12              Q.   Did she report that the Plan would adopt the Blue

13         Cross Blue Shield of North Carolina's medical policy, which

14         includes the requirement in support of medical necessity?

15              A.   She did.

16              Q.   And did Ms. Crabtree report that the Plan

17         recommend approval of coverage for the treatment of gender

18         dysphoria by removing the blanket exclusions resulting in

19         the provision of medically necessary services for the

20         treatment of gender dysphoria?

21              A.   Yes.

22              Q.   How did the board act on the Plan's

23         recommendation to approve coverage for treatment of gender

24         dysphoria?

25              A.   The board removed the exclusion for one year, for

1       Plan Year 2017.

2               Q.   Who is Dr. Paul Cunningham?

3               A.   He's a former board member and physician.

4               Q.   Did Dr. Cunningham move to recommend that the

5       State Health Plan remove the blanket exclusions?

6               A.   Yes.

7               Q.   And who is Dr. Aaron McKethan?

8               A.   He is an actuary, a data-analytics person, a

9       former board member.

10              Q.   Did Dr. McKethan offer a resolution to Dr.

11      Cunningham's motion?

12              A.   Yes.

13              Q.   I'm now on PLAN DEF12817, the second full

14      paragraph.

15                   Does this paragraph accurately reflect Dr.

16      McKethan's proposed resolution, the paragraph starting Dr.

17      McKethan offered a resolution to?

18              A.   Sorry, what was the question?

19              Q.   Does this text here -- starting with paragraph

20      Dr. McKethan offered a resolution to -- does this

21      accurately reflect the text of that proposed resolution?

22              A.   Yes.

23              Q.   And does this accurately reflect the reason that

24      Dr. McKethan requested that the exclusion be suspended for

25      Plan Year 2017 only?

1        A.   Yes.

2        Q.   Was this resolution the reason that the exclusion

3   was suspended for the 2017 Plan Year only?

4        A.   Can you repeat, rephrase your question?

5        Q.   Was this resolution the reason that the exclusion

6   was lifted for only the 2017 Plan Year?

7        A.   Yes.  The board voted on this resolution

8   language.

9        Q.   Okay.  And what was the outcome of that vote?

10       A.   The outcome was in favor of removing the

11  exclusion for the Plan Year 2017.

12       Q.   And following this recommendation from Plan

13  staff, were Plan staff ever subsequently asked to make a

14  recommendation as to coverage for treatment of gender

15  dysphoria?

16       A.   No.

17       Q.   Why not?

18       A.   Staff did not -- they notified me that it was

19  supposed to come up, right, per the previous document.  And

20  that was their reminder that we should look at it for 2018.

21       Q.   Did Plan staff ever make another recommendation

22  as to coverage for treatment of gender dysphoria?

23       A.   No.

24       Q.   And did Plan staff ever retract their

25  recommendation reflected in this Crabtree presentation at

1    paragraph.

2            As to payment requests from medical providers, the

3    Plan states that information provided from Blue Cross Blue

4    Shield of North Carolina for the 2017 Plan Year indicates

5    that 784,923.28 was billed to the State Health Plan for

6    medical treatment that Blue Cross Blue Shield indicated

7    would have been excluded had the coverage exclusion remained

8    in effect.

9            Is that right?

10   A.   Yes.

11   Q.   So is it correct that in Plan Year 2017, the Plan

12   received this amount, 784,923.28, in payment requests from

13   medical providers?

14   A.   No.

15   Q.   What does this statement mean?

16   A.   It means the provider charges were 785,000

17   dollars.

18   Q.   And how do provider charges differ from provider

19   requests?

20   A.   Provider charges have no basis particularly

21   because they're always well overstated.

22           The Plan incurred 504,000 dollars, rounded, in

23   allowed expenses.

24   Q.   What is the difference between allowed expenses

25   and the amount listed above, 784,000?

1          A.    The discount that Blue Cross provides.

2          Q.    So after discounts negotiated, the amount in

3     allowed expenses was 504,406.04?

4          A.    Yes.

5          Q.    And that was for treatment that would have been

6     excluded had the coverage exclusion remained in effect?

7          A.    Yes.

8          Q.    And after reductions, I'm sorry, after Plan

9     participants or other insureds paid their portion, the Plan

10    paid 404,609.26.

11             Is that right?

12         A.    That is correct.

13         Q.    All right.  And other Plan participants and other

14    insurers paid the balance of that difference between

15    404,000 and 504,000?

16         A.    Yes.

17         Q.    To the Plan's knowledge, other than this amount

18    of 404,609.26, did it incur any other costs for coverage of

19    treatment of gender dysphoria in 2017?

20         A.    I think that could be difficult to assess because

21    there were some coverages that have been covered all along,

22    like counseling, that may or may not have been incorporated

23    into these numbers, which could have been, so that would

24    inflate the cost if they were, you know, using diagnosis

25    codes, et cetera.  But counseling has generally not been

 1      prohibited.

 2          Q.   As a result of lifting the exclusion for the 2017

 3      Plan Year, are there any other costs that were incurred

 4      that the Plan is aware of?

 5          A.   No.

 6          Q.   Okay.

 7          A.   Other than what I just mentioned.

 8          Q.   Was counseling covered before the Plan lifted the

 9      exclusion for the 2017 Plan Year?

10          A.   Yes.

11          Q.   So as a result of lifting the exclusion for the

12      2017 Plan Year, was approximately 404,000 dollars what the

13      Plan incurred in costs as a result of lifting that

14      exclusion?

15          A.   That which was specifically designated for gender

16      dysphoria, yes.  But there were counseling, probably there

17      were counseling charges that were not listed as gender

18      dysphoria.  So there could have been a higher cost.

19          Q.   Were those counseling charges covered prior to

20      the lifting of the exclusion?

21          A.   Yes.

22          Q.   Okay.

23          A.   And they are still covered today.

24          Q.   Was Blue Cross Blue Shield of North Carolina

25      tracking gender dysphoria claim activity in 2017?

1          A.    No.

2          Q.    Other than the ones we've talked about, did the

3     Plan's Board of Trustees hold any other meetings in 2017?

4          A.    No.

5          Q.    Did the Board of Trustees ever take up a vote in

6     2017 to continue lifting the exclusion for the 2018 Plan

7     Year?

8          A.    No.

9          Q.    Okay.  Was there any board meeting from January

10    2018 to the present where this issue has been discussed?

11         A.    It's been discussed in public comment numerous

12    times, along with people who want hearing aids and other

13    such benefits.

14         Q.    Is Blue Cross Blue Shield of North Carolina the

15    Plan's third-party administrator?

16         A.    Yes.

17         Q.    In anticipation of the sunsetting of the gender

18    dysphoria coverage at the end of 2017, did the Plan provide

19    Blue Cross Blue Shield with revisions to the 2018 Plan

20    Benefits Booklets?

21         A.    The Plan updated its own benefits booklets and

22    provided Blue Cross with a decision memo on the fact that

23    they needed to put the exclusions back in play.

24         Q.    What was that decision memo?

25         A.    It's an called an ADM.

1            But the people we work with, and as I already

2       mentioned the journals or whatever that I have reviewed and

3       discussions we've had with current and former board

4       members, there's a lot of uncertainty on whether or not the

5       treatments are effective.  And in some cases, maybe they

6       are.  But there's discussion in the space of the, more the

7       psychological effects and how much it's important there

8       versus the surgery, the transition surgery.

9            Q.   And what was the basis for Treasurer Folwell's

10      statement regarding the medical uncertainty?

11               MR. RULEY:  Objection, form.

12               THE WITNESS:  I don't know.

13      BY MS. RAVI:

14           Q.   Did Treasurer Folwell discuss this statement with

15      you?

16           A.   No.

17           Q.   Did Treasurer Folwell discuss this statement with

18      anyone at the Plan?

19           A.   I'm not aware of any conversations he had with

20      anybody at the Plan.

21           Q.   And does this statement from October 25th reflect

22      the views of the State Health Plan?

23           A.   Parts of it might, such as the legal and medical

24      uncertainty.

25               The Franciscan Alliance opinion came out in

1    benefits and any benefits that might apply to a broad swath

2    of the population with a not guaranteed but a strong

3    proponent of lower costs in the future.

4            And so that's where legal and medical uncertainty

5    -- I don't have to cover medically necessary treatment.  We

6    cover a lot of it.  But in this case, we don't.

7        Q.   Prior to this statement coming out on October 25,

8    2018, did Plan staff discuss the legal uncertainty that's

9    referenced here?

10       A.   Yes.

11       Q.   Did Plan staff discuss the medical uncertainty

12   that's referenced here?

13       A.   Yes.

14       Q.   Let's turn back to Exhibit 5.  And if you can

15   turn to Page 10 of this document.

16           Plaintiffs' Interrogatory Number 3 asks the Plan

17   to discuss the factual basis for each governmental interest

18   that the Plan contends supports the exclusion.

19           Is that right?

20       A.   Yes.

21       Q.   And is it correct, turning to the next page, the

22   Plan states that the Plan has not identified any valid,

23   reliable, peer-reviewed longitudinal studies that support

24   the efficacy of the plaintiffs' desired treatment?

25       A.   I'm sorry -- where are you?

1    Q.   I am at the bottom of Page 11, last paragraph.

2    A.   Okay.

3         That would be true.

4    Q.   Is a peer-reviewed, longitudinal study that

5    supports the efficacy of treatment a prerequisite for the

6    Plan to cover a proposed benefit?

7    A.   Not necessarily.  When we evaluate, as I think we

8    said earlier, it's a holistic review.  There's no single

9    pathway to coverage.  It has to be a broad swath of

10   membership, that there's a benefit for multiple people.

11        There's a cost component to it.  There's a

12   downstream cost component to it.  There's got to be some

13   common -- not experimental for sure.

14        There's got to be some common understanding in

15   the medical community that it is a treatment that will

16   produce a downstream effect that's positive.

17        So, you know, it's very difficult to come back

18   and say well, peer-reviewed, longitudinal studies -- I'm

19   not a clinician and I'm not a researcher, so it's, you

20   know -- but to the extent that we have not found any real

21   evidence that it's absolutely black and white, this

22   particular issue.

23        You know, I think it goes, well, it should go

24   without saying this is not a personal issue for me.  I

25   don't get, I have no personal opinion about this.

1    of really healthy people for an app that was, I think we

2    paid 4000 dollars a person.  It was the healthy people who

3    were doing it.  It wasn't achieving anything for health.

4    So we canceled the benefit.  It was a small, very small

5    population, health management benefit.

6            But that is what we do every day.  And I have to

7    make choices that are awful sometimes.  And it gives me no

8    great pleasure, but it is my responsibility.

9        Q.   Turning back to the peer-reviewed studies we

10   discussed, did the Plan conduct a search for those studies?

11       A.   I did not.  I don't believe the Plan did.

12       Q.   Okay.  The Plan's response also states that

13   during the pendency of this case, the American Journal of

14   Psychiatry issued a correction to an article.

15           Do you see that here?

16       A.   I do.

17       Q.   What was that article?

18       A.   I don't know -- not right this moment.

19       Q.   To the Plan's knowledge, has Treasurer Folwell

20   reviewed that article and the correction referenced here?

21       A.   I do not know.

22       Q.   Has Plan staff reviewed the article?

23       A.   Possibly, but I do not know.

24       Q.   And has the Board of Trustees reviewed that

25   article?

1          A.    Possibly, but I do not know.

2          Q.    All right.

3          A.    If you'll recall, though, this says the Plan has

4     not identified any valid or reliable -- so to the extent

5     that we are reviewing articles, as I mentioned earlier,

6     when I'm reviewing the journal, the New England Journal of

7     Medicine and Kaiser and Milliman, those types of reviews,

8     there's been nothing that makes this in my mind 100 percent

9     clear.

10         Q.    Going back to the paragraph that starts with

11    Second on the same page, the Plan states that it remains

12    unaware of any objective test to identify individuals

13    suffering from gender dysphoria who will benefit from the

14    hormonal and surgical treatments sought here.

15              Is that right?

16         A.    That is correct.  The Plan remains unaware of any

17    objective test -- yes.

18         Q.    Is an objective test to identify individuals who

19    will benefit from the proposed treatment a prerequisite for

20    the Plan to cover a proposed benefit?

21         A.    As I've stated before, it's a holistic review.

22              And so if there are, in fact, objective tests,

23    then that might be taken into consideration.

24         Q.    Has the Plan conducted a search for such

25    objective tests?

1          A.   If it were to become necessary, then the Plan

2     would make a search.

3               But we do not find it necessary because of the

4     things I've already discussed -- about the small volume of

5     patients being a niche group, that we wouldn't be able to

6     afford to offer the benefit.

7          Q.   So to the Plan's knowledge today, has the Plan

8     conducted a search in the past for such tests?

9          A.   No.

10         Q.   And the Plan states that for minors, the Plan is

11    unaware of any methodology to reliably distinguish between

12    children for whom gender dysphoria will resolve without

13    hormonal therapy or surgical intervention and those for

14    whom it will not.

15              Is that right?

16         A.   Yes.

17         Q.   Was the Plan's unawareness of this methodology

18    for children also its justification for excluding this care

19    for adults?

20         A.   I can't say.

21         Q.   Is the Plan aware?

22         A.   Of?

23         Q.   Of this methodology.

24         A.   For minors?

25         Q.   Uh-huh.

1    Q.   Are there any governmental interests identified

2    in response to this interrogatory?

3    A.   So other than FDA, is that what you're asking

4    for?

