# DECLARATION OF AMY RICHARDSON

# PART IV

# Exhibit 40

Board of Trustees
State Health Plan for Teachers and State Employees
Department of State Treasurer
December 1, 2016

The meeting of the Board of Trustees of the North Carolina State Health Plan for Teachers and State Employees was called to order at approximately 4:00 p.m. on Thursday, December 1, 2016, at the Department of State Treasurer, 3200 Atlantic Avenue, Raleigh, NC 27604.

**Members**
Janet Cowell, Chair
Neal Alexander
Paul Cunningham, MD
Donald Martin
Warren Newton, MD
Elizabeth Poole
David Rubin

**Participated via Phone**
Margaret Way

**Absent:**
Andrew Heath
Aaron McKethan

**State Health Plan and Department of State Treasurer Staff:** Mona Moon, Lotta Crabtree, Caroline Smart, Nidu Menon, Lauren Wides, Mike Santos, Lucy Barreto, Mark Collins, Matthew Grabowski, Beth Horner, Lorraine Munk, Blake Thomas, Laura Rowe

**Welcome**

Janet Cowell, Chair, welcomed Board members, staff from the State Health Plan and Department of State Treasurer and visitors to the meeting.

**Agenda Item – Conflict of Interest**
*Presented by Janet Cowell, Chair*

In compliance with the requirements of Chapter 138A-15(e) of the State Government Ethics Act, Chair Cowell requested that members who have either an actual or perceived conflict of interest identify the conflict and refrain from discussion and voting in those matters as appropriate. Dr. Rubin and Ms. Way recused themselves from discussion regarding the Lake lawsuit. Dr. Martin noted, for the record, that he opted out of the Lake lawsuit and, therefore, wouldn't have a conflict of interest during those discussions.

**Agenda Item – Review of Minutes (Attachment 1)**
*Presented by Janet Cowell, Chair*

Following a motion by Dr. Cunningham and seconded by Dr. Newton, the Board unanimously approved the August 4-5, 2016, minutes, as written.

**Agenda Item – Introductions (Attachment 2)**
*Presented by Mona M. Moon, Executive Administrator*

Treasurer Cowell introduced new Board members, Dr. Donald Martin and Ms. Margaret Way. Ms. Moon introduced Dr. Patti Forest, State Health Plan Medical Director.

**Agenda Item – Financial Report, Forecasting and Monitoring (Attachment 3)**
*Presented by Mark Collins, Financial Analyst*

<u>October 2016 Financial Report</u>
Mr. Collins noted that a higher than expected membership increase accounted for the increase in Plan revenue. The October report followed a pattern similar to prior reports with the ending cash balance $222 million higher than the budgeted amount. Plan expenses were below projection and net income was higher than expected.

Medical utilization has remained relatively flat in recent years, while pharmacy expenditures demonstrate a slight but steady increase. Ms. Moon noted that the overall trend assumption may be a bit high, but breaking down the medical vs. pharmacy expenditures may provide a different story. In summary, the Plan's financials are currently outperforming the budget.

<u>CY 2016 3rd Quarter Actuarial Forecast Update</u>
Mr. Collins provided a presentation overview, noting that the CY 2016 3rd quarter forecast used a different comparison point than the previous Financial Report presentation. He also reviewed the revised 3rd quarter assumptions, noting that the quarterly rebate estimates were adjusted to reflect recent experience and the most recent guarantees under the new CVS Caremark contract. The higher than expected membership numbers resulted in a slightly higher revenue projection, while expenses are now expected to be slightly lower.

A review of the Plan's second quarter experience resulted in a projected decrease from 3.74% to 3.14% for the 2018-19 premium increases, which remain below the 4% target in the certified State Budget. The forecasted ending cash balance through June 2017 will not fall below the 12% legislative reserve floor for projected annual expenses.

<u>2015 Lowest Cost Plan/Optimized Enrollment Analysis</u>
The analysis conducted by the Segal Company to determine the lowest cost plan for each member was based on CY 2015 incurred claims. The report demonstrated that a majority of members would have been better off in the Consumer-Directed Health Plan (CDHP 85/15) but only 3% chose that option (up from 2% in 2014). While the final numbers for 2017 enrollment are not yet available, Ms. Moon stated that there was an increase in the CDHP membership in the current year.

Mr. Collins noted that the percent of members selecting the lowest cost plan increased in 2015 compared to 2014. The report analysis also demonstrated the potential member savings in moving from one plan to another.
Mr. Collins reviewed the key takeaways from the analysis, noting that the lowest cost plan option isn't necessarily the best option for every member. Some members may prefer a more consistent and predictable copay plan even if it is not the lowest cost option for them.

One Board member noted that the CDHP has been difficult to communicate and simplifying the communication may increase understanding. Another Board member stated that the enrollment process seemed smoother this year and looked forward to hearing more about the enrollment and

PLAN DEF0012811

communication process. Ms. Moon stated that the Plan is working with staff inside the Department as well as an external group to develop a health literacy program. She also stated that the Plan would like the next generation of the health benefits estimator tool to include member access to their claims information.

<u>Actuarial Valuation of Retired Employees' Health Benefits – Other Postemployment Benefits (OPEB) as of December 31, 2015</u>
Mr. Collins began by reminding everyone that the State Health Plan Board is not responsible for the retiree health benefits liability, but can affect the liability through some of its decisions. He provided background information and reviewed the actuarial valuation process. He reiterated that while some of the Plan's programs can affect the unfunded liability, the Board doesn't have a responsibility for the results.

The current liability is $32 billion, an increase of approximately $6 billion from 2014. The largest portion of that increase is due to an experience study for the State Retirement System which impacted the retiree mortality expectations. Mr. Collins noted that the Board-approved benefit design changes and OPEB liabilities are not currently listed on the Plan's overall balance sheet but that is due to change in 2017-18. Ms. Moon noted that offering the Medicare Advantage options and taking advantage of the federal subsidies available helped to reduce Plan costs.

At this point, Chair Cowell reminded the Board members to complete their self-assessment in preparation for the December 20 meeting.

**Agenda Item – Legislative Update (Attachment 4)**
*Presented by Matthew Grabowski, Health Policy Analyst and Legislative Liaison*

<u>Expansion of Local Government Participation</u>
Mr. Grabowski provided an overview of the local government participation, stating that the enrollment cap through CY 2017 is 16,000 members. He reviewed the language and key provisions in Session Law (SL) 2015-112 and SL 2016-104, noting that current and future retirees are not eligible for coverage. The language also clarified that premiums collected by local government units had to conform to the Plan premium structure.

In response to a question regarding the financial impact on the Plan, Mr. Grabowski stated that the loss ratios for local units enrolled prior to 2016 were very near 1; this suggests that the financial impact of enrolling local units is negligible. The profile of most local government members is not much different than current Plan members.

The Plan is currently in the process of onboarding 11 local government units that will offer coverage effective January 1, 2017. A list of participating units was included in the Board material.

<u>Transparency Workgroup Update</u>
Mr. Grabowski reviewed the portion of SL 2013-382 which directed the Plan to establish a workgroup to examine the best way to provide Plan members greater transparency in the cost of health care services. The workgroup included active and retiree representation, as well as the provider community.

The Transparency Workgroup has met 1-2 times per year since early 2014, most recently meeting October 5, 2016. Mr. Grabowski noted key accomplishments by the workgroup and stated that next steps would include finalizing and submitting the 2016 Transparency Report to the Joint Legislative

PLAN DEF0012812

Commission on Governmental Operations and the Joint Legislative Oversight Committee on Health and Human Services.

The legislative requirement to establish the workgroup and provide an annual report expires on December 31, 2016. However, the Plan is considering options to maintain or modify the workgroup to provide further insights on the development of transparency-related initiates.

**Agenda Item – Contracting and Vendor Partnerships (Attachment 5)**
*Presented by Lauren Wides, Director of Contracting and Healthcare Compliance*

Population Health Management Request for Proposal
Ms. Wides reviewed the benefits and services offered by the Plan's population health management vendor. The current contract with ActiveHealth Management expires in December 2017.

The Plan issued an RFP in August 2016 with two distinct scopes of work: Member Services and Supports and Worksite Supports and Services. The evaluation period by the Plan ended on November 15 and oral presentations are scheduled for December. The Plan will provide a recommendation to the Board at the January 2017 meeting.

**Agenda Item – Executive Session**

Pursuant to G.S. 143-318.11(a)(1) and (a)(3) and 132-1.9, Dr. Newton's motion to move into executive session was seconded by Ms. Poole and unanimously approved by the Board.

Consultation with Legal Counsel *(G.S. 143-(318.11(a)(1) and (a)(3))*
*Presented by Heather Freeman, Attorney General's Office*

Ms. Freeman discussed the legalities and the non-compliance impact of Affordable Care Act (ACA) Section 1557 requirements as they pertain to the Board of Trustees.

Due to the time, the Board decided to resume the discussion in executive session at 9:00 a.m. on Friday, December 2.

Lake Lawsuit Update (I. Beverly Lake et al. v. State Health Plan for Teachers and State Employees, et al.) *(G.S. §143.318.11(a)(3))*

This item was deferred to Friday, December 2.

Upon a motion by Ms. Poole and seconded by Dr. Cunningham, the Board voted unanimously to return to open session.

The meeting was adjourned at 6:30 p.m.

4

PLAN DEF0012813

**Board of Trustees**
**State Health Plan for Teachers and State Employees**
**Department of State Treasurer**
**December 2, 2016**

The meeting of the Board of Trustees of the North Carolina State Health Plan for Teachers and State Employees was called to order at approximately 9:00 a.m. on Friday, December 2, 2016, at the Department of State Treasurer, 3200 Atlantic Avenue, Raleigh, NC 27604.

**Members**
Janet Cowell, Chair
Neal Alexander
Paul Cunningham, MD
Warren Newton, MD
Elizabeth Poole
David Rubin

**Participated via Phone**
Aaron McKethan
Margaret Way

**Absent:**
Andrew Heath

**State Health Plan and Department of State Treasurer Staff:** Mona Moon, Lotta Crabtree, Caroline Smart, Nidu Menon, Tom Friedman, Lauren Wides, Mike Santos, Mark Collins, Matthew Grabowski, Beth Horner, Lorraine Munk, Lucy Barreto, Fran Lawrence, Blake Thomas, Schorr Johnson, Brad Young, Laura Rowe, Kathryn Keogh, Jessica Pyjas

**Welcome**

Janet Cowell, Chair, welcomed Board members, staff from the State Health Plan and Department of State Treasurer and visitors to the meeting. She stated that the Board would return to executive session to continue the discussion from Thursday evening, December 1.

Upon a motion by Dr. Newton and seconded by Ms. Poole, the Board voted unanimously to return to executive session.
Upon a motion by Mr. Alexander and seconded by Ms. Poole, the Board voted unanimously to return to open session at 11:10 a.m.

**Agenda Item – Conflict of Interest**
*Presented by Janet Cowell, Chair*

In compliance with the requirements of Chapter 138A-15(e) of the State Government Ethics Act, Chair Cowell requested that members who have either an actual or perceived conflict of interest identify the conflict and refrain from discussion and voting in those matters as appropriate. No conflict was noted.

5

PLAN DEF0012814

**Agenda Item – Benefit Design, Plan Options and Premiums (Attachment 6)**

Chair Cowell announced that the discussion would begin with Item 3.a.ii.

Recommended Benefit Changes for CY 2017

ACA Section 1557 Requirements – Coverage for Gender Dysphoria

Gender Dysphoria Condition and Treatment
*Presented by Patti Forest, MD, State Health Plan Medical Director*

Dr. Forest began by discussing the gender dysphoria diagnostic criteria and standards of care. The criteria for gender confirmation surgery was presented, with Dr. Forest noting that candidates for surgery must complete a minimum of 12 continuous months of real life experience in their new gender with no returning to their original gender.

The American Medical Association Resolution 122 issued in 2008 removes the financial barriers of care for transgender patients. The American College of Physicians and American College of Obstetricians and Gynecologists Committee have also endorsed coverage for transgender health care services.

Overview of Legal and Compliance Risks
*Presented by Ashley Gillihan, Alston & Byrd, LLP, (via phone)*

Mr. Gillihan, attorney with Alston & Byrd, introduced himself, stating that he has provided outside legal counsel to the Plan regarding the ACA for the past three years. His area of expertise is employee health benefits.

The Plan receives federal funds from the Retiree Drug Subsidy (RDS) and currently excludes coverage for the treatment of gender dysphoria. Section 1557 prohibits discriminating based on race, color, national origin, sex, age or disability. If the Plan continues to receive federal funding without including coverage for the treatment of gender dysphoria, the Plan will be considered non-compliant as of January 1, 2017. This could result in the suspension or termination of the RDS funding and/or the possibility of civil action by someone challenging the violation.

Proposed Benefit Change
*Presented by Lotta Crabtree, Deputy Executive Administrator and Legal Counsel*

Ms. Crabtree briefly reviewed the Section 1557 requirements, risks of non-compliance and protections under the rule. She stated that the Plan has already completed procedural requirements regarding a grievance procedure and taglines in communication material addressing individuals with limited English proficiency. The final rule does not define the coverage of specific services, but does make clear that denying coverage of transition-related services would be subject to "careful scrutiny."

A state-by-state response to Section 1557 and a summary of compliance and discrimination laws were provided to the Board. Ms. Crabtree noted that the Plan has submitted a request for RDS funding each month in 2016.

In response to a question regarding the State 's Medicare and Medicaid policies, Ms. Crabtree stated that while a medical policy is not in place, limited coverage is provided on a case-by-case basis and there are no categorical exclusions of which she is aware.

6

PLAN DEF0012815

The Plan's current benefit provides blanket exclusions for the treatment of gender dysphoria, including treatment or studies regarding sex changes or modifications, psychological assessments and psychotherapy treatment. The annual cost of coverage provided by the Plan's actuarial consultant is approximately $350,000 to $850,000.

If the Plan were to provide coverage for transgender dysphoria services, utilization management policies would apply to transition surgery and hormone therapy. The Plan would adopt the Blue Cross and Blue Shield of North Carolina (BCBSNC) medical policy, included in the Board material, which includes the requirements in support of medical necessity.

Several states and health care providers filed a lawsuit against the Obama administration seeking to block a portion of Section 1557. The Attorney General's Office and the Office of the Governor would need to provide consultation or make the decision as to whether or not the Plan could join the lawsuit. The Plan recommends approval of coverage for the treatment for gender dysphoria by removing the blanket exclusions resulting in the provision of medically necessary services for the treatment of gender dysphoria.

