# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

$\qquad$ *Plaintiffs*,

v.

DALE FOLWELL, et al.,

$\qquad$ *Defendants*.

No. 1:19-cv-00272-LCB-LPA

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THEIR STATUTORY CLAIMS

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................i

NATURE OF THE CASE........................................................................................ 1

STATEMENT OF FACTS ....................................................................................... 2

I.  THE PARTIES ............................................................................................. 2

    A.  Plaintiffs. ........................................................................................... 2

    B.  Defendants.......................................................................................... 6

II.  NCSHP'S HEALTH PLANS .................................................................... 7

    A.  The State Health Plan Structure. ....................................................... 7

    B.  NCSHP Staff's Efforts to Comply with the ACA ............................ 8

    C.  Coverage Lapses Under Treasurer Folwell ..................................... 11

III.  THE STANDARD OF CARE FOR GENDER-AFFIRMING CARE.................. 12

ARGUMENT........................................................................................................ 15

I.  THE EXCLUSION VIOLATES THE AFFORDABLE CARE ACT ................. 15

II.  THE EXCLUSION VIOLATES MS. CARAWAY'S RIGHTS
     UNDER TITLE VII.................................................................................... 18

    A.  The Exclusion is Impermissible Sex Discrimination
         Under Title VII................................................................................ 18

    B.  Defendants' Finger-Pointing Does Not Allow Them to
         Evade Liability ................................................................................ 19

         1.  DPS is liable as Ms. Caraway's employer............................. 20

         2.  NCSHP is liable as an agent of, and joint employer
             with, DPS .............................................................................. 21

III.  PLAINTIFFS SATISFY THE REQUIREMENTS FOR
      DECLARATORY AND INJUNCTIVE RELIEF................................................ 24

i

CONCLUSION ........................................................................................... 25

CERTIFICATE OF COMPLIANCE .......................................................... 27

CERTIFICATE OF SERVICE ..................................................................... 27

ii

Plaintiffs respectfully submit this memorandum of law in support of their motion for partial summary judgment on their statutory claims, which seeks declaratory and permanent injunctive relief on all Plaintiffs' claims under Section 1557 of the Affordable Care Act ("ACA"), and Plaintiff Dana Caraway's claims under Title VII of the Civil Rights Act of 1964, reserving issues of damages for trial.[1]

## NATURE OF THE CASE

Plaintiffs are current or former participants in the North Carolina State Health Plan for Teachers and State Employees ("NCSHP"). As part of compensation for employment, the State of North Carolina ("State") provides health coverage to employees and their dependents through NCSHP. Some employees and their dependents, however, receive less compensation than others: those who are denied coverage for the gender-affirming care that transgender people require. NCSHP contains sweeping exclusions of such care, while covering the same kinds of treatments for cisgender employees who require those treatments for other reasons. Defendants thus deny equal treatment under the law to employees who are transgender or have transgender dependents, and harm transgender family members who depend on employees for health care coverage.

---

[1] Unless otherwise indicated, all exhibits are attached to the Declaration of Amy Richardson.

## I.    THE PARTIES.

### A.    Plaintiffs.

Plaintiffs are, or have been, enrolled in NCSHP for health coverage.  ECF No. 85 ¶ 1.  Two plaintiffs are parents whose children are denied gender-affirming care, and the others are transgender employees, former employees, or dependents who have or continue to be denied coverage solely because they are transgender.  All transgender Plaintiffs have been diagnosed with gender dysphoria.  Mot. to Seal, Brown Rep. ¶¶ 50–68; Supp. Brown Rep. ¶¶ 9-14.  Plaintiffs have been denied care for their gender dysphoria under NCSHP's exclusions of coverage for "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation"[2] and "[t]reatment or studies leading to or in connection with sex changes or modifications and related care" (collectively, the "Exclusion").  Ex. 8-9.

**Plaintiff Maxwell Kadel** is enrolled in NCSHP as a University of North Carolina ("UNC"), Chapel Hill employee.  Kadel Decl. ¶¶ 2, 4, 16.  He is a 38-year-old transgender man.  Kadel Decl. ¶ 2.  Before his transition, Mr. Kadel experienced significant distress as a result of his gender dysphoria.  Ex. 15, 117:2-11; Kadel Decl. ¶ 6, 8.  He began hormone therapy in 2016, but because of the Exclusion, Mr. Kadel has been forced to pay out-of-pocket.  Kadel Decl. ¶ 7, 9.  The Exclusion also prevented Mr. Kadel

---

[2] While the health plans exclude coverage for psychological treatment, NCSHP's Rule 30(b)(6) designee testified that NCSHP does not enforce that exclusion.  Ex. 12, 49:8-23.

from obtaining chest surgery when he needed it, leading to a years-long delay while he saved up to pay at his own expense. Kadel Decl. ¶¶ 12-15. Mr. Kadel has an ongoing need for hormone therapy, and may seek additional surgical care in the future. Kadel Decl. ¶ 16.

