**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 20-1409

———————————

MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK, by his next
friends and parents; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by
his next friends and parents; SAM SILVAINE,

                    Plaintiffs – Appellees,

        v.

NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE
EMPLOYEES,

                    Defendant – Appellant,

    and,

DALE FOLWELL, in his official capacity as State Treasurer of North Carolina;
UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH
CAROLINA STATE UNIVERSITY; DEE JONES, in her official capacity as
Executive Administrator of the North Carolina State Health Plan for Teachers and
State Employees; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO.

                    Defendants.

———————————————————————

STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE;
STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE;
COMMONWEALTH OF MASSACHUSETTS; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO;
STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN;
DISTRICT OF COLUMBIA; EQUALITY NORTH CAROLINA;
CLEARINGHOUSE ON WOMEN'S ISSUES; FEMINIST MAJORITY
FOUNDATION; GENDER EQUALITY LAW CENTER; HARVARD LAW

SCHOOL LGBTQ+ADVOCACY CLINIC; LEGAL VOICE; NARAL PRO-
CHOICE AMERICA; NATIONAL CENTER FOR LESBIAN RIGHTS;
NATIONAL HEALTH LAW PROGRAM; NATIONAL WOMEN'S LAW
CENTER; NORTH CAROLINA AIDS ACTION NETWORK; PLANNED
PARENTHOOD SOUTH ATLANTIC; WOMEN'S BAR ASSOCIATION OF THE
DISTRICT OF COLUMBIA; WOMEN'S BAR ASSOCIATION OF THE STATE
OF NEW YORK,

                    Amici Supporting Appellees.

                    ————————————

Appeal from the United States District Court for the Middle District of North Carolina, at
Greensboro.  Loretta C. Biggs, District Judge.  (1:19-cv-00272-LCB-LPA)

                    ————————————

Argued:  March 11, 2021                              Decided:  September 1, 2021
                    Amended:  December 2, 2021

                    ————————————

Before GREGORY, Chief Judge, AGEE, and DIAZ, Circuit Judges.

                    ————————————

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Diaz
concurred in part.  Judge Diaz wrote a concurring opinion and Judge Agee wrote a dissenting
opinion.

                    ————————————

**ARGUED:**  John Guyton Knepper, LAW OFFICE OF JOHN G. KNEPPER, LLC,
Cheyenne, Wyoming, for Appellant.  Omar Francisco Gonzalez-Pagan, LAMBDA
LEGAL DEFENSE & EDUCATION FUND, INC., New York, New York, for Appellees.
**ON BRIEF:**  Mark A. Jones, Kevin G. Williams, BELL, DAVIS & PITT, PA,
Winston-Salem, North Carolina, for Appellant.  Samuel R. Bagenstos, Ann Arbor,
Michigan; Tara L. Borelli, Atlanta, Georgia, Carl S. Charles, LAMBDA LEGAL
DEFENSE AND EDUCATION FUNC, INC., New York, New York; Amy E. Richardson,
Lauren E. Snyder, HARRIS, WILTSHIRE & GRANNIS LLP, Washington, D.C.;
David P. Brown, TRANSGENDER LEGAL DEFENSE & EDUCATION FUND, INC.,
New York, New York, for Appellees.  Xavier Becerra, Attorney General, Renu R. George,
Senior Assistant Attorney General, Kathleen Boergers, Supervising Deputy Attorney
General, Nicole Ries Fox, Deputy Attorney General, OFFICE OF THE ATTORNEY
GENERAL OF CALIFORNIA, San Diego, California, for Amicus State of California.
Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF
COLORADO, Denver, Colorado, for Amicus State of Colorado.  Kathleen Jennings,
Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE,

2

Wilmington, Delaware, for Amicus State of Delaware. Clare E. Connors, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, Hawaii, for Amicus State of Hawaii. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Maura Healy, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE COMMONWEALTH OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada. Gurbir S. Grewal, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Joshua L. Kaul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WISCONSIN, Madison, Wisconsin, for Amicus State of Wisconsin. Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Ames Simmons, EQUALITY NORTH CAROLINA, Raleigh, North Carolina; Michael W. Weaver, Chicago, Illinois, Michael S. Stanek, Sarah P. Hogarth, Gilbert T. Smolenski, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Amicus Equality North Carolina. Kevin Barry, QUINNIPIAC UNIVERSITY SCHOOL OF LAW LEGAL CLINIC, Hamden, Connecticut; Kevin Costello, Maryanne Tomazic, Center for Health Law & Policy Innovation, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Amici Nonprofit Civil Rights, Advocacy, and Public Interest Organizations.

––––––––––––––––

3

GREGORY, Chief Judge:

In March 2019, several enrollees in the North Carolina State Health Plan for Teachers and State Employees (NCSHP) filed a three-count complaint against the State Health Plan and other State defendants. Plaintiffs allege that NCSHP discriminates against its transgender enrollees by categorically denying coverage for gender dysphoria treatments like counseling, hormone therapy, and surgical care. This, Plaintiffs argue, violates § 1557 of the Patient Protection and Affordable Care Act. NCSHP filed a motion to dismiss, asserting that it was entitled to sovereign immunity under the Eleventh Amendment. The district court denied the motion, holding that NCSHP waived its immunity against this claim by accepting federal financial assistance. We affirm.

## I.

North Carolina provides its employees and their dependents with health care through a self-funded plan, the North Carolina State Health Plan. NCSHP covers nearly three-quarters of a million teachers, state employees, retirees, current and former lawmakers, state university personnel, community college personnel, hospital staff members, and their dependents. Directed by North Carolina State Treasurer Dale Folwell, NCSHP has the power to "determine, define, adopt, and remove health care benefits and exclusions." J.A. 23. Relevant here, NCSHP has adopted an exclusion that denies coverage to all forms of gender-confirming health care—important and sometimes lifesaving care sought by state employees across North Carolina, including Plaintiffs.

A.

Maxwell Kadel, Jason Fleck, Connor Thonen-Fleck, Julia McKeown, Sam Silvaine, C.B., and Michael D. Bunting, Jr. filed this suit against NCSHP for declaratory and injunctive relief, as well as money damages.[1]  Plaintiffs are NCSHP enrollees.  They are also transgender or serve as a legal guardian to a transgender dependent.

People identify as transgender when their gender identity—their inherent and deeply felt sense of their gender—does not align with the sex they were assigned at birth.  We have previously noted what should by now be uncontroversial:  "Just like being cisgender, being transgender is natural and is not a choice."  *Grimm v. Gloucester County Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), *cert. denied*, No. 20-1163, 2021 WL 2637992, at *1 (June 28, 2021).  Nor is someone's transgender status a "psychiatric condition" that implies any "impairment in judgment, stability, reliability, or general social or vocational capabilities."  *Id.*

For some who identify as transgender, the "incongruence between gender identity and the body's other sex characteristics can result in gender dysphoria."  J.A. 26.  Gender dysphoria is a medical condition recognized in the DSM-V that often manifests as "a feeling of clinically significant stress and discomfort born out of experiencing that something is fundamentally wrong."  *Id.*   Left untreated, gender dysphoria "often intensifies," leading to "severe anxiety, depression, and suicidal ideation or suicide."  *Id.*

---

[1] Connor Thonen-Fleck is a plaintiff by his next friends and parents, Jason Fleck and Alexis Thonen; C.B. is a plaintiff by his next friends and parents, Michael D. Bunting, Jr. and Shelley K. Bunting.

5

The World Professional Association for Transgender Health has formulated STANDARDS OF CARE that have been adopted by health organizations across the country. These standards recognize that "[t]he ability to live in a manner consistent with one's gender identity is critical to the health and well-being of transgender individuals and is a key aspect in the treatment of gender dysphoria." *Id.* What it means to "live in a manner consistent with one's gender identity" varies from person to person. For transgender individuals, it "typically include[s] social, legal, and medical transition." J.A. 27. The medical component, in particular, can be "a critical part of transitioning," as it "includes treatments that bring the sex-specific characteristics of a transgender individual's body into alignment with their gender identity." *Id.* Medical transition may require counseling, hormone replacement therapy, or surgical care. These treatments "are not 'cosmetic,' 'elective,' or 'experimental.'" J.A. 29. Rather, they are safe, effective, and often medically necessary.

NCSHP offers three health care plans to eligible state employees. Each plan purports to cover "medically necessary pharmacy benefits, mental health benefits, and medical care." J.A. 30. But since 2018, every plan has excluded coverage for gender-confirming health care. *Id.*

NCSHP's exclusion marks a departure from the coverage provided in its 2017 Health Plans. Before NCSHP announced its 2017 plans, its consulting firm issued a report on § 1557 of the Affordable Care Act and how it applied to NCSHP. Section 1557 prohibits "any health program or activity" that receives federal funds from discriminating against individuals on any ground prohibited by various federal statutes, including Title IX. 42

6

U.S.C. § 18116(a). The 2016 report concluded that § 1557 likely applied to NCSHP, and that the existing exclusion on gender-confirming case risked "millions of dollars in federal funding" and "discrimination lawsuits for non-compliance." J.A. 31–32. These potential costs, the report noted, far exceeded the cost of providing gender-confirming care—an estimated 0.011% –0.027% of NCSHP's $3.2 billion of premiums.

Heeding this guidance, the State Treasurer, joined by a majority of NCSHP's Board of Trustees, voted to remove the exclusion for the 2017 Health Plans. The 2017 Plans did not mandate coverage for all gender-confirming care. They simply allowed claims for gender-confirming care to be reviewed under the same criteria and in the same manner as claims for any other medical, mental health, or pharmacy benefits.

But in 2017, a new Treasurer took office. He ensured that NCSHP reinstated its exclusion of gender-confirming care. He then pledged that until the courts, legislature, or voters required him "to spend taxpayers' money on sex change operations," he would not remove the exclusion. J.A. 33 (internal quotation marks omitted).

## B.

Plaintiffs filed suit against NCSHP, among others, alleging that the exclusion of gender-confirming health services violated § 1557 of the Affordable Care Act. They sought both money damages and equitable relief. NCSHP then filed a motion to dismiss, arguing it was immune from suit under the Eleventh Amendment. The district court denied the motion. Under the Civil Rights Remedies Equalization Act (CRREA), "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . any other Federal Statute prohibiting

7

discrimination by recipients of Federal financial assistance."  42 U.S.C. § 2000d-7.  The district court held that § 1557 of the Affordable Care Act qualified as a "Federal statute prohibiting discrimination," and NCSHP therefore waived its sovereign immunity by accepting federal funds.

NCSHP timely appealed.

## II.

On appeal from a Rule 12(b)(1) motion to dismiss, we review a district court's factual findings relating to jurisdiction for clear error and the resulting legal conclusion de novo.  *Williams v. Big Picture Loans*, 929 F.3d 170, 176 (4th Cir. 2019).

## III.

At its core, the Eleventh Amendment bars federal courts from exercising jurisdiction over suits against nonconsenting states or state entities.  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (citing *Hans v. Louisiana*, 134 U.S. 1, 15 (1793)).  This protection not only prevents federal court judgments, but also "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties."  *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993).  The Eleventh Amendment does not, however, prevent a state from "choos[ing] to waive its immunity in federal court."  *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (citing *Clark v. Barnard*, 108 U.S. 436, 447–48 (1883)).  Nor does it prohibit the federal government from conditioning

8

the availability of federal funds upon a state's waiver of its sovereign immunity.[2] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (explaining that Congress has "broad power to set the terms on which it disburses money to the States"); *but see South Dakota v. Dole*, 483 U.S. 203, 207–11 (1987) (placing restrictions on Congress's spending power).

A state's acceptance of conditioned funds "reflects an exercise, rather than a limitation of, State sovereignty." *Madison v. Virginia*, 474 F.3d 118, 129 (4th Cir. 2006). Indeed, the very reason the Spending Clause is a "permissible method of encouraging a State to conform to federal policy choices" is because it leaves states with "the ultimate decision of whether to conform." *Id.* at 124 (quoting *New York v. United States*, 505 U.S. 144, 168 (1992)) (internal quotation marks omitted).

That said, the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Sossamon*, 563 U.S. at 284 (quoting *Coll. Savings Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675 (1999)) (internal quotation marks omitted). "[T]here can be no consent by implication or by use of ambiguous language." *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986). Rather, a State's consent to suit must be "unequivocally expressed" in the text of the relevant statute. *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)). This

---

[2] Congress may also, in some instances, abrogate a state's sovereign immunity. *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 377–78 (2006); *Allen v. Cooper*, 140 S. Ct. 994, 1000, 1003–04 (2020). Here, however, neither party argues that either ACA or CRREA abrogated NCSHP's immunity.

9

"clear declaration" requirement allows us to be "certain that the State in fact consents to suit." *Id.* (quoting *Coll. Savings Bank*, 527 U.S. at 680).

Upon finding that Congress clearly conditioned federal funds upon a state's waiver of sovereign immunity, courts must then determine the waiver's scope. We "strictly construe[]" the scope of a sovereign immunity waiver "in favor of the sovereign." *Lane v. Peña*, 518 U.S. 187, 192 (1996). "[F]or example, a State's consent to suit in its own courts is not a waiver of its immunity from suit in federal court." *Sossamon*, 563 U.S. at 285 (citing *Coll. Savings Bank*, 527 U.S. at 676). And a waiver of sovereign immunity to other types of relief does not waive immunity against monetary damages. *Id.* (citing *Lane*, 518 U.S. at 192).

NCSHP argued before the district court that § 1557 of the Affordable Care Act—whether read in isolation or in conjunction with CRREA—did not unambiguously condition the receipt of federal funds upon NCSHP's waiver of sovereign immunity. The district court agreed only in part. It held that § 1557, standing alone, did not clearly condition federal funds on a state's waiver of sovereign immunity. J.A. 230. But when read in conjunction with CRREA, § 1557 placed state officials on clear notice that acceptance of federal funds amounted to a waiver of sovereign immunity against claims of discrimination arising out of that provision. J.A. 232–34.

We affirm the district court and hold that, when read alongside CRREA, § 1557 clearly conditions the receipt of federal funds upon NCSHP's waiver of sovereign immunity against suits for money damages. And by accepting federal financial assistance, NCSHP effectuated that waiver. In my view, however, § 1557 also stands as a clear and

10

unequivocal sovereign immunity waiver when standing alone.  I write separately in Part III.A. to express that view.

## A.

Section 1557 of the Affordable Care Act forbids "any health program or activity" receiving federal financial assistance from "subject[ing]" an individual to discrimination on a "ground prohibited under title VI of the Civil Rights Act of 1964 [], title IX of the Education Amendments of 1972 [], the Age Discrimination Act of 1975 [], or section 794 of Title 2 . . . ."  42 U.S.C. § 18116(a).  To remedy § 1557 violations, "[t]he enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply."  *Id.*  Most plainly understood, this provision conditions a health program or activity's receipt of federal funds upon its consent to be subject to "the enforcement mechanisms provided for and available under" the statutes listed in § 1557.  NCSHP therefore waived its sovereign immunity if (1) it received federal financial assistance, (2) it is a health program or activity, and (3) suits for money damages are an "enforcement mechanism" that is "provided for and available under" Title VI, Title IX, 29 U.S.C. § 794, or the Age Discrimination Act.

