# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

                *Plaintiffs*,

        v.

DALE FOLWELL, et al.,

                *Defendants*.

No. 1:19-cv-00272-LCB-LPA

## PLAINTIFFS' OPPOSITION TO STATE HEALTH PLAN DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

STATEMENT OF THE CASE AND FACTS ................................................................... 1

ARGUMENT................................................................................................................ 1

I.  The Exclusion Discriminates Based on Sex and Transgender Status ...................... 1

II.  NCSHP is Liable as an Agent and Joint Employer Under Title VII ....................... 13

    A.  NCSHP is Liable as an Agent. ...................................................................... 13

    B.  NCSHP is Liable as a Joint Employer............................................................ 15

CONCLUSION ........................................................................................................... 23

i

Plaintiffs respectfully oppose the Motion for Partial Summary Judgment ("MSJ") by Defendants Folwell, Jones, and North Carolina State Health Plan for Teachers and State Employees ("NCSHP"; collectively, "Defendants").[1]  ECF Nos. 136-37.

## STATEMENT OF THE CASE AND FACTS

This case seeks to vindicate the right of state employees and their dependents to receive health coverage free from sex discrimination.  Although Defendants repeatedly argue that NCSHP need not cover all medical treatments or all medically necessary care, ECF No. 137 at 5, 8, that is not what Plaintiffs seek.  Instead, Plaintiffs ask that Defendants comply with their obligations under federal law to provide coverage without invidious distinctions based on sex or transgender status.

## ARGUMENT

## I.      The Exclusion Discriminates Based on Sex and Transgender Status.

Although Defendants move only on Plaintiffs' statutory claims, Defendants' MSJ begins with extraneous discussion of constitutional doctrine.  ECF No. 137 at 1.  But Defendants subsequently clarify that they seek "partial summary judgment" on "two of Plaintiffs' claims" under Title VII and the ACA.  *See* ECF No. 137 at 1-2; *see also id.* at 2 ("Plaintiffs' equal protection claims remain for trial.").  Defendants' discussion of constitutional law is thus irrelevant, but to eliminate all doubt, Plaintiffs briefly explain

---

[1] All references to "Ex." refer to exhibits to the Declaration of Amy Richardson at ECF Nos. 180-81.  All references to "Supp. Richardson Decl." refer to the declaration filed with this brief.  All defined terms have the meaning ascribed to them in Plaintiffs' Motion for Summary Judgement "Plaintiffs' MSJ".

1

why Defendants' cited authorities do not affect Plaintiffs' statutory or constitutional claims.[2]

Defendants cite *Geduldig v. Aiello*, 417 U.S. 484 (1974), in an effort to paint the Exclusion as facially neutral, but this argument fails. ECF No. 137 at 1, 3. First, *Geduldig* was decided before the Supreme Court recognized sex stereotyping claims in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), and therefore says nothing about Plaintiffs' sex stereotyping claims. Second, *Geduldig* does not transform the sex discrimination on the face of the Exclusion into neutral "medical benefit" discrimination. ECF No. 137 at 3. In ruling on a disability insurance program's exclusion of pregnancy coverage, *Geduldig* did not hold that pregnancy-based classifications *never* violate the Equal Protection Clause, instead concluding more narrowly that not every pregnancy classification is an explicit sex-based classification "like those considered in" *Reed v. Reed*, 404 U.S. 71 (1971), and *Frontiero v. Richardson*, 411 U.S. 677 (1973). *Geduldig*, 417 U.S. at 496 n.20. Courts have had no trouble identifying the sex-based classification explicit in exclusions for gender-confirming care. *See, e.g.*, *Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1030 (D. Alaska 2020); *Boyden v. Conlin*, 341 F.Supp.3d 979, 995 (W.D. Wis. 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 948 (W.D. Wis. 2018).

---

[2] Plaintiff Silvaine's Equal Protection claim is moot since he no longer works for the state, but contrary to Defendants' suggestion, ECF No. 137 at 4, Mr. Kadel retains a ripe Equal Protection claim since he has rejoined state employment and is covered through NCSHP. ECF No. 179-1 ¶ 2. All Plaintiffs have damages claims under the ACA. ECF No. 75, Count III.

Regardless, Defendants' reliance on *Geduldig* in a motion regarding Plaintiffs' statutory claims is particularly odd. After the Supreme Court applied *Geduldig* to Title VII in *General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), Congress expressly repudiated *Gilbert* (and its reliance on *Geduldig*) by amending Title VII to include pregnancy discrimination. *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 678 (1983) (Congress "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision"). "By concluding that pregnancy discrimination is not sex discrimination within the meaning of Title VII, the Supreme Court disregarded the intent of Congress … to protect all individuals from unjust employment discrimination, including pregnant women." *Discrimination on the Basis of Pregnancy, 1977: Hearing on S. 995 Before the Subcomm. on Labor of the Senate Comm. on Hum. Res.,* 95th Cong. 1 (1977), *available at* https://bit.ly/2meSlm9; *see also Newport News*, 462 U.S. at 679 ("Proponents of the bill repeatedly emphasized that the Supreme Court had erroneously interpreted Congressional intent …."). Accordingly, *Geduldig*'s reasoning has been expressly repudiated under Title VII.

