# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., *by his next friends and parents*, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE, and DANA CARAWAY.<br><br>Plaintiffs,<br><br>v.<br><br>DALE FOLWELL*, in his official capacity as State Treasurer of North Carolina*; DEE JONES, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*; NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES; NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY.<br><br>Defendants. | No. 1:19-cv-272 |

## STATE HEALTH PLAN DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES .............................................................................. iv

STATEMENT OF THE CASE ........................................................................... 1

ARGUMENT ....................................................................................................... 4

    I.    Plaintiffs' motion for summary judgment rests on disputed material facts. ....................................................................................... 4

        A.    The efficacy of Plaintiffs' desired medical treatments presents a crucial dispute of material fact. ..................................... 5

        B.    Plaintiffs' purported expert evidence is not appropriate for resolution without consideration by the factfinder....................... 12

        C.    Plaintiffs' characterization of the Plan's coverage decisions is contradicted by the facts............................................................ 13

        D.    Plaintiffs have failed to provide the necessary evidence to answer crucial questions of fact. .................................................... 14

    II.    Plaintiffs have not provided sufficient evidence to receive summary judgment on their claim pursuant to the Equal Protection Clause of the 14th Amendment. ..................................... 16

        A.    Plaintiffs have not identified a group of individuals, with whom they are similarly situated, who are treated differently. ....................................................................................... 16

        B.    Plaintiffs have not established that the State Health Plan imposes facial classifications on its beneficiaries ........................ 23

        C.    Plaintiffs have not established any legal authority for their claim that the Plan has an obligation to provide any member with specific medical care............................................................. 31

III.    Plaintiffs' remaining claims are not supported by the evidence. ...... 35

    A.    Plaintiffs have not provided sufficient evidence to support a grant of summary judgment under § 1557 of the Affordable Care Act. ........................................................................................ 35

    B.    Plaintiff Caraway has not produced sufficient evidence to support her Title VII claim ............................................................ 37

CONCLUSION .................................................................................... 39

CERTIFICATE OF WORD COUNT ................................................. 41

Case 1:19-cv-00272-LCB-LPA   Document 197   Filed 01/19/22   Page 3 of 47

# TABLE OF AUTHORITIES

<u>CASES</u>

*Agostini v. Felton*, 521 U.S. 203 (1997)------------------------------------------------- 29

*Geduldig v. Aiello,* 417 U.S. 484 (1974) --------------------------------- 28, 29, 33, 34

*Alexander v. Choate*, 469 U.S. 287 (1985) ------------------------------------------- 31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ------------------------------------------------ 27

*Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.,*
   246 F.3d 1 (1st Cir. 2001)------------------------------------------------------------ 17

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ---------------------------- 25, 29

*Boyd v. Bulala,* 877 F.2d 1191 (4th Cir.1989)---------------------------------------- 33

*Boyden v. Conlin,* 341 F.Supp.3d 979 (W.D. Wis. 2018) --------------------------- 19

*Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263 (1993) --------- 11, 29

*C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois,*
   536 F. Supp.3d 791 (W.D. Wash. 2021) --------------------------------------- 34

*City of Los Angeles, Dep't of Water & Power v. Manhart,*
   435 U.S. 702 (1978)------------------------------------------------------------------- 37

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ----------------------- 12

*Doe v. Fairfax Cty. Sch. Bd.,*403 F.Supp.3d 508 (E.D. Va. 2019).---------------- 36

*Flaming v. Univ. of Texas Med. Branch,*
   2016 WL 727941 (S.D. Tex. Feb. 24, 2016)---------------------------------------- 17

Case 1:19-cv-00272-LCB-LPA   Document 197   Filed 01/19/22   Page 4 of 47

*Fletcher v. Alaska*, 443 F.Supp.3d 1024 (D. Alaska 2020)------------------------ 19

*Gann v. Schramm*, 606 F.Supp. 1442 (D. Del. 1985)------------------------------- 17

*Grider v. City of Auburn, Ala.*, 618 F.3d 1240 (11th Cir. 2010)------------- 17, 23

*Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)--------------- 16

*Harris v. Pittman*, 927 F.3d 266 (4th Cir. 2019) ---------------------------------- 4

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.,*
*UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ------------------------------ 23

*Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562 (4th Cir. 2015) ------------ 4

*Kirk v. State*, 465 S.E.2d 301 (N.C. Ct. App. 1995)--------------------------------- 31

*LaBella Winnetka, Inc. v. Village of Winnetka,*
   628 F.3d 937 (7th Cir. 2010) ----------------------------------------------- 17, 23

*Lake v. State Health Plan for Tchrs. & State Emps.,*
   825 S.E.2d 645 (N.C. Ct. App. 2019) ------------------------------------------ 31

*Lange v. Houston Cty.*, 499 F. Supp. 3d 1258 (M.D. Ga. 2020) ------------------ 30

*Maher v. Roe*, 432 U.S. 464 (1977)----------------------------------------------- 32

*McMain v. Peters*, 2018 WL 3732660 (D.Or. Aug. 2, 2018) ----------------------- 18

*Per*s. Adm'r of Mass. v. Feeney,442 U.S. 256 (1979)--------------------------------- 32

*Price v. City of Charlotte, N.C.*, 93 F.3d 1241 (4th Cir. 1996) --------------- 15, 36

*Raymond Lee X v. Johnson*, 888 F.2d 1387 (4th Cir. 1989)----------------------- 14

Case 1:19-cv-00272-LCB-LPA   Document 197   Filed 01/19/22   Page 5 of 47

*Roller v. Gunn*, 107 F.3d 227 (4th Cir. 1997)----------------------------------------- 16

*Saah v. Contel Corp.*, 978 F.2d 1256 (4th Cir.1992) ------------------------------- 33

*Saks v. Franklin Covey Co.*, 316 F.3d 337 (2d Cir. 2003)---------------------- 22, 32

*Sandlands C & D LLC v. Cty. of Horry*, 737 F.3d 45 (4th Cir. 2013) ------ 16, 22

*Toomey v. Arizona*, 2019 WL 7172144 (D. Ariz. Dec. 23, 2019)------------------ 27

*Union Pac. R.R. Emp.Practices Litig.*, 479 F.3d 936 (8th Cir. 2007)----------- 22

*United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996) -------------------------------- 22

*Walls v. Ford Motor Co.*, 2021 WL 5206388 (M.D.N.C. Nov. 9, 2021) ----------- 4

*Williams v. Hansen*, 326 F.3d 569 (4th Cir.2003)----------------------------------- 16

*Willis v. Town of Marshall, N.C.,* 275 Fed. App'x 227 (4th Cir. 2008)--------- 17

**STATUTES**

§ 1557 of the Affordable Care Act, 42 U.S.C. § 18116, ----------------3, 14, 34, 36
N.C. Gen. Stat. Ann. § 135-48.2 ------------------------------------------------------------- 1
N.C. Gen. Stat. Ann. § 135-48.42(a)------------------------------------------------------- 1
N.C. Gen. Stat. Ann.  § 135-1(7a)(b) ------------------------------------------------- 31, 37

**OTHER AUTHORITIES**

81 Fed. Reg. 31429 (May 18, 2019)--------------------------------------------------- 35
85 Fed. Reg. 37187 (June 19, 2020)---------------------------------------------------35
Fed. R. Civ. P. 56(a) ------------------------------------------------------------------ 4, 23
Fed. R. Evid. 702 --------------------------------------------------------------------------- 12
Fed. R. Civ. P. 65(d)-----------------------------------------------------------------14, 18

# STATEMENT OF THE CASE

The Court should deny Plaintiffs' motion for summary judgment against the Plan Defendants because their claims are inextricably tied to contested facts.

