```
          IN THE UNITED STATES DISTRICT COURT FOR
             THE MIDDLE DISTRICT OF NORTH CAROLINA



   MAXWELL KADEL, et al.,        )
                                 )
              Plaintiffs,        )
                                 )   No. 1:19-cv-272-LCB-LPA
         V.                      )
                                 )
   DALE FOLWELL, et al.,         )
                                 )
              Defendants.        )
   _____)
```

DEPOSITION
OF
DEE JONES

IN HER INDIVIDUAL CAPACITY
and
30(b)(6) DESIGNEE FOR NC STATE HEALTH PLAN

AUGUST 3, 2021

THIS TRANSCRIPT IS NOT COMPLETE
PORTIONS OF THIS TRANSCRIPT AND/OR EXHIBITS
MAY BE DESIGNATED CONFIDENTIAL/ATTORNEYS EYES ONLY
AFTER REVIEW OF TRANSCRIPT BY ATTORNEYS WITHIN 30
DAYS OF DATE OF DEPOSITION PER PROTECTIVE ORDER

PNC PLAZA DOWNTOWN
301 Fayetteville Street, Suite 1700
Raleigh, North Carolina

Reported by: Michelle Maar, RDR, RMR, FCRR

1  Q.  And in 2016, did the Plan's benefits coverage
2  provide for blanket exclusions for treatment of gender
3  dysphoria?
4  A.  Yes.
5  Q.  I would like to show you what I'm marking as
6  Plaintiffs' Exhibit 1.
7  (Exhibit 1 is marked for identification.)
8  MS. RAVI:  I'll give you a moment to review the
9  document.  I know it's lengthy.
10  MR. RULEY:  You've seen it before.
11  THE WITNESS:  I've seen it once or twice.
12  BY MS. RAVI:
13  Q.  Do you recognize this document?
14  A.  I do.
15  Q.  What is this?
16  A.  It is the 80/20 PPO Plan Benefits Booklet for the
17  period January 1 through December 31 of 2016.
18  Q.  Would you turn to the page marked as PLAN
19  DEF2711.
20  In the 2016 Plan Year, did the Plan exclude from
21  coverage treatment or studies leading to or in connection
22  with sex changes or modifications and related care?
23  A.  Yes.
24  Q.  If you could turn to the page marked PLAN
25  DEF2699.

1             In the 2016 Plan Year, did the Plan exclude from
2     coverage psychological assessment and psychotherapy
3     treatment in conjunction with proposed gender
4     transformation?
5         A.   Yes.
6         Q.   If I refer to these two exclusions from coverage
7     today as the exclusions, will you know what I'm talking
8     about?
9         A.   Yes.
10        Q.   All right.  When was this exclusion language
11    added to the Plan documents?
12        A.   As I understand it, back into the '90s in some
13    capacity.
14        Q.   And with the exception of Plan Year 2017, has the
15    exclusion been in place continuously since it was
16    introduced?
17        A.   As I understand it, yes.
18        Q.   And is that correct for the 80/20 PPO Plan?
19        A.   Yes.
20        Q.   Is that also correct for the 70/30 PPO Plan?
21        A.   Yes.
22        Q.   And for the High-Deductible Health Plan?
23        A.   Yes.
24        Q.   Who is eligible to enroll in the State Health
25    Plan?

1    A.   There was nobody that said oh, we should let it
2    sunset, oh, we should push it forward and bring it up for
3    vote.
4         Q.   I'll hand you what I've marked as Plaintiffs'
5    Exhibit 8.
6              (Exhibit 8 is marked for identification.)
7    BY MS. RAVI:
8         Q.   Do you recognize this document?
9         A.   Generally, yes.
10        Q.   Have you seen it before?
11        A.   I have not seen it with the track changes.
12        Q.   What is this document?
13        A.   It appears to be a draft of a resolution relative
14   to the coverage that suggests that the state will follow
15   the law and, if the, there's any repeal of the law or
16   notice by the Department of Health and Human Services that
17   this benefit will no longer be required to be provided
18   under federal law.
19        Q.   And looking at the document marked PLAN DEF35963,
20   does this appear to be the cover e-mail attaching that
21   document?
22        A.   It does.
23        Q.   What is the date on the cover e-mail?
24        A.   January 23, 2017.
25        Q.   So turning to the attachment PLAN DEF44771, who

1  Q. Did you discuss this recommendation with the
2  State Treasurer?
3  A. No.
4  Q. Is it correct that care must be medically
5  necessary to be covered by your Plan?
6  A. Yes. But the Plan does not cover all medically
7  necessary treatment.
8  Q. At the time of this draft resolution, was it the
9  Plan's position that gender transition services were
10  medically necessary care?
11       MR. RULEY: Objection, form.
12       THE WITNESS: Again, a lot of things are
13  medically necessary that the Plan doesn't cover. And a lot
14  is not, it's maybe a little bit of a loaded word. But that
15  is what it says here.
16  BY MS. RAVI:
17  Q. I'm sorry -- could you clarify when you say that
18  is what it says here?
19  A. It says here in the resolution that the board
20  approve medically necessary coverage.
21  Q. Medically necessary coverage of gender transition
22  services?
23  A. Yes.
24  Q. Regarding the position on whether or not gender
25  transition services are medically necessary coverage, has

