```
 1              UNITED STATES DISTRICT COURT
                NORTH CAROLINA MIDDLE DISTRICT
 2      _____
 3      MAXWELL KADEL, et al.,
 4                   Plaintiffs,
 5          vs.              Case No. 1:19-cv-00272-LCB-LPA
 6      DALE FOLWELL, et al.,
 7                   Defendants.
        _____
 8

             THE DEPOSITION OF GEORGE R. BROWN, M.D.
 9                    September 23, 2021
10
11
12          **PORTIONS ATTORNEYS' EYES ONLY**
13
14
15
16
17
18
19    Reported by:
20    PATRICIA A. NILSEN, RMR, CRR, CRC
      Licensed Court Reporter 717 for the State of
21    Tennessee
22
23
24
25
```

1  Foundation. Object to the extent it's outside the
2  scope of Dr. Brown's opinions.
3  A.     So the short answer is no, but I also want
4  to point out that the presence of symptoms is --
5  also has to be considered at a particular -- in a
6  particular time frame. So it's not just a simple
7  matter of, does the person experience gender
8  dysphoria if they have transgender identity. They
9  could have last year; they might have it next year;
10 they don't have it today. It depends on where they
11 are in time, and a variety of other parameters
12 specific to the individual.
13        But it is true that there are transgender
14 people who, sitting here today, if they were
15 sitting here today, do not have gender dysphoria
16 with little G, little D or big G, big D.
17 Q.     Are there studies that identify the
18 portion of -- the portion, prevalence, ratio of
19 gender dysphoria, the diagnosis in transgender
20 individuals?
21        MR. TISHYEVICH: Objection, to the
22 extent it's beyond the scope of Dr. Brown's
23 opinions.
24 A.     The answer to that is, no one knows the
25 answer to that.

1  of training.
2       So on a practical level, that's how it is
3  often done in systems.
4  Q.     Sure.
5  A.     I can -- I can speak from my -- my system
6  in the VA, in that what I've listed under 37 in the
7  VA is -- is the case that all of our patients who
8  are referred for hormonal interventions or surgical
9  interventions have been evaluated by at least one
10 qualified mental health professional.
11 Q.     Sure.  And I guess my -- my follow-up
12 question is, is that required under the WPATH
13 Version 7 Standards of Care?
14         MR. TISHYEVICH:  Objection.
15 A.     "Required" in the sense that they're
16 flexible clinical guidelines, recognizing that they
17 may not be met in all environments and in all
18 countries -- because, again, this is
19 international -- or in all states or in all
20 sections of all states.  So ...
21 Q.     Leaving aside other countries, is -- is
22 the flexibility you identify in the -- see if I can
23 get this -- you made the statement that the -- that
24 there is flexibility in the WPATH standard 7 --
25 Standards of Care; is that correct?

1  A.  Correct.
2  Q.  Is that flexibility identified in the
3  specific recommendation that -- that an assessment
4  can -- can occur after the -- the beginning of --
5  of hormone treatment or surgery, or is the
6  assessment located in sort of the overall nature of
7  the guidelines?
8  A.  In -- in the beginning of the guidelines
9  there's a -- there is verbiage to the effect that
10 these are meant to be flexible standards, with the
11 recognition that whatever standards you write on a
12 specialty area, whether that's cardiology or
13 interventional radiology or transgender healthcare,
14 that there are going to be large swatches of -- of
15 the world and the country, and given large states,
16 that are not going to have what you might aspire to
17 as the writer of a -- of a clinical practice
18 guideline.
19     Which doesn't -- doesn't mean that the
20 person isn't getting access to care and -- or
21 access to competent care; it's just a recognition
22 of the realities of scarcities of clinical
23 resources, even in a country like the U.S.
24 Q.  Sure.
25     COURT REPORTER:  Just before we go