# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.,*

               *Plaintiffs*,

          v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.,*

               *Defendants*.

Case No. 1:19-cv-00272-LCB-LPA

## DECLARATION OF DEEPIKA H. RAVI

I, Deepika H. Ravi, do hereby declare as follows:

1.     I am more than 18 years of age, have personal knowledge of the facts set forth herein, and am otherwise competent to testify to the matters set forth herein.

2.     I am an attorney at Harris, Wiltshire & Grannis LLP and counsel for Plaintiffs in the above-captioned matter.

3.     I submit this declaration in support of Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie.

4.     Attached as **Exhibit A** is a true and correct copy of the May 1, 2021 Disclosure of Expert Witnesses Who Do Not Provide a Written Report Pursuant to Fed. R. Civ. P. 26(A)(2) by Defendants Dale Folwell, Dee Jones, and the North Carolina State Health Plan for Teachers and State Employees.

1

5.      Attached as **Exhibit B** is a true and correct copy of excerpts of the transcript of and exhibits to the deposition of Dr. Peter Robie on September 22, 2021, taken in relation to the above-captioned matter.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 2nd day of February, 2022.


/s/ Deepika H. Ravi_____
Deepika H. Ravi

# Exhibit A

| | |
|---|---|
| MAXWELL KADEL; JASON FLECK; CONNOR THONEN-FLECK; JULIA MCKEOWN; MICHAEL D. BUNTING, JR.; C.B., by his next friends and parents, MICHAEL D. BUNTING, JR. and SHELLEY K. BUNTING; SAM SILVAINE; and DANA CARAWAY, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| DALE FOLWELL, in his official capacity as State Treasurer of North Carolina; DEE JONES, in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees; UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL; NORTH CAROLINA STATE UNIVERSITY; UNIVERSITY OF NORTH CAROLINA AT GREENSBORO; and NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

**DISCLOSURE OF EXPERT WITNESSES WHO DO NOT PROVIDE A WRITTEN REPORT PURSUANT TO FED. R. CIV. P. 26(A)(2) BY DEFENDANTS DALE FOLWELL, DEE JONES, AND THE NORTH CAROLINA STATE HEALTH PLAN FOR TREACHERS AND STATE EMPLOYEES**

The Rules of Civil Procedure require the Defendants to disclose witnesses who are qualified to provide expert testimony, and are expected to do so, but who are also not retained or specially employed to do so. Fed. R. Civ. P. 26(a)(2). Pursuant to the rule, the Plan Defendants disclosure that the following three individuals will present testimony within their areas of learning and expertise:

(1) <u>Treasurer Dale R. Folwell, CPA:</u>

Treasurer Folwell is the State Treasurer of North Carolina. Prior to his election to this office in 2016, he served as the Assistant Secretary for Employment Security of the North Carolina Department of Commerce from 2013 through 2015. From 2004 through 2011, Treasurer Folwell served in the North Carolina General Assembly. Treasurer Folwell has also earned a Bachelor's degree and a Master's degree in Accounting, and he is a Certified Public Accountant.

In his current role, Treasurer Folwell serves as Chair of the Board of Trustees for the State Health Plan. He has overall supervision of the employees who work for the Plan. In addition to testimony about his actions as Treasurer and his decisions involving the State Health Plan, Treasurer Folwell will present expert opinion testimony about the fiscal issues facing the State Health Plan.

Treasurer Folwell will testify about the role of the State Health Plan in North Carolina. The Plan provides health benefit coverage to more than 740,000 individuals and is one of the largest purchasers of health care in the State. Treasurer Folwell will testify that concerns about the fiscal sustainability of the State Health Plan have existed for

decades. Currently, Treasurer Folwell estimates that the Plan has a $28 billion unfunded liability.

Treasurer Folwell will testify about policies (both those adopted and those not yet adopted) to address this unfunded liability. These measures include premium adjustments, changes in eligibility for future retirees, and ongoing efforts to increase the transparency of health care costs. The Treasurer will contrast the lack of transparency and benchmarks for the State Health Plan with the structure of North Carolina's unemployment insurance program, which he supervised when he was an Assistant Secretary for the North Carolina Department of Commerce. The Treasurer will also testify to the inflation in health care costs resulting from the consolidation of hospital systems in North Carolina.

Finally, the Treasurer will testify to the adverse effect of the current premium structure for the Plan, which imposes significant unsubsidized costs for coverage of dependents. These costs have, for some time, discouraged younger, healthier employees from enrolling their families in the State Health Plan. Further, these costs – when combined with the rising healthcare costs experienced by North Carolina residents – have increased the economic uncertainty for all residents of North Carolina.

(2) <u>Dee Jones, Executive Director of the State Health Plan</u>

Dee Jones is the Executive Administrator of the State Health Plan, a position in which she has served for four years. Ms. Jones previously served as the Chief Operating Officer for North Carolina's Medicaid program. She has expertise in the administration of health benefits programs as well as operational and financial strategy and customer service within other industries. Ms. Jones has earned a Bachelor's degree in accounting and

business management from North Carolina State University and a Master's degree in Accounting and Business Management from the University of Phoenix.

Ms. Jones will testify about the operation of the State Health Plan. She is the Administrator of the Plan, responsible for implementation of policy and management of the State Health Plan, its employees, its contractors, and its vendors. She is also the individual designated by the Plan to testify on its behalf. Fed. R. Civ. P. 30(b)(6). Her testimony will include factual detail about Plan design and operation, including the coverage Exclusion challenged by the Plaintiffs.

The Defendants have also designated Ms. Jones as an expert witness to ensure that her knowledge and experience about how to operate an actuarially sound health plan are within the scope of her allowed testimony.

A portion of Ms. Jones's testimony will include opinion testimony related to the operation of the Plan. Ms. Jones will testify to the rate of increase for appropriations from the North Carolina General Assembly, the Plan's medical costs, and the Plan's pharmaceutical costs.

Ms. Jones will also testify about the cash reserves of the Plan, both the statutorily required reserves as well as the reserves necessary to ensure that the Plan can make timely payment for healthcare. She will testify as to the Plan's tracking of utilization by beneficiaries, and the analysis underlying the Plan's conclusion that a $1 billion reserve is necessary to ensure the Plan's financial soundness.

Ms. Jones will testify about the loss ratio for different age cohorts of Plan beneficiaries. She will also testify that a small portion (approximately 15% of the Plan

participants) incur 85% of the costs of medical treatment. She will testify that the maximum premium for the Plan is set by state law on a two-year cycle, limiting the ability of the Plan to adjust to changing health care costs. Further, Ms. Jones will testify that the statutory structure of the Plan – with caps on premiums for state employees and state employers and unsubsidized premiums for dependents – has skewed the Plan's population to become more elderly and more costly. This heightened cost has led to further diminution of younger participants, which negatively affects the Plan's overall loss ratio.

To ensure long-term sustainability, the State Health Plan's primary goal under her management has been to reduce the individual unit cost of healthcare. For example, the Plan has held family premiums constant even as medical costs have risen. Ms. Jones will testify to the actuarial analysis supporting the need for this policy as well as the feasibility of rejected alternatives, such as reliance on increased appropriations.

Ms. Jones will testify about the analysis performed when beneficiaries request new or augmented benefits from the Plan. Ms. Jones will testify that the Board's fiduciary obligation to the Plan beneficiaries, and concerns about overall Plan soundness, require the Board to review additional coverage benefits within the context of the effect of this additional benefit on the overall health of the Plan population. She will testify that overall cost of the new benefit is considered but that the cost of a new benefit cannot, consistent with prudential financial management, be considered in isolation. Ms. Jones will also testify about the analyses performed over the past five years, including requests that the Plan provide new or increased benefits, including coverage of gender transition costs, acupuncture, hearing aids, Colo-guard, and special dietary supplements.

5

(3)    <u>Peter W. Robie, M.D., FACP</u>

Dr. Robie has served on the Board of Trustees for the State Health Plan since 2017. He also serves on the Pharmacy and Therapeutics Committee for the Plan. Dr. Robie will testify about the Board's consideration of requests that the Plan eliminate the current coverage exclusion for gender transition surgery and related hormone treatment.

