# EXHIBIT A

Declaration of Omar Gonzalez-Pagan in support of
Motion to Exclude Expert Testimony of Dr. Paul W. Hruz
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA (M.D.N.C.)

1          IN THE UNITED STATES DISTRICT COURT FOR

2           THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4     MAXWELL KADEL, et al.                )

5                                          )

6        Plaintiffs                        )

7                                          ) Cause No.

8     vs.                                  ) 1:19-cv-00272-

9                                          ) LCB-LPA

10    DALE FOLWELL, et al.                 )

11                                         )

12       Defendants                        )

13

14        VIDEO ZOOM DEPOSITION OF DR. PAUL W. HRUZ

15            Taken on behalf of the Plaintiffs

16                 September 29, 2021

17

18              Sheryl A. Pautler, RPR,

19           MO-CCR 871, IL-CSR 084-004585

20

21     (The proceedings began at 9:31 a.m. Eastern.)

22

23

24

25

Case 1:19-cv-00272-LCB-LPA   Document 205-2   Filed 02/02/22   Page 2 of 112

1    QUESTIONS BY:                            PAGE
2    Mr. Gonzalez-Pagan                         8
3    Mr. Knepper                              269
4    Mr. Gonzalez-Pagan                       295
5
6                    INDEX OF EXHIBITS
7    NO.                                 PAGE MKD.
8    Exhibit 1   (Expert report.)            11
9    Exhibit 2   (November 26, 2017,
                  transcript.)                13
10
     Exhibit 3   (July 16, 2018, transcript.)  15
11
     Exhibit 4   (Publication of the National
12                Catholic Bioethics Center.)   51
13   Exhibit 5   (Endocrine Society guidelines.) 86
14   Exhibit 6   (Press release.)              95
15   Exhibit 7   (Thomas Insel statement.)    115
16   Exhibit 8   (Article on adolescent
                  health medicine and
17                therapeutics.)              122
18   Exhibit 9   (Adolescent Health, Medicine
                  Therapeutics article.)      123
19
     Exhibit 10  (APA Official Actions.)      167
20
     Exhibit 11  (Resolution by the American
21                Psychological Association.)  168
22   Exhibit 12  (Understanding the Well
                  Being of LGBTQI Plus
23                Population.)                 170
24   Exhibit 13  (Medical Treatment Methods
                  for Dysphoria Related to
25                Gender Variance in Minors.)  196

1                    INDEX OF EXHIBITS CONTINUED
2      NO.                                      PAGE MKD.

3      Exhibit 14  (November 18, 1994, Food and
                    Drug Administration notice.)  212
4

       Exhibit 15  (Understanding and Approved
5                   Use of Approved Drugs
                    Off-Label.)                   214
6

       Exhibit 16  (Off-Label, Investigational Use
7                   of Marketed Drugs, Biologics
                    and Medical Devices.)         215
8

       Exhibit 17  (Off-Label Use of Drugs
9                   in Children.)                 217
10     Exhibit 18  (2019 Journal of the
                    Endocrine Society article.)   230
11

       Exhibit 19  (Declaration of Norm Spack
12                  in the Adams case.)           248
13     Exhibit 20  (The use of Cross-Sex Steroids
                    in the Treatment of Gender
14                  Dysphoria article.)           255
15

       Exhibit 21  (Doe v. Boyertown Area School
16                  District amicus brief.)       266
17     Exhibit 22  (Hisle-Gorman article.)        270
18     Exhibit 23  (2019 Goddings article)        288
19
20              (Exhibits attached to transcritp.)
21
22
23
24
25

1          IN THE UNITED STATES DISTRICT COURT FOR
            THE MIDDLE DISTRICT OF NORTH CAROLINA
2

    MAXWELL KADEL, et al.                    )
3                                            )
        Plaintiffs                           )
4                                            ) Cause No.
    vs.                                      ) 1:19-cv-00272-
5                                            ) LCB-LPA
    DALE FOLWELL, et al.                     )
6                                            )
        Defendants                           )
7

8              VIDEO ZOOM DEPOSITION OF WITNESS, DR. PAUL
9          W. HRUZ, produced, sworn, and examined on the
10         29th day of September, 2021, between the hours
11         of nine o'clock in the forenoon and eight
12         o'clock in the afternoon of that day, via
13         Veritext Zoom, before SHERYL A. PAUTLER, RPR,
14         Certified Shorthand Reporter within and for the
15         State of Illinois and Certified Court Reporter
16         within and for the State of Missouri, in a
17         certain cause now pending before the United
18         States District Court for the Middle District
19         of North Carolina, wherein MAXWELL KADEL, et
20         al. are the Plaintiffs, and DALE FOLWELL, et
21         al. are the Defendants.
22
23
24
25

```
 1                A P P E A R A N C E S
 2          For the Plaintiffs via Zoom:
 3                Mr. Omar Gonzalez-Pagan
                  Ms. Tara Borelli
 4                Lambda Legal Defense and
                  Education Fund, Inc.
 5                120 Wall Street, 19th Floor
                  New York, New York  10005
 6                212-809-0055
                  Ogonzalez-pagan@lambdalegal.orb
 7
 8          For the Defendants Dale Folwell, Dee Jones
            and North Carolina State Health Plan for
 9          Teachers and State Employees via Zoom:
10                Mr. John G. Knepper
                  Law Office of John G. Knepper
11                1720 Carey Avenue, Suite 590
                  Cheyenne, Wyoming  82002
12                307-632-2842
                  John@knepperllc.com
13
14          For the Defendant State of North Carolina
            Department of Public Safety via Zoom:
15
                  Mr. Alan D. McInnes
16                N.C. Department of Justice
                  114 West Edenton Street
17                Raleigh, North Carolina  27603
                  919-716-6529
18                Amcinnes@ncdoj.com
19
            The Court Reporter:
20
                  Ms. Sheryl Pautler
21                Veritext Legal Solutions
                  701 Market Street, Suite 310
22                St. Louis, Missouri  63101
                  314-241-6750
23
24
25
```

1    Q.   Okay.  What is a wet lab?

2    A.   A wet lab is really designating somebody

3    that does hands-on research usually with either

4    in-vitro or in-vivo studies, as opposed to a dry lab

5    which mostly does literature searches or computer

6    programming or things that do not involve

7    experimentation with -- the reason the term comes,

8    from wet reagents like buffers and solutions and

9    bodily fluids.

10    Q.   Is your research primarily conducted in a

11    wet lab?

12    A.   My -- until recently the vast majority of

13    my research has been conducted in a wet lab.  I have

14    participated on a few occasions in clinical trials

15    and have served as an adviser and consultant for

16    colleagues in those types of studies.

17    Q.   On how many occasions have you

18    participated in clinical trials?

19    A.   I never direct -- well, there was one

20    trial at Washington University where I was more

21    directly involved.  But all of -- as far as

22    principal investigator, all of my NIH funded

23    research and service as a principal investigator has

24    been done with my basic science research.

25    Q.   Would you agree that clinical trials is

1    not your area of expertise?

2            MR. KNEPPER:  Objection, form.

3        A.   I would not agree with that statement.  I

4    would say that I -- in the course of the last decade

5    that -- as I've been required to investigate the

6    literature surrounding this particular issue of

7    treatment of gender dysphoria, I have developed

8    considerable expertise in clinical trials.  And I

9    also have previously served on institutional review

10   boards.  I did that while I was a medical student,

11   where I reviewed the ethics of clinical trials

12   and -- and in other ways as well.  So I would say

13   that covers my -- is included in my expertise as a

14   physician scientist.

15       Q.   (By Mr. Gonzalez-Pagan)  Earlier you stated

16   that the testimony you provided in the Bruce

17   deposition was truthful; is that right?

18       A.   To the best of my knowledge.

19       Q.   In the Bruce deposition, you were asked:

20   So clinical trials is in your area of expertise?

21               And you answered:  That is correct.

22       MR. KNEPPER:  Objection, form.

23       A.   Can you please read that statement again?

24   And it might even be helpful if we went to the area

25   of that deposition so I can see the entire context.

1    But for now maybe you can just reread that just so I

2    understand what that statement said.

3        Q.  (By Mr. Gonzalez-Pagan)  Well, let's -- my

4    computer is not going to survive today.  I

5    apologize.  It's on Page 39 of Exhibit 3.

6        A.   Is there an easy way to navigate directly

7    to a page without just scrolling down?

8        Q.   Unfortunately I don't believe so.  It's

9    limitation of the medium.  I apologize for that.

10            MR. KNEPPER:  I will confirm that.  Yeah.

11       I haven't found one either.

12       A.   Okay.  So which line are you -- I'm on

13   Page 39 right now.

14       Q.  (By Mr. Gonzalez-Pagan)  All right.  So on

15   line -- beginning on Line 23.

16       A.   Okay.

17       Q.   It says, Question:  I see.  So clinical

18   trials isn't your area of expertise?

19               Answer:  That is correct.

20               Did I read that correctly?

21       A.   Well, if you read the preceding lines, it

22   immediately followed a question about my direct

23   participation in clinical trials where I clearly

24   stated that there was only one clinical trial.  That

25   was the one I just mentioned to you at Washington

1    University.  And similar to what I had in this
2    deposition, my role in that project was relatively
3    minor.
4                       So in that sense, that does not mean
5    that I do not have knowledge and experience in the
6    context of clinical trials.  It only means I have
7    not directly participated in those clinical trials.
8    Context is important.
9         Q.   What is primary research?
10        A.   I'm sorry.  Primary research?
11        Q.   Yeah.
12        A.   Oh, so you're -- you're talking about the
13   difference between conducting experimental --
14   directly conducting experiments versus systematic
15   reviews and literature reviews of that nature.  Is
16   that the distinction you're trying to get at?
17        Q.   Is that what you understand the
18   distinction between primary and secondary research
19   to be?
20             MR. KNEPPER:  Objection, form.
21        A.   That would be one definition that I would
22   agree with, yes.
23        Q.  (By Mr. Gonzalez-Pagan)  Okay.  Would it be
24   okay if I were to adopt that definition, that
25   primary research refers to conducting experiments --

1  experiments, etc. and not literature review or
2  metanalysis of existing data?
3      A.   For the purposes of this deposition, yes,
4  that is fine.
5      Q.   With that understanding, have you
6  conducted any primary research relating to gender
7  dysphoria?
8          MR. KNEPPER:  Objection, form.
9      A.   So if you're asking whether I have
10  directly participated in clinical trials on gender
11  dysphoria, the answer is no.
12      Q.   (By Mr. Gonzalez-Pagan)  Have you
13  participated in cross-sectional studies related to
14  gender dysphoria?
15      A.   Again, I have not -- cross-sectional
16  studies, you're meaning retrospective reviews?
17      Q.   It could be longitudinal observational.
18  It could be cohort studies.  I guess my question
19  is -- let me back up.  Have you conducted any direct
20  research relating to gender dysphoria that is not
21  based on a literature review?
22          MR. KNEPPER:  Objection, form.
23      A.   It would depend on what your definition of
24  conduct.  I have not physically myself done those
25  chart reviews or participated in the clinical

1  setting.  My experience to what you had described as
2  primary research is limited to my role as associate
3  or assistant fellowship program director in
4  supervising my fellows, two of whom are doing what
5  we would -- what you would define as primary
6  research.
7           I'm not the primary investigator, but
8  I do have a role in directing my fellows in doing
9  that research to make sure it's of the highest
10  quality and standards that we expect of all of our
11  fellows.
12     Q.  (By Mr. Gonzalez-Pagan)  When did you
13  resume supervision of the fellowship program?
14     A.   The official designation has happened
15  since the time I filed my initial curriculum vitae.
16  However, I have continually throughout my career
17  been involved in the fellowship program.
18           One of the reasons I was reappointed
19  as the assistant program director was that it was
20  recognized that the area of scholarly research
21  needed somebody with my background to be able to
22  help the fellows to be able to select projects,
23  select mentors and conduct research in the most
24  rigorous manner.  And that was a shortcoming that
25  had developed since I had formally stepped away from

1        A.    Okay.

2        Q.    Well, actually, let me -- let me check.

3   We've been going about an hour.  Would you like to

4   take a break right now or I can do this line of

5   questioning?  And we can --

6        A.    I'm actually doing quite well.  I'd be

7   fine to keep pressing on.

8             MR. GONZALEZ-PAGAN:  Sheryl, is that okay?

9             THE COURT REPORTER:  That's fine.

10       Q.    (By Mr. Gonzalez-Pagan)  Okay.  So if we go

11  to the list of publications in your CV.  Are you

12  with me?

13       A.    I am.

14       Q.    In the category of journal articles,

15  No. 48 is titled Deficiencies in Scientific Evidence

16  for Medical Management of Gender Dysphoria.  Did I

17  read that correctly?

18       A.    Yes.  And I do see it here.

19       Q.    Is that one of your publications relating

20  to gender dysphoria?

21       A.    Yes, it is.  And it's probably one of the

22  most highly cited of the papers that I provided.

23       Q.    Sure.  Is that a publication based on any

24  primary research that you conducted?

25             MR. KNEPPER:  Objection, form.

1          A.   As which have defined it, no.  It's a

2     review of the literature and critical appraisal of

3     the evidence.

4          Q.  (By Mr. Gonzalez-Pagan)  And that

5     publication is -- that -- sorry.  That -- that

6     article was published in the Linacre Quarterly; is

7     that right?

8          A.   That is correct.

9          Q.   Is the Linacre Quarterly a scientific

10    publication?

11         A.   It is an ethics journal.  In fact, it's

12    the longest standing continuously published ethics

13    journal in the United States.

14         Q.   Who publishes the Linacre Quarterly?

15         A.   The NCBC.

16         Q.   What does the NCBC stand for?

17         A.   The National Catholic Bioethics Center.

18         Q.   Turn to 50.  Is this one of the other

19    publications you have relating to gender dysphoria?

20         A.   It's a letter to the editor.

21         Q.   So it's not -- this is not a publication

22    based on any primary research or scientific study

23    you have conducted?

24              MR. KNEPPER:  Objection, form.

25         A.   As we have defined primary research, it is

1    merely a presentation of -- of concerns about the

2    literature that has already been published.

3        Q.  (By Mr. Gonzalez-Pagan)  And as I

4    understand this letter to the editor is a commentary

5    on another publication, on another article; is that

6    right?

