# E<span style="font-variant: small-caps;">XHIBIT</span> A

Declaration of Omar Gonzalez-Pagan in support of
Motion to Exclude Expert Testimony of Dr. Paul R. McHugh
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA (M.D.N.C.)

1            IN THE UNITED STATES DISTRICT COURT FOR

2            THE MIDDLE DISTRICT OF NORTH CAROLINA

3     *     *     *     *     *

4   MAXWELL KADEL, et. al.,  *

5      Plaintiffs              * Case No.:

6        vs.                   * 1:19-CV-00272-LCB-LPA

7   DALE FOLWELL, et.al.,      *

8      Defendants              *

9     *     *     *     *     *

10            Remote videotaped deposition of PAUL

11   McHUGH, M.D., was taken on Wednesday, September 8,

12   2021, commencing at 9:40 a.m., before Allison L.

13   Shearer, RPR, a Notary Public.

14

15

16

17

18

19

20

21   Reported By:  Allison L. Shearer, RPR

```
1   APPEARANCES:

2

3   On behalf of the Plaintiff:

4        LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.

5             Omar Gonzalez-Pagan, Esquire

6             ogonzalez-pagan@lambdalegal.org

7             120 Wall Street, 19th Floor

8             New York, NY 10005

9             (212) 809-8585

10

11       MCDERMOTT, WILL, & EMERY

12            Rachel Evans, Esquire

13            levans@mwe.com

14            500 North Capitol Street NW

15            Washington, D.C. 20001

16            (202) 756 8864

17

18

19

20

21   ALSO PRESENT:  Eliza Spikes, Videographer
```

```
 1   APPEARANCES (Continued):

 2

 3   On behalf of the Defendants Dale Folwell, Dee

 4   Jones, and the North Carolina State Health Plan for

 5   Teachers and State Employees:

 6        LAW OFFICE OF JOHN G. KNEPPER

 7             John G. Knepper, Esquire

 8             john@knepperllc.com

 9             1720 Carey Avenue, Suite 590

10             Cheyenne, Wyoming 82001

11             (307) 632-2842

12

13   On behalf of Defendant State of North Carolina

14   Department of Public Safety:

15        NORTH CAROLINA DEPARTMENT OF JUSTICE

16             Alan McInnes, Esquire

17             amcinnes@ncdoj.gov

18             114 West Edenton Street

19             Raleigh, North Carolina 27602

20             (919) 716-6529

21
```

1                    EXAMINATION INDEX

2

3      PAUL McHUGH, M.D.
            BY MR. GONZALEZ-PAGAN                    7

4

5                      EXHIBIT INDEX

6      1      Notice of Deposition and Subpoena      17

7      2      Expert Report                          40

8      3       Littman Correction Notice             86

9      4      Costa Critique of Littman              88

10     5      APA DSM-5 FAQ                          111

11     6      APA NIMH Joint Statement               118

12     7      Psychiatric Misadventures PDF          144

13     8      Outcome Of Sex Reassignment Surgery For    171
              Transsexuals, Pauly

14

       9      Neurobiology of Gender Identity and    183

15            Sexual Orientation

16     10      American Psychiatric Association      207
              Position, Conversion-Therapy

17

       11      American Psychological Association    209

18            Resolution

19     12     American Psychological Association     210
              Resolution Gender Identity Change

20            Efforts

21

1                EXHIBIT INDEX (Continued)

2

13      Surgical Sex                              216

3

14      The Rise and Fall of Gender Identity   218

4       Clinics in the 1960s and 1970s

5

        NOTE:  Exhibits maintained in Exhibit Share.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1      Q.   Have there been any updates to your CV

2   since you submitted your report?

3      A.   Only my recent publication in Commentary

4   that was published in this -- the most recent issue

5   of Commentary.

6      Q.   And was --

7      A.   You know, that's in my CV.

8      Q.   Did this publication pertain to gender

9   identity?

10     A.   It did, yes.

11     Q.   What's the name of the publication?

12     A.   Oh, dear.  It's -- let me -- just a

13  second.  I've got the magazine lying over here.  It

14  just -- it's not that I carried it with me.  I just

15  happen to have it in -- lying here.  I'll get you

16  the actual title.

17          It's entitled Uninformed Consent:  The

18  Transgender Crisis and it's written by me and

19  Gerard Bradley, the Professor of Law at Notre Dame.

20  And it's in the September issue of Commentary.

21     Q.   And is Commentary a peer-reviewed

1    journal?

2          A.    No.

3          Q.    Is it a scientific journal?

4          A.    No, it's a -- it's a journal of opinion.

5          Q.    Thank you, Doctor.  I know you have a

6    long and sorted career so I -- I'm just going to

7    try to go for some highlights today.

8          A.    Nothing like living a long time; the

9    curriculum vitae.

10         Q.    Well, I can only hope to live this long

11   so I appreciate it.

12         A.    Yes.

13         Q.    Where did you go to college?

14         A.    I went to Harvard College.

15         Q.    And when did you graduate?

16         A.    1952.

17         Q.    And did you obtain a degree?

18         A.    I did.  I got a Bachelor's Degree from

19   Harvard College, yes.

20         Q.    And the Bachelor's Degree was in what?

21         A.    It was in biology.

1      A.    A what?

2      Q.    Literature review.  A new publication

3  that is based on existing research out there, not

4  --

5      A.    Okay.

6      Q.    Are you okay with my definitions for

7  purposes of today?

8      A.    I'm sure we can work with them and work

9  to make each other clear, yes.  You might have to

10  help me from time to time, but I'm -- I'm very

11  happy with those distinctions, yes.

12      Q.    Understood.  Thank you.  You previously

13  mentioned that you were an investigator, right?

14      A.    Yes.

15      Q.    As I understand it, you have conducted

16  primary research into particular phenomena?

17      A.    Yes, I've -- I've conducted basic

18  physiological research, as well as applied

19  research.  Yes.

20      Q.    Have you performed any primary research

21  regarding gender dysphoria?

1  A.  No, I -- I can't say that I've done --
2  done primary research.
3  Q.  Has your study of the -- of gender
4  dysphoria been limited to review of existing
5  literature and studies?
6  A.  Well, it's also been meeting patients and
7  talking with patients.  It's a bit on personal
8  experience.  It's a review of what's available and
9  personal experience with patients that come to
10 Johns Hopkins and have other reasons for consulting
11 me.
12  Q.  Okay.  With about how many transgender
13 patients have you worked with over your career?
14  A.  I suppose 30 or 35.
15  Q.  When was the last time you worked with a
16 transgender patient?
17  A.  Yes.  Oh, probably a few months ago;
18 talked with one.  Mm-hmm.
19  Q.  So one of your two to three current
20 patients is a transgender person?
21  A.  No, it's -- it's not.  I don't -- I don't

1  care for them in long-term.  They or their families

2  call me and ask me for -- sometimes to see the

3  patient and sometimes to advise them about other

4  representations for their treatment.

5          And I will talk with them and give them

6  my opinion about their situation and what seems to

7  me to be the best use of the available treatments

8  that are accessible to them.  Yeah.

9      Q.   Understood.  When these patients and/or

10 their families come to you, have any of these

11 patients been minors?

12     A.   Yes, most of them are minors that come to

13 see me.

14     Q.   How about -- let me go back.  You

15 mentioned previously that you've worked with 30 to

16 35 trans patients.  Does this include these

17 consultations?

18     A.   These kinds of consultations, yes.  Yeah.

19     Q.   About how many of the 30 to 35 patients

20 that you've worked with that were transgender have

21 been minors?

