# EXHIBIT B

Declaration of Omar Gonzalez-Pagan in support of
Motion to Exclude Expert Testimony of Dr. Paul R. McHugh
*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA (M.D.N.C.)

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3                          - - -

4    MAXWELL KADEL, et al.          )

                                    )

5              Plaintiffs           ) Case No.:P

                                    )

6              vs.                  ) 1:19-CV-00272-LCB-LPA

                                    )

7    DALE FOLWELL, et al.           )

                                    )

8              Defendants           )

9                          - - -

10              FRIDAY, OCTOBER 29, 2021

11                     VOLUME 2

12                          - - -

13        Continued remote videotaped deposition of PAUL R.

14   McHUGH, M.D., was taken on Friday, October, 29, 2021,

15   commencing at 9:46 a.m., before Rebecca L. Schnur,

16   Notary Public

17                          - - -

18

19

20

21   Reported By:  Rebecca L. Schnur

22

23

24

25

```
 1     REMOTE APPEARANCES:

 2     On behalf of the Plaintiffs:

 3         LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.

 4             Omar Gonzalez-Pagan, Esquire

 5             ogonzalez-pagan@lamdalegal.org

 6             120 Wall Street, 19th Floor

 7             New York, New York  10005

 8             (212) 809-8585

 9

10         McDERMOTT, WILL & EMERY

11             Lauren Evans, Esquire

12             levans@mwe.com

13             500 North Capitol Street NW

14             Washington, D.C.  20001

15             (202) 756-8864

16

17

18

19

20

21

22

23

24

25
```

