# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

               *Plaintiffs*,

         v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

               *Defendants*.

Case No. 1:19-cv-00272-LCB-LPA

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. PATRICK W. LAPPERT

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARD ................................................................................................ 3

ARGUMENT .............................................................................................................. 5

    I.    Dr. Lappert Is Not Qualified to Offer Any of His Purported
        Opinions. ................................................................................................ 5

        A.    Dr. Lappert Has Never Performed Gender-Affirming Surgery
            and Is Not Qualified to Opine on Such Procedures. .......................... 6

        B.    Dr. Lappert Has No Basis to Offer Opinions on Topics
            Outside of Plastic Surgery .................................................................. 9

    II.    Dr. Lappert's Opinions on Topics Outside of Gender-Affirming
        Surgery Do Not "Fit" the Disputed Issues, Are Unreliable, Or Both. ........ 11

        A.    Far from Being Generally Accepted, Dr. Lappert's Opinions
            Have Been Rejected by the Scientific Community .......................... 11

        B.    Dr. Lappert's Critiques of WPATH, Endocrine Society
            Guidelines, DSM-V, and Other Organizations' Positions Are
            Unreliable. ......................................................................................... 14

        C.    Dr. Lappert's Opinions About the Need for Randomized
            Clinical Trials Are Unreliable. .......................................................... 16

        D.    Dr. Lappert's Speculation About "Detransitioners," "Regret"
            and "Social Contagion" Is Unreliable. ............................................. 18

        E.    Dr. Lappert's Opinions About Risks Communicated to
            Plaintiffs Are Unreliable. .................................................................. 19

    III.    Dr. Lappert's Opinions Are Based on His Personal Beliefs Rather
        than Science .............................................................................................. 20

CONCLUSION ........................................................................................................ 23

i

Plaintiffs respectfully submit this memorandum of law in support of their motion to exclude the expert testimony of Dr. Patrick W. Lappert.

## INTRODUCTION[1]

Dr. Lappert holds himself out as being board-certified in both plastic surgery and general surgery. He is neither: his certification in plastic surgery lapsed in 2018, and he has not been board-certified in surgery since *2002*. Moreover, in his entire career, Dr. Lappert has never performed a single surgical procedure to treat gender dysphoria—which is not surprising, since he considers those procedures to be "intentional mutilation" and "child abuse." Dr. Lappert has no reliable basis to opine about gender-affirming surgery, and his purported expert opinions about those procedures should be excluded.

And Dr. Lappert's opinions outside of surgery are even more ripe for exclusion. Straying far afield from his surgical experience, Dr. Lappert gives a smorgasbord of opinions that he is not qualified to provide, and for which he has no basis. For example, he criticizes how organizations like the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have developed guidelines for diagnosis and treatment of gender dysphoria, despite admitting that he does not know the first thing about how those guidelines were created. He speculates about whether puberty-blocking treatment is appropriate for adolescents, even though he is not an endocrinologist and he admits "that's not [his] area of expertise." He criticizes the process by which patients are

---

[1] Unless otherwise noted, all emphasis is added, and all citations, alterations, and ellipsis are omitted. Exhibits referenced herein are attached to the concurrently-filed Declaration of Dmitriy Tishyevich.

1

diagnosed with gender dysphoria, despite admitting that he has "very limited psychiatric / psychological knowledge," is not "a licensed mental healthcare provider of any kind," and is not qualified to make this diagnosis himself. And he also offers rank speculation about patients with gender dysphoria who "detransition" or experience "regret," even though he concedes he has no reliable data to quantify these phenomena. These and other of Dr. Lappert's many non-surgery opinions are both unreliable and irrelevant, and they should all be excluded accordingly.

Dr. Lappert's deposition also made clear that he is certainly not a dispassionate expert who will offer neutral "specialized knowledge" to "help the trier of fact to understand the evidence," as Rule 702 contemplates. Far from it. In addition to calling gender-affirming surgery "intentional mutilation," Dr. Lappert says that parents who talk to their children about gender identity issues are "sexualizing them" and "grooming" them for abuse. He accuses doctors who provide gender-affirming treatment of being part of a "Transgender Treatment Industry" cabal—a term that he concedes is certainly not "commonly used" in his professional field, and is instead "idiosyncratic" to his report. He has given inflammatory presentations on gender-affirming surgery, opining that performing these surgeries is a "moral violation" for physicians and that "changing a person's sex is a lie." He tours the country, urging state legislatures to outlaw gender-affirming treatment for minors. And he also thinks that states should "criminally prosecute doctors" that provide this critically-needed treatment—even though *every* reputable

medical organization in the country, including his own professional society, has said that such treatment is medically necessary and appropriate.

