# EXHIBIT 2



Deposition of:
# Patrick Lappert, M.D.

*September 30, 2021*

In the Matter of:

# Kadel, et al vs. Folwell

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

1         IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5

6

7      CIVIL ACTION NO.:  1:19-cv-272-LCB-LPA

8

9      MAXWELL KADEL, et al.

10               Plaintiffs

11

12      v.

13

14      DALE FOLWELL, et al.

15               Defendants

16

17

18         REMOTE VIDEOTAPED VIDEOCONFERENCE

19            DEPOSITION TESTIMONY OF:

20              PATRICK LAPPERT, M.D.

21             September 30, 2021

22

23

```
 1              A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFFS (via remote

 4     videoconference):

 5

 6     Dmitriy Tishyevich, Esq.

 7     MCDERMOTT, WILL & EMERY

 8     One Vanderbilt Avenue

 9     New York, New York  10017

10     dtishyevich@mwe.com

11

12     Tara L. Borelli, Esq.

13     LAMBDA LEGAL DEFENSE AND EDUCATION FUND

14     158 West Ponce de Leon Avenue, Suite 105

15     Decatur, Georgia  30030

16     tborelli@lambdalegal.com

17

18     Omar Gonzalez-Pagan, Esq.

19     LAMBDA LEGAL DEFENSE AND EDUCATION FUND

20     120 Wall Street, 19th Floor

21     New York, New York  1005

22     ogonzalez-pagan@lambdalegal.com

23
```

1    FOR THE DEFENDANTS (via remote
2    videoconference):
3
4    John G. Knepper, Esq.
5    LAW OFFICE OF JOHN G. KNEPPER LLC
6    1720 Carey Avenue, Suite 590
7    Cheyenne, Wyoming  82001
8    john@knepperllc.com
9
10   Kevin G. Williams, Esq.
11   BELL, DAVIS & PITT
12   100 North Cherry Street, Suite 600
13   Winston-Salem, North Carolina  27101
14   kwilliams@belldavispitt.com
15
16
17   ALSO PRESENT (via remote
18   videoconference):
19
20   Andrew Baker, Videographer
21
22
23

1                    I N D E X

2

3    EXAMINATION BY:                    PAGE

4    Mr. Tishyevich                      11

5    Mr. Knepper                        472

6    REEXAMINATION BY:

7    Mr. Tishyevich                     489

8

9

10                   E X H I B I T S

11

12    FOR THE PLAINTIFFS:              MARKED

13    Exhibit 1    Lappert Expert Report      12

14    Exhibit 2    ABPlasticSurgery.org       27

15    Exhibit 3    Brandt - Lappert Declaration   34

16    Exhibit 4    Brandt - Supplemental Order,   37

17                 08/02/2021

18    Exhibit 5    Utah Legislature - Answers     55

19                 for Joint Interim Committee

20    Exhibit 6    "Alabama bill that would       62

21                 criminalize treatment for

22                 transgender minors headed to

23                 full Alabama Senate,"

1                rocketcitynow.com

2      Exhibit 7    ASPS - "State Focus on        108

3                   Gender Affirmation

4                   Intensifies"

5      Exhibit 8    ASPS - 2021 State Policy      116

6                   Priorities

7      Exhibit 9    Lappert Resumé                127

8      Exhibit 10   Code of Ethics of the         171

9                   American Society of Plastic

10                  Surgeons

11     Exhibit 11   Federal Register, Vol, 59,    223

12                  No. 22 - November 18, 1994

13     Exhibit 12   FDA, Understanding            230

14                  Unapproved Use of Approved

15                  Drugs "Off Label"

16     Exhibit 13   FDA, "Off-Label" and          232

17                  Investigational Use of

18                  Marketed Drugs, Biologics,

19                  and Medical Devices

20     Exhibit 14   American Academy of           239

21                  Pediatrics Policy Statement,

22                  Off-Label Use of Drugs in

23                  Children

1   Exhibit 15   Yackey, Off-label Medication   256
2                Prescribing Patterns in
3                Pediatrics: An Update
4   Exhibit 16   FDA Botox Cosmetic              263
5                2017-10-02 Approval Letter
6   Exhibit 17   Sugrue 2019, Levels of         299
7                Evidence in Plastic and
8                Reconstructive Surgery
9                Research: Have We Improved
10               Over the Past 10 Years?
11  Exhbiit 18   Reversal Surgery in            326
12               Regretful Male-to-Female
13               Transsexuals After Sex
14               Reassignment Surgery
15               (Djordjevic)
16  Exhibit 19   (Exhibit number not used)      ---
17  Exhibit 20   Wiepjes 2018, The Amsterdam    339
18               Cohort of Gender Dysphoria
19               Study (1972-2015)
20  Exhibit 21   Wilson 2017, Regret In         355
21               Surgical Decision Making: A
22               Systematic Review of Patient
23               and Physician Perspectives

1    Exhibit 22   Exposito-Campos, A Typology    361

2                 of Gender Detransition and

3                 Its Implications for

4              Healthcare Providers

5    Exhibit 23   BCBS NC - Corporate Medical    375

6                 Policy, update July 2021

7    Exhibit 24   Dhejne, Long-Term Follow-Up    388

8                 of Transsexual Persons

9                 Undergoing Sex Reassignment

10                Surgery: Cohort Study in

11                Sweden

12   Exhibit 25   Finnish Guidelines 2020        394

13                   Minors, Unofficial

14                Translation

15   Exhibit 26   WPATH Standards of Care,       396

16                Version 7

17   Exhibit 27   Carmichael, Short-term         411

18                outcomes of pubertal

19                suppression in a selected

20                cohort of 12 to 15 year old

21                young people with persistent

22                gender dysphoria in the UK

23   Exhibit 28   2020 Cochrane Database of      414

1           Systematic Reviews

2     Exhibit 29   Tradition 70/30 PPO Plan      419

3                  Benefits Booklet, 2017

4     Exhibit 30   Aetna, Gender Affirming       427

5                  Surgery Policy

6     Exhibit 31   Cigna Medical Coverage        430

7                  Policy, Treatment of Gender

8                  Dysphoria

9     Exhibit 32   United Healthcare Medical     434

10                 Policy, Gender Dysphoria

11                 Treatment

12    Exhibit 33   Lappert Denver Conference     451

13                 Presentation

14    Exhibit 34   Plastic surgeon: Sex-change   463

15                 operation 'utterly

16                 unacceptable' and a form of

17                 'child abuse',

18                 LifeSiteNews.com

19

20         (Exhibits attached to transcript.)

21

22

23

1            I, Lane C. Butler, a Court

2     Reporter and Notary Public, State of

3     Alabama at Large, acting as Notary,

4     certify that on this date, pursuant to

5     the Federal Rules of Civil Procedure,

6     there came before me via remote

7     videoconference from Decatur, Alabama,

8     commencing at approximately 8:30 a.m.

9     Central, on the 30th day of September,

10    2021, PATRICK LAPPER, M.D., witness in

11    the above cause, for oral examination,

12    whereupon the following proceedings were

13    had:

14

15            THE VIDEOGRAPHER:  Good morning.

16    We are going on the record at 8:31 a.m.,

17    Thursday, September 30th, 2021.  This is

18    Media Unit 1 of the videorecorded

19    deposition of Dr. Patrick Lappert as

20    taken by counsel for plaintiff in the

21    matter of Kadel, et al. v. Folwell, et

22    al., filed in the United States District

23    Court for the Middle District of North

1    Carolina, Civil Action No.

2    1:19-cv-272-LCB-LPA.

3         This deposition is being

4    recorded remote via Zoom located in

5    Decatur, Alabama.  My name is Andrew

6    Baker from the firm Veritext Legal

7    Solutions.  I am the videographer.  The

8    court reporter is Lane Butler, also from

9    Veritext Legal Solutions.

10        Will counsel now state their

11   appearance and affiliations for the

12   record.  The court reporter will swear in

13   the witness.  Thank you.  We may proceed.

14        MR. TISHYEVICH:  This is Dmitriy

15   Tishyevich from McDermott, Will & Emery,

16   LLP, for plaintiffs.

17        MR. KNEPPER:  My name is John

18   Knepper.  I represent three of the

19   defendants in this matter: the North

20   Carolina State Health Plan for Teachers

21   and State Employees; Dale Folwell, the

22   treasurer for the State of North

23   Carolina; and Dee Jones, the executive

1    administrator of the North Carolina State
2    Health Plan.  I'll be defending Dr.
3    Lappert's deposition.
4
5                    PATRICK LAPPERT, M.D.,
6            having first been duly sworn,
7       was examined and testified as follows:
8
9    EXAMINATION BY MR. TISHYEVICH:
10       Q.    Good morning, Doctor.
11       A.    Good morning, sir.
12       Q.    State your full name for the
13   record.
14       A.    Patrick Walter Lappert.
15       Q.    Any reason you're not able to
16   give complete and truthful testimony
17   today?
18       A.    There is no reason.
19       Q.    You've been retained as an
20   expert by defendants in this case;
21   correct?
22       A.    I have.
23       Q.    You've prepared an expert

1    report; right?

2        A.    I have.

3        Q.    So, I've premarked Exhibit 1.

4    Open that, and let me know when you have

5    it.

6    (Exhibit 1 was marked for identification

7    and is attached.)

8        A.    Okay.  I have it.

9        Q.    This report contains all the

10   opinions that you intend to offer in this

11   case; correct?

12       A.    It does.

13       Q.    All right.  Without telling me

14   any conversations that you had with

15   counsel, what did you do to prepare for

16   your deposition today?

17       A.    Well, I reviewed the -- the

18   documents.  I guess it's called the

19   complaint.  I reviewed the patient

20   records.  And then, I reviewed the

21   literature, pertinent journal articles,

22   publications, and had conversations with

23   -- with counsel, Mr. Kadel [sic], and his

1    staff at various times.

2         Q.   When you say "patient records,"

3    are you talking about the medical records

4    for the individual plaintiffs?

5         A.   Yes.  The ones that were -- that

6    were given to me to review.

7         Q.   And when you say "the

8    literature," are you referring to some of

9    the studies that you cite in your report?

10        A.   Yes.

11        Q.   Have you reviewed any studies --

12   strike that.

13             In preparing for your deposition

14   today, have you reviewed additional

15   studies that are not cited in your

16   report?

17        A.   No.  The report contains all of

18   the studies that I -- that I reviewed

19   that I consider pertinent.  I glossed

20   some but didn't see them as germane.  So

21   all the ones that were -- that were

22   germane to my opinion are -- are in the

23   -- in the document.

1    Q.   Understood.  And you mentioned
2    that you met with or spoke with Mr.
3    Knepper in preparing for today?
4    A.   I have.
5    Q.   Okay.  Again, without disclosing
6    any substance of the conversation, how
7    many times did you speak or meet with
8    him?
9    A.   Three or four times, I think.
10    Q.   And when did those conversations
11    take place?
12    A.   Well, as recently as yesterday
13    evening and I think a couple of meetings
14    back in May, I think it was.  I'd have to
15    look at my calendar, but.
16    Q.   Last evening, you spoke --
17    strike that.
18         You know that Dr. Hruz was
19    deposed yesterday; right?
20    A.   I'd heard, yes.
21    Q.   And so before yesterday, when
22    was the last time that you spoke with Mr.
23    Knepper to prepare for your deposition?

1      A.   I want to say it's a couple of
2   weeks ago.  I'm not exactly sure.
3      Q.   How long was the conversation
4   with Mr. Knepper last night?
5      A.   A little less than an hour.
6      Q.   Did he provide you with copies
7   of any of the exhibits that were used at
8   Dr. Hruz's deposition?
9      A.   No, he did not.
10      Q.   Did he provide you with any --
11   any portions of that deposition
12   transcript?
13      A.   No.
14      Q.   And then going in reverse
15   chronological order, you mentioned you
16   may have spoken a couple of weeks ago?
17      A.   I think.  I don't know exactly
18   -- I don't know exactly when that was,
19   Mr. Tishyevich.  I want to say three
20   weeks ago perhaps.  I'm not exactly sure.
21      Q.   Do you recall roughly how long
22   that conversation was?
23      A.   About the same duration.  I

1    think it was perhaps an hour, perhaps an

2    hour.

3        Q.   Okay.  All right.  You -- in the

4    course of -- strike that.

5            In the course of working on this

6    case, have you ever communicated with Dr.

7    Hruz?

8        A.   Not directly.  I've spoken with

9    Dr. Hruz, but in the matter at hand, I

10   have not spoken with him about it.

11           MR. TISHYEVICH:  For the court

12   reporter, that's H-R-U-Z.  And I'll try

13   and spell things as we go to make it a

14   little easier.

15       Q.   How about Dr. McHugh?

16   M-C-H-U-G-H.  Have you spoken with him in

17   the course of working on this case?

18       A.    I've never spoken directly to

19   him, no.

20       Q.   How about Dr. Levine?

21   L-E-V-I-N-E.

22       A.    I have not spoken with Dr.

23   Levine.

1       Q.   But you have met Dr. Hruz before

2    working on this case; right?

3       A.   Yes.

4       Q.   And is the same true for Dr.

5    Levine?

6       A.   I've never met Dr. Levine.

7       Q.   All right.  About how many hours

8    do you estimate you've spent working on

9    your expert report?

10      A.   Somewhere around maybe 60 hours.

11   I could -- I could look for that number,

12   but I'm going to estimate it at about 60

13   hours, something like that.

14      Q.   You're aware that the individual

15   plaintiffs in this case have been

16   deposed; right?

17      A.   Yes, I've heard.

18      Q.   Were you provided with

19   deposition transcripts or any portion of

20   their testimony?

21      A.   I have -- I have not seen those,

22   no.

23      Q.   Okay.  You're aware that other

1      experts in this case have also already

2      been deposed?

3          A.    Yes.

4          Q.    Have you been provided with

5      deposition transcripts or any portion of

6      their deposition testimony?

7          A.    I -- I saw a transcript of Dr.

8      McHugh's.

9          Q.    Was that the only tran- --

10     strike that.

11              Was Dr. McHugh's transcript the

12     only expert deposition transcript you've

13     seen?

14         A.    It's the only one I've read.  I

15     -- I think that -- yeah, I think it's the

16     only one I read.  Yes, sir.

17         Q.    Okay.  All right.  So throughout

18     your report, you use this term --

19         A.    Could I amend that last answer?

20         Q.    Of course.

21         A.    I -- I did read portions of Dr.

22     Brown's transcript, actually, some days

23     back.  My -- my apologies.

1     Q.   No.  And I should say that.  If

2   at any point in time in your deposition

3   you want to go back and amend your

4   answer, that is totally fine.

5     A.   Thank you.

6     Q.   Okay.  So in your report, you

7   use this term "transgender treatment

8   industry."  Right?

9     A.   Yes.

10     Q.   And you and Dr. Levine and Dr.

11   McHugh all use this term in your reports.

12   Were you aware of that?

13     A.   Oh, I was aware that the -- no,

14   I wasn't aware that they were using it,

15   actually.

16     Q.   Is it coincidental that the

17   three of you are using this term?

18     A.   I -- I think it's sort of

19   becoming a common term lately.  I don't

20   know where it came from.  I was trying to

21   think about that.  I don't know who

22   originated it, but I've -- I don't know

23   even if it was me that originated it,

1    actually, since I've been speaking about
2    this subject for some time now.  But it
3    seemed like an apt term, so it doesn't
4    surprise me that others are using it.
5        Q.   You don't know who came up with
6    that term?
7        A.   I don't.
8        Q.   It's possible that it was you?
9        A.   It wouldn't surprise me.
10       Q.   And you mentioned that it's
11   becoming more commonly used.  Is that
12   right?
13       A.   It seems to be.  I don't know.
14   I don't know how common it is, but it's
15   kind of a small circle of people talking
16   about these things.
17       Q.   Are you aware of a single
18   peer-reviewed scientific article that has
19   used the term "transgender treatment
20   industry"?
21       A.   I am not.
22       Q.   Do you know what PubMed is?
23   P-U-B-M-E-D.

1        A.    Yes.

2        Q.    It's a search engine maintained

3    by the National Institute of Health;

4    right?

5        A.    Yes.   That's my understanding.

6        Q.    It's a search engine for

7    scientific articles, basically; right?

8        A.    Yes.

9        Q.    So I'll represent to you that I

10    ran a search in PubMed for the phrase

11    transgender treatment industry, in

12    quotation marks, and came back with zero

13    results for that phrase.

14            MR. KNEPPER:  Objection to form.

15        Q.    Do you find that surprising?

16        A.    No.

17        Q.    Okay.  What does that lack of

18    results tell you about whether this term

19    is a commonly used term in this field?

20            MR. KNEPPER:  Objection to form.

21        A.    I wouldn't expect it to be a

22    commonly used term, and it doesn't

23    surprise me that you didn't find it.

1          Q.   Yeah.  "Transgender treatment
2     industry" is not a commonly used term in
3     the field of treatment and diagnosis of
4     gender dysphoria; right?
5               MR. KNEPPER:  Objection to form.
6          A.   I would agree.
7          Q.   Yeah.  It's a term that, as far
8     as I can tell, is fairly idiosyncratic to
9     the opinions that you and the other
10    defendant experts are using in this case.
11    Does that sound right?
12              MR. KNEPPER:  Objection to form.
13         A.   That sounds right to me, yeah.
14         Q.   Okay.  Look at page 1 of your
15    expert report, Exhibit 1.
16         A.   All right.
17         Q.   I see it says, "Declaration of
18    Patrick Lappert, MD."  You see that?
19         A.   Yes.
20         Q.   Under that, it says, "Board
21    Certified in Surgery and Plastic
22    Surgery."  Do you see that?
23         A.   I do.

1        Q.   Let's talk about your

2   certifications.  Let's start with plastic

3   surgery.  You originally received your

4   board certification in plastic surgery in

5   1997; correct?

6        A.   That's correct.

7        Q.   Then you got recertified in

8   2008; correct?

9        A.   That's correct.

10       Q.   That board certificate was only

11  valid for ten years; correct?

12       A.   Correct.

13       Q.   And your plastic board -- strike

14  that.

15            And your plastic surgery board

16  certificate expired at the end of 2018;

17  correct?

18       A.   Correct.

19       Q.   Well, why did you decide not to

20  renew your board certificate past 2018?

21       A.   Well, I'm a -- I'm a solo

22  practitioner, and the main reason for

23  maintaining that expensive certificate

1   was that many hospitals required it in

2   order to have privileges.  Several years

3   ago, a lot of hospitals started dropping

4   that requirement, so it didn't make sense

5   for a surgeon who is within three years

6   of retirement to expend all that money

7   and time to maintain a certification that

8   was no longer necessary for me in terms

9   of maintaining my practice.

10      Q.   Do you currently have admitting

11  privileges at any hospital?

12      A.   No.

13      Q.   When was the last time you had

14  admitting privileges in any hospital?

15      A.   A year ago.

16      Q.   What hospital was that?

17      A.   Crestwood Hospital, Huntsville,

18  Alabama.

19      Q.   So within the last year at

20  least, I take it you haven't performed

21  any surgeries at a hospital.  Right?

22      A.   That's correct.  A -- a year

23  ago, I retired from active surgical

1    practice.

2        Q.    Were you doing surgeries in 2019

3    after your plastic -- plastic surgery

4    board certificate expired?

5        A.    Yes.

6        Q.    When -- just can we pin this

7    down more?  What -- what month do you

8    think you stopped performing surgeries?

9        A.    Let's see.  This is November of

10   2021, so it would have been August of

11   2020.

12       Q.    All right.  You are not

13   currently board-certified in plastic

14   surgery; correct?

15       A.    Correct.

16       Q.    And you have not been

17   board-certified in plastic surgery since

18   2018; correct?

19       A.    Correct.

20       Q.    For over two and a half years at

21   this point; right?

22       A.    Correct.

23       Q.    So this page 1 of your report

1    says that you're board-certified in

2    plastic surgery.  Do you think it's

3    appropriate for you to make that

4    representation even though you don't have

5    an active certification?

6              MR. KNEPPER:  Objection, form.

7         A.    Well, appropriate in terms of --

8    I don't understand the question.

9         Q.    Let me be more specific.

10        A.    Okay.

11        Q.    Do you know what the Amer- --

12   I'll go back.

13              You know what the American Board

14   of Plastic Surgery is; right?

15        A.    Certainly.

16        Q.    Do you know what the American

17   Board of Plastic Surgery has to say about

18   doctors who represent that they're

19   board-certified when they don't have an

20   active certification?

21              MR. KNEPPER:  Objection, form.

22        A.    They discourage it.  I -- I

23   suspect that the -- the document -- well,

1    I didn't prepare that -- that particular

2    part of the document, although I signed

3    it, certainly.  But I see your point,

4    yes.

5        Q.   Okay.  I'm going to introduce

6    another exhibit.  You'll see it in a

7    minute.  Let me know when you have it,

8    Doctor.

9    (Exhibit 2 was marked for identification

10   and is attached.)

11       A.   I have it.

12       Q.   This is a printout from the -- a

13   web page from the American Board of

14   Plastic Surgery.  Go to page 2.

15       A.   All right.  I'm there.

16       Q.   Middle of the page, it says in

17   bold letters, "Guidelines for Stating

18   Certification Status."  Do you see that?

19       A.   I do.

20       Q.   Look at the third paragraph.

21       A.   All right.

22       Q.   It says, "ABPS does not mandate

23   the specifics of how diplomates state

1      their certification, except to assert
2      that diplomates should not state or imply
3      that they are certified if their
4      certification has expired."
5              Do you see that?
6      A.    I do.
7      Q.    All right.  You understand that
8      under this guidance from the ABPS, you
9      are not supposed to be representing that
10     you are board-certified in plastic
11     surgery because you do not have a current
12     certification; correct?
13             MR. KNEPPER:  Objection, form.
14     A.    Yes, I understand it.
15     Q.    Let's look at what else it says.
16     Towards the bottom of page 2, it says,
17     "We ask that you follow these guidelines
18     throughout your career to accurately
19     state your ABPS certification."  Do you
20     see that?
21     A.    I do.
22     Q.    The first bullet says,
23     "Diplomates of ABPS must accurately state

1       their certification status at all times."

2       Do you see that?

3           A.   I do.

4           Q.   And you understand what this

5       means; right?

6           A.   I do.

7                MR. KNEPPER:  Objection, form.

8           Q.   Page 3, next bullet says,

9       "Diplomates with expired time-limited

10      certification or those whose

11      certification is revoked may not claim

12      Board certification by ABPS and must

13      revise all descriptions of their

14      qualifications accordingly."  Right?

15               MR. KNEPPER:  Objection to form.

16          A.   Yes.  Yes, I see that.

17          Q.   And you understand what that

18      means; right?

19               MR. KNEPPER:  Objection to form.

20          A.   I do.

21          Q.   Your expert report is not in

22      compliance with this guidance from the

23      ABPS; correct?

1           MR. KNEPPER:  Objection, form.

2      A.   The -- the one line there under

3   my name is not in compliance.  That's

4   correct.

5      Q.   And the same is true of your CV;

6   right?

7      A.   Well, the CV states that I have

8   been board-certified by the American

9   Board of Surgery and have been

10  board-certified by the ABPS in 1997 and

11  2008, yes.  Have been.

12     Q.   And look back at this page 3

13  from the ABPS.  It says, "When a

14  physician misrepresents certification

15  status, ABPS may notify local

16  credentialing bodies, licensing bodies,

17  law enforcement agencies and others."  Do

18  you see that?

19     A.   I do.

20     Q.   All right.  And you understand

21  what this means; right?

22          MR. KNEPPER:  Objection to form.

23     A.   Yes.

1    Q.   Okay.  Are you going to update

2    your expert report so that it comports

3    with this guidance from the ABPS?

4         MR. KNEPPER:  Objection to form.

5    A.   Certainly.

6    Q.   Okay.  So that's plastic

7    surgery.  Let's talk about your board

8    certification in surgery next.  So, go

9    back to your expert report, page 1.

10   A.   Okay.

11   Q.   You received your board

12   certification in surgery in 1992;

13   correct?

14   A.   Was it '92 or '91?  '92, yes,

15   sir.

16   Q.   And that certification expired

17   in 2002; right?

18   A.   Yes.

19   Q.   And you had not renewed that

20   after 2002; right?

21   A.   Correct.

22   Q.   You're not currently

23   board-certified in surgery; correct?

```
 1        A.    Correct.
 2        Q.    You have not been
 3   board-certified in surgery since 2002;
 4   correct?
 5        A.    Since 2002, yes, sir.
 6        Q.    That's over nineteen years;
 7   right?
 8              So, I showed you this guidance
 9   from the American Board of Plastic
10   Surgery.  How about the American Board of
11   Surgery?  What do you think they have to
12   say about doctors who make these kind of
13   representations?
14              MR. KNEPPER:  Objection, form.
15        A.    I'm sure it's probably the same.
16        Q.    Yeah.  Would it surprise you
17   that the American Board of Surgery does
18   not allow doctors to represent that they
19   are board-certified in surgery unless
20   they have a current board certificate?
21              MR. KNEPPER:  Objection, form.
22        A.    It would not surprise me, no.
23        Q.    All right.  You are currently
```

1    serving as an expert in another case,

2    Brandt v. Rutledge.  B-R-A-N-D-T.

3    Correct?

4        A.   Yes.

5        Q.   That's a case pending in federal

6    court in Arkansas; right?

7        A.   Correct.

8        Q.   In that case, you were retained

9    by the defendants, by the State of

10   Arkansas; right?

11       A.   Yes.

12       Q.   Dr. Hruz, who is one of the

13   defendants -- strike that.  Dr. Hruz, who

14   is one of the experts in this case, is

15   also serving as an expert for defendants

16   in that Brandt case; right?

17       A.   That's my understanding, yes.

18       Q.   And the same is true for Dr.

19   Levine; right?

20       A.   I didn't know about Dr. Levine,

21   but.

22       Q.   And you submitted an expert

23   declaration in that Brandt case in July

1      of this year; correct?
2          A.    I believe that was when I
3      submitted it, yes.
4          Q.    All right.  Let's look at it.
5      And let me know when you get the exhibit,
6      Doctor.
7      (Exhibit 3 was marked for identification
8      and is attached.)
9          A.    Here it is.  Let's see.  All
10     right.
11         Q.    All right.  Page 1 says,
12     "Declaration of Dr. Patrick Lappert."
13     That's you; right?
14         A.    Yes.
15         Q.    Fair to say that there is at
16     least some overlap between the opinions
17     that you're offering in this case and the
18     opinions that you're offering in that
19     Brandt case; right?
20             MR. KNEPPER:   Form.
21         A.    Well, given that the subject
22     matter is the same, I would expect some
23     overlap, yes, sir.

1          Q.   Go to page 5 of that
2     declaration.
3          A.   All right.  I'm there.
4          Q.   You say under Section II,
5     "'Gender affirming' treatments are
6     experimental."  Right?
7          A.   Yes.
8          Q.   It's basically the same opinion
9     that you offered in this case; right?
10         A.   Yes, sir.
11         Q.   Go to page 29 of your
12    declaration.  See there's a paragraph 63?
13         A.   Yes, sir.
14         Q.   And toward the end of that
15    paragraph, you talk about the national
16    reviews in England, Sweden, and Finland
17    and other reviews like Cochrane, Griffin,
18    and Carmichael.  You see that?
19         A.   Yes, sir.
20         Q.   You relied -- you relied on all
21    those studies for your opinions in this
22    case as well; right?
23         A.   I did.

1          Q.    Okay.  Go to page 38 of your

2    declaration.  Do you see that it's the

3    section titled "Concluding Opinions" and

4    it goes through the next --

5          A.    Yes, sir.

6          Q.    -- few pages?

7                We don't need to go through

8    these individually, but you agree there's

9    a lot of overlap between the opinions

10   you're offering in that Brandt case and

11   the opinions you're offering in this

12   case; right?

13               MR. KNEPPER:  Objection to form.

14         A.    Yes.

15         Q.    The Brandt case involves a

16   challenge to an Arkansas law which bans

17   doctors from providing various types of

18   gender-affirming treatments to

19   adolescents; correct?

20         A.    Yes.

21         Q.    Including puberty blockers and

22   cross-sex hormones and gender-affirming

23   surgery; correct?

1      A.    Yes.

2            MR. KNEPPER:   Objection.

3      Q.    Have you kept up with what's

4    going on in that case in Arkansas?

5            MR. KNEPPER:   Objection, form.

6      A.    I haven't heard anything perhaps

7    in the last several weeks.

8      Q.    Well, are you aware that in July

9    of this year, the judge in that case held

10   that the State is prohibited from

11   enforcing the ban while the case is being

12   decided?

13     A.    I've heard that.

14     Q.    All right.  And as part of that

15   order, the judge made some factual

16   findings.  Are you aware of that?

17     A.    I'm not -- haven't read the

18   details.

19     Q.    All right.  Let me show you.

20     A.    Okay.

21     Q.    Let me introduce one more

22   exhibit.

23   (Exhibit 4 was marked for identification

1      and is attached.)

2          A.    I have it now.

3          Q.    Okay.  So, this is a

4      supplemental order from Judge Moody in

5      Arkansas dated August 2nd, 2021.  Do you

6      see that?

7          A.    I see that, yes.

8          Q.    This first paragraph says,

9      "After further consideration, the Court

10     supplements the ruling made at the

11     conclusion of the July 21, 2021 hearing

12     to include the following findings."  Do

13     you see that?

14         A.    I do.

15         Q.    By the way, did you testify live

16     at that July 2021 hearing?

17         A.    No.

18         Q.    Do you know if any of the other

19     experts testified live at that hearing?

20         A.    I don't know.

21         Q.    Go to page 7.

22         A.    All right.

23         Q.    All right.  Look at the last

1    paragraph.

2        A.    Okay.

3        Q.    The second sentence in that last

4    paragraph says, "Gender-affirming

5    treatment is supported by medical

6    evidence that has been subject to

7    rigorous study."  Right?  Do you see

8    that?

9        A.    That's what it says, yes, sir.

10       Q.    And that finding by the Court in

11   Arkansas is contrary to the opinions that

12   you offered in that case; right?

13       A.    Apparently so, yes.

14       Q.    And it's also contrary to the

15   opinions that Dr. Hruz and Dr. Levine

16   offered in that case; right?

17       A.    Yes.

18            MR. KNEPPER:  Objection to form.

19       A.    It appears to be, yes.

20       Q.    And it's also contrary to the

21   opinions that you and Dr. Hruz and Dr.

22   Levine are offering in this case; right?

23       A.    Yes.

1       Q.   Look at the next sentence.  It

2    says, "Every major expert medical

3    association recognizes that

4    gender-affirming care for transgender

5    minors may be medically appropriate and

6    necessary to improve the physical and

7    mental health of transgender people."

8            That's what it says; right?

9       A.   That's what it says, yes, sir.

10      Q.   That's also contrary to the

11   opinions that you and Dr. Hruz and Dr.

12   Levine are offering in both these cases;

13   right?

14      A.   Yes, it certainly is.

15      Q.   In fact, according to this

16   order, every major expert medical

17   association disagrees with you because

18   they've all taken a position that this

19   treatment is in fact medically necessary;

20   right?

21            MR. KNEPPER:  Objection to form.

22      A.   Apparently so, yes.

23      Q.   All right.  Look at page 6.

1      Look at the last paragraph.  You see it
2      says that -- the third sentence says,
3      "The consensus recommendation of medical
4      organizations is that the only effective
5      treatment for individuals at risk of or
6      suffering from gender dysphoria is to
7      provide gender-affirming care."  Do you
8      see that?
9          A.   I do.
10         Q.   You see there's a Footnote 3?
11         A.   Let me get my glasses on here.
12     Footnote 3.  I don't see Footnote 3.
13     Let's see.
14         Q.   The bottom of page 6.
15         A.   I see it now, yes.
16         Q.   Footnote 3 has a long list of
17     medical organizations that all have taken
18     the position that gender-affirming care
19     is medically appropriate for individuals
20     with gender dysphoria; right?
21             MR. KNEPPER:  Objection to form.
22         A.   Yeah, the consensus
23     recommendations.  Those are consensus

1   recommendations.  And yes, I was aware
2   that those were the positions taken by
3   those organizations even before the
4   judge's opinion.
5        Q.   Yeah.  By my count, Footnote 3
6   lists 18 different professional medical
7   organizations, and as I read this
8   footnote, every single one of them takes
9   the view that's contrary to the opinions
10  that you and Dr. Hruz and Dr. Levine are
11  offering; right?
12            MR. KNEPPER:  Objection to form.
13       A.   Yes.  There's a consensus of
14  consensus on this, exactly, yes, sir.
15       Q.   And you're not aware of a single
16  professional medical organization that
17  submitted anything in this Brandt case
18  and said that they agree with the
19  opinions that you and Dr. Hruz and
20  Dr. Levine are offering; right?
21       A.   Well, I'm aware of at least one
22  professional organization that -- that
23  disagrees with that, yeah, the

1    pediatric -- American Pediatric --

2    American Association of Pediatricians.

3        Q.    Do you know if they submitted

4    anything to the Court in this Brandt case

5    to that effect?

6        A.    I'm not aware.   I don't know.

7        Q.    Okay.   Look back to your report,

8    Exhibit 1.

9        A.    Okay.

10       Q.    And go to page 5.

11       A.    Okay.

12       Q.    See there's paragraph 11?

13       A.    Yes.

14       Q.    And you say that "Affirmation

15    Treatments are Currently Experimental."

16    And then you say, "are not generally

17    accepted by the relevant scientific

18    community."   Right?

19       A.    Yes, I say that, absolutely.

20       Q.    Well, apparently, there's at

21    least eighteen different professional

22    medical organizations that all say that

23    you and Dr. Hruz and Dr. Levine are wrong

1    and that these gender-affirming

2    treatments are, in fact, medically

3    appropriate; right?

4         A.    Well, I --

5              MR. KNEPPER:   Object.

6         A.    I would say that part of the

7    difficulty here is a misunderstanding

8    about how those consensus opinions are

9    arrived at.  They're not arrived at

10   scientifically.  So minus a scientific

11   opinion, those are -- those are consensus

12   opinions.

13             For example, in plastic surgery,

14   there was a controversy some years ago

15   about the use of fat grafting in breast

16   reconstruction, and there was a concern

17   about whether it would promote malignant

18   degeneration.  The American Society of

19   Plastic and Reconstructive Surgeons came

20   out with a consensus statement

21   essentially recommending against, if not

22   outright forbidding, the use of fat

23   grafting in breast reconstruction or

1    cosmetic surgery.  But I was never

2    polled.  I was a member of the American

3    Society of Plastic Surgery, but I was

4    never polled.

5              These consensus statements do

6    not poll the scientific or professional

7    community.  They're the work product of

8    a -- of small committees where they

9    perhaps will review scientific literature

10   and come to an opinion within that

11   relatively small group.

12             So I think the misunderstanding

13   is that because, for example, the

14   American Medical Association or the

15   American Pediatric Society has a

16   statement making this claim, it's not, by

17   definition, supported by the membership

18   of that -- that society.  It is the work

19   product of a committee, and it's -- and

20   it doesn't -- it doesn't lay out the

21   scientific basis for those opinions for

22   the membership to review, as was the case

23   in -- and it turns out that seven, eight

1    years later, the American Society of

2    Plastic and Reconstructive Surgery

3    rescinded their prohibition when the

4    membership basically chimed in and said

5    this is incorrect and this is our

6    evidence, here's the science.  And the

7    American Society rescinded that consensus

8    statement that they had made ten years

9    earlier.

10          So I imagine that similar things

11   are going on here.  Committees generates

12   consensus statements.  The consensus

13   statements are published.  And one gets

14   the impression that the entire membership

15   supports the statement when that in fact

16   is not the case.  And when these

17   consensus statements are published, they

18   don't publish the supporting scientific

19   literature.  They merely make the

20   statement.  So I think this is the case

21   here as well.

22        Q.   You are not a member of the,

23   let's say, American Medical Association;

1    right?

2         A.    Not -- not any longer, no.

3         Q.    And your -- I hear you

4    speculating that there's a committee that

5    came to this decision at the AMA; right?

6              MR. KNEPPER:   Objection, form.

7         A.    Well, if the AMA functions like

8    the American Society of Plastic Surgery

9    or other -- other professional bodies

10   like that, professional organizations

11   like that, I would expect that's how they

12   make their consensus statements, yes.

13        Q.    You personally do not know how

14   the AMA came to issue this consensus

15   statement, do you?

16             MR. KNEPPER:   Objection.

17        A.    I have no personal knowledge,

18   no.

19        Q.    You have no personal knowledge

20   what scientific literature they reviewed

21   in coming up with that consensus

22   statement, do you?

23        A.    That's the difficulty.   Yes,

1     sir.

2         Q.    Yeah.

3         A.    Correct.

4         Q.    You have no idea, in short, how

5     the AMA came to reach this consensus

6     statement; right?

7              MR. KNEPPER:  Objection to form.

8         A.    I have no personal knowledge of

9     it, no.

10        Q.    How about the American Pediatric

11    Society?  You're not a member of that;

12    right?

13        A.    No.

14        Q.    You have no idea how the

15    American Pediatric Society came to

16    support this consensus statement; right?

17        A.    Well, in that case, I do have

18    friends who are members of the American

19    Pediatric Society, I think it is.  And

20    they, in conversation, have told me that

21    this is how the process works.  I don't

22    have personal -- personal knowledge of

23    it, no.

1    Q.   Are those friends on the
2    committee at the APA that decided to
3    adopt this consensus statement?
4    A.   Not to my knowledge.
5    Q.   So they also -- strike that.
6         How about the American
7    Psychiatric Association?  You're not a
8    member of that --
9    A.   No.
10   Q.   -- right?
11   A.   No.
12   Q.   You have no idea on what basis
13   they decided to support this consen- --
14   what you call consensus -- consensus
15   statement about the necessity of
16   treatment for gender dysphoria, do you?
17   A.   No.
18   Q.   So, Doctor, I hear you
19   criticizing these organizations, but you
20   do not have firsthand knowledge of how
21   any of those organizations came to reach
22   these positions, do you?
23        MR. KNEPPER:  Objection to form.

1      A.    No.

2      Q.    And you do not know what

3    scientific literature they relied on, do

4    you?

5      A.    No.

6          MR. KNEPPER:  Objection to form.

7      A.    Other than to say that I'm

8    familiar with the current literature, and

9    I -- and whenever these -- these

10   consensus statements are supported with

11   references to the scientific literature,

12   that literature I have reviewed.  That

13   was part of the process of generating my

14   expert testimony.

15     Q.    I thought I just heard you say

16   that these position statements are not

17   typically supported by "Here's the study

18   we relied on."  Isn't that what you said?

19     A.    Well, no.  In the -- in the

20   actual document that they publish, they

21   make -- they make reference to things

22   like that.

23          What I meant to say, I suppose,

1    is that -- that I've reviewed the current

2    literature, particularly in the last

3    three to five years, that's germane to

4    the subject of gender affirmation in

5    pediatric patients and adolescents, and

6    I -- and I find that the science is weak,

7    so --

8        Q.    But because you have no

9    firsthand knowledge of how any of these

10   associations came out with these position

11   statements, you do not know to what

12   extent it may have taken that literature

13   into account before adopting these

14   position statements; right?

15           MR. KNEPPER:   Objection.

16       A.    I can only say that if they gave

17   full force to the scientific literature

18   that is used to support their position, I

19   find the scientific literature weak,

20   yeah.

21       Q.    This Brandt case involves a

22   state law that prohibits doctors in

23   Arkansas from providing gender-affirming

1      medical treatment to anyone under

2      eighteen; correct?

3          A.   Yes.

4          Q.   You yourself support these kind

5      of state law bans; right?

6               MR. KNEPPER:  Objection, form,

7      scope.

8          A.   I do support a control over

9      these kinds of therapies, yes, I do.

10         Q.   Well, not -- not just control,

11     because Arkansas says it will criminally

12     prosecute doctors that do it; right?

13         A.   Right.

14              MR. KNEPPER:  Objection to form,

15     scope.

16         Q.   And you think that's a good

17     idea; right?

18         A.   I do.

19              MR. KNEPPER:  Objection to form,

20     scope.

21         Q.   You think that other states

22     outside of Arkansas should be passing

23     similar bans; right?

1          MR. KNEPPER:  Objection, form,

2     scope.

3       A.   Actually, what I would prefer to

4     see is the -- is the professional

5     societies recommend against these sorts

6     of things, yes.  That would be my

7     preference.  I would rather that the

8     State did not step in and manage the care

9     of people who are suffering.  I'd rather

10    the State stayed out of it.  But short of

11    that, I suppose that's the -- the

12    fallback position is to recourse through

13    the law.

14          It would seem to me that

15    professional organizations should be

16    managing these issues, and practitioners

17    ultimately should be responsible, as was

18    found in the -- in the -- the case in

19    Great Britain at the Tavistock Portman

20    Institute when the Court came back and

21    reviewed the find -- the ruling there and

22    declared that primacy should be given to

23    the decision-making of doctors rather

1    than the Courts stepping in as -- as

2    managers of medical care.

3           And I feel the same way.  I

4    don't think that the State should have to

5    do this.  But -- given that -- given that

6    things are moving at the pace they are.

7       Q.   Are you aware that state

8    legislators in Utah have proposed a

9    similar ban as Arkansas for

10   gender-affirming medical treatment for

11   minors?

12      A.   Yes.

13           MR. KNEPPER:  Objection to form,

14   scope.

15      Q.   You had involvement with those

16   legislative efforts in Utah, didn't you?

17      A.   I think I made some

18   recommendations to them.  Yes, I did.

19      Q.   Yeah.  Because now I hear you

20   saying you prefer the professional

21   organizations handle it.  But the fact is

22   you have actively lobbied to get these

23   kind of bans passed in other states,

1    haven't you?

2         A.    Yes, I have.

3              MR. KNEPPER:  Objection to form,

4    scope.

5         A.    Yes, I have.

6         Q.    I'm going to introduce another

7    exhibit.  Let me know when you have it,

8    Doctor.

9    (Exhibit 5 was marked for identification

10   and is attached.)

11        A.    I have it.

12        Q.    Exhibit 5 is a document titled:

13   "Transgender 'Transition' Procedures

14   Performed on Minors.  Answers to

15   Questions and Information for Joint

16   Interim Committee," dated June 10th,

17   2021.  Do you see that?

18        A.    I do.

19        Q.    It says, "Submitted by Rep Rex

20   P. Shipp," S-H-I-P-P.  Do you know who

21   that is?

22        A.    I don't know him personally, but

23   I -- I see he's a representative from

1    Utah apparently.

2        Q.    Have you ever communicated with

3    Mr. Shipp and his staff?

4        A.    I may have and don't recall.

5        Q.    Why do you say you may have?

6        A.    I have a lot of correspondence

7    with people who ask a lot of questions

8    who are involved in this -- in this

9    issue, and I don't have a great memory

10   for names sometimes.  But I know I was in

11   communication at some level with people

12   in Utah, but I don't recall exactly the

13   nature of that conversation, or that

14   interchange.

15       Q.    Go to page 16.

16       A.    Sixteen?

17       Q.    One six.

18       A.    One six.  Okay.

19       Q.    Toward the bottom of the page,

20   it says, "We express appreciation to

21   these noted professionals who contributed

22   to this report."  Do you see that?

23       A.    I do.

1    Q.   Go to page 17.

2    A.   Okay.

3    Q.   The bottom of the page says,

4    "Patrick Lappert, M.D."

5    A.   Yes.

6    Q.   That's you; right?

7    A.   Yes.

8    Q.   So at some point earlier this

9    year, you were providing information to

10   the Utah State Legislature to support the

11   potential enactment of a ban on

12   gender-affirming healthcare for minors;

13   right?

14        MR. KNEPPER:  Objection, form.

15   A.   Yes.

16   Q.   Look at the fourth name from the

17   bottom on page 17.

18   A.   Fourth name -- I'm sorry?

19   Q.   Fourth name from the bottom.

20   A.   Paul Hruz.  Yes.

21   Q.   That's the same Dr. Hruz who's

22   an expert in this case; right?

23   A.   Yes.

1          Q.    Go to page 18.   The second name

2     from the top is Stephen B. Levine M.D.;

3     right?

4          A.    Yes.

5          Q.    Same Dr. Levine who is an expert

6     in this case; right?

7          A.    Yes.   I think so, yes.

8          Q.    And the next name is Paul

9     McHugh, M.D.; right?

10         A.    Yes.

11         Q.    The same Dr. McHugh who is an

12    expert in this case; right?

13         A.    Yes.

14         Q.    All four of you were providing

15    information to the Utah State Legislature

16    to support this potential ban; right?

17              MR. KNEPPER:   Objection to form.

18         A.    Yes.

19         Q.    How did you get involved with

20    providing this information to the Utah

21    State Legislature?

22         A.    I don't recall.   My -- my

23    suspicion is I may have been contacted by

1  e-mail or some other such thing.  In

2  fact, I'm fairly confident it was an

3  e-mail request for assistance, probably.

4       Q.   Do you remember who the e-mail

5  was from?

6       A.   I do not.

7       Q.   Do you remember who at the Utah

8  State Legislature or anyone affiliated

9  with them you were communicating with in

10  this respect?

11      A.   I don't remember, no.

12      Q.   All right.  Let's see what you

13  were telling the state legislature in

14  this report.  Go to page 5.  See there's

15  a section near the top titled "Sex

16  reassignment surgeries"?

17      A.   Yes.

18      Q.   There's some language in quotes

19  -- in quotes and italicized.  Do you see

20  that?

21      A.   I do.

22      Q.   And the first portion of the

23  paragraph says: '"Sex reassignment

1       surgery' is a massive misrepresentation
2       of what these operations actually do.
3       You can't change a person's sex.  All
4       that is happening is that the patient is
5       undergoing an intentional mutilation in
6       order to create a counterfeit appearance
7       of the other sex."
8               Do you see that?
9           A.    I do.
10          Q.    And underneath, it says,
11      "Patrick Lappert, M.D."  Right?
12          A.    Yes.
13          Q.    These are your words, Dr.
14      Lappert; right?
15          A.    Yes.
16          Q.    You consider gender reassignment
17      surgery to be an intentional mutilation;
18      right?
19          A.    I do.  Absolutely.
20              MR. KNEPPER:  Form.
21          Q.    And calling gender reassignment
22      surgery, quote, intentional mutilation,
23      is that commonly accepted terminology in

1    this field, Doctor?

2        A.    I expect not.

3        Q.    And then you say that when a

4    patient undergoes gender reassignment

5    surgery, all that is happening is, quote,

6    a counterfeit appearance of the other

7    sex; right?

8        A.    Yes.

9        Q.    This phrase, "counterfeit

10   appearance," do you think that's an

11   appropriate term for a doctor to use?

12       A.    Absolutely.

13       Q.    And you stand by these words;

14   right?

15       A.    I do.

16       Q.    All right.  So, we've talked

17   about Arkansas, we've talked about Utah.

18   Now, I know there is currently a number

19   of other states that are considering

20   passing similar bans.  Outside of Utah,

21   have you done any work whatsoever in

22   connection with these potential bans in

23   other states?

1            MR. KNEPPER:  Objection, form,
2     scope.
3        A.   I have.
4        Q.   Which states?
5        A.   Alabama, Texas.
6        Q.   What else?
7        A.   Texas.  I don't know if there
8     were any in the Northwest or not.  I
9     think that's all of them.  I may be
10    wrong, but I think that's all.  Alabama
11    and Texas I would just add to your list.
12        Q.   Okay.
13        A.   There may been something in
14    Arizona.  I'm not certain about Arizona
15    as well, but --
16        Q.   Now let me introduce another
17    exhibit.  Okay.  Let me know when you get
18    this one.
19    (Exhibit 6 was marked for identification
20    and is attached.)
21        A.   I've got it.
22        Q.   All right.  This article is
23    titled, "Alabama bill that would

1    criminalize treatment for transgender

2    minors headed to full Alabama Senate."

3    You see that?

4        A.    I do.

5        Q.    Alabama, your home state, was

6    considering a ban very similar to

7    Arkansas just this year; correct?

8        A.    Actually over the last couple of

9    years.

10        Q.    Okay.  The first paragraph says,

11    "The Alabama Senate Health Committee on

12    Wednesday approved a bill that would

13    outlaw puberty-blocking medications and

14    gender-affirming care for minors,

15    giving" -- "giving it a favorable report

16    in an 11-2 vote."  You see that?

17        A.    I do.

18        Q.    Then it says, "An Alabama House

19    committee heard testimony in a public

20    hearing on a companion bill, but the

21    committee did not vote on the" -- "on the

22    measure."  You see that?

23        A.    I do.

1     Q.   You testified in support of this

2     bill; right?

3     A.   Yes, sir.

4     Q.   Go to page 2.

5     A.   Okay.

6     Q.   Look at the second paragraph

7     from the bottom.

8     A.   Second from the bottom.  Yes.

9     Q.   It says, "Dr. Patrick Lappert, a

10    Decatur plastic surgeon, spoke in favor

11    of the bill."

12         That's you; right?

13    A.   That's right.

14    Q.   Go to page 3.

15    A.   Okay.

16    Q.   And look at the third paragraph.

17    It says that you've "spoken against the

18    use of medicine and surgery for

19    transgender people as a Catholic deacon

20    in his local diocese."  See that?

21    A.   Yes.

22    Q.   You don't deny that you've

23    spoken against the use of medical and

1    surgical treatment for transgender people

2    in your position as a Catholic deacon;

3    right?

4         A.   That's correct, I do not.

5         Q.   All right.  Focus on the last

6    sentence of this third paragraph.  It

7    says that when a committee member

8    questioned your medical expertise on this

9    issue, you said that you would not treat

10   a person for gender dysphoria and would

11   instead refer them to a qualified mental

12   health professional.  You see that?

13        A.   Yes.

14        Q.   At this hearing, someone on the

15   committee was questioning your medical

16   expertise to offer these opinions; right?

17            MR. KNEPPER:  Objection, form.

18        A.   I don't remember that detail,

19   but I think so, yeah.  I think the

20   objection they raised was that I don't do

21   these treatments, how could I know.

22        Q.   You're not a psychiatrist;

23   right?

```
 1        A.    No.
 2        Q.    You do not have specialized
 3    training or expertise in diagnosing
 4    mental health conditions; right?
 5        A.    I have limited -- limited
 6    training.  Yes.
 7        Q.    And when you say "limited
 8    training," what does that mean?
 9        A.    Well, in the training of plastic
10    surgeons, we are -- we are required --
11    because we offer aesthetic surgery, we
12    get some training in issues,
13    psychological/psychiatric issues relating
14    to people who will seek to modify their
15    bodies in order to achieve a sense of
16    peace or a sense of improvement in their
17    lives.  And it's imperative that a
18    plastic surgeon be able to recognize
19    persons who are suffering from
20    psychiatric problems because plastic
21    surgery -- to offer them plastic surgery
22    to modify their bodies is in the category
23    of malpractice, not to mention that very
```

1       often, dissatisfied patients will -- will

2       make life very difficult for the

3       practitioner, if not threaten them with

4       physical harm.

5               I would refer you to an article

6       by -- although we haven't offered it up,

7       -- a friend of mine, Dr. Mark Gorney, who

8       was one of the -- one of the grand old

9       men of plastic surgery, started the

10      Physicians Company to manage physician

11      liability and risk and had -- he

12      discovered that there's an

13      overrepresentation of -- of violence

14      against physicians by aesthetic patients

15      committing violence against plastic

16      surgeons.  That's just one of the

17      motivators.

18              But nonetheless, the issue of

19      body dysmorphic disorder is part of our

20      training, persons who are seeking a

21      remedy to their interior woundedness or

22      their psychological disturbances by

23      changing their outward opinion.  And body

1    dysmorphic disorder is a
2    well-characterized psychiatric diagnosis
3    that impinges greatly upon plastic
4    surgery precisely because aesthetic
5    surgery -- even in its name, you can tell
6    that aesthetic surgery is surgery aimed
7    at the aesthetic, the feelings, esthesia,
8    the feelings that a patient has about
9    themselves, about their life.  So it's
10   incumbent upon plastic surgeons to know
11   about these things, and so we get trained
12   in those matters.
13          So again, I have very limited
14   psychiatric/psychological knowledge, but
15   I do know that that subset of patients
16   should be referred for psychological help
17   rather than offered surgery.  Not to
18   mention the fact that such patients can't
19   even give informed consent because of
20   their psychological disturbances.
21      Q.   All right.  You're talking about
22   patients who have body dysmorphic
23   disorder; right?

1      A.    That's right.

2      Q.    When did you last receive

3    training in how to diagnose someone with

4    body dysmorphic disorder?

5      A.    I guess it's ongoing training

6    when one's in the -- in the practice of

7    plastic surgery.  But I had originally in

8    my residency and then on an ongoing basis

9    I think at conferences through the years.

10        Formal training in it, I -- I

11    don't recall beyond my residency.  All I

12    do is try to keep abreast of the

13    literature.

14      Q.    Yeah.  So, let's take that in

15    steps.  Outside of -- when was your

16    residency in plastic surgery, Doctor?

17      A.    '92 to '94.

18      Q.    Right.  Past '94, you have not

19    received formal training in how to

20    diagnose someone with body dysmorphic

21    disorder; right?

22      A.    There may have been some CME

23    credits at a conference in there

1    somewhere or remote learning.  I don't

2    recall.

3         Q.   But sitting here, you can't

4    recall any of those specifically; right?

5         A.   I cannot, no.

6         Q.   What are the diagnostic criteria

7    for body dysmorphic disorder?

8         A.   Well --

9         Q.   Do you know that sitting here

10   today?

11        A.   Yes.  So, a person with body

12   dysmorphic disorder, the diagnostic

13   criteria is the -- is the patient who

14   presents with evidence of a psychological

15   disturbance.  In review of their history

16   and physical examination, you may see

17   evidence of a history of substance abuse,

18   maybe evidence of some self-harm,

19   evidence of social isolation in their

20   intake forms, that sort of thing.  That

21   would raise the concern.

22             The second would be the person

23   who attaches tremendous potential benefit

1    of, psychologically, the -- the quality

2    of the -- sort of a transformative power

3    of cosmetic surgery.

4         And then the third criteria

5    would be that they -- they see something

6    that you don't see.  They see a defect

7    that you don't see.  And that's probably

8    the key diagnostic criteria.  For

9    example, a man who presents seeking a

10   modification to his nose who has evidence

11   of living a life of social isolation who

12   is adamant that by changing his -- the

13   appearance of his nose, he will -- he

14   will have a much better life.  And

15   hearing that, of course, the alarm bells

16   go off and then examining the patient and

17   seeing that there's no objectively

18   definable deformity, only a normal

19   variation that one would expect to see on

20   a man's face.

21         Those are all red flags.  And --

22   and based upon that, it is -- it

23   is definitely the -- has been

1    historically the recommendation of the

2    likes of Dr. Mark Gorney and other

3    leaders in the American Society of

4    Plastic Surgery to not offer surgery, but

5    rather to offer referral for

6    psychiatric/psychological support and

7    evaluation.

8        Q.    These diag- -- these diagnostic

9    criteria that you mentioned, where do

10   they come from?

11       A.    They -- I think you can find

12   much of that in the DSM book, if -- if --

13   if that's the route you want to go.  You

14   find it in the literature.  There are --

15   there are references in the scientific

16   literature about it dating back to I

17   think the 1920s.  I included some of

18   those, I think, in my discussion, if not

19   on this one, in the Arkansas case.

20           But -- but there have been

21   papers published through the years that

22   describe the condition and make

23   recommendations about care, and again,

1    going all the way back even to textbooks
2    in plastic surgery and -- and of course,
3    the residency training that speaks about
4    that as well.
5        Q.   So for diagnosing someone with
6    body dysmorphic disorder, you would rely
7    on the DSM-5; right?
8        A.   I wouldn't rely on it, no.  No.
9    I would rely on my -- my clinical
10   experience more than anything else there.
11       Q.   Well, you just rattled off three
12   or four guidelines that I think I heard
13   you say come from the DSM-5; right?
14            MR. KNEPPER:  Objection, form.
15       A.   Well, they're -- they don't come
16   from the DSM-5 but are described in the
17   DSM-5, yeah.
18       Q.   So when I asked you --
19       A.   And 4 -- actually, DSM-4 has a
20   clearer description, I think, than DSM-5.
21       Q.   So when I asked you what
22   criteria you would use to diagnose
23   someone with body dysmorphic disorder,

1    the source you went to was the DSM;

2    right?

3       A.    No.   The source I went to was my

4    training and the -- and the papers that

5    relate to it.   I think it's just been

6    subsequently characterized in the DSM.

7    And it's a ready -- it's a volume that's

8    readily accessible to people.   The

9    language is readily accessible, so people

10   who are seeking information about that,

11   they can go there for it or they can go

12   to the articles, if they like.   Yes.

13      Q.    Outside of whatever training you

14   had on diagnosing someone with body

15   dysmorphic disorder, you do not have

16   specialist training or expertise in

17   diagnosing other mental health

18   conditions; fair?

19           MR. KNEPPER:   Objection, form.

20      A.    Let's see.   Well, there's -- I

21   guess there are subcategories of -- of

22   body dysmorphic disorder, like

23   recognizing the anorexic patient, of

1     course, who presents for body

2     modification.  That -- that's a fairly

3     readily and obvious one.

4              But no, I'm not a -- I'm not

5     formally trained in psychiatry or

6     psychology.

7        Q.   You do not have -- you do not

8     hold yourself out as an expert in

9     diagnosing mental health conditions

10    outside, potentially, of body dysmorphic

11    disorder; right?

12       A.   Correct.

13       Q.   You do not have specialist

14    training or expertise in treating mental

15    health conditions; right?

16       A.   No.

17       Q.   You would refer that person to a

18    qualified mental health professional;

19    right?

20       A.   I would.  I would.

21       Q.   Because you yourself are not a

22    qualified mental health professional;

23    correct?

1        A.    Correct.

2        Q.    All right.  You've also

3   published an op-ed in May of this year

4   supporting this Alabama ban; correct?

5        A.    Yes.

6        Q.    And you said that Alabama

7   legislators should enact this ban because

8   they have a duty to protect the

9   vulnerable population of gender-confused

10   children.  Does that sound familiar?

11        A.    Yes.

12        Q.    So again, earlier you said you

13   had a preference for professional

14   societies dealing with this, but you're

15   out there publishing op-eds calling on

16   state legislatures to pass these bans;

17   right?

18             MR. KNEPPER:  Objection, form.

19        A.    Right.  Yes, sir.

20        Q.    All right.  How about Texas?

21   Tell me what work you've done supporting

22   this kind of a ban in Texas?

23        A.    It's been similar.  I've been in

1    communication with -- I can't remember if
2    they're on the legislative side or on the
3    justice side.  I don't remember exactly
4    where they fit into the -- the government
5    of Texas, but I've corresponded with them
6    and offered them information and advice.
7         Q.   Was it similar information to
8    what we've seen in that Utah packet?
9         A.   I'm sorry, sir?
10        Q.   Was it information similar to
11   what we've seen in that Utah legislation
12   packet?
13             MR. KNEPPER:  Objection, form.
14        A.   Right.  The substance -- the
15   substance of the issue at hand is the
16   same wherever you find it.  It's this
17   contest between those who -- who promote
18   gender-affirming care versus those who
19   promote, in the case of children, for
20   example, watchful waiting and
21   psychological support and cognitive
22   behavioral therapy and those things, yes.
23   It's the same battle wherever you find it

1      because it's the same problem, the same

2      science, the same language.  All of it's

3      the same.

4          Q.   So earlier, we saw that in

5      addition to you, Dr. Hruz and Dr. Levine

6      and Dr. McHugh were also involved with

7      those Utah legislative efforts; right?

8              MR. KNEPPER:  Objection, form.

9          A.   I -- I don't know their

10     involvement in -- in Texas.  I'm -- I'm

11     not aware.

12         Q.   Yeah.  Do you know whether any

13     of them have been involved with any of

14     these efforts in any other state?

15         A.   I don't.  I don't know.

16         Q.   Okay.  Fair to say that you have

17     some strong personal opinions on whether

18     doctors should be providing

19     gender-affirming treatment to minors?

20             MR. KNEPPER:  Objection to form.

21         A.   Very fair to -- very fair to

22     say, yes.

23             MR. TISHYEVICH:  Let's go off

1      the record.

2                  THE VIDEOGRAPHER:  This is the

3      end of Media Unit 1.  We are off the

4      record at 9:33 a.m.

5                        (Break taken.)

6                  THE VIDEOGRAPHER:  This is the

7      beginning of Media Unit No. 4.  We are on

8      the record at 9:44 a.m.

9          Q.    (By Mr. Tishyevich) Doctor,

10     you're familiar with an organization

11     called Alliance Defending Freedom, ADF;

12     right?

13         A.    Yes.

14         Q.    How are you familiar with the

15     ADF?

16         A.    I was invited down there for a

17     conference on the subject of transgender.

18     I was an invited presenter, I should say.

19     They asked me to come and speak from a

20     plastic surgeon's perspective on how I

21     view the current state of transgender

22     medicine and surgery.

23         Q.    Those were -- those were the

1    meetings in Arizona?  Is that right?

2              MR. KNEPPER:  Objection.

3         A.   Yes.

4         Q.   Who invited you?

5         A.   I don't remember who the

6    particular name was.  I -- I don't recall

7    who the -- the particular person, the one

8    that sent me the invitation.

9         Q.   Was it --

10        A.   It may have been -- it may have

11   been Gary McCaleb, I want to say.  I'm

12   not positive about that, though.

13        Q.   You -- you anticipated my

14   question.

15        A.   Okay.

16        Q.   To your knowledge, what's the

17   view that the FDA takes on providing

18   healthcare treatment to patients with

19   gender dysphoria?

20        A.   The position of the FDA?

21        Q.   The ADF.

22        A.   Oh, the ADF.  They -- let's see.

23   So, the sense I get is that the ADF takes

1    a -- the opinion that the present state

2    of transgender medicine and surgery is

3    not in the interest of the patients or

4    the families.

5        Q.   The ADF has moral objections to

6    doctors performing this kind of surgery

7    and treatment; right?

8            MR. KNEPPER:  Objection, form,

9    scope.

10       A.   I would -- I would characterize

11   the ADF's position as more than just a

12   moral objection.  It's both moral and

13   objective scientific objections.

14           So the -- the -- the sense I got

15   from that conference was that most of the

16   invited speakers came to speak about --

17   for example, Dr. Hruz was there, and he

18   spoke about endocrinology and the

19   endocrinol- -- endocrinologic basis for

20   sex/gender.  And he spoke about the

21   effects of -- the endocrinological

22   effects, the objective changes that are

23   caused by, for example, puberty-blocking

1   cross-sex hormones.

2           I was -- there was also another

3   speaker there, I think, on the subject

4   of -- from the family medicine

5   perspective, the overall effects on the

6   health of the child, developmental

7   issues.  There was a presenter on the

8   objective psychological issues.

9           And then, I presented on the

10  realities of the surgery.  They wanted me

11  to speak about the technical details of

12  transgender surgery, kind of the

13  evolution of the process of transitioning

14  surgery, and the -- and to give them a

15  summary of the state of the science on

16  it.

17          So I would characterize the ADF

18  as interested in both the moral -- the

19  moral issues and the objective, and they

20  impinge upon one another.  Clearly, to do

21  something that is not in the -- in the

22  objective benefit of the patient is a

23  moral problem.

1              Did I answer your question?

2       Q.   That's helpful, yeah.

3            The ADF is not a professional

4    scientific organization; right?

5       A.   Not to my knowledge, no.

6            MR. KNEPPER:  Objection to form,

7    scope.

8       Q.   They're a legal organization;

9    right?

10      A.   Yes.  That's my understanding.

11      Q.   ADF is engaged with bringing

12   lawsuits that do things like challenge

13   schools' rights to -- to have transgender

14   persons on their teams; right?

15           MR. KNEPPER:  Objection, form,

16   scope.

17      A.   I don't know the scope, the full

18   scope of their efforts, but yeah, they're

19   one of I guess several legal

20   organizations that are -- that are

21   approaching these matters, as are you,

22   for example.

23      Q.   All right.  Let's talk about

1    these meetings in more detail.  So, how
2    many -- strike that.
3           You've been to two meetings
4    organized by ADF?
5        A.   That's my recoll- -- yeah, two
6    meetings.  I think that's right.
7        Q.   All right.  Let's start with the
8    first one.  This was in 2017?
9        A.   That sounds about right, yeah.
10       Q.   What --
11       A.   I think it was 2017, yeah.
12       Q.   What month roughly?
13       A.   I don't remember now.
14       Q.   Do you know how they came to
15   invite you to that first meeting?
16       A.   I do not.
17       Q.   Before that meeting, you had not
18   published anything about gender
19   dysphoria, had you?
20       A.   No.
21       Q.   Before that meeting, you had not
22   published anything about the risks of use
23   of hormone blockers in minors; right?

1          A.    No.   I've given -- I gave some
2     -- some -- I think they may have heard of
3     me not through publications, but through
4     public speaking.
5          Q.    How long have you been doing
6     public speaking on the issues related to
7     gender dysphoria?
8          A.    Since 2014.
9          Q.    Let's start with the first
10    meeting.   So, Dr. Hruz was also present
11    at that meeting?
12         A.    Yes.
13         Q.    Was Dr. Levine present at that
14    meeting?
15         A.    I don't think I've ever met Dr.
16    Levine, so I don't -- he couldn't have
17    been there because I would have
18    remembered meeting him, and I don't
19    remember ever having met him.
20         Q.    How about Dr. McHugh?
21         A.    No.   I would have remembered
22    him.   He's a very famous person.
23         Q.    How many people were present at

1      this first meeting?
2          A.    Perhaps ten.  I'm not certain.
3          Q.    Outside of you and Dr. Hruz, who
4      else do you remember being at that first
5      meeting?
6          A.    I remember meeting a Dr. Andre
7      Van Mol.  I believe he was at that
8      meeting.  There was a pediatric
9      endocrinologist there by the name of
10     Quentin Van Meter.  I think he was there.
11          There was a -- there was an
12     expert in scientific data and scientific
13     data analysis, medical record data
14     analysis from UC-San Francisco.  I don't
15     believe he was a physician.  I think he
16     was a -- had a doctorate in science.  And
17     he was a -- he was actually a
18     detransitioner.  So he was giving not
19     only his knowledge of the medical
20     literature, he was just an incredible
21     resource and reference for medical
22     literature.  You could just about ask him
23     anything.  But he was also there, I

1    think, to speak from a personal
2    perspective as well, being a
3    detransitioner.
4         There was another detransitioner
5    there who I don't remember their name,
6    but they were there to speak.  I think
7    they were also an educator as well.  I'm
8    not positive about that.
9         So it's kind of vague for me,
10   but I -- but definitely Paul Hruz stands
11   out because we had a very good
12   conversation there.
13       Q.   What was the format?  Were there
14   presentations, a round table discussion?
15   How did the conversations go?
16       A.   There was some introductory
17   remarks, and then -- and then each --
18   each sort of specialist gave a
19   presentation.  I think I gave an
20   hour-long presentation.  And there were
21   others like mine on those other subjects
22   we talked about.
23       Q.   Did you use slides as part of

1    that presentation?

2        A.    I usually do, yes, although I

3    don't know what I've done with that slide

4    deck.  I don't keep them very long.  They

5    sort of morph all the time.

6        Q.    Do you think you might have an

7    electronic copy of that slide deck

8    somewhere?

9        A.    I don't.

10        Q.    At a very high level, what was

11    the -- what were you trying to convey

12    through your presentation to that group?

13    Let me ask it a different way.  Were --

14    was your presentation broadly similar to

15    the opinions that you're offering in this

16    case and in the Brandt case?

17            MR. KNEPPER:  Objection, form.

18        A.    Well, by the -- by "broadly

19    similar," do you mean the subject matter

20    or the nature of my opinion or the

21    evidence used to support my opinion?

22        Q.    All right.  Give me a high-level

23    summary of what your presentation was at

1        that first meeting.
2              A.    It was a --
3                    MR. KNEPPER:  Objection, form,
4        scope.
5              A.    -- a summary, a summary of the
6        present state of transgender medicine and
7        surgery, a review of the scientific
8        literature used to support the treatments
9        that are being offered, a review of the
10       long-term outcomes of treatment that are
11       being offered, with particular attention
12       to the European literature, which is more
13       reliable.  I sort of -- I compared the
14       American literature to the European
15       literature because that's one of the
16       great problems we're having in this
17       issue.  And it was already evident in
18       2017 that there was a great disparity
19       between the American literature and the
20       European literature in terms of the
21       quality of the scientific evidence that's
22       being used to support the interventions.
23                    So that was -- really at the

1    heart of the presentation was what's the
2    state of the science and where is the
3    reliable science coming from and what is
4    it -- what is it showing us, so.  But
5    they also -- the audience wanted to have
6    an understanding of what these plastic
7    surgery interventions were.  So there was
8    an extensive discussion of the
9    particulars of the surgeries, the details
10   about the surgeries, the typical outcomes
11   of the surgeries, so.
12        Q.   I want to -- strike that.
13             One of the topics of discussion
14   at that meeting was about the need to
15   have expert witnesses for litigation;
16   right?
17             MR. KNEPPER:  Objection, form,
18   scope.
19        A.   I remember -- I remember a
20   fairly long discussion about the poverty
21   of people who are willing to testify
22   because of the risk that they take in
23   testifying.  That was a -- that was a

1    fairly long discussion.  And the
2    difficulty that that -- that people have
3    in finding expert witnesses because of
4    the risks they place themselves in, in
5    testifying.
6        Q.   And people at that meeting were
7    asked whether they would be willing to
8    participate as expert witnesses; right?
9        A.   Yes.
10       Q.   Before that meeting, you had
11   never testified as an expert witness?
12       A.   Before this moment, I never
13   testified as an expert witness.
14       Q.   Who made the introductory
15   remarks at the beginning of this meeting?
16           MR. KNEPPER:  Objection, form,
17   scope.
18       A.   I'm trying to remember.  It was
19   a -- it was an attorney whose first name
20   is Jeff, and I'm trying to remember what
21   his last name was.  But he seemed to be
22   the -- the -- kind of the emcee, if you
23   will.  Yeah, Jeff.  I'll see if, in the

1    course of our conversation today, the

2    name will pop in.  This is the difficulty

3    I have with remembering names.  They'll

4    just pop in at a moment's notice.

5            But it was -- yeah, it was an

6    attorney who gave the overall scope of

7    why -- why we were there, to discuss this

8    issue, to see what -- what the -- what

9    the science is showing to see where --

10   what the -- the moral aspects of good

11   science versus bad science and issues

12   like that, yeah.

13       Q.   Aside from you and Dr. Hruz, do

14   you recall anyone else expressing an

15   interest at that conference about serving

16   as an expert witness?

17            MR. KNEPPER:  Objection, form,

18   scope.

19       A.   You mean someone expressing just

20   generally about having expert witnesses?

21       Q.   No.  Other participants saying,

22   "I might consider being an expert witness

23   in one of these cases."

1      A.   I don't recall.  I don't, no.

2      Q.   Okay.  All right.  So then there

3   was a second meeting also in Arizona;

4   right?

5      A.   Right.

6      Q.   And that was also in 2017?

7      A.   I don't remember the date of

8   that as well -- either, no.

9      Q.   What was the purpose of that

10  second meeting?

11     A.   I think it was similar, although

12  it may have been a little bit more

13  refined.  There was not as much

14  discussion of the really foundational

15  science as more a review, I think, of --

16  you know, I -- I guess it was similar in

17  terms of format.  I think there were more

18  -- more people there who were speaking

19  from personal experience.

20          So I think the most important

21  thing I recall from that meeting was that

22  -- that there was a mother -- actually, a

23  couple of family members of persons who

1    experienced cross-sex self-identification

2    who have gone through various -- various

3    phases of transitioning.  And they were

4    giving sort of a personal experience,

5    trying to describe to us what they went

6    through as a family, what they went

7    through with their children.  And that's

8    what -- so that was the difference

9    between the first and the second meeting.

10   I think it was more of a personal thing.

11   It had the science as well, but I think

12   it had more of a personal side to it as

13   well.

14       Q.   How many people do you think

15   attended -- attended that second meeting?

16       A.   I'm trying to think how full the

17   room was.  I think it was probably

18   comparable maybe, a dozen perhaps.  I'm

19   not sure.

20       Q.   Who do you remember being there

21   by name?

22       A.   I think that may have been when

23   I met Dr. Cretella.  I can't remember if

1    I met her at the first meeting or the
2    second meeting.
3              Oh, also at that second meeting,
4    there was a plastic surgeon.  I can't
5    remember his last name.  I was -- I
6    remember being very encouraged to meet
7    another plastic surgeon who saw this as
8    an issue.  And I do remember that he had
9    been the chairman -- this speaks to the
10   issue of fear about testifying.  He had
11   been the chairman of a major plastic
12   surgery department in a large Midwest
13   university, had built that program for
14   many years, had run one of the most
15   successful residency training programs.
16   And he had been fired because he had
17   objections to the transgender services
18   that the hospital administration -- or
19   the university administration wanted to
20   introduce.  And I thought it was a very
21   heartbreaking story to see that a man had
22   lost his entire career over his
23   professional opinion.  I don't remember

1    his last name, but I do know that I met

2    him at that second meeting.

3         Q.    Do you remember his first name?

4         A.    I don't.

5         Q.    Do you remember which center he

6    was affiliated with?

7         A.    I believe he was from the Ohio

8    State University.  But I haven't seen or

9    heard from him since.  He has just

10   disappeared.  I tried to reach out to

11   him, I recall, because, again, there's

12   not a lot of plastic surgeons who are

13   willing to speak on this matter.  And --

14   but I haven't heard from him since.

15        Q.    Did participants at the second

16   meeting make presenta- -- make

17   presentations as well?

18             MR. KNEPPER:  Objection, form,

19   scope.

20        A.    I -- I don't -- yeah, I think it

21   was more limited presentations, briefer,

22   sort of reviews sort of thing.  But it

23   wasn't -- it didn't have the formality of

1    the first meeting, as I recall.  Again,
2    it's -- it's a little bit murky four
3    years on.
4         Q.   Yeah.  I'm just asking for your
5    best recollection.  That's fine.
6         A.   Sure.  Okay.
7         Q.   Do you remember giving a
8    presentation at that second meeting?
9         A.   I believe I did.
10        Q.   How long do you think that
11   meeting lasted, roughly?
12             MR. KNEPPER:  Objection, form,
13   scope.
14        A.   Well, I remember it -- we went
15   through a full morning, a light lunch,
16   and perhaps into the very early
17   afternoon.
18        Q.   And you mentioned that there was
19   some personal testimony from parents,
20   families.  What portion of the meeting
21   was that, roughly?
22        A.   What -- what portion?
23             MR. KNEPPER:  Objection, form,

1    scope.

2        Q.    What portion, yes.

3        A.    I would be guessing that perhaps

4    a third of the meeting was -- was that.

5        Q.    Okay.  After these meetings in

6    2017, have you continued to stay in touch

7    with the ADF?

8            MR. KNEPPER:  Objection, form,

9    scope.

10       A.    I think perhaps, you know, one

11   or two e-mail exchanges, but nothing --

12   nothing substantive.  I haven't really

13   heard anything from them.  I think I got

14   a -- no.  Well, I can't -- I can't recall

15   anything other than maybe a thank-you

16   e-mail or hope you're doing well kind of

17   thing, but nothing substantive, no.

18       Q.    How did you come to get involved

19   with being an expert in this case?

20       A.    I was contacted by Mr. Knepper.

21       Q.    Okay.

22       A.    Actually, I was contacted by his

23   staff.  He didn't call me himself, but

```
1       his -- someone on his staff called me and
2       asked --
3           Q.   I understand.
4           A.   -- if I would be available.
5       Yeah.
6           Q.   How did you come to get involved
7       with the Brandt case in Arkansas?
8               MR. KNEPPER:  Objection, form,
9       scope.
10          A.   I think it may have been
11      similar.  I don't recall the particulars,
12      but I -- someone on -- on the legal
13      counsel side contacted me.  I don't
14      remember who it was.
15          Q.   Okay.  Let me shift gears a bit.
16      You know what the American Society of
17      Plastic Surgeons is; right?
18          A.   Of course.
19          Q.   Are you a current member?
20          A.   No.  I -- I let my membership
21      lapse years ago, yeah.
22          Q.   When --
23          A.   About two years ago, I would
```

1    say.  Maybe two years ago, yeah.

2        Q.    Why did you decide to let your

3    membership lapse?

4        A.    Well, in order to be a member of

5    the American Society of Plastic Surgeons,

6    you have to be board-certified.  And so

7    since I declined continuing board

8    certification for the reasons I explained

9    to you, then my membership -- you know,

10   over time, when my subscriptions and

11   membership fees lapsed, so did my

12   membership.  And I think that would have

13   been in 2019.

14       Q.    I understand.

15       A.    Yeah.

16       Q.    Is it -- is an active board

17   certification in plastic surgery a

18   prerequisite to being in the American

19   Society of Plastic Surgeons?

20       A.    I seem to remember that when I

21   -- back in the '90s after my residency,

22   there's a -- there's a membership for --

23   for board-eligible.  It's not the full

1    membership, but then when you get

2    board-certified, then you get full

3    membership and the rights to use the logo

4    and all that sort of stuff, so.  Yeah, as

5    I recall.  It's been a long time since I

6    read the bylaws.  That would have been

7    back in '95, I think, that I read those

8    things.

9        Q.   Yeah.  When did you first join

10   the ASPS?

11       A.   I think I joined as a student

12   member when I was in my residency.  I

13   want to say it was probably like '92 or

14   '93, somewhere in there.

15       Q.   So you were in the ASPS roughly

16   '92 --

17       A.   I think, yeah.

18       Q.   -- to 2017?

19       A.   I think, yeah.  As I recall --

20   again, it's a little bit murky, but as I

21   recall, there's sort of a provisional

22   membership for residents in training.

23   You sort of get a discounted rate on all

1    of the expensive things, and the -- and

2    access to the White Journal, as it's

3    called.  And then -- and then I -- as I

4    recall, you don't get the full membership

5    until you've been board-certified, which

6    happened for me, as you know, in '97.

7        Q.   Okay.  But you were part of the

8    ASPS for a long time; right?

9        A.   Yes.  Going to meetings.

10       Q.   You consider the ASPS to be a

11   reputable organization; right?

12            MR. KNEPPER:  Objection, form.

13       A.   Yeah.  Well, for the most part,

14   yeah.  Certainly, the members, virtually

15   most of the members I've ever known are

16   reputable.  And there are some things

17   that the ASPS has done through the years

18   that -- that I've had difficulty with

19   and -- but they're certainly the

20   organization in American plastic surgery.

21       Q.   Yeah.  I think one statistic I

22   heard is 93 or so percent of all plastic

23   surgeons are part of the ASPS.

1          A.    Yeah.

2          Q.    Right?

3          A.    That -- that number wouldn't

4    surprise -- I would have thought even

5    higher, actually, but yeah.

6          Q.    Do you think the ASPS would

7    encourage its members to perform

8    surgeries that are not medically

9    necessary?

10          MR. KNEPPER:  Objection, form.

11          A.    Well, the -- as a -- as an

12    organization, they don't encourage

13    particular surgeries, but they may

14    support them with their scientific

15    presentations, their conferences, and

16    that sort of thing.

17          For example, three or four years

18    ago, I went to a meeting of the

19    California Society of Plastic Surgery,

20    which is -- I think it has sort of a

21    subsidiary relationship with the ASPS.

22    And at that conference, among other

23    things -- I went there because that's one

1    of the -- the areas of the country where

2    I trained and I had hoped to see some

3    friends there.  But -- but for example,

4    in that conference I went to a lot of

5    great presentations, but the last day was

6    devoted almost entirely to transgender

7    surgery.

8           And so if you're asking me do I

9    -- how do I feel about that, well, I have

10   great difficulty with a professional

11   organization that would support or

12   promote those sorts of interventions

13   knowing what I know about the scientific

14   underpinnings of those medical and

15   surgical procedures.  And I had many

16   conversations at that conference on the

17   subject with persons who were providing

18   the services, and I didn't find their

19   answers particularly satisfactory.  So

20   that would be an example.

21          I can't give you carte blanche

22   that everything that the Society says and

23   does is to my liking.  I would say

1    probably most of what they say and do is

2    very much to my liking.  But on this

3    matter, I have -- I have a great

4    difficulty.  And it's one of the reasons

5    that I -- I -- yeah.

6        Q.   It's one of -- one of the

7    reasons that you what?

8        A.   That I -- that I don't have a

9    lot of heartache about stepping away from

10   the ASPS.

11       Q.   Do you think the AS- -- ASPS

12   advocates in favor of surgical procedures

13   that are not medically necessary?

14       A.   I think that would be probably

15   an overreaching statement.  I wouldn't

16   say that.  I would say that perhaps

17   they're mute on some of the -- some of

18   the procedures that their members

19   perform, and they certainly have their

20   eyes and ears open for new things.  And

21   so when members come forward to make

22   presentations about particular new

23   therapies and new approaches, as they

1     should, the ASPS is open to those things.

2     So for many years, transgender surgery

3     has been in that category.

4              I remember when I was a -- even

5     when I was a general surgeon and I was

6     looking for residency programs to train

7     in, I was considering UVA.  And I saw

8     that -- that Milton Edgerton, one of the

9     great names in plastic surgery was at UVA

10    doing transgender surgery, both at UVA

11    and at Johns Hopkins.  And I remember

12    thinking, well, I'm -- I really need --

13    it struck me as an unusual operation, and

14    I -- I started doing some research into

15    it.

16             And I remember starting to think

17    about the issue of transgender surgery

18    back in the -- what would have been 1991,

19    1990, 1991.  And -- and through the

20    years, the ASPS has made room for that

21    intervention, those therapies, in their

22    conferences, in their dialogues, in their

23    publications.  And I've reviewed all that

1    stuff as it has come along.  And I think
2    now being twenty, nearly thirty years on
3    since I first started looking at it and
4    they're still just sort of at that stage
5    of -- of putting it out there, although
6    now they're offering more extensive
7    training conferences on how to do those
8    procedures, and they're now encouraging
9    that it be included in residency
10   programs, and so -- yeah.
11       Q.   Do you know what position the
12   ASPS takes on whether gender-affirming
13   surgery is medically necessary?
14       A.   I think that position has
15   changed, and now they're -- they're
16   speaking positively about it.
17       Q.   Yeah.  Your own professional
18   organization, or at least your former
19   organization, takes the position that
20   gender-affirming surgery is medically
21   necessary; right?
22            MR. KNEPPER:  Objection, form.
23       A.   Yeah.  As I -- as I said before,

1    this is one of the reasons why I don't
2    have a lot of heartache about having
3    withdrawn my membership.  Yeah.
4        Q.   Now let me introduce another
5    exhibit.  Let me know when you have it,
6    Doctor.
7    (Exhibit 7 was marked for identification
8    and is attached.)
9        A.   Okay.  Okay.  I've got it.
10       Q.   The top of the page says,
11   "American Society of Plastic Surgeons."
12   Right?
13       A.   Yes.
14       Q.   You see this document is dated
15   February 25, 2021; right?
16       A.   Yes.
17       Q.   This is after all the studies
18   that you cite in your report; right?
19       A.   Where does that say that?  I'm
20   sorry, you're at a particular paragraph?
21       Q.   No.  The date of this --
22       A.   Oh, I see.  Oh, the date is
23   after this --

1      Q.    Yeah.

2      A.    Yes.  Well, February 25th, yes,

3   2021.

4      Q.    Yeah.  This is -- this is dated

5   after all of the studies that you cite in

6   your report; correct?

7      A.    I don't -- yeah, I don't

8   remember off the top of my head any

9   studies that were dated after.  There may

10  have been an April study in there, but

11  okay.

12     Q.    The first sentence says, "Policy

13  around transgender care has recently

14  gained considerable attention amid a

15  growing trend of legislation carrying

16  serious professional, financial or

17  criminal penalties for the provision of

18  gender affirmation care."  You see that?

19     A.    I do.

20     Q.    Now, this reference to a growing

21  trend of legislation, that's talking

22  about legislation like the Arkansas ban

23  and the Utah ban and the Alabama ban that

1      we talked about earlier; right?

2          A.    Right.

3                MR. KNEPPER:  Objection, form.

4          Q.    Go to page 2.  Look at the

5      second paragraph.  It says that "Less

6      than three months into 2021, 11 pieces of

7      legislation attempting to criminalize

8      gender affirmation therapies have been

9      introduced in 10 states."  See that?

10         A.    I do.

11         Q.    And then there's a list of

12     states; right?

13         A.    Yes.

14         Q.    So we talked about Utah and

15     Alabama and Texas before.  Looking at

16     this list, does that refresh your

17     recollection whether you've worked on

18     these kind of legislative efforts in any

19     other states?

20         A.    I think -- I think, yeah, my

21     answer has not changed.  I think I've

22     only been involved in Alabama, Texas, and

23     Utah.  I don't remember anything from

1    Oklahoma, New Hampshire, Montana, or

2    Missouri or Mississippi.  I don't recall

3    any other states in that list, no.

4        Q.   Okay.  All right.  Now let's

5    look at what position the ASPS takes on

6    whether gender-affirming treatment is

7    medically necessary.  Go to page 3.  The

8    first sentence says, "ASPS firmly

9    believes that plastic surgery services

10    can help gender dysphoria patients align

11    their bodies with whom they know

12    themselves to be and improve their

13    overall mental health and well-being."

14    Do you see that?

15        A.   I do.

16        Q.   The ASPS, your own professional

17    organization, does not agree with your

18    opinions that gender-affirming surgery is

19    medically inappropriate; right?

20            MR. KNEPPER:  Objection, form.

21        A.   Let me just read that.  Give me

22    just a moment to look at that.  Okay.

23           Yeah.  This is a very --

1    language used by the other professional
2    organizations, and essentially, the
3    language takes the position that surgical
4    intervention for a subjective problem is
5    medically indicated.  And that's the
6    difficulty that I'm having here, is that
7    in this document the ASPS does not --
8    does not provide medical scientific
9    support.  They essentially admit that the
10   surgery is for help with a psychological
11   problem of perception on the part of the
12   patient.  So essentially what -- what the
13   ASPS firmly believes in is the use of
14   surgery to manage a psychological
15   problem.  And -- and this is -- this is
16   consonant with the -- with the -- the
17   consensus opinions that were offered by
18   the other professional organizations that
19   you listed earlier.
20        Q.   The AS- -- ASPS does not agree
21   with your opinions that gender-affirming
22   surgery is experimental; correct?
23             MR. KNEPPER:  Objection, form.

1          A.    They don't -- let's see, do they
2     say anything about experimental in here?
3     No, they don't.  So yeah, I would agree.
4          Q.    Do you agree?  Yeah.
5          A.    I would agree, yeah, sure.
6          Q.    Look at the last sentence.  It
7     says, "ASPS will continue its efforts to
8     advocate across state legislatures for
9     full access to medically necessary
10    transition care."  Do you see that?
11         A.    Yeah.  I don't find that
12    statement at all surprising.  No.
13         Q.    Yeah.
14         A.    I do see that, yeah.  Not
15    surprising.  This is legislative --
16         Q.    The ASPS --
17         A.    -- legislative advocacy by the
18    ASPS.
19         Q.    The ASPS considers transition
20    care to be medically necessary; right?
21              MR. KNEPPER:  Objection, form.
22         A.    Again, that returns -- returns
23    to that -- that inherent and

1      contradictory statement of medical

2      necessity for a subjective condition.

3      And the statement is consistent with what

4      -- yeah.  Exactly, yeah.

5          Q.   It's fair to say that the

6      opinions that you and Dr. Hruz and Dr.

7      Levine are offering in this case are very

8      different than the position that the ASPS

9      has adopted on whether gender-affirming

10     surgery is medically necessary; right?

11             MR. KNEPPER:  Objection, form.

12         A.   Absolutely correct.

13         Q.   In fact, let me show you how

14     strongly the ASPS feels about this issue.

15     Let me introduce another exhibit.  Okay.

16     Let me know when you -- when you receive

17     it.

18             MR. KNEPPER:  Dmitriy, I -- I

19     will tell you, it seems to be moving more

20     slowly than normal.  I don't know if

21     you're seeing the same thing on your end.

22             MR. TISHYEVICH:  I am.

23         A.   So yeah, I have this document.

1      Again from the ASPS?  Is that the one?
2      February 25th?
3           Q.   No.  It should be -- it's a
4      one-page document.  I think it just says
5      ASPS in your folder.
6           A.   Exhibit 7?
7                MR. TISHYEVICH:  Let me -- let's
8      go off the record for a minute.
9                MR. KNEPPER:  Sure.
10               THE VIDEOGRAPHER:  We are off
11     the record at 10:19 a.m.
12                    (Break taken.)
13               THE VIDEOGRAPHER:  We are back
14     on the record at 10:21 a.m.
15          Q.   (By Mr. Tishyevich) All right.
16     Doctor, before the break, we were talking
17     about the ASPS and the position they take
18     on the medical necessity of
19     gender-affirming surgery.  You recall
20     that?
21          A.   Yes.
22          Q.   All right.  This is a document
23     from the ASPS titled "2021 State Policy

1  Priorities."  Do you see that?

2  (Exhibit 8 was marked for identification

3  and is attached.)

4      A.   Yes.

5      Q.   Last sentence of the first

6  paragraph says, "To ensure that our

7  health care system is effective and

8  efficient, ASPS will focus its state

9  advocacy efforts on," and then there's a

10  list.  Do you see that?

11      A.   Yes.

12      Q.   And there's three sections:

13  "Core Priorities," "High Priorities," and

14  "Other Priorities."  You see that?

15      A.   Yes.

16      Q.   Go to the "High Priorities"

17  section.

18      A.   Okay.

19      Q.   The last bullet says, "Opposing

20  attempts to criminalize gender

21  confirmation."  Do you see that?

22      A.   I do.

23      Q.   And you understand what this

1      bullet means; right?

2          A.    I do.

3                MR. KNEPPER:   Objection to form.

4          Q.    One of the ASPS's high

5      priorities for this year is to oppose

6      legislation like the Arkansas ban and the

7      Utah ban and the Alabama ban that you are

8      supporting; right?

9          A.    Apparently so, yes.

10               MR. KNEPPER:   Objection, form,

11     scope.

12         Q.    The sense that I got from

13     reading your report, Doctor, is that it's

14     supposedly generally accepted that

15     gender-affirming surgical treatment is

16     experimental and should not be performed

17     on anyone; right?  That's what you think?

18               MR. KNEPPER:   Objection, scope,

19     form.

20         A.    Right.  My opinion -- my opinion

21     in that matter is based on the -- on the

22     world literature rather than advocacy

23     statements by a professional

1    organization.  That's right.

2        Q.    You are suggesting, in fact,

3    that doctors who do these surgeries

4    should be investigated for unethical

5    behavior and potential misconduct; right?

6             MR. KNEPPER:  Objection, form.

7        A.    I -- yes, I do.

8        Q.    And you do not think it's

9    relevant to mention that your own

10   professional society takes a view that is

11   contrary to the opinions that you're

12   offering in this case; right?

13       A.    I'm not sure I understood your

14   question, sir.

15       Q.    Yeah.  When you talk about how

16   these doctors should be investigated for

17   misconduct, you don't think it's relevant

18   that your own professional society takes

19   a completely contrary view?

20            MR. KNEPPER:  Objection, form.

21       A.    Well, I think I would -- I would

22   characterize my concern and -- and

23   possibly recommendation of investigation,

1     I was discussing, I think, consent

2     procedures and getting informed consent.

3     I don't think -- yeah, so -- so I think

4     the object- -- the concerns I raised had

5     to do with the off-label use of drugs in

6     irreversible treatments, the -- the

7     problem of obtaining consent from

8     emotionally compromised people who are

9     threatening suicide.  Those were the

10    issues that I raised in terms of, you

11    know, investigation kind of things, or

12    examination would be a better term,

13    examination of -- of how a

14    physician/surgeon conducts their

15    practice, so.

16        Q.   Go -- go back to your report.

17        A.   Okay.

18        Q.   Go to page 15.  You with me?

19        A.   Yes, sir.

20        Q.   Look at the second sentence in

21    the bottom paragraph.  You say, "Basing

22    life changing surgeries that damage and

23    destroy the natural functions of

1    perfectly healthy organs on nothing more

2    than the unverified self-reports

3    (conversations) of often disturbed

4    patients as part of untested, unproven,

5    experimental 'treatments' that are

6    'supported' by a methodo-" --

7    "methodologically defective research base

8    when competent reviews have called such

9    research 'low quality' evidence and noted

10   the 'lack of any randomized clinical

11   trials' -- should be properly

12   investigated as unethical, misconduct and

13   an abuse of a vulnerable patient

14   population."

15          Right?  That's your opinion?

16      A.    Yes, sir.  And I stand by that.

17      Q.    You know that today there's

18   thousands of plastic surgeons that are

19   performing these surgeries; right?

20          MR. KNEPPER:  Objection, form,

21   scope.

22      A.    I don't know the number of

23   plastic surgeons who do these surgeries.

1      Q.   Hundreds?

2      A.   I'm -- I'm sure the number is

3    large.  I don't know what the number is.

4    Yes.

5      Q.   And you think all of those

6    doctors are out there committing

7    misconduct?  Is that really what you

8    think?

9      A.   Well, I think that -- that their

10   knowledge might affect their

11   decision-making.  So if somebody is going

12   through a residency training program that

13   -- that is teaching these things and they

14   grow up in that world -- let me give you

15   an example.

16            When I was a surgeon in training

17   in general surgery, the -- the most

18   coveted surgical experience would be, as

19   a chief resident, to do ulcer surgery.

20   At the time, we thought that ulcers were

21   caused by neurologic problems affecting

22   the stomach.  And so some of the most

23   complex abdominal surgeries were ulcer

1   surgeries, and some of the greatest names

2   in general surgery were given to those

3   operations.  Subsequent to my residency

4   training, perhaps five years later, it

5   was found to be a medical condition

6   treatable with antibiotics and antacids.

7   Nobody does ulcer surgery any longer.

8         I would put -- I would put

9   transgender surgery in the same category.

10  Well-meaning persons who are interested

11  in the care of people who are suffering,

12  in this case, transgender persons who are

13  suffering, well-meaning physicians and

14  surgeons are offering them the best care

15  that they've learned in their training.

16  But I -- I would expect that when the

17  science shows that to be not the case,

18  that those same doctors will abandon it.

19  And I think we're at the same stage now.

20  We're at an inflection point in plastic

21  surgery where in the last three years

22  things have changed radically.

23         If you had asked that question

1    five, seven years ago, it would have been

2    up for grabs.  But things have changed

3    radically with the flood of credible

4    scientific evidence pouring in from

5    Europe to now -- if -- if five years from

6    now, having seen that information,

7    surgeons persist in doing transgender

8    surgery, then I would -- then I would

9    have real issues with that, as I would

10    with a -- with a general surgeon offering

11    a Billroth II ulcer operation today when

12    you could give the patient erythromycin

13    and some -- and some Zantac.  You see

14    where I'm going.

15           So we're at a -- we're at a

16    tipping point in the world of plastic

17    surgery right now, and the last three

18    years have changed everything, because

19    the very, very well-supported -- see, the

20    problem is quality of evidence.  Plastic

21    surgeons in America are operating with

22    scientific evidence that even the

23    American Society of Plastic Surgery

1    characterizes as level 5 evidence,
2    basically, the -- the professional
3    opinions based on personal experience.
4    This is entry-level science for a
5    particular therapy or a particular
6    intervention.

7            To raise to level 4, you would
8    have to have the same collected cases
9    with -- with before and after tests of
10   the patient.  We haven't gotten to that
11   level yet.  There are no long-term
12   longitudinal studies in the American
13   literature.  It's all in the European
14   literature, and the bulk of it in the
15   last three years.

16           So the question is a difficult
17   one to answer.  As simply as saying that
18   all of these people are immoral, I'm not
19   saying that at all.  I'm saying that
20   they're doing the best that they know how
21   according to the training that they've
22   received for people that they very much
23   care for and are hoping to do good by.

1    But the -- but the world is changing
2    rapidly now, and we've reached a stage
3    now where it's such a controversy that
4    this is -- this is -- this is why I've
5    become so publicly vocal about it,
6    because the controversy is now raging.
7    It's no longer:  "Maybe so.  Milton
8    Edgerton, interesting guy.  You know, the
9    surgery at UVA, the surgery at Johns
10   Hopkins, let's get a look at that kind of
11   thing."  We've gone beyond that now, and
12   just in the last three years.
13             So I -- the people who do these
14   surgeries are not right out of residency
15   training.  These are people who have --
16   you know, who have been in the -- in the
17   business for a number of years now, and
18   they're relying on what they learned and
19   doing the best that they can.  But as I
20   say, the science is changing everything,
21   so.
22             MR. TISHYEVICH:  With respect,
23   I'm going to strike that answer as not

1    responsive.

2        Q.    Here's the -- here's --

3              MR. KNEPPER:  No.

4        Q.    -- the question that I'd like

5    you to answer.

6              MR. KNEPPER:  Go ahead.

7        Q.    Here's the question that I'd

8    like you to answer.  Is it your expert

9    opinion that the surgeons that are today

10   performing gender-affirming surgical

11   procedures are committing or potentially

12   committing misconduct, yes or no?

13             MR. KNEPPER:  Objection, form,

14   scope, asked and answered.  Dmitriy, you

15   asked him.  He gave you a --

16             MR. TISHYEVICH:  I don't need

17   the speaking objections.  I do not need

18   the speaking objections.

19       Q.    Answer my question, Doctor.

20             MR. KNEPPER:  He gave you a

21   thoughtful answer.

22       A.    Okay.  If you could ask me the

23   question again, I want to be sure that

1    I -- I answer it as succinctly as I can.

2         Q.   Is it your expert opinion that

3    the surgeons that are performing

4    gender-affirming surgical procedures

5    today are potentially committing

6    professional misconduct, yes or no?

7              MR. KNEPPER:  Objection, form.

8         A.   I would -- I would say, only to

9    the extent that they're familiar with the

10   more recent literature would make them

11   sort of culpable, if you will.  Not --

12   not being aware of that literature, I

13   would not accuse them of such a thing.

14        Q.   All right.  Let me introduce

15   another exhibit.  Let me know when you

16   get this one, Doctor, Exhibit 9.

17   (Exhibit 9 was marked for identification

18   and is attached.)

19        A.   All right.  The first page of

20   my -- well, that's the CV, I guess.  My

21   CV, yes.

22        Q.   This is a copy of your CV;

23   right?

1          A.   Yeah.  Yes.

2          Q.   You prepared this?

3          A.   Well, it was prepared for me by

4     -- I gave -- I gave the factual input for

5     it, but I didn't prepare it myself, let's

6     say.

7          Q.   Top of the page says, "Board

8     Certified in Surgery and Plastic Surgery"

9     again; right?

10         A.   Right.  Same mistake, yeah.

11         Q.   We agree that's not consistent

12    with guidance from the American Board of

13    Surgery, American Plastic Board of

14    Surgery; correct?

15              MR. KNEPPER:  Objection, form.

16         A.   Yes.

17         Q.   Go to page 3, the bottom of the

18    page.  It says, "Publications - Peer

19    Reviewed Medical Journals."  You see

20    that?

21         A.   I do.

22         Q.   And then through page 4, it

23    lists six publications; right?

1          A.    Right.

2          Q.    In your professional career,

3     you've published six articles in

4     peer-reviewed medical journals; right?

5          A.    Right.

6          Q.    First one was in 1997; right?

7          A.    '87.  Yes.

8          Q.    Most recent one was in 1998;

9     correct?

10         A.    Correct.

11         Q.    That's 23 years ago; right?

12         A.    Right.

13         Q.    You have not published any

14    original research in peer-reviewed

15    literature within the last 23 years;

16    correct?

17         A.    Correct.

18         Q.    All right.  Let's go through

19    these in reverse order.  All right.  Most

20    recent one from '98 is titled "Treatment

21    of an isolated outer table frontal sinus

22    fracture using endoscopic reduction and

23    fixation."  Right?

1         A.    Yes.

2         Q.    That publication doesn't relate

3    to gender-affirming surgery or to gender

4    dysphoria; correct?

5         A.    Tangentially, it would relate to

6    it.  And I would say this about it.  It

7    was one of the first, if not the first,

8    paper demonstrating the use of endoscopic

9    technique to operate on facial bones of

10   the forehead and the use of internal

11   fixation devices for modification or

12   repair of the forehead.  Those are the

13   same techniques that are now used by

14   transgender surgeons who are offering top

15   surgery.  For example, for feminization

16   of a masculine brow ridge, they use

17   endoscopic technique, which is described

18   in this paper that came out 23 years ago

19   and was written by myself and another

20   Navy surgeon.

21        Q.    Understood.

22        A.    Yeah.

23        Q.    The -- the patient in this

1    publication was not treated for face --

2    for gender dysphoria obviously; right?

3        A.   No.  She was a sweet pizza maker

4    who had slipped in the kitchen and struck

5    her head on a stainless steel table and

6    had a -- had a displaced fracture of her

7    forehead.  But no, she was -- not to my

8    knowledge.  I don't know if she was or

9    not, but to my knowledge, she was not.

10       Q.   Next one going backwards is from

11   1996, and it's titled, "Scarless Fetal

12   Skin Repair: 'Unborn Patients' and 'Fetal

13   Material.'"  Do you see that?

14       A.   I do.

15       Q.   All right.  That doesn't relate

16   to gender-affirming surgery or to gender

17   dysphoria, I take it?

18       A.   It -- it actually refers to all

19   forms of surgery and particularly,

20   ethical decision-making.  So I would say

21   that it's -- it's a -- it's a fairly

22   broad paper that talks about how we treat

23   other human persons.  So transgender

1    surgery is all about how we treat other
2    human persons.  That's what that paper is
3    about and how -- how some surgeons are
4    likely -- or possibly physicians and
5    surgeons could characterize someone as
6    less than human, which is a -- which is a
7    danger that transgender persons
8    experience when they're seeking care.
9    And so I would say that in a very
10   tangential way, it does.  It does impinge
11   upon the field of transgender medicine
12   precisely for the reason that transgender
13   persons suffer oftentimes from being
14   treated as -- as someone who is less than
15   human.
16        Q.   Aside from that very tangential
17   angle, this paper does not specifically
18   relate to gender-affirming surgery or
19   gender dysphoria; correct?
20        A.   No, it does not.
21        Q.   And the next one before that is
22   in 1995.  Do you see that?
23        A.   I do.

1      Q.   You're listed as the third

2    author in this one; right?

3      A.   Yes, sir.

4      Q.   Because you're not the lead

5    author; right?

6      A.   No.  The attending surgeon is

7    always the lead author, and I was a

8    resident.  I was a resident at that time,

9    yeah.

10      Q.   Understood.  This one's titled

11    "Delayed development of an ectopic

12    frontal sinus mucocele after pediatric

13    cranial trauma."

14      A.   Mucocele, yes.  Mucocele.

15      Q.   Thank you.  This publication

16    doesn't relate to gender-affirming

17    surgery or gender dysphoria; correct?

18      A.   Not directly, no.

19      Q.   Okay.  Next one before that is

20    titled "Patch Esophagoplasty"?

21      A.   Very good.

22      Q.   And that's repair or

23    reconstruction of the esophagus; right?

1       A.   Yes.

2       Q.   Does this relate to

3  gender-affirming surgery or gender

4  dysphoria?

5       A.   No.

6       Q.   Next one before that is titled

7  "Modified Skin Incisions for Mastectomy:

8  The Need for Plastic Surgical Input in

9  Preoperative Planning."  Do you see that?

10      A.   I do.

11      Q.   And finally, your oldest

12  publication is from 1987, titled

13  "Peritoneal Fluid in Human Acute

14  Pancreatitis."  Do you see that?

15      A.   Yes.

16      Q.   Does that relate to

17  gender-affirming surgery or gender

18  dysphoria?

19      A.   It does not.  By the way,

20  that -- that second to the last article,

21  your pattern of questions, I wondered if

22  you overlooked asking the same question

23  on that paper.

1          Q.    No.   I want to ask you more

2     specific questions about that one, so

3     we'll spend --

4          A.    Oh, okay.

5          Q.    -- more time on that one.

6          A.    Good.  Good.  Very good.  All

7     right.

8          Q.    Don't worry.

9          A.    Yeah.  "Peritoneal Fluid in

10    Acute Pancreatitis" was a research paper,

11    animal model, and review of the

12    literature.  Yeah.

13         Q.    Okay.  You agree there's a

14    difference between a scientific article

15    that reports original research versus a

16    letter to the editor that's published in

17    a scientific journal?

18              MR. KNEPPER:  Objection, form.

19         A.    Yes.

20         Q.    Some of your publications listed

21    here are just letters to editors; right?

22         A.    Yes.

23         Q.    Why is it that your CV doesn't

1    identify those as letters as opposed to

2    original research?

3        A.    I didn't -- that didn't occur to

4    me to do that.  Do we generally list them

5    separately?  I don't know.  I just put

6    all my publications there.

7        Q.    So we can look at them, but for

8    example, the scarless fetal skin repair,

9    that's a letter to the editor; right?

10       A.    Right.

11       Q.    And so is the 1993 publication

12   on patch esophagoplasty; right?

13       A.    Right.

14       Q.    So out of the six publications

15   that you list in your CV, at least two of

16   them are letters to editors rather than

17   original research; fair?

18            MR. KNEPPER:  Objection, form.

19       A.    Right.  Yes.

20       Q.    Okay.  Let's talk about your

21   experience treating transgender patients.

22   You retired from the military in 2002;

23   correct?

1        A.   Correct.

2        Q.   In 2002, the U.S. military

3   certainly was not providing any

4   gender-affirming treatment to anyone in

5   the military; right?

6        A.   That's correct.

7        Q.   Or to veterans; right?

8        A.   Correct.

9        Q.   In fact, at that time, there was

10  a policy not to provide gender-affirming

11  treatment to active military or to

12  veterans; correct?

13            MR. KNEPPER:  Objection, form,

14  scope.

15       A.   Correct.

16       Q.   So during your career in the

17  military, you did not provide any

18  gender-affirming treatment to any

19  patients; correct?

20       A.   Correct.

21       Q.   All right.  Let's focus on your

22  practice after you left the military in

23  2002.  You currently run the Lappert Skin

1    Care clinic; right?

2        A.    That's correct.

3        Q.    How long have you operated that

4    clinic?

5        A.    One year.

6        Q.    Did you operate any clinics

7    before opening this one?

8        A.    Yes.

9        Q.    What was that one?

10       A.    That was my plastic surgery

11   office called Lappert Plastic Surgery in

12   Madison, Alabama.  And before that, it

13   was under the same name but located in

14   Decatur, Alabama.  And before that, it

15   was in Scottsbluff, Nebraska, same name.

16       Q.    How long did you run the Lappert

17   Plastic Surgery clinic?

18       A.    The Madison office was for 15

19   years.  I'm sorry.  The Madison office

20   was for ten years.  My -- my mistake.

21   Ten years at the Madison office, five

22   years at the Decatur office, and three

23   years at the Scottsbluff office.

1     Q.   So, let me just make sure I have

2     my timing here.  So you've had the

3     Lappert Skin Care clinic for a year,

4     since 2020?

5     A.   Right.

6     Q.   And then the Lappert Plastic

7     Surgery ten years in Madison, so roughly

8     2010 to 2020?

9     A.   That's right.

10    Q.   And then five years before that

11    in Decatur, 2005 --

12    A.   Right.

13    Q.   -- to 2010, roughly?

14    A.   Right.

15    Q.   And then --

16    A.   Scottsbluff was from 2002

17    through two -- through 2005.  That was

18    where I went when I retired out of the

19    Navy.

20    Q.   Your -- your skin clinic

21    currently does treatments like Botox,

22    light therapy, laser hair removal; right?

23    A.   Right.  Laser tattoo removal,

1    injectables, just skin consultations for
2    skin problems like rosacea, acne, that
3    sort of thing.  That's right.
4        Q.   Were you performing similar
5    treatments at the Lappert Plastic Surgery
6    clinic?
7        A.   Yes.  All I've done is I've just
8    suspend -- I just retired from active
9    surgical practice.  I had an operatory in
10   my office in Madison as well as in
11   Decatur previously, so I would do both
12   hospital-based surgeries as well as
13   clinic-based, office-based procedures.
14       Q.   So for example, light therapy
15   services, you've offered that for
16   ten-plus years, I take it?
17       A.   I believe we got that instrument
18   in 2006.
19       Q.   How about Botox?  Have you been
20   offering that for more than ten years?
21       A.   Yes.
22       Q.   Have you done forehead
23   injections for more than ten years?

1          A.    With Botox?

2          Q.    Yes.

3          A.    Yes.

4          Q.    How about crow's feet?  Is that

5     the right term?

6          A.    Yes.

7          Q.    More than -- more than ten

8     years?

9          A.    Yes.

10         Q.    When was the last time you've

11    performed a surgical procedure?

12         A.    Well, as I said, I retired from

13    surgery in August of 2020, so it was -- I

14    think I was doing some last procedures in

15    that same month, perhaps July, somewhere

16    in there.

17         Q.    And in 2020, roughly how many

18    surgical procedures do you think you've

19    performed?

20         A.    From January to July?

21         Q.    Yes.

22         A.    Let's see.  Seven months.

23    Perhaps -- I don't know.  Maybe eighty,

1    something 80 to 100, I'm guessing.  I
2    don't know.
3        Q.   And give me examples of common
4    surgeries you would have performed in
5    2020.
6        A.   Well, among the most common ones
7    that we did in the -- in the office were
8    autologous fat grafting for recon- -- for
9    rejuvenation of the face, autologous fat
10   grafting for breast augmentation,
11   ultrasound -- I'm sorry -- laser
12   lipoplasty for body contouring, and then
13   many in-office surgical procedures for
14   skin cancer and skin cancer
15   reconstruction, particularly of the face
16   and the extremities.
17           And then on the hospital side, I
18   would be guessing how many, but it was
19   common for me to do breast reductions and
20   abdominoplasties, little local flap
21   reconstructions in the hospital for
22   younger patients who needed anesthesia,
23   reconstruction -- little reconstructive

1    flaps for trauma or for cancer.

2           I had a working relationship

3    with a dermatologist who did a lot of

4    what's called Mohs surgery for removal of

5    cancers.  He would send me his patients

6    if they -- if they were cancers that

7    involved the face.  I would do those

8    reconstructive surgeries.

9           Yeah, that was probably -- I was

10   definitely throttling back in my last

11   year.  I didn't take on a lot of complex

12   cases, so.

13      Q.   Okay.

14      A.   Because I needed -- you need

15   follow-up, and so limited.

16      Q.   I understand.  Let's go back to

17   your report.  Go to page 4.

18      A.   Okay.

19      Q.   Okay.  Five lines down, you see

20   the sentence starting with, "In my

21   private practice"?

22      A.   Yes.

23      Q.   Okay.  Let's break this down.

1    So you reference treated skin

2    pathologies.  What skin pathologies are

3    you referring to here?

4         A.   Skin can- -- well, surgically or

5    medically, we're talking two different

6    categories, but.  So I'm consulted on --

7    on a lot of nonsurgical skin pathologies.

8    But as far as surgical skin pathologies,

9    that would include various forms of

10   malignancy and then benign growths and

11   things that are either aesthetically or

12   -- aesthetically problematic or

13   suspicious in appearance, so both proven

14   cancers and things that are suspicious of

15   cancers.  So those would be the skin

16   conditions.  The medical --

17        Q.   Yeah.  Well --

18        A.   -- skin conditions -- I'm sorry?

19        Q.   Yeah.  That's all right.  I'm

20   asking more specifically.

21        A.   Okay.

22        Q.   Because here, you write, "I've

23   had occasion to treat many

1    self-identified transgender patients for
2    skin pathologies related to their use of
3    high dose sex steroids."
4        A.    Yeah.
5        Q.    So focusing specifically on that
6    patient population.
7        A.    Okay.
8        Q.    So, what skin pathologies are
9    you referring to here with respect to
10   transgender patients?
11       A.    Well, I've had a few patients
12   who've come in evidencing, you know,
13   acneiform conditions of the facial skin.
14   And so helping people manage acne is a
15   common thing that I do, and a variety of
16   interventions including, you know, the
17   light therapy, but more -- more properly,
18   the use of medications and -- and
19   sometimes laser therapy to manage
20   scarring.  But in those particular cases
21   of the trans-identified people, it's
22   mostly just ordinary management of acne.
23   And it's usually the same patients who

1    come to see me about facial hair removal
2    with laser.  I have a couple of patients
3    in that category, people who are
4    transitioning and who are seeking laser
5    removal of hair from their faces.
6        Q.   And you said this is a few
7    patients.  How many transgender patients
8    would you estimate you've treated for
9    skin pathologies related to steroids?
10       A.   Related to -- to sex steroids?
11       Q.   Yes.
12       A.   Oh, I don't know.  Probably less
13   than half a dozen.
14       Q.   Okay.  The acne you're referring
15   to, it's essentially a side effect from
16   the steroids; right?
17       A.   It's a common side effect of --
18   of -- yeah.  Particularly androgen is the
19   most common.
20       Q.   So this -- and so you're
21   treating patients with gender dysphoria
22   after they have already decided to follow
23   a certain course of treatment and started

1      taking sex steroids; right?

2          A.    Right.  Yeah.

3          Q.    Okay.  And then you say you've

4      done laser therapies for management of

5      facial hair of also the transgender

6      population?

7          A.    That's right.

8          Q.    Right?

9          A.    That's right.

10         Q.    And is that also in about half a

11     dozen patients?  Or what's you're

12     estimate?

13         A.    Yeah.  It's not a huge number.

14         Q.    Okay.  And finally, you say

15     you've done breast reversal surgeries for

16     detransitioning patients.  On how many

17     patients have you performed -- strike

18     that.

19              On how many detransitioning

20     patients have you performed the surgery?

21         A.    Two.

22         Q.    Two.  All right.  It's not a

23     commonly performed procedure for you;

1    fair?

2              MR. KNEPPER:  Objection, form.

3        A.    Yeah, no.  They -- they started

4    coming to me in that last year of

5    practice, so.  Yeah, that -- it's not

6    a -- yeah, it's not a -- it was never a

7    common procedure for me.  I did a lot of,

8    you know, implant removals and stuff

9    through my years.  It's the same

10   operation.  And I've done a lot of

11   gynecomastectomy surgeries.  That's also

12   the same operation.  But in terms of as

13   it's applied to a trans- -- a

14   transitioned person who wants to revert

15   back to male presentation, very limited

16   experience.  But even though it's the

17   same operation, I have only done it for

18   two people.

19       Q.    And you said both of those

20   patients were in 2020?

21       A.    I believe so, yeah.  One of them

22   may have been in 2019.  I'm not positive

23   about that.

1      Q.    Before 2019 or 2020, you had
2   never had a detransitioning patient come
3   to you to obtain breast reversal surgery;
4   fair?
5      A.    I think that's correct, yeah.
6   I'm just trying to think if there was
7   any, but I can't -- I can't recall any
8   other.
9      Q.    Okay.  Are you aware that modern
10  gender affirmation programs typically
11  have a multidisciplinary team of
12  healthcare providers?
13     A.    Yes.
14            MR. KNEPPER:  Objection, form.
15     Q.    And they usually involve mental
16  health specialists; right?
17     A.    Yes.
18            MR. KNEPPER:  Objection, form.
19     Q.    Endocrinologists?
20     A.    Yes, that's my understanding.
21     Q.    And oftentimes plastic surgeons
22  if the patient wants to go that route;
23  right?

1      A.   Right.  That's -- that's my
2   understanding, yes.
3      Q.   You personally have never been
4   part of this kind of a multidisciplinary
5   team for any patient with gender
6   dysphoria; correct?
7      A.   No.  I have always -- I have
8   always turned away personal -- for per-
9   -- well, my understanding of those
10  procedures has caused me to reject
11  offering them to my patients because I
12  don't see them as beneficial.  So
13  clearly, I wouldn't want to participate
14  in a multidisciplinary team that's
15  offering therapies that I consider to be
16  incorrect treatments for a condition that
17  deserves our care, so.
18     Q.   All right.
19     A.   If you want, I can give you a
20  shorter answer.  No.
21     Q.   Yeah, let's -- you personally
22  have never treated a single patient for
23  gender dysphoria; correct?

1        A.   I have never treated a patient
2    with gender dysphoria surgically.
3        Q.   Okay.
4        A.   Other than the detransitioner.
5    I -- I suspect they were still suffering
6    from dysphoria even though they were
7    detransitioning, but I didn't treat them
8    with surgery to -- per se for that
9    condition the way the transgender teams
10   do.  Yeah.
11       Q.   When you were providing laser
12   hair removal to trans women, is that
13   providing gender-affirming care?
14            MR. KNEPPER:  Objection, form.
15       A.   I don't get into the affirmation
16   side of the treatment.  I'm simply
17   providing a service to -- to people who
18   -- who I want to have as friends.
19   Believe it or not, it's true.  I -- I
20   don't turn anyone away whose -- whose
21   request is -- is within the scope of what
22   I consider moral practice of medicine and
23   surgery, so.

1    Q.    So earlier, I asked you, you

2    personally have never treated a single

3    patient for gender dysphoria, and I think

4    you said not surgically.  Let me ask more

5    broadly.  Not limited to surgery, you

6    have never treated a single patient for

7    their gender dysphoria symptoms; correct?

8    A.    Well, I guess if -- if you were

9    to look at laser facial hair removal and

10    consider that in the -- in the spectrum

11    of care, certainly that's -- that's --

12    that's clinic care that's probably

13    improving the emotional life of the

14    patient because they're seeking to

15    present as women.  So in that sense, I

16    have, yeah.

17    Q.    Nothing outside of laser hair

18    removal?

19    A.    No.

20    Q.    You personally have never --

21    A.    Well, and -- and acne.  Because

22    clearly, that's a problem.  But in terms

23    of their -- the trajectory of their

1    transition, acne doesn't enter into it.
2    But certainly laser hair removal, yeah.
3        Q.   You personally have never sat in
4    any meetings between a provider and a
5    patient where the doctor was trying to
6    diagnose whether the patient has gender
7    dysphoria; correct?
8        A.   Correct.
9        Q.   You have never sat in any
10   meetings between a provider and a patient
11   discussing their potential treatment
12   options for gender dysphoria; correct?
13       A.   No.
14       Q.   All right.  You're not an
15   endocrinologist; right?
16       A.   Correct.
17       Q.   You're not a psychiatrist;
18   right?
19       A.   Correct.
20       Q.   You're not a licensed mental
21   healthcare provider of any kind; right?
22       A.   Correct.
23       Q.   In your professional day-to-day

1      practice, you do not diagnose mental

2      health conditions of any kind; right?

3              MR. KNEPPER:  Objection, form.

4         A.    With the exception of what we

5      discussed earlier about body dysmorphic

6      disorder and gender -- gender identity as

7      a subcategory of body dysmorphic

8      disorder, no, I would say I don't.

9         Q.    Okay.  If some patient thinks

10     that they may have depression or anxiety,

11     you would expect that patient to go to a

12     mental health professional, not to you;

13     right?

14        A.    That's my expectation.  But

15     again, many depressed people come to

16     plastic surgeons seeking a remedy for

17     their depression thinking that their

18     appearance is the cause of their

19     depression.  And it's my duty as a

20     plastic surgeon to recognize those

21     patients and -- and send them to the

22     psychologist, psychiatrist, rather than

23     offering them surgical care, yeah, so.

1    Q.   Yeah.  I'm asking a slightly
2    different question.
3    A.   Okay.
4    Q.   If a -- if a patient, for some
5    reason, came to you and asked you to
6    diagnose them with depression or anxiety,
7    I assume you would refer them to a train
8    -- trained mental health professional;
9    right?
10   A.   Yes.
11   Q.   Because doctors should not be
12   diagnosing patients with mental health
13   conditions if they do not have training
14   in how to diagnose mental health
15   conditions; right?
16        MR. KNEPPER:  Objection, form.
17   A.   Well, I wouldn't say that,
18   because for example, as a -- as a -- as a
19   surgeon, as a plastic surgeon, we do have
20   to make diagnoses outside of our
21   specialty in order to get people to the
22   right specialist.  So to an extent, you
23   have to make that diagnosis.

1          So for example, as a resident in
2      training, I diagnosed an endocrinological
3      disease and probably saved a woman's life
4      because she was in a psych ward, and --
5      and -- and the doctors had a question
6      about her -- a lump in her neck.  She had
7      been on the psych ward for weeks, and I
8      diagnosed a hyperfunctioning thyroid
9      nodule.  I didn't confirm that diagnosis.
10     I sent her to an endocrinologist.  But I
11     made the initial diagnosis of
12     hyperfunctioning thyroid nodule, and --
13     and ultimately, I did her thyroidectomy.
14     But that's an example.
15          You have to understand pathology
16     outside your specialty because you don't
17     know why the patient is going to present
18     to you, and you have to be ready to start
19     the process that gets them to the
20     specialist, so you have to have a working
21     knowledge of the problems.
22     Q.   Yeah, that's exactly the point.
23     Even for that one example, you still send

1    this patient to a trained endocrinologist

2    to confirm the diagnosis; right?

3         A.   Right.  And then they sent them

4    back to me to give them definitive care.

5         Q.   Yeah.  And that's what you would

6    do for any patient that presents to you

7    with a mental health condition; right?

8    You would train -- you would send them to

9    someone who is -- who is trained in how

10   to diagnose mental health conditions;

11   right?

12             MR. KNEPPER:  Objection, form.

13        A.   Yes.

14        Q.   You're not trained in providing

15   psychotherapy counseling; right?

16        A.   Right.

17        Q.   You've never provided

18   counseling, psychotherapy counseling to

19   children or adolescents with gender

20   dysphoria; right?

21        A.   Right.

22        Q.   You've never provided

23   psychotherapy counseling to adults who

1    have gender dysphoria; right?

2       A.    Right.

3       Q.    You do not have the professional

4    training to provide psychotherapy

5    counseling to adults who have gender

6    dysphoria; right?

7             MR. KNEPPER:  Objection, form.

8       A.    Correct.

9       Q.    Or to children or adolescents

10   with gender dysphoria; right?

11            MR. KNEPPER:  Objection, form.

12      A.    Correct.

13      Q.    Go to page -- back to your --

14   strike that.

15            Back to your report on page 4,

16   in this paragraph 9, about six lines

17   down, you say, "I have consulted with

18   families with children who are

19   experiencing gender discordance."  Do you

20   see that?

21      A.    Yes.

22      Q.    Describe these consultations for

23   me at a high level.

1    A.   Basically, it was families that
2    wanted to understand what -- the nature
3    of plastic surgery sort of in the future
4    for their children.  These were -- these
5    were personal encounters rather than in
6    the office, but fairly lengthy at times,
7    talking to families about -- they wanted
8    to understand what was being offered to
9    their children.  They wanted to
10   understand the nature of -- or what the
11   future would look like for their
12   children.  They wanted to get some idea
13   of -- basically, they wanted to hear sort
14   of a fuller explanation of the -- of the
15   medical and surgical side of things.  So
16   I wasn't giving them psychiatric
17   counseling, but basically offering them
18   my experience as a plastic surgeon,
19   wanting to know what the surgery's about,
20   what the -- the hormone therapy that
21   precedes the surgery's about, that sort
22   of thing.
23        Q.   How many of these consultations

1   have you done, would you estimate?

2       A.   Perhaps five or six, maybe more.

3   Maybe -- yeah, five or six would be a

4   fair number, I think.

5       Q.   Over what years?

6       A.   Perhaps the last three.

7       Q.   Do you know how these parents

8   know to reach out to you for these

9   consultations?

10      A.   It's -- I think maybe some of

11  them were -- having heard about my public

12  presentations at various venues.  People

13  hear about this plastic surgeon in

14  Decatur who's raising objections, I

15  guess.  I don't know the particular

16  details about how a particular patient

17  might have come to me.  I just -- I just

18  always make myself available when people

19  are anxious for their children and

20  they're looking for an understanding of

21  what transgender is about.

22      Q.   What's the typical advice that

23  you give to parents of children or

1      adolescents who are considering starting

2      puberty blockers?

3         A.   Well, my advice on that score is

4      based on the -- on the world literature,

5      that the desistance rate for their child,

6      if they don't give them puberty blockers,

7      the likelihood is that by the time they

8      reach mid-adolescence, they have an 80

9      percent likelihood of desisting in their

10     cross-sex self-identification.  And if

11     you follow them into young adulthood,

12     that percentage will be in the 90s.

13             But essentially, I recommend

14     that they slow everything down, and I

15     recommend against the use of puberty

16     blockade because it's experimental and

17     because the likelihood is very high -- in

18     fact, if I had any medical procedure that

19     gave me 90-plus percent success rate, I

20     would consider that a great victory.

21     So -- so that's -- that's what I speak to

22     them about.

23             That -- that desistance data is

1      a very important thing for parents to

2      understand.  And very often, the patient

3      -- the parents are experiencing

4      tremendous pressure from the people

5      they've seen in consultation, a

6      tremendous pressure.  And usually, the

7      parents are very distressed about what

8      they're hearing, particularly the -- the

9      fear of suicide and self-harm.

10         Q.   Yeah.

11         A.   So --

12         Q.   You encourage -- yeah, no, I got

13     it.  You encourage patients of children

14     who -- or adolescents who experience

15     gender dysphoria not to start them on

16     puberty-blocking drugs; fair?

17             MR. KNEPPER:  Objection, form.

18         A.   Yeah, I discourage the use of

19     puberty blockade for anything other than

20     precocious puberty or other

21     endocrinopathies.

22         Q.   And you also discourage them

23     from pursuing surgical procedures for

1    gender dysphoria; correct?

2            MR. KNEPPER:  Objection, form.

3        A.    Correct.

4        Q.    When you do these consultations,

5    do you talk just to the parents or to the

6    children as well?

7        A.    Both, yeah.  I like to meet the

8    children and -- and -- and get to know

9    them, yeah.

10       Q.    And do you convey the same

11   message to the children?  Don't start

12   puberty blockers; don't start -- don't do

13   any surgical procedures?

14           MR. KNEPPER:  Objection.

15       A.    I -- I generally don't -- I'm

16   sorry.  I generally don't speak about the

17   details of therapy to children.  I speak

18   to their parents.

19       Q.    How many children do you think

20   you have consulted with specifically?

21       A.    On this -- on this issue?

22       Q.    Yes.

23       A.    As I say, maybe six.  I often --

1    well, yeah, I would say six is a good
2    number.
3        Q.   Do you know how many of them
4    went on to start hormone-blocking
5    therapy, if any?
6        A.   I don't.  I don't know the
7    answer to that question.  Yeah, I don't.
8        Q.   Do you know how many of them, if
9    any, went on to start cross-sex hormone
10   therapy?
11       A.   I don't know the answer to that
12   question, no.
13       Q.   You don't know how many of them
14   went on to do any kind of surgical
15   gender-affirming procedures?
16       A.   No.
17       Q.   You haven't done any follow-up
18   with any of these families that you've
19   consulted?
20       A.   As I say, this was an informal
21   thing, so.  Yeah.  So no, I -- I haven't
22   followed up long-term.  This has -- as I
23   say, this has happened over the last

1    perhaps three years.  And so the general
2    course of events there is -- is typically
3    longer than that, so.  But I have not
4    seen -- well, I have seen one -- one
5    child twice, actually, with the parents.
6    And actually -- okay.  So -- so perhaps
7    she would be an exception.
8              She was sort of headed in the
9    direction of seeking puberty blockade.
10   And then in our meetings, she has sort of
11   given that up.  She was under a lot of
12   pressure at school, you know, being
13   pressured by boys because she was
14   starting to develop secondary sex
15   characteristics, and she developed a
16   tremendous anxiety about it.  And someone
17   had told her that -- that if she went
18   through transition care, that that would
19   be avoided.  And I had a conversation
20   with her parents, I had a conversation
21   with her, and essentially just encouraged
22   her to slow down and sort of examine her
23   other options.  And I think within about

1    seven months, she came back to me, and

2    she's not even thinking along those lines

3    any longer.  In fact, now she's talking

4    about what high school she wants to go

5    to, so.

6        Q.   Okay.  So this is one child who

7    was considering, or whose parents were

8    considering starting puberty-blocking,

9    but after consultation with you, decided

10   not to; right?

11       A.   I think that she -- yeah.

12            MR. KNEPPER:  Objection to form.

13            MR. TISHYEVICH:  Okay.  All

14   right off the record.

15            THE VIDEOGRAPHER:  This is the

16   end of Media Unit No. 2.  We are off the

17   record at 11:06 a.m.

18                 (Break taken.)

19            THE VIDEOGRAPHER:  This is the

20   beginning of Media Unit No. 3.  We are on

21   the record at 11:16 a.m.

22       Q.   (By Mr. Tishyevich) Doctor, you

23   know what facial feminization surgery is;

1    right?

2         A.    Yes, I do.

3         Q.    You have never performed facial

4    feminization surgery for any transgender

5    patient; correct?

6         A.    Correct.

7         Q.    You know what facial

8    masculinization surgery is?

9         A.    Yes.

10        Q.    You have never performed that

11   for any transgender patient; correct?

12        A.    Correct.

13        Q.    Do you know what transfeminine

14   top surgery is?

15        A.    Yes.

16        Q.    You have never performed that on

17   a transgender patient?

18        A.    No.

19        Q.    How about a chest reconstruction

20   surgery?  Have you performed that on a

21   transgender patient?

22        A.    No.

23        Q.    You have never performed a

1    vaginoplasty for a transgender patient?

2        A.    No.

3        Q.    You have never performed a

4    metoidioplasty for any transgender

5    patient?

6        A.    No.

7        Q.    You've never performed what's

8    colloquially known as bottom surgery for

9    any transgender patient; correct?

10       A.    Correct.

11       Q.    Fair to say you've never

12   performed any kind of gender-affirming

13   surgery in transgender patients; right?

14       A.    Correct.

15       Q.    And fair to say you don't have

16   recent and substantive experience in

17   performing gender-affirming -- -affirming

18   surgery for transgender patients;

19   correct?

20            MR. KNEPPER:   Form.

21       A.    I have -- I have substantive

22   experience with all the actual -- the

23   nature of the particular operations but

1    never performed for transgender patients

2    to transition them, no.  But the

3    operations themselves as used in

4    reconstruction, I have considerable

5    experience with.

6         Q.   We talked earlier about the

7    American Society of Plastic Surgeons.

8    You recall that?

9         A.   I do.

10        Q.   You know that the ASPS has a

11   code of ethics?

12        A.   Yes.

13        Q.   And you know that members are

14   required to comply with the code of

15   ethics; right?

16        A.   Yes.

17        Q.   And I know you're not a member

18   now, but you were a member of the ASPS

19   for a considerable amount of time; right?

20        A.   Yes.

21        Q.   And I assume during that time,

22   you followed the ASPS code of ethics;

23   right?

1      A.   To my knowledge, I never
2   violated it.  Yes.
3      Q.   When was the last time you
4   reviewed it?
5      A.   I'm sorry, did I lose the sound
6   here?
7      Q.   When was the last time you
8   reviewed the ASPS code of ethics?
9      A.   Oh, gosh.  Years ago.  Years
10  ago.
11     Q.   Let me introduce an exhibit.
12          Let me ask you this first.  Are
13  you aware that the ASPS code of ethics
14  had some specific rules for members who
15  provide expert testimony?
16     A.   Yes.
17     Q.   Okay.  You didn't review those
18  provisions before you formed your expert
19  opinions in this case?
20     A.   No.
21     Q.   Sitting here today, do you know
22  if your opinions in this case are in
23  compliance with what the ASPS code of

1    ethics says about members who provide

2    expert testimony?

3        A.    I'm not aware that I've violated

4    them in any way, yeah.

5        Q.    Let me introduce an exhibit.

6    Okay.  Let me know when you have it.

7    (Exhibit 10 was marked for identification

8    and is attached.)

9        A.    Okay.

10       Q.    It's still opening on my end.

11             Okay.  So, Exhibit 10 is the

12   Code of Ethics of the American Society of

13   Plastic Surgeons.  You see that?

14       A.    I do.

15       Q.    The bottom left corner says,

16   "Updated September 25, 2017."  See that?

17       A.    I do.

18       Q.    That's when you were still an

19   active member of the ASPS; right?

20       A.    Yeah, that's right.

21       Q.    Go to page 4.

22       A.    I think I'm on page 4 here.

23   They're not numbered.  Oh, here we are,

1    yes.

2         Q.   Or I'm sorry, page 6.

3         A.   Page 6.

4         Q.   Section IV.

5         A.   Section IV, yes.

6         Q.   Section IV is "Expert

7    Testimony"; right?

8         A.   Yes.

9         Q.   I want to focus you on the last

10   two sentences of this first paragraph.

11   It says, "Members whose testimony,

12   including testimony as to credentials or

13   qualifications, is false, deceptive, or

14   misleading may be subject to disciplinary

15   action, including expulsion."  You see

16   that?

17        A.   Yes.

18        Q.   The next sentence says, "Further

19   to help limit false, deceptive and/or

20   mislead" -- "misleading testimony,

21   Members serving as expert witnesses

22   must," and then there's a list of

23   requirements.  You see that?

1          A.   I do.

2          Q.   Okay.  So "must" means this is a

3     mandatory rule, not an optional

4     suggestion; right?

5               MR. KNEPPER:  Objection, form.

6          A.   I expect that's what it means,

7     yes.

8          Q.   All right.  Let's look at these

9     rules.  Number 1 says that members

10    serving as expert witnesses must "Have

11    recent and substantive experience (as

12    defined in the Glossary of the Code) in

13    the area in which they testify,

14    including, without limitation, experience

15    in the relevant subspecialty or the

16    particular procedure performed on the

17    plaintiff."

18               Do you see that?

19          A.   I do.

20          Q.   All right.  Without looking at

21    the glossary, do you know, sitting here

22    today, how the glossary defines "recent

23    and substantive experience"?

1        A.    I don't.

2        Q.    Okay.  Why don't we look at that

3    definition together.  Go to page 8.

4        A.    Okay.

5        Q.    See there's subsection F?

6        A.    Yes.

7        Q.    All right.  Read that definition

8    to yourself, and tell me when you're

9    done.

10       A.    Okay.

11          (Witness reviews document.)

12       A.    Okay.

13       Q.    To be able to provide expert

14   testimony -- well, strike that.

15          Let me focus you on the very

16   last part of this definition.  Okay.  To

17   be able to provide expert testimony about

18   a particular surgical procedure, the ASPS

19   Code of Ethics requires a surgeon to have

20   performed a specific procedure in

21   question within three years of being

22   retained as an expert witness; correct?

23       A.    That's what it says, yes, sir.

1              MR. KNEPPER:  Objection, form.
2         Q.    All right.  Now, as we've just
3    discussed, you personally have not
4    performed any kind of facial
5    masculinization surgery in the last three
6    years; correct?
7              MR. KNEPPER:  Objection, form.
8         A.    Correct.
9         Q.    Any kind of facial feminization
10   surgery; right?
11        A.    Correct.
12             MR. KNEPPER:  Objection, form.
13        Q.    Vaginoplasty; right?
14             MR. KNEPPER:  Objection, form.
15        A.    Correct.
16        Q.    Metoidioplasty; right?
17             MR. KNEPPER:  Objection to form.
18        A.    Correct.
19        Q.    You personally have not
20   performed any kind of gender-affirming
21   surgical procedure on a transgender
22   patient in the last three years; correct?
23             MR. KNEPPER:  Objection, form.

1      A.   I have never performed such

2   procedures.

3      Q.   All right.  Well, given that you

4   have not ever personally performed any

5   kind of surgical procedures in the last

6   three years, I take it you're not

7   offering expert opinions on any of these

8   surgeries because doing so would be

9   inconsistent with the ASPS code of

10  ethics; right?

11          MR. KNEPPER:  Objection, form.

12      A.   Well, so the ethics that informs

13  my opinion here is I don't derive from

14  the ASPS, nor am I subject to their --

15  their -- what's the word I'm looking

16  for -- their sanctions, I guess, would be

17  the correct word.  The expert opinion I

18  offer here is not on -- on complications

19  of an operation that might enter into a

20  litigation.  In terms of the -- you know,

21  I guess the -- the question at hand here

22  is transition surgery, the bigger

23  picture.  I certainly make record of --

1    of the known complications as available

2    in the literature.  And in my testimony,

3    I did a literature review on the

4    complications of particular surgeries.

5         But I don't do these operations

6    for a reason, and the reason I don't do

7    these operations is ethical based on my

8    knowledge of the science.  I don't derive

9    my ethical decision-making from the ASPS,

10   and this is one of the reasons why,

11   again, I have no heartburn about having

12   withdrawn my membership.  I have great

13   issue with -- with the idea that a

14   professional organization would encourage

15   or sanction these operations given the

16   world literature.

17        Q.   Your opinion -- your -- strike

18   that.

19        Your expert report does offer

20   some opinion, or purports to offer some

21   opinions about surgical risks of some of

22   these gender-affirming surgical

23   procedures, does it not?

1     A.   Yes.   Based on my -- my
2     experience in microvascular surgery, on
3     flap reconstruction of the perineum, for
4     example, flap reconstruction of the chest
5     or the -- or the genital area in
6     treatment for traumatic injuries and
7     things.   So the operations themselves,
8     I'm quite familiar with.   I'm quite
9     familiar with the complications that are
10    peculiar to free flap or local flap
11    reconstructions.
12              But as far as doing those
13    operations for gender transitioning, I --
14    I don't do those operations.   But the
15    complications are the same: flap loss,
16    flap necrosis, urinary fistulas.   All of
17    those things I have -- I have experience
18    with in managing trauma, in managing
19    cancer, in managing infectious
20    destruction of the genital area.   But
21    I've never done the operation for
22    transgender per se, correct.
23        Q.   And because you've never done

1     any of those procedures on transgender
2     patients, can we agree that offering
3     those opinions is inconsistent with the
4     ASPS Code of Ethics?
5              MR. KNEPPER:  Objection, form.
6        A.   I would not agree with that.
7        Q.   Does it bother you that you
8     might be in violation of the Code of
9     Ethics by offering these opinions?
10             MR. KNEPPER:  Objection.
11       A.   No.  Not in the least.
12       Q.   Do you think that a judge might
13    be troubled by the fact that your
14    professional organization, former
15    professional organization, says you
16    shouldn't be allowed -- you shouldn't be
17    offering these kind of opinions?
18             MR. KNEPPER:  Objection, form.
19       A.   Yeah, I find -- I find the --
20    the whole situation troubling, and I
21    would hope that the judge would be
22    troubled by it, yes.
23       Q.   Okay.  Yeah, no, I mean, I'm

1    asking a much more specific question.

2    The judge is going to be asked to find

3    whether your testimony is reliable.  Do

4    you think the judge might have some

5    concerns if she -- if they were to

6    conclude that the testimony you're

7    offering in this case is not allowed

8    under the code of ethics of the ASPS?

9         MR. KNEPPER:  Objection, form.

10   A.   I -- I -- I haven't thought

11   about it.

12   Q.   And you haven't thought about it

13   because before today, you didn't know

14   whether or not your testimony complies

15   with the ASPS Code of Ethics; right?

16        MR. KNEPPER:  Objection, form.

17   A.   I was not -- I was not concerned

18   with the ASPS Code of Ethics, for reasons

19   we've discussed earlier.

20   Q.   Did you know that -- did you

21   know that the ASPS Code of Ethics

22   prohibits members from offering expert

23   testimony on topics in which they do not

1    have recent and substantive experience?

2              MR. KNEPPER:  Objection, form.

3         A.   Could you -- can you -- I want

4    to make sure I answer your question and

5    not something else.  Could you offer me

6    that question again, please?

7         Q.   Before I showed you this code of

8    ethics at your deposition today, were you

9    aware that the ASPS Code of Ethics

10   prohibits members from offering expert

11   opinions on topics on which they do not

12   have recent and substantive experience?

13             MR. KNEPPER:  Objection, form.

14        A.   Actually, I dreaded that such a

15   -- such a fact would come to light.  I

16   have not read the -- the ethics code in

17   recent years, as I said earlier.  But

18   I -- I have dreaded this evolution in the

19   ethics of my former professional society,

20   that they would consider transgender

21   surgery the way they do.

22             I -- other -- aside from that, I

23   was not concerned that I might be

1      violating the ethics of the society

2      because in all my previous life, I have

3      never violated the ethics of the society.

4      And I don't -- at present, I don't

5      consider my testimony to be a violation

6      of this policy that we've read together.

7          Q.   I understand.  All right.  Let's

8      switch gears.  You know what the WPATH

9      is?  The World Professional Association

10     for Transgender Health?

11         A.   Yes.

12             MR. TISHYEVICH:  And for the

13     court reporter, it's W-P-A-T-H, all

14     capital.

15         Q.   All right.  You know that the

16     WPATH publishes standards of care for the

17     health of transgender people; right?

18         A.   They have a publication that

19     they call the standards of care, yes.

20         Q.   And are you aware that they've

21     been publishing those standards since

22     1979?

23         A.   Yes.

1          Q.    The latest publicly available
2     standard of care is Version 7; correct?
3          A.    Correct.
4          Q.    And that was published in 2012;
5     right?
6          A.    That's right.
7          Q.    All right.  Before you wrote
8     your report, did you sit down and review
9     the Standards of Care, Version 7 that
10    you're criticizing?
11         A.    Yes, I did.
12         Q.    All right.  You yourself are not
13    part of the WPATH; correct?
14         A.    No, I am not.
15         Q.    You've never been part of the
16    WPATH; right?
17         A.    I would never be part of the
18    WPATH.
19         Q.    You've never advised the WPATH
20    in any capacity; right?
21         A.    They've never asked my opinion.
22    No.
23         Q.    You've never advised the WPATH

1      in any capacity; correct?

2          A.    I have not.

3          Q.    You personally have not been

4      involved with the development of WPATH's

5      Standards of Care, Version 7; correct?

6          A.    Correct.

7          Q.    You don't know what year the

8      WPATH started working on Version 7;

9      right?

10         A.    My understanding was it was in

11     2007, but I could be wrong.  I think it

12     was 2007.  I think it was a five-year

13     process, but I could be wrong on that.

14         Q.    You don't know for sure?

15         A.    I don't know for sure.

16         Q.    You don't know how many

17     different work groups at the WPATH were

18     involved with working on Version 7;

19     correct?

20             MR. KNEPPER:  Objection, form.

21         A.    In reading the -- the

22     introduction to the document, the number

23     nine pops into my mind, but I can't swear

1    to that.

2         Q.   Okay.  You don't know what kind

3    of scientific literature the WPATH

4    conducted as part of drafting Version 7;

5    right?

6         A.   As far as naming the particular

7    papers that they may have reviewed, I

8    can't do that for you because those

9    are -- that happens in closed committee.

10   I -- all I can say to you is my -- based

11   upon my reading of the product and the

12   verbiage that it's used, my suspicion is

13   that it's pretty heavily weighted towards

14   the American literature and -- and does

15   not bring in particular document -- well,

16   being that it was published in 2012, the

17   big inflection point in 2011 probably

18   wasn't available to the committee when

19   they were writing that document.

20              So given that the document is

21   already out of date and it's -- and the

22   subsequent WPATH 8, no one knows when

23   it's going to come out, yeah, it's --

1    it's almost -- it's almost irrelevant
2    because of the change in the literature
3    that happened since it was published, so.
4    In particular, the 2011 article by
5    Dhejne, Cecilia Dhejne, and -- and others
6    that kind of changed the view of the
7    scientific evidence.
8              So yeah, it's an out-of-date
9    document by the standards of what are
10   called standards of care.  It's not a
11   standards of care document.  It's a --
12   it's a treatment guideline document is
13   really what it is, and it's a poorly
14   supported treatment guideline at that,
15   so -- gosh, I wandered off.
16             Did I -- did I answer your
17   question?
18        Q.   Yeah, you anticipated my
19   objection.
20             MR. TISHYEVICH:  Which, again,
21   I'll move to strike most of that as
22   nonresponsive.
23        Q.   Because here's my question.  You

1    don't personally know what kind of

2    scientific literature the WPATH conducted

3    as part of drafting Version 7; correct?

4            MR. KNEPPER:  Objection, form.

5        A.    No.  Again, a closed session, so

6    I don't know what documents they used.

7        Q.    You don't know what kind of

8    outside experts the WPATH may have

9    consulted in drafting Version 7; right?

10       A.    No.

11       Q.    You don't know what kind of peer

12   review the WPATH may have conducted as

13   part of developing Version 7; right?

14           MR. KNEPPER:  Objection, form.

15       A.    No.

16       Q.    You don't know what kind of

17   public comments the WPATH may have

18   solicited as part of developing Version

19   7.

20           MR. KNEPPER:  Objection, form.

21       Q.    Right?

22       A.    No.

23       Q.    You don't know how many

1    different drafts the Version 7 went

2    through before it was finalized; right?

3        A.    No.

4        Q.    You don't know how many

5    different meetings or conferences the

6    WPATH had to discuss the development of

7    Version 7; right?

8        A.    Correct.

9        Q.    You have no idea what may have

10   gone on during those meetings or

11   conferences; correct?

12            MR. KNEPPER:  Objection, form.

13       A.    No.  I was not a part of the

14   conferences that produced the product.

15       Q.    Yeah, you are not an expert in

16   how Version 7 of the WPATH was developed;

17   right?

18       A.    Correct.

19       Q.    And we can go through all these

20   questions again individually for Version

21   8, but maybe we can shortcut this.

22       A.    Well, no one knows what's in

23   Version 8 except the people who are in

1      the committee.  It's a -- it's a
2      privileged document.  There's no one in
3      plastic surgery who knows it apart from
4      the people who serve as members of the
5      WPATH, so that would be the case.
6          Q.   Okay.
7          A.   It's a -- it -- yeah.
8          Q.   So just so we have it on the
9      record, you don't hold yourself out as an
10     expert on how Version 8 of the WPATH
11     Standards of Care are currently being
12     developed; fair?
13         A.   Fair.
14         Q.   Okay.  We talked earlier about
15     the DSM; right?
16         A.   Yes.
17         Q.   In your day-to-day practice, you
18     don't use the DSM-5; correct?
19         A.   No.
20         Q.   But you do know the DSM-5 is
21     widely used by psychiatrists; correct?
22         A.   Yes.
23         Q.   The DSM-5 was published in 2013;

1    correct?

2         A.    I don't know the publication

3    date, but it sounds about right.

4         Q.    Do you know that it was

5    developed by the American Psychiatric

6    Association?

7         A.    Yes.

8         Q.    You're not a member of the APA;

9    right?

10        A.    Correct.

11        Q.    You personally have not been

12   involved with the development of DSM-5;

13   right?

14        A.    No.

15        Q.    You don't know how many

16   different working groups were involved

17   with developing the DSM-5; right?

18             MR. KNEPPER:  Objection, form.

19        A.    Correct.

20        Q.    You don't know how many

21   different members those working groups

22   had; right?

23             MR. KNEPPER:  Objection, form.

1          A.    No.

2          Q.    Or how they were selected;

3    right?

4                MR. KNEPPER:  Objection, form.

5          A.    Correct.

6          Q.    You don't know how many

7    different authors contributed to the

8    development of DSM-5; correct?

9          A.    Correct.

10               MR. KNEPPER:  Objection, form.

11         Q.    You don't know what kind of

12   scientific literature review was done by

13   different work groups as part of

14   developing the DSM-5; correct?

15               MR. KNEPPER:  Objection, form.

16         A.    Correct.

17         Q.    You don't know what kind of

18   public comments the APA may have

19   solicited in developing the DSM-5;

20   correct?

21               MR. KNEPPER:  Objection, form.

22         A.    Correct.

23         Q.    You don't know how many

1    different drafts the DSM-5 went through

2    before it was finalized; correct?

3                MR. KNEPPER:  Objection, form.

4        A.    Correct.

5        Q.    You don't know how many

6    different meetings or conferences or

7    telephonic conferences the working groups

8    had to discuss the development of the

9    DSM-5; right?

10               MR. KNEPPER:  Objection, form.

11       A.    Right.

12       Q.    You have no idea what was

13   discussed during any of those meetings;

14   right?

15       A.    Right.

16       Q.    Let me ask you specifically

17   about the Sexual and Gender Identity

18   Disorders Work Group.  First of all,

19   before today, did you know that the APA

20   had a Sexual and Gender Identity

21   Disorders Work Group as part of the

22   development of the DSM-5?

23               MR. KNEPPER:  Objection, form.

1        A.    Yes.
2        Q.    Do you know how many members
3    were in that work group?
4        A.    No.
5        Q.    You don't know --
6            MR. KNEPPER:  Objection.
7        Q.    -- how those members were
8    selected; right?
9            MR. KNEPPER:  Objection to form.
10       A.    Correct.
11       Q.    You don't know their expertise;
12   right?
13       A.    Correct.
14       Q.    You do not have expert firsthand
15   knowledge of how the DSM-5 was developed;
16   fair?
17           MR. KNEPPER:  Objection, form.
18       A.    Fair.
19       Q.    Are you aware that the DSM-4
20   used the term "gender identity disorder"
21   instead of "gender dysphoria"?
22       A.    Yes.
23       Q.    Do you know the reason for that

1        change?

2             A.    From DSM-4 to DSM-5?

3             Q.    Yes.

4             A.    Yes.

5             Q.    What's the reason?

6             A.    In reading the literature and

7        reading the reports of perhaps people who

8        served on the committee, because I don't

9        know how else you would be privy to this

10       information, there was a desire on the

11       part of the APA to de-pathologize the

12       condition, and they wanted to use

13       terminology that didn't sound like

14       medical diagnoses.  It was the opinion of

15       the members of that committee that --

16       that transgenderism is only a diagnostic

17       issue from the standpoint of the

18       discomfort or the sorrow that the patient

19       feels rather than any underlying

20       pathology.  So the -- the desire was to

21       move those -- the diagnosis to change the

22       language of diagnosis to de-pathologize

23       it.  But the problem that the committee

1    faces is that having done that, there's

2    no mechanism for providing the services

3    that they felt that the patients needed,

4    so there had to be a diagnose -- a

5    diagnostic code in order to get

6    thirty-part -- third-party payers to pay.

7    So it's a de-pathologize but maintain a

8    diagnostic -- diagnostic code.  That's my

9    understanding of it.

10            Again, I wasn't there.  But

11   again, reading the writings of people who

12   could only have gleaned it from having

13   been present because it's closed session,

14   that's my understanding.

15       Q.   Understood.  All right.  Do you

16   know what the Endo- -- Endocrine Society

17   guidelines for treatment of

18   gender-dysphoric or gender-incongruent

19   persons are?

20       A.   Do I know what they are?

21       Q.   Yeah.

22       A.   Yes.

23       Q.   Do you know when they were

1        initially published?

2            A.    No.

3            Q.    Do you know when they were last

4        revised?

5            A.    I think it was just a couple of

6        years ago, but I don't know the exact

7        date.

8            Q.    If I tell you it's 2017, does

9        that sound right?

10           A.    That wouldn't -- it wouldn't

11       surprise me if that were true.  I -- just

12       within the last couple of years.  I think

13       theirs are current, and the expectation

14       is that these standards of care or

15       treatment guidelines will have a

16       five-year revision.  So given that

17       they're current, they couldn't be any

18       older than, say, 2017.  So I suspect that

19       -- yeah.

20           Q.    All right.  Did you review the

21       latest available version of those

22       Endocrine Society guidelines before

23       forming your opinions in this case?

1       A.    Yes.   I have read them, yes.

2       Q.    Okay.   You yourself are not part

3    of the Endocrine Society; right?

4       A.    Correct.

5       Q.    Have never been part of that

6    society; right?

7       A.    Correct.

8       Q.    You've never advised the

9    Endocrine Society in any capacity;

10   correct?

11      A.    Correct.

12      Q.    You personally were not involved

13   with the development of these original

14   guidelines; correct?

15      A.    That's correct.

16      Q.    Not personally involved with the

17   development of the updated guidelines in

18   2017; right?

19      A.    Correct.

20      Q.    Do you know how many people at

21   the Endocrine Society were involved with

22   those 2017 updates?

23      A.    I do not know that number.

1       Q.   And you don't know how they were

2    selected to work on the 2017 updates;

3    correct?

4       A.   Correct.

5       Q.   You personally don't know what

6    kind of scientific literature review the

7    Endocrine Society conducted in developing

8    those updates; correct?

9            MR. KNEPPER:  Objection to form.

10      A.   Correct.

11      Q.   You don't know what kind of

12   outside experts they may have used;

13   right?

14      A.   What kind of outside experts?  I

15   would imagine they were all

16   endocrinologists.  Or are you asking did

17   they have plastic surgeon input or --

18      Q.   Do you know specifically whether

19   the Endocrine Society used any outside

20   experts in updating the -- in

21   implementing the 2017 updates?

22      A.   Well --

23           MR. KNEPPER:  Objection, form.

1          A.   I can only infer that they

2     would, because such -- such statements,

3     in order to be valid, demand review by

4     outside parties to -- to obviate

5     conflicts of interest, whether financial

6     or professional.  Those are all issues

7     when generating standards of care, so of

8     necessity, they would have had to have

9     had outside experts to come in, yes.

10         Q.   Okay.  Do you know what kind of

11    public comments the Endocrine Society may

12    have solicited as part of developing the

13    2017 updates?

14         A.   I don't.

15              MR. KNEPPER:  Objection to form.

16         Q.   You don't know how many

17    different drafts there were of those 2017

18    updates before they were finalized;

19    right?

20         A.   No.

21              MR. KNEPPER:  Objection to form.

22         A.   No, I don't.

23         Q.   Again, you haven't been to any

1    meetings or conferences or telephonic
2    conferences where those 2017 updates were
3    discussed, where the development of those
4    2017 updates was discussed; correct?
5            MR. KNEPPER:  Objection to form.
6        A.   Correct.
7        Q.   You don't know what went on
8    during those meetings or conferences;
9    right?
10           MR. KNEPPER:  Objection, form.
11       A.   I do not.
12       Q.   You -- you're not an expert in
13   how the Endocrine Society developed the
14   original 2009 guidelines for treating
15   gender dysphoria; correct?
16           MR. KNEPPER:  Objection to form.
17       A.   That's not -- that's not my area
18   of expertise.  That's correct.
19       Q.   Right.  And you're also not an
20   expert in how the Endocrine Society then
21   developed the 2017 updates back to those
22   guidelines; correct?
23       A.   Correct.

1    Q.   Okay.  All right.  Now let's
2    talk about puberty-blocking agents.  What
3    puberty blocker drugs are you aware of by
4    name?
5    A.   Well, Lupron is probably the
6    most widely used one.  They're -- they're
7    all gonadotropin-releasing hormone
8    agonists.  They come by a variety of
9    trade names.  But gonadotropin-releasing
10   hormone is the genetic -- I'm sorry, the
11   generic name for the drug that may appear
12   under a variety of, you know, proprietary
13   names, Lupron being the most commonly
14   used.
15   Q.   You've never prescribed Lupron;
16   right?
17   A.   No, I have never.  No.
18   Q.   You have never prescribed any
19   puberty-blocking drugs of any kind;
20   right?
21   A.   No.  That's not my area of
22   expertise.
23   Q.   Right.  Have you ever looked at

1    the package -- strike that.

2              You know what a package insert

3    is; right?

4         A.   Yes.

5         Q.   Have you ever looked at a

6    package insert for Lupron?

7         A.   Some time ago, but yes, I have.

8         Q.   Okay.  How recently do you

9    think?

10        A.   Gosh, it's probably more than

11   four or five years ago.  I think probably

12   when I first started go -- you know,

13   looking into this more carefully back in

14   2014.  It was probably that long ago.

15        Q.   Do you know what Vantas is?

16   V-A-N-T-A-S.

17        A.   Oh, I've read that somewhere

18   before.  Let's see.  Is it -- it's the

19   adverse events reporting -- is that what

20   I -- I don't --

21        Q.   It's a type of drug.

22        A.   Oh.

23        Q.   So no, that doesn't sound

1    familiar?

2        A.    It does not sound familiar, no.

3        Q.    How about Triptodur?

4    T-R-I-P-T-O-D-U-R.

5        A.    That sounds like a trade name

6    I'm not familiar with.

7        Q.    Okay.  Fensolvil?

8    F-E-N-S-O-L-V-I-L.

9        A.    That sounds like a trade name

10    I'm not familiar with.

11        Q.    Trelstar?  T-R-E-L-S-T-A-R.

12        A.    Same.

13        Q.    All right.  You're not an expert

14    in the different types of prescription

15    drugs that are used as puberty-blocking

16    agents; fair?

17        A.    I do not consider myself an

18    expert in that area, no.  I rely on

19    experts.

20        Q.    All right.  You know that

21    puberty blockers are typically prescribed

22    by endocrinologists; right?

23        A.    Yes.  Pediatricians and

1    endocrinologists, yes.
2        Q.    Right.  You have no specialized
3    training or expertise in endocrinology;
4    correct?
5        A.    Correct.
6        Q.    You don't hold yourself out as
7    an expert in endocrinology; correct?
8        A.    No, I do not.
9        Q.    You're not planning on offering
10   any expert opinions in endocrinology in
11   this case because that's outside your
12   scope of expertise; right?
13       A.    Yes.
14            MR. KNEPPER:  Objection to form.
15       Q.    All right.  Earlier, you said
16   you have never prescribed
17   puberty-blocking agents to anyone, so I
18   take it you have no experience, no
19   firsthand experience with advising your
20   patients about potential risks and
21   benefits of puberty blockers; right?
22            MR. KNEPPER:  Objection, form.
23       A.    Well, I have talked to patients

1    -- well, families, really, about the
2    risks of puberty blockers in -- in early
3    puberty and into adolescence.  I have
4    because I've reviewed the literature and
5    I've spoken with experts in the area.
6    And so, is that the question --
7        Q.    Yeah.
8        A.    -- you're asking, have I spoken
9    to anybody?  Yeah, I have.  I -- I have,
10   again, knowing that -- for example, that
11   the drug Lupron, as an example, is -- is
12   -- is not cleared by the FDA for
13   application.  It's an off-label use when
14   using it in the diagnosed condition of
15   gender dysphoria.  So I know that it's an
16   off-label application of the drug, and I
17   know what the effects of the drug are.
18   But nobody knows what the effects of the
19   drug are on otherwise normal children,
20   and that's pretty much all I'd relate to
21   the families on the -- on that subject.
22            I don't offer myself as an
23   endocrinologist, but I offer myself as a

Case 1:19-cv-00272-LCB-LPA   Document 209-3   Filed 02/02/22   Page 207 of 577

1    concerned physician who has spoken with
2    the specialists and read the package
3    insert.  Yes.
4        Q.   You think off-label use is
5    improper; right?  That's the sense I got
6    from reading your report.
7            MR. KNEPPER:  Objection, form.
8        A.   Off-label use in certain
9    situations.  So I use -- I use -- I have
10   applied drugs' off-label use many times.
11   But what the -- what the practitioner has
12   to do is weigh the risk/benefit equation
13   there and what is the expected goal and
14   what are the likely risks.
15           For example, I used Botox long
16   ago in the treatment of -- of
17   hyperhidrosis before the company that
18   produces it got FDA clearance to use it
19   that way.  The risk, very, very low risk;
20   the potential benefit, very, very high.
21   But in this case, we're talking about
22   very significant risks for an unproven
23   benefit.  So that's an example of how you

1    have to weigh off-label use.

2           And the FDA understands that,

3    and they don't go after off-label use

4    unless there's significant risk.  And

5    even then, they might not yet spring into

6    action.  It's a pretty slow-moving

7    organization.

8       Q.   All right.  We'll come back to

9    that.

10      A.   Okay.

11      Q.   You never sat in on any

12   appointment where an endocrinologist

13   prescribed a puberty-blocking drug to a

14   patient; correct?

15      A.   I have never.

16           MR. KNEPPER:  Objection, form.

17      Q.   You personally don't know what

18   endocrinologists typically tell their

19   patients about risks and benefits of

20   puberty blockers; right?

21           MR. KNEPPER:  Objection, form.

22      A.   Only what I have read in the

23   record.  For example, the plaintiffs'

```
 1    records, I -- I -- I believe I have read
 2    that -- that kind of consultation, yeah.
 3    But I -- but I wasn't present in the
 4    room, if that's what your question is.
 5         Q.   Yeah.  You don't know what was
 6    actually communicated to the patient;
 7    correct?
 8         A.   Only what was entered in the
 9    record, yeah, the medical record.
10         Q.   And just as a more -- outside of
11    these plaintiffs, as a more general
12    matter, you don't personally know what
13    endocrinologists tell their patients
14    about potential risks and benefits of
15    puberty blockers because you're not
16    present on those prescribing decisions;
17    right?
18              MR. KNEPPER:  Objection, form.
19         A.   Well, if -- I assume that they
20    follow the same sort of process that
21    every other medical professional does
22    when getting consent for -- for therapies
23    of various kinds.  And so to offer
```

1      informed consent to a -- in this case,

2      perhaps a family, parents, that informed

3      consent would have to include -- in order

4      to be valid, it would have to include the

5      potential risks that are enumerated in

6      the package insert.  And then they would

7      also, in certain cases, have to enumerate

8      risks that may not be in the package

9      insert but may be expected given the --

10     the particular case of their child or the

11     particular patient.

12          So we all have to follow that

13     same general standard, and so to that

14     extent, I have some knowledge of what

15     they would be saying.  But the particular

16     words or the particular things they may

17     have emphasized, I have no -- no personal

18     knowledge of.

19     Q.   Your general expectation is that

20     before a doctor prescribes the drugs,

21     they will at least inform the patients of

22     the risks as specifically enumerated in

23     the drug labeling; right?

1          A.     Among other things, yes.

2          Q.     And the doctor may also go

3     beyond the labeling and advise them of

4     potential risks even though they're not

5     specifically disclosed in the drug

6     labeling; right?

7          A.     Yes.  Because there -- there are

8     circumstances wherein the underlying

9     conditions of the patient may -- may

10    cause particular risks in particular

11    areas, so that's right.

12             So there's the general

13    precautions that are included in the

14    package insert, but they usually tend to

15    be exhaustive.  They -- they list in the

16    package inserts even remote

17    possibilities, so.  But most physicians

18    can't drill down into those details with

19    a patient.  You don't want to overwhelm

20    the patient and their family with those

21    minute details.  You want to talk about

22    the major risks and then the risks that

23    are peculiar to the patient because of

1    their underlying condition.  And that's

2    generally what everybody does.

3        Q.   Yeah.

4        A.   Although, again, I'm not present

5    in every office on every occasion, but

6    that's generally how we're trained to

7    conduct a consent.

8        Q.   Do you know -- are you aware

9    that patients who are prescribed

10   puberty-blocking agents are typically

11   monitored through blood tests and lab

12   work?

13           MR. KNEPPER:  Objection, form.

14       A.    It -- I don't -- I'm not

15   familiar in all cases to what extent

16   they're monitored.  My hope is that

17   they're being monitored.  I would expect

18   that they're being monitored.

19       Q.   Yeah.  And you don't have

20   experience with monitoring patients who

21   undergoing treatment with puberty

22   blockers; right?

23       A.   No.

1    Q.   And you don't have experience
2    with reviewing blood work, labs, what's
3    normal, what's not, anything in that
4    field; right?
5         MR. KNEPPER:  Objection to form.
6    A.   Oh, no, I am familiar with
7    reviewing labs and interpreting
8    laboratory data --
9    Q.   Sorry.
10   A.   -- as it pertains -- yeah.
11   Q.   Sorry.  Let me make -- make my
12   question more specific.  I'm still
13   talking about patients who are treated
14   with puberty-blocking agents.
15   A.   Okay.
16   Q.   For those patients in
17   particular, you don't have experience
18   with reviewing their blood work, labs to
19   see -- to check their hormone levels and
20   see if any adjustments are needed; right?
21        MR. KNEPPER:  Objection, form.
22   A.   No.  I have some familiarity
23   with the interpretation of hormone levels

1    in endocrinology.  As a -- as a general
2    surgeon and a critical care doctor, these
3    issues were very important to me for a
4    number of years.  So I'm familiar with
5    that, although I haven't monitored
6    patients receiving puberty blockers or
7    cross-sex hormones per se.  So generally,
8    I am familiar with -- with that and the
9    ramifications of endocrinopathies, again,
10   because I had considerable experience
11   with management of critical care patients
12   and -- yeah.
13        Q.   Yeah.  My question is more
14   specific.
15        A.   Okay.
16        Q.   You personally have not
17   monitored blood work from patients who
18   are undergoing puberty-blocking agents;
19   right?
20        A.   Correct.
21        Q.   Okay.  And you mentioned
22   cross-sex hormones.  You know what those
23   are; right?

1          A.    Yes.
2          Q.    For transgender women, estrogen
3     is a hormone that's typically prescribed;
4     right?
5          A.    Yes.
6          Q.    For transgender men,
7     testosterone is the hormone that's
8     typically prescribed; right?
9          A.    Right.
10         Q.    You've never prescribed
11    cross-sex hormones for treatment of
12    gender dysphoria to anyone; correct?
13         A.    Correct.
14         Q.    You have no firsthand experience
15    with advising your patients about
16    potential risks and benefits of cross-sex
17    hormones when used for treatment of
18    gender dysphoria; correct?
19         A.    Correct.
20         Q.    You personally don't know what
21    doctors who do prescribe estrogen or
22    testosterone to their patients for gender
23    dysphoria tell those patients about the

1    risks and benefits of that treatment;

2    correct?

3              MR. KNEPPER:  Objection, form.

4        A.    I would answer that question as

5    we did earlier, that my expectation would

6    be that they would cover the -- the risks

7    and benefits of that -- of that

8    particular therapy and that the

9    exploration of potential risks would

10   include the major points that are

11   contained in the package insert and

12   whatever particular risks that the

13   patient may have because of their

14   underlying conditions, medical conditions

15   that may impinge upon them.  That would

16   be my expectation.

17       Q.    Okay.  So for testosterone and

18   estrogen when used to treat gender

19   dysphoria, you would generally expect

20   doctors to at least give the warning

21   about -- that's in the labeling and

22   potentially give additional warnings

23   outside of that as well; fair?

1              MR. KNEPPER:  Objection to form.

2        A.    That would be my -- that would

3     be my expectation.

4        Q.    All right.  We started talking

5     about off-label use, so let's circle back

6     to that.  So in your report, you

7     criticize Dr. Brown and Dr. Schechter for

8     not disclosing that the FDA has not

9     approved these hormones for treatment of

10    gender dysphoria.  Do you recall that?

11       A.    Yes.  My testimony, yes, I do

12    recall that.

13       Q.    All right.  Off-label use is

14    when a doctor prescribes a drug outside

15    of its FDA-approved indication; correct?

16       A.    Correct.

17       Q.    And we touched earlier on

18    whether it's proper or improper to

19    prescribe drugs on an off-label basis.

20    There are circumstances where it is

21    appropriate to prescribe a drug on an

22    off-label basis; correct?

23       A.    Yes.

1          Q.    It's a case-by-case decision;
2     right?
3              MR. KNEPPER:  Objection, form.
4          A.    Yes.
5          Q.    It's a case-by-case decision
6     that's made between the doctor and their
7     patient; right?
8              MR. KNEPPER:  Objection, form.
9          A.    Right.
10         Q.    You're not expressing the
11    opinion that doctors should not be
12    prescribing drugs on an off-label basis
13    ever; right?
14         A.    I'm expressing the opinion that
15    -- that drugs that have massive potential
16    side effects should not be off-label
17    prescribed unless those risks warrant --
18    I mean, those risks are warranted given
19    the underlying condition of the patient
20    and that the patient is being treated as
21    a -- as a -- as a trial or an
22    experimental patient with ethics
23    monitoring and all the rest of it that

1    attends.

2          The reason why off-label use is

3    problematic is because it doesn't have a

4    body of proven scientific evidence that

5    the FDA has made use of in order to -- to

6    warrant the use of the drug.  So if

7    you're going to go off label, again, the

8    risks have to be low.  If the condition

9    you're treating makes -- makes the risks

10   high, then that's where you have to get

11   into ethics panels and experimental

12   trials and things like that.  I think

13   that's at the heart of this issue.

14         We're dealing with a condition

15   where the application of these drugs is

16   not proven and the risks are very high,

17   and that's where my concern lay.

18        Q.   Do you think that off-label use

19   of prescription drugs is, by definition,

20   investigational?

21        A.   To the extent that very often

22   the -- the use of -- the off-label use of

23   drugs begins on the basis of anecdotal

1    reports.  So anecdotal reports, again,
2    are categorized as level 5 evidence.  And
3    -- and so when those reports are
4    published and -- and the risks are seen
5    as low, then other physicians may begin
6    the off-label use of those drugs.
7              But generally, one wants to
8    progress to a more definitive scientific
9    evidence, like level 4 evidence where
10   there's a pre-application test, the use
11   of the drug, and a post-application test,
12   or level 3 where you're looking at
13   longitudinal data to confirm not only the
14   safety but the efficacy of the
15   application of the drug.
16             In the case of the use of
17   puberty blockade and cross-sex hormones,
18   it doesn't exist beyond level 5 evidence
19   even though the treatment has now been
20   going on off-label for more than a
21   decade, if not approaching twenty years.
22        Q.   All right.  You mentioned
23   doctors are prescribing on an off-label

1      basis after there's case reports.  It
2      does happen that doctors prescribe drugs
3      on an off-label basis based on nothing
4      more than case reports; right?
5          A.   That's how it always begins,
6      yeah.
7          Q.   Yeah.  The FDA doesn't say
8      that's not permissible, do they?
9          A.   No, they don't.
10         Q.   Okay.
11         A.   I don't know.  I don't know what
12     the FDA -- if there's a published policy
13     about that.  I would suspect not, given
14     the history in my lifetime of people
15     off-label using, for example, asthma
16     medications for the treatment of breast
17     implant encapsulation, that kind of
18     stuff.  That's an example of a very
19     benign drug being used off-label to treat
20     a surgical condition of breast implant
21     encapsulation.  So that's my personal
22     experience.  I suspect there isn't an FDA
23     policy that utterly prohibits it.  I

1    would agree, yeah.

2       Q.   Okay.  The FDA is the federal

3    agency that regulates prescription drugs;

4    correct?

5       A.   Food and drugs, yes.

6       Q.   And they decide whether a

7    particular drug can be marketed for a

8    particular indication; correct?

9       A.   Right.

10          MR. KNEPPER:  Form.

11       Q.   And one of the areas of

12   oversight the FDA has is the safety of

13   prescription drugs; right?

14       A.   Right.

15       Q.   Before forming your opinions in

16   this case, did you investigate what

17   position the FDA takes on off-label use

18   of drugs?

19       A.   No, I did not.

20       Q.   Sitting here today, do you know

21   what that position is?

22       A.   I do not, no.

23       Q.   Do you know whether the expert

1    opinions you're expressing about

2    off-label use of drugs are consistent or

3    inconsistent with what the -- what the

4    FDA has said about off-label use?

5            MR. KNEPPER:  Objection, form.

6        A.    I remember when the controversy

7    about the use of Singulair in breast

8    implant capsules came up.  That was

9    discussed at an ASPS meeting and then

10   some articles that came out.  And I think

11   I recall from those -- either the

12   conference or the article that the FDA

13   takes a permissive attitude where risk is

14   low.

15       Q.    You think the FDA only allows

16   off-label use of prescription drugs when

17   the risk is low?

18       A.    I don't know that for a fact.

19       Q.    All right.

20       A.    I would -- I would hope.  I

21   would hope low risk/high benefit.  So --

22   so again, it's an equation, it's not just

23   a one-sided thing.  So it isn't just the

1    risk but also the potential benefits.
2    And the potential benefits have to be
3    very high.  The higher the risk is, the
4    higher the benefit has to be.  And that's
5    kind of a general principle of the
6    medical care.  You know, before all else,
7    do no harm.  That's what informs all
8    medical care, and I would hope that's
9    what informs the FDA policy, whatever
10    that may be.
11        Q.   Okay.  Well, let's look at the
12    policy.
13        A.   Okay.
14        Q.   I'm going to introduce another
15    exhibit.  Okay.  This is going to be
16    Exhibit 11.  Let me know when you have
17    it.
18    (Exhibit 11 was marked for identification
19    and is attached.)
20        A.   Okay.
21        Q.   Have you ever seen this document
22    before?
23        A.   I have not.

1      Q.   Do you know what the Federal

2    Register is?

3      A.   It's a -- it's a federal list of

4    regulations pertaining to things like

5    this.

6      Q.   Yeah.  It's the

7    official publication --

8      A.   Federal code.

9      Q.   -- of federal rules, proposed

10   rules, and notices for federal agencies;

11   right?

12     A.   Yeah.  Right.

13     Q.   I see this is dated at the top

14   November 18, 1994.  See that?

15     A.   Yes.

16     Q.   Page 1, middle column, see it

17   says, "Agency: Food and Drug

18   Administration, HHS"?

19     A.   Let's see.  "Agency: Food and

20   Drug Administration, HHS."  Yes.

21     Q.   It says, "Action."  It says,

22   "Notice; request for comments."  Do you

23   see that?

 1          A.    Yes.

 2          Q.    All right.  Go to page 2.

 3          A.    Okay.

 4          Q.    In the column all the way to the

 5     right, you see there's a section II, and

 6     it's titled, "FDA Policy on Promotion of

 7     Unapproved Uses."  Do you see that?

 8          A.    I do.

 9          Q.    All right.  The first paragraph

10     says, "Over a decade ago, the FDA Drug

11     Bulletin informed the medical community

12     that 'once a [drug] product had been

13     approved for marketing, a physician may

14     prescribe it for uses or in treatment

15     regimens of patient populations that are

16     not included in approved labeling.'"  Do

17     you see that?

18          A.    I do.

19          Q.    What do you understand that to

20     mean?

21          A.    That --

22          MR. KNEPPER:  Objection.

23          A.    I apply that to mean that --

1          that the -- that the FDA does not -- does

2          not intend to weigh in on off-label use,

3          you know, without restriction, I guess.

4          The sense I get of it is that they're --

5          they're declining to prohibit the

6          off-label use in -- in other patients at

7          this time, I would -- I would guess.  I

8          suppose that if they started to see

9          complications, they might weigh in.  This

10         has been the history, for example, with

11         nausea medicines and things like that

12         that created problems after use.

13             Q.   At that time at least, the FDA

14         was telling the medical community that

15         doctors may prescribe drugs for uses

16         outside of FDA-approved indications;

17         correct?

18             A.   Yes.  I would say that --

19                 MR. KNEPPER:  Objection, form.

20             A.   -- in 1994, the FDA declined to

21         -- to -- I don't know what they've done

22         subsequently.  I -- but -- but in 1994,

23         they -- they -- off-label use was not

1       prohibited.

2            Q.    Well, actually --

3            A.    They finally --

4            Q.    Sorry, finish.

5            A.    No, go ahead.

6            Q.    Well, you see this actually

7       says, "The publication further stated,"

8       and then there's a quote.  And after the

9       quote, there's a Footnote 4.

10            Before we get to that, do you

11       see it says -- it cites to the FDA Drug

12       Bulletin from 1982.

13            A.    Right.

14            Q.    Right?

15            A.    Right.

16            Q.    So that original guidance came

17       from a 1982 FDA position; right?

18            A.    Right.

19            MR. KNEPPER:  Objection, form.

20            Q.    And you say that you read this

21       and you don't think that the FDA has

22       taken a position, but let's see what else

23       that quote says.  You see the quoted

1    language starting with "The publication

2    further stated"?  Do you see that?

3         A.   That starts with the word

4    "unapproved"?

5         Q.   Yeah.  It says, "'unapproved'

6    or, more precisely, 'unlabeled' uses may

7    be appropriate and rational in certain

8    circumstances, and may, in fact reflect

9    approaches to drug therapy that have been

10   extensively reported in medical

11   literature."  Do you see that?

12        A.   I do.

13        Q.   You understand what that means;

14   right?

15             MR. KNEPPER:  Objection to form.

16        A.   Yes.  Yes.

17        Q.   Off-label use -- strike that.

18             The FDA has recognized as early

19   as 1982 that off-label use may be based

20   on medical literature, not published

21   indications; right?

22        A.   Right.

23        Q.   And then it says, "Valid new

1    uses for drugs already on the market are

2    often first discovered through

3    serendipitous observations and

4    therapeutic innovations, subsequently

5    confirmed by well-planned and executed

6    clinical investigations."  Right?

7         A.   Yeah.   That's -- that's kind of

8    a -- just a restating of what I related

9    to you about, for example, the use of

10   Botox and hyperhidrosis, as I have done.

11   Yeah, I would totally agree with that.

12        Q.   And then it says, "The agency

13   and its representatives have restated

14   this policy on numerous occasions."  Do

15   you see that?

16        A.   I do.

17        Q.   Do you understand that for

18   decades, for three decades at least, the

19   FDA has taken the position that

20   physicians are allowed to prescribe drugs

21   on an off-label basis?

22             MR. KNEPPER:  Objection, form.

23        A.   Yes.

1          Q.   Your report doesn't acknowledge

2     this longstanding position from the FDA,

3     does it?

4          A.   My report does not -- no, it

5     does not.

6          Q.   And I mean, I know I just heard

7     you say, well, maybe this is from the

8     '80s.  Let me show you what the FDA says

9     today.

10          A.   Okay.

11          Q.   I'm going to introduce another

12     exhibit.  This is Exhibit 12.  Let me

13     know when you get it.

14     (Exhibit 12 was marked for identification

15     and is attached.)

16          A.   Okay.  All right.  I've got it.

17          Q.   All right.  You see that this is

18     a printout from fda.gov, the official

19     website of the FDA; right?

20          A.   Right.

21          Q.   The title is "Understanding

22     Unapproved Use of Approved Drugs 'Off

23     Label.'"  Right?

1        A.   Right.

2        Q.   Go to page 2.

3        A.   Okay.

4        Q.   Toward the bottom, it says in

5    bold, "Why might an approved drug be used

6    for an unapproved use?"  Do you see that?

7        A.   I do.

8        Q.   Then it says, "From the FDA

9    perspective, once the FDA approves a

10   drug, healthcare providers generally may

11   prescribe the drug for an unapproved use

12   when they judge that it is medically

13   appropriate for their patient."  Do you

14   see that?

15       A.   I do.

16       Q.   And then skipping one sentence,

17   it says, "One reason is that there"

18   may -- "might not be an approved drug to

19   treat your disease or medical condition."

20   Right?

21       A.   Right.

22       Q.   So the FDA -- the position that

23   the FDA takes is off-label use may be

1      medically appropriate for patients;

2      right?

3          A.    Right.

4          Q.    That's a position they've taken

5      for thirty years plus; right?

6          A.    Right.

7                MR. KNEPPER:  Objection, form.

8          Q.    All right.  And we talked

9      earlier about, you know, is off-label use

10     experimental or investigational.  Before

11     forming those opinions, did you look to

12     see what the FDA says on that point?

13         A.    How the FDA classifies

14     experimental or investigational?

15         Q.    Do you know what position the

16     FDA takes on whether off-label use is

17     considered investigational?

18         A.    I don't know what their official

19     position is, no.

20         Q.    All right.  Let's look at that.

21     All right.  This is going to be Exhibit

22     13.  Let me know when you have it.

23     (Exhibit 13 was marked for identification

1      and is attached.)

2          A.    I have it.

3          Q.    This is a guidance document from

4      the FDA from 1998.  Generally, are you

5      aware that the FDA issues guidance

6      documents?

7          A.    Generally, yes, I am aware.

8          Q.    Have you ever seen an FDA

9      guidance document before today?

10         A.    I've heard them referred to, but

11     I've never read one, no.

12         Q.    Okay.  All right.  Well, this

13     one's titled "'Off-Label' and

14     Investigational Use of Marketed Drugs,

15     Biologics, and Medical Devices."  You see

16     that?

17         A.    I do.

18         Q.    Okay.  All right.  The first

19     paragraph, second sentence says, "If

20     physicians use a product for an

21     indication not in the approved labeling,

22     they have the responsibility to be well

23     informed about the product, to base its

1    use on firm scientific rationale and on

2    sound medical evidence, and to maintain

3    records of the product's use and

4    effects."  You see that?

5        A.   I do.

6        Q.   All right.  The next sentence

7    says, "Use of a marketed product in this

8    manner when the intent is the 'practice

9    of medicine' does not require the

10   submission of an Investigational New Drug

11   Application, Investigational Device

12   Exemption or review by an Institutional

13   Review Board."  Do you see that?

14       A.   I do.

15       Q.   I understand that what this is

16   saying, according to the FDA, when a

17   doctor prescribes a drug on an off-label

18   basis, that is not necessarily an

19   investigational use of that drug; right?

20            MR. KNEPPER:  Objection, form.

21       A.   I would disagree, because as it

22   says there, when they're -- when they're

23   prescribing in that manner, they have a

1    responsibility not only to be informed
2    about the product but to do the
3    recordkeeping of its effects, which is
4    really the initial phase of
5    investigation.  So in a sense, they are
6    -- they are part of the investigative
7    process now because a new application of
8    the medication has been proposed, and
9    safety and efficacy have -- have to be
10   documented in some measure.
11           So the FDA is giving you room to
12   broaden the application of the drug, but
13   they're also placing upon you the burden
14   of documenting so that its effects and
15   benefits can be characterized because
16   that's being -- obviously, it's being
17   investigated.  That's the point of their
18   wanting the recordkeeping, so --
19        Q.    Do you know what the
20   Institutional Review Board is?
21        A.    Yes.
22        Q.    Clinical trials have to be
23   cleared by IR- -- IRBs; right?

1      A.    Right.

2      Q.    And this says you don't actually

3    have to apply for approval by an IRB when

4    you're prescribing a drug on an off-label

5    basis; right?

6            MR. KNEPPER:  Objection, form.

7      A.    It says that it's not of

8    necessity, so they're not making a

9    blanket requirement.  I would imagine

10   that that might be modified in particular

11   cases.

12     Q.    Yeah.  Because this is saying

13   that when you're prescribing a drug on an

14   off-label basis, that doesn't mean you're

15   starting up a clinical trial; right?

16     A.    It doesn't necessarily mean

17   you're starting a clinical trial, that's

18   right.  It doesn't exclude the necessity

19   for a clinical trial.  It just says

20   you're not necessarily starting a

21   clinical trial.

22     Q.    Yeah.  And when this says --

23   when it says doctors should maintain

1    records of the product's use and effects,
2    it's not telling them that they're
3    enrolling their patients in a clinical
4    trial by starting -- by prescribing a
5    drug on an off-label basis; right?
6         MR. KNEPPER:  Objection, form.
7         A.    Right.  But what it -- what it
8    probably is inferring is that if they
9    start seeing complications, then the
10   further application of the drug in that
11   circumstance might be required -- might
12   require an IRB.  So yeah.  So it's --
13   what they're saying is it doesn't require
14   an IRB of necessity.  It does require
15   recordkeeping.  And I would expect that
16   if they were to see complications,
17   problems, lack of efficacy, that -- and
18   the desire for its continued use might
19   require an IRB.  In fact, I would -- I
20   would hope it would require an IRB.
21   Yeah.
22        Q.    Yeah.  A clinical trial down the
23   line is a "this might be nice to have,"

1       but it's not a requirement for a doctor
2       to prescribe a drug on an off-label use
3       basis.  That's what this says; right?
4               MR. KNEPPER:  Objection, form.
5           A.   That's what that says, yeah.
6           Q.   Yeah.  You don't cite this
7       guidance in your report obviously; right?
8           A.   I don't think it's --
9               MR. KNEPPER:  Objection, form.
10          A.   I don't think it's germane to my
11      report.  No.
12          Q.   All right.  You've also offered
13      opinions on whether it's proper to
14      prescribe drugs on an off-label basis to
15      children and adolescents; right?
16          A.   I've only offered it in the case
17      of this particular therapy.  I haven't
18      offered it generally, only in the case of
19      puberty blockade and cross-sex hormones
20      for the purposes of transitioning a child
21      to the appearance of the other sex.
22      That's all I've offered it as an opinion.
23          Q.   All right.  Do you know what the

1    American Pediatrics Association is?

2         A.    Yes.

3         Q.    Before forming your opinions,

4    did you look to see what the APA says

5    about off-label use of drugs in children

6    and adolescents?

7         A.    No.

8         Q.    Sitting here today, you don't

9    know the APA's position on this -- on

10   this topic; correct?

11             MR. KNEPPER:  Objection, form.

12        A.    Correct.

13        Q.    Let's look at that next.  Okay.

14   This is going to be Exhibit 14, and let

15   me know when you have it.

16   (Exhibit 14 was marked for identification

17   and is attached.)

18        A.    Okay.  I have it.

19        Q.    You understand this is a policy

20   statement from the APA?

21        A.    I'm reading it now.  I see that

22   it is a policy statement from the

23   American Academy of Pediatrics.

1      Q.   It's a policy statement

2   entitled, "Off-Label Use of Drugs in

3   Children."  Right?

4      A.   Yes.  Yes.

5      Q.   Look at the introduction section

6   toward the bottom of the page.

7      A.   Okay.

8      Q.   It says that, "The purpose of

9   this statement is to further define and

10   discuss the status of off-label use of

11   medic- -- medications in children."  And

12   then it talks about a publication of a

13   2002 statement.  You see that?

14      A.   Yes.

15      Q.   All right.  So the FDA -- APA

16   has taken a position on off-label use of

17   drugs in children since at least 2002;

18   right?

19          MR. KNEPPER:  Objection, form.

20      A.   I'm reading it now.  It appears

21   to be that, yeah.

22      Q.   All right.  Look at the abstract

23   towards the top.

1          A.    Okay.

2          Q.    Second sentence says, "However,

3     off-label drug use remains an important

4     public health issue for infants,"

5     childrens, and" -- "children, and

6     adolescents, because an overwhelming

7     number of drugs still have no information

8     in the labeling for use in pediatrics."

9     Do you see that?

10         A.    I do.

11         Q.    Okay.  And then it says, "The

12    purpose of off-label use is to benefit

13    the individual patient."  Right?

14         A.    Yes.

15         Q.    And then it says, "Practitioners

16    use their professional judgment to

17    determine these uses."  Correct?

18         A.    Yes.

19         Q.    And then it says, "As such, the

20    term 'off-label' does not imply an

21    improper, illegal, contraindicated, or

22    investigational use."  Right?

23         A.    That's what it says there, yes.

1      Q.   Yeah.   The APA also takes the

2   position that off-label use does not

3   imply investigational use; correct?

4           MR. KNEPPER:   Objection to form.

5      A.   It does not de facto imply

6   off-label use, that's right, yeah.   It

7   does not imply, right.

8      Q.   And it does not imply that

9   off-label use is de facto improper or

10   illegal or contraindicated; right?

11     A.   Right.

12           MR. KNEPPER:   Objection, form.

13     Q.   All right.   Go to page 2.

14     A.   Okay.

15     Q.   Look at the left column, the

16   very bottom paragraph.

17     A.   Okay.

18     Q.   It says:   "The absence of

19   labeling for a specific age group or for

20   a specific disorder does not necessarily

21   mean that the drug's use is improper for

22   that age or disorder.   Rather, it only

23   means that the evidence required by law

1    to allow inclusion in the label has not

2    been approved by the FDA.  Additionally,

3    in no way does a lack of labeling signify

4    that therapy is unsupported by clinical

5    experience or data in children."

6            Do you see that?

7        A.    I do.

8        Q.    This is the APA recognizing that

9    even in the absence of FDA approval for a

10   particular indication, that use may still

11   be supported by clinical experience and

12   data; right?

13           MR. KNEPPER:  Objection, form.

14       A.    Yeah.  I would -- I would say

15   also that the APA recognizes that -- that

16   there's a poverty of evidence.  The

17   poverty of evidence is one of the

18   characteristics of off-label use.  And

19   that's -- that's what the nature of my

20   expert opinion was about, that the

21   poverty of evidence is what makes the

22   off-label use an issue, and in this case,

23   poverty of evidence for off-label use in

1      a situation where the harms -- potential

2      harms are great.  That's what the concern

3      was, not -- obviously, I use -- I've

4      off-label used drugs in my own practice,

5      as I said before.

6              I don't have an objection

7      without qualification that -- that the

8      off-label use of drugs is somehow a

9      crime.  I'm saying that in this

10     particular instance of this particular

11     application, that the off-label use tells

12     us that there's a poverty of scientific

13     evidence to support its application that

14     way.  Clearly, there's anecdotal reports;

15     otherwise, doctors wouldn't be using it.

16     But there's a poverty of evidence, and

17     what we're dealing with here is not a

18     potential trivial complication but

19     potentially permanently life-altering

20     complications.

21             That was the issue that I was

22     addressing in my concern about the

23     off-label use, that there's a standard

1    of -- of caution that's required when you
2    go off-label.  And that caution isn't
3    being demonstrated by the -- for the
4    persons who are prescribing or applying
5    these drugs in this way.  That was my
6    concern.
7         Q.   All right.  You think that
8    before these drugs are to be prescribed,
9    they should first be supported by results
10   from clinical trials; right?
11             MR. KNEPPER:  Objection, form.
12        A.   That's the beginning.
13        Q.   That's the beginning.
14        A.   Yeah.
15        Q.   The absolute minimum to
16   prescribe these drugs; right?
17             MR. KNEPPER:  Objection, form.
18        A.   Well, no.  No, I -- I didn't say
19   that.  As I said, it begins with
20   anecdotal evidence, not clinical trials.
21   So somebody somewhere sees an effect.  As
22   it said in that FDA document, it's
23   oftentimes serendipitous.  A clinician

1    will see an effect, and then -- and then
2    they'll, based on that, they'll hopefully
3    check out the potential risks to the
4    patient and then begin that off-label
5    use.
6              So it begins actually with
7    anecdotal reports, maybe case
8    collections, maybe a number of providers'
9    case collections, maybe it's a -- it's
10   a -- it's an institutional experience.
11   But that leads to clinical trials and the
12   IRB and all the rest of it.  So that's
13   just the beginning of it.
14       Q.   It may be appropriate for a
15   doctor to prescribe a drug on an
16   off-label basis without having the
17   results from a clinical trial; correct?
18       A.   Yeah, I would -- I would hope
19   that after thirty years of doing this,
20   that we would beyond -- be beyond
21   institutional or personal experience,
22   that those trials would have already been
23   done.  This isn't -- we're not just at

1    the beginning of puberty blockade and
2    cross-sex hormones.  We're well into this
3    now, to the point where the European
4    literature is now vehemently rejecting
5    that.
6           That's -- these things have
7    changed.  In the last three years, it's
8    all changed.  With respect to this
9    off-label application of puberty blockade
10   and cross-sex hormones, it's changed
11   utterly.  So these general statements
12   about off-label use are important to
13   understand, certainly, when you see a
14   serendipitous result and you consider
15   applying the drug.  But we are so far
16   beyond that at this point in the history
17   of transgender therapy, this is where
18   we're concerned.  We're concerned with
19   the continued off-label use, the
20   continued absence of clinical trials.  We
21   should have been beyond that years ago.
22   And this is what the European literature
23   is now showing us, that the application

1       of those drugs by -- which is approved by

2       the APA, is now being rejected by the

3       medical services in Great Britain, in

4       Sweden, in Finland, in Holland.  And this

5       is where we as American providers have to

6       get.

7           Q.   All right.  We'll -- we'll

8       definitely come back to those --

9           A.   Okay.

10          Q.   -- studies.  I promise.

11          A.   Okay.

12          Q.   Let's finish this document

13      first, though.  All right.  Go to page 3.

14      All right.

15          A.   Okay.

16          Q.   Look at the left column.

17          A.   Okay.

18          Q.   It says:  "Therapeutic

19      decision-making should always be guided

20      by the best available evidence and the

21      importance of the benefit for the

22      individual patient.  Practitioners are in

23      agreement regarding the importance of

1    practicing evidence-based medicine.

2    However, for the pediatric population,

3    gold standard clinical trials are often

4    not available, so practitioners must rely

5    on either less definitive information,

6    such as expert opinion for the age group

7    that they are treating, or use evidence

8    from a different population to guide

9    practice."

10          You see that?

11       A.   I do.  And I would agree with

12    that, that particularly in pediatric

13    patients, the clinical trial approach

14    oftentimes is -- is not available because

15    of the nature of the condition and so on.

16    But in the -- in this case, there's a --

17    it's not an all or none, it's got to be

18    clinical trials or -- or nothing.

19          There's longitudinal

20    population-based studies, long-term

21    results seen in a population that has

22    matured through this therapy, and looking

23    at, you know, cohort studies

1    longitudinally, cohort study, which is --
2    which is an alternative when -- when the
3    clinical trial is not available to you
4    for ethical reasons.  Like you wouldn't
5    do sham surgery on somebody.  That would
6    be ethically untenable.  But you can look
7    at population-based studies where you
8    have a cohort to compare.  And that's --
9    that's where we should be.  That's where
10   the European literature is now.
11              So I would agree with that
12   statement that -- that the APA is making
13   there, but I would qualify it by saying
14   that there's an alternative available
15   that brings you to a higher level of
16   evidence that may in fact bring it to
17   on-label use if they were to bother to do
18   it.
19        Q.   The APA recognizes that for the
20   pediatric population in particular,
21   results from clinical trials are often
22   not available; right?
23        A.   Right.

1          Q.   And the answer in those

2     situations is not to stop prescribing

3     these drugs altogether; right?

4               MR. KNEPPER:  Objection, form.

5          A.   Yeah.  The "altogether" would be

6     the qualifier there because there are

7     some circumstances where it would be -- I

8     mean, it wouldn't be good to stop its

9     prescription, but there would be others

10    that you would have to examine more

11    carefully because of the risk issue.

12         Q.   Yeah.  Instead, what the APA

13    says is that when clinical trial results

14    are not available, doctors have to rely

15    on less definitive -- definitive

16    information; right?

17         A.   That's what -- that's all you

18    have.  That's right.

19         Q.   Yeah.  The APA says it may be

20    appropriate for doctors to prescribe

21    drugs to pediatric patients on an

22    off-label basis even when that use is not

23    supported by randomized clinical trials;

1    correct?

2        A.    Right.

3        Q.    Because the reality is that for

4    a lot of conditions, in the pediatric

5    population, there are no randomized

6    clinical trial results available; right?

7            MR. KNEPPER:  Objection, form.

8        A.    Again, so you're holding out

9    randomized clinical trial, or they're

10   holding out randomized clinical trial as

11   the only alternative to the lowest form

12   of evidence.  And I -- I agree that

13   randomized clinical trial are not always

14   available, and we have to have recourse

15   to perhaps lesser but nonetheless more

16   convincing forms of evidence to fall back

17   on rather than falling back to the lowest

18   form of evidence as is the case today

19   with the application of these drugs.

20       Q.    All right.  Look at the last

21   paragraph in the left column of this

22   page.

23       A.    Okay.

1        Q.   It says:  "In most situations,
2    off-label use of medications is neither
3    experimentation nor research.  The
4    administration of an approved drug for a
5    use that is not approved by the FDA is
6    not considered research and does not
7    warrant special consent or review if it
8    is deemed to be in the individual
9    patient's best interest."  Do you see
10   that?
11       A.   I do.
12       Q.   If the physician deems an
13   off-label use to be in the individual
14   patient's best interest, that's not
15   experimental use, according to the APA;
16   right?
17            MR. KNEPPER:  Object to the
18   form.
19       A.   Well, according to the --
20   according to the APA, in most situations.
21       Q.   Yeah.
22       A.   So in that statement, it
23   acknowledges that there are some

1    situations where that would be

2    considered.  That's the implication in

3    that statement.  So "most" is the

4    qualifier, implying that there are

5    situations where it would be considered

6    experimental.

7        Q.    Okay.

8        A.    And that's what we propose in

9    our expert testimony, is that this is one

10   of those situations.  This is

11   experimental use.

12            MR. TISHYEVICH:  Now let's go

13   off the record.

14            THE VIDEOGRAPHER:  This is the

15   end of Media Unit No. 3.  We are off the

16   record at 12:30 p.m.

17                (Break taken.)

18            THE VIDEOGRAPHER:  This is the

19   start of Media Unit No. 4.  We are on the

20   record at 1:21 p.m.

21        Q.   (By Mr. Tishyevich) All right,

22   Doctor.  You know you're still under

23   oath; right?

1      A.   Yes.

2      Q.   Before lunch, we were talking

3   about off-label use of prescription

4   drugs.  Do you know how common or

5   uncommon off-label use of prescription

6   drugs is in the overall population?

7      A.   I'm not familiar with that

8   number, no.

9      Q.   All right.  You don't know if

10  it's 5 percent or 10 percent or 50

11  percent of all drugs are prescribed off

12  label; right?

13     A.   I have no idea.

14     Q.   How about pediatrics

15  specifically?  Do you know how common or

16  uncommon off-label use is in the

17  pediatric population?

18     A.   I do not.

19     Q.   Let me introduce an exhibit.

20          MR. KNEPPER:  One second.

21          Dr. Lappert?

22          THE WITNESS:  Yes.

23          MR. KNEPPER:  Your camera has

Case 1:19-cv-00272-LCB-LPA   Document 209-3   Filed 02/02/22   Page 257 of 577

1    moved accidentally, yeah.

2          THE WITNESS:  It just allows me

3    to look at the bottom of the other screen

4    here so I can look at the exhibits.

5          MR. KNEPPER:  Okay.  I think

6    just for the video recording, we want to

7    make sure that the camera stays on your

8    face.

9          THE WITNESS:  I'll go like this,

10   then.

11         MR. KNEPPER:  Perfect.

12     Q.   (By Mr. Tishyevich) So this is

13   going to be Exhibit 15.  Let me know when

14   you have it.

15   (Exhibit 15 was marked for identification

16   and is attached.)

17     A.   All right.  I have it.

18     Q.   All right.  This is a study from

19   2019 by Dr. Yackey, Y-A-C-K-E-Y, titled

20   "Off-label Medication Prescribing

21   Patterns in Pediatrics: An Update."  Do

22   you see that?

23     A.   I do.

1          Q.    All right.  And the objective is
2     "To describe the frequency of off-label
3     drug use in 2014 as defined by the
4     FDA-approved age ranges in patients 18 or
5     under 18 years of age."  Do you see that?
6          A.    I do.
7          Q.    All right.  Look at "Methods."
8     Do you see that section?
9          A.    I do.
10         Q.    It says, "This is a
11    retrospective cohort study of an
12    administrative database containing
13    inpatient resource use data from January
14    1, 2014, to December 31, 2014."  And do
15    you see that?
16         A.    I do.
17         Q.    Look at the "Results" section.
18         A.    Okay.
19         Q.    The first sentence says, "At
20    least 1 drug was prescribed off-label in
21    779,270 of 2,773,770 (28.1%) patient
22    visits during the study period."  Do you
23    see that?

1          A.    I do.

2          Q.    And skipping a sentence, then it

3    says:  "Off-label usage of certain

4    medications differed between care

5    settings.  Rates of off-label medication

6    use were higher in observational (45.5%),

7    inpatient (53.9%), and ambulatory (54.2%)

8    settings."  Do you see that?

9          A.    I do.

10         Q.    All right.  The study concluded

11   after reviewing 2.7 patient visits that

12   overall, 28.1 percent of patients were

13   prescribed an off-label -- prescribed a

14   drug on an off-label basis; right?

15         A.    Right.

16         Q.    And depending on the setting,

17   off-label prescriptions in the pediatrics

18   context can be as high as 45 to 54

19   percent; right?

20         A.    That's what the study shows.

21         Q.    All right.  The reality is that

22   prescribing drugs to children and

23   adolescents on an off-label basis is a

1      fairly common practice; right?

2              MR. KNEPPER:  Objection to form.

3          A.   It appears to be, yes.

4          Q.   You did not know this before you

5      formed your expert opinions?

6          A.   I knew that it was more common

7      in children than in adults, and I knew

8      that it was, you know, fairly common,

9      having -- having prescribed off-label

10     myself to children, that it's -- it's

11     probably fairly common.  I didn't know

12     the exact numbers, though, until now.

13         Q.   Okay.

14         A.   Again, my -- my expert opinion

15     about this is not about does it happen.

16     It's about the particular case of the

17     transgendered person receiving an

18     off-label use of a -- of a fairly

19     problematic drug in light of the recently

20     changing evidence about its efficacy.  So

21     the issue of off-label use that I

22     presented was not about are drugs

23     prescribed off-label.  The issue was

1    these particular drugs in these
2    particular patients off-label in light of
3    the recent change in the world literature
4    about the risk/benefits of doing those
5    things.  And the evidence now is that
6    that whole position about puberty
7    blockade and cross-sex hormones, it's
8    falling apart in the last three years,
9    and there's a -- there's a growing wave
10   of evidence that says do not do this.
11   And in fact, that's where the Court
12   stepped in in Great Britain, and it's
13   where the Karolinska Institute stepped
14   in.
15            It's not that it's off-label
16   use.  It's that it's particularly
17   problematic in the case of these drugs in
18   these suffering patients.  That's what my
19   expert opinion was about.  It was not
20   about drug policy.  It was about these
21   patients, these problems, these drugs.
22   And the fact is that when you off-label
23   use, the responsibility falls much more

1  heavily on the provider.  When the FDA
2  approves it, the responsibility falls to
3  the shoulders of the approving authority.
4  But if you're going off-label, it's on
5  you as the provider to be certain that
6  you're doing good to the patient.  And up
7  until the last three years, the evidence
8  wasn't there.  Now it's there.  The
9  continued use of the drugs in this way
10  has become very problematic, and that's
11  -- that's what my expert opinion was
12  about, not about drug policy, but about
13  these drugs, these patients.
14      Q.   Doctor, there's actually no
15  question pending, so I'm going to ask
16  that you stick with listening to my
17  questions and then answering them instead
18  of making speeches.  Okay?
19          All right.  You -- we talked
20  earlier about the Botox injections that
21  you've done; right?
22      A.   Yes.
23      Q.   You told me you've been doing

1    Botox injections in the forehead for over

2    ten years; right?

3        A.   Correct.

4        Q.   You've told me that you've been

5    doing Botox injections for crow's feet

6    for over ten years; right?

7        A.   Yes.

8        Q.   Do you know when the FDA first

9    approved Botox for the use of treating

10   forehead wrinkles?

11       A.   Let's see.  I recall that it was

12   when I was the chief of plastics at

13   Portsmouth, Virginia, because we had been

14   using it for dystonias and things like

15   that in children.  And it got approved

16   for cosmetic use I'm going to say before

17   we moved to the new hospital, so it had

18   to have been around ninety- -- I want to

19   say '97, somewhere in there.  I'm just

20   ballparking it here.

21       Q.   So when you were using Botox to

22   do forehead injections, you think that

23   was an on-label FDA approved use for the

1      last ten years; right?

2          A.   Yeah.   When used in the

3      corrugator and procerus muscles, that's

4      the on-label use for cosmetic botulinum

5      toxin.

6          Q.   Let me introduce another

7      exhibit.  All right.  This is going to be

8      Exhibit 16, and let me know when you have

9      it.

10     (Exhibit 16 was marked for identification

11     and is attached.)

12         A.   All right.  I have it.

13         Q.   Top right corner, you see it

14     says, "Food and Drug Administration"?

15         A.   Yes.

16         Q.   Below that, do you see it says,

17     "Supplement Approval"?

18         A.   Yes.

19         Q.   You know what this is?

20         A.   It looks to be a -- a letter

21     from the FDA to the Allergan corporation,

22     to a particular Ph.D. there who is the

23     director of regulatory affairs.  And it's

1      a supplemental -- I guess it's an

2      amendment.  I haven't read it.  Can I

3      have a moment to read it?

4           Q.   I'll -- I'll point you to it.

5      Don't worry.

6           A.   All right.

7           Q.   Allergan is a manufacturer of

8      Botox; right?

9           A.   Allergan, yes, uh-huh.

10          Q.   Go to page 3.

11          A.   Okay.

12          Q.   And you see there's a signature

13     line, and under that, it says,

14     "10/02/2017"?

15          A.   Correct.

16          Q.   You understand this was issued

17     on October 2, 2017; right?

18          A.   That's -- that's what the

19     document appears to show, yeah.

20          Q.   Go back to the first page.

21          A.   Okay.

22          Q.   First paragraph says, "Dear Dr.

23     Richmond:  Please refer to your

1      Supplemental Biologics License
2      Application, dated and received December
3      2, 2016."  Do you see that?
4           A.   I do.
5           Q.   The next paragraph says, "This
6      Prior Approval supplemental biologics
7      application proposes an additional
8      indication for the temporary improvement
9      in the appearance of moderate to severe
10     forehead lines associated with frontalis
11     muscle activity."
12          A.   Right.
13          Q.   Do you see that?
14          A.   I do.
15          Q.   All right.  Then the next
16     section says, "Approval & Labeling."
17     Right?
18          A.   Yes.
19          Q.   It says, "We have completed our
20     review of this supplemental application,
21     as amended.  It is approved, effective on
22     the date of this letter, for use as
23     recommended in the enclosed, agreed-upon

1    labeling text."  Do you see that?

2        A.    I do.

3        Q.    All right.  You understand that

4    Botox was not an FDA-approved treatment

5    for improvement in moderate to severe

6    forehead lines until October 3, 2017 --

7              MR. KNEPPER:  Objection --

8        Q.    -- right?

9              MR. KNEPPER:  -- to form.

10       A.    The sense I get of your question

11   is that you -- you're conflating the

12   injection of corrugator and procerus

13   muscles with the injection of the

14   frontalis muscles.  I consider all those

15   muscle groups to be forehead muscles

16   because they all animate the brow.  The

17   approval of Botox for the corrugator and

18   frontalis -- I mean, corrugator and

19   procerus muscle that goes way back is, I

20   thought, what you were -- you were asking

21   me about with ten years application to

22   the forehead.  So yeah.  So I consider

23   the -- the corrugator and procerus

1    muscles (indicating) forehead muscles.

2    Maybe others would call them glabellar,

3    but glabellar is the lesser-included

4    category.  So yeah.

5          So I was aware of the broadened

6    application, and I was aware that for

7    most of the time it's been on the market,

8    it has been limited, the approval been

9    limited to the corrugator and procerus.

10   And the frontalis marginal radicularis

11   was considered off-label use, as was its

12   use in hyperhidrosis, like we talked

13   about earlier.  Yeah.

14      Q.   You have prescribed Botox

15   cosmetic -- or strike that.

16          You have used Botox for

17   treatment of moderate to severe forehead

18   lines associated with frontalis muscle

19   activity before October 3, 2017; correct?

20      A.   Yes.

21          MR. KNEPPER:  Objection to form.

22      A.   Absolutely.

23      Q.   It's an off-label use; right?

1        A.   As we've talked about before,
2   yes, I've -- I've used it off-label.
3        Q.   And do you know when Botox
4   received this indication for treatment of
5   crow lines?
6        A.   I'm sorry.  Of?
7        Q.   Treatment of crow lines.
8        A.   Crow lines?
9        Q.   Yes.
10       A.   Oh, crow's feet (indicating).
11       Q.   Sorry, crow's feet.
12       A.   Yeah.  Yeah.  I don't know -- I
13  don't know the exact date of that.  I
14  just know that it's been broadened.
15       Q.   All right.  Before -- strike
16  that.
17            Before you first started using
18  Botox on an off-label basis, did you do a
19  literature search to see if there was a
20  randomized, double-blinded controlled
21  trial to demonstrate that this forehead
22  use was safe and effective?
23       A.   No.

1          MR. KNEPPER:  Objection, form.

2      Q.   So you were using it without

3   having any idea if there was randomized

4   controlled clinical trials to demonstrate

5   the safety and effectiveness of that use;

6   correct?

7          MR. KNEPPER:  Objection, form.

8      A.   So the question is, was I using

9   it in other than the on-label purposes

10   before the approval was handed down by --

11   to the -- by the FDA?

12      Q.   No.  I already heard the answer

13   to that question.

14      A.   Oh, okay.

15      Q.   I'm asking you a different

16   question.

17      A.   Okay.

18      Q.   At the time you were using

19   Botox on --

20      A.   Oh.

21      Q.   -- an off-label basis --

22      A.   Right.

23      Q.   -- you were doing that without

1      having results from a randomized
2      controlled trial to demonstrate that this
3      off-label use was safe and effective;
4      correct?
5          A.   Correct.  Correct.
6               MR. KNEPPER:  Objection, form.
7          Q.   The same is true for respective
8      cohort studies; right?
9          A.   Correct.
10          Q.   The same is true for case
11      control studies; right?
12               MR. KNEPPER:  Objection, form.
13          A.   Right.  And that's an example of
14      what we were talking about earlier where
15      a low-risk application begins with
16      anecdotal experience, shared anecdotal
17      experience, and -- and the literature
18      that comes later leading to the
19      controlled trial that the Allergan
20      company may have done and it's then
21      subsequently approved by the FDA.  That's
22      right.  So this would fit into that
23      category.

1      Q.   All right.  Let's talk more

2   about randomized controlled trials

3   outside of Botox.  If I call them RCTs

4   for short, you'll know what I'm referring

5   to; right?

6      A.   Yes.

7      Q.   An RCT typically involves two

8   groups, an experiment group and a control

9   group; right?

10     A.   Yes.

11     Q.   RCTs are typically

12  double-blinded; right?

13     A.   Well, in most cases.  But when

14  you're talking about things where there's

15  going to be an outward change in the

16  patient, it's -- it's difficult to blind

17  such studies.  You're essentially just --

18  for example, you couldn't have a

19  double-blinded study of a surgical

20  procedure, or you couldn't have a

21  double-blinded study of a -- of a medical

22  intervention where there's outward change

23  to the patient that would be evident to

1          both the experimenter and the subject.
2          So yeah.
3               Q.   Yeah.  So -- yeah, we'll get to
4          that in a minute.  Let me ask just some
5          more general questions first.
6               A.   Okay.
7               Q.   Because I want to figure out
8          your experience with RCTs.  You
9          personally have never been the lead
10         investigator for an RCT; correct?
11              A.   That's correct.
12              Q.   You personally -- strike that.
13                   Have you ever been involved with
14         an RCT?
15              A.   Yes.  When I was a resident at
16         the University of California-San
17         Francisco working on the neurosurgical
18         trauma unit, we were doing a randomized
19         controlled trial of the medical
20         management of elevated intracranial
21         pressure, and I was -- because I was part
22         of the team, I was responsible for
23         gathering data in the critical care unit

1      and -- and working with the investigators
2      ensuring the integrity of the data.  So I
3      was not the lead investigator, obviously.
4      I was just one of the participants as one
5      of the treating physicians.
6          Q.   The only time you worked on a
7      randomized controlled trial was during
8      your surgery res- -- general surgery
9      residency; correct?
10             MR. KNEPPER:  Objection, form.
11         A.   I'm trying to think if there
12     were other instances here.  At UC-Davis
13     -- I'm trying to think.  Give me just a
14     moment.  I just want to --
15         Q.   Sure.
16         A.   -- make sure I'm not missing any
17     more.  I think that's the only one where
18     it was a randomized blinded study.
19     That's right, yeah.
20         Q.   And that residency was '87
21     through '91?
22         A.   That's right.
23         Q.   Okay.  You've never published

1    any articles in peer-reviewed journals
2    about RCTs; correct?
3        A.    That's correct.
4        Q.    You've personally never designed
5    an RCT; correct?
6        A.    That's correct.
7        Q.    You don't hold yourself out as
8    an expert in RCT design; right?
9              MR. KNEPPER:  Objection, form.
10        A.    Well, I would qualify that
11    answer by saying that part of my training
12    involves me being able to understand and
13    review published literature on the
14    subject even though I'm not the
15    investigator because of my training as a
16    plastic and reconstructive surgeon, as a
17    general surgeon.  As just a physician in
18    general, we're trained on how to
19    interpret the validity or the veracity of
20    the medical literature, including how to
21    interpret the randomized controlled trial
22    and -- and understand its validity, which
23    is -- what I'm testifying about is not my

1    personal experience.  It's my opinion of
2    the validity of the scientific data.  So
3    I -- so it's not that I -- that I can't
4    express an opinion on it.  It's just that
5    I haven't personally conducted one, but I
6    have been trained on how to interpret
7    them.
8        Q.    I understand that distinction
9    you're making.
10       A.    Thank you.
11       Q.    But when it comes to designing
12   RCT, you're not an expert in that aspect
13   of RCT?
14            MR. KNEPPER:  Objection, form.
15       A.    Well, again, part of the
16   evaluation of a randomized controlled
17   trial is to evaluate how the study was
18   designed.  That's one of the criteria
19   used for understanding the validity of a
20   published document like a RCT.  So you
21   always look at -- that's why it's such an
22   essential part of a -- of a RCT
23   publication is you look at the materials

1    and methods and you look at the study

2    design, and that's where, really, your

3    analysis begins if you're trying to

4    interpret the data.  Did they design the

5    study properly?  Does it have the power

6    of discrimination of what they claim that

7    it has?  And then you look at the actual

8    results, and it's on -- it's on your

9    shoulders as the -- as the professional,

10   whether you're a -- you know, a

11   researcher or somebody who's seeking to

12   apply it in his practice, you're

13   responsible for interpreting the data

14   quite apart from their interpretation of

15   it.

16            So an example of that would be

17   the Branström study, where they --

18   they -- they generated a good -- a

19   reasonable study design, but they

20   misinterpreted the data, and that's what

21   caused the retraction of the Branström

22   study, is that all the other people who

23   were not RCT investigators, but they were

1       all physicians, endocrinologists,

2       pediatricians, they looked at the data

3       and said, "You've misinterpreted the

4       study."

5               And that's really what we're

6       talking about here.  There are those who

7       perform the study, and then there's us

8       who have to live with it, and we have to

9       be able to understand what they're --

10      what they're purporting to.  So we have

11      to interpret the data even before reading

12      their conclusions.

13          Q.   Do you know what the CONSORT

14      criteria are?  C-O-N-S-O-R-T.

15          A.   I've read it sometime before.  I

16      can't -- I can't -- I can't quote it for

17      you, but it's -- it's germane to the

18      study design process?  I'm not sure.

19          Q.   Okay.  Can you describe for me

20      what the CONSORT criteria are in general

21      terms?

22          A.   I cannot.

23          Q.   All right.  How about cohort

1    studies?  You've personally never
2    designed a cohort study; correct?
3         A.    No, I have not.
4         Q.    You've personally never been an
5    investigator in a cohort study; correct?
6         A.    Well, so -- so, that experience
7    at -- at UC-San Francisco was a -- well,
8    so are you asking -- by cohort study, are
9    you talking about like a retrospective
10   study of a -- of a population cohort?  Is
11   that what you're asking me about?
12        Q.    Prospective or retrospective,
13   either -- either/or.
14        A.    I haven't designed any of those
15   studies, no.
16        Q.    Okay.  And outside the one
17   experience in your residency, have you
18   ever been involved with any prospective
19   or retrospective cohort study?
20        A.    No.
21        Q.    And how about case-control
22   studies?  Have you ever personally
23   designed a case-control study?

1        A.    No, I have not.

2        Q.    Have you ever been an

3    investigator in a case-control study?

4        A.    I'm just trying to think if the

5    -- if the head trauma investigation would

6    fit the category of a case control.  It

7    was a randomized study.  It had its own

8    internal controls.  So I guess I've

9    assisted in that investigation, but only

10   as a -- as a provider and a -- and a data

11   gatherer.

12       Q.    Outside of that one experience,

13   you have not been involved with any

14   prospective or retrospective cohort

15   study; right?

16       A.    No.

17       Q.    Or a case-control study?  Excuse

18   me.

19             Okay.  Let's go back to your

20   report, Exhibit 1, and go to page 13.

21       A.    Okay.  Okay.

22       Q.    You see there's a header that

23   says in capital letters, "Anecdotal

1    Patient Stories Are Not Data."  Do you

2    see that?

3        A.    I do.

4        Q.    And you write, "Drs Schechter

5    and Brown also failed to disclose and

6    properly discuss that Anecdotal Data

7    unverified patient reports without

8    control groups, randomized trials, or

9    other scientific protections for the

10   integrity of the medical system -- are

11   not reliable science."  Do you see that?

12       A.    I do.

13       Q.    And then you reference personal

14   patient stories, and you say, "This is

15   unreliable Anecdotal Data and it is not

16   credible, scientific information."  Do

17   you see that.

18       A.    I do.

19       Q.    All right.  You think that case

20   reports are anecdotal evidence; right?

21       A.    Yeah, they're --

22             MR. KNEPPER:  Objection.

23             THE WITNESS:  I'm sorry?

1           MR. KNEPPER:  Objection, form.

2           Go ahead.

3           THE WITNESS:  I'm sorry.

4      A.    Yeah.  And so anecdotal data is

5    personal experience of a -- of a

6    practitioner, for example.  So -- so a

7    surgeon reporting on five cases that he

8    did would be considered anecdotal

9    reporting, or case reports and things

10    like that, yeah.  That's anecdotal,

11    personal experience, a personal exper- --

12      Q.    And you think --

13      A.    I'm sorry?

14      Q.    Go ahead.  Sorry.

15      A.    Personal experience as distinct

16    from more stringent scientific evidence

17    like a longitudinal study or a cohort

18    study or something like that.  Or even --

19    even personal experience with pre- and

20    posttreatment testing rises to a higher

21    level than anecdotal.  So you can base --

22    you can base scientific evidence on that

23    next level, which would be anecdotal

1    experience elevated to the next level by
2    pretreatment and posttreatment testing.
3    This is -- this is from the guidance that
4    the American Society of Plastic Surgery
5    puts out.
6              So depending on the -- depending
7    on the type of study, if it's a -- if
8    it's a therapeutic study or a diagnostic
9    study or a prognostic study, depending on
10   what you're looking at, if -- if you --
11   if you take it to that next level with
12   pre- and posttreatment testing with a
13   validated scientific instrument, you
14   know, a validated study even of
15   subjective reporting from the
16   psychiatric/psychological side of things,
17   that has more validity than the anecdotal
18   reports of a practitioner or even an
19   institution.
20   Q.   Do you think that a case report
21   that doesn't have this before and after
22   comparator that you describe is
23   essentially worthless from the --

1        A.    No.

2        Q.    -- scientific perspective?

3        A.    No, no.  Not worthless.  Not

4    worthless, but it's what's considered in

5    the -- in the -- in plastic surgery

6    circles, certainly, it's considered the

7    lowest form of evidence.  So for a number

8    of years now, the American Society of

9    Plastic Surgery has insisted that

10   publications -- if you're going to

11   publish a case series, for example, that

12   they have to be a sequential -- you can't

13   pick the cases you're reporting on.  It

14   has to be a sequential series of

15   patients, and you have to declare in the

16   publication, in your -- in your article,

17   the level of evidence that you're

18   presenting.

19          So if -- if it's merely a --

20   case reports, that would be level 5

21   evidence.  If you added to that a review

22   of the literature with a -- you know, a

23   definitive review of the literature

1    looking at the -- at where the weight of
2    evidence lies, then you raise it to the
3    next level.  But we're -- we're now
4    required when we're publishing in -- in
5    the ASPS journal, for example, to state
6    in the -- in the document level of
7    evidence.  So a case report is not zero
8    scientific evidence.  It's level 5
9    evidence.  It's the lowest form of -- of
10   evidence is what it is.
11       Q.   You personally would not rely on
12   a level 5 case report to decide if a
13   surgical technique is effective?
14       A.   It would be the beginning of my
15   interest in a particular technique.  As a
16   surgeon, we tend to be very conservative,
17   and we call upon our personal experience
18   very much and certainly upon our
19   training.  So if somebody proposes
20   something radically new and all they have
21   to support it is level 5 evidence,
22   generally -- there's a saying that I
23   learned in training is never be the first

1    or -- first one to do a procedure or the

2    last one to do a procedure.

3            And so, yeah, you know, surgeons

4    tend to not jump in early on -- on

5    low-quality evidence.  We tend to be

6    conservative about it.  And I would

7    number myself among them.

8        Q.   All right.  Let me ask the flip

9    side.

10       A.   Okay.

11       Q.   Do you think it's necessary for

12   a surgical procedure to be supported by

13   results from a level 5 RCT before it can

14   be considered effective?

15       A.   No.

16            MR. KNEPPER:  Objection to form.

17       A.   That would -- that would be one

18   of those circumstances where what is the

19   risk to the patient and -- and what's the

20   potential benefit to the patient.

21   That's -- that's what kind of would drive

22   my decision to act on a level 5 case

23   report, offering something like that to

1    one of my patients.

2        Q.    Do you think that a surgical

3    procedure has to be supported by a level

4    2 controlled study before that surgical

5    procedure can be considered

6    nonexperimental?

7        A.    Not necessarily.  It would

8    depend on what is -- what is -- what is

9    at risk here.  Certainly, we're much more

10   willing to -- to proceed with -- with

11   techniques and procedures that aren't

12   hugely supported if there's great risk to

13   the patient of not doing anything.  So

14   level of risk and what is at stake kind

15   of drives that and -- and yeah.

16           Did I answer that question?  Is

17   that what you were asking?

18       Q.    Yeah.  It's basically a

19   case-by-case decision; right?

20           MR. KNEPPER:  Objection, form.

21       A.    Well, I wouldn't say case by

22   case.  I would say, you know, you're

23   relying on -- on -- on a lifetime of

1    experience possibly, and you're relying

2    also on -- on conversations with your

3    peers, your colleagues, what is their

4    experience in the area and how much of a

5    risk are you going to subject to the

6    patient -- subject the patient to in

7    order to achieve a result.  The greater

8    the risk, the greater the expectation of

9    a defined scientifically supported

10   outcome.

11          So in the case -- in the issue

12   at hand here, great risk of doing, for

13   example, a transition surgery, because

14   you're talking about permanent

15   sterilization, irreversible

16   sterilization, or the removal of the

17   breasts, permanent and irreversible loss

18   of the breasts, that's a huge stake, a

19   huge risk to the patient that the -- the

20   expected outcomes have to be consummately

21   much larger in order to justify something

22   like that if you don't have scientific

23   support.  If you're at low levels of

1    scientific evidence, then clearly, you
2    have an obligation to the patient not to
3    -- not to try something risky if you
4    don't have extensive and very valid
5    scientific -- and that's where we are
6    now.  We're at very low-level evidence
7    for these things.  That's kind of why
8    we're here today.
9        Q.   I guess I'm asking a more
10   specific question.  You're not taking the
11   position that in order to be considered
12   nonexperimental, a particular surgical
13   procedure has to be supported by at least
14   level 1 or level 2 evidence; right?
15            MR. KNEPPER:  Objection, form.
16       A.   Oh, okay.  So you're asking me
17   the definition of experimental.  Is
18   that -- do I understand you correctly?
19       Q.   Sure.
20       A.   Yes.  Am I saying that something
21   is nonexperimental once it reaches level
22   2 evidence or higher and not before?
23       Q.   Correct.

1       A.    I'm not saying that, no.

2       Q.    Okay.  How about level 3?  Are

3    you taking the position -- strike that.

4            Are you expressing the opinion

5    that a surgical procedure can only be

6    considered not experimental if it reaches

7    evidence level 3?

8       A.    Well, it's getting closer.  So

9    when you're -- when you're at level 3,

10   you're talking about a retrospective

11   study with a cohort.  And if we were

12   talking about some simple technique of

13   reconstructing, say, a wound on the face

14   for cancer therapy, then I certainly

15   wouldn't wait to try a new technique.  If

16   it promised to get a better result, I

17   wouldn't wait until I got to level 3

18   evidence.

19           But if you're talking about a

20   very drastic operation where I'm

21   amputating healthy parts, then yeah, I'm

22   going to want to go at least to level 3

23   before I consider that, because again,

1    you're talk about tremendous risk to the
2    patient, permanently life-altering
3    changes.  You better have very strong
4    evidence that you're doing the patient
5    good because you're doing the patient a
6    great harm by, you know, removing their,
7    genitals, permanently sterilizing them,
8    removing their breasts.  So again, it's
9    -- it's not a case by case, but let's --
10   let's say broad categories of -- of
11   techniques or surgery.
12          If you're talking about
13   something small like reconstructing a
14   facial defect, then yeah, you don't need
15   to get to level 3.  But if you're talking
16   about something large and permanently
17   life-altering, then at least level 3.
18       Q.   All right.  We talked earlier a
19   while ago about some of the surgical
20   procedure you performed, and I think one
21   of the things you mentioned was breast
22   reductions.
23       A.   Yes.

1      Q.    Right?

2      A.    Yes.

3      Q.    You've done those; right?

4      A.    I have done so many of those.

5      Q.    All right.  You've done breast

6    reduction surgery without having the

7    results from a randomized controlled

8    clinical trial; right?

9      A.    I believe the -- the bulk of the

10   evidence in the therapeutic benefit of

11   breast reduction is primarily given to us

12   by a long-term longitudinal cohort study

13   that we actually get from the insurance

14   industry.  Because when you do breast

15   reduction surgery, one of the key issues

16   in a breast reduction is, is it going to

17   be efficacious in curing an orthopedic

18   problem.  So if you're talking about

19   breast reduction surgery as a quote,

20   unquote reconstructive procedure, then

21   really, it's being applied to an

22   orthopedic condition.

23         And the insurance companies have

1      a wealth of evidence about, for example,

2      the weight of the specimen that has to be

3      submitted in order to have a hope of

4      relieving the orthopedic complaint of

5      neck, back, and shoulder pain.

6              So -- and vir- -- and I can tell

7      you categorically, because I'm very

8      fastidious about this, that all of the

9      breast reduction operations that I've

10     ever done for the orthopedic condition of

11     neck, back, and shoulder pain have met

12     the criteria based upon this long-term

13     longitudinal cohort study that the

14     insurance companies have been running

15     since back in the '80s at least.

16        Q.   All right.  Doctor, again, I

17     need you to listen to my questions.  I

18     didn't ask about cohort studies.  I asked

19     about randomized clinical trial.

20        A.   Oh.

21        Q.   You have done -- you have done

22     breast reductions without having results

23     from a randomized controlled clinical

1    trial?

2        A.    Oh, forgive me.  I -- I

3    misunderstood the question, then.  No.

4    The -- I have not, no.  The industry --

5    the plastic surgery community does not

6    rely on a randomized trial for the -- the

7    operation to be merited.  That's correct.

8        Q.    Right.  Nobody in this industry

9    waits for results from a randomized

10   controlled trial before determining that

11   a particular surgical procedure is

12   nonexperimental; right?

13           MR. KNEPPER:  Objection, form.

14       A.    Well, this gets back to what we

15   were talking about before, what the --

16   what the level of evidence is, what's at

17   risk, and what are the potential

18   benefits.  So in the case of breast

19   reduction surgery, yes, we have not

20   relied on randomized controlled trials

21   because there was such an abundance of

22   level 3 evidence to justify the

23   procedure.  And so -- and level 3

1    evidence is sufficient to answer the
2    question, is this experimental or not?
3    This procedure doesn't rise to the level
4    of level 2 or level 1 in order to be
5    justified.  I believe there have been --
6    well, no, I can't say categorically, so I
7    won't.
8              So yeah, to answer your
9    question, breast reduction does not rely
10   on randomized trials.  It relies on level
11   3 evidence.
12      Q.    All right.  Let's take it out of
13   the realm of breast reduction in
14   particular.
15      A.    Okay.
16      Q.    It is not uncommon for plastic
17   surgeons to perform procedures that are
18   not supported by results from an RCT;
19   correct?
20              MR. KNEPPER:  Objection, form.
21      A.    As a general principle, plastic
22   surgeons are perhaps more innovative than
23   other surgeons, so we're inclined to try

1       new techniques.  And then, of course, you

2       have to exercise some significant

3       prudential judgment about what risk are

4       you placing the patient in before you get

5       experimental with them.  Yeah.  So yes,

6       we -- we do that all -- we're innovators,

7       as -- as a general principle.

8            Q.   And as a general principle,

9       plastic surgeons will often commonly

10      perform procedures that are not supported

11      by level 2 evidence; correct?

12           MR. KNEPPER:  Objection, form.

13           A.   Yes.

14           Q.   And as innovators, plastic

15      surgeons will often perform surgical

16      procedures that are not level 3 evidence;

17      right?

18           MR. KNEPPER:  Objection, form.

19           A.   Yeah.  They -- if you're talking

20      about small like technical improvements

21      in -- in low-risk procedures, then yeah,

22      we -- we do that very commonly.

23           Q.   Okay.  You know what the

1    Plastics and Reconstructive Surgery

2    journal is; right?

3        A.    Yes.

4        Q.    It's the official publication of

5    the ASPS; correct?

6        A.    Correct.

7        Q.    It's a peer-reviewed medical

8    journal; right?

9        A.    Correct.

10       Q.    It's published monthly; right?

11       A.    And plus supplements as well and

12   online.  Yes, sir.

13       Q.    One purpose of that journal is

14   to educate members about new surgical

15   techniques; right?

16       A.    Yes.

17       Q.    Would you agree that the journal

18   is the premier peer-reviewed source for

19   current information on reconstructive and

20   cosmetic surgery?

21       A.    I would.

22       Q.    All right.  Are you -- I know

23   that you're no longer a member.  Are you

1        still subscribing to the journal?

2            A.   No, I'm not.  It's a -- it's for

3        members that you get the journal, so

4        yeah.  That's what my subscription relied

5        on, so -- all those years.

6            Q.   I understand.  So not -- you

7        haven't had access to it since 2018?

8            A.   Well, I -- no, I go online, and

9        I'll pay for access to particular

10       articles.  So yeah.  So it's not that

11       I've lost contact with it, it's just that

12       I do literature searches, and if an ASPS

13       citation comes up, I'll pay to look at

14       it.

15           Q.   I understand.  Sitting here

16       today, what percent of publications in

17       that journal do you think consist of

18       results from RCTs?

19               MR. KNEPPER:  Objection, scope,

20       form.

21           A.   Yeah, I'm -- I'm not sure I

22       could hazard a guess even.

23           Q.   Ballpark, do you think it's 10

1      percent?  50 percent?

2          A.    Of their published articles that

3      are randomized controlled trials?

4          Q.    Yes.

5                MR. KNEPPER:  Objection to form,

6      scope.

7          A.    Gosh, I'm going to guess it's

8      probably somewhere -- probably less than

9      10 percent.

10         Q.    How about cohort studies?  If

11     you had to estimate, what percentage of

12     publications in that journal do you think

13     consist of results from cohort studies?

14               MR. KNEPPER:  Objection, form.

15         A.    Again, just ballparking here

16     after, you know, 35 years of reading that

17     article -- that journal for 35 years, I

18     would say that -- I don't -- I may be

19     guessing, but 15 percent maybe are -- are

20     cohorts that are usually single-center

21     studies.  There's a lot of those in

22     the -- in the White Journal.  There'll be

23     a single-center cohort study of -- of

1      some operation or technique, and they'll

2      usually report it as three or four

3      surgeons at a single center reporting a

4      -- a longitudinal cohort of, say, breast

5      cancer reconstructions with implants

6      versus breast reconstruction with

7      autologous flaps and comparing

8      satisfaction surveys and things like

9      that.  So I'm going to ballpark it at 15

10     percent, but I don't know.  I don't know

11     for a fact.

12         Q.   Let me introduce an exhibit.  So

13     this will be Exhibit 17, and let me know

14     when you get it.

15     (Exhibit 17 was marked for identification

16     and is attached.)

17         A.   Okay.  All right.  I have it.

18         Q.   All right.  This is a study from

19     2019 by Sugrue, S-U-G-R-U-E, titled

20     "Levels of Evidence in Plastic and

21     Reconstructive Surgery Research."  See

22     that?

23         A.   I do.

1      Q.   All right.  See there's a
2    "Summary" box on the first page?
3      A.   Yes.
4      Q.   The third sentence says, "The
5    aim of this study is to determine if the
6    quality of evidence in plastic surgery
7    research has improved over the past 10
8    years.  Systematic review of research
9    published in Plastics and Reconstructive
10   Surgery journal over the years, 10-year
11   period (2008, 2013, 2018), was
12   performed."  Do you see that?
13     A.   I do.
14     Q.   Now, you understand what this
15   study was trying to accomplish; right?
16     A.    Yeah.  They were measuring the
17   level of success that the American
18   Society of Plastic Surgery was having
19   after having applied those criteria we
20   talked about earlier, the -- this
21   requirement of reporting levels of
22   evidence, seeking the clarity on levels
23   of evidence.  And so I expect -- I

1    haven't read this -- this article before,
2    but I guess that's what they're looking
3    at, is how successful have we been as a
4    professional society in publishing --
5        Q.    Yeah.
6        A.    -- these things.
7        Q.    And this references the levels
8    of evidence, LOE, metric; right?
9        A.    Yes.
10       Q.    And that's the same metric that
11   you referenced earlier, levels 1 through
12   5; right?
13       A.    Right.  Well, the levels 1
14   through 5 that I referenced includes
15   the -- sort of the subcategorizing,
16   depending on if it's a therapeutic trial
17   or a -- or a trial of risk or things like
18   that.  So the -- the document that the
19   ASPS published some years ago includes
20   risk studies and diagnostic studies, but
21   they're all ranked 1 through 5.  That's
22   right.
23       Q.    And you see a couple of

1    sentences down, it says 884 studies were

2    included in the final analysis.  You see

3    that?

4         A.    Yes, I do.

5         Q.    Okay.  Go to page 2.

6         A.    Okay.

7         Q.    You see there's a Table 1?

8         A.    Yes, I do.

9         Q.    Table 1 is "Percentage of Each

10   Level of Evidence Published per Year."

11   Do you see that?

12        A.    I do.

13        Q.    And there's columns for 2008,

14   2013, and 2018; right?

15        A.    Yes.

16        Q.    All right.  Let's start with

17   level 1, and that's randomized control

18   trials or metaanalyses of those trials;

19   right?

20        A.    Right.

21        Q.    In 2018, only 2.1 percent of all

22   publications in the journal were level 1

23   evidence; right?

1          A.    That's right.

2          Q.    And in 2008 and 2013, those

3     percentages were 0.3 and 1.7 percent

4     respectively; correct?

5          A.    Correct.

6          Q.    Not very common for the journal

7     to report on results of RCTs, according

8     to this summary; right?

9               MR. KNEPPER:   Objection, form.

10         A.    Yeah.   And it even goes along

11    with what -- my ballpark earlier, so I'm

12    surprised -- yes, it was less than 10

13    percent were -- were level 1 evidence and

14    somewhere around -- yeah, so those

15    numbers are consistent.   But yeah.

16              And the other thing to note

17    about it is that they appear to have been

18    successful in choosing what they publish

19    to support higher levels of evidence.   So

20    I guess they're to be commended for

21    having done this, yeah.

22         Q.    Okay.   All right.   Then level 2

23    are -- level 2 evidence includes

1    prospective cohort or comparative

2    studies; right?

3        A.   Yes.

4        Q.   With controls; right?

5        A.   Yeah.  There's a level of

6    randomization that -- that's there as

7    well --

8        Q.   Okay.

9        A.   -- in those prospective studies.

10   That's right.

11       Q.   And for that level 2 evidence,

12   only 13.6 percent of all publications in

13   the journal in 2018 consisted of that

14   evidence; right?

15       A.   Yes.  That's what it says there,

16   yes.

17       Q.   All right.  Level of evidence 4

18   is case series with a pre- or posttest or

19   only posttest; right?

20       A.   Right.

21       Q.   And in 2018, those amounted to

22   41.7 percent of all publications; right?

23       A.   Right.  It looks as though more

1    of those level 4 have been shifted up
2    into level 3, given that the level 5 has
3    declined.  So it looks like they're
4    pushing more of the level 4 up into level
5    5.  Yeah.
6        Q.    Yeah.  Much of the research on
7    which your field relies doesn't consist
8    of results from RCTs or controlled cohort
9    studies; right?
10        A.    Well, I wouldn't --
11            MR. KNEPPER:  Objection, form.
12        A.    I wouldn't say that based on
13    this.  I would say that much of the
14    published research in this journal is of
15    that -- of what you described, relying on
16    RCTs and so on.
17            This is a -- this is not a
18    document about what the profession is
19    doing.  This is a document about what
20    this journal is publishing.  And what
21    they're publishing is more papers of
22    higher value, for which they're to be
23    commended.  So this says nothing about

1    what people are investigating.  This says
2    about -- this says something about what
3    this journal is publishing.
4         Q.   Well, this is the journal for
5    the ASPS; right?
6         A.   Right.  With limited space for
7    publication.  So they're being,
8    apparently, more selective about what
9    they'll publish, that it's not just that
10   well, this is the chief of plastic
11   surgery at NYU, so we're going to publish
12   his paper.  It's the chief of plastic
13   surgery has a level 2 case.  Let's --
14   let's present -- let's publish that one.
15   I think that's what this is telling us,
16   that they're being more fastidious about
17   what they publish, whereas before, they
18   might have been more -- well, less
19   selective, let's say.
20        Q.   Have you ever been involved with
21   selecting articles to be published in
22   this journal?
23        A.   I've never been involved in --

1    in journal publication staff or -- no, I
2    have not.
3         Q.   You don't know the process by
4    which they select what article to
5    publish; right?
6              MR. KNEPPER:  Objection, form.
7         A.   I have some idea, but I'm --
8    it's not my -- my area of professional
9    expertise.
10        Q.   Yeah.
11        A.   I merely read the journal, and
12   have for approaching forty years now.
13        Q.   Look at Table 2.
14        A.   Okay.
15        Q.   And look at the column under
16   2018.
17        A.   Yes.
18        Q.   The first two rows, "Systematic
19   review/meta analysis" and "Randomized
20   control trials," account for 3.2 plus 3.8
21   percent of all publications of the
22   journal in 2018.  Correct?
23        A.   Right.

1          MR. KNEPPER:  Objection.

2      Q.   Case series account for 26.3

3  percent; right?

4      A.   Right.

5      Q.   Okay.  Go to page 3 of this

6  exhibit.

7      A.   Okay.  I'm there.

8      Q.   All right.  First full

9  paragraph, first sentence says, "Case

10  series are the backbone of surgical

11  research."  Do you see that?

12      A.   I do.

13      Q.   You don't disagree that case

14  series can be helpful scientific

15  evidence; right?

16      A.   No.  As I -- as I testified

17  before, this is the beginning of

18  research.  It always begins with perhaps

19  a serendipitous discovery, then to case

20  reports, then to case series, single --

21  single-provider case series or multiple

22  providers in a -- in a -- an institution.

23  But that's the beginning of surgical

1    research, yeah.  That's how it always
2    begins.
3        Q.   Well, it's a beginning, but
4    sometimes it's also the end; right?
5    Because look at the third sentence.  It
6    says:  "The absence of a control group
7    justifiably ranks this design at the
8    lower end of the evidence pyramid.
9    Despite this, case series are vital.
10   They may be the only feasible and ethical
11   study methodology obtainable, as seen
12   with craniofacial surgery."  You see
13   that?
14       A.   Yeah.  And to that -- to that
15   particular point, so I've got extensive
16   experience with craniofacial surgery, and
17   -- and it's -- this is one of those
18   procedures where the outward change to
19   the child can't be blinded.  You cannot
20   blind the investigator because,
21   obviously, he's doing the surgery, and
22   you can't blind the patient or the family
23   to it because the results are quite

1    obvious.  And that's what they're saying
2    here.  And obviously, they're not saying
3    that it's never useful or is never
4    necessary.  They're saying that in many
5    cases, you don't need to rise to that
6    level because you have evident benefit to
7    the patient and the risk is not only
8    manageable but -- but sufficiently low to
9    warrant the application of a particular
10   technique.
11          So that was certainly the case,
12   for example, when we introduced external
13   fixation devices for advancement of the
14   mid face in certain congenital
15   deformities.  Nobody had done a
16   randomized trial because you can't.
17   You've got this hardware sitting on the
18   patient's face.  So -- but yet, the --
19   the luminaries in craniofacial surgery
20   were able to demonstrate through a case
21   series that this was a valid technique,
22   and then the rest of us adopted it.  So
23   that's an example of how plastic surgery

1    works.

2              Now, if the patient was at risk

3    of death because this technique was being

4    applied or if the patient was at risk of

5    permanent life-altering changes that

6    couldn't be reversed, then yeah, you

7    would have to proceed with much greater

8    caution, and you may be looking at

9    finding some way, longitudinal

10   study-wise, to -- to quantify the benefit

11   of using your technique over using

12   established techniques.

13       Q.   There are some areas in plastic

14   surgery and reconstructive surgery where

15   case series are basically as good as it

16   gets in terms of scientific evidence;

17   right?

18            MR. KNEPPER:  Objection, form.

19       A.   Yeah.  I suppose in the newer --

20   at the newer end of techniques, that's

21   all you got for now until the technique

22   has been applied over a sufficiently long

23   time that you can look at a retrospective

1    cohort.

2         So for example, in the case of

3    gender transitioning surgery, the -- the

4    -- the surgeons have been at it now for

5    several decades.  And we should be

6    already at the level of level 3 evidence,

7    but -- but we're not.

8    Q.   Well, you --

9    A.   So I wouldn't put that in the

10   category of -- you're talking there about

11   a high-risk procedure that has a long

12   track record that can be examined.  And

13   -- and clearly, the examination of that

14   technique in the last three years, give

15   or take, has -- has shown us that that

16   this is in the category of those

17   operations that demand higher levels of

18   evidence than a case series, whether it's

19   single provider, single institution, or

20   even single nation.  You've got to --

21   you've got to look at the data now and --

22   and prove that you are doing something

23   good for the patient.

1          And quite frankly, it hasn't
2     been proven in the -- in the American
3     literature.  Certainly, WPATH hasn't
4     proven that.  But in the European
5     literature, they're looking at it and
6     saying, gosh, you know, the -- the
7     Swedish study shows us that if you only
8     follow patients for five years at the
9     most, you're not even going to see the
10    long-term effect of what you did to them.
11    And if you look at them eight years and
12    beyond, you'll see that you haven't
13    solved the suicidality, the self-harm,
14    the incarceration, psychiatric diagnosis
15    admissions, and things like that.
16          So -- so yeah, as far as what
17    we're talking about today, yeah, there's
18    a whole spectrum of what's acceptable
19    levels of evidence for a particular
20    procedure.  The higher the risk, the
21    higher the level of evidence is demanded.
22    And sometimes you have to wait to get to
23    that level of evidence if you're dealing

```
 1      with something potentially
 2      life-threatening.
 3              Like certainly, the providers
 4      were fully justified in considering this
 5      because of the high suicide rate of
 6      transgender patients.  Case series,
 7      totally valid reason given that the life
 8      of the patient is at risk here, totally
 9      valid to go with a case series as the
10      evidence by which you're consenting the
11      patient to surgery.  But we're now beyond
12      that.  We're now beyond that.  We're at
13      -- we're now -- the ethics demands that
14      we look at higher levels of evidence
15      because of the long-term risk to the
16      patient and the fact that the long-term
17      evidence doesn't support the indication
18      for surgery, which is lower suicide rate,
19      lower self-harm, lower drug abuse.
20      That's really what we're talking about
21      here.
22          Q.   I have some other questions.
23      You agree that -- strike that.
```

1              Do you agree that it is not

2       possible to perform RCTs for some

3       surgical procedure because you can't

4       blind the patient or the investigator to

5       what the procedure is?

6            A.    Absolutely agree, yeah.

7            Q.    So, let's take phalloplasty;

8       right?

9            A.    Okay.  Yeah.

10           Q.    When a surgeon performs a

11      phalloplasty on a patient, both the

12      surgeon and the patient are going to know

13      that the procedure was done; right?

14           A.    Yes.

15           Q.    It's not possible to have a RCT

16      for phalloplasty because you can't blind

17      the participant or the investigator;

18      right?

19           A.    Yeah.  That's typical of most

20      surgical interventions.  The only

21      exception to that would be intraabdominal

22      or intrathoracic surgeries or even

23      intracranial surgeries.  And -- and

1      that's considered sham surgery, which is

2      considered malpractice and ethical

3      violation of professional standards.  So

4      you can pretty much rule out most all

5      surgical procedures from the randomized

6      control trial category.  Correct.

7          Q.    And we agree that the same would

8      apply to metoidioplasty, for example;

9      right?

10         A.    Yes.

11         Q.    To all types of, again,

12     colloquially known as bottom surgery;

13     right?

14         A.    Correct.

15         Q.    All right.  Let's take

16     puberty-blocking hormones.

17         A.    Okay.

18         Q.    When patients with gender

19     dysphoria treatment start

20     puberty-blocking hormones, they're not

21     going to undergo puberty, basically;

22     right?

23         A.    Well, that's the intended use,

1       that's correct.
2            Q.    So there's going to be
3       observable physical effects of the
4       hormones that will be apparent to the
5       patient; right?
6            A.    Yes.   Within a year, that child
7       is going to look much smaller than his
8       peers.   He's going to be developmentally
9       delayed psychologically,
10      neurophysiologically.   His -- his
11      movements are not going to be as -- his
12      coordination is going to be less matured.
13      His higher executive functions will be
14      impaired.   So it will be very obvious
15      that this child is now different from his
16      peers.   So I would agree with you; you
17      couldn't find a way to blind such a study
18      because the evidence of effect is so
19      obvious within the first year that
20      everyone would know that they're taking
21      the -- the puberty-blocking
22      gonadotropin-releasing hormone agonist.
23           Q.    We agree that -- we agree that

1    it's not possible to do an RCT for

2    puberty-blocking hormones because of

3    these apparent physical effects; right?

4              MR. KNEPPER:  Objection, form.

5        A.    I -- I would agree, yes.

6        Q.    Okay.  Let's take cross-sex

7    hormones.

8        A.    And the -- the last question you

9    asked me, did you qualify that as you

10   couldn't do a double-blinded study using

11   puberty-blocking drugs in self-identified

12   transgender children?

13       Q.    Yes.

14       A.    Yeah.  Because if you're

15   applying the drug to other conditions

16   like precocious puberty, it -- it may be

17   possible.  It may be possible to -- I

18   don't know.  I'd have to think about that

19   but -- okay.  Sorry.

20       Q.    Let's take cross-sex hormones.

21       A.    Okay.

22       Q.    When somebody -- someone is

23   treated with estrogen or testosterone for

1    gender dysphoria, there are also going to

2    be physical effects from those

3    treatments; correct?

4        A.   Yes.  Given that sex hormones

5    have such a profound effect on every body

6    system, then it's going to be impossible

7    to conceal the fact that the person is on

8    sex hormones because every -- every

9    function of the body is affected by sex

10   hormone levels, particularly at the age

11   of early adolescence.

12       Q.   And given these visible physical

13   effects, it's not possible to design a

14   double-blind RCT for cross-sex hormones

15   for gender dysphoria; correct?

16       A.    It would probably be an invalid

17   study, yes.

18       Q.    All right.  Let's go back to

19   your -- actually, you know what?  I'm

20   going to move to a different area.  It's

21   been about an hour.  Let's take a quick

22   break.

23            MR. TISHYEVICH:  Off the record.

1           THE VIDEOGRAPHER:  This is the

2    end of Media Unit No. 4.  We are off the

3    record at 2:16 p.m.

4               (Break taken.)

5           THE VIDEOGRAPHER:  This is the

6    beginning of Media Unit No. 5.  We are on

7    the record at 2:24 p.m.

8        Q.   (By Mr. Tishyevich) Let's go

9    back to your report, Exhibit 1.

10       A.    Okay.

11       Q.    Go to page 21.

12       A.    Twenty-one.  Okay.

13       Q.    And you see there's a paragraph

14    starting with, "Failure to discuss the

15    failure to conduct"?

16       A.    Yes.

17       Q.    Okay.  So in the second line,

18    you reference the "unknown number and

19    percentage of patients who drop out of

20    transitioning or reverse the process

21    parentheses (Detransitioners)."

22       A.    Right.

23       Q.    You see that?

1          A.    I do.

2          Q.    All right.  You agree that the

3     number and percentage of patients with

4     gender dysphoria who drop out of

5     transitioning or who reverse the process

6     is currently unknown; right?

7          A.    Well, it depends on if you're

8     asking that question about the general

9     population or in a particular study.  So

10    in particular studies, that number is

11    known, but in the general population,

12    it's an unknown.

13         Q.    Yeah.

14         A.    And the reason -- the reason

15    it's unknown in the general population is

16    because the people doing the research

17    aren't following those patients.  That's

18    why we don't know.

19         Q.    In the overall population, the

20    number and percentage of patients who

21    drop out of transitioning or reverse the

22    process is unknown; agree?

23         A.    Yeah.  I would agree that's

1    unknown, yeah.

2        Q.    All right.  Given that,

3    obviously, you're not offering any expert

4    opinions on what that number or

5    percentage is in the general population;

6    right?

7        A.    Yeah, I don't -- I don't think

8    it's possible for anyone to break out the

9    difference, for example, between somebody

10   who isn't followed up because they've

11   detransitioned or somebody who isn't

12   followed up because they've taken their

13   own life.  We have no way of knowing

14   because nobody's following up.

15       Q.    All right.  Look toward the

16   bottom of this page 21.  You cite a case

17   series from I believe it's Djordjevic,

18   D-J-O-R-D-J-E-V-I-C.  Do you see that?

19       A.    I do.

20       Q.    And you say, "More dramatically,

21   a surgical group prominently active in

22   the SRS field has published a report on a

23   series of seven male-to-female patients

1    requesting surgery to transform their

2    surgically constructed female genitalia

3    back to their original male form."

4    Right?

5         A.    I see that, yes.

6         Q.    Okay.  Now, this article was not

7    an RCT, obviously; right?

8         A.    Right, right.

9         Q.    It was not a cohort study;

10   right?

11        A.    No.  This would be a case -- a

12   case series.

13        Q.    Yeah.  The lowest level of

14   evidence; right?

15        A.    No.  Actually, the lowest level

16   of evidence would be sort of single

17   patient -- well, it's sort of somewhere

18   between 4 and 5, I suppose.  I'd have to

19   look at the article again to see what the

20   -- what the denominator is, but --

21        Q.    Yeah.  Well, generally, you

22   think that anecdotal patient stories like

23   these are not reliable scientific

1    information; right?

2            MR. KNEPPER:  Objection, form.

3        A.    No.   They're the first clue to a

4    problem or the first clue to a solution.

5    That's exactly right.  So that -- that

6    sort of points to the controversial

7    nature of these therapies, is that -- is

8    that we don't have the answer.  We can't

9    explain why these detransitioners weren't

10   predicted preoperatively because we don't

11   have a test instrument to figure that

12   out.

13           So when you see a series like

14   this -- this is what we talked about

15   earlier, about the -- the history of

16   progression of levels of evidence.  You

17   start out with reports like this.  This

18   leads to further research.  And I'm just

19   trying to remember, when I read the

20   article, where that study was done.  I

21   don't have it in front -- I'm just trying

22   to remember what -- what country that was

23   done in.

1        Q.    Yeah.   I'll -- I'll show it to

2     you.

3        A.    Okay.

4        Q.    Hold on.   Let me introduce it.

5        A.    Thank you.

6        Q.    You did read these -- this

7     article in full before you cited it;

8     right?

9        A.    Yeah.   That -- it was -- it was

10     probably about seven months ago, but yes,

11     I did.

12        Q.    Sure.

13            THE COURT REPORTER:   I didn't

14     hear anything.   So it's just --

15            THE WITNESS:   Okay.

16            THE COURT REPORTER:   We're

17     losing it in Zoom.   Thank you.

18            THE WITNESS:   Forgive me.   I'm

19     sorry.

20            THE COURT REPORTER:   No, that's

21     okay.   It's awkward.

22        Q.    (By Mr. Tishyevich) Okay.   This

23     is going to be Exhibit 18, and let me

1    know when you have it.

2    (Exhibit 18 was marked for identification

3    and is attached.)

4        A.   Okay.  Okay.  Yeah, there it is.

5    Yes.  Yeah, right.  Okay.  It's coming

6    back to me now.  And this was published

7    out of the -- Amsterdam.  That's right.

8    Okay.  All right.  Yeah.

9        Q.   All right.  Let me ask you --

10   strike that.

11            Bottom of the page, there's a

12   section titled "Introduction."  You see

13   that?

14       A.   The bottom of the first page?

15       Q.   Yes.

16       A.   Yes, I see that.

17       Q.   Look at -- look to the column on

18   the right.

19       A.   Okay.

20       Q.   The last sentence says, "In

21   general, most researchers have reported

22   their patients are extremely satisfied

23   overall with their surgical outcomes,

1      with a low rate of complications."  You

2      see that?

3              (Witness reviews document.)

4          A.    Right.  I see -- I do see that,

5      yes.

6          Q.    Then it cites three footnotes, 5

7      through 7; right?

8          A.    Right.

9          Q.    You don't acknowledge this

10     portion of the article in your report;

11     right?

12         A.    Well, it is in the discussion, I

13     think.  Well, actually, probably maybe in

14     the summary of the -- of the medical

15     evidence.  The -- I would put this in the

16     category of subjective reporting and

17     short -- subjective reporting and short

18     follow-up.  Right.  That's what --

19         Q.    Well, you --

20         A.    I'm sorry.  Go ahead.

21         Q.    No, no, go ahead.

22         A.    So I think the reason I included

23     this was to show that there are -- you

1    know, that there's a growing pool of
2    patients who are returning for reversal
3    surgery.  I don't think I discussed in
4    this part of my report -- yeah.  I'm just
5    talking about increasingly visible
6    community and patient -- increasing
7    number of patients requesting reversal
8    surgery.  And as an example of that,
9    again, going to a single-center case
10    collection as an example, early evidence,
11    we're starting to see this now as numbers
12    of patients who have surgically
13    transitioned increases, the numbers of
14    patients who regret is going to increase,
15    particularly in light of what these
16    authors speak about here.
17            Let me see if I -- yeah.  So in
18    the second sentence of the abstract in
19    the introduction, it says, "However,
20    misdiagnosed patients sometimes regret
21    their decisions."  And one of the reasons
22    for including this article is the fact
23    that misdiagnosis is not measured.  The

1    world literature doesn't present error

2    rates.  This would be what I would

3    consider an error rate, that an erroneous

4    diagnosis was acted upon surgically,

5    leading to this complication of regret

6    and a -- and a desire for reversal.

7    Yeah.

8        Q.    Your expert testimony is that

9    there's no data available on the

10   percentage of people who have received

11   treatment for gender dysphoria who

12   experience regret?

13       A.    Yeah.  It's very, very low --

14   low-level evidence right now.  It's

15   basically we're in the -- we're in the

16   case collection study, whereas actually

17   in the -- well, that's not regret.  But

18   -- but perhaps in the category of

19   misdiagnosis would be the -- the reports

20   out of Sweden, certainly the -- yeah, so

21   beginning with the Swede -- Swedish

22   studies by Cecilia Dhejne and others that

23   shows us a lack of efficacy.  Whether or

1    not the patient presented for reversal is

2    definitely an unknown number, definitely.

3         Q.   All right.  That study doesn't

4    quantify anything about patient regret;

5    right?

6         A.   The Swedish study does not.  It

7    quantifies lack of -- of effect from the

8    surgical interventions.  Lack of benefit,

9    I should say.

10        Q.   Go to page -- PDF page 7 of this

11   document and look at the Conclusions --

12        A.   Okay.

13        Q.   -- section.

14        A.   All right.  Let's see that page.

15   Conclusions.  Okay.  I'm there.

16        Q.   The first sentence says, "The

17   vast majority of properly diagnosed

18   transsexual patients are satisfied with

19   their decision to undergo SRS, with only

20   a few coming to regret it."  Right?

21        A.   Right.  So this -- the other

22   reason why this study is useful to our

23   conversation is that this is the same

1    language and the same metrics that's used

2    to describe the success of cosmetic

3    surgery.  They don't include in here,

4    apart from the regret number that they're

5    actually publishing here -- not number

6    but the examples, I should say.  They

7    don't include in their -- in their

8    conclusions any statement about objective

9    quantifiable benefit from the surgery.

10   They talk about subjective reporting.

11          So this is an example of a -- of

12   a peer-reviewed journal article that

13   measures the efficacy of this surgery

14   based solely upon a satisfaction survey

15   of patients who have returned for

16   follow-up, so this would be an example of

17   that.  Yes, sir.

18      Q.   Do you know what metric was used

19   to measure satisfaction or

20   nonsatisfaction in these studies?

21      A.   I'd have to reread the -- the

22   methods and materials here, but I

23   would -- I would guess it was one of the

1       approved instruments for measuring

2       satisfaction.  There are a variety of

3       test instruments used for -- in

4       satisfaction surveys, particularly in the

5       world of plastic surgery.

6                 Let's see.  They used the --

7       these are the kind of things I don't keep

8       in my long-term memory here for a

9       particular article.  Okay.

10          (Witness reviews document.)

11          A.   Okay.  There's the outcomes

12      measures.  Forgive me for eating up your

13      time.

14          Q.   Let me -- let help you, Doctor.

15      Go to page --

16          A.   Okay.  There it is.

17          Q.   -- PDF page 5.

18          A.   Yeah.  Fif- -- yeah.

19          Q.   Yeah.

20          A.   Fifteen, right.

21          Q.   Question on the page --

22          A.   So there's a -- there's a test

23      instrument there.  Right.

1      Q.   Yeah.  There's a test instrument

2   that measures things like erectile

3   function, sexual desire, orgasmic

4   function, intercourse satisfaction, and

5   overall satisfaction; right?

6      A.   Right.

7      Q.   They don't just ask the patient,

8   "Hey, are you happy with the surgery?"

9   There's five criteria that are applied;

10   right?

11      A.   Right.

12      Q.   This is an approved instrument

13   for measuring this type of satisfaction

14   for surgery; right?

15           MR. KNEPPER:  Objection, form.

16      A.   This is -- this is -- yeah, it's

17   definitely a valuable instrument for

18   measuring things, but none of them are

19   the -- are the indication for surgery,

20   which is things like reduced suicidality,

21   reduced self-harm, reduced alcohol use,

22   all of those other things which are --

23   which are the reason, the indication for

1    the operation.  So you generally try to

2    match the surgical procedure with the

3    indication for the surgery.

4            They're measuring things that

5    weren't involved in the indications for

6    surgery.  They didn't get, you know,

7    reconstructive surgical approval so that

8    they could achieve erections, for

9    example.  This was approved because of

10   the risk of self-harm, suicide, those

11   sorts of things.  Yeah.  But none of

12   those are measured.  They -- it is -- it

13   is they do have objective measures, and

14   this is one of the -- one of the values

15   of this study.  But I don't think they

16   report the complication rate in this

17   study, as I recall.

18       Q.   This -- this study specifically

19   did not purport to seek out anything

20   about suicidality or mortality or other

21   adverse outcomes of that nature; right?

22       A.   Let's see.  I'm trying to

23   remember in their introduction.

1          (Witness reviews document.)
2      A.    Yeah.  I think their indications
3   used language that was more consistent
4   with -- with aesthetic, aesthetic surgery
5   rather than the reconstructive language.
6   So yeah.
7          (Witness reviews document.)
8      A.    Yeah.  So --
9      Q.    Yeah.  Here's --
10     A.    Yeah, I would --
11     Q.    Here's what I find interesting,
12   Doctor.
13     A.    Okay.
14     Q.    Your report cites this one case
15   series of seven patients to make the
16   point that there's this regret occurring
17   without even mentioning that there's
18   multiple case series that say the vast
19   majority of these patients end up being
20   satisfied with this type of surgery?
21     A.    No.  I don't think --
22     Q.    You don't think that's
23   appropriate to mention?

1        A.    No.   I -- actually, what I
2    present these examples to show, that --
3    that the literature in support of these
4    surgeries is characterized by very short
5    follow-up and subjective reporting.  So
6    this is an example of some objective
7    reporting, mostly subjective reporting.
8    And most of the articles, for example,
9    that you just asked me about involve
10   subjective reporting and short follow-up.
11   That's right, yeah.
12       Q.    All right.
13       A.    And in this case, you also --
14   I'm -- I'm pleased that they reported
15   that one, two, three, four, five, six,
16   seven -- so nearly half of their patients
17   had a surgical complication of a urethral
18   fistula, and if you have a urethral
19   fistula and you have a malleable
20   prosthesis, probably they went on to
21   remove the prosthesis as well.  But
22   that's -- I mean, I -- props for this --
23   this team that they reported their

1    complications.

2        Q.    Where -- what page is the

3    complications portion you're looking at?

4        A.    That's on -- just before you get

5    -- the last page before the -- the same

6    page as the conclusions.  There's a table

7    at the top, and they have the seven

8    patients, and you can see -- what's also

9    interesting here, too, is -- is that if

10   you look at the period after sex

11   reassignment surgery, that the -- that

12   the dissatisfaction level really kicks in

13   when you're beyond eight years.

14   Actually, if you look at even six years

15   beyond.

16            Initially, there's no patients

17   reporting dissatisfaction at anything

18   less than five years, and so this is

19   actually further evidence of the -- of

20   the inadequacy of the -- the papers that

21   are in the literature right now which

22   have follow-ups that are typically two to

23   three years.  So none of these patients

1    would have been seen, with most of the
2    literature that supports these
3    techniques, as a way to, you know, avoid
4    -- avoid dissatisfaction or -- or
5    suicidality or drug use or anything else
6    like that.  So that's an interesting -- I
7    hadn't noticed that before, but yeah.
8        Q.    Yeah.  Are you reading Table 1
9    to say that these complications like
10   urethral fistula and stricture were from
11   the original surgery?
12       A.    Well, I'm -- I'm merely --
13       Q.    Or is it from the reversal
14   surgery that was being done later?
15       A.    So they're talking here about
16   flaps.  They're talking about
17   complications from the -- the -- the
18   surgeries.  Yeah.  So this --
19       Q.    Yeah.  This is --
20       A.    They're speaking about urethral
21   fistulas and strictures are the main
22   problem after total phalloplasty.  So
23   that's the construct of the counterfeit

1    phallus because of insufficient vascular

2    supply.  I also discuss that in my

3    complications section.  These are

4    characteristic complications of these

5    free flaps, radial forearm free flaps,

6    and you see those complications here.

7    And you even see them later in -- in the

8    case, so.  Some of them are step

9    procedures.  In fact, all of them are.

10        Q.   All right.  Let me -- let me

11   show you another study.

12        A.   Okay.

13        Q.   Let me reintroduce this with an

14   exhibit -- exhibit stamp.  Give me a

15   second.  All right.  I'm reintroducing

16   this as Exhibit 20.  Let me know when you

17   have it.

18   (Exhibit 20 was marked for identification

19   and is attached.)

20        A.   I just got Exhibit 19.  Is there

21   another?  There's a 20 to follow?

22        Q.   It -- it should load

23   momentarily.  Yeah.

1          A.   Oh, I'm sorry.

2               MR. KNEPPER:  Are 19 and 20 the

3      same, just one's missing the little

4      stamp?

5               MR. TISHYEVICH:  Correct.

6               THE WITNESS:  Okay.  I'll just

7      go to 20, then, when it comes in.

8          Q.   Okay.  This is a study titled

9      "The Amsterdam Cohort of Gender Dysphoria

10     Study (1972-2015): Trends in Prevalence,

11     Treatment, and Regrets."  Do you see

12     that?

13         A.   I do.

14         Q.   And then it's by an author,

15     let's say Wiepjes, W-I-E-P-J-E-S.

16         A.   Yeah.

17         Q.   Right?

18         A.   I agree.

19         Q.   Have you seen this study before?

20         A.   I'm trying to gloss it to see if

21     I've read this before.  I -- I may have.

22     Give me just a moment, if that's okay.

23         Q.   Sure.

1          (Witness reviews document.)

2     A.   Yeah, this looks familiar.

3     Q.   I don't think I saw this in your

4     report, but tell me if you remember

5     otherwise.

6          (Witness reviews document.)

7     A.   Yeah, no.  I remember this being

8     evidence of the growing population of

9     self-reported transgender patients,

10    and it's a retro- --

11    Q.   Okay.  Let me --

12    A.   -- retrospective trial.  Yeah.

13    Q.   Yeah.  Let's go through this.

14    A.   Retrospective study, I should

15    say.

16    Q.   All right.  You see the

17    "Abstract" section on the first page?

18    A.   I do.

19    Q.   See the "Results" section?

20    A.   I do.

21    Q.   It says, "6,793 people (4,432

22    birth-assigned male, 2,361 birth-assigned

23    female) visited our gender identity

1    clinic from 1972 through 2015."  See
2    that?
3        A.   I do.
4        Q.   All right.  So you understand
5    that as part of this study, the authors
6    reviewed medical records of 6,793 people
7    who visited this gender identity clinic
8    from 1972 to 2015; right?
9        A.   I do.
10       Q.   All right.  And you see the
11   "Strengths and Limitations" section?
12       A.   Yes, I do.
13       Q.   And you understand that this
14   Dutch gender identity clinic treats more
15   than 95 percent of the transgender
16   population in the Netherlands; right?
17       A.   Right.
18       Q.   Pretty comprehensive study;
19   right?
20            MR. KNEPPER:  Objection, form.
21       A.   As of 2015, yes.  So it's a
22   7-year-old study, and it's -- it's
23   certainly large in numbers, that's for

1    sure.  So it's a retrospective chart
2    review of patients visiting the -- the
3    center in the Netherlands, and it's -- it
4    concludes in 2015.
5         Q.   This is certainly a better study
6    than that seven series case report that
7    you cited in your report; right?
8         A.   It's a different type of study.
9    Yes, it is.  Right.
10        Q.   Yeah.  This study reports on
11   6,793 people, whereas the case series on
12   which you rely has seven what you call
13   anecdotes; right?
14        A.   I wouldn't say I relied on that
15   study.  I merely presented it as an
16   example of -- of reporting on transgender
17   regret.  I didn't present it as a study
18   that I relied all my opinions on.
19   Certainly, there's other study types and
20   other studies in the literature that --
21   that one might rely more heavily on.
22        Q.   Well, let the --
23        A.   A retro- -- a retrospective

1    chart review, for example, might be more
2    useful.
3         Q.    Yeah.
4         A.    But not -- not definitive.   And
5    again, we've got to examine the fact that
6    we're looking at old data here.
7         Q.    Well, let's see what this
8    30-year retrospective review found.   Look
9    at the "Results" section.
10        A.    Scroll down.   Okay.
11        Q.    Look at the last two sentences.
12   "The percentage of people who underwent
13   gonadectomy within 5 years after starting
14   HT remained stable over time" --
15        A.    Right.
16        Q.    -- "(74.7% of transwomen and
17   83.8% of transmen).   Only 0.6% of
18   transwomen and 0.3% percent of transmen
19   who underwent gonadectomy were identified
20   as experiencing regret."   Do you see
21   that?
22        A.    I do.   And that has caused me to
23   want to look back and see -- okay.   So

1    they started with the 6,800, roughly, and

2    they report on 6,000 -- 7,000 almost.

3    Okay.  And clinic.  Okay.  And increase.

4            So I'm just trying to see if

5    they reported the average follow-up.

6    They're reporting when they underwent

7    gonadectomy after starting hormone

8    therapy, but they don't report the length

9    of follow-up, which is one of the key

10   reporting points there, because regret,

11   as we talked about earlier, is a -- tends

12   to be a function of time postsurgically.

13   So, let's just scroll down because it's

14   been a long time since I looked at this

15   article.  Transwomen, transmen total

16   underwent gonadectomy.

17           Yeah.  As I recall, they don't

18   report average follow-up time.  Every

19   five-year cohort.  So they're looking --

20   they -- they did look at when they

21   entered the system.  Prevalence and

22   treatment.  Confidence interval.

23           Yeah, as I -- yes.  So I think

1      that's -- this is coming back to me now.

2      I think they didn't report the average

3      follow-up or the -- let's see if I'm

4      missing something here.  Age for each

5      year, so they did break them out in age

6      that they -- they entered the -- the

7      process, the years during which they

8      entered the process, age groups.  And

9      yeah, I think that's -- that was one of

10     the -- one of the issues.

11           And this is -- consonant with --

12     with a lot of the literature, is they

13     don't report the follow-up interval.  And

14     that's what the Swedish study is showing

15     us, that if -- if you don't have a handle

16     on the length of follow-up after sex

17     reassignment surgery, then you don't have

18     a -- you don't have any way to fully

19     understand the issue of lack of efficacy

20     or regret.

21           If you're asking the questions

22     is the surgery effective in correcting

23     the most calamitous problems that a

1    transgender person has, which is
2    suicidality, self-harm, and all those
3    things that we talked about earlier, then
4    you have to look at the interval
5    postsurgery in order to have a full
6    understanding of the efficacy of the
7    procedure.  And as I recall now, looking
8    it over again, this study does not report
9    on the follow-up period.  The median age
10   at first visit was younger, 25.  Yeah.
11   So they talk about age.  They talk about
12   the years in which they were cared for,
13   but they don't talk about the length of
14   the follow-up interval, so.
15        Q.   All right.  Let me move on --
16        A.   Okay.
17        Q.   -- to save time.
18        A.   All right.
19        Q.   Go to page 4 and where it says
20   "Regret."
21        A.   Okay.
22        Q.   You with me?
23        A.   I am.

1          Q.    Third sentence says -- fourth

2     sentence says, "Reasons for regret were

3     divided into social regret, true regret,

4     or feeling non-binary."  You see that?

5          A.    I do.

6          Q.    And social regret -- strike

7     that.

8               It says, "Transwomen who were

9     classified as having social regret still

10    identified as women, but reported reasons

11    such as 'ignored by surroundings' or 'the

12    loss of relatives is a large sacrifice'

13    for returning to the male role."  Do you

14    see that?

15         A.    I do.

16         Q.    All right.  So some of the

17    persons who are being counted as

18    experiencing regret in the study did not

19    experience regret in the sense of they're

20    realizing they're not transgender; right?

21         A.    Realizing they're not

22    transgender?  I'm -- I'm trying to

23    understand your question here.  So you're

1      -- you're pointing me to the -- social

2      regret, true regret, feeling non-binary

3      is what's stated here.

4             "Transwomen who were classified

5      as having social regret still identified

6      as women, but reported reasons such as

7      'ignored by surroundings' or 'the loss of

8      relatives is a large sacrifice' for

9      returning to the male role."

10            Okay.  Yeah.  So -- so it's --

11     it's reporting without quantifying the

12     reasons for regret and the -- basically

13     all of them, subjective reporting again,

14     so -- okay.

15        Q.    Well -- well, let's go to page

16     6.

17        A.    That's the next page, isn't it?

18     Am I on the right page?

19        Q.    On page 6, it has a large

20     vertical table on the left side.

21        A.    Okay.  There we are.

22        Q.    And you may want to rotate it so

23     that you can see that table 6.

1          A.    When I got -- let's see.

2     There's a way to do that, isn't there?

3               THE COURT REPORTER:  Yeah.  If

4     you put your cursor over the document, a

5     black rectangle will come up at the

6     bottom.

7               THE WITNESS:  I see it now.

8     Yes.

9               THE COURT REPORTER:  There you

10    go.

11              THE WITNESS:  All right.  There

12    we are.

13         Q.    Table 4 is titled

14    "Characteristics of people with regret."

15         A.    Okay.

16         Q.    According to this table, out of

17    6,793 patients who received treatment, 14

18    of them reported regret of any type;

19    right?

20         A.    Okay.

21         Q.    And all the way on the right,

22    you see there's a "Reason for regret"

23    column; right?

1      A.    Right.

2      Q.    And you're welcome to count it,

3   but by my count, only 7 of those 14

4   reported, quote, unquote, true regret;

5   right?

6      A.    Yeah.  And what's interesting

7   about that is that those are the same

8   criteria that were used to seek

9   transgender surgery to solve their

10  interior problems.  So many patients will

11  present for care because they feel

12  socially isolated and because they have,

13  you know, issues of -- well, for example,

14  being non-binary and so on, those --

15  those -- like social acceptance and

16  feeling non-binary is among the

17  indications for the procedure.  So it's

18  interesting to note also that time after

19  surgery, the regretters seem to favor --

20  postsurgical, you start to see them,

21  what, maybe 50 to 90 months out and a lot

22  of them, years -- ten years out.  Yeah.

23  So that -- that speaks to what we talked

1    about earlier, that you see these regrets

2    and these problems beyond five years.

3        Q.    All right.    Whatever criticism

4    you have of the methodology, what the

5    study reports is -- are rates of regret

6    that are below 1 percent; right?

7            MR. KNEPPER:    Objection, form.

8        A.    Yeah.    Again, so as we talked

9    about earlier, that's the problem with

10   this study, is that -- is that the -- the

11   denominator is a much larger number than

12   these 14 patients, and they don't address

13   the length of follow-up out of which they

14   extracted these 14 patients.    So it makes

15   it difficult to interpret the study, and

16   the claim that it's a small number is

17   hard to support by their own evidence

18   because they didn't follow them long

19   enough.    As their own data shows, you got

20   to follow them longer to see the regret

21   in most patients.    And they don't tell us

22   what that number is.

23        Q.    Are you aware that there are

1    studies on patient regret outside of the

2    treatment for gender dysphoria?

3        A.    Am I aware of -- of transgender

4    transition regret outside of --

5        Q.    No.  I'm going to ask -- I'm

6    going to ask this again.

7        A.    I'm sorry.

8        Q.    Are you aware there are studies

9    on rates of patient regret outside of

10    surgical treatment for gender dysphoria?

11        A.    Yes.  Absolutely, yeah.  So --

12        Q.    Okay.

13        A.    One of the -- one of the most

14    important --

15        Q.    Okay.  Let me ask -- yeah,

16    Doctor, let's -- this is going to be a

17    long day.  Just listen to my questions.

18            Did you do a literature search

19    to find out what the average rates of

20    patient regret are for other surgical

21    procedures compared to surgical treatment

22    for gender dysphoria?

23        A.    I did not.

1      Q.   Do you know if those rates are

2   higher, lower, or about the same as the

3   rates of regret for surgical treatment

4   for gender dysphoria?

5      A.   I would say there's no way of

6   knowing because we don't have the -- the

7   rate of regret in transgender regretters.

8   We don't have that number, so there's no

9   way to compare or to know which is the

10  higher number.

11     Q.   Okay.

12     A.   Like we talked about earlier, we

13  don't have this number.

14     Q.   Well, this one study I just

15  showed you showed a finding of 0.3

16  percent to 0.6 percent; right?

17     A.   Right.  And I -- and as I said,

18  this is -- this is -- it's difficult to

19  use this to compare to other regret cases

20  because of the poor quality of this

21  study.  So I can't use this to compare it

22  to the other studies on regret because

23  this is not -- not useful to that end.  I

1    mean, it's useful in seeing that 14 -- 14

2    regretters had these complications, 14

3    regretters had these -- these

4    explanations for their regret.

5           And so it's kind of like a case

6    collection, and retrospective reviews of

7    -- of patient records are helpful in

8    getting a sense of the size of the

9    problem.  Certainly, this study shows us

10   that there's an increasing patient pool

11   of people who self-identify as

12   transgender.  So in that regard, this

13   publication is very useful.  But in terms

14   of comparing the regret rate based on

15   this paper, I'd say this paper is

16   useless.

17        Q.   Okay.  Open Exhibit 21.

18   (Exhibit 21 was marked for identification

19   and is attached.)

20        A.   Okay.

21        Q.   Let me know when you have it.

22        A.   Okay.

23        Q.   All right.  This is a

1    publication from 2017 by Wilson,

2    W-I-L-S-O-N, titled "Regret in Surgical

3    Decision Making: a Systematic Review of

4    Patient and Physician Perspectives."  See

5    that?

6        A.   I do.

7        Q.   All right.  Look at the

8    abstract.  You with me?

9        A.   I'm -- I'm looking -- I'm just

10   reading it now.

11       Q.   The third sentence says, "We

12   performed a systematic review of the

13   literature focused on patient and

14   physician regret in the surgical

15   setting."  See that?

16       A.   I do.

17       Q.   Now look at "Results."  See

18   that?

19       A.   I'm there now, yes.

20       Q.    It says, "Of 889 studies

21   identified, 73 patient studies and 6

22   physician studies met inclusion

23   criteria."  Do you see that?

1          A.    I'm reading it now, yes.

2          Q.    I understand this is a

3    systematic review of 73 patient studies

4    and 6 physician studies on regret and

5    surgical decision-making; right?

6          A.    That's what it says here, yes.

7          Q.    Then the third sentence of

8    "Results" says, "Interestingly

9    self-reported patient regret was

10   relatively uncommon with an average

11   prevalence across studies of 14.4%."

12   Right?

13         A.    Right.

14         Q.    And then "Conclusion" says,

15   "Self-reported decisional regret was

16   present in about 1 in 7 surgical

17   patients."  You see that?

18         A.    I do.

19         Q.    All right.  So according to this

20   systematic review, one out of seven

21   surgical patients, on average, report

22   having decisional regret; correct?

23              MR. KNEPPER:  Objection, form.

1      A.    Right.   So actually, I would go
2    a little deeper than that.   The first
3    thing to note about this study -- and
4    again, this is my first reading of it, so
5    I'm on the fly here.
6           The first thing to note about it
7    is that they looked at nearly 900
8    studies, of which only 73 qualified as
9    having sufficient validity to include in
10   their study.   So this -- this speaks to a
11   problem in the literature.   I'd have to
12   read lower to see what particular -- if
13   they even examined what kind of surgeries
14   were performed, because regret can happen
15   for a number of reasons, including
16   postsurgical complications and so on,
17   types of surgery.
18      Q.    We don't need --
19      A.    Yeah.
20      Q.    We don't need to dig into this
21   too deeply.   But, I mean, you don't
22   dispute that regret is not uncommon for
23   patients who have any kind of surgical

1      procedure; right?

2              MR. KNEPPER:  Objection to form.

3          A.    No.  You know, there's --

4      there's -- it's such a life-changing

5      event that the potential for regret is

6      very high, so that's why you have to be

7      careful in consenting the patient.

8          Q.    Okay.  Let me -- let's go back

9      to your report.

10         A.    Okay.

11         Q.    Because I hear you criticizing

12     all this evidence, and I want to see the

13     stuff that you're relying on.  Go to page

14     22.

15         A.    All right.

16         Q.    All right.  About halfway down

17     this paragraph, you say, "As reported by

18     one author in 2021, 60,000 testimonies of

19     personal de-transition can be found on

20     the Internet."

21         A.    Yeah, that's a typo.  That's a

22     typo.  That should have been 16, not 60.

23         Q.    Okay.  Well, I think it's more

1       than that.

2           A.      Okay.

3           Q.      So we'll look at this in a

4       second.

5           A.      Sure, sure.

6           Q.      And you cited this article from

7       Pablo Exposito-Campos.

8           A.      Yes.

9           Q.      E-X-P-O-S-I-T-O, dash,

10      C-A-M-P-O-S.   Right?   That's what you

11      rely on; right?

12          A.      Not relying.   I'm basically just

13      putting that out there as an example of a

14      growing number of patients regretting

15      transitioning, yeah.

16          Q.      Well, no.   What you say in your

17      report is that according to this

18      publication, you can find 60,000 -- or

19      let's call it 16,000 testimonies of

20      personal de-transition on the Internet;

21      right?   That's the point you're making?

22          A.      Sixteen thousand, right.   Yeah.

23          Q.      Let's look at what that article

1    actually says.

2         A.    Okay.

3         Q.    Okay.  This is going to be

4    Exhibit 22.  And let me know when you get

5    it.

6         A.    Doesn't seem to be coming

7    through.

8         Q.    Yeah, it may be stuck on my end.

9    Okay.  Just went through, so you should

10   see it shortly.

11   (Exhibit 22 was marked for identification

12   and is attached.)

13        A.    There it is.  Okay.  Right.

14        Q.    All right.  This is the article

15   that you're citing in your report; right?

16        A.    Uh-huh.

17        Q.    All right.  So before we get

18   there, you know that what this author was

19   talking about was a Reddit website;

20   right?

21        A.    Yeah.  That was -- that was

22   their data source, yeah.  Right.

23        Q.    Reddit is not a peer-reviewed

1      publication, obviously; right?

2          A.    Clearly.

3              MR. KNEPPER:  Objection.

4          A.    Yeah.

5          Q.    Right?

6          A.    Yes.  It's not a peer-reviewed.

7          Q.    It's a social website that

8      anyone can access; right?

9          A.    Right.  Correct.

10          Q.    Anyone can post -- can register

11      an account on Reddit and post whatever

12      they want; right?

13          A.    Right.

14          Q.    A post on Reddit is not

15      something that you would consider

16      reliable scientific evidence, I assume;

17      right?

18          A.    Yeah, no.

19              MR. KNEPPER:  Objection, form.

20          A.    I would -- I would put that as

21      self-reporting anecdotal-level evidence,

22      that's right.  So it's -- it's not

23      definitive, but it's suggestive of an

1    area in need of examination.  And that's

2    the reason I include it here, is not as

3    definitive evidence of a particular level

4    of problem but the -- the presence of a

5    problem that needs to be addressed.  So

6    the substance of my testimony there where

7    I call this study up is to show that

8    there's a growing body of patients, as we

9    talked about earlier, a growing body of

10   patients who regret their transition and

11   are seeking reversal.  So that's what

12   this is about.

13          It's not a quantification of the

14   phenomenon.  It's not a level 3 evidence

15   of the phenomenon.  It's a level 5,

16   self-reported, anecdotal stuff that --

17   that is basically just calling us to look

18   more carefully at what promises to be a

19   controversial area of medical care.  So

20   this is just part -- part of the

21   controversy is what we're looking at

22   here.  We're not looking at a definitive

23   scientific document, so.

1          Q.   It's not even level 5 because at
2     least a case report that's published in a
3     peer-reviewed journal has someone looking
4     at that case report to figure out if it's
5     a real thing; right?
6          A.   Right.
7               MR. KNEPPER:  Objection, form.
8          A.   What we have here is a clinical
9     psychologist who's looking at something
10    going on online, and the clinical
11    psychologist is -- is reporting this,
12    that's right.
13         Q.   Go to page 4 of this article.
14         A.   One, two, three, four.  Okay.
15         Q.   See there's a second paragraph
16    under "Further clarifications"?
17         A.   Yes, I do.
18         Q.   All right.  And it references
19    this Reddit/detrans subreddit; right?
20         A.   Right.
21         Q.   And it says it's "a subreddit
22    for detransitioners to share their
23    experiences with more than 16,000

1    members."

2         A.    That's correct.

3         Q.    Right?

4         A.    Uh-huh.

5         Q.    Then it says, "one can find

6    several stories of people who call their

7    transgender status into question."  You

8    see that?

9         A.    Right.

10        Q.    All right.  This author is not

11   saying that there's 16,000 separate

12   testimonies of people tran- --

13   detransitioning on that subreddit; right?

14        A.    I think the author is saying

15   that there's a pool of 16,000 people

16   among whom are evidence of regret or

17   cessation of transition.  That's what --

18   I think that's what the author's saying.

19        Q.    Well, let's be more specific,

20   because what he actually says is "one can

21   find several stories."  Right?

22        A.    Right.

23        Q.    There's a very big difference

1    between, quote, several stories and
2    16,000 stories of detransitioning; right?
3        A.    I think what the author is
4    saying is that -- that there are -- let's
5    see.  Subreddit -- detran- --
6    experiences -- more than 16- -- one can
7    find several stories of a particular kind
8    of transgender -- persons who call their
9    transgender status into question after
10   stopping transition.
11           So the several stories have to
12   do with people who call their transgender
13   status into question.  Not people who
14   regret the surgery, but these are people
15   who regret the diagnosis.  So he's
16   talking about several stories of
17   regretters of the diagnosis.  It doesn't
18   speak about regretters of the transition.
19   He doesn't address that in that.
20       Q.    All right.  A bunch of posts on
21   a social website is not scientifically
22   reliable evidence to show the number of
23   different people who actually

1      detransition; right, Doctor?

2              MR. KNEPPER:  Form.

3          A.   Yeah.  As we said before, we

4      have no way of -- at present, of knowing

5      the number of people.

6          Q.   Okay.  Go back to your report.

7          A.   Okay.

8          Q.   Go to page 40.

9          A.   All right.  Okay.

10          Q.   All right.  Your first paragraph

11      at the top of this page says, "A

12      currently unknown percent-" --

13      "percentage and number of patients

14      reporting gender dysphoria are being

15      manipulated by a -- peer group, social

16      media, YouTube role modeling, and/or

17      parental -- social contagion and social

18      pressure processes."  Right?

19          A.   That's right.

20          Q.   I take it you're not aware of

21      any peer-reviewed studies that quantifies

22      the number of people with gender

23      dysphoria that are being, quote, unquote,

1    manipulated by social contagion or social

2    pressure; right?

3         A.    Again, as I said before, we

4    don't know the numbers because that's not

5    -- it's not adequately reported in the

6    literature.  But what we do know is that

7    the social -- Lisa Littman's article, for

8    example, in 2017 shows us that there's a

9    significant factor in this new

10   demographic of self-reported transgender

11   patients, the new demographic being

12   adolescent to young adult females without

13   prior history of gender dysphoria or

14   gender discordance suddenly reporting

15   transgender self-identification.

16            And -- and what it shows us,

17   what Lisa -- Lisa Littman's publication

18   from Brown University shows us is that

19   underlying these outbreaks is peer group

20   networks of people online, peer groups

21   online, social media, a modeled speech, a

22   rehearsed speech, and -- and these --

23   these sudden outbreaks of -- of

1    self-identified transgender patients.

2              So we know it's there, but we

3    can't quantify it yet.  It's just it's --

4    but it's -- we have at present no other

5    explanation for why the demographic of

6    self-reported transgender patients has

7    suddenly shifted from virtually all young

8    boys to 50 to 60 percent of the new cases

9    being adolescent to young adult females.

10   And that's -- that's what we're -- what

11   we're talking about here.  This just

12   speaks to the controversial nature of

13   this -- medical and surgical

14   interventions is that we don't even

15   understand the origin of that phenomenon.

16   And -- and what that Littman article

17   shows us is precisely these things:  that

18   there's an element of social contagion,

19   that there's peer pressure, there's

20   rehearsed speech, online networks that

21   cause these outbreaks of these new kind

22   of patients, adolescent young adult

23   females who previously had no

1    self-reporting of trans- -- cross-sex
2    self-identification.
3           MR. TISHYEVICH:  This is not
4    responsive to my question, and I move to
5    strike it.
6      Q.    Here's my question, Doctor.  You
7    are not aware of any peer-reviewed study
8    that quantifies the number of people with
9    gender dysphoria who are being
10   manipulated by social contagion or social
11   pressure; correct?
12     A.    No.  We're at the -- we're at
13   the level of level 4/5 evidence now.
14   Lisa Littman's article is a level 5,
15   possibly 4.  A level 5.  So --
16     Q.    It's not a -- you're also not
17   aware of any peer-reviewed study that
18   quantifies the percentage of people with
19   gender dysphoria who are being
20   manipulated by social contagion or social
21   pressure; correct?
22     A.    No.  That's part of the -- part
23   of the problem with the literature.

1    Exactly right.

2         Q.    Yeah.

3         A.    Exactly right.

4         Q.    Given this lack of reliable

5    studies, do you agree that this

6    phenomenon of social contagion is

7    currently hypothetical?

8              MR. KNEPPER:  Objection, form.

9         A.    I would not agree with that.

10   It's not hypothetical.

11        Q.    Do you -- did you read the

12   response from Lisa -- from Littman to the

13   criticisms to that article?

14        A.    I did.  And -- and I also noted

15   that the -- the -- the organization under

16   which she published that article put

17   considerable pressure on her.  But she

18   can't retract her data.  She can retract

19   her conclusions, but she can't retract

20   her data, and she can't retract the

21   findings in the paper itself that show

22   the rehearsed speech, that show the

23   networks that are involved, that showed

1      the -- the character of the -- the

2      rehearsed speech, like, you know, if

3      you're talking to the psychologist, tell

4      them you've been thinking about suicide;

5      if you're talking to the endocrinologist,

6      tell them you feel better now that you're

7      started on T, that sort of stuff.  So --

8      so it's not hypothetical, it's actual.

9             The -- the size of the

10     phenomenon can only be compared to the

11     change in the demographic.  Why are 60

12     percent of patients fitting into that

13     category suddenly, whereas before, only

14     20 percent of patients were females?

15        Q.   Do you remember --

16        A.   That's what --

17        Q.   Okay.  Do you remember the part

18     of the correction from Ms. Littman where

19     she said that this is a

20     hypothesis-generating article?

21        A.   Hypothesis as to -- as to

22     mechanism of -- of action, and some of

23     the hypotheses are what's listed there:

1      social network peer -- media -- I'm

2      sorry -- peer pressure, social media,

3      role modeling, social contagion.  So she

4      admits that is a -- it is not understood.

5      She admits that those phenomena are

6      there, but it -- at present, we're

7      hypothesizing about the actual cause.

8      And this speaks again to the

9      controversial nature of even the

10     diagnosis, much less the treatment.

11          Q.   Go back to your report.

12          A.   Okay.

13          Q.   Page 40.

14          A.   I'm there.

15          Q.   Toward the bottom, you say, in

16     capital letters, "Not Generally

17     Accepted."  You see that?

18          A.   I do.

19          Q.   And you say, "Affirmation

20     medical treatments -- hormones and

21     surgery -- for gender dysphoria and

22     transitioning have not been accepted by

23     the relevant scientific communities."  Do

1    you see that?

2         A.    I do.

3         Q.    It's your expert opinion that

4    it's generally accepted that puberty

5    blockers are not medically necessary;

6    right?

7         A.    No.

8              MR. KNEPPER:  Objection, form.

9         A.    I would say puberty blockers in

10   the setting of a self-identified

11   transgender is not medically necessary,

12   but puberty blockers are often medically

13   necessary, just not in that particular

14   patient population.

15        Q.    Is it also your expert opinion

16   that it's generally accepted that hormone

17   treatment for gender dysphoria is not

18   medically necessary?

19        A.    Well, the scientific evidence

20   now shows that it is -- is not useful.

21   That's what I said --

22        Q.    Answer my question.  Is it your

23   expert opinion that it's generally

1    accepted that hormone treatment for
2    gender dysphoria is not medically
3    necessary?
4         A.   Yes.
5         Q.   Is it also your expert opinion
6    that it's generally accepted that
7    gender-affirming surgery for gender
8    dysphoria is not medically necessary?
9         A.   Yes.  I would say so, yeah.  I
10   can't put a number on it, but yeah.
11        Q.   All right.  Let me -- let me
12   show you another document.  Okay.  Let me
13   introduce this.  Okay.  This is going to
14   be Exhibit 23.  And let me know when you
15   get it.
16   (Exhibit 23 was marked for identification
17   and is attached.)
18        A.   Okay.  All right.  I'm there.
19        Q.   Okay.  Top of the page says,
20   "BlueCross BlueShield of North Carolina."
21   Right?
22        A.   Correct.
23        Q.   You know what Blue Cross and

1     Blue Shield is; right?

2          A.    Right.

3          Q.    It's a healthcare insurer;

4     right?

5          A.    Yes.

6          Q.    Are you aware that Blue Cross

7     Blue Shield is the largest private

8     insurer in the state of North Carolina?

9          A.    I am now.

10          MR. KNEPPER:  Objection, form.

11          Q.    All right.  This document is

12     titled "Corporate Medical Policy,"

13     "Gender Affirmation Surgery and Hormone

14     Therapy."  Right?

15          A.    Right.

16          Q.    Do you know what this is?

17          A.    Do I know what what is?

18          Q.    Do you know what this document

19     is?

20          A.    It appears to be an insurance

21     company document concerning the coverage

22     of certain services.  I would have to

23     read it to know what it is specifically,

1     but I think it's probably a policy
2     statement about what is covered and what
3     is not covered and what the diagnostic
4     criteria are.
5          Q.   Yeah.
6          A.   What the policy of the company
7     is.  Yeah.  So, shall I read it or?
8          Q.   I'll walk you through it.
9          A.   Okay.
10         Q.   You see it says "Last Review"
11    near the top?
12         A.   Right.
13         Q.   It's 3/2021.  That's March 2021;
14    right?
15         A.   Yes.
16         Q.   All right.  You understand this
17    policy was a -- strike that.
18              In your report, you cite a
19    number of articles that you say Dr. Brown
20    and Dr. Schechter overlooked, like a
21    bunch of 2020 articles; right?
22         A.   Right.
23         Q.   You understand this was

1       published -- updated after all those

2       studies that you cited were published;

3       right?

4            A.    It appears to be.

5            Q.    Okay.  Go to page 7.  You see it

6       says "Scientific Background and Reference

7       Sources"?

8            A.    Right.

9            Q.    You understand this section of

10      the policy provides some of the

11      scientific background on which the policy

12      is based; right?

13           A.    I see that, yes.

14           Q.    And if you go to page -- the

15      next page, page 8, you see there's a

16      bunch of references to Specialty Matched

17      Consultant Advisory Panel; right?

18           A.    I see that, yeah.

19           Q.    And there's some references to

20      sen- -- Senior Medical Director reviews;

21      right?

22           A.    I see that, yeah, from 2016.

23           Q.    Yeah.  Well, if you keep

1    looking, there's a bunch from 2020;

2    right?

3        A.   I see medical director review in

4    2020.  Yes, I do.  I see that.

5        Q.   And then including a medical

6    director review in March 2021; right?

7        A.   I see it.  That's probably what

8    generated this document.  Am I right?

9        Q.   Yeah.  Good guess.  Now,

10   obviously --

11       A.   That's why they pay me the big

12   bucks.  Sorry.

13       Q.   Obviously, you had no

14   involvement with the development of this

15   policy from BlueCross BlueShield of North

16   Carolina; right?

17       A.   Correct.

18       Q.   You have no idea how BlueCross

19   BlueShield of North Carolina came to

20   decide what gender affirmation surgeries

21   or hormone therapy they're going to cover

22   or not; right?

23       A.   Wrong.  I -- I have now some

1     idea of what they used because you've

2     listed -- or they've listed the

3     scientific background and reference

4     sources for coming to their company

5     policy.  And what I would point you to is

6     the fact that every one of the documents,

7     the scientific documents that support

8     their decision-making, I think the most

9     recent one is 2014.  You've got some that

10    go back to the year 2000.  So you've got

11    21-year-old DSM-4 characterizations.

12    You've got 2001 Harry Benjamin Gender

13    Dysphoria Association publications.  The

14    most recent thing is a -- is a -- well,

15    that's actually an advisory panel.  So

16    the most recent medical article is the

17    Cohen-Kettenis Hembree article from 2016.

18    So what's used to support a March 2021

19    document is essentially six-year-old

20    information.  And as we talked about

21    earlier, it hasn't -- it's changed a lot.

22    It's changed a lot since then.

23              The fact that Blue Cross Blue

1    Shield is slow off the mark would be
2    troublesome to the shareholders, I
3    suppose.  But as far as what I'm here to
4    talk about, the scientific basis for
5    this, the scientific basis is old data.
6         Q.    Doctor, you don't know whether
7    this is an exhaustive list of every
8    scientific resource that Blue Cross Blue
9    Shield considered in making the March
10   2021 update; right?  You have no idea?
11             MR. KNEPPER:  Objection, form.
12        A.    I can only go by what they've
13   disclosed.
14        Q.    Right.
15        A.    And what they've disclosed --
16   which I would assume they would be
17   leading with their best information
18   rather than their worst -- I would call
19   that -- the scientific support of low
20   quality because of the -- the
21   better-quality data that's now available
22   in the last three years.
23        Q.    You don't know personally

1     whether Blue Cross Blue Shield considered
2     any of the articles that you've cited
3     when they're making this policy change in
4     2021; right?  You don't know that?
5          A.   I have no way of knowing how --
6          Q.   Yeah.
7          A.   -- that committee worked.  I
8     only -- I only assume that they would
9     have put out their best scientific
10    support rather than their weakest.
11         Q.   Yeah.  Bottom of this page, by
12    the way, see there's a section that says,
13    "Policy Implementation/Update
14    Information"?
15         A.   Yes, I see that.
16         Q.   And it says, "7/19/11" --
17         A.   Yeah.
18         Q.   -- "New policy developed."
19    Right?
20         A.   Right.
21         Q.   You understand that Blue Cross
22    Blue Shield has had some form of this
23    policy for gender affirmation surgery

1    since July 2011?

2          MR. KNEPPER:  Objection, form.

3      A.    I can see that they have had a

4    policy, according to their own reporting,

5    since July of 2011.

6      Q.    All right.  So, let's look at

7    what Blue Cross Blue -- Blue Cross Blue

8    Shield thinks about whether these

9    procedures are medically necessary.  Go

10   to page 5.

11     A.    Let's see.  So we're at page 8.

12   We're going up to page 5?  Okay.  Okay.

13     Q.    Give me a second.  Actually, let

14   me start you on page 1.  You see there's

15   a description of -- let me know when you

16   get there.

17     A.    I'm there.

18     Q.    Okay.  Now, the beginning says,

19   "Gender Dysphoria is the formal diagnosis

20   used by professionals to describe persons

21   who experience significant gender

22   dysphoria (discontent with their

23   biological sex and/or birth gender)."

1    Right?

2         A.    Yes, I see that.

3         Q.    All right.  You understand what

4    this policy is addressing; right?

5         A.    Yeah.  It's addressing a

6    psychiatric classification, not medically

7    classified as a medical illness.  So

8    they're -- yeah.

9         Q.    Okay.  Go to page 2.

10        A.    Can you give me just a moment to

11   reread that sentence for just a second.

12        (Witness reviews document.)

13        A.    Okay.  Yeah.  So that's

14   boilerplate.  I'm sorry.  Sorry for

15   slowing you down here.

16        Q.    That's fine.  Go to page 2.

17        A.    Okay.

18        Q.    Top of the page says, "Policy."

19   Right?

20        A.    Correct.

21        Q.    And it says, "Services for

22   gender affirmation surgery and hormone

23   therapy may be considered medically

1    necessary when the criteria below are

2    met."  You see that?

3        A.   Right.  So that's -- that's

4    language that insurance companies use.

5    If you're not in the category of medical

6    necessity, there's no insurance coverage.

7    So whether or not one could classify it

8    as a medical diagnosis is not at issue.

9    What's at issue is, is the insurance

10   company going to cover this -- this

11   benefit.

12       Q.   Yeah.  Because insurers

13   typically are not in the business of

14   covering services that are not medically

15   necessary; right?

16       A.   No.  I wouldn't --

17            MR. KNEPPER:  Objection, form.

18       A.   -- characterize it that way.

19            THE WITNESS:  I'm sorry.

20       A.   I wouldn't characterize it that

21   way.  Insurance companies are in the

22   business of -- certainly, they're in the

23   business of -- of paying for covered

1    benefits.  But that's the problem with
2    the insurance industry, is their primary
3    fiduciary duty is to their investors.
4    And so the question of coverage has more
5    to do with are we going to make an
6    insurance policy that earns us money or
7    are we going to be paying for something
8    and not seeing the money.  Okay?  Does
9    that make sense?
10        Q.    Doctor, you --
11        A.    I think that's what -- that's
12   what this language here is talking about
13   is -- is medical necessity is the
14   language that's used when an insurance
15   company will cover.  They will not cover
16   cosmetic surgery, but they're -- they're
17   proposing to cover transgender surgery
18   beginning by attempting to define it as a
19   medical diagnosis.  That's what's at
20   stake here is.
21        Q.    No.  What -- what this policy
22   says is that when certain criteria are
23   met --

1          A.    Right.

2          Q.    -- gender affirmation surgery

3     and hormone therapy may be considered

4     medically necessary; right?  That's what

5     it says in black and white.

6               MR. KNEPPER:  Objection, form.

7          A.    Yeah, again, so medically

8     necessary from the standpoint of an

9     insurance company is if you meet these

10    criteria, we'll pay for it; if you don't

11    meet these criteria, we won't pay for it.

12    That's -- that's --

13         Q.    Right.  And the difference is

14    whether the surgery is considered to be

15    medically necessary or not; right?

16              MR. KNEPPER:  Objection, form.

17         A.    Well, again, so medically

18    necessary in this case is has the

19    insurance company decided that they're

20    going to cover this benefit.  It says

21    nothing about the scientific support for

22    the efficacy of the procedure.  They

23    haven't said anything in that about it.

1    They've just called it medically

2    necessary.

3        Q.   All right.  Let's -- let's go

4    off the record.

5        A.   Okay.

6             THE VIDEOGRAPHER:  This is the

7    end of Media Unit No. 5.  We are off the

8    record at 3:25 p.m.

9             (Break taken.)

10            THE VIDEOGRAPHER:  This is the

11   beginning of Media Unit No. 6.  We are on

12   the record at 3:36 p.m.

13       Q.   (By Mr. Tishyevich) All right.

14   I'm going to introduce another exhibit,

15   Doctor.

16       A.   Okay.

17       Q.   It's being slow on my end.  Bear

18   with me.  Okay.  This will be Exhibit 24.

19   Let me know when you have it.

20   (Exhibit 24 was marked for identification

21   and is attached.)

22       A.   I will.  Okay.  I've got it.

23       Q.   Okay.  You've seen this study

1    before; right?

2        A.    Yes, I have.

3        Q.    How do you pronounce the lead

4    author's name?

5        A.    That's the subject of great

6    debate, but I think it's Dhejne or -- I

7    think it's Dhejne, Cecilia Dhejne, but

8    I -- I -- I'm not -- I'm not a

9    Swissophone.

10       Q.    I'll use Dhejne as well.

11       A.    Okay.

12             MR. TISHYEVICH:  And for the

13   court reporter, it's D-H-E-J-N-E.

14       Q.    Okay.  This is a study from

15   2011; right?

16       A.    Yes.

17       Q.    And you cited this study in

18   several places in your report --

19       A.    I do.

20       Q.    -- right?

21             And one of the points for which

22   you cite this study is to say that

23   Swedish patients who underwent

1    gender-affirming surgery had a 19.1 times

2    greater suicide rate than the control

3    group; right?

4         A.    Yeah.   The hazard ratio for --

5    well, for all reassigned persons is 19.1,

6    and they further break out the -- that

7    into subgroups of female-to-male and

8    male-to-female.

9         Q.    Yeah.   And you understand how

10   the control group in this study was

11   defined; right?

12        A.    Yes.

13        Q.    The control group did not

14   consist of patients with gender dysphoria

15   who did not undergo gender-affirming

16   surgery; correct?

17        A.    Correct.

18        Q.    The control group consisted of

19   patients without gender dysphoria; right?

20        A.    Yeah.   That's kind of the point

21   of the -- of the research, yes.   That's

22   right.

23        Q.    Yeah.   What this Dhejne study

1    compared was the suicide rate for
2    patients who underwent gender-affirming
3    surgery against the general Swedish
4    population; right?
5        A.    Right.
6        Q.    And you know there's many
7    studies that find that patients with
8    gender dysphoria, as a population, have a
9    higher risk of suicide compared to the
10   general population; right?
11       A.    Very much accepted fact, yes.
12       Q.    Yeah.  All right.  We'll go to
13   page 7.
14       A.    Let's see here.
15       Q.    You see there's a "Strengths and
16   limitations of the study" section?
17       A.    Two, three, four, five, six,
18   seven.  Yes, I'm there.
19       Q.    All right.  Look at the third
20   full paragraph in that column.
21       A.    Okay.
22       Q.    All right.  Second sentence
23   says:  "The caveat with this design is

1      that transsexual persons before sex

2      reassignment might differ from healthy

3      controls (although this bias can be

4      statistically corrected for by adjusting

5      for baseline differences).  It is

6      therefore important to note that the

7      current study is only informative with

8      respect to transsexual persons health

9      after sex reassignment; no inferences can

10     be drawn as to the effectiveness of sex

11     reassignment as a treatment for

12     transsexualism."

13             You see that?

14         A.   Right.  Yeah.

15         Q.   Then it says:  "In other words,

16     the results should not be interpreted

17     such as sex reassignment per se increases

18     morbidity and mortality.  Things might

19     have been even worse without sex

20     reassignment."  Correct?

21         A.   Yeah.  It's -- the -- let's see.

22     The -- yeah, so -- and I don't think I

23     ever make the claim that the surgery

1      increases the risk of morbidity and

2      mortality.  Yeah, I -- I would agree with

3      that.

4          Q.    Yeah, no --

5          A.    But I would -- I would also

6      wonder on what basis they -- there's

7      nothing to support that it might have

8      been worse either.  It's for the same

9      reason.

10         Q.    Yeah.  This study does not

11     support the conclusion that sex

12     reassignment surgery by itself increases

13     risk of suicide; correct?

14         A.    That's what they -- they say,

15     yes.

16         Q.    And they also say that this

17     study does not support the conclusion

18     that surgical procedure for gender

19     dysphoria by themselves increase risk of

20     morbidities other than suicide; right?

21         A.    Right.

22         Q.    Okay.  All right.  Let me -- you

23     mentioned that -- in your report the 2020

1       Finland guidelines.  You recall that?

2            A.    I do.

3            Q.    Let me ask you a couple of

4       questions on those.

5            A.    Okay.

6            Q.    So I'll introduce another

7       exhibit.  This will be Exhibit 25, and

8       let me know when you get it.

9       (Exhibit 25 was marked for identification

10      and is attached.)

11           A.    Okay.

12           Q.    Let me ask you before we get

13      into this, look at page 46 of your

14      report.

15           A.    Okay.

16           Q.    Near the top, there's a "2020 -

17      Finland" reference.  You see that?

18           A.    I see that, yeah.

19           Q.    You say, "This new Finnish

20      guidance prioritizes psychological

21      therapy over treatment with hormones or

22      surgery and suggests different care plans

23      for early-onset vs late-onset childhood

1    gender dysphoria."  You see that?

2        A.    I do.

3        Q.    And then you say in the last

4    sentence, "The Finland National

5    Guidelines appear quite contrary to the

6    opinions of Drs Brown and Schechter and

7    WPATH."  Do you see that?

8        A.    I do.

9        Q.    Is it your opinion that the

10   WPATH guidelines recommend that children

11   who experience gender dysphoria should

12   transition to a different gender role?

13           MR. KNEPPER:  Objection, form.

14       A.    No.  I would say that the WPATH

15   guidelines essentially leaves us with

16   affirmation care only, that it does -- it

17   does, you know, recom- -- recommend all

18   of the psychological support but all of

19   it in support of transition.  I would say

20   that.  Yeah.

21       Q.    Yeah.  The WPATH guidelines do

22   not recommend that children with gender

23   dysphoria automatically be put on puberty

1    blockers; right?

2         A.    They don't make that

3    recommendation, no.  They don't state

4    that recommendation, no.

5         Q.    Yeah.  Let's look at what they

6    actually say.

7         A.    Okay.

8         Q.    I'm going to introduce one more

9    exhibit.

10        A.    So we're going to leave the

11   Finland article for now and go to --

12        Q.    Yeah.  We'll come back to it.  I

13   want to show you the WPATH --

14        A.    Okay.

15        Q.    -- Standards of Care Version 7

16   first.

17        A.    Uh-huh.

18        Q.    All right.  This will be Exhibit

19   26.  Let me know when you have it.

20   (Exhibit 26 was marked for identification

21   and is attached.)

22        A.    Okay.

23        Q.    This is a larger file, so this

1    may take an extra minute or so.

2         A.    Okay.  I've got it.

3         Q.    Okay.  These are the WPATH

4    Standards of Care Version 7; right?

5         A.    Yes.

6         Q.    Turn to page 23.

7         A.    Okay.

8         Q.    All right.  There's a section

9    titled "Social Transition in Early

10   Childhood."  You see that?

11        A.    I must be on the wrong page.

12   Did you say page 23?

13        Q.    It's PDF page 23, which is going

14   to be page 17 in the standards.

15        A.    Oh, I'm sorry.  Okay.  Let's go

16   back, then.  Page 17.  Okay.  I'm there.

17   Right.  "Social Transition in Early

18   Childhood."

19        Q.    All right.  It says:  "Some

20   children state that they want to make a

21   social transition to a different gender

22   role long before puberty.  For some

23   children, this may reflect an expression

1    of their gender identity.  For others,

2    this could be motivated by other forces."

3         You see that?

4         A.   I do.

5         Q.   And then a couple of sentences

6    down, it says:  "This is a controversial

7    issue, and divergent views are held by

8    health professionals.  The current

9    evidence base is insufficient to predict

10   the long-term outcomes of completing a

11   gender role transition during early

12   childhood."  You see that?

13        A.   I do.

14        Q.   All right.  The WPATH Standards

15   of Care Version 7 is not making any

16   clinical recommendations encouraging

17   children in early childhood to go through

18   gender transition roles; correct?

19        A.   Yeah, I would -- yes.  I would

20   add to that that they're also not

21   offering any clinical guidance on how to

22   distinguish who might or who might not be

23   suitable for transition.  Right.

1          Q.    Do you know whether that's
2     explored somewhere else in this Standards
3     of Care Version 7?
4          A.    Yeah.  I think it's discussed.
5          Q.    Okay.
6          A.    But -- but it's -- but I --
7     yeah.  So what's -- what's important, I
8     think, in what you cite here is that the
9     current evidence base is insufficient to
10     predict the long-term outcome.  Yes.
11          Q.    Okay.  Go to the next page.
12          A.    Okay.
13          Q.    Page 18, PDF page 24.
14          A.    Okay.
15          Q.    There's a section titled
16     "Physical Interventions for Adolescents."
17          A.    Right.
18          Q.    Right?
19          A.    Yes.
20          Q.    You understand that adolescents
21     are different than children; right?
22               MR. KNEPPER:  Objection, form.
23          A.    Well, yeah.  So, adolescents are

1    treated in pediatric clinics, but they're

2    different from prepubertal children, yes.

3         Q.   Yeah.  This section does not

4    provide any clinical recommendations for

5    hormone therapy in prepubescent children;

6    right?

7         A.   Let's see.  I've just got to

8    refresh my memory here on the verbiage.

9         (Witness reviews document.)

10        A.   Yeah.  So it -- it addresses the

11   important issue of gender fluidity in

12   adolescents, potential for shift to

13   conformity and -- that may not persist.

14   Yeah.  Right.

15        Q.   Okay.  And this section also

16   does not provide any clin- -- clinical

17   recommendations for surgical intervention

18   in prepubescent children; right?

19        A.   This section doesn't address

20   prepubescent children.  It addresses

21   adolescents.

22        Q.   Yeah, exactly.  And you don't

23   know of any other section in these

1    Standards of Care Version 7 that provide

2    those guidelines for prepubescent

3    children; right?

4        A.    No.

5        Q.    Okay.  Go to the next page, PDF

6    page 25, page 19 in the document.

7        A.    Okay.

8        Q.    And you see there's a section

9    that says, "Criteria for

10   Puberty-Suppressing Hormones"?

11       A.    Yes.

12       Q.    It says, "In order for

13   adolescents to receive

14   puberty-suppressing hormones, the

15   following minimum criteria must be met."

16   You see that?

17       A.    Yes.

18       Q.    And then there's four items;

19   right?

20       A.    Yes.

21       Q.    Number 4 says, "The adolescent

22   has given informed consent and,

23   particularly when the adolescent has not

1    reached the age of medical consent, the

2    parents or other caretakers or guardians

3    have consented to the treatment and are

4    involved in supporting the adolescents

5    throughout the treatment process."

6         You see that?

7    A.   Yeah.  That -- in fact, that was

8    one of the most troubling things I read

9    when I reviewed this whole document from

10   the WPATH guidelines, is that -- yeah,

11   that using those words in the same

12   sentence, an adolescent giving informed

13   consent, is a -- is a non sequitur

14   because I -- I don't think -- in all my

15   years of practice as a surgeon, which

16   amounts to greater than 35, the idea of

17   obtaining consent from an adolescent was

18   never accepted by the surgical community

19   or the medical community, to my

20   understanding.

21   Q.   Well, this also talks about

22   getting informed consent from the parents

23   or other caretakers or guardians; right?

1          A.   Yeah.  So in their role

2     supporting the adolescent's decision.  It

3     doesn't say -- yeah.  So the parents or

4     other caregivers have consented in

5     support.  Right.

6          Q.   Yeah.  What the guidelines

7     contemplate is that it's not just the

8     adolescent that's going to give an

9     informed consent, it's also the parents

10    or other caretakers or guardians; right?

11         A.   Yeah.  But again, that's the

12    problem I have with it, because that's --

13    the introductory sentence has -- has no

14    meaning -- or the introductory part of

15    the one sentence has no meaning.  If the

16    beginning point of the process is

17    adolescent consent, that's -- that's not

18    an ethical thing to do because --

19         Q.   Yeah.

20         A.   -- because an adolescent can't

21    grasp -- they don't have enough executive

22    function or development, particularly if

23    they have been through a period of

1       puberty suppression before they begin the
2       period of cross-sex hormones, that it's
3       -- it's already quite evident that these
4       patients, these children do not have
5       enough -- and it's just known in society
6       at large that adolescent children don't
7       have the capacity for long-term reckoning
8       of things like risk and outcomes and
9       neither do they have the executive
10      capacity in their brains to make an
11      informed consent decision.  So that part
12      of it is meaningless to me.  Yeah.
13          Q.   Yeah.  But you understand
14      there's two components to this
15      requirement; one is informed consent by
16      the adolescent, and two is informed
17      consent by parents or other caretakers or
18      guardians.  Right?
19          A.   Yes.
20          Q.   Okay.
21          A.   That's what it says.
22          Q.   All right.  Let's now go back to
23      the Finland guidelines.  It's Exhibit 25.

1      A.    Okay.

2      Q.    And go to PDF page 9 which has

3    Section 8, "Summary" -- "Summary of the

4    Recommendations."  Let me know when you

5    get there.

6      A.    Okay.

7      Q.    All right.  This page provides

8    recommendations for treatment of minors

9    with gender dysphoria in Finland; right?

10      A.    Yes.

11      Q.    All right.  Look at number 2 at

12    the bottom.

13      A.    At the bottom.  Okay.  Okay.

14      Q.    All right.  So it starts with,

15    "If a child is diagnosed prior to the

16    onset of puberty with a persistent

17    experience of identifying as the other

18    sex and shows symptoms of gender-related

19    anxiety, which increases in severity in

20    puberty."  You see that?

21      A.    Yes, I do.

22      Q.    All right.  And then next

23    sentence says, "Based on these

1    assessments, puberty suppression

2    treatment may be initiated on a

3    case-by-case basis after careful

4    consideration and appropriate diagnostic

5    examinations if the medical indications

6    for the treatment are present and there

7    are no contraindications."

8         Do you see that?

9    A.   I do.

10   Q.   All right.  You understand that

11   these Finland guidelines do not

12   categorically prohibit the use of

13   puberty-blocking agents in minors;

14   correct?

15        MR. KNEPPER:  Objection, form.

16   A.   Right.  They don't

17   categorically, but what they do is they

18   express uncertainty about the data that

19   -- that's been used to support the use of

20   those drugs in children.

21   Q.   Yeah.  But -- but despite that

22   data, what the guidelines recognize is

23   that puberty-blocking treatment may still

1      be initiated for some minor patients in

2      certain circumstances.

3          A.   Right.

4          Q.   Right?

5          A.   Agree.

6               MR. KNEPPER:  Objection, form.

7          Q.   All right.  Let's go back to

8      your report.  Go to page 46.

9          A.   I'm there.

10         Q.   So in your discussion of these

11     Finland guidelines, you cite something

12     called -- it's a website,

13     genderreport.ca.

14         A.   Correct.

15         Q.   Do you see that?

16         A.   I do.

17         Q.   And I saw at least two other

18     references to this source in your report.

19     All right.  This is -- genderreport is

20     not a peer-reviewed publication, Doctor;

21     right?

22         A.   No.  It's a data collection

23     site.  Yeah.

1          Q.   It's a data collection site?

2          A.   I think that's what the -- so,

3    let me just review what I wrote here.

4          (Witness reviews document.)

5          A.   All right.  Okay.  Yeah.  Okay.

6    Yeah, no.  I agree they're not

7    peer-reviewed to my knowledge, no.

8          Q.   It's a blog; right?

9          A.   Right.  It's on -- it's online,

10   exactly.

11         Q.   Blogs are not generally

12   considered reliable scientific evidence,

13   I take it.  Right?

14              MR. KNEPPER:  Objection, form.

15         A.   No, they're not.

16         Q.   Okay.  Do you know who started

17   this genderreport blog?

18         A.   I do not.

19         Q.   Do you know this person was a

20   doctor?

21         A.   I don't know the person, no.

22         Q.   You don't know they're a

23   scientist?

1      A.    I'm sorry?

2      Q.    You don't know whether they're a

3   scientist; right?

4      A.    I don't know.

5      Q.    Did you know that this blog was

6   started by a parent who was upset that

7   her daughter was told in school that

8   girls are not real and who filed a

9   lawsuit about it?

10          MR. KNEPPER:  Objection, form.

11     A.    I did not know those details,

12   no.

13     Q.    Assuming that's true, do you

14   think this is an unbiased, objective

15   resource?

16          MR. KNEPPER:  Objection to form.

17     A.    I -- I don't know.  I don't know

18   the answer to that question.

19     Q.    Do other experts in your field

20   rely on blogs like this one to support

21   their opinions?

22          MR. KNEPPER:  Objection, form.

23     A.    And I don't, and neither did I

1    rely on this as sole support for my

2    opinion.  This -- again, this is just

3    evidence of -- of controversy that exists

4    out in the literature, or that exists out

5    in the -- in the greater world, I should

6    say, in this case because this is not

7    medical literature, but in the wider

8    world.

9        Q.   Well, as I read this, your page

10   46, you're -- you're citing this gender

11   report for your analysis of the 2020

12   Finland guidelines.

13            MR. KNEPPER:  Objection, form.

14       Q.   Right?

15       A.   I think I'm using the Finland

16   guidelines as a standalone and just

17   referencing this gender report as

18   evidence of events in Finland rather than

19   scientific support for the conclusions of

20   the Finland review.

21       Q.   Okay.  Another article you cite

22   is the Carmichael 2021 study.

23       A.   Right.

1          Q.   Let's look at that one.  I'll

2     introduce it as Exhibit 27.  Let me know

3     when you have that.

4     (Exhibit 27 was marked for identification

5     and is attached.)

6          A.   Okay.  Okay.  I have it.

7          Q.   Okay.  This is titled,

8     "Short-Term outcomes of pubertal

9     suppression in a selected cohort of 12 to

10    15 year old young people with persistent

11    gender dysphoria in the UK."

12         A.   Right.

13         Q.   Right?

14         A.   Yeah.

15         Q.   All right.  Look at the -- on

16    page 1, you see there's an abstract?

17         A.   Yes.

18         Q.   Under "Methods," it says, "We

19    undertook an uncontrolled prospective

20    observational study."  Right?  Do you see

21    that?

22         A.   Right.

23         Q.   All right.  This is not a

1    randomly controlled clinical trial;

2    right?

3        A.    Right.

4        Q.    Not a cohort study --

5        A.    Right.

6        Q.    -- right?

7        A.    Right.

8        Q.    There's no control group; right?

9        A.    Correct.

10       Q.    You don't mention any of that in

11   your report even though you spend a lot

12   of time discussing the limitations of

13   other studies.  Why is that?

14            MR. KNEPPER:  Objection, form.

15       A.    I -- we include this to one to

16   show the raging controversy in the world

17   of transgender medicine, and this is an

18   example of that, the -- the evidence of

19   uncertain result or no result, no change

20   from baseline effect.

21            Let's see.  Let me just review

22   because I've reviewed so many of these

23   articles lately.

1          (Witness reviews document.)

2      A.   Right.  Yeah.  So -- yeah.  So

3    that's right.  So they were unable to

4    quantify benefit or harm from puberty

5    suppression.

6      Q.   Go to page 21.  See there's a

7    "Strength and Limitations" section?

8      A.   I see it.  Yes, I do.

9      Q.   The second sentence says:  "The

10   study size and uncontrolled design were

11   key limitations.  The small sample size

12   limited our ability to identify small

13   changes in outcomes.  This was an

14   uncontrolled observational study and thus

15   cannot infer causality."  See that?

16     A.   I do.

17     Q.   Again, you don't acknowledge any

18   of these limitations in your report;

19   right?

20          MR. KNEPPER:  Objection, form.

21     A.   Right.  I believe I made

22   reference to this in terms of it's

23   evidence of -- of controversy in the

1    literature, that they could not see a
2    benefit from it.  So again, at lower
3    levels of evidence, evidence of benefit
4    would suggest further study.  This shows
5    that further study is needed because, at
6    the observational level, you don't see
7    effect.
8        Q.   All right.  Another study -- not
9    a study, a review that you cite is this
10   Cochrane 2020 --
11       A.   Yes.
12       Q.   -- review; right?
13       A.   Right.
14            MR. TISHYEVICH:  And for the
15   court reporter, that's C-O-C-H-R-A-N-E.
16       Q.   I'm going to introduce that one
17   next.
18       A.   Okay.
19       Q.   All right.  I'm introducing this
20   as Exhibit 28, and let me know when you
21   get it.
22   (Exhibit 28 was marked for identification
23   and is attached.)

1          A.   I will.  Okay.
2          Q.   Okay.  This is from the Cochrane
3     Library.  This is the review that you
4     cite in your report; right?
5          A.   Right.
6          Q.   Go to page 2.
7          A.   Okay.
8          Q.   All right.  You see there's the
9     section titled, "Authors' Conclusions"?
10          A.   Okay.  Yes, I do.
11          Q.   All right.  Toward the end, do
12     you see it says, "We will include
13     non-controlled cohort studies in the next
14     iteration of this review, as our review
15     has shown that such studies provide the
16     highest quality evidence currently
17     available in the field."  You see that?
18          A.   Yes, I do.
19          Q.   All right.  So the Cochrane
20     review is not saying they're just going
21     to ignore all those studies going
22     forward; right?
23          A.   Right.

 1              MR. KNEPPER:  Objection, form.

 2         Q.    They rec- -- they recognize that

 3     those noncontrolled studies currently

 4     represent the best available evidence;

 5     right?

 6              MR. KNEPPER:  Objection, form.

 7         A.    Well, yeah.  Before they say

 8     best available evidence, they speak about

 9     the level of the evidence now.  And

10     what's -- what's interesting about this

11     Cochrane review, because it's a worldwide

12     review of the literature on the subject

13     of cross-sex hormones and hormone

14     blockade in transwomen, is that they

15     found over a thousand references, and by

16     the time they got through qualifying

17     those references for suitability, they

18     got down to thirteen studies.  And when

19     they fully screened the text, they got

20     down to a single study.  And that's --

21     that's kind of characteristic of -- of

22     the data used to support hormonal

23     transitioning.

1          And so yeah, they -- they have
2     to -- they have to backpedal in order to
3     get any data because what they have in
4     hand now is -- is not supportive of -- of
5     the use of cross-sex hormones in
6     transwomen, so.
7          Q.  All right.  Let me introduce
8     another exhibit.
9               MR. TISHYEVICH:  Can we go off
10     the record?
11               THE VIDEOGRAPHER:  We are off
12     the record at 4:07 p.m.
13                    (Break taken.)
14               THE VIDEOGRAPHER:  We are back
15     on the record at 4:20 p.m.
16          Q.  (By Mr. Tishyevich) All right.
17     Doctor, let me ask you about what
18     experience you have with the individual
19     plaintiffs in this case specifically.
20               You personally did not meet with
21     any of the plaintiffs in this case;
22     correct?
23          A.    No.  I did a review of their

1    charts and nothing more.  Yeah.

2        Q.    All right.  You've personally

3    never spoken with any of the plaintiffs;

4    correct?

5        A.    I have not.

6        Q.    You obviously were not present

7    in any meetings that any of these

8    plaintiffs may have had with their mental

9    health professionals; right?

10       A.    I was not.

11       Q.    And you don't know specifically

12   what was said or not said during those

13   meetings; correct?

14       A.    The only information I have

15   about those meetings was what's entered

16   in the medical record that was given to

17   me to review.

18       Q.    Yeah.  You were also not present

19   in any meetings any of the plaintiffs may

20   have had with their endocrinologists;

21   right?

22       A.    Correct.

23       Q.    And outside of reading medical

1    records, you don't know what was said or
2    not said during those meetings; correct?
3        A.   Correct.
4        Q.   And finally, for plaintiffs who
5    had undergone surgical procedures, you
6    were also not present in any meetings
7    between these plaintiffs and their
8    surgeons; correct?
9        A.   Correct.
10       Q.   And outside of medical records,
11   again, you don't know what was said or
12   not said during those meetings; correct?
13       A.   Correct.
14       Q.   Okay.  You should see a new
15   exhibit pop up, Exhibit 29.
16       A.   Okay.
17   (Exhibit 29 was marked for identification
18   and is attached.)
19       Q.   And if you can go to PDF page
20   54.
21       A.   PDF page 54.  Okay.
22       Q.   First of all, you understand
23   what this document is; right?

1          A.   I didn't get to see the header
2     on it.  I haven't seen this before, I
3     don't think.
4          Q.   Oh, feel free -- yeah, feel free
5     to go back to the first page if you want
6     to.
7          A.   Okay.
8          (Witness reviews document.)
9          Q.   All right.  This is the --
10         A.   Okay.  Okay.  So it's --
11         Q.   Yeah.
12         A.   -- a benefits booklet for the
13    State health plan.  Is that right?
14         Q.   For North Carolina, right.
15         A.   Yes.  The teachers union --
16    teachers and employ- -- and State
17    employees, right.  Okay.
18         Q.   You know what a benefit plan is;
19    right?
20         A.   Yes, uh-huh.
21         Q.   At a high level, it sets out
22    what the insurer is going to cover or not
23    cover; right?

1          A.   Correct.

2          Q.   Among other things.  Okay.  And

3     earlier, we talked about medical

4     necessity.  You recall that?

5          A.   Yes.

6          Q.   All right.  Go to -- now go back

7     to PDF page 54 of this plan.

8          A.   Okay.  I'm there.

9          Q.   You see at the top, it says,

10    "What is not Covered?"  And it's a list

11    of items?

12         A.   Am I on the right page?  I'm

13    on -- on PDF page 54?

14         Q.   Yeah.

15         A.   That's the -- the -- oh, I'm

16    sorry.

17         Q.   Plan page 46, so that's --

18         A.   Plan page 46.  Let me back up

19    real quickly here.  Sorry.  Okay.  I'm

20    there.

21         Q.   At the top or near the top, it

22    says, "What is not Covered?"  You see

23    that?

1          A.    I do.

2          Q.    There's a list of items

3     alphabetically.  See that?

4          A.    Yes.

5          Q.    And under M, it says, "Services

6     or supplies deemed not medically

7     necessary."  "Medically necessary" is in

8     bold; right?

9          A.    Right.

10         Q.    All right.  Let's look at that

11    definition.  Go to PDF page 89, which is

12    page 81 of the plan.

13         A.    Okay.

14         Q.    All right.  At the bottom, you

15    see there's a definition of "Medically

16    Necessary (or Medical Necessity"; right?

17         A.    Yes.

18         Q.    And it says, "those covered

19    services or supplies that are: a)

20    Provided for the diagnosis, treatment,

21    cure, or relief of a health condition,

22    illness, injury, or disease; and, except

23    for clinical trials as described under

1   this health benefit plan, not for

2   experimental, investigational, or

3   cosmetic purposes."  Right?

4       A.    Okay.

5       Q.    I understand that as part of

6   determining what the benefit plan is

7   going to consider medically necessary,

8   whether or not the treatment is

9   experimental is one of the factors;

10  right?

11      A.    As would be defined -- so all of

12  the definitions here are determined by

13  the insurance provider.  So they've

14  defined these listed necessities as

15  covered under their plan, yes.

16      Q.    Yeah.  So under this definition,

17  if a treatment is experimental, it is

18  likely not going to be covered under the

19  plan; right?

20      A.    Right.  According to their

21  definition, it doesn't appear they would

22  cover experimental surgery or cosmetic

23  surgery.

1          Q.    Conversely, if a treatment is

2     not experimental, it may be covered by

3     the plan in some circumstances; right?

4          A.    It would seem --

5                MR. KNEPPER:  Objection, form.

6          Q.    Yeah.  And I showed you earlier

7     a policy from BlueCross BlueShield of

8     North Carolina from March 2021 that says

9     that gender-affirming hormone and

10     surgical treatment is considered

11     medically necessary; right?

12                MR. KNEPPER:  Objection, form.

13          A.    Yeah, no.  As we talked about

14     before, these are definitions formulated

15     by the insurance company to define

16     coverage, not medical definitions in

17     terms of medical care.  This is strictly

18     coverage by insurance.  Yeah.

19          Q.    Well, one of the factors that

20     goes into that consideration is whether

21     or not that treatment in question is

22     experimental; right?

23                MR. KNEPPER:  Objection, form.

1     A.   Right.  The plan excludes

2    experimental or investigational or

3    cosmetic procedures.

4     Q.   Okay.  All right.  We're talking

5    about BlueCross BlueShield of North

6    Carolina.  Let me ask you about another

7    insurer, Aetna, A-E-T-N-A.  You've heard

8    of Aetna; right?

9     A.   Yes.

10     Q.   Are you aware that Aetna is one

11    of the five largest health insurance --

12    insurers in the U.S.?

13     A.   It would not surprise me to

14    learn that.

15         MR. KNEPPER:  Form.

16     Q.   Do you have any idea whether

17    Aetna considers gender-affirming surgery

18    and hormone therapy to be medically

19    necessary?

20         MR. KNEPPER:  Objection, form,

21    scope.

22     Q.   Would it surprise you if Aetna

23    --

1          THE COURT REPORTER:  I'm sorry.

2     I didn't hear the answer over the

3     objection.

4          THE WITNESS:  I haven't answered

5     yet.

6          THE COURT REPORTER:  Okay.

7          THE WITNESS:  Sorry.

8      A.    So as to the size of Aetna or

9     the -- that they cover --

10      Q.    Yeah, let me just ask -- I'll

11     ask the question again.

12      A.    Okay.

13      Q.    Do you have any idea whether

14     Aetna considers gender-affirming surgery

15     and hormone therapy to be medically

16     necessary?

17          MR. KNEPPER:  Objection, form,

18     scope.

19      A.    I don't.

20      Q.    Well, let me show you.  I'm

21     going to introduce another exhibit.

22     Okay.  This is going to be Exhibit 30.

23     Let me know when you have it.

1      (Exhibit 30 was marked for identification

2      and is attached.)

3          A.   Okay.  All right.  I have it.

4          Q.   All right.  This is a policy

5      from Aetna titled "Gender Affirming

6      Surgery."  You see that?

7          A.   I do.

8          Q.   You see there's a "Policy

9      History" on the right?

10         A.   Yes.

11         Q.   Under "Last Review," it says

12     January 12th, 2021; right?

13         A.   Yes.

14         Q.   So you understand this was

15     revised within this year; right?

16         A.   Yes.

17         Q.   And under Policy, it says,

18     "Aetna considers gender affirming surgery

19     medically necessary when all of the

20     following criteria are met."  Right?

21         A.   Right.

22              MR. KNEPPER:  Form.

23         Q.   All right.  So according to this

1      policy, in Aetna's view, gender-affirming

2      surgery is medically necessary, therefore

3      nonexperimental; right?

4              MR. KNEPPER:  Objection, form.

5          A.   Yeah, Aetna's definition of what

6      is medically necessary appears to allow

7      for gender-affirming surgery.

8          Q.   Okay.  Go to page 3.

9          A.   Okay.

10         Q.   Look at the bottom of the page.

11         A.   Okay.

12         Q.   The second to the last paragraph

13     says, "Aetna considers

14     gonadotropin-releasing hormone medically

15     necessary to suppress puberty in trans

16     identified adolescents if they meet World

17     Professional Association for Transgender

18     Health (WPATH) criteria."  Do you see

19     that?

20         A.   I do.

21         Q.   Okay.  According to Aetna,

22     puberty-blocking hormones are medically

23     necessary to suppress puberty in

```
1     trans-identified adolescents if they meet
2     the WPATH criteria; right?
3             MR. KNEPPER:  Objection, form.
4        A.   That -- that's what it states
5     there, yes.
6        Q.   By the way, look at the next
7     paragraph.  See it says, "Aetna considers
8     reversal of gender affirming surgery for
9     gender dysphoria not medically
10    necessary."
11            MR. KNEPPER:  Objection.
12       Q.   Do you see that?
13       A.   I do.
14       Q.   Okay.  We talked about Blue
15    Cross Blue Shield, talked about Aetna.
16    Do you know what Cigna is?
17       A.   Yeah.  It's one of the largest
18    health insurance providers.
19       Q.   Do you know what position Cigna
20    takes on whether gender dysphoria
21    treatment is medically necessary?
22            MR. KNEPPER:  Objection, form,
23    scope.
```

1    A.    I have not read their policies.

2    Q.    You don't know; right?

3    A.    Correct.

4    Q.    Let me show you that policy.

5    A.    Okay.

6    Q.    All right.  This is going to be

7    Exhibit 31.  Let me know when you have

8    it.

9    (Exhibit 31 was marked for identification

10   and is attached.)

11   A.    Okay.  Okay.  I have it.

12   Q.    All right.  This is a Cigna

13   medical coverage policy titled "Treatment

14   of Gender Dysphoria."  Do you see that?

15   A.    Yes, I do.

16   Q.    On the right top, it says

17   "Effective Date," May 18th, 2021; right?

18   A.    Yes.

19   Q.    Also recently updated; right?

20   A.    Yes.

21   Q.    Go to page 2.  Under "Coverage

22   Policy," look at the third paragraph in

23   bold.  It says, "Medically necessary

1  treatment for an individual with gender
2  dysphoria may include any of the
3  following services, when services are
4  available in the benefit plan."  Do you
5  see that?
6      A.   I do.
7      Q.   All right.  And then there's
8  five different bullets of different
9  categories of services; right?
10     A.   One, two, three, four, five.
11 Yes.
12     Q.   Number two is "Hormonal therapy,
13 including but not limited to androgens,
14 anti-androgens, Gn-" -- "GnRH analogues,
15 estrogens, and progestins."  Right?
16     A.   Yes.
17     Q.   That's a medically necessary
18 benefit in Cigna's view; right?
19          MR. KNEPPER:  Objection, form.
20     A.   It is a -- medically necessary
21 as defined by a insurance company for
22 purposes of a policy.
23     Q.   Yeah.

1      A.   Yes.

2      Q.   And the last bullet point says,

3  "Gender reassignment and related surgery

4  (see below)."  Do you see that?

5      A.   I do.

6      Q.   According to this policy, in

7  Cigna's view, gender reassignment and

8  related surgery is a medically necessary

9  service; right?

10         MR. KNEPPER:  Objection, form.

11     A.   Again, so -- so the insurance

12 company makes a distinction between

13 medically necessary, meaning things that

14 they will cover, versus not medically

15 necessary, meaning things they won't

16 cover.  It's not based on an actual

17 medical diagnosis but a -- a managerial

18 diagnosis, because if it's not medically

19 necessary, it's not covered by insurance.

20 So if they choose to cover it, they will

21 call that medically necessary.  And

22 that's what they're detailing here, what

23 they will cover and what they won't

1    cover.

2        Q.    Okay.

3        A.    And they call what they will

4    cover medically necessary.

5        Q.    Let me show you one last policy.

6    Do you know -- strike that.

7              You know what UnitedHealthcare

8    is; right?

9        A.    Yes, I do.

10       Q.    It's another health insurer;

11   right?

12       A.    Yes.

13       Q.    They're the largest health

14   insurer in the country; right?

15       A.    I don't know that for a fact.

16   I'll assume if you're telling me so.

17       Q.    All right.  Well, do you have

18   any idea whether United considers

19   gender-affirming surgery and hormone

20   treatment to be medically necessary for

21   gender dysphoria?

22       A.    I have a dawning suspicion that

23   they do.

1      Q.    Yeah.   I think you can probably
2   tell where this is heading at this point;
3   right?
4      A.    Sure.   The insurance industry
5   likes these services.
6      Q.    Let me introduce this next
7   exhibit.   This is going to be Exhibit 32.
8   All right at the top it says, "United
9   Healthcare."   You see that?
10   (Exhibit 32 was marked for identification
11   and is attached.)
12      A.    I don't have it yet.
13      Q.    Oh, I apologize.
14      A.    That's okay.
15      Q.    Let me know when.
16      A.    Okay.   Yes.
17      Q.    All right.   Top right says
18   "United Healthcare" -- "Healthcare
19   Commercial Medical Policy."   Right?
20      A.    Yes.
21      Q.    Under that, it says, "Gender
22   Dysphoria Treatment."   Right?
23      A.    Yes.

1        Q.   See there's an effective date of
2    April 1, 2021; right?
3        A.   Yes.
4        Q.   Also fairly recently updated;
5    right?
6        A.   Yes.
7        Q.   Okay.  And then you see there's
8    a bunch of bullet points setting forth
9    criteria for the services on page 1;
10   right?
11       A.   Yeah.  Yes.
12       Q.   Then go to page 2.
13       A.   Okay.
14       Q.   And the first full paragraph
15   says, "When the above criteria are met,
16   the following surgical procedures to
17   treat Gender Dysphoria are medically
18   necessary and covered as a proven
19   benefit."  Do you see that?
20       A.   I do.
21       Q.   Okay.  So United also covers --
22   also considers this treatment to be
23   medically necessary; right?

1          MR. KNEPPER:  Objection to form.

2      A.   Yeah, again, so the interesting

3    thing about this that I'm just reading --

4    because, again, this is the first time

5    I've seen this -- is that the same policy

6    declares that the policy does not apply

7    to individuals with objectively ambiguous

8    genitalia or disorders of sexual

9    development.  So that's an example of the

10   insurance company choosing what to call

11   medically necessary based upon an

12   insurance definition rather than a

13   medical definition.  Because under, you

14   know, plastic surgical/general medical

15   wisdom, ambiguous genitalia and disorders

16   of sexual development are objective

17   medical surgical -- well, medical

18   conditions, at least, that would be

19   covered -- would be considered medically

20   necessary to treat, you know, because

21   disorders of sexual development can

22   include emergencies like adrenal

23   hyperplasia.  So that's a -- you've given

1    an example of how insurance companies
2    make their own definitions for the sake
3    of distinguishing what they will cover
4    and what they will not cover.
5        Q.    Go to page 9.
6        A.    Okay.
7        Q.    You see there's a section toward
8    the bottom that says, "Benefit
9    Considerations"?
10       A.    Yes.
11       Q.    Third paragraph says, "Unless
12   otherwise specified, if a plan covers
13   treatment for Gender Dysphoria, coverage
14   includes psychotherapy, cross-sex hormone
15   therapy, puberty suppressing medications
16   and laboratory testing to monitor the
17   safety of hormone therapy."  Do you see
18   that?
19       A.    I do.
20       Q.    You understand that United
21   considers not just surgery but all these
22   other services, including cross-sex
23   hormone therapy and puberty suppressing

1      medications, to be medic- -- medically
2      necessary for the treatment of gender
3      dysphoria; right?
4              MR. KNEPPER:  Objection, form,
5      scope.
6         A.   Yeah, again, the same -- same
7      issues of definition.  So they -- they
8      can define it any way they choose for the
9      sake of the business of insuring people,
10     yeah.  So they -- they definitely have
11     defined all of the services associated
12     with gender dysphoria as covered
13     benefits.
14        Q.   And not just as covered
15     benefits, as medically necessary; right?
16        A.   Again --
17             MR. KNEPPER:  Objection, form
18     and scope.
19        A.   Again, they use -- the use of
20     the word "medically necessary" is defined
21     by the insurance company to distinguish
22     covered benefits from not covered
23     benefits, and it's not based in medical

1    evidence of efficacy or anything else.
2    It's just an internal definition for the
3    sake of their business model.
4        Q.   You think that insurers do not
5    look at scientific literature in deciding
6    whether or not to cover something?
7            MR. KNEPPER:  Objection, form.
8        Q.   Is that really what you think?
9        A.   Your -- your first example that
10   we've gone through is a -- is an example
11   of the level of literature they've been
12   using, and that example showed that the
13   most recent paper that they used to
14   support it was 2016.  So in my mind, it's
15   in doubt.  I don't know for a fact what
16   this particular policy used as
17   references.  All I have is what you've
18   shown me on that particular policy.  And
19   the evidence there was they're not
20   current in the -- in the literature.  But
21   they're still doing good business,
22   apparently, because they continue even
23   after reviewing.

1          Q.    Okay.  Go to page 10.

2          A.    Okay.  All right.

3          Q.    See there's a section at the

4     bottom that says, "Clinical Evidence"?

5          A.    Yes.

6          Q.    Do you know what that means?

7          A.    Yes, I do.

8          Q.    You see then the first thing

9     that's said -- cited is a study from 2019

10    and the second thing is a study from

11    2019, the third thing is a study from

12    2019.  You see that?

13         A.    I do.

14              MR. KNEPPER:  Objection, form.

15         Q.    Do you under- -- do you

16    understand what this section represents?

17              MR. KNEPPER:  Objection, form.

18         A.    Permit me to just look at the

19    particular names and the particular cited

20    articles, if I could.

21         (Witness reviews document.)

22         A.    Sorry.  I just wanted to see if

23    there were any -- and then they go to --

1   okay.  Okay.  Could I ask you to ask your

2   question again?  I'm sorry to have to do

3   that.  I just wanted to see what you were

4   referring to.

5       Q.   Yeah.  You understand that this

6   "Clinical Evidence" section provides an

7   overview of some of the scientific

8   evidence on which United based its

9   policy; right?

10          MR. KNEPPER:  Objection, form.

11      A.   Yes.  They -- they have listed

12  some of the scientific evidence available

13  in the literature.

14      Q.   Including studies as recently as

15  2019 --

16      A.   Yes.

17      Q.   -- right?

18      A.   Right.

19      Q.   And because you weren't involved

20  with writing this policy or updating for

21  United, you don't know what else they may

22  have considered outside of this policy;

23  right?

1          A.   I have no way of knowing what
2     they would have considered.  That's
3     right.
4          Q.   Okay.  All right.  Let's shift
5     gears a little bit.  You've heard the
6     term "Christian anthropology."  Right?
7          A.   Yes, I have.
8          Q.   You've used that term yourself;
9     right?
10          A.   Yes, I have.
11          Q.   The view that Christian
12     anthropology takes is that the -- a
13     person's sex assigned at birth is
14     intrinsic and unchangeable; correct?
15          A.   No.
16               MR. KNEPPER:  Objection, form,
17     scope.
18          A.   I would not say that.
19          Q.   What would you -- how would you
20     describe it?
21          A.   Well, your use of the term "sex
22     assigned at birth" is not -- is not
23     contained within Christian anthropology.

1      Q.   Let me try this --

2      A.   By the -- by the way, I don't --

3    I don't use definitions in Christian

4    anthropology to confect my expert

5    opinion.  My opinion is based in the

6    scientific literature, my review of that

7    literature, and my 30-plus years'

8    experience as a reconstructive surgeon.

9      Q.   I understand.  The view that

10   Christian -- to use your words, the view

11   that Christian anthropology takes is that

12   a person's biologic sex is intrinsic and

13   unchangeable; right?

14     A.   Yes.

15          MR. KNEPPER:  Objection, form,

16   scope.

17     Q.   You think that people with

18   gender dysphoria should be welcomed, but

19   they should be told that they're

20   biological sex cannot be changed; right?

21          MR. KNEPPER:  Objection, form,

22   scope.

23     A.   Yeah.  So, persons who

1      self-identify as transgender are to be
2      welcomed and are to be cared for because
3      they suffer greatly, and they -- they
4      deserve, in justice -- they deserve, out
5      of justice, I should say, our -- our care
6      and support.  But that care and support
7      must always be rooted in the truth of the
8      nature of the human person, the nature of
9      the biology that informs our
10     understanding of that, because that has
11     to drive our medical and surgical
12     decision-making.
13            So that's why my -- my expert
14     opinion is based in the objective
15     scientific evidence.  I don't make
16     reference to my -- any faith statements
17     when I'm -- when I'm developing my expert
18     opinion on transgender medicine and
19     surgery.
20        Q.   In your expert report, you refer
21     to plaintiff Julie -- Dr. Julie McKeown;
22     right?
23        A.   Could you walk me to where I

1    speak about her?

2        Q.   Yeah.  Go to -- go to page 54 of

3    your report.

4        A.   Fifty-four.  Thank you.

5             MR. TISHYEVICH:  And the

6    spelling is M-C-K-E-O-W-N.

7        A.   Fifty-four.  Okay.  I'm there.

8        Q.   Give me a second.  Yeah.  This

9    is -- this is you discussing one of the

10   plaintiffs; right?

11       A.   Yes.  Yes.  I'm on page 53, 54.

12       Q.   Yeah.  And the second full

13   paragraph on page 54, you refer to Dr.

14   McKeown as a he; right?

15           (Witness reviews document.)

16       A.   Am I looking at the right -- oh,

17   yes.  Okay.  I'm sorry.  Right at the

18   very beginning.  Yes.

19       Q.   Page 48 of your report, this is

20   you discussing minor plaintiff CB; right?

21       A.   Right.

22       Q.   And you refer to minor plaintiff

23   as a she; right?

1        A.    Correct.

2        Q.    Go to page 51.

3        A.    Fifty-one?

4        Q.    Five one.

5        A.    Okay.  All right.

6        Q.    This is you talking about

7    plaintiff Connor Thonen-Fleck; right?

8        A.    Let me go to the preceding page

9    because I've got to see where the names

10    -- oh, I only used the initials.  Yes.

11    CT-F, yes.

12        Q.    It's T-H-O-N-E-N, dash,

13    F-L-E-C-K.  And you refer to him as a

14    she; right?

15        A.    Yes.

16        Q.    Now, you personally do not

17    believe that a person's sex assigned at

18    birth can ever be changed?

19            MR. KNEPPER:  Objection.

20        Q.    Sorry, let me -- let me use your

21    terms.  You personally do not believe

22    that a person's biological sex can ever

23    be changed; right?

1          MR. KNEPPER:  Objection, form.

2     A.   A person's biological sex can

3     never be changed, yes.

4     Q.   Do you know what the term

5     "misgendering" is?

6     A.   It's a -- it's a political term,

7     yes.  It's a political, cultural term, I

8     should say.  Political, cultural term.

9     Q.   Misgendering means referring to

10     a person in a way that doesn't align with

11     their gender; right?

12          MR. KNEPPER:  Objection, form.

13     A.   In -- within their hearing, I

14     could see a problem with that.  But from

15     the standpoint of offering medical

16     evidence, I'm obliged to honor objective

17     biological realities when I speak about

18     an examination of their medical record.

19          There's so many things at stake

20     relating to the sex of the patient that

21     impinge upon the effects of drugs, the

22     effects of time, the effects of hormones

23     that I -- I cannot incorrectly report the

1    sex of the patient when I'm talking about

2    objective medical care.

3            Now, speaking with the patients

4    themselves, I wouldn't do that.  As we

5    talked about earlier, I have a number of

6    transgender patients, and I don't

7    misgender them.  We're talking here about

8    something that's not within their hearing

9    or I assume they -- I assume that they

10   wouldn't be reading this.  We're speaking

11   as a professional to a professional

12   review of this stuff, among other

13   experts.  So I think it's essential that

14   we stick to the biological reality that

15   -- that biological sex is immutable.

16       Q.   In your expert report, you are

17   misgendering several of the individual

18   plaintiffs in this case; correct?

19           MR. KNEPPER:  Objection, form.

20       A.   I would say incorrect, because

21   misgendering is something that's done to

22   the person themselves or is something

23   that they're going to read or hear or

1    see.  And that's an abuse of the person's

2    right to their name, and I don't do that

3    to people.  I don't misgender people.

4        Q.   Well, in this report at least,

5    you are referring to several of these

6    plaintiffs, including a minor, in a way

7    that does not align with their gender;

8    right?

9        A.   I would be --

10            MR. KNEPPER:  Objection, form.

11       A.   Again, I would be concerned to

12   not do that if it was going to be

13   something they were going to read or

14   hear.  But this expert testimony, in my

15   understanding, is for the Court and for

16   the other experts to review, in which

17   case, I insist upon the -- the prevailing

18   necessity of sticking to objective truths

19   when talking about medical opinions,

20   scientific opinions.

21            Again, I -- I'm not in the habit

22   of -- of offending people or using names

23   that they haven't chosen, because, again,

1       I treat transgender patients and I don't
2       subject them to that kind of abuse.  But
3       when reviewing medical and biological
4       realities like this, I have to insist
5       upon it because medical care is not
6       served by incorrectly naming biological
7       realities and confusing people.  I can
8       give you an example if you like.
9            Q.   That's all right.
10           A.   Of a --
11           Q.   That's all right.
12           A.   Okay.
13           Q.   You've used the phrase before,
14      "You can't heal an interior wound with
15      external surgery."  Right?
16           A.   Yes, I have.
17           Q.   Do you remember giving a
18      presentation at the Gospel of Life
19      conference in Denver in 2018?
20           A.   Yes.
21           Q.   And that presentation was titled
22      "Transgender Surgery & Christian
23      Anthropology."  Right?

1      A.   Yes.

2      Q.   All right.  Let me introduce an

3  exhibit.  This will be Exhibit 33.  Let

4  me know when you have it.

5  (Exhibit 33 was marked for identification

6  and is attached.)

7      A.   Okay.  Yes, I have it.

8      Q.   Go to page 2.

9      A.   Okay.

10     Q.   These are slides you prepared;

11  right?

12     A.   Yes.

13     Q.   On the bottom left corner,

14  there's a red logo for Courage

15  International.  You see that?

16     A.   I do.

17     Q.   Why did you include that logo in

18  this presentation?

19         MR. KNEPPER:  Objection, form,

20  scope.

21     A.   This was a presentation for the

22  Archdiocese of Denver, the Catholic

23  Archdiocese of Denver, and it was to an

1    audience of pastors, teachers, school

2    administrators, and so on.  And I was

3    there representing my position in the

4    Catholic apostolate of courage, and so

5    making a presentation to a church group,

6    I wanted them to understand the resource

7    so that they could investigate it

8    themselves if they wanted to.  So I put

9    that up there for their benefit.

10        Q.   Well, some of the topics you

11   covered also included your views on what

12   the scientific evidence on these issues

13   is; right?

14        A.   Yeah.  The -- the talk is a

15   combination of both the scientific

16   evidence and the historic Catholic

17   teachings on the nature of the human

18   person.

19        Q.   For example, go to page -- go to

20   page 87, for example.

21        A.   Okay.  Let me hustle down there.

22   Boy, no wonder people get bored when I

23   give this talk.  It's so long; right?

1       Let's see.  87.  Here we are.  Is that --

2       let's see.  This is -- I want to make

3       sure I'm on the same page as you are.

4       It's of the --

5           Q.   It's titled "The Swedish

6       Study" --

7           A.   Yes.

8           Q.   -- at the top.

9           A.   Yes, yes.

10          Q.   And go to the next page.

11          A.   Okay.  Yeah.

12          Q.   You cite from the abstract on

13      that study; right?

14          A.   Yes.  Well, I -- I'm not citing

15      it.  I'm showing them what this study

16      looks like if they search for it online.

17          Q.   So part of the talk was your

18      recitation of what you think the

19      scientific evidence on these issues

20      shows; right?

21              MR. KNEPPER:  Objection, form,

22      scope.

23          A.   Yeah, I was asked to talk on

1    this -- on -- on both subjects, as I said

2    earlier, both the -- the teaching in

3    human anthropology as well as the

4    scientific evidence that's used to

5    support these services of transgender

6    medicine and surgery.  That's right.

7         Q.   Courage International is an

8    organization that offers support for

9    persons who experience same-sex

10   attraction; right?

11        A.   Yes.

12             MR. KNEPPER:  Objection, form,

13   scope.

14        Q.   Courage International says that

15   people should not act on same sex

16   attraction and should strive for chastity

17   instead; right?

18             MR. KNEPPER:  Objection, form,

19   scope.

20        A.   Actually, it's broader than

21   that.  So, Courage addresses chastity as

22   something that's required of everyone.

23   But it -- it particularly addresses the

1    struggles that persons who experience

2    same-sex attraction experience in trying

3    to maintain the same chastity that all of

4    us are called to.  So it's not an

5    exceptional case; it's a particular

6    apostolate to a particular group of

7    people.

8        Q.   There's a chapter of Courage

9    International in Birmingham, Alabama;

10   right?

11       A.   That's correct.

12            MR. KNEPPER:  Objection, form,

13   scope.

14       Q.   And their website lists you as

15   the main contact for that chapter; right?

16       A.   I'm not only the contact, I'm

17   the chaplain for that chapter.

18       Q.   Okay.  Go to page 3 of this

19   presentation.

20       A.   Okay.

21       Q.   Let me know when you get there.

22       A.   Okay.  Two, three.  Yes.  The

23   Challenge?

1      Q.    It's titled "The Challenge"?

2      A.    Yeah.

3      Q.    The first bullet says, "'Male

4   and female He created them.'"   Right?

5      A.    Right.

6      Q.    That's a quote from Genesis;

7   right?

8      A.    Correct.

9      Q.    The capitalized "He" refers to

10   God; right?

11      A.    Yes.

12      Q.    And this bullet reflects the

13   church's position that God has created

14   each individual as either a man or a

15   woman; right?

16      A.    Well, actually, so this -- these

17   slides serve as jumping-off points for a

18   discussion that I have at each slide.   In

19   this case, the point of the discussion

20   was to disabuse the audience of the idea

21   that they can rely on scripture when

22   addressing this problem because the

23   majority of the people that are seeking

1    to serve do not speak in Biblical

2    language.  So the point of this slide is

3    to -- is to encourage them to understand

4    that they have to learn a new language in

5    order to be able to speak effectively to

6    people suffering from gender discordance

7    and to speak to their families on this

8    same issue.  That's what this slide is

9    about.  It's not a -- it's not a

10    declaration about what God has said.

11    It's a -- it's an explanation of the

12    problem they're going to have if they're

13    going to seek to serve people who

14    experience same-sex -- I'm sorry, who

15    experience cross-sex identification.

16        Q.   All right.  You say, "'Male and

17    female He created them' has been replaced

18    by a confusion of exceptional cases."

19    Right?

20        A.   Yes.

21        Q.   And by the phrase "confusion of

22    exceptional cases," one of the things

23    you're referring to are patients with

1    gender dysphoria; right?

2              MR. KNEPPER:  Objection, form,

3    scope.

4         A.   Right.  I'm referring to the --

5    the recently growing list of exceptional

6    cases that is enumerated in the -- the

7    acronyms of -- of this topic, LGBTQ add a

8    plus and so on, which can be very

9    confusing to people who are trying to

10   help.  And so I'm acknowledging that the

11   -- the likelihood that they may be

12   confused by those terms, and I'm also

13   acknowledging the sources of those

14   confusing terms.  And the point of the

15   slide, again, is to help them understand

16   there's a language they need to learn and

17   to not be daunted by the confusion that

18   they may experience when they first look

19   into this topic.  Yeah.  That's what this

20   is.

21        Q.   Go to slide 11.  It's titled

22   "Human Nature."

23        A.   So slide 11, Human Nature, yes.

1    Okay.

2        Q.   So the first two bullets say,

3    "Why must we consider first the nature of

4    the human person?"  Then it says,

5    "Defines the 'end' of medical and

6    surgical care."

7        A.   Yes.

8        Q.   What does it mean that it

9    "defines the 'end' of medical and

10   surgical care"?

11            MR. KNEPPER:  Objection, form,

12   scope.

13       A.   Okay.  So that's a -- that's a

14   term that dates back to Aristotelian

15   philosophy.  And what it has to do is

16   what is the purpose or what is the

17   ultimate arc of a particular thing.  So

18   the "end" meaning what are you seeking to

19   accomplish, what is the final goal of

20   that -- of that medical or surgical

21   treatment.

22            So -- and the examples I use are

23   you have to have an understanding, for

1    example, of normal blood pressure in

2    order to know when to treat it and why

3    normalizing blood pressure is important.

4    Or we have to know that, you know, the

5    human person has two legs, and if he has

6    a poverty of legs, he has a poverty of

7    human flourishing.  And so in the one

8    case, I might be treating with blood

9    pressure medicine, and in the other case,

10   I might be fitting him for a prosthesis.

11   But the point is we have an objective

12   understanding of the nature of the human

13   person, which defines the goals of

14   treatment, whether you're talking about

15   orthopedics or transgender medicine.

16        Q.   Yeah.  You think this concept

17   also applies to the concept of treatment

18   for gender dysphoria; right?

19        A.   It does.  Yes, it does.

20             MR. KNEPPER:  Objection, form,

21   scope.

22        Q.   All right.  Go to slide 23.

23        A.   Okay.  Okay.

1      Q.   The top left says, "Shaping the
2  Conversation, & Grooming a Generation."
3      A.   Right.
4      Q.   You see that?
5      A.   Right.
6      Q.   What do you mean by "grooming a
7  generation"?
8      A.   Grooming is a -- is a process by
9  which ideas are introduced that make
10  subsequent actions possible, so that's
11  what -- that's what grooming is, yeah.
12      Q.   Grooming is sometimes used to
13  refer to preparing to -- strike that.
14          Grooming is sometimes used as
15  preparing children for sexual abuse.
16  Isn't that true?
17      A.   That's one of the --
18          MR. KNEPPER:  Objection, form,
19  scope.
20      A.   That's one of the uses of
21  grooming, yeah, but it's not exclusive
22  use of grooming.  Yeah.  And I discuss
23  this in this -- in this slide.  Yes, I

1    do.

2         Q.   And you think that discussing

3    gender identity issues with children

4    means sexualizing them; right?

5         A.   Yes, I do.  Absolutely, I do.

6              MR. KNEPPER:  Objection, form,

7    scope.

8         Q.   And you think that discussing

9    gender identity issues with children

10   means grooming them for potential later

11   sexual abuse; right?

12             MR. KNEPPER:  Objection, form,

13   scope.

14        A.   No.  No.  What we're talking

15   about here is grooming them for -- for

16   future -- what's the word I would want to

17   choose carefully?  It's preparing them

18   for these interventions is what it does.

19   It lays the groundwork for it by

20   sexualizing their thoughts in a way

21   that's -- is not consonant with their

22   best interest.  That's what this slide is

23   about, so --

1      Q.   Let me introduce another

2    exhibit.

3      A.   Okay.

4      Q.   This will be Exhibit 34.

5    (Exhibit 34 was marked for identification

6    and is attached.)

7      A.   Could I back up to that last

8    one?  Would that be all right?

9      Q.   Sure.

10      A.   Before we -- before we press on.

11    One of the things I'm just recalling, the

12    -- the -- the urgency of having that

13    particular slide there is that when

14    people take care of transgender persons,

15    children in particular, we always -- but

16    including adults.  But -- but children

17    and adults, one always has to be on the

18    lookout for signs of sexual abuse because

19    it's a very -- it's a very commonly

20    reported comorbidity in persons who

21    experience these self-identifications.

22    It's not uncommon to discover that

23    they've suffered some form of abuse that

1    may be sexual but not necessarily sexual.
2    And so this is -- one of the things I
3    talk about in that slide is -- is for the
4    people who are care providers,
5    counselors, school administrators, to be
6    alert to that possibility.
7              So I'm sorry, we were going to
8    move on to the next one.
9         Q.   Do you have the next exhibit?
10        A.   And that is Exhibit 34?
11        Q.   Yeah.
12        A.   Okay.
13        Q.   All right.  This is a printout
14   from LifeSite, and the title is "Plastic
15   surgeon: Sex-change operation 'utterly
16   unacceptable' and a form of 'child
17   abuse.'"  Right?
18        A.   Yes.
19        Q.   And it says, "Dr. Patrick
20   Lappert, a Catholic deacon in Alabama,
21   says changing a person's sex is a lie and
22   also a moral violation for a physician."
23   Right?

1     A.   Yes.

2     Q.   And you hold those views --

3     A.   I do.

4     Q.   -- correct?

5     A.   I do.

6     MR. KNEPPER:  Objection, form,

7  scope.

8     Q.   Go to page 2.

9     A.   Okay.

10    Q.   This was published in September

11  2019; right?

12    A.   Yes.

13    Q.   This is reporting on you

14  appearing on a broadcast of something

15  called the "Relevant Radio's Trending

16  With Timmerie."

17    A.   Yes.

18    Q.   Right?

19    A.   Yes.

20    Q.   You made that appearance; right?

21    A.   On the radio, yes.

22    Q.   Okay.  Look -- look to the fifth

23  paragraph on page 2.

1       A.    Okay.

2       Q.    It says, "He called it 'utterly

3    unacceptable' on moral grounds for a

4    plastic surgeon, because it disregards

5    the surgeon's call to balance respect for

6    both form and function of the body in his

7    or her work."

8       A.    Right.

9       Q.    Right?

10      A.    Yes, sir.

11      Q.    You don't deny saying that;

12   right?

13      A.    Right.  You should understand,

14   though, that the use of the term "moral

15   grounds" here is strictly from the

16   standpoint of my training as a plastic

17   surgeon.  I'm not using this as a

18   platform for a religious discussion.

19   Speaking -- I'm speaking about form and

20   function, which are both very crucial to

21   an understanding of what plastic surgery

22   means.

23            And again, that speaks to the

1    end of plastic surgery, which is -- when
2    you're speaking about reconstructive
3    surgery, it's the restoration of form and
4    function.  And these operations lack
5    moral basis precisely because they
6    destroy essential human functions for the
7    sake of achieving a cosmetic result,
8    which is morally unacceptable.  And I say
9    that without reference to any religious
10   teaching.  This is strictly my training
11   as a plastic surgeon, morally
12   unacceptable.  And from the first moments
13   of my training as a reconstructive
14   surgeon, that was drilled into me, that
15   if you're planning a reconstructive
16   operation and it involves the movement of
17   tissue on the patient's body, you never
18   do something that's going to compromise
19   or destroy an essential human function.
20           You may challenge that function
21   a little bit, as you do, for example, in
22   a radial forearm flap, the same flap
23   that's used to recon- -- to construct a

```
1       phalloplasty.  I've used that flap many
2       times to reconstruct head and neck cancer
3       defects, the same neurotized vascular
4       flap.  And I would never dream of using
5       that flap, for example, if I was going to
6       compromise hand function.  So it obliges
7       me to be careful, to make sure that when
8       I raise the flap, I don't harm the blood
9       supply to the hand.  That's an example of
10      that.
11            In the example of transgender
12      surgery, by definition, you're destroying
13      fertility for life, which is an immoral
14      act in the eyes of plastic surgery as I
15      learned it through 30-plus years of
16      training.
17      Q.    I understand.  Let me just ask
18      you about the next two paragraphs --
19      A.    Okay.
20      Q.    -- of this article.
21      A.    Okay.
22      Q.    Then it says:  "Regarding
23      children, Lappert said, sexualizing them
```

1    at a young age with these ideas is

2    grooming them for later abuse.  'It's

3    atrocious,' he said.  'And no one even

4    knows how that's going to play out.

5    There's no body of scientific evidence to

6    even support the safety of doing that to

7    children.  But it's being done.'"  Right?

8            MR. KNEPPER:  Objection, form,

9    scope.

10       A.   Okay.  So, let's go through

11   that.  So in this case -- we talked about

12   multiple uses of the word "grooming."  In

13   this case, the abuse that they're -- it's

14   grooming them for is the abuse we just

15   finished discussing, what I consider to

16   be the abuse of transgender medicine and

17   surgery and what it does to the life of

18   that child.  So that's the abuse I'm

19   referring to here.  I'm not speaking

20   about this in terms of sexual abuse, I'm

21   speaking about in terms of

22   medical/surgical abuse of a child.  So if

23   you get a child -- if you sexualize a

1    child's thinking and encourage them to
2    believe, for example, if -- if -- if I --
3    and I don't want to take up your
4    remaining time, but we can go into it in
5    more detail if you wish.  But the point
6    I'm making here is this is grooming them
7    for medical and surgical abuse.
8         Q.   Okay.
9              MR. TISHYEVICH:  We can go off
10    the record.
11              THE VIDEOGRAPHER:  This is the
12    end of Media Unit 6.  We are off the
13    record at 5:07 p.m.
14                   (Break taken.)
15              THE VIDEOGRAPHER:  This is the
16    beginning of Media Unit No. 7.  We are on
17    the record at 5:14 p.m.
18         Q.   (By Mr. Tishyevich) Doctor,
19    that's all the questions I have for you
20    today.  Thanks for your time.
21         A.   Thank you.  This was my first
22    ever deposition, and you were very kind
23    to me.  Thank you for that.

1       Q.   Okay.

2           MR. TISHYEVICH:  All right.

3    Mr. Knepper?

4           MR. KNEPPER:  Yeah, I'm ready to

5    go.  I'm sorry.  I actually had you

6    turned down, because when I put you on

7    mute, I could still hear Lane and Andrew.

8    I thought I saw their lips moving.

9           THE COURT REPORTER:  Yeah, he

10   said he was finished asking questions.

11          MR. KNEPPER:  Oh, I'm sorry.  I

12   didn't hear that.  I'm sorry, Dmitriy.  I

13   apologize.  I had -- you know, Lane

14   and -- and Andrew were talking to one

15   another, and so I was -- I had to turn

16   down my speaker.

17          So I guess why don't we -- why

18   don't we take a -- I've got 4:15.  Why

19   don't we take a 15-minute break, and then

20   I'll see if I have anything on redirect,

21   and we'll come back at I guess it would

22   be 6:30 your time, Dmitriy?

23          MR. TISHYEVICH:  Yeah.

1                MR. KNEPPER:  Okay.

2                MR. TISHYEVICH:  Sounds good.

3                THE VIDEOGRAPHER:  We are off

4        the record at 5:15.

5                     (Break taken.)

6                THE VIDEOGRAPHER:  We are back

7        on the record at 5:29 p.m.

8

9        EXAMINATION BY MR. KNEPPER:

10           Q.   Dr. Lappert, I wanted to ask you

11       a couple of questions about your CV and

12       your biography.

13           A.   Okay.

14           Q.   On your biography, you identify

15       yourself as the Specialty Leader for

16       Plastic and Reconstructive Surgery, the

17       Office of the Surgeon General - United

18       States Navy, from 1997 to 2002.  Could

19       you describe what that position involved?

20           A.   Yeah.  So I advised the Surgeon

21       General, first of all, with regard to the

22       selection of physicians for advanced

23       training in plastic surgery.  I also

1    advised the Office of the Surgeon General

2    on policy matters pertaining to the

3    movement of patients and the availability

4    of services in the various treatment

5    facilities.  I also advised him on policy

6    relating to coverage of particular

7    medical problems versus sending them out

8    into the community for care or declining

9    care.

10           So part of it was resource

11   management, part of it was personnel

12   management, and part of it was financial

13   management.  And all the time, it

14   required to review the state of the

15   literature regarding reconstructive

16   surgery for combat-injured and as well as

17   medically retired personnel and other

18   retired people.

19      Q.   And I -- I note that also in

20   your resumé is that from 1996 to 2002,

21   you were the Chairman of the Department

22   of Plastic and Reconstructive Surgery at

23   Naval Hospital Portsmouth.  Could you

1    describe that -- that facility and its
2    role within the United States military?
3        A.   Okay.  Well, that -- as
4    department head, I was -- I had a five --
5    five staff plastic surgeons working for
6    me.  I had I think seventeen hospital
7    corpsmen working for me.  And we provided
8    services, reconstructive surgical
9    services on a referral basis from --
10   essentially from the eastern
11   Mediterranean all the way to Appalachia
12   and from North Carolina -- I'm sorry,
13   from -- from Maryland all the way down to
14   Florida.  So all persons requiring
15   reconstructive surgery, including
16   combat-injured or other, would be
17   referred to us, people with congenital
18   deformities, peop- -- you know, pediatric
19   patients and -- and adults.  And this was
20   in a -- in the facility which at the time
21   was the largest medical treatment
22   facility in -- I think in the world,
23   certainly in -- in the American purview.

1          I also -- I also established and
2     ran congenital craniofacial deformity
3     treatment.  We ran a limb salvage
4     treatment that involved a great deal of
5     microvascular reconstructive surgery for
6     wounds, cancer, that sort of thing.  We
7     also established the -- the wound care
8     center for that facility, and that --
9     again, we served that large catchment
10    area with advanced wound care services.
11         Q.    Dr. Lappert, you served as a --
12    as a plastic and reconstructive surgeon
13    for the United States Navy.  Is that
14    correct?
15         A.    Correct.
16         Q.    And you also served as a plastic
17    and reconstructive surgeon in private
18    practice.  Is that correct?
19         A.    Correct.
20         Q.    Could you describe the -- or
21    contrast or describe the similarities and
22    differences in those two practices.
23         A.    Certainly.  Well, so both

1    practices involved both reconstructive
2    surgery and aesthetic cosmetic surgery.
3    But the difference is that in the
4    military, because of the nature of the
5    requirements, the experience level grows
6    much more rapidly in the military than it
7    does in the civilian world.  So within
8    the first couple of years of my practice
9    as a reconstructive surgeon in the Navy,
10   I was doing the most advanced
11   reconstructive procedures, such as the
12   mi- -- the neurotized microvascular flap
13   operations that are often used, for
14   example, in the phalloplasties of
15   transgender surgery, or the perineal
16   vaginal reconstruction for cancer, same
17   operations that are used in the
18   vaginoplasty for transgender
19   self-identified persons.  So a very
20   advanced complexity.
21          In fact, when I sat for my
22   boards, my oral boards, we had to present
23   ten selected cases that the board

1    selected, and both of my examiners were

2    startled at the level of complexity for a

3    second-year person out of training, doing

4    craniofacial surgery, free flap

5    operations, massive limb salvage surgery.

6    So that's the distinct difference, what

7    you get in civilian versus what you get

8    in the military.  But both of them

9    involved reconstructive as well as

10   aesthetic cosmetic surgery.

11        Q.    Sure.  Now earlier, you were

12   asked about whether you had performed

13   certain procedures in the context of

14   transgender surgery.  Is that correct?

15        A.    Yes, sir.

16        Q.    And your answer was that you had

17   not.  Is that correct?

18        A.    That's correct.

19        Q.    Have you done those procedures

20   in the context of your practice of

21   plastic surgery?

22        A.    I have.

23        Q.    Could you describe that --

1    those -- those circumstances.

2         A.    Well, as an example, a -- a very

3    memorable case, a patient with what's

4    called Fournier's gangrene, where

5    essentially, they had a massive

6    uncontrollable infection of the perineum

7    that destroyed the scrotum, destroyed

8    major portions of the penis, required

9    what amounts to a reconstructive

10   phalloplasty/scrotoplasty to reconstitute

11   them after a long period of wound care.

12   But the -- the operations to reconstruct

13   the urethra is the same operation that's

14   used to construct the urethra in a

15   phalloplasty or construct the urethra in

16   a metoidioplasty, same operations

17   involving local flaps, mucosal grafts,

18   tubularized flap operations.  All of

19   those are the same.  Just the indication

20   for the surgery is reconstructive rather

21   than the surgeries for transgender.

22            Same thing with the

23   vaginoplasty.  Again, often --

1    oftentimes, reconstruction for radiation

2    injuries secondary to management of

3    vagineal -- vaginal perineal malignancies

4    that require removal of large areas of

5    soft tissue, again reconstruction of the

6    -- the perineum, the external genitalia,

7    the vaginal introitus, the vaginal canal,

8    same operations using flaps, grafts to

9    reconstruct as are used in the

10   transgender surgery world.

11        Q.   So, do you feel that your

12   professional experience and

13   qualifications allow you to comment on

14   the -- the medical operations involved in

15   surgery for a transgender individual?

16        A.   Yes.  I'm -- I'm very familiar

17   with all of those operations.

18        Q.   And -- and you've performed

19   those operations?

20        A.   Yes, I have.

21        Q.   Okay.  Just not in the context

22   of gender transition?

23        A.   That's correct.

1       Q.   Okay.  There was a -- there was

2    a brief question, and -- and we didn't

3    get back to it, about one of the articles

4    on your CV on breast reconstruction.  Is

5    that -- is that correct?

6       A.   Right.  Yeah, that's one of my

7    listed articles.  That's right.

8       Q.   Great.  Did you want to -- did

9    you want to say more about that article?

10       A.   Yeah.  So, that's -- was really

11    my entrance into the breast

12    reconstruction world.  That actually

13    started when I was still a general

14    surgeon and I was collaborating with a

15    plastic surgeon, and we examined the

16    surgical planning for mastectomy in the

17    setting of breast cancer or other causes

18    and -- and the surgeon's role in

19    designing those operations to get the

20    best possible outcome.  And it was

21    actually a seminal article, up until

22    recently was the most quoted article in

23    the literature on breast reconstruction.

1    And that was actually the first article
2    that spoke about conservation surgery in
3    surgical planning for the treatment of
4    breast malignancies or other breast
5    problems.
6        Q.   Dr. Lappert, you were asked
7    questions about the policy or position
8    statements of several professional
9    organizations.  Do you recall those
10   questions?
11       A.   I do.
12       Q.   Did those exhibits or any of the
13   questions change your opinion that
14   affirmative hormonal treatment and
15   surgery remains unproven and
16   experimental?
17       A.   It has not changed my opinion.
18       Q.   You were asked questions about
19   the evidence supporting the provision of
20   hormonal therapy and surgical
21   interventions for the treatment of gender
22   dysphoria.  Is that correct?
23       A.   Yes.

1    Q.   Were any of the questions or any
2    of the studies that were presented to
3    you, did they change your opinion that
4    the existing medical evidence supporting
5    those interventions is of very low
6    quality and has methodological defects?
7    A.   That did not change my opinion
8    about those, no.
9    Q.   And just to clarify, what is
10   your opinion about the -- about the
11   current state of the evidence supporting
12   hormonal therapy for treatment of gender
13   dysphoria?
14   A.   My opinion is that all of these
15   published studies that are used to
16   support or to justify the use of puberty
17   blockade, cross-sex hormones, or
18   transgender -- gender-affirming surgery
19   are of the lowest quality scientific
20   evidence and are not sufficient to
21   support care and interventions that have
22   such far-reaching and lifelong effects on
23   the patient.

1       Q.   Are your opinions on that -- on

2   that issue in this case based on anything

3   other than your review of the scientific

4   and medical literature and your training

5   as a -- as a physician?

6       A.   No, they're not.

7       Q.   Dr. Lappert, you were asked

8   about off-label use of Botox for certain

9   muscle -- muscle groups.  Is that

10   correct?

11       A.   Yes, I was.

12       Q.   And you -- and you described --

13   and you stated that you've actually used

14   Botox off label for treatment of those

15   muscle groups before that was approved by

16   the FDA.  Is that correct?

17       A.   That's correct.

18       Q.   But you have also said that you

19   believe that it is significant and -- and

20   relevant to this case that the use of

21   hormone and puberty blockers for

22   treatment of gender dysphoria is

23   off-label.  Is that correct?

1      A.    Yes.

2      Q.    Could you disting- --

3    distinguish between why you hold the view

4    that off-label uses of some

5    pharmaceuticals is acceptable by a -- by

6    a physician and when you consider that to

7    be unacceptable by a physician?

8      A.    Right.  So, the off-label use of

9    medications when there's a low risk to

10   the patient or that the -- the possible

11   adverse effect may be brief and that a

12   favorable result is likely where risk is

13   low, then that's justifiable to go off

14   label with medications.  But when you're

15   -- when you're talking about significant

16   risk to the patient and irreversible

17   changes, that the off-label use places a

18   tremendous burden on the practitioner to

19   -- to have scientific evidence to support

20   his decision to do that.  And to not have

21   sufficient evidence when doing that is a

22   -- is a -- is a great difficulty in terms

23   of consent and in terms of just general

1      medical/surgical decision-making.

2              So the distinction is the

3      risk/benefit equation.  How much risk are

4      you placing the patient under, is it

5      irreversible, and is the benefit so great

6      that it's worth taking the risk.

7      Q.   Sure.  Just to follow up, and

8      these are going to be my final questions,

9      is it your view that there are no -- and

10     does it continue to be your view that

11     there are no -- currently no competent --

12     competently conducted long-term,

13     peer-reviewed, reliable, and valid

14     research studies documenting the number

15     or percentage of patients who receive

16     gender-affirming medical interventions

17     who are helped by such procedures?

18     A.   It's still my position that --

19     that the medical literature does not

20     support those interventions of medical

21     and surgical treatment for

22     self-identified transgender persons.

23     Q.   Is it still your view that there

1    are no published, reliable, and valid

2    research studies that document a valid or

3    reliable biological, medical, surgical,

4    radiological, psychological, or other

5    objective assessment of a -- of a

6    patient's gender identity or gender

7    dysphoria?

8        A.    Yes.  It's still my position

9    that there are no tests that will confirm

10   or refute the diagnosis of transgender, a

11   diagnosis made by the patient.  There's

12   no way to test for that.

13       Q.    All right.  Is it still your

14   view, after the evidence and the

15   questions that you've been presented,

16   that an unknown percentage of patients

17   who present with gender dysphoria also

18   suffer from mental illnesses that

19   complicate and may distort their

20   judgments and perceptions of gender

21   identity?

22       A.    Yes.  The -- the world

23   literature demonstrates a consistent and

1    significant level of comorbidities,

2    including severe anxiety, major

3    depression, self-harm.  The patient is

4    very likely to be on the autism spectrum.

5    Suicidal ideation.  And -- and the world

6    literature supports that.  So -- and

7    those are -- those are serious issues,

8    not only in terms of decision-making, but

9    even on the question of consent and

10   competence for consent.

11        Q.   Just one -- one more thing I

12   wanted to follow up with.  Your testimony

13   -- we didn't cover this, but I want to

14   make sure that it's still your view that

15   medical treatments may differ

16   significantly by sex according to your

17   chromosomal assessment but not based on

18   your gender identity and that

19   misinforming physicians of a patient's

20   biological sex could have deleterious

21   effects on treatment for medical

22   conditions?

23        A.   Yes, that's correct.  And when

1    we discuss the issue of misgendering,
2    that's what we were talking about.  We
3    were talking about placing the patient at
4    risk.  If you're having a -- a discussion
5    or conversation about medical
6    decision-making, you have to distinguish
7    between biological male and female
8    because you run -- there -- there are
9    illnesses that predominate in females
10   that don't exist in males; there are
11   conditions that affect males that do not
12   affect females, and you have to know that
13   if you're going to offer care.  But
14   again, that hasn't been changed by -- by
15   what I've seen or heard here today.
16   That's still -- is still the case.
17        Q.   Okay.  And it's still your view
18   that the use of hormones and surgery to
19   treat gender dysphoria is not supported
20   by the relevant scientific communities as
21   discerned by your literature review and
22   your training as a physician in
23   reconstructive and plastic surgery?

1          A.    Yes.

2               MR. KNEPPER:  Those are my

3     questions.  I don't think I have anything

4     else.  Did you have follow-ups you

5     wanted, Dmitriy?

6               MR. TISHYEVICH:  Very, very

7     briefly.

8               MR. KNEPPER:  Okay.

9

10    EXAMINATION BY MR. TISHYEVICH:

11         Q.    Doctor, you were just asked

12    about your views on why it's okay to use

13    Botox off-label but you have a different

14    view of puberty blockers.  Do you recall

15    that?

16         A.    I do.

17         Q.    And one of your considerations

18    is the risk/benefit profile of Botox;

19    right?

20         A.    Right.

21         Q.    Do you know what a black box

22    warning is, Doctor?

23         A.    Yes.

1      Q.    It's the strongest warning that
2      the FDA can require; right?
3      A.    That's -- that's right.
4      Q.    And that warning is typically
5      only used if studies indicate that the
6      drug carries a significant risk of
7      serious or even life-threatening adverse
8      effects; right?
9      A.    Yes.
10      Q.    Do you know that Botox has a
11      black box warning?
12      A.    Yes, I do.
13      Q.    It's for distant spread of toxin
14      effect; right?
15      A.    Yes.
16      Q.    And the use of Botox has -- has
17      resulted in reports of life-threatening
18      injuries and death; right?
19      A.    I'm even familiar with the case
20      reports that reported that.  Yes, sir.
21      Q.    Okay.  That's all I've got for
22      you.
23              MR. KNEPPER:  Okay.  Thank you,

1    Dr. Lappert.

2              THE WITNESS:  Thank you.

3              MR. KNEPPER:  We're finished

4    with your testimony.

5              Thank you, Dimitry.  Thank you,

6    Lane.  Thank you, Andrew.

7              We can go off the record.

8              THE VIDEOGRAPHER:  This is the

9    end of Media Unit No. 7.  We are off the

10   record at 5:47 p.m. Thursday, September

11   30th, 2021, and this concludes today's

12   testimony given by Dr. Patrick Lappert.

13

14              END OF DEPOSITION

15                (5:47 p.m.)

16

17

18

19

20

21

22

23

1         C E R T I F I C A T E

2   STATE OF ALABAMA      )

3   COUNTY OF JEFFERSON )

4         I hereby certify that the above

5   and foregoing proceeding was taken down

6   by me by stenographic means, and that the

7   content herein was produced in transcript

8   form by computer aid under my

9   supervision, and that the foregoing

10  represents, to the best of my ability, a

11  true and correct transcript of the

12  proceedings occurring on said date at

13  said time.

14        I further certify that I am

15  neither of counsel nor of kin to the

16  parties to the action; nor am I in

17  anywise interested in the result of said

18  case.

19        /s/ Lane C. Butler

20        LANE C. BUTLER, RPR, CRR, CCR

21        CCR# 418 -- Expires 9/30/22

22        Commissioner, State of Alabama

23        My Commission Expires:  2/11/25

1      John G. Knepper, Esquire

2      john@knepperllc.com

3                           October 13, 2021

4      RE:    Kadel, Et Al v. Folwell

5          9/30/2021, Patrick Lappert, M.D. (#4814384)

6          The above-referenced transcript is available for

7      review.

8          Within the applicable timeframe, the witness should

9      read the testimony to verify its accuracy. If there are

10     any changes, the witness should note those with the

11     reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13     Deponent and Errata and return to the deposing attorney.

14     Copies should be sent to all counsel, and to Veritext at

15     erratas-cs@veritext.com

16

17      Return completed errata within 30 days from

18     receipt of transcript.

19       If the witness fails to do so within the time

20     allotted, the transcript may be used as if signed.

21

22                      Yours,

23                      Veritext Legal Solutions

24

25

1    Kadel, Et Al v. Folwell

2    Patrick Lappert, M.D. (#4814384)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Patrick Lappert, M.D.                        Date

25

1    Kadel, Et Al v. Folwell

2    Patrick Lappert, M.D. (#4814384)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Patrick Lappert, M.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Patrick Lappert, M.D.                    Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

| & | | | |
|---|---|---|---|

**&** 2:7 3:11 10:15
  265:16 450:22
  461:2

**0**

**0.3** 303:3 344:18
  354:15
**0.6** 344:17 354:16
**08/02/2021** 4:17

**1**

**1** 4:13 9:18 12:3,6
  22:14,15 25:23
  31:9 34:11 43:8
  79:3 173:9 224:16
  257:14,20 279:20
  288:14 294:4
  301:11,13,21
  302:7,9,17,22
  303:13 320:9
  338:8 352:6
  357:16 383:14
  411:16 435:2,9
**1.7** 303:3
**10** 5:8 6:10 110:9
  171:7,11 255:10
  297:23 298:9
  300:7,10 303:12
  440:1
**10/02/2017** 264:14
**100** 3:12 142:1
**10017** 2:9
**1005** 2:21
**105** 2:14
**108** 5:2
**10:19** 115:11
**10:21** 115:14
**10th** 55:16
**11** 4:4 5:11 43:12
  110:6 223:16,18
  458:21,23

**11-2** 63:16
**116** 5:5
**11:06** 166:17
**11:16** 166:21
**12** 4:13 5:13 7:20
  230:12,14 411:9
**120** 2:20
**127** 5:7
**12:30** 254:16
**12th** 427:12
**13** 5:16 232:22,23
  279:20 493:3
**13.6** 304:12
**14** 5:20 239:14,16
  350:17 351:3
  352:12,14 355:1,1
  355:2
**14.4** 357:11
**15** 6:1 7:20 119:18
  138:18 256:13,15
  298:19 299:9
  411:10 471:19
**158** 2:14
**16** 6:4 56:15 263:8
  263:10 359:22
  366:6
**16,000** 360:19
  364:23 365:11,15
  366:2
**17** 6:6 57:1,17
  299:13,15 397:14
  397:16
**171** 5:8
**1720** 3:6
**18** 5:12 6:11 42:6
  58:1 224:14 257:4
  257:5 325:23
  326:2 399:13
**18th** 430:17
**19** 6:16 339:20
  340:2 401:6

**19.1** 390:1,5
**1920s** 72:17
**1972** 342:1,8
**1972-2015** 6:19
  340:10
**1979** 182:22
**1982** 227:12,17
  228:19
**1987** 134:12
**1990** 106:19
**1991** 106:18,19
**1992** 31:12
**1993** 136:11
**1994** 5:12 224:14
  226:20,22
**1995** 132:22
**1996** 131:11
  473:20
**1997** 23:5 30:10
  129:6 472:18
**1998** 129:8 233:4
**19th** 2:20
**1:19** 1:7 10:2
**1:21** 254:20

**2**

**2** 4:14 27:9,14
  28:16 64:4 110:4
  166:16 225:2
  231:2 242:13
  264:17 265:3
  286:4 288:14,22
  294:4 295:11
  302:5 303:22,23
  304:11 306:13
  307:13 384:9,16
  405:11 415:6
  430:21 435:12
  451:8 465:8,23
**2,361** 341:22
**2,773,770** 257:21

**2.1** 302:21
**2.7** 258:11
**2/11/25** 492:23
**20** 6:17 339:16,18
  339:21 340:2,7
  372:14 495:15
**2000** 380:10
**2001** 380:12
**2002** 31:17,20 32:3
  32:5 136:22 137:2
  137:23 139:16
  240:13,17 472:18
  473:20
**2005** 139:11,17
**2006** 140:18
**2007** 184:11,12
**2008** 23:8 30:11
  300:11 302:13
  303:2
**2009** 200:14
**2010** 139:8,13
**2011** 185:17 186:4
  383:1,5 389:15
**2012** 183:4 185:16
**2013** 189:23
  300:11 302:14
  303:2
**2014** 85:8 202:14
  257:3,14,14 380:9
**2015** 342:1,8,21
  343:4
**2016** 265:3 378:22
  380:17 439:14
**2017** 6:20 8:3 84:8
  84:11 89:18 93:6
  98:6 101:18
  171:16 196:8,18
  197:18,22 198:2
  198:21 199:13,17
  200:2,4,21 264:17
  266:6 267:19

356:1 368:8
**2017-10-02**   6:5
**2018**   6:17 23:16,20
  25:18 297:7
  300:11 302:14,21
  304:13,21 307:16
  307:22 450:19
**2019**   6:6 25:2
  100:13 148:22
  149:1 256:19
  299:19 440:9,11
  440:12 441:15
  465:11
**2020**   7:12,23 25:11
  139:4,8 141:13,17
  142:5 148:20
  149:1 377:21
  379:1,4 393:23
  394:16 410:11
  414:10
**2021**   1:21 5:5 7:6
  9:10,17 25:10
  38:5,11,16 55:17
  108:15 109:3
  110:6 115:23
  359:18 377:13
  379:6 380:18
  381:10 382:4
  410:22 424:8
  427:12 430:17
  435:2 491:11
  493:3
**21**   6:20 38:11
  320:11 322:16
  355:17,18 380:11
  413:6
**22**   5:12 7:1 359:14
  361:4,11
**223**   5:11
**23**   7:5 129:11,15
  130:18 375:14,16

397:6,12,13
  460:22
**230**   5:13
**232**   5:16
**239**   5:20
**24**   7:7 388:18,20
  399:13
**25**   7:12 108:15
  171:16 347:10
  394:7,9 401:6
  404:23
**256**   6:1
**25th**   109:2 115:2
**26**   7:15 396:19,20
**26.3**   308:2
**263**   6:4
**27**   4:14 7:17 411:2
  411:4
**27101**   3:13
**272**   1:7 10:2
**28**   7:23 414:20,22
**28.1**   257:21 258:12
**29**   8:2 35:11
  419:15,17
**299**   6:6
**2:16**   320:3
**2:24**   320:7
**2nd**   38:5

**3**

**3**   4:15 29:8 30:12
  34:7 41:10,12,12
  41:16 42:5 64:14
  111:7 128:17
  166:20 219:12
  248:13 254:15
  264:10 266:6
  267:19 289:2,7,9
  289:17,22 290:15
  290:17 293:22,23
  294:11 295:16
  305:2 308:5 312:6

363:14 428:8
  455:18
**3.2**   307:20
**3.8**   307:20
**3/2021**   377:13
**30**   1:21 8:4 344:8
  426:22 427:1
  443:7 468:15
  493:17
**30030**   2:15
**30th**   9:9,17 491:11
**31**   8:6 257:14
  430:7,9
**32**   8:9 434:7,10
**326**   6:11
**33**   8:12 451:3,5
**339**   6:17
**34**   4:15 8:14 463:4
  463:5 464:10
**35**   298:16,17
  402:16
**355**   6:20
**361**   7:1
**37**   4:16
**375**   7:5
**38**   36:1
**388**   7:7
**394**   7:12
**396**   7:15
**3:25**   388:8
**3:36**   388:12

**4**

**4**   4:16 37:23 73:19
  73:19 79:7 124:7
  128:22 143:17
  158:15 171:21,22
  193:19 194:2
  219:9 227:9
  254:19 304:17
  305:1,4 320:2
  323:18 347:19

350:13 364:13
  370:15 380:11
  401:21
**4,432**   341:21
**4/5**   370:13
**40**   367:8 373:13
**41.7**   304:22
**411**   7:17
**414**   7:23
**418**   492:21
**419**   8:2
**427**   8:4
**430**   8:6
**434**   8:9
**45**   258:18
**45.5**   258:6
**451**   8:12
**46**   394:13 407:8
  410:10 421:17,18
**463**   8:14
**472**   4:5
**48**   445:19
**4814384**   493:5
  494:2 495:2
**489**   4:7
**4:07**   417:12
**4:15**   471:18
**4:20**   417:15

**5**

**5**   4:18 35:1 43:10
  55:9,12 59:14
  73:7,13,16,17,20
  124:1 189:18,20
  189:23 190:12,17
  191:8,14,19 192:1
  192:9,22 193:15
  194:2 219:2,18
  255:10 283:20
  284:8,12,21
  285:13,22 301:12
  301:14,21 305:2,5

| | 7 | 9 | absence 242:18 |
|---|---|---|---|

320:6 323:18
327:6 332:17
344:13 363:15
364:1 370:14,15
383:10,12 388:7
**50** 255:10 298:1
351:21 369:8
**51** 446:2
**53** 445:11
**53.9** 258:7
**54** 258:18 419:20
419:21 421:7,13
445:2,11,13
**54.2** 258:7
**55** 4:18
**59** 5:11
**590** 3:6
**5:07** 470:13
**5:14** 470:17
**5:15** 472:4
**5:29** 472:7
**5:47** 491:10,15

**6**

**6** 4:20 40:23 41:14
62:19 172:2,3
349:16,19,23
356:21 357:4
388:11 470:12
**6,000** 345:2
**6,793** 341:21 342:6
343:11 350:17
**6,800** 345:1
**60** 17:10,12 359:22
369:8 372:11
**60,000** 359:18
360:18
**600** 3:12
**62** 4:20
**63** 35:12
**6:30** 471:22

**7** 5:2 7:16 38:21
108:7 115:6 183:2
183:9 184:5,8,18
185:4 187:3,9,13
187:19 188:1,7,16
327:7 330:10
342:22 351:3
357:16 378:5
391:13 396:15
397:4 398:15
399:3 401:1
470:16 491:9
**7,000** 345:2
**7/19/11** 382:16
**70/30** 8:2
**73** 356:21 357:3
358:8
**74.7** 344:16
**779,270** 257:21

**8**

**8** 5:5 116:2 174:3
185:22 188:21,23
189:10 378:15
383:11 405:3
**80** 142:1 161:8
**80s** 230:8 292:15
**81** 422:12
**82001** 3:7
**83.8** 344:17
**87** 129:7 273:20
452:20 453:1
**884** 302:1
**889** 356:20
**89** 422:11
**8:30** 9:8
**8:31** 9:16

**9** 5:7 127:16,17
158:16 405:2
437:5
**9/30/2021** 493:5
**9/30/22** 492:21
**90** 161:19 351:21
**900** 358:7
**90s** 100:21 161:12
**91** 31:14 273:21
**92** 31:14,14 69:17
101:13,16
**93** 101:14 102:22
**94** 69:17,18
**95** 101:7 342:15
**97** 102:6 262:19
**98** 129:20
**9:33** 79:4
**9:44** 79:8

**a**

**a.m.** 9:8,16 79:4,8
115:11,14 166:17
166:21
**abandon** 122:18
**abdominal** 121:23
**abdominoplasties**
142:20
**ability** 413:12
492:10
**able** 11:15 66:18
174:13,17 274:12
277:9 310:20
457:5
**abplasticsurgery...**
4:14
**abps** 27:22 28:8,19
28:23 29:12,23
30:10,13,15 31:3
**abreast** 69:12

243:9 247:20
309:6
**absolute** 245:15
**absolutely** 43:19
60:19 61:12
114:12 267:22
315:6 353:11
462:5
**abstract** 240:22
328:18 341:17
356:8 411:16
453:12
**abundance** 293:21
**abuse** 8:17 70:17
120:13 314:19
449:1 450:2
461:15 462:11
463:18,23 464:17
469:2,13,14,16,18
469:20,22 470:7
**academy** 5:20
239:23
**acceptable** 313:18
484:5
**acceptance** 351:15
**accepted** 43:17
60:23 117:14
373:17,22 374:4
374:16 375:1,6
391:11 402:18
**access** 102:2 113:9
297:7,9 362:8
**accessible** 74:8,9
**accidentally** 256:1
**accomplish** 300:15
459:19
**account** 51:13
307:20 308:2
362:11

accuracy 493:9
accurately 28:18
  28:23
accuse 127:13
achieve 66:15
  287:7 334:8
achieving 467:7
acknowledge
  230:1 327:9
  413:17
acknowledgement
  495:3
acknowledges
  253:23
acknowledging
  458:10,13
acknowledgment
  493:12
acne 140:2 145:14
  145:22 146:14
  152:21 153:1
acneiform 145:13
acronyms 458:7
act 285:22 454:15
  468:14
acted 329:4
acting 9:3
action 1:7 10:1
  172:15 207:6
  224:21 372:22
  492:16
actions 461:10
active 24:23 26:5
  26:20 100:16
  137:11 140:8
  171:19 322:21
actively 54:22
activity 265:11
  267:19
actual 50:20
  168:22 276:7

372:8 373:7
  432:16
acute 134:13
  135:10
adamant 71:12
add 62:11 398:20
  458:7
added 283:21
addition 78:5
additional 13:14
  215:22 265:7
additionally 243:2
additions 495:6
address 352:12
  366:19 400:19
addressed 363:5
addresses 400:10
  400:20 454:21,23
addressing 244:22
  384:4,5 456:22
adequately 368:5
adf 79:11,15 80:21
  80:22,23 81:5
  82:17 83:3,11
  84:4 98:7
adf's 81:11
adjusting 392:4
adjustments
  212:20
administration
  95:18,19 224:18
  224:20 253:4
  263:14
administrative
  257:12
administrator
  11:1
administrators
  452:2 464:5
admissions 313:15

admit 112:9
admits 373:4,5
admitting 24:10
  24:14
adolescence 161:8
  205:3 319:11
adolescent 368:12
  369:9,22 401:21
  401:23 402:12,17
  403:8,17,20 404:6
  404:16
adolescent's 403:2
adolescents 36:19
  51:5 157:19 158:9
  161:1 162:14
  238:15 239:6
  241:6 258:23
  399:16,20,23
  400:12,21 401:13
  402:4 428:16
  429:1
adopt 49:3
adopted 114:9
  310:22
adopting 51:13
adrenal 436:22
adult 368:12 369:9
  369:22
adulthood 161:11
adults 157:23
  158:5 259:7
  463:16,17 474:19
advanced 472:22
  475:10 476:10,20
advancement
  310:13
adverse 202:19
  334:21 484:11
  490:7
advice 77:6 160:22
  161:3

advise 210:3
advised 183:19,23
  197:8 472:20
  473:1,5
advising 204:19
  214:15
advisory 378:17
  380:15
advocacy 113:17
  116:9 117:22
advocate 113:8
advocates 105:12
aesthetic 66:11
  67:14 68:4,6,7
  335:4,4 476:2
  477:10
aesthetically
  144:11,12
aetna 8:4 425:7,8
  425:10,17,22
  426:8,14 427:5,18
  428:13,21 429:7
  429:15
aetna's 428:1,5
affairs 263:23
affect 121:10
  488:11,12
affiliated 59:8
  96:6
affiliations 10:11
affirmation 5:3
  43:14 51:4 109:18
  110:8 149:10
  151:15 373:19
  376:13 379:20
  382:23 384:22
  387:2 395:16
affirmative 481:14
affirming 8:4 35:5
  36:18,22 39:4
  40:4 41:7,18 44:1

51:23 54:10 57:12
63:14 77:18 78:19
107:12,20 111:6
111:18 112:21
114:9 115:19
117:15 126:10
127:4 130:3
131:16 132:18
133:16 134:3,17
137:4,10,18
151:13 164:15
168:12,17,17
175:20 177:22
375:7 390:1,15
391:2 424:9
425:17 426:14
427:5,18 428:1,7
429:8 433:19
482:18 485:16
**afternoon** 97:17
**age** 242:19,22
249:6 257:4,5
319:10 346:4,5,8
347:9,11 402:1
469:1
**agencies** 30:17
224:10
**agency** 221:3
224:17,19 229:12
**agents** 201:2
203:16 204:17
211:10 212:14
213:18 406:13
**ago** 15:2,16,20
24:3,15,23 44:14
99:21,23 100:1
103:18 123:1
129:11 130:18
170:9,10 196:6
202:7,11,14
206:16 225:10

247:21 290:19
301:19 325:10
**agonist** 317:22
**agonists** 201:8
**agree** 22:6 36:8
42:18 111:17
112:20 113:3,4,5
128:11 135:13
179:2,6 221:1
229:11 249:11
250:11 252:12
296:17 314:23
315:1,6 316:7
317:16,23,23
318:5 321:2,22,23
340:18 371:5,9
393:2 407:5 408:6
**agreed** 265:23
**agreement** 248:23
**ahead** 126:6 227:5
281:2,14 327:20
327:21
**aid** 492:8
**aim** 300:5
**aimed** 68:6
**al** 1:9,14 9:21,22
493:4 494:1 495:1
**alabama** 4:20,23
9:3,7 10:5 24:18
62:5,10,23 63:2,5
63:11,18 76:4,6
109:23 110:15,22
117:7 138:12,14
455:9 464:20
492:2,22
**alarm** 71:15
**alcohol** 333:21
**alert** 464:6
**align** 111:10
447:10 449:7

**allergan** 263:21
264:7,9 270:19
**alliance** 79:11
**allotted** 493:20
**allow** 32:18 243:1
428:6 479:13
**allowed** 179:16
180:7 229:20
**allows** 222:15
256:2
**alphabetically**
422:3
**altering** 244:19
290:2,17 311:5
**alternative** 250:2
250:14 252:11
**altogether** 251:3,5
**ama** 47:5,7,14
48:5
**ambiguous** 436:7
436:15
**ambulatory** 258:7
**amend** 18:19 19:3
**amended** 265:21
**amendment** 264:2
**amer** 26:11
**america** 123:21
**american** 5:9,20
26:13,16 27:13
30:8 32:9,10,17
43:1,2 44:18 45:2
45:14,15 46:1,7,23
47:8 48:10,15,18
49:6 72:3 89:14
89:19 99:16 100:5
100:18 102:20
108:11 123:23
124:12 128:12,13
169:7 171:12
185:14 190:5
239:1,23 248:5

282:4 283:8
300:17 313:2
474:23
**amid** 109:14
**amount** 169:19
**amounted** 304:21
**amounts** 402:16
478:9
**amputating**
289:21
**amsterdam** 6:17
326:7 340:9
**analogues** 431:14
**analysis** 86:13,14
276:3 302:2
307:19 410:11
**andre** 86:6
**andrew** 3:20 10:5
471:7,14 491:6
**androgen** 146:18
**androgens** 431:13
431:14
**anecdotal** 218:23
219:1 244:14
245:20 246:7
270:16,16 279:23
280:6,15,20 281:4
281:8,10,21,23
282:17 323:22
362:21 363:16
**anecdotes** 343:13
**anesthesia** 142:22
**angle** 132:17
**animal** 135:11
**animate** 266:16
**anorexic** 74:23
**answer** 18:19 19:4
83:1 110:21
124:17 125:23
126:5,8,19,21
127:1 150:20

164:7,11 181:4
186:16 215:4
251:1 269:12
274:11 286:16
294:1,8 324:8
374:22 409:18
426:2 477:16
**answered** 126:14
426:4
**answering** 261:17
**answers** 4:18
55:14 104:19
**antacids** 122:6
**anthropology**
442:6,12,23 443:4
443:11 450:23
454:3
**anti** 431:14
**antibiotics** 122:6
**anticipated** 80:13
186:18
**anxiety** 154:10
155:6 165:16
405:19 487:2
**anxious** 160:19
**anybody** 205:9
**anywise** 492:17
**apa** 49:2 190:8
191:18 192:19
194:11 239:4,20
240:15 242:1
243:8,15 248:2
250:12,19 251:12
251:19 253:15,20
**apa's** 239:9
**apart** 189:3 260:8
276:14 331:4
**apologies** 18:23
**apologize** 434:13
471:13

**apostolate** 452:4
455:6
**appalachia** 474:11
**apparent** 317:4
318:3
**apparently** 39:13
40:22 43:20 56:1
117:9 306:8
439:22
**appear** 201:11
303:17 395:5
423:21
**appearance** 10:11
60:6 61:6,10
71:13 144:13
154:18 238:21
265:9 465:20
**appearing** 465:14
**appears** 39:19
240:20 259:3
264:19 376:20
378:4 428:6
**appended** 495:7
**applicable** 493:8
**application** 205:13
205:16 218:15
219:10,11,15
234:11 235:7,12
237:10 244:11,13
247:9,23 252:19
265:2,7,20 266:21
267:6 270:15
310:9
**applied** 148:13
206:10 291:21
300:19 311:4,22
333:9
**applies** 460:17
**apply** 225:23
236:3 276:12
316:8 436:6

**applying** 245:4
247:15 318:15
**appointment**
207:12
**appreciation**
56:20
**approach** 249:13
**approaches**
105:23 228:9
**approaching**
83:21 219:21
307:12
**appropriate** 26:3
26:7 40:5 41:19
44:3 61:11 216:21
228:7 231:13
232:1 246:14
251:20 335:23
406:4
**approval** 6:5
236:3 243:9
263:17 265:6,16
266:17 267:8
269:10 334:7
**approved** 5:14
63:12 216:9,15
225:13,16 226:16
230:22 231:5,18
233:21 243:2
248:1 253:4,5
257:4 262:9,15,23
265:21 266:4
270:21 332:1
333:12 334:9
483:15
**approves** 231:9
261:2
**approving** 261:3
**approximately** 9:8
**april** 109:10 435:2

**apt** 20:3
**arc** 459:17
**archdiocese**
451:22,23
**area** 173:13 178:5
178:20 200:17
201:21 203:18
205:5 287:4 307:8
319:20 363:1,19
475:10
**areas** 104:1
210:11 221:11
311:13 479:4
**aristotelian**
459:14
**arizona** 62:14,14
80:1 93:3
**arkansas** 33:6,10
36:16 37:4 38:5
39:11 51:23 52:11
52:22 54:9 61:17
63:7 72:19 99:7
109:22 117:6
**arrived** 44:9,9
**article** 20:18 62:22
67:5 134:20
135:14 186:4
222:12 283:16
298:17 301:1
307:4 323:6,19
324:20 325:7
327:10 328:22
331:12 332:9
345:15 360:6,23
361:14 364:13
368:7 369:16
370:14 371:13,16
372:20 380:16,17
396:11 410:21
468:20 480:9,21
480:22 481:1

**articles** 12:21 21:7
74:12 129:3
222:10 274:1
297:10 298:2
306:21 336:8
377:19,21 382:2
412:23 440:20
480:3,7
**aside** 92:13 132:16
181:22
**asked** 73:18,21
79:19 91:7 99:2
122:23 126:14,15
152:1 155:5 180:2
183:21 292:18
318:9 336:9
453:23 477:12
481:6,18 483:7
489:11
**asking** 97:4 104:8
134:22 144:20
155:1 180:1
198:16 205:8
266:20 269:15
278:8,11 286:17
288:9,16 321:8
346:21 471:10
**aspect** 275:12
**aspects** 92:10
**asps** 5:2,5 101:10
101:15 102:8,10
102:17,23 103:6
103:21 105:10,11
106:1,20 107:12
111:5,8,16 112:7
112:13,20 113:7
113:16,18,19
114:8,14 115:1,5
115:17,23 116:8
169:10,18,22
170:8,13,23

171:19 174:18
176:9,14 177:9
179:4 180:8,15,18
180:21 181:9
222:9 284:5 296:5
297:12 301:19
306:5
**asps's** 117:4
**assert** 28:1
**assessment** 486:5
487:17
**assessments** 406:1
**assigned** 341:22
341:22 442:13,22
446:17
**assistance** 59:3
**assisted** 279:9
**associated** 265:10
267:18 438:11
**association** 40:3
40:17 43:2 45:14
46:23 49:7 182:9
190:6 239:1
380:13 428:17
**associations** 51:10
**assume** 155:7
169:21 208:19
362:16 381:16
382:8 433:16
448:9,9
**assuming** 409:13
**asthma** 220:15
**atrocious** 469:3
**attached** 8:20 12:7
27:10 34:8 38:1
55:10 62:20 108:8
116:3 127:18
171:8 223:19
230:15 233:1
239:17 256:16
263:11 299:16

326:3 339:19
355:19 361:12
375:17 388:21
394:10 396:21
411:5 414:23
419:18 427:2
430:10 434:11
451:6 463:6
493:11
**attaches** 70:23
**attempting** 110:7
386:18
**attempts** 116:20
**attended** 94:15,15
**attending** 133:6
**attends** 218:1
**attention** 89:11
109:14
**attitude** 222:13
**attorney** 91:19
92:6 493:13
**attraction** 454:10
454:16 455:2
**audience** 90:5
452:1 456:20
**augmentation**
142:10
**august** 25:10 38:5
141:13
**author** 133:2,5,7
340:14 359:18
361:18 365:10,14
366:3
**author's** 365:18
389:4
**authority** 261:3
**authors** 191:7
328:16 342:5
415:9
**autism** 487:4

**autologous** 142:8
142:9 299:7
**automatically**
395:23
**availability** 473:3
**available** 99:4
160:18 177:1
183:1 185:18
196:21 248:20
249:4,14 250:3,14
250:22 251:14
252:6,14 329:9
381:21 415:17
416:4,8 431:4
441:12 493:6
**avenue** 2:8,14 3:6
**average** 345:5,18
346:2 353:19
357:10,21
**avoid** 338:3,4
**avoided** 165:19
**aware** 17:14,23
19:12,13,14 20:17
37:8,16 42:1,15,21
43:6 54:7 78:11
127:12 149:9
170:13 171:3
181:9 182:20
193:19 201:3
211:8 233:5,7
267:5,6 352:23
353:3,8 367:20
370:7,17 376:6
425:10
**awkward** 325:21

**b**

**b** 4:10 20:23 33:2
58:2
**back** 14:14 18:23
19:3 21:12 26:12
30:12 31:9 43:7

53:20 72:16 73:1
100:21 101:7
106:18 115:13
119:16 143:10,16
148:15 157:4
158:13,15 166:1
200:21 202:13
207:8 216:5 248:8
252:16,17 264:20
266:19 279:19
292:5,11,15
293:14 319:18
320:9 323:3 326:6
344:23 346:1
359:8 367:6
373:11 380:10
396:12 397:16
404:22 407:7
417:14 420:5
421:6,18 459:14
463:7 471:21
472:6 480:3
**backbone** 308:10
**background** 378:6
378:11 380:3
**backpedal** 417:2
**backwards** 131:10
**bad** 92:11
**baker** 3:20 10:6
**balance** 466:5
**ballpark** 297:23
299:9 303:11
**ballparking**
262:20 298:15
**ban** 37:11 54:9
57:11 58:16 63:6
76:4,7,22 109:22
109:23,23 117:6,7
117:7
**bans** 36:16 52:5,23
54:23 61:20,22

76:16
**base** 120:7 233:23
281:21,22 398:9
399:9
**based** 71:22
117:21 124:3
140:12,13,13
161:4 177:7 178:1
185:10 220:3
228:19 246:2
249:1,20 250:7
292:12 305:12
331:14 355:14
378:12 405:23
432:16 436:11
438:23 441:8
443:5 444:14
483:2 487:17
**baseline** 392:5
412:20
**basically** 21:7 35:8
46:4 124:2 159:1
159:13,17 286:18
311:15 316:21
329:15 349:12
360:12 363:17
**basing** 119:21
**basis** 45:21 49:12
69:8 81:19 216:19
216:22 217:12
218:23 220:1,3
229:21 234:18
236:5,14 237:5
238:3,14 246:16
251:22 258:14,23
268:18 269:21
381:4,5 393:6
406:3 467:5 474:9
**battle** 77:23
**bcbs** 7:5

**bear** 388:17
**becoming** 19:19
20:11
**beginning** 79:7
91:15 166:20
245:12,13 246:13
247:1 284:14
308:17,23 309:3
320:6 329:21
383:18 386:18
388:11 403:16
445:18 470:16
**begins** 218:23
220:5 245:19
246:6 270:15
276:3 308:18
309:2
**behavior** 118:5
**behavioral** 77:22
**believe** 34:2 86:7
86:15 96:7 97:9
140:17 148:21
151:19 208:1
291:9 294:5
322:17 413:21
446:17,21 470:2
483:19
**believes** 111:9
112:13
**bell** 3:11
**belldavispitt.com**
3:14
**bells** 71:15
**beneficial** 150:12
**benefit** 70:23
82:22 206:12,20
206:23 222:21
223:4 241:12
248:21 285:20
291:10 310:6
311:10 330:8

331:9 385:11
387:20 413:4
414:2,3 420:18
423:1,6 431:4,18
435:19 437:8
452:9 485:3,5
489:18
**benefits** 8:3
204:21 207:19
208:14 214:16
215:1,7 223:1,2
235:15 260:4
293:18 386:1
420:12 438:13,15
438:22,23
**benign** 144:10
220:19
**benjamin** 380:12
**best** 97:5 122:14
124:20 125:19
248:20 253:9,14
381:17 382:9
416:4,8 462:22
480:20 492:10
**better** 71:14
119:12 289:16
290:3 343:5 372:6
381:21
**beyond** 69:11
125:11 210:3
219:18 246:20,20
247:16,21 313:12
314:11,12 337:13
337:15 352:2
**bias** 392:3
**biblical** 457:1
**big** 185:17 365:23
379:11
**bigger** 176:22
**bill** 4:20 62:23
63:12,20 64:2,11

**billroth** 123:11

**binary** 348:4
349:2 351:14,16

**biography** 472:12
472:14

**biologic** 443:12

**biological** 383:23
443:20 446:22
447:2,17 448:14
448:15 450:3,6
486:3 487:20
488:7

**biologics** 5:18
233:15 265:1,6

**biology** 444:9

**birmingham**
455:9

**birth** 341:22,22
383:23 442:13,22
446:18

**bit** 93:12 97:2
99:15 101:20
442:5 467:21

**black** 350:5 387:5
489:21 490:11

**blanche** 104:21

**blanket** 236:9

**blind** 271:16
309:20,22 315:4
315:16 317:17
319:14

**blinded** 268:20
271:12,19,21
273:18 309:19
318:10

**blockade** 161:16
162:19 165:9
219:17 238:19
247:1,9 260:7
416:14 482:17

**blocker** 201:3

**blockers** 36:21
84:23 161:2,6
163:12 203:21
204:21 205:2
207:20 208:15
211:22 213:6
374:5,9,12 396:1
483:21 489:14

**blocking** 63:13
81:23 162:16
164:4 166:8 201:2
201:19 203:15
204:17 207:13
211:10 212:14
213:18 316:16,20
317:21 318:2,11
406:13,23 428:22

**blog** 408:8,17
409:5

**blogs** 408:11
409:20

**blood** 211:11
212:2,18 213:17
460:1,3,8 468:8

**blue** 375:23 376:1
376:6,7 380:23,23
381:8,8 382:1,1,21
382:22 383:7,7,7,7
429:14,15

**bluecross** 375:20
379:15,18 424:7
425:5

**blueshield** 375:20
379:15,19 424:7
425:5

**board** 22:20 23:4
23:10,13,15,20
25:4,13,17 26:1,13
26:17,19 27:13
28:10 29:12 30:8

30:9,10 31:7,11,23
32:3,9,10,17,19,20
100:6,7,16,23
101:2 102:5 128:7
128:12,13 234:13
235:20 476:23

**boards** 476:22,22

**bodies** 30:16,16
47:9 66:15,22
111:11

**body** 67:19,23
68:22 69:4,20
70:7,11 73:6,23
74:14,22 75:1,10
142:12 154:5,7
218:4 319:5,9
363:8,9 466:6
467:17 469:5

**boilerplate** 384:14

**bold** 27:17 231:5
422:8 430:23

**bones** 130:9

**book** 72:12

**booklet** 8:3 420:12

**bored** 452:22

**borelli** 2:12

**bother** 179:7
250:17

**botox** 6:4 139:21
140:19 141:1
206:15 229:10
261:20 262:1,5,9
262:21 264:8
266:4,17 267:14
267:16 268:3,18
269:19 271:3
483:8,14 489:13
489:18 490:10,16

**bottom** 28:16
41:14 56:19 57:3
57:17,19 64:7,8

119:21 128:17
168:8 171:15
231:4 240:6
242:16 256:3
316:12 322:16
326:11,14 350:6
373:15 382:11
405:12,13 422:14
428:10 437:8
440:4 451:13

**botulinum** 263:4

**box** 300:2 489:21
490:11

**boy** 452:22

**boys** 165:13 369:8

**brains** 404:10

**brandt** 4:15,16
33:2,16,23 34:19
36:10,15 42:17
43:4 51:21 88:16
99:7

**branström** 276:17
276:21

**break** 79:5 115:12
115:16 143:23
166:18 254:17
319:22 320:4
322:8 346:5 388:9
390:6 417:13
470:14 471:19
472:5

**breast** 44:15,23
142:10,19 147:15
149:3 220:16,20
222:7 290:21
291:5,11,14,16,19
292:9,22 293:18
294:9,13 299:4,6
480:4,11,17,23
481:4,4

Case 1:19-cv-00272-LCB-LPA   Document 209-3   Filed 02/02/22   Page 506 of 577

breasts 287:17,18 290:8
brief 480:2 484:11
briefer 96:21
briefly 489:7
bring 185:15 250:16
bringing 83:11
brings 250:15
britain 53:19 248:3 260:12
broad 131:22 290:10
broadcast 465:14
broaden 235:12
broadened 267:5 268:14
broader 454:20
broadly 88:14,18 152:5
brow 130:16 266:16
brown 216:7 280:5 368:18 377:19 395:6
brown's 18:22
bucks 379:12
built 95:13
bulk 124:14 291:9
bullet 28:22 29:8 116:19 117:1 432:2 435:8 456:3 456:12
bulletin 225:11 227:12
bullets 431:8 459:2
bunch 366:20 377:21 378:16 379:1 435:8

burden 235:13 484:18
business 125:17 385:13,22,23 438:9 439:3,21
butler 9:1 10:8 492:19,20
bylaws 101:6

**c**

c 2:1 9:1 16:16 256:19 277:14 322:18 360:10 414:15,15 445:6 446:13 492:1,1,19 492:20
calamitous 346:23
calendar 14:15
california 103:19 272:16
call 49:14 98:23 182:19 267:2 271:3 284:17 343:12 360:19 363:7 365:6 366:8 366:12 381:18 432:21 433:3 436:10 466:5
called 12:18 79:11 99:1 102:3 120:8 138:11 143:4 186:10 388:1 407:12 455:4 465:15 466:2 478:4
calling 60:21 76:15 363:17
camera 255:23 256:7
campos 7:1 360:7
canal 479:7

cancer 142:14,14 143:1 178:19 289:14 299:5 468:2 475:6 476:16 480:17
cancers 143:5,6 144:14,15
capacity 183:20 184:1 197:9 404:7 404:10
capital 182:14 279:23 373:16
capitalized 456:9
capsules 222:8
care 7:15 40:4 41:7,18 53:8 54:2 63:14 72:23 77:18 109:13,18 113:10 113:20 116:7 122:11,14 124:23 132:8 138:1 139:3 150:17 151:13 152:11,12 154:23 157:4 165:18 182:16,19 183:2,9 184:5 186:10,11 189:11 196:14 199:7 213:2,11 223:6,8 258:4 272:23 351:11 363:19 394:22 395:16 396:15 397:4 398:15 399:3 401:1 424:17 444:5,6 448:2 450:5 459:6 459:10 463:14 464:4 473:8,9 475:7,10 478:11 482:21 488:13

cared 347:12 444:2
career 28:18 95:22 129:2 137:16
careful 359:7 406:3 468:7
carefully 202:13 251:11 363:18 462:17
caregivers 403:4
caretakers 402:2 402:23 403:10 404:17
carey 3:6
carmichael 7:17 35:18 410:22
carolina 1:2 3:13 10:1,20,23 11:1 375:20 376:8 379:16,19 420:14 424:8 425:6 474:12
carries 490:6
carrying 109:15
carte 104:21
case 11:20 12:11 16:6,17 17:2,15 18:1 22:10 33:1,5 33:8,14,16,23 34:17,19 35:9,22 36:10,12,15 37:4,9 37:11 39:12,16,22 42:17 43:4 45:22 46:16,20 48:17 51:21 53:18 57:22 58:6,12 72:19 77:19 88:16,16 98:19 99:7 114:7 118:12 122:12,17 170:19,22 180:7 189:5 196:23

204:11 206:21
209:1,10 217:1,1,5
217:5 219:16
220:1,4 221:16
238:16,18 243:22
246:7,9 249:16
252:18 259:16
260:17 270:10
278:21,23 279:3,6
279:17 280:19
281:9 282:20
283:11,20 284:7
284:12 285:22
286:19,19,21,22
287:11 290:9,9
293:18 304:18
306:13 308:2,9,13
308:19,20,21
309:9 310:11,20
311:15 312:2,18
314:6,9 322:16
323:11,12 328:9
329:16 335:14,18
336:13 339:8
343:6,11 355:5
364:2,4 387:18
406:3,3 410:6
417:19,21 448:18
449:17 455:5
456:19 460:8,9
469:11,13 478:3
483:2,20 488:16
490:19 492:18
**cases** 40:12 92:23
124:8 143:12
145:20 209:7
211:15 236:11
271:13 281:7
283:13 310:5
354:19 369:8
457:18,22 458:6

476:23
**catchment** 475:9
**categorically**
292:7 294:6
406:12,17
**categories** 144:6
290:10 431:9
**categorized** 219:2
**category** 66:22
106:3 122:9 146:3
267:4 270:23
279:6 312:10,16
316:6 327:16
329:18 372:13
385:5
**catholic** 64:19
65:2 451:22 452:4
452:16 464:20
**causality** 413:15
**cause** 9:11 154:18
210:10 369:21
373:7
**caused** 81:23
121:21 150:10
276:21 344:22
**causes** 480:17
**caution** 245:1,2
311:8
**caveat** 391:23
**cb** 445:20
**ccr** 492:20,21
**cecilia** 186:5
329:22 389:7
**center** 96:5 298:20
298:23 299:3
328:9 343:3 475:8
**central** 9:9
**certain** 62:14 86:2
146:23 206:8
209:7 228:7 258:3
261:5 310:14

376:22 386:22
407:2 477:13
483:8
**certainly** 26:15
27:3 31:5 40:14
102:14,19 105:19
137:3 152:11
153:2 176:23
247:13 283:6
284:18 286:9
289:14 310:11
313:3 314:3
329:20 342:23
343:5,19 355:9
385:22 474:23
475:23
**certificate** 23:10
23:16,20,23 25:4
32:20
**certification** 23:4
24:7 26:5,20
27:18 28:1,4,12,19
29:1,10,11,12
30:14 31:8,12,16
100:8,17
**certifications** 23:2
**certified** 22:21
25:13,17 26:1,19
28:3,10 30:8,10
31:23 32:3,19
100:6 101:2 102:5
128:8
**certify** 9:4 492:4
492:14
**cessation** 365:17
**chairman** 95:9,11
473:21
**challenge** 36:16
83:12 455:23
456:1 467:20

**change** 8:14 60:3
186:2 194:1,21
260:3 271:15,22
309:18 372:11
382:3 412:19
464:15 481:13
482:3,7 494:4,7,10
494:13,16,19
**changed** 107:15
110:21 122:22
123:2,18 186:6
247:7,8,10 380:21
380:22 443:20
446:18,23 447:3
481:17 488:14
**changes** 81:22
290:3 311:5
413:13 484:17
493:10 495:6
**changing** 67:23
71:12 119:22
125:1,20 259:20
359:4 464:21
**chaplain** 455:17
**chapter** 455:8,15
455:17
**character** 372:1
**characteristic**
339:4 416:21
**characteristics**
165:15 243:18
350:14
**characterizations**
380:11
**characterize** 81:10
82:17 118:22
132:5 385:18,20
**characterized**
68:2 74:6 235:15
336:4

characterizes 124:1

chart 343:1 344:1

charts 418:1

chastity 454:16,21 455:3

check 212:19 246:3

cherry 3:12

chest 167:19 178:4

cheyenne 3:7

chief 121:19 262:12 306:10,12

child 8:17 82:6 161:5 165:5 166:6 209:10 238:20 309:19 317:6,15 405:15 464:16 469:18,22,23

child's 470:1

childhood 394:23 397:10,18 398:12 398:17

children 5:23 76:10 77:19 94:7 157:19 158:9,18 159:4,9,12 160:19 160:23 162:13 163:6,8,11,17,19 205:19 238:15 239:5 240:3,11,17 241:5 243:5 258:22 259:7,10 262:15 318:12 395:10,22 397:20 397:23 398:17 399:21 400:2,5,18 400:20 401:3 404:4,6 406:20 461:15 462:3,9 463:15,16 468:23

469:7

childrens 241:5

chimed 46:4

choose 432:20 438:8 462:17

choosing 303:18 436:10

chosen 449:23

christian 442:6,11 442:23 443:3,10 443:11 450:22

chromosomal 487:17

chronological 15:15

church 452:5

church's 456:13

cigna 8:6 429:16 429:19 430:12

cigna's 431:18 432:7

circle 20:15 216:5

circles 283:6

circumstance 237:11

circumstances 210:8 216:20 228:8 251:7 285:18 407:2 424:3 478:1

citation 297:13

cite 13:9 108:18 109:5 238:6 322:16 377:18 389:22 399:8 407:11 410:21 414:9 415:4 453:12

cited 13:15 325:7 343:7 360:6 378:2 382:2 389:17

440:9,19

cites 227:11 327:6 335:14

citing 361:15 410:10 453:14

civil 1:7 9:5 10:1

civilian 476:7 477:7

claim 29:11 45:16 276:6 352:16 392:23

clarifications 364:16

clarify 482:9

clarity 300:22

classification 384:6

classified 348:9 349:4 384:7

classifies 232:13

classify 385:7

clearance 206:18

cleared 205:12 235:23

clearer 73:20

clearly 82:20 150:13 152:22 244:14 288:1 312:13 362:2

clin 400:16

clinic 138:1,4,17 139:3,20 140:6,13 152:12 342:1,7,14 345:3

clinical 73:9 120:10 229:6 235:22 236:15,17 236:19,21 237:3 237:22 243:4,11 245:10,20 246:11 246:17 247:20

249:3,13,18 250:3 250:21 251:13,23 252:6,9,10,13 269:4 291:8 292:19,23 364:8 364:10 398:16,21 400:4,16 412:1 422:23 440:4 441:6

clinician 245:23

clinics 138:6 400:1

closed 185:9 187:5 195:13

closer 289:8

clue 324:3,4

cme 69:22

cochrane 7:23 35:17 414:10 415:2,19 416:11

code 5:8 169:11,14 169:22 170:8,13 170:23 171:12 173:12 174:19 176:9 179:4,8 180:8,15,18,21 181:7,9,16 195:5,8 224:8

cognitive 77:21

cohen 380:17

cohort 6:18 7:10 7:20 249:23 250:1 250:8 257:11 270:8 277:23 278:2,5,8,10,19 279:14 281:17 289:11 291:12 292:13,18 298:10 298:13,23 299:4 304:1 305:8 312:1 323:9 340:9 345:19 411:9

412:4 415:13
**cohorts** 298:20
**coincidental** 19:16
**collaborating**
480:14
**colleagues** 287:3
**collected** 124:8
**collection** 328:10
329:16 355:6
407:22 408:1
**collections** 246:8,9
**colloquially** 168:8
316:12
**column** 224:16
225:4 242:15
248:16 252:21
307:15 326:17
350:23 391:20
**columns** 302:13
**combat** 473:16
474:16
**combination**
452:15
**come** 45:10 72:10
73:13,15 79:19
98:18 99:6 105:21
107:1 145:12
146:1 149:2
154:15 160:17
181:15 185:23
199:9 201:8 207:8
248:8 350:5
396:12 471:21
**comes** 270:18
275:11 297:13
340:7
**coming** 47:21 90:3
148:4 326:5
330:20 346:1
361:6 380:4

**commencing** 9:8
**commended**
303:20 305:23
**comment** 479:13
**comments** 187:17
191:18 199:11
224:22
**commercial**
434:19
**commission**
492:23
**commissioner**
492:22
**committee** 4:19
45:19 47:4 49:2
55:16 63:11,19,21
65:7,15 185:9,18
189:1 194:8,15,23
382:7
**committees** 45:8
46:11
**committing** 67:15
121:6 126:11,12
127:5
**common** 19:19
20:14 142:3,6,19
145:15 146:17,19
148:7 255:4,15
259:1,6,8,11 303:6
**commonly** 20:11
21:19,22 22:2
60:23 147:23
201:13 295:9,22
463:19
**communicated**
16:6 56:2 208:6
**communicating**
59:9
**communication**
56:11 77:1

**communities**
373:23 488:20
**community** 43:18
45:7 225:11
226:14 293:5
328:6 402:18,19
473:8
**comorbidities**
487:1
**comorbidity**
463:20
**companies** 291:23
292:14 385:4,21
**companion** 63:20
**company** 67:10
206:17 270:20
376:21 377:6
380:4 385:10
386:15 387:9,19
424:15 431:21
432:12 436:10
438:21
**comparable** 94:18
**comparative**
304:1
**comparator**
282:22
**compare** 250:8
354:9,19,21
**compared** 89:13
353:21 372:10
391:1,9
**comparing** 299:7
355:14
**competence**
487:10
**competent** 120:8
485:11
**competently**
485:12

**complaint** 12:19
292:4
**complete** 11:16
495:8
**completed** 265:19
493:17
**completely** 118:19
**completing** 398:10
**complex** 121:23
143:11
**complexity** 476:20
477:2
**compliance** 29:22
30:3 170:23
**complicate** 486:19
**complication**
244:18 329:5
334:16 336:17
**complications**
176:18 177:1,4
178:9,15 226:9
237:9,16 244:20
327:1 337:1,3
338:9,17 339:3,4,6
355:2 358:16
**complies** 180:14
**comply** 169:14
**components**
404:14
**comports** 31:2
**comprehensive**
342:18
**compromise**
467:18 468:6
**compromised**
119:8
**computer** 492:8
**conceal** 319:7
**concept** 460:16,17
**concern** 44:16
70:21 118:22

218:17 244:2,22
245:6
**concerned** 180:17
181:23 206:1
247:18,18 449:11
**concerning** 376:21
**concerns** 119:4
180:5
**conclude** 180:6
**concluded** 258:10
**concludes** 343:4
491:11
**concluding** 36:3
**conclusion** 38:11
357:14 393:11,17
**conclusions**
277:12 330:11,15
331:8 337:6
371:19 410:19
415:9
**condition** 72:22
114:2 122:5
150:16 151:9
157:7 194:12
205:14 211:1
217:19 218:8,14
220:20 231:19
249:15 291:22
292:10 422:21
**conditions** 66:4
74:18 75:9,15
144:16,18 145:13
154:2 155:13,15
157:10 210:9
215:14,14 252:4
318:15 436:18
487:22 488:11
**conduct** 211:7
320:15
**conducted** 185:4
187:2,12 198:7

275:5 485:12
**conducts** 119:14
**confect** 443:4
**conference** 8:12
69:23 79:17 81:15
92:15 103:22
104:4,16 222:12
450:19
**conferences** 69:9
103:15 106:22
107:7 188:5,11,14
192:6,7 200:1,2,8
**confidence** 345:22
**confident** 59:2
**confirm** 156:9
157:2 219:13
486:9
**confirmation**
116:21
**confirmed** 229:5
**conflating** 266:11
**conflicts** 199:5
**conformity** 400:13
**confused** 76:9
458:12
**confusing** 450:7
458:9,14
**confusion** 457:18
457:21 458:17
**congenital** 310:14
474:17 475:2
**connection** 61:22
**connor** 446:7
**consen** 49:13
**consensus** 41:3,22
41:23 42:13,14
44:8,11,20 45:5
46:7,12,12,17
47:12,14,21 48:5
48:16 49:3,14,14
50:10 112:17

**consent** 68:19
119:1,2,7 208:22
209:1,3 211:7
253:7 401:22
402:1,13,17,22
403:9,17 404:11
404:15,17 484:23
487:9,10
**consented** 402:3
403:4
**consenting** 314:10
359:7
**conservation**
481:2
**conservative**
284:16 285:6
**consider** 13:19
60:16 92:22
102:10 150:15
151:22 152:10
161:20 181:20
182:5 203:17
247:14 266:14,22
289:23 329:3
362:15 423:7
459:3 469:15
484:6
**considerable**
109:14 169:4,19
213:10 371:17
**consideration** 38:9
406:4 424:20
**considerations**
437:9 489:17
**considered** 232:17
253:6 254:2,5
267:11 281:8
283:4,6 285:14
286:5 288:11
289:6 316:1,2
381:9 382:1

384:23 387:3,14
408:12 424:10
436:19 441:22
442:2
**considering** 61:19
63:6 106:7 161:1
166:7,8 314:4
**considers** 113:19
425:17 426:14
427:18 428:13
429:7 433:18
435:22 437:21
**consist** 297:17
298:13 305:7
390:14
**consisted** 304:13
390:18
**consistent** 114:3
128:11 222:2
303:15 335:3
486:23
**consonant** 112:16
346:11 462:21
**consort** 277:13,20
**construct** 338:23
467:23 478:14,15
**constructed** 323:2
**consultant** 378:17
**consultation** 162:5
166:9 208:2
**consultations**
140:1 158:22
159:23 160:9
163:4
**consulted** 144:6
158:17 163:20
164:19 187:9
**consummately**
287:20
**contact** 297:11
455:15,16

contacted   58:23
  98:20,22 99:13
contagion   367:17
  368:1 369:18
  370:10,20 371:6
  373:3
contained   215:11
  442:23
containing   257:12
contains   12:9
  13:17
contemplate   403:7
content   492:7
contest   77:17
context   258:18
  477:13,20 479:21
continue   113:7
  439:22 485:10
continued   98:6
  237:18 247:19,20
  261:9
continuing   100:7
contouring   142:12
contradictory
  114:1
contraindicated
  241:21 242:10
contraindications
  406:7
contrary   39:11,14
  39:20 40:10 42:9
  118:11,19 395:5
contrast   475:21
contributed   56:21
  191:7
control   52:8,10
  270:11 271:8
  278:21,23 279:3,6
  279:17 280:8
  302:17 307:20
  309:6 316:6 390:2

390:10,13,18
  412:8
controlled   268:20
  269:4 270:2,19
  271:2 272:19
  273:7 274:21
  275:16 286:4
  291:7 292:23
  293:10,20 298:3
  305:8 412:1
  415:13
controls   279:8
  304:4 392:3
controversial
  324:6 363:19
  369:12 373:9
  398:6
controversy   44:14
  125:3,6 222:6
  363:21 410:3
  412:16 413:23
conversation   14:6
  15:3,22 48:20
  56:13 87:12 92:1
  165:19,20 330:23
  461:2 488:5
conversations
  12:14,22 14:10
  87:15 104:16
  120:3 287:2
conversely   424:1
convey   88:11
  163:10
convincing   252:16
coordination
  317:12
copies   15:6 493:14
copy   88:7 127:22
core   116:13
corner   171:15
  263:13 451:13

corporate   7:5
  376:12
corporation
  263:21
corpsmen   474:7
correct   11:21
  12:11 23:5,6,8,9
  23:11,12,17,18
  24:22 25:14,15,18
  25:19,22 28:12
  29:23 30:4 31:13
  31:21,23 32:1,4
  33:3,7 34:1 36:19
  36:23 48:3 52:2
  63:7 65:4 75:12
  75:23 76:1,4
  109:6 112:22
  114:12 128:14
  129:9,10,16,17
  130:4 132:19
  133:17 136:23
  137:1,6,8,12,15,19
  137:20 138:2
  149:5 150:6,23
  152:7 153:7,8,12
  153:16,19,22
  158:8,12 163:1,3
  167:5,6,11,12
  168:9,10,14,19
  174:22 175:6,8,11
  175:15,18,22
  176:17 178:22
  183:2,3,13 184:1,5
  184:6,19 187:3
  188:8,11,18
  189:18,21 190:1
  190:10,19 191:5,8
  191:9,14,16,20,22
  192:2,4 193:10,13
  197:4,7,10,11,14
  197:15,19 198:3,4

198:8,10 200:4,6
  200:15,18,22,23
  204:4,5,7 207:14
  208:7 213:20
  214:12,13,18,19
  215:2 216:15,16
  216:22 221:4,8
  226:17 239:10,12
  241:17 242:3
  246:17 252:1
  262:3 264:15
  267:19 269:6
  270:4,5,5,9 272:10
  272:11 273:9
  274:2,3,5,6 278:2
  278:5 288:23
  293:7 294:19
  295:11 296:5,6,9
  303:4,5 307:22
  316:6,14 317:1
  319:3,15 340:5
  357:22 362:9
  365:2 370:11,21
  375:22 379:17
  384:20 390:16,17
  392:20 393:13
  398:18 406:14
  407:14 412:9
  417:22 418:4,13
  418:22 419:2,3,8,9
  419:12,13 421:1
  430:3 442:14
  446:1 448:18
  455:11 456:8
  465:4 475:14,15
  475:18,19 477:14
  477:17,18 479:23
  480:5 481:22
  483:10,16,17,23
  487:23 492:11
  495:8

corrected   392:4
correcting   346:22
correction   372:18
corrections   495:6
correctly   288:18
corresponded
   77:5
correspondence
   56:6
corrugator   263:3
   266:12,17,18,23
   267:9
cosmetic   6:4 45:1
   71:3 262:16 263:4
   267:15 296:20
   331:2 386:16
   423:3,22 425:3
   467:7 476:2
   477:10
counsel   9:20 10:10
   12:15,23 99:13
   492:15 493:14
counseling   157:15
   157:18,18,23
   158:5 159:17
counselors   464:5
count   42:5 351:2,3
counted   348:17
counterfeit   60:6
   61:6,9 338:23
country   104:1
   324:22 433:14
county   492:3
couple   14:13 15:1
   15:16 63:8 93:23
   146:2 196:5,12
   301:23 394:3
   398:5 472:11
   476:8
courage   451:14
   452:4 454:7,14,21

455:8
course   16:4,5,17
   18:20 71:15 73:2
   75:1 92:1 99:18
   146:23 165:2
   295:1
court   1:1 9:1,23
   10:8,12 16:11
   33:6 38:9 39:10
   43:4 53:20 182:13
   260:11 325:13,16
   325:20 350:3,9
   389:13 414:15
   426:1,6 449:15
   471:9
courts   54:1
cover   215:6
   379:21 385:10
   386:15,15,17
   387:20 420:22,23
   423:22 426:9
   432:14,16,20,23
   433:1,4 437:3,4
   439:6 487:13
coverage   8:6
   376:21 385:6
   386:4 424:16,18
   430:13,21 437:13
   473:6
covered   377:2,3
   385:23 421:10,22
   422:18 423:15,18
   424:2 432:19
   435:18 436:19
   438:12,14,22,22
   452:11
covering   385:14
covers   435:21
   437:12
coveted   121:18

cranial   133:13
craniofacial
   309:12,16 310:19
   475:2 477:4
create   60:6
created   226:12
   456:4,13 457:17
credentialing
   30:16
credentials   172:12
credible   123:3
   280:16
credits   69:23
crestwood   24:17
cretella   94:23
crime   244:9
criminal   109:17
criminalize   4:21
   63:1 110:7 116:20
criminally   52:11
criteria   70:6,13
   71:4,8 72:9 73:22
   275:18 277:14,20
   292:12 300:19
   333:9 351:8
   356:23 377:4
   385:1 386:22
   387:10,11 401:9
   401:15 427:20
   428:18 429:2
   435:9,15
critical   213:2,11
   272:23
criticism   352:3
criticisms   371:13
criticize   216:7
criticizing   49:19
   183:10 359:11
cross   36:22 82:1
   94:1 161:10 164:9
   213:7,22 214:11

214:16 219:17
   238:19 247:2,10
   260:7 318:6,20
   319:14 370:1
   375:23 376:6
   380:23 381:8
   382:1,21 383:7,7
   404:2 416:13
   417:5 429:15
   437:14,22 457:15
   482:17
crow   268:5,7,8
crow's   141:4
   262:5 268:10,11
crr   492:20
crucial   466:20
cs   493:15
ct   446:11
culpable   127:11
cultural   447:7,8
cure   422:21
curing   291:17
current   28:11
   32:20 50:8 51:1
   79:21 99:19
   196:13,17 296:19
   392:7 398:8 399:9
   439:20 482:11
currently   24:10
   25:13 31:22 32:23
   43:15 61:18
   137:23 139:21
   189:11 321:6
   367:12 371:7
   415:16 416:3
   485:11
cursor   350:4
cv   1:7 10:2 30:5,7
   127:20,21,22
   135:23 136:15
   472:11 480:4

| **d** | |  |  |
|---|---|---|---|

**d** 4:1 20:23 33:2
203:4 322:18,18
389:13
**dale** 1:14 10:21
**damage** 119:22
**danger** 132:7
**dash** 360:9 446:12
**data** 86:12,13,13
161:23 212:8
219:13 243:5,12
257:13 272:23
273:2 275:2 276:4
276:13,20 277:2
277:11 279:10
280:1,6,15 281:4
312:21 329:9
344:6 352:19
361:22 371:18,20
381:5,21 406:18
406:22 407:22
408:1 416:22
417:3
**database** 7:23
257:12
**date** 9:4 93:7
108:21,22 185:21
186:8 190:3 196:7
265:22 268:13
430:17 435:1
492:12 494:24
495:12
**dated** 38:5 55:16
108:14 109:4,9
224:13 265:2
**dates** 459:14
**dating** 72:16
**daughter** 409:7
**daunted** 458:17
**davis** 3:11 273:12

**dawning** 433:22
**day** 9:9 104:5
153:23,23 189:17
189:17 353:17
495:15
**days** 18:22 493:17
**de** 2:14 194:11,22
195:7 242:5,9
359:19 360:20
**deacon** 64:19 65:2
464:20
**deal** 475:4
**dealing** 76:14
218:14 244:17
313:23
**dear** 264:22
**death** 311:3
490:18
**debate** 389:6
**decade** 219:21
225:10
**decades** 229:18,18
312:5
**decatur** 2:15 9:7
10:5 64:10 138:14
138:22 139:11
140:11 160:14
**december** 257:14
265:2
**deceptive** 172:13
172:19
**decide** 23:19 100:2
221:6 284:12
379:20
**decided** 37:12
49:2,13 146:22
166:9 387:19
**deciding** 439:5
**decision** 6:21 47:5
53:23 121:11
131:20 177:9

217:1,5 248:19
285:22 286:19
330:19 356:3
357:5 380:8 403:2
404:11 444:12
484:20 485:1
487:8 488:6
**decisional** 357:15
357:22
**decisions** 208:16
328:21
**deck** 88:4,7
**declaration** 4:15
22:17 33:23 34:12
35:2,12 36:2
457:10
**declare** 283:15
495:4
**declared** 53:22
**declares** 436:6
**declined** 100:7
226:20 305:3
**declining** 226:5
473:8
**dee** 10:23
**deemed** 253:8
422:6 495:6
**deems** 253:12
**deeper** 358:2
**deeply** 358:21
**defect** 71:6 290:14
**defective** 120:7
**defects** 468:3
482:6
**defendant** 22:10
**defendants** 1:15
3:1 10:19 11:20
33:9,13,15
**defending** 11:2
79:11

**defense** 2:13,19
**definable** 71:18
**define** 240:9
386:18 424:15
438:8
**defined** 173:12
257:3 287:9
390:11 423:11,14
431:21 438:11,20
**defines** 173:22
459:5,9 460:13
**definitely** 71:23
87:10 143:10
248:8 330:2,2
333:17 438:10
**definition** 45:17
174:3,7,16 218:19
288:17 422:11,15
423:16,21 428:5
436:12,13 438:7
439:2 468:12
**definitions** 423:12
424:14,16 437:2
443:3
**definitive** 157:4
219:8 249:5
251:15,15 283:23
344:4 362:23
363:3,22
**deformities**
310:15 474:18
**deformity** 71:18
475:2
**degeneration**
44:18
**delayed** 133:11
317:9
**deleterious** 487:20
**demand** 199:3
312:17

demanded 313:21
demands 314:13
demographic
    368:10,11 369:5
    372:11
demonstrate
    268:21 269:4
    270:2 310:20
demonstrated
    245:3
demonstrates
    486:23
demonstrating
    130:8
denominator
    323:20 352:11
denver 8:12
    450:19 451:22,23
deny 64:22 466:11
department 95:12
    473:21 474:4
depend 286:8
depending 258:16
    282:6,6,9 301:16
depends 321:7
deponent 493:13
    495:3
deposed 14:19
    17:16 18:2
deposing 493:13
deposition 1:19
    9:19 10:3 11:3
    12:16 13:13 14:23
    15:8,11 17:19
    18:5,6,12 19:2
    181:8 470:22
    491:14
depressed 154:15
depression 154:10
    154:17,19 155:6
    487:3

derive 176:13
    177:8
dermatologist
    143:3
describe 72:22
    94:5 158:22 257:2
    277:19 282:22
    331:2 383:20
    442:20 472:19
    474:1 475:20,21
    477:23
described 73:16
    130:17 305:15
    422:23 483:12
description 73:20
    383:15
descriptions 29:13
deserve 444:4,4
deserves 150:17
design 274:8 276:2
    276:4,19 277:18
    309:7 319:13
    391:23 413:10
designed 274:4
    275:18 278:2,14
    278:23
designing 275:11
    480:19
desire 194:10,20
    237:18 329:6
    333:3
desistance 161:5
    161:23
desisting 161:9
despite 309:9
    406:21
destroy 119:23
    467:6,19
destroyed 478:7,7
destroying 468:12

destruction
    178:20
detail 65:18 84:1
    470:5
detailing 432:22
details 37:18
    82:11 90:9 160:16
    163:17 210:18,21
    409:11
determine 241:17
    300:5
determined
    423:12
determining
    293:10 423:6
detran 366:5
detrans 364:19
detransition 7:2
    367:1
detransitioned
    322:11
detransitioner
    86:18 87:3,4
    151:4
detransitioners
    320:21 324:9
    364:22
detransitioning
    147:16,19 149:2
    151:7 365:13
    366:2
develop 165:14
developed 165:15
    188:16 189:12
    190:5 193:15
    200:13,21 382:18
developing 187:13
    187:18 190:17
    191:14,19 198:7
    199:12 444:17

development
    133:11 184:4
    188:6 190:12
    191:8 192:8,22
    197:13,17 200:3
    379:14 403:22
    436:9,16,21
developmental
    82:6
developmentally
    317:8
device 234:11
devices 5:19
    130:11 233:15
    310:13
devoted 104:6
dhejne 7:7 186:5,5
    329:22 389:6,7,7
    389:10 390:23
diag 72:8
diagnose 69:3,20
    73:22 153:6 154:1
    155:6,14 157:10
    195:4
diagnosed 156:2,8
    205:14 330:17
    405:15
diagnoses 155:20
    194:14
diagnosing 66:3
    73:5 74:14,17
    75:9 155:12
diagnosis 22:3
    68:2 155:23 156:9
    156:11 157:2
    194:21,22 313:14
    329:4 366:15,17
    373:10 383:19
    385:8 386:19
    422:20 432:17,18
    486:10,11

diagnostic 70:6,12
71:8 72:8 194:16
195:5,8,8 282:8
301:20 377:3
406:4
dialogues 106:22
differ 392:2
487:15
differed 258:4
difference 94:8
135:14 322:9
365:23 387:13
476:3 477:6
differences 392:5
475:22
different 42:6
43:21 88:13 114:8
144:5 155:2
184:17 188:1,5
190:16,21 191:7
191:13 192:1,6
199:17 203:14
249:8 269:15
317:15 319:20
343:8 366:23
394:22 395:12
397:21 399:21
400:2 431:8,8
489:13
difficult 67:2
124:16 271:16
352:15 354:18
difficulty 44:7
47:23 91:2 92:2
102:18 104:10
105:4 112:6
484:22
dig 358:20
dimitry 491:5
diocese 64:20

diplomates 27:23
28:2,23 29:9
direction 165:9
directly 16:8,18
133:18
director 263:23
378:20 379:3,6
disabuse 456:20
disagree 234:21
308:13
disagrees 40:17
42:23
disappeared 96:10
discerned 488:21
disciplinary
172:14
disclose 280:5
disclosed 210:5
381:13,15
disclosing 14:5
216:8
discomfort 194:18
discontent 383:22
discordance
158:19 368:14
457:6
discounted 101:23
discourage 26:22
162:18,22
discover 463:22
discovered 67:12
229:2
discovery 308:19
discrimination
276:6
discuss 92:7 188:6
192:8 240:10
280:6 320:14
339:2 461:22
488:1

discussed 154:5
175:3 180:19
192:13 200:3,4
222:9 328:3 399:4
discussing 119:1
153:11 412:12
445:9,20 462:2,8
469:15
discussion 72:18
87:14 90:8,13,20
91:1 93:14 327:12
407:10 456:18,19
466:18 488:4
disease 156:3
231:19 422:22
disorder 67:19
68:1,23 69:4,21
70:7,12 73:6,23
74:15,22 75:11
154:6,8 193:20
242:20,22
disorders 192:18
192:21 436:8,15
436:21
disparity 89:18
displaced 131:6
dispute 358:22
disregards 466:4
dissatisfaction
337:12,17 338:4
dissatisfied 67:1
distant 490:13
distinct 281:15
477:6
distinction 275:8
432:12 485:2
disting 484:2
distinguish 398:22
438:21 484:3
488:6

distinguishing
437:3
distort 486:19
distressed 162:7
district 1:1,2 9:22
9:23
disturbance 70:15
disturbances
67:22 68:20
disturbed 120:3
divergent 398:7
divided 348:3
djordjevic 6:15
322:17
dmitriy 2:6 10:14
114:18 126:14
471:12,22 489:5
doctor 11:10 27:8
34:6 49:18 55:8
61:1,11 69:16
79:9 108:6 115:16
117:13 126:19
127:16 153:5
166:22 209:20
210:2 213:2
216:14 217:6
234:17 238:1
246:15 254:22
261:14 292:16
332:14 335:12
353:16 367:1
370:6 381:6
386:10 388:15
407:20 408:20
417:17 470:18
489:11,22
doctorate 86:16
doctors 26:18
32:12,18 36:17
51:22 52:12 53:23
78:18 81:6 118:3

118:16 121:6
122:18 155:11
156:5 214:21
215:20 217:11
219:23 220:2
226:15 236:23
244:15 251:14,20
**document** 13:23
26:23 27:2 50:20
55:12 108:14
112:7 114:23
115:4,22 174:11
184:22 185:15,19
185:20 186:9,11
186:12 189:2
223:21 233:3,9
245:22 248:12
264:19 275:20
284:6 301:18
305:18,19 327:3
330:11 332:10
335:1,7 341:1,6
350:4 363:23
375:12 376:11,18
376:21 379:8
380:19 384:12
400:9 401:6 402:9
408:4 413:1
419:23 420:8
440:21 445:15
486:2
**documented**
235:10
**documenting**
235:14 485:14
**documents** 12:18
187:6 233:6 380:6
380:7
**doing** 25:2 85:5
98:16 106:10,14
123:7 124:20

125:19 141:14
176:8 178:12
246:19 260:4
261:6,23 262:5
269:23 272:18
286:13 287:12
290:4,5 305:19
309:21 312:22
321:16 439:21
469:6 476:10
477:3 484:21
**dose** 145:3
**double** 268:20
271:12,19,21
318:10 319:14
**doubt** 439:15
**dozen** 94:18
146:13 147:11
**dr** 9:19 11:2 14:18
15:8 16:6,9,15,20
16:22 17:1,4,6
18:7,11,21 19:10
19:10 33:12,13,18
33:20 34:12 39:15
39:15,21,21 40:11
40:11 42:10,10,19
42:20 43:23,23
57:21 58:5,11
60:13 64:9 67:7
72:2 78:5,5,6
81:17 85:10,13,15
85:20 86:3,6
92:13 94:23 114:6
114:6 216:7,7
255:21 256:19
264:22 377:19,20
444:21 445:13
464:19 472:10
475:11 481:6
483:7 491:1,12

**drafting** 185:4
187:3,9
**drafts** 188:1 192:1
199:17
**dramatically**
322:20
**drastic** 289:20
**drawn** 392:10
**dreaded** 181:14,18
**dream** 468:4
**drill** 210:18
**drilled** 467:14
**drive** 285:21
444:11
**drives** 286:15
**drop** 320:19 321:4
321:21
**dropping** 24:3
**drs** 280:4 395:6
**drug** 201:11
202:21 205:11,16
205:17,19 207:13
209:23 210:5
216:14,21 218:6
219:11,15 220:19
221:7 224:17,20
225:10,12 227:11
228:9 231:5,10,11
231:18 234:10,17
234:19 235:12
236:4,13 237:5,10
238:2 241:3
246:15 247:15
253:4 257:3,20
258:14 259:19
260:20 261:12
263:14 314:19
318:15 338:5
490:6
**drug's** 242:21

**drugs** 5:15,18,22
119:5 162:16
201:3,19 203:15
206:10 209:20
216:19 217:12,15
218:15,19,23
219:6 220:2 221:3
221:5,13,18 222:2
222:16 226:15
229:1,20 230:22
233:14 238:14
239:5 240:2,17
241:7 244:4,8
245:5,8,16 248:1
251:3,21 252:19
255:4,6,11 258:22
259:22 260:1,17
260:21 261:9,13
318:11 406:20
447:21
**dsm** 72:12 73:7,13
73:16,17,19,20
74:1,6 189:15,18
189:20,23 190:12
190:17 191:8,14
191:19 192:1,9,22
193:15,19 194:2,2
380:11
**dtishyevich** 2:10
**duly** 11:6
**duration** 15:23
**dutch** 342:14
**duty** 76:8 154:19
386:3
**dysmorphic** 67:19
68:1,22 69:4,20
70:7,12 73:6,23
74:15,22 75:10
154:5,7
**dysphoria** 6:18
7:22 8:8,10 22:4

41:6,20 49:16
65:10 80:19 84:19
85:7 111:10 130:4
131:2,17 132:19
133:17 134:4,18
146:21 150:6,23
151:2,6 152:3,7
153:7,12 157:20
158:1,6,10 162:15
163:1 193:21
200:15 205:15
214:12,18,23
215:19 216:10
316:19 319:1,15
321:4 329:11
340:9 353:2,10,22
354:4 367:14,23
368:13 370:9,19
373:21 374:17
375:2,8 380:13
383:19,22 390:14
390:19 391:8
393:19 395:1,11
395:23 405:9
411:11 429:9,20
430:14 431:2
433:21 434:22
435:17 437:13
438:3,12 443:18
458:1 460:18
481:22 482:13
483:22 486:7,17
488:19
**dysphoric**  195:18
**dystonias**  262:14

**e**

**e**  2:1,1 4:1,10
16:21,21 20:23
59:1,3,4 98:11,16
203:8,11 256:19
299:19 322:18

340:15,15 360:9
389:13,13 414:15
425:7 445:6
446:12,13 492:1,1
494:3,3,3
**earlier**  46:9 57:8
76:12 78:4 110:1
112:19 152:1
154:5 169:6
180:19 181:17
189:14 204:15
215:5 216:17
232:9 261:20
267:13 270:14
290:18 300:20
301:11 303:11
324:15 345:11
347:3 352:1,9
354:12 363:9
380:21 421:3
424:6 448:5 454:2
477:11
**early**  97:16 205:2
228:18 285:4
319:11 328:10
394:23 397:9,17
398:11,17
**earns**  386:6
**ears**  105:20
**easier**  16:14
**eastern**  474:10
**eating**  332:12
**ectopic**  133:11
**ed**  76:3
**edgerton**  106:8
125:8
**editor**  135:16
136:9
**editors**  135:21
136:16

**eds**  76:15
**educate**  296:14
**education**  2:13,19
**educator**  87:7
**effect**  43:5 146:15
146:17 245:21
246:1 313:10
317:18 319:5
330:7 412:20
414:7 484:11
490:14
**effective**  41:4
116:7 265:21
268:22 270:3
284:13 285:14
346:22 430:17
435:1
**effectively**  457:5
**effectiveness**
269:5 392:10
**effects**  81:21,22
82:5 205:17,18
217:16 234:4
235:3,14 237:1
317:3 318:3 319:2
319:13 447:21,22
447:22 482:22
487:21 490:8
**efficacious**  291:17
**efficacy**  219:14
235:9 237:17
259:20 329:23
331:13 346:19
347:6 387:22
439:1
**efficient**  116:8
**efforts**  54:16 78:7
78:14 83:18
110:18 113:7
116:9

**eight**  45:23 313:11
337:13
**eighteen**  43:21
52:2
**eighty**  141:23
**either**  93:8 144:11
222:11 249:5
278:13,13 393:8
456:14
**electronic**  88:7
**element**  369:18
**elevated**  272:20
282:1
**eligible**  100:23
**emcee**  91:22
**emergencies**
436:22
**emery**  2:7 10:15
**emotional**  152:13
**emotionally**  119:8
**emphasized**
209:17
**employ**  420:16
**employees**  10:21
420:17
**enact**  76:7
**enactment**  57:11
**encapsulation**
220:17,21
**enclosed**  265:23
**encounters**  159:5
**encourage**  103:7
103:12 162:12,13
177:14 457:3
470:1
**encouraged**  95:6
165:21
**encouraging**  107:8
398:16
**endo**  195:16

endocrine 195:16
196:22 197:3,9,21
198:7,19 199:11
200:13,20
endocrinol 81:19
endocrinologic
81:19
endocrinological
81:21 156:2
endocrinologist
86:9 153:15
156:10 157:1
205:23 207:12
372:5
endocrinologists
149:19 198:16
203:22 204:1
207:18 208:13
277:1 418:20
endocrinology
81:18 204:3,7,10
213:1
endocrinopathies
162:21 213:9
endoscopic 129:22
130:8,17
enforcement
30:17
enforcing 37:11
engaged 83:11
engine 21:2,6
england 35:16
enrolling 237:3
ensure 116:6
ensuring 273:2
enter 153:1 176:19
entered 208:8
345:21 346:6,8
418:15
entire 46:14 95:22

entirely 104:6
entitled 240:2
entrance 480:11
entry 124:4
enumerate 209:7
enumerated 209:5
209:22 458:6
equation 206:12
222:22 485:3
erectile 333:2
erections 334:8
errata 493:11,13
493:17
erratas 493:15
erroneous 329:3
error 329:1,3
erythromycin
123:12
esophagoplasty
133:20 136:12
esophagus 133:23
esq 2:6,12,18 3:4
3:10
esquire 493:1
essential 275:22
448:13 467:6,19
essentially 44:21
112:2,9,12 146:15
161:13 165:21
271:17 282:23
380:19 395:15
474:10 478:5
established 311:12
475:1,7
esthesia 68:7
estimate 17:8,12
146:8 147:12
160:1 298:11
estrogen 214:2,21
215:18 318:23

estrogens 431:15
et 1:9,14 9:21,21
493:4 494:1 495:1
ethical 131:20
177:7,9 250:4
309:10 316:2
403:18
ethically 250:6
ethics 5:8 169:11
169:15,22 170:8
170:13 171:1,12
174:19 176:10,12
179:4,9 180:8,15
180:18,21 181:8,9
181:16,19 182:1,3
217:22 218:11
314:13
europe 123:5
european 89:12,14
89:20 124:13
247:3,22 250:10
313:4
evaluate 275:17
evaluation 72:7
275:16
evening 14:13,16
event 359:5
events 165:2
202:19 410:18
everybody 211:2
evidence 6:7 39:6
46:6 70:14,17,18
70:19 71:10 88:21
89:21 120:9 123:4
123:20,22 124:1
186:7 218:4 219:2
219:9,9,18 234:2
242:23 243:16,17
243:21,23 244:13
244:16 245:20
248:20 249:1,7

250:16 252:12,16
252:18 259:20
260:5,10 261:7
280:20 281:16,22
283:7,17,21 284:2
284:7,8,9,10,21
285:5 288:1,6,14
288:22 289:7,18
290:4 291:10
292:1 293:16,22
294:1,11 295:11
295:16 299:20
300:6,22,23 301:8
302:10,23 303:13
303:19,23 304:11
304:14,17 308:15
309:8 311:16
312:6,18 313:19
313:21,23 314:10
314:14,17 317:18
323:14,16 324:16
327:15 328:10
329:14 337:19
341:8 352:17
359:12 362:16,21
363:3,14 365:16
366:22 370:13
374:19 398:9
399:9 408:12
410:3,18 412:18
413:23 414:3,3
415:16 416:4,8,9
439:1,19 440:4
441:6,8,12 444:15
447:16 452:12,16
453:19 454:4
469:5 481:19
482:4,11,20
484:19,21 486:14
evidencing 145:12

**evident** 89:17
271:23 310:6
404:3
**evolution** 82:13
181:18
**exact** 196:6 259:12
268:13
**exactly** 15:2,17,18
15:20 42:14 56:12
77:3 114:4 156:22
324:5 371:1,3
400:22 408:10
**examination** 4:3
9:11 11:9 70:16
119:12,13 312:13
363:1 447:18
472:9 489:10
**examinations**
406:5
**examine** 165:22
251:10 344:5
**examined** 11:7
312:12 358:13
480:15
**examiners** 477:1
**examining** 71:16
**example** 44:13
45:13 71:9 77:20
81:17,23 83:22
103:17 104:3,20
121:15 130:15
136:8 140:14
155:18 156:1,14
156:23 178:4
205:10,11 206:15
206:23 207:23
220:15,18 226:10
229:9 270:13
271:18 276:16
281:6 283:11
284:5 287:13

292:1 310:12,23
312:2 316:8 322:9
328:8,10 331:11
331:16 334:9
336:6,8 343:16
344:1 351:13
360:13 368:8
412:18 436:9
437:1 439:9,10,12
450:8 452:19,20
460:1 467:21
468:5,9,11 470:2
476:14 478:2
**examples** 142:3
331:6 336:2
459:22
**exception** 154:4
165:7 315:21
**exceptional** 455:5
457:18,22 458:5
**exchanges** 98:11
**exclude** 236:18
**excludes** 425:1
**exclusive** 461:21
**excuse** 279:17
**executed** 229:5
**executive** 10:23
317:13 403:21
404:9
**exemption** 234:12
**exercise** 295:2
**exhaustive** 210:15
381:7
**exhbiit** 6:11
**exhibit** 4:13,14,15
4:16,18,20 5:2,5,7
5:8,11,13,16,20
6:1,4,6,16,16,17
6:20 7:1,5,7,12,15
7:17,23 8:2,4,6,9
8:12,14 12:3,6

22:15 27:6,9 34:5
34:7 37:22,23
43:8 55:7,9,12
62:17,19 108:5,7
114:15 115:6
116:2 127:15,16
127:17 170:11
171:5,7,11 223:15
223:16,18 230:12
230:12,14 232:21
232:23 239:14,16
255:19 256:13,15
263:7,8,10 279:20
299:12,13,15
308:6 320:9
325:23 326:2
339:14,14,16,18
339:20 355:17,18
361:4,11 375:14
375:16 388:14,18
388:20 394:7,7,9
396:9,18,20
404:23 411:2,4
414:20,22 417:8
419:15,15,17
426:21,22 427:1
430:7,9 434:7,7,10
451:3,3,5 463:2,4
463:5 464:9,10
**exhibits** 8:20 15:7
256:4 481:12
**exist** 219:18
488:10
**existing** 482:4
**exists** 410:3,4
**expect** 21:21 34:22
47:11 61:2 71:19
122:16 154:11
173:6 211:17
215:19 237:15
300:23

**expectation**
154:14 196:13
209:19 215:5,16
216:3 287:8
**expected** 206:13
209:9 287:20
**expend** 24:6
**expensive** 23:23
102:1
**exper** 281:11
**experience** 73:10
93:19 94:4 121:18
124:3 132:8
136:21 148:16
159:18 162:14
168:16,22 169:5
173:11,14,23
178:2,17 181:1,12
204:18,19 211:20
212:1,17 213:10
214:14 220:22
243:5,11 246:10
246:21 270:16,17
272:8 275:1 278:6
278:17 279:12
281:5,11,15,19
282:1 284:17
287:1,4 309:16
329:12 348:19
383:21 395:11
405:17 417:18
443:8 454:9 455:1
455:2 457:14,15
458:18 463:21
476:5 479:12
**experienced** 94:1
**experiences**
364:23 366:6
**experiencing**
158:19 162:3
344:20 348:18

**experiment** 271:8
**experimental** 35:6
43:15 112:22
113:2 117:16
120:5 161:16
217:22 218:11
232:10,14 253:15
254:6,11 288:17
289:6 294:2 295:5
423:2,9,17,22
424:2,22 425:2
481:16
**experimentation**
253:3
**experimenter**
272:1
**expert** 4:13 11:20
11:23 17:9 18:12
22:15 29:21 31:2
31:9 33:1,15,22
40:2,16 50:14
57:22 58:5,12
75:8 86:12 90:15
91:3,8,11,13 92:16
92:20,22 98:19
126:8 127:2
170:15,18 171:2
172:6,21 173:10
174:13,17,22
176:7,17 177:19
180:22 181:10
188:15 189:10
193:14 200:12,20
203:13,18 204:7
204:10 221:23
243:20 249:6
254:9 259:5,14
260:19 261:11
274:8 275:12
322:3 329:8 374:3
374:15,23 375:5

443:4 444:13,17
444:20 448:16
449:14
**expertise** 65:8,16
66:3 74:16 75:14
193:11 200:18
201:22 204:3,12
307:9
**experts** 18:1 22:10
33:14 38:19 187:8
198:12,14,20
199:9 203:19
205:5 409:19
448:13 449:16
**expired** 23:16 25:4
28:4 29:9 31:16
**expires** 492:21,23
**explain** 324:9
**explained** 100:8
**explanation**
159:14 369:5
457:11
**explanations**
355:4
**exploration** 215:9
**explored** 399:2
**exposito** 7:1 360:7
**express** 56:20
275:4 406:18
**expressing** 92:14
92:19 217:10,14
222:1 289:4
**expression** 397:23
**expulsion** 172:15
**extensive** 90:8
107:6 288:4
309:15
**extensively** 228:10
**extent** 51:12 127:9
155:22 209:14
211:15 218:21

**external** 310:12
450:15 479:6
**extra** 397:1
**extracted** 352:14
**extremely** 326:22
**extremities** 142:16
**eyes** 105:20
468:14

**f**

**f** 174:5 203:8
446:11,13 492:1
**face** 71:20 131:1
142:9,15 143:7
256:8 289:13
310:14,18
**faces** 146:5 195:1
**facial** 130:9
145:13 146:1
147:5 152:9
166:23 167:3,7
175:4,9 290:14
**facilities** 473:5
**facility** 474:1,20
474:22 475:8
**fact** 40:15,19 44:2
46:15 54:21 59:2
68:18 114:13
118:2 137:9
161:18 166:3
179:13 181:15
222:18 228:8
237:19 250:16
260:11,22 299:11
314:16 319:7
328:22 339:9
344:5 380:6,23
391:11 402:7
433:15 439:15
476:21
**facto** 242:5,9

**factor** 368:9
**factors** 423:9
424:19
**factual** 37:15
128:4
**failed** 280:5
**fails** 493:19
**failure** 320:14,15
**fair** 34:15 74:18
78:16,21,21 114:5
136:17 148:1
149:4 160:4
162:16 168:11,15
189:12,13 193:16
193:18 203:16
215:23
**fairly** 22:8 59:2
75:2 90:20 91:1
131:21 159:6
259:1,8,11,18
435:4
**faith** 444:16
**fall** 252:16
**fallback** 53:12
**falling** 252:17
260:8
**falls** 260:23 261:2
**false** 172:13,19
**familiar** 50:8
76:10 79:10,14
127:9 178:8,9
203:1,2,6,10
211:15 212:6
213:4,8 255:7
341:2 479:16
490:19
**familiarity** 212:22
**families** 81:4
97:20 158:18
159:1,7 164:18
205:1,21 457:7

**family** 82:4 93:23
94:6 209:2 210:20
309:22
**famous** 85:22
**far** 22:7 144:8
178:12 185:6
247:15 313:16
381:3 482:22
**fastidious** 292:8
306:16
**fat** 44:15,22 142:8
142:9
**favor** 64:10
105:12 351:19
**favorable** 63:15
484:12
**fda** 5:13,16 6:4
80:17,20 205:12
206:18 207:2
216:8,15 218:5
220:7,12,22 221:2
221:12,17 222:4
222:12,15 223:9
225:6,10 226:1,13
226:16,20 227:11
227:17,21 228:18
229:19 230:2,8,19
231:8,9,22,23
232:12,13,16
233:4,5,8 234:16
235:11 240:15
243:2,9 245:22
253:5 257:4 261:1
262:8,23 263:21
266:4 269:11
270:21 483:16
490:2
**fda.gov** 230:18
**fear** 95:10 162:9
**feasible** 309:10

**february** 108:15
109:2 115:2
**federal** 5:11 9:5
33:5 221:2 224:1
224:3,8,9,10
**feel** 54:3 104:9
351:11 372:6
420:4,4 479:11
**feeling** 348:4
349:2 351:16
**feelings** 68:7,8
**feels** 114:14
194:19
**fees** 100:11
**feet** 141:4 262:5
268:10,11
**felt** 195:3
**female** 6:12
322:23 323:2
341:23 390:7,8
456:4 457:17
488:7
**females** 368:12
369:9,23 372:14
488:9,12
**feminization**
130:15 166:23
167:4 175:9
**fensolvil** 203:7
**fertility** 468:13
**fetal** 131:11,12
136:8
**fiduciary** 386:3
**field** 21:19 22:3
61:1 132:11 212:4
305:7 322:22
409:19 415:17
**fif** 332:18
**fifteen** 332:20
**fifth** 465:22

**fifty** 445:4,7 446:3
**figure** 272:7
324:11 364:4
**file** 396:23
**filed** 9:22 409:8
**final** 302:2 459:19
485:8
**finalized** 188:2
192:2 199:18
**finally** 134:11
147:14 227:3
419:4
**financial** 109:16
199:5 473:12
**find** 21:15,23 51:6
51:19 53:21 72:11
72:14 77:16,23
104:18 113:11
179:19,19 180:2
317:17 335:11
353:19 360:18
365:5,21 366:7
391:7
**finding** 39:10 91:3
311:9 354:15
**findings** 37:16
38:12 371:21
**fine** 19:4 97:5
384:16
**finish** 227:4
248:12
**finished** 469:15
471:10 491:3
**finland** 35:16
248:4 394:1,17
395:4 396:11
404:23 405:9
406:11 407:11
410:12,15,18,20
**finnish** 7:12
394:19

**fired** 95:16
**firm** 10:6 234:1
**firmly** 111:8
112:13
**first** 11:6 28:22
38:8 59:22 63:10
84:8,15 85:9 86:1
86:4 89:1 91:19
94:9 95:1 96:3
97:1 101:9 107:3
109:12 111:8
116:5 127:19
129:6 130:7,7
170:12 172:10
192:18 202:12
225:9 229:2
233:18 245:9
248:13 257:19
262:8 264:20,22
268:17 272:5
284:23 285:1
300:2 307:18
308:8,9 317:19
324:3,4 326:14
330:16 341:17
347:10 358:2,4,6
367:10 396:16
419:22 420:5
435:14 436:4
439:9 440:8 456:3
458:18 459:2,3
467:12 470:21
472:21 476:8
481:1
**firsthand** 49:20
51:9 193:14
204:19 214:14
**fistula** 336:18,19
338:10
**fistulas** 178:16
338:21

**fit** 77:4 270:22
  279:6
**fitting** 372:12
  460:10
**five** 51:3 122:4
  123:1,5 138:21
  139:10 143:19
  160:2,3 184:12
  196:16 202:11
  281:7 313:8 333:9
  336:15 337:18
  345:19 352:2
  391:17 425:11
  431:8,10 446:4
  474:4,5
**fixation** 129:23
  130:11 310:13
**flags** 71:21
**flap** 142:20 178:3
  178:4,10,10,15,16
  467:22,22 468:1,4
  468:5,8 476:12
  477:4 478:18
**flaps** 143:1 299:7
  338:16 339:5,5
  478:17 479:8
**fleck** 446:7
**flip** 285:8
**flood** 123:3
**floor** 2:20
**florida** 474:14
**flourishing** 460:7
**fluid** 134:13 135:9
**fluidity** 400:11
**fly** 358:5
**focus** 5:2 65:5
  116:8 137:21
  172:9 174:15
**focused** 356:13
**focusing** 145:5

**folder** 115:5
**follow** 7:7 28:17
  143:15 146:22
  161:11 164:17
  208:20 209:12
  313:8 327:18
  331:16 336:5,10
  337:22 339:21
  345:5,9,18 346:3
  346:13,16 347:9
  347:14 352:13,18
  352:20 485:7
  487:12 489:4
**followed** 164:22
  169:22 322:10,12
**following** 9:12
  38:12 321:17
  322:14 401:15
  427:20 431:3
  435:16
**follows** 11:7
**folwell** 1:14 9:21
  10:21 493:4 494:1
  495:1
**food** 221:5 224:17
  224:19 263:14
**footnote** 41:10,12
  41:12,16 42:5,8
  227:9
**footnotes** 327:6
**forbidding** 44:22
**force** 51:17
**forces** 398:2
**forearm** 339:5
  467:22
**foregoing** 492:5,9
  495:5
**forehead** 130:10
  130:12 131:7
  140:22 262:1,10
  262:22 265:10

266:6,15,22 267:1
267:17 268:21
**forgive** 293:2
  325:18 332:12
**form** 8:16 21:14
  21:20 22:5,12
  26:6,21 28:13
  29:7,15,19 30:1,22
  31:4 32:14,21
  34:20 36:13 37:5
  39:18 40:21 41:21
  42:12 47:6 48:7
  49:23 50:6 52:6
  52:14,19 53:1
  54:13 55:3 57:14
  58:17 60:20 62:1
  65:17 73:14 74:19
  76:18 77:13 78:8
  78:20 81:8 83:6
  83:15 88:17 89:3
  90:17 91:16 92:17
  96:18 97:12,23
  98:8 99:8 102:12
  103:10 107:22
  110:3 111:20
  112:23 113:21
  114:11 117:3,10
  117:19 118:6,20
  120:20 126:13
  127:7 128:15
  135:18 136:18
  137:13 148:2
  149:14,18 151:14
  154:3 155:16
  157:12 158:7,11
  162:17 163:2
  166:12 168:20
  173:5 175:1,7,12
  175:14,17,23
  176:11 179:5,18
  180:9,16 181:2,13

184:20 187:4,14
187:20 188:12
190:18,23 191:4
191:10,15,21
192:3,10,23 193:9
193:17 198:9,23
199:15,21 200:5
200:10,16 204:14
204:22 206:7
207:16,21 208:18
211:13 212:5,21
215:3 216:1 217:3
217:8 221:10
222:5 226:19
227:19 228:15
229:22 232:7
234:20 236:6
237:6 238:4,9
239:11 240:19
242:4,12 243:13
245:11,17 251:4
252:7,11,18
253:18 259:2
266:9 267:21
269:1,7 270:6,12
273:10 274:9
275:14 281:1
283:7 284:9
285:16 286:20
288:15 293:13
294:20 295:12,18
297:20 298:5,14
303:9 305:11
307:6 311:18
318:4 323:3 324:2
333:15 342:20
352:7 357:23
359:2 362:19
364:7 367:2 371:8
374:8 376:10
381:11 382:22

383:2 385:17
387:6,16 395:13
399:22 406:15
407:6 408:14
409:10,16,22
410:13 412:14
413:20 416:1,6
424:5,12,23
425:15,20 426:17
427:22 428:4
429:3,22 431:19
432:10 436:1
438:4,17 439:7
440:14,17 441:10
442:16 443:15,21
447:1,12 448:19
449:10 451:19
453:21 454:12,18
455:12 458:2
459:11 460:20
461:18 462:6,12
463:23 464:16
465:6 466:6,19
467:3 469:8 492:8
**formal** 69:10,19
  383:19
**formality** 96:23
**formally** 75:5
**format** 87:13
  93:17
**formed** 170:18
  259:5
**former** 107:18
  179:14 181:19
**forming** 196:23
  221:15 232:11
  239:3
**forms** 70:20
  131:19 144:9
  252:16

**formulated** 424:14
**forth** 435:8
**forty** 307:12
**forward** 105:21
  415:22
**found** 53:18 122:5
  344:8 359:19
  416:15
**foundational**
  93:14
**four** 14:9 58:14
  73:12 97:2 103:17
  202:11 299:2
  336:15 364:14
  391:17 401:18
  431:10 445:4,7
**fournier's** 478:4
**fourth** 57:16,18,19
  348:1
**fracture** 129:22
  131:6
**francisco** 86:14
  272:17 278:7
**frankly** 313:1
**free** 178:10 339:5
  339:5 420:4,4
  477:4
**freedom** 79:11
**frequency** 257:2
**friend** 67:7
**friends** 48:18 49:1
  104:3 151:18
**front** 324:21
**frontal** 129:21
  133:12
**frontalis** 265:10
  266:14,18 267:10
  267:18
**full** 4:23 11:12
  51:17 63:2 83:17
  94:16 97:15

100:23 101:2
102:4 113:9 308:8
325:7 347:5
391:20 435:14
445:12
**fuller** 159:14
**fully** 314:4 346:18
  416:19
**function** 319:9
  333:3,4 345:12
  403:22 466:6,20
  467:4,19,20 468:6
**functions** 47:7
  119:23 317:13
  467:6
**fund** 2:13,19
**further** 38:9
  172:18 227:7
  228:2 237:10
  240:9 324:18
  337:19 364:16
  390:6 414:4,5
  492:14
**future** 159:3,11
  462:16

**g**

**g** 3:4,5,10 16:16
  299:19 493:1
**gained** 109:14
**gangrene** 478:4
**gary** 80:11
**gatherer** 279:11
**gathering** 272:23
**gears** 99:15 182:8
  442:5
**gender** 5:3 6:18
  7:2,22 8:4,7,10
  22:4 35:5 36:18
  36:22 39:4 40:4
  41:6,7,18,20 44:1
  49:16 51:4,23

54:10 57:12 60:16
60:21 61:4 63:14
65:10 76:9 77:18
78:19 80:19 81:20
84:18 85:7 107:12
107:20 109:18
110:8 111:6,10,18
112:21 114:9
115:19 116:20
117:15 126:10
127:4 130:3,3
131:2,16,16
132:18,19 133:16
133:17 134:3,3,17
134:17 137:4,10
137:18 146:21
149:10 150:5,23
151:2,13 152:3,7
153:6,12 154:6,6
157:19 158:1,5,10
158:19 162:15
163:1 164:15
168:12,17 175:20
177:22 178:13
192:17,20 193:20
193:21 195:18,18
200:15 205:15
214:12,18,22
215:18 216:10
312:3 316:18
319:1,15 321:4
329:11 340:9
341:23 342:7,14
353:2,10,22 354:4
367:14,22 368:13
368:14 370:9,19
373:21 374:17
375:2,7,7 376:13
379:20 380:12
382:23 383:19,21
383:23 384:22

387:2 390:1,14,15
390:19 391:2,8
393:18 395:1,11
395:12,22 397:21
398:1,11,18
400:11 405:9,18
410:10,17 411:11
424:9 425:17
426:14 427:5,18
428:1,7 429:8,9,20
430:14 431:1
432:3,7 433:19,21
434:21 435:17
437:13 438:2,12
443:18 447:11
449:7 457:6 458:1
460:18 462:3,9
479:22 481:21
482:12,18 483:22
485:16 486:6,6,17
486:20 487:18
488:19
**genderreport**
407:19 408:17
**genderreport.ca.**
407:13
**general** 106:5
121:17 122:2
123:10 165:1
208:11 209:13,19
210:12 213:1
223:5 247:11
272:5 273:8
274:17,18 277:20
294:21 295:7,8
321:8,11,15 322:5
326:21 391:3,10
436:14 472:17,21
473:1 480:13
484:23

**generally** 43:16
92:20 117:14
136:4 163:15,16
211:2,6 213:7
215:19 219:7
231:10 233:4,7
238:18 284:22
323:21 334:1
373:16 374:4,16
374:23 375:6
408:11
**generated** 276:18
379:8
**generates** 46:11
**generating** 50:13
199:7 372:20
**generation** 461:2
461:7
**generic** 201:11
**genesis** 456:6
**genetic** 201:10
**genital** 178:5,20
**genitalia** 323:2
436:8,15 479:6
**genitals** 290:7
**georgia** 2:15
**germane** 13:20,22
51:3 238:10
277:17
**getting** 119:2
208:22 289:8
355:8 402:22
**girls** 409:8
**give** 11:16 68:19
82:14 88:22
104:21 111:21
121:14 123:12
142:3 150:19
157:4 160:23
161:6 215:20,22
273:13 312:14

339:14 340:22
383:13 384:10
403:8 445:8 450:8
452:23
**given** 13:6 34:21
53:22 54:5,5 85:1
122:2 165:11
176:3 177:15
185:20 196:16
209:9 217:18
220:13 291:11
305:2 314:7 319:4
319:12 322:2
371:4 401:22
418:16 436:23
491:12 495:9
**giving** 63:15,15
86:18 94:4 97:7
159:16 235:11
402:12 450:17
**glabellar** 267:2,3
**glasses** 41:11
**gleaned** 195:12
**gloss** 340:20
**glossary** 173:12,21
173:22
**glossed** 13:19
**gn** 431:14
**gnrh** 431:14
**go** 16:13 19:3
26:12 27:14 31:8
35:1,11 36:1,7
38:21 43:10 56:15
57:1 58:1 59:14
64:4,14 71:16
72:13 74:11,11
78:23 87:15 110:4
111:7 115:8
116:16 119:16,16
119:18 126:6
128:17 129:18

143:16,17 149:22
154:11 158:13
166:4 171:21
174:3 188:19
202:12 207:3
210:2 218:7 225:2
227:5 231:2
242:13 245:2
248:13 254:12
256:9 264:10,20
279:19,20 281:2
281:14 289:22
297:8 302:5 308:5
314:9 319:18
320:8,11 327:20
327:21 330:10
332:15 340:7
341:13 347:19
349:15 350:10
358:1 359:8,13
364:13 367:6,8
373:11 378:5,14
380:10 381:12
383:9 384:9,16
388:3 391:12
396:11 397:15
398:17 399:11
401:5 404:22
405:2 407:7,8
413:6 415:6 417:9
419:19 420:5
421:6,6 422:11
428:8 430:21
435:12 437:5
440:1,23 445:2,2
446:2,8 451:8
452:19,19 453:10
455:18 458:21
460:22 465:8
469:10 470:4,9
471:5 484:13

491:7
**goal** 206:13
459:19
**goals** 460:13
**god** 456:10,13
457:10
**goes** 36:4 266:19
303:10 424:20
**going** 9:16 15:14
17:12 27:5 31:1
37:4 46:11 55:6
73:1 102:9 121:11
123:14 125:23
131:10 156:17
180:2 185:23
218:7 219:20
223:14,15 230:11
232:21 239:14
256:13 261:4,15
262:16 263:7
271:15 283:10
287:5 289:22
291:16 298:7
299:9 306:11
313:9 315:12
316:21 317:2,7,8
317:11,12 319:1,6
319:20 325:23
328:9,14 353:5,6
353:16 361:3
364:10 375:13
379:21 383:12
385:10 386:5,7
387:20 388:14
396:8,10 397:13
403:8 414:16
415:20,21 420:22
423:7,18 426:21
426:22 430:6
434:7 448:23
449:12,13 457:12

457:13 464:7
467:18 468:5
469:4 485:8
488:13
**gold** 249:3
**gonadectomy**
344:13,19 345:7
345:16
**gonadotropin**
201:7,9 317:22
428:14
**gonzalez** 2:18
**good** 9:15 11:10
11:11 52:16 87:11
92:10 124:23
133:21 135:6,6,6
164:1 251:8 261:6
276:18 290:5
311:15 312:23
379:9 439:21
472:2
**gorney** 67:7 72:2
**gosh** 170:9 186:15
202:10 298:7
313:6
**gospel** 450:18
**gotten** 124:10
**government** 77:4
**grabs** 123:2
**grafting** 44:15,23
142:8,10
**grafts** 478:17
479:8
**grand** 67:8
**grasp** 403:21
**great** 53:19 56:9
89:16,18 104:5,10
105:3 106:9
161:20 177:12
244:2 248:3
260:12 286:12

287:12 290:6
389:5 475:4 480:8
484:22 485:5
**greater** 287:7,8
311:7 390:2
402:16 410:5
**greatest** 122:1
**greatly** 68:3 444:3
**griffin** 35:17
**grooming** 461:2,6
461:8,11,12,14,21
461:22 462:10,15
469:2,12,14 470:6
**grounds** 466:3,15
**groundwork**
462:19
**group** 45:11 88:12
192:18,21 193:3
242:19 249:6
271:8,9 309:6
322:21 367:15
368:19 390:3,10
390:13,18 412:8
452:5 455:6
**groups** 184:17
190:16,21 191:13
192:7 266:15
271:8 280:8 346:8
368:20 483:9,15
**grow** 121:14
**growing** 109:15,20
260:9 328:1 341:8
360:14 363:8,9
458:5
**grows** 476:5
**growths** 144:10
**guardians** 402:2
402:23 403:10
404:18
**guess** 12:18 69:5
74:21 83:19 93:16

127:20 152:8
160:15 176:16,21
226:3,7 264:1
279:8 288:9
297:22 298:7
301:2 303:20
331:23 379:9
471:17,21
**guessing** 98:3
142:1,18 298:19
**guidance** 28:8
29:22 31:3 32:8
128:12 227:16
233:3,5,9 238:7
282:3 394:20
398:21
**guide** 249:8
**guided** 248:19
**guideline** 186:12
186:14
**guidelines** 7:12
27:17 28:17 73:12
195:17 196:15,22
197:14,17 200:14
200:22 394:1
395:5,10,15,21
401:2 402:10
403:6 404:23
406:11,22 407:11
410:12,16
**guy** 125:8
**gynecomastecto...**
148:11

| h |
| --- |

**h** 4:10 16:12,16,16
55:20 182:13
389:13 414:15
446:12 494:3
**habit** 449:21
**hair** 139:22 146:1
146:5 147:5

151:12 152:9,17
153:2
**half** 25:20 146:13
147:10 336:16
**halfway** 359:16
**hampshire** 111:1
**hand** 16:9 77:15
176:21 287:12
417:4 468:6,9
**handed** 269:10
**handle** 54:21
346:15
**happen** 220:2
259:15 358:14
**happened** 102:6
164:23 186:3
**happening** 60:4
61:5
**happens** 185:9
**happy** 333:8
**hard** 352:17
**hardware** 310:17
**harm** 67:4 70:18
162:9 223:7 290:6
313:13 314:19
333:21 334:10
347:2 413:4 468:8
487:3
**harms** 244:1,2
**harry** 380:12
**hazard** 297:22
390:4
**head** 109:8 131:5
279:5 468:2 474:4
**headed** 4:22 63:2
165:8
**header** 279:22
420:1
**heading** 434:2
**heal** 450:14

**health** 10:20 11:2
21:3 40:7 63:11
65:12 66:4 74:17
75:9,15,18,22 82:6
111:13 116:7
149:16 154:2,12
155:8,12,14 157:7
157:10 182:10,17
241:4 392:8 398:8
418:9 420:13
422:21 423:1
425:11 428:18
429:18 433:10,13
**healthcare** 7:4 8:9
57:12 80:18
149:12 153:21
231:10 376:3
434:9,18,18
**healthy** 120:1
289:21 392:2
**hear** 47:3 49:18
54:19 159:13
160:13 325:14
359:11 426:2
448:23 449:14
471:7,12
**heard** 14:20 17:17
37:6,13 50:15
63:19 73:12 85:2
96:9,14 98:13
102:22 160:11
230:6 233:10
269:12 425:7
442:5 488:15
**hearing** 38:11,16
38:19 63:20 65:14
71:15 162:8
447:13 448:8
**heart** 90:1 218:13
**heartache** 105:9
108:2

**heartbreaking**
95:21
**heartburn** 177:11
**heavily** 185:13
261:1 343:21
**held** 37:9 398:7
**help** 68:16 111:10
112:10 172:19
332:14 458:10,15
**helped** 485:17
**helpful** 83:2
308:14 355:7
**helping** 145:14
**hembree** 380:17
**hereto** 495:7
**hey** 333:8
**hhs** 224:18,20
**high** 88:10,22
116:13,16 117:4
145:3 158:23
161:17 166:4
206:20 218:10,16
222:21 223:3
258:18 312:11
314:5 359:6
420:21
**higher** 103:5
223:3,4 250:15
258:6 281:20
288:22 303:19
305:22 312:17
313:20,21 314:14
317:13 354:2,10
391:9
**highest** 415:16
**historic** 452:16
**historically** 72:1
**history** 70:15,17
220:14 226:10
247:16 324:15
368:13 427:9

**hold** 75:8 189:9
204:6 274:7 325:4
465:2 484:3
**holding** 252:8,10
**holland** 248:4
**home** 63:5
**honor** 447:16
**hope** 98:16 179:21
211:16 222:20,21
223:8 237:20
246:18 292:3
**hoped** 104:2
**hopefully** 246:2
**hoping** 124:23
**hopkins** 106:11
125:10
**hormonal** 416:22
431:12 481:14,20
482:12
**hormone** 84:23
159:20 164:4,9
201:7,10 212:19
212:23 214:3,7
317:22 319:10
345:7 374:16
375:1 376:13
379:21 384:22
387:3 400:5
416:13 424:9
425:18 426:15
428:14 433:19
437:14,17,23
483:21
**hormones** 36:22
82:1 213:7,22
214:11,17 216:9
219:17 238:19
247:2,10 260:7
316:16,20 317:4
318:2,7,20 319:4,8
319:14 373:20

394:21 401:10,14
404:2 416:13
417:5 428:22
447:22 482:17
488:18
**hospital** 24:11,14
24:16,17,21 95:18
140:12 142:17,21
262:17 473:23
474:6
**hospitals** 24:1,3
**hour** 15:5 16:1,2
87:20 319:21
**hours** 17:7,10,13
**house** 63:18
**hruz** 14:18 16:7,9
17:1 33:12,13
39:15,21 40:11
42:10,19 43:23
57:20,21 78:5
81:17 85:10 86:3
87:10 92:13 114:6
**hruz's** 15:8
**ht** 344:14
**huge** 147:13
287:18,19
**hugely** 286:12
**huh** 264:9 361:16
365:4 396:17
420:20
**human** 131:23
132:2,6,15 134:13
444:8 452:17
454:3 458:22,23
459:4 460:5,7,12
467:6,19
**hundreds** 121:1
**huntsville** 24:17
**hustle** 452:21
**hyperfunctioning**
156:8,12

**hyperhidrosis**
206:17 229:10
267:12
**hyperplasia**
436:23
**hypotheses** 372:23
**hypothesis** 372:20
372:21
**hypothesizing**
373:7
**hypothetical**
371:7,10 372:8

**i**

**idea** 48:4,14 49:12
52:17 159:12
177:13 188:9
192:12 255:13
269:3 307:7
379:18 380:1
381:10 402:16
425:16 426:13
433:18 456:20
**ideas** 461:9 469:1
**ideation** 487:5
**identification** 12:6
27:9 34:7 37:23
55:9 62:19 94:1
108:7 116:2
127:17 161:10
171:7 223:18
230:14 232:23
239:16 256:15
263:10 299:15
326:2 339:18
355:18 361:11
368:15 370:2
375:16 388:20
394:9 396:20
411:4 414:22
419:17 427:1
430:9 434:10

451:5 457:15
463:5
**identifications**
463:21
**identified** 145:1
145:21 318:11
344:19 348:10
349:5 356:21
369:1 374:10
428:16 429:1
476:19 485:22
**identify** 136:1
355:11 413:12
444:1 472:14
**identifying** 405:17
**identity** 154:6
192:17,20 193:20
341:23 342:7,14
398:1 462:3,9
486:6,21 487:18
**idiosyncratic** 22:8
**ignore** 415:21
**ignored** 348:11
349:7
**ii** 35:4 123:11
225:5
**illegal** 241:21
242:10
**illness** 384:7
422:22
**illnesses** 486:18
488:9
**imagine** 46:10
198:15 236:9
**immoral** 124:18
468:13
**immutable** 448:15
**impaired** 317:14
**imperative** 66:17
**impinge** 82:20
132:10 215:15

447:21
**impinges** 68:3
**implant** 148:8
220:17,20 222:8
**implants** 299:5
**implementation**
382:13
**implementing**
198:21
**implication** 254:2
**implications** 7:3
**imply** 28:2 241:20
242:3,5,7,8
**implying** 254:4
**importance**
248:21,23
**important** 93:20
162:1 213:3 241:3
247:12 353:14
392:6 399:7
400:11 460:3
**impossible** 319:6
**impression** 46:14
**improper** 206:5
216:18 241:21
242:9,21
**improve** 40:6
111:12
**improved** 6:9
300:7
**improvement**
66:16 265:8 266:5
**improvements**
295:20
**improving** 152:13
**inadequacy**
337:20
**inappropriate**
111:19
**incarceration**
313:14

incisions 134:7
inclined 294:23
include 38:12
  144:9 209:3,4
  215:10 331:3,7
  358:9 363:2
  412:15 415:12
  431:2 436:22
  451:17
included 72:17
  107:9 210:13
  225:16 267:3
  302:2 327:22
  452:11
includes 301:14,19
  303:23 437:14
including 36:21
  145:16 172:12,15
  173:14 274:20
  328:22 358:15
  379:5 431:13
  437:22 441:14
  449:6 463:16
  474:15 487:2
inclusion 243:1
  356:22
incongruent
  195:18
inconsistent 176:9
  179:3 222:3
incorrect 46:5
  150:16 448:20
incorrectly 447:23
  450:6
increase 328:14
  345:3 393:19
increases 328:13
  392:17 393:1,12
  405:19
increasing 328:6
  355:10

increasingly 328:5
incredible 86:20
incumbent 68:10
indicate 490:5
indicated 112:5
indicating 267:1
  268:10
indication 216:15
  221:8 233:21
  243:10 265:8
  268:4 314:17
  333:19,23 334:3
  478:19
indications 226:16
  228:21 334:5
  335:2 351:17
  406:5
individual 13:4
  17:14 241:13
  248:22 253:8,13
  417:18 431:1
  448:17 456:14
  479:15
individually 36:8
  188:20
individuals 41:5
  41:19 436:7
industry 19:8
  20:20 21:11 22:2
  291:14 293:4,8
  386:2 434:4
infants 241:4
infection 478:6
infectious 178:19
infer 199:1 413:15
inferences 392:9
inferring 237:8
inflection 122:20
  185:17
inform 209:21

informal 164:20
information 55:15
  57:9 58:15,20
  74:10 77:6,7,10
  123:6 194:10
  241:7 249:5
  251:16 280:16
  296:19 324:1
  380:20 381:17
  382:14 418:14
informative 392:7
informed 68:19
  119:2 209:1,2
  225:11 233:23
  235:1 401:22
  402:12,22 403:9
  404:11,15,16
informs 176:12
  223:7,9 444:9
inherent 113:23
initial 156:11
  235:4
initially 196:1
  337:16
initials 446:10
initiated 406:2
  407:1
injectables 140:1
injection 266:12
  266:13
injections 140:23
  261:20 262:1,5,22
injured 473:16
  474:16
injuries 178:6
  479:2 490:18
injury 422:22
innovations 229:4
innovative 294:22
innovators 295:6
  295:14

inpatient 257:13
  258:7
input 128:4 134:8
  198:17
insert 202:2,6
  206:3 209:6,9
  210:14 215:11
inserts 210:16
insist 449:17 450:4
insisted 283:9
instance 244:10
instances 273:12
institute 21:3
  53:20 260:13
institution 282:19
  308:22 312:19
institutional
  234:12 235:20
  246:10,21
instrument 140:17
  282:13 324:11
  332:23 333:1,12
  333:17
instruments 332:1
  332:3
insufficient 339:1
  398:9 399:9
insurance 291:13
  291:23 292:14
  376:20 385:4,6,9
  385:21 386:2,6,14
  387:9,19 423:13
  424:15,18 425:11
  429:18 431:21
  432:11,19 434:4
  436:10,12 437:1
  438:21
insurer 376:3,8
  420:22 425:7
  433:10,14

**insurers** 385:12
425:12 439:4
**insuring** 438:9
**intake** 70:20
**integrity** 273:2
280:10
**intend** 12:10 226:2
**intended** 316:23
**intensifies** 5:4
**intent** 234:8
**intentional** 60:5
60:17,22
**interchange** 56:14
**intercourse** 333:4
**interest** 81:3 92:15
199:5 253:9,14
284:15 462:22
**interested** 82:18
122:10 492:17
**interesting** 125:8
335:11 337:9
338:6 351:6,18
416:10 436:2
**interestingly**
357:8
**interim** 4:19 55:16
**interior** 67:21
351:10 450:14
**internal** 130:10
279:8 439:2
**international**
451:15 454:7,14
455:9
**internet** 359:20
360:20
**interpret** 274:19
274:21 275:6
276:4 277:11
352:15
**interpretation**
212:23 276:14

**interpreted**
392:16
**interpreting** 212:7
276:13
**interval** 345:22
346:13 347:4,14
**intervention**
106:21 112:4
124:6 271:22
400:17
**interventions**
89:22 90:7 104:12
145:16 315:20
330:8 369:14
399:16 462:18
481:21 482:5,21
485:16,20
**intraabdominal**
315:21
**intracranial**
272:20 315:23
**intrathoracic**
315:22
**intrinsic** 442:14
443:12
**introduce** 27:5
37:21 55:6 62:16
95:20 108:4
114:15 127:14
170:11 171:5
223:14 230:11
255:19 263:6
299:12 325:4
375:13 388:14
394:6 396:8 411:2
414:16 417:7
426:21 434:6
451:2 463:1
**introduced** 110:9
310:12 461:9

**introducing**
414:19
**introduction**
184:22 240:5
326:12 328:19
334:23
**introductory**
87:16 91:14
403:13,14
**introitus** 479:7
**invalid** 319:16
**investigate** 221:16
452:7
**investigated** 118:4
118:16 120:12
235:17
**investigating**
306:1
**investigation**
118:23 119:11
235:5 279:5,9
**investigational**
5:17 218:20
232:10,14,17
233:14 234:10,11
234:19 241:22
242:3 423:2 425:2
**investigations**
229:6
**investigative**
235:6
**investigator**
272:10 273:3
274:15 278:5
279:3 309:20
315:4,17
**investigators**
273:1 276:23
**investors** 386:3
**invitation** 80:8

**invite** 84:15
**invited** 79:16,18
80:4 81:16
**involve** 149:15
336:9
**involved** 56:8
58:19 78:6,13
98:18 99:6 110:22
143:7 184:4,18
190:12,16 197:12
197:16,21 272:13
278:18 279:13
306:20,23 334:5
371:23 402:4
441:19 472:19
475:4 476:1 477:9
479:14
**involvement** 54:15
78:10 379:14
**involves** 36:15
51:21 271:7
274:12 467:16
**involving** 478:17
**ir** 235:23
**irb** 236:3 237:12
237:14,19,20
246:12
**irbs** 235:23
**irrelevant** 186:1
**irreversible** 119:6
287:15,17 484:16
485:5
**isolated** 129:21
351:12
**isolation** 70:19
71:11
**issue** 47:14 56:9
65:9 67:18 77:15
89:17 92:8 95:8
95:10 106:17
114:14 163:21

177:13 194:17
218:13 241:4
243:22 244:21
251:11 259:21,23
287:11 346:19
385:8,9 398:7
400:11 457:8
483:2 488:1
**issued** 264:16
**issues** 53:16 66:12
66:13 82:7,8,19
85:6 92:11 119:10
123:9 199:6 213:3
233:5 291:15
346:10 351:13
438:7 452:12
453:19 462:3,9
487:7
**italicized** 59:19
**items** 401:18
421:11 422:2
**iteration** 415:14
**iv** 172:4,5,6

**j**

**j** 322:18,18 340:15
389:13
**january** 141:20
257:13 427:12
**jeff** 91:20,23
**jefferson** 492:3
**john** 3:4,5,8 10:17
493:1,2
**johns** 106:11
125:9
**join** 101:9
**joined** 101:11
**joint** 4:19 55:15
**jones** 10:23
**journal** 12:21
102:2 135:17
284:5 296:2,8,13

296:17 297:1,3,17
298:12,17,22
300:10 302:22
303:6 304:13
305:14,20 306:3,4
306:22 307:1,11
307:22 331:12
364:3
**journals** 128:19
129:4 274:1
**judge** 37:9,15 38:4
179:12,21 180:2,4
231:12
**judge's** 42:4
**judgment** 241:16
295:3
**judgments** 486:20
**julie** 444:21,21
**july** 7:6 33:23 37:8
38:11,16 141:15
141:20 383:1,5
**jump** 285:4
**jumping** 456:17
**june** 55:16
**justice** 77:3 444:4
444:5
**justifiable** 484:13
**justifiably** 309:7
**justified** 294:5
314:4
**justify** 287:21
293:22 482:16

**k**

**k** 256:19 445:6
446:13
**kadel** 1:9 9:21
12:23 493:4 494:1
495:1
**karolinska** 260:13
**keep** 69:12 88:4
332:7 378:23

**kept** 37:3
**kettenis** 380:17
**kevin** 3:10
**key** 71:8 291:15
345:9 413:11
**kicks** 337:12
**kin** 492:15
**kind** 20:15 32:12
52:4 54:23 76:22
81:6 82:12 87:9
91:22 98:16
110:18 119:11
125:10 150:4
153:21 154:2
164:14 168:12
175:4,9,20 176:5
179:17 185:2
186:6 187:1,7,11
187:16 191:11,17
198:6,11,14
199:10 201:19
208:2 220:17
223:5 229:7
285:21 286:14
288:7 332:7 355:5
358:13,23 366:7
369:21 390:20
416:21 450:2
470:22
**kinds** 52:9 208:23
**kitchen** 131:4
**knepper** 3:4,5 4:5
10:17,18 14:3,23
15:4 21:14,20
22:5,12 26:6,21
28:13 29:7,15,19
30:1,22 31:4
32:14,21 34:20
36:13 37:2,5
39:18 40:21 41:21
42:12 44:5 47:6

47:16 48:7 49:23
50:6 51:15 52:6
52:14,19 53:1
54:13 55:3 57:14
58:17 60:20 62:1
65:17 73:14 74:19
76:18 77:13 78:8
78:20 80:2 81:8
83:6,15 88:17
89:3 90:17 91:16
92:17 96:18 97:12
97:23 98:8,20
99:8 102:12
103:10 107:22
110:3 111:20
112:23 113:21
114:11,18 115:9
117:3,10,18 118:6
118:20 120:20
126:3,6,13,20
127:7 128:15
135:18 136:18
137:13 148:2
149:14,18 151:14
154:3 155:16
157:12 158:7,11
162:17 163:2,14
166:12 168:20
173:5 175:1,7,12
175:14,17,23
176:11 179:5,10
179:18 180:9,16
181:2,13 184:20
187:4,14,20
188:12 190:18,23
191:4,10,15,21
192:3,10,23 193:6
193:9,17 198:9,23
199:15,21 200:5
200:10,16 204:14
204:22 206:7

207:16,21 208:18
211:13 212:5,21
215:3 216:1 217:3
217:8 221:10
222:5 225:22
226:19 227:19
228:15 229:22
232:7 234:20
236:6 237:6 238:4
238:9 239:11
240:19 242:4,12
243:13 245:11,17
251:4 252:7
253:17 255:20,23
256:5,11 259:2
266:7,9 267:21
269:1,7 270:6,12
273:10 274:9
275:14 280:22
281:1 285:16
286:20 288:15
293:13 294:20
295:12,18 297:19
298:5,14 303:9
305:11 307:6
308:1 311:18
318:4 324:2
333:15 340:2
342:20 352:7
357:23 359:2
362:3,19 364:7
367:2 371:8 374:8
376:10 381:11
383:2 385:17
387:6,16 395:13
399:22 406:15
407:6 408:14
409:10,16,22
410:13 412:14
413:20 416:1,6
424:5,12,23

425:15,20 426:17
427:22 428:4
429:3,11,22
431:19 432:10
436:1 438:4,17
439:7 440:14,17
441:10 442:16
443:15,21 446:19
447:1,12 448:19
449:10 451:19
453:21 454:12,18
455:12 458:2
459:11 460:20
461:18 462:6,12
465:6 469:8 471:3
471:4,11 472:1,9
489:2,8 490:23
491:3 493:1
**knepperllc.com**
3:8 493:2
**knew**   259:6,7
**know**   12:4 14:18
15:17,18 19:20,21
19:22 20:5,13,14
20:22 26:11,13,16
27:7 33:20 34:5
38:18,20 43:3,6
47:13 50:2 51:11
55:7,20,22 56:10
61:18 62:7,17
65:21 68:10,15
70:9 78:9,12,15
83:17 84:14 88:3
93:16 96:1 98:10
99:16 100:9 102:6
104:13 107:11
108:5 111:11
114:16,20 119:11
120:17,22 121:3
124:20 125:8,16
127:15 131:8

136:5 141:23
142:2 145:12,16
146:12 148:8
156:17 159:19
160:7,8,15 163:8
164:3,6,8,11,13
165:12 166:23
167:7,13 169:10
169:13,17 170:21
171:6 173:21
176:20 180:13,20
180:21 182:8,15
184:7,14,15,16
185:2 187:1,6,7,11
187:16,23 188:4
189:20 190:2,4,15
190:20 191:6,11
191:17,23 192:5
192:19 193:2,5,11
193:23 194:9
195:16,20,23
196:3,6 197:20,23
198:1,5,11,18
199:10,16 200:7
201:12 202:2,12
202:15 203:20
205:15,17 207:17
208:5,12 211:8
213:22 214:20
220:11,11 221:20
221:23 222:18
223:6,16 224:1
226:3,21 230:6,13
232:9,15,18,22
235:19 238:23
239:9,15 249:23
254:22 255:4,9,15
256:13 259:4,8,11
262:8 263:8,19
268:3,12,13,14
271:4 276:10

277:13 282:14
283:22 285:3
286:22 290:6
295:23 296:22
298:16 299:10,10
299:13 307:3
313:6 315:12
317:20 318:18
319:19 321:18
326:1 328:1
331:18 334:6
338:3 339:16
351:13 354:1,9
355:21 359:3
361:4,18 368:4,6
369:2 372:2
375:14,23 376:16
376:17,18,23
381:6,23 382:4
383:15 388:19
391:6 394:8
395:17 396:19
399:1 400:23
405:4 408:16,19
408:21,22 409:2,4
409:5,11,17,17
411:2 414:20
418:11 419:1,11
420:18 426:23
429:16,19 430:2,7
433:6,7,15 434:15
436:14,20 439:15
440:6 441:21
447:4 451:4
455:21 460:2,4,4
471:13 474:18
488:12 489:21
490:10
**knowing**   104:13
205:10 322:13
354:6 367:4 382:5

442:1
**knowledge** 47:17
47:19 48:8,22
49:4,20 51:9
68:14 80:16 83:5
86:19 121:10
131:8,9 156:21
170:1 177:8
193:15 209:14,18
408:7
**known** 102:15
168:8 177:1
316:12 321:11
404:5
**knows** 185:22
188:22 189:3
205:18 469:4
**kwilliams** 3:14

**l**

**l** 2:12 16:21 203:8
203:8,11 356:2
446:13
**lab** 211:11
**label** 5:15,16,22
6:1 119:5 205:13
205:16 206:4,8,10
207:1,3 216:5,13
216:19,22 217:12
217:16 218:2,7,18
218:22 219:6,20
219:23 220:3,15
220:19 221:17
222:2,4,16 226:2,6
226:23 228:17,19
229:21 230:23
231:23 232:9,16
233:13 234:17
236:4,14 237:5
238:2,14 239:5
240:2,10,16 241:3
241:12,20 242:2,6

242:9 243:1,18,22
243:23 244:4,8,11
244:23 245:2
246:4,16 247:9,12
247:19 250:17
251:22 253:2,13
255:3,5,12,16
256:20 257:2,20
258:3,5,13,14,17
258:23 259:9,18
259:21,23 260:2
260:15,22 261:4
262:23 263:4
267:11,23 268:2
268:18 269:9,21
270:3 483:8,14,23
484:4,8,14,17
489:13
**labeling** 209:23
210:3,6 215:21
225:16 233:21
241:8 242:19
243:3 265:16
266:1
**laboratory** 212:8
437:16
**labs** 212:2,7,18
**lack** 21:17 120:10
237:17 243:3
329:23 330:7,8
346:19 371:4
467:4
**lambda** 2:13,19
**lambdalegal.com**
2:16,22
**lane** 9:1 10:8
471:7,13 491:6
492:19,20
**language** 59:18
74:9 78:2 112:1,3
194:22 228:1

331:1 335:3,5
385:4 386:12,14
457:2,4 458:16
**lapper** 9:10
**lappert** 1:20 4:13
4:15 5:7 8:12 9:19
11:5,14 22:18
34:12 57:4 60:11
60:14 64:9 137:23
138:11,16 139:3,6
140:5 255:21
464:20 468:23
472:10 475:11
481:6 483:7 491:1
491:12 493:5
494:2,24 495:2,4
495:12
**lappert's** 11:3
**lapse** 99:21 100:3
**lapsed** 100:11
**large** 9:3 95:12
121:3 290:16
342:23 348:12
349:8,19 404:6
475:9 479:4
**larger** 287:21
352:11 396:23
**largest** 376:7
425:11 429:17
433:13 474:21
**laser** 139:22,23
142:11 145:19
146:2,4 147:4
151:11 152:9,17
153:2
**lasted** 97:11
**late** 394:23
**lately** 19:19
412:23
**latest** 183:1
196:21

**law** 3:5 30:17
36:16 51:22 52:5
53:13 242:23
**lawsuit** 409:9
**lawsuits** 83:12
**lay** 45:20 218:17
**lays** 462:19
**lcb** 1:7 10:2
**lead** 133:4,7 272:9
273:3 389:3
**leader** 472:15
**leaders** 72:3
**leading** 270:18
329:5 381:17
**leads** 246:11
324:18
**learn** 425:14 457:4
458:16
**learned** 122:15
125:18 284:23
468:15
**learning** 70:1
**leave** 396:10
**leaves** 395:15
**left** 137:22 171:15
242:15 248:16
252:21 349:20
451:13 461:1
**legal** 2:13,19 10:6
10:9 83:8,19
99:12 493:23
**legislation** 77:11
109:15,21,22
110:7 117:6
**legislative** 54:16
77:2 78:7 110:18
113:15,17
**legislators** 54:8
76:7
**legislature** 4:18
57:10 58:15,21

59:8,13
**legislatures** 76:16
  113:8
**legs** 460:5,6
**length** 345:8
  346:16 347:13
  352:13
**lengthy** 159:6
**leon** 2:14
**lesser** 252:15
  267:3
**letter** 6:5 135:16
  136:9 263:20
  265:22
**letters** 27:17
  135:21 136:1,16
  279:23 373:16
**level** 56:11 88:10
  88:22 124:1,4,7,11
  158:23 219:2,9,12
  219:18 250:15
  281:21,23 282:1
  282:11 283:17,20
  284:3,6,8,12,21
  285:13,22 286:3
  286:14 288:6,14
  288:14,21 289:2,7
  289:9,17,22
  290:15,17 293:16
  293:22,23 294:3,4
  294:4,10 295:11
  295:16 300:17
  302:10,17,22
  303:13,22,23
  304:5,11,17 305:1
  305:2,2,4,4 306:13
  310:6 312:6,6
  313:21,23 323:13
  323:15 329:14
  337:12 362:21
  363:3,14,15 364:1

370:13,13,14,15
414:6 416:9
420:21 439:11
476:5 477:2 487:1
**levels** 6:6 212:19
  212:23 287:23
  299:20 300:21,22
  301:7,11,13
  303:19 312:17
  313:19 314:14
  319:10 324:16
  414:3
**levine** 16:20,23
  17:5,6 19:10
  33:19,20 39:15,22
  40:12 42:10,20
  43:23 58:2,5 78:5
  85:13,16 114:7
**lgbtq** 458:7
**liability** 67:11
**library** 415:3
**license** 265:1
**licensed** 153:20
**licensing** 30:16
**lie** 464:21
**lies** 284:2
**life** 67:2 68:9
  71:11,14 119:22
  152:13 156:3
  182:2 244:19
  290:2,17 311:5
  314:2,7 322:13
  359:4 450:18
  468:13 469:17
  490:7,17
**lifelong** 482:22
**lifesite** 464:14
**lifesitenews.com**
  8:18
**lifetime** 220:14
  286:23

**light** 97:15 139:22
  140:14 145:17
  181:15 259:19
  260:2 328:15
**likelihood** 161:7,9
  161:17 458:11
**likes** 72:2 434:5
**liking** 104:23
  105:2
**limb** 475:3 477:5
**limit** 172:19
**limitation** 173:14
**limitations** 342:11
  391:16 412:12
  413:7,11,18
**limited** 29:9 66:5,5
  66:7 68:13 96:21
  143:15 148:15
  152:5 267:8,9
  306:6 413:12
  431:13
**line** 30:2 237:23
  264:13 320:17
  494:4,7,10,13,16
  494:19
**lines** 143:19
  158:16 166:2
  265:10 266:6
  267:18 268:5,7,8
**lipoplasty** 142:12
**lips** 471:8
**lisa** 368:7,17,17
  370:14 371:12
**list** 41:16 62:11
  110:11,16 111:3
  116:10 136:4,15
  172:22 210:15
  224:3 381:7
  421:10 422:2
  458:5

**listed** 112:19
  133:1 135:20
  372:23 380:2,2
  423:14 441:11
  480:7
**listen** 292:17
  353:17
**listening** 261:16
**lists** 42:6 128:23
  455:14
**literature** 12:21
  13:8 45:9 46:19
  47:20 50:3,8,11,12
  51:2,12,17,19
  69:13 72:14,16
  86:20,22 89:8,12
  89:14,15,19,20
  117:22 124:13,14
  127:10,12 129:15
  135:12 161:4
  177:2,3,16 185:3
  185:14 186:2
  187:2 191:12
  194:6 198:6 205:4
  228:11,20 247:4
  247:22 250:10
  260:3 268:19
  270:17 274:13,20
  283:22,23 297:12
  313:3,5 329:1
  336:3 337:21
  338:2 343:20
  346:12 353:18
  356:13 358:11
  368:6 370:23
  410:4,7 414:1
  416:12 439:5,11
  439:20 441:13
  443:6,7 473:15
  480:23 483:4
  485:19 486:23

487:6 488:21
**litigation** 90:15
176:20
**little** 15:5 16:14
93:12 97:2 101:20
142:20,23 340:3
358:2 442:5
467:21
**littman** 369:16
371:12 372:18
**littman's** 368:7,17
370:14
**live** 38:15,19 277:8
**lives** 66:17
**living** 71:11
**llc** 3:5
**llp** 10:16
**load** 339:22
**lobbied** 54:22
**local** 30:15 64:20
142:20 178:10
478:17
**located** 10:4
138:13
**loe** 301:8
**logo** 101:3 451:14
451:17
**long** 7:7 15:3,21
41:16 85:5 87:20
88:4 89:10 90:20
91:1 97:10 101:5
102:8 124:11
138:3,16 164:22
202:14 206:15
249:20 291:12
292:12 311:22
312:11 313:10
314:15,16 332:8
345:14 352:18
353:17 397:22
398:10 399:10

404:7 452:23
478:11 485:12
**longer** 24:8 47:2
122:7 125:7 165:3
166:3 296:23
352:20
**longitudinal**
124:12 219:13
249:19 281:17
291:12 292:13
299:4 311:9
**longitudinally**
250:1
**longstanding**
230:2
**look** 14:15 17:11
22:14 27:20 28:15
30:12 34:4 38:23
40:1,23 41:1 43:7
57:16 64:6,16
110:4 111:5,22
113:6 119:20
125:10 136:7
152:9 159:11
173:8 174:2
223:11 232:11,20
239:4,13 240:5,22
242:15 248:16
250:6 252:20
256:3,4 257:7,17
275:21,23 276:1,7
297:13 307:13,15
309:5 311:23
312:21 313:11
314:14 317:7
322:15 323:19
326:17,17 330:11
337:10,14 344:8
344:11,23 345:20
347:4 356:7,17
360:3,23 363:17

383:6 391:19
394:13 396:5
405:11 411:1,15
422:10 428:10
429:6 430:22
439:5 440:18
458:18 465:22,22
**looked** 201:23
202:5 277:2
345:14 358:7
**looking** 106:6
107:3 110:15
160:20 173:20
176:15 202:13
219:12 249:22
282:10 284:1
301:2 311:8 313:5
337:3 344:6
345:19 347:7
356:9 363:21,22
364:3,9 379:1
445:16
**lookout** 463:18
**looks** 263:20
304:23 305:3
341:2 453:16
**lose** 170:5
**losing** 325:17
**loss** 178:15 287:17
348:12 349:7
**lost** 95:22 297:11
**lot** 24:3 36:9 56:6
56:7 96:12 104:4
105:9 108:2 143:3
143:11 144:7
148:7,10 165:11
252:4 298:21
346:12 351:21
380:21,22 412:11
**low** 120:9 206:19
218:8 219:5

222:14,17,21
270:15 285:5
287:23 288:6
295:21 310:8
327:1 329:13,14
381:19 482:5
484:9,13
**lower** 309:8
314:18,19,19
354:2 358:12
414:2
**lowest** 252:11,17
283:7 284:9
323:13,15 482:19
**lpa** 1:7 10:2
**luminaries** 310:19
**lump** 156:6
**lunch** 97:15 255:2
**lupron** 201:5,13
201:15 202:6
205:11

**m**

**m** 16:16 20:23
360:10 422:5
445:6
**m.d.** 1:20 9:10
11:5 57:4 58:2,9
60:11 493:5 494:2
494:24 495:2,4,12
**madison** 138:12
138:18,19,21
139:7 140:10
**mail** 59:1,3,4
98:11,16
**main** 23:22 338:21
455:15
**maintain** 24:7
195:7 234:2
236:23 455:3
**maintained** 21:2

**maintaining** 23:23
24:9
**major** 40:2,16
95:11 210:22
215:10 478:8
487:2
**majority** 330:17
335:19 456:23
**maker** 131:3
**making** 6:21 45:16
53:23 121:11
131:20 177:9
236:8 248:19
250:12 261:18
275:9 356:3 357:5
360:21 380:8
381:9 382:3
398:15 444:12
452:5 470:6 485:1
487:8 488:6
**male** 6:12 148:15
322:23 323:3
341:22 348:13
349:9 390:7,8
456:3 457:16
488:7
**males** 488:10,11
**malignancies**
479:3 481:4
**malignancy**
144:10
**malignant** 44:17
**malleable** 336:19
**malpractice** 66:23
316:2
**man** 71:9 95:21
456:14
**man's** 71:20
**manage** 53:8
67:10 112:14
145:14,19

**manageable** 310:8
**management**
145:22 147:4
213:11 272:20
473:11,12,13
479:2
**managerial**
432:17
**managers** 54:2
**managing** 53:16
178:18,18,19
**mandate** 27:22
**mandatory** 173:3
**manipulated**
367:15 368:1
370:10,20
**manner** 234:8,23
**manufacturer**
264:7
**march** 377:13
379:6 380:18
381:9 424:8
**marginal** 267:10
**mark** 67:7 72:2
381:1
**marked** 4:12 12:6
27:9 34:7 37:23
55:9 62:19 108:7
116:2 127:17
171:7 223:18
230:14 232:23
239:16 256:15
263:10 299:15
326:2 339:18
355:18 361:11
375:16 388:20
394:9 396:20
411:4 414:22
419:17 427:1
430:9 434:10
451:5 463:5

**market** 229:1
267:7
**marketed** 5:18
221:7 233:14
234:7
**marketing** 225:13
**marks** 21:12
**maryland** 474:13
**masculine** 130:16
**masculinization**
167:8 175:5
**massive** 60:1
217:15 477:5
478:5
**mastectomy** 134:7
480:16
**match** 334:2
**matched** 378:16
**material** 131:13
**materials** 275:23
331:22
**matter** 9:21 10:19
16:9 34:22 88:19
96:13 105:3
117:21 208:12
**matters** 68:12
83:21 473:2
**matured** 249:22
317:12
**maxwell** 1:9
**mccaleb** 80:11
**mcdermott** 2:7
10:15
**mchugh** 16:15
19:11 58:9,11
78:6 85:20
**mchugh's** 18:8,11
**mckeown** 444:21
445:14
**md** 22:18

**mean** 66:8 88:19
92:19 179:23
217:18 225:20,23
230:6 236:14,16
242:21 251:8
266:18 336:22
355:1 358:21
459:8 461:6
**meaning** 122:10
122:13 403:14,15
432:13,15 459:18
**meaningless**
404:12
**means** 29:5,18
30:21 117:1 173:2
173:6 228:13
242:23 440:6
447:9 462:4,10
466:22 492:6
**meant** 50:23
**measure** 63:22
235:10 331:19
**measured** 328:23
334:12
**measures** 331:13
332:12 333:2
334:13
**measuring** 300:16
332:1 333:13,18
334:4
**mechanism** 195:2
372:22
**media** 9:18 79:3,7
166:16,20 254:15
254:19 320:2,6
367:16 368:21
373:1,2 388:7,11
470:12,16 491:9
**median** 347:9
**medic** 240:11
438:1

**medical**  5:19 7:5
  8:6,9 13:3 39:5
  40:2,16 41:3,17
  42:6,16 43:22
  45:14 46:23 52:1
  54:2,10 64:23
  65:8,15 86:13,19
  86:21 104:14
  112:8 114:1
  115:18 122:5
  128:19 129:4
  144:16 159:15
  161:18 194:14
  208:9,21 215:14
  223:6,8 225:11
  226:14 228:10,20
  231:19 233:15
  234:2 248:3
  271:21 272:19
  274:20 280:10
  296:7 327:14
  342:6 363:19
  369:13 373:20
  376:12 378:20
  379:3,5 380:16
  384:7 385:5,8
  386:13,19 402:1
  402:19 406:5
  410:7 418:16,23
  419:10 421:3
  422:16 424:16,17
  430:13 432:17
  434:19 436:13,14
  436:17,17 438:23
  444:11 447:15,18
  448:2 449:19
  450:3,5 459:5,9,20
  469:22 470:7
  473:7 474:21
  479:14 482:4
  483:4 485:1,16,19
  485:20 486:3
  487:15,21 488:5
**medically**  40:5,19
  41:19 44:2 103:8
  105:13 107:13,20
  111:7,19 112:5
  113:9,20 114:10
  144:5 231:12
  232:1 374:5,11,12
  374:18 375:2,8
  383:9 384:6,23
  385:14 387:4,7,15
  387:17 388:1
  422:6,7,15 423:7
  424:11 425:18
  426:15 427:19
  428:2,6,14,22
  429:9,21 430:23
  431:17,20 432:8
  432:13,14,18,21
  433:4,20 435:17
  435:23 436:11,19
  438:1,15,20
  473:17
**medication**  6:1
  235:8 256:20
  258:5
**medications**  63:13
  145:18 220:16
  240:11 253:2
  258:4 437:15
  438:1 484:9,14
**medicine**  64:18
  79:22 81:2 82:4
  89:6 132:11
  151:22 234:9
  249:1 412:17
  444:18 454:6
  460:9,15 469:16
**medicines**  226:11

**mediterranean**
  474:11
**meet**  14:7 95:6
  163:7 387:9,11
  417:20 428:16
  429:1
**meeting**  84:15,17
  84:21 85:10,11,14
  85:18 86:1,5,6,8
  89:1 90:14 91:6
  91:10,15 93:3,10
  93:21 94:9,15
  95:1,2,3 96:2,16
  97:1,8,11,20 98:4
  103:18 222:9
**meetings**  14:13
  80:1 84:1,3,6 98:5
  102:9 153:4,10
  165:10 188:5,10
  192:6,13 200:1,8
  418:7,13,15,19
  419:2,6,12
**member**  45:2
  46:22 48:11 49:8
  65:7 99:19 100:4
  101:12 169:17,18
  171:19 190:8
  296:23
**members**  48:18
  93:23 102:14,15
  103:7 105:18,21
  169:13 170:14
  171:1 172:11,21
  173:9 180:22
  181:10 189:4
  190:21 193:2,7
  194:15 296:14
  297:3 365:1
**membership**
  45:17,22 46:4,14
  99:20 100:3,9,11

  100:12,22 101:1,3
  101:22 102:4
  108:3 177:12
**memorable**  478:3
**memory**  56:9
  332:8 400:8
**men**  67:9 214:6
**mental**  40:7 65:11
  66:4 74:17 75:9
  75:14,18,22
  111:13 149:15
  153:20 154:1,12
  155:8,12,14 157:7
  157:10 418:8
  486:18
**mention**  66:23
  68:18 118:9
  335:23 412:10
**mentioned**  14:1
  15:15 20:10 72:9
  97:18 213:21
  219:22 290:21
  393:23
**mentioning**
  335:17
**merely**  46:19
  283:19 307:11
  338:12 343:15
**merited**  293:7
**message**  163:11
**met**  14:2 17:1,6
  85:15,19 94:23
  95:1 96:1 292:11
  356:22 385:2
  386:23 401:15
  427:20 435:15
**meta**  307:19
**metaanalyses**
  302:18
**meter**  86:10

methodo  120:6
methodological
  482:6
methodologically
  120:7
methodology
  309:11 352:4
methods  257:7
  276:1 331:22
  411:18
metoidioplasty
  168:4 175:16
  316:8 478:16
metric  301:8,10
  331:18
metrics  331:1
mi  476:12
microvascular
  178:2 475:5
  476:12
mid  161:8 310:14
middle  1:2 9:23
  27:16 224:16
midwest  95:12
military  136:22
  137:2,5,11,17,22
  474:2 476:4,6
  477:8
milton  106:8
  125:7
mind  184:23
  439:14
mine  67:7 87:21
minimum  245:15
  401:15
minor  407:1
  445:20,22 449:6
minors  4:22 7:13
  40:5 54:11 55:14
  57:12 63:2,14
  78:19 84:23 405:8

406:13
minus  44:10
minute  27:7 115:8
  210:21 272:4
  397:1 471:19
misconduct  118:5
  118:17 120:12
  121:7 126:12
  127:6
misdiagnosed
  328:20
misdiagnosis
  328:23 329:19
misgender  448:7
  449:3
misgendering
  447:5,9 448:17,21
  488:1
misinforming
  487:19
misinterpreted
  276:20 277:3
mislead  172:20
misleading  172:14
  172:20
misrepresentation
  60:1
misrepresents
  30:14
missing  273:16
  340:3 346:4
mississippi  111:2
missouri  111:2
mistake  128:10
  138:20
misunderstanding
  44:7 45:12
misunderstood
  293:3
model  135:11
  439:3

modeled  368:21
modeling  367:16
  373:3
moderate  265:9
  266:5 267:17
modern  149:9
modification
  71:10 75:2 130:11
modified  134:7
  236:10
modify  66:14,22
mohs  143:4
mol  86:7
moment  91:12
  111:22 264:3
  273:14 340:22
  384:10
moment's  92:4
momentarily
  339:23
moments  467:12
money  24:6 386:6
  386:8
monitor  437:16
monitored  211:11
  211:16,17,18
  213:5,17
monitoring  211:20
  217:23
montana  111:1
month  25:7 84:12
  141:15
monthly  296:10
months  110:6
  141:22 166:1
  325:10 351:21
moody  38:4
moral  81:5,12,12
  82:18,19,23 92:10
  151:22 464:22
  466:3,14 467:5

morally  467:8,11
morbidities
  393:20
morbidity  392:18
  393:1
morning  9:15
  11:10,11 97:15
morph  88:5
mortality  334:20
  392:18 393:2
mother  93:22
motivated  398:2
motivators  67:17
move  186:21
  194:21 319:20
  347:15 370:4
  464:8
moved  256:1
  262:17
movement  467:16
  473:3
movements
  317:11
moving  54:6
  114:19 207:6
  471:8
mucocele  133:12
  133:14,14
mucosal  478:17
multidisciplinary
  149:11 150:4,14
multiple  308:21
  335:18 469:12
murky  97:2
  101:20
muscle  265:11
  266:15,19 267:18
  483:9,9,15
muscles  263:3
  266:13,14,15
  267:1,1

**mute** 105:17 471:7
**mutilation** 60:5,17
  60:22
**mwe.com** 2:10

**n**

**n** 2:1 4:1 16:21
  33:2 202:16 203:8
  277:14 356:2
  389:13 414:15
  425:7 445:6
  446:12,12
**name** 10:5,17
  11:12 30:3 57:16
  57:18,19 58:1,8
  68:5 80:6 86:9
  87:5 91:19,21
  92:2 94:21 95:5
  96:1,3 138:13,15
  201:4,11 203:5,9
  389:4 449:2
**names** 56:10 92:3
  106:9 122:1 201:9
  201:13 440:19
  446:9 449:22
**naming** 185:6
  450:6
**nation** 312:20
**national** 21:3
  35:15 395:4
**natural** 119:23
**nature** 56:13
  88:20 159:2,10
  168:23 243:19
  249:15 324:7
  334:21 369:12
  373:9 444:8,8
  452:17 458:22,23
  459:3 460:12
  476:4
**nausea** 226:11

**naval** 473:23
**navy** 130:20
  139:19 472:18
  475:13 476:9
**nc** 7:5
**near** 59:15 377:11
  394:16 421:21
**nearly** 107:2
  336:16 358:7
**nebraska** 138:15
**necessarily** 234:18
  236:16,20 242:20
  286:7 464:1
**necessary** 24:8
  40:6,19 103:9
  105:13 107:13,21
  111:7 113:9,20
  114:10 285:11
  310:4 374:5,11,13
  374:18 375:3,8
  383:9 385:1,15
  387:4,8,15,18
  388:2 422:7,7,16
  423:7 424:11
  425:19 426:16
  427:19 428:2,6,15
  428:23 429:10,21
  430:23 431:17,20
  432:8,13,15,19,21
  433:4,20 435:18
  435:23 436:11,20
  438:2,15,20 495:6
**necessities** 423:14
**necessity** 49:15
  114:2 115:18
  199:8 236:8,18
  237:14 385:6
  386:13 421:4
  422:16 449:18
**neck** 156:6 292:5
  292:11 468:2

**necrosis** 178:16
**need** 36:7 90:14
  106:12 126:16,17
  134:8 143:14
  290:14 292:17
  310:5 358:18,20
  363:1 458:16
**needed** 142:22
  143:14 195:3
  212:20 414:5
**needs** 363:5
**neither** 253:2
  404:9 409:23
  492:15
**netherlands**
  342:16 343:3
**network** 373:1
**networks** 368:20
  369:20 371:23
**neurologic** 121:21
**neurophysiologi...**
  317:10
**neurosurgical**
  272:17
**neurotized** 468:3
  476:12
**never** 16:18 17:6
  45:1,4 91:11,12
  148:6 149:2 150:3
  150:22 151:1
  152:2,6,20 153:3,9
  157:17,22 167:3
  167:10,16,23
  168:3,7,11 169:1
  170:1 176:1
  178:21,23 182:3
  183:15,17,19,21
  183:23 197:5,8
  201:15,17,18
  204:16 207:11,15
  214:10 233:11

  272:9 273:23
  274:4 278:1,4
  284:23 306:23
  310:3,3 402:18
  418:3 447:3
  467:17 468:4
**new** 2:9,9,21,21
  105:20,22,23
  111:1 228:23
  234:10 235:7
  262:17 284:20
  289:15 295:1
  296:14 368:9,11
  369:8,21 382:18
  394:19 419:14
  457:4
**newer** 311:19,20
**nice** 237:23
**night** 15:4
**nine** 184:23
**nineteen** 32:6
**ninety** 262:18
**nobody's** 322:14
**nodule** 156:9,12
**non** 348:4 349:2
  351:14,16 402:13
  415:13
**noncontrolled**
  416:3
**nonexperimental**
  286:6 288:12,21
  293:12 428:3
**nonresponsive**
  186:22
**nonsatisfaction**
  331:20
**nonsurgical** 144:7
**normal** 71:18
  114:20 205:19
  212:3 460:1

**normalizing** 460:3
**north** 1:2 3:12,13
  9:23 10:19,22
  11:1 375:20 376:8
  379:15,19 420:14
  424:8 425:5
  474:12
**northwest** 62:8
**nose** 71:10,13
**notary** 9:2,3
  495:13,19
**note** 303:16
  351:18 358:3,6
  392:6 473:19
  493:10
**noted** 56:21 120:9
  371:14 495:7
**notice** 92:4 224:22
**noticed** 338:7
**notices** 224:10
**notify** 30:15
**november** 5:12
  25:9 224:14
**number** 6:16
  17:11 61:18 103:3
  120:22 121:2,3
  125:17 147:13
  160:4 164:2 173:9
  184:22 197:23
  213:4 241:7 246:8
  255:8 283:7 285:7
  320:18 321:3,10
  321:20 322:4
  328:7 330:2 331:4
  331:5 352:11,16
  352:22 354:8,10
  354:13 358:15
  360:14 366:22
  367:5,13,22 370:8
  375:10 377:19
  401:21 405:11

  431:12 448:5
  485:14
**numbered** 171:23
**numbers** 259:12
  303:15 328:11,13
  342:23 368:4
**numerous** 229:14
**nyu** 306:11

**o**

**o** 203:4,8 277:14
  277:14 322:18
  356:2 360:9,9,10
  414:15 445:6
  446:12
**oath** 254:23
**object** 44:5 119:4
  253:17
**objection** 21:14,20
  22:5,12 26:6,21
  28:13 29:7,15,19
  30:1,22 31:4
  32:14,21 36:13
  37:2,5 39:18
  40:21 41:21 42:12
  47:6,16 48:7
  49:23 50:6 51:15
  52:6,14,19 53:1
  54:13 55:3 57:14
  58:17 62:1 65:17
  65:20 73:14 74:19
  76:18 77:13 78:8
  78:20 80:2 81:8
  81:12 83:6,15
  88:17 89:3 90:17
  91:16 92:17 96:18
  97:12,23 98:8
  99:8 102:12
  103:10 107:22
  110:3 111:20
  112:23 113:21
  114:11 117:3,10

  117:18 118:6,20
  120:20 126:13
  127:7 128:15
  135:18 136:18
  137:13 148:2
  149:14,18 151:14
  154:3 155:16
  157:12 158:7,11
  162:17 163:2,14
  166:12 173:5
  175:1,7,12,14,17
  175:23 176:11
  179:5,10,18 180:9
  180:16 181:2,13
  184:20 186:19
  187:4,14,20
  188:12 190:18,23
  191:4,10,15,21
  192:3,10,23 193:6
  193:9,17 198:9,23
  199:15,21 200:5
  200:10,16 204:14
  204:22 206:7
  207:16,21 208:18
  211:13 212:5,21
  215:3 216:1 217:3
  217:8 222:5
  225:22 226:19
  227:19 228:15
  229:22 232:7
  234:20 236:6
  237:6 238:4,9
  239:11 240:19
  242:4,12 243:13
  244:6 245:11,17
  251:4 252:7 259:2
  266:7 267:21
  269:1,7 270:6,12
  273:10 274:9
  275:14 280:22
  281:1 285:16

  286:20 288:15
  293:13 294:20
  295:12,18 297:19
  298:5,14 303:9
  305:11 307:6
  308:1 311:18
  318:4 324:2
  333:15 342:20
  352:7 357:23
  359:2 362:3,19
  364:7 371:8 374:8
  376:10 381:11
  383:2 385:17
  387:6,16 395:13
  399:22 406:15
  407:6 408:14
  409:10,16,22
  410:13 412:14
  413:20 416:1,6
  424:5,12,23
  425:20 426:3,17
  428:4 429:3,11,22
  431:19 432:10
  436:1 438:4,17
  439:7 440:14,17
  441:10 442:16
  443:15,21 446:19
  447:1,12 448:19
  449:10 451:19
  453:21 454:12,18
  455:12 458:2
  459:11 460:20
  461:18 462:6,12
  465:6 469:8
**objections** 81:5,13
  95:17 126:17,18
  160:14
**objective** 81:13,22
  82:8,19,22 257:1
  331:8 334:13
  336:6 409:14

Case 1:19-cv-00272-LCB-LPA   Document 209-3   Filed 02/02/22   Page 540 of 577

436:16 444:14
447:16 448:2
449:18 460:11
486:5
**objectively** 71:17
436:7
**obligation** 288:2
**obliged** 447:16
**obliges** 468:6
**observable** 317:3
**observational**
258:6 411:20
413:14 414:6
**observations**
229:3
**obtain** 149:3
**obtainable** 309:11
**obtaining** 119:7
402:17
**obviate** 199:4
**obvious** 75:3
310:1 317:14,19
**obviously** 131:2
235:16 238:7
244:3 273:3
309:21 310:2
322:3 323:7 362:1
379:10,13 418:6
**occasion** 144:23
211:5
**occasions** 229:14
**occur** 136:3
**occurring** 335:16
492:12
**october** 264:17
266:6 267:19
493:3
**offending** 449:22
**offer** 12:10 65:16
66:11,21 72:4,5
176:18 177:19,20

181:5 205:22,23
208:23 488:13
**offered** 35:9 39:12
39:16 67:6 68:17
77:6 89:9,11
112:17 140:15
159:8 238:12,16
238:18,22
**offering** 34:17,18
36:10,11 39:22
40:12 42:11,20
88:15 107:6 114:7
118:12 122:14
123:10 130:14
140:20 150:11,15
154:23 159:17
176:7 179:2,9,17
180:7,22 181:10
204:9 285:23
322:3 398:21
447:15
**offers** 454:8
**office** 3:5 138:11
138:18,19,21,22
138:23 140:10,13
142:7,13 159:6
211:5 472:17
473:1
**official** 224:7
230:18 232:18
296:4
**oftentimes** 132:13
149:21 245:23
249:14 479:1
**ogonzalez** 2:22
**oh** 19:13 80:22
95:3 108:22,22
135:4 146:12
170:9 171:23
202:17,22 212:6
268:10 269:14,20

288:16 292:20
293:2 340:1
397:15 420:4
421:15 434:13
445:16 446:10
471:11
**ohio** 96:7
**okay** 12:8 14:5
16:3 17:23 18:17
19:6 21:17 22:14
26:10 27:5 31:1,6
31:10 36:1 37:20
38:3 39:2 43:7,9
43:11 56:18 57:2
62:12,17 63:10
64:5,15 78:16
80:15 93:2 97:6
98:5,21 99:15
102:7 108:9,9
109:11 111:4,22
114:15 116:18
119:17 126:22
133:19 135:4,13
136:20 143:13,18
143:19,23 144:21
145:7 146:14
147:3,14 149:9
151:3 154:9 155:3
165:6 166:6,13
170:17 171:6,9,11
173:2 174:2,4,10
174:12,16 179:23
185:2 189:6,14
197:2 199:10
201:1 202:8 203:7
207:10 212:15
213:15,21 215:17
220:10 221:2
223:11,13,15,20
225:3 230:10,16
231:3 233:12,18

239:13,18 240:7
241:1,11 242:14
242:17 248:9,11
248:15,17 252:23
254:7 256:5
257:18 259:13
261:18 264:11,21
269:14,17 272:6
273:23 277:19
278:16 279:19,21
279:21 285:10
288:16 289:2
294:15 295:23
299:17 302:5,6
303:22 304:8
307:14 308:5,7
315:9 316:17
318:6,19,21
320:10,12,17
323:6 325:3,15,21
325:22 326:4,4,5,8
326:19 330:12,15
332:9,11,16
335:13 339:12
340:6,8,22 341:11
344:10,23 345:3,3
347:16,21 349:10
349:14,21 350:15
350:20 353:12,15
354:11 355:17,20
355:22 359:8,10
359:23 360:2
361:2,3,9,13
364:14 367:6,7,9
372:17 373:12
375:12,13,18,19
377:9 378:5
383:12,12,18
384:9,13,17 386:8
388:5,16,18,22,23
389:11,14 391:21

393:22 394:5,11
394:15 396:7,14
396:22 397:2,3,7
397:15,16 399:5
399:11,12,14
400:15 401:5,7
404:20 405:1,6,13
405:13 408:5,5,16
410:21 411:6,6,7
414:18 415:1,2,7
415:10 419:14,16
419:21 420:7,10
420:10,17 421:2,8
421:19 422:13
423:4 425:4 426:6
426:12,22 427:3
428:8,9,11,21
429:14 430:5,11
430:11 433:2
434:14,16 435:7
435:13,21 437:6
440:1,2 441:1,1
442:4 445:7,17
446:5 450:12
451:7,9 452:21
453:11 455:18,20
455:22 459:1,13
460:23,23 463:3
464:12 465:9,22
466:1 468:19,21
469:10 470:8
471:1 472:1,13
474:3 479:21
480:1 488:17
489:8,12 490:21
490:23
**oklahoma** 111:1
**old** 7:20 67:8
342:22 344:6
380:11,19 381:5
411:10

**older** 196:18
**oldest** 134:11
**omar** 2:18
**once** 225:12 231:9
288:21
**one's** 69:6 133:10
233:13 340:3
**ones** 13:5,21 142:6
**ongoing** 69:5,8
**online** 296:12
297:8 364:10
368:20,21 369:20
408:9 453:16
**onset** 394:23,23
405:16
**op** 76:3,15
**open** 12:4 105:20
106:1 355:17
**opening** 138:7
171:10
**operate** 130:9
138:6
**operated** 138:3
**operating** 123:21
**operation** 8:15
106:13 123:11
148:10,12,17
176:19 178:21
289:20 293:7
299:1 334:1
464:15 467:16
478:13
**operations** 60:2
122:3 168:23
169:3 177:5,7,15
178:7,13,14 292:9
312:17 467:4
476:13,17 477:5
478:12,16,18
479:8,14,17,19
480:19

**operatory** 140:9
**opinion** 13:22 35:8
42:4 44:11 45:10
67:23 81:1 88:20
88:21 95:23
117:20,20 120:15
126:9 127:2
176:13,17 177:17
177:20 183:21
194:14 217:11,14
238:22 243:20
249:6 259:14
260:19 261:11
275:1,4 289:4
374:3,15,23 375:5
395:9 410:2 443:5
443:5 444:14,18
481:13,17 482:3,7
482:10,14
**opinions** 12:10
22:9 34:16,18
35:21 36:3,9,11
39:11,15,21 40:11
42:9,19 44:8,12
45:21 65:16 78:17
88:15 111:18
112:17,21 114:6
118:11 124:3
170:19,22 176:7
177:21 179:3,9,17
181:11 196:23
204:10 221:15
222:1 232:11
238:13 239:3
259:5 322:4
343:18 395:6
409:21 449:19,20
483:1
**oppose** 117:5
**opposed** 136:1

**opposing** 116:19
**optional** 173:3
**options** 153:12
165:23
**oral** 9:11 476:22
**order** 4:16 15:15
24:2 37:15 38:4
40:16 60:6 66:15
100:4 129:19
155:21 195:5
199:3 209:3 218:5
287:7,21 288:11
292:3 294:4 347:5
401:12 417:2
457:5 460:2
**ordinary** 145:22
**organization**
42:16,22 79:10
83:4,8 102:11,20
103:12 104:11
107:18,19 111:17
118:1 177:14
179:14,15 207:7
371:15 454:8
**organizations** 41:4
41:17 42:3,7
43:22 47:10 49:19
49:21 53:15 54:21
83:20 112:2,18
481:9
**organized** 84:4
**organs** 120:1
**orgasmic** 333:3
**origin** 369:15
**original** 129:14
135:15 136:2,17
197:13 200:14
227:16 323:3
338:11
**originally** 23:3
69:7

**originated** 19:22
19:23
**orthopedic** 291:17
291:22 292:4,10
**orthopedics**
460:15
**outbreaks** 368:19
368:23 369:21
**outcome** 287:10
399:10 480:20
**outcomes** 7:18
89:10 90:10
287:20 326:23
332:11 334:21
398:10 404:8
411:8 413:13
**outer** 129:21
**outlaw** 63:13
**outright** 44:22
**outside** 52:22
61:20 69:15 74:13
75:10 86:3 152:17
155:20 156:16
187:8 198:12,14
198:19 199:4,9
204:11 208:10
215:23 216:14
226:16 271:3
278:16 279:12
353:1,4,9 418:23
419:10 441:22
**outward** 67:23
271:15,22 309:18
**overall** 82:5 92:6
111:13 255:6
258:12 321:19
326:23 333:5
**overlap** 34:16,23
36:9
**overlooked** 134:22
377:20

**overreaching**
105:15
**overrepresentation**
67:13
**oversight** 221:12
**overview** 441:7
**overwhelm** 210:19
**overwhelming**
241:6

## p

**p** 2:1,1 20:23
55:20,20,20
182:13 203:4
340:15 360:9,10
**p.m.** 254:16,20
320:3,7 388:8,12
417:12,15 470:13
470:17 472:7
491:10,15
**pablo** 360:7
**pace** 54:6
**package** 202:1,2,6
206:2 209:6,8
210:14,16 215:11
**packet** 77:8,12
**pagan** 2:18,22
**page** 4:3 22:14
25:23 27:13,14,16
28:16 29:8 30:12
31:9 34:11 35:1
35:11 36:1 38:21
40:23 41:14 43:10
56:15,19 57:1,3,17
58:1 59:14 64:4
64:14 108:10
110:4 111:7 115:4
119:18 127:19
128:7,17,18,22
143:17 158:13,15
171:21,22 172:2,3
174:3 224:16

225:2 231:2 240:6
242:13 248:13
252:22 264:10,20
279:20 300:2
302:5 308:5
320:11 322:16
326:11,14 330:10
330:10,14 332:15
332:17,21 337:2,5
337:6 341:17
347:19 349:15,17
349:18,19 359:13
364:13 367:8,11
373:13 375:19
378:5,14,15,15
382:11 383:10,11
383:12,14 384:9
384:16,18 391:13
394:13 397:6,11
397:12,13,14,16
399:11,13,13
401:5,6,6 405:2,7
407:8 410:9
411:16 413:6
415:6 419:19,21
420:5 421:7,12,13
421:17,18 422:11
422:12 428:8,10
430:21 435:9,12
437:5 440:1 445:2
445:11,13,19
446:2,8 451:8
452:19,20 453:3
453:10 455:18
465:8,23 494:4,7
494:10,13,16,19
**pages** 36:6
**pain** 292:5,11
**pancreatitis**
134:14 135:10

**panel** 378:17
380:15
**panels** 218:11
**paper** 130:8,18
131:22 132:2,17
134:23 135:10
306:12 355:15,15
371:21 439:13
**papers** 72:21 74:4
185:7 305:21
337:20
**paragraph** 27:20
35:12,15 38:8
39:1,4 41:1 43:12
59:23 63:10 64:6
64:16 65:6 108:20
110:5 116:6
119:21 158:16
172:10 225:9
233:19 242:16
252:21 264:22
265:5 308:9
320:13 359:17
364:15 367:10
391:20 428:12
429:7 430:22
435:14 437:11
445:13 465:23
**paragraphs**
468:18
**parent** 409:6
**parental** 367:17
**parentheses**
320:21
**parents** 97:19
160:7,23 162:1,3,7
163:5,18 165:5,20
166:7 209:2 402:2
402:22 403:3,9
404:17

**part** 27:2 37:14
44:6 50:13 67:19
87:23 102:7,13,23
112:11 120:4
150:4 174:16
183:13,15,17
185:4 187:3,13,18
188:13 191:13
192:21 194:11
195:6 197:2,5
199:12 235:6
272:21 274:11
275:15,22 328:4
342:5 363:20,20
370:22,22 372:17
403:14 404:11
423:5 453:17
473:10,11,12
**participant** 315:17
**participants** 92:21
96:15 273:4
**participate** 91:8
150:13
**particular** 27:1
80:6,7 89:11
103:13 105:22
108:20 124:5,5
145:20 160:15,16
168:23 173:16
174:18 177:4
185:6,15 186:4
209:10,11,15,16
210:10,10 212:17
215:8,12 221:7,8
236:10 238:17
243:10 244:10,10
250:20 259:16
260:1,2 263:22
284:15 288:12
293:11 294:14
297:9 309:15

310:9 313:19
321:9,10 332:9
358:12 363:3
366:7 374:13
439:16,18 440:19
440:19 455:5,6
459:17 463:13,15
473:6
**particularly** 51:2
104:19 131:19
142:15 146:18
162:8 249:12
260:16 319:10
328:15 332:4
401:23 403:22
454:23
**particulars** 90:9
99:11
**parties** 199:4
492:16
**parts** 289:21
**party** 195:6
**pass** 76:16
**passed** 54:23
**passing** 52:22
61:20
**pastors** 452:1
**patch** 133:20
136:12
**pathologies** 144:2
144:2,7,8 145:2,8
146:9
**pathologize**
194:11,22 195:7
**pathology** 156:15
194:20
**patient** 6:22 12:19
13:2 60:4 61:4
68:8 70:13 71:16
74:23 82:22
112:12 120:13

123:12 124:10
130:23 145:6
149:2,22 150:5,22
151:1 152:3,6,14
153:5,6,10 154:9
154:11 155:4
156:17 157:1,6
160:16 162:2
167:5,11,17,21
168:1,5,9 175:22
194:18 207:14
208:6 209:11
210:9,19,20,23
215:13 217:7,19
217:20,22 225:15
231:13 241:13
246:4 248:22
257:21 258:11
261:6 271:16,23
280:1,7,14 285:19
285:20 286:13
287:6,6,19 288:2
290:2,4,5 295:4
309:22 310:7
311:2,4 312:23
314:8,11,16 315:4
315:11,12 317:5
323:17,22 328:6
330:1,4 333:7
353:1,9,20 355:7
355:10 356:4,13
356:21 357:3,9
359:7 374:14
447:20 448:1
478:3 482:23
484:10,16 485:4
486:11 487:3
488:3
**patient's** 253:9,14
310:18 467:17
486:6 487:19

**patients** 51:5 67:1
67:14 68:15,18,22
80:18 81:3 111:10
120:4 131:12
136:21 137:19
142:22 143:5
145:1,10,11,23
146:2,7,7,21
147:11,16,17,20
148:20 150:11
154:21 155:12
162:13 168:13,18
169:1 179:2 195:3
204:20,23 207:19
208:13 209:21
211:9,20 212:13
212:16 213:6,11
213:17 214:15,22
214:23 226:6
232:1 237:3
249:13 251:21
257:4 258:12
260:2,18,21
261:13 283:15
286:1 313:8 314:6
316:18 320:19
321:3,17,20
322:23 326:22
328:2,7,12,14,20
330:18 331:15
335:15,19 336:16
337:8,16,23 341:9
343:2 350:17
351:10 352:12,14
352:21 357:17,21
358:23 360:14
363:8,10 367:13
368:11 369:1,6,22
372:12,14 389:23
390:14,19 391:2,7
404:4 407:1 448:3

448:6 450:1
457:23 473:3
474:19 485:15
486:16
**patrick** 1:20 9:10
9:19 11:5,14
22:18 34:12 57:4
60:11 64:9 464:19
491:12 493:5
494:2,24 495:2,4
495:12
**pattern** 134:21
**patterns** 6:2
256:21
**paul** 57:20 58:8
87:10
**pay** 195:6 297:9
297:13 379:11
387:10,11
**payers** 195:6
**paying** 385:23
386:7
**pdf** 330:10 332:17
397:13 399:13
401:5 405:2
419:19,21 421:7
421:13 422:11
**peace** 66:16
**peculiar** 178:10
210:23
**pediatric** 43:1,1
45:15 48:10,15,19
51:5 86:8 133:12
249:2,12 250:20
251:21 252:4
255:17 400:1
474:18
**pediatricians** 43:2
203:23 277:2
**pediatrics** 5:21 6:3
239:1,23 241:8

255:14 256:21
258:17
**peer** 20:18 128:18
129:4,14 187:11
274:1 296:7,18
331:12 361:23
362:6 364:3
367:15,21 368:19
368:20 369:19
370:7,17 373:1,2
407:20 408:7
485:13
**peers** 287:3 317:8
317:16
**penalties** 109:17
**pending** 33:5
261:15
**penis** 478:8
**peop** 474:18
**people** 7:21 20:15
40:7 53:9 56:7,11
64:19 65:1 66:14
74:8,9 85:23
90:21 91:2,6
93:18 94:14 119:8
122:11 124:18,22
125:13,15 145:14
145:21 146:3
148:18 151:17
154:15 155:21
160:12,18 162:4
182:17 188:23
189:4 194:7
195:11 197:20
220:14 276:22
306:1 321:16
329:10 341:21
342:6 343:11
344:12 350:14
355:11 365:6,12
365:15 366:12,13

366:14,23 367:5
367:22 368:20
370:8,18 411:10
438:9 443:17
449:3,3,22 450:7
452:22 454:15
455:7 456:23
457:6,13 458:9
463:14 464:4
473:18 474:17
**percent** 102:22
161:9,19 255:10
255:10,11 258:12
258:19 297:16
298:1,1,9,19
299:10 302:21
303:3,13 304:12
304:22 307:21
308:3 342:15
344:18 352:6
354:16,16 367:12
369:8 372:12,14
**percentage** 161:12
298:11 302:9
320:19 321:3,20
322:5 329:10
344:12 367:13
370:18 485:15
486:16
**percentages** 303:3
**perception** 112:11
**perceptions**
486:20
**perfect** 256:11
**perfectly** 120:1
**perform** 103:7
105:19 277:21
294:17 295:10,15
315:2
**performed** 24:20
55:14 117:16

141:11,19 142:4
147:17,20,23
167:3,10,16,20,23
168:3,7,12 169:1
173:16 174:20
175:4,20 176:1,4
290:20 300:12
356:12 358:14
477:12 479:18
**performing** 25:8
81:6 120:19
126:10 127:3
140:4 168:17
**performs** 315:10
**perineal** 476:15
479:3
**perineum** 178:3
478:6 479:6
**period** 257:22
300:11 337:10
347:9 403:23
404:2 478:11
**peritoneal** 134:13
135:9
**permanent** 287:14
287:17 311:5
**permanently**
244:19 290:2,7,16
**permissible** 220:8
**permissive** 222:13
**permit** 440:18
**persist** 123:7
400:13
**persistent** 7:21
405:16 411:10
**person** 65:10
70:11,22 75:17
80:7 85:22 148:14
259:17 319:7
347:1 408:19,21
444:8 447:10

448:22 452:18
459:4 460:5,13
477:3
**person's** 60:3
442:13 443:12
446:17,22 447:2
449:1 464:21
**personal** 47:17,19
48:8,22,22 78:17
87:1 93:19 94:4
94:10,12 97:19
124:3 150:8 159:5
209:17 220:21
246:21 275:1
280:13 281:5,11
281:11,15,19
284:17 359:19
360:20
**personally** 47:13
55:22 150:3,21
152:2,20 153:3
175:3,19 176:4
184:3 187:1
190:11 197:12,16
198:5 207:17
208:12 213:16
214:20 272:9,12
274:4 275:5 278:1
278:4,22 284:11
381:23 417:20
418:2 446:16,21
**personnel** 473:11
473:17
**persons** 7:8 66:19
67:20 83:14 93:23
104:17 122:10,12
131:23 132:2,7,13
195:19 245:4
348:17 366:8
383:20 390:5
392:1,8 443:23

454:9 455:1
463:14,20 474:14
476:19 485:22
**perspective** 79:20
82:5 87:2 231:9
283:2
**perspectives** 6:23
356:4
**pertaining** 224:4
473:2
**pertains** 212:10
**pertinent** 12:21
13:19
**ph.d.** 263:22
**phalloplasties**
476:14
**phalloplasty** 315:7
315:11,16 338:22
468:1 478:10,15
**phallus** 339:1
**pharmaceuticals**
484:5
**phase** 235:4
**phases** 94:3
**phenomena** 373:5
**phenomenon**
363:14,15 369:15
371:6 372:10
**philosophy** 459:15
**phrase** 21:10,13
61:9 450:13
457:21
**physical** 40:6 67:4
70:16 317:3 318:3
319:2,12 399:16
**physician** 6:23
30:14 67:10 86:15
119:14 206:1
225:13 253:12
274:17 356:4,14
356:22 357:4

464:22 483:5
484:6,7 488:22
**physicians** 67:10
67:14 122:13
132:4 210:17
219:5 229:20
233:20 273:5
277:1 472:22
487:19
**pick** 283:13
**picture** 176:23
**pieces** 110:6
**pin** 25:6
**pitt** 3:11
**pizza** 131:3
**place** 14:11 91:4
**places** 389:18
484:17
**placing** 235:13
295:4 485:4 488:3
**plaintiff** 9:20
173:17 444:21
445:20,22 446:7
**plaintiffs** 1:10 2:3
4:12 10:16 13:4
17:15 207:23
208:11 417:19,21
418:3,8,19 419:4,7
445:10 448:18
449:6
**plan** 8:2 10:20
11:2 420:13,18
421:7,17,18
422:12 423:1,6,15
423:19 424:3
425:1 431:4
437:12
**planned** 229:5
**planning** 134:9
204:9 467:15
480:16 481:3

**plans** 394:22
**plastic** 5:9 6:7
8:14 22:21 23:2,4
23:13,15 25:3,3,13
25:17 26:2,14,17
27:14 28:10 31:6
32:9 44:13,19
45:3 46:2 47:8
64:10 66:9,18,20
66:21 67:9,15
68:3,10 69:7,16
72:4 73:2 79:20
90:6 95:4,7,11
96:12 99:17 100:5
100:17,19 102:20
102:22 103:19
106:9 108:11
111:9 120:18,23
122:20 123:16,20
123:23 128:8,13
134:8 138:10,11
138:17 139:6
140:5 149:21
154:16,20 155:19
159:3,18 160:13
169:7 171:13
189:3 198:17
274:16 282:4
283:5,9 293:5
294:16,21 295:9
295:14 299:20
300:6,18 306:10
306:12 310:23
311:13 332:5
436:14 464:14
466:4,16,21 467:1
467:11 468:14
472:16,23 473:22
474:5 475:12,16
477:21 480:15
488:23

plastics 262:12
296:1 300:9
platform 466:18
play 469:4
please 181:6
264:23
pleased 336:14
plus 140:16
161:19 232:5
296:11 307:20
443:7 458:8
468:15
point 19:2 25:21
27:3 57:8 122:20
123:16 156:22
185:17 232:12
235:17 247:3,16
264:4 309:15
335:16 360:21
380:5 390:20
403:16 432:2
434:2 456:19
457:2 458:14
460:11 470:5
pointing 349:1
points 215:10
324:6 345:10
389:21 435:8
456:17
policies 430:1
policy 5:5,21 7:6
8:5,7,10 109:12
115:23 137:10
182:6 220:12,23
223:9,12 225:6
229:14 239:19,22
240:1 260:20
261:12 376:12
377:1,6,17 378:10
378:11 379:15
380:5 382:3,13,18

382:23 383:4
384:4,18 386:6,21
424:7 427:4,8,17
428:1 430:4,13,22
431:22 432:6
433:5 434:19
436:5,6 439:16,18
441:9,20,22 473:2
473:5 481:7
political 447:6,7,8
poll 45:6
polled 45:2,4
ponce 2:14
pool 328:1 355:10
365:15
poor 354:20
poorly 186:13
pop 92:2,4 419:15
pops 184:23
population 76:9
120:14 145:6
147:6 249:2,8,20
249:21 250:7,20
252:5 255:6,17
278:10 321:9,11
321:15,19 322:5
341:8 342:16
374:14 391:4,8,10
populations
225:15
portion 17:19 18:5
59:22 97:20,22
98:2 327:10 337:3
portions 15:11
18:21 478:8
portman 53:19
portsmouth
262:13 473:23
position 40:18
41:18 50:16 51:10
51:14,18 53:12

65:2 80:20 81:11
107:11,14,19
111:5 112:3 114:8
115:17 221:17,21
227:17,22 229:19
230:2 231:22
232:4,15,19 239:9
240:16 242:2
260:6 288:11
289:3 429:19
452:3 456:13
472:19 481:7
485:18 486:8
positions 42:2
49:22
positive 80:12
87:8 148:22
positively 107:16
possibilities
210:17
possibility 464:6
possible 20:8
315:2,15 318:1,17
318:17 319:13
322:8 461:10
480:20 484:10
possibly 118:23
132:4 287:1
370:15
post 219:11
362:10,11,14
posts 366:20
postsurgery 347:5
postsurgical
351:20 358:16
postsurgically
345:12
posttest 304:18,19
posttreatment
281:20 282:2,12

potential 57:11
58:16 61:22 70:23
118:5 153:11
204:20 206:20
208:14 209:5
210:4 214:16
215:9 217:15
223:1,2 244:1,18
246:3 285:20
293:17 359:5
400:12 462:10
potentially 75:10
126:11 127:5
215:22 244:19
314:1
pouring 123:4
poverty 90:20
243:16,17,21,23
244:12,16 460:6,6
power 71:2 276:5
ppo 8:2
practice 24:9 25:1
69:6 119:15
137:22 140:9
143:21 148:5
151:22 154:1
189:17 234:8
244:4 249:9 259:1
276:12 402:15
475:18 476:8
477:20
practices 475:22
476:1
practicing 249:1
practitioner 23:22
67:3 206:11 281:6
282:18 484:18
practitioners
53:16 241:15
248:22 249:4

**pre**  219:10 281:19 282:12 304:18
**precautions**  210:13
**precedes**  159:21
**preceding**  446:8
**precisely**  68:4 132:12 228:6 369:17 467:5
**precocious**  162:20 318:16
**predict**  398:9 399:10
**predicted**  324:10
**predominate**  488:9
**prefer**  53:3 54:20
**preference**  53:7 76:13
**premarked**  12:3
**premier**  296:18
**preoperative**  134:9
**preoperatively**  324:10
**prepare**  12:15 14:23 27:1 128:5
**prepared**  11:23 128:2,3 451:10
**preparing**  13:13 14:3 461:13,15 462:17
**prepubertal**  400:2
**prepubescent**  400:5,18,20 401:2
**prerequisite**  100:18
**prescribe**  214:21 216:19,21 220:2 225:14 226:15 229:20 231:11

**prescribed**  201:15 201:18 203:21 204:16 207:13 211:9 214:3,8,10 217:17 245:8 255:11 257:20 258:13,13 259:9 259:23 267:14
**prescribes**  209:20 216:14 234:17
**prescribing**  6:2 208:16 217:12 219:23 234:23 236:4,13 237:4 245:4 251:2 256:20 258:22
**prescription**  203:14 218:19 221:3,13 222:16 251:9 255:3,5
**prescriptions**  258:17
**presence**  363:4
**present**  3:17 81:1 85:10,13,23 89:6 152:15 156:17 182:4 195:13 208:3,16 211:4 306:14 329:1 336:2 343:17 351:11 357:16 367:4 369:4 373:6 406:6 418:6,18 419:6 476:22 486:17
**presenta**  96:16
**presentation**  8:13 87:19,20 88:1,12 88:14,23 90:1

97:8 148:15 450:18,21 451:18 451:21 452:5 455:19
**presentations**  87:14 96:17,21 103:15 104:5 105:22 160:12
**presented**  82:9 259:22 330:1 343:15 482:2 486:15
**presenter**  79:18 82:7
**presenting**  283:18
**presents**  70:14 71:9 75:1 157:6
**press**  463:10
**pressure**  162:4,6 165:12 272:21 367:18 368:2 369:19 370:11,21 371:17 373:2 460:1,3,9
**pressured**  165:13
**pretreatment**  282:2
**pretty**  185:13 205:20 207:6 316:4 342:18
**prevailing**  449:17
**prevalence**  340:10 345:21 357:11
**previous**  182:2
**previously**  140:11 369:23
**primacy**  53:22
**primarily**  291:11
**primary**  386:2
**principle**  223:5 294:21 295:7,8

**printout**  27:12 230:18 464:13
**prior**  265:6 368:13 405:15
**priorities**  5:6 116:1,13,13,14,16 117:5
**prioritizes**  394:20
**private**  143:21 376:7 475:17
**privileged**  189:2
**privileges**  24:2,11 24:14
**privy**  194:9
**probably**  32:15 59:3 71:7 94:17 101:13 105:1,14 143:9 146:12 152:12 156:3 185:17 201:5 202:10,11,14 237:8 259:11 298:8,8 319:16 325:10 327:13 336:20 377:1 379:7 434:1
**problem**  78:1 82:23 112:4,11,15 119:7 123:20 152:22 194:23 291:18 324:4 338:22 352:9 355:9 358:11 363:4,5 370:23 386:1 403:12 447:14 456:22 457:12
**problematic**  144:12 218:3 259:19 260:17 261:10

problems 66:20
  89:16 121:21
  140:2 156:21
  226:12 237:17
  260:21 346:23
  351:10 352:2
  473:7 481:5
procedure 9:5
  141:11 147:23
  148:7 161:18
  173:16 174:18,20
  175:21 271:20
  285:1,2,12 286:3,5
  288:13 289:5
  290:20 291:20
  293:11,23 294:3
  312:11 313:20
  315:3,5,13 334:2
  347:7 351:17
  359:1 387:22
  393:18
procedures 55:13
  104:15 105:12,18
  107:8 119:2
  126:11 127:4
  140:13 141:14,18
  142:13 150:10
  162:23 163:13
  164:15 176:2,5
  177:23 179:1
  286:11 294:17
  295:10,16,21
  309:18 316:5
  339:9 353:21
  383:9 419:5 425:3
  435:16 476:11
  477:13,19 485:17
proceed 10:13
  286:10 311:7
proceeding 492:5

proceedings 9:12
  492:12
procerus 263:3
  266:12,19,23
  267:9
process 48:21
  50:13 82:13
  156:19 184:13
  208:20 235:7
  277:18 307:3
  320:20 321:5,22
  346:7,8 402:5
  403:16 461:8
processes 367:18
produced 188:14
  492:7
produces 206:18
product 45:7,19
  185:11 188:14
  225:12 233:20,23
  234:7 235:2
product's 234:3
  237:1
profession 305:18
professional 42:6
  42:16,22 43:21
  45:6 47:9,10 53:4
  53:15 54:20 65:12
  75:18,22 76:13
  83:3 95:23 104:10
  107:17 109:16
  111:16 112:1,18
  117:23 118:10,18
  124:2 127:6 129:2
  153:23 154:12
  155:8 158:3
  177:14 179:14,15
  181:19 182:9
  199:6 208:21
  241:16 276:9
  301:4 307:8 316:3

  428:17 448:11,11
  479:12 481:8
professionals
  56:21 383:20
  398:8 418:9
profile 489:18
profound 319:5
progestins 431:15
prognostic 282:9
program 95:13
  121:12
programs 95:15
  106:6 107:10
  149:10
progress 219:8
progression
  324:16
prohibit 226:5
  406:12
prohibited 37:10
  227:1
prohibition 46:3
prohibits 51:22
  180:22 181:10
  220:23
prominently
  322:21
promise 248:10
promised 289:16
promises 363:18
promote 44:17
  77:17,19 104:12
promotion 225:6
pronounce 389:3
proper 216:18
  238:13
properly 120:11
  145:17 276:5
  280:6 330:17
propose 254:8

proposed 54:8
  224:9 235:8
proposes 265:7
  284:19
proposing 386:17
proprietary
  201:12
props 336:22
prosecute 52:12
prospective
  278:12,18 279:14
  304:1,9 411:19
prosthesis 336:20
  336:21 460:10
protect 76:8
protections 280:9
prove 312:22
proven 144:13
  218:4,16 313:2,4
  435:18
provide 15:6,10
  41:7 112:8 137:10
  137:17 158:4
  170:15 171:1
  174:13,17 400:4
  400:16 401:1
  415:15
provided 17:18
  18:4 157:17,22
  422:20 474:7
provider 153:4,10
  153:21 261:1,5
  279:10 308:21
  312:19 423:13
providers 7:4
  149:12 231:10
  246:8 248:5
  308:22 314:3
  429:18 464:4
provides 378:10
  405:7 441:6

providing  36:17
  51:23 57:9 58:14
  58:20 78:18 80:17
  104:17 137:3
  151:11,13,17
  157:14 195:2
provision  109:17
  481:19
provisional  101:21
provisions  170:18
prudential  295:3
psych  156:4,7
psychiatric  49:7
  66:13,20 68:2,14
  72:6 159:16 190:5
  282:16 313:14
  384:6
psychiatrist  65:22
  153:17 154:22
psychiatrists
  189:21
psychiatry  75:5
psychological
  66:13 67:22 68:14
  68:16,20 70:14
  72:6 77:21 82:8
  112:10,14 282:16
  394:20 395:18
  486:4
psychologically
  71:1 317:9
psychologist
  154:22 364:9,11
  372:3
psychology  75:6
psychotherapy
  157:15,18,23
  158:4 437:14
pubertal  7:18
  411:8

puberty  36:21
  63:13 81:23 161:2
  161:6,15 162:16
  162:19,20 163:12
  165:9 166:8 201:2
  201:3,19 203:15
  203:21 204:17,21
  205:2,3 207:13,20
  208:15 211:10,21
  212:14 213:6,18
  219:17 238:19
  247:1,9 260:6
  316:16,20,21
  317:21 318:2,11
  318:16 374:4,9,12
  395:23 397:22
  401:10,14 404:1
  405:16,20 406:1
  406:13,23 413:4
  428:15,22,23
  437:15,23 482:16
  483:21 489:14
public  9:2 63:19
  85:4,6 160:11
  187:17 191:18
  199:11 241:4
  495:19
publication  130:2
  131:1 133:15
  134:12 136:11
  182:18 190:2
  224:7 227:7 228:1
  240:12 275:23
  283:16 296:4
  306:7 307:1
  355:13 356:1
  360:18 362:1
  368:17 407:20
publications  12:22
  85:3 106:23
  128:18,23 135:20

136:6,14 283:10
  297:16 298:12
  302:22 304:12,22
  307:21 380:13
publicly  125:5
  183:1
publish  46:18
  50:20 283:11
  303:18 306:9,11
  306:14,17 307:5
published  46:13
  46:17 72:21 76:3
  84:18,22 129:3,13
  135:16 183:4
  185:16 186:3
  189:23 196:1
  219:4 220:12
  228:20 273:23
  274:13 275:20
  296:10 298:2
  300:9 301:19
  302:10 305:14
  306:21 322:22
  326:6 364:2
  371:16 378:1,2
  465:10 482:15
  486:1
publishes  182:16
publishing  76:15
  182:21 284:4
  301:4 305:20,21
  306:3 331:5
pubmed  20:22
  21:10
purport  334:19
purporting  277:10
purports  177:20
purpose  93:9
  240:8 241:12
  296:13 459:16

purposes  238:20
  269:9 423:3
  431:22
pursuant  9:4
pursuing  162:23
purview  474:23
pushing  305:4
put  122:8,8 136:5
  312:9 327:15
  350:4 362:20
  371:16 375:10
  382:9 395:23
  452:8 471:6
puts  282:5
putting  107:5
  360:13
pyramid  309:8

q

qualification
  244:7
qualifications
  29:14 172:13
  479:13
qualified  65:11
  75:18,22 358:8
qualifier  251:6
  254:4
qualify  250:13
  274:10 318:9
qualifying  416:16
quality  71:1 89:21
  120:9 123:20
  285:5 300:6
  354:20 381:20,21
  415:16 482:6,19
quantifiable  331:9
quantification
  363:13
quantifies  330:7
  367:21 370:8,18

quantify 311:10 330:4 369:3 413:4
quantifying 349:11
quentin 86:10
question 26:8 80:14 83:1 118:14 122:23 124:16 126:4,7,19,23 134:22 155:2 156:5 164:7,12 174:21 176:21 180:1 181:4,6 186:17,23 205:6 208:4 212:12 213:13 215:4 261:15 266:10 269:8,13,16 286:16 288:10 293:3 294:2,9 318:8 321:8 332:21 348:23 365:7 366:9,13 370:4,6 374:22 386:4 409:18 424:21 426:11 441:2 480:2 487:9
questioned 65:8
questioning 65:15
questions 55:15 56:7 134:21 135:2 188:20 261:17 272:5 292:17 314:22 346:21 353:17 394:4 470:19 471:10 472:11 481:7,10 481:13,18 482:1 485:8 486:15 489:3

quick 319:21
quickly 421:19
quite 178:8,8 276:14 309:23 313:1 395:5 404:3
quotation 21:12
quote 60:12 61:5 227:8,9,23 277:16 291:19 351:4 366:1 367:23 456:6
quoted 227:23 480:22
quotes 59:18,19

**r**

r 2:1 16:12 33:2 203:4,4,11,11 277:14 299:19 322:18 414:15 492:1 494:3,3
radial 339:5 467:22
radiation 479:1
radically 122:22 123:3 284:20
radicularis 267:10
radio 465:21
radio's 465:15
radiological 486:4
raging 125:6 412:16
raise 70:21 124:7 284:2 468:8
raised 65:20 119:4 119:10
raising 160:14
ramifications 213:9
ran 21:10 475:2,3
randomization 304:6

randomized 120:10 251:23 252:5,9,10,13 268:20 269:3 270:1 271:2 272:18 273:7,18 274:21 275:16 279:7 280:8 291:7 292:19,23 293:6,9 293:20 294:10 298:3 302:17 307:19 310:16 316:5
randomly 412:1
ranges 257:4
ranked 301:21
ranks 309:7
rapidly 125:2 476:6
rate 101:23 161:5 161:19 314:5,18 327:1 329:3 334:16 354:7 355:14 390:2 391:1
rates 258:5 329:2 352:5 353:9,19 354:1,3
ratio 390:4
rational 228:7
rationale 234:1
rattled 73:11
rct 271:7 272:10 272:14 274:5,8 275:12,13,20,22 276:23 285:13 294:18 315:15 318:1 319:14 323:7
rcts 271:3,11 272:8 274:2

297:18 303:7 305:8,16 315:2
reach 48:5 49:21 96:10 160:8 161:8
reached 125:2 402:1
reaches 288:21 289:6
reaching 482:22
read 18:14,16,21 37:17 42:7 101:6 101:7 111:21 174:7 181:16 182:6 197:1 202:17 206:2 207:22 208:1 227:20 233:11 264:2,3 277:15 301:1 307:11 324:19 325:6 340:21 358:12 371:11 376:23 377:7 402:8 410:9 430:1 448:23 449:13 493:9 495:5
readily 74:8,9 75:3
reading 117:13 184:21 185:11 194:6,7 195:11 206:6 239:21 240:20 277:11 298:16 338:8 356:10 357:1 358:4 418:23 436:3 448:10
ready 74:7 156:18 471:4
real 123:9 364:5 409:8 421:19

**realities** 82:10
447:17 450:4,7
**reality** 252:3
258:21 448:14
**realizing** 348:20
348:21
**really** 89:23 93:14
98:12 106:12
121:7 186:13
205:1 235:4 276:2
277:5 291:21
314:20 337:12
439:8 480:10
**realm** 294:13
**reason** 11:15,18
23:22 132:12
155:5 177:6,6
193:23 194:5
218:2 231:17
314:7 321:14,14
327:22 330:22
333:23 350:22
363:2 393:9
493:11 494:6,9,12
494:15,18,21
**reasonable** 276:19
**reasons** 100:8
105:4,7 108:1
177:10 180:18
250:4 328:21
348:2,10 349:6,12
358:15
**reassigned** 390:5
**reassignment** 6:14
7:9 59:16,23
60:16,21 61:4
337:11 346:17
392:2,9,11,17,20
393:12 432:3,7
**rec** 416:2

**recall** 15:21 56:4
56:12 58:22 69:11
70:2,4 80:6 92:14
93:1,21 96:11
97:1 98:14 99:11
101:5,19,21 102:4
111:2 115:19
149:7 169:8
216:10,12 222:11
262:11 334:17
345:17 347:7
394:1 421:4 481:9
489:14
**recalling** 463:11
**receipt** 493:18
**receive** 69:2
114:16 401:13
485:15
**received** 23:3
31:11 69:19
124:22 265:2
268:4 329:10
350:17
**receiving** 213:6
259:17
**recertified** 23:7
**recitation** 453:18
**reckoning** 404:7
**recognize** 66:18
154:20 406:22
416:2
**recognized** 228:18
**recognizes** 40:3
243:15 250:19
**recognizing** 74:23
243:8
**recoil** 84:5
**recollection** 97:5
110:17
**recom** 395:17

**recommend** 53:5
161:13,15 395:10
395:17,22
**recommendation**
41:3 72:1 118:23
396:3,4
**recommendations**
41:23 42:1 54:18
72:23 398:16
400:4,17 405:4,8
**recommended**
265:23
**recommending**
44:21
**recon** 142:8
467:23
**reconstitute**
478:10
**reconstruct** 468:2
478:12 479:9
**reconstructing**
289:13 290:13
**reconstruction**
44:16,23 133:23
142:15,23 167:19
169:4 178:3,4
299:6 476:16
479:1,5 480:4,12
480:23
**reconstructions**
142:21 178:11
299:5
**reconstructive** 6:8
44:19 46:2 142:23
143:8 274:16
291:20 296:1,19
299:21 300:9
311:14 334:7
335:5 443:8 467:2
467:13,15 472:16
473:15,22 474:8

474:15 475:5,12
475:17 476:1,9,11
477:9 478:9,20
488:23
**record** 9:16 10:12
11:13 79:1,4,8
86:13 115:8,11,14
166:14,17,21
176:23 189:9
207:23 208:9,9
254:13,16,20
312:12 319:23
320:3,7 388:4,8,12
417:10,12,15
418:16 447:18
470:10,13,17
472:4,7 491:7,10
**recorded** 10:4
**recording** 256:6
**recordkeeping**
235:3,18 237:15
**records** 12:20 13:2
13:3 208:1 234:3
237:1 342:6 355:7
419:1,10
**recourse** 53:12
252:14
**rectangle** 350:5
**red** 71:21 451:14
**reddit** 361:19,23
362:11,14 364:19
**redirect** 471:20
**reduced** 333:20,21
333:21
**reduction** 129:22
291:6,11,15,16,19
292:9 293:19
294:9,13
**reductions** 142:19
290:22 292:22

reexamination 4:6
refer 65:11 67:5
   75:17 155:7
   264:23 444:20
   445:13,22 446:13
   461:13
reference 50:21
   86:21 109:20
   144:1 280:13
   320:18 378:6
   380:3 394:17
   413:22 444:16
   467:9
referenced 301:11
   301:14 493:6
references 50:11
   72:15 301:7
   364:18 378:16,19
   407:18 416:15,17
   439:17
referencing
   410:17
referral 72:5
   474:9
referred 68:16
   233:10 474:17
referring 13:8
   144:3 145:9
   146:14 271:4
   441:4 447:9 449:5
   457:23 458:4
   469:19
refers 131:18
   456:9
refined 93:13
reflect 228:8
   397:23
reflects 456:12
refresh 110:16
   400:8

refute 486:10
regard 355:12
   472:21
regarding 248:23
   468:22 473:15
regimens 225:15
register 5:11
   224:2 362:10
regret 6:20 328:14
   328:20 329:5,12
   329:17 330:4,20
   331:4 335:16
   343:17 344:20
   345:10 346:20
   347:20 348:2,3,3,6
   348:9,18,19 349:2
   349:2,5,12 350:14
   350:18,22 351:4
   352:5,20 353:1,4,9
   353:20 354:3,7,19
   354:22 355:4,14
   356:2,14 357:4,9
   357:15,22 358:14
   358:22 359:5
   363:10 365:16
   366:14,15
regretful 6:12
regrets 340:11
   352:1
regretters 351:19
   354:7 355:2,3
   366:17,18
regretting 360:14
regulates 221:3
regulations 224:4
regulatory 263:23
rehearsed 368:22
   369:20 371:22
   372:2
reintroduce
   339:13

reintroducing
   339:15
reject 150:10
rejected 248:2
rejecting 247:4
rejuvenation
   142:9
relate 74:5 130:2,5
   131:15 132:18
   133:16 134:2,16
   205:20
related 85:6 145:2
   146:9,10 229:8
   405:18 432:3,8
relating 66:13
   447:20 473:6
relationship
   103:21 143:2
relatively 45:11
   357:10
relatives 348:12
   349:8
releasing 201:7,9
   317:22 428:14
relevant 43:17
   118:9,17 173:15
   373:23 465:15
   483:20 488:20
reliable 89:13 90:3
   180:3 280:11
   323:23 362:16
   366:22 371:4
   408:12 485:13
   486:1,3
relied 35:20,20
   50:3,18 293:20
   297:4 343:14,18
relief 422:21
relies 294:10
   305:7

relieving 292:4
religious 466:18
   467:9
rely 73:6,8,9
   203:18 249:4
   251:14 284:11
   293:6 294:9
   343:12,21 360:11
   409:20 410:1
   456:21
relying 125:18
   286:23 287:1
   305:15 359:13
   360:12
remained 344:14
remaining 470:4
remains 241:3
   481:15
remarks 87:17
   91:15
remedy 67:21
   154:16
remember 59:4,7
   59:11 65:18 77:1
   77:3 80:5 84:13
   85:19 86:4,6 87:5
   90:19,19 91:18,20
   93:7 94:20,23
   95:5,6,8,23 96:3,5
   97:7,14 99:14
   100:20 106:4,11
   106:16 109:8
   110:23 222:6
   324:19,22 334:23
   341:4,7 372:15,17
   450:17
remembered
   85:18,21
remembering 92:3
remote 1:18 2:3
   3:1,17 9:6 10:4

70:1 210:16
**removal** 139:22,23
  143:4 146:1,5
  151:12 152:9,18
  153:2 287:16
  479:4
**removals** 148:8
**remove** 336:21
**removing** 290:6,8
**renew** 23:20
**renewed** 31:19
**rep** 55:19
**repair** 130:12
  131:12 133:22
  136:8
**replaced** 457:17
**report** 4:13 12:1,9
  13:9,16,17 17:9
  18:18 19:6 22:15
  25:23 29:21 31:2
  31:9 43:7 56:22
  59:14 63:15
  108:18 109:6
  117:13 119:16
  143:17 158:15
  177:19 183:8
  206:6 216:6 230:1
  230:4 238:7,11
  279:20 282:20
  284:7,12 285:23
  299:2 303:7 320:9
  322:22 327:10
  328:4 334:16
  335:14 341:4
  343:6,7 345:2,8,18
  346:2,13 347:8
  357:21 359:9
  360:17 361:15
  364:2,4 367:6
  373:11 377:18
  389:18 393:23

394:14 407:8,18
  410:11,17 412:11
  413:18 415:4
  444:20 445:3,19
  447:23 448:16
  449:4
**reported** 228:10
  326:21 336:14,23
  341:9 345:5
  348:10 349:6
  350:18 351:4
  357:9,15 359:17
  363:16 368:5,10
  369:6 463:20
  490:20
**reporter** 9:2 10:8
  10:12 16:12
  182:13 325:13,16
  325:20 350:3,9
  389:13 414:15
  426:1,6 471:9
**reporting** 202:19
  281:7,9 282:15
  283:13 299:3
  300:21 327:16,17
  331:10 336:5,7,7
  336:10 337:17
  343:16 345:6,10
  349:11,13 362:21
  364:11 367:14
  368:14 370:1
  383:4 465:13
**reports** 19:11
  120:2 135:15
  194:7 219:1,1,3
  220:1,4 244:14
  246:7 280:7,20
  281:9 282:18
  283:20 308:20
  324:17 329:19
  343:10 352:5

490:17,20
**represent** 10:18
  21:9 26:18 32:18
  416:4
**representation**
  26:4
**representations**
  32:13
**representative**
  55:23
**representatives**
  229:13
**representing** 28:9
  452:3
**represents** 440:16
  492:10
**reputable** 102:11
  102:16
**request** 59:3
  151:21 224:22
**requesting** 323:1
  328:7
**require** 234:9
  237:12,13,14,19
  237:20 479:4
  490:2
**required** 24:1
  66:10 169:14
  237:11 242:23
  245:1 284:4
  454:22 473:14
  478:8 495:13
**requirement** 24:4
  236:9 238:1
  300:21 404:15
**requirements**
  172:23 476:5
**requires** 174:19
**requiring** 474:14
**reread** 331:21
  384:11

**res** 273:8
**rescinded** 46:3,7
**research** 6:9
  106:14 120:7,9
  129:14 135:10,15
  136:2,17 253:3,6
  299:21 300:7,8
  305:6,14 308:11
  308:18 309:1
  321:16 324:18
  390:21 485:14
  486:2
**researcher** 276:11
**researchers**
  326:21
**residency** 69:8,11
  69:16 73:3 95:15
  100:21 101:12
  106:6 107:9
  121:12 122:3
  125:14 273:9,20
  278:17
**resident** 121:19
  133:8,8 156:1
  272:15
**residents** 101:22
**resource** 86:21
  257:13 381:8
  409:15 452:6
  473:10
**respect** 59:10
  125:22 145:9
  247:8 392:8 466:5
**respective** 270:7
**respectively** 303:4
**response** 371:12
**responsibility**
  233:22 235:1
  260:23 261:2
**responsible** 53:17
  272:22 276:13

**responsive**   126:1
  370:4
**rest**   217:23 246:12
  310:22
**restated**   229:13
**restating**   229:8
**restoration**   467:3
**restriction**   226:3
**result**   247:14
  287:7 289:16
  412:19,19 467:7
  484:12 492:17
**resulted**   490:17
**results**   21:13,18
  245:9 246:17
  249:21 250:21
  251:13 252:6
  257:17 270:1
  276:8 285:13
  291:7 292:22
  293:9 294:18
  297:18 298:13
  303:7 305:8
  309:23 341:19
  344:9 356:17
  357:8 392:16
**resumé**   5:7 473:20
**retained**   11:19
  33:8 174:22
**retired**   24:23
  136:22 139:18
  140:8 141:12
  473:17,18
**retirement**   24:6
**retract**   371:18,18
  371:19,20
**retraction**   276:21
**retro**   341:10
  343:23
**retrospective**
  257:11 278:9,12

278:19 279:14
289:10 311:23
341:12,14 343:1
343:23 344:8
355:6
**return**   493:13,17
**returned**   331:15
**returning**   328:2
  348:13 349:9
**returns**   113:22,22
**reversal**   6:11
  147:15 149:3
  328:2,7 329:6
  330:1 338:13
  363:11 429:8
**reverse**   15:14
  129:19 320:20
  321:5,21
**reversed**   311:6
**revert**   148:14
**review**   6:22 13:6
  45:9,22 70:15
  89:7,9 93:15
  135:11 170:17
  177:3 183:8
  187:12 191:12
  196:20 198:6
  199:3 234:12,13
  235:20 253:7
  265:20 274:13
  283:21,23 300:8
  307:19 343:2
  344:1,8 356:3,12
  357:3,20 377:10
  379:3,6 408:3
  410:20 412:21
  414:9,12 415:3,14
  415:14,20 416:11
  416:12 417:23
  418:17 427:11
  443:6 448:12

449:16 473:14
483:3 488:21
493:7
**reviewed**   12:17,19
  12:20 13:11,14,18
  20:18 47:20 50:12
  51:1 53:21 106:23
  128:19 129:4,14
  170:4,8 185:7
  205:4 274:1 296:7
  296:18 331:12
  342:6 361:23
  362:6 364:3
  367:21 370:7,17
  402:9 407:20
  408:7 412:22
  485:13
**reviewing**   212:2,7
  212:18 258:11
  439:23 450:3
**reviews**   8:1 35:16
  35:17 96:22 120:8
  174:11 327:3
  332:10 335:1,7
  341:1,6 355:6
  378:20 384:12
  400:9 408:4 413:1
  420:8 440:21
  445:15
**revise**   29:13
**revised**   196:4
  427:15
**revision**   196:16
**revoked**   29:11
**rex**   55:19
**richmond**   264:23
**ridge**   130:16
**right**   12:1,13
  14:19 16:3 17:2,7
  17:16 18:17 19:8
  20:12 21:4,7 22:4

22:11,13,16 24:21
25:12,21 26:14
27:15,21 28:7
29:5,14,18 30:6,20
30:21 31:17,20
32:7,23 33:6,10,16
33:19 34:4,10,11
34:13,19 35:3,6,9
35:22 36:12 37:14
37:19 38:22,23
39:7,12,16,22 40:8
40:13,20,23 41:20
42:11,20 43:18
44:3 47:1,5 48:6
48:12,16 49:10
51:14 52:5,12,13
52:17,23 57:6,13
57:22 58:3,6,9,12
58:16 59:12 60:11
60:14,18 61:7,14
61:16 62:22 64:2
64:12,13 65:3,5,16
65:23 66:4 68:21
68:23 69:1,18,21
70:4 73:7,13 74:2
75:11,15,19 76:2
76:17,19,20 77:14
78:7 79:12 80:1
81:7 83:4,9,14,23
84:6,7,9,23 88:22
90:16 91:8 93:2,4
93:5 99:17 102:8
102:11 103:2
107:21 108:12,15
108:18 110:1,2,12
111:4,19 113:20
114:10 115:15,22
120:19 123:17
125:14 127:14,19

127:23 128:9,10
128:23 129:1,4,5,6
129:11,12,18,19
129:23 131:2,15
133:2,5,23 135:7
135:21 136:9,10
136:12,13,19
137:5,7,21 138:1
139:5,9,12,14,22
139:23 140:3
141:5 144:19
146:16 147:1,2,7,8
147:9,22 149:16
149:23 150:1,18
153:14,15,18,21
154:2,13 155:9,15
155:22 157:2,3,7
157:11,15,16,20
157:21 158:1,2,6
158:10 166:10,14
167:1 168:13
169:15,19,23
171:19,20 172:7
173:4,8,20 174:7
175:2,10,13,16
176:3,10 180:15
182:7,15,17 183:5
183:6,7,12,16,20
184:9 185:5 187:9
187:13,21 188:2,7
188:17 189:15
190:3,9,13,17,22
191:3 192:9,11,14
192:15 193:8,12
195:15 196:9,20
197:3,6,18 198:13
199:19 200:9,19
201:1,16,20,23
202:3 203:13,20
203:22 204:2,12
204:15,21 206:5

207:8,20 208:17
209:23 210:6,11
211:22 212:4,20
213:19,23 214:4,8
214:9 216:4,13
217:2,7,9,13
219:22 220:4
221:9,13,14
222:19 224:11,12
225:2,5,9 227:13
227:14,15,17,18
228:14,21,22
229:6 230:16,17
230:19,20,23
231:1,20,21 232:2
232:3,5,6,8,20,21
233:12,18 234:6
234:19 235:23
236:1,5,15,18
237:5,7 238:3,7,12
238:15,23 240:3
240:15,18,22
241:13,22 242:6,7
242:10,11,13
243:12 245:7,10
245:16 248:7,13
248:14 250:22,23
251:3,16,18 252:2
252:6,20 253:16
254:21,23 255:9
255:12 256:17,18
257:1,7 258:10,14
258:15,19,21
259:1 261:19,21
262:2,6 263:1,7,12
263:13 264:6,8,17
265:12,15,17
266:3,8 267:23
268:15 269:22
270:8,11,13,22
271:1,5,9,12

273:19,22 274:8
277:23 279:15
280:19,20 285:8
286:19 288:14
290:18 291:1,3,5,8
292:16 293:8,12
294:12 295:17
296:2,8,10,15,22
299:17,18 300:1
300:15 301:8,12
301:13,22 302:14
302:16,19,20,23
303:1,8,22 304:2,4
304:10,14,17,19
304:20,22,23
305:9 306:5,6
307:5,23 308:3,4,8
308:15 309:4
311:17 315:8,13
315:18 316:9,13
316:15,22 317:5
318:3 319:18
320:22 321:2,6
322:2,6,15 323:4,7
323:8,8,10,14
324:1,5 325:8
326:5,7,8,9,18
327:4,7,8,11,18
329:14 330:3,5,14
330:20,21 332:20
332:23 333:5,6,10
333:11,14 334:21
336:11,12 337:21
339:10,15 340:17
341:16 342:4,8,10
342:16,17,19
343:7,9,13 344:15
347:15,18 348:16
348:20 349:18
350:11,19,21,23
351:1,5 352:3,6

354:16,17 355:23
356:7 357:5,12,13
357:19 358:1
359:1,15,16
360:10,11,21,22
361:13,14,15,17
361:20,22 362:1,5
362:8,9,12,13,17
362:22 364:5,6,12
364:18,19,20
365:3,9,10,13,21
365:22 366:2,20
367:1,9,10,18,19
368:2 371:1,3
374:6 375:11,18
375:21 376:1,2,4
376:11,14,15
377:12,14,16,21
377:22 378:3,8,12
378:17,21 379:2,6
379:8,16,22
381:10,14 382:4
382:19,20 383:6
384:1,3,4,19 385:3
385:15 387:1,4,13
387:15 388:3,13
389:1,15,20 390:3
390:11,19,22
391:4,5,10,12,19
391:22 392:14
393:20,21,22
396:1,18 397:4,8
397:17,19 398:14
398:23 399:17,18
399:21 400:6,14
400:18 401:3,19
402:23 403:5,10
404:18,22 405:7,9
405:11,14,22
406:10,16 407:3,4
407:7,19,21 408:5

408:8,9,13 409:3
410:14,23 411:12
411:13,15,20,22
411:23 412:2,3,5,6
412:7,8 413:2,3,19
413:21 414:8,12
414:13,19 415:4,5
415:8,11,19,22,23
416:5 417:7,16
418:2,9,21 419:23
420:9,13,14,17,19
420:23 421:6,12
422:8,9,10,14,16
423:3,10,19,20
424:3,11,22 425:1
425:4,8 427:3,4,9
427:12,15,20,21
427:23 428:3
429:2 430:2,6,12
430:16,17,19
431:7,9,15,18
432:9 433:8,11,14
433:17 434:3,8,17
434:17,19,22
435:2,5,10,23
438:3,15 440:2
441:9,17,18,23
442:3,4,6,9 443:13
443:20 444:22
445:10,14,16,17
445:20,21,23
446:5,7,14,23
447:11 449:2,8
450:9,11,15,23
451:2,11 452:13
452:23 453:13,20
454:6,10,17
455:10,15 456:4,5
456:7,10,15
457:16,19 458:1,4
460:18,22 461:3,5

462:4,11 463:8
464:13,17,23
465:11,18,20
466:8,9,12,13
469:7 471:2 480:6
480:7 484:8
486:13 489:19,20
490:2,3,8,14,18
rights 83:13 101:3
rigorous 39:7
rise 294:3 310:5
rises 281:20
risk 41:5 67:11
90:22 206:12,19
206:19 207:4
222:13,17,21
223:1,3 251:11
260:4 270:15
285:19 286:9,12
286:14 287:5,8,12
287:19 290:1
293:17 295:3,21
301:17,20 310:7
311:2,4 312:11
313:20 314:8,15
334:10 391:9
393:1,13,19 404:8
484:9,12,16 485:3
485:3,6 488:4
489:18 490:6
risks 84:22 91:4
177:21 204:20
205:2 206:14,22
207:19 208:14
209:5,8,22 210:4
210:10,22,22
214:16 215:1,6,9
215:12 217:17,18
218:8,9,16 219:4
246:3

risky 288:3
rocketcitynow.c...
5:1
role 348:13 349:9
367:16 373:3
395:12 397:22
398:11 403:1
474:2 480:18
roles 398:18
room 94:17
106:20 208:4
235:11
rooted 444:7
rosacea 140:2
rotate 349:22
roughly 15:21
84:12 97:11,21
101:15 139:7,13
141:17 345:1
round 87:14
route 72:13
149:22
rows 307:18
rpr 492:20
rule 173:3 316:4
rules 9:5 170:14
173:9 224:9,10
ruling 38:10 53:21
run 95:14 137:23
138:16 488:8
running 292:14
rutledge 33:2

s

s 2:1 4:10 55:20
202:16 203:8,11
277:14 299:19
340:15 356:2
360:9,10 492:19
494:3
sacrifice 348:12
349:8

safe 268:22 270:3
safety 219:14
221:12 235:9
269:5 437:17
469:6
sake 437:2 438:9
439:3 467:7
salem 3:13
salvage 475:3
477:5
sample 413:11
san 86:14 272:16
278:7
sanction 177:15
sanctions 176:16
sat 153:3,9 207:11
476:21
satisfaction 299:8
331:14,19 332:2,4
333:4,5,13
satisfactory
104:19
satisfied 326:22
330:18 335:20
save 347:17
saved 156:3
saw 18:7 78:4 95:7
106:7 341:3
407:17 471:8
saying 54:20 92:21
124:17,19,19
209:15 234:16
236:12 237:13
244:9 250:13
274:11 284:22
288:20 289:1
310:1,2,4 313:6
365:11,14,18
366:4 415:20
466:11

**says** 22:17,20 26:1
27:16,22 28:15,16
28:22 29:8 30:13
34:11 38:8 39:4,9
40:2,8,9 41:2,2
52:11 55:19 56:20
57:3 59:23 60:10
63:10,18 64:9,17
65:7 104:22
108:10 109:12
110:5 111:8 113:7
115:4 116:6,19
128:7,18 171:1,15
172:11,18 173:9
174:23 179:15
224:17,21,21
225:10 227:7,11
227:23 228:5,23
229:12 230:8
231:4,8,17 232:12
233:19 234:7,22
236:2,7,19,22,23
238:3,5 239:4
240:8 241:2,11,15
241:19,23 242:18
248:18 251:13,19
253:1 257:10,19
258:3 260:10
263:14,16 264:13
264:22 265:5,16
265:19 279:23
300:4 302:1
304:15 305:23
306:1,2 308:9
309:6 326:20
328:19 330:16
341:21 347:19
348:1,2,8 356:11
356:20 357:6,8,14
361:1 364:21
365:5,20 367:11

375:19 377:10
378:6 382:12,16
383:18 384:18,21
386:22 387:5,20
391:23 392:15
397:19 398:6
401:9,12,21
404:21 405:23
411:18 413:9
415:12 421:9,22
422:5,18 424:8
427:11,17 428:13
429:7 430:16,23
432:2 434:8,17,21
435:15 437:8,11
440:4 454:14
456:3 459:4 461:1
464:19,21 466:2
468:22
**scarless** 131:11
136:8
**scarring** 145:20
**schechter** 216:7
280:4 377:20
395:6
**school** 165:12
166:4 409:7 452:1
464:5
**schools** 83:13
**science** 46:6 51:6
78:2 82:15 86:16
90:2,3 92:9,11,11
93:15 94:11
122:17 124:4
125:20 177:8
280:11
**scientific** 20:18
21:7 43:17 44:10
45:6,9,21 46:18
47:20 50:3,11
51:17,19 72:15

81:13 83:4 86:12
86:12 89:7,21
103:14 104:13
112:8 123:4,22
135:14,17 185:3
186:7 187:2
191:12 198:6
218:4 219:8 234:1
244:12 275:2
280:9,16 281:16
281:22 282:13
283:2 284:8
287:22 288:1,5
308:14 311:16
323:23 362:16
363:23 373:23
374:19 378:6,11
380:3,7 381:4,5,8
381:19 382:9
387:21 408:12
410:19 439:5
441:7,12 443:6
444:15 449:20
452:12,15 453:19
454:4 469:5
482:19 483:3
484:19 488:20
**scientifically**
44:10 287:9
366:21
**scientist** 408:23
409:3
**scope** 52:7,15,20
53:2 54:14 55:4
62:2 81:9 83:7,16
83:17,18 89:4
90:18 91:17 92:6
92:18 96:19 97:13
98:1,9 99:9
117:11,18 120:21
126:14 137:14

151:21 204:12
297:19 298:6
425:21 426:18
429:23 438:5,18
442:17 443:16,22
451:20 453:22
454:13,19 455:13
458:3 459:12
460:21 461:19
462:7,13 465:7
469:9
**score** 161:3
**scottsbluff** 138:15
138:23 139:16
**screen** 256:3
**screened** 416:19
**scripture** 456:21
**scroll** 344:10
345:13
**scrotoplasty**
478:10
**scrotum** 478:7
**se** 151:8 178:22
213:7 392:17
**search** 21:2,6,10
268:19 353:18
453:16
**searches** 297:12
**second** 39:3 58:1
64:6,8 70:22 93:3
93:10 94:9,15
95:2,3 96:2,15
97:8 110:5 119:20
134:20 233:19
241:2 255:20
320:17 328:18
339:15 360:4
364:15 383:13
384:11 391:22
413:9 428:12
440:10 445:8,12

477:3
**secondary** 165:14
479:2
**section** 35:4 36:3
59:15 116:17
172:4,5,6 225:5
240:5 257:8,17
265:16 326:12
330:13 339:3
341:17,19 342:11
344:9 378:9
382:12 391:16
397:8 399:15
400:3,15,19,23
401:8 405:3 413:7
415:9 437:7 440:3
440:16 441:6
**sections** 116:12
**see** 13:20 22:17,18
22:22 25:9 27:3,6
27:18 28:5,20
29:2,16 30:18
34:9 35:12,18
36:2 38:6,7,13
39:7 41:1,8,10,12
41:13,15 43:12
53:4 55:17,23
56:22 59:12,14,19
60:8 63:3,16,22
64:20 65:12 70:16
71:5,6,6,7,19
74:20 80:22 91:23
92:8,9 95:21
104:2 108:14,22
109:18 110:9
111:14 113:1,10
113:14 116:1,10
116:14,21 123:13
123:19 128:19
131:13 132:22
134:9,14 141:22

143:19 146:1
150:12 158:20
171:13,16 172:15
172:23 173:18
174:5 202:18
212:19,20 224:13
224:14,16,19,23
225:5,7,17 226:8
227:6,11,22,23
228:2,11 229:15
230:17 231:6,14
232:12 233:15
234:4,13 237:16
239:4,21 240:13
241:9 243:6 246:1
247:13 249:10
253:9 256:22
257:5,8,15,23
258:8 262:11
263:13,16 264:12
265:3,13 266:1
268:19 279:22
280:2,11,17
299:21 300:1,12
301:23 302:2,7,11
308:11 309:12
313:9,12 320:13
320:23 322:18
323:5,19 324:13
326:12,16 327:2,4
327:4 328:11,17
330:14 332:6
334:22 337:8
339:6,7 340:11,20
341:16,19 342:1
342:10 344:7,20
344:23 345:4
346:3 348:4,14
349:23 350:1,7,22
351:20 352:1,20
356:4,15,17,23

357:17 358:12
359:12 361:10
364:15 365:8
366:5 373:17
374:1 377:10
378:5,13,15,18,22
379:3,4,7 382:12
382:15 383:3,11
383:14 384:2
385:2 391:14,15
392:13,21 394:17
394:18 395:1,7
397:10 398:3,12
400:7 401:8,16
402:6 405:20
406:8 407:15
411:16,20 412:21
413:6,8,15 414:1,6
415:8,12,17
419:14 420:1
421:9,22 422:3,15
427:6,8 428:18
429:7,12 430:14
431:5 432:4,4
434:9 435:1,7,19
437:7,17 440:3,8
440:12,22 441:3
446:9 447:14
449:1 451:15
453:1,2 461:4
471:20
**seeing** 71:17
114:21 237:9
355:1 386:8
**seek** 66:14 334:19
351:8 457:13
**seeking** 67:20 71:9
74:10 132:8 146:4
152:14 154:16
165:9 276:11
300:22 363:11

456:23 459:18
**seen** 17:21 18:13
77:8,11 96:8
123:6 162:5 165:4
165:4 219:4
223:21 233:8
249:21 309:11
338:1 340:19
388:23 420:2
436:5 488:15
**sees** 245:21
**select** 307:4
**selected** 7:19
191:2 193:8 198:2
411:9 476:23
477:1
**selecting** 306:21
**selection** 472:22
**selective** 306:8,19
**self** 70:18 94:1
120:2 145:1
161:10 162:9
313:13 314:19
318:11 333:21
334:10 341:9
347:2 355:11
357:9,15 362:21
363:16 368:10,15
369:1,6 370:1,2
374:10 444:1
463:21 476:19
485:22 487:3
**seminal** 480:21
**sen** 378:20
**senate** 4:23 63:2
63:11
**send** 143:5 154:21
156:23 157:8
**sending** 473:7
**senior** 378:20

sense   24:4 66:15
66:16 80:23 81:14
117:12 152:15
206:5 226:4 235:5
266:10 348:19
355:8 386:9
sent   80:8 156:10
157:3 493:14
sentence   39:3 40:1
41:2 65:6 109:12
111:8 113:6 116:5
119:20 143:20
172:18 231:16
233:19 234:6
241:2 257:19
258:2 300:4 308:9
309:5 326:20
328:18 330:16
348:1,2 356:11
357:7 384:11
391:22 395:4
402:12 403:13,15
405:23 413:9
sentences   172:10
302:1 344:11
398:5
separate   365:11
separately   136:5
september   1:21
9:9,17 171:16
465:10 491:10
sequential   283:12
283:14
sequitur   402:13
serendipitous
229:3 245:23
247:14 308:19
series   283:11,14
304:18 308:2,10
308:14,20,21
309:9 310:21

311:15 312:18
314:6,9 322:17,23
323:12 324:13
335:15,18 343:6
343:11
serious   109:16
487:7 490:7
serve   189:4 456:17
457:1,13
served   194:8
450:6 475:9,11,16
service   151:17
432:9
services   95:17
104:18 111:9
140:15 195:2
248:3 376:22
384:21 385:14
422:5,19 431:3,3,9
434:5 435:9
437:22 438:11
454:5 473:4 474:8
474:9 475:10
serving   33:1,15
92:15 172:21
173:10
session   187:5
195:13
sets   420:21
setting   258:16
356:15 374:10
435:8 480:17
settings   258:5,8
seven   45:23 123:1
141:22 166:1
322:23 325:10
335:15 336:16
337:7 343:6,12
357:20 391:18
seventeen   474:6

severe   265:9 266:5
267:17 487:2
severity   405:19
sex   6:13 7:9 8:14
36:22 59:15,23
60:3,7 61:7 81:20
82:1 94:1 145:3
146:10 147:1
161:10 164:9
165:14 213:7,22
214:11,16 219:17
238:19,21 247:2
247:10 260:7
318:6,20 319:4,8,9
319:14 337:10
346:16 370:1
383:23 392:1,9,10
392:17,19 393:11
404:2 405:18
416:13 417:5
437:14,22 442:13
442:21 443:12,20
446:17,22 447:2
447:20 448:1,15
454:9,15 455:2
457:14,15 464:15
464:21 482:17
487:16,20
sexual   192:17,20
333:3 436:8,16,21
461:15 462:11
463:18 464:1,1
469:20
sexualize   469:23
sexualizing   462:4
462:20 468:23
sham   250:5 316:1
shaping   461:1
share   364:22
shared   270:16

shareholders
381:2
sheet   493:11
shield   376:1,7
381:1,9 382:1,22
383:8 429:15
shift   99:15 400:12
442:4
shifted   305:1
369:7
shipp   55:20 56:3
short   7:17 48:4
53:10 271:4
327:17,17 336:4
336:10 411:8
shortcut   188:21
shorter   150:20
shortly   361:10
shoulder   292:5,11
shoulders   261:3
276:9
show   37:19 114:13
230:8 264:19
325:1 327:23
336:2 339:11
363:7 366:22
371:21,22 375:12
396:13 412:16
426:20 430:4
433:5
showed   32:8 181:7
354:15,15 371:23
424:6 439:12
showing   90:4 92:9
247:23 346:14
453:15
shown   312:15
415:15 439:18
shows   122:17
258:20 313:7
329:23 352:19

355:9 368:8,16,18
369:17 374:20
405:18 414:4
453:20
**sic** 12:23
**side** 77:2,3 94:12
99:13 142:17
146:15,17 151:16
159:15 217:16
282:16 285:9
349:20
**sided** 222:23
**sign** 493:12
**signature** 264:12
**signed** 27:2 493:20
**significant** 206:22
207:4 295:2 368:9
383:21 483:19
484:15 487:1
490:6
**significantly**
487:16
**signify** 243:3
**signs** 463:18
**similar** 46:10
52:23 54:9 61:20
63:6 76:23 77:7
77:10 88:14,19
93:11,16 99:11
140:4
**similarities** 475:21
**simple** 289:12
**simply** 124:17
151:16
**single** 20:17 42:8
42:15 150:22
152:2,6 298:20,23
299:3 308:20,21
312:19,19,20
323:16 328:9
416:20

**singulair** 222:7
**sinus** 129:21
133:12
**sir** 11:11 18:16
31:15 32:5 34:23
35:10,13,19 36:5
39:9 40:9 42:14
48:1 64:3 76:19
77:9 118:14
119:19 120:16
133:3 174:23
296:12 331:17
466:10 477:15
490:20
**sit** 183:8
**site** 407:23 408:1
**sitting** 70:3,9
170:21 173:21
221:20 239:8
297:15 310:17
**situation** 179:20
244:1
**situations** 206:9
251:2 253:1,20
254:1,5,10
**six** 56:17,18
128:23 129:3
136:14 158:16
160:2,3 163:23
164:1 336:15
337:14 380:19
391:17
**sixteen** 56:16
360:22
**size** 355:8 372:9
413:10,11 426:8
**skin** 131:12 134:7
136:8 137:23
139:3,20 140:1,2
142:14,14 144:1,2
144:4,7,8,15,18

145:2,8,13 146:9
**skipping** 231:16
258:2
**slide** 88:3,7 456:18
457:2,8 458:15,21
458:23 460:22
461:23 462:22
463:13 464:3
**slides** 87:23
451:10 456:17
**slightly** 155:1
**slipped** 131:4
**slow** 161:14
165:22 207:6
381:1 388:17
**slowing** 384:15
**slowly** 114:20
**small** 20:15 45:8
45:11 290:13
295:20 352:16
413:11,12
**smaller** 317:7
**social** 70:19 71:11
348:3,6,9 349:1,5
351:15 362:7
366:21 367:15,17
367:17 368:1,1,7
368:21 369:18
370:10,10,20,20
371:6 373:1,2,3
397:9,17,21
**socially** 351:12
**societies** 53:5
76:14
**society** 5:9 44:18
45:3,15,18 46:1,7
47:8 48:11,15,19
72:3 99:16 100:5
100:19 103:19
104:22 108:11
118:10,18 123:23

169:7 171:12
181:19 182:1,3
195:16 196:22
197:3,6,9,21 198:7
198:19 199:11
200:13,20 282:4
283:8 300:18
301:4 404:5
**soft** 479:5
**sole** 410:1
**solely** 331:14
**solicited** 187:18
191:19 199:12
**solo** 23:21
**solution** 324:4
**solutions** 10:7,9
493:23
**solve** 351:9
**solved** 313:13
**somebody** 121:11
245:21 250:5
276:11 284:19
318:22 322:9,11
**sorrow** 194:18
**sorry** 57:18 77:9
108:20 138:19
142:11 144:18
163:16 170:5
172:2 201:10
212:9,11 227:4
268:6,11 280:23
281:3,13,14
318:19 325:19
327:20 340:1
353:7 373:2
379:12 384:14,14
385:19 397:15
409:1 421:16,19
426:1,7 440:22
441:2 445:17
446:20 457:14

464:7 471:5,11,12
474:12
**sort** 19:18 70:20
71:2 87:18 88:5
89:13 94:4 96:22
96:22 101:4,21,23
103:16,20 107:4
127:11 140:3
159:3,13,21 165:8
165:10,22 208:20
301:15 323:16,17
324:6 372:7 475:6
**sorts** 53:5 104:12
334:11
**sound** 22:11 76:10
170:5 194:13
196:9 202:23
203:2 234:2
**sounds** 22:13 84:9
190:3 203:5,9
472:2
**source** 74:1,3
296:18 361:22
407:18
**sources** 378:7
380:4 458:13
**space** 306:6
**speak** 14:7 79:19
81:16 82:11 87:1
87:6 96:13 161:21
163:16,17 328:16
366:18 416:8
445:1 447:17
457:1,5,7
**speaker** 82:3
471:16
**speakers** 81:16
**speaking** 20:1
85:4,6 93:18
107:16 126:17,18
338:20 448:3,10

466:19,19 467:2
469:19,21
**speaks** 73:3 95:9
351:23 358:10
369:12 373:8
466:23
**special** 253:7
**specialist** 74:16
75:13 87:18
155:22 156:20
**specialists** 149:16
206:2
**specialized** 66:2
204:2
**specialty** 155:21
156:16 378:16
472:15
**specific** 26:9 135:2
170:14 174:20
180:1 212:12
213:14 242:19,20
288:10 365:19
**specifically** 70:4
132:17 144:20
145:5 163:20
192:16 198:18
209:22 210:5
255:15 334:18
376:23 417:19
418:11
**specifics** 27:23
**specified** 437:12
**specimen** 292:2
**spectrum** 152:10
313:18 487:4
**speculating** 47:4
**speech** 368:21,22
369:20 371:22
372:2
**speeches** 261:18

**spell** 16:13
**spelling** 445:6
**spend** 135:3
412:11
**spent** 17:8
**spoke** 14:2,16,22
64:10 81:18,20
481:2
**spoken** 15:16 16:8
16:10,16,18,22
64:17,23 205:5,8
206:1 418:3
**spread** 490:13
**spring** 207:5
**srs** 322:22 330:19
**stable** 344:14
**staff** 13:1 56:3
98:23 99:1 307:1
474:5
**stage** 107:4 122:19
125:2
**stainless** 131:5
**stake** 286:14
287:18 386:20
447:19
**stamp** 339:14
340:4
**stand** 61:13
120:16
**standalone** 410:16
**standard** 183:2
209:13 244:23
249:3
**standards** 7:15
182:16,19,21
183:9 184:5 186:9
186:10,11 189:11
196:14 199:7
316:3 396:15
397:4,14 398:14
399:2 401:1

**standpoint** 194:17
387:8 447:15
466:16
**stands** 87:10
**start** 23:2 84:7
85:9 156:18
162:15 163:11,12
164:4,9 237:9
254:19 302:16
316:19 324:17
351:20 383:14
**started** 24:3 67:9
106:14 107:3
146:23 148:3
184:8 202:12
216:4 226:8
268:17 345:1
372:7 408:16
409:6 480:13
**starting** 106:16
143:20 161:1
165:14 166:8
228:1 236:15,17
236:20 237:4
320:14 328:11
344:13 345:7
**startled** 477:2
**starts** 228:3
405:14
**state** 5:2,5 9:2
10:10,20,21,22
11:1,12 27:23
28:2,19,23 33:9
37:10 51:22 52:5
53:8,10 54:4,7
57:10 58:15,21
59:8,13 63:5
76:16 78:14 79:21
81:1 82:15 89:6
90:2 96:8 113:8
115:23 116:8

284:5 376:8 396:3
397:20 420:13,16
473:14 482:11
492:2,22
**stated** 227:7 228:2
349:3 483:13
**statement** 5:21
44:20 45:16 46:8
46:15,20 47:15,22
48:6,16 49:3,15
105:15 113:12
114:1,3 239:20,22
240:1,9,13 250:12
253:22 254:3
331:8 377:2
**statements** 45:5
46:12,13,17 47:12
50:10,16 51:11,14
117:23 199:2
247:11 444:16
481:8
**states** 1:1 9:22
30:7 52:21 54:23
61:19,23 62:4
110:9,12,19 111:3
429:4 472:18
474:2 475:13
**stating** 27:17
**statistic** 102:21
**statistically** 392:4
**status** 27:18 29:1
30:15 240:10
365:7 366:9,13
**stay** 98:6
**stayed** 53:10
**stays** 256:7
**steel** 131:5
**stenographic**
492:6
**step** 53:8 339:8

**stephen** 58:2
**stepped** 260:12,13
**stepping** 54:1
105:9
**steps** 69:15
**sterilization**
287:15,16
**sterilizing** 290:7
**steroids** 145:3
146:9,10,16 147:1
**stick** 261:16
448:14
**sticking** 449:18
**stomach** 121:22
**stop** 251:2,8
**stopped** 25:8
**stopping** 366:10
**stories** 280:1,14
323:22 365:6,21
366:1,2,7,11,16
**story** 95:21
**street** 2:20 3:12
**strength** 413:7
**strengths** 342:11
391:15
**strictly** 424:17
466:15 467:10
**stricture** 338:10
**strictures** 338:21
**strike** 13:12 14:17
16:4 18:10 23:13
33:13 49:5 84:2
90:12 125:23
147:17 158:14
174:14 177:17
186:21 202:1
228:17 267:15
268:15 272:12
289:3 314:23
326:10 348:6
370:5 377:17

433:6 461:13
**stringent** 281:16
**strive** 454:16
**strong** 78:17 290:3
**strongest** 490:1
**strongly** 114:14
**struck** 106:13
131:4
**struggles** 455:1
**stuck** 361:8
**student** 101:11
**studies** 13:9,11,15
13:18 35:21
108:17 109:5,9
124:12 248:10
249:20,23 250:7
270:8,11 271:17
278:1,15,22
292:18 298:10,13
298:21 301:20,20
302:1 304:2,9
305:9 321:10
329:22 331:20
343:20 353:1,8
354:22 356:20,21
356:22 357:3,4,11
358:8 367:21
371:5 378:2 391:7
412:13 415:13,15
415:21 416:3,18
441:14 482:2,15
485:14 486:2
490:5
**study** 6:19 7:10
39:7 50:17 109:10
250:1 256:18
257:11,22 258:10
258:20 271:19,21
273:18 275:17
276:1,5,17,19,22
277:4,7,18 278:2,5

278:8,10,19,23
279:3,7,15,17
281:17,18 282:7,8
282:9,9,14 286:4
289:11 291:12
292:13 298:23
299:18 300:5,15
309:11 311:10
313:7 317:17
318:10 319:17
321:9 323:9
324:20 329:16
330:3,6,22 334:15
334:17,18 339:11
340:8,10,19
341:14 342:5,18
342:22 343:5,8,10
343:15,17,19
346:14 347:8
348:18 352:5,10
352:15 354:14,21
355:9 358:3,10
363:7 370:7,17
388:23 389:14,17
389:22 390:10,23
391:16 392:7
393:10,17 410:22
411:20 412:4
413:10,14 414:4,5
414:8,9 416:20
440:9,10,11 453:6
453:13,15
**stuff** 101:4 107:1
148:8 220:18
359:13 363:16
372:7 448:12
**subcategories**
74:21
**subcategorizing**
301:15

subcategory 154:7
subgroups 390:7
subject 20:2 34:21
    39:6 51:4 79:17
    82:3 88:19 104:17
    172:14 176:14
    205:21 272:1
    274:14 287:5,6
    389:5 416:12
    450:2
subjective 112:4
    114:2 282:15
    327:16,17 331:10
    336:5,7,10 349:13
subjects 87:21
    454:1
submission 234:10
submitted 33:22
    34:3 42:17 43:3
    55:19 292:3
subreddit 364:19
    364:21 365:13
    366:5
subscribed 495:14
subscribing 297:1
subscription 297:4
subscriptions
    100:10
subsection 174:5
subsequent 122:3
    185:22 461:10
subsequently 74:6
    226:22 229:4
    270:21
subset 68:15
subsidiary 103:21
subspecialty
    173:15
substance 14:6
    70:17 77:14,15
    363:6

substantive 98:12
    98:17 168:16,21
    173:11,23 181:1
    181:12
success 161:19
    300:17 331:2
successful 95:15
    301:3 303:18
succinctly 127:1
sudden 368:23
suddenly 368:14
    369:7 372:13
suffer 132:13
    444:3 486:18
suffered 463:23
suffering 41:6
    53:9 66:19 122:11
    122:13 151:5
    260:18 457:6
sufficient 294:1
    358:9 482:20
    484:21
sufficiently 310:8
    311:22
suggest 414:4
suggesting 118:2
suggestion 173:4
suggestive 362:23
suggests 394:22
sugrue 6:6 299:19
suicidal 487:5
suicidality 313:13
    333:20 334:20
    338:5 347:2
suicide 119:9
    162:9 314:5,18
    334:10 372:4
    390:2 391:1,9
    393:13,20
suitability 416:17

suitable 398:23
suite 2:14 3:6,12
summary 82:15
    88:23 89:5,5
    300:2 303:8
    327:14 405:3,3
supervision 492:9
supplement
    263:17
supplemental 4:16
    38:4 264:1 265:1
    265:6,20
supplements
    38:10 296:11
supplies 422:6,19
supply 339:2
    468:9
support 48:16
    49:13 51:18 52:4
    52:8 57:10 58:16
    64:1 72:6 77:21
    88:21 89:8,22
    103:14 104:11
    112:9 244:13
    284:21 287:23
    303:19 314:17
    336:3 352:17
    380:7,18 381:19
    382:10 387:21
    393:7,11,17
    395:18,19 403:5
    406:19 409:20
    410:1,19 416:22
    439:14 444:6,6
    454:5,8 469:6
    482:16,21 484:19
    485:20
supported 39:5
    45:17 50:10,17
    120:6 123:19
    186:14 243:11

245:9 251:23
    285:12 286:3,12
    287:9 288:13
    294:18 295:10
    488:19
supporting 46:18
    76:4,21 117:8
    402:4 403:2
    481:19 482:4,11
supportive 417:4
supports 46:15
    338:2 487:6
suppose 50:23
    53:11 226:8
    311:19 323:18
    381:3
supposed 28:9
supposedly 117:14
suppress 428:15
    428:23
suppressing
    401:10,14 437:15
    437:23
suppression 7:19
    404:1 406:1 411:9
    413:5
sure 15:2,20 32:15
    94:19 97:6 113:5
    115:9 118:13
    121:2 126:23
    139:1 181:4
    184:14,15 256:7
    273:15,16 277:18
    288:19 297:21
    325:12 340:23
    343:1 360:5,5
    434:4 453:3 463:9
    468:7 477:11
    485:7 487:14
surgeon 8:14 24:5
    64:10 66:18 95:4

95:7 106:5 119:14
121:16 123:10
130:20 133:6
154:20 155:19,19
159:18 160:13
174:19 198:17
213:2 274:16,17
281:7 284:16
315:10,12 402:15
443:8 464:15
466:4,17 467:11
467:14 472:17,20
473:1 475:12,17
476:9 480:14,15
**surgeon's**   79:20
466:5 480:18
**surgeons**   5:10
44:19 66:10 67:16
68:10 96:12 99:17
100:5,19 102:23
108:11 120:18,23
122:14 123:7,21
126:9 127:3
130:14 132:3,5
149:21 154:16
169:7 171:13
285:3 294:17,22
294:23 295:9,15
299:3 312:4 419:8
474:5
**surgeries**   24:21
25:2,8 59:16 90:9
90:10,11 103:8,13
118:3 119:22
120:19,23 121:23
122:1 125:14
140:12 142:4
143:8 147:15
148:11 176:8
177:4 315:22,23
336:4 338:18

358:13 379:20
478:21
**surgery**   6:8,11,14
7:10 8:5 22:21,22
23:3,4,15 25:3,14
25:17 26:2,14,17
27:14 28:11 30:9
31:7,8,12,23 32:3
32:10,11,17,19
36:23 44:13 45:1
45:3 46:2 47:8
60:1,17,22 61:5
64:18 66:11,21,21
67:9 68:4,5,6,6,17
69:7,16 71:3 72:4
72:4 73:2 79:22
81:2,6 82:10,12,14
89:7 90:7 95:12
100:17 102:20
103:19 104:7
106:2,9,10,17
107:13,20 111:9
111:18 112:10,14
112:22 114:10
115:19 121:17,19
122:2,7,9,21 123:8
123:17,23 125:9,9
128:8,8,13,14
130:3,15 131:16
131:19 132:1,18
133:17 134:3,17
138:10,11,17
139:7 140:5
141:13 143:4
147:20 149:3
151:8,23 152:5
159:3 166:23
167:4,8,14,20
168:8,13,18 175:5
175:10 176:22
178:2 181:21

189:3 250:5 273:8
273:8 282:4 283:5
283:9 287:13
290:11 291:6,15
291:19 293:5,19
296:1,20 299:21
300:6,10,18
306:11,13 309:12
309:16,21 310:19
310:23 311:14,14
312:3 314:11,18
316:1,12 323:1
328:3,8 331:3,9,13
332:5 333:8,14,19
334:3,6 335:4,20
337:11 338:11,14
346:17,22 351:9
351:19 358:17
366:14 373:21
375:7 376:13
382:23 384:22
386:16,17 387:2
387:14 390:1,16
391:3 392:23
393:12 394:22
423:22,23 425:17
426:14 427:6,18
428:2,7 429:8
432:3,8 433:19
437:21 444:19
450:15,22 454:6
466:21 467:1,3
468:12,14 469:17
472:16,23 473:16
473:22 474:15
475:5 476:2,2,15
477:4,5,10,14,21
478:20 479:10,15
481:2,15 482:18
488:18,23

**surgery's**   159:19
159:21
**surgical**   6:21
24:23 65:1 104:15
105:12 112:3
117:15 121:18
126:10 127:4
134:8 140:9
141:11,18 142:13
144:8 154:23
159:15 162:23
163:13 164:14
174:18 175:21
176:5 177:21,22
220:20 271:19
284:13 285:12
286:2,4 288:12
289:5 290:19
293:11 295:15
296:14 308:10,23
315:3,20 316:5
322:21 326:23
330:8 334:2,7
336:17 353:10,20
353:21 354:3
356:2,14 357:5,16
357:21 358:23
369:13 393:18
400:17 402:18
419:5 424:10
435:16 436:14,17
444:11 459:6,10
459:20 469:22
470:7 474:8
480:16 481:3,20
485:1,21 486:3
**surgically**   144:4
151:2 152:4 323:2
328:12 329:4
**surprise**   20:4,9
21:23 32:16,22

103:4 196:11
425:13,22
**surprised** 303:12
**surprising** 21:15
113:12,15
**surroundings**
348:11 349:7
**survey** 331:14
**surveys** 299:8
332:4
**suspect** 26:23
151:5 196:18
220:13,22
**suspend** 140:8
**suspicion** 58:23
185:12 433:22
**suspicious** 144:13
144:14
**swear** 10:12
184:23
**swede** 329:21
**sweden** 7:11 35:16
248:4 329:20
**swedish** 313:7
329:21 330:6
346:14 389:23
391:3 453:5
**sweet** 131:3
**swissophone**
389:9
**switch** 182:8
**sworn** 11:6 495:14
**symptoms** 152:7
405:18
**system** 116:7
280:10 319:6
345:21
**systematic** 6:22
8:1 300:8 307:18
356:3,12 357:3,20

**t**

**t** 4:10 33:2 182:13
202:16 203:4,4,11
203:11 277:14
360:9 372:7 425:7
446:12 492:1,1
494:3,3
**table** 87:14 129:21
131:5 302:7,9
307:13 337:6
338:8 349:20,23
350:13,16
**take** 14:11 24:20
69:14 90:22
115:17 131:17
140:16 143:11
176:6 204:18
282:11 294:12
312:15 315:7
316:15 318:6,20
319:21 367:20
397:1 408:13
463:14 470:3
471:18,19
**taken** 9:20 40:18
41:17 42:2 51:12
79:5 115:12
166:18 227:22
229:19 232:4
240:16 254:17
320:4 322:12
388:9 417:13
470:14 472:5
492:5
**takes** 42:8 80:17
80:23 107:12,19
111:5 112:3
118:10,18 221:17
222:13 231:23
232:16 242:1
429:20 442:12

443:11
**talk** 23:1 31:7
35:15 83:23
118:15 136:20
163:5 201:2
210:21 271:1
290:1 331:10
347:11,11,13
381:4 452:14,23
453:17,23 464:3
**talked** 61:16,17
87:22 110:1,14
169:6 189:14
204:23 232:8
261:19 267:12
268:1 290:18
300:20 324:14
345:11 347:3
351:23 352:8
354:12 363:9
380:20 421:3
424:13 429:14,15
448:5 469:11
**talking** 13:3 20:15
68:21 109:21
115:16 144:5
159:7 166:3
206:21 212:13
216:4 255:2
270:14 271:14
277:6 278:9
287:14 289:10,12
289:19 290:12,15
291:18 293:15
295:19 312:10
313:17 314:20
328:5 338:15,16
361:19 366:16
369:11 372:3,5
386:12 425:4
446:6 448:1,7

449:19 460:14
462:14 471:14
484:15 488:2,3
**talks** 131:22
240:12 402:21
**tangential** 132:10
132:16
**tangentially** 130:5
**tara** 2:12
**tattoo** 139:23
**tavistock** 53:19
**tborelli** 2:16
**teachers** 10:20
420:15,16 452:1
**teaching** 121:13
454:2 467:10
**teachings** 452:17
**team** 149:11 150:5
150:14 272:22
336:23
**teams** 83:14 151:9
**technical** 82:11
295:20
**technique** 130:9
130:17 284:13,15
289:12,15 299:1
310:10,21 311:3
311:11,21 312:14
**techniques** 130:13
286:11 290:11
295:1 296:15
311:12,20 338:3
**telephonic** 192:7
200:1
**tell** 21:18 22:8
68:5 76:21 114:19
174:8 196:8
207:18 208:13
214:23 292:6
341:4 352:21
372:3,6 434:2

telling 12:13 59:13
226:14 237:2
306:15 433:16
tells 244:11
temporary 265:8
ten 23:11 46:8
86:2 138:20,21
139:7 140:16,20
140:23 141:7
262:2,6 263:1
266:21 351:22
476:23
tend 210:14
284:16 285:4,5
tends 345:11
term 7:7,17 18:18
19:7,11,17,19 20:3
20:6,19 21:18,19
21:22 22:2,7
61:11 89:10
119:12 124:11
141:5 164:22
193:20 241:20
249:20 291:12
292:12 313:10
314:15,16 332:8
398:10 399:10
404:7 411:8 442:6
442:8,21 447:4,6,7
447:8 459:14
466:14 485:12
terminology 60:23
194:13
terms 24:8 26:7
89:20 93:17
119:10 148:12
152:22 176:20
277:21 311:16
355:13 413:22
424:17 446:21
458:12,14 469:20

469:21 484:22,23
487:8
test 219:10,11
324:11 332:3,22
333:1 486:12
testified 11:7
38:19 64:1 91:11
91:13 308:16
testify 38:15 90:21
173:13
testifying 90:23
91:5 95:10 274:23
testimonies 359:18
360:19 365:12
testimony 1:19
11:16 17:20 18:6
50:14 63:19 97:19
170:15 171:2
172:7,11,12,20
174:14,17 177:2
180:3,6,14,23
182:5 216:11
254:9 329:8 363:6
449:14 487:12
491:4,12 493:9
495:8
testing 281:20
282:2,12 437:16
testosterone 214:7
214:22 215:17
318:23
tests 124:9 211:11
486:9
texas 62:5,7,11
76:20,22 77:5
78:10 110:15,22
text 266:1 416:19
textbooks 73:1
thank 10:13 19:5
98:15 133:15
275:10 325:5,17

445:4 470:21,23
490:23 491:2,5,5,6
thanks 470:20
theirs 196:13
therapeutic 229:4
248:18 282:8
291:10 301:16
therapies 52:9
105:23 106:21
110:8 147:4
150:15 208:22
324:7
therapy 77:22
124:5 139:22
140:14 145:17,19
159:20 163:17
164:5,10 215:8
228:9 238:17
243:4 247:17
249:22 289:14
345:8 376:14
379:21 384:23
387:3 394:21
400:5 425:18
426:15 431:12
437:15,17,23
481:20 482:12
thing 59:1 70:20
93:21 94:10 96:22
98:17 103:16
114:21 125:11
127:13 140:3
145:15 159:22
162:1 164:21
222:23 303:16
358:3,6 364:5
380:14 403:18
436:3 440:8,10,11
459:17 475:6
478:22 487:11

things 16:13 20:16
46:10 50:21 53:6
54:6 68:11 77:22
83:12 101:8 102:1
102:16 103:23
105:20 106:1
119:11 121:13
122:22 123:2
144:11,14 159:15
178:7,17 209:16
210:1 218:12
224:4 226:11
247:6 260:5
262:14 271:14
281:9 282:16
288:7 290:21
299:8 301:6,17
313:15 332:7
333:2,18,20,22
334:4,11 347:3
369:17 392:18
402:8 404:8 421:2
432:13,15 447:19
457:22 463:11
464:2
think 14:9,13,14
15:17 16:1 18:15
18:15 19:18,21
25:8 26:2 32:11
45:12 46:20 48:19
52:16,21 54:4,17
58:7 61:10 62:9
62:10 65:19,19
69:9 72:11,17,18
73:12,20 74:5
82:3 84:6,11 85:2
85:15 86:10,15
87:1,6,19 88:6
93:11,15,17,20
94:10,11,14,16,17
94:22 96:20 97:10

98:10,13 99:10
100:12 101:7,11
101:17,19 102:21
103:6,20 105:11
105:14 106:16
107:1,14 110:20
110:20,21 115:4
117:17 118:8,17
118:21 119:1,3,3
121:5,8,9 122:19
141:14,18 149:5,6
152:3 160:4,10
163:19 165:23
166:11 171:22
179:12 180:4
184:11,12 196:5
196:12 202:9,11
206:4 218:12,18
222:10,15 227:21
238:8,10 245:7
256:5 262:22
273:11,13,17
279:4 280:19
281:12 282:20
285:11 286:2
290:20 297:17,23
298:12 306:15
318:18 322:7
323:22 327:13,22
328:3 334:15
335:2,21,22 341:3
345:23 346:2,9
359:23 365:14,18
366:3 377:1 380:8
386:11 389:6,7
392:22 399:4,8
402:14 408:2
409:14 410:15
420:3 434:1 439:4
439:8 443:17
448:13 453:18

460:16 462:2,8
474:6,22 489:3
**thinking**  106:12
154:17 166:2
372:4 470:1
**thinks**  154:9 383:8
**third**  27:20 41:2
64:16 65:6 71:4
98:4 133:1 195:6
300:4 309:5 348:1
356:11 357:7
391:19 430:22
437:11 440:11
**thirteen**  416:18
**thirty**  107:2 195:6
232:5 246:19
**thonen**  446:7
**thought**  50:15
95:20 103:4
121:20 180:10,12
266:20 471:8
**thoughtful**  126:21
**thoughts**  462:20
**thousand**  360:22
416:15
**thousands**  120:18
**threaten**  67:3
**threatening**  119:9
314:2 490:7,17
**three**  10:18 14:9
15:19 19:17 24:5
51:3 73:11 103:17
110:6 116:12
122:21 123:17
124:15 125:12
138:22 160:6
165:1 174:21
175:5,22 176:6
229:18 247:7
260:8 261:7 299:2
312:14 327:6

336:15 337:23
364:14 381:22
391:17 431:10
455:22
**throttling**  143:10
**thursday**  9:17
491:10
**thyroid**  156:8,12
**thyroidectomy**
156:13
**time**  14:22 19:2
20:2 24:7,13 29:9
88:5 100:10 101:5
102:8 121:20
133:8 135:5 137:9
141:10 161:7
169:19,21 170:3,7
202:7 226:7,13
267:7 269:18
273:6 311:23
332:13 344:14
345:12,14,18
347:17 351:18
412:12 416:16
436:4 447:22
470:4,20 471:22
473:13 474:20
492:13 493:19
**timeframe**  493:8
**times**  13:1 14:7,9
29:1 159:6 206:10
390:1 468:2
**timing**  139:2
**timmerie**  465:16
**tipping**  123:16
**tishyevich**  2:6 4:4
4:7 10:14,15 11:9
15:19 16:11 78:23
79:9 114:22 115:7
115:15 125:22
126:16 166:13,22

182:12 186:20
254:12,21 256:12
319:23 320:8
325:22 340:5
370:3 388:13
389:12 414:14
417:9,16 445:5
470:9,18 471:2,23
472:2 489:6,10
**tissue**  467:17
479:5
**title**  230:21 464:14
**titled**  36:3 55:12
59:15 62:23
115:23 129:20
131:11 133:10,20
134:6,12 225:6
233:13 256:19
299:19 326:12
340:8 350:13
356:2 376:12
397:9 399:15
411:7 415:9 427:5
430:13 450:21
453:5 456:1
458:21
**today**  11:17 12:16
13:14 14:3 70:10
92:1 120:17
123:11 126:9
127:5 170:21
173:22 180:13
181:8 192:19
221:20 230:9
233:9 239:8
252:18 288:8
297:16 313:17
470:20 488:15
**today's**  491:11
**told**  48:20 165:17
261:23 262:4

409:7 443:19
**top** 58:2 59:15
108:10 109:8
128:7 130:14
167:14 224:13
240:23 263:13
337:7 367:11
375:19 377:11
384:18 394:16
421:9,21,21
430:16 434:8,17
453:8 461:1
**topic** 239:10 458:7
458:19
**topics** 90:13
180:23 181:11
452:10
**total** 338:22
345:15
**totally** 19:4 229:11
314:7,8
**touch** 98:6
**touched** 216:17
**toxin** 263:5 490:13
**track** 312:12
**trade** 201:9 203:5
203:9
**tradition** 8:2
**train** 106:6 155:7
157:8
**trained** 68:11 75:5
104:2 155:8 157:1
157:9,14 211:6
274:18 275:6
**training** 66:3,6,8,9
66:12 67:20 69:3
69:5,10,19 73:3
74:4,13,16 75:14
95:15 101:22
107:7 121:12,16
122:4,15 124:21

125:15 155:13
156:2 158:4 204:3
274:11,15 284:19
284:23 466:16
467:10,13 468:16
472:23 477:3
483:4 488:22
**trajectory** 152:23
**tran** 18:9 365:12
**trans** 145:21
148:13 151:12
370:1 428:15
429:1
**transcript** 8:20
15:12 18:7,11,12
18:22 492:7,11
493:6,18,20 495:5
495:8
**transcripts** 17:19
18:5
**transfeminine**
167:13
**transform** 323:1
**transformative**
71:2
**transgender** 4:22
19:7 20:19 21:11
22:1 40:4,7 55:13
63:1 64:19 65:1
79:17,21 81:2
82:12 83:13 89:6
95:17 104:6 106:2
106:10,17 109:13
122:9,12 123:7
130:14 131:23
132:7,11,12
136:21 145:1,10
146:7 147:5 151:9
160:21 167:4,11
167:17,21 168:1,4
168:9,13,18 169:1

175:21 178:22
179:1 181:20
182:10,17 214:2,6
247:17 314:6
318:12 341:9
342:15 343:16
347:1 348:20,22
351:9 353:3 354:7
355:12 365:7
366:8,9,12 368:10
368:15 369:1,6
374:11 386:17
412:17 428:17
444:1,18 448:6
450:1,22 454:5
460:15 463:14
468:11 469:16
476:15,18 477:14
478:21 479:10,15
482:18 485:22
486:10
**transgendered**
259:17
**transgenderism**
194:16
**transition** 55:13
113:10,19 153:1
165:18 169:2
176:22 287:13
353:4 359:19
360:20 363:10
365:17 366:10,18
395:12,19 397:9
397:17,21 398:11
398:18,23 479:22
**transitioned**
148:14 328:13
**transitioning**
82:13 94:3 146:4
178:13 238:20
312:3 320:20

321:5,21 360:15
373:22 416:23
**translation** 7:14
**transmen** 344:17
344:18 345:15
**transsexual** 7:8
330:18 392:1,8
**transsexualism**
392:12
**transsexuals** 6:13
**transwomen**
344:16,18 345:15
348:8 349:4
416:14 417:6
**trauma** 133:13
143:1 178:18
272:18 279:5
**traumatic** 178:6
**treasurer** 10:22
**treat** 65:9 131:22
132:1 144:23
151:7 215:18
220:19 231:19
435:17 436:20
450:1 460:2
488:19
**treatable** 122:6
**treated** 131:1
132:14 144:1
146:8 150:22
151:1 152:2,6
212:13 217:20
318:23 400:1
**treating** 75:14
136:21 146:21
200:14 218:9
249:7 262:9 273:5
460:8
**treatment** 4:21 8:7
8:11 19:7 20:19
21:11 22:1,3 39:5

40:19 41:5 49:16
52:1 54:10 63:1
65:1 78:19 80:18
81:7 89:10 111:6
117:15 129:20
137:4,11,18
146:23 151:16
153:11 178:6
186:12,14 195:17
196:15 206:16
211:21 214:11,17
215:1 216:9
219:19 220:16
225:14 266:4
267:17 268:4,7
316:19 329:11
340:11 345:22
350:17 353:2,10
353:21 354:3
373:10 374:17
375:1 392:11
394:21 402:3,5
405:8 406:2,6,23
422:20 423:8,17
424:1,10,21
429:21 430:13
431:1 433:20
434:22 435:22
437:13 438:2
459:21 460:14,17
473:4 474:21
475:3,4 481:3,14
481:21 482:12
483:14,22 485:21
487:21
**treatments** 35:5
36:18 43:15 44:2
65:21 89:8 119:6
120:5 139:21
140:5 150:16
319:3 373:20

487:15
**treats** 342:14
**trelstar** 203:11
**tremendous** 70:23
162:4,6 165:16
290:1 484:18
**trend** 109:15,21
**trending** 465:15
**trends** 340:10
**trial** 217:21
236:15,17,19,21
237:4,22 246:17
249:13 250:3
251:13 252:6,9,10
252:13 268:21
270:2,19 272:19
273:7 274:21
275:17 291:8
292:19 293:1,6,10
301:16,17 310:16
316:6 341:12
412:1
**trials** 120:11
218:12 235:22
245:10,20 246:11
246:22 247:20
249:3,18 250:21
251:23 269:4
271:2 280:8
293:20 294:10
298:3 302:18,18
307:20 422:23
**tried** 96:10
**triptodur** 203:3
**trivial** 244:18
**troubled** 179:13
179:22
**troublesome** 381:2
**troubling** 179:20
402:8

**true** 17:4 30:5
33:18 151:19
196:11 270:7,10
348:3 349:2 351:4
409:13 461:16
492:11 495:8
**truth** 444:7
**truthful** 11:16
**truths** 449:18
**try** 16:12 69:12
288:3 289:15
294:23 334:1
443:1
**trying** 19:20 88:11
91:18,20 94:5,16
149:6 153:5
273:11,13 276:3
279:4 300:15
324:19,21 334:22
340:20 345:4
348:22 455:2
458:9
**tubularized**
478:18
**turn** 151:20 397:6
471:15
**turned** 150:8
471:6
**turns** 45:23
**twenty** 107:2
219:21 320:12
**twice** 165:5
**two** 25:20 84:3,5
98:11 99:23 100:1
136:15 139:17
144:5 147:21,22
148:18 172:10
271:7 307:18
336:15 337:22
344:11 364:14
391:17 404:14,16

407:17 431:10,12
455:22 459:2
460:5 468:18
475:22
**type** 202:21 282:7
333:13 335:20
343:8 350:18
**types** 36:17 203:14
316:11 343:19
358:17
**typical** 90:10
160:22 315:19
**typically** 50:17
149:10 165:2
203:21 207:18
211:10 214:3,8
271:7,11 337:22
385:13 490:4
**typo** 359:21,22
**typology** 7:1

**u**

**u** 16:12,16 20:23
203:4 299:19,19
**u.s.** 137:2 425:12
**uc** 86:14 273:12
278:7
**uh** 264:9 361:16
365:4 396:17
420:20
**uk** 7:22 411:11
**ulcer** 121:19,23
122:7 123:11
**ulcers** 121:20
**ultimate** 459:17
**ultimately** 53:17
156:13
**ultrasound** 142:11
**unable** 413:3
**unacceptable** 8:16
464:16 466:3
467:8,12 484:7

unapproved 5:14
225:7 228:4,5
230:22 231:6,11
unbiased 409:14
unborn 131:12
uncertain 412:19
uncertainty
406:18
unchangeable
442:14 443:13
uncommon 255:5
255:16 294:16
357:10 358:22
463:22
uncontrollable
478:6
uncontrolled
411:19 413:10,14
undergo 316:21
330:19 390:15
undergoes 61:4
undergoing 7:9
60:5 211:21
213:18
undergone 419:5
underlying 194:19
210:8 211:1
215:14 217:19
368:19
underneath 60:10
underpinnings
104:14
understand 26:8
28:7,14 29:4,17
30:20 99:3 100:14
116:23 143:16
156:15 159:2,8,10
162:2 182:7
225:19 228:13
229:17 234:15
239:19 247:13

264:16 266:3
274:12,22 275:8
277:9 288:18
297:6,15 300:14
342:4,13 346:19
348:23 357:2
369:15 377:16,23
378:9 382:21
384:3 390:9
399:20 404:13
406:10 419:22
423:5 427:14
437:20 440:16
441:5 443:9 452:6
457:3 458:15
466:13 468:17
understanding
5:13 21:5 33:17
83:10 90:6 149:20
150:2,9 160:20
184:10 195:9,14
230:21 275:19
347:6 402:20
444:10 449:15
459:23 460:12
466:21
understands 207:2
understood 14:1
118:13 130:21
133:10 195:15
373:4
undertook 411:19
underwent 344:12
344:19 345:6,16
389:23 391:2
unethical 118:4
120:12
union 420:15
unit 9:18 79:3,7
166:16,20 254:15
254:19 272:18,23

320:2,6 388:7,11
470:12,16 491:9
united 1:1 8:9 9:22
433:18 434:8,18
435:21 437:20
441:8,21 472:17
474:2 475:13
unitedhealthcare
433:7
university 95:13
95:19 96:8 272:16
368:18
unknown 320:18
321:6,12,15,22
322:1 330:2
367:12 486:16
unlabeled 228:6
unofficial 7:13
unproven 120:4
206:22 481:15
unquote 291:20
351:4 367:23
unreliable 280:15
unsupported
243:4
untenable 250:6
untested 120:4
unusual 106:13
unverified 120:2
280:7
update 6:3 7:6
31:1 256:21
381:10 382:13
updated 171:16
197:17 378:1
430:19 435:4
updates 197:22
198:2,8,21 199:13
199:18 200:2,4,21
updating 198:20
441:20

ups 337:22 489:4
upset 409:6
urethra 478:13,14
478:15
urethral 336:17
336:18 338:10,20
urgency 463:12
urinary 178:16
usage 258:3
use 5:14,17,22
18:18 19:7,11
44:15,22 61:11
64:18,23 73:22
84:22 87:23 101:3
112:13 119:5
130:8,10,16 145:2
145:18 161:15
162:18 189:18
194:12 205:13
206:4,8,9,9,10,18
207:1,3 216:5,13
218:2,5,6,18,22,22
219:6,10,16
221:17 222:2,4,7
222:16 226:2,6,12
226:23 228:17,19
229:9 230:22
231:6,11,23 232:9
232:16 233:14,20
234:1,3,7,19 237:1
237:18 238:2
239:5 240:2,10,16
241:3,8,12,16,22
242:2,3,6,9,21
243:10,18,22,23
244:3,8,11,23
246:5 247:12,19
249:7 250:17
251:22 253:2,5,13
253:15 254:11
255:3,5,16 257:3

257:13 258:6
259:18,21 260:16
260:23 261:9
262:9,16,23 263:4
265:22 267:11,12
267:23 268:22
269:5 270:3
316:23 333:21
338:5 354:19,21
385:4 389:10
406:12,19 417:5
438:19,19 442:21
443:3,10 446:20
459:22 461:22
466:14 482:16
483:8,20 484:8,17
488:18 489:12
490:16
**useful** 310:3
330:22 344:2
354:23 355:1,13
374:20
**useless** 355:16
**uses** 225:7,14
226:15 228:6
229:1 241:17
461:20 469:12
484:4
**usually** 88:2
145:23 149:15
162:6 210:14
298:20 299:2
**utah** 4:18 54:8,16
56:1,12 57:10
58:15,20 59:7
61:17,20 77:8,11
78:7 109:23
110:14,23 117:7
**utterly** 8:15
220:23 247:11
464:15 466:2

**uva** 106:7,9,10
125:9

**v**

**v** 1:12 9:21 16:21
33:2 202:16 203:8
322:18 493:4
494:1 495:1
**vaginal** 476:16
479:3,7,7
**vagineal** 479:3
**vaginoplasty**
168:1 175:13
476:18 478:23
**vague** 87:9
**valid** 23:11 199:3
209:4 228:23
288:4 310:21
314:7,9 485:13
486:1,2
**validated** 282:13
282:14
**validity** 274:19,22
275:2,19 282:17
358:9
**valuable** 333:17
**value** 305:22
**values** 334:14
**van** 86:7,10
**vanderbilt** 2:8
**vantas** 202:15
**variation** 71:19
**variety** 145:15
201:8,12 332:2
**various** 13:1 36:17
94:2,2 144:9
160:12 208:23
473:4
**vascular** 339:1
468:3
**vast** 330:17 335:18

**vehemently** 247:4
**venues** 160:12
**veracity** 274:19
**verbiage** 185:12
400:8
**verify** 493:9
**veritext** 10:6,9
493:14,23
**veritext.com**
493:15
**version** 7:16 183:2
183:9 184:5,8,18
185:4 187:3,9,13
187:18 188:1,7,16
188:20,23 189:10
196:21 396:15
397:4 398:15
399:3 401:1
**versus** 77:18 92:11
135:15 299:6
432:14 473:7
477:7
**vertical** 349:20
**veterans** 137:7,12
**victory** 161:20
**video** 256:6
**videoconference**
1:18 2:4 3:2,18
9:7
**videographer** 3:20
9:15 10:7 79:2,6
115:10,13 166:15
166:19 254:14,18
320:1,5 388:6,10
417:11,14 470:11
470:15 472:3,6
491:8
**videorecorded**
9:18
**videotaped** 1:18

**view** 42:9 79:21
80:17 118:10,19
186:6 428:1
431:18 432:7
442:11 443:9,10
484:3 485:9,10,23
486:14 487:14
488:17 489:14
**views** 398:7
452:11 465:2
489:12
**violated** 170:2
171:3 182:3
**violating** 182:1
**violation** 179:8
182:5 316:3
464:22
**violence** 67:13,15
**vir** 292:6
**virginia** 262:13
**virtually** 102:14
369:7
**visible** 319:12
328:5
**visit** 347:10
**visited** 341:23
342:7
**visiting** 343:2
**visits** 257:22
258:11
**vital** 309:9
**vocal** 125:5
**vol** 5:11
**volume** 74:7
**vote** 63:16,21
**vs** 394:23
**vulnerable** 76:9
120:13

## w

w 182:13 340:15
356:2 445:6
wait 289:15,17
313:22
waiting 77:20
waits 293:9
walk 377:8 444:23
wall 2:20
walter 11:14
wandered 186:15
want 15:1,19 19:3
72:13 80:11 90:12
101:13 126:23
135:1 150:13,19
151:18 172:9
181:3 210:19,21
256:6 262:18
272:7 273:14
289:22 344:23
349:22 359:12
362:12 396:13
397:20 420:5
453:2 462:16
470:3 480:8,9
487:13
wanted 82:10 90:5
95:19 159:2,7,9,12
159:13 194:12
440:22 441:3
452:6,8 472:10
487:12 489:5
wanting 159:19
235:18
wants 148:14
149:22 166:4
219:7
ward 156:4,7
warning 215:20
489:22 490:1,4,11

warnings 215:22
warrant 217:17
218:6 253:7 310:9
warranted 217:18
watchful 77:20
wave 260:9
way 38:15 54:3
73:1 88:13 132:10
134:19 151:9
171:4 181:21
206:19 225:4
243:3 244:14
245:5 261:9
266:19 311:9
317:17 322:13
338:3 346:18
350:2,21 354:5,9
367:4 382:5,12
385:18,21 429:6
438:8 442:1 443:2
447:10 449:6
462:20 474:11,13
486:12
we've 61:16,17
77:8,11 125:2,11
175:2 180:19
182:6 268:1 344:5
439:10
weak 51:6,19
weakest 382:10
wealth 292:1
web 27:13
website 230:19
361:19 362:7
366:21 407:12
455:14
wednesday 63:12
weeks 15:2,16,20
37:7 156:7
weigh 206:12
207:1 226:2,9

weight 284:1
292:2
weighted 185:13
welcome 351:2
welcomed 443:18
444:2
went 74:1,3 94:5,6
97:14 103:18,23
104:4 139:18
164:4,9,14 165:17
188:1 192:1 200:7
336:20 361:9
west 2:14
whatsoever 61:21
white 102:2
298:22 387:5
who've 145:12
widely 189:21
201:6
wider 410:7
wiepjes 6:17
340:15
williams 3:10
willing 90:21 91:7
96:13 286:10
wilson 6:20 356:1
winston 3:13
wisdom 436:15
wise 311:10
wish 470:5
withdrawn 108:3
177:12
witness 9:10 10:13
91:11,13 92:16,22
174:11,22 255:22
256:2,9 280:23
281:3 325:15,18
327:3 332:10
335:1,7 340:6
341:1,6 350:7,11
384:12 385:19

400:9 408:4 413:1
420:8 426:4,7
440:21 445:15
491:2 493:8,10,12
493:19
witnesses 90:15
91:3,8 92:20
172:21 173:10
woman 456:15
woman's 156:3
women 151:12
152:15 214:2
348:10 349:6
wonder 393:6
452:22
wondered 134:21
word 176:15,17
228:3 438:20
462:16 469:12
words 60:13 61:13
209:16 392:15
402:11 443:10
work 45:7,18
61:21 76:21
184:17 191:13
192:18,21 193:3
198:2 211:12
212:2,18 213:17
466:7
worked 110:17
273:6 382:7
working 16:5,17
17:2,8 143:2
156:20 184:8,18
190:16,21 192:7
272:17 273:1
474:5,7
works 48:21 311:1
world 117:22
121:14 123:16
125:1 161:4

177:16 182:9
260:3 329:1 332:5
410:5,8 412:16
428:16 474:22
476:7 479:10
480:12 486:22
487:5
**worldwide** 416:11
**worry** 135:8 264:5
**worse** 392:19
393:8
**worst** 381:18
**worth** 485:6
**worthless** 282:23
283:3,4
**wound** 289:13
450:14 475:7,10
478:11
**woundedness**
67:21
**wounds** 475:6
**wpath** 7:15 182:8
182:16 183:13,16
183:18,19,23
184:8,17 185:3,22
187:2,8,12,17
188:6,16 189:5,10
313:3 395:7,10,14
395:21 396:13
397:3 398:14
402:10 428:18
429:2
**wpath's** 184:4
**wrinkles** 262:10
**write** 144:22 280:4
**writing** 185:19
441:20
**writings** 195:11
**written** 130:19
**wrong** 43:23 62:10
184:11,13 379:23

397:11
**wrote** 183:7 408:3
**wyoming** 3:7

**x**

**x** 4:1,10 360:9

**y**

**y** 256:19,19
**yackey** 6:1 256:19
**yeah** 18:15 22:1,7
22:13 32:16 41:22
42:5,23 48:2
51:20 54:19 65:19
69:14 73:17 78:12
83:2,18 84:5,9,11
91:23 92:5,12
96:20 97:4 99:5
99:21 100:1,15
101:4,9,17,19
102:13,14,21
103:1,5 105:5
107:10,17,23
108:3 109:1,4,7
110:20 111:23
113:3,4,5,11,13,14
114:4,4,23 118:15
119:3 128:1,10
130:22 133:9
135:9,12 143:9
144:17,19 145:4
146:18 147:2,13
148:3,5,6,21 149:5
150:21 151:10
152:16 153:2
154:23 155:1
156:22 157:5
160:3 162:10,12
162:18 163:7,9
164:1,7,21 166:11
171:4,20 179:19
179:23 185:23

186:8,18 188:15
189:7 195:21
196:19 205:7,9
208:2,5,9 211:3,19
212:10 213:12,13
220:6,7 221:1
224:6,12 228:5
229:7,11 236:12
236:22 237:12,21
237:22 238:5,6
240:21 242:1,6
243:14 245:14
246:18 251:5,12
251:19 253:21
256:1 263:2
264:19 266:22
267:4,13 268:12
268:12 272:2,3,3
273:19 280:21
281:4,10 285:3
286:15,18 289:21
290:14 294:8
295:5,19,21 297:4
297:10,21 300:16
301:5 303:10,14
303:15,21 304:5
305:5,6 307:10
309:1,14 311:6,19
313:16,17 315:6,9
315:19 318:14
321:13,23 322:1,7
323:13,21 325:1,9
326:4,5,8 328:4,17
329:7,13,20
332:18,18,19
333:1,16 334:11
335:2,6,8,9,10
336:11 338:7,8,18
338:19 339:23
340:16 341:2,7,12
341:13 343:10

344:3 345:17,23
346:9 347:10
349:10 350:3
351:6,22 352:8
353:11,15 358:19
359:21 360:15,22
361:8,21,22 362:4
362:18 367:3
371:2 375:9,10
377:5,7 378:18,22
378:23 379:9
382:6,11,17 384:5
384:8,13 385:12
387:7 390:4,9,20
390:23 391:12
392:14,21,22
393:2,4,10 394:18
395:20,21 396:5
396:12 398:19
399:4,7,23 400:3
400:10,14,22
402:7,10 403:1,3,6
403:11,19 404:12
404:13 406:21
407:23 408:5,6
411:14 413:2,2
416:7 417:1 418:1
418:18 420:4,11
421:14 423:16
424:6,13,18
426:10 428:5
429:17 431:23
434:1 435:11
436:2 438:6,10
441:5 443:23
445:2,8,12 452:14
453:11,23 456:2
458:19 460:16
461:11,21,22
464:11 471:4,9,23
472:20 480:6,10

**year** 7:20 24:15,19
24:22 34:1 37:9
57:9 63:7 76:3
117:5 138:5 139:3
143:11 148:4
184:7,12 196:16
300:10 302:10
317:6,19 342:22
344:8 345:19
346:5 380:10,11
380:19 411:10
427:15 477:3
**years** 6:10 23:11
24:2,5 25:20 32:6
44:14 46:1,8 51:3
63:9 69:9 72:21
95:14 97:3 99:21
99:23 100:1
102:17 103:17
106:2,20 107:2
122:4,21 123:1,5
123:18 124:15
125:12,17 129:11
129:15 130:18
138:19,20,21,22
138:23 139:7,10
140:16,20,23
141:8 148:9 160:5
165:1 170:9,9
174:21 175:6,22
176:6 181:17
196:6,12 202:11
213:4 219:21
232:5 246:19
247:7,21 257:5
260:8 261:7 262:2
262:6 263:1
266:21 283:8
297:5 298:16,17
300:8,10 301:19
307:12 312:14

313:8,11 337:13
337:14,18,23
344:13 346:7
347:12 351:22,22
352:2 381:22
402:15 443:7
468:15 476:8
**yesterday** 14:12
14:19,21
**york** 2:9,9,21,21
**young** 7:21 161:11
368:12 369:7,9,22
411:10 469:1
**younger** 142:22
347:10
**youtube** 367:16

## z

**z** 16:12
**zantac** 123:13
**zero** 21:12 284:7
**zoom** 10:4 325:17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.