# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

        *Plaintiffs*,

        v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

        *Defendants*.

Case No. 1:19-cv-00272-LCB-LPA

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
EXCLUDE EXPERT TESTIMONY OF STEPHEN B. LEVINE, M.D.**

# TABLE OF CONTENTS

I. STATEMENT OF THE CASE AND FACTUAL BACKGROUND .......................... 1

II. QUESTION PRESENTED ........................................................................ 1

III. SUMMARY OF THE ARGUMENT ......................................................... 1

IV. ARGUMENT ........................................................................................ 3

    A. Legal Standard ................................................................................ 3

    B. Many of Dr. Levine's Opinions Have No Relevance To This Case Because They Are Consistent With Plaintiffs' Position. ......................................................... 6

    C. Certain Opinions of Dr. Levine Have No Relevance To This Case Because They Address Issues Beyond The Scope Of The Dispute Or Have Already Been Decided By The Fourth Circuit. ................................................................ 8

    D. Dr. Levine's Testimony Is Methodologically Unreliable and Unsupported by Science or Medicine. ...................................................... 11

        1. Dr. Levine's Assertion that There are Widely Varying Views about the Appropriate Treatment for Gender Dysphoria Is Simply Wrong. ............................. 12

        2. Dr. Levine's Opinion That Accessing Gender-Confirming Care Is Experimental and Unethical is Unfounded. ...................................................... 13

        3. Dr. Levine's Opinions About Gender Dysphoria in Transgender Children and Puberty-Delaying Treatment Are Not Based In Fact. ............................... 15

        4. Dr. Levine's Assertion that "Social Contagion," "Rapid Onset Gender Dysphoria," and "Involvement With the Internet," as Causes for Gender Dysphoria Justify Denying Treatment to Transgender People Is Not Supported By Scientific Evidence. ...................................................... 17

        5. Dr. Levine's Assertion That The "Transgender Treatment Industry" Is An Entity That Exists And Is Monetarily And Politically Motivated To Push Medical Treatments On Transgender People Is A Political Not Scientific Opinion. ............... 19

    E. Dr. Levine Is Not Qualified To Offer Opinions About the Treatment of Pre-Pubescent Transgender Children In This Case. ..................................... 20

    F. Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403. ................................ 22

    CONCLUSION ................................................................................ 23

# I. STATEMENT OF THE CASE AND FACTUAL BACKGROUND

Plaintiffs, all current or former employees, or dependents of current or former employees, of certain North Carolina public Universities ("NC Universities") or the North Carolina Department of Safety ("NCDPS") filed an Amended Complaint with this Court on March 12, 2021 challenging a discriminatory exclusion in the North Carolina State Health Plan for Teacher and State Employees ("State Health Plan").

Plaintiffs contend that the State Health Plan's exclusion of coverage for gender-confirming healthcare treatment violates their equal protection rights and discriminates against them based on their sex in violation of Title IX and the Affordable Care Act.

# II. QUESTION PRESENTED

Whether the testimony of Stephen B. Levine, M.D.,[1] should be excluded because it is irrelevant and unreliable in accordance with *Daubert* v. *Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) and the applicable Federal Rules of Evidence.

# III. SUMMARY OF THE ARGUMENT

Dr. Levine's proffered opinions fall into three categories of exclusion. First, most of Dr. Levine's opinions are irrelevant because they are not in opposition to the relief Plaintiffs seek and instead align with Plaintiffs' experts. Second, Dr. Levine's opinions fail to create any material disputes of fact because the relevance of his opinions are outside the scope of the parties' dispute which is simply whether an insurance plan can exclude coverage for some people that it does not exclude for others. Further, his opinions cover

---

[1] Declaration of Stephen B. Levine, M.D., signed April 28, 2021, is attached as Exhibit A to the concurrently filed Declaration of Carl S. Charles ("Charles Decl.").

1

topics already addressed by Fourth Circuit precedent including the appeal in this case, *Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422 (4th Cir. 2021) and *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021). Third, Dr. Levine's remaining opinions must be excluded because they are unreliable, not based on scientific methodology but rather untested hypotheses, pure speculation, and beliefs that lack any support besides Dr. Levine's own *ipse dixit*. As Dr. Levine's opinions should be excluded pursuant to *Daubert* standards, and – when viewed in the context of Federal Rule of Evidence 403, any probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues confusion of the issues, waste of time, undue delay and needless presentation of cumulative evidence – this Court must exclude them.

