# Exhibit B



Deposition of:
## Stephen B. Levine , MD

*September 10, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2                   ~~~~~~~~~~~~~~~~~~~~

3      MAXWELL KADEL, et al.,

4
5                     Plaintiffs,
6
            vs.            Case No. 1:19-cv-272-LCB-LPA
7
8      DALE FOLWELL, in his official
       capacity as State Treasurer of
9      North Carolina, et al.,
10
                      Defendants.
11
12                  ~~~~~~~~~~~~~~~~~~~~
13                  Video Deposition of
                    STEPHEN B. LEVINE, M.D.
14
15                   September 10, 2021
                        9:05 a.m.
16
17                      Taken at:
                   Veritext Legal Solutions
18                  1100 Superior Avenue
                     Cleveland, Ohio
19
20                  Tracy Morse, RPR
21
22
23
24
25

```
 1      APPEARANCES:
 2           On behalf of the Plaintiff:
 3                Lambda Legal, by
                  CARL S. CHARLES, ESQ.
 4                120 Wall Street, 19th Floor
                  New York, New York  10005-3919
 5                ccharles@lambdalegal.org
 6                TARA BORELLI, ESQ.
                  730 Peachtree Street, N.E.
 7                Suite 640
                  Atlanta, Georgia  30308-1210
 8                tborelli@lambdalegal.org
 9                     and
10                McDermott Will & Emery, by
                  MICHAEL M. WEAVER, ESQ.
11                444 West Lake Street, Suite 4000
                  Chicago, Illinois  60606-0029
12                mweaver@mwe.com
13
          On behalf of the Defendants Dale Folwell,
14        Dee Jones, and the NC State Health Plan
          For Teachers and State Employees:
15
                  Law Office of John Knepper, LLC, by
16                JOHN KNEPPER, ESQ.
                  1720 Carey Avenue, Suite 590
17                Cheyenne, Wyoming  82001
                  john@knepperllc.com
18
19        On behalf of the Defendant State of North
          Carolina Department of Public Safety:
20
                  North Carolina Dpt. Of Justice, by
21                ALAN MCINNES, ESQ.
                  114 W. Edenton Street
22                Raleigh, North Carolina  27603
                  amcinnes@ncdoj.gov
23
                       ~ ~ ~ ~ ~
24      ALSO PRESENT:
25                Joseph Vandetta, Videographer
```

1                    TRANSCRIPT INDEX

2

        APPEARANCES.............................    2

3

4       INDEX OF EXHIBITS.......................    4

5

        EXAMINATION OF STEPHEN B. LEVINE, M.D.

6       By MR. CHARLES..........................    7

        By MR. KNEPPER.......................... 227

7       By MR. CHARLES.......................... 244

8

        REPORTER'S CERTIFICATE.................. 249

9

10      EXHIBIT CUSTODY

        EXHIBITS RETAINED BY COURT REPORTER, 1-21

11      (No Exhibit 16)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS
 2       NUMBER              DESCRIPTION        MARKED
 3       Exhibit 1      4/28/2021 Declaration.... 14
                        of Stephen B. Levine,
 4                      M.D. With Attachment
         Exhibit 2      12/21/2020 Zoom.......... 56
 5                      Deposition of Stephen
                        Levine, M.D.
 6       Exhibit 3      Typewritten Three-Page... 62
                        Document Entitled,
 7                      "Special Programs,"
         Exhibit 4      1/1/2019-12/31/2019...... 78
 8                      North Carolina State
                        Health Plan Benefits
 9                      Booklet, Bates Numbers
                        PLAN DEF0001785-0001900
10       Exhibit 5      Lesbian Gay Bisexual..... 89
                        Transgender Center
11                      Document Entitled,
                        "Transgender Resources"
12       Exhibit 6      4/8/19 Soneeya v. Turco..104
                        Trial Transcript, Day 1
13       Exhibit 7      "Correction: Parent......116
                        Reports of adolescents
14                      And young adults
                        Perceived to show signs
15                      Of a rapid onset of
                        Gender dysphoria,"
16                      Article
         Exhibit 8      "Transgender Teens: Is...122
17                      The Tide Starting To
                        Turn?" Article
18       Exhibit 9      "Finland Issues Strict...139
                        Guidelines for Treating
19                      Gender Dysphoria,"
                        Article
20       Exhibit 10     "Recommendation of the...140
                        Council for Choices in
21                      Health Care in Finland
                        (PALKO/COHERE Finland),"
22                      Article
         Exhibit 11     "Stod och utredning vid..145
23                      konsinkongruens hos barn
                        Och ungdomar," Article
24
25
```

