# Exhibit G

Stephen Levine
December 21, 2020

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:20-cv-00020-MW/MAF

JAMI CLAIRE, KATHRYN LANE and
AHMIR MURPHY,

    Plaintiffs,

vs.

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES, et al,

    Defendants.
_____

ZOOMED DEPOSITION OF STEPHEN B. LEVINE, M.D.

Monday, December 21, 2020

9:30 a.m. - 2:51 p.m.

Via Zoom

Tallahassee, Florida  32308

STENOGRAPHICALLY REPORTED BY:

SANDRA L. NARGIZ
RPR, CM, CRR, CRC, FPR, CCR-GA

Job No. 166551

Stephen Levine
December 21, 2020

Page 2

1  APPEARANCES: (All appearing via Zoom.)

2             ON BEHALF OF THE PLAINTIFFS:

3             SOUTHERN LEGAL COUNSEL, INC.
              1229 NW 12th Avenue
4             Gainesville, FL   32601
              352.271.8347
5             BY: JODI SIEGEL, ESQUIRE
              jodi.siegel@southernlegal.org
6             SIMONE MICHELLE CHRISS, ESQUIRE
              simone.chriss@southernlegal.org
7

8             LEGAL SERVICES OF GREATER MIAMI
              4343 West Flagler Street, #100
9             Miami, FL   33134
              305.438.3809
10            BY:   JOCELYN JAUREGUI ARMAND, ESQUIRE
              jjauregui@legalservicesmiami.org
11            PAMELA FLORES, ESQUIRE
              pflores@legalservicesmiami.org
12
              ACLU OF FLORIDA
13            4343 W Flagler Street, #400
              Miami, FL 33134
14            786.363.2700
              BY: DANIEL TILLEY, ESQUIRE
15            dtilley@aclufl.org

16            ON BEHALF OF THE DEFENDANT DMS/SECRETARY
              SATTER:
17
              HENRY BUCHANAN HUDSON SUBER & CARTER
18            P.O. BOX 14079
              Tallahassee, FL   32317
19            850.222.2920
              BY: MIRIAM COLES, ESQUIRE
20            mcoles@henryblaw.com

21
              ALSO PRESENT:
22
              Samantha Howell
23

24

25

Stephen Levine
December 21, 2020

Page 3

1                           I N D E X

2   WITNESS                                               PAGE
    STEPHEN B. LEVINE, M.D.                                  5
3
        Direct Examination by Mr. Tilley                     5
4       Cross Examination by Ms. Coles                     171

5

6

7

8   (STENOGRAPHER'S NOTE:  Exhibits were received
    premarked electronically; only Exhibits 1, 2, 3, 7,
9   10, 11 and 13 were referred to in deposition.)

10

11                      INDEX OF EXHIBITS

12
    NO.        DESCRIPTION                                  ID
13
    1    Levine expert report                               70
14  2    Psychotherapeutic Approaches to Sexual            109
         Problems: An Essential Guide for Mental
15       Health Professionals
    3    Dhejne study                                     165
16  7    Standards of Care, V7                             48
    10   Kosilek report                                    83
17  11   Soneeya 2011 report                               94
    13   Soneeya case trial transcript                    167
18

19

20

21

22
    CERTIFICATE OF OATH                                   181
23  CERTIFICATE OF REPORTER                               182
    READ AND SIGN LETTER                                  183
24  ERRATA SHEET                                          184

25

Stephen Levine
December 21, 2020

Page 29

1 right?

2     A    No, that is. I think -- we'll quibble
3 over the word only. If you use the word
4 predominantly, I would say they are predominantly
5 taking care of. They are a specialty clinic for the
6 transgender.

7     Q    So predominantly treating transgender
8 people, but not 100 percent?

9     A    That's my guess.

10     Q    Okay. What sorts of treatments do you
11 provide for your patients with gender dysphoria?

12     A    Psychiatric evaluation of the patient and
13 the family, the parents and the other siblings;
14 psychotherapy to further the process of
15 understanding this whole phenomenon; recommendations
16 for hormones and occasionally recommendations for --
17 depending on the biologic sex of the patient, for
18 genital or breast surgery.