5    Q.   Other than the statement made in response to

6    Interrogatory Number 3.

7    A.   Then --

8         MR. RULEY:  Objection, form.

9         THE WITNESS:  Again, I don't -- no, I don't know.

10   BY MS. RAVI:

11   Q.   Okay.  Let's turn back to Page 10, actually Pages

12   9 to 10 of this document.

13        Plaintiffs' Interrogatory 2 asks the Plan to

14   describe the financial sustainability of the State Health

15   Plan.

16        Is that right?

17   A.   Yes.

18   Q.   And turning over to Page 10, the Plan references

19   several policies or decisions to improve the Plan's

20   long-term sustainability that have been proposed, adopted,

21   or implemented since 2017.

22        Is that right?

23   A.   That is correct.

24   Q.   Listed under Response (a), the Plan references an

25   increased use of a Medicare Advantage plan.

1      A.    Yes.

2      Q.    And it states that this change is expected to

3    generate 590 million dollars in savings over three years.

4           Is that right?

5      A.    I don't see the 590 -- oh, right there.  Thank

6    you.  Appreciate that.

7           Yes, that is correct.

8      Q.    And under (b), it states elimination of the

9    subsidy for retiree healthcare benefits for members hired

10   after January 2021.

11          Is that right?

12     A.    Yes.

13     Q.    How much is that expected to save?

14     A.    Well, out of the OPEB liability, it will be

15   billions.  But it is not calculable without that.

16          It's probably in the 300, for the retirees,

17   again, probably 300 dollars per member per month.  But,

18   again, it's pretty difficult to calculate that.

19     Q.    Under (c), the Plan references competitive

20   bidding for third-party administration services for the

21   Plan.

22          Is that right?

23     A.    Correct.

24     Q.    And the Plan estimates that this will save at

25   least 20 million dollars per year.

1              Is that right?

2          A.    Correct.

3          Q.    And under (d), the Plan references the Clear

4      Pricing Project.

5              Is that correct?

6          A.    Correct.

7          Q.    How much is that expected to save?

8          A.    In its full state of, of action, if we were to

9      achieve the full goal, we would save probably 300 million

10     dollars.

11         Q.    All right.  I'll hand you what I've marked as

12     Exhibit 10.

13              (Exhibit 10 is marked for identification.)

14     BY MS. RAVI:

15         Q.    Are you familiar with this document?

16         A.    I am.

17         Q.    What is this?

18         A.    It is a Disclosure of Expert Witnesses Who Do Not

19     Provide a Written Report Pursuant to -- a citation -- by

20     Defendants Dale Folwell, Dee Jones, and the North Carolina

21     State Health Plan for Teachers and State Employees.

22         Q.    As of December 2017, what was the amount of the

23     Plan's unfunded liability?

24         A.    December 2017?  It's not calculated as of the end

25     of the year.  It's more as of 6-30.  I want to say that was

1    booklet is laid out and given to every new employee.  And

2    they can make a choice as to whether or not they want the

3    benefit, can afford the benefit, or if the benefit covers

4    what they need to have covered.

5         Q.  Is it correct that individuals cannot receive

6    coverage under the Plan unless they are employed by a state

7    agency or participating local agency?

8         A.  They could be a dependent of someone on the State

9    Health Plan.

10         Q.  So an individual to receive coverage must either

11    be employed by a state agency or be a dependent of somebody

12    who is?

13         A.  Correct.  And that dependency would be validated

14    through a qualifying documentation.

15         Q.  How is an individual's eligibility for

16    participating in the Plan determined?

17         A.  First of all, it's laid out in statute.  But,

18    again, it's just be an employee of an employing unit that

19    is participating in the Plan is the simplest way to put it.

20         Q.  And who makes that determination?

21         A.  General Assembly.

22         Q.  Does someone review an enrollee's request to

23    participate in the Plan to confirm that they are, in fact,

24    employed by a state agency?

25         A.  Yes.  We have what we call Health Benefit

1    Representatives that are at every employing unit and/or

2    agency office.  And they assist any new member, new

3    employee with the benefits enrollment.

4         Q.   And how are eligible employees enrolled in the

5    Plan?

6         A.   Again, they can go into the system either on

7    their own or call in and be enrolled by a call center

8    representative.

9         Q.   Do participating employers play a role in getting

10   eligible employees enrolled in the Plan?

11        A.   Yes.  The HBR is very much responsible for

12   helping the member.  But it's still on the member or the

13   employee to enroll in a timely fashion.  There's a 30-day

14   window for which a new employee has to be enrolled.  That's

15   the window.  And that's in statute.

16        Q.   And you said that a Health Benefits

17   Representative can provide assistance in that process.

18        A.   Correct.

19        Q.   What about participating employers, do they play

20   a role in this process?

21        A.   In what way?

22        Q.   Do participating employers play a role in the

23   process of getting an eligible --

24        A.   Only through the fact that they have an HBR

25   available.

1       Q.   Do participating employers have any role in

2   determining eligibility?

3       A.   To the extent that it's either a new hire and

4   they're working more than 30 hours a week as a full-time

5   employee, but other than that, no.

6       Q.   Do participating employers provide enrollment

7   forms?

8       A.   Yes.

9       Q.   Do they transmit those enrollment forms to the

10  Plan?

11      A.   If there's, if it's -- first of all, we do mostly

12  electronic enrollment.  So they might provide a computer

13  for someone to enroll.  I'm not -- we don't manage what the

14  employers do as to how exactly they do it.

15          But I know of some that will provide a computer

16  for an employee who does not necessarily work in a desk

17  job.  But they are, they help them get enrolled.  But

18  that's, again, on the HBR and the agency or the employer.

19      Q.   Okay.  And do participating employers deduct

20  premiums from their employees' salary?

21      A.   The State Controller deducts the premiums from

22  the salary.  But it's the local HR people who are

23  responsible for getting it right into the system, the HR

24  payroll system.

25          There are 408 employing units, for example, that

1    after 2018, the Plan is not aware of any specific time when

2    the medical uncertainty of gender dysphoria treatment was

3    discussed?

4         A.    That may be fair.

5         Q.    And you mentioned that the Plan has resources

6    that it can reach out to for information on this topic.

7    You said that Blue Cross Blue Shield is one of those

8    resources and CVS.

9              Are there any other resources?

10        A.    Those are our main go-tos.  Segal, we talk to

11   Segal.  They have consulting staff that includes

12   clinicians.

13        Q.    Any other resources for the topic of gender

14   dysphoria treatment?

15        A.    No.

16        Q.    All right.  And you testified earlier that you,

17   yourself, did some research into the medical necessity of

18   gender dysphoria treatment.

19              Is that right?

20        A.    Yes.

21        Q.    You said that you researched Kaiser, Milliman,

22   and the New England Journal of Medicine.

23              Is that right?

24        A.    Yes.

25        Q.    How did you decide to look at those resources?

1              A.   I reached out to Segal, Blue Cross, and CVS.

2        They are our partners.  They all have clinical staff.  And

3        that's where we get our, a lot of our clinical feedback.

4              Q.   Did you save your research?

5              A.   What's that?

6              Q.   Did you save your research?

7              A.   No.

8              Q.   Why not?

9              A.   Because I wasn't researching to write a white

10       paper.

11             Q.   So is it correct that that research has not been

12       produced to the plaintiffs at this point?

13             A.   Right.  General curiosity.

14             Q.   In the fall of 2017, how long did you spend

15       researching these issues?

16             A.   Several hours maybe.

17             Q.   And you said maybe again in 2018.  How long did

18       you spend in 2018?

19             A.   Probably less.

20             Q.   Did you share your research with anyone?

21             A.   The staff discussed it.  They may have researched

22       as well.  And, again, it was more general conversation.

23             Q.   Who at the, in the staff did you share your

24       research with?

25             A.   Caroline, Ted, Beth.  It's my leadership team, we

1      not personal.  This is not something that I get to make a

2      choice about.  Because if I had every single group that

3      comes in to ask for a benefit, if I covered that, then I

4      would be completely, completely avoiding my fiduciary

5      responsibility to cover basic health.  That's what the Plan

6      Benefits Booklet says, right?

7                  The Plan Benefits Booklet identifies every single

8      thing I cover.  And it provides healthcare.  We want every

9      member of the Plan to have good healthcare.  We want the --

10     and the reality is we have a lot of members who have

11     diabetes.  We have a lot of members who have orthopedic

12     issues.  We have a lot of members who have RA.  We have

13     really a lot of members who have cancer.  And they want to

14     be, they want to be covered.

15                 And so it's really difficult for me to just say,

16     you know, I can take this group of 25 and this group of 10

17     and these -- if you add all that up -- I'll, I'll totally

18     admit that the cost of this benefit is not going to break

19     the Plan, never was, never will.

20                 But it -- I can't do it for that group and not do

21     it for the group that wants it for their infants, for, you

22     know, for a certain feeding formula for that infant group,

23     and I can't do it for the hearing aid group, and I can't do

24     it for the group that really wants acupuncture.

25                 Because once you start adding those, then I have

1          And it may sound big and like we can get all this

2     buying power.  We don't have all the buying power.  The

3     hospitals and the providers that work in the hospitals are

4     killing us all from a cost standpoint.

5          And so it's, you know, my focus is to be able to

6     reduce family premiums 100 bucks.  That's my, that is one of

7     my biggest goals right now.  And that is the only way I'm

8     going to get an uptick -- to bill 100 dollars -- I'm paying

9     right now 720 dollars for three people.  That's a lot of

10    money.  And I am grateful that I can afford it.  But for

11    your average teacher, they can't afford that.

12         And I'm going to have to reduce the family premium

13    100 bucks at a minimum to make somebody take it up.

14         And so until I can take that kind of money out of

15    the Plan and at the same time shore up the Retiree Health

16    Benefit Trust Fund for the unfunded liability and make up

17    trend -- oh, by the way, they're not covering COVID costs

18    right now.  The General Assembly is not interested in giving

19    us back our money for COVID.

20         So people ask me why carry a billion dollar

21    budget, cash, cash balance?  It's to make up for things like

22    that.  Like a bad flu season, which we're going to have,

23    we're going to have it if we're not careful about vaccines

24    and COVID's still raging.

25         I mean that's what I have to live with every day

1           A.    Surgical procedures for psychological or
2      emotional reasons.
3           Q.    And would those exclusions also potentially apply
4      to coverage for gender dysphoria?
5           A.    Yes.
6           Q.    Earlier, you mentioned HBRs.  What are they again
7      please?
8           A.    Health Benefit Representatives.  They are
9      actually defined in statute.  And they work at the various
10      employing units.  I mentioned there are 408.  They are
11      liaisons to the Plan.  So the Plan teaches them, keeps them
12      apprised of the benefits being offered.  But they're
13      responsible for their employer's employees and getting them
14      enrolled and making sure they understand the processes.
15           Q.    So are they employed by the State Health Plan or
16      by others?
17           A.    By the others.
18           Q.    All right.  Thank you.
19                 On costs -- would you get Exhibits 6 and 7 please.
20                 Looking at Exhibit 6, for example, look at the
21      first e-mail on Exhibit 6, Page DEF61647, the January 22,
22      2017 e-mail.
23           A.    Yes.
24           Q.    And that reports, as of 1-21, a total paid of
25      287.57.

# Exhibit 13



Deposition of:
## Peter Robie , M.D.

*September 22, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

1    IN THE UNITED STATES DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2    Civil Action No. 1:19-cv-00272

3

4    MAXWELL KADEL, et al.,
5             Plaintiffs,
6      vs.
7    DALE FOLWELL, in his official
    capacity as State Treasurer of
8    North Carolina, et al.,
9             Defendants.

10

11

12

13       VIRTUAL ZOOM VIDEOTAPED DEPOSITION OF
               PETER ROBIE, M.D.
14           (Taken by Plaintiffs)
15        Winston-Salem, North Carolina
16       Wednesday, September 22, 2021

17

18

19

20

21    Reported by Andrea L. Kingsley, RPR

22

23

24

25

```
 1              A P P E A R A N C E S
 2     ON BEHALF OF THE PLAINTIFFS (via Virtual Zoom):
 3              Tara Borelli, Esquire
                Lambda Legal Defense And
 4              Education Fund, Inc.
                730 Peachtree Street NE, Suite 640
 5              Atlanta, Georgia 30318-1210
                404-897-1880
 6              Tborelli@lambdalegal.org
 7                   -and-
 8              Deepika Ravi, Esquire
                Harris, Wiltshire & Grannis, LLP
 9              1919 M Street NW, 8th Floor
                Washington, DC 20036
10              (202) 730-1300
                Dravi@hwglaw.com
11
12     ON BEHALF OF THE DEFENDANT NC DEPARTMENT OF PUBLIC
       SAFETY (via Virtual Zoom):
13
                Alan McInnes, Esquire
14              Assistant Attorney General
                North Carolina Department of Justice
15              114 W Edenton Street
                Raleigh, North Carolina 27603
16              (919) 716-6400
                Amcinnes@ncdoj.gov
17
18     ON BEHALF OF THE DEFENDANT FOLWELL AND NCSHP (via
       Virtual Zoom):
19
                John G. Knepper, Esquire
20              Law Office of John G. Knepper
                1720 Carey Avenue, Suite 590
21              Cheyenne, Wyoming 82001
                (307) 632-2842
22              John@knepperLLC.com
23
24
25
```

1              A P P E A R A N C E S (Cont'd.)
2     ON BEHALF OF THE DEFENDANT FOLWELL AND NCSHP (Via
      Virtual Zoom):
3

                  Kevin G. Williams, Esquire
4                 Bell Davis & Pitt
                  100 N. Cherry Street, Suite 600
5                 Winston-Salem, North Carolina 27101
                  (336) 722-3700
6                 Kwilliams@belldavispitt.com
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              VIRTUAL ZOOM VIDEOTAPED DEPOSITION

2         OF PETER ROBIE, M.D., a witness called on

3         behalf of the Plaintiffs pursuant to the

4         Federal Rules of Civil Procedure, before

5         Andrea L. Kingsley, Notary Public, in and for

6         the State of North Carolina, at Winston-Salem,

7         North Carolina, on Wednesday, September 22,

8         2021, commencing at 10:05 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 Q. When you retired in 2016, did you stop
2 practicing medicine at that time?
3 A. For six months.
4 Q. Are you currently practicing medicine?
5 A. Yes.
6 Q. What is your area of practice?
7 A. Internal medicine.
8 Q. Do you have any other specializations?
9 A. No.
10 Q. Any other areas of practice?
11 A. No.
12 Q. Are you an expert in the diagnosis of
13 gender dysphoria?
14 A. No.
15 Q. Have you ever diagnosed a patient with
16 gender dysphoria?
17 A. No.
18 Q. Are you an expert in the treatment of
19 gender dysphoria?
20 A. No.
21 Q. Have you ever treated a patient for
22 gender dysphoria?
23 A. No.
24 Q. Are you an expert in the cost of
25 treatment for gender dysphoria?