Member and Public Comment Period
*TBA*

Ms. Jeanne Duwve and her son, Luke, both members of the Plan, relayed the story of her son's life and what it means to be transgender. She thanked the Board for their consideration in removing the exclusions for the treatment of gender dysphoria.

Ms. Patti Adams, a clinical social worker, stated that she is not eligible for state benefits, but has had the opportunity to work with adolescents and adults contemplating gender transformation. She discussed the mental health aspects of gender dysphoria and stated that the decisions for some people can be a matter of life and death. She also thanked the Board for considering the benefit change.

Board Discussion and Vote
Dr. Cunningham made a motion recommending that the State Health Plan removes the blanket exclusions that relate to treatment or studies leading to or in connection with sex changes or modifications and related care, and psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation, resulting in the provision of medically necessary services for the treatment of gender dysphoria. This implies that the third-party administrator, Blue Cross and Blue Shield, will utilize the existing approach to administrating this issue. Separately, the State Health Plan will communicate with the Attorney General's Office to fully explore any of the residual issues that may be relevant to this.

Dr. Rubin seconded the motion. Chair Cowell opened the floor for discussion.

Mr. Alexander made a motion to defer the decision until the January Board meeting. Mr. Thomas replied that a vote could not be deferred beyond the next regularly scheduled meeting, which is December 20, 2016.

The question was asked if a motion could be made to lay the original motion by Dr. Cunningham on the table. A yes vote would allow the Board to take other action. Such motion was made by Mr. Alexander and seconded by Donald Martin. Mr. Alexander, Dr. Martin, Dr. McKethan and Ms. Way voted yes. Dr.

PLAN DEF0012816

Cunningham, Dr. Newton, Dr. Rubin and Ms. Poole voted no. Chair Cowell broke the tie and voted not to table the motion.

Chair Cowell stated that the Board could now further discuss and debate the original motion by Dr. Cunningham.

Dr. McKethan offered a resolution to Dr. Cunningham's original motion, stating that "with this resolution, the Board intends to ensure that the State Health Plan follows all applicable laws and regulations, but recognizes that the validity of the federal regulation and interpretation of related laws are currently the subject of litigation and may change over time. Therefore, the Board intends for this resolution to apply to the 2017 plan year. It will be revisited in advance of the 2018 plan year.

Dr. Rubin asked a procedural question as to whether Dr. McKethan's resolution could be accepted as a friendly amendment to the original motion. Following consultation with legal counsel, Dr. Cunningham agreed to accept Dr. McKethan's resolution as a friendly amendment to his original motion.

Chair Cowell stated that the removal of the blanket exclusion for benefit year 2017, with the Board to revisit the benefit change for the 2018 benefit year, was now on the table for a vote.
The vote to approve the original motion with the friendly amendment passed unanimously, with one board member, Neal Alexander, abstaining.

Following the vote, a Board member requested the vote and amendment verbiage, in writing, prior to the end of the Board meeting.

Mr. Blake Thomas, General Counsel for the State Treasurer, agreed to provide the verbiage, in writing, before the Board adjourned.

Coverage of Short-Term Rehabilitative Therapies under the CDHP
*Presented by Lotta Crabtree, Deputy Executive Administrator and Legal Counsel*

During the Public Comment Period at the August Board of Trustees meeting, a Plan member asked the Board to consider a benefit change to the combined maximum number of physical therapy (PT), occupational therapy (OT), and chiropractic visits allowed in a benefit year. She and other Plan members have conditions and circumstances that may require more than the 30 visits allowed.

Ms. Crabtree reviewed the utilization for these services in 2015 and stated that the cost to make the benefit change would be approximately $137,000, since only a small portion of the Plan's membership would be impacted.

Mr. Alexander made a motion, which was seconded by Dr. Newton. The Board unanimously voted to approve the staff recommendation to remove the combined 30-visit limit on PT, OT and chiropractic care services, as well as to remove the 30-visit limit on speech therapy and to place a 30-visit limit on chiropractic care under the CDHP plan option.

With this change, the coverage under the CDHP will align with the current coverage under the 80/20 and 70/30 plans.

In response to a question regarding where the 30-visit maximum originated, Ms. Crabtree stated that it was industry standard.

8

PLAN DEF0012817

## 2018 Benefit Development

Stork Rewards Program
*Presented by Jessica Pyjas, Health Promotion and Wellness Coordinator*

Ms. Pyjas provided an overview, history and goals of the Stork Rewards program launched in October 2011.  She reviewed the incentives under each plan option and the engagement outcomes in the past four years.  The program has had a positive impact on the overall engagement for medium and high risk members. The program modification in 2014, requiring members to enroll by their 13th week of pregnancy, resulted in an increase of engagement early in the pregnancy.

One Board member commented that the program costs per year seemed very high.  Ms. Pyjas stated that the cost of the program was covered, for the most part, by the annual Per Member Per Month (PMPM) that is paid to the Population Health Management Vendor. The incentive payment is over and above this payment.

The Return on Investment (ROI) was based on avoided adverse events, such as antenatal complications, preterm birth, low birth weight and pre-term with low birth weight newborns.  Ms. Pyjas noted that the Plan members have a lower rate of preterm births compared to the state rate.

The Plan is considering the phase-out of the Stork Rewards incentive program in 2017 but will continue to offer maternity coaching without the incentives in 2018.  Enrollment into the program would be discontinued after March 31, 2017.  Phasing out the Storks Reward program would require Board approval, followed by the development of a communication plan. A board member suggested keeping the program but reducing the incentive.

In order to improve the health of our members, one Board member suggested that perhaps the Plan could incent parental group visits to reduce the preterm labor rate.  Another suggestion was for the Plan to consider not paying for C-sections prior to 37 weeks unless medically indicated.

Another Board member noted that after the first year, the ROI wasn't significantly different.  Another member noted the modest cost increase in year 4 but the savings in that year dropped rather significantly. In that same year, member engagement decreased somewhat, but the number of women who completed the program dropped significantly.  Another member requested more details regarding the sources of savings and what, specifically, was prevented by those who participated in the program. One Board member felt that the Plan needed to determine why members weren't finishing the program and urged Plan staff not to drop the program altogether.

Chair Cowell acknowledged the thoughtful questions and stated that the program would be further discussed at the January meeting.  Ms. Moon asked the Board members to consider revisions in response to the questions and comments raised and share them with her.  Plan staff will discuss potential changes and present them to the Board in January.

Strategy and Potential Benefit Changes
*Presented by Mona M. Moon, Executive Administrator; Patti Forest, MD, Medical Director; Caroline Smart, Chief Operating Officer; Nidu Menon, Director of Integrated Health Management*

The 2018 potential benefit design changes have been developed based on the strategic plan that was revised and approved at the August Board meeting. The legislative mandate to keep the employer contribution less than 4% in 2018 and 2019 gives the Board a chance to enhance and change some

9

PLAN DEF0012818

things to further the mission of the Plan, given that the updated baseline forecast projects a required premium increase of 3.14%.

Ms. Moon reviewed a summary of the benefit changes under consideration for each plan option. One of the benefit enhancements would be to incent the use of Blue Distinction Centers. These are nationally designated treatment facilities recognized for providing specialty care for certain procedures. The Plan has used Blue Designated Providers for bariatric surgery, which has worked very well.

If the current healthy activities are maintained, the value of the credits would increase in the CDHP and Enhanced 80/20 Plan. The result would be a premium increase of 3.14% in 2018 and 2019. If the tobacco attestation was the only healthy activity maintained, the premium increase would be 3.69%.

Dr. Forest stated that diabetes remains one of the most prevalent chronic conditions of Plan members. Diabetes has an impact on overall health, as well as a significant financial impact. In 2015, active members and non-Medicare retirees with diabetes incurred approximately $400 million in allowed claims. The Plan offers tools and resources to assist members in managing diabetes and the Board approved a diabetic drug tier in the Enhanced 80/20 and Traditional 70/30 plans for 2017.

In response to a question as to whether the Plan could focus on incenting medications that help people live longer, Dr. Forest stated that some of the generic drugs in that category are very low cost.

A Board member suggested that selecting a Primary Care Provider (PCP) is a very important piece in the coordination of care and that it appears that a lot of members don't have a regular provider. The validity of the health assessment was also questioned. Dr. Menon stated that the health assessment helps to identify members "at risk" who would not present themselves through the medical claims data. The Plan is also preparing a detailed analysis of three years of health assessment data to present to the Board. She further stated that the Plan isn't abandoning the health assessment but is trying to determine how to incorporate it into other plan benefits such as the Health Engagement Program.

In response to another question regarding whether the tobacco attestation has reduced the number of smokers, Dr. Menon stated that the attestation by itself was not intended to reduce the number of smokers but to identify smokers and ensure that they have access to the resources that will assist them in their effort to quit smoking.

Dr. Forest stated that the Plan has considered expanding the diabetic pharmacy tier or creating a new one for preferred insulin. Over the next month, staff will also discuss the possibility of reducing the coinsurance on the CDHP since many medications are already deductible exempt. A suggestion was also made to consider the cost of diabetic test strips.

As the plan design is structured for diabetes care, the Plan will share the information with the Board. Dr. Menon reviewed information on the Health Engagement Program (HEP). The Healthy Lifestyles enrollment continues to grow and currently totals 3,153 members. The enrollment in the Positive Pursuits program has also seen a steady growth since its launch in April.

The Plan would like the Board to consider expanding the Positive Pursuits program to members in the 80/20 Plan. Dr. Menon reviewed the reasons for expansion, one of them being that there are more members with chronic conditions in the 80/20 Plan rather than the CDHP. Staff recommends further experience with the Healthy Lifestyles program before expanding it to the 80/20 Plan. This is a different approach from what was presented at the August Board meeting.

10

PLAN DEF0012819

The guiding principles for expansion and incentives were briefly summarized. Dr. Menon stated that incentives for the Positive Pursuits program would require more thought and discussion. The Plan eventually wants to move in the direction of incrementally expanding this program.

Ms. Moon stated that staff is interested in what the Board thinks regarding incentives and what would work best to change behavior. In response to a question regarding focus groups to determine what members want, Ms. Horner stated that the Plan has conducted focus groups regarding benefit options but not incentives specifically. A suggestion was made to survey CDHP members to determine what motivates them to engage and what incentives work.

Another suggestion by a Board member was to discuss the types of data and experience BCBSNC has on other groups they cover. Learning what has worked for other group members and lessons learned might provide valuable feedback for the Plan. Ms. Moon stated that discussions with Plan vendors and in-house data modeling is incorporated in program development. A request was made to share that data with the Board.

Mr. Collins discussed the potential of establishing a base premium on all plans in order to spread the risk across the membership. He also reviewed the premium increases required for 2018 and 2019 if dependent premiums were frozen.

Mr. Collins presented three options for the 70/30 Plan, along with the medical and pharmacy plan design under each option. He noted that the Plan recommends at some point to take steps to realign the pharmacy benefit in the 70/30 and 80/20 plans and determine whether or not to give up Grandfather Status.

Ms. Moon stated that prior to the February 10, 2017, vote on the 2018 benefit design, she would share information with the Board via email and workgroup calls. The benefit design will be shared with the Board at the January 26-27, 2017, meeting.

Reconsideration of Motion in re Section 1557 of the ACA
At this point in the meeting, Mr. Thomas provided the Board with the written verbiage of the earlier motion. The Board agreed that the language provided did not match what they thought they had approved. After a motion to reconsider by Paul Cunningham, seconded by David Rubin, which was approved unanimously, the language for the motion was revised. There was then a motion to approve the amended language by Warren Newton, seconded by Liz Poole. The motion carried unanimously by those voting, 6-0. Neal Alexander abstained from the vote and Dr. McKethan was not present. The final benefit approval is as follows:

> "The NC State Health Plan removes the blanket exclusions that relate to treatment or studies leading to or in connection with sex changes or modifications and related care; and psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation; resulting in the provision of medically necessary services for the treatment of gender dysphoria. This infers that the third-party administrator – Blue Cross Blue Shield - will utilize the existing approach to administrating this issue."

> "Separately, the State Health Plan will communicate with the Attorney General's Office to fully explore any of the residual issues that may be relevant to this."

PLAN DEF0012820

Case 1:19-cv-00272-LCB-LPA   Document 144   Filed 11/30/21   Page 13 of 74

"With this resolution, the Board intends to ensure that the State Health Plan follows all applicable laws and regulations, but recognizes that the validity of the Federal Regulation and interpretation of related laws are currently the subject of litigation and may change over time. Therefore, the Board intends for this resolution to apply to the 2017 plan year. It will be revisited in advance of the 2018 plan year."

**Agenda Item – Member Experience and Communications (Attachment 7)**
*Presented by Beth Horner, Customer Experience Manager, and Caroline Smart, Chief Operating Officer*

Open Enrollment Communications and Results
In the interest of time, Ms. Horner and Ms. Smart provided a high level summary of the presentations. The enrollment period was extended from October 31 to November 5, 2016, to allow for those affected by Hurricane Matthew to complete their enrollment.

Ms. Horner reviewed the HBR training efforts, member outreach events and the resources and tools that were in place to assist members with their Open Enrollment selection. Ms. Smart reviewed the actual enrollment results with the Board. Website statistics indicated that 366,000 new users accessed the Plan's website. At the end of the Open Enrollment period, a total of 401,088 subscribers completed enrollment.

The tobacco attestation rate improved over last year, with members in the 70/30 Plan having a chance to complete the attestation for the first time during Open Enrollment. Members who agreed to enroll in QuitlineNC have until the end of the year to do so. Ms. Smart also noted that more members completed the health assessment this year compared to October 2015.

Enrollment in the CDHP for non-Medicare subscribers increased significantly this year with 23,399 enrolling in this plan option, compared to approximately 14,000 last year. Sixty-three percent of the Medicare primary subscribers remained in the Traditional 70/30 Plan. Termination letters were sent to members who are currently enrolled in Humana, which has generated a significant number of phone calls to Benefitfocus and Humana. Overall, the enrollment process went well, with minimal technical barriers.

The full report from the telephone town hall meetings was included in the Board material.

CVS Implementation and Communication Outreach
Plan staff have been working with CVS Caremark over the past months to prepare for the January 1, 2017, effective date. Over the next few weeks, final testing, member notification letters and ID cards will be finalized and completed.