**Plaintiff Connor Thonen-Fleck** is enrolled in NCSHP as a dependent of **Plaintiff Jason Fleck**, a UNC-Greensboro employee. ECF No. 85 ¶¶ 83-84; ECF No. 96 ¶ 8. Mr. Thonen-Fleck is a 19-year-old transgender man. Thonen-Fleck Decl. ¶¶ 2-3. Until he began to transition, he experienced increasing anguish. Thonen-Fleck Decl. ¶ 5. Beginning hormone therapy and obtaining chest reconstruction surgery to masculinize his chest was life changing. Ex. 16, 102:8-19, 116:16-25; Ex. 17, 64:2-21; Thonen-Fleck Decl. ¶¶ 7, 16. Based on the Exclusion, Mr. Thonen-Fleck has been denied coverage for endocrinologist appointments, testosterone, and chest reconstruction surgery. Ex. 16, 6:23-7:11; Fleck Decl. ¶¶ 10-14. The denials invoked only the Exclusion for treatment of gender dysphoria, and no other exclusions. Fleck Decl. ¶¶ 11-12. Mr. Thonen-Fleck has an ongoing need for hormone therapy, and anticipates seeking additional surgical care in the future. Thonen-Fleck Decl. ¶ 17.

**Plaintiff Julia McKeown** is enrolled in NCSHP as an employee of North Carolina State University ("NCSU"). ECF No. 85 ¶ 94; ECF No. 96 ¶ 9. Dr. McKeown is a 45-year-old transgender woman. McKeown Decl. ¶ 2. Until she began her transition, she experienced significant distress. McKeown Decl. ¶¶ 4-5, 9; Ex. 18, 150:11-151:4. By 2018, Dr. McKeown's medical provider referred her for vaginoplasty, and she requested

3

preauthorization for the surgery.  McKeown Decl. ¶ 9.  The request was denied based on the Exclusion for treatment of gender dysphoria and no other exclusions. McKeown Decl. ¶¶ 10-11.  Dr. McKeown appealed that decision to Blue Cross and Blue Shield of North Carolina ("BCBSNC") but was informed that they only administer the plan and could not resolve the issue.  McKeown Decl. ¶ 11; ECF No. 85 ¶ 96.  Dr. McKeown has an ongoing need for hormone therapy and anticipates possibly seeking additional surgical care in the future.  McKeown Decl. ¶ 14.

**Plaintiff C.B.** is enrolled in the NCSHP as a dependent of **Plaintiff Michael D. Bunting, Jr.**, a retiree of UNC-Chapel Hill.  ECF No. 85 ¶¶ 109, 117; C.B. Decl. ¶ 19; M. Bunting Decl. ¶ 26; S. Bunting Decl. ¶ 16.  C.B. is a 16-year-old transgender young man.  C.B. Decl. ¶¶ 2-4.  Before his transition, C.B. experienced distress associated with his birth-designated sex.  Ex. 19, 35:8-22; C.B. Decl. ¶¶ 11, 13, 24; Ex. 20, 82:2-9; M. Bunting Decl. ¶ 9; S. Bunting Decl. ¶¶ 7, 12.  In 2017, C.B. was diagnosed with gender dysphoria and was later prescribed puberty-delaying medication.  C.B. Decl. ¶ 14; M. Bunting Decl. ¶ 14; S. Bunting Decl. ¶ 13.  Because of the Exclusion, C.B.'s parents were forced to obtain additional coverage for C.B. for 2019 in order to be able to afford C.B.'s puberty-delaying medication that year. Ex. 20, 105:20-106:12; M. Bunting Decl. ¶¶ 22–23; S. Bunting Decl. ¶ 27.  C.B. has also been prescribed testosterone, but coverage has been denied on multiple occasions.  C.B. Decl. ¶¶ 21-22; M. Bunting Decl. ¶ 26; S. Bunting Decl. ¶¶ 30-32.  C.B. has an ongoing need for hormone therapy.  Ex. 20, 132:21–133:1; M. Bunting Decl. ¶ 26; S. Bunting Decl. ¶ 35.  C.B.'s gender-conforming

4

treatment has helped reduce his anxiety and brought him a great deal of relief.  Ex. 19, 36:1-3; C.B. Decl. ¶¶ 15, 21, 24; M. Bunting Decl. ¶ 15; S. Bunting Decl. ¶ 14.

**Plaintiff Sam Silvaine** was enrolled in the NCSHP as an employee of NCSU from 2016 through 2018.  Ex. 21, 8:23-9:1; Silvaine Decl. ¶ 5.  He is a 33-year-old transgender man.  Silvaine Decl. ¶ 2.  While he was working at NCSU, Mr. Silvaine lived with significant distress caused by gender dysphoria.  Ex. 21, 105:14-23; Silvaine Decl. ¶ 7. In 2017, Mr. Silvaine was prescribed hormone therapy, but that was not sufficient to alleviate the daily distress he experienced related to his non-masculine chest.  Ex. 21, 48:9-16; Silvaine Decl. ¶¶ 8-12.  In consultation with his provider, he decided to seek chest surgery to treat his gender dysphoria.  Ex. 21, 48:9-20; Silvaine Decl. ¶ 13. Although he initially received prior authorization, after the Exclusion was reinstated, the prior authorization was rendered invalid.  Ex. 21, 73:9-74:19; Silvaine Decl. ¶¶ 14-16. He was forced to pay for his surgery out-of-pocket, which was a stressful burden.  Ex. 21, 72:16-22; Silvaine Decl. ¶ 17-18.