It is undisputed that NCSHP receives federal funds.  But, for the first time on appeal, NCSHP argues that it is not a health program or activity.  "We have repeatedly held that issues raised for the first time on appeal generally will not be considered."  *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) (citing *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993); *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 318 (4th Cir. 1988)).  Exceptions to this rule exist "only in very limited circumstances, such as where

11

refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Id.* (quoting *Muth*, 1 F.3d at 250).

NCSHP does not argue that exceptional circumstances excuse its waiver. Rather, NCSHP insists that by "rais[ing] an immunity-based argument from [the] suit's inception," it preserved the question of whether it qualifies as a medical program or activity. Reply Br. at 11, ECF No. 45. But this stretches preservation beyond its intended utility. We require preservation to ensure that district courts "be fairly put on notice as to the substance of [an] issue" before resolving it in the first instance. *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000). This calls for parties to "do more than raise a non-specific objection or claim." *Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 922 F.3d 568, 578 (4th Cir. 2019). NCSHP's invocation of "an immunity-based argument" did not place the district court on notice that NCSHP challenged its status as a medical program or activity. Given NCSHP's silence on this issue below, the district court had no reason to understand it as anything but undisputed. We too take that view.

This leaves us with the question of whether suits for money damages are an "enforcement mechanism provided for and available under" Title VI, Title IX, 29 U.S.C. § 794, or the Age Discrimination Act. There is no question that a plaintiff may enforce Title IX through a claim for money damages. But NCSHP contends that § 1557 did not incorporate this remedy because (1) a sovereign immunity waiver is not an "enforcement mechanism," and (2) even if it were, the immunity waiver that permits Title IX damages claims is not "available under" Title IX itself. We reject both efforts to introduce ambiguity into a statute where it would not otherwise exist.

12

i.

NCSHP argues that Title IX has two enforcement mechanisms:  the administrative procedure set forth in 20 U.S.C. § 1682 and an implied private right of action.  Sovereign immunity, by contrast, exists as "an independent barrier to the court's jurisdiction over a claim made by a specific plaintiff."  Reply Br. at 5.  But simply stating that sovereign immunity is "independent" of a law's enforcement mechanism does not make it so.  A "mechanism" is not one thing, but "a process, technique, or system for achieving a result." *Mechanism*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/mechanism (saved as ECF opinion attachment).  It follows that an "enforcement mechanism" is a process, technique, or system for "compelling observance of or compliance with a law, rule, or obligation."  *See Enforcement*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/enforcement (saved as ECF opinion attachment); *see also Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 953 (9th Cir. 2020) (finding that, at minimum, "enforcement mechanism" refers to "the process for compelling compliance with a substantive right"); *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 239 (6th Cir. 2019) ("The phrase 'enforcement mechanism' refers to the process for compelling compliance with a substantive right . . . .").

The existence of an absolute immunity, then, is not independent of a statute's enforcement mechanism.  Rather, an enforcement mechanism varies in scope depending on who can be charged with violating a given law.  Sovereign immunity narrows the scope of permissible enforcement; a sovereign immunity waiver broadens it.  So, while a

13

sovereign immunity waiver is not, by itself, an "enforcement mechanism," it is an inseparable component of that broader process.

ii.

NCSHP next argues that the sovereign immunity waiver that allows Title IX actions against state defendants is not "available under" Title IX itself. Rather, it is available under § 1003 of CRREA—a separate provision, enacted at a separate time, under a separate title of the United States Code.

It is true that CRREA codifies the sovereign immunity waiver that permits Title IX plaintiffs to sue states for money damages. Congress enacted CRREA in response to *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 246–47 (1985). In *Atascadero*, the Supreme Court held that the Rehabilitation Act failed to clearly condition the receipt of federal funds upon a state's immunity waiver. 473 U.S. at 246–47. At the time, many civil rights statutes used the same waiver language that the Supreme Court found lacking in the Rehabilitation Act. To remedy the problem identified in *Atascadero*, CRREA codified what is now the standard for unequivocal sovereign immunity waivers. *Lane*, 518 U.S. at 198 ("By enacting § 1003 [of CRREA], Congress sought to provide the sort of unequivocal waiver that our precedents demand."). It mandates that states receiving federal financial assistance "shall not be immune under the Eleventh Amendment . . . from suit in Federal court" for discrimination prohibited by various federal statutory provisions—including Title IX. 42 U.S.C. § 2000d-7(a)(1). Moreover, it provides remedies for those violations "to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U.S.C. § 2000d-7(a)(2).

14

Starting from this premise, NCSHP contends that a sovereign immunity waiver is "available under" CRREA, not Title IX, because "under" imposes a physical requirement, "specif[ying] where to look to find out" what remedies are "available." Opening Br. at 17, ECF No. 27. NCSHP insists that this definition is the only way to avoid redundancy and honor the principle that we "give effect, if possible, to every clause and word of a statute." *Advoc. Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017). Any other, NCSHP argues, would give "provided for" and "available under" the same meaning. This is where I disagree. NCSHP's proposed definition places the statute in greater danger of redundancy, not less.

Recall, § 1557 incorporates the enforcement mechanisms that are "provided for and available under" Title IX. The phrase "provided for" identifies the source of a qualifying enforcement mechanism under § 1557. *See Provide for*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/provide%20for ("to supply what is needed for (something or someone)"); (saved as ECF opinion attachment). If "available under" imposes a location requirement as NCSHP suggests, then it too identifies where an enforcement mechanism must find its roots, just in a narrower sense. Using NCSHP's definition, I struggle to see how an enforcement mechanism could ever be "available under" a particular title of the United States Code without also being "provided for" by that statute. To render "provided for" without meaning would imbue § 1557 with the very flaw that the canon against surplusage seeks to avoid. *See Redundancy*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/redundancy ("the state of being not or no longer needed or useful") (saved as ECF opinion attachment).

15

Thankfully, textualism does not compel this result. As the Supreme Court has recognized, "[t]he word 'under' has many dictionary definitions and must draw its meaning from context." *Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991). In some contexts, "under" may refer to a location—"extending or directly below." In others, it indicates what something is "controlled, managed, or governed by," i.e., "as provided for by the rules of" or "in accordance with." *Under*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/under (saved as ECF opinion attachment). "Under" can also "express grouping or classification." *Id.* Read most naturally, "available under" asks not where an enforcement mechanism can be found, but whether the use of an enforcement mechanism is permitted by or consistent with one of the statutes enumerated in § 1557.[3] This question is distinct from whether an enforcement mechanism is "provided for" by a particular statute. Put simply, "provided for" identifies the source of a qualifying enforcement mechanism, while "available under" identifies the mechanism's scope. And as explained above, the sovereign immunity waiver CRREA contains readily falls within the scope of Title IX's enforcement mechanism.

NCSHP argues that the "careful textualist distinction" required to identify the correct meaning of "available under" serves as "evidence that Congress has not manifested

---

[3] Contrary to what NCSHP argues, the Supreme Court gave "under" a similar meaning in *Ardestani*, 502 U.S. at 135. *Ardestani* held that deportation proceedings were not adjudications "under section 554 of [Title 5]" because they were not "subject to or governed by" that provision. *Id.* (internal quotation marks omitted). The Immigration and Nationality Act provides the "*sole* and *exclusive* procedure for determining [] deportability," so deportation proceedings fall outside the scope of what § 554 can permissibly govern. *Id.* at 134 (quoting 8 U.S.C. § 1252(b)). But unlike the INA, which operates unaided by § 554 of the APA, Title IX and CRREA necessarily work in tandem.

16

a clear intent to require each State's consent to waive its constitutional immunity."  Reply Br. at 8 (internal quotation marks and modifications omitted).  I disagree.  To label a phrase ambiguous every time it contains words that have multiple meanings would call into question nearly every provision in the United States Code.  In statutory interpretation, as in daily life, we understand words with multiple meanings to bear the most natural one, according to context.  When interpreting statutes, we have an additional set of tools to discern meaning from a range of alternatives:  the canons of construction.  The only definition of "available under" that NCSHP offers is one that, without reason, violates those canons.  Parties cannot inject ambiguity into a statute by simply rebuffing established principles of statutory interpretation.

Nor does the absence of certain magic words introduce ambiguity into an otherwise clear provision.  The late Justice Scalia provided the critical fifth vote in *Dellmuth v. Muth*, 491 U.S. 223, 233 (1989), a case upon which the dissent heavily relies.  In a one-sentence concurrence, he conditioned his vote upon "the understanding that [the majority's] reasoning [did] not preclude congressional elimination of sovereign immunity in statutory text . . . without explicit reference to state sovereign immunity or the Eleventh Amendment."  *Id.* (Scalia, J., concurring); *contra* Diss. Op. at 69.  A provision can be clear without being talismanic.

The enforcement mechanism provided for and available under Title IX is one that permits states receiving federal financial assistance to be haled into court for money damages.  And this is the enforcement mechanism that § 1557 incorporates by reference.

17

Even when read on its own, § 1557 plainly conditions the receipt of federal funds on NCSHP's waiver of sovereign immunity.

### B.

Were there any doubt about whether § 1557 conditioned the receipt of federal funds upon states' waiver of sovereign immunity against suits for money damages, it is remedied by reading the provision alongside CRREA's residual clause.  As discussed above, CRREA provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7.  Plaintiffs argue, and the district court held, that § 1557 is a "provision[] of any other Federal statute prohibiting discrimination," and thus falls within CRREA's residual clause.  Neither this Court nor any of our sister circuits have addressed the relationship between CRREA and § 1557.  But each district court confronted with this issue has, so far, reached same conclusion as the court below.  *Fain v. Crouch*, No. 3:20-0740, 2021 WL 2004793, at *3 (May 19, 2021); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 998–99 (W.D. Wis. 2018); *Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, No. 17-4803, 2017 WL 4791185, at *5–8 (E.D. La. Oct. 24, 2017); *see also Concepcion v. Cal. Dep't of Corr. & Rehab.*, No. 1:18-cv-01743-NONE-JLT(PC), 2021 WL 1516401, at *11 (E.D. Cal. Apr. 16, 2021).

18

In reaching its conclusion, the district court asked two questions: (1) whether § 1557 was a provision of a federal statute that prohibited discrimination, and (2) whether § 1557 was "sufficiently similar" to the statutes that CRREA specifically listed. *Kadel v. Folwell*, 446 F. Supp. 3d 1, 15 (M.D.N.C.) (2020) (citing *Madison*, 474 F.3d 118). It answered both questions in the affirmative, finding that "[l]ike the four statutes named in CRREA, Section 1557 is a nondiscrimination provision which is directly aimed at recipients of federal funding." *Id.* Indeed, after comparing § 1557 to Title VI, Title IX, the Age Discrimination Act, and § 504 of the Rehabilitation Act, the court remarked that it would be "hard to see how Section 1557 could be any more 'like the statutes expressly listed' [in CRREA]." *Id.*

NCSHP contends that this was in error. Specifically, it argues that Congress could not have intended CRREA's residual clause to cover § 1557, and that the "sufficiently similar" inquiry improperly substitutes the judicial for the legislative branch of government. Opening Br. at 22–29. Both arguments are unpersuasive.

i.

As a preliminary matter, NCSHP is wrong to suggest that § 1557 cannot fall within CRREA's residual clause unless Congress specifically contemplated § 1557 at the time CRREA was enacted. Congressional intent notwithstanding, we have long assumed that "Congress says in a statute what it means and means in a statute what it says there." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). To that end, "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.* (internal quotation marks omitted). Here, CRREA covers four enumerated

19

statutes along with "the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d-7. NCSHP does not argue the residual clause is susceptible to multiple interpretations. Rather, it seems to argue that CRREA is ambiguous simply by virtue of its breadth. Opening Br. at 24–29. But "[b]road general language is not necessarily ambiguous when congressional objectives require broad terms." *Cf. Diamond v. Chakrabarty*, 477 U.S. 303, 315 (1980) (interpreting "any new and useful process, machine, manufacture, or composition of matter" in 35 U.S.C. § 101). CRREA's origin story, explained above, indicates that broad terms were precisely what congressional objectives required.

Moreover, we do not view sovereign immunity waivers through the lens of what Congress intended at the time of enactment, but "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds." *Murphy*, 548 U.S. at 296. From that perspective, CRREA "furnishes clear notice" to state officials that its sovereign immunity waiver encompasses the provisions of "any" federal statute that prohibits discrimination by recipients of federal funds. *See id.* The ACA is a federal statute that prohibits discrimination, and § 1557 is a provision contained therein. On top of this objective notice provided by statute, the record also indicates that NCSHP was subjectively aware that it waived its sovereign immunity against § 1557 suits by accepting federal funds. J.A. 51–53; *see also* Br. for Equality North Carolina as Amicus Curiae Supporting Appellees 5–23, ECF No. 39.

Still, NCSHP resists this plain reading of the statute, urging us to join the Fifth and Tenth Circuits in holding "Federal statute prohibiting discrimination" refers only to "statutes that deal *solely* with discrimination by recipients of federal financial assistance." *Cronen v. Tex. Dep't of Human Servs.*, 977 F.2d 934, 937–38 (5th Cir. 1992); *see also Levy v. Kan. Dep't of Soc. & Rehab Servs.*, 789 F.3d 1164, 1171 (10th Cir. 2015). The dissent agrees, insisting that the Court, too, could see this ambiguity if only it'd ignore the statute's text. Diss. Op. at 58, 60–63 (interpreting "the provisions of any other Federal statute prohibiting discrimination" to mean "statutory enactments whose subject matter deals solely with discrimination"). But there is a difference between identifying ambiguity in a statute and identifying ambiguity that would exist if a statute's text were different. NCSHP and the dissent only do the latter.[4] *Contra Borden v. United States*, 141 S. Ct. 1817, 1829 (2021) ("A court does not get to . . . insert convenient language to yield the court's preferred meaning."); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the *existing* statutory text.") (emphasis added).

---

[4] The dissent correctly notes that, by rejecting this brand of statutory interpretation, we take a different view of the residual clause than two of our sister circuits. *See Levy*, 789 F.3d at 1171; *Cronen*, 977 F.2d at 937–38. But this split is not new. The Fourth Circuit first diverged from *Cronen*'s reasoning with our decision in *Madison v. Virginia*, 474 F.3d 118, 130 (4th Cir. 2006). *Madison*, decided 14 years after *Cronen*, declined to acknowledge, let alone adopt, the Fifth Circuit's view that that residual clause only encompasses "statutes that deal solely with discrimination" 977 F.2d at 937. Instead, we found CRREA's enumerated statutes similar because they all "expressly" prohibited discrimination, and we reasoned that a non-enumerated statute must share this feature to fall within the residual clause. 474 F.3d at 132–33. Today, we follow the path that *Madison* paved.

21

If we constrain ourselves to the text as written, the residual clause imposes but two conditions: that the law be federal and that it prohibit discrimination by recipients of Federal financial assistance. The Affordable Care Act is undoubtedly federal. And it prohibits discrimination by recipients of Federal financial assistance—as it was designed to do. *See, e.g.*, 42 U.S.C. § 18116(a) (prohibiting health programs and activities from engaging in discrimination if they "receiv[e] Federal financial assistance"); *cf. Doe*, 926 F.3d at 239 ("The Affordable Care Act prohibits discrimination based on several grounds."); *Mead v. Holder*, 766 F. Supp. 2d 16, 19 (D.D.C. 2011) (explaining that the Affordable Care Act was designed to remedy disparate access to health care rooted, in part, on discrimination based on wealth and preexisting conditions); Valarie K. Blake, *Civil Rights as Treatment for Health Insurance Discrimination*, 2016 WIS. L. REV. FORWARD 37, 41 (2016) ("[M]any of the ACA's more notable provisions sought to discourage discrimination by health insurers . . . .").