Defendants also cite *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), but that case supports Plaintiffs, not Defendants. As *Bray* observed, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and … happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Id.* at 270. Just as a "tax on wearing yarmulkes is a tax on Jews," *id.*, an exclusion of gender-affirming care is an

3

exclusion of transgender people since the need for medical transition applies exclusively to transgender people. *See Boyden*, 341 F.Supp.3d at 1000; *Toomey v. Arizona*, No. 19-cv-00035, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019) ("[T]ransgender individuals are the only people who would ever seek gender reassignment surgery.").

Defendants misleadingly imply that four exclusions deny coverage to transgender people. ECF No. 137 at 8. Not so. Plaintiffs' Complaint challenged two facially discriminatory exclusions: one for "[p]sychological assessment and psychotherapy treatment in conjunction with proposed gender transformation," and one for "[t]reatment … in connection with sex changes or modifications" (the "Exclusion"). Exs. 8-9. NCSHP's corporate designee testified that NCSHP does not enforce the first exclusion, Ex. 12, 49:8-23, and Defendants now clarify that it has not been enforced for decades and will be removed in 2022. ECF No. 137 at 8 n.2. Accordingly, the Exclusion for "[t]reatment … in connection with sex changes or modifications" is the one at issue. ECF No. 137 at 8.

Defendants point to two other exclusions, including one for "[c]osmetic services … and surgery for psychological or emotional reasons," *id.*, and one for experimental medications and medications not approved by the U.S. Food and Drug Administration ("FDA"), *id*. at 9. Neither has any relevance to this case. They have not been invoked in Plaintiffs' denials of care. *See* ECF No. 179-3 ¶¶ 11-12 Exs. A-B; ECF No. 179-9 ¶ 24 Ex. A; ECF No. 179-4 ¶ 10 Ex. A; ECF No. 179-1 ¶ 10 Ex. A; ECF No. 179-8 ¶¶ 31-32 Exs. B-E. When NCSHP staff recommended that the Exclusion for gender-confirming

4

care be eliminated in 2017, they did not mention any other exclusion, Ex. 39,

PLANDEF0006985, PLANDEF00069888; and those exclusions remained untouched in

2017 while NCSHP covered gender-confirming care.  Supp. Richardson Decl. Exs. A-B.

In 2017, NCSHP followed the Blue Cross Blue Shield of North Carolina ("BCBSNC")

Corporate Medical Policy, which does not apply those exclusions.  *See* Ex. 40,

PLANDEF0012816; Ex. 12, 41:25-42:15; Ex. 43.  Indeed, the very BCBSNC testimony

that Defendants submitted with their MSJ states that BCBSNC "has never implemented

the portion of the Plan's benefit booklets that excludes 'surgery for psychological or

emotion[al] reasons.'"  ECF No. 137-4 ¶ 27.

Defendants also note that several medications prescribed to transgender people are

not approved by the FDA to treat gender dysphoria.  ECF No. 137 at 13; ECF No.

137-10.  But they ignore the evidence in the record that off-label usage is common and

has been covered by NCSHP previously.[3]  Regardless, Defendants fail to explain how

this could serve as a defense to Plaintiffs' claims.  As explained in Plaintiffs' MSJ,

exclusions for gender-confirming care are facially discriminatory.  ECF No. 179 at 17-18;

*Fletcher*, 443 F.Supp.3d at 1030-31.  Facial discrimination can be justified *only* by a bona

---

[3] Not only is it "common for medications to be used 'off label' across all domains of medicine," Ex. 26(a) ¶ 96, the lack of FDA approval did not prevent NCSHP from covering care during plan year 2017, and NCSHP's Rule 30(b)(6) designee admitted NCSHP has covered other non-approved applications of medications.  *See* Ex. 12, 107:17-19 (NCSHP covered COVID care, which was not FDA-approved until many months after).  The FDA has provided for at least three decades that physicians may prescribe drugs on an off-label basis.  *See, e.g.*, Ex. 28, 223:14-232:6; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001) ("off-label use is generally accepted").

5

fide occupational qualification, which does not apply to fringe benefits plans. *Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1084 n.13 (1983). Defendants' claims about FDA approval are both misleading and irrelevant to the statutory analysis.

With little to say about the Exclusion actually at issue, Defendants focus instead on the billing practices of BCBSNC and CVS. ECF No. 137 at 9-12. But BCBSNC and CVS are not the problem. Both administered inclusive coverage in 2017, it was BCBSNC's Corporate Medical Policy that was used to determine coverage parameters, and BCBSNC advised NCSHP that it would need to be indemnified once NCSHP reinstated the Exclusion. *See* Exs. 45, 47.