At the outset of their Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Plaintiffs assert that "health coverage" is part of their employee compensation, and thus the Plan's "sweeping exclusion" for "gender-affirming care" means Plaintiffs receive "less compensation than others" for the same work. ECF No. 179 at 4. Plaintiffs further assert that because the Plan provides certain drugs and surgeries "for other reasons," it should pay for "the same kinds of treatments" for their psychiatric diagnosis of gender dysphoria.

Each of these assertions is incorrect. The General Assembly and courts of North Carolina are clear that state employees do not receive "health coverage" as a part of compensation. Rather, the State "undertakes to make available a State Health Plan," N.C. Gen. Stat. Ann. § 135-48.2, and state employees, such as Plaintiffs, are "given the opportunity to enroll or decline enrollment" in a group plan at the time they are hired (but only if they meet other eligibility criteria, such as working full-time), N.C. Gen. Stat. Ann. § 135-48.42(a). In return for payment of a premium, the Plan pays money to health

care providers to offset the member's cost of treatment for various diagnoses and procedures. Plaintiffs pay the same premiums as other members do, and they receive the same coverage for the same illnesses. ECF No. 137 at 9-10.

Second, "gender affirming care" has no accepted medical definition and does not correspond to the actual delivery of healthcare services, and Plaintiffs offer no definition in their motion for summary judgment. Plaintiffs have invented this artificial category for litigation purposes to distinguish it from "treatments for cisgender employees," but no such distinction exists in the world. ECF No. 179 at 4. Like the rest of the healthcare industry, the Plan uses the medical coding system to determine whether to pay for specific medical procedures to treat a specific diagnosis. ECF No. 137 at 10-11. When one reviews the specific procedures that Plaintiffs do identify, they are offered to *everyone*, including the Plaintiffs themselves, for treatment of the same diagnoses. The Plan's coding and payment practices make this clear. *See* ECF No. 137 at 13-18.

The ambiguity of the category "gender-affirming care" also distracts the Court from understanding that some of the treatments that Plaintiffs seek are not covered for *anyone* on the State Health Plan. Plaintiffs' equal protection claim—that they are denied the "kinds of treatments" offered to "cisgender employees" for "other reasons," ECF No. 179 at 4—cannot justify the

expansion of Plan coverage to services that are offered to *no one else* for any diagnosis.

The Plan's decision not to provide more generous health benefits is not a violation of the equal protection clause, § 1557 of the Affordable Care Act, or Title VII of the Civil Rights Act. The Plan has legitimate, non-discriminatory reasons to deny coverage for hormonal and surgical treatment for gender dysphoria. The Plan's leadership has a fiduciary duty to all Plan members. Consistent with this statutory duty, the Board has chosen to "focus on costs" and limit spending to protect the long-term health and availability of the Plan. The Plan's "fiduciary responsibility to cover basic health" needs for Plan participants, with limited dollars, requires that it focus on coverage for illnesses that affect many Plan members (diabetes, rheumatoid arthritis, and cancer) and is inconsistent with adding additional benefits for small "niche groups" (including not only gender dysphoria, but also adult hearing aids, special infant formula, and acupuncture) Ex. 1 (Jones. Dep.) at 104:20-105:24. This is especially true when, as here, there is considerable uncertainty about whether medical science supports these desired hormonal and surgical interventions.

# ARGUMENT

## I. Plaintiffs' motion for summary judgment rests on disputed material facts.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant… and to draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). A court "cannot weigh the evidence or make credibility determinations," and thus must "usually" adopt "the nonmovant's version of the facts," even if it seems unlikely that the moving party would prevail at trial. *Walls v. Ford Motor Co.*, 2021 WL 5206388, at *1 (M.D.N.C. Nov. 9, 2021) (Biggs, J.) (quoting *Jacobs*, 780 F.3d at 569 and *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011)).

The parties fundamentally disagree on critical facts underlying Plaintiffs' claims, so the Plan Defendants respectfully submit that this Court may not resolve their claims at summary judgment.

- 4 -

**A.** ***The efficacy of Plaintiffs' desired medical treatments presents a crucial dispute of material fact.***

First, Plaintiffs have not established the efficacy of the medical treatments that they demand. Plaintiffs assert that undefined "gender affirming care" procedures are medically necessary treatments for gender dysphoria, and they have offered several experts who will testify about the need for hormonal therapy and surgical procedures. Plaintiffs also ask this Court to defer to the WPATH Guidelines as "authoritative standards of care" for transgender individuals, and proof that these treatments are "medically necessary and effective." ECF No. 179 at 17, 20. In doing so, Plaintiffs ask this Court to make a judgment about a significant medical controversy without any review of the current scientific evidence.[1]

"[G]ender dysphoria was, until just a few years ago, a very rare condition." Ex. 3 (Hruz Rep.) at 41. Recent data, however, shows "the number of people seeking care for gender dysphoria is rapidly increasing," *id.* at 42,

---

[1] Evidence before this Court shows that the WPATH Guidelines are far from a trustworthy resource. Dr. Stephen B. Levine, a licensed psychiatrist and Professor at Case Western Reserve University School of Medicine was a member of WPATH for almost 20 years. Ex. 2 (Levine Rep.) at 1. Dr. Levine explains that WPATH has become "a voluntary membership, activist advocacy organization" that accepts members who are not licensed medical professionals and "can no longer be considered a purely professional or scientific organization." Id. at 36.

and there has been a drastic "transformation of the patient population from early onset males to rapid onset adolescent girls," *id* at 67. For example, "[t]he number of adolescent girls seeking sex transitioning" in the United Kingdom increased "4,000% in the last decade." *Id.* For many decades, the typical patient with gender dysphoria was a biological male with a long, stable history of dysphoria since early childhood. But in the past 10 years, this has changed abruptly, and the typical patient is now an adolescent female with no documented long-term history of gender dysphoria. *Id.* at 67-68. Scientists have not explained this surprising shift, but such a quick change in a patient population suggests that theories of the cause or causes of gender dysphoria that are based on static features like "brain structures" or "genetics" are incorrect. *Id.* at 69.

While the patient population has changed and increased, the physical interventions for gender dysphoria remain experimental. As Dr. Paul McHugh noted in his expert report, "this controversial field has faced increasing scrutiny" in recent years, with "national research reviews in England, Sweden, and Finland" and other studies finding that "the evidentiary base for these experimental treatments is weak;" hormonal and surgical treatments demonstrate "few benefits" and may actually "cause more harm than good." Ex. 4 (McHugh Rep.) at 10.