1    drafted this document?
2    　　　　A.    I do not know.  But based on the e-mail, it would
3    appear that some combination of Blake Thomas and Lotta
4    Crabtree.
5    　　　　Q.    And why was this resolution drafted?
6    　　　　A.    My guess is there is -- well, it's not really a
7    guess -- it's based on following the law and whether or not
8    the coverage is mandated or not.  That was the general
9    reason for covering it in the first place was because of
10   the risk of losing federal funding.
11   　　　　Q.    And the resolution states that the Board of
12   Trustees approve medically necessary coverage of gender
13   transition services for the 2017 Benefit Year.
14   　　　　　　　Is that right?
15   　　　　A.    That's what it says, yes.
16   　　　　Q.    And it states that that was in response to a
17   final rule issued by the Department of Health and Human
18   Services?
19   　　　　A.    Yes.
20   　　　　Q.    Turning to the fourth WHEREAS clause, it states
21   that the State Treasurer recommends that this benefit only
22   be offered so long as it is required to be offered under
23   federal law.
24   　　　　　　　Is that correct?
25   　　　　A.    Yes.

1      A.   That is correct.

2      Q.   What was the basis for that reference?

3      A.   This is the Treasurer's words.  I'm not aware of

4   what he was referring to.  I don't disagree with it.  But

5   these are his words.

6      Q.   All right.  Are you aware of the Treasurer's

7   basis for this statement?

8      A.   No.

9      Q.   Does the Plan believe the treatment for gender

10  dysphoria is medically uncertain?

11     A.   Yes.

12     Q.   When did this view develop?

13     A.   Please repeat.

14     Q.   When did this view develop?

15     A.   I would say over several years.  In 2016, it's

16  very clear that while the presentations had a lot of

17  supporting documentation, the basis of the sunsetting or

18  the removal of the exclusion was based on the 1557 Rule and

19  the need to keep the federal funding.

20          And the Plan at the time, the staff used and put

21  forth all sorts of other information when we just went

22  through.

23          But since that time, we have new staff, we have a

24  small staff, we manage contracts, and we have limited

25  clinical staff.

Page 72

```
 1   benefits and any benefits that might apply to a broad swath
 2   of the population with a not guaranteed but a strong
 3   proponent of lower costs in the future.
 4           And so that's where legal and medical uncertainty
 5   -- I don't have to cover medically necessary treatment.  We
 6   cover a lot of it.  But in this case, we don't.
 7       Q.  Prior to this statement coming out on October 25,
 8   2018, did Plan staff discuss the legal uncertainty that's
 9   referenced here?
10       A.  Yes.
11       Q.  Did Plan staff discuss the medical uncertainty
12   that's referenced here?
13       A.  Yes.
14       Q.  Let's turn back to Exhibit 5.  And if you can
15   turn to Page 10 of this document.
16           Plaintiffs' Interrogatory Number 3 asks the Plan
17   to discuss the factual basis for each governmental interest
18   that the Plan contends supports the exclusion.
19           Is that right?
20       A.  Yes.
21       Q.  And is it correct, turning to the next page, the
22   Plan states that the Plan has not identified any valid,
23   reliable, peer-reviewed longitudinal studies that support
24   the efficacy of the plaintiffs' desired treatment?
25       A.  I'm sorry -- where are you?
```

1  Q.  I am at the bottom of Page 11, last paragraph.
2  A.  Okay.
3      That would be true.
4  Q.  Is a peer-reviewed, longitudinal study that
5  supports the efficacy of treatment a prerequisite for the
6  Plan to cover a proposed benefit?
7  A.  Not necessarily.  When we evaluate, as I think we
8  said earlier, it's a holistic review.  There's no single
9  pathway to coverage.  It has to be a broad swath of
10 membership, that there's a benefit for multiple people.
11     There's a cost component to it.  There's a
12 downstream cost component to it.  There's got to be some
13 common -- not experimental for sure.
14     There's got to be some common understanding in
15 the medical community that it is a treatment that will
16 produce a downstream effect that's positive.
17     So, you know, it's very difficult to come back
18 and say well, peer-reviewed, longitudinal studies -- I'm
19 not a clinician and I'm not a researcher, so it's, you
20 know -- but to the extent that we have not found any real
21 evidence that it's absolutely black and white, this
22 particular issue.
23     You know, I think it goes, well, it should go
24 without saying this is not a personal issue for me.  I
25 don't get, I have no personal opinion about this.