Dr. Robie is not a specialist in the treatment of gender dysphoria, and the Defendants do not seek to qualify him as such. Dr. Robie is, however, a primary care physician with more than forty-seven years of experience. As a member of the Board of Trustees, and a physician, Dr. Robie has contributed his medical knowledge to Board deliberations. Dr. Robie will testify to the medical knowledge he has shared with other Board members. He will also testify that, in order to provide diagnostic and medical treatment that meets a professional standard of care, primary care physicians must know the chromosomal sex of patients.

Dr. Robie has served as a primary care physician for more than forty-seven years. He has treated patients as a physician in a small group/solo practice and as a member of a large primary care practice group affiliated with Wake Forest Medical Center. Dr. Robie earned his M.D. with honors from the Baylor College of Medicine in 1976. He has served as an Assistant Professor and Clinical Associate Professor at the Department of Internal Medicine for the Wake Forest School of Medicine since 1981.

Dated this 1st day of May, 2021.

Respectfully submitted by,

/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
LAW OFFICE OF JOHN G. KNEPPER, LLC
Post Office Box 1512
Cheyenne, WY 82003-1512
Telephone: (307) 632-2842
Facsimile: (307) 432-0310
John@KnepperLLC.com

Kevin G. Williams
N. C. Bar No. 25760
Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 North Cherry St., Suite 600
Winston-Salem, NC 27120-1029
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

James Benjamin Garner
N.C. Bar. No. 41257
General Counsel
North Carolina Department of
    the State Treasurer
3200 Atlantic Avenue
Raleigh, North Carolina 27604
Telephone: (919) 814-4000
Ben.Garner@nctreasurer.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document was served upon the following individuals through electronic mail on the 1st day of May, 2021.

| NAME | METHOD | |
|---|---|---|
| Amy E. Richardson<br>N.C. State Bar No. 28768<br>HARRIS, WILTSHIRE & GRANNIS LLP<br>1033 Wade Avenue, Suite 100<br>Raleigh, NC 27605-1155<br>Telephone: 919-429-7386<br>arichardson@hwglaw.com | Hand Delivery<br>Facsimile<br>U.S. Mail<br>Email | ☐<br>☐<br>☐<br>☒ |
| Tara Borelli<br>LAMBDA LEGAL DEFENSE AND<br>EDUCATION FUND, INC.<br>730 Peachtree Street NE, Suite 640<br>Atlanta, GA 30318-1210<br>tborelli@lambdalegal.org | Hand Delivery<br>Facsimile<br>U.S. Mail<br>Email | ☐<br>☐<br>☐<br>☒ |
| Deepika H. Ravi<br>HARRIS, WILTSHIRE & GRANNIS LLP<br>919 M Street N.W., 8th Floor<br>Washington, D.C. 20036<br>dravi@hwglaw.com | Hand Delivery<br>Facsimile<br>U.S. Mail<br>Email | ☐<br>☐<br>☐<br>☒ |
| David Brown<br>Alejandra Caraballo<br>TRANSGENDER LEGAL DEFENSE<br>AND EDUCATION FUND, INC.<br>520 8th Ave, Ste. 2204<br>New York, NY 10018<br>Telephone: 646-993-1680<br>dbrown@transgenderlegal.org<br>acaraballo@transgenderlegal.org | Hand Delivery<br>Facsimile<br>U.S. Mail<br>Email | ☐<br>☐<br>☐<br>☒ |
| Carl S. Charles<br>Omar Gonzalez-Pagan<br>LAMBDA LEGAL DEFENSE AND<br>EDUCATION FUND, INC.<br>120 Wall Street, 19th Floor<br>New York, NY 10005 | Hand Delivery<br>Facsimile<br>U.S. Mail<br>Email | ☐<br>☐<br>☐<br>☒ |

| | |
|---|---|
| Telephone: 212-809-8585<br>ccharles@lambdalegal.org<br>ogonzalez-pagan@lambdalegal.org | |
| Zach Padget<br>NC State Bar No. 46610<br>Alan McInnes<br>NC State Bar No. 20938<br>Assistant Attorneys General<br>NC Department of Justice<br>PO Box 629<br>Raleigh, NC 27602<br>Tel: 919-716-6920<br>zpadget@ncdoj.gov<br>amcinnes@ncdoj.gov | Hand Delivery ☐<br>Facsimile ☐<br>U.S. Mail ☐<br>Email ☒ |

*/s/ John G. Knepper*

9

# Exhibit B



Deposition of:
## Peter Robie , M.D.

*September 22, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

1       Q.    Did you attend college before you

2  attended medical school?

3       A.    Yes.  Rice University in Houston, Texas.

4       Q.    What did you study at Rice?

5       A.    Baccalaureate of arts, English, biology.

6  Double major.

7       Q.    When did you graduate?

8       A.    1972.

9       Q.    Did attend the Baylor College of

10  Medicine right after that?

11       A.    Yes.

12       Q.    What were you studying there?

13       A.    Doctor of medicine.

14       Q.    When did you graduate?

15       A.    1976.

16       Q.    Did you attend any other school after

17  that?

18       A.    No.

19       Q.    Do you have any other degrees?

20       A.    No.

21       Q.    Do you have any certifications?

22       A.    Yes.

23       Q.    What are your certifications?

24       A.    American Board of Internal Medicine

25  1979.

Case 1:19-cv-00272-LCB-LPA  Document 203-1  Filed 02/02/22  Page 15 of 69

1    Q.    Anything else?

2    A.    No.

3    Q.    Where did you work after graduating from

4    Baylor?

5    A.    1979 to 1981 I was on the faculty of the

6    department of internal medicine at Baylor College

7    of Medicine, Houston.  From 1981 to 1991 I was on

8    the faculty, department of internal medicine, Wake

9    Forest University Baptist Medical School.  1991 to

10   1997 I was in private practice at Forsyth Hospital

11   in Winston-Salem.  1997 to 2016 I returned to Wake

12   Forest and was a general internist in an academic

13   group practice in Winston-Salem.  I retired in

14   2016.  Since then I've done five activities.  One,

15   I'm one of the medical directors with the community

16   care center.  We're the largest and highest rated

17   center for the uninsured and poor in the State of

18   North Carolina.  I also attend at the urgent care

19   centers and minor emergency rooms in Winston-Salem

20   as needed.  I'm on the county board of health for

21   Forsyth County.  And I'm also executive director

22   for a foundation -- Sister Mary Foundation that

23   works in the countries of Benin, the Democratic

24   Republic of Congo to rescue war orphans from their

25   circumstances.

Case 1:19-cv-00272-LCB-LPA   Document 203-1   Filed 02/02/22   Page 16 of 69

1        Q.    When you retired in 2016, did you stop
2    practicing medicine at that time?
3        A.    For six months.
4        Q.    Are you currently practicing medicine?
5        A.    Yes.
6        Q.    What is your area of practice?
7        A.    Internal medicine.
8        Q.    Do you have any other specializations?
9        A.    No.
10       Q.    Any other areas of practice?
11       A.    No.
12       Q.    Are you an expert in the diagnosis of
13   gender dysphoria?
14       A.    No.
15       Q.    Have you ever diagnosed a patient with
16   gender dysphoria?
17       A.    No.
18       Q.    Are you an expert in the treatment of
19   gender dysphoria?
20       A.    No.
21       Q.    Have you ever treated a patient for
22   gender dysphoria?
23       A.    No.
24       Q.    Are you an expert in the cost of
25   treatment for gender dysphoria?

```
 1        A.    No.
 2        Q.    Have you ever submitted a request for
 3    pre-authorization for insurance coverage for gender
 4    concerning care?
 5        A.    No.
 6        Q.    Have you ever communicated with an
 7    insurer regarding a denial of coverage for gender
 8    confirming care?
 9        A.    No.
10        Q.    Have you ever taught medicine?
11        A.    Yes.
12        Q.    Where did you teach?
13        A.    Baylor College of Medicine, Wake Forest
14    Baptist Medical Center.
15        Q.    At Baylor what were you teaching?
16        A.    General internal medicine.
17        Q.    Did you teach anything else at Baylor?
18        A.    No.
19        Q.    What about at Wake Forest?
20        A.    General internal medicine.
21        Q.    Either at Baylor or at Wake Forest did
22    you teach on the subject of gender dysphoria?
23        A.    No.
24        Q.    Have you ever taught on that subject?
25        A.    No.
```

1          Q.     Have you ever been published in the area
2     of gender dysphoria?
3          A.     No.
4          Q.     Have you ever conducted research on the
5     treatment of gender dysphoria?
6          A.     No.
7          Q.     Have you ever read medical literature on
8     the subject?
9          A.     Yes.
10          Q.     What literature have you reviewed?
11          A.     Psychology article journals, I can't
12     remember the names of them, but many related to the
13     provision of psychological support for people with
14     gender dysphoria.  I've also read recommended
15     guidelines of the American Medical Association,
16     similar other organizations I can't recall, on the
17     management of gender dysphoria.
18          Q.     When did you review this literature?
19          A.     In the last six months.
20          Q.     Do you recall the authors of the
21     literature you reviewed?
22          A.     No.
23          Q.     Do you recall the dates any of it was
24     published?
25          A.     I think the psychology one I read was in

1    December of 2020.

2          Q.    Do you recall the title of that article?

3          A.    No.

4          Q.    Do you recall any other medical

5    literature that you have reviewed on the subject of

6    gender dysphoria?