7           MR. KNEPPER:  Objection, form.

8        A.  It includes more information than just the

9    article itself.  But, yes.

10       Q.  (By Mr. Gonzalez-Pagan)  And just pure

11   curiosity, I don't know the answer to this, but are

12   letters to the editor peer reviewed?

13       A.  This particular one was.  I recall when we

14   were submitting this, that we were asked to make

15   changes.  And I interpret that as being peer

16   reviewed.

17       Q.  Well, I just want to clarify.  There's

18   peer review and then there's editorial review; is

19   that right?

20          MR. KNEPPER:  Objection, form.

21       A.  There are numbers of different types of

22   review; that's correct.

23       Q.  (By Mr. Gonzalez-Pagan)  Okay.  As I

24   understand peer review to mean, it is a process of

25   objecting and circulating an author's work to the

1    scrutiny of others who are experts in the same

2    field; is that right?

3                MR. KNEPPER:  Objection.

4        A.    That's how it's generally defined yes.

5        Q.    Are you saying that the letter to the

6    editor was circulated to experts in the field before

7    it was published?

8        A.    I don't know the details of how the letter

9    was handled.  I only can say that when we submitted

10   it, we were asked to make revisions.  It was

11   reviewed by individuals with understanding of the

12   area that was covered.  I don't know any more

13   details.  And that's the way generally peer review

14   occurs.  One is not usually told who actually

15   reviews the submission.

16       Q.    The next publication, it's -- it's No. 2

17   under book chapter.  It's titled Medical Approaches

18   to Alleviating Gender Dysphoria.  And it's a chapter

19   in the book Transgender Issues in Catholic

20   Healthcare; is that right?

21       A.    That is correct.

22       Q.    Who publishes the book, Transgender Issues

23   in Catholic Healthcare?

24       A.    That was also the NCBC.

25       Q.    Is the book a peer-reviewed publication?

1      A.   No.

2      Q.   Going to the next page, there's a list of

3  invited publications; is that right?

4      A.   Yes.

5      Q.   No. 6 is your article titled Growing

6  Pains, Problems With Pubertal Supression in Treating

7  Gender Dysphoria.

8           Did I read that correctly?

9      A.   Yes, you did read it correctly.

10     Q.   Is this a peer-reviewed publication?

11     A.   It is not peer reviewed.  It was

12  editorially reviewed.

13     Q.   The growing pains article was published in

14  the New Atlantis; is that right?

15     A.   That is correct.

16     Q.   Is the New Atlantis a scientific journal?

17     A.   It is not considered a scientific journal

18  in the definition that we normally designate it.  It

19  was -- it's a journal that provides more broad

20  readership to be able to distill topics of relevance

21  at an understandable level to the lay public.

22     Q.   At the time of the publication of the

23  article, who published the New Atlantis?

24     A.   Well, the New Atlantis.

25     Q.   Was the new Atlantis a publication of the

1    ethics and public policy center?

2              MR. KNEPPER:  Objection, form.

3         A.   I believe that may be true.  I didn't pay

4    much attention to that.

5         Q.  (By Mr. Gonzalez-Pagan)  Let's turn to

6    Exhibit No. 3, Page 44 -- sorry -- Page 46.

7         A.   I went too far.

8         Q.   You know what, it could probably be me.

9    It's a few later.  It's Page 49.  I do apologize.

10   Page 49.

11        A.   I'm still scrolling, so.  Okay.  I'm

12   there.

13        Q.   Okay.  Beginning on Line 13, it reads;

14   Question:  Okay.  And the New Atlantis was founded

15   by the Ethics and Public Policy Center; is that

16   right?

17                   Answer:  I believe that that is

18   correct.

19                   Question:  Okay.  And that's a center

20   dedicated to applying the Judeo-Christian moral

21   tradition to critical issues of public policy; is

22   that your understanding?

23                   Answer:  I believe that question came

24   up at the last deposition.  And I believe that

25   that's an accurate statement.

1           Did I read that correctly?

2      A.   You did read it correctly, yes.

3      Q.   And you stand by that testimony?

4      A.   Yes.  I have no reason -- it's not

5  something that I consider all that important.  And I

6  don't usually retain that.  I've got so many other

7  pieces of information for me to retain.  But, yes.

8      Q.   Going back to your CV, under invited

9  publications.

10      A.   I'm there.

11      Q.   Okay.  The next publication is an article

12  titled The Use of Cross-Sex Steroids in Treating

13  Gender Dysphoria; is that right?

14      A.   That is correct.

15      Q.   It was published in the National Catholic

16  Bioethics Quarterly; is that right?

17      A.   That is correct.

18      Q.   Is this article, The Use of Cross-Sex

19  Steroids, a peer-reviewed publication?

20      A.   No, it is not.

21      Q.   Is the National Catholic Bioethics

22  Quarterly a peer-reviewed journal?

23      A.   No.

24      Q.   Is the National Catholic Bioethics

25  Quarterly a scientific journal?

1           A.    No.  It is an ethics journal.
2           Q.    All right.  And the next publication, 8,
3      under publications in your CV is Experimental
4      Approaches to Alleviating Gender Dysphoria in
5      Children; is that right?
6           A.    Yes.
7           Q.    And this is another one of your
8      publications that relates to gender dysphoria?
9           A.    Yes.
10          Q.    Is this a peer-reviewed article?
11          A.    It is published in the same journal as
12     No. 7.  And it is not a peer-reviewed journal.
13          Q.    Okay.  Do you have any other publications
14     besides the ones that we just went through that
15     relate to gender dysphoria?
16               MR. KNEPPER:  Objection, form.
17          A.    So there are -- I have no publications
18     that have been added since the time I submitted this
19     CV and it reflects my publications to date.
20          Q.    (By Mr. Gonzalez-Pagan)  Do you have any
21     other publications besides the ones that we've
22     discussed today relating to transgender people?
23          A.    Not that I recall.
24               MR. GONZALEZ-PAGAN:  All right.  I
25          actually do need to break.  So if we can go off

1  scientific understanding of this condition.  To my

2  understanding, the transition from this definition

3  as gender identity disorder to gender dysphoria was

4  not based upon new scientific information.

5            It was more of a desire to alleviate

6  the discomfort that one has in that label.  So how

7  we classify that really rests on the premises that

8  one has about the underlying etiology.  And I think

9  that there are -- are more than one valid hypothesis

10 or I should say premises that can be put forward,

11 not necessarily all of equal weight.

12       Q.  (By Mr. Gonzalez-Pagan)  Okay.  But what is

13 your understanding of the condition of gender

14 incongruent?

15            MR. KNEPPER:  Objection, form, scope.

16       A.   It's a very broad question.  Could you

17 narrow it down a little bit?

18            MR. GONZALEZ-PAGAN:  John, what's the

19            objection of the scope?  I thought Dr. Hruz is

20            here to testify about gender-affirming

21            treatment for the condition of gender dysphoria

22            and gender incongruent.

23            MR. KNEPPER:  Hold on, Omar.  You're free

24            to ask the questions.  I think the question I'm

25            trying to understand is:  Are you trying to ask

1       him to testify about -- as a psychiatrist or a
2       psychologist?  And it's not clear to me, you
3       know, what the definition of gender
4       incongruence -- are you -- it's not clear to me
5       when you use that term, are you trying to say
6       it's the ICD-11 definition or are you using
7       something else?
8            I'm happy -- happy to let you continue to
9       pursue this.  I'm just as interested as you
10      are.  But I want to make sure that as you go
11      through this, we don't end up -- we don't end
12      up down a path where you're trying to say, now,
13      ah-ha, he's coming here pretending to be a
14      psychologist which is outside the scope of what
15      he said he's going to testify to.
16           MR. GONZALEZ-PAGAN:  Well, I mean, we have
17      a 90-page report that I'm happy to go through.
18           MR. KNEPPER:  Please do.
19      Q.  (By Mr. Gonzalez-Pagan)  Dr. Hruz, in your
20  report, you state a number of opinions about the
21  validity of the diagnosis of gender dysphoria
22  contained within the DSM; is that right?
23           MR. KNEPPER:  Objection, form.
24      A.   I would be much more comfortable looking
25  at the specific areas that you're referring to.

1    Because I present many things in my report as

2    hypotheses.  And without making definitive

3    statements.  So it would be most helpful if we can

4    look at specific areas that you're referring to.

5         Q.  (By Mr. Gonzalez-Pagan)  Okay.  So I guess

6    what I'm curious about is, do you have a particular

7    as a physician scientist, do you have a particular

8    belief as to whether gender dysphoria is a disorder?

9         A.   I have multiple scientific premises that I

10   have and continue to consider.  Again not of equal

11   weight or validity.  One of those premises is that

12   this condition arises from a disconnect between

13   neuronal biology and the bodily from -- sex --

14   bodily form of the body.

15                Another scientific premise is that

16   this condition is due to the number of

17   environmental, social, hormonal and neuronal

18   components.  So how we understand this condition is

19   markedly influenced by the premise that we come to

20   address the hypotheses that we're going to need to

21   consider to develop clinical trials to establish

22   safety and efficacy of treatment that provides the

23   greatest benefit to the affected patients.

24        Q.   Would you agree there are transgender

25   people in this world?

1     A.   Again, we have to be very careful about

2    the terminology that we're using, to acknowledge

3    that the condition of sex discordant gender

4    identity, and there are individuals that -- that

5    express an identity that is not in agreement with

6    their biology is a true statement.  That's

7    undeniable that these -- there are individuals that

8    have this experience of discordance between their

9    gender identity and their sex.

10     Q.   Do you believe that the experience of

11    discordance between their identity and what you term

12    their biology, is a disorder?

13          MR. KNEPPER:  Objection, form.

14     A.   So, again, it depends on what premise

15    you're operating under.  As far as whether this is a

16    normal experience of -- of a human condition or

17    whether it falls outside of -- of the norm for us as

18    sexed beings.  And, again, as a physician scientist

19    I'm obligated to be able to consider all

20    possibilities to be able to do the proper science to

21    get at the ultimate question here as to what we can

22    do to alleviate the suffering.

23     Q.   (By Mr. Gonzalez-Pagan)  Dr. Hruz, I guess

24    I'm a little confused as to what it is that is your

25    opinion here.  Can you briefly summarize for me what

1    more cautious approach by the recognition that the

2    studies that have been done up to this point in time

3    do not give us an answer as to whether this is the

4    best or the only course of intervention to alleviate

5    that suffering.  Is that -- is that what you're

6    looking for?

7         Q.    Thank you.  I appreciate that.  In your --

8    as part of your opinions, do you provide -- let me

9    back up.

10              Do you express an opinion as to which

11   modality of care should be provided to people

12   diagnosed with gender dysphoria?

13        A.    I believe that it's an ongoing scientific

14   question about what the most efficacious approach is

15   to provide the greatest benefit with the least

16   amount of risk.  And that is why I'm participating

17   as an expert witness in this case, to bring to light

18   for the benefit of the court that this is something

19   that needs to be very much investigated to be able

20   to get an answer to that question.

21        Q.    Do you express an opinion as to which

22   modality of care should be provided to people

23   experiencing gender dysphoria?

24              MR. KNEPPER:  Objection, form.

25        A.    I would say because it's an unsettled

1    scientific question, that I don't have a firm

2    opinion as to which is the best approach.  Yet as

3    time has gone on, more and more information is being

4    generated that calls into question the

5    affirmation-only approach.

6        Q.  (By Mr. Gonzalez-Pagan)  And I don't

7    want -- what I'm trying to do is get clarity here.

8    So would it be fair to say that you do not provide

9    an opinion as to which modality of care should be

10   provided for people experiencing gender dysphoria?

11           MR. KNEPPER:  Objection, form.

12       A.   My opinion is that based upon the lack of

13   evidence for the gender -- gender-affirmation

14   approach, that if we are going to provide

15   interventions for this population that it is best

16   done under a carefully controlled clinical

17   experimental setting.

18       Q.  (By Mr. Gonzalez-Pagan)  You express that

19   there are ongoing questions as to the efficacy of

20   the gender-affirmation approach; is that right?

21       A.   That is correct.

22       Q.   Again for clarity's sake, are you --

23   you're not expressing an opinion with -- with

24   medical certainty as to whether the

25   gender-affirmation approach is effective or not; is

1    anxiety?

2        A.    I would say that the answer is yes.

3        Q.    So for people who experience gender

4    dysphoria and do not have any other co-morbidity,

5    what would you do to address their gender dysphoria

6    while the clinical trials are being conducted?

7            MR. KNEPPER:  Objection, form.

8        A.    That's a broad question.  And it depends

9    upon the individual characteristics of the patient,

10   including their age and including all of the other

11   factors that are associated with that gender

12   dysphoria.  Was it a child who is prepubertal?  Is

13   it a child who is an adolescent?  Is it an adult?

14   Is it a child or an adult that, you know, all of the

15   social situations or circumstances that they're

16   involved in?

17            Again, without having a formal

18   diagnosis of depression or anxiety or these other

19   co-morbidities, all of that is going to impact how

20   one approaches that particular patient.

21       Q.   (By Mr. Gonzalez-Pagan)  I guess here we're

22   talking about this case, you said it's a provision

23   of coverage for treatment for gender dysphoria; is

24   that right?

25       A.    That is the nature of this case, correct.

1    had a new chairman that came on board from the one

2    that recruited me to that position.  We disagreed in

3    more than one area.

4                There was also my research program

5    had been rapidly expanding and was getting into the

6    area of drug development.  I would say that the role

7    of chief of any division is a thankless job.  It

8    requires a tremendous amount of time and effort.

9    And so, you know, the decision to -- to step down

10   from that position was actually very advantageous to

11   my further career development.  But, you know, it

12   was one of the -- the gender center was one among

13   many disagreements that I had at that time.

14        Q.   Does the Washington University Transgender

15   Center offer pediatric and adolescent

16   gender-affirming care?

17        A.   Yes.  In the definition that we're talking

18   about here meaning the GnRH agonist or puberty

19   blockers, cross-sex hormones.

20        Q.   Does the Wash --

21        A.   In addition to --

22        Q.   Does the Washington University Transgender

23   Center offer hormone therapy as treatment for gender

24   dysphoria in adults?

25        A.   Does the pediatric center -- your question

1    is does the pediatric center provide care for

2    adults?