1    A.    Well, I'd say about 80 percent of them;
2    20 percent have been adults.
3    Q.    And to clarify, you have not provided
4    them with long-term care.  You have provided a
5    consultation for specific questions that they had?
6    A.    That's right.  Mm-hmm.
7    Q.    Let's go back.  Have you performed any
8    primary research relating to transgender people?
9    A.    Again, as I say, I'm not quite sure what
10   you mean, but I have not -- importantly, what I
11   have not done is made a -- a collection of my
12   experiences with patients and pulled them together
13   into a -- into a particular article or things of
14   that sort.
15         I've used more secondary information that
16   I've acquired by seeing what's being asked for the
17   patients and what's in the literature.  Yeah.
18         So I suppose I have not actually produced
19   primary research and if I had, I would have, of
20   course, published and we could have pointed to it.
21   Q.    Okay.  Thank you.  And that's what I'm

1  getting at.  So I -- I -- we don't need to make

2  this overly difficult, right.  So just so we

3  understand each other, that's -- that's what I'm

4  getting at, right.

5          I'm asking whether you have defined and

6  conducted a study, whether clinical, observational,

7  longitudinal, resectional, having to do with gender

8  dysphoria or transgender people?

9      A.   No.  No, Mr. Gonzalez, I did not.

10     Q.   Okay.  Thank you.  I have your CV in

11  front of me.  There are a ton of publications and

12  -- over a long career.

13     A.   Yeah.

14     Q.   I understand that there are some of these

15  publications that are peer-reviewed publications;

16  is that right?

17     A.   Yes.  Yes, many of them.  Yes.

18     Q.   Are any of your peer-reviewed

19  publications regarding gender dysphoria?

20     A.   No -- well, yes.  Yes, one of them.  One

21  of them in the -- in Nature Medicine entitled

1    Witches, Multiple Personalities, and other

2    things.  Yes, that's a peer-reviewed journal.

3            And in it I lay out my opinions about the

4    transgender phenomenon.  You'll find it in the

5    Nature Medicine article.

6        Q.   Do you recall about when this article was

7    published?

8        A.   In the 1990s somewhere.  I've had a long

9    experience discussing these matters and I was

10   talking about it back in the '90s.  You'll find it

11   in my CV, if you look.

12       Q.   Oh, no, I am looking.  So just --

13       A.   I'm  --

14       Q.   I was just going through it.  Just going

15   through it just to kind of --

16       A.   --

17       Q.   -- to make sure we --

18       A.   --

19       Q.   -- we're talking about the same...  So

20   this is in Nature Medicine, right?

21       A.   Right.  That's right.

1    Q.   Is this the article, Witches, Multiple
2  Personalities, and Other Psychiatric Artifacts?
3    A.   That's right.
4    Q.   Okay.
5    A.   That's the one.
6    Q.   And is this article based on primary
7  research?
8    A.   No, it's involved in a -- a consideration
9  of what was the themes at that time about the
10 transgender/transsexual treatments and the
11 involvement at Johns Hopkins with it.  It was a --
12 it was a commentary on the state of the literature
13 then that was published in this peer-reviewed
14 journal.
15   Q.   Thank you.  Aside from the article in
16 Nature Medicine in 1995, do you have any other
17 peer-reviewed publications regarding gender
18 dysphoria?
19   A.   No, I don't.
20   Q.   Aside from the article --
21   A.   I just have my opinion really from the

1   one that I expressed in that article.  I beg your

2   pardon.  I'm sorry, sir.  I interrupted you.

3        Q.   No.  No.  It's no problem.  Aside from

4   the article in Nature Medicine in 1995, do you have

5   any peer-reviewed publications relating to

6   transgender people?

7        A.   No.

8        Q.   And aside from the article in Nature

9   Medicine in 1995, do you have any peer-reviewed

10  publications relating to gender identity?

11       A.   No.  No, sir.

12       Q.   You also have a number of non-peer

13  reviewed publications, right?

14       A.   Yes.

15       Q.   Are any of your non-peer reviewed

16  publications regarding gender dysphoria?

17       A.   Yes, some of them are.  Yes.

18       Q.   Which are those publications?

19       A.   Which are they?

20       Q.   Yeah.

21       A.   Oh, good grief.  There are -- there are

```
 1    that is my first venture into this area.  Yeah.

 2         Q.   So your first venture into publishing in

 3    this area was with Psychiatric Misadventures?

 4         A.   That's right.

 5         Q.   That was back in 1992?

 6         A.   That's right.

 7         Q.   All right.  Have you ever diagnosed a

 8    person with gender dysphoria?

 9         A.   Yes.

10         Q.   How many times?

11         A.   Oh, as I said, most -- my 30 patients, 35

12    patients.  I suppose most of them had gender

13    dysphoria.  So I suppose I thought they were all

14    involved with it in some way or another.  You know,

15    they varied in intensity.  Some of them were

16    not.  Some of the adults didn't have dysphoria and

17    -- and were just looking to me to ask what I

18    thought the outcome might be if they proceeded with

19    their transsexual behavior and sought hormonal and

20    surgical treatment.

21         Q.   And when you met with these patients, you
```

1  were not seeing them long-term we've established,

2  right?

3      A.   That was right.  I wasn't seeing them

4  long-term.

5      Q.   So were you providing them with care for

6  their gender dysphoria?

7      A.   I was providing -- providing them with

8  advice about what I thought would do the best for

9  them.

10     Q.   Okay.  And as I understand a little bit

11 of the conversation, you think some of them had and

12 some of them hadn't had gender dysphoria, but did

13 you ever formally diagnose any of these patients?

14     A.   By formally diagnosing that I wrote -- I

15 wrote the patient up in some kind of way for the

16 records in the hospital, no.  I only saw them,

17 advised them, and wrote about my advice to them.

18     Q.   Were your consultations with these

19 patients like one-offs or did it involve multiple

20 visits?

21     A.   Well, several of them involved several

1    visits.  Not -- I wouldn't say multiple as though

2    it was ongoing caregiving, but sometimes they had

3    questions and sometimes the people I referred them

4    to had questions and we talked back and forth a

5    couple of times, yes.

6        Q.   When you -- when you were presented with

7    any of these patients, did you ever refer them to a

8    provider that would provide gender-affirming care?

9        A.   I -- I referred them sometimes.  A couple

10   of them I referred to somebody who could -- who I

11   thought was equipped to offer them treatment, but

12   not gender -- not necessarily gender-affirming,

13   although they might when they -- when they reviewed

14   the patient themselves come to that conclusion.

15           I referred them to particular -- a couple

16   of them to Dr. Fred Berlin here at -- at Johns

17   Hopkins who was a student of sexual behavior and

18   offered them treatment.

19       Q.   To whom besides Dr. Berlin did you refer

20   patients to?

21       A.   It was only Dr. Berlin.

1      Q.   Is it fair to say that you're not -- have

2  not provided care to a transgender patient

3  diagnosed with gender dysphoria?

4      A.   It's fair to say that I have not provided

5  long-term care, no.  That's correct.  Mm-hmm.

6      Q.   Is it fair to say that you have not

7  provided care -- long-term care to a transgender

8  patient diagnosed with gender identity disorder?

9      A.   That's fair to say, at least

10  personally.  You have to remember, I was overseeing

11  a -- for a while -- a sexual behavior unit in which

12  care was being offered to these patients and my

13  responsibility was to oversee that and recognize

14  and advise as to the direction it was going in, but

15  that experience was early in the 1970s.

16      Q.   And this is in your capacity as

17  psychiatrist-in-chief --

18      A.   That's right.

19      Q.   -- at Johns Hopkins --

20      A.   That's right, yes.

21      Q.   -- Hospital?  And your tenure as

1      Q.   Have you overseen any clinic providing

2   gender-affirming care between 1979 to today?

3           MR. KNEPPER:  Objection; form.

4           THE WITNESS:  As I -- as I say, I don't

5   like this term gender-affirming care.  I have

6   overseen clinics, that clinic in particular and

7   it's later development in the offering of other

8   forms of treatment other than physical forms of

9   treatment --

10  BY MR. GONZALEZ-PAGAN:

11     Q.   Right.

12     A.   -- for the transgendered and transsexual

13  patients.  Yes.

14     Q.   Okay.

15     A.   But that was -- that was -- that was it,

16  sir.  Yeah.

17     Q.   All right.  Just because there was an

18  objection and just to clarify the record, in your

19  capacity as a physician at Johns Hopkins, have you

20  overseen or directed any clinic providing medical

21  and surgical interventions for the treatment of

1   gender dysphoria since 1979?