1    REMOTE APPEARANCES:  (Continued)

2    On behalf of the Defendants Dale Folwell, Dee Jones,

3    And the North Carolina State Health Plan for Teachers

4    And State Employees:

5        LAW OFFICE OF JOHN G. KNEPPER

6            John G. Knepper, Esquire

7            john@knepperllc.com

8            1720 Carey Avenue, Suite 590

9            Cheyenne, Wyoming  82001

10            (307) 632-2842

11

12        BELL, DAVIS & PITT

13            Kevin G. Williams, Esquire

14            kwilliams@belldavispitt.com

15            100 N. Cherry Street

16            Winston-Salem, North Carolina  27101

17            (336) 714-4150

18

19

20

21

22

23

24

25

1    REMOTE APPEARANCES:  (Continued)

2    On behalf of the Defendant State of North Carolina

3    Department of Public Safety:

4         NORTH CAROLINA DEPARTMENT OF JUSTICE

5              Alan McInnes, Esquire

6              amcinnes@ncdoj.gov

7              114 West Edenton Street

8              Raleigh, North Carolina  27602

9              (919) 716-6529

10

11   ALSO PRESENT:  Bob Jorissen, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    EXAMINATION INDEX
 2       PAUL R. McHUGH, M.D.
 3            BY MR. GONZALEZ-PAGAN                    244
 4            BY MR. KNEPPER                           308
 5            BY MR. GONZALEZ-PAGAN                    310
 6                         - - -
 7                     EXHIBIT INDEX
 8       DEPOSITION EXHIBIT                           MARKED
 9       Exhibit 15 Understanding the Well-Being       249
10                  of LGBTQI+ Populations,
11                  Patterson, et al.
12       Exhibit 16 Position Statement on Access       253
13                  to Care for Transgender and
14                  Gender Diverse Individuals
15       Exhibit 17 Endocrine Society Position         259
16                  Statement on Transgender
17                  Health
18       Exhibit 18 Johns Hopkins Medicine Website     261
19                  Information
20       Exhibit 19 3/22/17 Letter                     266
21       Exhibit 20 The Baltimore Sun Op-Ed            268
22       Exhibit 21 6/15/18 Deposition of Lawrence     271
23                  S. Mayer
24
25           (Exhibits attached to transcript.)
```

1      Q.   Is there a particular calculation that you do

2   to define what a reasonable degree is?

3           MR. KNEPPER:  Objection.  Form.

4      A.   I do, on the foundations of an opinion.

5   There are sources in science that -- applications, when

6   reported, and the degree of confidence in which people

7   are proceeding.

8      Q.   Okay.  Is there a specific degree of

9   certainty here, like 95 percent confidence, like -- or

10  something like that?

11     A.   No.  I don't -- I don't suppose there is,

12  especially in a contested opinion.

13     Q.   Is there an error rate for what is a

14  reasonable degree of medical certainty?

15          MR. KNEPPER:  Objection to form.

16     A.   In this area, there isn't.  Yeah.

17     Q.   If we can turn to page 14 of this document --

18     A.   Sure.  Yes.

19     Q.   -- and in the second-to-last paragraph

20  here --

21     A.   Yeah.  Yes.  14.

22     Q.   -- sorry, third-to-last paragraph, do you see

23  that, where it says -- you state, as one of the

24  summaries you're repeating is that, quote, "Affirmation

25  ('transgender transitioning') medical treatments -

1    hormones and surgery - for gender dysphoria and

2    'transitioning' remain unproven and thus not been

3    accepted by the relevant scientific communities

4    (biology, genetics, neonatology, medicine, psychiatry,

5    psychology, et cetera.)"

6        A.   Yes.

7        Q.   Did I read that correctly?

8        A.   You did, sir.

9        Q.   Okay.  What is the relevant scientific

10   community to which you refer when you state that

11   gender-affirming medical treatments have not been

12   accepted by the relevant scientific medical

13   communities?

14       A.   It's just the plain ordinary medical

15   community of practitioners, especially practitioners at

16   the forefront of this matter.

17          MR. GONZALEZ-PAGAN:  And, Lauren, we can stop

18      the screen scare.

19       Q.   Mr. McHugh, are you familiar with the

20   National Academy for Medicine, formerly known as

21   Institute of Medicine?

22       A.   I'm a member.

23       Q.   You're a member.

24          Would you consider that to be part of the

25   relevant scientific community?

Case 1:19-cv-00272-LCB-LPA   Document 207-3   Filed 02/02/22   Page 8 of 56

1     A.  It is an organization that is a contemporary

2  scientific and medical community.  And I don't -- I'm

3  not sure that their opinion, really, on these matters

4  are ones that I would always accept, no.

5         Yes.  So it's a complicated thing.  I think

6  it's a relevant community, but not a commanding

7  community.

8     Q.  Okay.  Are you familiar with the National

9  Academy for Science?

10    A.  Yes.

11    Q.  Okay.  And would your opinion be the same,

12  that it is a relevant community?

13    A.  Yes.

14        MR. GONZALEZ-PAGAN:  This is a large PDF, but

15      I'm introducing what's been marked as Exhibit 15,

16      continuing the enumeration from the beginning of

17      the deposition on September 8.

18        Lauren, if you can screen share Exhibit 15.

19        (Whereupon, Deposition Exhibit 15 was marked

20      for identification.)

21        MR. GONZALEZ-PAGAN:  We can turn to page 2 of

22      that exhibit.

23        THE WITNESS:  Yes.

24  BY MR. GONZALEZ-PAGAN:

25     Q.  Dr. McHugh, I'm showing you what's been

1    titled -- what is titled, "Understanding the Well-Being
2    of LGBTQI-plus Populations."  And it appears to be a
3    consensus study report of the National Academies of
4    Sciences, Engineering and Medicine.
5            Do you see that?
6        A.   I do, sir.
7            MR. GONZALEZ-PAGAN:  Okay.  If we go on to
8        the next page -- and I'll note for the record that
9        this exhibit contains some highlighting that is
10       not part of the original, that has been done by
11       me.  There are no other alterations to the
12       document.
13           Actually, if we go to what would be page 5 of
14       the PDF -- and we can zoom in there a little
15       bit -- the prior page.
16   BY MR. GONZALEZ-PAGAN:
17       Q.   Dr. McHugh, it states, that a "Consensus
18   study" report "published by the National Academies of
19   Sciences, Engineering, and Medicine document the
20   evidence-based consensus on the study's statement of
21   task by an authoring committee of experts," that the
22   "Reports typically include findings,
23   conclusions...recommendations based on information
24   gathered by the committee and the
25   committee's deliberations.  Each report has been

1    subjected to a rigorous and independent peer-review

2    process and it represents the position of the National

3    Academies on the statement of task."

4              Did I read that correctly?

5         A.   You did, sir.

6         Q.   So would you agree with me that it appears

7    that this document, as a consensus study report, is

8    both the official position of the National Academies

9    and that it is a document that was subjected to an

10   independent peer review?

11        A.   Yes.  That's what it says, yeah.

12             MR. GONZALEZ-PAGAN:  If we go to the page 311

13        of the PDF, Lauren.  It's page 12-10 of the

14        document.

15             MR. KNEPPER:  Omar, one second.  I'm still

16        having trouble pulling up the exhibit.

17             Do the other counsel have access to it

18        through exhibit share?

19             MS. EVANS:  Yes, John.  Actually, what I'm

20        sharing on the screen is from the marked exhibits

21        folder.

22             MR. KNEPPER:  Yeah.  That's what I -- I was

23        hoping you'd say that because I've just -- I've

24        still got only 14.

25             MR. GONZALEZ-PAGAN:  So it's a different

1          folder for today, John.

2                MR. KNEPPER:  Got it.  Okay.  I see what's

3          going on here.  Yep.  Got it.

4                Okay.  Thank you for your time.  Yeah.  Okay.

5          Great.  Thank you.

6                MR. GONZALEZ-PAGAN:  We can zoom in on that a

7          little bit more, Lauren.

8     BY MR. GONZALEZ-PAGAN:

9          Q.   The consensus study report on this page,

10    page 12-10 of the report, states, "Clinicians who

11    provide gender-affirming psychosocial and medical

12    services in the United States are informed by expert

13    evidence-based guidelines.  In 2012, the World

14    Professional Association for Transgender Health (WPATH)

15    published version 7 of the 'Standards of care for the

16    Health of Transgender, Transsexual, and

17    Gender-Nonconforming People,' which have been

18    continuously maintained since 1979, and revisions for

19    version 8 are currently underway (Coleman et al.,

20    2012.)  Two newer guidelines have also been published

21    by the Endocrine Society (Hembree et al., 2017) and

22    the Center of Excellence for Transgender Health (UCSF

23    Transgender Care, 2016).  Each set of guidelines is

24    informed by the best available data and is intended to

25    be flexible and holistic in application to individual

Case 1:19-cv-00272-LCB-LPA   Document 207-3   Filed 02/02/22   Page 12 of 56

1    people.  All of the guidelines recommend psychosocial

2    support in tandem with physical interventions and

3    suggest timing interventions to optimize an

4    individual's ability to give informed consent.  Mental

5    and physical health problems need not be resolved

6    before a person can begin a process of medical gender

7    affirmation, but they should be managed sufficiently"

8    so "that they do not interfere with treatment."

9         Did I read that correctly?

10   A.   You did, sir.

11   Q.   Will you agree that it is, then, the official

12   position of the National Academies of Medicine,

13   Science, and Engineering that the provision of

14   gender-affirming psychosocial and medical services for

15   the treatment of gender dysphoria is informed by expert

16   evidence-based guidelines, including the WPATH

17   standards of care?

18   A.   Well, that's what it says.

19        MR. GONZALEZ-PAGAN:  We can stop sharing this

20        exhibit.

21        I'm introducing what's been marked as

22        Exhibit 16.

23        (Whereupon, Deposition Exhibit 16 was marked

24        for identification.)

25

1    BY MR. GONZALEZ-PAGAN:

2         Q.   Mr. McHugh, would you consider the American

3    Psychiatric Association to be part of the relevant

4    scientific community when it comes to these questions?

5         A.   Do I consider them -- well, I consider

6    them part -- yes, I consider them part of -- yes,

7    they're part of the community, yes.

8              MR. GONZALEZ-PAGAN:  We're showing you --

9         Lauren, if we could screen share Exhibit 16.

10        Q.   This is the position statement of the

11   American Psychiatric Association on "Access to Care for

12   Transgender and Gender Diverse Individuals."

13             Do you see that?

14        A.   I do see it.

15        Q.   Okay.  Have you seen this document before?

16        A.   Actually, I haven't, no.

17        Q.   Okay.  Have you seen the National Academies

18   report before?

19        A.   No, I hadn't.

20        Q.   And the National Academies report was

21   published in 2020.

22             Is there any reason why you were -- didn't

23   look to what the National Academies have said on this

24   question?

25        A.   I don't think I had any particular reason.