Even if Dr. Lappert's opinions were reliable under Rule 702 (and they are not), and even if they had any minimal probative value (and they do not), that value would be far outweighed by unfair prejudice and confusion of the issues under Rule 403. For these reasons, and as explained below, all of Dr. Lappert's opinions should be excluded.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on the trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). As the Fourth Circuit recently reaffirmed, "the importance of the gatekeeping function cannot be overstated." *Sardis*, 10 F.4th at 283.

"The proponent of the testimony must establish its admissibility by a preponderance of proof." *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019). The first step is to determine if the expert is qualified to give the proffered opinion, which requires examining the expert's professional qualifications and "full range of experience and training." *Belk, Inc. v. Meyer Corp.*, U.S., 679 F.3d 146, 162 (4th Cir. 2012). If the expert is not qualified, the testimony should be excluded. *See SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 639 (E.D.N.C. 2013).

3

Even if the expert is qualified, the court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis*, 10 F.4th at 282. To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id.* at 281. "If an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Id.*

The opinion must also be based on a reliable foundation, with the inquiry focusing on the expert's "principles and methodology" to assess whether it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Id.* at 281-82. In evaluating reliability, courts consider, among other things, whether: (1) the theory "can be and has been tested"; (2) has been "subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "whether the technique is generally accepted in the scientific community." *Id.* at 281.

When an expert relies upon experience and training rather than a specific methodology, the application of the *Daubert* factors is more limited. *See Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997). In those cases, courts consider: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015).

Finally, the Fourth Circuit has cautioned that although the trial court has "broad latitude" to determine reliability, it must still engage in the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281. Even rigorous cross-

4

examination is not a substitute for the court's gatekeeping role. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017).

<u>**ARGUMENT**</u>

**I.** **Dr. Lappert Is Not Qualified to Offer Any of His Purported Opinions.**

An expert witness must have "knowledge, skill, experience, training, or education" that would assist the trier of fact. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). "[Q]ualifications alone do not suffice," however. *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *Patel ex rel. Patel v. Menard, Inc.*, 2011 WL 4738339, at *1 (S.D. Ind. Oct. 6, 2011). Even "a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark*, 192 F.3d at 759 n.5.

Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *Lebron v. Sec. of Fla. Dept. of Children and Families*, 772 F.3d 1352, 1369 (11th Cir. 2014).

Importantly, this qualification inquiry is subject-specific, because "[g]eneralized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Martinez*, 2007 WL 2570362, at *2. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved

5

certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). Dr. Lappert fails these requirements, for reasons below.

### A. Dr. Lappert Has Never Performed Gender-Affirming Surgery and Is Not Qualified to Opine on Such Procedures.

Dr. Lappert's report represents that he is "Board Certified in Surgery and Plastic Surgery." (Ex. 1 at 1.) This is not true. As he admitted, his "plastic surgery board certificate expired at the end of 2018." (Ex. 2 at 23.) His "board certification in surgery" expired "in 2002"; thus, he has not "been board-certified in surgery" for "over nineteen years." (*Id.* at 31-32.)

These are not trivial fibs, because physicians are not allowed to hold themselves out as board-certified unless they actually have a ***current*** board certificate. The American Board of Plastic Surgeons unequivocally prohibits such misrepresentations, stating that "when a physician misrepresents certification status," as Dr. Lappert did here, "ABPS may notify local credentialing bodies, licensing bodies, law enforcement agencies, and others." (*Id.* at 30; Ex. 3 at 3.) And the American Board of Surgery takes a similarly dim view of such misrepresentations, as Dr. Lappert also acknowledged. (Ex. 2 at 32 (agreeing it does not "surprise [him] that the [ABS] does not allow doctors to represent that they are board-certified in surgery unless they have a current board certificate.").)