Relevant to this Court's consideration is other federal courts' resounding dismissal of Dr. Levine's opinions about transgender people and the treatment of gender dysphoria. This began seven years ago with the holding in *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188–89 (N.D. Cal. 2015) that "the Court gives very little weight to the opinions of Levine, whose report misrepresents the Standards of Care; overwhelmingly relies on generalizations about gender dysphoric prisoners, rather than an individualized assessment of Norsworthy; contains illogical inferences; and admittedly includes references to a fabricated anecdote." This holding was echoed in *Edmo v. Idaho Dep't of Corr.* 358 F. Supp. 3d 1103, 1125-1126 (D. Idaho 2018) (vacated in part on other grounds in *Edmo v.*

*Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019)) (holding that Dr. Levine "is an outlier in the field of gender dysphoria" and place[s] "virtually no weight" on his opinions.).

Dr. Levine's opinions were further diminished in *Hecox v. Little,* where the Court dismissed his opinion that "gender affirming policies are harmful to transgender individuals," and instead "accept[ed] Plaintiffs' evidence regarding the harm forcing transgender individuals to deny their gender identity can cause." 479 F. Supp. 3d 930, 977 n.33 (D. Idaho 2020). And in this year alone, two more federal courts strongly discounted his proffered testimony by granting preliminary injunction motions against laws banning gender-confirming medical care and participation in school athletics, respectively. *Brandt v. Rutledge*, No. 4:21CV00450 JM, 2021 WL 3292057 (E.D. Ark. Aug. 2, 2021); *B. P. J.* v. *W. Virginia State Bd. of Educ*., No. 2:21-CV-00316, 2021 WL 3081883 (S.D.W.Va. July 21, 2021).

## IV. ARGUMENT

### A. Legal Standard

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert*, 509 U.S. at 597; *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021); *see* Advisory Committee Note to 2000 Amendments to Rule 702 (amendment "affirms the trial court's role as gatekeeper," and that "all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful"). The party offering the expert carries the burden of

3

establishing the admissibility of testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

The initial step is to determine whether the proposed expert is qualified to render the proffered opinion. In doing so, a trial court considers an expert's professional qualifications and "full range of experience and training." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (cleaned up). If the purported expert lacks the knowledge, skill, experience, training or education on the issue for which the opinion is proffered, the trial court must exclude the expert. *See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019) (Biggs, J.), *aff'd*, 842 F. App'x 847 (4th Cir. 2021). Even if the expert is deemed qualified, the trial court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis,* 10 F.4th at 282 (cleaned up). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id*. at 281 ("Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded.").

Finally, if deemed relevant, the trial court will inquire if the opinion is based on a reliable foundation, which focuses on "the principles and methodology" employed by the expert to assess whether it is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id*. at 281, 290 (cleaned up). When evaluating whether an expert's methodology is reliable, a court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or

potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-150 (1999); *Daubert,* 509 U.S. at 593-94. While trial courts have "broad latitude" to determine reliability, they must engage in the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281.

In certain situations, when an expert relies upon his experience and training, and not a specific methodology, the application of *Daubert* is more limited. *See Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997). When addressing an expert whose methodology is grounded in experience, courts use three factors: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd*., 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015); *see also Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, No. 1:17-cv-53, 2021 WL 736375, at *3 (M.D.N.C. Feb. 25, 2021) (Biggs, J.).

Finally, because "expert evidence can be both powerful and misleading because of the difficulty in evaluating it," "the judge in weighing possible prejudice against probative force under Rule 403…exercises *more* control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (cleaned up). As such, "the importance of [the] gatekeeping function cannot be overstated." *Sardis*, 10 F.4th at 283 (cleaned up).

5

**B. Many of Dr. Levine's Opinions Have No Relevance To This Case Because They Are Consistent With Plaintiffs' Position.**

Nearly all of Dr. Levine's opinions are not relevant and will not help the "trier of fact to understand the evidence or to determine a fact in issue," because, with very limited exception, he simply does not oppose the relief plaintiffs seek. *Nease*, 848 F.3d at 229. For that reason, Dr. Levine's opinions do not "fit" with the facts relevant to resolving Plaintiffs' claims. *Bourne v. E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004); *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 846 (W.D.N.C. 2016) ("The test for relevance, or 'fit,' considers 'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" (quoting Daubert, 509 U.S. at 591)).