```
 1              INDEX OF EXHIBITS (Continued)
 2        NUMBER              DESCRIPTION           MARKED
 3        Exhibit 12         "Long-Term Follow-Up of..154
                             Transsexual Persons
 4                           Undergoing Sex
                             Reassignment Surgery:
 5                           Cohort Study in Sweden,"
                             Article
 6        Exhibit 13         2017 "On Gender.........156
                             Dysphoria," Booklet
 7                           From Department of
                             Clinical Neuroscience,
 8                           Karolinska Institutet
          Exhibit 14         "Long-Term Follow-Up of..161
 9                           Individuals Undergoing
                             Sex-Reassignment Surgery:
10                           Somatic Morbidity and
                             Cause of Death," Article
11        Exhibit 15         5/15/2017 Telephonic.....170
                             Deposition of Stephen
12                           Levine, M.D.
          Exhibit 17         "A Typology of Gender....196
13                           Detransition and Its
                             Implications for
14                           Healthcare Providers,"
                             Article
15        Exhibit 18         DSM-5: Frequently Asked..202
                             Questions
16        Exhibit 19         "Endocrine Treatment of..213
                             Gender-Dysphoric/Gender
17                           Incongruent Persons:
                             An Endocrine Society
18                           Clinical Practice
                             Guideline," Article
19        Exhibit 20         "Pediatric Obesity.......217
                             Assessment, Treatment,
20                           And Prevention: An
                             Endocrine Society
21                           Clinical Practice
                             Guideline," Article
22        Exhibit 21         "Practice Parameter on...223
                             Gay, Lesbian, or Bisexual
23                           Sexual Orientation,
                             Gender Nonconformity,
24                           and Gender Discordance
                             In Children and
25                           Adolescents," Article
```

1          Q.     Okay.  And so then were there any
2     external grants to research and publish about
3     the treatment of children or adolescents --
4          A.     No.
5          Q.     -- with gender dysphoria?
6          Okay.  Is that a, "No," when I included
7     the, "Gender dysphoria," as well?
8          A.     That is a, no.
9          Q.     Okay.  Thank you.  Okay.  So on
10    page 3 of your report -- actually, I'm sorry.
11    It's going to be the bottom of page 4 and to
12    the top of page 5.  Your report lists your
13    experience as an expert witness, which we
14    talked about a little bit earlier.  I just --
15    I'm wondering if you would confirm this is not
16    an exhaustive list of your experience as an
17    expert witness either via deposition or report.
18         A.     I wouldn't want to testify that
19    this is absolutely complete, given the fact
20    that I don't keep a list compiled.  This is
21    kind of compiled retrospectively from memory
22    and documents.  And so this is the best I could
23    have done on April of 2021 --
24         Q.     Understood.  Thank you.  So --
25         A.     -- you might find something else.

1          Q.     Was it --

2          A.     -- in a commercial building where

3    our clinic was.  It was just, you know, a

4    conference room in our clinic.

5          Q.     And that was within -- was that

6    within a business --

7          A.     It was --

8          Q.     -- a psychiatric practice?

9          A.     I'm sorry.  I interrupted you.

10         It was within The Center For Marital

11   Health, which was a business that I and two

12   other people started and owned and ran.  And in

13   that business, we continued the same kind of

14   work we did with the University minus the large

15   number of trainees.

16         Q.     You mentioned that after '93, you

17   were not being paid by the University.  Were

18   you providing your clinical psychiatric

19   professorship gratuitously?

20         A.     Meaning without pay?  Yes.

21         Q.     Okay.  Do you know if, after you

22   moved the clinic away from Case Western

23   Reserve, if Case Western Reserve University

24   Medical School created a separate gender

25   identity clinic?

1          A.    Years later they did --
2          Q.    Oh, sorry.
3          A.    -- I would say, they created a
4     separate clinic perhaps in 2017, 2016.
5          Q.    Do you know the name of that
6     clinic?
7          A.    I don't think it's in the
8     department of psychiatry.  I think it's in the
9     department of pediatrics.  And the answer to
10    your question is, no.
11         Q.    Does The LGBTQ and Gender Care
12    Program sound familiar?
13         A.    No.
14         Q.    But have you -- sorry.  Have you
15    evaluated any patients through that separate
16    clinic that Case Western Reserve has?
17         A.    No.  Much to my dismay, that clinic
18    was formed and maintained without any input
19    from me, who I thought was one of the experts
20    in the field.
21         Q.    Do you know if they have
22    psychiatrists, within that clinic?
23         A.    I -- I'm not knowledgeable about
24    the composition of that clinic.  There is a
25    very strong liaison between our department of

1    What do you mean by, "This era"?

2        A.    Before 1993.

3        Q.    Okay.  And what do you mean by,

4    "Occasional"?

5        A.    I would say that 95 percent of the

6    patients that we saw were 16 and 17, 18 and up.

7    We could debate what the word, "Child," means,

8    but to me an 11-year-old is a child, even

9    a 13-year-old is a child, especially when my

10    children were 13.  And so we -- in the first

11    twenty years, transgender issues were primarily

12    an older teenager and adult, mostly adult

13    issues.  In recent years, I would say, 12, 15

14    years, the number of adolescents appearing in

15    gender clinics at our place and everywhere as

16    far as I can see has increased exponentially,

17    especially the number of teenage girls who are

18    declaring themselves trans boys.

19        Q.    So how many -- sorry.  So the first

20    twenty or so years, you said approximately 5

21    percent of all patients were children.

22        A.    Were younger -- on the younger end

23    of the spectrum --

24        Q.    Right.

25        A.    -- yes.

1    it, you see?  But at this moment -- this week,

2    I have one patient that I see weekly, who is a

3    transgender teen.  My staff -- if I can be

4    presumptuous to call them, "My staff" -- our

5    staff sees more.

6          Q.    And thinking about the last year,

7    approximately how many adult patients did you

8    see -- and let's use your framing of,

9    "Regular."  So that could be one, for one

10   followup visit or that could be for more -- how

11   many adult patients did you see for treatment

12   of gender dysphoria?

13         A.    Approximately six.

14         Q.    And using that same framing of,

15   "Regular," how many children, so under age 11?

16         A.    In the last year?

17         Q.    Yes, yes.  In the last year.

18         A.    Zero.

19         Q.    How many adolescents in regular

20   treatment for gender dysphoria would you

21   approximate you've seen in the last five years

22   individually, exclusive of your supervision of

23   other clinicians?

24         A.    If you ask me the question in the

25   last year, I would have told you five or six,

1       but since you ask it as a five-year period, I'm

2       at a loss to tell you whether it's twelve or

3       fifteen.  I --

4              Q.    An approximate is fine.  Thank you.

5              A.    -- let's just say a dozen with an

6       asterisk, very approximate.

7              Q.    And jumping a little bit more in

8       terms of time.  How about the last ten years?

9              A.    Again, using the same asterisk, I

10      would say, double it.

11             Q.    Okay.  And you said zero people

12      under age 11, so children this last year.  What

13      about in the last five years?

14             A.    Oh, two years ago, we had this

15      charming little 6-year-old.  One of my

16      colleagues specializes in children and I get to

17      hear about these cases.  Occasionally I get to

18      meet the parents, but I personally have not

19      delivered a psychotherapeutic care or