19     Q    How many patients have you recommended
20 hormone therapy for?

21     A    You mean over 47 years?

22     Q    Let's start with the 47 years, yeah.

23     A    I don't know. Can I give you a gross
24 estimate?

25     Q    Sure.

Page 37

1  to be directed to the surgeon.

2      Q    Okay.  If a surgeon told you I require a
3  letter for this facial feminization surgery, are
4  there circumstances under which you could see
5  yourself providing a letter, not of recommendation
6  but of authorization, for a person to receive this
7  surgery from the surgeon?

8      A    I could see myself under certain
9  circumstances, if I understood the patient's motives
10 and had a lot of time to discover and discuss this,
11 the history and alternative approaches and wondering
12 about the psychology of wanting this, I could see
13 theoretically.

14          That's what I do, you know, as a
15 psychiatrist; I am trying to investigate the meaning
16 of the wish and the solution that the patient is
17 hoping for, the problem the patient is hoping this
18 would be a solution for.

19          And so I want to be able to consider this
20 and have a respectful, mutual, slow dialogue that is
21 slow, meaning multiple sessions, to consider the
22 nuances of this because, you know, all of us have a
23 self-concept of how handsome we are or pretty we
24 are, and most everyone wants to get a little more
25 handsome and a little more pretty and we are -- we

Stephen Levine
December 21, 2020

Page 47

1    Q    Okay.

2    A    I believe that if a surgeon is going to do
3  this, he ought to know what I think -- what I know
4  about the person's history and the person's
5  intellectual capacities and the prices they paid for
6  their gender dysphoria already.

7        For example, the loss of a family and no
8  relations to children, or the inability to have a
9  relationship, an intimate relationship with other
10  people. I believe the surgeon needs to have an
11  understanding of the person.

12        I don't have an understanding whatsoever
13  of the techniques of surgery. You see? I am just a
14  psychiatrist. And the psychiatrist -- and the
15  surgeon has very little understanding of how a
16  person got to be in his office. And I believe that
17  the letters of recommendation should capture the
18  humanness of this person and the desperation of this
19  person and the justification that the person uses
20  and the hopes they have for this surgery. But
21  that's Levine, you know.

22    Q    I want to show you the WPATH Centers of
23  Care section that discusses letters. This is
24  Exhibit 7 which we are going to put on the screen.
25

Stephen Levine
December 21, 2020

Page 48

```
 1                (Exhibit 7 was marked for identification.)
 2      BY MR. TILLEY:
 3           Q    Let's go to page 27.  It looks like the
 4      document page 27, it's .pdf page 33, Bates stamp
 5      PL 0450524.
 6                You see, Dr. Levine --
 7                MS. COLES:  Can you read that, Dr. Levine?
 8           It looks a little small on my computer.
 9                THE WITNESS:  I can read it.  It says
10           referral for surgery.
11                MS. COLES:  Okay.  Just making sure.
12      BY MR. TILLEY:
13           Q    At the bottom, I am going to start there
14      and then we'll go on to the following page.  At the
15      bottom it says, The recommended content of the
16      referral letters for surgery is as follows:  1, the
17      client's general identifying characteristics -- now
18      we are continuing on to the next page -- number 2,
19      results of the client's psychosocial assessment,
20      including any diagnoses.
21                And then it goes on to 3, 4, 5, and 6.
22                Dr. Levine, can you just review those if
23      you can read it and then let me know if you agree
24      with those statements.
25                (Short pause.)
```

Page 49

1    A    I don't disagree with the statements, but
2    each of those statements, of course, need to be
3    operationalized by the letter writer.  For example,
4    the first one, identifying characteristics,
5    oftentimes identifying characteristics would be like
6    this is a 63-year-old Caucasian veterinarian.  But
7    there are many other identifying characteristics
8    that might be included.
9         So you can interpret these things with
10   terse statements or elaborate statements.  I favor
11   elaborate statements.  For example, I would like to
12   say a divorced father of four, or a roller derby
13   official.  I would like to identify him as much as a
14   person as possible.  But in the history of medicine,
15   race, age, and nourishment passes for identifying
16   information.
17        So the results of the psychosocial
18   assessment, including any diagnosis.  Psychosocial
19   assessment would be the processes in his life
20   history, including any current or past diagnoses,
21   you see.  So substance abuse might be a very
22   important part of number 2.; and the duration.  So
23   if I am writing a letter, if I am one of two people
24   who have been hired to write a letter for genital
25   surgery, and I might have had three visits with the