1        A.    No.

2        Q.    Have you ever submitted a request for

3    pre-authorization for insurance coverage for gender

4    concerning care?

5        A.    No.

6        Q.    Have you ever communicated with an

7    insurer regarding a denial of coverage for gender

8    confirming care?

9        A.    No.

10       Q.    Have you ever taught medicine?

11       A.    Yes.

12       Q.    Where did you teach?

13       A.    Baylor College of Medicine, Wake Forest

14    Baptist Medical Center.

15       Q.    At Baylor what were you teaching?

16       A.    General internal medicine.

17       Q.    Did you teach anything else at Baylor?

18       A.    No.

19       Q.    What about at Wake Forest?

20       A.    General internal medicine.

21       Q.    Either at Baylor or at Wake Forest did

22    you teach on the subject of gender dysphoria?

23       A.    No.

24       Q.    Have you ever taught on that subject?

25       A.    No.

1      Q.    Apart from the statement itself, did you
2    discuss any of the content of the statement with
3    Treasurer Folwell?
4                  MR. WILLIAMS:  Objection to the
5          form.
6      A.    No.
7      Q.    Have you ever had a conversation with
8    Treasurer Folwell regarding the medical necessity of
9    gender confirming care?
10     A.    No.
11     Q.    Can gender confirming care ever be
12    medically necessary for a patient?
13     A.    That decision is made by the provider,
14    patient's physician, and the patient together.  The
15    medical necessity is determined really at that
16    level.  To me, when the guidelines are issued by
17    organizations such as the American Medical
18    Association and the Society and so on, they are
19    guidelines.  The medical necessity is not
20    determined by the guidelines, it's determined by
21    the provider and the patient.
22     Q.    Is there ever a circumstance where a
23    provider and patient together could determine that
24    gender confirming care is medically necessary?
25                  MR. WILLIAMS:  Objection to the

1    form.

2         A.    I don't know.

3         Q.    Going back to Exhibit 3, other than

4    Treasurer Folwell, did you discuss the contents of

5    this statement with anyone else?

6         A.    No.

7         Q.    Are you familiar with the Segal Company?

8         A.    No.

9         Q.    Are you aware of the total cost that the

10   plan incurred for covering gender confirming care in

11   2017?

12        A.    No.

13        Q.    I will ask you to take a look at what's

14   been marked as Exhibit 4.

15                    (Exhibit 4, PLAN DEF0038905, marked

16        for identification, as of this date.)

17        A.    Okay.

18        Q.    Are you familiar with this document,

19   Dr. Robie?

20        A.    Yes.

21        Q.    What is this document?

22        A.    It's an e-mail on our last board meeting

23   sharing my thoughts about several e-mails that plan

24   members had sent to the board since their last

25   meeting.

# Exhibit 14



Deposition of:
## Becki Johnson 30(b)(6) North Carolina Department of Public Safety

*September 15, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

1            IN THE UNITED STATES DISTRICT COURT FOR

2             THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5       MAXWELL KADEL, et al.,       )

                                     )

6                Plaintiffs,     )

                                     )    No. 1:19-cv-272-LCB-LPA

7             V.                )

                                     )

8       DALE FOLWELL, et al.,       )

                                     )

9               Defendants.     )

      _____ )

10

11

12

                VIDEOCONFERENCE DEPOSITION

13                     OF

                  BECKI JOHNSON

14     30(b)(6) DESIGNEE FOR NC DEPARTMENT OF PUBLIC SAFETY

15

                 SEPTEMBER 15, 2021

16

17           THIS TRANSCRIPT IS NOT COMPLETE

        PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS

18     MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY

     AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30

19     DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

20

21

             WAKE COUNTY, NORTH CAROLINA

22

23

24

25     Reported by: Michelle Maar, RDR, RMR, FCRR

```
 1      APPEARANCES: (All via videoconference)
 2      On behalf of the Plaintiffs:
 3          HARRIS, WILTSHIRE & GRANNIS
            By: Evan Marolf
 4          1919 M Street NW, 8th Floor
            Washington, DC 20036
 5          Emarolf@hwglaw.com
 6          HARRIS, WILTSHIRE & GRANNIS
            By: Amy E. Richardson
 7          1033 Wade Avenue, Suite 100
            Raleigh, NC 27605
 8          Arichardson@hwglaw.com
 9          Lambda Legal Defense and Education Fund
            By: Tara Borelli
10          730 Peachtree Street NE, Suite 640
            Atlanta, GA 30318
11          Tborelli@lambdalegal.org
12
        On behalf of Defendant State of North Carolina Department
13      of Public Safety:
14          NORTH CAROLINA DEPARTMENT OF JUSTICE
            By: Alan McInnes
15          114 W. Edenton Street
            Raleigh, NC 27603
16          Amcinnes@ncdoj.gov
17
        On behalf of Defendants Dale Folwell, Dee Jones, and the NC
18      State Health Plan for Teachers and State Employees:
19          LAW OFFICE OF JOHN G. KNEPPER
            By: John G. Knepper
20          1720 Carey Avenue, Suite 590
            Cheyenne, WY 82001
21          John@knepperLLC.com
22          BELL, DAVIS & PITT
            By: Mark A. Jones
23              Kevin Williams
            100 N. Cherry Street, Suite 600
24          Winston-Salem, NC 27101
            Mjones@belldavispitt.com
25          Kwilliams@belldavispitt.com
```

1                      INDEX
2         Examination by Mr. Marolf.................. 5
          Examination by Mr. Knepper................ 32
3         Examination by Mr. McInnes................ 66
          Further examination by Mr. Knepper......... 68
4
5                 DEPOSITION EXHIBITS
6     Plaintiffs' Exhibit No.    Description          Page
7     Exhibit 1      Notice of Rule 30(b)(6) Deposition
                     of North Carolina Department of
8                    Public Safety......................... 6
9     Exhibit 2      Defendant State of North Carolina
                     Department of Public Safety's
10                   Answer to Plaintiffs' Amended
                     Complaint............................. 12
11
      Exhibit 3      Defendant N.C. Department of Public
12                   Safety's Responses to Plaintiffs'
                     First Set of Interrogatories.......... 18
13
      Exhibit 4      Department of State Treasurer,
14                   Retirement Systems Division Form....... 36
15    Exhibit 5      State of North Carolina Department of
                     Justice, Criminal Justice Education
16                   And Training Standards Commission
                     General Certification.................. 38
17
      Exhibit 6      NC DPS STS History (ST03) Report....... 47
18
      Exhibit 7      Training Transcript Report............. 48
19
      Exhibit 8      Confirmation Statement................. 53
20
21
22
23
24
25

1                    P R O C E E D I N G S

2                        BECKI JOHNSON,

3          called as a witness and having been first duly sworn

4              remotely, pursuant to NC Session Law 2021-3,

5                  was examined and testified as follows:

6                          * * * * *

7              MR. MAROLF:  I'm Evan Marolf, representing the

8       Plaintiffs in this matter.  I'm with Harris, Wiltshire &

9       Grannis.

10             Also here on behalf of Plaintiffs are Amy

11      Richardson, with Harris, Wiltshire & Grannis, and Tara

12      Borelli, with Lambda Legal.

13             MR. KNEPPER:  And my name is John Knepper.  I

14      represent Co-Defendants, the State Health Plan, Treasurer

15      Dale Folwell, and the Administrator of the Health Plan Dee

16      Jones.

17             And with me is Mark Jones, who is with Bell,

18      Davis, Pitt.

19             And we may be joined later by Kevin Williams,

20      another attorney from Bell, Davis, Pitt, or Joel Heimbach,

21      who is one of the in-house counsel for the North Carolina

22      Treasurer's Office.

23             MR. MCINNIS:  And my name is Alan McInnis.  I

24      represent the North Carolina Department of Public Safety.

25             I'm in the room with the witness, Becki Johnson.

1          That's all that's appearing on behalf of DPS.

2

3                        EXAMINATION

4     BY MR. MAROLF:

5          Q.   All right.  Good morning, Ms. Johnson.

6          A.   Good morning.

7          Q.   Would you start by just stating your full name

8     for the record please.

9          A.   Becki Johnson.

10         Q.   Have you ever had your deposition taken before?

11         A.   No.

12         Q.   Okay.  So I just want to quickly go over a few

13    ground rules just to make sure that we're on the same page.

14              So the court reporter is going to be transcribing

15    my questions and your answers.  So if you could, please give

16    a verbal response to my questions so that she can correctly

17    transcribe them.  That would be helpful.

18              And then I'll also ask that you let me finish my

19    questions, you know, before you start answering.  And I'll

20    do my best to avoid interrupting you.

21              That might be a little more difficult with being

22    remote.  And so, hopefully, we don't have too many

23    connection issues.

24              We'll both do our best.  Is that fair?

25         A.   Yes.

1          Q.   And if I ask you a question that you don't
2     understand, please just ask me to rephrase it.
3              And if you don't, I'll assume that you did
4     understand.  Is that fair?
5          A.   Yes.
6          Q.   Is there anything inhibiting your ability to give
7     complete, honest answers today?
8          A.   No.
9          Q.   All right.  Do you understand that you're
10    testifying as a designated representative of the North
11    Carolina Department of Public Safety today?
12         A.   Yes.
13         Q.   What did you do to prepare for your deposition
14    today?
15         A.   I just read over some of the stuff that Mr.
16    McInnis had sent me.
17         Q.   What documents did you review?
18         A.   The, it was the personnel file and the medical
19    file for the plaintiff and the interrogatories that DPS had
20    already submitted, and an expert witness, and expert
21    witness stuff too.
22         Q.   I'm going to show you an exhibit.
23              MR. MAROLF:  Well, actually, Alan, sorry, if you
24    would, if you could pull up Exhibit 1.
25              (Exhibit 1 is marked for identification.)

1          MR. MCINNIS:  Okay.  We're looking at it.

2     BY MR. MAROLF:

3          Q.   And I'll give you a chance if you want to review

4     it before I ask you any questions about it.

5          A.   (Witness reviews the document.)

6               Okay.

7          Q.   Have you seen this document before?

8          A.   Yes.

9          Q.   Could you just read the bold, underlined text

10    near the, in the bottom third or so of the first page of

11    the document.

12         A.   Hold on.

13              The Notice of Rule 30(b)(6) Deposition of North

14    Carolina Department of Public Safety.

15         Q.   Yes.  Thank you.

16              And did you review this document as you prepared

17    for the deposition today?

18         A.   Yes.

19         Q.   And I'm going to direct you to page, it's the

20    third page of the document, it doesn't have a page number

21    on it, but the third page of the document near the bottom

22    says in bold, underlined, it says Deposition Topics.

23         A.   Okay.

24         Q.   And on the next couple of pages or so, there are

25    17 numbered paragraphs.

1          A.    Yes.

2          Q.    Are you prepared to testify on the topics listed

3     in those paragraphs?

4          A.    Yes.

5          Q.    Okay.  Aside from your attorney, did you speak

6     with anyone else to develop your knowledge on these topics?

7          A.    No.

8          Q.    Okay.  Ms. Johnson, do you currently work at the

9     Department of Public Safety?

10         A.    Yes.

11         Q.    And if I refer to it as DPS, would that be

12    confusing?  Or will that make sense to you?

13         A.    No.  That's fine.

14         Q.    Okay.  How long have you been working with DPS?

15         A.    This, this stint I came back in 2018.  I

16    previously worked for them in 2006 to 2014.

17         Q.    And what's your current job title?

18         A.    HR Benefits Manager.

19         Q.    And was that the same job that you held in your

20    first stint?

21         A.    No.

22         Q.    Okay.  What, what was your, what positions did

23    you hold previously to this one?

24         A.    I was the Disability and Retirement Program

25    Manager prior.

1        Q.   Okay.  And any other positions before that?

2        A.   No.

3        Q.   Or in between the two?

4        A.   Not for DPS.

5        Q.   Okay.  Yeah.

6            What are your, what are your responsibilities?

7        A.   I oversee the benefits programs for the

8   department, which include insurance benefits, leave

9   benefits, retirement and disability benefits, as well as

10   leave of absence and separations.

11       Q.   And what were your, what were your

12   responsibilities as disability -- was it Disability

13   Benefits Manager?  Was that the previous position?

14       A.   It was Disability and Retirement Program Manager.

15          And my responsibilities were to oversee the

16   retirement program for the agency, as well as the

17   disability benefits for the agency, and process disability

18   payments monthly for employees out on short-term

19   disability.