Communication materials have been sent to members and providers and CVS will send a communication blast to pharmacies in December. Information has also been posted on the Plan's website. In response to a question regarding the exception process effective date of January 1, Ms. Horner stated the Plan has communicated the importance of planning ahead to both members and providers.

2016 Membership Satisfaction Survey Results
Approximately 2% of subscribers and covered spouses responded to the satisfaction survey, an increase from last year's survey. Ms. Horner reviewed highlights in the executive summary, noting that 36% and 33% of active/non-Medicare and Medicare retiree members, respectively, would likely benefit from a smartphone app to assist them in better understanding their health benefits.

PLAN DEF0012821

The overall satisfaction with the Plan is not as high as the Plan would like. Ms. Horner stated that the next survey may delve a bit deeper into this question to learn specifically what might be driving the dissatisfaction. It was noted that the 2015-16 survey results were compared to 2012, since this question wasn't asked in the 2014 survey. The survey details were included in the Board material.

<u>2017 Communication and Marketing Strategy</u>
As the Plan strives to engage members and increase their health plan literacy, efforts will focus on several programs and initiatives in 2017. Webinars have gained in popularity over the past year and the Plan will continue to offer them on a variety of topics. The Plan will also increase educational efforts regarding Blue Option Designated Providers. With the growing membership in the CDHP, direct mailers will be sent and webinars offered in January to remind members how the plan works.

In response to a question as to whether the Plan can link data with members who have saved money in order to target educational efforts to members not in the CDHP, Ms. Moon stated that the Plan would discuss it with Segal. She further noted that the Plan continues to look at ways to enhance member education and welcomes suggestions.

Another Board member asked if the health benefit estimator could include a member's out-of-pocket expenditures for the previous year. Ms. Moon stated that while that feature is not currently available, the Plan would like a link to a member's claims data in the next generation of the tool.

Due to time constraints, the Clinical and Program Operations items were deferred to the December 20, 2016, meeting.

Following a motion by Dr. Newton and seconded by Mr. Alexander, the Board voted unanimously to adjourn at approximately 3:00 p.m.

Janet Cowell, Chair

13

PLAN DEF0012822

# Exhibit 41

**From:** Blake Thomas <Blake.Thomas@nctreasurer.com>
**Sent:** Tue, 06 Dec 2016 10:51:45 -0500
**To:** Mona Moon <Mona.Moon@nctreasurer.com>, Lotta Crabtree
<Lotta.Crabtree@nctreasurer.com>, Brad Young <Brad.Young@nctreasurer.com>
**CC:** Beth Horner <Beth.Horner@nctreasurer.com>
**Subject:** RE: State Health Plan board to cover gender reassignment surgery

---

I agree with Lotta's addition and endorse this response.  --Blake

---

**From:** Mona Moon
**Sent:** Tuesday, December 06, 2016 10:00 AM
**To:** Lotta Crabtree <Lotta.Crabtree@nctreasurer.com>; Brad Young
<Brad.Young@nctreasurer.com>; Blake Thomas <Blake.Thomas@nctreasurer.com>
**Cc:** Beth Horner <Beth.Horner@nctreasurer.com>
**Subject:** RE: State Health Plan board to cover gender reassignment surgery

Yes, that's an important distinction.  So to be clear the benefit change "will allow coverage of medically necessary gender dysphoria-related treatments, including transition surgery and hormone therapy"

---

**From:** Lotta Crabtree
**Sent:** Tuesday, December 06, 2016 9:58 AM
**To:** Brad Young <Brad.Young@nctreasurer.com>; Blake Thomas
<Blake.Thomas@nctreasurer.com>; Mona Moon <Mona.Moon@nctreasurer.com>
**Cc:** Beth Horner <Beth.Horner@nctreasurer.com>
**Subject:** RE: State Health Plan board to cover gender reassignment surgery

I would add "medically necessary"

---

**From:** Brad Young
**Sent:** Tuesday, December 06, 2016 9:57 AM
**To:** Blake Thomas; Mona Moon; Lotta Crabtree
**Cc:** Beth Horner
**Subject:** RE: State Health Plan board to cover gender reassignment surgery

I got a final follow up from the N&O. Would you agree with this statement?

PLAN DEF0007133

"Is it correct to say that this change to the State Health Plan "will allow coverage of gender dysphoria-related treatments, including transition surgery and hormone therapy"?"

Thanks,
Brad

---

**From:** Blake Thomas
**Sent:** Monday, December 05, 2016 5:03 PM
**To:** Mona Moon; Brad Young; Lotta Crabtree
**Cc:** Beth Horner
**Subject:** RE: State Health Plan board to cover gender reassignment surgery

A couple of changes below to clarify the technical back-and-forth on the vote. I also added the text of the final written motion, since it looked like the report might not have it. Brad, if you're asked, here are the names of the various people who made the motions referenced below: Paul Cunningham made the original motion; then, Neal Alexander moved to table the motion; and then, Aaron McKethan moved to make an amendment to the original motion. --Blake

1. Another source told me that the vote was split 4-4, with Ms. Cowell breaking the tie and one member of the board abstaining. Is that correct? No, but Treasurer Cowell broke a 4-4 tie vote on a procedural motion.

After the motion was introduced and seconded, one board member indicated a desire to postpone consideration of the motion until 2017. That board member then moved to table the original motion. On the motion to table, Treasurer Cowell broke a 4-4 tie in order to proceed with consideration of the original motion.

With debate then open on the original motion, another board member made a motion to amend, and that motion passed by unanimous consent. The amended motion then passed 7-0 with 1 abstention.

Later in the meeting, the board made a technical change to the motion's wording to ensure there was no ambiguity. The revised motion passed 6-0 with 1 abstention and 1 member absent from that portion of the meeting. Here is the final text of the motion:

"The NC State Health Plan removes the blanket exclusions that relate to treatment or studies

leading to or in connection with sex changes or modifications and related care; and psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation; resulting in the provision of medically necessary services for the treatment of gender dysphoria. This infers that the third-party administrator – Blue Cross Blue Shield - will utilize the existing approach to administrating this issue.

"Separately, the State Health Plan communicate with the Attorney General's office to fully explore any of the residual issues that may be relevant to this.

"With this resolution, the Board intends to ensure that the State Health Plan follows all applicable laws and regulations, but recognizes that the validity of the Federal Regulation and interpretation of related laws are currently the subject of litigation and may change over time. Therefore, the Board intends for this resolution to apply to the 2017 plan year.  It will be revisited in advance of the 2018 plan year."

2. It's my understanding that this vote will go into effect in January of 2017 and be in effect for one year until it is reconsidered, presumably in December 2017. Is that correct? Yes, the removal of the exclusion applies to the 2017 plan year only; however, a date for the Board to consider the benefit for the 2018 plan year has not been set, but is expected to occur earlier in the year than December 2017.

3. Lastly, does this decision specify any specific treatments that would be allowed, such as gender reassignment surgery? It's my understanding that the vote removes a previous exclusion of coverage for gender dysphoria-related medical treatments, but I wasn't sure if there were any specific treatments now allowed since the previous exclusion has been removed. See slides beginning at 19
 https://shp.nctreasurer.com/Board%20of%20Trustees%20Meeting%20Documents/3aii-1%20Coverage%20for%20Gender%20Dysphoria%20(final).pdf

---

**From:** Mona Moon
**Sent:** Monday, December 05, 2016 3:33 PM
**To:** Brad Young <Brad.Young@nctreasurer.com>; Lotta Crabtree <Lotta.Crabtree@nctreasurer.com>
**Cc:** Blake Thomas <Blake.Thomas@nctreasurer.com>; Beth Horner <Beth.Horner@nctreasurer.com>
**Subject:** RE: State Health Plan board to cover gender reassignment surgery

I revised #2.  The board will be asked to approve most benefit changes for 2018 by Feb 2017.  I don't necessarily expect this to come up for another vote that soon, unless the federal rule has been repealed or legal action has occurred to bring about re-consideration, but I would expect a decision on 2018 well before next December.

PLAN DEF0007135

Also I'm attaching several other documents that go with the 1557 presentation.  They are also on the website, but the titles aren't quite right and while we will be correcting that I didn't want there to be an issue with the N&O getting/finding the correct documents.  Please note the one attachment entitled BCBSNC corporate medical policy helps answer #3 regarding specific treatments and surgery.

**From:** Brad Young
**Sent:** Monday, December 05, 2016 3:18 PM
**To:** Mona Moon <Mona.Moon@nctreasurer.com>; Lotta Crabtree <Lotta.Crabtree@nctreasurer.com>
**Cc:** Blake Thomas <Blake.Thomas@nctreasurer.com>
**Subject:** FW: State Health Plan board to cover gender reassignment surgery

We got these follow ups from the N&O regarding Friday. Can you review and approve my drafted responses in red?

Thanks,

Brad

**From:** Iszler, Madison [mailto:miszler@newsobserver.com]
**Sent:** Monday, December 05, 2016 3:04 PM
**To:** Brad Young
**Subject:** Re: State Health Plan board to cover gender reassignment surgery

Okay, thanks! Questions are as follows:

1. Another source told me that the vote was split 4-4, with Ms. Cowell breaking the tie and one member of the board abstaining. Is that correct? No. There was a procedural vote to delay (table) the motion to a future meeting in which Treasurer Cowell broke the tie in order to proceed with consideration.

2. It's my understanding that this vote will go into effect in January of 2017 and be in effect for one year until it is reconsidered, presumably in December 2017. Is that correct? Yes, the removal of the exclusion applies to the 2017 plan year only; however, a date for the Board to consider the benefit

for the 2018 plan year has not been set, but is expected to occur earlier in the year than December 2017.


3. Lastly, does this decision specify any specific treatments that would be allowed, such as gender reassignment surgery? It's my understanding that the vote removes a previous exclusion of coverage for gender dysphoria-related medical treatments, but I wasn't sure if there were any specific treatments now allowed since the previous exclusion has been removed. See slides beginning at 19
 https://shp.nctreasurer.com/Board%20of%20Trustees%20Meeting%20Documents/3aii-1%20Coverage%20for%20Gender%20Dysphoria%20(final).pdf


Let me know if these questions make sense. Thanks so much for your help!


On Mon, Dec 5, 2016 at 2:47 PM, Brad Young < Brad.Young@nctreasurer.com> wrote:

Madison,


I'm unavailable by phone but can assist via email.


Brad


**From:** Iszler, Madison [mailto:miszler@newsobserver.com]
**Sent:** Monday, December 05, 2016 12:26 PM
**To:** Brad Young
**Subject:** Re: State Health Plan board to cover gender reassignment surgery


Hey Brad,


Thanks for the information. I have a few more questions, just left you a voicemail. Could you give me a call back when you have the chance? My cell is 954-809-4555.


Thanks!


- Madison

PLAN DEF0007137

On Sun, Dec 4, 2016 at 8:29 PM, Brad Young < Brad.Young@nctreasurer.com> wrote:

Madison,

Apologies for getting your email so late. I've attached a statement and some background below.

The State Health Plan Board, by a unanimous vote except for one abstention, voted to comply with the federal Department of Health and Human Services rule interpreting section 1557 of the Affordable Care Act for calendar year 2017.  This was consistent with actions taken by health plans in Indiana, Wyoming, Wisconsin, Kentucky and many other states. If the Plan did not take action to comply with the federal law and federal regulation, the Plan would have risked losing millions of dollars in federal funding and faced discrimination lawsuits for non-compliance.

I've included the following information for greater detail on the policy:

http://www.hhs.gov/about/news/2016/05/13/hhs-finalizes-rule-to-improve-health-equity-under-affordable-care-act.html

From DHHS:

"Under the final rule, categorical coverage exclusions or limitations for all health services related to gender transition are discriminatory.  Also, a covered entity cannot deny or limit coverage, deny or limit a claim, or impose additional cost sharing or other limitations or restrictions, for any specific health services related to gender transition if such denial, limitation or restriction results in discrimination against a transgender individual."

http://www.hhs.gov/civil-rights/for-individuals/section-1557/1557faqs/index.html

Brad Young

Press Secretary

Office of the State Treasurer

Phone: (919) 814-3822

Media Line: (919) 814-3820

PLAN DEF0007138

3200 Atlantic Avenue, Raleigh, NC 27604
www.NCTreasurer.com

E-mail correspondence to and from this address may be subject to the
North Carolina Public Records Law. It may be subject to monitoring and
disclosed to third parties, including law enforcement personnel, by an
authorized state official.
IMPORTANT: When sending confidential or sensitive information,
encryption should be used.

On Dec 4, 2016, at 1:59 PM, Iszler, Madison <miszler@newsobserver.com> wrote:

Hi Brad,

Hope you're doing well! Thanks again for coordinating the event with Janet at Lynn Road.
It was a neat event to cover.

I'm working on an article, slotted for tomorrow, about the board's vote on Friday to
eliminate an exclusion barring coverage for gender dysphoria-related medical treatments.
Could I ask you a question or two for the article?

If so, please give me a call at 954-809-4555. Thanks - hope I'm not interrupting your
weekend.

Best,

Madison

--

Madison Iszler | @madisoniszler
Reporter
The News & Observer

Office: 919-836-4952
Mobile: 954-809-4555

--

Madison Iszler | @madisoniszler
Reporter
The News & Observer

Office: 919-836-4952
Mobile: 954-809-4555

--

Madison Iszler | @madisoniszler
Reporter
The News & Observer

Office: 919-836-4952
Mobile: 954-809-4555

PLAN DEF0007140

# Exhibit 42



PLAINTIFF'S
EXHIBIT
3
8-3-21

**From:** Brad Young <Brad.Young@nctreasurer.com>
**Sent:** Thu, 08 Dec 2016 11:39:14 -0500
**To:** Mona Moon <Mona.Moon@nctreasurer.com>
**Subject:** RE: WUNC: Gender Dysphoria Coverage (noon deadline)

Thanks

**From:** Mona Moon
**Sent:** Thursday, December 08, 2016 11:27 AM
**To:** Brad Young; Lotta Crabtree
**Cc:** Beth Horner; Schorr Johnson
**Subject:** RE: WUNC: Gender Dysphoria Coverage (noon deadline)

Section 1557 of the Affordable Care Act (ACA) prohibits discrimination based on race, color, national origin, sex, age or disability in certain health programs and activities and has been in effect since the enactment of the ACA in 2010. The rule applies to any health program or activity, any part of which receives funding from the Department of Health and Human Services (HHS). The State Health Plan receives between $15 million and $20 million annually in federal Retiree Drug Subsidy.