**Plaintiff Dana Caraway** is a transgender woman and Department of Public Safety employee.  Caraway Decl. ¶¶ 2-3, 8; ECF No. 96 ¶ 12.  She pays the same monthly premium as other State employees to enroll in the 80/20 plan.  Caraway Decl. ¶¶ 16-17; ECF No. 96 ¶ 133.  Until she began to transition in 2018, she had grown increasingly isolated and distressed.  Ex. 22, 78:15-79:4, 79:18-80:1, 152:12-20; Caraway Decl. ¶¶ 9-14.  Treating her gender dysphoria was so important that she obtained surgery in 2020 by paying for it largely out of her retirement savings.  Caraway Decl. ¶¶ 23-25.

5

BCBSNC denied coverage, citing the Exclusion as the only reason. Ex. 22, 64:6-10; Caraway Decl. ¶ 24. She paid for a second surgery and needs one more procedure to feminize her facial features, which she cannot afford on her own. Caraway Decl. ¶¶ 25-26. She also takes hormone therapy, which NCSHP has covered inconsistently—both as to the medication and related visits to her practitioner. Caraway Decl. ¶¶ 20, 28.

## B.    Defendants.

**Defendant NCSHP** provides group health insurance to eligible state employees and their dependents pursuant to N.C. Gen. Stat. § 135-48.2. "The opportunity to enroll in [NCSHP] is a part of the compensation package provided to state employees." Ex. 4 Admis. 6. NCSHP is self-funded, ECF No. 85 ¶ 1, and "determines what health benefits are available to state employees through their employment" and the number of plan options. ECF No. 96 ¶ 179; Ex. 14, 13:3-14:6. NCSHP receives federal funding in the form of "quarterly payments under the Retiree Drug Subsidy from the U.S. Department of Health and Human Services." Ex. 5 Admis. 1 Interrog. 1.

**Defendant State of North Carolina, Department of Public Safety** ("DPS") is an employer within the meaning of Title VII. ECF No. 96 ¶ 18; ECF No. 85 ¶ 18; ECF Nos. 104-1, 105; Ex. 7 Admis. 1. As an employer, DPS provides health care coverage to its employees through NCSHP. ECF No. 85 ¶ 18; ECF No. 96 ¶¶ 18, 22; Ex. 14, 9:20-24, 17:18-23. DPS facilitates employee access to NCSHP coverage in several ways. DPS contributes $521.96 to NCSHP per month per employee. Ex. 7 Admis. 2. Upon hiring, and during annual open enrollment, DPS "Health Benefit Representatives provide the

6

benefits information to the employees to give them the information they need to determine if they would like to join the SHP." Ex. 6 Interrog. 3(a); Ex. 12, 88:22-89:3.

Each Health Benefits Representative ("HBR") is an employee not of NCSHP, but instead of the relevant state agency, such as DPS. Ex. 12, 118:6-17. HBRs are "the first line of contact" for employees with questions about their insurance, Ex. 14, 24:7-13, and are "responsible for their employer's employees and getting them enrolled [in NCSHP] and making sure they understand the processes." Ex. 12, 118:6-14; Ex. 14, 21:20-22:13. Additionally, the human resources staff of the participating employer, such as DPS, are responsible for entering information into the system so that the State Controller can deduct premiums from the employees' salary. Ex. 12, 90:19-24. When an employee changes their health coverage because of a qualifying life event, DPS's human resources section reviews relevant documents and determines whether to approve the requested change. Ex. 14, 14:18-16:22.

DPS also becomes "involved if an employee loses coverage of the State Health Plan due to non-payment of the employee's premium." Ex. 6 Interrogs. 3(b)-4. "If the employee wants . . . coverage . . . reinstated before the annual enrollment period," DPS works with both "the employee to submit an exception request to the State Health Plan," and "with the State Health Plan which is a part of the State Treasurer's Office to submit the exception request . . . ." Ex. 6 Interrog. 3(b).

## II.    NCSHP'S HEALTH PLANS.

### A.    The State Health Plan Structure.

NCSHP covers more than 740,000 teachers, state employees, retirees, current and former lawmakers, state university and community college personnel, state hospital staff members, and their dependents.  Ex. 10 at 2; Ex. 12, 18:14; ECF No. 85 ¶ 4.  NCSHP offers an 80/20 PPO Plan and a 70/30 PPO Plan (collectively, the "Plan") that are generally available to enrollees.  ECF No. 85 ¶ 48; ECF No. 96 ¶ 48.  Covered services include medically necessary pharmacy benefits, mental health benefits, and medical care such as surgical benefits at inpatient and outpatient facilities.  Exs. 8-9; ECF No. 85 ¶ 49; ECF No. 96 ¶ 49.  BCBSNC serves as the third-party administrator and CVS Caremark ("CVS") administers pharmacy benefits for these plans.  ECF No. 85 ¶ 48.