Section 1557 is one of the many provisions within the ACA advancing this objective. It requires that "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). This prohibition mirrors those contained in Title VI, Title IX, the Age Discrimination Act, and § 504 of the Rehabilitation Act—the four statutes CRREA incorporates by name. *See id.* Reinforcing the statute's plain meaning, one Senator explained that § 1557's "explicit[] prohib[ition]" was "necessary to remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system." Br. for Nonprofit Civil

22

Rights, Advocacy, and Public Interest Organizations as Amici Curiae Supporting Appellees 4 n.7, ECF No. 40 (quoting Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1821, 1842 (daily ed. Mar. 23, 2010) (statement of Sen. Patrick Leahy)). With § 1557, the ACA took a major step toward "ensur[ing] that all Americans are able to reap the benefits of health insurance reform equally without discrimination." *Id.* That the Affordable Care Act does more than prohibit discrimination does not lessen the prohibition's force or effect.[5]

As a result, this case stands in contrast to our decision in *Madison*, 474 F.3d at 132–33. There, we addressed whether the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000c-1(a) (RLUIPA) "clearly and unambiguously" fell within CRREA's residual clause. 474 F.3d at 132–33. Declining to rule on the question of whether a "catch-all provision" like CRREA's residual clause "could suffice as an unequivocal textual waiver," we held that RLUIPA fell outside CRREA because it was not

---

[5] The concurring opinion contends that we need not look beyond § 1557's objectives if we read the phrase "prohibiting discrimination by recipients of Federal financial assistance" to modify "provision" instead of "statute." Conc. Op. at 33–38. But where this reading avoids surplusage, it runs up against the last-antecedent rule. *See Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 508 (4th Cir. 2011) (explaining that under the last-antecedent rule, a statutory clause ordinarily only modifies its nearest antecedent). To be sure, the last-antecedent rule "is not an absolute and can assuredly be overcome by other indicia of meaning." *Cf. Lockhart v. United States*, 577 U.S. 347, 352 (2016). But I am reluctant to resolve a battle of the canons that the parties did not raise, brief, or argue. *See* Opening Br. at 28–29 (assuming that the phrase "prohibiting discrimination by recipients of Federal financial assistance"); Response Br. at 17–23 (same). And I do not find it necessary to do so here. As a majority of the Court today holds, the sovereign immunity waiver contained in CRREA's residual clause clearly applies to NCSHP regardless of whether "prohibiting discrimination by recipients of Federal financial assistance" modifies "provision" or "statute."

23

sufficiently similar to the statutes CRREA specifically listed. *Id.* Invoking *noscitur a sociis* and *ejusdem generis*, we explained that "[e]very statute set out in the CRREA expressly prohibits discrimination." *Id.* (citing 29 U.S.C. § 794(a) (2000) (prohibiting "discrimination" on the basis of disability); 20 U.S.C. § 1681(a) (2000) (prohibiting "discrimination" on the basis of sex); 42 U.S.C. § 6102 (2000) (prohibiting "discrimination" on the basis of age); 42 U.S.C. § 2000d (2000) (prohibiting "discrimination" on the basis of race, color, or national origin)). RLUIPA, however, "does not speak in those terms." *Id.* at 133. In fact, rather than "requir[ing] identical treatment of similarly situated individuals," like the CRREA statutes, "RLUIPA requires that States treat religious accommodation requests *more favorably* than non-religious requests." *Id.* (emphasis added).

As *Madison* illustrates, the "sufficiently similar" inquiry does little more than ask whether the provision identified is really one that prohibits discrimination. 474 F.3d at 132–33. It does not, as NCSHP puts it, "substitute the judicial for the legislative department of government." Opening Br. at 24 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.7 (1983)). Unlike the cases NCSHP cites involving unduly vague criminal laws, this case is not one where the "legislature fail[ed] to provide such minimal guidelines" that it permits judges to "pursue their personal predilections." *Cf. Kolender*, 461 U.S. at 358 (discussing the notice and separation-of-powers problems that arise when *criminal* statutes are unconstitutionally vague). Instead, CRREA's residual clause reflects a specific objective to render states liable for money damages when they engage in unlawful discrimination. Reading this clause to encompass § 1557 is wholly consistent with the task

24

to which the judiciary is assigned: enforcing statutes "according to [their] terms." *Hartford Underwriters Ins. Co.*, 530 U.S. at 6.

ii.

The dissent contends that *Dellmuth v. Muth*, 491 U.S. 223 (1989) forecloses today's result. Diss. Op. at 76–82; *but see Sossamon*, 563 U.S. at 292 (recognizing that the question of whether CRREA's residual clause satisfies the clear-statement rule is an open question). Not so.[6]

At the most basic level, *Dellmuth* involved Congress's ability to abrogate a state's sovereign immunity, not its ability to condition spending upon a state's waiver of sovereign immunity. 491 U.S. at 227. Abrogation is conceptually similar but analytically distinct from sovereign immunity waivers. *Cf. Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 450–55 (5th Cir. 2005) (differentiating a sovereign immunity waiver from the abrogation of sovereign immunity). For one, the source of authority is different. Congress's authority to condition federal funds upon a state's waiver of sovereign immunity flows from the spending clause. *Murphy*, 548 U.S. at 296; *see also* U.S. CONST., Art. I, § 8, cl. 1. Meanwhile, Congress's authority to abrogate a state's sovereign immunity finds its footing in § 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *see also* U.S. CONST., Amend XIV, § 5. With sovereign immunity waivers,

---

[6] The dissent's reliance on *Lane*, 518 U.S. at 198–200 is similarly puzzling. *See* Diss Op. at 42 n.12. *Lane* of course concluded that the term "public entity" was insufficiently clear to allow CRREA's equalization provision to stand as a federal sovereign immunity waiver. In the Court's view, this provides little guidance on whether the CRREA's residual clause may stand as the state sovereign immunity waiver that it purports to be.

25

states remain the ultimate decisionmakers on whether they will subject themselves to suits for damages by accepting federal funds. *New York*, 505 U.S. at 168. Not so with abrogation—Congress has the final word. *Tennessee v. Lane*, 541 U.S. 509, 518 (2004).

It is undoubtedly tempting to conflate the two concepts—they both implicate states' sovereign immunity and they both trigger a stringent, "clear statement" requirement. *Sossamon*, 563 U.S. at 284 (sovereign immunity waivers); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) (abrogation). But the differences between these concepts are far from academic. It is easy to imagine a statute that clearly abrogates states' sovereign immunity without clearly setting forth a sovereign immunity waiver (e.g., "Exercising our powers under § 5 of the Fourteenth Amendment, we abrogate states' sovereign immunity defense against claims of intentional race-based discrimination in the workplace that seek monetary or equitable relief."). And vice versa. This does not diminish the clarity with which Congress must reduce its intentions into the text of a statute. It merely acknowledges that Congress can clearly engage in abrogation without engaging in conditional spending, and it can clearly engage in conditional spending without engaging in abrogation. Stated differently: The fact that both doctrines require a "clear statement" from Congress does not mean that they require (or permit) the same statement. Accordingly, even if *Dellmuth* stood for the proposition that the dissent asserts—that CRREA's residual clause is not a clear statement of congressional abrogation—it would not answer the question presented here.

But *Dellmuth* becomes even less relevant when you realize that it does not in fact hold that the residual clause cannot abrogate states' sovereign immunity. Russell Muth's

26

complaint recounted EHA violations spanning from 1980 to 1983. *Dellmuth*, 491 U.S. at 225. But CRREA only applies to "violations that occur in whole or in part after October 21, 1986." 42 U.S.C. § 2000d-7(b); *see also Dellmuth*, 491 U.S. 228–29 ("In connection with the [CRREA] argument, respondent recognizes that the Rehabilitation Act amendments expressly apply only to violations that occur in part after October 21, 1986.") (internal quotation marks omitted). Noting the obstacle posed by CRREA's text, Muth raised a "nontextual" argument: "that [a]lthough the amendment became effective after Muth initially filed suit, . . . the overwhelming support for the amendment show[ed] that it reflect[ed] Congress' intent in originally enacting the EHA []." *Id.* at 229 (quoting Br. for Respondent Muth 32, n.48). Muth's argument lacked a textual hook, not because CRREA cannot work in tandem with other statutes, but because CRREA could not apply to Muth's claims at all. Consequently, the Supreme Court's rejection of Muth's argument simply affirmed the well-settled principle that Congress's intent to abrogate sovereign immunity must be textual. *Id.* at 230. It did not, as the dissent insists, prejudge the force or effect of CRREA's residual clause. *Id.* at 229 (addressing Muth's nontextual arguments "[w]ithout intending in any way to prejudge the Rehabilitation Act Amendments").

Here, by contrast, Plaintiffs' sovereign-immunity-waiver argument is rooted in clear statutory text. Their claims arose after 1986 and they allege violations of a provision of a "Federal statute prohibiting discrimination by recipients of Federal financial assistance"— specifically, § 1557 of the Affordable Care Act. *See* 42 U.S.C. § 2000d-7(a)(1); *see supra* at 18–24. *Dellmuth* simply does not provide helpful guidance here; nor does it "plainly

27

lead[] to" the conclusion that the residual clause is not a clear and unequivocal sovereign immunity waiver. *See* Diss. Op. 76.

## IV.

Section 1557 of the ACA unequivocally conditions the receipt of federal financial assistance upon a state's waiver of sovereign immunity against suits for money damages. NCSHP, being a recipient of federal funds, is not immune from suit here. We affirm.

*AFFIRMED*

28

DIAZ, Circuit Judge, concurring in part:

Because I agree that Section 1557 of the Affordable Care Act, when read in conjunction with the Civil Rights Remedies Equalization Act of 1986 ("CRREA"), constitutes a waiver of sovereign immunity for states (and state agencies) that choose to accept federal funds for a health program or activity, I'm pleased to join Chief Judge Gregory in affirming the district court's judgment. I write separately to address some of the dissent's contentions and highlight how Section 1557 claims are categorically different from the claims in the cases our colleague relies on. [1]

I.

It's important to note that the plaintiffs here brought discrimination claims under a federal provision that explicitly prohibits discrimination by recipients of federal financial assistance. CRREA's residual clause provides, in relevant part: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d-7(a)(1). This provision evinces Congress's intent that CRREA's carefully crafted, "unambiguous

---

[1] The North Carolina State Health Plan argues for the first time on appeal that Section 1557 doesn't "extend unambiguously" to it because it's "not clearly a 'health program or activity.'" Appellant's Br. at 20–21. But I agree with Chief Judge Gregory that the Plan didn't make this argument before the district court and thus waived it. I therefore assume that the Plan is a "health program or activity" under Section 1557.

29

waiver," *Lane v. Pena*, 518 U.S. 187, 200 (1996), would apply to at least some claims beyond those brought under its four enumerated statutes.

The question is what kind of claims clearly and unequivocally fall within the residual clause's scope. The text alone allows for two interpretations. The first, and in my view correct, reading is that Congress sought to waive sovereign immunity for claims brought under statutory *provisions* that target discrimination by recipients of federal financial assistance. The second reading would find a waiver of sovereign immunity with respect to a claim brought under any provision of a *statute* that, somewhere, contains a provision prohibiting discrimination by recipients of federal financial assistance. I explain next why that second reading is wrong.

A.

My analysis begins with a definition. A "statute" is "legislation enacted by any lawmaking body, such as a legislature, administrative board, or municipal court. The term *act* or *legislation* is interchangeable as a synonym." STATUTE, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, reading "prohibiting discrimination by recipients of Federal financial assistance" to in effect modify only the word "statute" would extend CRREA's waiver to *any* claim based on an alleged violation of *any* provision in an act that also contains a provision prohibiting discrimination by recipients of federal financial assistance. This interpretation results in a broad waiver of state sovereign immunity—even for claims that have nothing to do with discrimination.

30

This was the type of claim at issue in *Cronen v. Texas Department of Human Services*, 977 F.2d 934 (5th Cir. 1992).[2]   There, the Fifth Circuit rejected the plaintiff's argument that CRREA abrogated state sovereign immunity in a suit for damages and injunctive relief for alleged violations of the Food Stamp Act. *Id.* at 937–38. The plaintiff didn't allege discrimination; rather, he alleged that the state violated the Act by refusing to allow him to deduct certain expenses from his income for purposes of computing his food stamp benefits. *Id.* at 936. His abrogation argument relied on the mere existence of the following provision within the Act: "In the certification of applicant households for the food stamp program, there shall be no discrimination by reason of race, sex, religious creed, national origin, or political beliefs." *Id.* at 937 (quoting 7 U.S.C. § 2020(c)).

As framed by the Fifth Circuit, the plaintiff sought to "interpret the [residual] clause as abrogating Eleventh Amendment immunity under any federal statute prohibiting discrimination and involving the distribution of any federal financial assistance. Under [this] interpretation, the general subject matter of the statute makes no difference." *Id.* Unsurprisingly, the court rejected this argument, instead holding "that Congress intended

---

[2] *Cronen* is an abrogation case that was decided in 1992, four years before the Supreme Court first recognized CRREA as an "unambiguous waiver" of state sovereign immunity to suits brought under Section 504 of the Rehabilitation Act, *Lane*, 518 U.S. at 200, and without the benefit of subsequent case law in the waiver context. Indeed, the Fifth Circuit has since recognized CRREA as a valid waiver of state sovereign immunity for suits brought under its four enumerated statutes. *See Pederson v. La. State Univ.*, 213 F.3d 858, 876 (5th Cir. 2000) (Title IX); *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 347–48 (5th Cir. 2005) (en banc) (Rehabilitation Act); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 280–85 (5th Cir. 2005) (en banc) (same). It hasn't considered whether Section 1557 claims fall within CRREA's scope.

31

to abrogate Eleventh Amendment immunity only for statutes that deal solely with discrimination by recipients of federal financial assistance."[3]  *Id.*

The district court's opinion in *Ohta v. Muraski*, another case relied on by the dissent, turns on the same interpretation of the residual clause—that "prohibiting discrimination by recipients of Federal financial assistance" modifies "statute."[4]  No. 3:93 CV 00554 (JAC), 1993 WL 366525 (D. Conn. Aug. 19, 1993).  That case also involved a plaintiff who didn't allege discrimination.  Rather, he sued for an alleged violation of 42 U.S.C. § 290dd-2, which required the state to keep records of substance-abuse treatment confidential.  *Id.* at *1.  The plaintiff argued that CRREA's residual clause applied because the provision was "part of a comprehensive scheme intended to establish and protect certain rights of substance abusers."[5]  *Id.* at *3.

---

[3] As I discuss later, the Fifth Circuit recently applied (and explained) this holding in a waiver case.  *See Sullivan v. Tex. A&M Univ. Sys.*, 986 F.3d 593 (5th Cir. 2021).