Defendants nonetheless recount at length the codes used to process claims for care, ECF No. 137 at 10-12, arguing that the Exclusion "is based on diagnosis and medical coding and not transgender identity"—as if the codes employed by third party administrators *to implement NCSHP's discriminatory Exclusion* are somehow the culprit. The way the Exclusion operates is simple: NCSHP inserts it into the plans (against the advice of their consultants, and over BCBSNC's objection that it needs to be indemnified); and BCBSNC and CVS have no choice but to implement it. *See, e.g.*, ECF No. 137-4 ¶ 11 (testimony from BCBSNC that NCSHP "creates a benefits booklet" and BCBSNC "is responsible for implementation" of it); *see also* ECF No. 137 at 5 (acknowledging that the booklet "describes the covered and non-covered services," which BCBSNC "implements"). Defendants also emphasize that BCBSNC and CVS do

6

not track whether a participant is transgender, ECF No. 137 at 9-10, 12, but that does not change the analysis. Defendants ensure that the care is not covered when transgender people need it for gender transition, and BCBSNC and CVS implement the discriminatory Exclusion. *See* ECF No. 137-4 ¶ 19 (BCBSNC "will not approve a claim … not covered by the Plan").

This structure is apparent even when one considers the codes themselves: Treatment is not covered when "performed to treat one of two diagnosis codes: F64.0 (*Transsexualism*) or Z87.890 (Personal history of *sex reassignment*)"—i.e., when the codes indicate the care is required by transgender people for gender transition. ECF No. 137 at 10 (emphasis added); *see also* ECF No. 137 at 9-10, 12 (procedures are not covered when used for "treatment of gender dysphoria," but if care is coded for other purposes, "the Plan would pay it").

Defendants' attempt to disguise the Exclusion as mere "diagnosis and medical coding" discrimination—instead of sex and transgender status discrimination—repeats an error the Supreme Court has rejected definitively. It is "irrelevant" what a defendant "might call its discriminatory practice, how others might label it, or what else might motivate it." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1744 (2020). For this reason, the defendant in *Manhart v. City of Los Angeles, Dep't of Water & Power*, 435 U.S. 702 (1978), could not have justified requiring larger pension contributions from women as "life expectancy" discrimination instead of sex discrimination. *Bostock*, 140 S. Ct. at 1744. Nor could the defendant in *Phillips v. Martin Marietta Corp.*, 400 U.S.

542 (1971) (per curiam), have recast its prohibition on pre-school age children for female applicants as "motherhood" discrimination instead of sex discrimination. *Bostock*, 140 S. Ct. at 1744. Defendants thus cannot pretend that the facially discriminatory Exclusion is mere "diagnosis and medical coding" discrimination. "[J]ust as labels and additional intentions or motivations didn't make a difference in *Manhart* or *Phillips*, they cannot make a difference here." *Id.* Accordingly, the Exclusion is sex discrimination for all the reasons described in Plaintiffs' MSJ. ECF No. 179 at 17-20.

Defendants offer some tangential assertions about the nature of gender dysphoria, but without explaining how they relate to the legal analysis. ECF No. 137 at 7-8. "Critically," Defendants claim, "not all transgender individuals suffer from gender dysphoria." *Id.* at 7. While Defendants never explain why that is purportedly "critical," the fact that symptoms of gender dysphoria abate after treatment is not remarkable—it is the purpose of providing care. *See* Supp. Richardson Decl. Ex. C, 20:12-22; Ex. 25(a) ¶ 56 (the "overarching goal … is to eliminate clinically significant distress by aligning an individual patient's body and presentation with their internal sense of self"). Defendants also claim Plaintiffs have not provided evidence of the "proportion of transgender individuals suffer[ing] from gender dysphoria." ECF No. 137 at 7-8. But this makes no difference. The Exclusion is not concerned with how many transgender participants experience untreated gender dysphoria—it simply denies care to them all. Nor is this relevant to the legal analysis. There is no numerosity threshold that a targeted group must reach before it is entitled to equal protection of the law.