There are no long-term, peer-reviewed, reliable research studies that allow physicians to know "the percentage of patients receiving gender transition procedures who *are helped* by such procedures, using objective criteria" or the "percentage of patients receiving gender transition procedures who *are harmed* by such procedures, measured with objective criteria." Ex. 2 (Levine Rep.) at 87 (emphasis added).

While patients may say, when interviewed, that they have benefited from hormone and surgical treatment, the current peer-reviewed scientific literature has not found evidence to support these subjective claims. As Plaintiffs note, a diagnosis of gender dysphoria requires more than a feeling of "dissonance" between one's perceived gender and one's biological sex; the patient must also suffer "clinically significant distress or significant impairment of functioning." ECF No. 179 at 17-18. Patients identify depression or anxiety as debilitating symptoms of gender dysphoria, and they assert anecdotally, after hormone therapy or surgery, that they feel less anxious or depressed. But when follow-up studies track *objective* measurements, like use of antidepressants and anti-anxiety medication, there

is no measurable difference between patients who receive hormone therapy or surgery and those who do not.[2]

In particular, the "affirmation" model of care—the basis for the WPATH Guidelines—is not supported by existing medical science. "The available data does not support the contention that 'affirmation' of transgender identity reduces suicide or results in better physical or mental health outcomes generally." Ex. 2 (Levine Rep.) at 45, 45-69. Finland, Sweden, and United Kingdom have retreated from prior medical policies on cross-sex hormones and surgical treatments. Medical providers in these countries now restrict the use of hormones and surgery in minors based on identified gaps in the medical science. *Id.* at 51-55. "The current status of the field of gender affirmation treatments has been labelled 'low quality' science by multiple reviews." *Id.* at 56. Studies have concluded that the field of affirmation treatments is "still at the experimental stage lacking in general acceptance within the relevant

---

[2]     The lack of valid, reliable scientific data about the effect of gender dysphoria treatments has ethical consequences, especially when a patient seeks surgery. "Since the abandonment of frontal lobotomies in 1967, there has been no other psychological condition for which surgery is performed, and there is no other area of surgical care where the diagnostician is the patient themselves, and the surgeon has no means of confirming or rejecting the diagnosis." Ex. 5 (Lappert Rep.) at 23-24. Valid surgical consent requires that a surgeon be able to ensure that a diagnosis is correct. *Id.* at 24. The surgical procedures involved in gender transition can have very high complication rates, with one procedure having a rate of complication over 50%, making it even more important to have confidence in treatment benefits. *Id.* at 29-39.

Case 1:19-cv-00272-LCB-LPA   Document 197   Filed 01/19/22   Page 14 of 47

scientific communities and without known error rates for the efficacy of the treatment." *Id.*

Striking scientific evidence was made public in 2020. The American Journal of Psychiatry published a study of individuals in Sweden with gender dysphoria. *Id.* at 57-58. Researchers used national health system data to research individuals with gender dysphoria in 2005 and again in 2015. The study sought to determine whether individuals who used cross-sex hormones or underwent surgery had, ten years later, lower use of anti-anxiety medication or anti-depressants, fewer mental health visits, or fewer hospitalizations connected to unsuccessful suicide attempts (*i.e.* improved mental health) when compared to individuals who did not receive these treatments. Ex. 6 (Branstrom & Pachankis; Follow-up Letters). After review of the study's data, outside experts and the authors agreed that the evidence did not show that hormone treatment or surgery improves the mental health of patients with gender dysphoria. Ex. 2 (Levine Rep.) at 57-63. Indeed, patients who received surgery "were more likely to be treated for anxiety disorders" than those who did not. *Id.* at 63.[3]

---

[3]  This conclusion—that hormone treatment for gender dysphoria does not reduce mental healthcare needs—is supported by a 2021 study in the peer-reviewed Journal of Sexual Medicine. Looking over time at adolescents who received cross-sex hormones, researchers found the patients' "mental health

Dr. Paul W. Hruz, M.D., Ph.D. is a pediatric endocrinologist and a Professor of Medicine at the Washington University School of Medicine in St. Louis. Ex. 3 (Hruz Rep.) at 2. He is also the *only endocrinologist—i.e.*, a physician with specific expertise in the endocrine system (hormones)—to provide an expert opinion in this case. Dr. Hruz's opinion is that hormone therapy and surgery are "experimental, highly intrusive, and potentially harmful medical procedures" that lack "credible, reliable, and valid scientific support." *Id.* at 7-8. As one example, scientists understand that sex hormones affect brain development, but this knowledge "is in its rudimentary stages right now." Ex. 7 (Hruz Dep.) at 285:1-286:11. Testosterone appears to have some effect on brain development for biological males, and this finding creates "many reasons to be concerned and question" what the effect of puberty suppressing medications or testosterone has on the brain of a biological female. *Id.* at 285:1-287:2. At this time, any effect is completely unknown. Plaintiffs respond to these concerns by citing to guidelines from the Endocrine Society regarding hormone therapy, but the guidelines explicitly state that "the strength of recommendations and the quality of evidence was low or very low"

---

utilization remained elevated" even after hormone treatment, and the "use of psychotropic medications increased." Ex. 7 (Hruz Dep.) at 269:8-271:6. *See also* Ex.8 (Hisle-Gorman).

in support of these treatments. Ex. 3 (Hruz Rep.) at 53. "Low" and "very low" are terms of art. A "low recommendation" means that "[f]urther research is very likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate." Very low recommendations mean that "any estimate of effect is very uncertain." *Id.*

Plaintiffs' experts do not inform the Court about this current, raging scientific controversy. Instead, Plaintiffs shift the argument to assertions that the Plan has changed its mind about the efficacy of Plaintiffs' desired treatments, or that, in any event, any concerns are misplaced. ECF No. 179 at 27-30. In doing so, Plaintiffs improperly shift the burden of proof.

The Plan need not demonstrate that Plan officials are experts on medical care. It is the Plaintiffs who must demonstrate that the medical evidence supporting their proposed treatments is so strong that it would be "irrational" to "disfavor" coverage for such procedures. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). They cannot. Not a single drug has been FDA-approved for treatment of gender dysphoria. ECF No. 137 at 18.

Plaintiffs assert that these treatments have reduced their symptoms, ECF No. 137 at 5-9, but anecdotal evidence cannot establish that it is *unconstitutional* to reach a different conclusion about medical science. The existing scientific ambiguity demonstrates it would be profoundly

inappropriate for this Court enter an injunction at summary judgment, as Plaintiffs ask, and order the Plan to pay for Plaintiffs' desired medical treatment.