1          Because I walk through the front door at the
2     office, and I'm a fiduciary.  This is all about the cost
3     and maintaining this benefit for 740,000 people who expect
4     it every single day and the retirees that have an
5     expectation of the benefit when they retire.
6               And so every decision I make -- and I'm speaking
7     for myself -- is about that.  It's all about that every
8     day.
9               It breaks my heart 9 times out of 10 when I have
10    to decline a benefit, 9 times out of 10.
11              When I see people that need hearing aids, I would
12    love to give them a hearing aid, I would love to.
13              I have nothing against transgender people.  I
14    would be more than happy to provide the benefit.  But it's
15    not my decision.  I'm a fiduciary first.  And I'm
16    responsible for 740,000 people.  This is not personal.
17    This is all about money very simply put.
18              I've been charged with reducing the costs of the
19    Plan to operate since the day I started.  And we have done
20    just that.
21              You know, there's some discussions about how much
22    money the Plan has saved.  Well, it's because we've worked
23    really hard to do that.  We've taken out all extraneous
24    benefits.
25              We used to cover benefits for a small population

1  not personal.  This is not something that I get to make a
2  choice about.  Because if I had every single group that
3  comes in to ask for a benefit, if I covered that, then I
4  would be completely, completely avoiding my fiduciary
5  responsibility to cover basic health.  That's what the Plan
6  Benefits Booklet says, right?
7          The Plan Benefits Booklet identifies every single
8  thing I cover.  And it provides healthcare.  We want every
9  member of the Plan to have good healthcare.  We want the --
10 and the reality is we have a lot of members who have
11 diabetes.  We have a lot of members who have orthopedic
12 issues.  We have a lot of members who have RA.  We have
13 really a lot of members who have cancer.  And they want to
14 be, they want to be covered.
15         And so it's really difficult for me to just say,
16 you know, I can take this group of 25 and this group of 10
17 and these -- if you add all that up -- I'll, I'll totally
18 admit that the cost of this benefit is not going to break
19 the Plan, never was, never will.
20         But it -- I can't do it for that group and not do
21 it for the group that wants it for their infants, for, you
22 know, for a certain feeding formula for that infant group,
23 and I can't do it for the hearing aid group, and I can't do
24 it for the group that really wants acupuncture.
25         Because once you start adding those, then I have

1  to keep going.  Everybody who comes in and wants a benefit,
2  I'll have to do it because I can't discriminate.
3            I'm not discriminating.  This is about what the
4  Plan can afford in the environment that we're in today --
5  which is I have a General Assembly that's funding me at 4
6  percent when my trend rate is 7 plus.  And that's not even
7  absolutely certain.
8            I have a 28.8 billion unfunded liability for
9  retiree healthcare that I, myself, am ready to have in a few
10 years.
11           And so, you know, this is all about being a
12 government plan.  And I don't get to, I don't get to pick
13 and choose.  I'm not a commercial plan.
14           So let's start with that.  A commercial plan, they
15 have revenues, right?  You go out and sell widgets, and you
16 sell a lot of widgets, and then you decide how much you want
17 to put into the benefit.  And you can have your member, your
18 staff, your employees pay.
19           I would bet most employers -- I was paying 100
20 bucks when I was at Time Warner.  I was paying for the
21 family, and I wasn't fully subsidized.
22           At the State Health Plan, we've got people who, a
23 whole lot of employees have to work one week out of a month
24 just to cover their Health Plan for their family.
25           And the effort to just institute a 25 dollar

```
                                                              Page 117
 1      -- if that's okay.
 2              MS. RAVI:  Alan, I think we're taking another 5
 3      to 10 minute break, and then we'll be back.
 4              (Off the record)
 5              MR. RULEY:  I have just a few follow-up questions
 6      for you.
 7
 8                           EXAMINATION
 9      BY MR. RULEY:
10          Q.  Would you find Exhibit 1 please.  Would you turn
11      to Page 50 please.
12              Page 50 is titled What Is Not Covered?  Is that
13      right?
14          A.  That is correct.
15          Q.  And are these basically exclusions, a list of
16      exclusions?
17          A.  Yes.
18          Q.  And would you look at the fourth bullet point.
19          A.  Yes.
20          Q.  What is that exclusion?
21          A.  Any experimental drug or any drug or device not
22      approved by the Food and Drug Administration (FDA) for the
23      applicable diagnosis or treatment.
24          Q.  Then turning the page to Page 51, the fourth
25      bullet point from the bottom, what is that exclusion?
```

1     A.    Surgical procedures for psychological or
2     emotional reasons.
3     Q.    And would those exclusions also potentially apply
4     to coverage for gender dysphoria?
5     A.    Yes.
6     Q.    Earlier, you mentioned HBRs.  What are they again
7     please?
8     A.    Health Benefit Representatives.  They are
9     actually defined in statute.  And they work at the various
10    employing units.  I mentioned there are 408.  They are
11    liaisons to the Plan.  So the Plan teaches them, keeps them
12    apprised of the benefits being offered.  But they're
13    responsible for their employer's employees and getting them
14    enrolled and making sure they understand the processes.
15    Q.    So are they employed by the State Health Plan or
16    by others?
17    A.    By the others.
18    Q.    All right.  Thank you.
19          On costs -- would you get Exhibits 6 and 7 please.
20          Looking at Exhibit 6, for example, look at the
21    first e-mail on Exhibit 6, Page DEF61647, the January 22,
22    2017 e-mail.
23    A.    Yes.
24    Q.    And that reports, as of 1-21, a total paid of
25    287.57.