7          A.    No.

8          Q.    Have you ever peer reviewed any

9    literature on the subject of gender dysphoria?

10         A.    No.

11         Q.    Are you currently serving on the board

12   of trustees for the North Carolina State Plan

13   Insurance for Teachers and State Employees?

14         A.    Yes.

15         Q.    If I refer to that as the plan today,

16   will you know what I'm talking about?

17         A.    I'm sorry, I didn't hear your question.

18         Q.    If I refer to the North Carolina State

19   Health Plan for Teachers and State Employees as the

20   plan today, will you know what I'm talking about?

21         A.    Yes.

22         Q.    How long have you served on the plan

23   board of trustees?

24         A.    Since February 2018.

25         Q.    What are your responsibilities as a

Case 1:19-cv-00272-LCB-LPA   Document 203-1   Filed 02/02/22   Page 20 of 69

1    or modifications?

2         A.    Yes.

3         Q.    Do you see that language on the page

4    there, about two-thirds of the way down?

5         A.    Yes, I see it.

6         Q.    I will ask you to turn to the page

7    marked PLAN DEF2699.

8         A.    We're on that page.

9         Q.    Are you aware that in the 2016 plan year

10   the plan excluded from coverage psychological

11   assessment and psychotherapy treatment in

12   conjunction with proposed gender transformation?

13        A.    Yes.

14        Q.    If I refer to these exclusions from

15   coverage as exclusions today, will you know what I'm

16   talking about?

17        A.    Yes.

18        Q.    Do you know Treasurer Dale Folwell?

19        A.    Yes.

20        Q.    How do you know Treasurer Folwell?

21        A.    We've been friends since the 1980s, and

22   I know him in his capacity as the treasurer of the

23   State of North Carolina and director of the State

24   Health Plan along with Dee Jones as assistant.

25        Q.    You said you've been friends since the

1    1990s.  How long have you known Dale Folwell?

2                    MR. WILLIAMS:  Objection to the

3           form.

4           A.    Since the 1980s.  40 years.

5           Q.    Where did you first meet?

6           A.    He came in as a patient.  He's been a

7    patient of mine.

8           Q.    I will ask you to take a look at what's

9    been marked as Exhibit 2.

10                    (Exhibit 2, Disclosure of Expert

11           Witnesses, marked for identification, as of

12           this date.)

13          Q.    Have you seen this document before,

14   Dr. Robie?

15          A.    Yes.

16          Q.    Would you turn to page 6 of this

17   document.

18          A.    Okay.

19          Q.    The document states, "Dr. Robie will

20   testify about the board's consideration of request

21   that the plan eliminate the current coverage

22   exclusion for gender transition surgery and related

23   hormone development."  Is that correct?

24          A.    Yes.

25          Q.    What testimony can you provide on this

1    topic?

2            A.    I'm sorry, I didn't hear you.

3            Q.    What testimony can you provide on this

4    topic?

5            A.    Can you be more specific in your

6    question?

7            Q.    What testimony can you provide about the

8    board's consideration of request that the plan

9    eliminate the current exclusion?

10           A.    The cost of the gender transition

11   surgery and related hormone treatment.

12           Q.    What request did the plan receive for

13   eliminating the current exclusion?

14           A.    I don't know.

15           Q.    Do you know what the plan considered in

16   terms of whether to eliminate the exclusion or not?

17           A.    Are you referring to discussions that

18   occurred in 2016?

19           Q.    Are you aware of discussions that

20   occurred in 2016?

21           A.    No.

22           Q.    What about in 2017?

23           A.    No.

24           Q.    In 2018?

25           A.    I think by then the plan excluded the

Case 1:19-cv-00272-LCB-LPA   Document 203-1   Filed 02/02/22   Page 23 of 69

1    gender dysphoria treatment so I don't think we had

2    any discussions about eliminating it, it was

3    already not part of the plan package.

4         Q.    Were there any discussions about

5    eliminating the exclusion in 2018?

6         A.    No.

7         Q.    In 2018, did the plan receive any

8    requests to lift the exclusion?

9         A.    Yes.

10        Q.    From whom?

11        A.    Mr. Kadel and some other people in our

12   board meeting, I believe it was October, November,

13   December of 2018 when the public part of our board

14   meeting made a presentation requesting we cover

15   treatment for gender dysphoria.

16        Q.    When was that presentation?

17        A.    I believe October 2018.

18        Q.    Who was giving that presentation?

19        A.    There was a group.  There was an

20   attorney present.  I do recall Mr. Kadel.  I don't

21   recall the other individuals, but there were about

22   four or five others.

23        Q.    In 2018, do you recall any other

24   requests that the plan received to lift the

25   exclusion?

1          MR. WILLIAMS:  Objection to the

2     form of the question.  You can answer.

3     A.    No.

4     Q.    What was the board's consideration of

5  the request it did consider?

6     A.    Really, at that time there was no

7  discussion other than hearing what Mr. Kadel and

8  the other people had to say.  The board didn't have

9  any more discussion.

10     Q.    Was there any internal deliberation

11  following that meeting in October 2018?

12     A.    At that time or any time since then?

13     Q.    Let's start with at that time.

14     A.    No.

15     Q.    What about since then?

16     A.    I recall two episodes.  Ms. Kim Hargett

17  who was a board member bringing up --

18          MR. WILLIAMS:  Dr. Robie, let me

19     caution you.  To the extent that these

20     discussions occurred outside the presence of

21     counsel in open session, I think it's

22     perfectly fine and appropriate for you to

23     testify to.  To the extent that any

24     discussions occurred in closed session within

25     the presence of counsel, I'm going to instruct

1       you not to answer those questions.

2       A.    Okay.  Well, those were closed sessions

3    so I will not answer.

4       Q.    To clarify, those were closed sessions

5    you're referring to after October 2018?

6       A.    Yes.

7       Q.    Is there any other testimony you can

8    offer about the board's consideration or request

9    that the plan eliminate the exclusion?

10      A.    No.

11      Q.    Turning back to page 6 of the document,

12   it states, "As a member of the board of trustees and

13   as a physician, Dr. Robie has contributed his

14   medical knowledge to board deliberations.  Dr. Robie

15   will testify to the medical knowledge he has shared

16   with other board members."

17            Is that correct?

18      A.    Yes.

19      Q.    What medical knowledge have you shared

20   with other board members?

21      A.    Most recently, the coverage of

22   continuous glucose monitors for diabetic patients.

23      Q.    Anything else?

24      A.    Some discussion of the biological agents

25   for cancer treatment.

1      Q.    Any other medical knowledge you've
2    shared since joining the board?
3      A.    Not that I recall.
4      Q.    How did you share this information with
5    other board members?  Was it at a board meeting?
6      A.    Yes.
7      Q.    Which board meeting was it at?
8      A.    Continuous glucose monitors has been
9    over the last three or four board meetings as an
10   agenda item.
11     Q.    What about the information regarding
12   cancer treatment?
13     A.    Those were agenda items for board
14   approval to cover the medicines.
15     Q.    Were there any other board meetings
16   where you shared this information?
17     A.    No.
18     Q.    What about outside of board meetings?
19     A.    No.
20     Q.    Apart from the information regarding
21   diabetic treatment and cancer treatment, is there
22   any other medical knowledge that you have shared
23   with the board since joining the board of trustees?
24     A.    I'm sure there has been, I just can't
25   recall the specifics today.