3        Q.   Well, my -- the transgender center offers

4    both care to pediatric and adult patients; is that

5    right?

6        A.   So in general, the care that's delivered

7    at St. Louis Children's Hospital spans birth to the

8    low -- early 20s.  There are individuals that are

9    adults that are cared for by the adult endocrine

10   division.  And there's a separate team of doctors

11   that participate in that care.

12       Q.   Are you a member of the Endocrine Society?

13       A.   Yes.

14       Q.   The Endocrine Society publishes clinical

15   practice guidelines regarding the treatment of

16   gender dysphoria; is that right?

17       A.   That's correct.  Their initial document

18   came out in 2009 with lead author Hembree and then

19   they had a revision that was done in 2017.

20       Q.   Showing you what's been marked as

21   Exhibit 5.

22                     (Whereupon Exhibit 5 was

23                      introduced for identification.)

24       A.   Okay.  I see it.

25       Q.   (By Mr. Gonzalez-Pagan)  Do you recognize

1          THE COURT REPORTER:  Thank you.

2          MR. GONZALEZ-PAGAN:  Borrowing a word from

3     you, John.

4     Q.  (By Mr. Gonzalez-Pagan)  What is WPATH?

5     A.    It's an organization known as the World

6     Association of Professional Transgender Health.  It

7     is -- again, this is the organization that came out

8     with their version seven of the guidelines quite a

9     long time ago to provide their perspective on what

10    should be done for people that experience sex

11    discordant gender identity.

12    Q.    Does the Washington University Transgender

13    Center follow the WPATH guidelines?

14    A.    Again, I will say that I'm not directly

15    involved in the gender center.  My understanding

16    based on conversations with the director of that

17    center, he claims that they do.

18    Q.    Do you, yourself, provide treatment for

19    gender dysphoria?

20    A.    I will state that I'm a pediatric

21    endocrinologist charged with treating hormonal

22    diseases.  And because I have not seen the evidence

23    that supports the proper risk/benefit to that

24    intervention, I do not provide that care, as I don't

25    in any other area where I have not determined

1    appropriate benefit versus risk.

2         Q.   Have you ever diagnosed a person with

3    gender dysphoria?

4              MR. KNEPPER:  Objection, form.

5         A.   I'm a pediatric endocrinologist and my

6    charge is to treat hormone related diseases.  And

7    therefore, I've not been called upon to make that

8    diagnosis.

9         Q.  (By Mr. Gonzalez-Pagan)  Would you agree

10   you do not have any clinical experience providing

11   care for people for gender dysphoria?

12        A.   I would not agree with that.

13        Q.   Do you provide treatment for people?

14        A.   I provide -- I provide treatment for

15   hormone-related conditions that includes people with

16   gender dysphoria.

17        Q.   But specifically in treating gender

18   dysphoria, do you have any clinical experience with

19   regards to the treatment of that condition?

20        A.   Since I'm a pediatric endocrinologist, my

21   experience is limited to the treating of

22   hormone-related diseases.

23        Q.   Is that a no?

24        A.   I have not treated with hormones for the

25   purpose of alleviating gender dysphoria.  I have

1    however treated patients that have experienced side
2    effects related to that hormonal treatment including
3    obesity, diabetes, dyslipidemia.  So in that respect
4    I have treated them, but not to address dysphoria.
5    But, rather, the complications that have occurred in
6    association with that treatment.
7         Q.   Clarify, you said association, yes?
8         A.   That's correct.
9         Q.   Do you have proof -- do you have proof
10   that it was caused by the treatment for gender
11   dysphoria?
12        A.   If I thought I had enough evidence to say
13   cause, I would have said caused.  I said
14   association.
15        Q.   Thank you.  You've given a number --
16   Strike that.
17             Have you given presentations
18   regarding gender dysphoria?
19        A.   Yes.
20        Q.   Have any of these presentations been at
21   medical conference -- conferences or settings?
22        A.   Yes.  I've -- well, I've delivered many
23   lectures to major academic centers during medical
24   grand rounds.  And I'm happy to detail those for
25   you.  It includes University of Tennessee, Texas

1    Tech, Notre Dame, the University of Montevideo.  And

2    there are probably others.  I can't remember.  So --

3    and so as being a grand rounds presentation in major

4    medical centers, yes.

5         Q.   Aside from grand rounds, have you provided

6    any presentations regarding gender dysphoria at any

7    medical conferences or sites?

8         A.   Well, I would consider grand rounds a

9    conference.

10        Q.   Grand rounds is when there's an invited

11   lecturer at a particular hospital and everybody is

12   invited to attend; is that right?

13        A.   So you're asking about national meetings,

14   like the Endocrine Society meetings or such?

15        Q.   Well, let me just clarify what grand

16   rounds are for the record.  So what are grand

17   rounds?

18        A.   Grand rounds are usually a recurring

19   series of talks given by experts in various fields

20   to the relevant scientific community about topics of

21   interest to those physicians.  And generally, it

22   involves the presentation of high quality scientific

23   evidence for the conditions that those physicians in

24   the audience would encounter.

25        Q.   Okay.  So you have not conducted any

1    studies for any gender dysphoria, right?

2         A.    I believe we answered that question

3    earlier when we went through my CV.

4         Q.    Well, I'm just wondering what your

5    presentation of the grand rounds are since you have

6    not conducted any such study?

7         A.    It was providing the same types of

8    evidence that I presented in my expert declaration

9    about the scientific studies that have been done or

10   need to be done in this field.  Presenting the

11   various hypotheses for etiology and potential

12   treatment.  The various side effects that are known

13   or potentially could occur.  So it includes all

14   of -- or very similar information regarding the

15   scientific studies that I presented in my expert

16   declaration.

17        Q.    And now, to continue aside from grand

18   rounds, have you provided any presentations

19   regarding gender dysphoria in any other medical

20   conferences or settings?

21        A.    I would have to -- I'd have to think

22   through my list.  It's actually most of the major

23   presentations that I've made are listed within my

24   CV.  So I'd have to look back as to what I listed

25   there.  But if you're asking about the Endocrine

1    Society or the pediatric Endocrine Society or those

2    types of organizations, I have not presented at

3    those conferences.

4         Q.   Are you familiar with the gender and sex

5    conference?

6         A.   Yes.  And are you referring to the one in

7    Madrid.

8         Q.   That was going to be my question.  Did you

9    participate in the gender and sex conference in

10   Madrid in 2018?

11        A.   I don't recall the exact date.  But if it

12   was 2018, yes, I did present there.

13        Q.   Did you know that the conference was

14   billed as, quote:  A rebellion against the gender

15   ideology and its freedom destroying damaging law,

16   closed quote?

17        A.   I -- I don't recall that language being

18   presented to me when I agreed to present at that

19   conference.

20        Q.   Did you know that the conference was

21   focused on opposing what it termed "gender

22   ideology"?

23        A.   You know, again, I was asked -- and this

24   is true for -- if you're going to go through the

25   list of all of the places that I've spoken at.  When

1    I've been invited to present at any of these
2    conferences, my desire is to provide the most
3    accurate and up-to-date scientific information
4    related to the condition of gender dysphoria.
5              I am willing to present to any
6    audience that is willing to hear that information.
7    I don't make judgment about what the motives are of
8    the individuals organizing the conference.  But
9    merely serve with my area of expertise and my
10   knowledge to be able to further that discussion in a
11   productive manner.  And that applies to that sex and
12   gender conference in Madrid.
13        Q.   Who organized the gender and sex
14   conference in Madrid?
15        A.   I do not recall the entity.  I'm sure
16   you'll tell me.  But again that wasn't who invited
17   me was not as important as whether I was going to be
18   given the opportunity to present the information
19   objectively on this particular condition within my
20   area of expertise.
21             MR. GONZALEZ-PAGAN:  Oh, shoot.  John, I
22        just published an exhibit without a label.  Do
23        you have any objection to me calling it
24        Exhibit 6?
25             MR. KNEPPER:  Having done that very same

1       thing, Omar, let me take a look at it.  But,

2       no, I -- I cannot imagine I will have an

3       objection.  Actually it labeled it as Exhibit 6

4       automatically, but there's no stamp.

5               MR. GONZALEZ-PAGAN:  There's no stamp,

6       yes.

7               MR. KNEPPER:  Sheryl, you'll have to put

8       the stamp on it.  But I'm completely okay with

9       calling that Exhibit 6.

10              MR. GONZALEZ-PAGAN:  Thank you.

11                      (Whereupon Exhibit 6 was

12                      introduced for identification.)

13      Q.  (By Mr. Gonzalez-Pagan)  Dr. Hruz, I'm

14      showing you what's been marked as Exhibit 6.

15      A.   I can see it.

16      Q.   And I apologize for the formatting.  Some

17      pages don't print as well as others.  This appears

18      to be a press release following the conclusion of

19      the gender and sex conference which you were talking

20      about; is that right?

21      A.   I've never seen this document before.

22      Q.   Okay.  If you go to the second page.

23      A.   Okay.  I think I'm there.

24      Q.   It talks about the gender and sex -- in

25      the paragraph beginning eight speakers, sort of --

1      A.   Okay.  I'm there.  I've got it now.

2      Q.   Okay.  It speaks of the gender and sex

3  conference as being organized by HazteOir.org and

4  its international platform, CitizenGo; is that

5  right?

6      A.   That's what it says here, yes.

7      Q.   And does that -- is that in keeping with

8  your recollection about who organized the gender and

9  sex conference?

10     A.   Yes.  I seem to recall now that you've

11  jogged my memory.  That is correct.

12     Q.   Okay.  And then on the third page in the

13  middle, there's a paragraph beginning:  The rest of

14  the panel experts and lecturers was made up by

15  Professor Glenn Stanton; Dr. Paul Hruz; the

16  sociologist, Gabriella Kuby; and the former

17  transsexual, Walt Heyer.

18          Did I read that correctly?

19     A.    I see the paragraph that starts Stanton

20  assured that and, in quotes, the gender theory is

21  unscientific, is that what you're --

22     Q.   Just above.

23     A.   Oh.

24     Q.   I skipped the links in reading those.

25     A.   Ah, okay.  I see that, yes.

1      Q.   Okay.  So it is your recollection then

2   that you presented at this conference; is that

3   right?

4      A.   Oh, yes.  I do recall the conference.  I

5   just didn't until you reminded me.  I didn't know

6   who organized it.

7      Q.   You used the term "gender ideology" in

8   your report; is that right?

9      A.   I have used that term in the course of my

10  investigation of this condition, yes.

11     Q.   What is gender ideology?

12     A.   I would define ideology is including

13  statements that are made on a non -- a

14  non-scientific basis with premises and goals that

15  are outside of science.

16     Q.   Do you consider any healthcare

17  professional that subscribes to the gender-affirming

18  treatment model to be a gender ideolog?

19     A.   I think you're conflating different terms.

20  You mentioned gender-affirming medical care and

21  ideology; those are two separate --

22     Q.   Well, that's my question.  My question is,

23  does somebody that provides or advocates for

24  gender-affirming treatment, is that person a person

25  who subscribes to the gender ideology?

1    turn to, to be able to define, you know, the

2    condition and the treatment approach.  And I --

3         Q.   Isn't that true for many psychiatric

4    conditions?

5         A.   Absolutely.  I would -- absolutely.  It is

6    not unique to the area of gender dysphoria.  In

7    fact, in talking, you know, to those that are

8    engaged more in the field of psychiatry, they will

9    acknowledge that the rudimentary nature of the

10   discipline in comparison to the rest of the

11   medical -- medical enterprise, it is a very known

12   and serious shortcoming.  And there is a desire

13   certainly to -- to fill in those gaps.

14                   And there's actually hope that as

15   time moves forward with the advance in tools that

16   one has, to study neurobiology and address some of

17   these questions.  But there will be an opportunity

18   to provide clearer answers that are more evidenced

19   based.

20        Q.   Sure.  But, I mean, isn't that the nature

21   of science and medicine; we don't know everything,

22   period?

23        A.   We know far less of the psychiatric

24   conditions that are listed in -- or many of the

25   psychiatric conditions -- I wouldn't say all -- that

1          Q.    But your practice is in the field of

2     endocrinology, not psychiatry; is that right?

3          A.    I think we've touched upon this earlier,

4     but I'm happy to expound upon that.  Is --

5          Q.    Well, it's a yes or no.

6          A.    I'm a physician scientist.  So I'm very

7     qualified to talk about deficiencies in scientific

8     evidence that are present in this particular area.

9          Q.    So you're not a psychiatrist?

10          A.    I covered that earlier.  That I'm a

11     pediatric endocrinologist.  Yes, that's correct.

12          Q.    Are you aware that the revision of the DSM

13     involves the establishment of a scientific review

14     committee that evaluated and provided guidance on

15     the strength of evidence of any proposed changes?

16          A.    You know, that is how they describe the

17     process.  I again have asked for the evidence,

18     scientific evidence for the change between gender

19     identity disorder and gender dysphoria and then even

20     the move to shift toward the ICD code of gender

21     incongruence, that is based upon a scientific

22     evidence, rather than something other than that.

23          Q.    You also make reference in your report

24     with statements by Thomas Insel, the then director

25     of the National Institute of Mental Health, that it

1    field forward.  So I think that's entirely

2    consistent with my interpretation of the whole

3    question.

4        Q.   Were you aware that two weeks after the

5    statement that you reference from Dr. Insel,

6    Dr. Insel issued a joint statement with the American

7    Psychiatric Association stating that, quote:  The

8    American Psychiatric Association Diagnostic and

9    Statistical Manual of Mental Disorders, along with

10    the International Classification of Diseases

11    represents the best information currently available

12    for clinical diagnosis of mental disorders.

13              Were you aware of that statement?

14        A.   Yes.  And that is completely in agreement

15    with my opinion that I put forward here as well.

16              (Whereupon Exhibit 7 was

17              introduced for identification.)

18        Q.  (By Mr. Gonzalez-Pagan)  Showing you what's

19    been marked as Exhibit 7.

20        A.   I have it.

21        Q.   Okay.  This is a statement issued by

22    Thomas Insel, the then director of the National

23    Institute of Mental Health, and Jeffrey Lieberman,

24    the then president elect of the American Psychiatric

25    Association; is that right?

1      A.   Yes.  I believe -- well, I don't know for

2  sure, but I agree.