2        A.   No.  I --

3        Q.   Thank you.

4        A.   -- think the fair answer to that is

5   no.  I think that's fair.

6        Q.   You mentioned that your conclusion that

7   there's a uni-directed Transgender Treatment

8   Industry was based on your clinical observations --

9   well, was based on your conversations with 30 to 35

10  transgender patients, your experience with the

11  sexual behaviors clinic at Johns Hopkins from 1975

12  to 1979, and what you've heard from other people;

13  is that right?

14       A.   Once again, you stop at 1979 as though I

15  was stopped from that point on seeing any kinds of

16  an understanding from other kinds of patients that

17  came then, even though we were not offering these

18  so-called treatments, that we didn't oversee and

19  observe what the treatments had been that brought

20  them to us and for which we were offering an

21  alternative.  No.  So --

1  conferences that were -- out of conferences that

2  would be taking place around the Sexual Behavior

3  Clinic.

4       Q.   Okay.  But not patients that -- let me

5  rephrase that.  Your experience with regards to

6  patients diagnosed with gender identity disorder or

7  gender dysphoria is limited to this 30 to 35

8  patients; is that right?  Direct experience.

9       A.   No.  No.  My -- my direct personal

10 experience out of the care would be that, yes.

11      Q.   Right.

12      A.   But my oversight gave me consultation and

13 responsibility for hundreds of patients that were

14 flowing through that clinic both before we stopped

15 offering the surgical treatment and afterwards I

16 would say.

17      Q.   These are patients that were being seen

18 by other physicians that were under your purview?

19      A.   That's right.

20      Q.   Okay.  Is the term Transgender Treatment

21 Industry a term of art?

1      A.    That's okay.

2      Q.    -- have practiced in this field for a

3  while.  So it was new.

4      A.    That's -- that's wonderful,

5  Mr. Gonzalez.  I appreciate your pointing this out.

6  Mm-hmm.

7      Q.    So I will ask this:  Is it a term that

8  you commonly use?

9          MR. KNEPPER:  Objection.

10          THE WITNESS:  No.  I'm using it more and

11  more frequently now and as I'm more and more

12  impressed by the single-mindedness of the

13  treatments being offered, I -- for example, I even

14  think this idea, the very concept of affirming,

15  gender-affirming treatment, is an expression of

16  that industrial movement.  I -- I don't think

17  there's anything affirming about any of this.

18  BY MR. GONZALEZ-PAGAN:

19      Q.    Well, isn't the idea that you are

20  affirming the person's identity?

21      A.    No, it's affirming the patient's

 1  misdirection and therefore affirming isn't the

 2  correct word I don't think, but -- but, you know,

 3  we could -- we could talk about that just as it's

 4  -- it has become a -- a term of art within the

 5  industry, but it -- it's -- it's an easily

 6  challengeable word.

 7      Q.   When did you first hear the term

 8  Transgender Treatment Industry?

 9      A.   Oh, dear.  As I say, I --

10           MR. KNEPPER: Objection; asked and

11  answered.

12           THE WITNESS:  That's right.  I've got no

13  idea when -- when I heard it or if I heard it from

14  somebody else or I thought it up myself in the

15  process of watching what was happening.

16           I was trying to characterize in words

17  what I thought was happening and the huge increase

18  in patients that were making the claims that they

19  were of the opposite sex, just the building up of

20  some 4,000 percent more women, young women,

21  reporting this.  It was just --

1  overreliance on the DSM?

2      A.   Do I opine?  I think that part of the

3  problem is DSM for all of the -- our woes in

4  psychiatry right at the moment and many of the

5  arguments we get into relate to the fact that the

6  DSM is the so-called bible of our discipline rather

7  than a true classification of -- of mental

8  disorders like we have a true classification of

9  medical disorders.

10      Q.   Sure.  And to clarify, the DSM is the

11  Diagnostic and Statistical Manual of Mental

12  Disorders published by the American Psychiatric

13  Association; is that right?

14      A.   Yes, it is.  Yes.

15      Q.   Okay.  Let me ask you:  Do you -- is

16  gender dysphoria a very real condition?  Well, let

17  me scratch that.  Is gender dysphoria a real

18  condition?

19      A.   Well, it's certainly a feeling that

20  patients report.  So this concept --

21      Q.   Well --

1    A.   This concept of -- look, this is just

2  what I do every day, Mr. Gonzalez.  This concept of

3  a real thing versus a feeling or an attitude or an

4  assumption are all important things to distinguish

5  because those things differ in relationship to

6  their generation.

7         Something that is a condition like heart

8  failure or pneumonia can be attributed and called a

9  condition because it has a common generation and a

10 -- a common outline.

11        Gender dysphoria like many other sort of

12 senses and feelings can come from all kinds of

13 different directions and therefore it's best

14 thought of as a state of mind.  Let's put it that

15 way.  It's a state of mind.

16    Q.   Well, how would you define gender

17 dysphoria?

18    A.   Well, as I say, it's a state of mind in

19 which a person has come to feel somehow from -- for

20 reasons that we don't quite understand that he or

21 she belongs to the opposite sex and is discomforted

1  by the fact that his body and -- and the world

2  around him does not agree with that.

3       Q.   Would you agree that there are people

4  that experience distress due to the misalignment of

5  their perceived gender identity and their sex

6  assigned at birth?

7       A.   All of those things are -- are terms that

8  I would debate with you, each one of them alone.

9  You don't assign a sex at birth.  You discover sex

10  -- sex at birth.

11       There are plenty of people though in the

12  world who right now for a variety of reasons, many

13  of which are still to be discovered, find

14  themselves arguing that they don't feel comfortable

15  in their body, their sexual body.

16       Q.   How is the sex of a child determined at

17  birth?

18       A.   Well, it's usually very -- about 99

19  percent of them are determined by the parents of

20  the body and it turns out to be quite correct in

21  relationship, both to the chromosomal --

1      Q.   Would you then -- would you consider the

2    ICD, the International Classification of Diseases,

3    to be a classification?

4      A.   Yes, that is and when you compare the

5    two, you can see the difference.  You have to be a

6    physician to read ICD and understand it.

7           You have -- you don't have to be a

8    physician -- as you know, anybody can read DSM and

9    it's even said that -- that authors use DSM to

10   characterize some of the characters they're going

11   to put in their fiction.

12     Q.   Okay.  Would you agree that the DSM,

13   however, does not prescribe treatment?

14     A.   Yes.  Yes.  Yes.  I -- I suppose it

15   doesn't.

16     Q.   You describe the DSM as "essentially a

17   dictionary based on consensus-seeking voting

18   methodologies rather than evidence-based" --

19   apologies -- "rather than evidence-seeking

20   scientific methodologies."

21     A.   Yes.  Yes.

1        Q.    -- view of the DSM.

2        A.    Okay.

3        Q.    Would you say that the DSM is a reliable

4   tool for the diagnosis of particular conditions,

5   but that it does not --

6        A.    It's --

7        Q.    -- explain the causes of said condition?

8        A.    I'm -- I'm afraid you're using the term

9   reliable in a way that -- that you and I ought to

10  be clear about.  It is reliable in the sense that

11  other people can agree that that term applies here,

12  but it is not valid in the sense of understanding

13  what the condition really is between the people,

14  okay.

15        So often the word reliable as used by

16  other people outside of science is used as a way of

17  saying well, if this is a reliable diagnosis, it

18  must be a correct diagnosis or an understanding

19  diagnosis.  I want to make a point that this is

20  only to permit people to use the same words for

21  patients that look alike.

1    Q.   Understood.  So in diagnosing patients,

2  without delving into the treatment and/or causes

3  for said patient's condition, does the DSM serve to

4  identify a diagnosis?

5         MR. KNEPPER:  Objection; form.

6  BY MR. GONZALEZ-PAGAN:

7    Q.   I guess what I'm trying to get at here

8  is:  What would you use to diagnose a

9  patient?  Like isn't it -- isn't the purpose of the

10  DSM to come up with some common language for mental

11  health practitioners?