```
1                MR. GONZALEZ-PAGAN:  On this document, if we
2           could zoom in on the center of the issue.
3                MR. KNEPPER:  Just to clarify, what's the
4           date on this document, Omar?
5           Q.   Sure.  Dr. McHugh, do you see where it says
6      it was approved by the board of trustees of the
7      American Psychiatric Association in July of 2018?
8           A.   Yes, I do, sir.
9           Q.   And it was approved by the assembly May 2018.
10     Is that right?
11          A.   I do.  Yes.  Uh-huh.
12          Q.   It states -- just below the issue, it states
13     that, "Significant and longstanding medical and
14     psychiatric literature exists that demonstrates clear
15     benefits of medical and surgical interventions to
16     assist gender diverse individuals seeking transition.
17     However, private and public insurers often do not
18     offer, or may specifically exclude, coverage for
19     medically necessary treatments" of "gender transition.
20     Access to medical care (both medical and surgical)
21     positively impacts the mental health of transgender and
22     gender diverse individuals."
23               Did I read that correctly?
24          A.   Yes.  I didn't follow you at first, but I
25     think I'm following it now.  Yes.  I don't see that you
```

Case 1:19-cv-00272-LCB-LPA  Document 207-3  Filed 02/02/22  Page 15 of 56

1    read it incorrectly, no.

2         Q.   Okay.  If we move a little bit further down

3    on the document --

4         A.   Yes.

5         Q.   -- on position Number 3, it states that the

6    American Psychiatric Association, "Opposes categorical

7    exclusions of coverage for such medically necessary

8    treatment when prescribed by a physician."

9              Did I read that correctly?

10        A.   You did, yes.

11        Q.   Okay.  Were you aware of this position of the

12   American Psychiatric Association?

13        A.   I was.

14        Q.   Is there any reason why you didn't disclose

15   this when you were stating that the relevant scientific

16   community does not accept this position?

17        A.   No, other than my opinion that this did not

18   rest on a solid science foundation.  The references

19   that they all have made and looked at are weak, a weak

20   proof for the medical necessity in many of the -- at

21   least the hormonal and surgical treatment of these

22   patients, so I disagreed with them.

23        Q.   I agree -- I understand that, Dr. McHugh.  I

24   guess my question is, because your opinion is that this

25   view has not -- about the medical necessity of this

Case 1:19-cv-00272-LCB-LPA   Document 207-3   Filed 02/02/22   Page 16 of 56

1    treatment, quote, has not been accepted by the relevant

2    scientific communities -- and I've just shown you two

3    examples of the National Academies and the American

4    Psychiatric Association that appear to say to the

5    contrary.

6              And I'm just curious why you didn't disclose

7    that in your report.

8         A.   Because I didn't agree with it, I suppose.  I

9    didn't agree that they had -- actually, in their

10   opinions, every time I did look, I know it was

11   discussing the foundations, like in the Anderson

12   Society.  They agree that the foundations were not

13   strong.  So I believe that these represented more

14   advocacy groups in this area than true full scientific

15   evaluations of the benefit of these processes to the

16   patient.  I held that opinion and I still hold it to

17   this day.

18        Q.   Would you agree that the American

19   Psychological Association also is in agreement that

20   this medical -- that this medical treatment and

21   hormonal and surgical treatments are medically

22   necessary and beneficial to the transgender population?

23             MR. KNEPPER:  Objection.

24        A.   Yes.  I understand that.  Yes.

25        Q.   Will you agree that the American Medical

1    Association also supports the provision of medical

2    treatment for the treatment of gender dysphoria?

3              MR. KNEPPER:  Objection to foundation.

4        A.   I realize that these organizations have made

5    these statements.  What I've said and what I still hold

6    is that the foundations on which they hold these

7    opinions, they, themselves, agree are somewhat shaky,

8    when they look at them individually and at the data

9    that they show, that these do not represent the kind of

10   evidence on which they would ordinarily support a

11   treatment.

12             They've done this before, in other

13   conditions, such as the multiple personality disorder,

14   so I've seen this kind of approach to vexed social

15   question.

16       Q.   I understand that, Mr. McHugh.  I guess --

17       A.   Right, Counsel.  I'm sorry.  I beg your

18   pardon.

19       Q.   No.  No.  It's okay.  I appreciate it.

20             MR. GONZALEZ-PAGAN:  If we can stop sharing

21        this exhibit, Lauren.

22       Q.   Dr. McHugh, you made mention, for example, of

23   the Endocrine Society, which you noted have published

24   guidelines that were graded and were peer-reviewed.

25             Do you recall that?

1        A.   Yes.

2          MR. GONZALEZ-PAGAN:  Okay.  I am introducing

3    what's been marked as Exhibit 17.

4          (Whereupon, Deposition Exhibit 17 was marked

5    for identification.)

6          MR. GONZALEZ-PAGAN:  Lauren, if we could

7    share it.

8          If we can zoom in, at the top.

9  BY MR. GONZALEZ-PAGAN:

10       Q.   This appears to be a position statement on

11  transgender health by the Endocrine Society and the

12  Pediatric Endocrine Society.

13         Do you see that?

14       A.   I do.

15       Q.   I believe this is the same Endocrine Society

16  to which you referred to as having done a graded look

17  at the evidence in support of their guidelines.  Is

18  that right?

19       A.   Yes.

20       Q.   And if we go to the next page, at the bottom,

21  at the very bottom, this appears to have been published

22  in December 2020.

23         Do you see that?

24       A.   I do, yes.

25       Q.   Just a little bit on top, the second bullet

1    point under "Positions" --

2         A.   Okay.  Yeah.

3         Q.   -- it states, "Medical intervention for

4    transgender youth and adults (including puberty

5    suppression, hormone therapy and medically indicated

6    surgery) is effective, relatively safe (when

7    appropriately monitored), and has been established as

8    the standard of care.  Federal and private insurers

9    should cover such interventions as prescribed by a

10   physician as well as the appropriate medical screenings

11   that are recommended for all body tissues that a person

12   may have."

13             Do you see that?

14        A.   I do.

15        Q.   Okay.  So it is the view of this

16   organization, which you referenced to have done an

17   assessment of the evidence, that these medical

18   interventions are effective, relatively safe, and have

19   been established as the standard of care.

20             Is that right?

21        A.   That's what it says, yes.

22        Q.   Would you consider your fellow medical

23   professionals at Johns Hopkins to be part of the

24   relevant scientific community with regards to this

25   question?