Setting aside these misrepresentations about his credentials, Dr. Lappert is also not qualified to give expert opinions about gender-affirming surgery for a more basic reason: he has never even performed a single such procedure. He admitted that he has "never

6

performed facial feminization surgery" or "facial masculinization surgery" for any transgender patient. (*Id.* at 167.) The same is true for "transfeminine top surgery" and "chest reconstruction surgery." (*Id.* at 167.) He has also never "performed a vaginoplasty" nor "metoidioplasty." (*Id.* at 167-68.) In short, Dr. Lappert has "**never** performed **any kind** of gender-affirming surgery in transgender patients." (*Id.* at 168; *id.* at 151 ("I have never treated a patient with gender dysphoria surgically.").) He was also emphatic that he would never perform such surgeries, because he personally does not "see them as beneficial" and thinks that they are "incorrect treatments." (*Id.* at 150.)

Dr. Lappert has not published any research on gender-affirming surgery either. He agreed that he has "not published any original research in peer-reviewed literature within the **last 23 years**" at all—and of the six total articles that he did publish a quarter-century ago, not one was on gender-affirming surgeries for patients with gender dysphoria. (*Id.* at 129; *see id.* at 130-134.)

As a substitute for first-hand experience, Dr. Lappert cites a handful of studies in his report about supposed complications from gender-affirming surgery. But reading studies does not make one an expert. That is just the sort of "generalized knowledge of a particular subject" that courts have rejected as a qualification under Rule 702. *Martinez*, 2007 WL 2570362, at *2. As with the disqualified expert in *Lebron* who "reached his opinion . . . by relying on studies," reading literature is not enough. 772 F.3d at 1369.

It is also telling that the Code of Ethics of the American Society of Plastic Surgeons ("ASPS") prohibits members from giving this kind of unfounded testimony.[2]  Section IV of that Code of Ethics says that "to help limit false, deceptive and/or misleading testimony, Members serving as expert witnesses **must**:   1.  Have ***recent and substantive experience*** (as defined in the Glossary of the Code) in the area in which they testify[.]"  (Ex. 4 at 6.) The Glossary, in turn, defines "recent and substantive experience" to mean (among other requirements) that the member "has performed the specific procedure in question within three (3) years of the date of being retained as an expert witness."  (*Id.* at 8.)

Dr. Lappert fails these requirements.  Far from having actually performed any of the gender-affirming procedures that he criticizes in his report (*see* Ex. 1 at 29-39)—***ever***, let alone within the last three years—Dr. Lappert was emphatic that he would never perform such surgeries because he does not "see them as beneficial."  (Ex. 2 at 150.)  To be sure, the ASPS Code of Ethics is not a substitute for the Court's Rule 702 inquiry.  But the fact that the ASPS prohibits members from providing these kinds of ill-informed expert opinions precisely to "help limit false, deceptive, and/or misleading [expert] testimony" from being offered in court (Ex. 4 at 6) should give the Court serious pause, to say the least, about allowing Dr. Lappert's testimony.

---

[2] Dr. Lappert resigned from ASPS around the time his board certification lapsed (Ex. 2 at 100-101), but he was a member from 1997 to 2017, and he agreed that ASPS is a "reputable organization" to which "93 or so percent of all plastic surgeons" in the country belong.  (*Id.* at 102-103.)

**B. Dr. Lappert Has No Basis to Offer Opinions on Topics Outside of Plastic Surgery.**

Dr. Lappert also offers a grab-bag of opinions on topics far outside his field of plastic surgery—including endocrinology (*e.g.*, opining whether puberty-blocking agents and cross-sex hormones like testosterone are appropriate treatments for gender dysphoria), psychiatry (*e.g.*, criticizing how patients are diagnosed with gender dysphoria), and more.

Dr. Lappert has no qualifications or any other basis to give any of these opinions, and they all should be excluded. For example, he has no basis to opine about purported risks of puberty-blocking treatments, given that he agreed that he is "not an endocrinologist" and has "no specialized training or expertise in endocrinology." (Ex. 2 at 153, 204.) He also has "never prescribed any puberty-blocking drugs of any kind"; and indeed, he admitted: "I ***do not*** consider myself an expert in that area" and "that's not my area of expertise." (*Id.* at 201, 203.)

The same is true for Dr. Lappert's opinions on cross-sex hormone treatments—given that he admits that he has "never prescribed cross-sex hormones for treatment of gender dysphoria," and that he has "no firsthand experience with advising [his] patients about potential risks and benefits" of such treatment. (*Id.* at 214.) Here, again, Dr. Lappert conceded that he does not "hold [himself] out as an expert in endocrinology," and that he does not plan to offer "any expert opinions in endocrinology in this case because that's outside [his] scope of expertise." (*Id.* at 204.) All of his purported opinions related to endocrinology should be excluded accordingly.