Overwhelmingly, Dr. Levine's opinions align with the relief Plaintiffs seek in this case: that adolescents and adults with gender dysphoria receive and be able to access and afford individualized medical treatments. Charles Decl., Ex. B at 66:21-67:3; 69:18-70:2. For almost fifty years, Dr. Levine's clinical practice has notably adhered to the medical community's widely accepted and authoritative guidance for transgender care, the World Professional Association of Transgender Health ("WPATH") Standards of Care ("SOC"). Charles Decl., Ex. C at 1-100:15-22. As the WPATH's former Chairman of the SOC Committee, Dr. Levine helped to write Version 5 of the WPATH SOC, recognized his own writing in Version 7, and asked if he could help draft the forthcoming Version 8. Charles Decl., Ex. A at ¶3; Ex. D at 37:17-38:7; Ex. C at 1-90:10-20. In accordance with the SOC,

he provides individualized treatment including providing letters of recommendation for gender affirming surgeries and hormone therapy. Charles Decl., Ex. B at 55:13-17; 56:2-5; 112:16-21; 176:8-16. He does not provide such letters unless he has sufficiently informed patients and received a reasonable assurance that they understand. Charles Decl., Ex. B at 176: 8-16; 225:24-226:17. He testified repeatedly that he "is not advocating denying endocrine treatment or surgical treatment" to transgender people, a position he described as "draconian."[2]

Dr. Levine admitted at deposition that he is "not an expert in health insurance," nor an expert about what "health insurance should or should not cover." Charles Decl., Ex. B at 86:1-8. But he supported the idea that patients should be able to access and afford treatment for gender dysphoria.[3] *Id.* at 66:21-67:3. Dr. Levine also confirmed that he has not met with or interviewed any of the Plaintiffs and is not offering any opinions about them, including the veracity of their symptoms of gender dysphoria, the accuracy of their

---

[2] Charles Decl., Ex. B at 73:4-7 ("Q: Is the worrisomeness about a patient's future health, is that a reason to ban all medical care for gender dysphoria? A: Absolutely not."); 84:21-85:1 ("Q: Given all those concerns you have, is that a reason to deny all medical interventions to people with gender dysphoria? A: No …."); 85:4-11 ("Q: Are those concerns you raised justifications in your mind for denying medical interventions to people who have gender dysphoria? A: You know, I'm not advocating denying endocrine treatment or surgical treatment."); 152:1-6 ("Q: do you think because that study showed that some people committed suicide after gender affirming surgery that no patient should be able to access gender affirming surgery? A: That would be illogical"); 154:3-5 ("Q: But you're not recommending total bans on gender affirming surgery? A: I'm not recommending total bans."); 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that.").

[3] And testified at deposition only nine months earlier that treatment should be afforded through insurance coverage if necessary. Charles Decl., Ex. G at 156:10-157:17.

diagnoses, their mental health histories, or the effects of any treatment they have received. Charles Decl., Ex. A at ¶128; Ex. B at 91:5-92:5. None of these opinions are oppositional to relief Plaintiffs seek, and therefore are not relevant to the issues before this Court. Additionally, his uncertainty about the percentage of transgender people who experience gender dysphoria, ECF No. 137-8, 241:24-242:14, has no relevance to the transgender plaintiffs before the Court who *do* requirement treatment. And his speculation about people "who present themselves as cis gender" but may have cross-gender identification and "really dangerous degrees of substance abuse" is completely untethered to the claims here. ECF No. 137-8, 242:15-243:20.

### C. Certain Opinions of Dr. Levine Have No Relevance To This Case Because They Address Issues Beyond The Scope Of The Dispute Or Have Already Been Decided By The Fourth Circuit.

Dr. Levine's opinions fail to create any material disputes of fact because the relevance of his opinions has been disclaimed by the binding admissions of Defendants' witnesses. For example, Dr. Levine proposes to offer the opinion that "sex as defined by biology and reproductive function cannot be changed." Charles Decl., Ex. A at ¶8(a), ¶12. But this is simply an insurance dispute asking whether a state health plan's categorical exclusion of care for transgender people that is covered for cisgender people discriminates based on sex and transgender status. The Court need not resolve questions about the etiology of sex or being transgender, whether "sex is permanently assigned at conception," or, frankly, whether it is okay for a person to be transgender. *Id*. at ¶9. The Court here need only decide whether this insurer can deny the same kinds of treatments to transgender

8

people that it affords to cisgender people. The Fed. R. Civ. P. 30(b)(6) witness for the health plan, Dee Jones, agrees. She testified that individuals enrolled in the State Health Plan can change their sex identification marker in the Plan's records by simply calling into the call center, talking to a representative, validating their identity and requesting the change. Charles Decl., Ex. E at 85:10-87:22. She further testified that to make such a change the Plan does not require proof of the enrollee's current physical anatomy, their DNA, or their chromosomal make up. *Id*. The Plan thus takes no position on the issues in Dr. Levine's report about the etiology of sex, and instead respects participants' self-reported gender identity as an accurate determinant of their sex designation. Facts provided by Defendants' own witnesses render Dr. Levine's proposed opinions about "immutable biology" irrelevant.