20      evaluation directly of a child with the

21      exception of this one person that I was

22      involved with.

23             Q.    And that was this last year, you

24      said?

25             A.    That was -- I think it was probably

1   two, two and a half years ago.

2         Q.    Oh, okay.  And what kind of

3   treatment -- I should say, have you referred

4   any of those adolescent patients for additional

5   treatment, besides psychotherapy, for the

6   treatment of gender dysphoria?

7         A.    Yes.

8         Q.    And what kinds of treatment have

9   you referred them for?

10        A.    For endocrine treatment.

11        Q.    Okay.  And approximately what

12  percentage of those adolescent patients have

13  you referred for endocrine treatment?

14        A.    Give me the timeframe of that

15  question, please.

16        Q.    Sure.  So you said a few moments

17  ago, in the last five years, you saw maybe,

18  asterisk, 12 to 15 adolescent individually

19  yourself.  Of those 12 to 15, what would be the

20  approximate percentage you referred for

21  endocrine treatment?

22        A.    I'm hesitating to answer the

23  question, because some of those children have

24  been taking testosterone or estrogen

25  surreptitiously from their parents.  And while

1    I didn't refer them for the treatment, I was
2    seeing them while they were taking the
3    treatment.  So if we're only talking about
4    adolescent -- referrals of adolescents for
5    hormones, I would say a very small percentage
6    of those, say, I guess you would say 10
7    percent.
8         Q.    Fair enough.  Have you had yourself
9    individually as a clinician, have you had any
10   non-transgender children who you have made a
11   referral for endocrine treatments related to
12   other conditions?
13        A.    No.
14        Q.    Okay.  So then zooming out 30,000
15   foot view of your 48-year career now, would you
16   say overall, you have provided treatment --
17   that is, psychiatric treatment -- to mostly
18   adults experiencing gender dysphoria, gender
19   identity issues?
20             MR. KNEPPER:  Objection, form.
21        A.    I would say that throughout my
22   career, we should divide my career into the
23   first twenty years where mostly adults were
24   seen by our team and myself.  And then we ought
25   to talk about the last ten or fifteen years

1   where the number of adults has diminished and
2   the number of adolescents has increased
3   dramatically.
4           Q.    Okay.  Thank you.  So as a part of
5   your private practice, do you write letters of
6   authorization for endocrine treatments?
7           A.    Yes.
8           Q.    And do you write letters of
9   authorization for gender affirming surgeries?
10          A.    I have.  I have not recently,
11  because most of my patients are 13 or 15 or 16,
12  you know.
13          Q.    Okay.  And I'm sorry.  Just by,
14  "Recent," when was the last time you wrote a
15  letter of authorization for a gender affirming
16  surgery for an adult?
17          A.    Probably twelve months ago.
18          Q.    Okay.  And over the course of your
19  career focusing on your treatment of adults
20  experiencing gender identity issues, for what
21  percentage of those patients would you estimate
22  you wrote a letter of authorization for gender
23  affirming surgery for?
24                MR. KNEPPER:  Objection, form.
25          A.    Again, I would like to put an

1     asterisk to whatever I answer this question as.
2     I have not kept track of those figures.  I have
3     written -- I've written or cosigned letters for
4     hormone treatments and for gender confirming
5     surgeries for many people.  There were more
6     people in the '70s and '80s than in recent
7     decades.  In part as a reflection of my own
8     evolution of understanding of these problems
9     and in part it's a reflection of the demography
10    of patients who are coming to see me.  I really
11    would not like to answer that question, only
12    because I don't know if the word, "Fifteen," or
13    the word, "Twenty-five," or the word,
14    "Thirty-five," is more accurate --
15            Q.    Understood.
16            A.    -- but I can tell you, I have
17    written letters, especially in the early years,
18    for the things that you're making reference to.
19                         -  -  -  -  -
20                  (Thereupon, Deposition Exhibit 2,
21                  12/21/2020 Zoom Deposition of
22                  Stephen B. Levine, M.D., was marked
23                  for purposes of identification.)
24                         -  -  -  -  -
25            Q.    Okay.  For the record, I'm showing

1          Q.    Do you think as a general matter

2     that it's good for patients who come to DELR

3     for services related to gender dysphoria to be

4     able to have insurance coverage of that care?

5               MR. KNEPPER:  Objection, form.

6     Beyond the scope.

7          A.    Well, the people who come to DELR

8     are generally coming for evaluation and

9     psychotherapy services.  And I believe it's

10    very important that people have access to

11    mental health care and that mental health care

12    for many of our patients are not wealthy,

13    affluent people.  And the fees that even

14    masters prepared people charge can become

15    prohibitive.  And so I think it's a very nice

16    idea, the psychiatric services, mental health

17    services evaluation and ongoing treatments,

18    with or without medication, it would be nice to

19    be able to cover those things, yes.  I think

20    that's a long answer, yes.

21         Q.    Understood.  And thinking about the

22    treatment that you refer patients out for, the

23    endocrine treatments in particular, do you

24    think it is generally good if you provide

25    authorization for that treatment that the

 1    patient be able to afford it?

 2                MR. KNEPPER:  Objection, form.

 3         A.    May I say, of course?

 4         Q.    You may.  You may say anything you

 5    would like.

 6         A.    Of course.

 7         Q.    Thank you.  Well, anything you

 8    would like within reason.

 9         If you make a letter of authorization for

10    a patient for the treatment of gender dysphoria

11    specifically related to a surgical treatment,

12    do you think it is good that they be able to

13    access that treatment that you've authorized?

14                MR. KNEPPER:  Objection, form.

15         A.    Not to be cagey, I want to talk

16    about one word you just used in that sentence.

17    I need you to understand that historically in

18    our clinic for those 47 years, our clinics

19    for 47 years, we are not in the business and we

20    have never been in the business of recommending

21    surgery or recommending hormones.  We recommend

22    a continued evaluation so that we -- the person

23    can make up their mind how to proceed.

24         It is not our knowledge base to know

25    who's going to do better and who's going to do

1   worse and who is not going to have any

2   difference at all with hormones or with

3   surgery.  So what we do is we say, we will

4   write a letter of support for endocrine

5   treatment or for hormones if this is what you

6   want.  And we say what our concerns are.  We

7   tell the endocrinologist and we tell the

8   surgeon what our concerns are and that we

9   see -- we have reservations about this, and

10  these are our reservations, but the patient has

11  decided this is what he or she wants to do.

12          And so we write a letter of support, but

13  I don't -- every time you use the word,

14  "Recommendation," there's part of me that wants

15  to say, no, we do not recommend.  We have never

16  recommended.  We have not had the knowledge

17  base.  We have not had the clinical experience

18  and the knowledge base to say, I'm a doctor.  I

19  know this field.  This is what I recommend to

20  make you better.  We do not talk that way.  We

21  do not think that way.  And so I may want to

22  always put an asterisk to any sentence that you

23  use the word, "Recommend."  I need you to

24  understand that that's where I'm coming from.

25              MR. CHARLES:  Thank you,

Case 1:19-cv-00272-LCB-LPA   Document 213-3   Filed 02/02/22   Page 20 of 60

1    Dr. Levine.
2         Excuse me just a moment.  Can you read
3    back my question.  I don't recall if I used,
4    "Recommend."  I thought I used,
5    "Authorization."  I just want to make sure.
6              (Record was read.)
7              MR. CHARLES:  If we could just go
8    off the record for a second.
9              VIDEOGRAPHER: Off the record 10:52.
10         (Discussion held off the record.)
11             VIDEOGRAPHER: On the record 10:53.