Stephen Levine
December 21, 2020

Page 103

1  not inquiring about your medical history and your
2  psychiatric history.  But it may be psychologically
3  beneficial to you and an M.D. may recommend that you
4  do that.  And that recommendation would be based on
5  his or her knowledge that you are likely to suffer
6  from seasonal affective disorder, and the treatment
7  is bright lights and sunshine.  And sunshine would
8  be far superior because of its luminescence, the
9  number of lumens exposed, than bright lights.
10 BY MR. TILLEY:
11      Q    Let's go back just briefly to WPATH.  And
12 I know you mentioned you have a more conservative
13 approach.  So let me ask you this.
14           Is it fair to say that if you personally
15 believed that you would authorize hormones or
16 surgery for someone with gender dysphoria, someone
17 following the WPATH Standards of Care would also
18 believe that?
19      A    Yes.
20      Q    Okay.  Let's talk about insurance for a
21 little bit.  If you recommended that -- if you
22 authorized some form of treatment for gender
23 dysphoria, whether it be hormones or some form of
24 surgery, would you expect that that treatment would
25 be covered by your patient's insurance?

Stephen Levine
December 21, 2020

Page 145

1  offering an opinion on transgender people accessing
2  sex-specific public places; is that right?
3      A    No.
4      Q    It's correct that that's not right?
5      A    You mean like bathrooms, and so forth?
6      Q    Right.  You are not making an expert
7  opinion in this case concerning sex-specific spaces;
8  is that correct?
9      A    That's right.
10     Q    Okay.  Let's go to page 13.  You say that
11 plaintiffs assert that the WPATH Standards of Care
12 are widely accepted.  Do you see that statement?
13     A    Please tell me what paragraph it's in.
14     Q    Under heading number 4.
15     A    Yes.  Okay.
16     Q    Do you disagree that the WPATH Standards
17 of Care are widely accepted by the major medical and
18 mental health associations?
19     A    No.
20     Q    Okay.  You just think that they are wrong;
21 is that correct?
22     A    Yes, and widely accepted doesn't tell you
23 60 percent or 40 percent.  It just says widely
24 accepted.
25     Q    Okay.  Is it -- how would -- how would you

Stephen Levine
December 21, 2020

Page 156

1  You see?
2         So I am saying, please, let me talk to you
3  about human beings here and how important having
4  ongoing lifelong relations with one's children are
5  and being a grandfather or grandmother, and being
6  connected to a family of origin.  I am not talking
7  about categorical bans.  I am talking about being
8  smart.
9  BY MR. TILLEY:
10    Q    Are you aware that this case concerns an
11 insurance exclusion that is categorical at
12 preventing --
13        MS. COLES:  Form.
14 BY MR. TILLEY:
15    Q    -- hormones and surgery as a treatment for
16 gender dysphoria?
17        MS. COLES:  Form.
18    A    I am aware that your plaintiffs are suing
19 to get coverage for -- that is not provided by their
20 particular insurance.  I am aware of that.
21 BY MR. TILLEY:
22    Q    Do you think that exclusion is
23 appropriate?
24        MS. COLES:  Form.
25    A    I've already answered that question, I

Stephen Levine
December 21, 2020

Page 157

1  believe.
2  BY MR. TILLEY:
3     Q    What is the answer?
4     A    That it's a political decision that varies
5  from state to state, and it belongs to the process
6  of political science and the courts and not doctors.
7     Q    **And if you yourself were treating them and**
8  **determined that they understood the risks and you**
9  **thought the treatment would be psychologically**
10 **beneficial and provided letters of authorization to**
11 **them, you would want that treatment to be covered by**
12 **insurance; is that correct?**
13          MS. COLES:  Form.
14    A    I am an agent of the patient, I want
15 what's best for the patient, and especially if the
16 patient couldn't otherwise afford it, I would wish
17 for my patient to have it, yes.
18 BY MR. TILLEY:
19    Q    **I know you said you are not about**
20 **categorical bans, but let me ask you about minors**
21 **again.**
22         **Would you support a categorical ban on**
23 **access to puberty blockers to treat gender**
24 **dysphoria?**
25          MS. COLES:  Form.