20       Q.   Ms. Johnson, does the Department of Public Safety

21   offer health insurance to its employees?

22       A.   Yes.  Through the State Health Plan.

23       Q.   Sorry -- you said through the State Health Plan?

24       A.   Yes.  Yes.

25       Q.   And does DPS pay money into the State Health Plan

1      to contribute for its employees' health insurance premiums?

2          A.   Yes.  We pay a monthly employee, employer portion

3      for each employee.

4          Q.   And how is the amount that DPS pays into the

5      State Health Plan each month determined?

6          A.   The State Health Plan determines it each year and

7      provides it to us.

8          Q.   And so DPS doesn't play a role in making that

9      determination.  It's purely the State Health Plan, and DPS

10     just goes along with that.

11              Is that right?

12         A.   Yes.  That's correct.

13         Q.   And so if the amount changes at any point, that

14     would all be determined by the State Health Plan?

15         A.   Correct.

16         Q.   Approximately how many DPS employees qualify for

17     health insurance through the State Health Plan?

18         A.   We have about 21,000 employees.

19         Q.   And all of them are on the State Health Plan?

20              There aren't any who don't qualify for insurance

21     or --

22         A.   Well, depending on their hours worked, some

23     probably don't qualify, or some that have declined coverage

24     because they have other coverage.

25         Q.   Right.  Can you estimate of how many of those

1    21,000 employees would be on the State Health Plan?

2         A.   I would say maybe about 18 or 19,000.

3         Q.   And again approximately, how much does DPS pay

4    the State Health Plan each year in total for all these

5    employees?

6         A.   We don't pay it directly, the Office of the State

7    Controller pays it.  I can give you the monthly amount per

8    employee.

9         Q.   Sure.  That's fine.

10        A.   It's 521.96 currently.

11        Q.   And so just to make sure I'm understanding -- so

12   that's, it's 521 or so for each of those employees.

13             And that's for all of those employees who are on

14   the Health Plan, correct?

15        A.   Correct.  Yes.

16        Q.   So if I were doing the math, I could just

17   multiply that by 18 or 19,000 and that would be the total?

18        A.   Yes.

19        Q.   Does the Department of Public Safety have any

20   control over the health insurance that its employees

21   receive?

22        A.   No.

23        Q.   Okay.  And I'm actually going to pull up -- well,

24   I'm going to send another, put another exhibit into the

25   folder, if you'll bear with me for a minute.

1          (Exhibit 2 is marked for identification.)

2          THE WITNESS:  Okay.

3     BY MR. MAROLF:

4          Q.   Do you have Exhibit 2 in front of you?

5          A.   Yes.

6          Q.   Do you recognize this document?

7          A.   Looks a lot like the other document -- so, no.  I

8     don't think so.

9          Q.   Okay.  Could you just read what it says in the

10    upper, the right half in bold text on Page 1?

11         A.   Defendant State of North Carolina Department of

12    Public Safety's Answers to Plaintiffs' Amended Complaint.

13         Q.   Thank you.  And I'll give you a chance to review

14    this if you want.

15              I just have one spot in it that I want to ask you

16    about.  But please go ahead and review it for as much time

17    as you want.

18         A.   (Witness reviews the document.)

19              Okay.  Go ahead.

20         Q.   So I want to direct you to the bottom of Page

21    Number 27.

22              And it's going to be, the paragraphs are

23    numbered, it's going to be paragraph numbered 179 at the

24    very bottom of that page.

25         A.   Okay.

1          Q.    Are you there?

2          A.    Yes.

3          Q.    So it says there that NCSHP, the State Health

4    Plan, determines what health benefits are available to

5    state employees through their employment.

6              Is that your understanding of what is true for

7    the Department of Public Safety?

8          A.    Yes.  That's correct.

9          Q.    And so just not to belabor the point -- so is it

10   true then that DPS does, plays no role in determining what

11   health benefits are available to its employees?

12         A.    That's correct.

13         Q.    Does DPS play any role in determining the number

14   of health plan options that are offered to its employees?

15         A.    Not to my knowledge.  My understanding is that

16   we're only allowed to offer the State Health Plan for

17   medical coverage.

18         Q.    Right.  Is there more than one health insurance

19   plan that employees can choose between to sign up for?

20         A.    So the State Health Plan currently offers two

21   plans for active employees, the 70/30 and the 80/20 Plan.

22         Q.    Okay.  Thanks.

23              And so you're saying that the State Health Plan

24   determines those, and DPS doesn't choose whether to

25   offer --

1       A.   Correct.

2       Q.   -- one or the other, that's determined by the

3  State Health Plan?

4       A.   That's correct.  The employee chooses between the

5  70/30 or the 80/20.  But those plans are determined by the

6  State Health Plan.

7       Q.   Okay.  And does DPS play any role in determining

8  the terms of those health plans?

9       A.   No.  We don't.

10      Q.   Does DPS play any role in determining which

11  third-party administrator is selected to offer the health

12  insurance coverage?

13      A.   No.

14      Q.   Does DPS play any role in determining which

15  third-party administrator is selected to administer

16  pharmaceutical coverage?

17      A.   No.

18      Q.   Are DPS employees allowed to change their health

19  coverage outside of the open enrollment period if they have

20  a qualifying life event?

21      A.   Yes.

22      Q.   And in that event, who would an employee notify

23  of the qualifying life event?

24      A.   The employee would log into the system online and

25  create a qualifying life event and make their changes.

1        Q.   And when you say the system online, what is that

2    system?

3        A.   It's the Integrated HR Payroll System, formerly

4    known as Beacon.

5        Q.   Okay.  And is that system, is that, is that

6    provided by the Department of Public Safety?  Or is that

7    run by the State Health Plan?

8        A.   It's run by the Office of the State Controller.

9        Q.   And does DPS play any role in managing that

10    system or monitoring what its employees, what information

11    its employees put into the system?

12        A.   Can you repeat that please?

13        Q.   Does DPS play any role in monitoring what its

14    employees put into that payroll system?

15        A.   So when employees put in a qualifying life event,

16    that has to be approved by the Central HR Insurance

17    Section.  So we do review the documents and the event, and

18    approve it if we can.

19        Q.   And so that Central, you said Central HR

20    Insurance, is that an office within the Department of

21    Public Safety?

22        A.   Yes.

23        Q.   And so that office determines whether the

24    employee has a qualifying life event, is that what you're

25    testifying to?

1      A.    Yes.   That's correct.

2      Q.    Okay.   And would that office also decide whether

3      to approve the request to change health coverage for a

4      qualifying life event?

5      A.    I'm not sure what you mean by change health

6      insurance.

7      Q.    So if the employee has a qualifying life event,

8      does that office, is that the end of it, that office

9      approves the request to change the employee's health

10     coverage?

11            Or does that office make any other determinations

12     to decide whether the employee is allowed to make that

13     change in their insurance coverage?

14     A.    So we would make that determination.  We would

15     need the documentation, view the dates -- because they have

16     to do it within 30 days of the qualifying life event.  And

17     they have to provide documentation for the event.

18            And if they're adding dependents, they have to

19     add documentation to verify that they're legitimate

20     dependents.

21            And we would review those documents and approve

22     it.

23     Q.    And if an employee, say an employee doesn't know

24     how to access the website, would that employee come to

25     someone in your office to ask for a form to fill out?  Or

1      would they have to ask a question about how to access the

2      website?

3              A.   So, yeah, generally they would go to the HBR at

4      their facility to ask questions, for help.

5                   There is no form.  It has to be done through the

6      system.

7                   But if they can't get up with the HBR, they would

8      reach out to the Insurance Section in our office.

9              Q.   Okay.  And HBR, is that Health Benefits

10     Representative?

11             A.   Yes.  It is.

12             Q.   Does DPS offer any type of health insurance apart

13     from what is offered through the State Health Plan?

14             A.   No.

15             Q.   Are DPS employees required to sign up for health

16     insurance?

17             A.   No.

18             Q.   Does DPS provide insurance, health insurance for

19     employees' qualifying dependents?

20             A.   Yes.

21             Q.   And does DPS offer health insurance for anyone

22     other than the employees and their qualifying dependents?

23             A.   No.

24             Q.   I'm going to pull up another exhibit here.

25                  MR. MAROLF:  Give me one second, Alan.

1          (Exhibit 3 is marked for identification.)

2          MR. MAROLF:  Okay.  Alan, there should be an

3     Exhibit 3 in that folder now.

4          MR. MCINNIS:  Okay.

5     BY MR. MAROLF:

6     Q.   Do you have Exhibit 3 pulled up?

7     A.   Yes.

8     Q.   Have you seen this document before?

9     A.   Let me see -- I've seen one set of the

10    interrogatories.  I'm not sure -- this says it's the first

11    set.  So --

12    Q.   Okay.

13    A.   Yeah.

14    Q.   I'll give you a chance -- you have seen it

15    before?

16    A.   Yes.

17    Q.   And could you just read what is in the top right

18    in bold text on the first page?

19    A.   Defendant NC Department of Public Safety's

20    Responses to Plaintiffs' First Set of Interrogatories.

21    Q.   Thank you.  And are -- Ms. Johnson, I'll give you

22    a chance to review this if you want.

23         But my first question is just going to be if you

24    helped put these responses together.

25    A.   Yes.

1          Q.    Which ones did you help put together?

2          A.    I believe my, my insurance manager and myself and

3     the deputy director met and went over them, so we did them

4     all.

5          Q.    Okay.  And I'm going to direct you to the bottom

6     of Page 3 in this document.

7                And it's, there's a Paragraph 3, and then there's

8     a Subparagraph marked A.

9                And then there's, in bold text, an answer to that,

10    which is DPS's response to that interrogatory.

11         A.    Okay.

12         Q.    And that answer goes onto the next page.

13         A.    Okay.

14         Q.    So I think we were talking about this earlier a

15    little bit -- but the answer to Interrogatory Number 3A

16    states that employees can enroll online through the

17    Integrated HR Payroll System formerly known as Beacon.

18         A.    That's correct.

19         Q.    And so, again, we talked about this a little bit

20    -- but this is the same HR payroll system that you

21    mentioned earlier that has a website that employees go

22    onto.

23                Is that right?

24         A.    Yes.  That's correct.

25         Q.    And could you remind me who maintains the

```
1        Integrated HR Payroll System?

2              A.    The Office of the State Controller.

3              Q.    Thank you.

4              A.    Uh-huh.

5              Q.    So if an employee goes onto that system to make

6        any changes to their health plan -- well, is there ever a

7        time when they can do that -- we talked about qualifying

8        life events.

9                    Is there a time when employees can go onto that

10       website without some intervention from DPS or without any

11       oversight from DPS?

12             A.    Yes.

13             Q.    And when would that be?

14             A.    Employees can go on there to upload any

15       documentation that they want to unrelated to a QLE.

16                   They update beneficiaries to some of the plans,

17       update Social Security numbers, the birth dates for their

18       dependents or beneficiaries.  And they can also update

19       their primary care physician at any time.

20             Q.    And would DPS have access to all of that

21       information when an employee makes those changes?

22             A.    So we're not notified when they make them.  But,

23       yes, we would have access to see them after they've been

24       made -- if we were to go in and look at it for some reason.

25             Q.    Does the State Health Plan have access to that
```

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 216 of 284

1    information?

2         A.   I believe so.

3         Q.   Who -- so do employees have log-in credentials to

4    access that HR system?

5         A.   Yes.

6         Q.   Who provides those log-in credentials to

7    employees?

8         A.   They're given an NCID.  I believe it's given when

9    they're hired by the agency.

10        Q.   And what is an NCID?

11        A.   North Carolina Identification.

12        Q.   And did you say that's provided by the agency?

13        A.   Yes.

14        Q.   If an employee has a technical issue with the HR

15   website, who would they contact for assistance with that?

16        A.   Generally, they would contact Best Shared

17   Services at the Office of the State Controller.

18             They may also go to their HRB at their facility

19   or contact our office.

20        Q.   I want to ask a little bit more about the HBRs,

21   the Health Benefits Representatives.

22        A.   Okay.

23        Q.   Who are they employed by?  Are they Department of

24   Public Safety employees?

25        A.   Yes.

1       Q.   And what are their job responsibilities?

2       A.   To my knowledge, they have separate

3  responsibilities, but for whatever reason they have been

4  designated as the HBR for that particular work location.

5         And in that role, they have to provide

6  information about benefits, benefit changes.  They're there

7  to help them with any enrollments and stuff that they might

8  do and show them where all the documentation is.

9         I think they also do like new hire stuff with

10  them and new hire orientation.  I think they have several

11  duties.

12         But the one that our office is involved with them

13  in is the insurance piece and benefits.

14       Q.   And you said there's one HBR for each work

15  location?

16       A.   There may be more than one.  We ask them to

17  designate two, so we have a back-up.  If it's a larger

18  facility, they may have three or four.

19       Q.   And so you said you designate them.

20         So is the HBR, is that their entire job?  Or do

21  they have other, is it someone with another job and then

22  they're also designated as the HBR, so they have these

23  additional duties?

24       A.   Yes.  They have another job.  And then their work

25  location has designated them as the HBR.

1        Q.   And then so does your office or does DPS train

2    the Health Benefits Representatives on their roles?

3        A.   We do provide some training occasionally for the

4    HBRs.  We also provide them information from the State

5    Health Plan or NCFlex about benefits trainings that they

6    offer.  And we have them attend those.

7        Q.   And does -- so the State Health Plan participates

8    in training them.  Does it also supervise them at all in

9    their HBR roles?

10       A.   Not to my knowledge.

11       Q.   Does your office or does DPS supervise them in

12   that role?