Failure to comply with section 1157 may result in suspension of, termination of, or refusal to grant or continue to grant Federal financial assistance, i.e. loss of the Retiree Drug Subsidy. Failure to comply also makes the State Health Plan at risk of civil action filed by an individual to challenge a Section 1557 violation.

The estimated $350,000 to $850,000 cost associated with this benefit change is approximately 0.011% to 0.027% of the Plan's total $3.2 billion in annual premiums – meaning premiums would increase by less than 0.03%.

**From:** Brad Young
**Sent:** Thursday, December 08, 2016 10:13 AM
**To:** Lotta Crabtree <Lotta.Crabtree@nctreasurer.com>; Mona Moon

<Mona.Moon@nctreasurer.com>
Cc: Beth Horner <Beth.Horner@nctreasurer.com>; Schorr Johnson
<Schorr.Johnson@nctreasurer.com>
**Subject:** FW: WUNC: Gender Dysphoria Coverage (noon deadline)

Good morning,

Can you clarify her question on how much this affects overall health coverage spending?

Thanks,

Brad

---

**From:** Fitzgerald, Rebecca Martinez [mailto:rmartinez@wunc.org]
**Sent:** Thursday, December 08, 2016 9:29 AM
**To:** Press
**Subject:** WUNC: Gender Dysphoria Coverage (noon deadline)

Mr. Young and colleagues,

I'm writing to request a short phone interview this morning about the State Health Plan's decision to cover gender dysphoria treatments. I've read the Segal Consulting report that this coverage could cost the state up to $850,000 dollars annually. I'd like to ask how much this affects overall health coverage spending, and why it makes sense for the state to comply with this particular ACA requirement.

My deadline is noon today. If no one is available for a phone call, please send a written statement here.

Thank you for your help!

**Rebecca Martinez**

PLAN DEF0029556

Morning Edition Producer

North Carolina Public Radio, WUNC

(919) 445-9246

rmartinez@wunc.org

PLAN DEF0029557

# Exhibit 43



**BlueCross BlueShield
of North Carolina**

An independent licensee of the Blue Cross and Blue Shield Association

# Corporate Medical Policy

# Gender Confirmation Surgery and Hormone Therapy
# "Notification"

**File Name:** gender_confirmation_surgery_and_hormone_therapy
**Origination:** 7/2011
**Last CAP Review:** 11/2015
**Next CAP Review:** 11/2016
**Last Review:** 9/2016

# Policy Effective January 1, 2017

## Description of Procedure or Service

Gender Identity Dysphoria (GID) is the formal diagnosis used by professionals to describe persons who experience significant gender dysphoria (discontent with their biological sex and/or birth gender). Although it is a psychiatric classification, GID is not medically classified as a mental illness.

In the U.S., the American Psychiatric Association (APA) permits a diagnosis of gender dysphoria in adolescents and adults if the diagnostic criteria in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, (DSM-5™) are met. The criteria are:

    A.  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six month's duration, as manifested by at least **two** of the following:

        1.  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics); **OR**
        2.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics; **OR**
        3.  A strong desire for the primary and/or secondary sex characteristics of the other gender; **OR**
        4.  A strong desire to be of the other gender (or some alternative gender different from one's assigned gender); **OR**
        5.  A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender); **OR**
        6.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender); **AND**

    B.  The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Gender dysphoria is a medical condition when the elements of the condition noted above are present. Gender confirmation surgery is one treatment option. Gender Confirmation Surgery (GCS) is not a single procedure, but part of a complex process involving multiple medical,

An Independent Licensee of the Blue Cross and Blue Shield Association

psychiatric, and surgical modalities performed in conjunction with each other to help the candidate for gender reassignment achieve successful behavioral and medical outcomes. Before undertaking GCS, candidates need to undergo important medical and psychological evaluations, and begin medical/hormonal therapies and behavioral trials to confirm that surgery is the most appropriate treatment choice. GCS presents significant medical and psychological risks, and the results are irreversible.

***Note: This Medical Policy is complex and technical. For questions concerning the technical language and/or specific clinical indications for its use, please consult your provider.*

## Policy

**Services for gender confirmation surgery and hormone therapy may be considered medically necessary when the criteria below are met.**

**Please see the following section "Benefits Application" regarding specific benefit and medical management requirements.**

## Benefits Application

**Gender confirmation surgery and hormone therapy may be specifically excluded under some health benefit plans. Please refer to the Member's Benefit Booklet for availability of benefits.**

**When benefits for gender confirmation surgery and hormone therapy are available, coverage may vary according to benefit design. Some benefit designs for gender confirmation surgery may include benefits for pelvic and/or breast reconstruction. Member benefit language specific to gender confirmation should be reviewed before applying the terms of this medical policy. This medical policy relates only to the services or supplies described herein.**

**Prior review and certification are required by most benefit plans, and when required, must be obtained or services will not be covered. Some benefit plans provide coverage without a requirement for prior approval or medical necessity review. Please refer to the Member's Benefit Booklet for specific prior approval or medical necessity review requirements.**

**If prior authorization and medical necessity review are required for hormone therapy, and related surgical procedures for the treatment of gender identity dysphoria, the medical criteria and guidelines shown below will be utilized to determine the medical necessity for the requested procedure or treatment.**

## When Gender Confirmation Surgery and Hormone Therapy is covered

Gender confirmation surgery and hormone therapy may be considered medically necessary when all the following candidate criteria are met and supporting provider documentation is provided:

**Candidate Criteria for Adults and Adolescents age 18 years and Older (based on World Professional Association for Transgender Health (WPATH) Standards of Care):**

1. The candidate is at least 18 years of age; and
2. Has been diagnosed with GID, including meeting all of the following indications:
   a. The desire to live and be accepted as a member of the opposite sex,

An Independent Licensee of the Blue Cross and Blue Shield Association

PLAN DEF0008645

- Typically accompanied by the desire to make the physical body as congruent as possible with the identified sex through surgery and hormone treatment; and
  b. The new gender identity has been present for at least 24 months; and
  c. The gender identity dysphoria is not a symptom of a mental disorder or a chromosomal abnormality; and
  d. The gender identity dysphoria causes clinical or social distress or impairment in social, occupational, or other important areas of functioning.
3. For those candidates without a medical contraindication, the candidate has undergone a minimum of 12 months of continuous hormonal therapy that is (Note: for those candidates requesting female to male surgery see item 4. below):
   a. Recommended by a mental health professional and
   b. Provided under the supervision of a physician; and the supervising physician indicates that the patient has taken the hormones as directed.
4. For candidates requesting <u>female to male surgery only</u>:
   a. When the initial requested surgery is solely a mastectomy, the treating physician may indicate that no hormonal treatment (as described in criteria 3. above) is required prior to performance of the mastectomy. In this case, the 12 month requirement for hormonal treatment will be waived only when all other criteria contained in this policy and in the member's health benefit plan are met.
5. The candidate has completed a minimum of 12 months of successful continuous full time real-life experience in their new gender, with no returning to their original gender. This requirement must be demonstrated by living in their new gender while:
   a. Maintaining part- or full-time employment; or
   b. Functioning as a student in an academic setting; or
   c. Functioning in a community-based volunteer activity as applicable. (For those candidates not meeting this criteria, see item 6. below.)
6. If the candidate does not meet the 12 month time frame criteria as noted in item 5. above, then the treating clinician must submit information indicating why it would be clinically inappropriate to require the candidate to meet these criteria. When submitted, the criteria in item 5. will be waived unless the criteria noted in item 5. above are specified as required in the candidate's health benefit plan.

### <u>Provider Documentation Criteria for Surgical and Hormone Therapy:</u>

The treating clinicians must provide the following documentation. The documentation must be provided in letters from the appropriate clinicians and contain the information noted below.
1. The letters must attest to the psychological aspects of the candidate's GID.
   a. One of the letters must be from a behavioral health professional with an appropriate degree (Ph.D., M.D., Ed.D., D.Sc., D.S.W., psychiatric physician assistant, Psy.D, or psychiatric nurse practitioner under the supervision of a psychiatrist) who is capable of adequately evaluating if the candidate has any co-morbid psychiatric conditions.
   b. One of the letters must be from the candidate's established physician or behavioral health provider. The letter or letters must document the following:
      1. Whether the author of the letter is part of a gender identity dysphoria treatment team and/or follows WPATH Standards of Care or Endocrine Society Guidelines for the Treatment of Transsexual Persons (2009) for evaluation and treatment of gender identity dysphoria; and
      2. The initial and evolving gender, sexual, and other psychiatric diagnoses (if applicable); and
      3. The duration of their professional relationship including the type evaluation that the candidate underwent; and
      4. The eligibility criteria that have been met by the candidate according to the above Standards of Care; and

An Independent Licensee of the Blue Cross and Blue Shield Association

5. The physician or mental health professional's rationale for hormone therapy and/or surgery; and
6. The degree to which the candidate has followed the treatment and experiential requirements to date and the likelihood of future compliance; and
7. The extent of participation in psychotherapy throughout the 12 month real-life trial, (if such therapy is recommended by a treating medical or behavioral health practitioner) and
8. That during the 12 month, real-life experience (for candidates not meeting the 12 month candidate criteria as noted in 6 and 7, the letter should still comment on the candidates ability to function and experience in the desired gender role), persons other than the treating therapist were aware of the candidate's experience in the desired gender role and could attest to the candidate's ability to function in the new role.
9. That the candidate has, intends to, or is in the process of acquiring a legal gender-identity-appropriate name change and
10. Demonstrable progress on the part of the candidate in consolidating the new gender identity, including improvements in the ability to handle:
    - Work, family, and interpersonal issues
    - Behavioral health issues, should they exist.

c. If the letters specified in 1a and 1b above come from the same clinician, then a letter from a second physician or behavioral health provider familiar with the candidate corroborating the information provided by the first clinician is required.

d. For members requesting surgical treatment, a letter of documentation must be received from the treating surgeon. If one of the previously described letters is from the treating surgeon then it must contain the documentation noted in the section below. All letters from a treating surgeon must confirm that:
1. The candidate meets the "candidate criteria" listed in this policy and
2. The treating surgeon feels that the candidate is likely to benefit from surgery and
3. The surgeon has personally communicated with the treating mental health provider or physician treating the candidate, and
4. The surgeon has personally communicated with the candidate and the candidate understands the ramifications of surgery, including:
   - The required length of hospitalizations,
   - Possible complications of the surgery, and
   - The post surgical rehabilitation requirements of the various surgical approaches and the planned surgery.

## Candidate Criteria for Children and Adolescents under Age 18 years

Pubertal delay and gender affirming hormone therapy may be considered medically necessary when all the following candidate criteria are met and supporting provider documentation is provided:

## Candidate Criteria (based on World Professional Association for Transgender Health (WPATH) Standards of Care):

1. The patient has been diagnosed with GID, including meeting all of the following indications:
   a. The desire to live and be accepted as a member of the opposite sex,
      - Typically accompanied by the desire to make the physical body as congruent as possible with the identified sex through surgery and hormone treatment; and
   b. The gender identity dysphoria is not a symptom of a mental disorder or a chromosomal abnormality; and

An Independent Licensee of the Blue Cross and Blue Shield Association

PLAN DEF0008647

    c.   The gender identity dysphoria causes clinical or social distress or impairment in social, occupational, or other important areas of functioning.

2. The candidate has completed a minimum of 12 months of successful continuous full time real-life experience in their new gender, with no returning to their original gender. This requirement must be demonstrated by living in their new gender while:
   a. Maintaining part- or full-time employment; or
   b. Functioning as a student in an academic setting; or
   c. Functioning in a community-based volunteer activity as applicable. (For those candidates not meeting this criteria, see item 3. below.)
3. If the candidate does not meet the 12 month time frame criteria as noted in item 2. above, then the treating clinician must submit information indicating why it would be clinically inappropriate to require the candidate to meet these criteria. When submitted, the criteria in item 2. will be waived unless the criteria noted in item 2. above are specified as required in the candidate's health benefit plan.

### Provider Documentation Criteria for Pubertal Delay and Gender Affirming Hormonal Therapy:

The treating clinicians must provide the following documentation. The documentation must be provided in letters from the appropriate clinicians and contain the information noted below.

1. The letters must attest to the psychological aspects of the candidate's GID.
   a. One of the letters must be from a behavioral health professional with an appropriate degree (Ph.D., M.D., Ed.D., D.Sc., D.S.W., psychiatric physician assistant, Psy.D, or psychiatric nurse practitioner under the supervision of a psychiatrist) who is capable of adequately evaluating if the candidate has any co-morbid psychiatric conditions.
   b. One of the letters must be from the candidate's established physician or behavioral health provider. The letter or letters must document the following:
      1. Whether the author of the letter is part of a gender identity dysphoria treatment team and/or follows WPATH Standards of Care or Endocrine Society Guidelines for the Treatment of Transsexual Persons (2009) for evaluation and treatment of gender identity dysphoria; and
      2. The initial and evolving gender, sexual, and other psychiatric diagnoses (if applicable); and
      3. The duration of their professional relationship including the type evaluation that the candidate underwent; and
      4. The eligibility criteria that have been met by the candidate according to the above Standards of Care; and
      5. The physician or mental health professional's rationale for hormone therapy; and
      6. The degree to which the candidate has followed the treatment and experiential requirements to date and the likelihood of future compliance; and
      7. The extent of participation in psychotherapy throughout the 12 month real-life trial, (if such therapy is recommended by a treating medical or behavioral health practitioner); and
      8. That during the 12 month, real-life experience (for candidates not meeting the 12 month candidate criteria as noted in 6 and 7, the letter should still comment on the candidates ability to function and experience in the desired gender role), persons other than the treating therapist were aware of the candidate's experience in the desired gender role and could attest to the candidate's ability to function in the new role.

### Prepubertal children do not require medical or surgical treatment, but do require mental health services as listed above.

An Independent Licensee of the Blue Cross and Blue Shield Association

PLAN DEF0008648

# Gender Confirmation Surgery and Hormone Therapy "Notification"

**Criteria for Adolescents Entering Puberty**

Adolescents, having reached puberty (tanner 2), and who have met eligibility and readiness criteria can be treated with GnRH analogues.