NCSHP's health plans all share one feature: a categorical Exclusion of coverage for gender-affirming care.  Exs. 8-9.  The Exclusion applies even to the very same treatments that are covered when they are medically necessary for cisgender participants, including hormone therapy, Ex. 2 Admis. 1, *id.* Ex. 5 Admis. 2; puberty-delaying hormone treatment, *id.* Ex. 5 Admis. 2; mammoplasty and breast reconstruction, *id.* Ex. 2 Admis. 2, *id.* Ex. 5 Admis. 3; vaginoplasty, *id.* Ex. 2 Admis. 3; and hysterectomy, *id.* Ex. 2 Admis. 4.  Because of the Exclusion, transgender people are denied the opportunity to make the same individualized showing of medical necessity for treatments covered by the Plan as cisgender people are permitted.  Exs. 8-9.

8

**B.     NCSHP Staff's Efforts to Comply with the ACA.**

In 2010, Congress enacted Section 1557 of the ACA, 42 U.S.C. § 18116, a broad civil rights remedy meant to protect patients and other health care consumers from discrimination on the basis of race, ethnicity, sex, disability, and age.  On May 18, 2016, HHS promulgated a final rule prohibiting "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition."  Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,471-72 (May 18, 2016).[3]

NCSHP was aware at least as early as summer 2016 that it needed to eliminate the Exclusion to comply with the ACA.  NCSHP's Deputy Executive Administrator and Legal Counsel Lotta Crabtree asked Mark Collins, a Plan financial analyst, to investigate the "cost of coverage for gender dysphoria" because "[t]he Plan believes that we will need to cover treatment and services for gender dysphoria beginning with Plan year 2017."  Ex. 31; *see also* Ex. 32 (email from Ms. Crabtree stating: "we need to ensure coverage under our benefits do not discriminate on the basis of . . . sex.  Sex includes gender identity and so we are trying to determine what we need to cover for individuals diagnosed with gender dysphoria."); *see also* Ex. 30.  By July 2016, NCSHP adopted a Section 1557 grievance procedure which explained NCSHP "is subject to Section 1557." Ex. 33, PLANDEF0012787.

---

[3] The prior administration's attempt to roll back this aspect of the rule was enjoined and the rule's gender identity protections remain in effect.  *See Walker v. Azar*, 480 F.Supp.3d 417, 420 (E.D.N.Y. 2020); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F.Supp.3d 1, 10 (D.D.C. 2020).

9

Subsequently, Ms. Crabtree worked with then-Executive Administrator Mona Moon to create bullet points for the NCSHP's Board of Trustees ("Board") about the ACA requirements. Ex. 34. The bullet points explained that the ACA "applies to" NCSHP by virtue of the $19.5 million retiree drug subsidy NCSHP receives from HHS, and that participants "have a private right of action to sue for violations of the rule." *Id.* KADEL00136650.

NCSHP retained Segal Consulting for guidance regarding ACA requirements. Ex. 35; Ex. 12, 23:8-12. On November 29, 2016, Segal Consulting delivered a memo advising that NCSHP is "likely" a covered entity "subject to" the ACA, and that covered entities "must provide coverage for transgender health care … beginning on or after 1-1-17." Ex. 36.

On November 28-29, 2016, NCSHP approved a press release related to the upcoming Board meeting stating:

> The Plan's outside legal counsel determined this rule requires action by the Plan on or before January 1, 2017. If the Plan does not take action to comply, the Plan risks losing millions of dollars in federal funding and could face discrimination lawsuits for non-compliance.

Ex. 37. Ms. Moon also helped NCSHP staff craft a response for members of the public, adding a statement that the Exclusion was being eliminated "as required by Federal law and to preserve federal Retiree Drug Subsidy funds received by the Plan." Ex. 38.

NCSHP staff requested that the Board remove the Exclusion during its December 2016 meeting to provide "medically necessary services for the treatment of gender dysphoria." Ex. 39, PLANDEF006988; Ex. 12, 33:25-34:3. During that meeting, the

10

Plan's outside legal counsel advised them that continuing to receive federal funding

without coverage for treatment of gender dysphoria would render NCSHP

"non-compliant as of January 1, 2017," resulting in "the possibility of civil action by

someone challenging the violation." Ex. 40, PLANDEF0012825.

A Board member moved to eliminate the Exclusion, and another Board member

amended the motion to apply only for plan year 2017. Ex. 40, PLANDEF0012816-17;

Ex. 12, 43:2-44:11. The amended motion, which stated that the Exclusion would be

"revisited in advance of the 2018 plan year," was approved. Ex. 40, PLANDEF0012817.

But the Board never revisited it. Ex. 12, 63:5-8.

In response to media requests, NCSHP reiterated its understanding that

eliminating the Exclusion was necessary to avoid the risk of private discrimination suits.

*See, e.g.*, Ex. 42; Ex. 41, PLANDEF0007138. NCSHP staff also worked to survey their

contractors to ensure compliance with the ACA. Ex. 44.

### C. Coverage Lapses Under Treasurer Folwell.

By August 2017, however, NCSHP staff had begun preparing for the Exclusion to

be reinstated. A representative of BCBSNC emailed plan staff member Caroline Smart to

explain that NCSHP would need to "sign a hold harmless if the plan decided not to cover

gender dysphoria." Ex. 45.