[4] *Ohta* was also a pre-*Lane* abrogation case decided without the benefit of subsequent case law in the waiver context.  The Second Circuit had previously listed CRREA as an example of legislation "that has clearly stated Congress' intention to abrogate states' immunity from damage actions in a variety of contexts," *Santiago v. N.Y. State Dep't of Corr. Servs.*, 945 F.2d 25, 31 (2d Cir. 1991), and it recently recognized CRREA as a waiver of immunity for claims under Section 504 of the Rehabilitation Act against recipients of federal financial assistance, *T.W. v. N.Y. State Bd. of Law Exam'rs*, 996 F.3d 87, 92 (2d Cir. 2021).  It hasn't considered whether (or in what contexts) the residual clause effectuates waiver.

[5] The statute at issue in *Ohta* was later amended to include an antidiscrimination provision, but it didn't include one when *Ohta* was decided.  *Compare* 42 U.S.C. § 290dd-2 (1993) *with* 42 U.S.C. § 290dd-2 (2020).

32

As our friend in dissent emphasizes, the district court in *Ohta* assumed that the statute at issue was "a statute prohibiting discrimination by recipients of federal aid within the meaning of [CRREA]."[6] *Id.* at *4. The court then concluded that "broad and unspecific language like 'any other Federal statute prohibiting discrimination'" can't "meet the stringent requirements established by the Supreme Court for Congressional abrogation." *Id.* And it rejected a strawman argument that, in enacting CRREA, Congress considered its residual clause a "sufficient waiver of state immunity for *every* federal statute referring to discrimination by recipients of federal aid." *Id.* at *5.

### B.

But the residual clause needn't—and shouldn't—be interpreted so broadly. That's because the phrase "prohibiting discrimination by recipients of Federal financial assistance" can be read to waive sovereign immunity only for claims alleging violations of *provisions* that themselves prohibit discrimination by recipients of federal financial assistance. The difference is both simple and a natural reading of CRREA's residual clause: the phrase "prohibiting discrimination by recipients of Federal financial assistance" modifies the entire preceding integrated clause, "provisions of any other Federal statute," rather than the word "statute" alone.

Under this narrower interpretation, Section 1557 claims are categorically different from those brought in *Cronen* and *Ohta*. As the district court here explained, "Section

---

[6] This was quite the assumption, as the statute neither contained the word "discrimination" nor prohibited federal financial recipients from engaging in it. *See* 42 U.S.C. § 290dd-2 (1993).

33

1557 is a nondiscrimination provision which is directly aimed at recipients of federal funding." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 16 (M.D.N.C. 2020). "In fact, the kinds of discrimination prohibited by Section 1557 coincide with those referenced in CRREA." *Id.* And "the enforcement mechanisms provided for in Section 1557 are exactly those 'provided for and available under' the statutes expressly named in CRREA." *Id.* (quoting 42 U.S.C. § 18116(a)). "In short," the district court reasoned, "it is hard to see how Section 1557 could be any more 'like the statutes expressly listed.'" *Id.* (quoting *Madison v. Virginia*, 474 F.3d 118, 133 (4th Cir. 2006)); *see also Sossamon v. Texas*, 563 U.S. 277, 292 (2011) ("General words, such as the residual clause [], are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. . . . [E]ach of the statutes specifically enumerated in CRREA explicitly prohibits 'discrimination.'") (cleaned up).

And the narrower interpretation is what we must apply in the Eleventh Amendment immunity context, because—as the dissent correctly points out—the Supreme Court has explained that "where a statute is susceptible of multiple plausible interpretations, including one preserving immunity, this Court will not consider a State to have waived its sovereign immunity." [7] *Sossamon*, 563 U.S. at 287. But here (and unlike in *Sossamon*),

---

[7] In *Sossamon*, the Supreme Court determined that suits for damages under Section 3 of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") fall outside of the residual clause's scope. *Id.* at 291–92. The Court assumed without deciding "that a residual clause like the one in [CRREA] could constitute an unequivocal waiver." *Id.* at 292. But the Court concluded that because Section 3's text "does not prohibit 'discrimination'; rather, it prohibits 'substantial burdens' on religious exercise," it's "not unequivocally a 'statute prohibiting discrimination' within the meaning of [CRREA]." *Id.* (cleaned up).

34

the plaintiffs' claims clearly and unequivocally fall within the residual clause's scope—even when the clause is interpreted narrowly.

## C.

This narrower interpretation of the residual clause is also the most faithful to CRREA's text. When interpreting a statute, we should consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). And "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (cleaned up).

Here, the relevant text provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1). Reading the text such that the phrase "prohibiting discrimination by recipients of Federal financial assistance" modifies only the word "statute" would render "the provisions of" superfluous. One can't violate a statute without violating one (or more) of its provisions. Thus, if "prohibiting discrimination by recipients of Federal financial assistance" modifies "statute," then "the provisions of" could simply be removed from the residual clause without losing any meaning. But "we cannot adopt a reading of [CRREA] that renders part of [it] superfluous over one that gives effect to its

every clause and word." *United States v. Simms*, 914 F.3d 229, 241 (4th Cir.), *cert. denied*, 140 S. Ct. 304 (2019) (cleaned up).

Interpreting "prohibiting discrimination by recipients of Federal financial assistance" to modify "*provisions of* any other Federal statute" is also consistent with CRREA's structure. Eleventh Amendment immunity is waived for claims alleging "a violation of *section 504* of the Rehabilitation Act of 1973, *title IX* of the Education Amendments of 1972, the Age Discrimination Act of 1975, *title VI* of the Civil Rights Act of 1964, or *the provisions* of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d-7(a)(1) (emphasis added). By its terms, CRREA's waiver applies to violations of certain kinds of antidiscrimination provisions located within broader statutes.[8] It doesn't, however, apply to all violations of those statutes simply because they happen to contain antidiscrimination provisions.

So too with the residual clause. Here, CRREA's unambiguous waiver doesn't apply to all violations of the Affordable Care Act simply because Section 1557 exists. Rather, it applies only to violations of Section 1557, which is precisely what the plaintiffs allege.[9]

Chief Judge Gregory and Judge Agee say that my reading of the residual clause conflicts with the last-antecedent rule, which counsels that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately

---

[8] The exception is the Age Discrimination Act, which deals solely with discrimination by recipients of federal financial assistance. *See* 42 U.S.C. §§ 6101–6107.

[9] The district court recognized this distinction, emphasizing that the residual clause "applies to '*the provisions* of any other Federal statute' which, like Section 1557, tie nondiscrimination to federal funding." *Kadel*, 446 F. Supp. 3d at 15 n.8.

36

follows," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). But this case is unlike others where that canon typically controls.

The last-antecedent rule generally applies where a statute contains a list, "reflect[ing] the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Lockhart v. United States*, 577 U.S. 347, 351 (2016). And the canon doesn't apply when "the modifier directly follows a concise and 'integrated' clause." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S.Ct. 1061, 1077 (2018). Here, the phrase "the provisions of any other Federal statute," 42 U.S.C. § 2000d-7(a)(1), "hangs together as a unified whole, referring to a single thing (a type of [provision])," *Cyan*, 138 S.Ct. at 1077. Thus, "the most natural way to view the modifier is as applying to the entire preceding clause." *See id.* (eschewing the last-antecedent rule to apply the modifier to the entire phrase "*[a]ny covered class action* brought in any State court involving a covered security," rather than the partial phrase "involving a *covered security*" (emphasis added)).

Moreover, as both the Chief and Judge Agee acknowledge, the last-antecedent rule isn't "absolute." *Barnhart*, 540 U.S. at 26. In this case and as I explain above, "other indicia of meaning," including the canon of surplusage and the structure of the statute, point to the narrower interpretation. *Id*; *see also United States v. Hayes*, 555 U.S. 415, 425–26 (2009) (holding that the last-antecedent rule is defeated when applying it would violate the rule against superfluity and strain the syntax of the provision).

Judge Agee further argues that the canon of *ejusdem generis* (of the same kind) requires narrowing the residual clause to reach only the operative provisions within statutes

that can be deemed "antidiscrimination legislation" at large. *See* Diss. Op. at 60–61; 61 n.4. Respectfully, that's not correct.

*Ejusdem generis* prevents the broadest reading of a general provision in a statute from swallowing a more specific one. *See RadLAX Gateway Hotel, LCC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). But here, my colleague deploys the last-antecedent rule to create the very breadth in the residual clause that he then argues must be resolved by *ejusdem generis*. A reading which forcibly broadens the reach of a statutory provision by use of one canon only to narrow it with another proves too much.

Rather, reading the clause "prohibiting discrimination by recipients of Federal financial assistance" to modify "provisions of any other Federal statute" instead of "statute" alone is both natural and avoids any tension with *ejusdem generis*. That reading alone gives effect to every word in CRREA and ensures that the residual clause only reaches "objects similar in nature to those objects enumerated by the preceding specific words," *i.e.*, federal statutory provisions that themselves target discrimination by recipients of federal financial assistance. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (internal citation omitted). *Ejusdem generis* requires no more.

## II.

### A.

Our dissenting colleague also urges us to adopt the Fifth Circuit's interpretation of the residual clause which, in his view, defeats waiver here. With respect, that view misreads the Fifth Circuit's cases.

38

As I noted earlier, *Cronen* held "that Congress intended to abrogate Eleventh Amendment immunity only for statutes that deal solely with discrimination by recipients of federal financial assistance." 977 F.2d at 937. Relying on this holding, the dissent insists that the residual clause's waiver can be read to apply only "to statutory enactments whose subject matter deals solely with discrimination by recipients of federal financial assistance." Diss. Op. at 61. According to the dissent, this "plausible" interpretation precludes finding waiver here, because Section 1557 prohibits discrimination only by "any health program or activity" receiving federal financial assistance (as opposed to prohibiting discrimination by *anyone* receiving federal financial assistance). *Id.* at 16; 42 U.S.C. § 18116(a).

There are at least three problems with the dissent's analysis. First, it adds words to the residual clause that simply aren't there. Second, it assumes that "prohibiting discrimination by recipients of Federal financial assistance" modifies "statute" rather than "provisions," a mistake that I've already addressed. Third, it relies on an incorrect assertion from *Cronen*: that "[e]ach of the four statutes listed in [CRREA] aims to prevent various types of discrimination by recipients of *any* type of federal financial assistance." 977 F.2d at 937–38. As the Fifth Circuit later recognized in *Sullivan*, Title IX prohibits sex discrimination specifically by "any *education program or activity* receiving Federal financial assistance." 986 F.3d at 597 (quoting 20 U.S.C. § 1681(a)) (emphasis added).

Indeed, the Fifth Circuit applied *Cronen*'s holding quite differently in *Sullivan*. There, it held that the state didn't waive its immunity to suit by accepting federal financial

39

assistance under either Title I of the Americans with Disabilities Act ("ADA") or the

Family and Medical Leave Act ("FMLA").  *Id.* at 596–99.  The court reasoned:

> [*Cronen*'s] narrower interpretation accords with [CRREA's] text.  The listed
> statutes preceding the residual clause all limit their substantive
> antidiscrimination provisions to recipients of federal funding.  *See* 29 U.S.C.
> § 794(a) (prohibiting discrimination on the basis of disability in "any
> program or activity receiving Federal financial assistance"); 20 U.S.C.
> § 1681(a) (prohibiting discrimination on the basis of sex "under any
> education program or activity receiving Federal financial assistance"); 42
> U.S.C. § 6102 (prohibiting discrimination on the basis of age in "any
> program or activity receiving Federal financial assistance"); 42 U.S.C.
> § 2000d (prohibiting discrimination on the basis of race, color, or national
> origin in "any program or activity receiving Federal financial assistance").

*Id.* at 597.  Thus, the *Sullivan* court held that Title I of the ADA doesn't fall within the

residual clause's scope because its "substantive provisions prohibit discrimination by a

wide range of entities, not just those receiving federal funding."[10]  *Id.* at 598.  And "[l]ike

the ADA," the court held, "the FMLA's substantive provisions cover a far broader range

of entities than "recipients of Federal financial assistance."  *Id.*

This reasoning supports waiver here.  Like CRREA's four enumerated statutes, the

Affordable Care Act "limit[s] its substantive antidiscrimination provisions to recipients of

federal funding."  *Id.* at 597; 42 U.S.C. § 18116(a) (prohibiting discrimination by "any

---

[10] The Tenth Circuit reached a similar conclusion in *Levy v. Kansas Department of Social and Rehabilitation Services*, where it held that a retaliation claim brought under Title V of the ADA didn't fit within the residual clause's scope. 789 F.3d 1164, 1171 (10th Cir. 2015) ("[T]he ADA has a much broader focus than discrimination by recipients of federal financial assistance.").  The court went on to observe "that the ADA was passed *after* [CRREA]," reasoning that "Congress could have included a similar waiver provision in the ADA or added the ADA to the list of nondiscrimination statutes in [CRREA], but it did not."  *Id.*  To the extent that *Levy* purports to reject wholesale the residual clause's applicability to provisions enacted after 1986, I decline to follow it.

40

health program or activity, *any part of which is receiving Federal financial assistance*")
(emphasis added). That the Affordable Care Act as a whole is broader than its
antidiscrimination provision is beside the point—the same is true for CRREA's enumerated
statutes. Just like Section 504, Title IX, and Title VI, Section 1557 is a provision of a
broader federal statute that explicitly "prohibit[s] discrimination by recipients of Federal
financial assistance." 42 U.S.C. § 2000d-7(a)(1).

The district court was thus correct to hold that "Section 1557, when read in
conjunction with CRREA, effectuates a valid waiver of sovereign immunity." *Kadel*, 446
F. Supp. 3d at 26.

## B.

I briefly address two more of the dissent's points.

First, it can't be true that CRREA isn't a "relevant statute" when determining
whether a state has waived immunity to suits within CRREA's scope. *See* Diss. Op. at 68
(quoting *Sossamon*, 563 U.S. at 284). Every circuit court to consider the question has read
CRREA in conjunction with its enumerated statutes to find waiver. *See Gruver v. La. Bd.
of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 181 n.2 (5th Cir.
2020), *cert. denied sub nom. Bd. of Supervisors of LSU v. Gruver*, No. 20-494, 2020 WL
7132339 (U.S. Dec. 7, 2020) (collecting cases); *T.W.*, 996 F.3d at 92. And *Sossamon* didn't
overrule or abrogate any of those decisions.

If (as our colleague insists) a waiver must be spelled out within the
antidiscrimination provision itself, it logically follows that CRREA can't be a "relevant
statute" in *any* waiver case. The Supreme Court, however, has said no such thing. Indeed,

41

after determining that Section 3 of RLUIPA doesn't fall within the residual clause's scope, the *Sossamon* Court described its holding more broadly: "We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because *no statute* expressly and unequivocally includes such a waiver." *Sossamon*, 563 U.S. at 293 (emphasis added).[11]

Second, it's of no moment that Congress has drafted some sovereign immunity waivers differently. Could Congress have chosen to copy and paste CRREA's text into Section 1557 rather than craft Section 1557 to fall within CRREA's scope? Of course. But choosing the latter construction over the former doesn't invalidate an otherwise clear, unequivocal waiver. As Justice Stevens warned in *Lane*:

> A rule that refuses to honor such a waiver because it could have been expressed with even greater clarity . . . does not facilitate—indeed, actually obstructs—the neutral performance of the Court's task of carrying out the will of Congress. . . . Our task . . . is not to educate busy legislators in the niceties and details of scholarly draftsmanship, but rather to do our best to determine what message they intended to convey. When judge-made rules require Congress to use its valuable time enacting and reenacting provisions whose original intent was clear to all but the most skeptical and hostile reader, those rules should be discarded.