8

Defendants feign confusion about whether the Exclusion targets transgender people, or whether cisgender people might also be affected. ECF No. 137 at 2 ("Plaintiffs cannot prevail only with assertions that gender dysphoria disproportionately affects members of a protected class."). But the Exclusion makes clear who is targeted: those seeking "[t]reatment … in connection with sex changes or modifications"—i.e., transgender people. Exs. 8-9. In fact, this Court has previously rejected Defendants' "attempt to frame the Exclusion as one focused on 'medical diagnoses, not ... gender.'" *Kadel v. Folwell*, 446 F.Supp.3d 1, 18 (M.D.N.C. 2020); *id.* ("[S]ex and gender are directly implicated; it is impossible to refer to the Exclusion without referring to them."). The Exclusion's singling out of transgender people for differential treatment thus is unmistakable. *See also Toomey*, 2019 WL 7172144, at *6 ("No cisgender person would seek, or medically require, gender reassignment. Therefore, as a practical matter, the exclusion singles out transgender individuals for different treatment."); *Kadel*, 446 F.Supp.3d at 18 (an "employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination") (quote omitted).[4]

Defendants' argument also is belied by a record replete with admissions that Defendants knew the Exclusion treats transgender people differently, lifted it for one year

---

[4] For these reasons, the motion to dismiss-stage holding in *Lange v. Houston County, Georgia*, 499 F.Supp.3d 1258, 1275 (M.D. Ga. 2020), that a similar exclusion was facially neutral, fails to persuade. ECF No. 137 at 2-3. This Court has already rejected that analysis, and *Lange*'s reliance on *Geduldig* renders it particularly unpersuasive for Plaintiffs' statutory claims, where Congress has directly renounced *Geduldig*'s reasoning.

9

to afford equal treatment, and provided for reinstatement after concluding (wrongly) that the law no longer required equal treatment. *See, e.g.*, Ex. 39 (slides presented to the Board as it considered lifting the Exclusion for 2017, which include the term "transgender" 10 times); *see also id.* PLANDEF0006980 (explaining that ACA regulation "makes clear … that blanket exclusions of transgender services" are outmoded); Ex. 36 ( "Transgender Cost Estimate" memorandum from Segal Consulting); Ex. 48 (Defendant Folwell's statement that he would not provide coverage for "sex change operations" until "the court system … tells us that we 'have to'"); Supp. Richardson Decl. Ex. D, 107:17-108:6 (Defendant Folwell uses "sex change operation" to refer to "folks who want to transition, transition their gender"—i.e., transgender people).

　　*In re Union Pacific R.R. Emp. Pracs. Litig.*, 479 F.3d 936 (8th Cir. 2007), does not change the analysis. Defendants cite this case for the proposition that the proper comparator is the medical benefit in question, ECF No. 137 at 3, but *Union Pacific* merely clarified that in a challenge alleging that men were treated more favorably than women for contraception coverage, one must compare women's contraception coverage with men's contraception coverage—not women's contraception coverage with men's coverage for male-pattern baldness or tetanus shots. 479 F.3d at 944. Here, the comparison between the care covered for cisgender people and excluded for transgender people is direct: the Exclusion bars the same treatments for transgender people that are covered when medically necessary for cisgender participants, including hormone therapy,

Ex. 2 Admis. 1, Ex. 5 Admis. 2; puberty-delaying hormone treatment, Ex. 5 Admis. 2;

mammoplasty and breast reconstruction, Ex. 2 Admis. 2, Ex. 5 Admis. 3; vaginoplasty,

Ex. 2 Admis. 3; and hysterectomy, Ex. 2 Admis. 4.

Because of the Exclusion's facial discrimination, showing discriminatory intent is

not necessary—let alone "animus." ECF No. 137 at 3. *See, e.g.*, *Gerdom v. Cont'l*

*Airlines*, 692 F.2d 602, 608 (9th Cir. 1982) (where a policy "on its face applies less

favorably" to a group, the complainant "need not otherwise establish … discriminatory

intent"); *Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL

1607756, at *6 (Apr. 1, 2015). And as this Court already has observed, "[s]ometimes …

the government's chosen classification will be clear from the text of the law or policy

itself. Plaintiffs argue that that is the case here … and the Court agrees." *Kadel*, 446

F.Supp.3d at 18.

Defendants inaccurately claim that Plaintiffs allege that "discriminatory animus"

motivated the reinstatement of the Exclusion, but that term appears nowhere in Plaintiffs'

Complaint, ECF No. 75, and animus has never been required for statutory or

constitutional claims. It does not matter whether discriminatory treatment is rooted in an

undisputed truth, innocent misunderstanding, or active bias—sex and transgender

discrimination are no more tolerable in any of these circumstances. *See, e.g.*, *Manhart*,

435 U.S. at 707 (pension plan violated Title VII even though "the parties accept as

unquestionably true [that]: Women, as a class, do live longer than men."); *Erie Cnty.*

*Retirees Ass'n v. Cnty. of Erie, Pa.*, 220 F.3d 193, 212 (3d Cir. 2000) (an employer's

"beneficence … does not undermine the conclusion that an explicit gender-based policy is sex discrimination") (quoting *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200 (1991)); *cf. Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 112 (2d Cir. 2001) (it is no defense "to hold a good-faith, but erroneous, belief that the law permits taking an adverse job action on the basis of a prohibited factor").[5]