**B.** ***Plaintiffs' purported expert evidence is not appropriate for resolution without consideration by the factfinder.***

To avoid the ongoing scientific controversy, Plaintiffs place extensive reliance upon guidelines issued by the World Professional Association for Transgender Health and the Endocrine Society. But this Court cannot summarily resolve this case by adopting such opinions as its own. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 584 (1993). Prior to *Daubert*, courts asked whether a scientific opinion is based on a scientific technique that is "'generally accepted' as reliable in the relevant scientific community." *Daubert,* 509 U.S. at 584. Adoption of the Federal Rules of Evidence eliminated this standard. Instead, Plaintiffs must provide more.

*Daubert* held that to be admissible, expert testimony must be "not only relevant, but reliable"—*i.e.*, it must impart "'scientific knowledge'" "*derived by [a] scientific method*" and "*supported by appropriate validation*." 509 U.S. at 589-590 (emphasis added). Federal Rule of Evidence 702 requires courts to determine not only that expert testimony is "the product of reliable principles

and methods," but also that the expert has "reliably applied" those principles and methods to the facts of the case before admitting testimony.

Reference to the holdings of a professional association can be relevant under *Daubert*, but the WPATH Guidelines do not accurately reflect medical science, having been developed by a "private, activist, non-science organization" that "takes a very narrow and politically-ideologically driven view on increasingly controversial issues as to which there is a wide range of opinion among professionals." Ex. 2 (Levine Rep.) at 36, 35-40. "When policy is made by voting in the face of low quality science, claims that treatments are evidence-based should be considered misleading and deceptive." *Id.* at 89.

### C. Plaintiffs' characterization of the Plan's coverage decisions is contradicted by the facts.

Another factual dispute arises, in part, from disagreement over medical efficacy. Because Plaintiffs are certain about the effect of their desired treatments, they assert that no possible motive other than sex stereotyping or discriminatory animus could justify the Plan's coverage decisions. This is not supported by the evidence. The Plan's decision has no animus associated with it. Rather, the timeline is transparent. The Plan received federal funding from the Retiree Drug Subsidy program. When the federal government attached new requirements to this funding—requiring that the Plan cover the Plaintiffs'

desired benefits—the Plan complied, but the Board of Trustees' approval in 2016 was temporary due to their uncertainty regarding the benefits. When this funding condition was enjoined, later to be rescinded, the Plan allowed the benefits to expire when the initial approval sunset. Ex. 1 (Jones Dep.) at 69:9-19; 56:12-57:25. As the courts have repeatedly recognized, health plans are permitted to cover some illnesses and not others. In this case, the Board of Trustees focused on reducing the overall cost of treatment under the Plan and covering illnesses that affect large numbers of members.

### D. Plaintiffs have failed to provide any evidence for crucial questions of fact.

Several remaining factual disputes arise from Plaintiffs' failure to develop evidence to carry their burden of proof. Plaintiffs repeatedly refer to "gender-confirming care," but they have never defined or otherwise provided a concrete list of the procedures that comprise such care. Plaintiffs seek injunctive relief for the alleged violation of the Equal Protection clause, ECF No. 75 at 37, but this Court cannot grant summary judgment and order such relief without clarity about exactly how the Plan is to comply. The Plan can no more be ordered to provide undefined "gender-confirming care" than a prison can be ordered to accommodate religious "dietary requirements." *Raymond Lee X v. Johnson*, 888 F.2d 1387 (4th Cir. 1989) (holding "Muslim dietary

requirements" insufficiently clear requirement to impose as an injunction under Fed. R. Civ. P. 65(d).

Moreover, under both § 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and Title VII, Plaintiffs seek damages. But they have not presented any evidence for these damages. Plaintiffs seek damages for "financial harm," ECF No. 75 at 42, 44-45, but present no calculations or medical bills. Without such evidence, the Court cannot award summary judgment. Plaintiffs allege emotional damages, *id.*, but they have neither identified nor attempted to quantify the "independent compensable harm" that resulted from the alleged violation. *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1248 (4th Cir. 1996).

Indeed, Plaintiffs have not submitted any medical records to this Court that prove they suffer from gender dysphoria. As noted in the Plan Defendants' response to the Plaintiffs' Motion to Seal, ECF No. 190 at 6-7, Plaintiffs submitted an expert report from George Brown, M.D., which includes statements about Plaintiffs' medical histories. Dr. Brown's report, however, does not specifically cite any of Plaintiffs' medical records, and he expressly disavowed that he himself was engaged in the practice of medicine (which is required to provide a medical diagnosis). *Id.*

## II. Plaintiffs have not provided sufficient evidence to receive summary judgment on their claim pursuant to the Equal Protection Clause of the 14th Amendment.

### A. Plaintiffs have not identified a group of individuals, with whom they are similarly situated, who are treated differently.

The Equal Protection Clause of the 14th Amendment is "essentially a direction that all persons *similarly situated* should be treated alike." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 635 (4th Cir. 2020) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (emphasis in original)). Plaintiffs must therefore produce evidence that the Plan is "treating differently persons *who are in all relevant respects alike.*" *Id.* (emphasis in original).[4]

This is a sequential analysis. First, Plaintiffs must make an "initial showing" they have been "intentionally treated differently" from others who are "similarly situated." *Sandlands C & D LLC v. Cty. of Horry*, 737 F.3d 45, 55 (4th Cir. 2013). The court does not apply constitutional scrutiny—whether rational-basis or heightened—until *after* a plaintiff has made this showing of

---

[4] The Defendants note that Plaintiffs can still demonstrate an Equal Protection violation if they can prove that a discriminatory animus motivated the adoption of a facially neutral policy that is neutrally applied. *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir.2003). Plaintiffs must proceed to trial, however, and allow the jury to weigh competing evidence of the Plan's intent.

similarity. *Id.* Without proof that two groups are "similarly situated," the Court has no basis to proceed with an equal protection analysis. "The Constitution does not require things which are different in fact … to be treated in law as though they were the same." *Roller v. Gunn*, 107 F.3d 227, 234 (4th Cir. 1997) (quoting *Tigner v. Texas,* 310 U.S. 141, 147 (1940)).

To satisfy the "similarly situated" standard, Plaintiffs must identify a comparative group of persons who are (1) materially identical to them but who (2) have received different treatment. "[A]pples should be compared to apples." *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.,* 246 F.3d 1, 8 (1st Cir. 2001). Two compared groups must be "identical or directly comparable in all material respects," *LaBella Winnetka, Inc. v. Village of Winnetka,* 628 F.3d 937, 942 (7th Cir. 2010), or "prima facie identical," *Grider v. City of Auburn, Ala.,* 618 F.3d 1240, 1264 (11th Cir. 2010). The Fourth Circuit requires that the "evidence must show an extremely high degree of similarity." *Willis v. Town of Marshall, N.C.,* 275 Fed. App'x. 227, 233 (4th Cir. 2008); *see also LaBella,* 628 F.3d at 942 ("The similarly situated analysis is not a precise formula, but … what is clear is that similarly situated individuals must be very similar indeed.").