1          Q.    If anything else comes to mind today,

2     will you let me know?

3          A.    Yes.

4          Q.    With which board members did you share

5     this information?

6          A.    All the board members in attendance at

7     the meetings that I talked.

8          Q.    With regard to the medical knowledge you

9     have shared with other board members, is there any

10    other testimony that you could provide on this

11    topic?

12         A.    No.

13         Q.    Staying on page 6 of the document, it

14    states that you will testify, "In order to provide

15    diagnostic and medical treatment that meets a

16    professional standard of care, primary care

17    physicians must know the chromosomal sex of

18    patients."  Is that right?

19         A.    Yes, I see it.

20         Q.    What expert testimony can you provide on

21    this topic?

22         A.    Situations where it would be important

23    for the treating provider to know the chromosomal

24    sex of a patient.

25         Q.    When is it important for a treating

1    the patient for the three conditions you mentioned

2    here?

3         A.    I would be more concerned about ovarian,

4    uterine cancers in a chromosomal female.

5    Chromosomal male would be testicular cancer.  The

6    potential workup and treatment with each condition

7    is very different.

8         Q.    How would that affect the care you give

9    to the patient?

10        A.    Delay in diagnosis.

11        Q.    Is there anything else that affects the

12    care you give the patient?

13        A.    No.

14        Q.    In your practice, do you confirm the

15    chromosomal makeup of your patients?

16        A.    No.

17        Q.    When did you first form the opinion that

18    primary care physicians must know the chromosomal

19    makeup of their patients?

20        A.    When this case was brought up.  When I

21    say case, I mean the legal action that you are a

22    part of.

23        Q.    Do you recall the year?

24        A.    Of this individual that I saw?

25        Q.    I'm sorry, I didn't catch that.

1          A.    Would you ask the question a little more

2     specifically, I'm sorry.

3          Q.    You said that you formed the opinion

4     that physicians must know the chromosomal makeup of

5     their patient when this case was brought up.  Do you

6     recall the year that you formed that opinion?

7          A.    It was the year the case was filed.  So

8     I'm going to guess 2019.

9          Q.    Apart from what you mentioned in terms

10    of delayed diagnosis, are there any other harms that

11    you believe stem from primary care physicians not

12    knowing their patients' chromosomes?

13         A.    No.

14         Q.    We've been going for about a half-hour

15    now.  Let's take a quick five-minute break and

16    return in five minutes.

17         A.    Okay.

18               MS. RAVI:  Off the record.

19            (Recess taken.)

20               MS. RAVI:  Before we proceed, will

21         counsel for the defendant stipulate that the

22         board intends to maintain its attorney/client

23         privilege as to the closed sessions that

24         occurred at board meetings in October 2018 and

25         thereafter?

1          MR. WILLIAMS:  Yes.

2      Q.    Dr. Robie, turning back to page 6 of

3    Exhibit 2, do you still have that in front of you?

4          MR. WILLIAMS:  Let me log back in.

5      A.    Okay, I have it.

6      Q.    With regard to the statement that,

7    "Dr. Robie will testify about the board's

8    consideration of request that the plan eliminate the

9    current coverage exclusion for gender transition

10   surgery and related hormone development," other than

11   what we've discussed today, is there any other

12   testimony that you intend to offer on this topic?

13         MR. WILLIAMS:  Objection to the

14         form of the question.

15     A.    The cost of the procedures.

16     Q.    Anything else?

17         MR. WILLIAMS:  Same objection.

18     A.    No.

19     Q.    Moving down, the document states,

20   "Dr. Robie has contributed his medical knowledge to

21   board deliberations.  Dr. Robie will testify to the

22   medical knowledge he has shared with other board

23   members."

24         Other than what we discussed today

25   regarding your discussions on treatment for patients

1  with diabetes and cancer treatment, is there any

2  other testimony you intend to offer on this subject?

3                    MR. WILLIAMS:  Objection to the

4       form.

5       A.    COVID management, plan for COVID care,

6  the status of COVID in the country, state.  I

7  mentioned earlier, I'm on the Forsyth County Board

8  of Health so I'm in the loop, if you will, with

9  boards of health, CDC and other agencies such as

10 the State Department of Health and Human Services.

11 So that was another topic I've spoken on to the

12 board.

13      Q.    Anything else?

14      A.    No.

15      Q.    With regard to your testimony that in

16 order to provide diagnostic and medical treatment

17 that meets the professional standard of care,

18 primary care physicians must know the chromosomal

19 sex of patients, with regard to that issue, apart

20 from the examples you mentioned regarding treatment

21 of patients with hemophilia, contacting patients'

22 families and your own experience with a patient in

23 the mid '90s, is there any other testimony that you

24 intend to offer on this topic?

25                    MR. WILLIAMS:  Objection to the

1      form.

2      A.    No.

3      Q.    Dr. Robie, are you familiar with the

4   World Professional Association for Transgender

5   Health Standards of Care for Treatment of Gender

6   Identification Disorder?

7      A.    Yes.

8      Q.    Do you have a position on the validity

9   of those standards of care?

10     A.    No.

11     Q.    Are you familiar with the American

12  Medical Association's Resolution 122 issued in 2008?

13     A.    May I see it?

14     Q.    Are you familiar with it?

15     A.    I believe, yes.

16     Q.    What is your understanding of that

17  resolution?

18     A.    I can't recall.

19     Q.    Are you familiar with the DSM 5, the

20  diagnostic and statistical manual of mental

21  disorders definitions?

22     A.    No.

23     Q.    Are you familiar with the Endocrine

24  Society Clinical Practice Guidelines on Treatment of

25  Gender Dysphoria Or Gender Incongruent Persons?

1          A.     No.

2          Q.     If you could please take a look at

3     what's been marked as Exhibit 3.

4                    (Exhibit 3, PLAN DEF0028665, marked

5          for identification, as of this date.)

6                    MR. WILLIAMS:  Okay.

7          Q.     Have you seen this document before?

8          A.     Yes.

9          Q.     What is this document?

10         A.     It's a statement from Treasurer Folwell,

11    coverage of sex change operations.

12         Q.     Did you discuss the statement with

13    Treasurer Folwell?

14                    MR. WILLIAMS:  Objection to the

15         form.

16         A.     Before its release or after its release?

17         Q.     Let's start with before its release.

18         A.     No.

19         Q.     Did you discuss this statement with

20    Treasurer Folwell after its release?

21         A.     The only discussion that I recall that

22    the board with me being on the board was that any

23    further discussion with people not on the board

24    would come through Treasurer Folwell's office, not

25    from us as individuals.

1      Q.    Apart from the statement itself, did you

2   discuss any of the content of the statement with

3   Treasurer Folwell?

4              MR. WILLIAMS:  Objection to the

5        form.

6      A.    No.

7      Q.    Have you ever had a conversation with

8   Treasurer Folwell regarding the medical necessity of

9   gender confirming care?

10     A.    No.

11     Q.    Can gender confirming care ever be

12  medically necessary for a patient?

13     A.    That decision is made by the provider,

14  patient's physician, and the patient together.  The

15  medical necessity is determined really at that

16  level.  To me, when the guidelines are issued by

17  organizations such as the American Medical

18  Association and the Society and so on, they are

19  guidelines.  The medical necessity is not

20  determined by the guidelines, it's determined by

21  the provider and the patient.

22     Q.    Is there ever a circumstance where a

23  provider and patient together could determine that

24  gender confirming care is medically necessary?

25             MR. WILLIAMS:  Objection to the

1       form.

2       A.    I don't know.

3       Q.    Going back to Exhibit 3, other than

4  Treasurer Folwell, did you discuss the contents of

5  this statement with anyone else?

6       A.    No.

7       Q.    Are you familiar with the Segal Company?

8       A.    No.

9       Q.    Are you aware of the total cost that the

10  plan incurred for covering gender confirming care in

11  2017?