3      Q.   Okay.  Right below DSM-5 and RDoC, colon,

4  shared interests, it states:  The authors of this

5  statement.

6               Do you see that?

7      A.   I see the two authors, Thomas Insel and

8  Jeffrey Lieberman, correct.

9      Q.   All right.  Going to the second paragraph,

10  it reads:  Today the American Psychiatric

11  Association Diagnostic and Statistical Manual of

12  Mental Disorders, along with the International

13  Classification of Diseases represents the best

14  information currently available for clinical

15  diagnosis of mental disorders.  Patients, families

16  and insurers can be confident that effective

17  treatments are available, and that the DSM is the

18  key resource for delivering the best available care.

19  The National Institute of Mental Health has not

20  changed its position on DSM-5.  As the National

21  Institute of Mental Health research domain criteria

22  project website states, the diagnostic categories

23  represent that in the DSM-IV and the International

24  Classification of Diseases 10, the main contemporary

25  consensus standard for how mental disorders are

1       diagnosed and treated.

2                   Did I read that correctly?

3           A.   You read it correctly.  Yet what follows

4       in the next paragraph is more pertinent to the

5       statement that I made in the declaration

6       acknowledging the fact that the DSM is not

7       sufficient for researchers and the statement was

8       related to the basis for research funding.  So, you

9       know, taken in context, this document is completely

10      in line with the statement that I made about the

11      limitations of the DSM.

12          Q.   But the DS -- the DSM -- this is a case

13      about the treatment of gender dysphoria; is that

14      right?

15                  MR. KNEPPER:  Objection form.

16          A.   So as we've been talking about all

17      morning, okay, the ability to have effective

18      treatments is based upon quality research.  And if

19      the DSM is not sufficient for researchers to be able

20      to conduct their scientific study, because of how

21      the DSM generates their diagnostic codes, I think

22      that that understanding is completely relevant to

23      why one needs to be aware of that.

24          Q.   (By Mr. Gonzalez-Pagan)  All right.  Going

25      to what is the fifth paragraph, the second to last

1    sentence.  It states:  As research findings begin to

2    emerge from the RDoC effort, this finding may be

3    incorporated into future DSM revisions and clinical

4    practice guidelines.  But this is a long-term

5    undertaking.  It will take years to fulfill the

6    promise that this research effort represents for

7    transforming the diagnosis and treatment of mental

8    disorders.

9                    Did I read that correctly?

10        A.    You did read it correctly.

11        Q.    Is there a reason why you did not include

12   this follow-up statement from Dr. Insel regarding

13   the DSM views and reliability in your report?

14        A.    You know, I could have put the entire

15   document that you have here into the report.  The

16   point being made, I think, is one that I fully agree

17   with.  I think that as we be able to -- are able to

18   incorporate science into the DSM, it is going to

19   increase in its validity and its usefulness.  But in

20   its current state there is acknowledged in this

21   statement itself by the fact that this research is

22   needed.  It acknowledges the deficiencies that

23   currently exist.  So there's a whole host of other

24   things that I could have included in my declaration.

25   The point that was intended, I think, was

1   sufficiently made and supported even by this

2   document that you put forward as a new exhibit.

3       Q.   Sure.  But in clinical qualification to

4   your statement is that that doesn't exist yet, and

5   that the DSM is the best current available tool that

6   we have according to this statement?

7           MR. KNEPPER:  Objection, form.

8       A.   The point I made is that there are

9   deficiencies in how it was -- or limitations how the

10  DSM has been put together.  And that is relevant to

11  the understanding of how we put forward hypotheses

12  for efficacious treatments.  And so I would say

13  that, you know, that's -- the state of knowledge in

14  this area is -- is what is of concern and how we are

15  using the DSM beyond its capabilities without

16  knowledge of molecular or physiologic mechanisms for

17  most of the psychiatric diseases is a major

18  limitation which is acknowledged by the authors of

19  this document.  That is what I believe is important

20  for the court to recognize and to understand as we

21  move forward in this conversation.

22      Q.   (By Mr. Gonzalez-Pagan)  In your report you

23  speak of three modalities of treatment for gender

24  dysphoria; is that right?

25      A.   I would say three different categories

1  based upon different underlying scientific premises.

2  I think the reality of interventions are much

3  broader than that and not as easily demarcated into

4  three categories.  But indeed, I do present those in

5  my declaration.

6       Q.   And these modalities, are they reparative

7  therapy, watchful waiting and the affirming

8  approach?

9       A.   That is how I presented it, correct.  And,

10  again, if it would be helpful, if we're going to

11  talk about it, if we can direct ourselves to that

12  part of my declaration.

13       Q.   We'll get there.  Are you familiar with

14  Ken Zucker's work?

15       A.   Yes, I am.

16       Q.   In fact, you repeatedly cite Dr. Zucker

17  throughout your report; is that right?

18       A.   Yes, I do, among other people, yes.

19       Q.   What do you understand to be the model of

20  care that Dr. Zucker employed?

21       A.   Broadly speaking prior to his clinic being

22  shut down was to approach care in a way to

23  understand the underlying basis for the sex

24  discordant gender identity in that era was referred

25  to as gender identity disorder.

1          And to -- one of the approaches that
2     he used was to help facilitate an individual to
3     realign their gender identity with their sex.  And
4     if that was not possible, would then advocate for
5     moving forward with affirmative approaches.
6          Q.   So under Dr. Zucker's model, affirming
7     care would be provided if there was persistence of
8     cross-gender identification into adolescence and
9     adulthood?
10          A.   Based upon the information that Dr. Zucker
11     had at the time that he was engaged in that care,
12     that was how he proceeded, yes.  He was not privy to
13     the information that has come forward in the last
14     several years about outcomes with that affirmative
15     approach.
16          Q.   What is the watchful waiting model?
17          A.   Again, all of these approaches are based
18     upon different scientific premises and it is based
19     upon the experience that the majority of prepubertal
20     children that experience sex discordant gender
21     identity, if merely left alone, will have
22     spontaneous realignment of their gender identity
23     with their sex.
24          And it is again, whether it's
25     intended or not, perceived as to be a desirable

 1    outcome.  And that those individuals that have that
 2    experience will not be exposed to gender-affirming
 3    medical interventions with all the associated risks
 4    and questionable benefits that we -- that I
 5    mentioned already.  And I certainly can share more
 6    information if you would like.
 7         Q.   Let me introduce you to what's been marked
 8    as Exhibit 8.
 9                   (Whereupon Exhibit 8 was
10                   introduced for identification.)
11         Q.  (By Mr. Gonzalez-Pagan)  Do you have access
12    to the exhibit?
13         A.   Yeah.  I'm seeing it now, correct.
14         Q.   This is a publication on -- it's an
15    article on adolescent health medicine and
16    therapeutics; is that right?
17         A.   I'm seeing that here.  Is this a
18    peer-reviewed journal -- a peer-reviewed article,
19    just so I know?
20         Q.   I'll answer that question for you then.
21    The answer is yes, but it's the next exhibit.
22         A.   Okay.  I'm sorry.  Did you have a question
23    for me?
24         Q.   Not yet.
25         A.   Okay.

1      Q.   I will represent to you that this is a
2    peer-reviewed journal, but -- and I'll come back
3    to -- to another exhibit to discuss that with you.
4    But turning --
5      A.   The reason I ask that was because it's a
6    review article.  And even in peer-reviewed journals,
7    not all reviewed articles are reviewed with the same
8    rigor.  So that's -- but thank you.
9      Q.   Let's exit out of that exhibit.  And if my
10   computer will cooperate.
11                     (Whereupon Exhibit 9 was
12                      introduced for identification.)
13     Q.  (By Mr. Gonzalez-Pagan)  All right.  I'm
14   introducing what's been marked as Exhibit 9.
15     A.   I have the document, just so you know.
16     Q.   Great.  Do you see where it describes the
17   journal as an international peer-reviewed, open
18   access journal focusing on health, pathology and
19   treatment issues specific to the adolescent age
20   group?
21     A.   That's true.  Just below the ISSN number.
22     Q.   Correct.
23     A.   Yes, I see that.
24     Q.   Okay.  So you would agree that it is a
25   peer-reviewed journal?

1      A.   Yes.  They're claiming it is.  I would

2   have no reason to doubt that.

3      Q.   Okay.  So going back to Exhibit 8.  If you

4   can turn to Page 61 of the document.

5      A.   Okay.  Are you referring to the

6   highlighted area?

7      Q.   Well, we're going to go to the bottom of

8   the right-hand -- right-hand column.

9      A.   Okay.

10      Q.   Under the watchful waiting model.

11          MR. KNEPPER:  And, Omar, let's identify on

12          the record the highlighting is not in the

13          underlying document, but it's been added.

14          MR. GONZALEZ-PAGAN:  For the record, the

15          highlighting in the exhibit has been added by

16          me.  Otherwise the document is unaltered.

17      Q.   (By Mr. Gonzalez-Pagan)  The highlighted

18   portion states -- reads:  In contrast to live in

19   your own skin approach, a young child's

20   demonstration of gender nonconformity, be it gender

21   identity, expressions or both, is not to be

22   manipulated in any way, but observed over time.  If

23   a child's cross-gender identification and

24   affirmations are persistent over time, interventions

25   are made available for a child to consolidate a

1    transgender identity, once it is assessed, through

2    therapeutic intervention and psychometric assessment

3    as in the best interest of the child.  These

4    interventions include social transition (the shift

5    from one gender to another, including possible name

6    change, gender marker change and gender pronoun

7    changes), puberty blockers and, later, hormone and

8    possible gender-affirming surgeries.

9                Did I read that correctly?

10        A.   Yes.

11        Q.   So under the watchful waiting model,

12   gender-affirming care is provided for adolescents

13   and adults if they persist in the cross-gender

14   identification; is that right?

15             MR. KNEPPER:  Objection to form.

16        A.   That's correct according to this use of

17   the model, yes.

18        Q.  (By Mr. Gonzalez-Pagan)  Well, the watchful

19   waiting model was developed by -- it's the Dutch

20   model.  It was developed in the Amsterdam Center of

21   Expertise on Gender Dysphoria; is that right?

22        A.   That's my understanding.

23        Q.   Under the gender-affirmative model,

24   medical and -- no medical and surgical interventions

25   are initiated until after the onset of puberty; is

1    that right?

2         A.    If you're talking about there's no reason

3    to block puberty that hasn't started yet or to

4    intervene with cross-sex hormones until that age;

5    that is correct.

6         Q.    Did you disclose to the -- in your report

7    that under Dr. Zucker's model, under the watchful

8    waiting model, and under the gender-affirmative

9    model, gender-affirming medical treatment is

10   indicated if cross-gender identification persists

11   into adolescence and adulthood?

12        A.    I would challenge you on the assertion

13   that it's indicated.  I would say that the model

14   itself bases itself on the next step of

15   intervention.  Whether there's a prudent approach is

16   really what is of concern with the literature that

17   we have available.  So the models itself indeed --

18   and they actually differ in not only in the timing

19   of when one engages.

20             The affirmative model actually begins

21   earlier with social affirmation, not just medical

22   intervention.  And there's different scientific

23   premises that are underlying -- underlie these two

24   different approaches.

25        Q.    But under each of the models of the three

1    models that we've discussed, medical and surgical

2    care is provided as a mode of treatment?

3               MR. KNEPPER:  Objection, form.

4       A.   Under the model.  So let me be clear.

5    Okay.  So the reason for the watch and wait approach

6    is to know that in prepubertal children that present

7    with gender dysphoria, that the vast majority of

8    them will have that spontaneous realignment, other

9    gender identity with their sex, by varying estimates

10   ranging from 50 to 98 percent.  I think 88 --

11   85 percent is a good average based upon the

12   published literature.

13               That means that this would apply to

14   15 -- at most 15 percent, maybe even less, that

15   would have persistence.  It also makes the

16   assumption -- and this is certainly one that one

17   considers with the current social environment as to

18   whether the influence of the social affirmation

19   component, you know, is -- is provided.

20               So the underlying premises are

21   different in the two models.  One has a premise that

22   there are a number of factors that led to the gender

23   dysphoria.  And the vast majority of individuals,

24   that they may differ from one patient to another.

25   There is no biological test that one can do to

Case 1:19-cv-00272-LCB-LPA  Document 205-2  Filed 02/02/22  Page 54 of 112

1    determine which of these individuals are going to
2    have persistence or have that spontaneous
3    realignment.  And the safest course of action is to
4    do nothing until things are sorted out.
5                    The gender-affirmative model makes a
6    scientific premise that when one experiences sex
7    discordant gender identity, it reflects something
8    that is innate and immutable.  And, therefore, a
9    prudent approach would be to immediately engage in
10   social affirmation followed by these hormonal
11   interventions.  I hope that I've stated that clearly
12   enough for you and for the court.
13        Q.  (By Mr. Gonzalez-Pagan)  Sure.  But
14   ultimately as to the question for transgender people
15   who persist in their cross-gender identification by
16   definition into adolescence and adulthood, medical
17   care and surgical care if indicated under any of the
18   three models, that being Zucker's model, the
19   watchful waiting model or the gender-affirming
20   model?
21        A.   I don't know that I would distinguish what
22   we were talking about earlier with the Zucker model
23   being -- I think you're doing that more as the
24   reparative therapy.
25                    And this is based upon again the

1    issue at hand of the emerging scientific evidence
2    that leads one to question whether this provides a
3    long-term solution to the problem of dysphoria.
4    And, again, I will state again that there are many
5    concerns about the presumption in proceeding with
6    affirmative care that can be challenged by the
7    outcomes that one is observing about how well these
8    individuals are doing after receiving the
9    gender-affirmative care.
10              So this is -- these are statements in
11   this particular paper by Dr. Ehrensaft that is based
12   upon the presumption that those are -- who receive
13   the affirmative approach are going to be completely
14   cured of their difficulties that they experience.
15   And my point is that when you say indicated, it
16   fails to recognize the -- the challenges that are
17   emerging for that outcome.
18        Q.   Sure.  But my last question wasn't whether
19   it was indicated.  My last question is whether under
20   each of the three models -- and let me clarify
21   something.  You discuss a reparative therapy model
22   in your report; is that right?
23        A.   Yes.  Can we again go to that part just so
24   you can direct me just so we can be looking exactly
25   at what I wrote.