12    A.   The purpose of DSM is to make sure that

13  people are referring to patients that look alike,

14  but it is not its purpose to presume that those

15  things that look alike have the same sources and

16  the same natures, okay?

17    Q.   Understood.

18    A.   I mean, I wrote an -- an article in the

19  New England Journal with Dr. Slavney that, you

20  know, made reference to it before and what I was --

21  what I wanted to use for the title is What is

1   but if you look at it in general medical terms, the

2   ICD in cardiology and all those, that is a real

3   classification and you have to be a doctor to

4   really understand it.

5       Q.   Okay.  The ICD defines gender

6   incongruence as "a marked and persistent

7   incongruence between the gender felt or experienced

8   and the gender assigned at birth"  Are you aware of

9   that?

10      A.   I'm not, but it doesn't surprise me.

11      Q.   Okay.

12      A.   It uses all the usual words, including

13  the word gender.

14      Q.   It also uses assigned at birth.

15      A.   Yeah.  Exactly.  It -- it says that,

16  too.  It -- it will change.

17      Q.   Okay.  Going back to -- to the statement

18  that you made in your report --

19          MR. GONZALEZ-PAGAN:  And we can -- we can

20  take off -- take it off the screen.

21          THE WITNESS:  Okay.

1   BY MR. GONZALEZ-PAGAN:

2        Q.   You indicated that the DSM is not based

3   on evidence-seeking scientific methodologies; is

4   that right?

5        A.   No, it's -- it's based on appearances.

6   It says so.

7        Q.   Okay.  Are you aware that the revision of

8   the DSM involves a multi-year process?

9        A.   No, the DSM's fifth edition has tried to

10  be -- to modify it just as they did in DSM-4, but

11  -- DSM-3, but it still uses the same methodology,

12  the same -- same method and with the assumption

13  that you had to find reliability and then through

14  reliability you might get to validity and

15  intelligibility didn't matter.

16       Q.   Okay.  Are you aware that the revision of

17  the DSM involves research evaluation, publication

18  of whitepapers, peer-reviewed articles, and

19  scientific conferences?

20       A.   Yes, I am and I'm also aware that DSM has

21  decided that it still would use the original

1    approach that -- that it took, that the sciences

2    and the things of that sort were -- that they'd

3    employed were methods that employed ways of

4    demonstrating that they could still find

5    reliability in the sense of consistency in

6    diagnosis.

7              Nothing -- nothing radically changed

8    between DSM-3 and DSM-5 in relationship to the

9    method that was being employed.

10        Q.    Are you aware that there were -- revision

11   of the DSM involves the establishment of task force

12   and workgroups that review scientific literature?

13        A.    Of course I am, yes.

14        Q.    Are you aware that the revision of the

15   DSM involves the establishment of scientific review

16   committee that evaluated and provided guidance on

17   the strength of evidence of any proposed changes?

18        A.    Yes.

19        Q.    Would it be fair to say then that the

20   development of the DSM does involve the evaluation

21   of scientific information and literature?

1      A.    Well, that word scientific is being used

2   -- you're using it in a -- in a very broad

3   sense.  It is useful and -- and DSM does use

4   scientific information to encourage its own

5   reliability studies.  That's scientific, but it's

6   not necessarily related to validity.

7           And nothing has been done in relationship

8   to validating the distinctions of any of these

9   conditions in relationship to their sources, their

10  generative sources.

11     Q.    If I'm understanding correctly where

12  you're coming from here, and just correct me if I'm

13  wrong, is a broader critique of the DSM in almost

14  what its purpose is, that rather than serve as a

15  guide to come up with a diagnosis based on

16  observable phenomena or criteria, it should be more

17  explanatory as to the nature and cause of a

18  particular condition?

19     A.    Yes, a real classification as in general

20  medicine would.  And psychiatry should be working

21  towards a classification that rests itself in the

 1   distinctions amongst conditions related to their
 2   generation.
 3          This is -- this is a very simple
 4   scientific concept that extends far back into
 5   scientific studies, but the field guide step, which
 6   is the step that DSM is, is considered only a step
 7   on the pathway to an ultimate coherent
 8   classification or a method.  So...
 9      Q.   Let me ask you this --
10      A.   Yeah.
11      Q.   -- is there any -- is there any
12   classification system currently in existence that
13   -- that operates that way with regards to mental
14   disorders?
15      A.   Yes, there is.
16      Q.   Which one?
17      A.   The one that I employ at Johns Hopkins
18   and we employ, the so-called Perspectives of
19   Psychiatry.  If you read that, you'll see that it
20   strives to -- to generate a coherent distinction
21   amongst conditions that relate to what a person has

Case 1:19-cv-00272-LCB-LPA   Document 207-2   Filed 02/02/22   Page 36 of 76

1    is a diseases, to what a person is is a
2    personality, what a person encounters is a life in
3    a life, and that what a person is doing is a
4    behavior.
5              And it wants to make a distinction and it
6    struggles to show the data that relates to those
7    distinctions between diseases, dimensions,
8    behaviors, and life stories or life encounters.
9    Yes.  And where --
10        Q.   And the -- this is the Perspective in
11   Psychiatry that was published in the 1980s; is that
12   right?
13        A.   Yes.  And -- and the second edition in
14   the 1990s I believe.  Yeah.
15        Q.   And second edition in 1998?
16        A.   Yeah, that's right.
17        Q.   Is this the -- is Perspective in
18   Psychiatry the -- commonly used within the field of
19   psychiatry to make diagnoses?
20        A.   It's commonly used at Johns Hopkins all
21   the time and it's making headway elsewhere.

1      Q.   All right.

2      A.   I don't know how much it's going

3  anywhere, but -- let's put it this way.  That --

4  you asked is there an alternative classificatory

5  system and I'm saying yes, there is this one.

6      Q.   But is it widely -- what I'm asking as a

7  follow up -- I accept your answer.

8      A.   Yes.

9      Q.   Is it -- is it the widely-used system of

10  classification used in the field of psychiatry?

11      A.   I wish it were more widely used and it

12  will eventually be so, but right now it is a -- a

13  proposal.  You asked me to begin with is there

14  anything out there and actually --

15      Q.   No.  No.  Yeah.  I appreciate it.  I

16  mean, I guess what I'm trying to get at is --

17      A.   Okay.

18      Q.   There -- there is --

19      A.   You know, the real problem here is that

20  once you have a field guide, it's very hard to get

21  somebody to do something else because it requires

Case 1:19-cv-00272-LCB-LPA   Document 207-2   Filed 02/02/22   Page 38 of 76

1    look at it in relationship to disorders of the skin

2    or the heart or the -- the stomach or something,

3    will show you what a real classification is like.

4          Q.   Okay.  And the definition of gender

5    incongruence in the ICD is quite similar to the

6    definition of gender dysphoria in the DSM; is that

7    right?

8          A.   That's right.  It uses all the same stock

9    phrases.

10         Q.   In your report you make reference to a

11   statement by Thomas Insel, the then director of the

12   National Institute of Mental Health, that it --

13   that the NIMH would be reorienting its research

14   away from the DSM categories.  Do you recall that?

15         A.   I do.  I recall that, yes.

16         Q.   Okay.  Do you understand that Dr. Insel

17   -- Dr. Insel's statement pertained to the NI -- the

18   NIMH establishing the Research Domain Criteria

19   project?

20         A.   Yes, I do.

21         Q.   Okay.  And you understand that

 1  Dr. Insel's statement pertaining to the Research

 2  Domain Criteria project reflects a long-term goal

 3  to understand mental illness as disorders of brain

 4  structure and function?

 5       A.   I -- I understand that, yes.

 6       Q.   Okay.  Were you aware that two weeks

 7  after the statement that you referenced with

 8  regards to Dr. Insel he issued a joint statement

 9  with the American Psychiatric Association stating

10  that "The American Psychiatric Association's

11  Diagnostic and Statistical Manual of Mental

12  Disorders along with the International

13  Classification of Diseases represents the best

14  information currently available for clinical

15  diagnosis of mental disorders"?