```
 1        A.    Some of them.
 2        Q.    Do you recall that last time we discussed the
 3   Johns Hopkins Center for Transgender Health?
 4        A.    I do, yes.
 5              MR. GONZALEZ-PAGAN:  Lauren, we can drop this
 6        exhibit.
 7              I'm introducing what's been marked as Exhibit
 8        18.
 9              And Lauren, if we could show it.
10              (Whereupon, Deposition Exhibit 18 was marked
11        for identification.)
12   BY MR. GONZALEZ-PAGAN:
13        Q.    This is a printout of the web page for -- the
14   services and appointments page of the Center for
15   Transgender Health at Johns Hopkins Medicine.
16              Do you see that?
17        A.    I do.  I see it, sir.  Yes.
18        Q.    Okay.  And Johns Hopkins Medicine is where
19   you are employed.  Is that correct?
20        A.    That is, yes.
21        Q.    Okay.  And as we discussed, they have a
22   Center for Transgender Health?
23        A.    It does.
24        Q.    Okay.  That first paragraph states, "The
25   Johns Hopkins Center for Transgender Health offers
```

1    comprehensive, evidence-based and affirming care for

2    transgender youth and adults that is in line with the

3    standards of care set by the World Professional

4    Association for Transgender Health."

5         Did I read that correctly?

6    A.   You did.

7         MR. GONZALEZ-PAGAN:  All right.  We can take

8         the exhibit down.

9    Q.   Mr. McHugh, are you aware who -- are you

10   familiar with Dr. Kenneth Zucker?

11   A.   Yes.

12   Q.   Okay.  Would you consider Dr. Zucker to be

13   part of the relevant scientific community?

14   A.   Yes.

15   Q.   Are you aware that Dr. Zucker supports

16   providing hormonal and surgical care for the treatment

17   of gender dysphoria to a transgender person whose

18   gender dysphoria persists into adolescence?

19   A.   I'm aware of Dr. Zucker's position on this,

20   which he believes, from case to case, is very

21   complicated, and sometimes he says that he feels that

22   he should support this kind of treatment.

23        And I have disagreed with him on those

24   matters.  And he and I -- I have great respect for him,

25   but we are in contention a little bit about what should

1    be done for youth.  Most of the time, Mr. Zucker --

2    Dr. Zucker has recognized that most of these patients

3    are not helped by -- are not benefited by these

4    physical treatments.

5         Q.   Well --

6         A.   You can find plenty of evidence for that in

7    his testimony, such that, ultimately, because of his

8    position on these things, he was deprived of his

9    position in Canada.

10        Q.   And even then, he still provided this care

11   for individuals whose gender dysphoria persisted into

12   adolescence?

13        A.   Yes, I gather he did, but very reluctantly, I

14   believe, and not reluctantly enough, in my opinion.

15             I believe that these kinds of treatments

16   should not be given to adolescents or anyone who is a

17   minor.

18        Q.   Just shifting gears, then, a little bit, last

19   time, we briefly discussed some of your publications --

20        A.   Yes.

21        Q.   -- relating to the topic of gender dysphoria

22   and transgender persons.

23             Do you recall that?

24        A.   Yes, I do.  I remember that very well,

25   Counselor.

1       Q.   And we established that two of those
2    publications were the -- an article titled, "Sexuality
3    and Gender Findings from the Biological, Psychological
4    and Social Sciences," and the other, "Growing Pains,
5    Problems with Puberty Suppression in Treating Gender
6    Dysphoria."
7            Do you recall that?
8       A.   I do, yes.
9       Q.   Okay.  Those two articles were published in
10   "The New Atlantis."  Is that right?
11      A.   That's correct, sir.  Yes.
12      Q.   Okay.  "The New Atlantis" is not a
13   peer-reviewed journal.  Is that right?
14      A.   No, it wasn't.  No.
15      Q.   Is it a scientific journal?
16      A.   No.  It's an ordinary journal for the public.
17   It's a public publication to inform the public about
18   what the authors believe the scientific community has
19   shown.
20      Q.   Who published "The New Atlantis" at the time
21   of the publication of these articles?
22      A.   Who published it?
23      Q.   Yes.
24      A.   I don't know exactly who the publishers are.
25      Q.   Are you familiar with the Center for -- the

1    Ethics and Public Policy Center?

2         A.   Yes.  I'm sorry.  Yes.  These are things that

3    slip my mind.  Yes, of course.  And it was from that

4    organization that this -- that "The New Atlantis" is

5    one of its publications, yes.

6         Q.   Are you aware that the Ethics and Public

7    Policy Center represents itself as Washington, DC's

8    premier institute dedicated to applying the

9    Judeo-Christian moral tradition to critical issues of

10   public policy?

11        A.   Yes, I am.  I'm aware of that, yes.

12        Q.   Why did you decide to publish these articles

13   in a journal published by an organization that was

14   dedicated to applying Judeo-Christian moral traditions

15   to critical issues of public policy?

16        A.   It seemed an interesting organization and

17   interesting publication to me.

18        Q.   Is there any reason why you chose not to

19   publish either of these articles in a peer-reviewed

20   journal?

21        A.   Because it's -- I didn't discover anything

22   new.  I wasn't describing anything new, which is what a

23   peer-reviewed article is about.

24             This was my evaluation of what the

25   peer-reviewed periodicals had shown.  This is my

1  opinion of what peer-reviewed things -- it was not a

2  new discovery.  There were no new discoveries that were

3  reported in that.  It was an article of opinion, as you

4  might find in "The Atlantic" or in "The New Republic"

5  or in "The New Yorker."

6        Q.    Thank you.

7              Were you aware of some of the criticisms of

8  the "Sexuality and Transgender" article by medical and

9  scientific professionals?

10       A.    I'm very aware of it.  None of them seem to

11  attack any particular opinion by other evidence.  Most

12  of the attacks were that they didn't like my reading of

13  the literature.

14             MR. GONZALEZ-PAGAN:  I'm introducing what's

15         been marked as Exhibit 19.

16             Lauren, if you could please share it on the

17         screen.

18             (Whereupon, Deposition Exhibit 19 was marked

19         for identification.)

20  BY MR. GONZALEZ-PAGAN:

21       Q.    This is a letter dated March 22, 2017.  It

22  starts by saying, the "Sexuality and Gender" report

23  published in "The New Atlantis" by you and Dr. Lawrence

24  Mayer -- the first -- the first page contains

25  the letter, and there are another 35 pages or so of

1    signatories.

2         A.   Yes.  Yes.  I'm aware of that, yes.

3         Q.   Yeah.  Are you familiar with this letter?

4         A.   I am.

5         Q.   In its last sentence, the letter states --

6              MR. GONZALEZ-PAGAN:  And if we can zoom in,

7         Lauren, that would be great.

8         Q.   -- "In summary, as researchers and clinicians

9    with expertise in gender and sexuality, we affirm that

10   the 'Sexuality and Gender' report does not represent"

11   the "prevailing expert consensus opinion about sexual

12   orientation or gender identity related research or

13   clinical care."

14        A.   Yes.  Yes.

15        Q.   Were you aware of this critique?

16        A.   I was.  I was, very much so, yes.

17        Q.   Would you agree that the various doctors,

18   researchers, and healthcare medical professionals that

19   signed this letter are part of the relevant scientific

20   community?

21             MR. KNEPPER:  Object to form.

22        A.   They are, yes.  I suppose they are, yeah.

23             I've always supposed that they were,

24   demonstrating, of course, that -- how contended this

25   field is.  Experts that disagree.

1          MR. GONZALEZ-PAGAN:  Let's exit this share.

2          And I'm introducing what's been marked as

3      Exhibit 20.

4          (Whereupon, Deposition Exhibit 20 was marked

5      for identification.)

6          MR. GONZALEZ-PAGAN:  Lauren, if you could

7      please share as soon as it publishes.

8  BY MR. GONZALEZ-PAGAN:

9      Q.   Mr. McHugh, were you aware of some colleagues

10  at Johns Hopkins that criticized your publication of