9

Dr. Lappert also has no qualifications—or any other basis—to opine about diagnosis or treatment of mental conditions. He admits that he has "very limited psychiatric/psychological knowledge"; he is "not a psychiatrist" or "a licensed mental healthcare provider of any kind"; and in his "professional day-to-day practice," he "do[es] not diagnose mental health conditions of any kind." (*Id.* at 68, 153-54.)[3] Thus, as Dr. Lappert conceded, "for any patient that presents to [him] with a mental health condition," he would "send them to someone who is . . . trained in how to diagnose mental health conditions."). (*Id.* at 157.) And after all of these admissions, he also conceded that he "do[es] not hold [himself] out as an expert in *diagnosing* mental health conditions outside, potentially, of body dysmorphic disorder," and that he also does "not have special[ized] training or expertise in *treating* mental health conditions." (*Id.* at 75.)

In short, while Dr. Lappert does not even have the relevant expertise to opine about gender-affirming surgery, he certainly does not have the expertise to "waltz into the courtroom" and mislead a factfinder with purported expert testimony about endocrinology, psychiatry, or anything else. *See Clark*, 192 F.3d at 759 n.5. So at the very least, all of his opinions outside of plastic surgery should be excluded.

---

[3] Dr. Lappert said he feels qualified to identify a potential diagnosis of body dysmorphia, and to then "offer referral for psychiatric/psychological support and evaluation" to those patients. (Ex. 2 at 72.) Body dysmorphic disorder is a distinct condition from gender dysphoria, however, that "is primarily characterized by an excessive preoccupation with a perceived defect or flaw in appearance that others cannot see or would judge as slight in appearance." (Ex. 17 at 1; Ex. 2 at 71 ("They see a defect that you don't see.").)

10

## II. Dr. Lappert's Opinions on Topics Outside of Gender-Affirming Surgery Do Not "Fit" the Disputed Issues, Are Unreliable, Or Both.

An expert's testimony should only be admitted if it is reliable. And "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018).

Even if the testimony is reliable, the court must still "satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis*, 10 F.4th at 282. "The test for relevance, or fit, considers whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 846 (W.D.N.C. 2016).

This case turns on whether Defendants' exclusion of coverage for gender-confirming health care treatments violates Plaintiffs' rights under the equal protection clause, Title VII, and Section 1557 of the Affordable Care Act. Many of Dr. Lappert's opinions are both unreliable and irrelevant to this inquiry, as described below.

### A. Far from Being Generally Accepted, Dr. Lappert's Opinions Have Been <u>Rejected</u> by the Scientific Community.

General acceptance is a reliability factor, *Nease*, 848 F.3d at 229, and the fact that a particular theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Dr. Lappert asserts that gender-affirming surgical and hormonal treatments "have not been accepted by the relevant

11

scientific communities" (Ex. 1 at 40), but this is not true. In fact, it is Dr. Lappert's opinions that are on the scientific fringe, to say the least.

Another court found as much just last year in addressing a challenge to Arkansas' state-law ban on gender-affirming treatment for minors, where Dr. Lappert had offered virtually identical opinions to support that ban. *Brandt v. Rutledge*, 4:21-cv-450 (E.D. Ark.); Ex. 2 at 33-34; Ex. 5 (Lappert *Brandt* Declaration). In *Brandt*, Dr. Lappert asserted that "'[g]ender affirming' treatments are experimental," which he agreed was "basically the same opinion that [he] offered in this case." (Ex. 2 at 35.) Drs. Hruz and Levine had also submitted similar declarations in *Brandt* in support of the ban. (*See id.* at 33-34.)

The *Brandt* court preliminarily enjoined the ban on August 2, 2021 (Ex. 6), squarely rejecting these opinions. That court recognized that "the consensus recommendation of medical organizations is that the ***only*** effective treatment for . . . gender dysphoria is to provide gender-affirming care," citing briefs from organizations like the American Medical Association, American Academy of Pediatrics, and many more. (*Id.* at 6 n.3; Br. of Am. Med. Ass'n, et al. (ECF No. 131 (expressing same views in this case).) *Brandt* also found that "gender-affirming treatment is supported by medical evidence that has been subject to rigorous study," and that "***every*** major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people." (Ex. 6 at 7-8.)