Dr. Levine's opinions do not help this Court because the Fourth Circuit's precedent informs review of the issues. Controlling precedent on these issues in the recently decided *Grimm v. Gloucester Cnty. Sch. Bd.* and the Fourth Circuit appeal in this case render Dr. Levine's opinions irrelevant. His attempts to disparage the credibility of the WPATH and diminish the SOC as ideological and unscientific fail and are ironically contrary to his testimony about treatment he provides transgender patients in private practice, which follows the SOC. Charles Decl., Ex. B at 55:13-17; 56:2-5; 112:16-21; 176:8-16; 225:24-226:17. Further, this "opinion" is directly contrary to the Fourth Circuit's holding in *Grimm*:

> Fortunately, we now have modern accepted treatment protocols for gender dysphoria. Developed by the World Professional Association for Transgender

Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) (hereinafter "WPATH Standards of Care") represent the consensus approach of the medical and mental health community, Br. of Medical Amici 13, and have been recognized by various courts, including this one, as the authoritative standards of care, see *De'lonta v. Johnson*, 708 F.3d 520, 522–23 (4th Cir. 2013); see also *Edmo*, 935 F.3d at 769; *Keohane v. Jones*, 328 F. Supp. 3d 1288, 1294 (N.D. Fla. 2018), vacated sub nom. *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257 (11th Cir. 2020). There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Edmo*, 935 F.3d 769 (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

*Grimm*, 972 F.3d at 595-596. Further irreconcilable with available data and the consensus of the medical community, Dr. Levine asserts that gender dysphoria is a psychiatric condition, and "educational failure, vocational inconstancy and social isolation" are "clinical errors" of gender confirming treatment. Charles Decl., Ex. A at ¶8(m), ¶23. The Fourth Circuit disagrees, holding that: "Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm*, 972 F.3d at 594 (quote marks omitted); *see also*, *Kadel*, 12 F.4th at 427. Dr. Levine espouses the belief that gender dysphoria, or being transgender, is a way of living that people commit to in youth and is a "product of other things," including possibly familial sexual abuse, distress over "their body changing," growing up in a single-parent home, or having an autism diagnosis. Charles Decl., Ex. B at 154:5-8; 235:23-25; 137:10-13; 235:20-22; 235:17-20. Here too, the Fourth Circuit has held conclusively that "[J]ust like being cisgender, being transgender is natural and is not a choice." (*Kadel*, 12 F.4th at 427 (quoting *Grimm*, 972 F.3d at 594)). Dr. Levine admits to

Case 1:19-cv-00272-LCB-LPA   Document 213   Filed 02/02/22   Page 12 of 28

practicing and advocates for the use of "conversion therapy" with transgender youth,[4] but the Fourth Circuit has found that "mental health practitioners' attempts to convert transgender people's gender identity to conform with their sex assigned at birth did not alleviate dysphoria, but rather caused shame and psychological pain." (*Grimm*, 972 F.3d at 595). Fourth Circuit precedent renders much of Dr. Levine's testimony irrelevant.

### D. Dr. Levine's Testimony Is Methodologically Unreliable and Unsupported by Science or Medicine.

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis*, 10 F.4th at 281. Dr. Levine's opinions fall far short of each prong of this reliability standard. Dr. Levine admitted at deposition that theories upon which he relies lack any scientific support and have not been tested or subjected to peer review or publication. Charles Decl., Ex. B at 109:20-25; 116:4-7; 122:8-124:22; 131:11-132:1; 200:11-201:25. As such, Dr. Levine cannot and does not offer the known or potential error rates, and perplexingly asserts without any evidence whatsoever that his views are accepted and shared by the amorphous and unspecific "scientific community." Charles Decl., Ex. A at ¶9, ¶10, ¶11, ¶12, ¶13, ¶23 ¶48, ¶121.

Even putting the *Daubert* factors aside, as Dr. Levine claims his "experience" is sufficient foundation for his opinions, he fails to address how this purported experience leads to his conclusions and how such experience is reliably applied to the facts here. *See, e.g.*, *Cooper*, 259 F.3d at 200 (affirming the exclusion of an expert because he "asserted

---

[4] Charles Decl., Ex. A at ¶31, ¶18, ¶119.

what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method."); *SAS Inst.,* 125 F. Supp. 3d at 589; *see also Nat'l Ass'n. for Rational Sexual Offense L.* at *3 (excluding expert where offering party failed to establish how expert's "experience leads to his conclusions nor how those experiences have been reliably applied to the facts").