12   BY MR. CHARLES:
13        Q.   Okay.  Thank you for that
14   clarification, Dr. Levine.  I'll be more
15   careful about using terminology more close to,
16   "Authorization," rather than, "Recommendation,"
17   and I understand your distinction in your
18   practice.  So do you, though, think it's good,
19   if you are authorizing a treatment, a patient
20   has said, This is the treatment I would like,
21   and you have done an evaluation and determined
22   that you will write, as you said, a letter of
23   support, do you then, as a practitioner, think
24   it's good that they can access it, that they
25   can afford it?

1    concept of agency and being a doctor, I think
2    is different than the implication of your
3    question.
4            Q.    Is the worrisomeness for a
5    patient's future health, is that a reason to
6    deny all medical care for gender dysphoria?
7            A.    Absolutely not.
8            Q.    Dr. Levine, I'd like to return back
9    to, I believe it's Exhibit 2, the Claire
10   deposition.  And please, if you would turn to
11   page 156.
12           A.    I'm sorry.  150 what?
13           Q.    Page 156.  And beginning at line 10
14   on page 156, Dr. Levine, I'll read it, if
15   you'll just follow along, please.
16           Question:  "Are you aware that this case
17   concerns an insurance exclusion that is
18   categorical at preventing" --
19           Skipping to line 15.
20           "-- hormones and surgery as a treatment
21   for gender dysphoria?"
22           Answer:  "I am aware that your plaintiffs
23   are suing to get coverage for -- that is not
24   provided by their particular insurance.  I am
25   aware of that."

1    demonstrate their efficacy.  This is the

2    problem.

3          This is the essence of the problem.  This

4    is, I think the essence of my testimony with

5    you today.  It's not whether I personally as a

6    doctor would like this patient to have

7    insurance to cover their hormones.  It's about,

8    is this the right thing to do for this person

9    and can I help the person see clearly what the

10   dangers are and what the benefits are.  That's

11   the issue for a doctor, for Stephen Levine as a

12   doctor.  I hope that's a cogent answer --

13         Q.    It is --

14         A.    -- to your question.

15         Q.    -- it is cogent.  Thank you.

16         Given all of that, is that -- so you just

17   explained, testified that there are

18   complications, some lack of -- and I'm

19   summarizing here, so I will confirm that this

20   is an accurate summary of what you just shared,

21   but I can't possibly repeat all of that.  Given

22   all of those concerns that you have, is that a

23   reason to deny all medical interventions to

24   people with gender dysphoria?

25                    MR. KNEPPER:  Objection, form.

1          A.    No, but that's not -- that's a
2     separate question about insurance.
3          Q.    Yes, it is a separate question.  So
4     now I'm asking:  Are those concerns you raised
5     justifications in your mind for denying medical
6     interventions to all people with gender
7     dysphoria?
8               MR. KNEPPER:  Objection, form.
9          A.    You know, I'm not advocating
10    denying endocrine treatment or surgical
11    treatment.  I'm just saying that we as a
12    medical profession need to walk the walk that
13    we talk.  We say as a principle of ethics that
14    our interventions should be based upon the best
15    current knowledge, it should be based on
16    science.  It should not be based on politics.
17    It should not be based on fashion.  It should
18    not be based on civil rights considerations.
19    They should be based on the kinds of studies
20    that I just described to you with predetermined
21    outcome majors that are agreed upon --
22          Q.    Sorry?
23          A.    -- period.
24          Q.    I was --
25          A.    I forgot to put the period.

1          Q.    That's okay.  Did you just say,
2     Dr. Levine, you're not an expert in health
3     insurance?
4          A.    I am not an expert in health
5     insurance.
6          Q.    Okay.  Or what insurance should or
7     should not cover?
8          A.    Yes.
9          Q.    Do you recall what the insurance
10    billing code typically is for psychotherapy for
11    gender dysphoria?  I know it's been a long time
12    since you've accepted commercial insurance, so
13    I'm not sure if the billing codes are the same,
14    but do you recall --
15         A.    The billing code is 90837.
16         Q.    Okay.  Is there a code that you're
17    familiar with that is F64.0?
18         A.    That's not a billing -- that's
19    diagnostic code --
20         Q.    Thank you.
21         A.    -- there's a separate code for
22    diagnosis and a separate code for procedure.
23         Q.    I see.  So F64.0 is a diagnostic
24    code?
25         A.    Yes.

1                    VIDEOGRAPHER: Off the record 11:26.

2                        (Recess taken.)

3                    VIDEOGRAPHER: On the record 11:31.

4        BY MR. CHARLES:

5            Q.    Okay.  Dr. Levine, in your report,

6        you stated that you had not met with any of the

7        plaintiffs in this case, correct?

8            A.    Yes.

9            Q.    Okay.  And you have not interviewed

10       any of the plaintiffs in this case, correct?

11           A.    Correct.

12           Q.    And so you are not offering any

13       opinions about the plaintiffs in this case,

14       correct?

15           A.    Correct.

16           Q.    Okay.  And that would include the

17       veracity of their experiences of gender

18       dysphoria, correct?

19           A.    Yes, correct.

20           Q.    And that would not include the

21       accuracy of their gender dysphoria diagnoses,

22       correct?

23           A.    Correct.

24           Q.    Okay.  You're not offering any

25       opinions about their mental health histories?

1          A.    Correct.

2          Q.    Nor any of the affects of the

3    gender affirming treatment they may have

4    received?

5          A.    Correct.

6          Q.    Okay.  Thank you.  Let's return to

7    your report.  I don't know if you have that --

8          A.    My report?

9          Q.    Yes.  You can put away that

10   document in your hand.

11         So if you would, please, turn to page 6

12   of your report.

13         Okay.  So on page 6, paragraph a. at the

14   bottom of the page there, Dr. Levine.  The

15   report states that this is one of the opinions

16   you're offering, which is, "Sex as defined by

17   biology and reproductive function cannot be

18   changed.  While hormonal and surgical

19   procedures may enable some individuals to

20   'pass' as the opposite gender during some or

21   all of their lives, such procedures carry with

22   them physical, psychological, and social risks,

23   and no procedures can enable an individual to

24   perform the reproductive role of the opposite

25   sex."  Did I read that correctly?

Case 1:19-cv-00272-LCB-LPA   Document 213-3   Filed 02/02/22   Page 27 of 60

1   methodology and are capable of critically

2   reviewing the literature.  So your statement is

3   true on the most superficial level, but is

4   totally incorrect when it comes to scientific

5   standards of care for issuing guidelines for

6   the medical profession.  So I don't know how to

7   answer the question.  On the surface, the

8   answer is, yes.  And underneath the surface,

9   the answer is, no.

10          Q.    So the International Journal For

11  Transgender Health is still a peer-reviewed

12  source, though, right?

13          A.    It's peer reviewed by people who

14  make their living supporting transgender care.

15          Q.    But it's still peer reviewed,

16  right?

17          A.    It's peer reviewed --

18          Q.    And as for your --

19          A.    -- I think it's peer reviewed.

20          Q.    Okay.  Understood.  And as for your

21  more conservative approach, can you cite to any

22  studies or research that resulted in better

23  outcomes than people who adhere strictly to the

24  WPATH standards of care version 7?

25          A.    No.  This is part of the problem in

1    evaluation leading to a therapeutic process, it
2    seems prudent, given the fact that we are
3    changing people's bodies, especially teenagers'
4    bodies, and they are not of developmental
5    sophistication yet that court systems or at
6    least one court system thinks they're certainly
7    too young to make these life-altering
8    decisions.  So people in SEGM are biased in the
9    direction of being conservative and providing
10   psychotherapeutic evaluations of the child, of
11   the teenager and of their parents, of their