13       A.   So we, you know, we help them.  They don't report

14   to us, and we're not supervisors over them.  But, yes, we

15   do provide them the information.

16            And if they need help and they're reaching out to

17   the Central Insurance Section, yes.

18       Q.   So you said the HBRs provide, you know, certain

19   information to employees.

20            And did I also hear you say that that information

21   comes from the State Health Plan that they provide to the

22   employees?

23       A.   Yes.  Usually we'll get the information from the

24   State Health Plan, and then we disseminate it to the HBRs.

25       Q.   Does any information not come from the State

1    Health Plan?  Does any information just come from DPS?

2         A.   So, yes, we will send out, you know, reminders

3    about things.  Or, you know, if we're seeing issues with

4    something, we might send out reminders.

5              So, yes, the Insurance Office also sends them

6    information.

7         Q.   If an employee has a question during the open

8    enrollment period, are they allowed to talk to the Health

9    Benefits Representatives?

10        A.   Yes.

11        Q.   And is that, in fact, who they're supposed to

12   talk to if they have questions about their insurance?

13        A.   That's their first line of contact, yes.

14        Q.   And so if they have, if an employee has a

15   question, aside from the open enrollment period, would they

16   also go to the HBR in that case as well?

17        A.   Yes.

18        Q.   How do employees contact their HBR?

19        A.   They're onsite.  So I mean they could call them.

20   They could e-mail them.  I'm not sure because I'm not

21   there.  But they're onsite, so they could go to their

22   office as well.  I'm sure they do all three.

23        Q.   And you said they can also potentially e-mail

24   them in some cases?

25        A.   Yes.

1          Q.   Is there any, is there any website for employees

2     to interface with the HBRs?  Or would it just be through

3     e-mail if they're doing it online?

4          A.   To my knowledge, it would just be through e-mail

5     -- unless a certain facility has set something up that

6     we're not aware of.

7          Q.   And does DPS provide contact information to

8     employees for their HBRs?

9          A.   To my knowledge, yes.  I mean they should be

10    because they're meeting with them when they hire them.  So

11    they're being told who that contact is from, you know, the

12    initial employment.

13         Q.   You said they meet with them.  So when a new

14    employee starts work at DPS, the HBR is one of the people

15    they would meet with to discuss their health insurance?

16         A.   Yes.  They do a new hire orientation.

17         Q.   And by new hire orientation, do you mean

18    specifically to insurance and benefits?  Or is it more than

19    that?

20         A.   It's more than that.

21         Q.   So what else is included in that orientation?

22         A.   It covers the whole department, you know, the

23    divisions, all sorts of things, disciplinary stuff.

24              There is a benefit section that covers leave,

25    covers some policies .

1    Q.   So it covers all of the typical new employee

2    stuff.  It's not limited to just the bare health benefits.

3         Even though these are Health Benefits

4    Representatives, they provide this training that covers

5    basically all new employee training?

6    A.   Yes.  Because they do other things than just the

7    health benefits, yes.

8    Q.   Right.  I want to look back at Exhibit 3.

9         And on Page 4 of that exhibit, it's a

10   continuation of Interrogatory Number 3, and it's Number 3B.

11   A.   Okay.

12   Q.   And I'll give you a chance to review it if you

13   would like to.

14   A.   (Witness reviews the document.)

15        Okay.

16   Q.   So this response says that DPS would get involved

17   in certain cases where an employee loses coverage.

18        And without just reading the whole text to you --

19   when an employee loses coverage because the employee goes

20   on leave without pay and there's no monthly paycheck to,

21   for DPS to deduct the employee's monthly insurance premium

22   from -- and it says that if an employee wants to have their

23   coverage reinstated, DPS would work with the employee and

24   submit an exception request to the State Health Plan.

25        So when an employee loses their insurance coverage

1    in a case like this, when does DPS first become involved?

2            Is it immediately when the employee goes on leave?

3        A.   So when the employee first goes on leave, the HBR

4    at the facility provides them with a continuation of

5    benefits while on leave of absence letter.

6            That will explain what is going to happen with

7    their benefits, whether they're exhausting leave or on

8    leave without pay.

9        Q.   Okay.  And when the employee's monthly paychecks

10   eventually stop and the premiums can no longer be paid,

11   does DPS notify the State Health Plan of that?

12           Or does it just remove that employee's, you know,

13   521 dollar monthly payment from its payments to the State

14   Health Plan?

15       A.   So the Office of the State Controller, who all

16   receives the Integrated HR Payroll System, runs reports --

17   they call it a deduction not taken report.

18           When the employee shows up on that report and

19   when there's not enough funds in a paycheck to cover their

20   State Health Plan deduction, then they go in the system and

21   set them to direct bill with a third-party vendor that the

22   State Health Plan uses.

23       Q.   So does DPS have any role in any of that?

24           Or is that all handled through the Office of the

25   State Controller and the State Health Plan?

1          A.    It's all handled through the Office of the State

2     Controller and the State Health Plan.

3          Q.    And so going back to the second half of the

4     second piece of this response in Number 3B, it says that

5     when an employee wants coverage reinstated, DPS would work

6     with the employee to submit an exception request to the

7     State Health Plan.

8               How does that process work?

9          A.    So if the employee's benefits were termed because

10    they were not making premium payments to the third-party

11    vendor and they would like that insurance back, we can

12    submit an exception request to the State Health Plan.

13              So that employee generally just starts with their

14    HBRs.  They might come directly to the Insurance Section at

15    Central HR.  All exception requests have to be submitted

16    through our Insurance Section.

17              So if the HBR is contacted, then they would send

18    that information up to the Central Office.

19              And basically the employee has to, you know,

20    indicate what happened, why they didn't make the payment,

21    and what was going on so that it can be determined if an

22    exception request can be submitted based on the State

23    Health Plan's guidelines for what they'll review.

24         Q.    And so to kind of look at that process from the

25    other side -- what does DPS do with the State Health Plan

1    to process those exception requests?

2         A.   So if our Insurance Section determines that we

3    can submit an exception request, we type up that exception

4    request and submit it through an online form to the State

5    Health Plan.

6              And then the State Health Plan reviews that and

7    makes the final determination as to whether they'll

8    reinstate the coverage or not.

9         Q.   And so that, that final determination is made by

10   the State Health Plan.

11             Is that right?

12        A.   Yes.   That's correct.

13        Q.   I want to ask about the State Health Plan's

14   exclusion of coverage for gender confirming healthcare.

15             Does that exclusion apply to DPS employees?

16        A.   Yes.   It would apply, if it's a State Health Plan

17   exclusion, it would apply to anybody enrolled in the State

18   Health Plan.

19        Q.   And does DPS have any control over whether that

20   exclusion remains in the Plan?

21        A.   We do not.

22        Q.   Does DPS have any control over any terms of the

23   Plan?

24        A.   No.   We do not.

25        Q.   Has DPS ever received any complaints from

# Exhibit 15

1            IN THE UNITED STATES DISTRICT COURT FOR
2             THE MIDDLE DISTRICT OF NORTH CAROLINA
3

4

5     MAXWELL KADEL, et al.,        )
                                    )
6                Plaintiffs,        )
                                    )   No. 1:19-cv-272-LCB-LPA
7           V.                      )
                                    )
8     DALE FOLWELL, et al.,         )
                                    )
9                Defendants.        )
      _____    )
10

11

12

                          DEPOSITION
13                            OF
                        MAXWELL KADEL
14

15                     AUGUST 16, 2021

16

17            THIS TRANSCRIPT IS NOT COMPLETE

        PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
18     MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY

       AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
19      DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

20

21

22                   PNC PLAZA DOWNTOWN

              301 Fayetteville Street, Suite 1700
23                   Raleigh, North Carolina

24

25    Reported by: Michelle Maar, RDR, RMR, FCRR

```
 1    APPEARANCES:
 2    On behalf of the Plaintiffs:
 3         HARRIS, WILTSHIRE & GRANNIS
           By: Evan Marolf (via teleconference)
 4         1919 M Street NW, 9th Floor
           Washington, DC 20036
 5         Emarolf@hwglaw.com
 6         HARRIS, WILTSHIRE & GRANNIS
           By: Lauren E. Snyder
 7         1033 Wade Avenue, Suite 100
           Raleigh, NC 27605
 8         Lsnyder@hwglaw.com
 9         Lambda Legal Defense and Education Fund
           By: Carl Charles
10         120 Wall Street, 19th Floor
           New York, NY 10005
11         Ccharles@lambdalegal.org
12
      On behalf of Defendants Dale Folwell, Dee Jones, and the NC
13    State Health Plan for Teachers and State Employees:
14         LAW OFFICE OF JOHN G. KNEPPER
           By: John G. Knepper
15         1720 Carey Avenue, Suite 590
           Cheyenne, WY 82001
16         John@knepperLLC.com
17         BELL, DAVIS & PITT
           By: Kevin G. Williams (via teleconference)
18             Mark A. Jones (via teleconference)
           100 N. Cherry Street, Suite 600
19         Winton-Salem, NC 27101
           Mjones@belldavispitt.com
20
           NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
21         DEPARTMENT OF THE STATE TREASURER
           By: Joel Heimbach
22         3200 Atlantic Avenue
           Raleigh, NC 27604
23         Joel.heimbach@nctreasurer.com
24
25
```

1    On behalf of Defendant State of North Carolina Department
     of Public Safety:

2
             NORTH CAROLINA DEPARTMENT OF JUSTICE

3            By: Alan McInnes (via teleconference)
             114 W. Edenton Street

4            Raleigh, NC 27603
             Amcinnes@ncdoj.gov

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      A.   Would you rephrase the question?
 2      Q.   Sure.  Do you believe that the diagnosis of
 3  Gender Dysphoria is a significant medical condition from
 4  which you are suffering?
 5      A.   I believe in the past, I have felt a very strong
 6  sense of incongruence between my gender, or my sex assigned
 7  at birth and my gender identity, and that that has caused
 8  me a lot of distress.
 9           By taking hormones and presenting in a way that
10  I'm more comfortable with, that has alleviated a lot of
11  that distress.
12      Q.   Now, you previously testified -- but I just want
13  to tie it in with what you've just said.
14           You testified before you're not a physician.  Is
15  that correct?
16      A.   Correct.
17      Q.   You're not a scientist.  Is that correct?
18      A.   Correct.
19      Q.   Do you have any specialized knowledge or training
20  that would allow you to give an expert opinion on gender
21  dysphoria?
22      A.   No.
23      Q.   You're a fact witness in this case.  Is that
24  correct?
25      A.   According to my lawyers, that's my understanding,
```

# Exhibit 16

1       IN THE UNITED STATES DISTRICT COURT FOR

2        THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5    MAXWELL KADEL, et al.,        )
                                   )
6              Plaintiffs,         )
                                   )    No. 1:19-cv-272-LCB-LPA
7          V.                      )
                                   )
8    DALE FOLWELL, et al.,         )
                                   )
9              Defendants.         )
     _____    )

10

11

12

                        DEPOSITION

13                          OF

                   CONNOR THONEN-FLECK

14

15                  AUGUST 6, 2021

16

17         THIS TRANSCRIPT IS NOT COMPLETE

       PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS

18    MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY

      AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30

19     DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

20

21

22               PNC PLAZA DOWNTOWN

            301 Fayetteville Street, Suite 1700

23               Raleigh, North Carolina

24

25   Reported by: Michelle Maar, RDR, RMR, FCRR

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
 3        MCDERMOTT WILL & EMERY
          By: Michael W. Weaver
 4        444 W. Lake Street, Suite 4000
          Chicago, IL 60606
 5        Mweaver@mwe.com
 6        Lambda Legal Defense and Education Fund
          By: Tara Borelli
 7        730 Peachtree Street NE, Suite 640
          Atlanta, GA 30318
 8        Tborelli@lambdalegal.org
 9
     On behalf of Defendants Dale Folwell, Dee Jones, and the NC
10   State Health Plan for Teachers and State Employees:
11        LAW OFFICE OF JOHN G. KNEPPER
          By: John G. Knepper
12        1720 Carey Avenue, Suite 590
          Cheyenne, WY 82001
13        John@knepperLLC.com
14        BELL, DAVIS & PITT
          By: Mark A. Jones (via teleconference)
15        100 N. Cherry Street, Suite 600
          Winton-Salem, NC 27101
16        Mjones@belldavispitt.com
17        NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
          DEPARTMENT OF THE STATE TREASURER
18        By: Kendall M. Bourdon
          3200 Atlantic Avenue
19        Raleigh, NC 27604
          Kendall.bourdon@nctreasurer.com
20
     On behalf of Defendant State of North Carolina Department
21   of Public Safety:
22        NORTH CAROLINA DEPARTMENT OF JUSTICE
          By: Alan McInnes (via teleconference)
23        114 W. Edenton Street
          Raleigh, NC 27603
24        Amcinnes@ncdoj.gov
25
```

Veritext Legal Solutions
www.veritext.com                                888-391-3376
Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 233 of 284

1    APPEARANCES CONTINUED:

2    On behalf of Defendants UNC at Chapel Hill, NC State
     University, and UNC at Greensboro:

3

         NORTH CAROLINA DEPARTMENT OF JUSTICE

4        By: Zachary Padget
         114 W. Edenton Street

5        Raleigh, NC 27603
         Zpadget@ncdoj.gov

6

7    Also Present:

8        Jason Fleck

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                    CONNOR THONEN-FLECK,

3     called as a witness and having been first duly sworn,

4              was examined and testified as follows:

5

6                         EXAMINATION

7     BY MR. KNEPPER:

8          Q.   Good morning.  My name is John Knepper.  And I'm

9     an attorney who represents the State Health Plan.