The definition of puberty is having reached Tanner stage 2/5 and/or having LH, estradiol levels or testosterone levels, within the pubertal range. These LH, estradiol and testosterone ranges are well-known and published and are broken down by biological male vs. biological female Tanner stage, and nocturnal and diurnal levels.

Adolescents are *eligible* for GnRH treatment, (for suppression of puberty) by these eligibility criteria: (same for adults)

1. Have an established diagnosis for GID or transsexualism based on DSM V or ICD-10 criteria;
2. Have experienced puberty to at least Tanner stage 2, which can be confirmed by pubertal levels of LH, estrogen or testosterone;
3. Have experienced pubertal changes that resulted in an increase of their gender dysphoria;
4. Do not suffer from psychiatric comorbidity (that interferes with the diagnostic work-up or treatment);
5. Have adequate psychological and social support during treatment, to include having parental/guardian consent;
6. Demonstrate knowledge and understanding of the expected outcomes of GnRH analogue treatment, cross-sex hormone treatment, and gender confirmation surgeries, as well as the medical and social risks and benefits of gender reassignment; and have been counseled regarding fertility options.

**Criteria for Postpubertal Adolescents under the Age of 18 Years**

Post-pubertal adolescents under age 18 must meet the same criteria and documentation requirements for treatment as listed above for adults. If those criteria are met, they are eligible for gender affirmation hormonal treatment and treatment for menstrual suppression when gender affirming hormones are not successful in eliminating menses.

Gender confirmation surgery is rarely appropriate for patients under the age of 18. Requests for mastectomy for female to male transgender individuals age 17 or older may be considered only in exceptional circumstances on an individual consideration basis.

## When Gender Confirmation Surgery and Hormone Therapy are not covered

Gender Confirmation Surgery and hormone therapy are non-covered benefits when the member does not have benefits for the services requested contained in their health benefit plan.

Gender Confirmation Surgery and hormonal therapy are considered not medically necessary for plans offering gender confirmation services when the candidate criteria and provider documentation criteria are not met.

Gender Confirmation Surgery Exclusions:

Services and procedures that are considered Cosmetic in all benefit plans are considered non-covered benefits, including but not limited to:

- Cosmetic services that may be used for gender confirmation, including, but not limited to, procedures such as: plastic surgery of the nose; face lift; lip enhancement; facial bone reduction; plastic surgery of the eyelids; liposuction of the waist; reduction of the thyroid cartilage; hair removal; hair transplants; and surgery of the larynx, including shortening of the vocal cords; chin implants; nose implants, and lip reduction.
- Fertility preservation, including but not limited to: sperm banking and embryonic freezing.

An Independent Licensee of the Blue Cross and Blue Shield Association

PLAN DEF0008649

# Gender Confirmation Surgery and Hormone Therapy
## "Notification"

Autologous tissue flap breast reconstructions are considered not medically necessary for gender confirmation surgery.

## Policy Guidelines

Gender confirmation surgery and hormone therapy have been shown to be of benefit to transsexual people. Recognized diagnostic and eligibility criteria and care standards for applicants from the World Professional Association for Transgender Health (WPATH) and Endocrine Society Guidelines for Treatment of Transsexual Persons are increasingly being used in routine clinical practice.

## Billing/Coding/Physician Documentation Information

This policy may apply to the following codes. Inclusion of a code in this section does not guarantee that it will be reimbursed. For further information on reimbursement guidelines, please see Administrative Policies on the Blue Cross Blue Shield of North Carolina web site at www.bcbsnc.com. They are listed in the Category Search on the Medical Policy search page.

*ICD-10 diagnosis codes: F64.0, Z87.890*

*Applicable codes: 19304, 19316, 19318, 19324, 19325, 19340, 54400, 54401, 54405, 54406, 54408, 54410, 54411, 54415, 54416, 54417, 54660, 55175, 55180, 55970, 55980, 56800, 56805, 57291, 57292, 57295, 57296, 57335, C1813, C2622, J1950, J3315, J9217, J9219, J9226.*

*Applicable non-covered procedure codes, including, but not limited to: 11950, 11951, 11952, 11954, 15775, 15776, 15780, 15781, 15782, 15783, 15786, 15787, 15788, 15789, 15792, 15793, 15820, 15821, 15822, 15823, 15824, 15825, 15826, 15828, 15829, 15830, 15832, 15833, 15834, 15835, 15836, 15837, 15838, 15839, 15876, 15877, 15878, 15879, 17380, 21120, 21121, 21122, 21123, 21125, 21127, 21208, 21210, 21270, 30400, 30410, 30420, 30430, 30435, 30450, 67900, 92507, 92508.*

BCBSNC may request medical records for determination of medical necessity. When medical records are requested, letters of support and/or explanation are often useful, but are not sufficient documentation unless all specific information needed to make a medical necessity determination is included.

## Scientific Background and Reference Sources

Diagnostic and Statistical Manual of Mental Disorders Fourth Edition. Text Revision (DSM-IV-TR). American Psychiatric Association. American Psychiatric Association, Inc. July 2000

Harry Benjamin International Gender Dysphoria Association, Inc (2001). Standards of Care for Gender Identity Disorders—Sixth Version. *International Journal of Transgenderism 5 (1)*. Available at: http://www.symposion.com/ijt/soc_2001/index.htm

Day P. Trans-gender Reassignment Surgery. Tech Brief Series. New Zealand Health Technology Assessment. NZHTA Report February 2002, volume 1, Number 1. Available at: http://nzhta.chmeds.ac.nz/publications/trans_gender.pdf

Medical Director review, July 2011

The World Professional Association for Transgender Health; Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People; 7th Version; July 2012. Accessed at

An Independent Licensee of the Blue Cross and Blue Shield Association

PLAN DEF0008650

# Gender Confirmation Surgery and Hormone Therapy
## "Notification"

http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=4655 on 9/21/2016.

Specialty Matched Consultant Advisory Panel 12/2012

American Psychiatric Association (APA). Gender dysphoria. *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5™)*. Arlington, VA: American Psychiatric Publishing; 2013: 451-459.

American College of Obstetricians and Gynecologists (ACOG). Healthcare for transgender individuals. Committee Opinion. No 512. December 2011. Obstet Gynecol 2011; 118:1454-8.

Hembree WC, Cohen-Kettenis P, et al. Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. September 2009, 94(9):3132–3154. Accessed at http://press.endocrine.org/doi/pdf/10.1210/jc.2009-0345 on 9/21/2016.

Specialty Matched Consultant Advisory Panel 11/2014

Specialty Matched Consultant Advisory Panel 11/2015

Specialty Matched Consultant Advisory Panel 9/2016

Senior Medical Diector review 9/2016

## Policy Implementation/Update Information

7/19/11    New policy developed. When benefits for gender reassignment surgery are available, coverage may vary. Some benefit plans provide coverage without a requirement for prior approval or medical necessity review. Benefits for upper and/or lower body gender reassignment procedures vary by benefit plan. If prior authorization and medical necessity review are required for hormone therapy, breast augmentation surgery (mammoplasty), and mastectomy for the treatment of gender identity disorders, the medical criteria and guidelines outlined in the policy will be utilized to determine the medical necessity for the requested procedure or treatment. (adn)

9/18/12    Added diagnosis codes 302.0, 302.5, 302.50 – 302.53, 302.6, 302.85, 302.9, 313.82, 752.7 to Billing/Coding section. (sk)

1/1/13    Reference added. Specialty Matched Consultant Advisory Panel review 12/4/12. No change to policy statement. (sk)

7/1/13    ICD-10 diagnosis codes added to Billing/Coding section. (sk)

10/29/13    Reference added. Replaced DSM-IV TR criteria with DSM-5™ criteria. Removed "Sex change surgical procedures other than breast augmentation surgery (mammoplasty) and mastectomy" from the When Not Covered section. Added "pelvic reconstruction" to the When Covered section. Applicable Service Codes removed from Billing/Coding section. Senior Medical Director review. (sk)

7/1/14    Removed ICD-10 effective date from Billing/Coding section. (sk)

An Independent Licensee of the Blue Cross and Blue Shield Association

PLAN DEF0008651

# Gender Confirmation Surgery and Hormone Therapy
## "Notification"

12/9/14   Reference added.  Specialty Matched Consultant Advisory Panel review 11/24/14.  No change to policy statement.  (sk)

12/30/15  Specialty Matched Consultant Advisory Panel review 11/18/2015.  (sk)

9/30/16   Policy re-titled to Gender Confirmation Surgery and Hormone Therapy. Information regarding coverage of services for adolescents added to the "When Covered" section. Fertility preservation, including but not limited to:  sperm banking and embryonic freezing added to Non-covered section.  ICD 9 codes removed from Billing/Coding section.  ICD 10 codes, covered codes and non-covered codes added to Billing/Coding section.  Policy noticed 10/1/2016 for policy effective date 1/1/2017. (sk)

---

Medical policy is not an authorization, certification, explanation of benefits or a contract. Benefits and eligibility are determined before medical guidelines and payment guidelines are applied. Benefits are determined by the group contract and subscriber certificate that is in effect at the time services are rendered. This document is solely provided for informational purposes only and is based on research of current medical literature and review of common medical practices in the treatment and diagnosis of disease. Medical practices and knowledge are constantly changing and BCBSNC reserves the right to review and revise its medical policies periodically.

An Independent Licensee of the Blue Cross and Blue Shield Association

PLAN DEF0008652

# Exhibit 44

| From: | Chris Almberg [chris.almberg@nctreasurer.com] |
|---|---|
| Sent: | 3/30/2017 12:22:19 PM |
| To: | chris.almberg@gmail.com |
| BCC: | clarke.wallace@benefitfocus.com; WOwen@medcost.com; Cathryn.scivicque@itedium.com; Carl_p_hill@uhc.com; Sarah.Smith@CVSHealth.com; aimee.forehand@bcbsnc.com; joyce.swetlick@dhhs.nc.gov; sally.herndon@dhhs.nc.gov; pete@rivalhealth.com; Chad.Paddock@rivalhealth.com; wmuribholmes@activehealth.net |
| Subject: | ACA Section 1557 Compliance Questionnaire |
| Attachments: | SHP 1557 Vendor Questionnaire - FINAL.docx |

The State Health Plan is evaluating its compliance with federal disability access requirements of the Americans with Disabilities Act (ADA), the Rehabilitation act of 1973 (Rehabilitation Act), Section 1557 of the Affordable Care Act (Section 1557), and other applicable federal law. As a recipient of federal funding, the Plan is required to comply with these and all applicable federal laws. As a contractor of the Plan, you are also required to comply with all laws that apply to the Plan, as stated in our contract.

To that end, we are requesting that you complete the attached questionnaire in order to help the Plan assess your current compliance with the above-named regulations and laws.

Please complete and return the questionnaire by May 1, 2017. Thank you, and please don't hesitate to contact me if you have any questions.

**Chris Almberg**
*Compliance Officer*
State Health Plan
Office: (919) 814-4428



3200 Atlantic Avenue, Raleigh, NC 27604
wwww.SHPNC.org

 





STATE TREASURER OF NORTH CAROLINA
DALE R. FOLWELL, CPA

E-mail correspondence to and from this address may be subject to the North Carolina Public Records Law. It may be subject to monitoring and disclosed to third parties, including law enforcement personnel. by an authorized state official.

IMPORTANT. When sending confidential or sensitive information, encryption should be used.



3200 Atlantic Avenue • Raleigh, NC 27604 • Phone: 919-814-4400 • Fax: 919-814-5817 • www.shpnc.org

March 30, 2017

Please complete and return the below questionnaire in order to help the State Health Plan assess your organization's current compliance with federal law.

Thank you for your assistance.

Sincerely,

Chris Almberg
Compliance Officer
State Health Plan
Phone: (919) 814-4428

| Question | Yes | No | Comments |
|---|---|---|---|
| 1. Is your organization considered a "Covered Entity" for purposes of Section 1557 of the Affordable Care Act (ACA)? If no, please explain why not. | | | |
| 2. Does your organization understand that the North Carolina State Health Plan is a Covered Entity and is required to comply with applicable portions of Section 1557? | | | |
| **Language Assistance** | | | |
| 3. Has your organization developed and implemented a language access plan for those with limited English proficiency (LEP)? | | | |
| 4. Please describe the steps your organization has taken to provide individuals with limited English proficiency meaningful access to health programs or activities. | | | |
| 5. Does your organization offer, free of charge, the services of a qualified interpreter when reasonable for oral communications? Please describe the process used to determine whether an individual needs an interpreter. | | | |



| | | | |
|---|---|---|---|
| 6. Has your organization taken steps to assure that children are not asked to serve as interpreters for a family member? | | | |
| 7. Does your organization use a qualified translator for written content in paper or electronic form? If yes, please describe how the translator is selected and which documents are translated. | | | |
| 8. How do you assess the spoken language proficiency of your staff and interpreters who provide language assistance to individuals with LEP? | | | |
| **Notices and Taglines** | | | |
| 9. Has your organization posted notices of nondiscrimination and taglines, in certain physical locations and on its website, that alert individuals with limited English proficiency to the availability of language assistance services? | | | |
| 10. Please confirm that your organization includes the notice of nondiscrimination and taglines with significant publications and communications. | | | |
| **Assistance to Individuals with a Disability** | | | |
| 11. Has your organization made reasonable modifications in policies, practices, and procedures to avoid disability-based discrimination? | | | |
| 12. Does your organization have an effective compliance plan that meets Americans with Disabilities Act (ADA) guidelines? | | | |
| 13. Please describe the steps your organization has taken to ensure effective communication with people with disabilities. | | | |

KADEL00223710

| | | | |
|---|---|---|---|
| 14. Has your organization performed an assessment of its website or other electronic communication methods, to ensure that they are accessible to people with disabilities and compliant with the accessibility requirements of Title II of the ADA? If yes, please note when this assessment was last performed, and by whom. | | | |
| 15. Please confirm that your organization provides, free of charge, appropriate auxiliary aids and services to people with impaired sensory, manual, or speaking skills (e.g., TTY device). | | | |
| 16. Please confirm that your organization gives primary consideration to the choice of aid or service requested by the person who has a disability. | | | |
| **Physical Accessibility** | | | |
| 17. Do you have an Americans with Disabilities Act Accessibility Guidelines (ADAAG) Transition Plan? | | | |
| **Gender Coverage** | | | |
| 18. Has your organization modified its coding to address gender-coding mismatch? Please describe. | | | |
| 19. 1557 does not permit denying or limiting health services to a transgender individual based on the fact that the individual's sex assigned at birth, gender identity, or gender otherwise recorded is different from the one to which such health services are ordinarily or exclusively available. Please confirm that your organization does not deny or limit health services that are ordinarily or exclusively available to individuals of one sex. | | | |
| **General Nondiscrimination** | | | |
| 20. Does your organization administer coverage or benefits in any way that discriminates on the basis of race, color, national origin, sex, age, or | | | |

| | | | |
|---|---|---|---|
| disability? | | | |
| 21. Has your organization implemented any marketing practices or benefit designs that discriminate on the basis of race, color, national origin, sex, age, or disability? | | | |
| 22. Does your organization deny or limit coverage, or impose additional cost sharing or other limits, on the basis of race, color, national origin, sex, age, or disability? | | | |

KADEL00223712

| | | | |
|---|---|---|---|
| **Compliance Coordinator and Grievance Process** | | | |
| 23. Has your organization appointed and trained at least one Section 1557 coordinator to coordinate your efforts to comply with and carry out your responsibilities under Section 1557? | | | |
| 24. Has your organization adopted a grievance procedure that incorporates appropriate due process standards and provides prompt and equitable resolution of grievances under Section 1557? | | | |

[ KEYWORDS ]

KADEL00223713

# Exhibit 45

**From:** Caroline Smart <Caroline.Smart@nctreasurer.com>
**Sent:** Fri, 04 Aug 2017 09:34:42 -0400
**To:** 'Aimee Forehand' <Aimee.Forehand@bcbsnc.com>
**Subject:** RE: Hold Harmless

---

That would be great.