The Exclusion was "reinstated on January 1, 2018" by "operation of law." Ex. 3

Interrog. 6. As NCSHP staff worked with vendors to reinstate the Exclusion, BCBSNC

informed NCSHP again in December 2017 that it would need to sign an indemnification

agreement before BCBSNC would make the necessary coding changes. Ex. 47. Several Plaintiffs and members of the public addressed the Board again at its October 22, 2018 Board meeting and asked that the Exclusion be eliminated. Ex. 11, 144:2-145:21. The Board declined. Exs. 8-9.

Three days later, on October 25, 2018, Mr. Folwell released a statement providing that "[u]ntil the court system, a legislative body or voters tell us that we 'have to,' 'when to,' and 'how to' spend taxpayers money on sex change operations," he would not allow the NCSHP to provide coverage. Ex. 48. Defendants Folwell and Jones negotiated and approved contracts for 2018 through 2021 health plans excluding coverage for gender-confirming health care. ECF No. 85 ¶ 63; Ex. 8-9.

## III. THE STANDARD OF CARE FOR GENDER-AFFIRMING CARE.

Gender identity is a person's internal sense of one's sex, such as male or female. Ex. 23(a) ¶ 20; Ex. 24(a) ¶ 17; Ex. 25(a) ¶ 24; Ex. 27(a) ¶ 22; Ex. 26(a) ¶ 18. Although most people are cisgender, meaning their gender identity matches their birth-assigned sex, transgender people have a gender identity that differ from their birth-assigned sex. Ex. 23(a) ¶ 19; Ex. 25(a) ¶ 25; *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020). Left untreated, the dissonance between one's gender identity and birth-assigned sex can be associated with clinically significant distress or significant impairment of functioning. Ex. 23, 84:16-85:7; Ex. 24, 18:12-16; Ex. 25, 17:18-22; Ex. 26, 18:25-19:6; Ex. 27, 18:5-19:4; Ex. 23(a) ¶ 24; Ex. 24(a) ¶ 18; Ex. 25(a) ¶¶ 29, 35; Ex. 27(a) ¶¶ 23, 38; Ex. 26(a) ¶ 62. The medical diagnosis for that incongruence and the

attendant distress or impairment is gender dysphoria. Ex. 23, 84:16-85:7; Ex. 25, 18:4–6; Ex. 26, 19:12-17; Ex. 27, 18:5-19:4; Ex. 25(a) ¶¶ 29, 32; Ex. 27(a) ¶¶ 23-25; *Grimm*, 972 F.3d at 594-95.

The World Professional Association for Transgender Health ("WPATH") has continuously maintained *Standards of Care for the Health of Transgender, Transsexual, and Gender-Nonconforming People* ("WPATH Standards") since 1979, publishing its most recent update, Version 7, in 2012. Ex. 23(a) ¶ 33; Ex. 24(a) ¶ 21; Ex. 25(a) ¶ 36; Ex. 27(a) ¶ 26. The WPATH Standards "represent the consensus approach of the medical and mental health community . . . and *have been recognized by various courts, including this one, as the authoritative standards of care*." *Grimm*, 972 F.3d at 595 (emphasis added; collecting authorities); Ex. 25, 99:9-15; Brown Rebuttal Rep. ¶¶ 80, 101; Ex. 24(a) ¶ 21; Ex. 25(a) ¶¶ 36-37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27. In addition, the Endocrine Society has published Guidelines for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, which are consistent with the WPATH Standards. Ex. 23(a) ¶ 33; Ex. 27(a) ¶ 28; Ex. 26(a) ¶ 28.

The American Medical Association and other major health organizations recognize the WPATH Standards and Endocrine Society Guidelines as authoritative. Ex. 23(d) ¶¶ 80, 101; Ex. 25(a) ¶ 37; Ex. 27(a) ¶ 27; Ex. 26(a) ¶ 27. "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Grimm*, 972 F.3d at 595-96 (quote omitted).

13

Under the WPATH Standards, treatment for gender dysphoria may involve counseling, hormone therapy, and surgery. Ex. 23(a) ¶ 34; Ex. 25(a) ¶ 38; Ex. 27(a) ¶ 29. Medically necessary surgical procedures treat gender dysphoria by bringing a person's body into better alignment with their gender identity, Ex. 24(a) ¶ 19; Ex. 24(b) ¶ 28; Ex. 26(a) ¶ 45, and are similar to surgical procedures performed for other diagnoses. Ex. 24(a) ¶¶ 27, 30-31; Ex. 24(b) ¶¶ 11, 21. Hormone therapy specifically for transgender adolescents may include puberty-delaying treatment. The beginning of puberty in transgender adolescents "is often a painful and sometimes traumatic experience" as their body develops sex characteristics that are incongruent with their gender identity. Ex. 26(a) ¶ 40; *see also* Ex. 27, 82:4-22; *Grimm*, 972 F.3d at 595. Puberty-delaying treatment "essentially pauses puberty," so that an adolescent can undergo "a single, correct pubertal process" consistent with their gender identity. Ex. 26(a) ¶¶ 40, 43; Ex. 26, 63:1-4; Ex. 27, 82:4-22. "No medical care is initiated until *after* the onset of puberty," and care is provided based on "the youth's unique cognitive and emotional maturation and ability to provide a knowing and informed consent." Ex. 25(a) ¶ 74; Ex. 26(a) ¶¶ 36, 44; *see also* Ex. 26, 42:23-43:3; Ex. 27(a) ¶ 31; *Grimm*, 972 F.3d at 596.