518 U.S. at 211–12 (Stevens, J., dissenting).[12]

_____

[11] *Sossamon* also expressly left open the question whether (and, by implication, when) the residual clause can constitute an unequivocal waiver. *Sossamon*, 563 U.S. at 292. It's thus wrong to say that *Dellmuth*, an abrogation case decided 22 years before *Sossamon*, somehow settled that question. *See* Diss. Op. 75–82; *Dellmuth v. Muth*, 491 U.S. 223 (1989).

[12] In *Lane*, the majority held that CRREA doesn't waive the federal government's immunity to suit for money damages under Section 504 of the Rehabilitation Act, reasoning that "an admittedly ambiguous reference to 'public ... entit[ies]' in the remedies provision" pales in comparison to "the care with which Congress responded to [the Court's] (Continued)

42

* * *

The plaintiffs here brought discrimination claims under Section 1557. That provision, in turn, explicitly prohibits discrimination by recipients of federal financial assistance. It follows that Section 1557, when read in conjunction with CRREA, constitutes a clear and unequivocal waiver of sovereign immunity for states that choose to accept federal funds for a health program or activity (as the district court found). Indeed, the North Carolina State Health Plan knew full well that it could be sued for violating Section 1557 no later than 2016, when its Board of Trustees voted to remove the challenged exclusion from its 2017 plans after being advised by a consulting firm and outside legal counsel that it needed to do so to comply with the Affordable Care Act. The Plan reinserted the exclusion in 2018, and the plaintiffs' alleged harm occurred thereafter.

But because I find it unnecessary to decide whether Section 1557 constitutes such a waiver standing alone, I join only those portions of Chief Judge Gregory's opinion that affirm the district court's reasoning.

---

decision in *Atascadero* by crafting an unambiguous waiver of the States' Eleventh Amendment immunity in [CRREA]." *Id.* at 200.

43

AGEE, Circuit Judge, dissenting:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court is unmistakably clear that this guarantee of state sovereign immunity is "central to sovereign dignity," *Sossamon v. Texas*, 563 U.S. 277, 283 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)), and "enforce[s] an important constitutional limitation on the power of federal courts," *id.* at 284. To safeguard that "important constitutional limitation" and preserve the states' "sovereign dignity," the Supreme Court applies a simple, yet "stringent" test to determine if a state has waived its sovereign immunity from private suits in federal court: "A State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute." *Id.*

*Sossamon* thus directs us to undertake two inquiries when presented with Congressional Spending Clause legislation that a private party claims requires a waiver of state sovereign immunity in exchange for federal funding. First, we must ensure that Congress has unambiguously conditioned the receipt of federal funding upon a state's agreement to waive its sovereign immunity. Second, we must hold Congress to the strict task of stating that unambiguous condition in the *text* of that relevant statute so as to prevent implied waivers of state sovereign immunity. The majority opinion does not follow these precepts. It ignores the latent ambiguity that every circuit to consider the statute at issue here has found, and doubles down by using that statute to hold that states have implicitly waived their sovereign immunity despite the absence of any clear textual waiver.

44

At issue in this case is the residual clause in a single provision of the Civil Rights Remedies Equalization Act of 1986 ("CRREA"). The majority holds this clause unambiguously requires the North Carolina State Health Plan ("NCSHP") to waive its sovereign immunity from suits brought under "the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." Pub. L. No. 99-506, tit. X, § 1003(a)(1), 100 Stat. 1808, 1845 (1986) (codified at 42 U.S.C. § 2000d–7(a)(1)) [hereinafter "the Residual Clause"]. The majority further posits that section 1557 of the Patient Protection and Affordable Care Act ("ACA") is one such law, so that the NCSHP is liable in private discrimination suits brought under section 1557 by operation of the Residual Clause.

The Fifth and Tenth Circuits, the only courts of appeals to consider the Residual Clause, plainly held that it cannot serve as waiver of state sovereign immunity from any discrimination statute. Both courts recognized that there are multiple plausible ways of interpreting the Residual Clause. Because applying one of those plausible interpretations to the ACA would preserve the NCSHP's sovereign immunity, the Supreme Court requires that we hold that there is no waiver. *See Sossamon*, 563 U.S. at 287.

To create a circuit split on this consequential issue, one would expect the majority opinion to provide a good reason—or at least *some* reason—why the Fifth and Tenth Circuits' reading of the Residual Clause is implausible. Circuit splits are not to be created without a "strong" or "compelling" reason for doing so, *see United States v. Thomas*, 939 F.3d 1121, 1130 (10th Cir. 2019) (collecting cases from the First, Second, Third, Fifth, Seventh, Ninth, and Federal Circuits), because federal law, especially federal constitutional

45

law, "is supposed to be unitary," *Wash. Energy Co. v. United States*, 94 F.3d 1557, 1561 (Fed. Cir. 1996). But here, all that the majority provides is a single sentence in a footnote acknowledging that it is creating a circuit split. In doing so it fails to give respect to a fundamental aspect of our constitutional design that provides the states "a residuary and inviolable sovereignty," and does not "relegate[] [them] to the role of mere provinces or political corporations." *Alden*, 527 U.S. at 715 (citation and internal quotation marks omitted).

Compounding that error, the majority fails to recognize that the Residual Clause cannot serve as the requisite *textual* waiver of sovereign immunity from section 1557 claims. As the Tenth Circuit has held, "[f]or a waiver of sovereign immunity to be 'knowing and voluntary,' it cannot be hidden in another statute and only applied to [section 1557] through implication." *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1170 (10th Cir. 2015). *Sossamon*'s clear textual waiver requirement also ensures that Congress specifically considered the issue of state sovereign immunity vis-à-vis section 1557, but the Residual Clause—enacted twenty-five years before the ACA—gives no such assurance. Indeed, the Supreme Court's decision in *Dellmuth v. Muth*, 491 U.S. 223 (1989), recognized that the Residual Clause could not provide the required textual expression of Congressional intent to abrogate state sovereign immunity. That holding counsels the same conclusion in the waiver context.

The majority's flawed decision will not impact just the NCSHP. Since this case was argued, at least one other district court has made the same analytical errors that the majority makes here, finding that the Residual Clause implicitly waives states' sovereign immunity

46

from section 1557 actions. *See Fain v. Crouch*, No. 3:20-0740, 2021 WL 2004793, at *2–4 (S.D. W. Va. May 19, 2021). More lower courts will now be compelled to follow that same fallacious path.

The Supreme Court should correct the majority's errors without delay to ensure the preservation of the integrity of the Eleventh Amendment and the dignity of state sovereign immunity.

I must therefore respectfully dissent.

## I.

### A.

On March 23, 2010, President Barack Obama signed into law the ACA, Pub. L. No. 111-148, 124 Stat. 119, "a sweeping legislative and regulatory overhaul of the nation's health-care system," *Korte v. Sebelius*, 735 F.3d 654, 659 (7th Cir. 2013). Its primary aims were "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). To accomplish that task, Congress adopted a complicated statutory framework, including provisions compelling insurers to issue coverage to every person who requests it; compelling citizens to purchase health insurance or else be "taxed" for not doing so; and requiring states to establish health care "Exchanges" in which people can purchase health insurance. *See King v. Burwell*, 576 U.S. 473, 478–82 (2015). And that just barely scratches the surface.

47

Nestled within the hundreds, if not thousands, of provisions that sprawl across the ACA's 900 pages is a single antidiscrimination provision, the statute at issue in this case. In Subtitle G of Title I of the ACA, under the "Miscellaneous Provisions" subtitle, Congress created section 1557, which states:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, *any health program or activity, any part of which is receiving Federal financial assistance,* including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

Pub. L. No. 111-148, tit. I, § 1557(a), 124 Stat. at 260 (emphasis added) (codified at 42 U.S.C. § 18116(a)). Not one of the ACA's myriad provisions defines the phrase "health program or activity." In fact, the Department of Health and Human Services, which was delegated the responsibility for making rules and regulations relating to section 1557, 42 U.S.C. § 18116(c), did not enact a final rule defining the term "health program or activity" until 2016, some six years after its enactment, *see* 81 Fed. Reg. 31,375, 31,467 (May 18, 2016). Additionally, and of particular relevance to this case, nowhere in section 1557 or the ACA did Congress use the words "sovereign immunity" or reference the Eleventh Amendment.

48

B.

Invoking the district court's federal question jurisdiction, 28 U.S.C. § 1331, Plaintiffs here sought compensatory, injunctive, and declaratory relief against the NCSHP, which "administers comprehensive group health insurance to eligible teachers and other North Carolina state employees," J.A. 23. Plaintiffs argue that the NCSHP violates section 1557 of the ACA by declining to cover certain medical procedures for transgender individuals.

The NCSHP moved to dismiss the suit on sovereign immunity grounds, positing that neither section 1557 nor the Residual Clause provides the requisite clear, unambiguous declaration that the NCSHP consented to suit in federal court.[1] The district court properly recognized that "[s]ection 1557 does not purport to condition a state's acceptance of federal funding on a waiver of sovereign immunity[,] [n]or does any other provision of the ACA." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 15 (M.D.N.C. 2020). However, the court then went astray by finding that the Residual Clause serves as North Carolina's clear and unambiguous waiver of its sovereign immunity because it accepted federal funding for "health program[s] and activit[ies]" after the ACA's passage. *Id.* at 15–17. The CRREA provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. § 794], title IX of the Education Amendments of 1972 [20 U.S.C. § 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. § 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d et seq.], *or the provisions of any other*

---

[1] In its motion to dismiss below, the NCSHP agreed that it "is an agency of the State of North Carolina." J.A. 82.

49

> *Federal statute prohibiting discrimination by recipients of Federal financial assistance.*

42 U.S.C. § 2000d–7(a)(1) (emphasis added).

According to the district court, our precedent made clear that "'any state reading [the Residual Clause] in conjunction with' an applicable nondiscrimination provision 'would clearly understand' that it consents to suit for violations of the statute in question." *Kadel*, 446 F. Supp. 3d at 15 (quoting *Litman v. George Mason Univ.*, 186 F.3d 544, 554 (4th Cir. 1999)). Because section 1557 of the ACA "is a nondiscrimination provision . . . directly aimed at recipients of federal funding," *id.* at 16, the district court concluded that "[s]ection 1557, when read in conjunction with [the Residual Clause], effectuates a valid waiver of sovereign immunity," *id.* at 17. That conclusion is error.

## II.

### A.

In 1793, the Supreme Court "literally shocked the Nation," *Edelman v. Jordan*, 415 U.S. 651, 662 (1974), when it held that a state could be liable for monetary damages to a citizen of another state, *see generally Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793). Soon thereafter, "[s]entiment for passage of a constitutional amendment to override the decision rapidly gained momentum." *Edelman*, 415 U.S. at 662. On February 7, 1795, the Eleventh Amendment was ratified.

Since then, the Supreme Court has consistently held that the Eleventh Amendment confirms that states are immune from private suits brought against them in federal court.

50

*Hans v. Louisiana*, 134 U.S. 1, 15 (1890); *accord, e.g.*, *In re New York*, 256 U.S. 490, 497 (1921) ("[T]he entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given[.]"); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" (quoting *Hans*, 134 U.S. at 15)). The Supreme Court systematically adheres to this understanding of the Eleventh Amendment because it is most faithful to the Founders' intention for the states' retention of independent sovereignty under the system of federalism created by the Constitution. *See Alden*, 527 U.S. at 728 ("[The Court's precedents] reflect a settled doctrinal understanding, consistent with the views of the leading advocates of the Constitution's ratification, that sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself."); *Monaco v. Mississippi*, 292 U.S. 313, 323–25 (1934) (collecting examples of James Madison's, John Marshall's, and Alexander Hamilton's views on how the Constitution preserves states' sovereignty, which includes immunity from private suit).

This does not mean that private suits can never be maintained against a state. As relevant here, a state is free to waive its sovereign immunity and consent to suit in federal court. *E.g.*, *Clark v. Barnard*, 108 U.S. 436, 447–48 (1883). "Permitting such waivers reflects the fact that sovereign immunity is an element of state sovereignty, not a categorical limitation on the federal judicial power." *Litman*, 186 F.3d at 550. Such a waiver can occur in one of several ways, for example: (1) expressly, through a state statute

51

or constitutional provision, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985), *superseded on other grounds by* 42 U.S.C. § 2000d–7; (2) through the state's voluntary, affirmative litigation conduct in a particular suit, *see Lapides v. Bd. of Regents*, 535 U.S. 613, 619 (2002); or (3) by voluntarily participating in those federal programs in which Congress, pursuant to its Spending Clause power, unequivocally conditions participation upon a waiver of sovereign immunity, *see Atascadero*, 473 U.S. at 246–47. Plaintiffs rely solely on the third means, contending that the NCSHP (as an arm of the State of North Carolina) waived its sovereign immunity by accepting federal funding for "health program[s] and activit[ies]," as that term is used in the ACA.

B.

Under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, "Congress may fix the terms on which it shall disburse federal money to the States," *Pennhurst State Sch. & Hosp. v. Halderman* (*Pennhurst I*), 451 U.S. 1, 17 (1981). Such legislation "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* Generally speaking, "the legitimacy of the attached conditions rests 'on whether the State voluntarily and knowingly accepts the terms of the contract.'" *Litman*, 186 F.3d at 552 (quoting *Pennhurst I*, 451 U.S. at 17).

"[T]he Eleventh Amendment reflects 'the fundamental principle of sovereign immunity [that] limits the grant of judicial authority in Art[icle] III,'" so unless a state waives its immunity, courts lack jurisdiction over suits brought by private citizens against a state in federal court. *Seminole Tribe*, 517 U.S. at 64 (second alteration in original) (quoting *Pennhurst State Sch. & Hosp. v. Halderman* (*Pennhurst II*), 465 U.S. 89, 97–98

52

(1984)); *see Wisc. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) (explaining that the Eleventh Amendment "does not automatically destroy original jurisdiction," but instead "grants the State a legal power to assert a sovereign immunity defense should it choose to do so"). Accordingly, the "test for determining whether a State has waived its immunity from federal-court jurisdiction *is a stringent one*." *Sossamon*, 563 U.S. at 284 (emphasis added) (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999)). To satisfy this stringent test, "[a] State's consent to suit must be '*unequivocally expressed*' in the text of the relevant statute." *Id.* (emphasis added) (quoting *Pennhurst II*, 465 U.S. at 99); *accord Madison v. Virginia*, 474 F.3d 118, 130 (4th Cir. 2006) ("Congress must make its intention unmistakably clear in the language of the statute." (quoting *Hoffman v. Conn. Dep't of Income Maintenance*, 492 U.S. 96, 101 (1989) (plurality opinion))). This requirement is a clear statement rule. *Sossamon*, 563 U.S. at 290 (referring to the "'unequivocal statement' rule" as a "requirement of a clear statement in the text of the statute"); *see also, e.g.*, *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014) (stating that *Sossamon* created a "clear-statement rule"). "Only by requiring this 'clear declaration' by the State can [a court] be 'certain that the State in fact consents to suit.'" *Sossamon*, 563 U.S. at 284 (quoting *Coll. Sav. Bank*, 527 U.S. at 680).