For these reasons, the argument that Defendants merely maintain the Exclusion based on their (mistaken) conclusion that the ACA no longer requires equal treatment is both incorrect on the law, and inadequate. Defendants invoke *Franciscan All., Inc. v. Burwell*, 227 F.Supp.3d 660 (N.D. Tex. 2016), but that only enjoined the U.S. Department of Health and Human Services ("HHS") from enforcing an ACA regulation; it did not alter the statutory guarantee of freedom from sex discrimination, or enjoin the ability to bring private suits. Separately, deliberately reinstating and maintaining the Exclusion because of a mistaken belief about the status of the ACA's regulations provides Defendants no shelter. The question is not whether Defendants intended to be meanspirited, but simply whether they intended to do it. On that point, there is no dispute: the Exclusion was not accidental or inadvertent, but intentional and deliberate. Ex. 40, PLANDEF0012816-17.

---

[5] Defendants cite *Williams v. Hansen*, 326 F.3d 569 (4th Cir. 2003) to suggest that animus is required, but cite the *dissenting* opinion in this constitutional case, which says nothing about Plaintiffs' statutory claims. ECF No. 137 at 3.

## II.    NCSHP is Liable as an Agent and Joint Employer Under Title VII.

### A.    NCSHP is Liable as an Agent.

Title VII defines "employer" to include the "agent" as well, and prohibits sex discrimination by both.  42 U.S.C. § 2000e(b).  Defendants argue that inclusion of an employer's "agent" in the statute does not establish liability for the agent, but simply expands the employer's liability for an agent's conduct.  ECF No. 137 at 20-21.  But this Court previously rejected that argument when Plaintiffs sought to amend their Complaint with Sgt. Caraway's Title VII claim against NCSHP.  ECF No. 74.  Defendants nonetheless press the argument again, claiming that *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir. 1994), and *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177 (4th Cir. 1998), establish that only employers may bear liability and not their agents.  ECF No. 137 at 21.  This Court flatly rejected that characterization:

> [I]n context *Birkbeck* merely concluded that no liability could attach to an *individual* employee …, *see Birkbeck*, 30 F.3d at 509-11, … consistent with the many courts that have rejected employment discrimination claims against individuals, *see Lissau*, 159 F.3d at 181 ….  *Birkbeck* neither foreclosed nor endorsed an agency theory under which more than one *entity* may bear Title VII liability.  …  Here, the issue of individual Title VII liability (and *Birkbeck*'s holding to that effect) remains irrelevant because the Amended Complaint does not lodge a Title VII claim against anyone in an individual capacity.

ECF No. 74 at 22-23.  Then as now, "Defendants have identified no authority demonstrating that such theory … fails." *Id.* at 23-24, and case law instead shows that

13

NCSHP is liable on the merits.[6]  *See* ECF No. 179 at 31-33 (discussion in Plaintiffs' MSJ of NCSHP's liability as an agent of Sgt. Caraway's employer).

The Supreme Court itself held in *Manhart* that an administrative board implementing a discriminatory fringe benefit may be sued as the "agent" of the employing government agency.  435 U.S. at 718 n.33; *id*. ("Title VII applies to 'any agent' of a covered employer.").  Other courts examining this question in a similar context have reached the same conclusion.  *See, e.g.*, *Boyden v. Conlin*, No. 17-cv-264, 2017 WL 5592688, at *2-3 (W.D. Wis. Nov. 20, 2017) (collecting authorities demonstrating that to be liable as an agent under Title VII, an entity must be "empowered" with respect to an employment practice such as "provid[ing] benefits"); *id*. at *3 (W.D. Wis. May 11, 2018) (finding plaintiff's university employers had delegated responsibility for health coverage to state entities administering that coverage).

This Court also considered a similar argument in *Crowder v. Fieldcrest Mills, Inc.*, 569 F.Supp. 825 (M.D.N.C. 1983), involving claims against an employer and its health plan administrator as the employer's agent under Title VII.[7]  The plaintiff challenged the

---

[6] Defendants also misconstrue *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404 (4th Cir. 2015), claiming that it held only an "employer" can be liable under Title VII.  ECF No 137 at 20.  But the paragraph Defendants quote observes that Title VII expressly defines an employer to include an "agent."  793 F.3d at 408.  *Butler* does not otherwise discuss agent liability, and certainly does not contain the holding Defendants suggest.  Instead, *Butler*'s adoption of the joint employer doctrine expressly recognizes that more than one entity can be liable as an employer.

[7] Defendants attempt to distinguish *Crowder* because it was decided before *Butler* adopted the current standards for the joint employment doctrine.  ECF No. 137 at 22 n.5.  But Plaintiffs rely on *Crowder*'s analysis of whether an entity is liable as an "agent."  569 F.Supp. at 828.