Providing different medical treatments for different medical diagnoses does not violate equal protection. "[A] function of medical diagnosis is to

- 17 -

determine in what ways individuals are not similarly situated so that they can be treated accordingly." *Gann v. Schramm*, 606 F. Supp. 1442, 1447 (D. Del. 1985). This remains true even when different diagnoses have the same treatment. *Flaming v. Univ. of Texas Med. Branch*, 2016 WL 727941, at *9 (S.D. Tex. Feb. 24, 2016). An individual with testicular cancer may need testosterone injections, but that person is not 'similarly situated' to someone with gender dysphoria. *McMain v. Peters*, 2018 WL 3732660, at *3-4 (D.Or. Aug. 2, 2018).

This failure to define who is "similarly situated" to the Plaintiffs is exacerbated by the WPATH Guidelines on which Plaintiffs rely. Plaintiffs repeatedly cite the WPATH Guidelines as a "consensus" approach to the medical care they need, ECF No. 179 at 17-19, but when asked about that care, emphasize that the Guidelines are expressly "meant to be flexible standards," Ex. 13 (Brown. Dep.) at 160:8-18, that "individual health professionals and programs may modify themselves." Eli Coleman, et al., STANDARDS OF CARE FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, AND GENDER-NONCONFORMING PEOPLE, v.7 at 2 (2012) (WPATH Guidelines). The term "gender affirming care" thus means anything the Plaintiffs, or an individual physician, believes could be helpful to a child or adult with gender dysphoria. This vague concept, which Plaintiffs advance despite the encyclopedic coding

system adopted by the federal government for medical diagnoses and procedures, is not sufficient information to permit the determination whether one Plan participant is "similarly situated" to another.[5]

Plaintiffs, and the two out-of-circuit district court cases they cite, do not acknowledge or even consider this initial requirement of an equal protection analysis. *See, e.g., Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1030-31 (D. Alaska 2020). This failure is most clear in *Boyden v. Conlin*. 341 F.Supp.3d 979, 995 (W.D. Wis. 2018). In that case, the district court assumed, without medical evidence, that a person with an unidentified genetic birth defect ("born without a vagina") is similarly situated to an individual with gender dysphoria, but then held that "no reasonable factfinder" could conclude without additional medical evidence that "a cisgender woman's depression because of small breast size" (which was not covered) "is medically comparable to gender dysphoria." *Id.*

If Plaintiffs want this Court to make similar findings, then at a minimum they need to show "medically comparable" diagnoses. *Id.* Plaintiffs do not. They argue only that if the Plan provides "the same kinds of treatments" for "other

---

[5]    This vagueness also prevents the Court from simply relying on the WPATH Guidelines to define the healthcare procedures at issue. An injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

reasons," then it must also cover their desired treatment for gender dysphoria. ECF No. 179 at 4. In doing so, Plaintiffs claim that hormones, puberty-delaying hormones, mammoplasty and breast reduction, vaginoplasty, and hysterectomies are available only for "cisgender participants" but not for "transgender people." ECF No. 179 at 12.

This is false. The Plan does not identify or track or record whether any participant is transgender, cisgender, non-binary or otherwise. ECF No. 137 at 14. The Plan evaluates whether the billed medical procedure corresponds to a covered diagnosis. For prescription medicines that are neither costly nor subject to abuse, neither the Plan nor CVS/Caremark (the Plan's Pharmacy Benefit Manager) *ever know* the reason for the prescription (*i.e.* the patient's diagnosis). *Id.* at 17-18. Those claims are paid.

Some prescription drugs are subject to special restrictions because they are expensive or subject to abuse. Each of these drugs must be prescribed for an FDA-approved diagnosis or for cancer treatment. *Id.* When these drugs are prescribed "off-label" for any other use, including treatment of gender dysphoria, they are denied. For example, the Plan requires prior authorization for some testosterone prescriptions. *See* Ex. 9 (CVS/Caremark, Prior Authorization Criteria). The authorization criteria identify the covered diagnoses: primary hypogonadism, hypogonadotropic hypogonadism, and

metastatic mammary cancer. *Id.* No individual ever receives a testosterone prescription to "reaffirm an individual's natal sex" or to "diverge[ ] from an individual's natal sex." ECF No. 179 at 21. Nothing in the authorization document refers to transgender individuals; prescriptions are authorized for both men and women.

The Plan applies the same restrictions—that the prescription is used to treat an FDA-approved diagnosis or to treat cancer—to hormone suppressing drugs that are covered by Specialty Guideline Management: Supprelin (central precocious puberty in all children), Eligard (prostate cancer and certain salivary gland tumors); Vantas (prostate cancer); Zoladex (prostate cancer, endometriosis, breast cancer); Triptodur (central precocious puberty in all children); and Trelstar (prostate cancer). *See* Ex. 10. Plaintiffs qualify for these prescriptions on the exact same basis as every other Plan participant.

For surgeries, again, the Plan authorizes payment based on diagnosis and procedure code. The Plan provides mastectomies for breast cancer, gynecomastia, breast reduction for macromastia (when breast size causes neck, back, and shoulder pain), and for individuals with a high risk of breast cancer. Ex. 11 (Blue Cross Blue Shield of North Carolina, Corporate Medical Policy, Breast Surgeries, August 2020. These patients can also, if they desire, receive breast reconstruction, but this is not the result of a Plan design or "sex

stereotypes." Federal law requires it. Every group health plan that provides "medical and surgical benefits with respect to a mastectomy" must provide "all stages of reconstruction of the breast on which the mastectomy has been performed" and "surgery and reconstruction of the other breast to produce a symmetrical appearance." 29 U.S.C. § 1185b(a).[6]

Payment for a specific procedure is not based on the sex or transgender identity of the patient; rather, the denial of coverage arises from the diagnosis. At deposition, at least some of the Plaintiffs conceded this point. *See, e.g.,* Ex. 12 (M. Bunting. Dep.) at 108:11-20 (Plaintiff does not assert that the "Plan does not pay for any of [C.B.'s] medical treatment," but rather that the Plan does not "cover treatment connected to [C.B.'s] gender dysphoria."). *See Saks v. Franklin Covey Co.,* 316 F.3d 337, 342 (2d Cir. 2003) (applying similar analysis to infertility); *In re Union Pac. R.R. Employment Practices Litig.,* 479 F.3d 936, 942, 944 (8th Cir. 2007) (contraceptive coverage).

"Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine *all* relevant factors." *United States v. Olvis,* 97 F.3d 739, 744 (4th Cir. 1996) (emphasis added). *Sandlands*

---

[6]     The Plaintiffs claim there is a discrepancy in coverage of hysterectomies, ECF No. 179 at 12, but the Plan has no procedure codes that limit hysterectomies in connection with a diagnosis of gender dysphoria, ECF No. 137 at 15-17.

*C & D LLC,* 737 F.3d at 55. Plaintiffs' motion for summary judgment fails at this threshold inquiry because they have not produced any evidence to establish that an individual with gender dysphoria is "identical or directly comparable in all material respects," *LaBella Winnetka,* 628 F.3d at 942, or "prima facie identical," *Grider,* 618 F.3d at 1264, to an individual with a different medical diagnosis, such as breast or prostate cancer.