12       A.    No.

13       Q.    I will ask you to take a look at what's

14  been marked as Exhibit 4.

15              (Exhibit 4, PLAN DEF0038905, marked

16       for identification, as of this date.)

17       A.    Okay.

18       Q.    Are you familiar with this document,

19  Dr. Robie?

20       A.    Yes.

21       Q.    What is this document?

22       A.    It's an e-mail on our last board meeting

23  sharing my thoughts about several e-mails that plan

24  members had sent to the board since their last

25  meeting.

1      Q.    This e-mail was sent by you on August
2   26, 2018; is that correct?
3      A.    Yes.
4      Q.    It was sent to Treasurer Folwell and to
5   Dee Jones?
6      A.    Yes.
7      Q.    Your e-mail states you looked into the
8   cost of covering transgender surgery by the State
9   Health Plan; is that correct?
10     A.    Yes.
11     Q.    What did you look into?
12     A.    I looked at the cost using my browser
13  search engine on the potential cost of transgender
14  surgeries and potentially how much that cost would
15  be to the plan.
16     Q.    What sources did you review?
17     A.    I'm sorry, what websites?
18     Q.    Yes.  Let's start with websites.  What
19  websites did you review on this issue?
20     A.    I don't recall.
21     Q.    Do you recall how many websites you
22  looked at?
23     A.    Five or six.
24     Q.    Do you recall any of the authors of the
25  contents you looked at?

1          A.     No.

2          Q.     Do you recall any of the dates that

3     content was made available?

4          A.     After our board meeting -- really before

5     our board meeting, in October 2018, and I looked at

6     it after Treasurer Folwell released the in

7     statement Exhibit 3, and then I reviewed it last

8     week.

9          Q.     Is it correct that as of the date of

10    your e-mail, August 26, 2018, you had already looked

11    at those five to six websites?

12         A.     Yes.

13         Q.     Do you recall anything else about the

14    websites you looked at?

15         A.     No.

16         Q.     Other than websites, did you look into

17    any other sources regarding the cost of covering

18    transgender surgery by the State Health Plan?

19         A.     I looked at what the city of San

20    Francisco plan was for covering transgender surgery

21    at that time.

22         Q.     You said that was the San Francisco

23    plan?

24         A.     The city of San Francisco, yes.

25         Q.     How did you get that information?

1        A.    Just search on my browser.

2        Q.    Was that one of the five or six websites
3    you looked at?

4        A.    Yes.

5        Q.    What did you learn about the San
6    Francisco plan?

7        A.    That up until, I believe, 2012 San
8    Francisco was giving plan members requiring gender
9    dysphoria treatment care a plan amount of money per
10   year and capped it at that amount of money.  I
11   don't remember what the amount was.  But the
12   follow-up study that I did showed that they dropped
13   that and now provide full coverage.

14       Q.    I'm sorry, I didn't catch that last
15   sentence.

16       A.    A follow-up study of the plan showed
17   that they had dropped that plan amount and now
18   provided full coverage for gender dysphoria.

19       Q.    Did you review that follow-up study?

20       A.    It wasn't a study, it was just a public
21   release by the city health plan.

22       Q.    With regard to your own searches into
23   the cost of covering this treatment, other than the
24   five to six websites you looked at, were there any
25   other sources that you looked at to learn this

1       information?

2              A.     No.

3              Q.     Your e-mail states that you were told

4       the average cost of this surgery was on the average

5       of $142,000; is that correct?

6              A.     Yes.

7              Q.     Who told you that?

8              A.     The websites.

9              Q.     Do you recall which website had that

10      figure?

11             A.     No.

12             Q.     Does this $142,000 refer to surgery for

13      a transgender male or transgender female?

14             A.     I believe it was not differentiated that

15      I recall.

16             Q.     What surgical procedures would be

17      included in this $142,000 amount?

18             A.     I believe I counted 20.  I'm trying to

19      remember what they were.  Scalp surgery, eye

20      surgery, eyebrow surgery, forehead surgery, ear

21      surgery, two nose procedures, one on the bridge of

22      the nose, one on the nose itself, lip surgery, chin

23      surgery, cheek surgery, Adam's apple surgery,

24      breast augmentation or breast removal surgery,

25      genital surgery, surgery on the buttocks and on the

1    hips, one's going male to female to get the hour

2    glass shape to the top of the body.  Those are the

3    surgeries.  There are also websites included in the

4    cost.  Speech therapy to speak more like the

5    opposite sex.  Walking therapy.  And then, of

6    course, psychological therapy and medication

7    coverage.

8         Q.    Those are the surgical procedures that

9    would be included within this $142,000 average cost?

10        A.    Yes.

11        Q.    Are there any other surgical procedures

12   that you --

13        A.    There may be, I don't know if there are

14   any more but there may be.

15        Q.    You stated that you were told there is

16   an additional cost of 71,000 for breast augmentation

17   for male to female transgender surgery; is that

18   correct?

19        A.    I think that was -- the answer is yes, I

20   was for people that just wanted that surgery.  From

21   what I gathered reading websites, not all

22   transgender individuals want all 20 operations.

23   They want certain operations and not others.  So if

24   they're getting just that, that's the cost I saw

25   quoted.

1    Q.    So to clarify, you mentioned earlier

2    that the $142,000 figure could include breast

3    augmentation surgery.  Is that cost included within

4    the 142,000 or is that a separate $71,000 cost --

5    A.    That's included in the cost of the

6    142,000.

7    Q.    Are there any other surgeries that you

8    are aware of that would go into this cost that you

9    were referencing in October 2001?

10    A.    The electrolysis for hair removal.

11    Q.    Anything else?

12    A.    No.

13    Q.    With regard to the cost of breast

14    augmentation surgery, other than the information

15    that you learned from these websites that you looked

16    at, have you ever otherwise researched the cost of

17    the surgery yourself?

18    A.    No.

19    Q.    Have you ever consulted with other

20    medical providers on how much that particular

21    surgery might cost?

22    A.    For gender dysphoria or any other

23    conditions?

24    Q.    Let's start with just gender dysphoria.

25    A.    No.

1      Q.    What about for other conditions?

2      A.    It's really determined by the insurance

3  coverage.

4      Q.    How is the cost of the surgery

5  determined by the insurance coverage?

6      A.    I don't know.

7      Q.    So there's a particular cost of surgery

8  for the surgery and that surgery is determined by a

9  process that includes consideration of insurance

10  coverage?

11      A.    Yes.

12      Q.    But you're not aware of how the

13  insurance coverage plays into the determination of

14  the cost?

15      A.    Yes.

16      Q.    I will ask you to please take a look at

17  what's been marked as Exhibit 5.

18                (Exhibit 5, PLAN DEF0033668, marked

19         for identification, as of this date.)

20      A.    Okay, I have it.

21      Q.    Are you familiar with this document?

22      A.    Yes.

23      Q.    Is this an e-mail exchange between you,

24  Treasurer Folwell and Dee Jones on October 25, 2018?

25      A.    Yes.

1     Q.    You stated that you were asked by a

2  reporter for an interview about the board's attitude

3  about coverage for transgender surgery; is that

4  correct?

5     A.    Yes.

6     Q.    You responded that in the interview you

7  had focused on the cost of the surgery and how we

8  are trying to control cost; is that right?

9     A.    That's what I said.  The interview did

10  not take place.

11     Q.    When you referred to, "We are trying to

12  control cost," who were you referring to there?

13     A.    The State Health Plan.

14     Q.    At this time in October 2018, what was

15  your understanding of the cost of surgery for gender

16  confirming care?

17     A.    The numbers that we just discussed,

18  142,000.

19     Q.    And those numbers were based on research

20  you did prior to your August 2018 e-mail exchange

21  that we just looked at?

22     A.    Yes.

23     Q.    Was there any other time when you

24  researched the cost of gender confirming care?