Case 1:19-cv-00272-LCB-LPA   Document 205-2   Filed 02/02/22   Page 56 of 112

1      Q.   Sure.  It's Page 49 going into Page 50.

2      A.   Thank you very much.  Okay.  Very good.

3      Q.   My point is --

4      A.   I do remember what I wrote.  I just want

5 to make sure we're talking about the same thing.

6      Q.   My point is that -- that I'm trying to

7 distinguish actually there are four models, if you

8 will.  The Ken Zucker model is distinguished from

9 reparative therapy in that -- in a significant way.

10            And let's go to Page 61 of Exhibit 8,

11 the highlighted portion above the watchful waiting

12 model.  It states:  If by the arrival of puberty a

13 child is still exhibiting cross-gender

14 identification and expressing a cross-gender

15 identity, that child should be supported in

16 transitioning to the affirmed gender including

17 receiving puberty blockers and hormones once it is

18 assessed from clinical interviews and psychometric

19 testing that the affirmed gender identity is

20 authentic.

21            Did I read that correctly?

22      A.   Yes.

23      Q.   Okay.  So my question was whether you

24 disclose in your report that under the watchful

25 waiting model and/or Ken Zucker's approach,

1    gender-affirming medical care is provided after the

2    onset of puberty?

3        A.   I'm trying to -- let's go back again to my

4    report and the context of the discussion that I'm

5    putting forward.  You said that was -- we were on

6    page -- page or bullet point No. 59, I think you

7    said.

8        Q.   Page 49, going into 50.

9        A.   49.  Okay.  That's where I -- that's where

10    I lost you.  I was on 59.  Sorry.  So I would also

11    add that the presentation of three broad

12    categories -- and you've mentioned a variation of

13    one of those categories saying there are four

14    approaches.  I would -- I would posit it that

15    there's a number of other hypotheses that have been

16    put forward about treatment approaches that --

17        Q.   Did you disclose any of those other

18    approaches in your report beyond the three that you

19    listed in this paragraph?

20        A.   Let me explain what I mean by that.  Okay?

21    As I repeatedly said in my declaration that there

22    are multiple hypoth -- alternative hypotheses that

23    can be put forward about the most prudent approach

24    to care.  These broad categories provide the

25    foundation for understanding the design and

1    implementation of these various applications of

2    these broad categories.

3                    The point of dividing it up into

4    three categories is to really -- and I think that

5    that is still valid -- that the starting underlying

6    scientific hypotheses or the scientific premise, I

7    should say, varies in these three different

8    approaches.  How that scientific premise is

9    translated into hypotheses that lead to care

10   approaches is -- is at issue here.  And that I think

11   is the important point that I wanted to illustrate

12   for the court.  And make it very clear that what is

13   put forward by the plaintiff experts, and they said

14   this repeatedly, is that the affirmation-only

15   approach is the only accepted intervention in the

16   care of gender dysphoria youth.  And in this paper

17   here and in my declaration, you know, challenge that

18   as far as the most prudent approach.  And that's the

19   point of why it was included in a benefit for the

20   court.

21                   The affirmation approach is not the

22   sole approach.  And there are alternative approaches

23   that haven't been adequately investigated and that

24   need to be investigated.  And this is an area of

25   unsettled controversial treatment that is going on

1    currently.

2         Q.    Sure.  But ultimately there's a

3    distinction that they are different, right?  Under

4    all three of these models, gender medical care and

5    surgical care is provided after the onset of

6    puberty?

7              MR. KNEPPER:  Objection, form.

8         A.    I would say that is an important

9    distinction because if the underlying --

10        Q.    (By Mr. Gonzalez-Pagan)  The modalities of

11   treatment, are they different?

12        A.    If the outcome of the affirmation approach

13   is proven to be not effective it would change the

14   way that one applies that model to the effected

15   patients.

16        Q.    But on the altering model, you're

17   providing medical care after the onset of puberty.

18   So the real difference has to do with prepubertal

19   children and how they're treated; is that right?

20        A.    Well, let's talk a little bit about the

21   emerging demographic of what we are experiencing

22   right now.  Many of the people --

23        Q.    But that's not my question, though.

24   Like --

25        A.    Okay.  I don't think it applies

1     exclusively to the prepub -- medical care -- I would

2     say the hormonal interventions apply only to people

3     that have progressed at least to stage two puberty.

4     Social affirmation applies across the board and

5     would be relevant whether one presented during

6     adolescence or in childhood.

7         Q.   But social affirmation is not a medical or

8     surgical treatment.

9         A.   Many would argue that.  And I would say in

10    a technical sense, that is true.  However, there are

11    many concerns that are evidenced in the literature,

12    that that influences the trajectory of the children

13    as to whether they go on to medical care.  So many

14    can and have argued that it is the first step that

15    is leading them on to the subsequent hormonal

16    interventions.  So I think it is relevant.

17        Q.   In Paragraph 50 in discussing -- in

18    describing the watchful waiting approach, you note

19    that this approach may include the use of

20    scientifically validated treatment, e.g., CBT, for

21    the patient's anxiety, depression, social skill

22    deficits or other issues.

23            But you do not note that

24    gender-affirming medical care and surgical care are

25    provided under this approach.  I'm just wondering

Case 1:19-cv-00272-LCB-LPA   Document 205-2   Filed 02/02/22   Page 61 of 112

1    why you did not provide that context in your report?

2        A.   Because that's under the premise that the

3    affirmative approach actually provides benefit, and

4    throughout my declaration I have raised multiple

5    concerns with existing published data that lead to a

6    presumptive or tentative conclusion that at best we

7    should have more caution to that approach.

8        Q.   So at best your description of the

9    watchful waiting approach in this paragraph is

10   incomplete?

11       MR. KNEPPER:  Objection.

12       A.   Let's read through and we can even read it

13   into the record if you'd like, the way that I

14   present that.  Because that's where I think it's

15   important to look at this in context.

16       Q.  (By Mr. Gonzalez-Pagan)  Actually let's

17   just -- let's just go to Paragraph 53 of your

18   declaration.  It states:  Another controversy --

19       A.   Hold on.  I'm not there yet.

20       Q.   Okay.  I'll wait for you.

21       A.   It's a long paragraph.

22       Q.   Well, I'm right at the beginning of

23   Paragraph 53.

24       A.   It starts with "assistance"?

25       Q.   Paragraph 53.

1          A.    Paragraph 53 talking about another

2     controversy, the watchful waiting treatment; is that

3     what you're talking about?

4          Q.    Sure.

5          A.    Okay.

6          Q.    I'll just read the heading:  Another

7     Controversy, the watchful waiting treatment modality

8     involves no medical treatment and is currently the

9     best specifically -- sorry -- is currently the best

10     scientifically supported intervention for young

11     children reporting gender dysphoria.

12                    But the watchful waiting model does

13     involve medical treatment; isn't that right?

14          A.    Perhaps to clarify that statement when I

15     say young children when we're referring to

16     prepubertal children, that is true, and it is

17     actually included in the Endocrine Society

18     guidelines.  As far as the concerns about

19     intervening and the caution that should be expressed

20     precisely because of the high rates of desistence.

21                    So that statement, again, when we're

22     talking about social affirmation and your contention

23     as I'm hearing it as you're stating it is social

24     affirmation is not technically a medical

25     intervention.  And I think we've already discussed

1    that.  That it is relevant as far as the first step

2    in influencing the trajectory of these individuals.

3           Q.    This case --

4           A.    And there's also --

5           Q.    So this case involves gender-affirming

6    care, right?

7                 MR. KNEPPER:  Object to form.

8                 MR. GONZALEZ-PAGAN:  I apologize, Sheryl.

9           A.    So -- so -- okay.  Let's -- let's also

10   move on.  So if -- if you then look at the first

11   stage of medical intervention which involves the

12   administration of an GnRH agonist or also known as a

13   puberty blocker, significant concerns that that

14   normal trajectory where you see the majority 50 to

15   98, I would say 85 percent have the desistence.

16   That demographic or that statistic changes

17   drastically in those individuals that have received

18   that first step of pubertal blockade and that

19   actually most of the studies that have been

20   published thus far says the vast majority of -- it's

21   not 100 percent.  It's very close to that -- will go

22   on cross-sex hormones.  So again that is not -- that

23   is more the affirmative model.

24                      The watch and wait model would posit

25   that as a child begins into their puberty, that

1    acknowledging that the bodily changes that occur may

2    heighten the level of dysphoria that they

3    experience.  But as they go through that

4    developmental process, that experience of puberty is

5    actually critically important in the overall

6    integration of one's identity with their sex.  And

7    that would be consistent with the watch and wait

8    model.  So that again, as being presented in this

9    one review article by Dr. Ehrensaft -- much more I

10   could say about that -- I think there's much more to

11   be said about the way that these models are being

12   presented.

13        Q.   The study that you -- the study to which

14   you refer regarding persistent cross-gender

15   identification following the provision of GnRH

16   analogue, is that the de Vries study?

17        A.   That's the one that shows a hundred

18   percent persistence or a hundred percent moving that

19   across sex hormones.  There's been subsequent ones

20   where it's not been a hundred percent, but it's been

21   the 90 percent range.

22        Q.   You say that those studies pertain to the

23   application of the gender-affirmation model, but the

24   de Vries study is actually speaking to the watchful

25   waiting model.  It is the Dutch model.

1      A.   We need to say a lot more about that if we
2   want to flesh that out for you.  I don't know that
3   you've adequately characterized the Dutch model.
4   And I will add that the Dutch model was presented a
5   decade ago with a different patient population that
6   is currently presenting at the gender clinics across
7   the world.  And even --
8      Q.   But that's a different point than -- than
9   the one that we're talking about, right?  You
10  indicated that the affirmation model -- studies show
11  that the affirmation model leads into persistence,
12  but you're relying on a study based on the Dutch
13  model.
14     A.   Well, I would qualify that statement.  I
15  didn't say that it leads to that model, because the
16  way the study was conducted, you know, causal effect
17  cannot be inferred.  Okay?  So I would moderate
18  that.  But I would say it's certainly of concern
19  that that number is drastically different than the
20  prior studies that have shown that rate of
21  spontaneously -- spontaneous realignment with gender
22  identity with sex.
23     Q.   But those are different populations,
24  right?  I mean, we're talking about prepubertal and
25  pubertal youth versus prepubertal youth?

1          A.    Not necessary -- so, again, you know, it

2     would be much more helpful to talk about specific

3     studies.  In the de Vries study, the whole basis of

4     giving pubertal blockers applied only to pubertal

5     patients.

6          Q.    That's by definition any person who's

7     receiving puberty blockers.

8          A.    No necessarily.

9          Q.    It has to happen at the onset of puberty.

10         A.    Well, yes, onset of puberty, that would be

11    the only indication for giving it in the area of

12    pediatrics.

13              MR. GONZALEZ-PAGAN:  All right.  How about

14         we break now for lunch?

15              MR. KNEPPER:  Dr. Hruz?

16              MR. GONZALEZ-PAGAN:  Well, I'm -- I'm

17         hungry, so.

18              MR. KNEPPER:  I know.  This works with

19         your diet?

20              THE WITNESS:  Yeah.  I think as we go

21         through this, I'm going to be happy just

22         plowing through.  So it's going to have to come

23         from your end if you want to take a break.

24              MR. GONZALEZ-PAGAN:  Well, it's coming

25         from my end.  Because I -- I'm running on a

1    have to demonstrate a concept of what we call

2    non-inferiority.  So if that's the natural outcome,

3    so if there's a realignment with gender identity

4    with sex and that obviates the need for them to go

5    on to receive hormonal treatment of any sort at all,

6    that would be a desired outcome.

7                    The challenge is that in those

8    individuals, there is no reliable diagnostic test to

9    predict which of those children are in the category

10   of 85 percent, like we go to this realignment versus

11   the subset that's going to persist in that sex

12   discordant gender identity.

13                   So that's the challenge.  So I would

14   say I wouldn't be so firm to make an absolute

15   determination of the best course of action, but I

16   wouldn't say that any alternate approach would have

17   to prove that non-inferiority outcome.

18        Q.   (By Mr. Gonzalez-Pagan)   Okay.  And the

19   desistence study speaks to prepubertal youth who

20   were diagnosed with gender identity disorder under

21   the DSM-III or the DSM-IV; is that right?

22        A.   So this is -- I'm very much aware of that

23   critique, and the way that people have attempted to

24   dismiss that desistence literature based upon that

25   difference of gender identity disorder versus gender

1    dysphoria.  It's very interesting that if you look

2    in detail for example at that same paper the number

3    of people based upon the criteria --

4         Q.   I'm sorry, Doctor.  I apologize for

5    interrupting.  But I guess -- I'm happy to go into a

6    conversation about this.  But I guess I have a

7    predicate question, which is I want to establish

8    whether it's true or not that the desistence studies

9    are based on prepubertal children diagnosed with

10   gender identity disorder as opposed to gender

11   dysphoria under the DSM-5?

12        A.   Well, older studies would certainly

13   necessitate that they use the diagnostic criteria

14   that was available at the time the study was

15   conducted.  And some of them -- and most of those

16   studies were the era prior to the revision of the

17   DSM-5 giving the gender dysphoria diagnosis.

18        Q.   Are you aware of any studies looking into

19   the desistence in prepubertal youth using the DSM-5

20   criteria?

21        A.   You know, that is an outstanding question

22   and I'm very happy to share with you the problems

23   with that question.  In the fact that because of

24   what has happened in the approach to the care of

25   these individuals, the opportunity because of the

1   widespread adoption of the affirmation only approach

2   and the early adoption of social affirmation makes

3   it very challenging to be able to even put forward

4   as a hypothesis a study that would be able to

5   operate under the current diagnosis of gender

6   dysphoria.

7               And I think that's very problematic

8   as we seek to understand the natural history of this

9   disease, and we seek to find ways to alleviate the

10  suffering that will be sustained long-term in these

11  individuals.  I think it's the fact that the

12  discussion is not allowed to occur and the studies

13  have not been proposed and conducted.  And even if

14  they were, there would be challenges in the current

15  environment of really encouraging that social

16  affirmation approach.

17              So the answer to the question is that

18  there are many problems that currently exist as to

19  why those studies have not been reported and would

20  be very difficult to perform at this point in time,

21  yet would be essential to providing the best care

22  for these individuals.