16       A.   I wasn't aware of that, but it doesn't

17  surprise me.

18       Q.   Okay.

19            MR. GONZALEZ-PAGAN:  Let's mark up the

20  joint statement, Lauren.

21            (Whereupon, Exhibit No. 6 was marked for

1  identification.)

2           MR. GONZALEZ-PAGAN:  Just to preview,

3  John, I think what I'm going to do is finish with

4  this exhibit and line of questioning and then we

5  can do a lunch break, if it works for people.

6           MR. KNEPPER:  That was going to be my

7  thought, Mar, is sort of get the DSM conversation

8  completed, if -- if that's -- if that's where we're

9  close, and then we can take a lunch break.

10          MR. GONZALEZ-PAGAN:  Yeah, that sounds

11  good.  Let's do that.  All right.  If we can zoom

12  in a little bit, Lauren.  All right.

13  BY MR. GONZALEZ-PAGAN:

14      Q.   Dr. McHugh, I'm showing you what's been

15  marked as Exhibit 6.  It is a news release by the

16  American Psychiatric Association issued on behalf

17  of Thomas R. Insel, M.D., Director of NIMH, and

18  Jeffrey A. Lieberman, M.D., president-elect of the

19  APA.  Is that right?

20      A.   Yeah.

21      Q.   Okay.  Let's just go to the second

Case 1:19-cv-00272-LCB-LPA   Document 207-2   Filed 02/02/22   Page 41 of 76

1    paragraph.  And we can zoom a little bit into that.

2        A.   Yes.  Yes, sir.  Okay.

3        Q.   I'm just going to read it.  "Today the

4    American Psychiatric Association's Diagnostic and

5    Statistic Manual of Mental Disorders along with the

6    International Classification of Diseases represents

7    the best information currently available for

8    clinical diagnosis of mental disorders.

9            Patients, families, and insurers can be

10   confident that effective treatments are available

11   and that the DSM is the key resource for delivering

12   the best available care.

13           The National Institute of Mental Health

14   has not changed its position on DSM-5.  As the NIMH

15   Research Domain Criteria project website states,

16   the diagnostic categories represented in the DSM-4

17   and the International Classification of Diseases 10

18   containing virtually identical disorder codes

19   remain the contemporary consensus standard for how

20   mental disorders are diagnosed and treated."  Did I

21   read that correctly?

1      A.   You did.

2      Q.   Okay.  And just to clarify, you were not

3  aware about this joint statement by Dr. Insel with

4  the APA?

5      A.   I wasn't aware of it, but there you are.

6      Q.   Do you think it is important information

7  to put into context the statement that you included

8  from Dr. Insel with regards to the DSM?

9      A.   No.

10     Q.   Why not?

11     A.   Well, because I think that it's still

12  discussing -- he discussed when he was at the NIH

13  the reasons why they were dissatisfied with the DSM

14  and he's here just reassuring everybody that what

15  he has done shouldn't be taken as radical as many

16  people have taken it.  You know, he was --

17     Q.   Well, I --

18     A.   He was -- he was saying at one time that

19  -- at the time when he was proposing the Research

20  Diagnostic Domain Criteria, that something needed

21  to change.

1          What he's saying here is although

2     something needs to be changed, what they -- what he

3     believes now is that this remains the standard for

4     which mental diagnoses are diagnosed and treated.

5     But if you tried to get a research project that was

6     resting only on that rather than a reference to the

7     Research Domain Criteria, you wouldn't get it from

8     the NIH.  It doesn't say that as well.

9          Q.    Okay.  Thank you.  If we go down a little

10    bit more closer to the bottom, just reading the

11    last three sentences of the -- what appears to be

12    the third-to-last paragraph.

13         A.    Yeah.

14         Q.    It starts "RDoC is a new comprehensive

15    effort to redefine the research agenda for mental

16    illness.  As research findings begin to emerge from

17    the RDoC effort, these findings may be incorporated

18    into future DSM revisions and clinical practice

19    guidelines, but that is a long-term undertaking.

20          It will take years to fulfill the promise

21    that this research effort represents for

1    transforming the diagnosis and treatment of mental

2    disorders.  Did I -- did I read that correctly?

3         A.   Yeah.

4         Q.   Okay.  And just to sum, the position of

5    the NIMH seems to be we want to move towards a more

6    research-based understanding of mental disorders

7    and their causes, but we're not discrediting the

8    DSM as a method for diagnoses at the time at the

9    present?

10        A.   I'm -- yes.  Yes.  And your point?

11        Q.   Great.

12             MR. GONZALEZ-PAGAN:  Okay.  All right.

13   That looks good.  I think we can -- we can take it

14   off, Lauren.  We'll take a break for lunch.

15             THE WITNESS:  Okay.

16             MR. GONZALEZ-PAGAN:  Would an hour

17   suffice?

18             THE WITNESS:  That would be wonderful.

19   But, you know, whatever -- whatever fits with you.

20             MR. GONZALEZ-PAGAN:  Well, I'm asking --

21   I'm asking everybody here, including you.

1           MR.GONZALEZ-PAGAN:  So let's do this.

2   Let's come back at 1:15.

3           THE WITNESS:  1:15?  Fine.  Fine with me.

4           MR. GONZALEZ-PAGAN:  And we'll reconvene

5   then.

6           MR. McINNES:  All right.

7           THE WITNESS:  Okay.

8           VIDEOGRAPHER:  Okay.  We are going --

9           THE WITNESS:  That will be --

10          VIDEOGRAPHER:  We are going off the

11  record.  The time is 12:11 p.m.

12          (Whereupon, a brief recess was taken.)

13          VIDEOGRAPHER:  We're back on the

14  record.  The time is 1:15 p.m.  This is media

15  number three.

16  BY MR. GONZALEZ-PAGAN:

17      Q.   Dr. McHugh, earlier you had testified

18  about how for some of the 30 to 35 transgender

19  patients for whom you've consulted you've referred

20  some of these to Fred Berlin --

21      A.   Yeah.

 1       Q.    -- psychiatrist at Johns Hopkins himself;
 2  is that right?
 3       A.    Yes.   Right.   That's right.
 4       Q.    Okay.  And my understanding is that he is
 5  a director at the Sex and Gender Clinic at Johns
 6  Hopkins Hospital?
 7       A.    He is now, yes.  Mm-hmm.
 8       Q.    Okay.  And my understanding is that the
 9  Sex and Gender Clinic works in collaboration with
10  the Transgender Health Center that has been now
11  established at Johns Hopkins; is that right?
12       A.    They do.  They collaborate with them,
13  yes.  Mm-hmm.
14       Q.    Okay.  Thank you.  Let's go to paragraph
15  nine of your report.
16            MR. GONZALEZ-PAGAN:  Lauren, if we could
17  pull the report up, that would be great.
18            THE WITNESS: Uh-huh.
19  BY MR. GONZALEZ-PAGAN:
20       Q.    In this paragraph, Dr. McHugh, you speak
21  of the Transgender Treatment Industry as a

1    comes out of a checklist out of DSM.  You satisfy

2    these criteria; therefore, you get this treatment.

3    Not a good solid workup.  I mean, that's what we

4    were talking about this morning.

5          Q.    Would you agree that there are -- there

6    are some people for whom their gender

7    identification is inconsistent with the sex they

8    were determined to be at birth and that they don't

9    have any other co-occurring conditions?

10         A.    I believe that all of these patients -- I

11   hold that all of these patients have a disorder of

12   assumption and that although it's conceivable that

13   some of them may well have a genetic -- some

14   chromosomal abnormality, that's what needs to be

15   demonstrated, not -- not simply presumed.  And

16   that's what I'm objecting to; they're often

17   presumed.

18         So I -- I have no idea whether there

19   might -- and how many might be due to a genetic

20   cause and -- because nobody has given me any

21   evidence for any of it.

1    able to independently observe particular -- in

2    their meetings with their patient particular

3    behaviors and/or expressions?