11  the "Sexuality and Gender" report?

12     A.   I'm very aware of that, yes.

13     Q.   Okay.  I am showing you what is a printout of

14  an op-ed in "The Baltimore Sun."  It was by --

15         MR. GONZALEZ-PAGAN:  If we can zoom in to the

16     authors.

17     Q.   -- Drs. Chris Beyrer, Robert Blum, and Tonia

18  Poteat, who are -- who represent themselves to be

19  faculty at Johns Hopkins.

20     A.   Yes.

21     Q.   It was published in September of 2016.  And

22  this printout was printed into PDF on -- if we can go

23  to the top -- on September 7, of this year.

24         Were you aware of their critique by these

25  faculty colleagues at Johns Hopkins?

1           A.    Yes.

2                 Were you, Counselor, aware of my response to

3     this in another editorial that followed a couple of

4     weeks later?

5           Q.    If we go to the second paragraph, it states,

6     "As faculty at Johns Hopkins, a major educational,

7     research and health institution, we are writing to

8     express our concern about a recently published report

9     that we believe mischaracterizes the current state of

10    the science on sexuality and gender."

11          A.    Yes.

12          Q.    Were you aware that faculty colleagues at

13    your institution thought that you were

14    mischaracterizing the science in your report?

15          A.    Well, these ones did, yes.

16                MR. GONZALEZ-PAGAN:  We can exit the exhibit.

17          A.    As you can see, the first sentence of that

18    article is -- demonstrates how lack of experts they

19    are, in university life.

20          Q.    Are you familiar with Dean Hamer?

21          A.    Yes.

22          Q.    Dean Hamer is a geneticist.  Is that right?

23          A.    Yes.  A distinguished person, yes.

24          Q.    Are you aware that he criticized your

25    "Sexuality and Gender" article?

1      A.    I am.

2      Q.    Would you consider Dean Hamer to be part of

3      the relevant scientific community to which you refer to

4      in your report?

5      A.    He's certainly relevant.

6      Q.    Would you consider Dr. Lawrence Mayer to be

7      part of the relevant scientific community?

8      A.    Yes.  Yes.

9      Q.    And Dr. Mayer was your coauthor in the

10     "Sexuality and Gender" and "Growing Pains" articles.

11     Is that right?

12     A.    That's right.  Yes.

13     Q.    How did you come to work with Dr. Mayer on

14     the "Sexuality and Gender" article?

15     A.    Dr. Mayer was a member of my department of

16     psychiatry and he is an expert statistician.  And I

17     very much appreciate his enterprise in understanding

18     the statistics of complicated matters, and so I asked

19     him if he would join with me in this.  And he was

20     pleased to do so.

21     Q.    Were you aware that Dr. Mayer had been

22     deposed in a court case involving a similar question

23     with regards to this case, which had to do with

24     coverage for gender-affirming care?

25     A.    I'm aware that -- I'm aware that Dr. Mayer

1    Hopkins could give it, you know.  And Johns Hopkins --

2         Q.   If we turn to the next page --

3         A.   Yeah.

4         Q.   -- in the first full question and following

5    answer, it states:

6              Question:  You said that some of his views

7    concern you or bother you.  What views are those?

8              Answer:  Well, I don't want to say what he

9    thinks, but he's made statements that I would consider

10   anti-gay, anti-transgender.  And sometimes he has

11   strong opinions, but he could influence people more if

12   he wasn't so extreme.  People told me he could use

13   words like "gender pretender."  Or he's made analogies

14   to anorexia.  And I don't think those are very helpful.

15   I also think they can be mean-spirited, quite frankly.

16             Were you aware of this critique by Dr. Mayer

17   about your views?

18        A.   I'm aware of this critique by many people

19   about my views.

20             I consider them wrong.  I'm not

21   anti-anything.  I'm trying to work for the benefit of

22   all patients.

23             And so they might be right that I could

24   influence people if I wasn't so flat-footed about my

25   opinion, but I believe that somebody in my position as

Case 1:19-cv-00272-LCB-LPA   Document 207-3   Filed 02/02/22   Page 31 of 56

1      Which -- Question:  Which is Paul McHugh's

2    view?

3          Answer:  Well, I don't know.  He's made some

4    extreme statements about tran -- I mean, I read a

5    statement about gender pretenders or something like

6    that, an analogy to -- to body dysmorphic disorder.

7    And kind of -- I believe he might even have said that

8    transgenders are mentally ill.  Don't quote me on that,

9    but I believe he has.  I find that very bothersome.

10   Very bothersome.

11         Were you aware of that critique by Dr. Mayer

12   of your views?

13     A.   No, I wasn't.  He never expressed it to me,

14   as he says.

15     Q.   Do you believe that being transgender is

16   against God's will?

17     A.   Of course not.

18         MR. KNEPPER:  Form.

19     Q.   We previously looked at an article titled,

20   "Surgical Sex," that you published in "First Things"

21   in 2004.

22         Do you recall that?

23     A.   I do.  Yes.

24     Q.   Who publishes "First Things"?

25     A.   "First Things" is published by -- well, I

1    don't know the organization behind it.  It's a -- it's

2    a Christian organization, and it has a -- it has a

3    Christian background.

4              MR. GONZALEZ-PAGAN:  And Lauren, we can

5         remove the exhibit from screen share.

6    BY MR. GONZALEZ-PAGAN:

7         Q.   Are you familiar with the Institute on

8    Religion and Public Life?

9         A.   Yes, I am.  I should know that.

10        Q.   Is that the publisher of "First Things"?

11        A.   That's right.  Yes.

12        Q.   And is "First Things" a peer-reviewed

13   journal?

14        A.   No.

15        Q.   Is it a scientific publication?

16        A.   No.  But I'd already published in scientific

17   peer-reviewed journals, so I was now expressing my

18   opinion to the public, as I would in -- if I were

19   writing for "The Atlantic" or "The New Yorker."

20             MR. GONZALEZ-PAGAN:  Lauren, if we could show

21        on the screen what's been marked as Exhibit 13 on

22        the September 8 deposition.

23        Q.   And this is your article in "First Things"

24   titled "Surgical Sex."  Is that right, Dr. McHugh?

25        A.   That's correct.  Yes.  Right.

1      Q.   The first four sentences of the second

2   paragraph read, "Their regular response was to show me

3   their patients.  Men (and until recently they were all

4   men) with whom" I'd spoken -- "with whom I spoke before

5   their surgery would tell me that their bodies and

6   sexual identities were at variance.  Those I met after

7   surgery would tell me that the surgery and hormone

8   treatments that had made them 'women' had also made

9   them happy and contented.  None of these encounters

10  were persuasive, however.  The postsurgical subjects

11  struck me as caricatures of women.  They wore high

12  heels, copious makeup, and flamboyant clothing; they

13  spoke about how they found themselves able to give vent

14  to their natural inclinations for peace, domesticity,

15  and gentleness -- but their large hands, prominent

16  Adam's apples, and thick facial features were

17  incongruous (and would become more so as they aged)."

18          Did I read that correctly?

19      A.   Yes, sir.  Yes.

20      Q.   Do you believe that transgender women are

21  caricatures of women?

22      A.   They often are, yes.

23      Q.   You begin your article "Surgical Sex," in the

24  first paragraph, by making reference to the "Serenity

25  Prayer."  Is that right?

1      A.   Yes, I did.  Yes.

2      Q.   Do you believe that religious views should

3  determine whether transgender people diagnosed with

4  gender dysphoria should be able to access

5  gender-affirming care?

6      A.   Excuse me.  I didn't understand that

7  question.  Give it to me again.

8      Q.   Sure.  Do you believe that religious views

9  should determine whether a transgender person diagnosed

10  with gender dysphoria should be able to access

11  gender-affirming care?

12      A.   No, I don't believe religious views, at the

13  moment, should do that.  I think somebody's religious

14  views may well influence what they're doing, but in