As Dr. Lappert admitted, *Brandt*'s findings were "contrary to the opinions that [he] offered." (Ex. 2 at 39.) And as he also agreed, "every major expert medical association

12

disagrees with [him] because they've all taken [the] position that this treatment is in fact medically necessary." (*Id.* at 40; *see also id.* (agreeing the same is true regarding Drs. Hruz and Levine).) In fact, Dr. Lappert admits that there are at least "18 different professional medical organizations" that "take[] the view that's contrary to the opinions that [he] and Dr. Hruz and Dr. Levine are offering" here, testifying that "there's a consensus of consensus on this, exactly." (*Id.* at 42.)

That consensus also includes Dr. Lappert's own former association, the ASPS. While he says that gender-affirming surgery is experimental, the ASPS said the exact opposite in a February 2021 statement—stating that it "***firmly believes*** that plastic surgery services can help gender dysphoria patients align their bodies with whom they know themselves to be," and promising to "continue its efforts to advocate across state legislatures for full access to medically necessary transition care." (Ex. 8 at 3.) So as Dr. Lappert admitted, the ASPS also "does not agree with [his] opinions that gender-affirming surgery is experimental." (Ex. 2 at 112-13.)

And it is not just professional medical associations either. ***Every major insurer*** in the country also says that gender-affirming surgical and hormonal treatments are medically necessary, as Dr. Lappert also admitted. (Ex. 2 at 334-38 & Ex. 9 at 2 (BCBS North Carolina policy, stating that "[s]ervices for gender affirming surgery and hormone therapy may be considered medically necessary when the criteria below are met"); Ex. 2 at 427-28 & Ex. 10 at 1 (similar for Aetna); Ex. 2 at 430-33 & Ex. 11 (similar for Cigna); Ex. 2 at 434-39 & Ex. 12 (similar for UnitedHealthCare).)

In short, this overwhelming consensus confirms that far from being generally accepted, Dr. Lappert's opinions are fringe and unreliable.

**B.    Dr. Lappert's Critiques of WPATH, Endocrine Society Guidelines, DSM-V, and Other Organizations' Positions Are Unreliable.**

Aware that his views are contrary to those of every major medical society and professional organization, Dr. Lappert tries to dismiss every single one of them as partisan—part of the same supposed "Transgender Treatment Industry" that he crusades against. For example, he contends that the "WPATH, APA, AAP," and "AMA" all supposedly rely on a "non-scientific" methodology, and that the guidelines and position statements issued by every one of those organizations are "political" and are "not the product of a reliable scientific method." (Ex. 1 at 10-11.)

These opinions are—again—not generally accepted, to put it mildly. Just recently, the Fourth Circuit confirmed that the WPATH guidelines in particular "represent the consensus approach of the medical and mental health community" and "have been recognized by various courts, including [the Fourth Circuit], as the authoritative standards of care." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020). "There are ***no*** other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups," in fact. *Id.* at 595-596.

Dr. Lappert's deposition further confirmed that his critiques are baseless *ipse dixit* because he admitted that he has no idea how any of these standards of care were actually developed, and on what scientific basis. Take WPATH SOC Version 7 ("WPATH7"), for example. Dr. Lappert admits that he has "not been involved with the development" of

14

WPATH7; he does not "know what kind of scientific literature [review] the WPATH conducted as part of drafting" WPATH7; he does not know what kind of "peer review" or "outside experts" or "public comments" the WPATH may have relied on in developing WPATH7, or how many "different drafts" the WPATH7 went through, or "what may have gone on during [WPATH] meetings or conferences" to discuss the development of WPATH7. (Ex. 2 at 184-87.) And after these admissions, Dr. Lappert unsurprisingly conceded that he is "**not an expert** in how Version 7 of the WPATH was developed." (*Id.* at 188.) The same is true for WPATH SOC Version 8. (*Id.* at 189 (agreeing he does not "hold [himself] out as an expert on how Version 8" is being developed).)