1.    **Dr. Levine's Assertion that There are Widely Varying Views about the Appropriate Treatment for Gender Dysphoria Is Simply Wrong.**

Chief among Dr. Levine's many unreliable opinions is his assertion that wide disagreement exists about the appropriate treatment for gender dysphoria and that the SOC are not accepted by the scientific community. Charles Decl., Ex. A at ¶8(c). Contrary to Dr. Levine's personal feelings, there ***is broad consensus*** about the appropriate treatment for gender dysphoria. All major medical associations, the largest health systems in the United States (Department of Veterans Affairs, Kaiser-Permanente, the Federal Bureau of Prisons), and most major health insurers endorse and follow the treatment protocols established by the WPATH in the SOC Version 7. Charles Decl., Ex. F at ¶27. This factual reality, combined with Dr. Levine's *own admissions* about his use of the WPATH treatment protocols calls into serious question the reliability of this proffered opinion. Charles Decl., Ex. B at 55:13-17; 56:2-5; 112:16-21; 176:8-16; 225:24-226:17. Dr. Levine even admitted this in his most recent prior deposition in December 2020, acknowledging that he continues to utilize the WPATH SOC when writing letters to authorize hormones or surgery for someone with gender dysphoria. Charles Decl., Ex. G at 29:10-18; 37:2-13; 47:22-49:3;

12

103:11-19. At the *Claire* deposition, Dr. Levine confessed that he does not dispute that the WPATH SOC is widely accepted, but just maintains, without evidence, that they are "wrong," even though his clinical care continues to be consistent with these standards. Charles Decl., Ex. G at 145:16-24; Charles Decl., Ex. B at 55:13-17; 56:2-5; 112:16-21; 176:8-16; 225:24-226:17; Ex. G at 103:11-19. Dr. Levine fails to show how his experience leads to this conclusion, and when applied to the present facts, he cannot bridge the analytic gap.

## 2. Dr. Levine's Opinion That Accessing Gender-Confirming Care Is Experimental and Unethical is Unfounded.

Dr. Levine alleges that because transgender adults face increased vulnerability to negative life outcomes, providing any "affirmation treatments," particularly to adolescents, is experimental and unethical. Charles Decl., Ex. A at ¶8(k), ¶81. This opinion cannot satisfy the reliability standard because Dr. Levine authorizes this care for his own patients and either ignores studies contrary to his belief or distorts them beyond the authors' explicit intentions or design. Significantly, he omits recent studies demonstrating that medical treatments for transgender adolescents and adults have favorable outcomes across many measures. Charles Decl., Ex. F at ¶79. A plethora of studies also show that trans people experience pervasive stigma and discrimination, resulting in health disparities. But Dr. Levine baselessly claims that receiving gender-confirming care *causes* those disparities and is therefore experimental, relying most heavily on two articles which do not support this assertion. Charles Decl., Ex. A at ¶74. First, he relies on a study by Cecilia Dhejne, a

13

scholar in the field who has publicly and specifically said Dr. Levine's assertion is a mischaracterization of her work. Charles Decl., Ex. H at 65. Her study also does not support his assertion because *the study itself* states it is not designed to "evaluate whether or not gender affirming care is beneficial." Charles Decl., Ex. I at 2. And when confronted at deposition, he admitted the study design created a serious limitation in drawing any conclusions about the efficacy of the care. Charles Decl., Ex. B at 156:7-11. The second study that Dr. Levine misrepresents to support his claim that gender confirming care is experimental reached a similar conclusion to Dhejne's. Despite this, Dr. Levine implies that the article demonstrates higher death rates among people who received gender-confirming surgery, but the article itself precisely states that "the present study design does not allow for determination of causal relations between HT (hormone therapy) and SRS (sex reassignment surgery) and somatic morbidity or mortality." Charles Decl., Ex. J at e65-e66.

Ultimately, Dr. Levine fails to cite any literature that supports this belief, and regardless, he confirmed that this should not prevent Plaintiffs from receiving the relief they seek. When asked if he believes that because a study showed that some people committed suicide *no patient* should be able to access gender affirming surgery, Dr. Levine responded, "that would be illogical." Charles Decl., Ex. B at 151:25-152:6. And when asked if all the concerns he has are justifications for denying medical interventions to all people with gender dysphoria, he responded "I'm not advocating denying endocrine treatment or surgical treatment." Charles Decl., Ex. B at 85:4-11.

14

### 3. Dr. Levine's Opinions About Gender Dysphoria in Transgender Children and Puberty-Delaying Treatment Are Not Based In Fact.