12   family systems to see if we can find a way to
13   help them be informed about what is going --
14   what they think they want to do in their
15   future.
16         Q.    And so when you provide letters of
17   authorization for hormones or for surgery, do
18   you do so in accordance with the WPATH
19   standards of care?
20         A.    Yes.  That is the standard, to
21   provide a letter of recommendation.
22         Q.    Okay.  So turning back to your
23   report, Dr. Levine.  You can go ahead and put
24   away the trial transcript there.
25         A.    I'm sorry.  Did you say, "Turning

1          Q.    Okay.  So is a, "Hypothesis," an
2     idea about why something happens, but doesn't
3     provide evidence for why something is
4     happening?
5               MR. KNEPPER:  Objection, form.
6          A.    A, "Hypothesis," generates the
7     pursuit of evidence.
8          Q.    Has social contagion as an
9     explanation for increased cases of gender
10    dysphoria been scientifically proven yet?
11         A.    No.  But when you seek -- when you
12    see -- actually see patients and talk to them
13    about their friends and hear about the
14    influence of the Internet and the gurus on the
15    Internet who tell 13 and 12-year-old children
16    who are concerned about menses or concerned
17    about breast development or concerned about
18    their bodies changing and then they're told
19    that they're transsexual by somebody that
20    they've never met that they talked to on the
21    Internet, that would be social contagion or
22    social education.
23              Or when you hear about a friend who
24    declares themselves trans and then your patient
25    six months later declares themselves trans, you

1    wonder about the -- the interpersonal,
2    psychological link between best friends in
3    young puberty, young years of puberty and how
4    one can identify with one's friends and that
5    would be a social contagion.  Those are 3the
6    kinds of ideas that people like me get when we
7    sit with people week after week talking about
8    their lives.  You see, that's not science.
9         But that is clinician and this is the
10   kind of thing that leads to intuition, clinical
11   intuition and that's the source of the
12   generation of the hypothesis.  But we think as
13   clinicians, when we hear -- I mean, I don't
14   think I've ever seen a teenager trans person
15   who hasn't been heavily involved and influenced
16   by the Internet, for example, but I have not
17   done studies to document that in a way that
18   would be scientifically acceptable.  There are
19   other people who have.
20        And I doubt very much if you'll ever find
21   a clinician on any side of this issue, you see,
22   who would say, oh, no most of my patients have
23   never talked to anyone on the Internet about
24   transgender.  The Internet is just part of life
25   today and -- but transgender teenagers spend

1    hours and hours of their time getting counseled
2    or participating with the virtual trans
3    community.  That's a hypothesis.
4         Q.    So no scientific citation?
5         A.    When we use the word, "Scientific,"
6    in the best sense, yes, the answer to your
7    question is, no scientific.
8         Q.    Okay.  No studies of citations you
9    can point to today to support that hypothesis?
10        A.    Oh, I think Lisa Littman's studies
11   are in the literature and/or in press that
12   documents this.
13                    -  -  -  -  -
14                (Thereupon, Deposition Exhibit 7,
15                "Correction: Parent reports of
16                adolescents and young adults
17                perceived to show signs of a rapid
18                onset of gender dysphoria," Article,
19                was marked for purposes of
20                identification.)
21                    -  -  -  -  -
22        Q.    Okay.  For the record, please note
23   I'm showing to Dr. Levine what has been marked
24   as Exhibit 7.  "Correction: Parent reports of
25   adolescents and young adults perceived to show

1    signs of a rapid onset of gender dysphoria," by

2    Lisa Littman published March 19, 2019.  Have

3    you seen this material before, Dr. Levine?

4         A.    I've seen of it.  I don't think

5    I've read it.

6         Q.    Okay.  Were you aware that the Lisa

7    Littman article had to be withdrawn, corrected

8    and republished?

9         A.    Yes.

10         Q.    Okay.  And were you aware that the

11    initial article was based on a survey of

12    parents --

13         A.    Yes.

14         Q.    -- of purportedly transgender

15    children and the parents were recorded -- I'm

16    sorry.  Let me start over.  Were you aware that

17    the Littman article was based on a survey of

18    parents who were recruited through some parent

19    groups?

20              MR. KNEPPER:  Objection, form.

21         A.    I knew it was a survey of parents.

22         Q.    Okay.  And did you know there were

23    no report-outs from the young adults of those

24    parents in the article?

25         A.    It was a report of parents'

1    transitioning.  However, it is...important to

2    note that there are other survey items where

3    the parent would have direct access to

4    information about their child and that those

5    answers reflect items that can be directly

6    observed."  Did I read that correctly?

7          A.    Yes, you did.

8          Q.    All right.  Your report also cites

9    as support for the social contagion hypothesis

10   to an article from Medscape.com written by

11   Becky Mccall and Lisa Nainggolan as support for

12   the social contagion theory.  Is that correct?

13   I'm sorry.  It's not going to be on this

14   article, Doctor.

15         A.    I don't know that article.

16         Q.    Okay.

17         A.    You haven't asked me a question

18   about this.  Did I misunderstand something?

19         Q.    No, no.  Sorry.  We're just --

20         A.    You haven't asked my opinions about

21   that, yeah.

22                     -  -  -  -  -

23               (Thereupon, Deposition Exhibit 8,

24               "Transgender Teens: Is the Tide

25               Starting To Turn?" Article, was

1                    marked for purposes of

2                    identification.)

3                         -  -  -  -  -

4          Q.    Yeah.  So, for the record, I'm

5    showing Dr. Levine what has been marked as

6    Exhibit 8.  "Transgender Teens:  Is the Tide

7    Starting To Turn?" by Becky McCall and Lisa

8    Nainggolan, April 26, 2021.  Dr. Levine, you

9    said you have not reviewed this article before?

10         A.    Which one are you referring to?

11         Q.    I'm sorry.  That one to your left.

12         A.    This?

13         Q.    Yes.  Take your time.

14         A.    Have I reviewed it, no.  You know,

15   I've seen the picture of Keira Bell.  I've seen

16   news reports of this in the past, but they were

17   just news reports, yeah.

18         Q.    Do you know if either of the

19   authors of this article is a scientist?

20         A.    I have no idea.

21         Q.    Okay.  Or a psychiatrist?

22         A.    (Indicating.)

23         Q.    I'm sorry.  Could you make your

24   responses verbal?  I'm forgetting.

25         A.    I have no idea.

1      Q.    Okay.  Thank you.  Have either of
2    them ever treated transgender children or
3    adolescents?
4      A.    I would have no idea.
5      Q.    Okay.  To your knowledge, is the
6    information provided on Medscape.CA subject to
7    peer review?
8      A.    I don't know how Medscape works.
9    I've heard there have been retractions, but I
10   don't know how their peer reviewed is made.
11   Perhaps people write in that, This is
12   ridiculous what you've been teaching or what
13   you've been saying, but whether they're peer
14   reviewed or not, I have no idea.
15     Q.    So you probably -- I'm sorry.  So
16   do you know if this article has been published
17   in a peer-reviewed journal to your knowledge?
18     A.    "Transgender teens:  Is the
19   Tides" -- that article?
20     Q.    Yes.
21     A.    I don't know.  I don't know this
22   article.  I don't know where it's from.
23     Q.    Okay.  So your report includes a
24   quotation from this article.  "The vast
25   majority of youth now presenting with gender

1    multi-continental set of observations from
2    Europe, from Australia, from North America --
3         Q.   Okay.
4         A.   -- it almost doesn't even need
5    citations it's so clinically apparent.
6         Q.   Okay.  But there's no citation in
7    your report?
8         A.   In my report, yes.
9         Q.   Okay.  So on page 18, going back to
10   your report, at the bottom of page 18, you use