10              We are here for the deposition of Connor

11    Thonen-Fleck.

12              Mr. Fleck, do you understand why you're here

13    today?

14         A.   Yes.

15         Q.   Why is that?

16         A.   Concerning a lawsuit against the State Health

17    Plan.

18         Q.   And are you a plaintiff in that lawsuit?

19         A.   Yes.

20         Q.   What as a plaintiff are you alleging?

21         A.   That the State Health Plan has unfairly

22    discriminated against me.

23         Q.   How has the State Health Plan discriminated

24    against you?

25         A.   They have refused to pay for any of the care

1    related to transgender expenses.

2         Q.   And do you have specific expenses that you, that

3    have not been paid for you?

4         A.   All medications, including my testosterone, and

5    surgery I received.

6         Q.   So you said all medications.  Are there

7    medications other than testosterone?

8         A.   No.

9         Q.   How about surgery, is it one surgery or are there

10   multiple surgeries?

11        A.   It was one.

12        Q.   Okay.  And how old are you, Mr. Thonen-Fleck?

13        A.   I'm 19.

14        Q.   And where are you -- are you in school now?

15        A.   Yes.

16        Q.   And where are you in school?

17        A.   I'm in college at North Carolina State

18   University.

19        Q.   And what are you studying?

20        A.   I'm doing a double major in Animal Science and

21   Biochemistry.

22        Q.   And what are your long-term career plans?

23        A.   I hope to be a vet.

24        Q.   Has that been a long-time interest of yours?

25        A.   Yes.

1          A.    Not at this time.

2          Q.    Are there any other surgeries that you're aware

3    of that might be something you intend to pursue in the

4    future?

5                MR. WEAVER:  Objection to form.

6                THE WITNESS:  No.

7    BY MR. KNEPPER:

8          Q.    What benefits have you received from your hormone

9    therapy?

10               MR. WEAVER:  Objection, form.

11               THE WITNESS:  Mentally I feel completely

12   different than I did before starting.

13               We've read through multiple documents discussing

14   the depression and suicidal ideation and anxiety I

15   experienced prior to and at the very beginning of hormone

16   therapy.

17               Since then, I'm no longer suicidal.  And I no

18   longer experience depression.  I feel worlds better now that

19   my body matches my brain.

20   BY MR. KNEPPER:

21         Q.    Do you continue to experience anxiety?

22         A.    In stressful situations, yes.

23         Q.    Did anyone tell you that hormonal therapy would

24   reduce your anxiety?

25         A.    No.

1                    EXAMINATION

2    BY MR. WEAVER:

3         Q.   So, Connor, my understanding is that since you've

4    been on testosterone, Dr. Walsh has regularly checked your

5    blood.  Is that correct?

6         A.   Yes.

7         Q.   Do you know why Dr. Walsh does that?

8         A.   She was monitoring for any changes in my

9    testosterone levels, making sure they stayed within normal

10   limits for a biological male, while also checking the other

11   values.

12        Q.   Okay.  Has she expressed any concerns about any

13   of your blood work since you've been on testosterone?

14        A.   No.  From my understanding, it's all been within

15   normal limits.

16        Q.   And overall, how would you compare your mood

17   today or the last several weeks compared to a year ago, two

18   years ago, three years ago?

19        A.   Worlds better.  I think my quality of life during

20   2018, when my gender dysphoria was at its worse, was far

21   worse than it is now.

22             Now I'm happy.  I'm living on my own comfortably,

23   at ease with myself.

24        Q.   Do you have any suicidal thoughts anymore?

25        A.   No.

# Exhibit 17

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2
Civil Action No. 1:19-cv-0027

3
4

MAXWELL KADEL, et al.,

5
                Plaintiffs,

6
    vs.

7

DALE FOLWELL, in his official
8
capacity as State Treasurer of
North Carolina, et al.,

9
                Defendants.

10

11

12              * CONFIDENTIAL ATTORNEYS' EYES ONLY *

13
                 DEPOSITION OF JASON FLECK

14
                    (Taken by Defendants)

15
                 Raleigh, North Carolina

16
                 Friday, August 13, 2021

17

18

19

20

21

22  Reported by Andrea L. Kingsley, RPR

23

24

25

```
 1                   A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4               Michael W. Weaver, Esquire
                 Mcdermott Will & Emery
 5               444 W. Lake Street, Suite 4000
                 Chicago, Illinois 60606
 6               312-984-5820
                 Mweaver@mwe.com
 7
                      -and-
 8
                 Tara Borelli, Esquire
 9               Lambda Legal Defense And
                 Education Fund, Inc.
10               730 Peachtree Street NE, Suite 640
                 Atlanta, Georgia 30318-1210
11               404-897-1880
                 Tborelli@lambdalegal.org
12
13   ON BEHALF OF THE DEFENDANT NC DEPARTMENT OF PUBLIC
     SAFETY (Via telephone):
14
                 Alan McInnes, Esquire
15               Assistant Attorney General
                 North Carolina Department of Justice
16               114 W Edenton Street
                 Raleigh, North Carolina 27603
17               (919) 716-6400
                 Amcinnes@ncdoj.gov
18
19   ON BEHALF OF THE DEFENDANT FOLWELL AND NCSHP:
20               John G. Knepper, Esquire
                 Law Office of John G. Knepper
21               1720 Carey Avenue, Suite 590
                 Cheyenne, Wyoming 82001
22               (307) 632-2842
                 John@knepperLLC.com
23
24
25
```

1          A P P E A R A N C E S (Cont'd.)

2

3   ON BEHALF OF THE DEFENDANT FOLWELL AND NCSHP (Via
    telephone):

4

            Kevin G. Williams, Esquire
5           Bell Davis & Pitt
            100 N. Cherry Street, Suite 600
6           Winston-Salem, North Carolina 27101
            (336) 722-3700
7           Kwilliams@belldavispitt.com

8

    ALSO PRESENT: Joel Heibach, Esquire, NCSHP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
1                DEPOSITION OF JASON FLECK, a
2        witness called on behalf of the Defendants
3        pursuant to the Federal Rules of Civil
4        Procedure, before Andrea L. Kingsley, Notary
5        Public, in and for the State of North
6        Carolina, at Williams Mullens, 301
7        Fayetteville Street, Suite 1700, Raleigh,
8        North Carolina, on Friday, August 13, 2021,
9        commencing at 9:10 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    ceased to be suicidal in January of 2018?

2         A.    My observation was he became a totally

3    different person.

4         Q.    How so?

5         A.    His mood brightened.  He started

6    interacting with friends, being social, more

7    social.  He started thriving.

8         Q.    What do you mean he started driving?

9         A.    Thriving.

10         Q.    Thriving.

11               Was that an instant change?  I'm trying

12    to understand --

13         A.    As the treatment progressed.  I would

14    say over a series of a few months, there was a

15    drastic change in his personality.

16         Q.    So by the end of his 9th grade year, you

17    weren't concerned about Connor's committing suicide?

18         A.    No.

19         Q.    But the beginning of the year, you were?

20         A.    Before the treatment, we were very

21    concerned.

22         Q.    Do you remember discussing the

23    connection between gender dysphoria and suicide with

24    any of Connor's physicians?

25         A.    Not specifically.

# Exhibit 18

1          IN THE UNITED STATES DISTRICT COURT FOR
2           THE MIDDLE DISTRICT OF NORTH CAROLINA
3

4

5     MAXWELL KADEL, et al.,        )
                                     )
6               Plaintiffs,         )
                                     )   No. 1:19-cv-272-LCB-LPA
7            V.                      )
                                     )
8     DALE FOLWELL, et al.,         )
                                     )
9               Defendants.         )
      _____   )
10

11

12

                             DEPOSITION
13                               OF
                           JULIA MCKEOWN
14

15                        AUGUST 5, 2021

16

17          THIS TRANSCRIPT IS NOT COMPLETE
         PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
18      MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
        AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
19       DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER
20

21

22                    PNC PLAZA DOWNTOWN
              301 Fayetteville Street, Suite 1700
23                  Raleigh, North Carolina
24

25    Reported by: Michelle Maar, RDR, RMR, FCRR

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
 3       HARRIS, WILTSHIRE & GRANNIS
         By: Lauren E. Snyder
 4       1033 Wade Avenue, Suite 100
         Raleigh, NC 27605
 5       Lsnyder@hwglaw.com
 6       HARRIS, WILTSHIRE & GRANNIS
         By: Evan Marolf (via teleconference)
 7       1919 M Street NW, 9th Floor
         Washington, DC 20036
 8       Emarolf@hwglaw.com
 9       MCDERMOTT WILL & EMERY
         By: Michael W. Weaver
10       444 W. Lake Street, Suite 4000
         Chicago, IL 60606
11       Mweaver@mwe.com
12       Lambda Legal Defense and Education Fund
         By: Tara Borelli
13       730 Peachtree Street NE, Suite 640
         Atlanta, GA 30318
14       Tborelli@lambdalegal.org
15
     On behalf of Defendants Dale Folwell, Dee Jones, and the NC
16   State Health Plan for Teachers and State Employees:
17       LAW OFFICE OF JOHN G. KNEPPER
         By: John G. Knepper
18       1720 Carey Avenue, Suite 590
         Cheyenne, WY 82001
19       John@knepperLLC.com
20       BELL, DAVIS & PITT
         By: Mark A. Jones
21       100 N. Cherry Street, Suite 600
         Winton-Salem, NC 27101
22       Mjones@belldavispitt.com
23       NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
         DEPARTMENT OF THE STATE TREASURER
24       By: Kendall M. Bourdon
         3200 Atlantic Avenue
25       Raleigh, NC 27604
         Kendall.bourdon@nctreasurer.com
```

1    APPEARANCES CONTINUED:

2    On behalf of Defendant State of North Carolina Department
     of Public Safety:

3

         NORTH CAROLINA DEPARTMENT OF JUSTICE

4        By: Alan McInnes (via teleconference)
         114 W. Edenton Street

5        Raleigh, NC 27603
         Amcinnes@ncdoj.gov

6

     On behalf of Defendants UNC at Chapel Hill, NC State

7    University, and UNC at Greensboro:

8        NORTH CAROLINA DEPARTMENT OF JUSTICE
         By: Kenzie Rakes

9        114 W. Edenton Street
         Raleigh, NC 27603

10       Krakes@ncdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        A.    You want me to read the whole section?

2        Q.    You don't need to read it out loud.

3              I just want to give you an opportunity to read

4    it, just the bottom of that second page, and it continues

5    onto the top.

6              (Brief pause in the proceeding)

7              THE WITNESS:  Okay.

8    BY MR. KNEPPER:

9        Q.    Are you ready?

10       A.    Sure.

11       Q.    Do you believe that you suffer from a marked or

12   in the past have suffered from a marked incongruence

13   between your experienced or expressed gender and your

14   assigned gender?

15       A.    I do believe so.

16       Q.    Do you believe that was associated with

17   clinically significant distress or impairment in social,

18   occupational, or other important areas of functioning?

19       A.    I do believe so with that, yes.

20       Q.    Okay.  What are, where does that clinically

21   significant distress or impairment manifest itself in your

22   life?

23       A.    It's manifested in different ways.  I think the

24   biggest one would be the constant thinking about that

25   inhibits like other activities cognitively because this is

1    always an incongruence you're having to apply.

2           So things like portraying myself as, when I was

3    working and presenting as a male required a lot of

4    cognitive load that wouldn't have otherwise been there.

5        Q.   Do you think it -- did that impairment manifest

6    in depression?

7        A.   I've never been diagnosed with depression.

8        Q.   In anxiety?

9        A.   I've never been diagnosed with anxiety.

10       Q.   Do you think it manifested itself in depression?

11           You said you've never been diagnosed.

12       A.   Again, I'm not a clinical psychologist, so I'm

13   not going to self-diagnose myself.

14       Q.   Okay.  So earlier we looked at a couple of

15   assessments by Dr. Barnhill and Dr. Yu that concluded you

16   were not depressed.

17           You would attribute accuracy to those diagnoses?

18       A.   My understanding is those are just the screener

19   questions that would lead to more tests.

20       Q.   But they said that you were not depressed.

21           Do you think that they were, they should have

22   inquired more closely?

23       A.   Again, I'm not a clinical psychologist.  I'm not

24   a medical doctor either.

25       Q.   So yes or no or I don't know?

# Exhibit 19

```
1            IN THE UNITED STATES DISTRICT COURT FOR
2             THE MIDDLE DISTRICT OF NORTH CAROLINA
3
4
5    MAXWELL KADEL, et al.,         )
                                    )
6              Plaintiffs,          )
                                    )   No. 1:19-cv-272-LCB-LPA
7           V.                      )
                                    )
8    DALE FOLWELL, et al.,          )
                                    )
9              Defendants.          )
     _____      )
10
11
12
                           DEPOSITION
13                             OF
                              C.B.
14
                           VOLUME I
15                       PAGES 1-58
16                     AUGUST 9, 2021
17
18         THIS TRANSCRIPT IS NOT COMPLETE
        PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
19    MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
      AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
20     DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER
21
22                    PNC PLAZA DOWNTOWN
             301 Fayetteville Street, Suite 1700
23                  Raleigh, North Carolina
24
25    Reported by: Michelle Maar, RDR, RMR, FCRR
```