Thanks.

---

**From:** Aimee Forehand [mailto:Aimee.Forehand@bcbsnc.com]
**Sent:** Friday, August 04, 2017 9:34 AM
**To:** Caroline Smart <Caroline.Smart@nctreasurer.com>
**Subject:** Hold Harmless


Hi Caroline-


I have confirmed with Brian that you would need to sign a hold harmless if the plan decided not to cover gender dysphoria.

Do you want me to go ahead and get a copy of that document?


Aimee

Confidentiality Notice: This message is intended only for the use of the individual or entity to which it is addressed. This communication may contain individual protected health information ("PHI") that is subject to protection under state and federal laws, or other privileged, confidential or proprietary information of Blue Cross and Blue Shield of North Carolina that may not be further disclosed. if you are not the intended recipient, or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer. Thank you.

PLAN DEF0069016

# Exhibit 46

**From:** Andrew Norton <andrew.norton@nctreasurer.com>
**Sent:** Thu, 28 Sep 2017 10:05:48 -0400
**To:** Dee Jones <Dee.Jones@nctreasurer.com>
**Subject:** RE: Medical Policy Development #$*

Thanks for this.

**Andrew J. Norton**
*Assistant General Counsel*
Office of the State
Treasurer
Office: (919) 814-3815

3200 Atlantic Avenue,
Raleigh, NC 27604
www.NCTreasurer.com



NORTH CAROLINA
DEPARTMENT OF STATE TREASURER

STATE TREASURER OF NORTH CAROLINA
DALE R. FOLWELL, CPA

E-mail correspondence to and from this address is subject
to North Carolina's Public Records Act, N.C. Gen. Stat.
Sec. 132, and may be disclosed to third parties. However
Federal and State law protects personal health and other
information that may be contained in this e-mail from
unauthorized disclosure. If you are not the intended
recipient, please delete this e-mail and any accompanying
documents and contact the sender immediately.
Unauthorized disclosure, copying or distribution of any
confidential or privileged content of this e-mail is prohibited.

---

**From:** Dee Jones
**Sent:** Thursday, September 28, 2017 9:48 AM
**To:** Andrew Norton <andrew.norton@nctreasurer.com>
**Subject:** FW: Medical Policy Development #$*

I met with Susan yesterday and we discussed this topic and I asked for the BCBS Medical Policy
policy and how something becomes incorporated into their Medical Policy using gd as an example.
See below...

PLAN DEF0073378

**Dee Jones**
*Executive Administrator*
State Health Plan
Office: (919) 814-4407

3200 Atlantic Avenue, Raleigh,
NC 27604
wwww.SHPNC.org





E-mail correspondence to and from this address is subject to
North Carolina's Public Records Act, N.C. Gen. Stat. Sec.
132, and may be disclosed to third parties. However Federal
and State law protects personal health and other information
that may be contained in this e-mail from unauthorized
disclosure. If you are not the intended recipient, please delete
this e-mail and any accompanying documents and contact the
sender immediately. Unauthorized disclosure, copying or
distribution of any confidential or privileged content of this e-
mail is prohibited.

**From:** Susan Murray [mailto:Susan.Murray@bcbsnc.com]
**Sent:** Wednesday, September 27, 2017 2:53 PM
**To:** Dee Jones <Dee.Jones@nctreasurer.com>
**Cc:** Aimee Forehand <Aimee.Forehand@bcbsnc.com>
**Subject:** Medical Policy Development #$*

Hi, Dee. It was good to see you this morning!

Following up on our discussion about the gender dysphoria medical policy, I've attached some
general information about our overall medical policy development, maintenance and
communication. In addition, following is some information specific to the development of our policy
for gender dysphoria:

This specific policy was developed using the following Scientific Background and Reference
Sources:

PLAN DEF0073379

Diagnostic and Statistical Manual of Mental Disorders Fourth Edition. Text Revision (DSM-IV-TR). American Psychiatric Association. American Psychiatric Association, Inc. July 2000

Harry Benjamin International Gender Dysphoria Association, Inc (2001). Standards of Care for Gender Identity Disorders—Sixth Version. International Journal of Transgenderism 5 (1). Available at:

http://www.symposion.com/ijt/soc_2001/index.htm

Day P. Trans-gender Reassignment Surgery. Tech Brief Series. New Zealand Health Technology Assessment. NZHTA Report February 2002, volume 1, Number 1. Available at:

http://nzhta.chmeds.ac.nz/publications/trans_gender.pdf

Medical Director review, July 2011

Specialty Matched Consultant Advisory Panel 12/2012

Specialty Matched Consultant Advisory Panel 11/2014

Specialty Matched Consultant Advisory Panel 11/2015

The World Professional Association for Transgender Health; Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People; 7th Version; July 2012. Accessed at http://www.tmeltzer.com/assets/wpathsocv7.pdf

on 9/21/2016.

American Psychiatric Association (APA). Gender dysphoria. Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5™). Arlington, VA: American Psychiatric Publishing; 2013: 451-459.

American College of Obstetricians and Gynecologists (ACOG). Healthcare for transgender individuals. Committee Opinion. No 512. December 2011. Obstet Gynecol 2011; 118:1454-8.

Hembree WC, Cohen-Kettenis P, et al. Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. September 2009, 94(9):3132–3154. Accessed 9/2016.

Specialty Matched Consultant Advisory Panel 9/2016

PLAN DEF0073380

Senior Medical Director review 9/2016

We will get updated claim information to you in early-November. Let me know if you need more information.

Thanks-

Susan

Susan Murray | Vice President State Segment

919.765.1669 | 919.943.7081 | susan.murray@bcbsnc.com



Confidentiality Notice: This message is intended only for the use of the individual or entity to which it is addressed. This communication may contain individual protected health information ("PHI") that is subject to protection under state and federal laws, or other privileged, confidential or proprietary information of Blue Cross and Blue Shield of North Carolina that may not be further disclosed. If you are not the intended recipient, or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer. Thank you.

# Exhibit 47

**From:** Caroline Smart <Caroline.Smart@nctreasurer.com>
**Sent:** Wed, 06 Dec 2017 10:44:02 -0500
**To:** Andrew Norton <andrew.norton@nctreasurer.com>, Ted Enarson
<Ted.Enarson@nctreasurer.com>, Dee Jones <Dee.Jones@nctreasurer.com>
**Subject:** FW: Gender Transition Services Amendment
**Attachments:**
· Gender Transition Services Amendment.docx *(31 kb)*

How would you like me to respond?

---

**From:** Aimee Forehand [mailto:Aimee.Forehand@bcbsnc.com]
**Sent:** Wednesday, December 06, 2017 10:00 AM
**To:** Caroline Smart <Caroline.Smart@nctreasurer.com>
**Cc:** Susan Murray <Susan.Murray@bcbsnc.com>
**Subject:** Gender Transition Services Amendment


Caroline-


Per your email confirming you do not want to cover gender transition services for 2018, we will
need to execute an amendment in order to update the benefits for 2018. I know we had discussed
this process with the Plan previously. Please review the attached (this is the same document we
sent in August) and let us know if you have any revisions you would like us to consider. We cannot
change the coding for this benefit until we have an executed document so if you can send any edits
back to us as soon as possible we will move things along quickly on our end.


Thanks,

Aimee


Aimee Forehand | Client Manager

Office 919.765.4899 | Cell 203.873.9117 | Aimee.Forehand@bcbsnc.com


 NC

PLAN DEF0071731

Confidentiality Notice: This message is intended only for the use of the individual or entity to which it is addressed. This communication may contain individual protected health information ("PHI") that is subject to protection under state and federal laws, or other privileged, confidential or proprietary information of Blue Cross and Blue Shield of North Carolina that may not be further disclosed. If you are not the intended recipient, or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer. Thank you.

PLAN DEF0071732

# AMENDMENT NUMBER <mark>TBD</mark>
## TO THE
## THIRD PARTY ADMINISTRATION SERVICES CONTRACT
## AND
## AGREEMENT TO HOLD HARMLESS, INDEMNIFY, AND DEFEND

THIS AMENDMENT ("Amendment") to the Third Party Administration Services Contract ("TPA Contract" or "Contract"), dated the 20th day of August, 2012, is between the North Carolina State Health Plan for Teachers and State Employees ("Plan") and BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA ("BCBSNC" or "Contractor"), each, a "Party" and collectively, the "Parties."

### Background

The Plan has contracted with BCBSNC under the TPA Contract to perform certain services with respect to administration of the State Health Plan.

The Plan has notified BCBSNC that the Plan intends to maintain in its Benefit Booklet(s) a standard exclusion for gender transition services, including but not limited to surgery and pharmaceutical services, and not to provide coverage for these services ("the Benefit Exception"), notwithstanding the issuance of a new regulation by the Department of Health and Human Services, Office of Civil Rights implementing Section 1557 of the Patient Protection and Affordable Care Act, amended by the Health Care and Education Reconciliation Act, commonly known as the Affordable Care Act ("ACA").

### Agreement

1. **Assertions.** The Plan asserts that the plan benefits related to gender transition services is not discriminatory and does NOT violate Section 1557 of the ACA.

2. **The Plan Assumes ALL Risk.** The Plan acknowledges that maintaining the Benefit Exception for the Plan could be held to violate provisions of state and federal law, including Section 1557 of the ACA.

3. **Hold Harmless, Indemnify and Defend.** The Plan agrees to indemnify, hold harmless, and defend BCBSNC, and its contractors, licensors and suppliers, and their parents, subsidiaries, affiliates, and their officers, directors, trustees, subcontractors, agents and employees (each, individually, an "Indemnified Party") against all costs, expenses, liabilities, losses, claims, settlements, judgments, awards and damages (including reasonable attorney's fees) of every kind and nature (including, without limitation, actual, special, punitive, incidental and consequential), incurred by any Indemnified Party in connection with any claims or complaint arising out of: (i) the Administration of this Benefit Exception; (ii) the Plan design; and (iii) The Plan's breach of any of its obligations set forth in this Amendment. The Plan shall not settle any such claim without the written consent of the applicable Indemnified Party.

|  | **BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA** |
|---|---|
| _____ |  |
| By:_ | By:_____ |
| _____ |  |
| Name: | Name: |
| Title: | Title: |

PLAN DEF0030342

# Exhibit 48

**From:** Lorraine Munk
**Sent:** Thu, 25 Oct 2018 18:32:51 +0000
**To:** Charles Perusse; Donald Martin; Kim Hargett; Margaret Way; Pete Robie; Peter Chauncey; Ted Brinn; Wayne Fish
**CC:** Dale Folwell; Dee Jones ; Andrew Norton; Beth Horner; Frank Lester
**Subject:** Message from Treasurer Folwell

*Sent on behalf of Dee Jones*

\*\*\*

Board Members,

It is my understanding that many, if not all, of you have received an inquiry about the board meeting this past Monday. Please note the following statement that was released just before noon today. Give me a call if you have any questions.

Statement from Treasure Dale R. Folwell, CPA, on State Health Plan Coverage of Sex Change Operations

October 25, 2018

The State Health Plan's policy of not covering sex change operations as a benefit, is the same now as it was during the entire eight years of Treasurer Janet Cowell's administration and all previous North Carolina Treasurers.

The legal and medical uncertainty of this elective, non-emergency procedure has never been greater.

Until the court system, a legislative body or voters tell us that we "have to," "when to," and "how to" spend taxpayers money on sex change operations, I will not make a decision that has the potential to discriminate against those who desire other currently uncovered elective, non-emergency procedures.

We empathize with all members' health conditions, but cannot provide them all with every elective, non-emergency procedure they want.

PLAN DEF0028665

**Lorraine Munk**
*Executive Assistant*
State Health Plan
Office: (919) 814-4409

3200 Atlantic Avenue, Raleigh,
NC 27604
wwww.SHPNC.org





E-mail correspondence to and from this address is subject to
North Carolina's Public Records Act, N.C. Gen. Stat. Sec.
132, and may be disclosed to third parties. However Federal
and State law protects personal health and other information
that may be contained in this e-mail from unauthorized
disclosure. If you are not the intended recipient, please delete
this e-mail and any accompanying documents and contact the
sender immediately. Unauthorized disclosure, copying or
distribution of any confidential or privileged content of this e-
mail is prohibited.

This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity
to which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that any dissemination, distribution or copying of this e-mail is
prohibited. If you have received this e-mail in error, please notify the
sender by replying to this message and delete this e-mail immediately.

PLAN DEF0028666

# Exhibit 49

**From:** Susan Murray <Susan.Murray@bcbsnc.com>
**Sent:** Thu, 25 Oct 2018 20:16:24 +0000
**To:** Tracy Linton <Tracy.Linton@nctreasurer.com>, Caroline Smart
<Caroline.Smart@nctreasurer.com>, Andrew Norton <andrew.norton@nctreasurer.com>
**CC:** Dee Jones <Dee.Jones@nctreasurer.com>, Brian Vick <Brian.Vick@bcbsnc.com>, Aimee
Forehand <Aimee.Forehand@bcbsnc.com>
**Subject:** Pharmacy appeals related to gender dysphoria or transgender services

Recently, we have received several appeals for CVS pharmacy benefit denials for testosterone being used to treat gender dysphoria. CVS denied the claims based on lack of medical necessity. As we are handling these appeals, we believe that the denial should be upheld, based on the Plan's benefits, not based on lack of medical necessity.