"The American Medical Association [], the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that medical treatment for gender dysphoria is medically necessary and effective." Ex. 23(a) ¶ 32; Ex. 25(a) ¶¶ 42, 49, 106; Ex. 24(a) ¶ 41; Ex. 24(b) ¶ 52; Br. of Amicus Curiae Am. Med. Ass'n, et al. Accordingly, the "denial of gender affirming care is harmful to

14

transgender people, as it exacerbates gender dysphoria and leads to negative health outcomes." Ex. 25(a) ¶¶ 57, 106; Ex. 27(a) ¶ 38.  BCBSNC has also advised NCSHP that "the services associated with the treatment of gender dysphoria generally meet the statutory definition of medical necessity" in North Carolina law.  Ex. 49 (citing N.C. Gen. Stat. § 58-3-200(b)).

## ARGUMENT

## I.    THE EXCLUSION VIOLATES THE AFFORDABLE CARE ACT.

Congress passed the ACA with the "aim[] to increase the number of Americans covered by health insurance" through the creation of "a comprehensive national plan to provide universal health insurance coverage" across the nation.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 583 (2012).  Section 1557 imposes an obligation to not discriminate by incorporating "Title IX . . . to prohibit discrimination based on sex in healthcare."  *C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-CV-06145-RJB, 2021 WL 1758896, at *4 (W.D. Wash. May 4, 2021).

A plaintiff states a claim under Section 1557 by alleging that (1) defendant is a healthcare program that receives federal financial assistance; and (2) plaintiff was subjected to discrimination in healthcare services; (3) on the basis of sex.  *See C.P.*, 2021 WL 1758896, at *4.  Here, the undisputed facts show that Plaintiffs are entitled to judgment on this claim.

First, NCSHP is a "health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).  "By extending nondiscrimination

protections to individuals under 'any health program or activity,' Congress clearly intended to prohibit discrimination by any entity acting within the 'health' system." *Fain v. Crouch*, No. CV 3:20-0740, 2021 WL 2657274, at *3 (S.D. W.Va. June 28, 2021). Health insurance providers "implicate[] the health of persons falling within the scope of ACA protections," including an insurer who denies access to transgender participants, "by virtue of its authority to design health benefits." *Id.* Accordingly, as "the gatekeeper" to transgender participants' health coverage, an insurer like NCSHP "qualifies as a 'health program' that Congress intended to rid of discrimination." *Id.*[4] In addition, NCSHP receives federal funding for its Retiree Drug Subsidy from the U.S. Department of Health and Human Services. Ex. 5 Admis. 1 Interrog. 1.

Second and third, Plaintiffs have been subjected to discrimination in the provision of healthcare services on the basis of sex by having coverage for their medically necessary gender-confirming care be denied by the Exclusion.

"[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020). *Bostock* "guides our evaluation of claims under Title IX." *Grimm*, 972 F.3d at 616. Where an "employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as

---

[4] Such understanding is consistent with other definitions of "health program" and "health care" in the ACA, which refers to "health programs" and "health care entities" as including insurers and insurance plans in other provisions. *See, e.g.*, 42 U.S.C. § 18051; 42 U.S.C. § 18113.

16

female at birth," it has discriminated. *Bostock* at 1741-42. This is what the Exclusion does. The plan covers medically necessary care for cisgender participants, including hormone therapy, puberty-delaying hormone treatment, mammoplasty and breast reconstruction, vaginoplasty, and hysterectomy. The Exclusion penalizes transgender employees by withdrawing that coverage based on an employee's birth-assigned sex.

Considering a similar exclusion in the Alaska state employee health plan, a district court granted the plaintiff summary judgment, finding that where the plan "covers vaginoplasty and mammoplasty surgery if it reaffirms an individual's natal sex, but denies coverage for the same surgery if it diverges from an individual's natal sex," that constitutes "discrimination because of sex." *Fletcher*, 443 F.Supp.3d at 1030; *see also Boyden*, 341 F.Supp.3d at 995 (discrimination in coverage for vaginoplasty based on one's birth-assigned sex is "straightforward" case of sex discrimination).

"[D]iscrimination against transgender people" also "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608; *see id.* at 608-09 (collecting authorities). District courts throughout the country, including this Court, have found that healthcare discrimination against transgender people is rooted in impermissible stereotyping. *See, e.g.*, *Kadel v. Folwell*, 446 F.Supp.3d 1, 14 (M.D.N.C. 2020) (the Exclusion "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject"); *Toomey v. Arizona*, No. 19-cv-00035, 2019 WL 7172144, at *5-6 (D. Ariz. Dec. 23, 2019); *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015). As

17

*Boyden* explained, a health plan exclusion for gender-confirming care "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [birth-assigned] sex over not just personal preference, but specific medical and psychological recommendations to the contrary." 341 F. Supp. 3d at 997; *see also Flack*, 328 F. Supp. 3d 931, 951.