In undertaking this "stringent" analysis, "a waiver of sovereign immunity 'will be strictly construed, in terms of its scope, in favor of the sovereign.'" *Id.* at 285 (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)). Accordingly, a "[w]aiver may not be implied." *Id.* at 284; *accord Madison*, 474 F.3d at 130 ("There can be no consent by implication or by use of ambiguous language." (alteration omitted) (quoting *Library of Congress v. Shaw*, 478

U.S. 310, 318 (1986))). This also means that neither the "mere receipt of federal funds," *Atascadero*, 473 U.S. at 246–47, nor a state's waiver of immunity from private suits in its own courts, *Coll. Sav. Bank*, 527 U.S. at 676, can implicitly establish a waiver of sovereign immunity from private suits brought in federal court.

The strict construction of statutes in favor of the sovereign has one final, important consequence: "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *FAA v. Cooper*, 566 U.S. 284, 290 (2012).[2] "Ambiguity exists if there is a plausible interpretation of the statute that would not authorize [the claim]." *Id.* at 290–91. Thus, "where a statute is susceptible of multiple plausible interpretations, including one preserving immunity, [courts] will not consider a State to have waived its sovereign immunity." *Sossamon*, 563 U.S. at 287.

## III.

As the above discussion reflects, the Supreme Court has meticulously curated its sovereign immunity jurisprudence to ensure that all courts are to follow the same well-trodden analytical path: "A State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute." *Id.* at 284 (quoting *Pennhurst II*, 465 U.S. at 99). That trail of decisions should compel two relatively straightforward conclusions in this case.

---

[2] While *Cooper* considered a waiver of the United States' sovereign immunity, the Supreme Court has made clear that the principles underlying the relevant analysis of whether Congress unequivocally expressed an intent to waive the federal government's sovereign immunity apply equally to determining whether Congress unequivocally expressed an intent to condition the receipt of federal funds on a state's waiver of sovereign immunity. *See Sossamon*, 563 U.S. at 285 n.4.

54

First, the Residual Clause is not an unequivocal expression of Congress' intent for states to waive their sovereign immunity from section 1557 claims in exchange for federal funding. There is at least one other plausible interpretation of the Residual Clause that preserves the NCSHP's immunity from section 1557 suits, and pursuant to *Sossamon*, that mandates finding that no waiver of state sovereign immunity occurred.

Second, even assuming Congress intended for the Residual Clause to apply, its general catch-all provisions cannot serve as an unequivocal expression of a State's consent to suit "in the text of the relevant statute." *Sossamon*, 563 U.S. at 284. As confirmed by the Supreme Court's decision in *Dellmuth*, the Residual Clause provides no basis to conclude that states knowingly waived their sovereign immunity from section 1557 suits, or that Congress specifically considered the issue of state sovereign immunity when enacting section 1557.

By adopting a contrary analysis, the majority precipitously creates a circuit split. It disregards the strict mandates that both the Eleventh Amendment and binding Supreme Court precedent place upon Congress when it seeks to exact a waiver of sovereign immunity from the states in exchange for federal funding. In short, the majority's analysis is wrong.

## A.

*Sossamon* first requires that we ensure that Congress has unambiguously conditioned the receipt of federal funding upon a state's agreement to waive its sovereign immunity. *See* 563 U.S. at 285–88. To determine whether the NCSHP has waived its sovereign immunity from section 1557 suits, one must first discern *what category* of

statutes fall under the Residual Clause's broad umbrella. I agree with the majority that with any question of statutory interpretation, the inquiry begins with the text of the relevant statute. *See, e.g.*, *Peck v. U.S. Dep't of Labor, Admin. Review Bd.*, 996 F.3d 224, 230 (4th Cir. 2021). From there, however, we diverge significantly.

## 1.

Because the CRREA does not define what constitutes a "provision[] of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance," *see* 42 U.S.C. § 2000d–7(a)(1), "we look first to its language, giving the words used their ordinary meaning," *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).[3] More particularly, we look to the prevailing ordinary meaning "at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

In reviewing statutory language for its plain meaning, "[w]e customarily turn to dictionaries for help," *Blakely v. Wards*, 738 F.3d 607, 611 (4th Cir. 2013) (en banc), for "[o]rdinarily, a word's usage accords with its dictionary definition," *Yates v. United States*,

---

[3] This question is demonstrably not controlled by this Court's decision in *Madison*. *Contra* Maj. Op. 21 n.4. We had no occasion there to, and did not, consider the Residual Clause's precise scope. Indeed, *Madison*'s central holding was that the Residual Clause could not apply to the Religious Land Use and Institutionalized Persons Act because it was not a discrimination statute. *See Madison*, 474 F.3d at 133 ("[W]e cannot say that the CRREA's catch-all provision is a 'clear, unambiguous, and unequivocal waiver,'" because "it is not clear that RLUIPA is a 'Federal statute prohibiting discrimination' and ambiguity again defeats plaintiff's claim that Virginia, by accepting federal funds, knowingly consented for damages actions to be brought against it."). If anything, *Madison* supports the NCSHP. It made no "path" for the majority to follow. Maj. Op. 21 n.4.

56

574 U.S. 528, 537 (2015) (plurality opinion); *see, e.g.*, *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (relying exclusively on dictionary definitions for the meaning of a term in a statutory provision). Nonetheless, in this analysis, the judiciary must remain mindful that "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when . . . read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000)). And it is a "cardinal rule of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation and internal quotation marks omitted). Thus, if we ascertain in applying these basic principles of statutory interpretation that a statute purporting to require states to waive their sovereign immunity is "susceptible of multiple plausible interpretations, including one preserving immunity," then we "[can]not consider a State to have waived its sovereign immunity." *Sossamon*, 563 U.S. at 287.

The majority holds that the Residual Clause unambiguously "imposes but two conditions: that the law be federal and that it prohibit discrimination by recipients of Federal financial assistance." Maj. Op. 22. Judge Diaz echoes this point in his concurrence, explaining that the phrase "prohibiting discrimination by recipients of Federal financial assistance" modifies the word "provisions." Thus, if Congress passes a statute containing a provision concerning discrimination by those receiving federal financial assistance, and

57

it provides a private right of action, the majority would hold that states have waived their sovereign immunity from such suits. Full stop. That is incorrect.

To the contrary, there is another plausible way to interpret the scope of antidiscrimination statutes to which the Residual Clause's purported waiver of sovereign immunity applies. Specifically, like the Fifth and Tenth Circuits, I read the Residual Clause to require that the relevant legislative enactment *as a whole*—not just one of its individual provisions—be solely aimed at prohibiting discrimination by recipients of federal financial assistance. *See Cronen v. Tex. Dep't of Hum. Servs.*, 977 F.2d 934, 936–38 (5th Cir. 1992); *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1170–71 (10th Cir. 2015). That reading flows naturally from the Residual Clause's plain language and, when applied to this case, would preserve the NCSHP's sovereign immunity from section 1557 claims. As such, *Sossamon* requires us to hold that there is no waiver of sovereign immunity.

Again, the Residual Clause purports to encompass "the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." The distinction between the terms "provision" and "statute" is as meaningful now as it was in 1986. When the Residual Clause was passed, the word "statute" ordinarily referred to "[a]n act of the legislature," and "[d]epending upon its context in usage, a statute [could] mean a single act of a legislature or a body of acts[.]" *Statute*, Black's Law Dictionary (5th ed. 1979); *see also Legislative act*, Black's Law Dictionary, *supra* ("Enactment of laws. Law (*i.e.* statute) passed by legislature in contrast to court-made law."). Especially given the regularity in which these legal terms of art are used in the legislative process, we must presume that Congress intended for them to retain these specialized meanings in the

58

Residual Clause. *See Sekhar v. United States*, 570 U.S. 729, 733 (2013) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." (alteration in original) (citation omitted)).

The prevailing edition of Black's Law Dictionary at the time of the CRREA's passage did not include a relevant definition for the word "provision." It is evident from other sources, however, that "provision" held a much narrower meaning, referring to only a *clause* within a statute. *See Provision*, Webster's Third New International Dictionary (1961) ("[A] stipulation (as a *clause in a statute* or contract) made in advance." (emphasis added)); *Provision*, Oxford English Dictionary (rev. 1st ed. 1978) ("Each of the *clauses* or divisions of a legal or formal statement, or such a statement itself, providing for some particular matter; also, a clause in such a statement which makes an express stipulation or condition[.]" (emphasis added)).

Plainly, the modifying phrase "prohibiting discrimination by recipients of Federal financial assistance" acts as a limit of application to certain objects. But what category of objects? The oft-applied textual canon of statutory interpretation, the "last antecedent rule," helps answer that inquiry. That canon presumes that "a limiting clause or phrase . . . modif[ies] only the noun or phrase that it immediately follows." *United States v. Hayes*, 555 U.S. 415, 425 (2009) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also* Maj. Op. 23 n.5. Here, the phrase "prohibiting discrimination by recipients of Federal

59

financial assistance" immediately follows the word "statute." Under the last antecedent rule, the Residual Clause pertains only to Congressional enactments ("statutes") that concern the issue of discrimination by recipients of federal financial assistance, not to discrete provisions or clauses. In other words, it is not the *clause* that must prohibit discrimination by these recipients; it is the *legislative act* as a whole that must do so. The Residual Clause thus would not encompass antidiscrimination *clauses* that happen to appear in statutes that cannot be characterized as antidiscrimination statutes: like the ACA.

While the last antecedent rule may be overcome by textual evidence of a contrary legislative intent, *see Hayes*, 555 U.S. at 425, there is no such evidence here. In fact, the textual evidence available in the CRREA further underscores the plausibility of reading the phrase "prohibiting discrimination by recipients of Federal financial assistance" as modifying the word "statute." The CRREA's four enumerated statutes demonstrate that Congress was only concerned with antidiscrimination *legislation*, not antidiscrimination provisions. As the Fifth Circuit aptly explained in *Cronen*, "[e]ach of the four statutes listed in section 2000d–7"—the Rehabilitation Act, the Age Discrimination Act of 1975, Title VI of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972—are ones that "deal *solely* with discrimination by recipients of federal financial assistance." 977 F.2d at 937; *accord Sullivan v. Texas A&M Univ. Sys.*, 986 F.3d 593, 597–99 (5th Cir. 2021) (reaffirming and applying *Cronen*'s interpretation of the Residual Clause). It is thus eminently reasonable, under the interpretative canon *ejusdem generis*, to read the Residual Clause as only reaching those statutes that, when considering their provisions holistically, deal solely with discrimination by recipients of federal financial assistance. *See Circuit*

60

*City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) ("Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (alteration and citation omitted)); *see also Sullivan*, 986 F.3d at 597.[4]

Under the plausible reading of the Residual Clause as applying only to statutory enactments whose subject matter deals solely with discrimination by recipients of federal financial assistance, states would retain their sovereign immunity from suits under section 1557. As the Residual Clause demands, we must look to the characteristics of the relevant

---

[4] My concurring colleague implicitly finds that the last antecedent rule is overcome here because the CRREA specifies section 504 of the Rehabilitation Act, Title IX of the Education Amendments of 1972, and Title VI of the Civil Rights Act of 1964, despite the fact that it generally references the Age Discrimination Act of 1975. Concurring Op. 35–36. I respectfully disagree. That is the kind of specificity that Supreme Court precedent requires to achieve a waiver of sovereign immunity. But because of the ambiguous nature of the Residual Clause, we must examine those four enumerated statutes for some common characteristics to determine what falls under the nebulous umbrella of "other Federal statute[s] prohibiting discrimination by recipients of Federal financial assistance." As the Fifth Circuit observed, each of those enumerated statutory enactments were designed to end different types of discrimination by federal funding recipients. *See Cronen*, 977 F.2d at 937–38. As the Rehabilitation Act demonstrates, for example, not every prohibition against discrimination carries with it a private right of action for damages. But to the extent that the Act provides such a cause of action (specifically, in section 504), states must waive their sovereign immunity from those claims. The same is true for Title VI of the Civil Rights Act, Title IX of the Education Amendments of 1972, and the Age Discrimination Act of 1975. The CRREA merely targets the operative *provisions* giving rise to a private right of action within those broader pieces of antidiscrimination *legislation*. We must therefore treat the Residual Clause similarly, and only apply its purported waiver to those legislative enactments solely concerning discrimination by recipients of federal financial assistance. *See Circuit City Stores, Inc.*, 532 U.S. at 114–15. That statutory context similarly demonstrates why we cannot read the Residual Clause's reference to "provisions of any other Federal statute" as an "integrated" phrase or clause. *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021) ("The rule of the last antecedent is context dependent."). *Contra* Concurring Op. 37–38.

61

*statute*, the ACA. But, the ACA simply is not a law that holistically "aims to prevent various types of discrimination" by recipients of federal financial assistance. *Cronen*, 977 F.2d at 937–38. While my colleagues are correct that the ACA contains one "[m]iscellaneous *[p]rovision*" concerning discrimination by recipients of federal financial assistance, *see* 124 Stat. at 258, 260, the ACA itself is not an antidiscrimination statute. Rather, it is an omnibus health care "reform" package "that happens to include a provision prohibiting discrimination" in carrying out one minute aspect of its legislative plan. *Cronen*, 977 F.2d at 938. Just like the statutes at issue in *Cronen* and *Levy*, the ACA does not fall within the set of statutes defined in the Residual Clause. *See Cronen*, 977 F.2d at 937–38 (concluding that a provision of the Food Stamp Act, 7 U.S.C. § 2020(c), would not qualify under this reading of the Residual Clause because it "constitutes a comprehensive federal entitlement program that happens to include a provision prohibiting discrimination in disbursing these entitlements"); *Levy*, 789 F.3d at 1171 (concluding that a provision of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203, did not fall under the Residual Clause—assuming it could validly provide Congress' intent for states to waive state sovereign immunity—for while it was an antidiscrimination statute, the ADA encompassed those who did and did not receive federal funding, giving it "a much broader focus" than the CRREA's four enumerated statutes).[5]

In sum, the Residual Clause can plausibly be read to require that the relevant legislative enactment *as a whole*—not just one of its individual provisions—be solely

---

[5] Similarly, many of the ACA's provisions apply to those who do and do not receive federal financial assistance. *See Levy*, 789 F.3d at 1171.

62

aimed at prohibiting discrimination by recipients of federal financial assistance. "[A] plaintiff seeking to invoke the [R]esidual [C]lause must show that his cause of action arises *under a statute within that defined set*." *Sullivan*, 986 F.3d at 597 (emphasis added). Since the ACA does not fall within that defined set, the NCSHP's sovereign immunity from section 1557 suits would be preserved. Thus, *Sossamon* requires that we hold that there is no waiver of sovereign immunity from section 1557 suits. *See* 563 U.S. at 287.