14

health plan's more favorable coverage for spouses of male employees than female employees. *Id.* at 826. Because the administrator served in merely an "advisory capacity" with no "significant control" over the plan terms, no agent relationship existed; but where an employer delegates responsibility, that "functionally result[s]" in the administrator "having control of an aspect of the terms and conditions of employment," rendering the administrator an "employer" by virtue of serving as an agent. *Id.* at 827-28. That describes NCSHP precisely. *See* N.C. Gen. Stat. § 135-48.2(a); Ex. 5 Admis. 12-14; ECF No. 96 ¶ 179. For these reasons, the Court should find that NCSHP has violated Title VII as an agent of DPS.

**B. NCSHP is Liable as a Joint Employer.**

NCSHP admits that the "'joint employment doctrine is the law of [the Fourth] Circuit.'" ECF No. 137 at 22 (quoting *Butler*, 793 F.3d at 409). Defendants try to undercut *Butler*'s application by focusing rigidly on the factors it identifies to help determine whether two entities share control over a key aspect of employment. ECF No. 137 at 23-27. But the underlying purpose of *Butler*'s "hybrid test" is to allow for "the broadest possible set of considerations in making a determination of which entity is an employer." 793 F.3d at 414. *Butler* instructs that "courts can modify the factors to the specific industry context." *Id.* Importantly, "the consideration of factors must relate to the particular relationship under consideration." *Id.* at 415 (quote omitted). Above all else, the guide star remains the common law element of control. *Id.* The Court should heed *Butler*'s call to adapt the analysis to this context, and set aside Defendants' urging to

15

focus on everything but the term of employment actually at issue—health coverage. ECF No. 137 at 24-27. NCSHP's mechanistic arguments about irrelevant factors such as control of Sgt. Caraway's work uniform thus should not persuade this Court. ECF No. 137 at 23-24. Nothing about the *Butler* test requires the Court to apply a host of factors with no bearing on the term of employment at issue, and the Court should instead examine *Butler*'s guidepost, i.e., "control" over the health coverage relevant to this case. *Id.* at 414.

On this core issue, NCSHP is largely silent. But there is no dispute that state law delegates control over employee health coverage to NCSHP, which exists solely to permit that delegation. N.C. Gen. Stat. § 135-48.2(a); *see also* ECF No. 96 ¶ 179; Ex. 14, 13:3-14:6. NCSHP implicitly concedes the point. *See* ECF No. 137 at 17 (conceding that "DPS does not determine the health risks that the Plan will protect against or the benefits available to those who elected to participate"—because that is NCSHP's role). Where an entity "exhibit[s] a high degree of control over the terms of [] employment," it must be held liable as a joint employer. *Butler*, 793 F.3d at 415. The undisputed facts here make clear that NCSHP functions as a joint employer for purposes of health coverage, and is liable under Title VII for all the reasons explained in Plaintiffs' MSJ. ECF No. 179 at 33-34.

## III. Defendants' Reliance on HHS's Redefinition of "Health Program or Activity" in 2020 is Misplaced.

Defendants argue NCSHP is entitled to summary judgment on Plaintiffs' ACA claim because in 2020, HHS, under the Trump administration, issued a rule redefining

16

"health program or activity" to exclude health insurance and that such redefinition is entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Defendants' argument lacks merit. The text of Section 1557 is unambiguous in this regard and the redefinition is contrary to law, arbitrary, and capricious.

"*Chevron* deference is not a given." *People for the Ethical Treatment of Animals v. United States Dep't of Agric.*, 861 F.3d 502, 506–07 (4th Cir. 2017). "*Chevron* deference is not warranted where … the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016). Among those requirements is that a rule not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

A.     **The Statutory Text is Clear and Unambiguous Such That the Health Insurance is Covered.**

Resolving the dispute over the meaning of "health program or activity" "begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *see also King v. Burwell*, 759 F.3d 358, 367 (4th Cir. 2014) ("At *Chevron*'s first step, a court looks to the 'plain meaning' of the statute."), *aff'd*, 576 U.S. 473 (2015). "[W]hen conducting [this] statutory analysis, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *King*, 759 F.3d at 368 (quote omitted).

The redefinition of "health program or activity" is contrary to the ACA's statutory text, as well as common sense. Section 1557 plainly covers health insurance as a "health program or activity." Indeed, health insurance is what enables most Americans to access

17

health care.  It defies logic to argue that *health* insurance is not a *health* program or activity.  Moreover, Section 1557 applies to "*any health program or activity*, any part of which is receiving Federal financial assistance, including … *contracts of insurance*."  42 U.S.C. § 18116(a) (emphasis added).  "It is unclear to whom this clause would apply if not health insurance issuers like The Health Plan."  *Fain v. Crouch*, No. CV 3:20-0740, 2021 WL 2657274, at *3 (S.D.W. Va. June 28, 2021).