At the summary judgment stage, these relevant factors must be resolved against the Plaintiffs. The Court must assume that the differences between the diagnosis of gender dysphoria and other diagnoses are significant, and that the medical efficacy of the treatments differs, creating a "genuine dispute" of "material fact." Fed. R. Civ. P. 56(a).

### B. Plaintiffs have not established that the State Health Plan imposes facial classifications on its beneficiaries

"Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). The Plaintiffs argue that the Plan discriminates, on its face, against the Plaintiffs. They do so based on the

Plan's benefit booklet, which states that the Plan does not cover, among other medical treatments, the following services:

> Treatment or studies leading to or in connection with sex changes or modifications and related care.

The text of this exclusion, however, does not distinguish between individuals on the basis of sex, gender, or transgender status. To be facial discrimination, the provision must distinguish between men and women. It does not. To discriminate against transgender individuals, it must separate the health care available to transgender individuals from the health care available to others. The provision does not.

Plaintiffs attempt to establish facial discrimination under two broad lines of reasoning. First, and primarily, Plaintiffs assert that the State Health Plan improperly denies coverage for certain "medically necessary care … based on an employee's birth-assigned sex." ECF No. 153 at 17. But by focusing on their individual desires for specific medical treatments, Plaintiffs miss the broader context of how those treatments are prescribed, administered, and paid for across the healthcare industry.

Case 1:19-cv-00272-LCB-LPA   Document 197   Filed 01/19/22   Page 30 of 47

Plaintiffs are mistaken in their assertion that the Plan's exclusion of certain coverage is "discriminating against a person for being transgender," "based on gender transition," or "based on an employee's birth-assigned sex."[7] ECF No. 153 at 16-18. The Plan excludes coverage for specific procedures if they are prescribed for treatment of the psychiatric diagnosis of gender dysphoria. Ex. 1 (Jones Dep.) at 15:1-16:23, 117:10-18:5.

Payment hinges solely on the medical condition and the procedure performed to treat it, which is determined independently of the Plan by the patient's chosen healthcare provider. Unlike in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), where the employer both evaluated the Plaintiff's biological sex and terminated the employee after considering that information, a patient's biological sex and/or expressed gender play no role in Plan coverage. For example, the Plan covers breast reduction surgery for a transgender man with a family history of breast cancer, a hysterectomy for a transgender man suffering from endometriosis, testosterone treatment for a transgender woman

---

[7] Plaintiffs improperly conflate these three distinct equal protection claims into a single element of "discrimination." Discrimination based on gender identity and discrimination based on biological sex operate in different ways. Furthermore, Plaintiffs make no effort to clarify whether they allege discriminatory animus, disparate impact, or both. In sum, the breadth and vagueness of Plaintiffs' assertions highlight their misunderstanding of the specific policy grounds for the State Health Plan's coverage policies.

based on specific hormonal needs, or genital constructive surgery for any transgender (or cisgender) person with relevant injuries from a workplace or automobile accident. Ex. 14 (BCBS Decl.) at ¶ 28.

As the Plan has shown, ECF No. 137 at 14, none of its coverage decisions for gender dysphoria consider a patient's sex. It is unclear whether Plaintiffs' claim of discrimination is that *any* coverage decision is subject to heightened scrutiny if *the healthcare provider* considered the patient's biological sex as part of the diagnostic process. Healthcare providers must know a patient's sex for *every* medical diagnosis. While hormones or surgical procedures can alter the visual appearance of a patient, "the biology of the person remains as defined by genetic makeup, normatively by his (XY) or her (XX) chromosomes, including cellular, anatomic, and physiologic characteristics and the particular disease vulnerabilities associated with that chromosomally-defined sex." Ex. 3 (Hruz Rep.) at 66. As but one example how this is so: under the clinical guidelines for cardiovascular health, male biological sex is, by itself, a risk factor indicating preventive intervention. Ex. 15 (Robie. Dep.) at 70:13-71:25. Competent medical care requires *every diagnosing physician* to know and to consider the patient's biological sex. *Id.* This does not, however, make the

physician an agent of the Plan or mean that the Plan itself has looked beyond the diagnosis that this independent actor has supplied.[8]

Gender dysphoria is a mental illness that affects some people who are transgender and some who are not, Ex. 16 (Ettner Dep.) at 28:11-13, Ex. 17 (Levine Dep.) at 241:24-243:20, and the proportion of transgender individuals who suffer from this condition is entirely unknown. Ex. 13 (Brown Dep.) at 92:17-25. Many transgender people do not suffer from gender dysphoria at all. Ex. 16 (Ettner Dep.) at 28:11-13; Ex. 17 (Levine Dep.) at 241:24-243:20. Furthermore, "there may be people who have symptoms of gender dysphoria, but they personally don't identify as transgender." Ex. 18 (Karasic Dep.) at 27:25-28:17; Ex. 17 (Levine Dep.) at 241:24-243:20. As a result, Plaintiffs' assertion that "transgender individuals are the only people who would ever seek" treatments for gender dysphoria is flatly contradicted by the testimony

---

[8] In contrast to the information before a treating physician, the Plan sees only the information on the standard reimbursement form for health insurance, adopted by BCBSNC and the entire healthcare industry. This form does require each healthcare provider to report the patient's sex, but this can be biological sex or expressed gender; the information is irrelevant because the coverage decisions here do not consider this information at all. ECF No. 137 at 10-11. The Plan also receives bills that use the diagnostic codes developed by the World Health Organization and required by HHS, as is the case for every other participant in the healthcare industry. While some diagnostic or procedure codes are sex-specific, *see*, *e.g.*, ECF No. 137 at 10, this does not mean that the Plan has made any decision other than to use coding required by the healthcare industry.

of their own medical experts submitted to this Court. ECF No. 139 at 16 (citing *Toomey v. Arizona*, 2019 WL 7172144 at *6 (D. Ariz. Dec. 23, 2019)).[9]

The Plan's benefits, and limits on coverage, apply equally, and they are implemented *without any knowledge of the beneficiary's sex or gender*. Ex. 14 (BCBS Decl.) at ¶¶ 22,28. The Plan's benefit scheme therefore cannot be shown to discriminate facially on the basis of sex. This remains true even if one assumes, incorrectly, that only transgender individuals suffer from gender dysphoria. Ex. 16 (Ettner Dep.) at 28:11-13; Ex. 17 (Levine Dep.) at 241:24-243:20.

In *Geduldig v. Aiello*, the Supreme Court held that the exclusion of pregnancy from an insurance program was not facially "sex-based" even though only (biological) females become pregnant. 417 U.S. 484, 496 n.20 (1974). There is "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.* at 496. "The lack of identity between the excluded disability and gender as

---

9    Plaintiffs rely on the denial of a motion to dismiss in *Toomey v. Arizona*, 2019 WL 7172144 (D.Ariz. 2019) to support their motion for summary judgment. *Toomey* decided only that a particular plaintiff had stated a claim "that is plausible on its face," accepting all allegations and reasonable inferences as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard is in sharp contrast to Plaintiffs' motion here for summary judgment, under which the Plaintiffs themselves must produce evidence there is "no genuine dispute as to any material fact."

such under this insurance program becomes clear upon the most cursory analysis." *Id.*

> The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes.