25     A.    No.

Case 1:19-cv-00272-LCB-LPA   Document 203-1   Filed 02/02/22   Page 44 of 69

1          Q.     Have there been any other sources that
2     you have consulted regarding the cost of gender
3     confirming care?
4          A.     No.
5          Q.     I will ask you to take a look at what
6     has been marked as Exhibit 6 please.
7                        (Exhibit 6, PLAN DEF0079132, marked
8          for identification, as of this date.)
9          A.     Okay.
10         Q.     Have you seen this document before?
11         A.     No.
12         Q.     Does this appear to be a compilation of
13    articles mentioning or relevant to the North
14    Carolina State Department of the Treasurer
15    circulated on October 25, 2018?
16         A.     Yes.
17         Q.     Around October 22, 2018, did you attend
18    a board of trustees meeting?
19         A.     I don't remember.
20         Q.     You mentioned earlier regarding the
21    board's consideration of request to lift the
22    exclusion that there was some testimony at a meeting
23    around October 2018.  Do you recall that?
24         A.     Yes.
25         Q.     Was that a board of trustees meeting?

1    A.    It was an open public session of the

2    board of trustees meeting, for the public to make

3    presentations.

4    Q.    Do you recall speaking at that meeting?

5    A.    Yes.

6    Q.    Did you speak about your own experience

7    with the cost of surgery for gender confirming care?

8    A.    Yes.

9    Q.    Did you speak on any other subject at

10   that meeting?

11   A.    At the open public session?

12   Q.    Yes.

13   A.    Not that I recall.

14   Q.    What did you say about your own

15   experience with the cost of surgery for gender

16   confirming care?

17   A.    Several years before I had a transgender

18   male that had no insurance, was at an age where if

19   he was going to have the transgender surgery he

20   figured that would be the time to do it, the issue

21   was approaching so we looked into the cost, what we

22   thought would be the cost for him with that

23   insurance to have the surgery.  At that time, I

24   came up with that figure of 140,000 roughly.  And

25   when he heard that, he decided not to proceed

1    further.

2         Q.    What was the year in which you were

3    having that conversation with the individual

4    thinking about surgery?

5         A.    I don't recall.

6         Q.    It was sometime prior to 2018?

7         A.    Yes.

8         Q.    Do you recall approximately how long

9    prior to 2018 you had that discussion with a

10   patient?

11        A.    It would be a guess, but I would guess

12   10 years.

13        Q.    If you could turn to the page marked

14   PLAN DEF 79138.

15        A.    Yes.  I have it.

16        Q.    The first two paragraphs under "De

17   Minimus," is that an accurate representation of your

18   statements at that October 2018 meeting?

19        A.    To my memory, yes.

20        Q.    Your statement that the cost for

21   uninsured patients for counseling, medication,

22   surgery and follow up was $140,000, how did you come

23   to an understanding of those costs?

24        A.    We did a browser search, and I believe I

25   checked with the Duke Medical Center Transgender

1    Center which I believe was operational at that time

2    for uninsured patients, those were the numbers I

3    recall being quoted.

4         Q.    Was this browser search separate from

5    the search we discussed prior to your August 2018

6    e-mail?

7         A.    Yes.

8         Q.    When did you do this browser search?

9         A.    2008.

10        Q.    2008?

11        A.    Yes.

12        Q.    What websites did you review in your

13   search in 2008?

14        A.    I don't remember.

15        Q.    Were there any other sources you

16   reviewed in 2008?

17        A.    No.

18        Q.    With regard to your outreach to -- you

19   said it was the Duke Medical Center?

20        A.    To my memory, yes.

21        Q.    Was that also in 2008?

22        A.    Yes.

23        Q.    Who did you talk to there?

24        A.    I didn't.  I looked at their website.

25        Q.    What did their website say about the

1    cost for counseling, medication, surgery and

2    followup?

3        A.    For uninsured patients, that was the

4    number that was provided to my memory.

5        Q.    Were there any other sources that you

6    consulted to get to this estimate of $140,000?

7        A.    No.

8        Q.    Other than the search you conducted in

9    2008, and the search we discussed that you conducted

10   prior to your e-mail in August 2018, was there any

11   other time that you researched the cost of gender

12   confirming care?

13       A.    Yes.

14       Q.    When was that?

15       A.    Yesterday.

16       Q.    What did you look at yesterday?

17       A.    Websites.

18       Q.    Which websites did you look at

19   yesterday?

20       A.    I looked at several.  The one that comes

21   to mind was the Philadelphia Center for Gender

22   Translational Surgery -- that may not be a totally

23   accurate rendition, but it was Philadelphia based

24   transgender surgical site.

25       Q.    Any other websites that you looked at

1    yesterday?

2          A.    I did, but I don't recall their names.

3          Q.    Do you remember how many websites you

4    looked at yesterday?

5          A.    Three.

6          Q.    One was the Philadelphia center and two

7    others?

8          A.    Yes.

9          Q.    Other than in 2008, around August of

10   2018, and yesterday, any other time you looked into

11   the cost of gender confirming care?

12         A.    No.

13         Q.    Let's go back to PLAN DEF 7913.  Do you

14   still have that in front of you?

15                    MR. WILLIAMS:  79138?

16                    MS. RAVI:  That's right.

17                    MR. WILLIAMS:  Yes.

18         Q.    At the October 2018 meeting, did you

19   also state that the cost for male to female

20   transgender breast augmentation was $60,000?

21         A.    Yes.

22         Q.    How did you come to the understanding of

23   that cost?

24         A.    My memory is that that was the cost

25   quoted at one of the websites for uninsured

1       patients.

2              Q.     Was that one of the websites you looked

3       at in 2008?

4              A.     No.

5              Q.     When did you look at that website?

6              A.     The one we're talking about that I just

7       mentioned in this document?

8              Q.     That's right.

9              A.     In October 2018.

10             Q.     In October 2018, were you researching

11      the cost of gender confirming care?

12             A.     Yes.

13             Q.     Was this separate from what you had

14      looked at in August of 2018?

15             A.     I believe it was the same browser

16      search, clicking on websites, it may have been

17      different websites.

18             Q.     Do you remember which website had this

19      information?

20             A.     No.

21             Q.     Other than the websites we've discussed,

22      is there any other source that you have consulted

23      with regarding the cost of gender confirming care?

24             A.     No.

25                    MR. WILLIAMS:  Objection to the

1          form of the question.

2          A.     No.

3          Q.     Have you spoken with anyone about this

4     cost?

5          A.     No.

6          Q.     Regarding the statement that the cost

7     for an insured patients for counseling, medication

8     and surgery and followup was $140,000, what is the

9     counseling referred to in your statement?

10         A.     Pre-surgical counseling for a year and

11    counseling after the surgery.

12         Q.     How much does that counseling cost?

13         A.     I don't remember.

14         Q.     Are you aware of whether the plan

15    currently covers counseling for treatment of gender

16    dysphoria?

17         A.     I believe they do not.

18         Q.     With regard to the medication referred

19    to in your statement, what medication is being

20    referred to there?

21         A.     Hormone therapy.

22         Q.     Any other medication?

23         A.     Psychiatric medication, antidepressants.

24         Q.     Anything else?

25         A.     Not that I can think of.

1        A.    I don't remember.

2        Q.    Do you remember when you received that

3    information?

4        A.    No.

5        Q.    In your statement you refer to followup.

6    What is that followup you're referring to?

7        A.    Surgical followup for potential

8    complications from the surgery plus psychological

9    followup.

10       Q.    Are you aware of the prevalence of

11   individuals in North Carolina who identify as

12   transgender?

13       A.    Last night when I was reading one of the

14   websites for cost, I think I saw the figure

15   estimated of 45,000 individuals in the State of

16   North Carolina that are transgender.

17       Q.    Which website was that?

18       A.    I don't remember.

19       Q.    When did you look at that website?

20       A.    Yesterday.

21       Q.    So this was one of the three websites

22   you reviewed yesterday?

23       A.    Yes.

24       Q.    Do you remember the author of the

25   material you looked at?

1          A.    No.

2          Q.    How long did you spend reviewing that

3    website?

4          A.    I don't remember.

5          Q.    Are you familiar with the number of

6    North Carolina State Health Plan members who are

7    expected to use coverage for gender dysphoria?

8                      MR. WILLIAMS:  Objection to the

9          form of the question.

10         A.    No.

11         Q.    Yesterday when you were looking at the

12   three websites you mentioned, how long did you spend

13   looking at them?