23      Q.   Okay.  But you do not know of any studies

24  documenting an 85 percent desistance rate for kids

25  diagnosed -- prepubertal kids diagnosed with gender

1  dysphoria mode in the DSM-5?

2      A.   I'm not aware the question has actually

3  been investigated by a scientific trial.  Not that

4  there's data that says it doesn't exist, but that it

5  has not been investigated.  The only data that's

6  available right now are people that have received

7  that social affirmation which clearly shows that

8  that demographic has changed.  And, you know, if you

9  ask this as a hypothesis --

10     Q.   I appreciate that, Dr. Hruz.  We'll get to

11  the demographic changes later on.  But I want to

12  stay focused.  So going back, the studies have to

13  do -- the studies in desistance that you reference

14  have to do with prepubertal children; is that right?

15     A.   The ones that were done previously that

16  I'm referring to dealt with prepubertal children.

17  Now, there's another component of this, that of --

18  you divided this between prepubertal and adults.

19  And it's very necessary if we're going to adequately

20  address this question to consider what happens

21  during the period of puberty.

22     Q.   Okay.  Are there studies that document

23  desistence during the period of puberty?

24     A.   There are case reports.  There are not --

25  and there's a growing -- this gets at the --

1    Q.   In your report you state that case reports
2    are not valid scientific evidence.
3    A.   They are useful for hypothesis generation.
4    They're not useful for making definitive causal
5    conclusions.   That is correct.
6    Q.   So are there any studies showing high
7    desistence among adolescence diagnoses with gender
8    identity disorder?
9    A.   There are not.  And the reason for that,
10   again, is because in many of the studies where one
11   looks at this, there's a very, very high dropout
12   rate in many of the subjects where one can't
13   conclude at all what the outcomes were.  Based upon
14   the available evidence, more by case reports of
15   growing number of people experiencing this
16   desistence, that did occur when it's experienced
17   post pubertally would lead one to raise hypotheses
18   to be investigated in a rigorous scientific manner
19   to address that question.
20   Q.   You believe that all medical treatment
21   needs to be subjected to randomized clinical trial?
22   A.   It depends on -- so every medical decision
23   that is made is based upon consideration of the
24   overall risk and the overall benefit.  And I think
25   that the greater the risk, the greater the scrutiny

1    are certainly --

2          Q.    But that's just a hypothesis; is that

3    right?

4          A.    You know, all along here, I've been

5    tell -- I've been stating, and I hope very clearly,

6    that much of my opinion is based upon hypotheses and

7    alternative hypotheses, because there is no

8    definitive answer to this question.  But the

9    prevailing current hypothesis that's not presented

10   as a hypothesis, it's presented as an established

11   fact, is that gender-affirming interventions are the

12   solution to gender dysphoria.  And that is what I

13   challenge.  And that is what, I think, is very

14   important for this court to understand, is that the

15   scientific evidence does not support that as being a

16   cure for all of the difficulties that these

17   individuals are experiencing.

18         Q.    Going back to the desistence studies.

19   What is the error rate for the desistence studies

20   that you rely on?

21         A.    So the error rate is -- there's a number

22   of factors.  I'm glad that you brought this up as

23   far as, you know, how we think about the reliability

24   of studies.  So this is a problem throughout the

25   literature.  And I've addressed this in my

1    Q.   (By Mr. Gonzalez-Pagan)  Are you aware

2    that the American Psychiatric Association opposes

3    reparative therapy efforts regarding gender

4    identity?

5    A.   Now we're into a new line of questioning

6    about medical societies.  But I'm aware of -- of the

7    general recommendations for affirmation only.  That

8    is entirely consistent with what has been put

9    forward by WPATH, American Psychological

10   Association.  There's a little bit more caveat in

11   the Endocrine Society guidelines.  I think they're a

12   little bit more cautious in the prepubertal

13   children, at least in the 2009 document cautioned

14   against social affirmation in recognition of the

15   same desistence literature that I'm referring to.

16   Again, not just my opinion.  This is the

17   professional societies in the 2009 guidelines

18   acknowledged those studies of being relevant to that

19   consideration of treatment.

20   Q.   Sorry.  I just don't want us to go down a

21   different path.  I'm not talking about the general

22   position statement about gender-affirming care.  I

23   am talking about the physician statements regarding

24   conversion therapy.  Are you aware that the American

25   Psychiatric Association opposes conversion therapy

1    eff -- conversion therapy efforts?

2          A.    The reason I answered in the way I did to

3    your previous question was not to evade the

4    question.  It was merely to -- you began with a

5    professional association.  And so it's necessary to

6    acknowledge what the basis of those statements are.

7    The APA recommends the affirmative approach to care.

8          Q.    Okay.  But that's not my question.  That

9    is a different position statement.  And I'm glad --

10    yeah, the APA does do that.  But does the American

11    Psychiatric Association also have a position

12    statement regarding conversion therapy?

13          A.    Okay.  Thank you.  Because you used the

14    word "conversion therapy" for the first time.  I

15    think it's very important for us to acknowledge when

16    we're talking about reparative therapy and what

17    people talk about as far as conversion therapy.

18    That's actually a pejorative term that actually is

19    trying to equate these efforts to realign gender

20    identify with sex to a completely different

21    condition related to same sex attraction with

22    methods that virtually everyone would recognize as

23    being unethical.

24                    And so I think it's an injustice

25    to -- and the statements are often made in the

1    literature published talking about conversion

2    therapy.

3        Q.   All right.  One second.  Let's just go --

4    let's just go to Page 49 of your report,

5    Paragraph 52.

6        A.   Sorry.  Paragraph 52?

7        Q.   Yeah.  So very last sentence going into

8    the next page of your report states:  The first

9    approach often referred to as conversion or

10   reparative -- reparative therapy --

11       A.   Correct.

12       Q.   -- is directed to or actively supporting

13   and encouraging children to identify with their

14   biological sex.

15                 Did I read that correctly?

16       A.   I could add often incorrectly referred to

17   as conversion therapy.  I think that's probably

18   something I could have added to my declaration to

19   indicate that.  I think it's incorrect and an

20   injustice to use that term to describe the approach

21   to -- to addressing gender dysphoria.

22       Q.   Are you aware that the American -- you

23   know what, let's -- I apologize.  I forgot the stamp

24   again.  It is marked Exhibit 10.  Do you see that?

25                 (Whereupon Exhibit 10 was

1                    introduced for identification.)

2        A.    Correct.  I see this.

3        Q.    (By Mr. Gonzalez-Pagan)  Okay.  Under the

4    position heading at the bottom of the page, in

5    Paragraph 2, it states:  APA recommends that ethical

6    practitioners respect the identity for those with

7    gender diverse expression.

8                    Did I read that correctly?

9        A.    I'm in the wrong paragraph.  You said the

10   second paragraph?

11       Q.    Under -- under the heading position at the

12   bottom of the page?

13              MR. KNEPPER:  Omar, I think you made -- I

14         think you swapped gender and diverse.  But it's

15         just -- in other words, I think you read gender

16         diverse expression and it's diverse gender

17         expression.

18       Q.    (By Mr. Gonzalez-Pagan)  Sure.  Let me

19   just read that again.  Are you there?

20       A.    I'm here.  Okay.  I'm sorry.  I was

21   reading the introductory paragraph.  Sorry.

22       Q.    Okay.  It states, Paragraph 2, quote:  APA

23   recommends that ethical practitioners respect the

24   identity for those with diverse gender expressions.

25                    Did I read that correctly?

1          A.   Yes.

2          Q.   Then just below that on Paragraph 3 on the

3     next page, it states, quote:  APA encourages

4     psycho -- psychotherapies which affirm individual's

5     sexual orientations and gender identities.

6                    Did I read that correctly?

7          A.   Yes.

8                    (Whereupon Exhibit 11 was

9                    introduced for identification.)

10         Q.  (By Mr. Knepper)  Showing you what's been

11    marked as Exhibit 11.

12         A.   I see it.

13         Q.   Okay.  This is a resolution by the

14    American Psychological Association on gender

15    identity change efforts.  Is that right?

16         A.   That's the title of this document,

17    correct.

18         Q.   It's dated February 2021; is that correct?

19         A.   That's correct.

20         Q.   Go to the second page, third to last

21    paragraph on the right-hand side column.  And it's

22    use of GICE as an acronym for gender identity change

23    effort; is that right?

24         A.   I see that, yes.

25         Q.   It reads:  Whereas, GICE has not been

1   shown to alleviate or resolve gender dysphoria

2   (Bradley and Zucker, 1997; Cohen-Kettenis & Kuiper,

3   1984; Gelder and Marks, 1969; Greenson, 1964; Pauly,

4   1965; and SAMHSA, 2015).

5               Did I read that right?

6       A.   You did.

7       Q.   If you go to Page 3, the last two

8   paragraphs, on the right-hand side column, it

9   states:  Be it therefore resolved, that consistent

10  with the APA definition of evidenced-based practice

11  (APA 2005), the APA affirms that scientific evidence

12  and clinical experience indicates that GICE put

13  individuals at significant risk of harm.

14              Be it further resolved that the APA

15  opposes GICE because such efforts put individuals at

16  significant risk of harm and encourages individuals,

17  families, health professionals, organizations to

18  avoid GICE.

19              Did I read that correctly?

20      A.   You did.

21      Q.   Okay.  So the American Psychiatric

22  Association and the American Psychological

23  Association both oppose reparative therapy as a form

24  of treatment; is that right?

25      A.   Gender identity change efforts as stated

1    in the document, which again is different than what

2    people generally equate with conversion therapy, in

3    quotes.

4         Q.   And the American Psychiatric Association

5    and the American Psychological Association consider

6    gender identity change efforts to be unethical and

7    harmful; is that right?

8         A.   That's what's stated in these documents.

9         Q.   All right.  I will apologize in advance,

10   that exhibit is large and will make navigating it a

11   little difficult.  Hopefully it will take a little

12   bit longer to upload.

13                        (Whereupon Exhibit 12 was

14                        introduced for identification.)

15        Q.   (By Mr. Gonzalez-Pagan)  Showing you

16   what's been marked as Exhibit 12.  It's a document

17   entitled Understanding the Well Being of LGBTQI Plus

18   Population.  Is that right?

19        A.   That's the title in the document that I'm

20   looking at, yes.

21        Q.   It appears to have been published in 2010;

22   is that right?

23        A.   It says 2020.

24        Q.   Sorry.  2020.

25        A.   Okay.

1   correctly.  And that many of the studies that are
2   referenced here have major methodologic weaknesses
3   and the strength of the statement based upon that
4   evidence in light of the emerging evidence that is
5   coming forward, for example, in the other studies
6   that we've discussed already today --
7        Q.   Well, let's --
8        A.   -- this conclusion can be scrutinized.
9        Q.   Let's move to the next page.  The
10  highlighted statement reads:  The available evidence
11  suggests that sexual orientation and gender identity
12  conversion efforts were ineffective and dangerously
13  detrimental to the health of SGD population,
14  especially for minors who are unable to give
15  informed consent.
16            Did I read that correctly?
17       A.   I'll say again, you read it correctly.
18  And the meaning of that statement and context of the
19  whole paper is something that we can discuss later.
20       Q.   Would you agree that it is the position of
21  the National Academies of Sciences, Engineering and
22  Medicine that conversion therapy is harmful?
23            MR. KNEPPER:  Objection, form.
24       A.   I don't know whether the small panel of
25  people that were included in generating this

1    consensus statement represents the entire views of

2    the entire membership of that society.  I know from

3    my own experience that for the other societies that

4    I'm involved with these types of consensus

5    statements are not brought to the entire membership

6    of the organization.  I can only conclude that the

7    members that were present on this panel made those

8    conclusions.  I would not go as far as to say that

9    it was supported by every member or even majority or

10   even substantial number of the rest of that group.

11       Q.   (By Mr. Gonzalez-Pagan)  If you go to the

12   fourth page of the PDF.

13       A.   Back up to the top now?  Okay.

14       Q.   On the last sentence, the second clause,

15   it states:  It represents the position of the

16   National Academies on the statement of facts; is

17   that right?

18       A.   That is what is stated here, and that is

19   also stated by other organizations that have put

20   forward similar statements.  The same concern

21   applies, that just because they put it forward, it

22   does not mean that -- that the entire membership has

23   been able to weigh into this question or those that

24   wish to do so.

25       Q.   Was the review that you referenced in

1      A.   You know, again I don't have the answer.

2    I don't know.

3      Q.   Okay.  Are you aware that in the United

4    Kingdom, medical and surgical care is provided for

5    transgender adolescents post puberty and for

6    transgender adults?

7           MR. KNEPPER:  Objection to form.

8      A.   I guess I didn't understand the question

9    there.

10     Q.   (By Mr. Gonzalez-Pagan)  Sure.

11                    (Simultaneous speakers.)

12     Q.   (By Mr. Gonzalez-Pagan)  You talk about --

13   you talk about the reviews in the United Kingdom, in

14   Finland and in Sweden.  So I'm curious, are you

15   aware -- are you aware whether in the national

16   health system in the United Kingdom, they provide

17   coverage and treatment for gender dysphoria in post

18   prepubertal adolescents and adults?

19     A.   So I think it's reflected in the recent

20   Tavistock versus Bell decision.  It is recognized

21   that this is an area of controversy and that is an

22   unsettled question about --

23     Q.   Well, the Tavistock decision has to do

24   with minors.  I'm talking about adults and cross-sex

25   hormones and surgery.  Are you aware whether in the

1    United Kingdom they provide coverage and treatment

2    of cross-sex hormones and surgery as a modality of

3    treatment for gender dysphoria?

4         A.   Yes, I do.

5         Q.   Okay.  Same question with regards to

6    Sweden?

7         A.   Sweden -- again, I'm a pediatric

8    endocrinologist.  And I think that the caution that

9    is put forward in relegating this care to the

10   setting of -- of an experimental setting is where

11   it's been pulled back with concerns based upon

12   the --

13        Q.   The restrictions to which you speak all

14   relate to the provision of puberty blockers; is that

15   right?

16        A.   No.  I think it's more extensive than

17   that.  But it -- it acknowledges that based upon the

18   literature that there's not very stong evidence and

19   then instructs that this care be delivered with the

20   safeguards exactly as I'm saying, you know, it

21   should be done here in the United States.