4           MR. KNEPPER:  Objection.

5           THE WITNESS:  Obviously, that's part of

6    my job as a teacher and a builder of the Department

7    of Psychiatry is to make clinicians of the sort

8    that would look for more than one hypothesis for

9    the explanation of something that was reliably

10   recognized, but not validly understood.  Yes,

11   that's exactly what we're trying to do.

12   BY MR. GONZALEZ-PAGAN:

13      Q.   Okay.  So as I understand your critique,

14   and correct me, part of your critique, is that the

15   so-called Transgender Treatment Industry, somebody

16   comes in, says this is my gender identity, and

17   they're immediately referred to for medical and

18   surgical care based on that self-report?

19      A.   Yeah.  Well -- yes.  That's my objection

20   to it.  I find that it was very often, very often

21   that the patients weren't sufficiently studied

1   before a prescription was offered.

2           They met criteria for gender dysphoria in

3   DSM terms and with that, the presumption was

4   there's one standard treatment and that is offered

5   to them and that's what I'm -- one of my main

6   objections here.

7       Q.   Okay.  So would your objection then be

8   moot if you were informed that a clinician actually

9   engaged in a detailed psychiatric interview and

10  various visits with the patient in order to

11  corroborate their self-report?

12          MR. KNEPPER:  Objection to form.

13          THE WITNESS:  I would be helped along the

14  way.  I would like to know what it is, especially

15  if a radical treatment which the benefits are

16  uncertain as often, you know.

17          After all, I have -- I have seen doctors

18  who have said they've done a good study of a

19  patient and said that probably a frontal lobotomy

20  would help them.  After all, I go back a long

21  while.

1    I wanted to encourage him to go on with that

2    because I had my serious doubts about this matter.

3        Q.   What gave rise -- what gave rise to your

4    doubts?

5        A.   Well, just I saw some of the patients and

6    they looked -- and this -- this is before I came to

7    Baltimore, but I saw some of them in Oregon and I

8    -- I thought they looked like caricatures of -- of

9    women and I very much doubted that they were

10   benefiting from it, but I wasn't certain.

11       Q.   Don't you think it is pejorative to refer

12   to transgender women as caricatures of women?

13       A.   No, I don't think it's pejorative if it's

14   true.

15            MR. KNEPPER:  Objection; form.

16            MR. GONZALEZ-PAGAN:  Lauren, let's mark

17   Exhibit -- that's Dr. McHugh's Psychiatric

18   Adventure -- Misadventures.

19            (Whereupon, Exhibit No. 7 was marked for

20   identification.)

21   BY MR. GONZALEZ-PAGAN:

1    things.  It writes about scientific matters.

2    Science after all is discussed outside of

3    peer-reviewed articles, you know.  It's discussed

4    and debated and this is in addition to that debate

5    that I was invited to contribute.

6        Q.   Let's go to page 501 of the article and

7    let's zoom in to the second-to-last paragraph,

8    please.  We're just going to read the last sentence

9    of that paragraph.

10        "It was my intention when I arrived in

11   Baltimore in 1975 to help end it."  Did I read that

12   correctly?

13        A.   You did, yes.  Mm-hmm.

14        Q.   And it is in reference to sexual

15   reassignment surgery; is that right?

16        A.   That's right, yes.

17        Q.   Okay.  So is it safe to say that you had

18   already made up your mind to end the provision of

19   this care when you arrived at Johns Hopkins in '75?

20        A.   No.  No, that's not correct.  It is --

21   it's -- what this really means is when I came to

1  avoid what they had undergone, I would have done

2  that.  So anyway, there you go.

3       Q.   Why weren't you impressed?

4       A.   Well, as I said, I thought they were --

5  they were men masquerading as women.

6       Q.   Did you speak with these patients?

7       A.   Yeah.  Yes, I did.  But, you know, not

8  more than -- I was -- I was the director of the --

9  of the department there and I was being shown these

10  by a member of the department.

11       Q.   Had you looked into the literature at the

12  time --

13       A.   I had -- no, it -- it was my -- it was my

14  first encounter with this.  Ira Pauly, who was the

15  -- who was the most distinguished psychiatrist out

16  there, was working on picking up on this idea and

17  was showing some of the patients.  They did it at

18  their grand rounds there and I was, as I said, not

19  impressed that these patients had been benefited.

20  Mm-hmm.

21       Q.   And you haven't conducted any independent

1   research of your own into the efficacy of sex

2   reassignment surgery at the time?

3        A.   No, I didn't.  No.  But it was already

4   going on at Hopkins when I arrived and I encouraged

5   it.

6        Q.   Later in the article, if we go to page

7   503 --

8        A.   Yes.

9        Q.   -- I think it's third-to-last

10  paragraph --

11       A.   Yeah.

12       Q.   -- I'm going to read that first sentence.

13  "Moral matters should have some salience here."

14       A.   Yes.

15       Q.   Did I read that correctly?

16       A.   Yes.  Yes.

17       Q.   What did you mean by that?

18       A.   Well, let me just get it again.  Where --

19  where is it?  I -- I know I said that, but I can't

20  find it.  So I know if it is --

21       Q.   Sure.  Yes.  We can -- can you see my --

1    the cursor?

2         A.   Yes, I can see your cursor.  No, I can't

3    see your cursor.  Let me -- I mean, I know it's in

4    here.  I -- yeah, there it is.  "Moral matters..."

5    Yes, I've got it.  Yeah, "...should have some

6    salience here."  Yes.  What do you want to know?

7         Q.   What did you mean by that?

8         A.   Well, I followed on with it, didn't I?  I

9    said "These include the waste of human resources,

10   the confusions imposed on society where men and

11   women insist on acceptance, even in athletic

12   competitions with women, the encouragement of the

13   illusion of technique, which assumes that the body

14   is like a suit of clothes."

15             All of those are -- and finally, the

16   ghastliness of the mutilated anatomy.  All of those

17   are moral matters.

18        Q.   Do you think moral concerns should affect

19   whether somebody is able to obtain care?

20        A.   Excuse me.  I'm -- I'm not sure I

21   understand that.

1     Q.   Did he have -- did he share the same
2   concerns that you had?
3     A.   No.  He was very sure that he was doing
4   -- the exercises that he was doing were -- were
5   only beneficial.  Yeah.
6     Q.   In the just under 50 years since you've
7   became psychiatrist-in-chief, you, yourself, have
8   not sought to conduct any primary research to
9   address the concerns that you have; is that right?
10    A.   No.  That's right.
11    Q.   And you -- who made the decision to stop
12  providing medical and surgical care at Johns
13  Hopkins?
14    A.   Well, it -- it was -- I suppose it was a
15  departmental-wide decision, but of course I led
16  that because I was leading the department.  So I in
17  looking at the Meyer data that came along, I said
18  that I didn't think that we should continue it.
19  And so we stopped.
20    Q.   And did you advocate against its
21  reopening while you --

1    and followed on after the Meyer study seemed to

2    confirm and, in fact, enhance what the Meyer study

3    had demonstrated.

4          Q.    And to which Swedish study are you

5    referring to?

6          A.    The -- the John Meyer and Ryder study

7    that was done in 1979.

8          Q.    Sorry.  That's the Meyer study?

9          A.    Yes.

10          Q.    But you mentioned a --

11          A.    Yes.

12          Q.    -- a Swedish -- a Swedish study.

13          A.    A Swedish study, Dhejne's study, that

14    followed for 30 years the people treated with

15    transgender surgery in Sweden.

16          Q.    The Dhejne study that was published in

17    2011; is that right?

18          A.    That's right.  That's the one.  Yes, sir.

19          Q.    Okay.  What do you believe that the

20    Dhejne study showed?

21          A.    It showed that the -- that the patients

1    that had the transgender surgery, their suicide

2    rate was 19, close to 20 times the general

3    populations and that they had a -- a variety of

4    further troubles that began about 10 years after

5    the surgery.

6           Q.   That was comparing the transgender

7    population postsurgery to the general population at

8    large; is that right?

9           A.   That's right.  Yes.

10          Q.   Wouldn't the apt comparison for the

11   conclusion to which you are referring, would it

12   have been comparing postsurgical patients with

13   presurgical patients?