15  this discussion, I don't think religious views should

16  be the prominent ones.

17          MR. GONZALEZ-PAGAN:  We can stop sharing the

18      exhibit on the screen.

19  BY MR. GONZALEZ-PAGAN:

20      Q.   We also previously established that you had

21  three other publications relating to gender dysphoria,

22  one being "Psychiatric Misadventures"?

23      A.   Yes.

24      Q.   And that publication was in the early '90s in

25  "The American Scholar."  Is that right?

1      A.   Correct.  Yes.

2      Q.   And "The American Scholar" is not peer

3  reviewed?

4      A.   No, it's not.

5      Q.   And it's not a scientific publication.  Is

6  that right?

7      A.   No, it's not.  Yes.

8      Q.   And the other was a commentary piece that you

9  published in "Nature Medicine" in 1995.

10     A.   Yes.

11     Q.   It was not a study, but an essay.

12     A.   Yes.

13     Q.   Is that correct?

14     A.   That's correct.

15     Q.   And the last one was a publication just last

16  month on the publication "Commentary."  Is that right?

17     A.   That's right.  Yes.

18     Q.   And "Commentary" is not a peer-reviewed

19  publication.  Is that right?

20     A.   No, it's not.  That's right.

21     Q.   And it's not a scientific publication.  Is

22  that right?

23     A.   No.  That's correct.

24     Q.   So none of your publications relating to this

25  topic are actually studies.  Is that correct?

1      A.   No.  I have not published an actual study.
2   Right.  I've reviewed studies, but I haven't made a
3   study of my own, no.
4           Oh, dear.  It's okay.
5      Q.   All right.  I just -- previewing, I just have
6   like three or four questions, and then I think it may
7   be appropriate to take a break, but I just want to
8   finish my questioning.
9      A.   Sir, you're very welcome.
10          Just a second.  I've lost your screen for
11  some reason or another.
12     Q.   Okay.  We can wait.  We can wait for you, of
13  course.
14     A.   I think I'm coming back.
15          There you are.  I'm back.
16     Q.   No problem.
17     A.   For some reason or another, my screen
18  automatically shut off.
19          Okay, sir.  Here, I am.  Go ahead.
20     Q.   I think we've discussed throughout
21  September 8 and today how you state your concerns are
22  scientific in nature about the provision of this care.
23  Is that right?
24     A.   That's correct.
25          MR. KNEPPER:  Form.

1    Q.   I am wondering, if your concerns are

2    scientific and, purportedly, they date back at least

3    until the mid-'70s -- is that correct?

4    A.   Yes.

5    Q.   Why have you chosen to publish about these

6    matters primarily in nonscientific journals?

7    A.   Because I thought that I could express my

8    opinions there to the public at large.  I thought the

9    public at large needed to know that there was great

10   contention in these matters.  And although I did, after

11   all, publish in "Nature Medicine," I did publish my

12   opinions also publicly.  It seemed that that was my

13   responsibility as the director of the psychiatry

14   department at Johns Hopkins, especially after we had

15   decided that we were not going to support this any

16   longer.

17   Q.   I am curious.  If your concerns are also --

18   in a similar vein, if your concerns are primarily

19   scientific, why did you decide to publish primarily

20   three of the last four publications in the last 20

21   years in religiously affiliated publications?

22   A.   They were interested in my opinion.  They

23   asked me, most of them.  They asked me if I would

24   express it.

25   Q.   Have you -- have you sought to have your

1  views regarding this matter, in the last few years,

2  published in a peer-reviewed journal?

3          A.   I have.   In fact, I asked "The New England

4  Journal" if they would be interested in having me write

5  something on a respective.   And they decided they

6  didn't wish to have it published -- they didn't wish

7  me to -- they didn't want to commission me to do that.

8  So I tried.

9          MR. GONZALEZ-PAGAN:   I think that we're at a

10          good point to do a break, if that makes -- if

11          that's okay with people.

12          THE WITNESS:   If that is needed.   It's not

13          necessary for me.   I would really like to press on

14          to the end here, if I could, given that the day --

15          I don't wish to consume the whole day in this.

16          MR. GONZALEZ-PAGAN:   No.   I appreciate that.

17          I'll be honest, I only have a few more pages left.

18          So let's do -- understanding that you'd like to

19          press on, let's do a five-minute break.

20          THE WITNESS:   That would be fine.

21          THE VIDEOGRAPHER:   We'll go off the record at

22          10:48 a.m.

23          (Recess taken.)

24          THE VIDEOGRAPHER:   We are back on the record

25          at 10:59 a.m.

1    general population at large.  Is that right?

2         A.    That's correct.

3         Q.    Did you file a brief opposing the ability of

4    transgender students to use the restroom consistent

5    with their gender identity?

6         A.    I did.

7         Q.    Was that in the Gavin Grimm case?

8         A.    Yes.  Yes, sir.

9         Q.    In that brief, did you argue that

10   conditioning children into believing that a lifetime of

11   impersonating someone of the opposite sex achievable

12   only from chemical and surgical interventions is a form

13   of child abuse?

14        A.    I did say that.  And I believe that.

15        Q.    Is it your view, then, that the provision of

16   gender-affirming care to transgender adolescents is a

17   form of child abuse?

18             MR. KNEPPER:  Object to the form.

19        A.    I believe that's exactly -- I've said that

20   several times.

21        Q.    Do you believe that the Center for

22   Transgender Health at Johns Hopkins is engaging in a

23   form of child abuse?

24        A.    When I talked with them when they were

25   beginning, they said they were not going to do this

1    treatment to any child, and therefore, I said, that's

2    good.  If you don't do it to any child, you won't --

3    you'll avoid child abuse, as Dr. Lee may well testify

4    to.

5             I've made no secret of the idea that these --

6    it's impossible to give informed consent, when you're a

7    child or adolescent, about what is going to be a

8    long-term effect on your body and, fundamentally, your

9    life.

10        Q.   Are you aware that the Johns Hopkins Center

11   for Transgender Health provides gender-affirming

12   hormonal care to adolescents?

13        A.   I have learned that since.

14        Q.   Do you believe, then, that they're engaging

15   in a form of child abuse?

16        A.   Let me -- this is what -- probably thinks

17   about being flat-footed.  I'm quite flat-footed about

18   this.  I believe that changing the body of

19   adolescents -- children or adolescents before the age

20   of 21 is a form of child abuse.  I'm quite -- I'm quite

21   certain about that, about my opinion.  Let's put it

22   that way.

23             This is my opinion, and I've expressed it in

24   several ways.  You don't have to change around to find

25   that.  I'm terribly against it, as a form of misabuse

 1    of a child -- misuse of a child and their feelings.

 2        Q.   And you're aware that no medical or hormonal

 3    or surgical treatment is recommended or provided to

 4    prepubertal youth?  Are you aware of that?

 5        A.   There's no -- no -- nothing --

 6        Q.   Let me restate that.  Are you aware that no

 7    hormonal or medical treatment is recommended for

 8    prepubertal youth?

 9        A.   I'm aware that some people are doing it with

10    children in the early phases of puberty.  So I suppose

11    the issue of prepubertal or early pubertal is a useful

12    guideline, but that they're talking about using these

13    treatments before people have fully developed, is my

14    opinion; not only my opinion, it's what they're saying

15    they're doing.

16             I'm sure the endocrinologists will help you

17    with that better than me.

18        Q.   Do you believe that transgender people

19    are disordered?

20        A.   I believe they suffer from an overvalued

21    idea, yes.  I expressed that in my article in "Nature

22    Medicine."

23        Q.   Let me ask you this.  Do you -- do you

24    believe that your opinion that the provision of