The same is also true with respect to Dr. Lappert's critiques of other standards of care and position statements:

- Endocrine Society Guidelines for Treatment of Gender Dysphoria: Dr. Lappert does not know when these guidelines "were initially published" or "last revised"; he was "not involved with the[ir] development"; he does not know "what kind of scientific literature review" went into that development; thus, he agrees he is "**not an expert** in how the Endocrine Society developed the original 2009 guidelines" or "the 2017 updates" (Ex. 2 at 195-200);

- DSM-5: Dr. Lappert has "not been involved with the development of DSM-5"; does not know "what kind of scientific literature review was done" during that development; does not know what went on during "different meetings or conferences" to "discuss that development"; thus, he "do[es] **not** have expert firsthand knowledge of how the DSM-5 was developed" (*id.* at 190-93);

- AMA Position Statement on Gender-Affirming Treatment: Dr. Lappert "do[es] not know how the AMA came to issue this consensus statement" and has "no personal knowledge what scientific literature they reviewed"; thus, he has "**no idea** . . . how the AMA came to reach this consensus statement" (*id.* at 47-48);

15

- American Academy of Pediatrics Position Statement on Gender-Affirming Treatment: has no "personal knowledge" of how the AAP adopted this statement (*id.* at 48).

In the end, Dr. Lappert agreed more broadly that he does "not have firsthand knowledge of how *any* of those organizations came to reach these positions," and that he "do[es] not know what scientific literature they relied on." (*Id.* at 49-50.) He should not be allowed to mislead a factfinder with these unfounded *ipse dixit* critiques. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### C. Dr. Lappert's Opinions About the Need for Randomized Clinical Trials Are Unreliable.

A key component of Dr. Lappert's opinions is that surgical and hormone gender-affirming treatments are supposedly experimental because they are unsupported by results from randomized clinical trials ("RCTs"). (*See, e.g.*, Ex. 1 at 5 (arguing that "properly conducted [RCTs] and long-term treatment outcome studies" are necessary to make "experimental procedures actual, proven treatments"). But his deposition confirmed that these critiques are baseless because he agreed that: (1) it is common for surgeons to perform procedures unsupported by RCT results; and (2) in any event, it is not possible to conduct RCTs for hormonal or surgical gender-affirming treatments.

First, RCTs in surgery are exceedingly rare. The ASPS's Plastics and Reconstructive Surgery Journal—which Dr. Lappert agreed is the "premier peer-reviewed source for current information on reconstructive and cosmetic surgery" (Ex. 2 at 296)— confirms as much. As a 2019 study found, in 2018, "only *2.1 percent* of all publications" in the ASPS Journal "were level 1 [*i.e.*, RCT] evidence"; "in 2008 and 2013, those

16

percentages were **0.3** and **1.7 percent** respectively," as he also agreed. (*Id.* at 299, 302; Ex. 7 (Sugrue study)). Given this paucity of RCTs, Dr. Lappert unsurprisingly conceded that surgeons in the real world do not actually wait for RCT results before deciding that a particular procedure is non-experimental. (Ex. 2 at 294-95 (agreeing it is "not uncommon for plastic surgeons to perform procedures that are not supported by results from an RCT").) In fact, he ***himself*** does not even "think it's necessary for a surgical procedure to be supported by results from a[n] . . . RCT before it can be considered effective." (*Id.* at 285.) Rule 702 demands that experts apply "the same level of intellectual rigor [in the courtroom] that characterizes the practice of an expert in the relevant field." *Cooper*, 259 F.3d at 200. Here, though, Dr. Lappert tries to impose an impossible RCT-based standard that he concedes surgeons in the real world—including himself—do not actually apply.

<u>Second</u>, it is not possible to perform RCTs for gender-affirming surgery or hormonal treatment. Dr. Lappert conceded this too: he agreed "it is not possible to perform RCTs for some surgical procedures because you can't blind the patient or the investigator to what the procedure is" (meaning, it is impossible to do the surgery without the patient and the investigator knowing that it was done)—including for "phalloplasty," "metoidioplasty," and more generally for all types of what is "colloquially known as bottom surgery." (Ex. 2 at 315-16.) He also agreed the same is true for "puberty-blocking hormones," since they cause "observable physical effects"; thus, "it's not possible to do an RCT for puberty-blocking hormones" either. (*Id.* at 316-18.) And he also conceded that the same is true for

cross-sex hormones, because those also cause "physical effects" and thus "it's not possible to design a double-blind RCT" for those treatments. (*Id.* at 318-19.)

Given all this, Dr. Lappert should not be permitted to offer his misleading opinion that gender-affirming surgery and hormone treatments are experimental in the absence of RCT support.

### D. Dr. Lappert's Speculation About "Detransitioners," "Regret" and "Social Contagion" Is Unreliable.

Dr. Lappert also opines that some patients will "drop out of transitioning or reverse the process" (so-called "detransitioners"); others will experience "regret" after surgery; and yet others supposedly develop gender dysphoria as a result of "social contagion" like "peer group, social media, [and] YouTube role modeling." (Ex. 1 at 21-22, 40.)