Another unreliable opinion presented by Dr. Levine is that "a majority" of pre-pubescent children diagnosed with gender dysphoria will cease to be transgender. Charles Decl., Ex. A at ¶8(d); Charles Decl., Ex. B at 178:17-24. This opinion is undermined by Dr. Levine's admission at deposition that some children are transgender and that as they progress into adolescence, they would need medical care that he has, and would, authorize. Charles Decl., Ex. B. at 173:7-15; 137:14-23; 173:22-174:5; 53:16-54:7. Dr. Levine glosses over the lack of peer-reviewed and scientific evidence to support his opinion by providing only vague references to "science articles," and "eleven studies," that support his belief. Charles Decl., Ex. B at 178:17-24. Upon closer inspection, this "evidence" falls apart. Dr. Levine could not name eleven studies, but rather only one article from 2019 which purportedly listed those studies. Charles Decl., Ex. B at 191:20-192:7. But all studies used to support this conclusion suffer from the same malady: they analyze data from children identified under the obsolete and overly broad diagnosis for "Gender Identity Disorder in Children" and not the current DSM-5 diagnostic criteria "Gender Dysphoria in Children." Dr. Levine then notes "the latest one" of the "eleven studies" was published in 2021 by Singh. *Id*. But not only does Singh's article suffer the same infirmity as the "eleven studies," but it also analyzes data initially collected *30 years ago*, with children diagnosed under criteria from the DSM III, which is now four versions old. Charles Decl., Ex. B at 192:5-14. Therefore, the "desistance" rates Dr. Levine discusses reflect children who might

have exhibited gender non-conforming behaviors but did not necessarily identify as transgender and *would not satisfy the current diagnostic criteria*. Charles Decl., Ex. K at ¶89. This illustrates Dr. Levine manipulating available research to assert his personal views as unreliable "opinions."

Dr. Levine's most strikingly unreliable opinion is his testimony at deposition that puberty blockers should not be available to any transgender adolescents.[5] Charles Decl., Ex. B at 184:14-18; 187:8-11. Dr. Levine's methodological and scientific support for this opinion is woefully insufficient. He states that in the cases he has seen, puberty blocking treatment was "like a treatment for the mother's pathology, not for the child." Charles Decl., Ex. B at 184:25-185:2. He asserts, without evidence, that the cause of gender dysphoria is related to "acting out the ambitions of the mother or father," and puberty "lead[s] to desistance in many, many children." Charles Decl., Ex. B at 185:7-16. If it were up to Dr. Levine, he would "consider banning puberty blocking hormones even for children who have been cross-gender identified for four years to give them a chance to desist." Charles Decl., Ex. B at 186:20-25. Taken together with Dr. Levine's view that parents

---

[5] It is contradictory and newly formed. Dr. Levine's report states, "it is not possible to make a single, categorical statement about the proper treatment of children presenting with gender dysphoria," and yet this new opinion does just that. Charles Decl., Ex. A at ¶43. And a mere nine months earlier, Dr. Levine sat for deposition and opined the exact opposite, i.e., puberty blockers should be available in limited cases "[w]here we had a healthy mother and father, an intact family who was psychologically informed and who has – where a child has come out of toddlerhood acting consistently in a gender atypical fashion, and where the parents are not homophobic people." Charles Decl., Ex. G at 158:6-16.

should be able to subject their children to conversion therapy "to assist their child to achieve comfort with the gender corresponding to his or her sex" assigned at birth, this makes clear that Dr. Levine's believes transgender people should not exist, an opinion he cannot connect to any meaningful data, and that is not reliably applied to the facts of this case. Charles Decl., Ex. A at ¶119. Even Dr. Levine admits the unscientific nature of this opinion, he does not know where it comes from or "to what extent it's from my politics, or from my being a parent or a doctor, I don't know." Charles Decl., Ex. B at 187:20-24.

### 4. Dr. Levine's Assertion that "Social Contagion," "Rapid Onset Gender Dysphoria," and "Involvement With the Internet," as Causes for Gender Dysphoria Justify Denying Treatment to Transgender People Is Not Supported By Scientific Evidence.

A stark example of Dr. Levine's opinions failing to meet methodological reliability is his assertion that the untested and scientifically unsupported hypotheses of "social contagion," "rapid onset gender dysphoria" and "involvement with the Internet," justifies denying treatment to transgender adolescents and adults. Charles Decl., Ex A at ¶15. "[W]hile hypothesis is essential in the scientific community because it leads to advances in science, speculation in the courtroom cannot aid the fact finder in making a determination … ." *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003). Dr. Levine conceded that "social contagion" has not even been tested, let alone proven and could not provide a single citation to a scientific source discussing the theory in any research study. Charles Decl., Ex. A at ¶122(f); Charles Decl., Ex. B at 114:8-11; 116:4-7. When confronted with a news article cited in his report to support the hypothesis,

17

Dr. Levine confessed he was not familiar with the article, its authors, or whether it was peer-reviewed. Charles Decl., Ex. B at 123:4-124:20. The only publication Dr. Levine *could* name in relation to these hypotheses was withdrawn and republished with a significant correction that Dr. Levine confessed he had not read. Charles Decl., Ex. B at 116:22-117:9. The correction admitted that: "rapid onset gender dysphoria is not a formal mental health diagnosis," "the report did not collect data from adolescents and young adults or clinicians and therefore does not validate the phenomenon," and "the use of the term, rapid onset gender dysphoria should be used cautiously by clinicians and parents to describe youth." Charles Decl., Ex. L at 1. Indeed, the only peer-reviewed study to interrogate this hypothesis using adolescent clinical data "did not support the ROGD hypothesis." Charles Decl., Ex. M at 1.