11   a term, "Transgender Treatment Industry."  Is
12   this the first time you have used this term?
13        A.   In this report?
14        Q.   No.
15        A.   You mean, did I ever use it in
16   another report?
17        Q.   Yeah, yeah.
18        A.   I'm not sure.  If this is -- if
19   it's not the first, it might be the second.
20        Q.   And where did the term originate?
21        A.   I think it -- the term originated
22   from Dwight Eisenhower at the end of his --
23   when he was leaving the presidency in 1952, he
24   warned the people about the military industrial
25   complex and that there was a very comfortable

1    the methods we made reference to before, the

2    efficacy of the treatment and the downsides of

3    the treatment.  But because WPATH is an

4    advocacy organization and the scientific

5    establishment of the efficacy of their

6    treatments are not important to them, what they

7    are doing is teaching young mental health

8    professionals and medical professionals as a

9    whole what their ideology is.  They say it's

10   scientifically established.

11        I'm here to tell you to the extent that I

12   understand science, it is not scientifically

13   established.  In a sense, there is an industry

14   that has different elements that feed each

15   other; that's the transgender treatment

16   industry.  I think if we put our heads

17   together, we could find another term.

18        Q.    So did you coin that phrase then?

19        A.    No --

20        Q.    Okay.

21        A.    -- no.

22        Q.    Have you seen it used before in any

23   peer-reviewed articles?

24        A.    Not in a peer-reviewed article.

25   I've seen it used in these kind of expert

1       opinion -- (Indicating.)

2              Q.     Okay.

3              A.     -- I would -- you know, if I had

4       time and I had a committee of people, I -- I

5       would probably find a different term for it.

6       But I don't mean it in a disparaging way.  I

7       mean that this is a group of compassionate

8       people trying to help other people who actually

9       believe that the science has established the

10      best practices when in fact they're not well

11      informed.

12             Q.     Do you need a sip of water after

13      that?

14             A.     No.  I'm just a long-winded guy.

15             I want to add, if I may, that we should

16      make a distinction between education and

17      indoctrination.  Education can be based on

18      science.  Indoctrination is based on preferred

19      beliefs that, if you allow me to use this term

20      again.  The transgender treatment industry is

21      heavy on indoctrination and has declared, if

22      you look at the standards of care, if you don't

23      believe these systems, you're not a

24      competent -- you're not competent to take care

25      of people.  That of course is the height of

1       A.    No.   Their gender dysphoria may be

2    a product, you see, of these other things.  For

3    example, if you have someone who has been

4    sexually abused by her stepfather and becomes a

5    trans person in adolescents, we want to talk

6    about the sexual abuse and the process between

7    that person and what fears for the present and

8    the future that has caused the child.  And

9    we're not attacking their trans identity.

10   We're trying to help them understand where they

11   came from and what they're coping with and why

12   they're so fearful or so distressed by their

13   body changing.

14       Q.    And their gender dysphoria could be

15   separate and apart from that traumatic

16   experience?

17       A.    Theoretically it could be, yes.

18       Q.    And if it persisted sufficiently

19   enough, you would consider a letter of

20   authorization for --

21       A.    Yes.

22       Q.    -- hormones?

23       A.    Yes.

24            MR. KNEPPER:  Objection, form.

25       Q.    Okay.  If you would, please, turn

1          A.     That is correct.  And may I add

2     that it's very, very difficult to understand.

3     The natural question would be, how do you

4     compare the general population with the trans

5     people who did not have surgery with the trans

6     people who did have surgery.

7          Q.     Thank you, Dr. Levine.  That's not

8     my question, though.  I just wanted to confirm

9     that was not the control group.  You mentioned

10    this study later in your report, page 66

11    beginning at paragraph 74.  Do you see that?

12         A.     Um-hum.

13         Q.     Okay.  And basically that -- well,

14    here, let me point you exactly.  The sentence

15    starts with, "Similarly," about halfway down

16    the page, third sentence of that paragraph.

17         A.     Um-hum.

18         Q.     And, as you mentioned, you cite the

19    Dhejne study and I believe -- or I should ask:

20    Is the Denmark study you're referencing the

21    study directly after it --

22         A.     The Simonsen study.

23         Q.     -- the Simonsen study?

24         A.     Yes.

25         Q.     Okay.  So beginning with the Dhejne

1    study, do you think because that study showed
2    that some people committed suicide after gender
3    affirming surgery that no patient should be
4    able to access gender affirming surgery?
5                    MR. KNEPPER:  Objection, form.
6         A.    That would be illogical.
7         Q.    Okay.  Dr. Levine, I understand you
8    said that would be illogical, but just to be
9    clear.  You're not recommending -- sorry.  I'm
10   not using that word.  You're not saying that
11   the fact that some people commit suicide
12   following gender affirming surgery means that
13   there should be a ban on access to that
14   surgery.  Is that right?
15        A.    Not for that reason, no.
16                   MR. KNEPPER:  Objection, form.
17        Q.    Not for that reason.  Okay.  Are
18   you recommending that there would be bans on
19   gender affirming surgery for any reason?
20        A.    I think there are -- you know, I
21   think most prudent people in this field, just
22   to use the example of what you read out loud
23   about the Finland study, a case-by-case basis.
24   That's how doctor need to decide things, but
25   there are many, many reasons to be cautious

1   fashion and to be very hesitant about going
2   forward.
3          Q.    But you're not recommending total
4   bans on gender affirming surgery?
5          A.    I'm not recommending total bans.
6   I'm aware of the individual circumstances of
7   individual people's lives and their commitment
8   to transgender living.  And I don't want to be
9   draconian about this.  I want to be
10  compassionate about this.
11         Q.    I understand.  I appreciate that.
12  I just want to make sure I'm understanding you
13  correctly.
14                     -  -  -  -  -
15                (Thereupon, Deposition Exhibit 12,
16                "Long-Term Follow-Up of Transsexual
17                Persons Undergoing Sex Reassignment
18                Surgery: Cohort Study in Sweden,"
19                Article, was marked for purposes of
20                identification.)
21                     -  -  -  -  -
22         Q.    So for the record, I'm presenting
23  to Dr. Levine what has been marked as
24  Exhibit 12.  "Long-Term Follow-Up of
25  Transsexual Persons Undergoing Sex Reassignment

1          For the 22nd time today, did I read that

2     correctly?

3          A.    It's the 23rd time.

4          Q.    Oh, okay.

5          A.    Yes.

6          Q.    I was hoping you weren't counting,

7     but, okay.  Did you testify earlier today that

8     the limitation of the Dhejne study is that the

9     controls were not transgender persons who had

10    not undergone gender affirming surgery?

11         A.    Yes.

12               MR. KNEPPER:  Objection, form.

13         Q.    Okay.  You can set that aside,

14    Dr. Levine.

15                    -   -   -   -   -

16               (Thereupon, Deposition Exhibit 13,

17               2017 "On Gender Dysphoria," Booklet

18               From Department of Clinical

19               Neuroscience, Karolinska Institutet,

20               Stockholm, Sweden, was marked for

21               purposes of identification.)

22                    -   -   -   -   -

23         Q.    For the record, Dr. Levine has an

24    exhibit that has been marked as Exhibit 13.

25    "On Gender Dysphoria," by Cecilia Dhejne from

1      ideation in transgender people.

2             A.    Well, you know about the

3      Branstrom-Pachankis study and the criticism of

4      the study --

5             Q.    But I'm not talking about the

6      study.

7             A.    -- and part of the study

8      demonstrated that it increased suicidal