```
 1    APPEARANCES:
 2    On behalf of the Plaintiffs:
 3         MCDERMOTT WILL & EMERY
           By: Lauren H. Evans
 4         500 North Capitol Street NW
           Washington, DC 20001
 5         Levans@mwe.com
 6         Lambda Legal Defense and Education Fund
           By: Omar Gonzalez-Pagan
 7         120 Wall Street, 19th Floor
           New York, NY 10005
 8         Ogonzalez-pagan@lambdalegal.org
 9
      On behalf of Defendants Dale Folwell, Dee Jones, and the NC
10    State Health Plan for Teachers and State Employees:
11         LAW OFFICE OF JOHN G. KNEPPER
           By: John G. Knepper
12         1720 Carey Avenue, Suite 590
           Cheyenne, WY 82001
13         John@knepperLLC.com
14
      On behalf of Defendant State of North Carolina Department
15    of Public Safety:
16         NORTH CAROLINA DEPARTMENT OF JUSTICE
           By: Alan McInnes (via teleconference)
17         114 W. Edenton Street
           Raleigh, NC 27603
18         Amcinnes@ncdoj.gov
19
20
21
22
23
24
25
```

1    calm and happy?

2         A.    Yes.

3         Q.    What can you tell me about those times?

4               MR. GONZALEZ-PAGAN:  Objection, form.

5               THE WITNESS:  I've always been a pretty anxious

6    person.  So I wasn't always calm and happy.

7    BY MR. KNEPPER:

8         Q.    You said you've always been a pretty anxious

9    person.  Does that mean that for as long as you can

10   remember, you've been anxious about something?

11              I'm trying to understand how you would describe

12   it.  Is it that you've always had a little anxiety or

13   you've always felt anxious about things as long as you can

14   remember?

15              I'm trying to get some sense of time.

16              MR. GONZALEZ-PAGAN:  Objection, form.

17              THE WITNESS:  I've always felt -- for as long as

18   I can remember, I've always felt dysphoria which causes

19   anxiety.

20   BY MR. KNEPPER:

21        Q.    So you tie your anxiety to your gender dysphoria?

22        A.    Some of it, yes.

23        Q.    Do you think -- do you continue to be anxious now

24   that your gender dysphoria is being treated?

25        A.    Yes.

1      Q.   Do you think the treatment of gender dysphoria

2  has reduced your anxiety?

3      A.   Yes.

4      Q.   When you told your mom you were a boy, did you

5  tell her about your feelings of anxiety?

6      A.   Yes.

7      Q.   Had you told your parents before about your

8  anxiety?

9      A.   Well, I mean I was 11.  I didn't know what

10  anxiety was.  But I definitely expressed the feeling of

11  being anxious.

12      Q.   So it was more of a sense than using the term

13  anxiety?

14      A.   Correct.

15      Q.   Is January 2017 about the time that you started

16  to meet with ██████?

17      A.   I don't remember.

18      Q.   Okay.  Do you remember -- your next visit is in

19  March, involves a sore throat.

20          Do you remember going to a doctor for a sore

21  throat in March of your 6th grade year?

22      A.   What page is that?

23      Q.   Sorry -- Page 7145.

24      A.   Can you repeat the question?

25      Q.   The next visit in the records is a visit for a

# Exhibit 20

1      IN THE UNITED STATES DISTRICT COURT FOR

2        THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5    MAXWELL KADEL, et al.,        )
                                   )
6              Plaintiffs,         )
                                   )   No. 1:19-cv-272-LCB-LPA
7          V.                      )
                                   )
8    DALE FOLWELL, et al.,         )
                                   )
9              Defendants.         )
     _____     )

10

11

12

                        DEPOSITION
13                          OF
                    MICHAEL D. BUNTING
14

15                   AUGUST 9, 2021

16

17        THIS TRANSCRIPT IS NOT COMPLETE

      PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS

18    MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY

      AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30

19     DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

20

21

22                 PNC PLAZA DOWNTOWN

              301 Fayetteville Street, Suite 1700

23                 Raleigh, North Carolina

24

25   Reported by: Michelle Maar, RDR, RMR, FCRR

```
 1    APPEARANCES:
 2    On behalf of the Plaintiffs:
 3         MCDERMOTT WILL & EMERY
           By: Lauren H. Evans
 4         500 North Capitol Street NW
           Washington, DC 20001
 5         Levans@mwe.com
 6         Lambda Legal Defense and Education Fund
           By: Omar Gonzalez-Pagan
 7         120 Wall Street, 19th Floor
           New York, NY 10005
 8         Ogonzalez-pagan@lambdalegal.org
 9
      On behalf of Defendants Dale Folwell, Dee Jones, and the NC
10    State Health Plan for Teachers and State Employees:
11         LAW OFFICE OF JOHN G. KNEPPER
           By: John G. Knepper
12         1720 Carey Avenue, Suite 590
           Cheyenne, WY 82001
13         John@knepperLLC.com
14         BELL, DAVIS & PITT
           By: Mark A. Jones (via teleconference)
15         100 N. Cherry Street, Suite 600
           Winton-Salem, NC 27101
16         Mjones@belldavispitt.com
17         NORTH CAROLINA STATE HEALTH PLAN/NORTH CAROLINA
           DEPARTMENT OF THE STATE TREASURER
18         By: Kendall M. Bourdon (via teleconference)
           3200 Atlantic Avenue
19         Raleigh, NC 27604
           Kendall.bourdon@nctreasurer.com
20
      On behalf of Defendant State of North Carolina Department
21    of Public Safety:
22         NORTH CAROLINA DEPARTMENT OF JUSTICE
           By: Alan McInnes (via teleconference)
23         114 W. Edenton Street
           Raleigh, NC 27603
24         Amcinnes@ncdoj.gov
25
```

1          MS. EVANS:  Object to form.

2          THE WITNESS:  Because  C B.  had struggled with

3    anxiety.  And I don't know that he had been diagnosed at

4    this point, but, but with depressive behavior, and this

5    openness about his gender was very freeing.

6          This appeared to be, the knowledge of what his

7    true gender was appeared to be the, a burden, if you will,

8    that he alone had carried for many years.  And he was only

9    11.

10   BY MR. KNEPPER:

11        Q.   And you had noticed anxiety and depressive

12   behavior before he had told you that he was a boy?

13        A.   Yes.

14        Q.   And had you been seeking medical care for it at

15   that time?

16        A.   I don't recall the timeline for any treatment,

17   whether there was any prior to.

18        Q.   But you think, you believe he had symptoms of

19   anxiety that caused you concern as his father?

20        A.   Yes.

21        Q.   What, what kinds of behaviors indicated the

22   anxiety at age 11?

23        A.   As I recall, the behavior that was difficult for

24   me to understand was low grade anger, short temper over

25   what I would characterize as innocuous things, a general,

1      A.    I see that, yes.

2            MS. EVANS:  Object to form.

3    BY MR. KNEPPER:

4      Q.    And there's also another insurance coverage

5    there, identified as BLUECRO2.

6            This is 2019, was C.B. covered by two different

7    insurance plans at that time?

8      A.    I believe so, yes.

9      Q.    What, what, what was the nature of C.B. 's

10   insurance coverage in 2019?

11     A.    Can you be more specific?

12     Q.    Were you covered by two insurance plans in 2019?

13     A.    No.

14     Q.    Was your wife covered by two insurance plans in

15   2019?

16     A.    No.

17     Q.    Was your other child covered by two insurance

18   plans in 2019?

19     A.    No.

20     Q.    Did C.B. have a separate policy through Blue

21   Cross Blue Shield of North Carolina in 2019?

22     A.    He had supplemental insurance, additional

23   insurance.  I don't know that it was through Blue Cross

24   Blue Shield.

25     Q.    Do you remember signing C.B. up for that

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 260 of 284

```
 1    insurance?

 2        A.   No.  I don't specifically.

 3        Q.   Was that something your wife did?

 4        A.   Yes.

 5        Q.   Why did your wife sign up  C.B.  for supplemental

 6    insurance?

 7              MS. EVANS:  Object to form.

 8              THE WITNESS:  To get coverage for medically

 9    necessary treatment.

10    BY MR. KNEPPER:

11        Q.   Is that treatment for  C.B. 's gender dysphoria?

12        A.   Gender dysphoria.

13        Q.   So did your wife explain to you that -- you

14    mentioned earlier that the cost of the puberty blockers was

15    around 29,000 dollars.  Is that correct?

16              MS. EVANS:  Object to form.

17    BY MR. KNEPPER:

18        Q.   Is my memory correct?

19              MS. EVANS:  Object to form.

20              THE WITNESS:  That is what I recall, yes.

21    BY MR. KNEPPER:

22        Q.   And you discussed how you and your wife didn't

23    feel that you had the additional disposable income to be

24    able to pay for a 28,000 or 29,000 dollar medical bill in

25    the spring of 2019.
```

Case 1:19-cv-00272-LCB-LPA  Document 141  Filed 11/30/21  Page 261 of 284

1    C.B. 's application and approval to buy a Marketplace

2    plan?

3        A.    Yes.

4        Q.    And your understanding is that plan did not, or

5    did cover gender dysphoria treatment for C.B. .  Is that

6    correct?

7        A.    It covered very specific medication.

8        Q.    Okay.

9        A.    Again, this goes back to it did not cover the

10   implant, but it would cover the injections.

11       Q.    So this plan would not cover the implant either?

12       A.    That's my understanding, that it did not cover

13   the implant.

14       Q.    But it does cover the Lupron injection that

15   C.B. received?

16       A.    Correct.

17       Q.    Is C.B. still receiving the Lupron injection?

18       A.    I don't know when he received the last one.  I

19   think, I believe he has had his last one.  I don't believe

20   he will get another one.

21       Q.    But C.B. is still receiving testosterone

22   therapy.  Is that correct?

23       A.    Correct.

24       Q.    And to the best of your knowledge, he'll receive

25   that for the rest of his life?

1      A.    To the best of my knowledge, yes.

2      Q.    Have you discussed surgery with C.B. for the

3  treatment of his gender dysphoria?

4      A.    I don't believe he and I have discussed that, no.

5      Q.    Have you discussed surgery for C.B. with

6  someone else?

7      A.    Yes.

8      Q.    Who?

9      A.    His mother.

10      Q.    Okay.  What was that discussion?

11      A.    The only discussion I can recall about that was

12  about the, his chest.  And C.B. had expressed to her

13  concern that his chest wasn't as flat as he would like it

14  to be, as he believed it should be.

15      Q.    Do you have a view about whether C.B. needs to

16  have surgery for that purpose?

17          MS. EVANS:  Object to form.

18          THE WITNESS:  My view is that I will likely

19  support C.B. in every way.

20  BY MR. KNEPPER:

21      Q.    Would that extend to surgery on C.B. 's face to

22  make it appear more masculine?

23      A.    I will participate in a conversation about that.

24  I will be open-minded about that if that were to ever come

25  up.

# Exhibit 21

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2                File No. 1:19-CV-00272
3
4
    MAXWELL KADEL, et al.,        )
5                                 )
        Plaintiffs,               )
6                                 )
    vs.                           )
7                                 )
    DALE FOLWELL, in his          )
8    official capacity as State )
    Treasurer of North           )
9    Carolina, et al.,            )
                                  )
10       Defendants.              )
    _____)
11
12
13
14
15

16              DEPOSITION OF SAM SILVAINE

17                (Taken by Defendants)

18               Raleigh, North Carolina

19               Friday, August 20, 2021

20               10:00 a.m. - 2:57 p.m.

21
22
23
24
25      ---Reporter:  Tina Sarcia-Maxwell, RPR, CRR

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 265 of 284