For medical appeals, our policy is to first determine if the service is a covered benefit. If the service is not covered, a benefit denial is upheld based on no benefit. Only if the benefit is covered do we then review based on medical policy. One reason for this is that the statutory definition of medical necessity in NCGS 58-3-200(b) does not incorporate any consideration of the benefits offered by a plan. As a result, a service could be medically necessary for the treatment of a specific condition, but denied based on lack of benefit coverage by a plan. Because the services associated with the treatment of gender dysphoria generally meet the statutory definition of medical necessity, we believe that these pharmacy denials should be handled as lack of benefits, rather than lack of medical necessity.

According to the Plan's benefit booklets' grievance and appeals language:

"Grievances are not allowed for benefits or services that are clearly excluded by this benefits booklet or for deductibles, coinsurance or out-of-pocket limit, as well as other aspects of coverage excluded from appeal by law."

The Plan clearly excludes these services:

"Treatment or studies leading to or in connection with sex changes or modifications and related care"

Denying this treatment due to lack of medical necessity sends the appeal down the medical necessity path, as required by NCQA regulations, rather than down the path of Plan benefits. We have concerns about the inconsistency created when CVS denies a claim based on lack of medical necessity, then we uphold the denial for a different reason – due to the benefit not being covered.

For our appeals process to follow NCQA regulations, and uphold the denial of testosterone for gender reassignment at the appeals level, we are asking that CVS consider denying testosterone for gender reassignment as a benefit exclusion.

PLAN DEF0120919

Please let us know if you would like to discuss.


Thank you.


Susan


Susan Murray | Vice President State Segment

919.765.1669 | 919.943.7081 | susan.murray@bcbsnc.com


 NC


Confidentiality Notice: This message is intended only for the use of the individual or entity to which it is addressed. This communication may contain individual protected health information ("PHI") that is subject to protection under state and federal laws, or other privileged, confidential or proprietary information of Blue Cross and Blue Shield of North Carolina that may not be further disclosed. If you are not the intended recipient, or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this message and deleting it from your computer. Thank you.

PLAN DEF0120920

# Exhibit 50



**BlueCross BlueShield of North Carolina**

An independent licensee of the Blue Cross and Blue Shield Association

# Corporate Medical Policy

# Gender Affirmation Surgery and Hormone Therapy

**File Name:** gender_affirmation_surgery_and_hormone_therapy
**Origination:** 7/2011
**Last CAP Review:** 4/2021
**Next CAP Review:** 4/2022
**Last Review:** 6/2021

## Description of Procedure or Service

Gender Dysphoria (GD) is the formal diagnosis used by professionals to describe persons who experience significant gender dysphoria (discontent with their biological sex and/or birth gender). Although it is a psychiatric classification, GD is not medically classified as a mental illness.

In the U.S., the American Psychiatric Association (APA) permits a diagnosis of gender dysphoria in adolescents and adults if the diagnostic criteria in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, (DSM-5™) are met. The criteria are:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six month's duration, as manifested by at least **two** of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics); **OR**
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics; **OR**
3. A strong desire for the primary and/or secondary sex characteristics of the other gender; **OR**
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender); **OR**
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender); **OR**
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender); **AND**

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Gender dysphoria is a medical condition when the elements of the condition noted above are present. Gender affirmation surgery is one treatment option. Gender affirmation surgery is not a single procedure, but part of a complex process involving multiple medical, psychiatric, and surgical modalities performed in conjunction with each other to help the candidate for gender affirmation achieve successful behavioral and medical outcomes. Before undertaking gender affirmation surgery, candidates need to undergo important medical and psychological evaluations, and begin medical/hormonal therapies and behavioral trials to confirm that surgery is the most appropriate treatment choice. Gender affirmation surgery presents significant medical and psychological risks, and the results are irreversible.

***Note: This Medical Policy is complex and technical. For questions concerning the technical language and/or specific clinical indications for its use, please consult your provider.*

An Independent Licensee of the Blue Cross and Blue Shield Association

# Gender Affirmation Surgery and Hormone Therapy

## Policy

Services for gender affirmation surgery and hormone therapy may be considered medically necessary when the criteria below are met.

Please see the following section "Benefits Application" regarding specific benefit and medical management requirements.

## Benefits Application

Gender affirmation surgery and hormone therapy may be specifically excluded under some health benefit plans. Please refer to the Member's Benefit Booklet for availability of benefits.

When benefits for gender affirmation surgery and hormone therapy are available, coverage may vary according to benefit design. Some benefit designs for gender affirmation surgery may include benefits for pelvic and/or breast reconstruction. Member benefit language specific to gender affirmation should be reviewed before applying the terms of this medical policy. This medical policy relates only to the services or supplies described herein.

Prior review and certification are required by most benefit plans, and when required, must be obtained or services will not be covered. Some benefit plans provide coverage without a requirement for prior approval or medical necessity review. Please refer to the Member's Benefit Booklet for specific prior approval or medical necessity review requirements.

If prior authorization and medical necessity review are required for hormone therapy, and related surgical procedures for the treatment of gender dysphoria, the medical criteria and guidelines shown below will be utilized to determine the medical necessity for the requested procedure or treatment.

## When Gender Affirmation Surgery and Hormone Therapy is covered

Gender affirmation surgery and hormone therapy may be considered **medically necessary** when all the following candidate criteria are met and supporting provider documentation is provided:

**SURGERY**
**Candidate Criteria for Adults and Adolescents age 18 years and Older for Gender Affirmation Surgery**

1. The candidate is at least 18 years of age; and
2. Has been diagnosed with gender dysphoria, including meeting all of the following indications:
    a. A strong conviction to live as some alternative gender different from one's assigned gender.
        • Typically accompanied by the desire to make the physical body as congruent as possible with the identified sex through surgery and hormone treatment; and
    b. The new gender identity has been present for at least 6 months; and
    c. If significant medical or mental health concerns are present, they must be reasonably well-controlled; and
    d. The gender dysphoria causes clinical or social distress or impairment in social, occupational, or other important areas of functioning.

3. For those candidates without a medical contraindication, the candidate has undergone a minimum of 12 months of continuous hormonal therapy that is (Note: for those candidates requesting female to male surgery see item 4. below):

An Independent Licensee of the Blue Cross and Blue Shield Association

a. Recommended by a mental health professional and

b. Provided under the supervision of a physician; and the supervising physician indicates that the patient has taken the hormones as directed.

4. For candidates requesting <u>female to male surgery only</u>:

   a. When the initial requested surgery is solely a mastectomy, the treating physician may indicate that no hormonal treatment (as described in criteria 3. above) is required prior to performance of the mastectomy. In this case, the 12 month requirement for hormonal treatment will be waived only when all other criteria contained in this policy and in the member's health benefit plan are met.

5. The candidate has completed a minimum of 12 months of successful continuous full time real-life experience in their new gender, with no returning to their original gender. This requirement may be demonstrated by living in their new gender while:

   a. Maintaining part- or full-time employment; or

   b. Functioning as a student in an academic setting; or

   c. Functioning in a community-based volunteer activity as applicable. (For those candidates not meeting this criteria, see item 6. below.)

6. If the candidate does not meet the 12 month time frame criteria as noted in item 5. above, then the treating clinician must submit information indicating why it would be clinically inappropriate to require the candidate to meet these criteria. When submitted, the criteria in item 5. will be waived unless the criteria noted in item 5. above are specified as required in the candidate's health benefit plan.

**<u>Provider Documentation Criteria for Gender Affirmation Surgery</u>:**

The treating clinicians must provide the following documentation. The documentation must be provided in letters from the appropriate clinicians and contain the information noted below.

1. The letters must attest to the psychological aspects of the candidate's gender dysphoria.

   a. One of the letters must be from a licensed behavioral health professional with an appropriate degree (Ph.D., M.D., L.C.S.W., Ed.D., D.Sc., D.S.W., psychiatric physician assistant, Psy.D, or psychiatric nurse practitioner under the supervision of a psychiatrist) with established competence and clinical expertise in the assessment and treatment of gender dysphoria, who is capable of adequately evaluating if the candidate has any co-morbid psychiatric conditions. When patients with gender dysphoria are also diagnosed with severe psychiatric disorders and impaired reality testing (e.g., psychotic episodes, bipolar disorder, dissociative identity disorder, borderline personality disorder) an effort must be made to improve these conditions with psychotropic medications and/or psychotherapy before surgery is contemplated. Reevaluation by a mental health professional qualified to assess and manage psychotic conditions should be conducted prior to surgery, describing the patient's mental status and readiness for surgery. It is preferable that this mental health professional be familiar with the patient. No surgery should be performed while a patient is actively psychotic.

   b. One of the letters must be from the candidate's established physician or behavioral health provider. The letter or letters must document the following:

      1. Whether the author of the letter is part of a gender dysphoria treatment team and/or follows current WPATH Standards of Care or Endocrine Society Guidelines for the Endocrine Treatment of Gender-Dysphoric/ Gender-Incongruent Persons for evaluation and treatment of gender dysphoria; and

      2. The initial and evolving gender, sexual, and other psychiatric diagnoses (if applicable); and

      3. The duration of their professional relationship including the type evaluation that the candidate underwent; and

      4. The eligibility criteria that have been met by the candidate according to the above Standards of Care; and

      5. The physician or mental health professional's rationale for hormone therapy and/or surgery; and

An Independent Licensee of the Blue Cross and Blue Shield Association

KADEL00316788

6. The degree to which the candidate has followed the treatment and experiential requirements to date and the likelihood of future compliance; and
7. The extent of participation in psychotherapy throughout the 12 month real-life trial, (if such therapy is recommended by a treating medical or behavioral health practitioner) and
8. That during the 12 month, real-life experience (for candidates not meeting the 12 month candidate criteria as noted in 6 and 7, the letter should still comment on the candidates ability to function and experience in the desired gender role), persons other than the treating therapist were aware of the candidate's experience in the desired gender role and could attest to the candidate's ability to function in the new role.
9. Demonstrable progress on the part of the candidate in consolidating the new gender identity, including improvements in the ability to handle:
   - Work, family, and interpersonal issues
   - Behavioral health issues, should they exist.

c. If the letters specified in 1a and 1b above come from the same clinician, then a letter from a second physician or behavioral health provider familiar with the candidate corroborating the information provided by the first clinician is required.

d. For members requesting surgical treatment, a letter of documentation must be received from the treating surgeon. If one of the previously described letters is from the treating surgeon, then it must contain the documentation noted in the section below. All letters from a treating surgeon must confirm that:

1. The candidate meets the "candidate criteria" listed in this policy and
2. The treating surgeon feels that the candidate is likely to benefit from surgery and
3. The surgeon has personally communicated with the treating mental health provider or physician treating the candidate, and
4. The surgeon has personally communicated with the candidate and the cardidate understands the ramifications of surgery, including:
   - The required length of hospitalizations,
   - Possible complications of the surgery, and
   - The post-surgical rehabilitation requirements of the various surgical approaches and the planned surgery.

**Surgical procedures**

The following surgical procedures may be considered **medically necessary** if the above general criteria have been met AND the procedures are being performed only as a part of the overall treatment plan for gender dysphoria:

1. Genital procedures:
a. Male to Female
   - Vaginoplasty
   - Vulvoplasty
   - Repair of introitus
   - Penectomy
   - Orchiectomy

b. Female to Male
   - Vaginectomy
   - Vulvectomy
   - Metoidioplasty
   - Phalloplasty
   - Penile prosthesis
   - Urethroplasty/urethromeatoplasty
   - Hysterectomy
   - Salpingo-oophorectomy
   - Scrotoplasty

An Independent Licensee of the Blue Cross and Blue Shield Association

- Testicular prostheses
- Testicular expanders

2. Chest procedures
a. Male to Female
- Breast reconstruction including augmentation with implants

b. Female to Male
- Mastectomy
- Nipple-areola reconstruction related to mastectomy reconstruction
- Breast reduction
- Pectoral implants

3. Facial procedures for facial feminization or masculinization:
- Blepharoplasty
- Brow lift
- Cheek/malar implants
- Chin contouring and implants
- Face lift (only if done as necessary in conjunction with other facial procedures)
- Facial bone osteoplasty
- Forehead reduction and contouring
- Mandible reduction, contouring, augmentation
- Rhinoplasty

Revision surgery to correct complications or functional impairment resulting from initial gender affirming surgery may be considered **medically necessary.**

**MISCELLANEOUS SERVICES**
The following are considered **medically necessary** as part of the overall treatment plan for gender dysphoria if the general criteria for treatment have been met:
- Chondrolaryngoplasty (tracheal shave)
- A limited number of electrolysis or laser hair removal sessions to prepare for approved genital surgery when the surgeon makes a recommendation documented in the medical record
- Voice therapy/voice lessons, up to 12 lessons

**HORMONAL THERAPY**

Pubertal delay and gender affirming hormone therapy may be considered **medically necessary** when all the following candidate criteria are met and supporting provider documentation is provided:

Candidate Criteria (based on World Professional Association for Transgender Health (WPATH) Standards of Care):

1. The patient has been diagnosed with gender dysphoria, including meeting all of the following indications:
a. A strong conviction to live as some alternative gender different from one's assigned gender,
- Typically accompanied by the desire to make the physical body as congruent as possible with the identified sex through surgery and hormone treatment; and
b. Any co-existing psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and
c. The gender dysphoria causes clinical or social distress or impairment in social, occupational, or other important areas of functioning.

An Independent Licensee of the Blue Cross and Blue Shield Association

2. The candidate has completed a minimum of 12 months of successful continuous full time real-life experience in their new gender, with no returning to their original gender. This requirement may be demonstrated by living in their new gender while:
   a. Maintaining part- or full-time employment; or
   b. Functioning as a student in an academic setting; or
   c. Functioning in a community-based volunteer activity as applicable. (For those candidates not meeting this criteria, see item 3. below.)
3. If the candidate does not meet the 12 month time frame criteria as noted in item 2. above, then the treating clinician must submit information indicating why it would be clinically inappropriate to require the candidate to meet these criteria. When submitted, the criteria in item 2. will be waived unless the criteria noted in item 2. above are specified as required in the candidate's health benefit plan.