Additionally, discrimination based on gender transition is necessarily because of sex. *Schroer v. Billington*, 577 F.Supp.2d 293, 306 (D.D.C. 2008); *accord Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509, 527 (D. Conn. 2016). The same is true here, because the Exclusion expressly prohibits coverage for "treatment in conjunction with proposed gender *transformation*" and "sex *changes*." Exs. 8-9 (emphasis added); *see also Flack*, 328 F.Supp.3d at 949.[5]

## II.   THE EXCLUSION VIOLATES MS. CARAWAY'S RIGHTS UNDER TITLE VII.

### A.   The Exclusion is Impermissible Sex Discrimination Under Title VII.

Title VII prohibits an employer from discriminating against an individual in the terms of employment "because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1). Health insurance constitutes an important part of one's compensation for employment. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983). Substantively, the Exclusion is sex discrimination under Title VII for exactly the same reasons it is under Title IX. Under Title VII, a facially discriminatory policy may be

---

[5] The Fourth Circuit has now settled NCSHP's previous claims of immunity from suit. *Kadel*, 12 F.4th at 439.

justified only where "gender is a 'bona fide occupational qualification [("BFOQ")] reasonably necessary to the normal operation of the particular business or enterprise.'" *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989) (alterations omitted) (quoting 42 U.S.C. § 2000e-2(e)); *see also Fletcher*, 443 F.Supp.3d at 1030-31 (finding facially discriminatory exclusion in state employee plan only justifiable by BFOQ).

However, where a case involves "the terms of a retirement [or fringe benefit] plan," the BFOQ defense "is inapplicable since the terms of a retirement [or fringe benefit] plan have nothing to do with occupational qualifications." *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1084 n.13 (1983); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1367 (9th Cir. 1986). Title VII only permits an employer to "hire and employ" based on sex in the extremely narrow circumstances where sex is a BFOQ. 42 U.S.C. § 2000e-2(e)(1); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991) (BFOQ defense "reaches only special situations."); *see also Fletcher*, 443 F.Supp.3d at 1031. Accordingly, judgment should be entered for Ms. Caraway because the Exclusion cannot be justified by a BFOQ.

## B. Defendants' Finger-Pointing Does Not Allow Them to Evade Liability.

Ms. Caraway raises this claim against two defendants: DPS, as her employer; and NCSHP, as an agent of and joint employer with DPS. If one credits both Defendants' arguments, no one bears any liability at all for the Exclusion's facial discrimination. *See* ECF No. 64 at 9 (NCSHP's argument that "[l]iability for delegated decisions remains

19

with the employer [DPS]"); ECF No. 96 ¶¶ 187-88 (denying that DPS "violated Title VII"). Defendants' positions are thus "untenable." *Boyden*, 341 F.Supp.3d at 997. The law does not permit this kind of evasion, because Title VII does not allow "an employer who exercises actual control [to] avoid Title VII liability by hiding behind another entity." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 415 (4th Cir. 2015). DPS and NCSHP share liability under Title VII.

### 1. DPS is liable as Ms. Caraway's employer.

DPS admits it is Ms. Caraway's employer. ECF No. 96 ¶ 12. Title VII "prohibits an employer from offering its employees" a discriminatory fringe benefits plan. *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1074 (1983) (per curiam). DPS plays an extensive role in facilitating access to the discriminatory coverage. To begin, "had [DPS] not hired" Ms. Caraway, she "would not have been permitted to enroll in the Plan at all." *Kadel*, 446 F.Supp.3d at 10. DPS also contributes $521.96 monthly to NCSHP for each employee, Ex. 7 Admis. 2; and employs the HBRs responsible for assisting employees with enrollment. Ex. 6 Interrogs. 2-3(a); Ex. 12, 88:22-89:3. DPS human resources staff enter the relevant information in the system so that premiums can be deducted from employees' salary; they also approve changes in coverage due to qualifying life events. Ex. 12, 90:19-24; Ex. 14, 14:18–16:22. DPS also becomes involved to assist employees who lose coverage due to non-payment of the premium. Ex. 6 Interrog. 3(b).

## 2. NCSHP is liable as an agent of, and joint employer with, DPS.

NCSHP has violated Title VII for two reasons, and each independently establishes NCSHP's liability under the statute.

***First, NCSHP is an agent of DPS.*** Title VII defines "employer" to include the "agent" of one as well. 42 U.S.C. § 2000e(b). The Supreme Court held nearly half a century ago that a government administrative board that implements a discriminatory fringe benefit may be sued as the "agent" of the government agency that provides the benefit to its employees. *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 718 n.33 (1978). This Court examined these principles when Plaintiffs moved to add Ms. Caraway's Title VII claims to the complaint, finding that "Title VII's inclusion of 'agent' within its definition of 'employer' reinforces the principle that 'an employer can[not] avoid his responsibilities by delegating discriminatory programs to corporate shells.'" *Kadel v. Folwell*, No. 1:19-cv-272, 2021 WL 848203, at *6 (M.D.N.C. Mar. 5, 2021) (quoting *Manhart*, 435 U.S. at 718 n.33).