My concurring colleague resists this result because, in effect, it may render the Residual Clause void in some settings. However, that is precisely what the Supreme Court instructs us to do in the context of state sovereign immunity. The Court has been crystal clear that when a statute like the Residual Clause "is susceptible of multiple plausible interpretations, including one preserving immunity," we are required to conclude that states have not waived immunity. *Id.* (holding that an ambiguity regarding whether the phrase "appropriate relief" encompassed damages suits prevented a finding that a state waived its sovereign immunity from such suits); *see also Cooper*, 566 U.S. at 290 ("Any ambiguities in the statutory language are to be construed in favor of immunity, so that the [state's] consent to be sued is never enlarged beyond what a fair reading of the text requires." (internal citation omitted)). Lower courts must simply recognize the statutory shortcoming and leave to Congress such future action as it chooses. *See, e.g.*, *Dellmuth*, 491 U.S. at 230–31; *Atascadero*, 473 U.S. at 245–47. At that point the judicial role has ended. *See, e.g.*, *Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991) ("[I]t is the province of Congress, not this Court, to decide whether to bring administrative deportation proceedings within the scope of the statute['s waiver of sovereign immunity.]"); *Peck*, 996 F.3d at 234 ("Waiving

63

sovereign immunity is a legislative, not a judicial, prerogative."). Pursuant to this Supreme Court mandate, we are required to conclude that the NCSHP has not waived sovereign immunity from suits by virtue of the Residual Clause.

2.

The majority can avoid this straightforward result only by creating a circuit split and saying that the Residual Clause's text unambiguously applies to—and thus waives immunity from suit under—section 1557. In other words, the majority must hold that the Residual Clause can only be read to apply for all time to any statute that contains a discrimination provision and involves the distribution of any federal financial assistance. *See Sebelius v. Cloer*, 569 U.S. 369, 380–81 (2013) (explaining that the "canon favoring strict construction of waivers of sovereign immunity" only "give[s] way when the words of a statute are unambiguous" (internal quotation marks omitted)). But as explained above, assuming the majority's reading of the Residual Clause can be deemed plausible, it is certainly not the *only* plausible reading. Fundamentally, however, both the majority's and concurrence's readings seem of limited plausibility.

The majority pins its interpretation of the Residual Clause as the only plausible view under the amorphous rubric that "[b]road general language is not necessarily ambiguous when congressional objectives require broad terms." Maj. Op. 20 (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980)). Emblematic of the majority's failure to base its decision on any of the Supreme Court's controlling sovereign immunity case law, *Diamond* is about as irrelevant a case as one can cite—it has nothing to do with sovereign immunity. Instead, it considered whether a company's "micro-organism constitutes a 'manufacture'

64

or 'composition of matter' within the meaning of" the Patent Act, 35 U.S.C. § 101. 447 U.S. at 307. That issue and the related analysis have no nexus to whether Congress has met the strict requirements necessary to express its intent that states waive their sovereign immunity from private suits for damages in exchange for federal funding.

Even if *Diamond* were tangentially relevant, it simply does not follow that in the *sovereign immunity* context, broad language used to achieve broad policy goals is sufficient to effectuate a waiver of state sovereign immunity. Quite the contrary, the Supreme Court has been clear such a construct is invalid. For example, consider *Atascadero*'s discussion of section 504 of the Rehabilitation Act, in which Congress used broad language to accomplish a broad goal: eliminate discrimination against individuals with disabilities. *See* 473 U.S. at 244–46 (discussing the then-enacted language of 29 U.S.C. §§ 794 and 794a, which provided: "No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" and made available "to any person aggrieved by any act or failure to act by any recipient of Federal assistance" "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964"). Those broad provisions failed to satisfy the rigorous requirements that the Eleventh Amendment places on Congress to express its intent for states to consent to a waiver of their sovereign immunity. As the *Atascadero* Court explained, "given their constitutional role, the States are not like any other class of recipients of federal aid. A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh

65

Amendment." *Id.* at 246. Nor is such general language sufficient to "manifest[] a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Id.* at 247. Similarly, whatever broad goals were intended by the Residual Clause's broad language, that alone cannot satisfy the stringent requirements for effectively requiring states to waive their sovereign immunity in exchange for federal funding.

The majority's strained reliance on *Diamond* is further undercut by its *ipse dixit* observation that the "CRREA's origin story . . . indicates that broad terms were precisely what congressional objectives required." Maj. Op. 20. As *Lane* demonstrates, Congress' goal in enacting the CRREA—overturning *Atascadero*—was completed by making specific reference to section 504 of the Rehabilitation Act in the text of § 2000d–7(a)(1). Whatever else Congress may have intended to do through the Residual Clause, even if it were necessary to use broad terms, *Sossamon*, *Dellmuth*, and a host of other cases require that Congress do so in a way that cannot plausibly be interpreted to preserve states' sovereign immunity. The Residual Clause simply fails to pass that stringent test.[6]

---

[6] The majority further strains to find support for its interpretation of the Residual Clause in the ACA's legislative history, citing to the statement of a single Senator supporting it. Maj. Op. 22–23. But relying on legislative history at all in this analysis yet again ignores Supreme Court precedent. The Court could not be more explicit: "Legislative history cannot supply a waiver [of sovereign immunity] that is not clearly evident from the language of the statute." *Cooper*, 566 U.S. at 290 (citing *Lane*, 518 U.S. at 192); *see also, e.g.*, *Dellmuth*, 491 U.S. at 230 ("Lest *Atascadero* be thought to contain any ambiguity, we reaffirm today that in this area of the law, evidence of congressional intent must be both unequivocal and textual.").

66

Ultimately, the majority fails to engage with the plausible (if not "more persuasive") interpretation of the Residual Clause adopted by the Fifth Circuit in *Cronen* and the Tenth Circuit in *Levy*. It simply does not follow that, based on the *CRREA's* structure, the Residual Clause's reference to "Federal statute[s] prohibiting discrimination by recipients of Federal financial assistance" can *only* be read to refer to all discrimination provisions dealing with all types of federal financial assistance.

Judge Diaz disagrees that the phrase "prohibiting discrimination by recipients of Federal financial assistance" modifies the word "statute." In my concurring colleague's view, that phrase actually modifies the word "provisions." Concurring Op. 33–34. But this, too, is far from the *only* plausible reading, as it would have us improperly assume that Congress violated both the last antecedent rule, *see Hayes*, 555 U.S. at 425, and basic grammatical rules by intentionally misplacing that modifying phrase far away from its object ("provision"), *see Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("Because words are to be given the meaning that proper grammar and usage would assign them, the rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose." (alteration, internal citations, and internal quotation marks omitted)). As explained in the previous section, there is no legislative intent or purpose evident in the CRREA's text to make either assumption. Instead, we must interpret the statute as written.[7]

---

[7] My concurring colleague further argues that the phrase "prohibiting discrimination by recipients of Federal financial assistance" cannot modify "statute" because doing so would render the word "provisions" superfluous. Concurring Op. 35. That is incorrect. The relevant statutory context demonstrates that the word "provisions" requires that there be a clause within an antidiscrimination statute that provides a private right of action. (Continued)

67

But again assuming that the majority's and Judge Diaz' readings of the Residual Clause were plausible or even "more" plausible than another reading, nothing in either opinion persuasively demonstrates how either is the *only* plausible reading. To the contrary, reading the Residual Clause as only applying to those statutes that deal solely with discrimination by recipients of federal financial assistance is the most faithful to the Residual Clause's text and the CRREA's structure. The fact that other plausible readings might exist does not give the majority license to ignore a plausible reading that would preserve state sovereign immunity. *Sossamon* directly precludes that course. 563 U.S. at 287 ("[W]here a statute is susceptible of multiple plausible interpretations, including one preserving immunity, we will not consider a State to have waived its sovereign immunity."). That should end this case.

## B.

*Sossamon* also requires that Congress "unequivocally express[] *in the text of the relevant statute*" its intent for states to waive their sovereign immunity in exchange for federal funding, thus giving rise to a clear statement rule. *Sossamon*, 563 U.S. at 284 (internal quotation marks omitted); *id.* at 290; *see also, e.g.*, *Haight*, 763 F.3d at 568. The Supreme Court just reiterated that such "a clear statement [of Congressional intent] is

---

Otherwise, without such a provision, there is no need for a sovereign immunity waiver. *See Seminole Tribe*, 517 U.S. at 54 (explaining that the Eleventh Amendment embodies the principle that states as independent sovereigns are "not to be amenable *to the suit of an individual* without its consent" (emphasis added) (quoting *Hans*, 134 U.S. at 13)).

required to subject States to suit in the waiver and abrogation contexts." *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2262 (2021).

The *Sossamon* Court left undecided the question of whether the Residual Clause could constitute an unequivocal textual waiver. *See* 563 U.S. at 292. The case before us directly presents that question, and I would answer it in the negative. The Residual Clause's broad, catchall language does not meet the clear statement mandate of a textual waiver of state sovereign immunity.

The logic of the majority is contrary to both the reasons why the clear statement rule is so well established and the Supreme Court's decision in *Dellmuth*. Congress knows how to satisfy this requirement and on multiple occasions has done so in direct response to Supreme Court decisions holding that Congress' initial language had failed to meet that burden. Eschewing any semblance of adhering to this past practice, the majority here improperly assumes a legislative role and rewrites section 1557 altogether, a function not delegated to this Court under Article III of the Constitution.

1.

The clear statement rule in the sovereign immunity context serves a dual purpose. First, it ensures that states make knowing waivers of their sovereign immunity in exchange for federal funding. *Sossamon*, 563 U.S. at 284; *accord, e.g.*, *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 279 (5th Cir. 2005) (en banc) (explaining that *Pennhurst I*'s "stringent clear-statement rule ensures that when a state foregoes its Eleventh Amendment immunity

69

in exchange for federal funds, it does so 'knowingly'"). And second, as Justice Kennedy explained in *Spector v. Norwegian Cruise Line Ltd.*, "clear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation." 545 U.S. 119, 139 (2005) (plurality opinion). Particularly, in the sovereign immunity context, the clear statement rule "ensures that Congress has *specifically considered state sovereign immunity* and has *intentionally legislated* on the matter." *Sossamon*, 563 U.S. at 290 (emphases added).

The Residual Clause meets none of those purposes. As the Tenth Circuit has explained, the Residual Clause does not allow for a knowing waiver of state sovereign immunity vis-a-vis section 1557 because it is "hidden in another statute and only applied to [section 1557] through implication" by the judicial branch on a case-by-case basis. *Levy*, 789 F.3d at 1170. Separately, and equally problematic, the Residual Clause also does not ensure that Congress "specifically considered state sovereign immunity" when adopting section 1557.

To be sure, one can presume that the 111th Congress was aware of the Residual Clause when enacting the ACA. *See, e.g.*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."). But this "fanciful presumption of legislative knowledge," *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1079 (2020) (Thomas, J., dissenting) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 324 (2012)), cannot without something more enable a court to "ensure[] that Congress has . . . intentionally legislated" on the issue of sovereign immunity, *Sossamon*, 563 U.S. at 290. As *Sossamon*

70

clearly explained, "[w]aiver may not be implied," *id.* at 284, but that is precisely what the majority does by merely assuming that the 111th Congress was aware of the Residual Clause and obliquely intended that it function as a waiver of sovereign immunity by virtue of receiving federal funding for "health program[s] or activit[ies]." Instead, the something more that is required is an unequivocal textual expression of that intent in the language of the relevant statute. *See, e.g.*, *id.*; *Dellmuth*, 491 U.S. at 229–30.

Contrary to the clear statement rule, the majority proffers that Congress may enact a catchall residual clause purporting to require states to waive their sovereign immunity for an amorphous category of discrimination statutes, decline to use it for decades, mention discrimination in an omnibus bill like the ACA, and still effectuate a waiver of a state's sovereign immunity. But section 1557 neither discusses sovereign immunity nor incorporates the Residual Clause. That fact leads to only two reasonable inferences: (a) Congress had forgotten that the Residual Clause exists and did not specifically consider the issue of sovereign immunity, or (b) Congress remembered that the Residual Clause exists, but only "drop[ped] coy hints" that it intended to rely on it and "stop[ped] short of making its intention manifest." *Dellmuth*, 491 U.S. at 231. In either situation, the clear statement rule is not satisfied. In the former, an inference of Congressional amnesia, the Residual Clause would enable Congress to improperly, "by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation" *twenty-five years* in advance. *Spector*, 545 U.S. at 139. And in the latter, as the Tenth Circuit has explained, the unexpecting state has not made a "knowing and voluntary" waiver of its sovereign immunity. *Levy*, 789 F.3d at 1170. "Congress 'does not hide elephants in mouseholes,'"

71

and a state's waiver of sovereign immunity "cannot be hidden in another statute and only applied to the [ACA] through implication." *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); *see also Pennhurst I*, 451 U.S. at 17 ("There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

Moreover, Congress is well-versed in how to satisfy these clear statement principles in the sovereign immunity context. Time and again, Congress has shown its ability to make very clear *in the relevant statute* its intention for states to be subject to suit in federal court, particularly in response to judicial decisions finding that Congress' first effort was insufficient. First, the CRREA itself was passed in response to the *Atascadero* decision, which held that section 504 of the Rehabilitation Act did not unmistakably express an intent for states to waive their sovereign immunity. *See Lane*, 518 U.S. at 197–98. The language the CRREA used to require a waiver of state sovereign immunity from section 504 suits––"A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973," 42 U.S.C. § 2000d–7(a)(1)—is "the sort of unequivocal waiver that [the Supreme Court's] precedents demand." *Lane*, 518 U.S. at 198; *accord Litman*, 186 F.3d at 553–54.[8] Next, just one year

---

[8] The majority interprets *Lane* as holding that the CRREA *as a whole*, including the Residual Clause, is "the standard for unequivocal sovereign immunity." Maj. Op. 14. But that reading does not track the facts or legal principles of *Lane*. The narrow question presented in that case was whether § 2000d–7 effectively waived the Federal Government's sovereign immunity from damages suits for violations of section 504 of the (Continued)

72

after *Dellmuth*, which held that the Residual Clause did not effectively abrogate states' sovereign immunity from Education of the Handicapped Act ("EHA") claims, Congress amended the EHA—and, notably, *not* the Residual Clause—to make clear that states would not be immune to suits under it. *See* Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101-476, § 103, 104 Stat. 1103, 1106 (codified at 20 U.S.C. § 1403(a)) ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this Act."). That same Congress also passed the Copyright Remedy Clarification Act ("CRCA"), Pub. L. No. 101-553, 104 Stat. 2749 (1990) (codified at 17 U.S.C. §§ 501(a), 511), in response to decisions of the federal courts of appeals holding that the copyright laws failed to clearly articulate an intent to abrogate state sovereign immunity or otherwise require states to waive their sovereign immunity, *see, e.g.*, *Richard Anderson Photography v. Brown*, 852 F.2d 114, 118–22 (4th Cir. 1988); *BV Eng'g v. Univ. of Cal., L.A.*, 858 F.2d 1394, 1396 (9th Cir. 1988). The CRCA used no uncertain terms: "Any State . . . shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person" for violations of specified copyright laws. Pub. L. No. 101-553, § 2(a), 104 Stat. at 2749 (codified at 17 U.S.C. §

---

Rehabilitation Act. 518 U.S. at 191. The Court did not base any of its holdings on the Residual Clause. The Court's observation regarding the "unequivocal waiver" contained in § 2000d–7 came in discussing how Congress passed that provision in response to *Atascadero*—a section 504 Rehabilitation Act case. *Id.* at 197–98. Indeed, when considering whether § 2000d–7(a)(1) waived the Federal Government's sovereign immunity, the Court *only* referred to "the listed Acts" contained in § 2000d–7(a)(1), not the Residual Clause. *Id.* at 198–99.