This Court should not review the meaning of "health program or activity" in isolation; it should seek to ascertain the statutory term's meaning from its context.  *King*, 759 F.3d at 368.  The Court "must … interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole."  *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (cleaned up).  In that sense, that "health program or activity" includes health insurance is evident from definitions of "health program" and "health care" contained within the ACA, which refers to "health programs" and "health care entities" as including insurers and insurance plans in other provisions.  *See Fain*, 2021 WL 2657274, at *3 (noting "[o]ther sections of the ACA provide further support").  For example, Section 1331 permits states flexibility to provide a "basic *health program*" by offering "1 or more standard *health plans* providing at least the essential health benefits described in section 1302(b) to eligible individuals." 42 U.S.C. § 18051 (emphasis added).  Similarly, Section 1553 defines "health care entity" to include "*a health maintenance organization*, *a health*

18

*insurance plan*, or any other kind of health care facility, organization, or *plan*." 42 U.S.C. § 18113 (emphasis added).

Defendants invite the Court to ignore the statute's plain language and rewrite the law, but courts "are not permitted to ignore the statute's plain language." *United States v. Stitt*, 552 F.3d 345, 353 (4th Cir. 2008). And an agency "may not make its own administrative amendments," as HHS sought to do here. *Bracamontes v. Holder*, 675 F.3d 380, 387 (4th Cir. 2012). Instead, courts "are obliged to give effect to the statutes as they are written and enacted." *Id.* (cleaned up); *see also Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986) ("[O]nly Congress can rewrite [a] statute.").

Moreover, courts "must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9. Here, the inclusion of health insurance within "health program or activity" is apparent from Congress's intent. Senator Patrick Leahy explained that Section 1557's prohibition on discrimination was "necessary to remedy the shameful history of invidious discrimination and the stark disparities in outcomes in our health care system" and to "ensure that all Americans are able to reap the benefits of *health insurance* reform equally *without discrimination*." Health Care and Education Reconciliation Act of 2010, 156 Cong. Rec. S. 1821, 1842 (daily ed. Mar. 23, 2010) (emphasis added). Moreover, "when looking at the ACA as a whole, the Act clearly aims to increase the number of Americans covered by health insurance by transforming the health insurance industry." *Fain*, 2021 WL 2657274, at *3 (quote omitted). "Given this context, … 'health program or activity' under Section 1557

19

necessarily includes health insurance issuers such as The Health Plan." *Fain*, 2021 WL 2657274, at *3.

Defendants' argument that this Court holding that "health program or activity" unambiguously includes health insurance would mean that HHS can never interpret that phrase, ECF No. 137 at 31 n.6, is without merit.  It just means that HHS cannot adopt a definition excluding health insurance, in accordance with the statutory text and context.

The Court should therefore "conclude that The Health Plan is unambiguously a 'health program or activity' under the plain text of Section 1557." *Fain*, 2021 WL 2657274, at *5; *see also T.S. v. Heart of CarDon, LLC*, No. 1:20-cv-01699, 2021 WL 981337, at *9 (S.D. Ind. Mar. 16, 2021), *reconsideration denied, motion to certify appeal granted*, No. 1:20-cv-01699, 2021 WL 2946447 (S.D. Ind. July 14, 2021).[8]

**B.      The 2020 Redefinition of "Health Program or Activity" is Not Entitled to Deference.**

Even assuming "health program or activity" is ambiguous with regard to inclusion of health insurance (it is not), the Court, under *Chevron* Step Two, must assess whether the redefinition of "health program or activity" is permissible or reasonable.  *See PETA v. United States Dep't of Agric.*, 861 F.3d 502, 510 (4th Cir. 2017).  It is not, as the

---

[8] Defendants claim that *Callum v. CVS Health Corp.*, 137 F.Supp.3d 817, 849-50 (D.S.C. 2015) found the term "health program or activity" to be ambiguous.  ECF No. 137 at 30. Not so.  *Callum* simply noted that it was undefined and "the parties disagree as to whether a retail pharmacy outlet … qualifies as one."  *Callum*, 137 F.Supp.3d at 850.  *Callum* "did not consider whether an insurance issuer could be held liable under Section 1557 and instead applied the law to pharmacies."  *Fain*, 2021 WL 2657274, at *2 n.2.

20

redefinition is inconsistent with the ACA's text and Congress's intent, as well as arbitrary and capricious.

In 2016, HHS issued a regulation interpreting "health program or activity" to include all operations of an entity "principally engaged" in "the provision or administration of … health-related coverage." 81 Fed. Reg. 31,467. Notably, courts applied Section 1557 to health insurance *prior to* the 2016 rule. *See East v. Blue Cross & Blue Shield of Louisiana*, No. 3:14-cv-00115, 2014 WL 8332136 (M.D. La. Feb. 24, 2014).