*Id.* at 496 n.20. This case is the same. Not all transgender individuals suffer from gender dysphoria. Ex. 16 (Ettner Dep.) at 28:11-13; Ex. 17 (Levine Dep.) at 241:24-243:20; Ex. 13 (Brown Dep.) at 92:17-25. The Supreme Court's reasoning in *Aiello* controls the analysis here:

> The program divides potential recipients into two groups—[individuals who suffer from gender dysphoria and individuals who do not. Even if] the first group is exclusively [transgender (and the evidence shows it is not)], the second group includes [both transgender and non-transgender individuals]. The fiscal and actuarial benefits of the program thus accrue to members of both [groups]

*Aiello*, 417 U.S. at 496. Under the Plan, transgender females have the same coverage as a transgender males, and both transgender males and females have the same coverage as cisgender males and females.

Plaintiffs may feel that the Plan burdens them unfairly as transgender people, but this does not establish discrimination. *Aiello* holds that an insurance exclusion that disparately impacts members of a particular class is

not discrimination without evidence of discriminatory intent.[10] 417 U.S. at 496 n.20. Plaintiffs have made no effort to establish discriminatory intent beyond vague references to "impermissible stereotyping." This is precisely the type of contested fact that must proceed to trial. The Plan's exclusion of certain treatments for the psychiatric condition of gender dysphoria does not stem from any view about what healthcare Plaintiffs should receive; it stems from judgment about how to best provide medical care for all members in light of existing regulations, the health care needs for all patients covered by the Plan, and limited financial resources. Ex. 1 (Jones Dep.) at 73:4-75:8.

Plaintiffs must proceed to trial and provide more: evidence of discriminatory intent. They cannot prevail only with assertions that gender dysphoria disproportionately affects members of a protected class. *See Lange*

---

[10]     Plaintiffs argue that *Aiello* has been overruled, ECF No. 188 at 5-6, but this is flatly incorrect. The Pregnancy Discrimination Act and cases cited by Plaintiffs "cast[ ] no doubt on the continuing vitality" of *Aiello*. *Bray*, 506 U.S. at 273 n.3. Nor does *Bostock* permit this Court to depart from *Aiello*'s reasoning and analysis. *Bostock* involved statutory interpretation. 140 S.Ct. at 1738. The Court did not consider whether the same analysis should apply in cases involving the Equal Protection Clause. When a Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," the lower court must "follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

*v. Houston Cty.*, 499 F. Supp. 3d 1258, 1275-77 (M.D. Ga. 2020) (insurance exclusion for gender dysphoria not facially discriminatory).

### C. Plaintiffs have not established any legal authority for their claims that the Plan has an obligation to provide any member with specific medical care or that the refusal to do so is improper.

Plaintiffs' motion for summary judgment devotes significant time and attention to assertions that "medical treatment for gender dysphoria is medically necessary and effective." ECF No. 179 at 17-20. The claim that denial of medically necessary care inherently constitutes discrimination is mistaken, because *the Plan has no obligation to cover medically necessary care for participants*.

Plaintiffs assert that health benefits are "compensation" to employees. ECF No. 179 at 4. This is false. The General Assembly of North Carolina has explicitly provided that "employer-provided fringe benefits," which include "health, life or disability plans," are *not* "compensation." N.C. Stat. § 135-1(7a)(b). "A State employee receives the benefits of the State Health Plan only when needed," so the agency's payment to the Plan to offset the cost of these health benefits is not part of the employee's wages. *Kirk v. State*, 465 S.E.2d 301, 306 (N.C. Ct. App. 1995). "The State endeavors to 'make available a State Health Plan.' But "[m]aking available and providing access

does not create any specific contractual financial obligation." *Lake v. State Health Plan for Tchrs. & State Emps.*, 825 S.E.2d 645, 656 (N.C. Ct. App. 2019).

Plaintiffs' participation or "subscription" to the Plan does not guarantee any particular health benefits. "The value of this benefit [participation in the health plan] cannot be quantified." *Kirk*, 465 S.E.2d at 306. Moreover, the facts clearly indicate that the medical necessity of a given treatment is irrelevant to the State Health Plan's policies. The Plan declines to cover any number of "medically necessary" treatments and procedures, and it is well within its rights to do so. Ex. 1 (Jones Dep.) at 58:12-15; 72:4-6. The Plan is not a doctor. Its duty is not to guarantee maximalist treatment for every member; rather, its duty is to maximize value for the whole of its members. The Plan's "package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered—not 'adequate health care.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985).

Accordingly, any differences in the "individual services offered" by the Plan stems from its discretionary analysis of the applicable regulations, the relative priority of different treatments, and the available resources—not "because of … its adverse effects" upon Plaintiffs or any other group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The federal courts have endorsed insurers' rights to make these decisions. Even when a patient has a fundamental right to a medical procedure and cannot afford to pay for it, the Constitution does not require that the Plan cover it; if anything, this barrier to care (refusal to pay for a procedure) represents a wealth classification based on individuals' ability to pay for certain treatment, not an actionable form of discrimination under the ACA or on equal protection grounds. *See Maher v. Roe*, 432 U.S. 464, 471 (1977). The Plan's policies discriminate against Plaintiffs "only in the same sense that [they] discriminate[ ] against those who might need penile prosthetic implants (which may be medically necessary to cure impotence), Kerato-refractive eye surgery (which may be medically necessary to cure vision defects), hearing aids (which may be medically necessary to overcome deafness), or those who suffer from eating or sleep disorders: they must pay for those procedures or devices themselves." *Saks v. Franklin Covey Co.*, 117 F.Supp.2d 318, 329 (S.D.N.Y. Oct. 2, 2000). All Plan members, including Plaintiffs, receive the actuarial benefit of this—and every other—coverage limit. Just as not all women are pregnant, not all transgender individuals require treatment for gender dysphoria.

Finally, it is a "legitimate purpose" to "limit[] health care costs." *Saah v. Contel Corp.*, 978 F.2d 1256 (4th Cir.1992) (per curiam). *See also Boyd v.*

*Bulala*, 877 F.2d 1191, 1197 (4th Cir.1989) ("[C]ap on [malpractice] liability bears a reasonable relation to a valid legislative purpose—the maintenance of adequate health care services."). "[S]o long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point" even if members of a protected class are disproportionately affected by the lack of coverage. *Aiello*, 417 U.S. at 495.