14         A.    Half an hour.

15         Q.    You mentioned that you also looked into

16   this issue in around August of 2018.  Do you recall

17   how long you spent looking into the issue at that

18   time?

19         A.    No.

20         Q.    What about in 2008?

21         A.    I don't remember.

22                      MS. RAVI:  Off the record.

23                      (Discussion off the record.)

24         Q.    Dr. Robie, are you aware of whether the

25   plan negotiates rates with medical providers?

1    the hospital, total cost for each procedure.

2         Q.    What were the procedures listed on the

3    Philadelphia website?

4         A.    Pretty much the ones that I mentioned

5    earlier.  Do you want me to go through them again?

6         Q.    Yes, please.

7         A.    Scalp surgery, eye surgery, eyelid

8    surgery, forehead surgery, eyebrow surgery.  Two

9    nose operations, bridge of the nose and the nose

10   itself.  Teeth surgery, chin surgery.  Ear surgery.

11   Adam's apple surgery.  Breast augmentation or

12   removal surgery.  Genital surgery.  Surgery on the

13   buttocks and hip to get the hour glass figure for

14   female.  And I forgot -- electrolysis for hair

15   removal.

16        Q.    Are you aware whether these procedures

17   were covered in 2017 by the plan?

18        A.    No.  I don't know.

19        Q.    Are you aware of whether any of the

20   procedures you just mentioned were not covered by

21   the plan in 2017?

22        A.    I don't know.

23        Q.    With regard to your estimate of

24   $140,000, does that cover all of the procedures that

25   you just mentioned?

1              MR. WILLIAMS:  Objection to the

2       form.

3       A.    It covers the procedures, I don't recall

4  if it also covers the counseling and the hormone

5  therapy.  I think it did not.  These were surgical

6  procedures.

7       Q.    Are you aware of whether a person

8  seeking gender confirming care would receive all of

9  the procedures that you just listed?

10             MR. WILLIAMS:  Objection to the

11       form.

12       A.    From what I saw on the websites, some

13  choose a few procedures, it's very patient

14  specific.

15       Q.    So is it the case that a person seeking

16  gender confirming care might not choose all of these

17  procedures?

18       A.    Yes.

19       Q.    But the cost of them, your understanding

20  based on the websites you reviewed is that the cost

21  of all these procedures together totals $140,000?

22       A.    The one in Philadelphia yesterday was

23  184,000.  One would assume that if the plan covered

24  transgender surgery, we would have a mix of

25  patients wanting a few procedures, moderate number

1  firm Bell Davis & Pitt and I'm one of the

2  attorneys for Mr. Folwell, Ms. Jones and the

3  State Health Plan.

4        With apologies to everybody, I will

5  bounce around a little bit to clean up some

6  areas.

7  EXAMINATION BY

8  MR. WILLIAMS:

9  Q.    Dr. Robie, I will start by asking you

10  this question.  We looked at some -- an e-mail

11  earlier where Treasurer Folwell used the word

12  elective.  We talked a little bit about medical

13  necessity.  And I wonder if you can just provide

14  some context as to what that means to you as an

15  internist and someone who has been practicing in the

16  medical field for over 40 years?

17  A.    Well, it's an issue I deal with

18  everyday.  I mentioned earlier, I'm one of the

19  medical directors of the community care center plus

20  I work in the urgent care centers and minor

21  emergency rooms in Winston-Salem.  I've been

22  working several days this month and will work

23  everyday at the end of the month.  We have people

24  come in with COVID, with low oxygen levels, that's

25  an emergency, that's not an elective problem,

1    that's something that needs to be addressed right

2    then and there, and we do that.  As opposed to

3    somebody coming in with, relevant to what we're

4    talking about, need for plastic surgery procedure,

5    that's not something that needs to be done to save

6    your life that day.  That's something that is

7    elective which means it could be scheduled at an

8    opportune time for the patient and surgeon.  As you

9    probably know, many medical centers have actually

10   had to hold off on elective surgery because of the

11   COVID crisis.  Transgender surgery would fall in

12   that category, elective, wait until the COVID

13   crisis calms down before they will proceed.

14          The only thing about elective surgery,

15   we're talking plastic surgical procedures in

16   transgender surgery, and you're cutting across

17   normal tissue, really you're treating a

18   psychological issue, major psychological issue, by

19   cutting on normal tissues.  So you're having an

20   elective procedure where you're cutting on normal

21   tissues to treat a psychological condition that

22   could be very significant, but I just want the

23   surgical procedure to be viewed in that mindset.

24          You know, I've been the head of -- one

25   of the medical directors for the community care

1    the same kind of numbers.  That's what's surprising

2    to me, that the cost is, to me, very high.

3         Q.    Dr. Robie, remind us how long have you

4    been a practicing physician?

5         A.    Since 1976.  45 years.

6         Q.    I believe your testimony was that in

7    2008 you probably spent about an hour doing this

8    internet research, same thing for 2018, maybe about

9    an hour doing this research, and then yesterday you

10   spent maybe 30 minutes; is that correct?

11        A.    Right.

12        Q.    So based on your 45, 46 years of

13   experience as a physician, combined with the

14   research -- internet research that you did, did

15   you -- were you able to reasonably conclude that

16   those figures that you were using were pretty close?

17        A.    Yes.

18        Q.    Did you determine that the websites that

19   you were visiting and information that you were

20   gathering were both reasonable and reliable to lead

21   you to conclude that those cost approximations were

22   reasonable and accurate?

23        A.    Yes.  What struck me is how the numbers

24   haven't changed.  Over 13 years.

25        Q.    One thing we haven't touched on today

1    is, as a physician, your concerns potentially about

2    adolescents receiving transgender treatments.  Can

3    you speak a little bit to that?

4         A.    Well, yes.  The human brain in an

5    adolescent is not fully developed.  I think the

6    current thinking is that in young women, the brain

7    is fully developed by age 21, and the young male or

8    young man would be 25 before the brain is fully

9    developed.  So looking at an adolescence brain, it

10   changes dramatically from year to year.  To have an

11   adolescent undergo irreversible drug treatment or

12   surgery for gender dysphoria to me is really not

13   ethically appropriate because who you're talking to

14   at age 16 may be different at age 18.

15              I have a little personal experience with

16   that.  I was friends, not the doctor, but I was

17   friends with a couple who had a child at age 16

18   undergo transgender surgery, graduated high school,

19   went off to college.  After a year, had to be

20   treated for severe depression, at age 19 had to

21   hospitalized.  One of the issues that caused the

22   depression was that the transgender may have been a

23   mistake.  That's got to happen.  I don't know that

24   the -- I guess publicized, but it's common sense is

25   going to tell you when you deal with an age group

1    for counseling as a measure of success goes up

2    after transgender surgery, and if you're doing

3    operations mainly for psychological benefits and

4    then your counseling needs to increase after the

5    surgery, are you really succeeding.  I think that's

6    what he is quoting about some uncertainty.

7         Q.   Do you recall having a specific

8    conversation with Treasurer Folwell about this

9    concept of medical uncertainty has never been

10   greater in or around October 2019?

11        A.   I may have, but I don't recall it as I

12   sit here at the moment.

13        Q.   So you don't recall a specific

14   conversation but it's certainly possible?

15        A.   It's possible.  But my emphasis is the

16   cost of the procedure, trying to have a fiduciary

17   duty of prudence to the plan members, to spend that

18   much money on a small group of individuals versus

19   spending that money on a large group of individuals

20   before proving benefit is my concern.

21        Q.   Last topic I think.

22           I want to take you back, teleport you

23   back to October 2018 and the board meeting where

24   Mr. Kadel and others made presentations during the

25   public session to the board meeting.

1       A.      Yes.

2       Q.      The best you can recall, I would like

3   for you to recount for the group what that

4   presentation, what you recall from that presentation

5   and what you recall saying to these folks who were

6   presenting and to the rest of the board in the open

7   session of the board meeting.

8       A.      I do recall there was a group, I think

9   there was about five of them, they had an attorney.

10  I believe the attorney made an opening statement

11  requesting that the board of trustees approve

12  covering for transgender surgery.  Mr. Kadel then

13  came and talked.  My memory is that he spoke very

14  eloquently.  I think he was a music major at UNC.