22   Recognizing that this is --

23        Q.   That's in the context of minors, though;

24   is that right?

25             MR. KNEPPER:  Objection, form.

1          A.    Again, that's what I've addressed in my
2     declaration.   And that is my --
3          Q.    (By Mr. Gonzalez-Pagan)  But with regards
4     to transgender adults in Sweden, does the
5     nationalized healthcare system in Sweden provide
6     coverage and treatment for gender dysphoria in the
7     form of hormones and surgical care?
8          A.    You know, I would say this is outside the
9     scope if we're getting into a discussion about
10    insurance coverage.   My expertise is in looking at
11    the scientific data about the affirmation and
12    other --
13         Q.    Well, you rely on the national reviews of
14    Sweden, Finland, and the United Kingdom.   So --
15         A.    Correct.
16         Q.    -- I'm wondering if you rely on the
17    national reviews, I think it's pertinent and
18    relevant whether you disclose in your report that
19    these countries provide for the treatment and
20    coverage of this care?
21              MR. KNEPPER:  Objection, form, scope.
22         A.    As a pediatric endocrinologist and
23    physician scientist, my service to this court is not
24    to opine upon -- I know it's a big part about this
25    case about insurance coverage.   My role in this

1    gender-affirming treatment for adults?

2         A.   Again, I would have to say for me to

3    comment specifically about that, we would need to

4    have the document in front of me to be able to look

5    through all of the papers.  It was a very extensive

6    study.  And there are a number of papers there.

7              And so I would have to look through

8    the papers to specifically look at the inclusion

9    criteria, whether it was exclusively in kids or

10   included adults and, again, how he defined, you

11   know, adulthood, whether it's post prepubertal, post

12   18, early 20s.  You know, many people have different

13   definitions of that.  And so --

14        Q.   All right.  Same line of questioning with

15   regards to Finland.  Did you disclose that Finland

16   provides through its national -- nationalized health

17   care system gender-affirming treatment for gender

18   dysphoria for adults?

19             MR. KNEPPER:  Objection, form, scope.

20        A.   I'm going to state again that for me to

21   opine on that, I would need to look at, in those

22   studies, what the inclusion -- inclusion criteria

23   and whether it extended into adulthood.

24        Q.   (By Mr. Gonzalez-Pagan)  My -- my -- my

25   question is not pertinent to the report.  It's not a

1    question of whether they reviewed it.  It's a
2    question whether that care is provided in Finland.
3            MR. KNEPPER:  Objection, form.
4        A.   I will say again that this is a question
5    related to insurance coverage.  And I'm a pediatric
6    endocrinologist, physician scientist opining on
7    issues of science, not on medical coverage.
8        Q.  (By Mr. Gonzalez-Pagan)  One moment,
9    please.  Let's take a -- well, actually no.  We'll
10   come back.  In your report you disclose the Bell v.
11   Tavistock position; is that right?
12       A.   That's correct.
13       Q.   That was a decision from December 2020 in
14   the United Kingdom?
15       A.   Correct.  And it was before the appeals
16   court decision came out recently.
17       Q.   And you submitted an expert report in
18   Tavistock; is that right?
19       A.   In that Bell versus Tavistock case, I did.
20       Q.   Are you aware that the Bell v. Tavistock
21   case dealt solely with the ability of a minor to
22   provide informed consent on their own?
23           MR. KNEPPER:  Objection to form.
24       A.   So the decision was based on that.  But
25   that was not what I was opined [sic] to comment on.

1    there's no indication here that this was a

2    peer-reviewed document.  It wasn't published in a

3    journal in the typical way that we do it.  So it's a

4    Council for Choices -- recommendations of the

5    Council for Choices in Healthcare in Finland.  So

6    this is -- the council itself came to this

7    conclusion to answer your question.

8         Q.   Let's go back to Exhibit 12.

9         A.   I'm there.

10        Q.   All right.  We're going to go to

11   Page 12-10.  It is Page 311 of the PDF.

12        A.   I wish there was a way you could just type

13   in the number and get to it.

14        Q.   Don't we all.

15        A.   Okay.  This is with the section that's

16   titled Guidelines and Policies Related to

17   Gender-Affirmation?

18        Q.   That's right.

19        A.   Very good.

20        Q.   The highlighted statement states:

21   Clinicians who provide gender-affirming psychosocial

22   and medical services in the United States are

23   informed by expert evidence-based guidelines.  In

24   2012, the World Professional Association for

25   Transgender Health, WPATH, published Version 7 of

Case 1:19-cv-00272-LCB-LPA   Document 205-2   Filed 02/02/22   Page 88 of 112

1    the Standards of Care for the Health of Transgender,

2    Transsexual, and Gender-Nonconforming People, which

3    have been continuously maintained since 1979, and

4    revisions for Version 8 are currently underway

5    (Coleman, et al., 2012).  Two newer guidelines have

6    also published -- have also been published by the

7    Endocrine Society (Hembree, et al., 2017), and the

8    Center of Excellence for Transgender Health (UCSF

9    Transgender Care, 2016).  Each set of guidelines is

10   informed by the best available data and is intended

11   to be flexible and holistic in application to

12   individual people.  All of the guidelines recommend

13   psychosocial support in tandem with physical

14   interventions and suggest timing interventions to

15   optimize an individual's ability to give informed

16   consent.  Mental and physical health problems need

17   not be resolved before a person can begin a process

18   of medical gender-affirmation, but they should be

19   managed sufficiently such that they do not interfere

20   with treatment.

21              Did I read that correctly?

22        A.   You indeed read that correctly.

23        Q.   Okay.  This is a consensus study report by

24   the National Academies of Sciences, Engineering and

25   Medicine of the United States; is that right?

1       record.  This is Media Unit No. 5.  The time is

2       4:05 Eastern time.

3            Q.  (By Mr. Gonzalez-Pagan)  Dr. Hruz, one of

4       the critiques in your report is that puberty

5       blockers have not been approved by the FDA as a

6       treatment for gender dysphoria; is that right?

7            A.   That is correct.  Although it's important

8       to understand why that is a relevant piece of

9       information.

10           Q.   Well, let's go to page 50 of your report.

11           A.   I'm there.

12           Q.   Okay.  On the -- there's a number of

13      statements that you bold and italicize, but on the

14      third -- the sentence involving the third bold and

15      italics.

16           A.   Okay.

17           Q.   It's like in the middle of the page.  It

18      states:  The off-label prescription of this drug is

19      legal but unethical outside the setting of a

20      carefully controlled and supervised clinical trial.

21                Did I read that correctly?

22           A.   You did.

23           Q.   And why is that?

24           A.   So, again, this relates to the statements

25      that are made that these drugs are known to be safe

1  in this patient population.  And we really don't

2  have the scientific evidence to make that statement.

3  Because it's unknown what the -- some of the effects

4  are known, but many of the effects are unknown, to

5  be able to expose people to this intervention, not

6  only to expose them to that, but to make the

7  statement that it is known to be safe with that

8  absence of evidence, it really finds itself outside

9  of what I'd consider ethical.

10      Q.   Just for clarify, what do you understand

11  "off-label" use to mean?

12      A.   Oh, it's actually very common in the area

13  of pediatrics.  It's to prescribe a medication for

14  something that it has not been FDA approved.  So it

15  could be for another -- a drug that's approved for

16  one purpose and using it for another purpose.  Most

17  often that's how it's used.

18      Q.   Have you personally ever prescribed any

19  drugs on an off-label basis?

20      A.   Very frequently do.

21      Q.   Do you do so even in the absence of

22  randomized clinical control trials?

23      A.   Usually when I prescribe them off-label,

24  there are randomized controlled trials in different

25  populations that I turn to.  I look at the relative

1    risk and -- but I don't make the statement that we

2    know with definity [sic] about the safety of a

3    medication in a way that we don't have that

4    information.

5         Q.   And you said usually.  So there are times

6    when you prescribe off-label drugs even in the

7    absence of clinical controlled randomized trials?

8              MR. KNEPPER:  Objection, form.

9         A.   Usually when I'm prescribing it, what we

10   would consider off-label most often, it is for a

11   condition that is not markedly different for the use

12   that it is being given only that it had been

13   approved most often for adults rather than children.

14        Q.   (By Mr. Gonzalez-Pagan)  And clinical

15   control trials are actually relatively rare in the

16   pediatric population?

17        A.   No.  I would say that -- I mean, that's

18   the standard that's accepted especially for

19   medication use.  The reason why they're not done in

20   pediatrics is that usually there's a substantial

21   cost associated with that.  People are looking at

22   market share and, you know, how much it's going to

23   cost to be able to study that drug in that patient

24   population.  Yet it's already been studied in a

25   randomized control trial in a similar population

1    without the same caveats that we consider when we

2    look at this question of pubertal blockade.

3         Q.   What is the FDA?

4         A.   The Food and Drug Administration.

5         Q.   Does the FDA regulate prescription drugs?

6         A.   Yes.

7         Q.   What is the FDA's decision with regards to

8    a prescription of off-label use of drugs?

9              MR. KNEPPER:  Objection, form, scope.

10        A.   You know, I don't know that they have a

11   statement that there is an ethical responsibility

12   that all physicians who are prescribing off-label.

13   It also applies both to the prescribing physician

14   and it also applies to the pharmaceutical company

15   that's making the medication.

16             If it's off-label, they cannot market

17   it to a group of people that it wasn't approved for.

18   Physicians that prescribe off-label medications

19   accept the responsibility, you know, for the risks

20   and benefits.  And they're obligated to inform their

21   patients of the evidence that they have, where it

22   comes from, and the basis for recommending that

23   medication.

24             That's true for all medications, but

25   certainly when you're using it off-label, you know,

1  it involves consideration of the indication, how
2  applicable the randomized control studies that have
3  been done to approve the drug are applicable to the
4  population that you're going to use it for.
5                     (Whereupon Exhibit 14 was
6                     introduced for identification.)
7       Q.  (By Mr. Gonzalez-Pagan)  Showing you what's
8  been marked as Exhibit 14.  Do you have that in
9  front of you?
10      A.   I do.
11      Q.   This appears to be a notice by the Food
12 and Drug Administration in the Federal Register
13 dated November 18, 1994, pertaining to a citizen
14 petition regarding the Food and Drug
15 Administration's policy on promotion of unapproved
16 uses of approved drugs and devices, request for
17 comments.
18      A.   I see that.
19      Q.   Did I -- did I describe the document
20 correctly?
21      A.   I've not read the entire document.  But
22 that section that you read was read correctly.
23      Q.   Okay.  Going on to the second page.  It's
24 a highlighted portion.  I will represent any
25 highlights in the document were done by me.  And

1    there are no other alterations to the document.

2              The highlighted portion reads:  Over

3    a decade ago, the FDA Drug Bulletin informed the

4    medical community that once a drug product has been

5    approved for marketing, a physician may prescribe it

6    for uses or in treatment regimens of patient

7    populations that are not included in approved

8    labeling.

9              The publication further stated

10   unapproved, or more precisely unlabeled uses may be

11   appropriate and rational in certain circumstances

12   and may, in fact, reflect approaches to the drug

13   therapy that have been extensively reported in

14   medical literature.  Valid new uses of drugs already

15   on the market are often first discovered through

16   serendipitous observations and therapeutic

17   innovations, subsequently confirmed by well-planned

18   and executed clinical investigations.

19              Did I read that correctly?

20        A.   You did, indeed.

21        Q.   Your report doesn't acknowledge that the

22   long-standing position of the FDA has -- with

23   regards to off-label use of drugs?

24        MR. KNEPPER:  Objection, form.

25        A.   I would say that this paragraph that you

1    read does not directly apply for the reason for my

2    consideration of this use of GnRH agonist in

3    pubertal adolescence for gender dysphoria is the

4    same.  And it's important to note in this paragraph,

5    it says the word "may."  It doesn't guarantee that

6    it is.  And it reflects the nature of the

7    application that one is providing.

8                        (Whereupon Exhibit 15 was

9                        introduced for identification.)

10        Q.  (By Mr. Gonzalez-Pagan)  Introducing what

11   has been marked as Exhibit 15.  Noted below, the

12   creator of the document is a printout of a web page

13   from the Food and Drug Administration's website.  It

14   is titled Understanding and Approved Use of Approved

15   Drugs Off-Label.

16                        Did I read the title of this web page

17   correctly?

18        A.  Yes, you did.

19        Q.  Okay.  Moving on to the second page,

20   there's a highlighted portion.  I will stipulate for

21   the record that any highlights in this document were

22   inserted by me and that there are no other

23   alterations to the document.

24                        The highlighted portion of the

25   document states:  From the FDA perspective, once the

1  FDA approves a drug, healthcare providers generally
2  may prescribe the drug for an unapproved use when
3  they judge that it is medically appropriate for
4  their patient?
5              Did I read that correctly?
6       A.   You indeed read it correctly.
7       Q.   Before opining as to whether the use of
8  off-label puberty blockers should be considered
9  unethical, did you review the positions of the FDA
10 with regards to off-label use?
11      A.   Again, I'm very, very familiar with that.
12 Maybe perhaps not these specific documents, but I --
13 this is entirely consistent with my understanding of
14 the off-label use of drugs.
15              (Whereupon Exhibit 16 was
16               introduced for identification.)
17      Q.   (By Mr. Gonzalez-Pagan)  Showing you what's
18 been marked as Exhibit 16.  I'll represent this is a
19 guidance for institutional review board for clinical
20 investigators published by the Food and Drug
21 Administration dated January 1998.  It is titled
22 Off-Label, an Investigational Use of Marketed Drugs,
23 Biologics and Medical Devices.
24              Did I represent the document
25 correctly?

1     A.   You correctly read the title of this

2  document.

3     Q.   There is a highlighted portion in the

4  first page of the exhibit.  I'll represent that all

5  the highlights were added by me to that exhibit.

6  And there are no other alterations to the document.

7              The highlighted statement reads:  If

8  physicians use a product for an indication not in

9  the approved labeling, they have the responsibility

10  to be well-informed about the product, to base its

11  use on firm scientific rationale and on sound

12  medical evidence, and to maintain records of the

13  product's use and effects.  Use of the marketed

14  product in this manner when the intent is the

15  practice of medicine does not require the submission

16  of an Investigational New Drug Application,

17  Investigational Device Exception or review by an

18  Institutional Review Board.

19              Did I read that correctly?

20     A.   You read that section correctly.

21     Q.   Do you acknowledge this guidance of the

22  FDA in your report?

23     A.   You mean the statement that I made about

24  the ethics of prescribing the medication and the

25  need does not require that, but it does not mean

1    that it's not the approach that should be done.  So

2    that one -- for example, it's not malpractice and

3    one's not going to lose their license by prescribing

4    a medication off-label in this manner.