14          A.   Well, it -- it would have been, but they

15   didn't do that.  But after all, the Meyer study did

16   compare patients with other patients and the

17   Branstrom study did the same afterwards.

18              But the, you know, the Dhejne study was

19   powerful in the fact that it really did do what one

20   wanted, namely do a complete follow-up of

21   everybody.

1      Q.   And -- but the Dhejne study only shows

2  that transgender people even after surgery have a

3  higher incidence of suicide when compared to the

4  general population at large.  That's all that it

5  showed; is that right?

6      A.   That's something, isn't it?

7      Q.   Well, I wouldn't be surprised by that.

8  Wouldn't --

9      A.   Twenty times?  Nineteen times more?  Oh,

10  you'd be surprised by that, Dr. Gonzalez.

11      Q.   Wouldn't it be -- wouldn't it be -- I

12  wouldn't be surprised given the social

13  stressors.  So I guess my question is:  Wouldn't it

14  be an alternative hypothesis that that difference

15  compared to the general population at large is due

16  to social stigma, oppression, and/or

17  discrimination?

18      A.   Yeah, you'd think that and particularly

19  in other countries besides Sweden.  Sweden is a

20  very accepting country.  You know, this social

21  pressure or social stigma argument is being used to

1    -- to justify this thing, but it -- I must say I

2    don't see it as powerful as people claim.  But, you

3    know --

4         Q.   But it is still an alternative

5    hypothesis?

6         A.   Oh, it's an alternative hypothesis and it

7    needs to be studied.  Absolutely.  But meanwhile we

8    probably should stop if 20 times suicide

9    continues.  It's not doing people a lot of good.

10        Q.   Well, how do you know that it's not doing

11   good?  It didn't -- it didn't do a comparison pre

12   and postsurgical?

13        A.   It's not doing good because it's evident

14   that it's not doing good yet and it's up to them to

15   show where the evidence -- where the good is and we

16   didn't find any good out -- out of the Meyer study.

17        Q.   Okay.

18        A.   You see, it was -- it was -- you know,

19   the -- the fact that the Meyer study showed that

20   the patients really weren't better in the claims --

21   in the things that they claimed that they would be

1    discovered in doing this and it was very

2    unexpected.  No one expected to find a 20 times

3    increase in suicide amongst those patients.  They

4    would never have started this treatment if they

5    were going to find that result.

6         Q.   Are you aware that Cecilia Dhejne has

7    said that that is a mischaracterization of her

8    study?

9         A.   I -- I'm very well aware of it that, you

10   know, that's what her claim is, but this is what

11   anyone who reads the data would ordinarily feel.

12        Q.   You say anyone who would read the data.

13        A.   Yes.  Yes.

14        Q.   Are you aware that multiple people have

15   read the data and do not come to that same

16   conclusion?

17        A.   Yes, I am aware of that.

18        Q.   Okay.

19        A.   But they were not looking closely at what

20   the implications might be in my opinion.  In my

21   opinion they did not carefully and -- think about

1   their role in -- their role as doctors.  They were

2   not --

3        Q.   I don't -- I don't mean to be combative

4   with these questions.

5        A.   No, that's fine.  That's fine.

6        Q.   But I -- are you saying that the only way

7   that somebody would have -- the only way to prove

8   that somebody looked at the data is that they came

9   to the same conclusion as you did?

10        A.   Well, it's close to that.  It seems to me

11   this is so -- this is almost black and white,

12   Mr. Gonzalez, it seems to me.  But you know,

13   obviously people are disagreeing, but I think

14   they're disagreeing because of the social pressures

15   that are felt still.  I -- I -- I don't --

16        Q.   Well, you're quoting the author, right?

17        A.   I don't know -- I don't know how many

18   other bodies have to accumulate before people start

19   -- start saying, you know, this isn't a good idea,

20   but it will -- it will come.

21        Q.   What is the incidence of suicide for

1 would want in talking with my endocrine colleagues

2 to talk about that matter.

3       Because it turns out that the use of --

4 of puberty blockers seems to alter the ultimate

5 results of patients, young children, with gender

6 dysphoria. The majority of them, 70 to 80 to 90

7 percent of them, lose this gender dysphoria going

8 through puberty and therefore are not interested in

9 cross-sex hormones or surgery; whereas, once you

10 start them on this, puberty blockers, almost 90

11 percent of them go the whole way it seems.

12       At any rate, that's the -- that's the

13 present data that I know and that means to me that

14 something has organized them or reorganized their

15 brain or made them at least more suggestive to

16 further treatment that comes along with accepting

17 the treatment of the -- of the puberty blockers.

18       And that may be simply a psychologically

19 phenomena, but it may well be a biological

20 phenomenon demonstrating that some of the

21 reversibility that's claimed doesn't happen. But

1    Q.   Do you know what studies were being

2  referenced in the DSM-5?

3    A.   I -- I have no idea, but I think there

4  are several.

5    Q.   Do you know that those studies have to do

6  with children diagnosed with gender identity

7  disorder as opposed to gender dysphoria?

8         MR. KNEPPER:  Objection; form.

9         THE WITNESS:  I'm -- I'm not sure I

10  understand the difference there --

11  BY MR. GONZALEZ-PAGAN:

12    Q.   Well --

13    A.   -- that you're trying to draw.

14    Q.   -- would you agree that the gender

15  identity disorder diagnosis is distinct from the

16  gender dysphoria diagnosis?

17    A.   Yeah.  Well, I agree that in DSM they are

18  trying to make that distinction and I'm not sure I

19  understand it.  And I don't think it's necessarily

20  valid.

21    Q.   It could be that some of the children

1  diagnosed with gender identity disorder were indeed

2  simply not transgender to begin with?

3       MR. KNEPPER:  Objection; form.

4  BY MR. GONZALEZ-PAGAN:

5       Q.  Would you agree that there -- that an

6  alternative --

7       A.  I believe -- I believe they're all

8  capable of -- of changing and as far as I know,

9  nobody is making these distinctions that you are

10  trying to draw here for me.

11       And I know that these patients, these

12  subjects rather, if let alone, they desist.  But

13  they are to begin with and how they are distinct is

14  for somebody else to show me, okay.

15       But as far as I know, the evidence right

16  now is to say if somebody says they don't -- their

17  -- their sex of opinion and the sex of their body

18  are discordant -- discordant, they change and

19  become concordant in 80 to 90 percent of the cases

20  if they're allowed to go through puberty.  That I

21  know.

1  purpose.  Its purpose is over, okay.  It's -- that
2  purpose has been settled.  We can go on now and
3  should be using more intelligible, coherent
4  approaches to classification than a field guide.
5      Q.  Do you -- in speaking about this 70 to 80
6  percent statistic just now, you made reference to
7  the word change, that these children were able to
8  change from their cross-gender identification, did
9  you not?
10     A.  Did I use the word change?  Well, they
11  abandoned it.
12     Q.  I believe you did, but I'm asking you.
13     A.  Well, what I -- what I just meant was
14 that they abandoned the idea that they were somehow
15 in the wrong sex.  They were the -- you know, their
16 sex of opinion and their sex of the body were
17 misaligned.
18     Q.  Do you believe that transgender patients
19 should you be encouraged to align their identity
20 and presentation with the sex they were determined
21 at birth?

1    A.    Wouldn't you?  Wouldn't that spare them a

2  long lifetime of hormone treatments and constantly

3  dealing with doctors and things of that sort?

4  Finding themselves to be what they were born --

5  they were made in conception.  Oh, yes, I think

6  that this -- that would -- if we could do that, we

7  would all do that.

8    Q.    Do you believe that that's effective?

9    A.    I think that it would be.  I think it

10  would be effective and I think going through

11  puberty is one of the ways that they -- that those

12  kinds of things come back into alignment.