25    hormonal and surgical care to anyone under 21 for the

1    ethnic origins or, for that matter, your sex.

2         Q.   All right.  Let's return to Exhibit 2 to the

3    September 8 deposition, that being your report, if we

4    can put that up.

5         A.   Good.

6         Q.   If we go to page 13, if we look in the middle

7    there's -- one of your opinions states, "A currently

8    unknown" --

9              MR. GONZALEZ-PAGAN:  You can zoom in towards

10         the middle.  Yeah.  Yeah, if we can zoom in a

11         little bit for the doctor, that would be great.

12              THE WITNESS:  Yes.

13              MR. GONZALEZ-PAGAN:  Okay.  If you go down a

14         little bit, just so it's in the center.

15    BY MR. GONZALEZ-PAGAN:

16         Q.   It states, "A currently unknown number (but

17    likely larger than 50 percent)" --

18         A.   Just a second.

19              Yeah, I got it.  Okay.  Yes.

20         Q.   Did you find it, right in the middle?

21         A.   I did.  I've got it, yeah.

22         Q.   Okay.  It states, "A currently unknown number

23    (but likely larger than 50 percent) of patients

24    reporting gender dysphoria suffer from psychiatric

25    illness(es) that can complicate and may distort their

1    judgments and perceptions of gender identity."

2             Did I read that correctly?

3        A.   You did, sir.

4        Q.   What is the literature that you rely on to

5    back up this statement?

6        A.   The literature in autism and other articles

7    of that sort.  As I say, it's currently unknown, just

8    as the literature describes some of the psychological

9    problems these patients are suffering from, some

10   reported by their families.

11            I think Laura Littman's article, for example,

12   on the rapid onset of gender dysphoria in young girls

13   makes something of this.

14       Q.   This article does not involve any

15   conversations or study with any of the patients

16   allegedly having gender dysphoria.  Is that right?

17       A.   No.  It has -- it is involved with a

18   discussion with the parents of these -- often the

19   parents of these young children -- young people.

20       Q.   I guess I'm wondering, on what literature do

21   you rely on to say "likely...than 50 percent"?

22       A.   I can't give you an article that would show

23   you that.  But the patients that are there, that other

24   people speak about, wonder, you know.  What's really

25   happening is that, when I say "a currently unknown

1    number," it's very often because people are not

2    studying the patients thoroughly enough.  That's the

3    reason it's currently unknown.  I believe it's larger

4    than 50 percent.

5         Q.   Is there any literature that you can cite to,

6    to --

7         A.   Not at the moment.  But I'm certain you could

8    probably find it, if you look.

9         Q.   To what psychiatric illnesses do you refer to

10   in this statement?

11        A.   I'm referring to patients with depression,

12   with major depression, with autism, with some aspects

13   of obsessive compulsive disorder, and things of that

14   sort.

15        Q.   Autism is not a psychiatric illness, though.

16   Right?

17        A.   No.  It is a psychiatric disorder.  Yes, it

18   is.  Autism is.  Of course, it is.

19        Q.   Is there any literature that you can point

20   to, to back up your statement that depression distorts

21   a person's judgment and perception of gender identity?

22        A.   Of course, I can.  Many -- many people with

23   depression have disordered attitudes about their world,

24   including committing suicide.

25        Q.   But, like, is there any literature that you

1    can point to, specifically, with regards to how

2    depression distorts a person's judgment and perception

3    of their gender identity?

4         A.   It distorts judgments and perceptions about

5    everything in its life.  And if he or she is in a

6    community where gender identity is a problem, it turns

7    up there.

8         Q.   Okay.  Is there any literature that you can

9    point us to that, any examples you can give us?

10        A.   I'm certain it could be found, but I haven't

11   -- I can't point to one right at the moment, no.

12        Q.   Okay.  Same question with regards to anxiety.

13   Any literature you can point to?

14        A.   No.  I cannot.  No, I can't point to any

15   particular literature.

16        Q.   Would you agree that there are some patients

17   with gender dysphoria who do not have other cooccurring

18   mental health diagnoses?

19        A.   I can't -- I can't affirm to that because I

20   don't believe that many people study their patients

21   thoroughly enough to make sure there are not other

22   things in their mind, some aspects of their life story,

23   some aspects of their sexual abuse as children.  Many

24   have reported, later on, about sexual abuse.  These are

25   the kinds of things which produce psychiatric problems

Case 1:19-cv-00272-LCB-LPA   Document 207-3   Filed 02/02/22   Page 46 of 56

1    for which gender identity sometimes is a problem.

2         Q.   Is it your opinion that every person who is

3    transgendered, therefore, has another psychiatric

4    illness?

5         A.   No.  It is my opinion that everybody who has

6    a gender dysphoria suffers from an overvalued idea.

7    That's what they have.  And that overvalued idea often

8    will derive from some psychiatric problem, a

9    psychiatric problem expressed in diagnostic terms, like

10   depression, but may well be expressed -- may be the

11   expression of some abuse or mistreatment that they had

12   earlier in their life.  But all of them suffer from an

13   overvalued idea in my opinion.

14        Q.   And that overvalued idea, does it always come

15   from a psychiatric illness?

16        A.   Well, you have to understand what I mean by

17   psychiatric illness.  I mean a disturbance of

18   psychiatrics, of a psychological kind.  And that may

19   come out of a life experience, as does grief,

20   posttraumatic stress disorder, things of that sort.  It

21   may come out of a personality type, like obsessive

22   compulsive disorder.  It may come out of a disorder and

23   illness like depression, but it may come out as simply

24   a behavior -- another form of behavior that encourages

25   gender identity questions.

1    Q.   I guess what I'm asking is, can gender
2    dysphoria exist independent of whether somebody else
3    has a psychiatric illness or experience that leads to
4    this overvalued issue?
5    A.   I don't know the answer to that because I
6    don't think it's being studied properly to decide
7    whether gender dysphoria is an independent event or
8    whether it, in some way, comes out of some
9    misadventure, psychological misadventure.
10           To some extent, that's why it's so
11   contentious at the moment, because we're not studying
12   it thoroughly.  We've committed ourselves to a
13   particular therapy without really studying it
14   adequately.
15   Q.   If you go to the next bullet point, the next
16   opinion, it states, "A currently unknown percentage and
17   number of patients - many of them adolescent females -
18   reporting gender dysphoria have been heavily influenced
19   and/or manipulated by a source of social contagion -
20   peer group, social media, YouTube influencers,
21   therapists, and/or parents."
22           Can you cite to any scientific study that
23   show that gender dysphoria is caused by social
24   contagion?
25   A.   Yes, I can point -- of course, Laura Littman,

1   she was the one who made it -- made this most clearly.

2           But you know, social contagion, it would be

3   very strange if it didn't have some role here since the

4   discussions by and studies of Nicholas Christakis and

5   other people show social contagion to be an important

6   aspect of all kinds of human behaviors.

7           As I said, since I believe that gender

8   dysphoria is an expression of a behavior, social

9   contagion must be a role -- must be playing a role.

10  And you go, now, onto social media, and you see that

11  people whose backgrounds and whose attitudes -- and

12  they have no idea about it -- are speaking in groups to

13  young people.

14      Q.   Well, would it be fair to say, then, that

15  your statement here is, at best, a hypothesis and not a

16  statement of fact?

17          MR. KNEPPER:  Object to form.

18      A.   Excuse me.  I didn't hear that, Counselor.