None of this passes *Daubert* muster. To start, none of these opinions are even remotely connected to Dr. Lappert's experience as a plastic surgeon, given that he studiously avoids performing gender-affirming surgical procedures due to his personal beliefs, and has "never treated a single patient for gender dysphoria." (Ex. 2 at 150-51; *SAS Inst., Inc.*, 125 F. Supp. 3d at 589 (when an expert relies on experience, he must show how his "experience leads to the conclusion reached" and "why that experience is a sufficient basis for the opinion").)

Next, Dr. Lappert's own report makes clear that these are all speculative hypotheses at best. For instance, he admits that the extent of "social contagion" is unknown, writing: "a currently <u>unknown</u> percentage and number of patients reporting gender dysphoria are being manipulated by . . . social contagion and social pressure processes." (Ex. 1 at 40

18

(underlining in original).) He also wrote the same thing about "desistance" and "regret," stating that these phenomena have "to my knowledge ***not been quantified or well-studied***." (*Id.* at 21 (emphasis in original).)

Dr. Lappert's deposition confirmed that these opinions are pure guesswork. He conceded that he is "not aware of any peer-reviewed studies that quantifies the number of people" affected by social contagion, and that "we don't know the numbers." (Ex. 2 at 367-38; *id.* at 373 ("At present, we're ***hypothesizing*** about the actual cause.").) The same was true for his "regret" opinions. (*Id.* at 329 (agreeing "there's no data available on the percentage of people" treated for "gender dysphoria who experience regret.").)

But "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996); *accord, e.g.*, *Small v. WellDyne, Inc.*, 927 F.3d 169, 176-77 (4th Cir. 2019) (expert testimony "must not be based on belief or speculation"). Dr. Lappert's speculation about regret, de-transitioning, and social contagion should be excluded accordingly.

### E. Dr. Lappert's Opinions About Risks Communicated to Plaintiffs Are Unreliable.

Dr. Lappert also purports to opine about what risks were or were not communicated to individual Plaintiffs before they started gender dysphoria treatment. (*See, e.g.*, Ex. 1 at 50 (for C.B., asserting there is no evidence that "the parents were counseled concerning" risks of "off-label use of puberty blocker"); *id.* (opining there was a "failure to obtain proper informed consent" for Plaintiff "CT-F").)

19

There is no basis for these opinions either. Dr. Lappert "did not meet with any of the plaintiffs" and has "never spoken" with any of them about what risks their doctors discussed. (Ex. 2 at 417-18.) He was "not present in any meetings that any of these plaintiffs may have had with their mental health professionals," or their "endocrinologists," or their "surgeons"; thus, outside of reviewing medical records, he has no idea "what was said or not said during those meetings." (*Id.* at 418-19.) With no reliable basis to say what was or was not communicated during these meetings, Dr. Lappert should not be permitted to create confusion with this speculation. *See, e.g.*, *Small*, 927 F.3d at 176-77.

## III. Dr. Lappert's Opinions Are Based on His Personal Beliefs Rather than Science.

Reliability is a flexible inquiry, under which "courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Sardis*, 10 F.4th at 281. There is ample evidence that Dr. Lappert's opinions are so tainted by his strong personal views against gender-affirming care as to make those opinions unreliable. To be clear, Plaintiffs do not seek to impugn whatever moral or religious views Dr. Lappert may hold. But because those views plainly inform the opinions that he offers here—indeed, they seem to be the main driver of those opinions—they are something the Court should consider in assessing their reliability.

Dr. Lappert readily admits that he has "strong personal opinions on whether doctors should be providing gender-affirming treatment to minors." (Ex. 2 at 79.) That's putting it mildly. He has urged state legislatures in Utah, Arkansas, Alabama, and Texas (at least) to pass laws that would ban doctors from being able to provide this medical care for

20

adolescents.  (*Id.* at 57, 61-62; *id.* at 54-55 (agreeing he has "actively lobbied to get these kinds of bans passed").)  For example, he spoke in favor of the ban before the Alabama legislature and "publish[ed] an op-ed" that urged the legislature to protect what he called "gender-confused children."  (Ex. 2 at 77, 64, 76 & Ex. 14.)  He likewise threw his support behind a similar proposed ban in Utah—arguing to the legislature that "you can't change a person's sex," and that "all that is happening is that the patient is undergoing an intentional mutilation in order to create a counterfeit appearance of the other sex."  (Ex. 13 at 5).