Finally, Dr. Levine uses "the Internet" as a sword to question the veracity of transgender adolescents' identities and deny them medically necessary care and a shield for his unsubstantiated beliefs about the prevalence of "detransition." Charles Decl., Ex. A at ¶14, ¶15, ¶99; *id.* at ¶35, ¶56, ¶98. Again, Dr. Levine admitted that his belief about transgender adolescents being "influenced by the internet" is a hypothesis lacking any support in studies, research, or peer-reviewed publications. Charles Decl., Ex. B at 115:24-116:7. While Dr. Levine even admits he has not performed any research or "scientifically acceptable" studies to support this hypothesis, he claims others have but provided not even a single study in his report or at deposition. Charles Decl., Ex. B at 115:13-19.

18

Similarly, when confronted about his report's assertion that "the internet housed some 60,000 reports of detransition," in a "subreddit called r/detransition," Dr. Levine admitted this was a substantial numerical error repeated throughout his report, and the figure should be *16,000*. Charles Decl., Ex. B at 196:3-7. Even still, he admitted he had no evidence that *even one* of the 16,000 members of the subreddit had actually "detransitioned." Charles Decl., Ex. B at 200:6-201:25. Given that these hypotheses about the influence of the internet and the evidence of these estimates about "detransition" are entirely unverified, Dr. Levine cannot claim that they are supported by the scientific community or have any known error rate. His reliance on his own *ipse dixit* fails to establish a reliable basis upon which to assert this opinion.

### 5. Dr. Levine's Assertion That The "Transgender Treatment Industry" Is An Entity That Exists And Is Monetarily And Politically Motivated To Push Medical Treatments On Transgender People Is A Political Not Scientific Opinion.

Ironically, while Dr. Levine invokes the mantra throughout his testimony that interventions should be "based on science and not politics," he brings politics into the discussion by claiming a cabal of medical professionals are part of a "Transgender Treatment Industry." He employs this novel term to malign, stereotype, and diminish the thousands of medical professionals working to provide competent and standards-based psychiatric and medical care to transgender people. Charles Decl., Ex. A at ¶8(l)(n), ¶15, ¶62, ¶65, ¶120, ¶125. As Dr. Levine has confessed with other asserted "opinions," there is no peer-reviewed study or published research that uses this term. Charles Decl., Ex. B at

131:18-24. When asked to describe the term's genesis, Dr. Levine said he long pondered this concept and yet "if it's not the first, it might be the second" time he used the phrase. Charles Decl., Ex. B at 128:9-19. Notably, this term appeared in another of Defendants' expert witness reports who, at deposition, claimed the term was his and admitted it does not appear in a peer-reviewed article or study and is not accepted or commonly used in the scientific or medical community. Charles Decl., Ex. N at 63:3-16. Again, Dr. Levine can point to no data or research to support his theory the "Transgender Treatment Industry" exists as a concept outside of his subjective beliefs, and therefore is not reliable or relevant in application to the facts of Plaintiffs' claims.

### E. Dr. Levine Is Not Qualified To Offer Opinions About the Treatment of Pre-Pubescent Transgender Children In This Case.

To render expert testimony, the witness must possess the requisite "knowledge, skill, experience, training, or education" that would assist the trier of fact. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *Wright v. United States*, 280 F. Supp. 2d 472, 478 (M.D.N.C. 2003) ("A witness may testify as to his specialized knowledge so long as he is qualified as an expert based on any combination of knowledge, skill, experience, training, or education."). If not qualified, the expert's testimony is unreliable. *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 5:13-CV-210-BO, 2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014); *see, e.g., Mod. Auto. Network, LLC* at 537 (affirming the district court's exclusion of an expert because they lacked experience relevant to the matters at issue); *Lebron v. Sec. of Fla. Dept. of Children and Families*, 772 F.3d 1352, 1369 (11th Cir. 2014) (holding

expert witness was properly excluded who did not propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation).

Dr. Levine admitted at his deposition—as he must—that he has almost no experience researching and writing about or administering psychiatric treatment to transgender children. He confessed that none of the numerous external grants he has received for research and writing during his 48-year career were to study the treatment of transgender children or adolescents. Charles Decl., Ex. A at ¶1; Ex. B at 23:1-8. Indeed, in the voluminous list of articles he has authored or co-authored, only one even mentions transgender children ("Ethical Concerns"), and only to echo Dr. Levine's personal views on their care, not to report any study he has completed. Charles Decl., Ex. A at Exhibit A at 6-16.