9      ideation and attempts in the first two and a

10     half years after surgery, especially in the

11     first year --

12            Q.    Right.   Is your testimony --

13            A.    -- so I'm not testifying that.   I

14     thought you were asking me about this, which I

15     need to comment on, because this is not an

16     accurate depiction of my statement in the

17     reference.   (Indicating.)

18            Q.    Well, that's not what I'm asking

19     about, Dr. Levine.

20            A.    Well, you're reading this and I'm

21     misquoted here.   So I don't want you to imply

22     that she is accurately representing my views,

23     because I did not say that gender affirming

24     treatment in general should be stopped.   I've

25     never said that.   This is an article about

1      at different times have reported that in the
2      large majority of patients, absent a
3      substantial intervention such as social
4      transition and/or hormone therapy, gender
5      dysphoria does not," continue, "through
6      puberty."
7            So there are some children who persist in
8      their asserted gender identity through puberty,
9      correct?
10                 MR. KNEPPER:  Objection, form.
11           A.    Correct.
12           Q.    And some who persist in wanting to
13     transition via medical treatments?
14                 MR. KNEPPER:  Objection, form.
15           A.    Yes.  Some of the children have
16     learned about medical treatments somewhere
17     along the line and they feel instantly that
18     this is for them.
19           Q.    And then looking at paragraph 56,
20     which is on page 41, so just the very next page
21     on the bottom, the second sentence in that
22     paragraph.  "I observe an increasingly vocal
23     online community of young women who have
24     reclaimed a female identity after claiming a
25     male...identity at some point during their teen

1    transgender people is individual based, right?

2           A.    Well, it's both --

3                 MR. KNEPPER:  Objection, form.

4           A.    -- yes, that's partially true.  And

5    ideally that's true, but it's obviously not

6    entirely true.  It's why we're here, is it's

7    categorically based.

8           Q.    Let me rephrase that.  You design

9    treatment for your patients based on what that

10   patient in front of you, what they need, what

11   they want, what you determine -- sorry.  Not

12   what you determine, but what you might

13   authorize?

14                MR. KNEPPER:  Objection, form.

15          A.    What the patient and I discern

16   together.

17          Q.    Thank you.  Okay.  Let's jump to,

18   again, still in your report, page 68.

19          A.    We've left 40 and 41?  68.

20          Q.    Okay.  Looking at the bottom of

21   page 68, Dr. Levine, paragraph 78.  It states,

22   "Similarly, the American Psychological

23   Association has stated because approach" --

24          A.    Sorry.

25          Q.    I apologize.

1       Gender Nonconforming People (2015)."

2               So is that lack of consensus that you

3       discuss a justification to categorically ban

4       social transition for children as a treatment

5       for gender dysphoria?

6                       MR. KNEPPER:  Objection, form.

7               A.    By, "Children," you mean 6 and 7

8       year olds?

9               Q.    Those for whom medical intervention

10      is not indicated.

11              A.    Is that a reason to ban it?

12              Q.    Correct, social transition.

13                      MR. KNEPPER:  Objection, form.

14              A.    The reason to -- so let me qualify

15      that.  There's a, yes, answer, there's a reason

16      to ban it.  And the reason to ban it is both a

17      developmental and an ethical reason.  There

18      have been eleven studies of these cross-gender

19      identity children who are not socially

20      transitioned and the vast majority of them

21      de-transition by the time they're mid

22      adolescents or older adolescents.  They become

23      homosexual individuals usually or bisexual

24      individuals, but they are cis gender.

25              So if we take a 6-year-old child and

1          A.    -- nor you didn't ask me to comment
2     on that.
3          Q.    It was related to what you had said
4     before.  So this is related but not related to
5     what we just read.  So you can put that aside.
6          A.    Okay.  But your next question was
7     about puberty blocking hormones, which are not
8     being used for 6-year-old's and 7-year-old's --
9          Q.    Correct, yes, a separate group of
10    people.
11         A.    -- so we're on a different
12    category.
13         Q.    Yes.
14         A.    Okay.  So you asked me if I think
15    puberty blocking hormones should be used on a
16    case-by-case basis?
17         Q.    Correct, yes.
18         A.    I don't think so.
19         Q.    So that is to say, there are no
20    circumstances you would advocate for a total
21    ban on that intervention?
22              MR. KNEPPER:  Objection, form.
23         A.    Number one, I've never seen a child
24    where that has come up where I thought it was a
25    good idea.  In the cases I've seen, it was like

1    a treatment for the mother's pathology, not for

2    the child.  And it's like a warning sign, boy,

3    be careful.  You see, if you see one case like

4    that, you wonder -- and it's so conspicuous,

5    you wonder in the next case, if the same thing

6    is going on in a more subtle way.

7          Is the child acting out the ambitions of

8    the mother or the father?  I just think

9    prudence -- I think considering the child has

10   not gone through puberty or has not gone far

11   into puberty and puberty brings all kind of

12   psychological, physical and social changes to a

13   child and those changes lead to desistance in

14   many, many children, to put them into a state

15   where all their peers are developing physically

16   and they're going to be poirot (phonetic).

17         And then most of those children have

18   social anxiety problems and they avoid -- they

19   don't have friends, right.  And this is going

20   to make them even more different than their

21   peers and it's gone to deprive them of the

22   sexualization of their mind and the discovery

23   of masturbation and the discovery of sexual

24   desire for partners, you see.  This is only

25   going to increase the child's difference from

1  her peers or his peers and I don't think this
2  is a prudent idea.
3      And if you wanted me to suggest a ban on
4  anything, it would be a ban on using puberty
5  blocking hormones, especially when the
6  evaluation of those children are focused on the
7  gender dysphoria of the child and not on the
8  background of the child and not on what's going
9  on.  So I think that's an answer to your
10  question.
11      If we're going to use these drugs, if
12  we're going to use social transformation of
13  children, if we're going to use puberty
14  blocking hormones, it should only be used in a
15  carefully designed protocol.  And follow up has
16  to be guaranteed so in one year and in two
17  years and in three years and before we start
18  giving cross-gender hormones we have data --
19      Q.    Sorry.
20      A.    -- so the answer to your question
21  is, I would consider banning puberty blocking
22  hormones even for children who have been
23  cross-gender identified for four years to give
24  them a chance to desist, which is exactly what
25  the Dutch protocol did, by the way.

1        Q.    Sorry.  So you just said you would

2    ban -- you would recommend a ban on --

3        A.    If --

4               MR. KNEPPER:  Objection, form.

5        A.    -- look, I'm a doctor.  I'm not a

6    policy maker --

7        Q.    I understand, yes.

8        A.    -- if you ask me my political

9    opinion about, should we ban this, is that a

10   reasonable thing, I think there's a very strong

11   argument for banning puberty blocking hormones.

12        Q.    Okay.  And, right.  So you're here

13   as an expert offering an expert opinion.  So

14   are you separating that from -- like are you

15   saying your political views that you would

16   advocate for bans or are you saying your expert

17   opinion you're offering in this case is you

18   would recommend ban?

19              MR. KNEPPER:  Objection, form.

20        A.    I would recommend ban.  To what

21   extent it's from my politics or from my being a

22   parent or from my being a doctor, I don't know.

23   I would recommend we not use puberty blocking

24   hormones.

25        Q.    In Claire, in this case that we

1          Answer:  "Where we had a healthy mother