```
 1              A P P E A R A N C E S
 2
 3     ON BEHALF OF PLAINTIFFS:
 4     Amy Richardson, Esquire
       Grace Wynn, Esquire
 5     Carl Charles, Esquire
       HARRIS, WILTSHIRE & GRANNIS, LLP
 6     1033 Wade Avenue
       Raleigh, North Carolina  27605-1155
 7     919.429.7386
       arichardson@hwglaw.com
 8
 9     ON BEHALF OF DEFENDANT STATE HEALTH PLAN:
10     John G. Knepper, Esquire
       Ben Garner, Esquire
11     LAW OFFICE OF JOHN G. KNEPPER, LLC
       1720 Carey Avenue, Suite 590
12     Cheyenne, Wyoming  82001
       john@knepperllc.com
13
14     ON BEHALF OF DEFENDANT NORTH CAROLINA
       DEPARTMENT OF PUBLIC SAFETY:
15
       Alan McInnes, Esquire
16     Assistant Attorney General
       114 West Edenton Street
17     Raleigh, North Carolina  27603
       amcinnes@ncdoj.gov
18
19
20
21
22
23
24
25
```

1    therapist.  I provide support for life and mental

2    health concerns and helping people process them.

3        Q.   Are you a licensed counselor in North

4    Carolina?

5        A.   I am.

6        Q.   What is the licensure regime you are

7    licensed as?

8        A.   I'm licensed clinical mental health

9    counselor.

10       Q.   And how long have you been a licensed

11   clinical mental health counselor?

12       A.   I have been licensed in some form since

13   2015.

14       Q.   You said "licensed in some form"?

15       A.   There is provisional licensure that is

16   required to get the full licensure.

17       Q.   How long were you provisionally licensed?

18       A.   About two and a half years.  I was fully

19   licensed in 2018, May.

20       Q.   Are you covered by the State Health Plan

21   at this time?

22       A.   I'm not.

23       Q.   When were you covered by the State Health

24   Plan?

25       A.   I was covered by the State Health Plan

1    from August 2016 through July 2018.

2         Q.   Where were you working at the time?

3         A.   I was working at the Counseling Center at

4    North Carolina State University.

5         Q.   What did you do there?

6         A.   I was a post master's fellow, which is

7    doing therapy but specifically also being trained

8    at the same time.

9         Q.   And you said you were covered until

10   July 2018; did you leave North Carolina State at

11   that time?

12        A.   I did.

13        Q.   And where did you go?

14        A.   I moved to Syracuse, New York.

15        Q.   And what did you do in Syracuse?

16        A.   I was in a doctoral program at Syracuse

17   University.

18        Q.   What was the program;

19        A.   Counselor of education, Ph.D.

20        Q.   And how long were you a part of that

21   program?

22        A.   Two full semesters.

23        Q.   So when did you -- so you were in

24   Syracuse then from July or was it August of 2018?

25        A.   Let me remember.  I think it was early

Case 1:19-cv-00272-LCB-LPA   Document 141   Filed 11/30/21   Page 268 of 284

1       Q.    How about with other medical providers?

2       A.    No, I don't believe so.

3       Q.    When did you decide that you wanted to

4    pursue having top surgery?

5              MS. WYNN:  Objection.

6       A.    I don't think I specifically decided that

7    I wanted to pursue top surgery.  Can you rephrase

8    the question.

9       Q.    When did you first begin investigating

10   top surgery as a medical treatment for you?

11             MS. WYNN:  Objection.

12      A.    I experienced a lot of dysphoria around

13   my chest and knew that was a potential medical

14   option and began the process of consulting with

15   medical professionals about whether or not that

16   was recommended treatment.

17      Q.    Who did you consult with?

18      A.    Well, Dr. ████████████.  Dr. ████████.

19      Q.    Anyone else?

20      A.    That's who comes to mind.

21      Q.    At the time you began hormone replacement

22   therapy with ████████████████, was that covered

23   by the State Health Plan?

24      A.    It was.

25      Q.    Did you ever have your testosterone

1    part of the procedure with the surgery as
2    scheduled on March 1, 2018?
3         A.   Yes.
4         Q.   If you hadn't signed this document, the
5    surgeon wouldn't have done the surgery?
6         A.   Correct.
7              MS. WYNN:  When you reach a natural
8    stopping point, maybe we can take a five-minute
9    break?
10             MR. KNEPPER:  We can take a five-minute
11   break now.
12             (Recess)
13          (Exhibit No. 7, Financial History Document,
14          so marked)
15   BY MR. KNEPPER:
16        Q.   This is Exhibit 7.  We had previously
17   asked you about the cost of the surgery with
18   Dr. Emerson; you said it was about 7,000.  Does
19   this refresh your memory?
20        A.   Yes, it does.
21        Q.   What was the total amount of surgery?
22        A.   7,100.
23        Q.   Do you remember paying more than 7,100?
24        A.   No, I don't remember doing that.
25        Q.   This Exhibit 7 likely reflects the

1    entirety of the cost of Dr. ████'s services?

2        A.   For this specific surgery on this

3    specific day.

4        Q.   Do you remember other costs for

5    Dr. ████?

6        A.   There might have been a consultation fee;

7    I don't recall specifically.  I can only say yes

8    for this specific service.

9        Q.   Now, I want to -- you said that you

10    reached out to Dr. ████'s office upon learning

11    of the change in the State Health Plan; is that

12    correct?

13        A.   That's correct.

14        Q.   Did Dr. ████'s ever communicate with

15    the State Health Plan, to the best of your

16    knowledge?

17        A.   I'm uncertain.

18        Q.   Did you ever determine whether the prior

19    preauthorization for this surgery would have been

20    honored by the State Health Plan?

21        A.   I'm not certain.  I don't know what they

22    did.

23        Q.   Did anyone from the State Health Plan

24    ever tell you that you needed to change the

25    payment method for this surgery?

1       A.    What do you mean by that?

2       Q.    I'm trying to understand.  You reached

3    out to Dr. ████'s office and said there has

4    been a change in my insurance?

5       A.    Yes.

6       Q.    You suggested to Dr. ████ you needed

7    to go from an insurance paid to self-paid service;

8    is that correct?

9       A.    They said that was my option.

10      Q.    Did they ever verify that your insurance

11    no longer covered the surgery?

12      A.    I'm not sure.  I have no idea.

13      Q.    Were you ever denied coverage of this

14    surgery by the State Health Plan?

15      A.    When I spoke to somebody on the phone,

16    they told me it would no longer be covered.

17      Q.    Did you explain to that person you

18    already had it set up?

19      A.    Yes.

20      Q.    Did you ever receive -- did you ever file

21    it with insurance for denial?

22      A.    Post?

23      Q.    Either pre- or post-surgery?

24      A.    Besides the August one?

25      Q.    Did anyone ever file that claim with

1      Q.    The letter says you report "Nonconforming

2   gender behaviors throughout childhood and early

3   adolescence;" can you describe those, please?

4      A.    Yes.  Traditionally, boyish things, I

5   liked sports, you know, when I was really young,

6   dinosaurs and cars and things like that, and I

7   often wanted to be included in things more like

8   than what was expected of me.  I really wanted to

9   be in Boy Scouts, for example.

10      Q.    When did you first question the gender

11   you were assigned at birth?

12      A.    Consciously, I would say by late 2015 I

13   really started thinking about it.

14      Q.    Prior to that time, had you expressed

15   dissatisfaction with your gender?

16      A.    I knew that I felt some discomforts.  I

17   didn't have the language for it before then.

18      Q.    What were the discomforts?

19      A.    Being perceived as a woman.  At the time,

20   I was uncomfortable with -- I was uncomfortable

21   with that.  I didn't like the clothing I was

22   expected to wear.  I didn't like the things I was

23   expected to be.  I felt discomforts in my body.

24              (Exhibit No. 16, Letter by █████████, so

25              marked)

# Exhibit 22



Deposition of:
## Dana Caraway

*September 17, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2    Civil Action No. 1:19-cv-00272
3
4    MAXWELL KADEL, et al.,
5                    Plaintiffs,
6        vs.
7    DALE FOLWELL, in his official
     capacity as State Treasurer of
8    North Carolina, et al.,
9                    Defendants.
10
11
12
13
              * CONFIDENTIAL ATTORNEY EYES ONLY *
14
15        VIRTUAL ZOOM VIDEOTAPED DEPOSITION OF
                   SERGEANT DANA CARAWAY
16                (Taken by Defendants)
17               Morganton, North Carolina
18              Friday, September 17, 2021
19
20
21
22
23    Reported by Andrea L. Kingsley, RPR
24
25

Page 2

```
 1                   A P P E A R A N C E S
 2      ON BEHALF OF THE PLAINTIFFS (via Virtual Zoom):
 3                   David Brown, Esquire
                     Transgender Legal Defense &
 4                   Education Fund
                     520 Eighth Avenue, Suite 2204
 5                   New York, New York  10018
                     (646) 862-9396
 6                   Dbrown@transgenderlegal.org
 7                        -and-
 8                   Tara Borelli, Esquire
                     Carl Charles, Esquire
 9                   Lambda Legal Defense And
                     Education Fund, Inc.
10                   730 Peachtree Street NE, Suite 640
                     Atlanta, Georgia 30318-1210
11                   404-897-1880
                     Tborelli@lambdalegal.org
12
                          -and-
13
                     Lauren Snyder, Esquire
14                   Harris, Wiltshire & Grannis, LLP
                     1033 Wade Avenue, Suite 100
15                   Raleigh, North Carolina 27605-1155
                     919-429-7386
16                   Lsnyder@hwglaw.com
17
        ON BEHALF OF THE DEFENDANT NC DEPARTMENT OF PUBLIC
18      SAFETY (via Virtual Zoom):
19                   Alan McInnes, Esquire
                     Assistant Attorney General
20                   North Carolina Department of Justice
                     114 W Edenton Street
21                   Raleigh, North Carolina 27603
                     (919) 716-6400
22                   Amcinnes@ncdoj.gov
23
24
25
```

```
 1              A P P E A R A N C E S (Cont'd.)
 2     ON BEHALF OF THE DEFENDANT FOLWELL AND NCSHP (via
       Virtual Zoom):
 3
                  John G. Knepper, Esquire
 4                Law Office of John G. Knepper
                  1720 Carey Avenue, Suite 590
 5                Cheyenne, Wyoming 82001
                  (307) 632-2842
 6                John@knepperLLC.com
 7
       ON BEHALF OF THE DEFENDANT FOLWELL AND NCSHP (Via
 8     Virtual Zoom):
 9                Mark Jones, Esquire
                  Kevin G. Williams, Esquire
10                Bell Davis & Pitt
                  100 N. Cherry Street, Suite 600
11                Winston-Salem, North Carolina 27101
                  (336) 722-3700
12                Kwilliams@belldavispitt.com
13
       VIDEOGRAPHER: Michael Kirby
14
15
16
17
18
19
20
21
22
23
24
25
```

1         VIRTUAL ZOOM VIDEOTAPED DEPOSITION

2     OF SERGEANT DANA CARAWAY, a witness called on

3     behalf of the Defendants pursuant to the

4     Federal Rules of Civil Procedure, before

5     Andrea L. Kingsley, Notary Public, in and for

6     the State of North Carolina, at Morganton,

7     North Carolina, on Friday, September 17, 2021,

8     commencing at 9:49 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    seeing physical therapists three days per week.

2         Q.    Does the State Health Plan cover the

3    cost of the physical therapy?

4         A.    Yes.  Except out-of-pockets and

5    deductibles.

6         Q.    Did you submit any of your bills for the

7    surgical treatment to the State Health Plan?

8         A.    Yes.

9         Q.    What happened?

10        A.    They denied everything.

11        Q.    Did you attempt to get pre-authorization

12   for the surgical procedures?

13        A.    Yes.

14        Q.    And they denied that?

15        A.    Yes.

16        Q.    Do you have plans for any other

17   treatments in the future other than continuing the

18   drug therapy and continuing the physical therapy?

19        A.    Yes.

20        Q.    What is that?

21        A.    Voice feminization surgery, facial

22   feminization surgery and the completion of laser

23   hair removal and electrolysis hair removal.

24        Q.    Have you had any of these procedures or

25   are any of these procedures scheduled?

1    insurance against us, against me.

2         Q.    Were you diagnosed by anyone with gender

3    dysphoria prior to 2018?

4         A.    No.

5         Q.    Can you describe the symptoms of gender

6    dysphoria for me please, as you experience them?

7         A.    As I experience them?  I will give you

8    the best answer I can.  My desire to be in a proper

9    body fitting what I was supposed to have been born

10   as.  I believe that I was -- I know that I was born

11   into the wrong body.  I should have been born into

12   a body more consistent with female parts and

13   anatomy, and I've known about that since early

14   childhood.

15        Q.    You testified that you've known that you

16   were born into the wrong body since early childhood.

17   What do you remember about the first time that you

18   knew that you were born into the wrong body?

19        A.    I had a childhood friend when I was real

20   young, and probably at that point somewhere in

21   my -- I don't know, somewhere around four, five,

22   six, I was already cross dressing and wearing her

23   clothes and until I got caught and was punished

24   multiple times for wearing clothes not consistent

25   with what I was assigned at birth.  As it went

1    along, my older age comes in, the years, my

2    dreams -- my desperations deepened knowing that I

3    was born into a male -- with male parts and not

4    what I should have been born as.

5          Q.    So you used the phrase should have been

6    born as.

7          A.    I did.

8          Q.    Why do you say you should have been born

9    into a female body?

10         A.    Because I'm a female that was born with

11   male parts.

12         Q.    Do you believe that you have two X

13   chromosomes?

14         A.    I'm not sure.

15         Q.    Do you believe it's possible you have

16   two X chromosomes?

17         A.    I'm not sure.

18         Q.    You mentioned dreams.  When did you

19   first experience dreams related to gender dysphoria?

20         A.    Early age.  As far back as I can

21   remember dreaming.

22         Q.    What do you remember about the dreams?

23         A.    That I was a female and born with the

24   wrong parts and knowing I should have been born

25   with a female's body parts and not punished for

1      that by society later on realizing what it was.

2          Q.    Later on realizing what --

3          A.    As I grew older, I become more aware of

4      what was going on.

5          Q.    I'm sorry, could you repeat that last

6      phrase?

7          A.    As I grew older, I become more aware of

8      what was going on with myself.

9          Q.    Do you remember when you became more

10     aware?

11         A.    Gradually.  I'm sure it was a graduation

12     over time.  To say that I can hit on one specific

13     date would be impossible.

14         Q.    Did you ever seek information about your

15     feelings of gender dysphoria before the age of 18?

16         A.    To be honest, Mr. Knepper, it was prior

17     to the internet age.  I lived in Morganton, North

18     Carolina, and there was nowhere to turn to to look

19     for that kind of help without being ridiculed or

20     sent to a home for mental issues even though I

21     wasn't facing mental issues.  If I could have found

22     a place that would have supported me and accepted

23     me, absolutely, I would have years prior.

24         Q.    When did you first find information?

25     Was it the internet age?

1    consolidation of your gender identity with your

2    expressed gender?

3                    MR. BROWN:  Objection to the form.

4        A.    Same question you asked.

5        Q.    Sergeant Caraway, what is your gender

6    identity?

7        A.    I don't have a gender identity.  I am a

8    female.

9        Q.    Have you always expressed the female

10   gender in your presentation to others?

11       A.    No.

12       Q.    Did that failure to express the female

13   gender in your presentation to others cause you

14   discomfort?

15       A.    It caused me distress, mental anguish,

16   hurt, harm, dysphoria, sleeplessness, restlessness,

17   weight issues, relationship problems, career

18   problems.  Everything was centered around with me

19   having to hide the fact that I was female and born

20   in the wrong body.

21       Q.    Do you believe that treatment for your

22   gender dysphoria will resolve your concerns about

23   sleeplessness?

24       A.    I'm sorry, the last one one more time.

25       Q.    Do you believe the treatment for your