**Provider Documentation Criteria for Pubertal Delay and Gender Affirming Hormonal Therapy:**
The treating clinicians must provide the following documentation. The documentation must be provided in letters from the appropriate clinicians and contain the information noted below.
1. The letters must attest to the psychological aspects of the candidate's gender dysphoria
   a. One of the letters must be from a licensed behavioral health professional with an appropriate degree (Ph.D., M.D., Ed.D., D.Sc., D.S.W., psychiatric physician assistant, Psy.D, or psychiatric nurse practitioner under the supervision of a psychiatrist) with established competence and clinical expertise in the assessment and treatment of gender dysphoria, who is capable of adequately evaluating if the candidate has any co-morbid psychiatric conditions.
   b. One of the letters must be from the candidate's established physician or behavioral health provider. The letter or letters must document the following:
      1. Whether the author of the letter is part of a gender dysphoria treatment team and/or follows current WPATH Standards of Care or Endocrine Society Guidelines for the Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons for evaluation and treatment of gender dysphoria; and
      2. The initial and evolving gender, sexual, and other psychiatric diagnoses (if applicable); and
      3. The duration of their professional relationship including the type evaluation that the candidate underwent; and
      4. The eligibility criteria that have been met by the candidate according to the above Standards of Care; and
      5. The physician or mental health professional's rationale for hormone therapy; and
      6. The degree to which the candidate has followed the treatment and experiential requirements to date and the likelihood of future compliance; and
      7. The extent of participation in psychotherapy throughout the 12 month real-life trial, (if such therapy is recommended by a treating medical or behavioral health practitioner); and
      8. That during the 12 month, real-life experience (for candidates not meeting the 12 month candidate criteria as noted in 6 and 7, the letter should still comment on the candidates ability to function and experience in the desired gender role), persons other than the treating therapist were aware of the candidate's experience in the desired gender role and could attest to the candidate's ability to function in the new role.

**Prepubertal children do not require medical or surgical treatment, but do require mental health services as listed above.**

**Criteria for Adolescents Entering Puberty**
Adolescents, having reached puberty (Tanner 2), and who have met eligibility and readiness criteria can be treated with GnRH analogues.

The definition of puberty is having reached Tanner stage 2/5 and/or having LH, estradiol levels or testosterone levels, within the pubertal range. These LH, estradiol and testosterone ranges are well-known and published and are broken down by biological male vs. biological female Tanner stage, and nocturnal and diurnal levels. Adolescents are eligible for GnRH treatment, (for suppression of puberty) by these criteria: (same for adults)

An Independent Licensee of the Blue Cross and Blue Shield Association

# Gender Affirmation Surgery and Hormone Therapy

1. Have an established diagnosis for GD based on DSM V or ICD-10 criteria;
2. Have experienced puberty to at least Tanner stage 2, which can be confirmed by pubertal levels of LH, estrogen or testosterone;
3. Have experienced pubertal changes that resulted in an increase of their gender dysphoria;
4. Do not suffer from psychiatric comorbidity (that interferes with the diagnostic work-up or treatment);
5. Have adequate psychological and social support during treatment, to include having parental/guardian consent;
6. Demonstrate knowledge and understanding of the expected outcomes of GnRH analogue treatment, cross-sex hormone treatment, and gender affirmation surgeries, as well as the medical and social risks and benefits of gender affirmation; and have been counseled regarding fertility options.

**Criteria for Postpubertal Adolescents under the Age of 18 Years**
Post-pubertal adolescents under age 18 must meet the same criteria and documentation requirements for treatment as listed above for adults. If those criteria are met, they are eligible for gender affirmation hormonal treatment and treatment for menstrual suppression when gender affirming hormones are not successful in eliminating menses.

Gender affirmation surgery is rarely appropriate for patients under the age of 18. Requests for mastectomy for female to male transgender individuals age 17 or older may be considered only in exceptional circumstances on an individual consideration basis.

## When Gender Affirmation Surgery and Hormone Therapy are not covered

Gender Affirmation Surgery and hormone therapy are non-covered benefits when the member does not have benefits for the services requested contained in their health benefit plan.

Gender Affirmation Surgery and hormonal therapy are considered **not medically necessary** for plans offering gender affirmation services when the candidate criteria and provider documentation criteria are not met.

The following procedures as part of gender affirmation surgery are considered **not medically necessary**:
Abdominoplasty
Calf implants
Collagen injections
Hair transplantation
Lip filler/lip enhancement
Neck lift/tightening
Skin resurfacing (e.g. dermabrasion, chemical peels)
Laryngoplasty/voice modification surgery is considered **investigational.**

Reversal of gender affirmation surgery, except for revision surgery as outlined in the when covered section, is considered **investigational.**

Autologous tissue flap breast reconstructions are considered **not medically necessary** for gender affirmation surgery.
Fertility preservation, including but not limited to: sperm banking and embryonic freezing is considered **not medically necessary**.

## Policy Guidelines

Gender affirmation surgery and hormone therapy candidate criteria and care standards are based, in part, on the World Professional Association for Transgender Health (WPATH) and Endocrine Society Guidelines for Endocrine Treatment of Gender-Dysphoric/ Gender-Incongruent Persons.

An Independent Licensee of the Blue Cross and Blue Shield Association

# Gender Affirmation Surgery and Hormone Therapy

## Billing/Coding/Physician Documentation Information

This policy may apply to the following codes. Inclusion of a code in this section does not guarantee that it will be reimbursed. For further information on reimbursement guidelines, please see Administrative Policies on the Blue Cross Blue Shield of North Carolina web site at www.bcbsnc.com. They are listed in the Category Search on the Medical Policy search page.

*ICD-10 diagnosis codes: F64.0, F64.1, F64.2, F64.8, F64.9, Z87.890*

*Applicable codes: 15820, 15821, 15822, 15823, 15824, 15825, 15826, 15828, 17380, 19304, 19316, 19318, 19324, 19325, 19340, 21120, 21121, 21122, 21123, 21125, 21127, 21137, 21138, 21139, 21208, 21209, 21270, 21299, 21499, 30400, 30410, 30420, 54400, 54401, 54405, 54406, 54408, 54410, 54411, 54415, 54416, 54417, 54660, 55175, 55180, 55970, 55980, 56800, 56805, 57291, 57292, 57295, 57296, 57335, 67900, C1813, C2622, J1950, J3315, J9217, J9219, J9226.*

*Applicable non-covered procedure codes, including, but not limited to: 11950, 11951, 11952, 11954, 15775, 15776, 15780, 15781, 15782, 15783, 15786, 15787, 15788, 15789, 15792, 15793, 15829, 15830, 15832, 15833, 15834, 15835, 15836, 15837, 15838, 15839, 15876, 15877, 15878, 15879, 21208, 21210, 30430, 30435, 30450, 92507, 92508.*

BCBSNC may request medical records for determination of medical necessity. When medical records are requested, letters of support and/or explanation are often useful, but are not sufficient documentation unless all specific information needed to make a medical necessity determination is included.

## Scientific Background and Reference Sources

Diagnostic and Statistical Manual of Mental Disorders Fourth Edition. Text Revision (DSM-IV-TR). American Psychiatric Association. American Psychiatric Association, Inc. July 2000

Harry Benjamin International Gender Dysphoria Association, Inc (2001). Standards of Care for Gender Identity Disorders—Sixth Version. *International Journal of Transgenderism 5 (1)*. Available at: http://www.symposion.com/ijt/soc_2001/index.htm

Day P. Trans-gender Reassignment Surgery. Tech Brief Series. New Zealand Health Technology Assessment. NZHTA Report February 2002, volume 1, Number 1. Available at: http://nzhta.chmeds.ac.nz/publications/trans_gender.pdf

Medical Director review, July 2011

The World Professional Association for Transgender Health; Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People; 7th Version; July 2012. Accessed at http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=4655 on 9/21/2016.

Specialty Matched Consultant Advisory Panel 12/2012

American Psychiatric Association (APA). Gender dysphoria. *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5™)*. Arlington, VA: American Psychiatric Publishing; 2013: 451-459.

American College of Obstetricians and Gynecologists (ACOG). Healthcare for transgender individuals. Committee Opinion. No 512. December 2011. Obstet Gynecol 2011; 118:1454-8.

An Independent Licensee of the Blue Cross and Blue Shield Association

Hembree WC, Cohen-Kettenis P, et al. Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. September 2009, 94(9):3132–3154. Accessed at http://press.endocrine.org/doi/pdf/10.1210/jc.2009-0345 on 9/21/2016.

Specialty Matched Consultant Advisory Panel 11/2014

Specialty Matched Consultant Advisory Panel 11/2015

Specialty Matched Consultant Advisory Panel 9/2016

Senior Medical Diector review 9/2016

Specialty Matched Consultant Advisory Panel 5/2017

Specialty Matched Consultant Advisory Panel 5/2018

Specialty Matched Consultant Advisory Panel 6/2019

The World Professional Association for Transgender Health; Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People; 7th Version; July 2012. Accessed at https://www.wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf on 4/27/2020

Specialty Matched Consultant Advisory Panel 5/2020

Medical Director review 7/2020

Medical Director review 9/2020

Hembree WC, Cohen-Kettenis P, et al. Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endocrinol Metab. November 2017, 102(11):3869-3903. Accessed at https://academic.oup.com/jcem/article/102/11/3869/4157558 on 9/25/2020.

Medical Director review 3/2021

## Policy Implementation/Update Information

| | |
|---|---|
| 7/19/11 | New policy developed. When benefits for gender reassignment surgery are available, coverage may vary. Some benefit plans provide coverage without a requirement for prior approval or medical necessity review. Benefits for upper and/or lower body gender reassignment procedures vary by benefit plan. If prior authorization and medical necessity review are required for hormone therapy, breast augmentation surgery (mammoplasty), and mastectomy for the treatment of gender identity disorders, the medical criteria and guidelines outlined in the policy will be utilized to determine the medical necessity for the requested procedure or treatment. (adn) |
| 9/18/12 | Added diagnosis codes 302.0, 302.5, 302.50 – 302.53, 302.6, 302.85, 302.9, 313.82, 752.7 to Billing/Coding section. (sk) |
| 1/1/13 | Reference added. Specialty Matched Consultant Advisory Panel review 12/4/12. No change to policy statement. (sk) |
| 7/1/13 | ICD-10 diagnosis codes added to Billing/Coding section. (sk) |

An Independent Licensee of the Blue Cross and Blue Shield Association

Case 1:19-cv-00272-LCB-LPA   Document 144   Filed 11/30/21   Page 72 of 74   KADEL00316794

10/29/13   Reference added. Replaced DSM-IV TR criteria with DSM-5™ criteria. Removed "Sex change surgical procedures other than breast augmentation surgery (mammoplasty) and mastectomy" from the When Not Covered section. Added "pelvic reconstruction" to the When Covered section. Applicable Service Codes removed from Billing/Coding section. Senior Medical Director review. (sk)

7/1/14      Removed ICD-10 effective date from Billing/Coding section. (sk)

12/9/14    Reference added. Specialty Matched Consultant Advisory Panel review 11/24/14. No change to policy statement. (sk)

12/30/15  Specialty Matched Consultant Advisory Panel review 11/18/2015. (sk)

9/30/16    Specialty Matched Consultant Advisory Panel review 9/2016. Policy re-titled to Gender Confirmation Surgery and Hormone Therapy. Information regarding coverage of services for adolescents added to the "When Covered" section. Fertility preservation, including but not limited to: sperm banking and embryonic freezing added to Non-covered section. ICD 9 codes removed from Billing/Coding section. ICD 10 codes, covered codes and non-covered codes added to Billing/Coding section. Policy noticed 10/1/2016 for policy effective date 1/1/2017. (sk)

6/30/17    Specialty Matched Consultant Advisory Panel review 5/31/2017. (sk)

6/29/18    Specialty Matched Consultant Advisory Panel review 5/23/2018. (sk)

7/16/19    Specialty Matched Consultant Advisory Panel review 6/28/2019. (sk)

6/23/20    Reference added. Specialty Matched Consultant Advisory Panel review 5/20/2020. (sk)

8/25/20    Medical Director review. Provider Documentation Criteria updated to include "licensed" behavioral health professional, and "with established competence and clinical expertise in the assessment and treatment of gender dysphoria". (sk)

11/10/20  Medical Director review. Policy title changed from "Gender Confirmation Surgery and Hormone Therapy" to "Gender Affirmation Surgery and Hormone Therapy". The word "confirmation" changed to "affirmation" throughout the policy. In the When Covered section, Candidate Criteria for Adults and Adolescents age 18 years and older, criteria 2, wording changed from "the desire to live and be accepted as a member of the opposite sex" to "A strong conviction to live as some alternative gender different from one's assigned gender". In the When Covered section, Candidate Criteria for Children and Adolescents under age 18 years, criteria 1a, wording changed from "the desire to live and be accepted as a member of the opposite sex" to "A strong conviction to live as some alternative gender different from one's assigned gender". When Covered section updated to include information on medically necessary hair removal prior to genital surgery. References updated. (sk)

3/23/21    Medical Director review. Removed "That the candidate has, intends to, or is in the process of acquiring a legal gender-identity appropriate name change and" from the list of Provider Documentation Criteria for Gender Affirmation Surgery. (sk)

7/1/21      Medical necessity criteria added for facial surgery. Added specificity for which genital and chest procedures are covered. Tracheal shave and voice lessons added as medically necessary. Laryngoplasty added as investigational. Reversal surgery added as investigational. Several not

Case 1:19-cv-00272-LCB-LPA   Document 144   Filed 11/30/21   Page 73 of 74   KADEL00316795

medically necessary surgical and cosmetic services added as not medically necessary. Billing/Coding section updated. (hb/sk)

---

Medical policy is not an authorization, certification, explanation of benefits or a contract. Benefits and eligibility are determined before medical guidelines and payment guidelines are applied. Benefits are determined by the group contract and subscriber certificate that is in effect at the time services are rendered. This document is solely provided for informational purposes only and is based on research of current medical literature and review of common medical practices in the treatment and diagnosis of disease. Medical practices and knowledge are constantly changing and BCBSNC reserves the right to review and revise its medical policies periodically.

---

An Independent Licensee of the Blue Cross and Blue Shield Association