This is consistent with this Court's analysis in analogous cases. In *Crowder v. Fieldcrest Mills, Inc.*, 569 F. Supp. 825 (M.D.N.C. 1983), the Court considered claims by a plaintiff against her employer and its health plan administrator as an agent of the employer under Title VII. The plaintiff sued because the health plan offered more favorable health coverage to male employees for their spouses than to female employees. *Id.* at 826. *Crowder* explained that where the administrator served in merely an "advisory capacity" with no "significant control" over the plan terms, no agent relationship existed;

21

but where an employer had delegated responsibility for fringe benefits, this "delegation of authority functionally resulted in the associations having control of an aspect of the terms and conditions of employment," thus rendering the administrator an "employer" by virtue of serving as the employer's agent. *Id.* at 827-28. Here, there is no dispute that NCSHP has significant control over the terms of the plan, which has been delegated to it by operation of law. N.C. Gen. Stat. § 135-48.2(a); Ex. 5 Admis. 12-14; ECF No. 96 ¶ 179. State employers such as DPS do not have control over the health insurance their employees receive, the plan terms, which third-party administrators are selected, or whether the Exclusion remains in the plan—all of which NCSHP decides. Ex. 14, 11:19–22, 14:7-17, 29:13-24.

Where a "delegation of authority functionally result[s]" in an entity like NCSHP "having control of an aspect" of employment such as insurance, the failure to impose liability on that agent means that "the purposes of Title VII . . . could be frustrated by employers delegating to such parties authority over terms and conditions of employment." *Crowder*, 569 F. Supp. at 828. The Court should not permit NCSHP to succeed with that kind of frustration here. *See also Boyden*, 341 F. Supp. 3d at 998 (being empowered to administer health policies "forms a sufficient basis to hold [defendant liable] as an agent of the State and the ultimate employer").

**_Second, NCSHP is a joint employer with DPS._** The "joint employment doctrine is the law of [the Fourth] Circuit." *Butler*, 793 F.3d at 409. This doctrine "serves Title VII's purpose of eliminating discrimination in employment based on . . . sex," *id.* at 410

22

(quote marks omitted), "prevent[ing] those who effectively employ a worker from evading liability by hiding behind another entity." *Id.* Accordingly, "multiple entities may simultaneously be considered employers for the purposes of Title VII." *Id.* The Court should hold that NCSHP is such an entity.

The Fourth Circuit uses a "hybrid test" to allow for "the broadest possible set of considerations in making a determination of which entity is an employer." *Id.* at 414. Courts consider nine factors to determine whether an entity is a joint employer, but none is dispositive—and the Fourth Circuit instructs that "courts can modify the factors to the specific industry context." *Id.*; *see also id.* at 415 ("the consideration of factors must relate to the particular relationship under consideration") (quote omitted). The principal guidepost, however, remains the common law element of control. *Id.* at 415. "Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity." *Id.*

There is no dispute that state law delegates control over employee health coverage to NCSHP, which exists solely to permit that delegation, as its enacting statute makes clear. N.C. Gen. Stat. § 135-48.2(a). NCSHP thus is a joint employer with DPS for the same reasons that it is an agent of DPS. Where an entity "exhibit[s] a high degree of control over the terms of [] employment," it must be held liable as a joint employer. *Butler*, 793 F.3d at 415.

Case 1:19-cv-00272-LCB-LPA   Document 153   Filed 11/30/21   Page 26 of 31

## III. PLAINTIFFS SATISFY THE REQUIREMENTS FOR DECLARATORY AND INJUNCTIVE RELIEF.

Plaintiffs satisfy the requirements for declaratory relief. This case presents an "actual controversy," allowing the Court to "declare the rights of the parties." 28 U.S.C. § 2201(a).

Plaintiffs also satisfy the four criteria for permanent injunctive relief. First, the denial of Plaintiffs' statutory rights constitutes irreparable harm, particularly when future harm is likely. *See, e.g.*, *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004). So does the denial and delay of healthcare. Ex. 25(a) ¶¶ 57, 106; Ex. 27(a) ¶ 38. Second, no monetary damages can restore Plaintiffs to their rightful position of being able to access medical care at the time they need it, or undo the deprivation of equal treatment under law. *See Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859 (E.D.N.Y. Aug. 17, 2020). Third, the balance of the hardships tips sharply in Plaintiffs' favor. NCSHP negotiates reduced rates and covering Plaintiffs at those lower rates would save NCSHP and taxpayers money, instead of compensating Plaintiffs for the full price charged by providers without those negotiated discounts. Ex. 12, 47:11-48:4. Finally, "[t]he public interest in remedying gender discrimination is strong . . . ." *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F.Supp.2d 1093, 1115 (S.D. Cal. 2012). And "[t]here is clearly a robust public interest in safeguarding prompt access to health care." *Whitman-Walker Clinic*, 485 F.Supp.3d at 61.

24

## CONCLUSION

Plaintiffs respectfully request that the Court grant them partial summary judgment on their statutory claims, declare that the Exclusion violates the ACA and Title VII, and permanently enjoin Defendants from enforcing it.

* * *

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Respectfully submitted,

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
 EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
 EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
TRANSGENDER LEGAL DEFENSE AND
 EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

26

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1) because the body of this brief, including headings and footnotes, does not exceed 6,250 words as indicated by Microsoft Word, the program used to prepare this document.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of

Court using the CM/ECF system which will send notification of such filing to all

registered users.

Dated: November 30, 2021

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com