73

511).[9] Similarly, in 1994, Congress sought to override the Supreme Court's ruling in *Hoffman v. Connecticut Department of Income Maintenance*, 492 U.S. 96 (1989), that section 106 of the Bankruptcy Code, 11 U.S.C. § 106, did not sufficiently express an intent to abrogate the states' Eleventh Amendment immunity. It amended § 106 to unequivocally provide that "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit . . . with respect to" a host of enumerated sections of the U.S. Code. Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, tit. I, § 113, 108 Stat. 4106, 4117 (codified at 11 U.S.C. § 106(a)). And as this Court pointed out in *Robinson v. U.S. Department of Education*, Congress is especially well-versed in the identical task of legislating waivers of federal sovereign immunity. 917 F.3d 799, 803 (4th Cir. 2019) (citing and discussing six different statutes).

These non-exhaustive, representative examples demonstrate that Congress is well aware of how to express its intent to legislate on the issue of state sovereign immunity *in the text of the relevant statute*. And it could have done so here vis-à-vis section 1557 in several ways. Like the statutes just discussed, Congress could have placed the relevant waiver language in section 1557. Alternatively, like the CRREA's explicit reference to, *inter alia*, Title IX, Congress could have amended the CRREA to include an explicit reference to section 1557. *See Litman*, 186 F.3d at 553–54. Or Congress could have expressly incorporated the Residual Clause into section 1557. *See Kimel v. Fla. Bd. of*

---

[9] As it turns out, while the CRCA may have clearly expressed Congress' intent to abrogate state sovereign immunity, Congress did not actually have the power to do so. *See Allen v. Cooper*, 140 S. Ct. 994 (2020).

74

*Regents*, 528 U.S. 62, 73–74 (2000) (holding that the Age Discrimination in Employment Act, 29 U.S.C. § 626(b), effectively abrogated states' sovereign immunity by incorporating the Fair Labor Standards Act's cause of action against a "public agency," which the FLSA statutorily defined to include "any agency of . . . a State, or a political subdivision of a State," 29 U.S.C. §§ 203(x), 216(b)). Congress did none of these here, however. Without such clear action, courts cannot be assured that Congress intentionally legislated on the issue of state sovereign immunity when crafting the "miscellaneous provision" at issue here, section 1557. *See Sossamon*, 563 U.S. at 290. Nor can courts be assured that *all* states have objective notice that their acceptance of federal funding for health programs and activities is conditioned upon a waiver of their sovereign immunity from section 1557 actions.

There is no clear textual evidence that Congress intended for states to waive their sovereign immunity from section 1557 actions by operation of the Residual Clause. The majority's analysis wholly fails to acknowledge—and ultimately cannot overcome—this inability to establish a waiver of state sovereign immunity sufficient to establish Article III jurisdiction.

2.

Further undercutting the majority's use of the Residual Clause as an implicit waiver of state sovereign immunity from section 1557 claims is the Supreme Court's decision in *Dellmuth*, which deemed the Residual Clause a "nontextual" argument in determining whether Congress abrogated states' sovereign immunity from suits under the EHA. 491

75

U.S. at 229–30. As explained below, the holding in *Dellmuth* plainly leads to the conclusion that the Residual Clause similarly cannot serve as the necessary textual waiver of state sovereign immunity.

As an initial matter, the majority says that *Dellmuth* is irrelevant because efforts to abrogate state sovereign immunity and to exact waivers of state sovereign immunity do not "require (or permit) the same clear statement." Maj. Op. 26. That is simply incorrect. The requirement of a clear textual statement of Congressional intent does not stem from § 5 of the Fourteenth Amendment (abrogation) or from the Spending Clause (waiver). Rather, it is "a rule of constitutional law based on the Eleventh Amendment." *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 204 (1991). So it necessarily follows that if Congress fails to make its intent to abrogate state sovereign immunity explicit in the text of the relevant statute, then it has similarly failed to make a textual indication of its intent to condition the states' receipt of federal funds upon a waiver of sovereign immunity.

That is precisely what *Atascadero* held. The Court explained that the Rehabilitation Act lacked any textual evidence of a Congressional intent to condition the states' receipt of federal funding upon a waiver of sovereign immunity for the same reason the Act failed to abrogate that immunity: the Act "does not evidence an unmistakable congressional purpose . . . to subject unconsenting States to the jurisdiction of federal courts." *Atascadero*, 473 U.S. at 247. In other words, *Atascadero* merely "reaffirm[ed] the rule of prior decisions requiring the same degree of clarity in a spending power statute, which triggers inquiry into whether the state waived its eleventh amendment protection, as would be required by an abrogation statute. The two inquiries are now the same." George D. Brown, *State*

76

*Sovereignty Under the Burger Court—How the Eleventh Amendment Survived the Death of the Tenth: Some Broader Implications of* Atascadero State Hospital v. Scanlon, 74 Geo. L.J. 363, 388 (1985); *see also* John R. Pagan, *Eleventh Amendment Analysis*, 39 Ark. L. Rev. 447, 496–97 n.194 (1986) ("Prior to *Atascadero*, some commentators thought the Court required a less precise articulation of intent when Congress acted pursuant to the [F]ourteenth [A]mendment than when it used its [A]rticle I powers. *Atascadero* indicates, however, that a uniform clear-statement test now applies." (internal citations omitted)).

Given that the clear textual statement requirement for abrogation and waivers are one and the same, the analysis here should be easily guided by *Dellmuth*. In that case, Russell Muth brought suit on behalf of his son, who had a learning disability, under the EHA, Pub. L. No. 94-142, 84 Stat. 175 (1975), as amended 20 U.S.C. § 1400 *et seq*. *Dellmuth*, 491 U.S. at 225–26. Muth challenged various aspects of the individualized education plan a public school district implemented for his son. *Id.* The State argued that Muth's federal suit was barred by its Eleventh Amendment immunity. *Id.* at 226. Both lower courts rejected the State's challenges, *id.* at 226–27, but on appeal, the Supreme Court reversed, *id.* at 227.

Of relevance here, Muth specifically argued that the Residual Clause "expressly abrogates state immunity from suits for tuition reimbursement brought under the EHA." Br. for Resp. Muth at 30, *Dellmuth*, 491 U.S. at 223 (No. 87-1855), 1988 WL 1025571, at *31. Despite the fact that Muth's claims arose before the CRREA's effective date, the Supreme Court nonetheless directly addressed Muth's Residual Clause arguments as "nontextual" claims. 491 U.S. at 228. The Court first compared "the language in the

77

[CRREA] with the language of the EHA" and concluded it "serve[d] only to underscore the difference in the two statutes, and the absence of any clear statement of abrogation *in the EHA*." *Id.* at 229 (emphasis added). Next, the Court observed that "[w]hen measured against such explicit consideration of abrogation of the Eleventh Amendment, the EHA's treatment of the question appears ambiguous at best." *Id.* at 230. The Court continued:

> More importantly, however, respondent's contentions [regarding the Residual Clause] are beside the point. Our opinion in *Atascadero* should have left no doubt that we will conclude Congress intended to abrogate sovereign immunity only if its intention is "unmistakably clear in the language of the statute." *Atascadero*, 473 U.S., at 242, 104 S.Ct., at 3147. Lest *Atascadero* be thought to contain any ambiguity, we reaffirm today that in this area of the law, evidence of congressional intent must be both unequivocal and textual. Respondent's evidence is neither.

*Id.* After "turn[ing] [its] attention to the *proper* focus of an inquiry into congressional abrogation of sovereign immunity, the language of the statute" forming the basis for Muth's claim, the Court held that the EHA did not validly abrogate state sovereign immunity, because it "ma[de] no reference whatsoever to either the Eleventh Amendment or the States' sovereign immunity." *Id.* at 231 (emphasis added).

*Dellmuth* thus stands for the principle that, setting aside the CRREA's enumeration of four specific statutes, the Residual Clause cannot provide the requisite *textual* evidence of Congressional intent to abrogate or waive states' sovereign immunity from suits under "Federal statute[s] prohibiting discrimination by recipients of federal financial assistance."[10] Because the clear textual statement rule for the abrogation doctrine is the

---

[10] *Dellmuth* is not alone in this regard. As previously noted, the *Lane* Court again had an opportunity to utilize the Residual Clause to hold that the Federal Government's (Continued)

same as that in the waiver doctrine, *see Atascadero*, 473 U.S. at 247; Brown, *supra*, at 388, it necessarily follows that the Residual Clause fails to provide the necessary textual evidence of Congressional intent to condition the receipt of federal funds under any statute enacted after CRREA as a waiver of state sovereign immunity.

The majority's attempts to distinguish *Dellmuth* based on the fact that Muth's complaint alleged EHA violations that predated the effective date of the CRREA, Maj. Op. 26–27, fail. That timing factor did not impact the Court's analysis. Instead, the Court rooted its holding in determining whether Congress expressed an intent to abrogate state sovereign immunity from EHA suits in the EHA, not a residual clause in a separate statute. So, had Muth alleged a harm that occurred after the CRREA's effective date, that would not have impacted the Court's characterization of the Residual Clause as a "nontextual" argument that failed. *See Dellmuth*, 491 U.S. at 228–31. Further, assuming *arguendo* that the timing factor had some impact on the Court's analysis, at minimum the Court's recognition of the Residual Clause as a "nontextual" argument would be dicta. But even as dicta, "we simply cannot ignore the import of the language used by the Supreme Court in [*Dellmuth*]," for we are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings." *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) (quoted approvingly by *Yanez-Marquez v. Lynch*, 789 F.3d 434, 450 (4th Cir. 2015); United *States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002)).

---

sovereign immunity was waived to suits under section 504 of the Rehabilitation Act, but it declined to do so, holding that the CRREA was too ambiguous to constitute an unequivocal waiver of federal sovereign immunity. 518 U.S. at 198–200; *see supra* n.5.

79

Here, as in *Dellmuth*, there is no "textual hook" between the Residual Clause and Plaintiffs' section 1557 claims. Maj. Op. 27. Whatever similarities may lie between section 1557 and the CRREA's four enumerated antidiscrimination statutes, *see* Maj. Op. 22–23, section 1557 does not expressly reference or incorporate the Residual Clause, nor does the CRREA expressly reference or incorporate section 1557. Just like the EHA in *Dellmuth*, that dooms Plaintiffs' section 1557 claims. As Justice Kennedy wrote for the Court, it is "difficult to believe that . . . Congress, taking careful stock of the state of Eleventh Amendment law, decided it would drop coy hints but stop short of making its intention manifest" that section 1557 would be encompassed by the Residual Clause. *Dellmuth*, 491 U.S. at 230–31. Without more, the Residual Clause cannot give states the notice required under the Supreme Court's sovereign immunity precedent for an effective waiver of their sovereign immunity from private suits in federal court brought under section 1557.

That conclusion is illustrated by the discussion of *Dellmuth* by then-Chief United States District Judge José A. Cabranes in *Ohta v. Muraski*, No. 3:93 CV 00554 (JAC), 1993 WL 366525 (D. Conn. Aug. 19, 1993). In that case, the plaintiff argued that the Residual Clause waived state sovereign immunity from suits under 42 U.S.C. § 290dd–2, which barred the disclosure of certain information "maintained in connection with the performance of any program or activity relating to substance abuse education, prevention, training, treatment, rehabilitation, or research." *Id.* at *1–2 & n.6 (quoting 42 U.S.C. § 290dd–2(a)). As relevant here, *Ohta* assumed that "§ 290dd–2 is a statute prohibiting discrimination by recipients of federal aid within the meaning of" the Residual Clause, but held that the Residual Clause was not "capable of satisfying the requirements of clarity and

80

specificity required by the Supreme Court in cases of Congressional abrogation of state immunity." *Id.* at *4. The court explained:

> If, indeed, Congress itself had felt this phrasing to be sufficient waiver of state immunity for *every* federal statute referring to discrimination by recipients of federal aid, it would scarcely have taken such pains in § 2000d–7(a)(1) specifically to list the Rehabilitation Act, the Education Amendments of 1972, and Title VI of the Civil Rights Act of 1964 by name. Nor would it have been necessary for Congress to pass subsequent—and very specific—abrogations of state immunity in regard to other anti-discrimination statutes. If the plaintiff were correct that § 2000d–7 eliminates state immunity to suit for every federal law dealing in some way with "discrimination," no court should thereafter have found a suit under an anti-discrimination statute barred by the Eleventh Amendment, and Congress should not have had to pass any further abrogation legislation.

*Id.* at *5.

But, as Judge Cabranes pointed out, the Supreme Court did just that in *Dellmuth*, requiring Congress to amend the EHA to provide a specific waiver of sovereign immunity. *Id.* Based on this plain logic, he concluded that the Residual Clause "did not automatically strip states of their immunity to suit in federal court under any and all federal anti-'discrimination' statutes," for "[h]ad the language of § 2000d–7(a)(1) applied as sweepingly as the plaintiff suggests, neither the *Dellmuth* decision nor the 1990 amendments abrogating state immunity with respect to the EHA would have been necessary." *Id.* In other words, "Congress has simply not yet been specific enough." *Id.* at *6.

In sum, *Dellmuth* stands for the principle that the Residual Clause does not satisfy the Supreme Court's clear statement requirement for effectuating an abrogation of state sovereign immunity. And there is no meaningful difference in the waiver context.

81

Therefore, under our clear statement analysis, the presumption that Congress is "'aware of relevant judicial precedent' when it enacts a new statute," *Guerrero-Lasprilla*, 140 S. Ct. at 1072 (majority opinion) (citation omitted), we should reach the same result as a matter of first principles. Congress was presumably aware of *Dellmuth*'s rejection of the Residual Clause as "nontextual," which required a separate amendment of the EHA to effectively legislate on the issue of states' sovereign immunity from private suits under the EHA in federal court. *Dellmuth*, 491 U.S. at 229–30. That should lead to the identical conclusion that the Supreme Court's clear statement requirement for conditioning the receipt of federal funding upon a state's agreement to waive its sovereign immunity is not met in this case. *See Sossamon*, 563 U.S. at 290–91; *Atascadero*, 473 U.S. at 245–47.

## IV.

There is no new ground to break here, and especially no justification for creating a consequential circuit split. The majority only acknowledges one possible interpretation of the Residual Clause despite the existence of at least one other plausible interpretation that has been endorsed by the only circuits to consider the issue and would preserve states' sovereign immunity. The majority's result is squarely foreclosed by the Supreme Court's sovereign immunity jurisprudence, and fails to respect the "stringent" requirement that a state's waiver of sovereign immunity be "unequivocally expressed in the text of the relevant statute." *Sossamon*, 563 U.S. at 284 (internal quotation marks omitted). Indeed, as *Dellmuth* confirms, the Residual Clause does not provide courts with the necessary assurance that states have knowingly waived their sovereign immunity from section 1557

82

suits, or that Congress specifically considered the issue of state sovereign immunity when enacting section 1557.

The NCSHP's sovereign immunity from suit should have been confirmed and the case dismissed. Accordingly, I respectfully dissent. The Supreme Court should proceed expeditiously to correct the constitutional error here.