When it issued its 2020 rule, HHS did not explain or provide rational explanation for its redefinition. Rather, it sought to justify the redefinition through its *ipse dixit* that providing "health insurance" is different than providing "healthcare." 85 Fed. Reg. at 37,172-73. But Section 1557 plainly covers "*any* health program or activity," not just direct health care. The argument that the Civil Rights Restoration Act ("CRRA") applies "to all health programs or activities receiving Federal financial assistance, but not to all providers of health insurance" has no support. 85 Fed. Reg. at 37,171. Indeed, the CRRA does not define "health care" or suggest that "being principally engaged in the business of providing healthcare" excludes health insurance companies.

Furthermore, the redefinition violates Section 1554 of the ACA and undermines the ACA's purpose, which was designed to expand access to health insurance and create new nondiscrimination protections in health insurance. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 519 (2012). Section 1554 explicitly prohibits HHS from

21

promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services." 42 U.S.C. § 18114. The redefinition of "health program or activity" frees health insurance providers from the ACA's nondiscrimination mandate and violates Section 1554 by creating unreasonable barriers to individuals seeking care.

In addition, the administration "entirely failed to consider an important aspect of the problem"—the harm caused by its new interpretation. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Commenters expressed concern that the exclusion of "many of the plans, products, and operations of most health insurance issuers, such as self-funded group health plans," would allow health insurers to conduct their activities "in a discriminatory manner." 85 Fed. Reg. at 37,173. The Trump administration arbitrarily and capriciously ignored these concerns, responding only that HHS "will robustly enforce the nondiscrimination requirements for [qualified health plans] under Title I of the ACA, for Exchange plans established by the ACA, and for any other insurance plans that Section 1557 covers." *Id.*

Finally, multiple challenges to the redefinition are pending and stayed in courts across country. *See, e.g.*, *Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1 (D.C. Cir. 2020);[9] *Boston All. of Gay, Lesbian, Bisexual & Transgender*

---

[9] Defendants misrepresent *Whitman-Walker Clinic*. There the court found plaintiffs had not sufficiently showed standing at the preliminary injunction stage but noted "the potential for Plaintiffs to better support their standing argument in the future with revamped allegations," such as through "representational standing." 485 F.Supp.3d at 32.

22

*Youth v. U.S. Dep't of Health & Hum. Servs.*, No. 20-cv-11297, 2021 WL 3667760 (D. Mass.); *New York v. U.S. Dep't of Health & Hum. Servs.*, No.1:20-cv-05583 (S.D.N.Y.). These cases are stayed based on the Biden administration's reporting "that its ongoing reassessment had raised substantial and legitimate policy concerns with the challenged Rule that HHS intends to address in a Section 1557 rulemaking proceeding … in early 2022." Defs.' Mem. in Opposition to Mot. to Lift Stay at 11, *Whitman-Walker Clinic*, 485 F.Supp.3d 1 (D.D.C. filed Aug. 13, 2021) (ECF No. 75). Given the above, the Court should refuse to afford the 2020 redefinition *Chevron* deference.

Health insurance is a "health program or activity" covered by Section 1557 of the ACA. This Court should join the multitude of courts that have applied Section 1557 to health insurance plans. *See, e.g.*, *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 951 (9th Cir. 2020); *Tovar v. Essentia Health*, 857 F.3d 771, 779 (8th Cir. 2017); *Fain*, 2021 WL 2657274; *C.P. v. Blue Cross Blue Shield of Illinois*, 536 F.Supp.3d 791 (W.D. Wash. 2021); *T.S.*, 2021 WL 981337; *Boyden*, 341 F.Supp.3d 979; *Ferrer v. CareFirst, Inc.*, 265 F.Supp.3d 50 (D.D.C. 2017); *East*, 2014 WL 8332136.

## CONCLUSION

For all the reasons above, the Court should deny Defendants' MSJ on Sgt. Caraway's Title VII claim, and all Plaintiffs' ACA claims, against NCSHP.

23

Dated: December 30, 2021

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HARRIS, WILTSHIRE & GRANNIS
LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
Grace Wynn*
HARRIS, WILTSHIRE & GRANNIS
LLP
1919 M Street N.W., 8th Floor
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Tara L. Borelli
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Suite 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
Ezra Cukor*
TRANSGENDER LEGAL
DEFENSE AND EDUCATION
FUND, INC.
520 8th Ave, Suite 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

Lauren H. Evans*
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

25

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1)

because the body of this brief, including headings and footnotes, does not exceed 6,250

words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  December 30, 2021       /s/ Amy E. Richardson

Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386
Fax: 202-730-1301
arichardson@hwglaw.com

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated:  December 30, 2021        /s/ Amy E. Richardson
                                     Amy E. Richardson
                                     N.C. State Bar No. 28768
                                     HARRIS, WILTSHIRE & GRANNIS LLP
                                     1033 Wade Avenue, Suite 100
                                     Raleigh, NC 27605-1155
                                     Phone: 919-429-7386
                                     Fax: 202-730-1301
                                     arichardson@hwglaw.com