As one member of the Board of Trustees stated, his goal is "not to limit increases in cost" but to actually "cut the cost of healthcare for our state workers" because some individuals "are paying 20, 25 percent of their monthly income on healthcare on the State Health Plan." Robie.Dep.73:3-11. Once the Plan starts adding niche benefits, "then I have to keep going" for "[e]verybody who comes in and wants a benefit … because I can't discriminate." Jones.Dep.104:25-105:24. Plaintiffs suggest that this rationale weakens when the marginal cost of additional coverage is low, but there is no *de minimus* exception permitting Court intrusion when only "moderate alterations" to premium "variables" are needed. *Aiello*, 417 U.S. at 495-96. "The State has a legitimate interest in maintaining the self-supporting nature of its insurance program" and nothing in the Constitution requires a "more comprehensive" one. *Id.* at 496.

## III. The Plaintiffs' remaining claims are not supported by the evidence.

### A. *Plaintiffs have not provided sufficient evidence to support a grant of summary judgment under § 1557 of the Affordable Care Act.*

Plaintiffs seek summary judgment for injunctive relief and damages under § 1557 of the Affordable Care Act, alleging that the failure to cover hormone treatment and surgery for gender dysphoria is "discrimination based on sex in healthcare." ECF No. 179 at 30-32.[11]

To the extent Plaintiffs claim the Plan's decision not to cover each and every possible treatment for gender dysphoria reflects discrimination "on the basis of sex," this argument has been addressed above. Also relevant to the § 1557 claim, however, is the fact that the U.S. Department of Health and Human Services ("HHS") has now expressly disavowed the factual analysis and conclusions reached in its earlier 2016 rule interpreting the scope of § 1557. In 2016, HHS stated that transition-related treatment could no longer be considered "cosmetic or experimental;" refusal to cover hormone treatment

---

[11]    Plaintiffs cite another district court ruling on a motion to dismiss as support for a grant of summary judgment. ECF No. 179 at 28 (citing *C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, 536 F. Supp.3d 791 (W.D. Wash. 2021). *CP* held only that "[p]laintiffs provide enough [unspecified] factual support" to make an allegation of discrimination "plausible." The case is irrelevant on summary judgment, especially as the court did not identify the "factual support" it found persuasive. *Id.*

or surgery on such a basis "is now recognized as outdated and not based on current standards of care." 81 Fed. Reg. 31429 (May 18, 2019).

The revised 2020 Rule studied this factual question, received extensive comment, and the agency concluded after a "review of the most recent evidence" that the 2016 statement "was an erroneous assertion." 85 Fed. Reg. 37187 (June 19, 2020). The current Rule found that "there is, at a minimum, a lack of scientific and medical consensus to support this assertion," and the "lack of scientific and medical consensus—and the lack of high-quality scientific evidence supporting such treatments—is borne out by other evidence." *Id.*

With their claim under § 1557, Plaintiffs ask this Court to do what HHS has refused: impose a view about appropriate care for gender dysphoria in a way that "inappropriately interfere[s] with the ethical and medical judgment of health professionals." 85 Fed. Reg. 37187. "A medical provider may rightly judge a hysterectomy due to the presence of malignant tumors to be different in kind from the removal of properly functioning and healthy reproductive tissue for psychological reasons, even if the instruments used are identical." *Id.*[12]

---

[12] Plaintiffs have provided no alternative theories or evidence in support their § 1557 claim other than the claim of facial discrimination rejected above.

Plaintiffs have also provided no evidence of damages. Under both § 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and Title VII, Plaintiffs seek damages, but have presented no evidence for this Court to consider. Although Plaintiffs allege "financial harm," ECF No. 75 at 42, 44-45, they present no calculations or medical bills. Similarly, Plaintiffs allege emotional damages, *id.*, but have not identified or quantified the "independent compensable harm" that resulted from the alleged statutory violation. *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1248 (4th Cir. 1996). Without such evidence, the Court cannot award summary judgment to Plaintiffs on either the § 1557 claim or the Title VII claim.

### B. *Plaintiff Caraway has not produced sufficient evidence to support her Title VII claim.*

The Court should deny Caraway's motion for summary judgment and dismiss her Title VII claim. ECF No. 137 at 25-33; ECF No. 193 at 1-6. Caraway misunderstands the application of Title VII to fringe benefits, asserting that her health benefits are "compensation." ECF No. 179 at 4. This is false. As discussed earlier, "employer-provided fringe benefits" which include

---

Because § 1557 adopts the "enforcement mechanisms provided for and available under" the referenced civil rights statutes, 42 U.S.C. § 18116(a), and because Title IX does not permit a claim based on "disparate impact," *Doe v. Fairfax Cty. Sch. Bd.*, 403 F.Supp.3d 508, 515 (E.D. Va. 2019), Plaintiffs cannot assert a disparate impact claim in this case either.

"health, life or disability plans" are *not* "compensation." N.C. Stat. § 135-1(7a)(b).

*Manhart*, the case Caraway relies upon, makes this analysis clear. In *Manhart*, the Supreme Court considered whether a pension plan could "require[ ] female employees to make monthly contributions to the fund which were…higher than the contributions required of comparable male employees." *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 705 (1978). The Court rejected such a distinction, because Title VII's "focus on the individual is unambiguous" and "precludes treatment of individuals as simply components of a racial, religious, sexual, or national class." *Id.* at 708. Therefore, even if "[w]omen, as a class, do live longer than men," *id.* at 707, the employer could not charge different amounts based on sex.

In response, the employer made an argument very similar to Caraway's. Just as Caraway argues that it is unfair that the Plan does not pay for all of her treatments, Manhart's employer argued that a *failure* to charge different contributions "would itself violate Title VII because of its disproportionately heavy impact on male employees." *Id.* at 710 n.20. The Court rejected this analysis. "This suggestion has no force in the sex discrimination context because each retiree's total pension benefits are ultimately determined by his *actual life span*; any differential in benefits paid to men and women in the

aggregate is thus "based on [a] factor other than sex." *Id.* The same logic applies here. Caraway's health care payments "are ultimately determined by" her *actual medical needs*; "any differential in benefits paid … in the aggregate is thus based on a factor other than sex." *Id.*

## CONCLUSION

Plaintiffs ask this Court to conceptualize their case as involving an by the Plan on the autonomy of transgender individuals, but this profoundly misstates the facts, the law, and the procedural posture. The State Health Plan does not restrict Plaintiffs' medical care. The Plan does not classify Plan members based on whether they identify as transgender, cisgender, non-binary, non-gendered, or otherwise. The Plan does not provide different health coverage to Plaintiffs. The discrimination alleged by Plaintiffs is that the Plan cannot cover a medication or treatment for one diagnosis—for example, a mastectomy for a man or woman with breast cancer—without also paying for medical treatment for *a different diagnosis*. This is not the law.

Respectfully submitted, this the 19th day of January, 2022.


/s/ John G. Knepper
Wyo. Bar. No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
Facsimile: (307) 432-0310
john@knepperllc.com

/s/ Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Brief complies with the Court's expanded word limit using the word count feature of the word processing software in making this certification.

/s/ John G. Knepper
Wyo. Bar. No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone:  (307) 632-2842
Facsimile:  (307) 432-0310
john@knepperllc.com

/s/ Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone:  (336) 722-3700
Facsimile:  (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com