15  That's my memory.  But he was very eloquent in what

16  he was saying.  In that mix was a mother and father

17  talking on behalf their teenage child to have

18  transgender surgery.  I believe the mother was a

19  nurse, if my memory serves, or in the medical

20  healthcare field I think, was a little more upset

21  that it was not covered.

22          After the board meeting was over with,

23  that group had a press conference, some people of

24  the press there, I was not party to what they were

25  saying, they did talk to the press afterwards, I

1    think the attorney was the main one I recall
2    talking to the press, and they had the group
3    picture taken.  That's what I recall.
4         Q.    Do you remember addressing the group of
5    presenters during open session?
6         A.    Yes.  About the fact the person I had in
7    2008 searching for the cost for an uninsured person
8    to have transgender surgery, female to male, that's
9    where I got those numbers originally.  They took
10   one look at that and said it's too much money, I
11   don't have it.
12        Q.    That's the testimony that you gave
13   earlier about the cost?
14        A.    Right.
15        Q.    Dr. Robie, I'm going to refer you to
16   Exhibit 5.
17        A.    Okay.
18        Q.    I want to refer you to two e-mails in
19   this chain.  There's an original e-mail from you,
20   this is at the bottom of the page, that e-mail is
21   from you to Treasurer Folwell with a copy to -- we
22   can't see but presumably it's a copy to Dee Jones,
23   and Mr. Folwell responds to you and we can see the
24   response is copied to Dee Jones; correct?
25        A.    Right.

1      Q.    Your e-mail is October 25, 2018 at 9:40
2  a.m.  This is when you had been approached by North
3  Carolina Policy Watch for an interview that you
4  testified earlier never happened; is that correct?
5      A.    Correct.
6      Q.    My only question with respect to this
7  e-mail is the very last part, the last sentence, it
8  says, "Let me know if you were okay with this PR."
9  What does PR mean in that e-mail?
10      A.    Those are my initials, Pete Robie.  It
11  doesn't mean public relations, it means PR, Pete
12  Robie.  Those are my initials.
13              MR. WILLIAMS:  Off the record.
14          (Recess taken.)
15      Q.    Dr. Robie, thank you for your time today
16  and we have no further questions.
17              MS. RAVI:  Off the record.
18          (Recess taken.)
19  FURTHER EXAMINATION
20  BY MS. RAVI:
21      Q.    Dr. Robie, I have just a few follow up
22  questions for you.  You were discussing earlier
23  elective treatment and you gave an example of life
24  saving treatment that was not elective.  Is it the
25  case that elective surgery is something you consider

1    doctor, provider and the patient, medical

2    necessity.  So the answer is it depends on

3    doctor/patient relationship to make that

4    relationship.

5         Q.    So is it correct that some elective care

6    can be medically necessary as determined by the

7    doctor/patient --

8         A.    If that's determined, the answer is yes.

9         Q.    You also testified earlier regarding

10   knowledge of chromosomal makeup of patients.

11        A.    Correct.

12        Q.    In your practice, do you ask your

13   patients about their gender identity?

14        A.    They are now asked as a standard screen

15   on intake, every patient.  We use the Epic

16   electronic medical record and they do have a

17   section on just that question.  What do you

18   consider your identity.  Cis male, cis female,

19   trans male, trans female.  There are so many

20   variations I forget what the others they ask.  Not

21   sure.  But that question is standard.  So the

22   answer is yes, all of them are asked.

23        Q.    When did you start asking your patients

24   that question?

25                   MR. WILLIAMS:  Objection to the

1          form of the question.

2          A.    It was not up to me to make that

3     decision, it was up to the Wake Forest Baptist

4     Medical Center and the Novant Health System -- Epic

5     updated their software to include those questions

6     when that happened.  I don't recall.  But I know

7     it's been asked for several months now.

8          Q.    I'm sorry, did you say several months

9     now?

10         A.    Yes.

11         Q.    Do you ask your patients in your

12    practice about their chromosomal makeup?

13         A.    Only if the nurse says I need to.  I

14    can't recall recently where I've been asked to do

15    that.

16         Q.    When does a nurse tell you that you need

17    to?

18         A.    If the patient's not comfortable

19    expressing that they're trans male or trans female

20    to the nurse.  You know, a lot of human

21    communication is non-visual.  So the patient may

22    say I'm a cis male but the way they say it to the

23    nurse that there's some uncertainty about this, so,

24    Dr. Robie, would you follow-up on that and try and

25    establish what's going on.

1    Q.    Separate from asking patients about

2  their gender identity, do you ask patients about

3  their chromosomal makeup?

4    A.    No.

5    Q.    Are you aware of whether emergency rooms

6  perform chromosomal testing before providing care?

7    A.    Well, the chromosomal testing is not a

8  quick test.  I think it's 24, 48 hours.  If they

9  order it, it won't be any help if they have an

10  immediate emergency, life threatening emergency.

11    Q.    So is it the case then that an emergency

12  room would not provide that test before providing

13  emergency care?

14    A.    Yes.

15    Q.    You've been practicing as a primary care

16  physician for 45 years; is that correct?

17    A.    Yes.

18    Q.    In that time, how many transgender

19  patients have you treated?

20    A.    That I've knowingly treated.  Four come

21  to mind.  But I'm sure there were others that I was

22  not aware were transgender.

23    Q.    Of those four, how many were adults?

24    A.    All four.

25    Q.    Have you ever treated a transgender

1    adolescent?

2         A.    No.

3         Q.    Have you ever treated a transgender

4    child?

5         A.    No.

6         Q.    Thank you very much.  I have no further

7    questions.

8                   MR. WILLIAMS:  Nothing further from

9         me.

10                  MR. MCINNES:  No questions on

11        behalf of the North Carolina Department of

12        Public Safety.

13                  THE REPORTER:  Would you like a

14        copy of the transcript, Ms. Ravi?

15                  MS. RAVI:  Yes, please.

16                  THE REPORTER:  Would you like a

17        copy of the transcript, Mr. Williams?

18                  MR. WILLIAMS:  Just however they

19        have been sent before, yes.

20                  THE REPORTER:  Would you like a

21        copy of the transcript, Mr. McInnes?

22                  MR. MCINNES:  Yes, e-Tran please.

23          (Deposition concluded at 1:07 p.m.)

24               (Signature reserved)

25


**From:** Peter Robie <pwrobie@gmail.com>
**Sent:** Sun, 26 Aug 2018 10:55:01 -0400
**To:** Dee Jones <dee.jones@nctreasurer.com>
**CC:** Dale.Folwell@nctreasurer.com
**Subject:** Emails since our last board meeting

I'd like to share some thoughts on several emails members have sent to the board since the last meeting, in preparation for the meeting this Thursday. An early email was limiting the cost of an insulin pump for juvenile diabetics. The writer implied that juvenile diabetics were not at fault for their diabetic state as opposed to adult onset diabetics. I think if a deductible change is made for insulin pump diabetics it should apply to all diabetics not just juvenile onset diabetics. I suspect this would be cost prohibitive and not an option the board should pursue. On a similar line there was a request to cover transgender surgery by the state health plan, claiming not doing so was discriminatory. I looked into the cost of such surgery and was told it was on average $142,000, with an additional cost of $71,000 for breast augmentation for male-to-female transgender surgery I don't think the plan can absorb such costs and I think we should decline coverage because of this. I got the impression there may be legal action taken against the state health plan if we don't cover transgender surgery but on a cost basis alone I don't think we can afford it. Another member decried the cost of taking his son to the ER late at night and having to pay a four figure charge for the visit after the state health plan discount was applied. This problem is not a state health plan issue but just the effects of unavailable urgent care coverage at night. One member decried the limitation on pain med limitations-I reviewed the NC medical board's position paper on opioid prescribing and the BCBS coverage is entirely in keeping with current opioid prescribing practices-perhaps that member should be directed to a pain clinic to explore nonopioid options for chronic pain. Finally a member requested that the plan cover CPAP supplies more generously. I agree with her that we should look into that, perhaps at a board meeting if you think the board should make a decision. The other emails I think were handled fine by your excellent staff. See you Thursday! Pete Robie MD

PLAN DEF0038905