5                        However, when we look at the use of

6    this -- the GnRH agonist with a reference that I

7    made to the FDA off-label use involves product use

8    that is not the same as what it is used in the

9    treatment of prepubertal children and the risks

10   require -- and because of the risks of the

11   intervention and the lack of knowledge, it's very

12   different than many of the other times that I myself

13   have used off-labeled use of medications.

14                        So the statement itself is accurate.

15   It is consistent with my understanding of the FDA

16   guidelines for that.  And I think my statement in my

17   declaration fully reflects the reason why it is of

18   ethical concern in this case.

19                        (Whereupon Exhibit 17 was

20                        introduced for identification.)

21        Q.   (By Mr. Gonzalez-Pagan)  Showing you what's

22   been marked as Exhibit 17.  Are you familiar with

23   the American Academy of Pediatrics?

24        A.   I was a member of the American Academy of

25   Pediatrics for over 20 years.

1       Q.   This is a policy statement by that

2   organization titled Off-Label Use of Drugs in

3   Children; is that right?

4       A.   That is the title of the statement, yes.

5       Q.   I'll represent that there are highlights

6   within this document.  Those highlights have been

7   added by me.  And there are no other alterations in

8   the document.

9              On the abstract in the highlighted

10   portion, it states:  However, off-label drug use

11   remains an important public health issue for

12   infants, children and adolescents, because an

13   overwhelming number of drugs still have no

14   information in the labeling for use in pediatrics.

15   The purpose of off-label use is to benefit the

16   individual patient.  Practitioners use their

17   professional judgment to determine these uses.  As

18   such, the term "off-label" does not imply an

19   improper, illegal, contraindicated or

20   investigational use.  Therapeutic decision-making

21   must always rely on best available evidence, the

22   importance of the benefit for the individual

23   patient.

24              Did I read that correctly?

25       A.   You read it correctly.  And I would

1    comment that the very last sentence is at the heart

2    of my concern about how it's -- GnRH agonists are

3    being used in the setting of gender dysphoria.

4         Q.   So is your critique that the use of GnRH

5    analogues [sic] for the treatment of gender

6    dysphoria is unethical because it's not the best

7    available evidence in your opinion?

8         A.   There are many layers to the question.  I

9    would say that many of the people that are

10   prescribing these drugs are not even aware of the

11   emerging evidence that is coming forward about lack

12   of efficacy and the risks of these medications.

13   They're relying on their decision based upon

14   statements made by many of the organizations that

15   you mentioned earlier that -- that are not

16   considering the relative risk-benefit analysis.  And

17   so a provider, unless they've had the opportunity

18   like myself and others who have been familiar with

19   the literature, are going to be misled with the

20   assumption that this is the available evidence,

21   supports its use.

22        Q.   Well --

23        A.   Many of the people that are prescribing

24   these medications have not read those papers, not

25   considered those papers, not considered the poor

1      Q.   (By Mr. Gonzalez-Pagan)  Dr. Hruz, how did

2  you first come to be an expert in transgender

3  litigation?

4      A.    Well, I think it was a recognition of my

5  knowledge of the -- of the subject area and -- that

6  I had in a number of different settings including

7  the grand rounds talks that I said previously and

8  some of the things that I've been discussing for the

9  last -- since almost ten years now.

10      Q.   Do you know what the Alliance Defending

11  Freedom is?

12      A.   Yes.

13      Q.   Have you met with staff from the Alliance

14  Defending Freedom in order to discuss how to serve

15  as an expert in cases involving transgender issues?

16      A.    My involvement was mostly to tap into my

17  knowledge and expertise in this area, to inform that

18  organization of some of the relevant issues.  I've

19  never been coached on how to be an expert witness,

20  nor have I necessarily been encouraged in any way.

21  These requests have generally come from the

22  litigating lawyers, how they received my name or to

23  what extent and in what ways they became familiar

24  with my knowledge and expertise in this area is not

25  known to me.

1          Just like the other groups that I've

2    spoken to, I've been more than willing to be -- to

3    share the knowledge that I've accumulated over this

4    last decade in this area.

5          Q.   Did you attend a meeting at the Alliance

6    Defending Freedom offices in Arizona in 2017?

7          A.   I don't recall the exact date, but I did

8    travel to Arizona to meet with other individuals

9    that also had unique areas of expertise in the area,

10   yes.

11         Q.   Just to clarify, was that one or two

12   meetings?

13         A.   I think I've had two separate meetings.

14   The first was much shorter.  And the second one was

15   much more of presentations with actual data.

16         Q.   What was discussed in that first meeting?

17         A.   Again, it was many years ago.  But my

18   recollection was just to understand what was going

19   on.  It was -- it was the same types of questions

20   about the care that is being proposed and offered.

21   But it was much less defined, I think, at that point

22   in time.  It was more of an informal type of

23   meeting.

24         Q.   Who was in attendance at that first

25   meeting?

1       A.   I suspected you were going to ask me.
2    And, you know, honestly I don't remember the exact
3    composition of the people that were there.  If you
4    happen to know, I can acknowledge or deny whether
5    they were there or not.  But I've met literally
6    hundreds of people over the last ten years in
7    various settings.  I do know that at that first
8    meeting, Allan Josephson was there.  And I believe
9    that Mark Ramirez was there as well.
10      Q.   Was Jeff Shafer there?
11      A.   Yes.  He actually at that time was working
12   for ADF.
13      Q.   Was Gary McCaleb there?
14      A.   Yes.  And he was one of the first contacts
15   I had from that group.
16      Q.   When they invited you to this meeting,
17   what was the invitation, what did they tell you it
18   was going to be about?
19      A.   They had desired to convene a group of
20   people that had knowledge in this area and to be
21   able to discuss that, is my recollection at that
22   point in time.
23      Q.   Was Ryan Anderson there?
24      A.   He was at one of the meetings, the two
25   meetings, I'm not sure which -- which one.

1      Q.   About how many people were in that first

2   meeting?

3      A.   Probably about eight to ten if you include

4   Jeff Shafer and Gary McCaleb.  You know, no more

5   than a dozen, probably less than that.

6      Q.   And the second meeting, you indicated that

7   it involved some presentations; is that right?

8      A.   That's correct.

9      Q.   Was it also in Arizona?

10      A.   Yes.

11      Q.   Who was present at the second meeting?

12      A.   Similar to the first meeting.  And, again,

13   I may get mixed up, the first and second meetings.

14   There were different people that were present.  I

15   know that Walt Heyer was at one of the meetings.

16   Oxy Horvath was at one of the meetings as well.

17   You'd have to give me the other names if there was

18   any.  I'm drawing a blank.  It was a while ago.

19      Q.   Was Mark Regnerus at the second meeting?

20           THE COURT REPORTER:  I'm sorry.  What was

21      that name?

22      A.   He was only at --

23           MR. GONZALEZ-PAGAN:  Mark Regnerus,

24      R-E-G-N-E-R-U-S.

25      A.   I believe he was at one of the meetings.

1    I'm not sure which one.

2         Q.  (By Mr. Gonzalez-Pagan)  Was Patrick

3    Lappert at one of these meetings?

4         A.  He would have been likely at the second

5    meeting.

6         Q.  Was Paul McHugh at any of those meetings?

7         A.  No.

8         Q.  Was Michelle Cortella at any of these

9    meetings?

10        A.  I've encountered Michelle at a number of

11   different settings.  I'm trying to think back.  I

12   honestly -- I just can't remember.  She may have

13   been at one of them.

14        Q.  Was Quinton Van Meter at any of these

15   meetings?

16        A.  I have met with him.  I'm just trying to

17   think of what the circumstances and when he was

18   there.  Again, you know, I've met so many people

19   over many different years in many different venues.

20   It's challenging for me to remember who was in what

21   meeting.

22        Q.  Did the ADF lawyers discuss the need to

23   develop expert witnesses for litigation?

24        A.  Again since it was several years ago, I'm

25   trying to remember the exact content.  I think the

1   main focus was -- was understanding what was going

2   on to be able to understand from multiple different

3   perspectives.  One of the most helpful outcomes for

4   myself was the opportunity to talk to the

5   transitioners.  These are adults that have had the

6   experience of going through the affirmation approach

7   only to discover eight to ten years after that, that

8   it did not solve their problems.

9           It was similar to my efforts to

10  connect with parents and -- that were experiencing

11  this with their children as part of my understanding

12  of the unique circumstances facing these

13  individuals.  That's what I walked away with more

14  than anything else.  Whether there was discussions

15  about, you know, whether there were -- were

16  litigation going on is -- I just don't recall.

17       Q.   Were you aware that the Alliance Defending

18  Freedom is a religious organization?

19       A.   I think that's -- if you travel to their

20  headquarters, that's hard to miss.

21       Q.   Let's go back to your report, Exhibit 1.

22  On the third page, Paragraph 7.

23       A.   We're on my expert report.  Okay.

24       Q.   Page 3, Paragraph 7.

25       A.   Thank you.  I'm going to go to my clean

1    copy that I have printed out.  Okay.

2         Q.   Okay.  It is mentioned that you also

3    spoken with parents of children experiencing gender

4    dysphoria and earlier you mentioned that you had

5    spoken with Eli Coleman; is that right?

6         A.   That is correct.

7         Q.   And Eli Coleman is one the authors of the

8    WPATH standards of the care; is that correct?

9         A.   He's one of the lead authors, correct.

10        Q.   In Paragraph 7 you state that you have met

11   individually and consulted with several pediatric

12   endocrinologists including Dr. Norman Spack, who had

13   developed and led transgender programs in the United

14   States; is that right?

15        A.   That is correct.

16        Q.   Who's Norman Spack?

17        A.   Norman Spack was from Harvard.  He was

18   actually probably the first person to introduce the

19   Dutch model of care to the United States.  In the

20   latter years of his career, he became a very

21   outspoken advocate for that approach.  In fact,

22   Dr. Spack was invited to Washington University very

23   early on when the question was being proposed to

24   start the gender center at Washington University.

25        Q.   And you discussed the treatment of gender

1    dysphoria and transgender people with Dr. Spack?

2         A.   That's correct.

3                   (Whereupon Exhibit 19 was

4                   introduced for identification.)

5         Q.   (By Mr. Gonzalez-Pagan)  Showing you what's

6    been marked as Exhibit 19.

7         A.   So this is the declaration for Norm Spack

8    for the Drew Adams case, correct?

9         Q.   That's correct, yes.  Have you seen this

10   document before?

11        A.   I've heard of it.  I believe I saw that

12   during the -- my involvement in the Adams case.

13        Q.   He mentions that on or about October 19,

14   2014 -- sorry.  On Paragraph 8 of the declaration on

15   Page 2, he mentions that on or about October 9,

16   2014, he gave a presentation at St. Louis Children's

17   Hospital regarding the foundation of GeMS, the

18   workings of a gender management program at a

19   pediatric hospital, and in medical treatment and

20   care of gender and nonconforming and transgender

21   children and adolescents; is that right?

22        A.   Other than the word "gender" is

23   misspelled, yes.

24        Q.   It goes on to say on Paragraph 9 on the

25   next page that following the presentation, he met

1    privately with medical staff including

2    endocrinologists at St. Louis Children's Hospital to

3    answer their questions and share his knowledge and

4    experience.

5                    He then goes on to say that he also

6    in that context met privately with you at St. Louis

7    Children's Hospital when you approached him after

8    the presentation.

9                    Do you recall that?

10   A.    I recall the meeting both with the

11   faculty -- I don't specifically remember the private

12   meeting afterwards.  I do remember we had kind of a

13   round table.  We actually sat around a circle with

14   other colleagues of mine and addressed questions.

15   But I -- it certainly would be in agreement with

16   where I was at that point in time in an

17   understanding for the proposal for care involving

18   affirmation.

19   Q.    He goes on say that during his meeting

20   with you, you directly expressed that you had,

21   quote, a significant problem with the entire issue,

22   closed quote, and, quote, whole idea of transgender,

23   closed quote.  He then states that you followed up

24   these comments by stating, quote, for me it is a

25   matter of my faith, closed quote.

1          Do you recall making these statements

2     to Dr. Spack?

3          A.    I do not.

4          Q.    Do you deny making these statements to

5     Dr. Spack?

6          A.    I do not recall making those statements.

7     And it really seems to be -- I'm not sure of the

8     context of the conversation, where that came from.

9     This was a time shortly after our institution was

10    considering the adoption of the affirmative care

11    model for starting their gender center.  And very

12    clearly at that point in time, I was very early in

13    investigating the literature and I remember talking

14    with my colleagues at that very same time about the

15    questions that I had about the science, about some

16    of the statements that were being made.

17          One of the questions that came up

18    related to some of the assertions about more in the

19    area of anthropology as far as a human being and

20    whether it was possible for one to change one's sex.

21    I recall that at that point in time, you know, the

22    people were just starting to make the comments like

23    in one of the other cases where Dr. Atkins would

24    make the statements gender is sex.  And I certainly

25    challenged those assertions at that time.

1          So this is a period of discovery for

2     me.  And for me to make a definitive statement like

3     that is not really even logical from where I was at

4     that point in time.

5          Q.   Are you familiar with the St. John Paul,

6     II, Bioethics Center?

7          A.   Yes.

8          Q.   Is St. John Paul, II, Bioethics Center a

9     religiously affiliated institution?

10         A.   I believe it is, yes.

11         Q.   Did you speak at the St. John Paul, II,

12    Bioethics Center in November of 2017?

13         A.   I'm not sure of the exact date.  But I did

14    deliver a talk to that group.

15         Q.   During that talk, did you not state about

16    being transgender that, quote, in fact, probably

17    goes back to some of the early heresies in the

18    church, closed quote?

19              MR. KNEPPER:  Objection, form, scope.

20         A.   You know, I'd have to see the context of

21    when that statement was made and how it was being

22    portrayed to that audience, whether it was in

23    response to a question with context that is not

24    included in your question.

25              Again, as you mentioned, this was a