13    Q.    I guess what I'm asking is:  You oppose

14  the provision of hormonal and surgical care for the

15  treatment of gender dysphoria, you have noted

16  throughout that -- that your clinic -- that the

17  clinic at Johns Hopkins continued to provide

18  psychiatric care, and I guess what I'm wondering is

19  what is the psychiatric care that you believe

20  should be provided to transgender people --

21    A.    Yes.

1      Q.    -- with gender dysphoria?

2      A.    Well, it depends on various kinds of

3  sources of their transsexual feelings, but amongst

4  young children I think that there should be family

5  therapy that looks into the reasons why the person

6  is dissatisfied with their sex at conception.

7      Q.    And --

8      A.    And often you'll find that there are

9  other kinds of other sources of discouragement,

10 depression, and sometimes abuse, sexual abuse,

11 things of this sort.  And those things should be

12 dealt with.  Those should be dealt with

13 psychologically.

14     Q.    And if the young person persists in their

15 cross-gender identification into adults and

16 adulthood, what then?

17     A.    Well, they can do whatever they please.

18     Q.    Except --

19     A.    I -- I would --

20     Q.    -- get hormonal and medical care?

21     A.    But I -- I think that they -- you know, I

1    -- I think that if they persist -- we have -- we

2    have lots of disorders of assumption that appear in

3    adolescence and persist into adulthood, but we

4    still try to help people with them.  The best

5    example being anorexia nervosa.

6            It is a condition that springs up usually

7    amongst young women in their early teens and -- but

8    it can extend right into long life with people and

9    they often need counseling and support to get them

10   to eat satisfactorily enough to keep them at least

11   reasonably healthy even though they continue to

12   have the fear of fatness that is fundamental to

13   this.  This is -- this is not new, that -- it would

14   -- it would continue.

15       Q.   What's the goal of the therapy?

16       A.   What's the role of the therapy?

17       Q.   The goal.

18       A.   The goal --

19       Q.   What's the goal of the therapy?

20       A.   The goal of the therapy is explain to the

21   patients right off the bat is to lead them to move

1    from an idea that is unreal to the reality world

2    that they need to live in and they should live in.

3        Q.   I guess to clarify --

4        A.   And that they would flourish -- they

5    would flourish better if they did that we think.

6        Q.   Just to clarify, when you talk about

7    shifting from the idea to the real, do you mean to

8    align their identity with the sex that they were

9    determined at birth?

10            MR. KNEPPER:  Objection; form.

11            THE WITNESS:  Once again, the sex was --

12   was --

13   BY MR. GONZALEZ-PAGAN:

14       Q.   That's semantics, but --

15       A.   -- received at conception.  Their sex was

16   -- has been from conception.  Let's call it --

17   let's just call it for the sake of argument natal

18   sex, okay?  That's fair enough.

19       Q.   Great.

20       A.   We can do that.

21       Q.   Fair enough.  We'll use that terminology.

1        A.    I think -- I think people do better and

2    live better and flourish better and need less help

3    from -- from doctors if their natal sex and their

4    attitude towards their -- their own sex is the

5    same.

6        Q.    Are you aware that the American

7    Psychiatric Association opposes conversion therapy

8    efforts?

9        A.    Oh, I know the American Psychiatric

10   Association -- its -- its views about any of these

11   conversion therapies and I think that we often

12   mistake the idea that -- that -- this is something

13   that we're trying to force on patients or something

14   that we're trying to do for their benefit, you

15   know.

16       Q.    Okay.

17       A.    I think the benefit of patients is that

18   they -- they do better the more they're aligned

19   with reality, not what is possibly true.  It's true

20   regardless of whether anyone believes it or not.

21             MR. GONZALEZ-PAGAN:  Lauren, let's look

 1        A.    I do, yes, sir.  Yeah.

 2        Q.    Okay.  And it is titled Transgender,

 3   Gender Identity, and Gender Expression

 4   Non-Discrimination.  Do you see that?

 5        A.    I do.  I do see that.  Yeah.

 6             MR. GONZALEZ-PAGAN:  If you go to -- give

 7   me one moment.  I apologize, Lauren.  This is the

 8   wrong resolution.  There's two.  Let's introduce

 9   the other one.  We'll leave this one marked as 11.

10             MS. EVANS:  Sorry about that.

11             MR. GONZALEZ-PAGAN:  That's okay.

12   They're both called APA resolutions.

13             MS. EVANS:  Give me a second.  Hopefully

14   this is the right one.

15             MR. GONZALEZ-PAGAN:  Yes.

16             (Whereupon, Exhibit No. 12 was marked for

17   identification.)

18   BY MR. GONZALEZ-PAGAN:

19        Q.    Dr. McHugh, I'm showing you what's been

20   marked as Exhibit 12.  Do you see that?

21        A.    Yes.  Okay.  Yes.  Right.

 1        Q.    Okay.  And it is a resolution by the

 2    American Psychological Association --

 3        A.    Yes.

 4        Q.    -- on gender identity change efforts.  Do

 5    you see that?

 6        A.    I do.  I see that, yes.

 7        Q.    Okay.  And it is dated February

 8    2021.  All right.  Let's go to the second page and

 9    zoom in at the bottom.

10        A.    Yeah.

11        Q.    On the third-to-last paragraph in that

12    second column, one of the whereas statements, it

13    states "Whereas, GICE have not been shown to

14    alleviate or resolve gender dysphoria (Bradley and

15    Zucker, 1997; Cohen-Kettenis and Kuiper, 1984;

16    Gelder and Marks, 1969; Greenson, 1964; Pauly,

17    1965; and SAMHSA, 2015)"  Did I read that

18    correctly?

19        A.    Yes.  Yes.

20        Q.    Do you understand GICE to mean gender

21    identity change efforts?

1    A.    Yeah.

2    Q.    Okay.  And the American Psychological

3 Association is citing to a number of scientific

4 articles in support of that statement that they

5 make there; is that right?

6    A.    Yes.

7    Q.    Okay.  Including one by Ira Pauly --

8    A.    Yes.

9    Q.    -- that you earlier discussed?

10    A.    Yes.  Yes.

11    Q.    And including one by Ken Zucker; is that

12 right?

13    A.    Yes.  Yes.  I see that, yes.  It's very

14 interesting that -- that he would be quoted in that

15 given that he has demonstrated that with 25

16 patients -- he studied children, young people, with

17 gender or sex disorder -- that 24 or 25 of them he

18 was able to alleviate.  So I'm -- I'm surprised to

19 see that.  Anyway...

20    Q.    And Ken Zucker believes that once a

21 patient has persisted into adolescence and

1   adulthood, they should have access to hormonal and

2   medical treatment; is that right?

3         A.   Yes.

4              MR. KNEPPER:  Objection.

5              THE WITNESS:  Yes.  Yes, he does.  Yeah.

6   BY MR. GONZALEZ-PAGAN:

7         Q.   Let's go to page three, the last two

8   paragraphs, the first "Be it therefore resolved..."

9   It states "Be it therefore resolved that consistent

10  with the APA definition of evidence-based practice

11  (APA, 2005) the APA affirms that scientific

12  evidence and clinical experience indicate that GICE

13  put individuals at significant risk of harm."

14        A.   Yes.

15        Q.   "Be it further resolved that the APA

16  opposes GICE because such efforts put individuals

17  at significant risk of harm and encourages

18  individuals, families, health professionals, and

19  organizations to avoid GICE."  Did I read that

20  correctly?

21        A.   You did.

1      Q.   Okay.  Is it fair to say that the

2  American Psychiatric Association and the American

3  Psychological Association both oppose therapeutic

4  efforts to change a person's gender identity?

5            MR. KNEPPER:  Objection; form.

6            THE WITNESS:  Yes.  Yes, that's right.

7  BY MR. GONZALEZ-PAGAN:

8      Q.   And that -- is it fair to say that the

9  American Psychiatric Association and the American

10  Psychological Association both consider such

11  efforts to be unethical and harmful?

12           MR. KNEPPER:  Objection; form.

13           THE WITNESS:  That -- that's what they

14  say here.

15  BY MR. GONZALEZ-PAGAN:

16      Q.   Thank you.  All right.  Let's go to --

17  let's show you your report again, Dr. McHugh.

18      A.   Okay.

19      Q.   Let's go to paragraph 10 of your report

20  on page 12.

21      A.   Yes.