19  Give it to me --

20      Q.   Would it be fair to characterize your opinion

21  here as a hypothesis and not a statement of fact?

22      A.   It is a hypothesis, yes.

23      Q.   Okay.  And aside from the Littman article,

24  which we established does not study the actual patients

25  with gender dysphoria, can you cite to any scientific

1    study that shows that gender dysphoria is caused by

2    social contagion?

3          A.   At the moment, I can't point out to any --

4    any particular one.  But many -- many students of the

5    social media today are making this point themselves.

6          Q.   In your report, you make reference to

7    national reviews --

8               MR. GONZALEZ-PAGAN:  And we can go to

9          page 10, Lauren, if we could.

10              THE WITNESS:  Sure.

11   BY MR. GONZALEZ-PAGAN:

12         Q.   And the last paragraph there on page 10.

13              You make reference to "national research

14   reviews in England, Sweden, and Finland."  Do you see

15   that?

16         A.   Yes, I do.  Yeah.

17              MR. GONZALEZ-PAGAN:  We can -- we can stop

18         sharing the screen, Lauren.

19         Q.   What is the national review from England to

20   which you refer?

21         A.   There was these various studies that -- there

22   have been a number of studies, both in Britain and in

23   Sweden and in Finland, that have been reviewed in the

24   legal documents.  And I can't put my finger on it for

25   you right now.  I'm sure we could find it.

1        Q.  Do you know whether it was peer reviewed?

2        A.  I'm sure it would be.

3        Q.  Would it surprise you if I told you that it

4  wasn't?

5        A.  Well, it would not surprise me, but it

6  would -- it would encourage me to tell you that it

7  hasn't been refuted either.  But peer reviewed --

8        Q.  Do you know if it was published in a

9  scientific journal?

10       A.  I don't.

11       MR. KNEPPER:  Objection.  Form.

12       Q.  What is the national review from Sweden to

13  which you refer?

14       A.  I was referring to the Dhejne one that we

15  mentioned before.

16       Q.  Is it the study from 2011?

17       A.  Yes.

18       Q.  This is not a national review study.  This is

19  an academic scientific study.  Is that right?

20       A.  It is a scientific study, yes.

21       Q.  And we established that it was just simply

22  comparing the rate of suicidality between postop people

23  with gender dysphoria and the general population at

24  large.  Is that right?

25       A.  Yes, we did.

1        Q.   What is the national review from Finland to
2    which you refer?
3        A.   I can't put my finger on it for you right
4    now, but Finland is, as I understand it, because of
5    these things, looking much more carefully at the
6    treatments.  I can't point these things out to you
7    right at the moment.  Not at my fingertips.
8        Q.   Yeah.  I mean, I guess my question, in part,
9    has to do with, I may have an idea, maybe, of what
10   you're talking about.
11       A.   Good.
12       Q.   But I don't know to what you're referring to
13   in your report, and there's no bibliography.  So I'm
14   asking those questions now --
15       A.   That's fair enough.
16       Q.   -- because I don't know to what studies you
17   are referring to.
18       A.   That's fair enough.  I think we can find them
19   if we need to.
20       Q.   Do you know whether the review -- the
21   national research review from Finland to which you
22   refer was published in a scientific journal?
23       A.   No.  I'm not sure.
24       Q.   Do you know whether it was peer reviewed?
25       A.   I'm not sure.  It probably was.

1      Q.   Would you be surprised if I told you that it
2   wasn't?
3      A.   Nothing would surprise me right now because
4   this is a contentious issue and a contentious matter,
5   and so the fact that you say, well, the peers not
6   reviewing it, yeah, that will happen.
7           Most of the evidence now is moving in the
8   direction that I'm saying.
9      Q.   Are you aware that the review in Finland
10  pertained solely to the care for minors or adolescents?
11     A.   Yes, I am.  I was aware of that.
12     Q.   Are you aware that the report --
13          Yeah.  Go ahead.
14     A.   That's the issue, isn't it, the minors?
15  Yeah.
16     Q.   Well, you say, "That's the issue."  And so I
17  guess I want to ask, this care pertains to a
18  categorical exclusion that prohibits medical care not
19  just for adolescents but also for adults.
20     A.    I understand that.  I was just saying, this
21  is the issue in Finland, isn't it?  That's what I
22  meant.
23     Q.   Are you aware that the report from Finland
24  recommends that hormonal intervention may be considered
25  before reaching adulthood in those with firmly

1    established transgender identity?

2        A.   I was aware of that, yes.

3        Q.   Do you disclose in your report that Finland

4    does provide coverage for hormonal and medical

5    treatment for gender dysphoria in adolescents and

6    adults?

7             MR. KNEPPER:  Objection.  Form.

8        A.   I don't -- I don't understand the question

9    quite there.

10       Q.   Sure.  You speak of this review -- national

11   research reviews as casting doubt on the propriety of

12   this treatment.

13            Is that a fair characterization?

14       A.   That's fair, casting doubt, yes.

15       Q.   And I guess an important limitation to that

16   is that, in these countries, which have nationalized

17   healthcare systems --

18       A.   Yeah.

19       Q.   -- they provide and cover this care.

20       A.   Yes.  Yes.  But they're doubting it, and the

21   chances -- what I'm saying, I suppose, here -- what I

22   mean to imply is that the movement is towards more and

23   more doubt of this, what was once a confident opinion

24   of treatment and --

25       Q.   Do you think it is any -- do you think it is

1     a limitation of your opinion and a valid -- it would

2     have been helpful to the Court for you to disclose

3     that, notwithstanding this doubt, the healthcare system

4     in these countries still provide for and cover for this

5     care?

6                 MR. KNEPPER:  Objection.

7          A.   No, I don't think so.  I was making a point.

8          Q.   Last time, on September 8, when we were

9     talking, you stated that, quote, "I think people do

10    better and live better and flourish better and need

11    less help from...doctors if their natal sex and their

12    attitude towards...their own sex is the same."

13         A.   Yes.

14         Q.   Okay.  So that sounds like -- do you stand by

15    that statement today?

16         A.   I do.

17         Q.   On what peer-reviewed or scientific

18    literature do you rely on for that opinion?

19         A.   This -- this is -- I'm relying on, primarily,

20    common sense, having -- seeing nothing on the opposite

21    that would prove me wrong.

22         Q.   But as we stand here today, is there any

23    scientific literature or article or study that you can

24    point to, that supports that opinion?

25         A.   What I'm saying is that, this is my opinion.

1      If you wish to change my opinion, you need a scientific

2      article that proves my opinion to be wrong.

3             I know no article that proves my opinion to

4      be wrong.  I'm not saying that my opinion will be

5      supported, but I'm saying that, when you make such a

6      contention that somebody's sex would do -- somebody

7      would do better by trying to change what is impossible

8      to change and to live in that way, that that will be

9      the long-term benefit of the patient, I think the

10     problem of the proof is with you, not with me.

11          Q.   You are aware, however, that there are

12     cohorts and cross-sectional studies that do demonstrate

13     benefit to the transgender patients' --

14          A.   I'm aware of them.  I also --

15          Q.   -- medical treatment?

16          A.   I beg your pardon.  I didn't mean to

17     interrupt you.

18          Q.   No.

19               -- that complete medical treatment.

20          A.   Yeah, I'm aware of them.  I'm also aware of

21     their limitations, that they're not long enough and

22     that many professional organizations agree, even when

23     they -- when they support it, that the evidence is yet

24     not strong.

25               MR. GONZALEZ-PAGAN:  All right.  I know we've