Dr. Lappert was unapologetic about these opinions at his deposition.  He testified that he "absolutely" stands by them, and that he "absolutely" considers "gender reassignment surgery to be an intentional mutilation."  (Ex. 2 at 60.)  What's more, he also wants doctors who perform these gender-affirming surgeries to be "criminally prosecute[d]"—agreeing that he thinks "that's a good idea."  (*Id.* at 52.)

And even though Dr. Lappert was understandably more careful in how he phrased his expert report—avoiding inflammatory language that he uses outside of litigation, like calling gender-affirming care "intentional mutilation"—sometimes the mask slips.  For instance, his report accuses every single doctor and organization who oppose his views of being part of some made-up "Transgender Treatment Industry."  That is obviously not "a commonly used term in the field of treatment and diagnosis of gender dysphoria," as he admitted; instead, it is "idiosyncratic" to his report.  (*Id.* at 21-22.)

Dr. Lappert has also worked closely with the Alliance Defending Freedom ("ADF"), an organization he agreed has "moral objections" to gender-affirming healthcare.  (*Id.* at

21

83, 82.)  Among other things, he attended an ADF conference that discussed the "poverty of [experts] who are willing to testify" about these anti-gender-affirming treatments.  (*Id.* at 90-91.)  Attendees at that conference "were asked whether they would be willing as participate as expert witnesses"; not coincidentally, Dr. Lappert became an expert witness for the first time after attending that conference.  (*Id.* at 91.)

Dr. Lappert's report also unapologetically misgenders individual Plaintiffs— "referring to [them] in a way that doesn't align with their gender"—because in Dr. Lappert's view, he is "obliged to honor objective biological realities" (*id.* at 447), which is to say that he does not believe that a person's birth-assigned sex can ever be changed.  (*See also id.* at 448 ("I think it's essential that we stick to the biological reality that . . . biological sex is ***immutable***.").)

And then there are Dr. Lappert's many public interviews and presentations where he crusades against gender-affirming care.  These include, for example, his views that the religious conception of "the human person" "defines the 'end' of medical and surgical care." (Ex. 2 at 459.)  They also include his opinions that "changing a person's sex is a lie and also a moral violation for a physician," and that gender-affirming surgery is "diabolical in every sense of the word."  (*Id.* at 464 & Ex. 16 at 1, 7; Ex. 2 at 465 (agreeing that he "hold[s] those views").  And finally, these also include his inflammatory views that parents who "discuss[] gender identity issues with children" are "sexualizing them" (Ex. 2 at 462), and that these conversations are "grooming a generation" for abuse.  (*Id.* at 461 & Ex. 15 (Dr. Lappert's presentation titled "Transgender Surgery & Christian Anthropology") at 23;

22

*see also* Ex. 16 at 1, 2 (another interview with Dr. Lappert titled "Plastic surgeon: sex-change operation 'utterly unacceptable' and a form of 'child abuse'"; reporting that "regarding children, Lappert said, sexualizing them at a young age with these ideas is grooming them for later abuse.").)

These are obviously not neutral, well-reasoned scientific opinions by a dispassionate expert. It is moral opprobrium masquerading as science, and it should be excluded as such.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should exclude Dr. Lappert's opinions in full.

Dated:  February 2, 2022

Respectfully submitted,

/s/ Amy E. Richardson

/s/ Dmitriy Tishyevich

Amy E. Richardson
(N.C. Bar No. 28768)
Lauren E. Snyder
(N.C. Bar No. 54150)
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
500 N. Capitol St., NW
Washington, D.C. 20001
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

Dmitriy Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534
Fax: 646-417-7668
dtishyevich@mwe.com

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

*Counsel for Plaintiffs*

* Appearing by special appearance pursuant to L.R. 83.1(d).

24

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1) because the body of this brief, including headings and footnotes, does not exceed 6,250 words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  February 2, 2022

/s/ Dmitriy Tishyevich
Dmitriy Tishyevich*
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: 212-547-5534
Facsimile: 212-547-5444
dtishyevich@mwe.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered users.

Dated:  February 2, 2022

/s/ Dmitriy Tishyevich
Dmitriy Tishyevich
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534
Fax: 646-417-7668
dtishyevich@mwe.com

25