Dr. Levine's report states that when he began practicing in 1974 that, "[a]n occasional child was seen during this era." Charles Decl., Ex. A at ¶3. When asked to clarify, he explained that "this era" meant the first twenty years of his practice and that "occasional" meant that "95 percent of the patients that we saw were 16, 17, 18 and up," and "in the first twenty years, transgender issues were primarily an older teenager and adult, mostly adult issues." Charles Decl., Ex. B at 47:5-6; 47:10-13. When asked about more recent experience treating children with gender dysphoria, Dr. Levine confessed that he had treated *no children* with gender dysphoria in the last year and had seen only *one child* under age 11 in the last five years. Charles Decl., Ex. B at 51:14-18; 52:14-22 (he

"personally [has] not delivered a psychotherapeutic care or evaluation directly of a child" in the last five years.).

Dr. Levine is not recognized as an expert in providing treatment to transgender children by his private employer, nor by the university where he is a clinical professor of psychiatry. He does not write or research about providing treatment to transgender children, nor does he deliver any psychiatric care to them in his day-to-day practice. Dr. Levine is not qualified under the *Daubert* standards to offer opinions on matters relating to the care of transgender children, and he cannot use his personal beliefs as evidence in this case.

### F.     Dr. Levine's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice, confusion of the issues, or result in misleading testimony. Fed. R. Evid. 403. As noted above, Dr. Levine offers no opinions on any factual dispute in this case, and, in any event, the opinions he offers are irrelevant and unreliable. Consideration of his testimony would waste time and create confusion. The testimony would also result in prejudice, as the testimony seeks to sow confusion about the veracity of Plaintiffs' gender identity, gender dysphoria diagnosis, and other experiences—issues unrelated to whether this insurer can deny coverage of the same kinds of treatments to transgender people that it provides cisgender people. Accordingly, Dr. Levine's testimony fails to satisfy the requirements of Federal Rule of Evidence 403 and should be excluded.

# CONCLUSION

WHEREFORE, based on the foregoing, Plaintiffs respectfully request that this Court grant the instant motion and exclude all of Dr. Levine's purported expert testimony because it is not admissible under *Daubert* and the Federal Rules of Evidence.

Dated: February 2, 2022                     Respectfully submitted,

/s/ Amy E. Richardson                     /s/ Carl S. Charles
Amy E. Richardson                          Carl S. Charles*
N.C. State Bar No. 28768                   Tara L. Borelli*
Lauren E. Snyder                           LAMBDA LEGAL DEFENSE AND
N.C. State Bar No. 54150                   EDUCATION FUND, INC.
HARRIS, WILTSHIRE & GRANNIS                1 West Court Square, Ste. 105
LLP                                        Decatur, GA 30030
1033 Wade Avenue, Suite 100                Telephone: 404-897-1880
Raleigh, NC 27605-1155                     Facsimile: 404-506-9320
Phone: 919-429-7386 | Fax: 202-730-1301    tborelli@lambdalegal.org
arichardson@hwglaw.com                     ccharles@lambdalegal.org

Deepika H. Ravi*                           Omar Gonzalez-Pagan*
Grace H. Wynn*                             LAMBDA LEGAL DEFENSE AND
HARRIS, WILTSHIRE & GRANNIS                EDUCATION FUND, INC.
LLP                                        120 Wall Street, 19th Floor
1919 M Street N.W., 8th Floor,             New York, NY 10005
Washington, D.C. 20036                     Telephone: 212-809-8585
Phone: 202-730-1300 | Fax: 202-730-1301    Facsimile: 212-809-0055
dravi@hwglaw.com                           ogonzalez-pagan@lambdalegal.org

Michael W. Weaver*                         David Brown*
Adam M. Safer*                             Ezra Cukor*
MCDERMOTT WILL & EMERY                      TRANSGENDER LEGAL
444 W. Lake St., Suite 4000                DEFENSE AND EDUCATION
Chicago, IL 60606                          FUND, INC.
Phone: 312-984-5820 | Fax: 312-984-7700    520 8th Ave, Ste. 2204
mweaver@mwe.com                            New York, NY 10018
                                           Telephone: 646-993-1680

23

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

Facsimile: 646-993-1686
dbrown@transgenderlegal.org

*Counsel for Plaintiffs*

* Appearing by special appearance pursuant to L.R. 83.1(d).

24

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1)

because the body of this brief, including headings and footnotes, does not exceed 6,250

words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  February 2, 2022

/s/ Carl S. Charles
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
ccharles@lambdalegal.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the

Clerk of Court using the CM/ECF system which will send notification of such filing to all

registered users.

Dated: February 2, 2022

/s/ Carl S. Charles
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
ccharles@lambdalegal.org