2     and father, an intact family who was
3     psychologically informed and who has -- where a
4     child has come out of toddlerhood acting
5     consistently in a gender atypical fashion, and
6     where the parents are not homophobic..."
7          Question:  "The parents are not what kind
8     of people?"
9          Answer:  "Homophobic."
10         For the 27th time, did I read that
11    correctly?  Did I read that correctly?
12         A.    Yes.
13              MR. CHARLES:  Okay.  All right.
14    Let's go ahead and take a break for a few
15    minutes.
16              VIDEOGRAPHER: Off the record 3:20.
17                 (Recess taken.)
18              VIDEOGRAPHER: On the record 3:38.
19    BY MR. CHARLES:
20         Q.    So, Dr. Levine, before the break,
21    you were talking about 6 and 7 year olds and
22    you mentioned there were eleven studies.  Can
23    you identify which eleven studies from your
24    report you're referring to?
25         A.    Cantor, the reference Cantor lists

1    the eleven studies and these eleven studies
2    have been done over probably thirty years.
3        Q.    Okay.  So Cantor was one review of
4    eleven studies?
5        A.    Cantor was a review of the eleven
6    studies.  I can't list to you the eleven
7    individual studies.  The latest one is written
8    by Singh, S-i-n-g-h.  It was published in April
9    of 2021, in the Frontiers of Psychiatry.  And
10   that perhaps is the most comprehensive of them.
11   And that's the one that confirms -- that's a
12   study of boys and it confirmed that 12.2, I
13   think percentage of them persisted over a
14   thirteen-year period.
15       Q.    So that was one -- that was the
16   Singh study that came out.  Is that same study
17   mentioned in the Cantor review?
18       A.    (Nodding.)
19       Q.    Okay.  And you said that
20   established that 12.2 percent of prepubertal
21   boys persisted into adolescents?  Okay.
22       A.    Yes.  This harkens back to the
23   ethical issue that I talked about before.  You
24   know, if you know that 88 percent of them are
25   going to persist -- desist, why in the world

1    identified 60,000 case reports world wide on

2    the Internet.  See Exposito-Campos..." --

3         A.    That is an error, by the way.

4         Q.    Sorry.  Which part of that is an

5    error?

6         A.    That, "60,000," is my error.  It

7    should say, "16,000."

8                   -  -  -  -  -

9              (Thereupon, Deposition Exhibit 17,

10             "A Typology of Gender Detransition

11             and Its Implications for Healthcare

12             Providers," Article, was marked for

13             purposes of identification.)

14                   -  -  -  -  -

15        Q.    Okay.  So for the record, I'm

16   showing Dr. Levine what has been marked as

17   Exhibit 17.  "A Typology of Gender Detransition

18   and Its Implications for Healthcare Providers,"

19   Pablo Exposito-Campos, 2021.  Okay.  Have you

20   seen this study before, Dr. Levine?

21        A.    Yes.

22        Q.    Okay.  So on page 1 of this report,

23   about halfway through the very first paragraph

24   in the introduction beginning with, "As a

25   consequence."  Do you see that there?

1    important to note that this typology does not
2    suggest two clear-cut categories, for a
3    secondary detransition can lead to a primary
4    detransition" -- oh, sorry.  Let me start over.
5    Sorry.
6              Okay.  Let me start from a different
7    place, Dr. Levine.  The second sentence.
8    "In r/detrans" --
9              And there's an HTTP address --
10             A.    Okay.
11             Q.    Okay.  You see that.
12             -- "a subreddit for detransitioners to
13   share their experiences with more than 16,000
14   members, one can find several stories of people
15   who call their transgender status into question
16   after stopping transitioning due to medical
17   complications or feeling dissatisfied with
18   their treatment results"?
19             Do you know what a, "Subreddit," is,
20   Dr. Levine?
21             A.    I believe it's just a division of a
22   larger website where people, you know, with
23   similar interests.
24             Q.    Okay.  Do you understand this
25   sentence to be suggesting that all 16,000 of

1    those members have offered a story of

2    detransition?

3                MR. KNEPPER:  Objection, form.

4        A.    I think -- I think it may be true

5    that either they have offered a personal story

6    or they're fascinated because of their own

7    considerations of that story.  They're thinking

8    about it themselves, which would be in keeping

9    with the idea that even people who have

10   transitioned begin to doubt whether they made a

11   wise decision and they're considering

12   detransition.  I'm not so sure it means that

13   all 16,000.  I would have no way of

14   ascertaining that.  You know, in my worry, I

15   would lean towards most of them are seriously

16   considering or have detransitioned.  And in my

17   skepticism, I would say I'm not sure whether

18   it's 15,000 or 12,000 or 8,000.

19       Q.    But you have no way to confirm

20   that --

21       A.    I have no way.

22       Q.    -- if it's all of them or a few of

23   them or three of them?

24       A.    You're absolutely right.  I have no

25   way of confirming that.

1    where hormones are safe and surgery is a good

2    thing to do.  If a person said that, you know,

3    skeptically, I think that would disappoint

4    certain patients, but how it was said and when

5    it was said in response to what would either

6    determine whether the person is engaged with

7    the mental health professional or leaves the

8    mental health professional.  You know, all

9    mental health professionals are not created

10   equal.

11       Q.    So it sounds like you're saying it

12   could do harm to that patient?

13           MR. KNEPPER:  Objection, form.

14       A.    No, I'm not saying that.  I'm

15   saying it could be disappointing to that

16   person.  What that person did with the

17   disappointment may prove harmful just because

18   of that person or it may prove in fact

19   beneficial.

20       Q.    Are you satisfied -- let's orient

21   this question around the patients you've seen

22   in the last 12 months.  Are you satisfied that

23   those patients -- actually, sorry.  Let me

24   start over.  Are you satisfied that the

25   patients you have seen historically for whom

1    you provide letters of authorization for

2    hormones give sufficiently informed consent?

3              MR. KNEPPER:  Objection, form.

4         A.    From my point of view, I did what I

5    could to reach the standard of having the

6    person internalize and think about, digest,

7    dream about and come back and talk to me about

8    it.  That's all I can do.  I can't guarantee

9    that if I do what I do that it's going to

10   change your mind or help you steer your ship in

11   a slightly different angle --

12        Q.    So --

13        A.    -- so I would not write a letter of

14   recommendation if I didn't feel like I did my

15   part.  And if the person indicated that they

16   couldn't pay attention to me, I wouldn't write

17   the letter.

18             MR. CHARLES:  Understood.

19        Okay.  John, finished.

20             MR. KNEPPER:  You're finished?

21             MR. CHARLES:  I mean, barring --

22             MR. KNEPPER:  Barring --

23             MR. CHARLES:  We can't tell the

24   future.

25             MR. KNEPPER:  I wasn't ready for

1    history and current psychiatric diagnosis, it's

2    more complicated than just the internet.

3          But we need to understand who these

4    children are and how they're different from

5    their peers and what we could possibly do to

6    help them to have a better life.  I know some

7    of the conversation today was, we'll help them

8    have a better life by giving them puberty

9    blocking hormones, but that doesn't address --

10   I think it has a risk of harming them further.

11   And it doesn't address the comorbid

12   developmental challenges that these children

13   face.

14         And I'm afraid -- and it's controversial,

15   because I don't have the answer.  I'm afraid

16   there's a possibility we're making these

17   children have a worse outcome.  And until you

18   can demonstrate to me in a very careful

19   controlled study that separates the autistic

20   from the non-autistic, you see?  That separates

21   the kids who come from a family that's intact

22   from a family where there's a single parent.

23   Where you can separate the kids who were

24   sexually abused from the kids who were not

25   sexually abused.  I'm not sure puberty blocking