# Exhibit A

*Kadel v. Folwell*, No. 1:19-cv-00272-LCB-LPA (M.D.N.C.)
*Reply in Support of Plaintiffs' Motions to Exclude Experts*

| ACF | U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES |
| :---: | :--- |
| | Administration on Children, Youth and Families |
| Administration for Children and Families | **1. Log No:** ACYF-CB-IM-22-01    **2. Issuance Date:** 03-02-2022 |
| | **3. Originating Office:** Children's Bureau |
| | **4. Key Words:** Title IV-E and Title IV-B; LGBTQI+; John H. Chafee Foster Care Program for Successful Transition to Adulthood; Training; Foster Care |

**INFORMATION MEMORANDUM**

**TO:** State, Tribal, and Territorial Agencies Administering or Supervising the Administration of Titles IV-E and IV-B of the Social Security Act (the Act); Indian Tribes and Indian Tribal Organizations

**SUBJECT:** Titles IV-B and IV-E of the Act program requirements that state, county, and tribal child welfare agencies and their federally funded contractors (collectively, title IV-B and IV-E agencies, unless otherwise noted) can use to guide their work when determining how best to serve lesbian, gay, bisexual, transgender, queer or questioning, and intersex (LGBTQI+[1]) children and youth, including those with non-conforming gender identity or expression who are involved with the child welfare system.

**LEGAL AND RELATED REFERENCES:** Titles IV-B and IV-E of the Act

**PURPOSE:** Research and best child welfare practices clearly demonstrate that every child and youth in foster care should be affirmed and supported, including children and youth who are LGBTQI+ or who have a non-conforming gender identity or expression. Supporting and affirming LGBTQI+ children and youth in foster care is an overarching equity issue for each title IV-B and IV-E agency and for the Children's Bureau, and we encourage each agency to approach serving these children and youth through both a programmatic and an equity lens.

---

[1] Throughout the Information Memorandum, we use the term "LGBTQI+" as inclusive of individuals who have non-conforming gender identity or expression.

This Information Memorandum (IM) offers guidance to title IV-B and IV-E agencies when serving LGBTQI+ children and youth who are involved with the child welfare system. It also encourages agencies to consider the many provisions in titles IV-B and IV-E of the Act that agencies can use to help guide their work with families at risk, and when creating case plans for LGBTQI+ children and youth in foster care.

**SUMMARY:** Children and youth who are LGBTQI+ and are involved with the child welfare system historically and currently are particularly vulnerable and often are underserved. Many are at high risk for varying degrees of family rejection, neglect, exploitation, and hostility. Many other children and youth, especially transgender youth, are unable to access necessary and affirming medical care for a variety of reasons, including as a result of intentionally erected systemic barriers. These include policies that discourage, penalize, or otherwise impede providing such care and policies that falsely seek to characterize gender-affirming care, both of which present a severe risk of creating further barriers to access to such care. The Department of Health and Human Services and all leading national medical and pediatric associations confirm that providing gender-affirming medical care is in the best interest of children and youth who need it. Such children, youth, and their families can require specific support in order to ensure that a child or youth can remain at home in an emotionally and physically safe environment. As such, each title IV-B and IV-E agency should consider how best to provide services and supports to each LGBTQI+ child and youth who is at risk of entering or is in foster care. These services and supports should be tailored to their individual needs, including those related to their sexual orientation, gender identity, or gender expression.

Entities that accept title IV-B and IV-E federal funding must comply with the title IV-B and IV-E plan requirements associated with the funding, as well as with all other applicable federal laws. Title IV-B and IV-E agencies and their federally funded grantees and contractors are encouraged to apply the title IV-B and IV-E requirements in ways that are intentional, creative, and responsive to the needs of each LGBTQI+ child and youth who is involved with the child welfare system.

For example, title IV-B and IV-E agencies must consider and address the needs of children and youth in their care as part of their case plan. This includes placing them in safe, permanent placements that support the whole of each child and youth's well-being. This also should include addressing needs that a child or youth may have as a result of their sexual orientation, gender identity, or gender expression. Agencies also must consult with youth age 14 and older on various aspects of their case plans and provide services that are appropriate for older youth and young adults. Such services should address LGBTQI+ issues as needed. See generally section 475(1) of the Act. This IM delineates the title IV-B and IV-E program provisions that each agency should consider when serving LGBTQI+ children and youth who are in care or whose families are at risk of a child or youth entering foster care.

### I. Background Research: LGBTQI+ Children and Youth

Studies demonstrate that children and youth who are LGBTQI+ are over-represented in the child welfare system. The Williams Institute published "Sexual and Gender Minority Youth in Foster Care," which was the result of a multi-year study that examined the experiences of sexual and gender-minority youth in the Los Angeles, California foster care system (the LAFYS Study). The LAFYS Study found that LGBTQI+ youth are 1.5 to 2 times more likely than their peers to be living in foster care.[2] They also experienced increased rates of physical violence and emotional harm both prior to being involved with, and while in, the child welfare system.[3] The LAFYS Study also found that 12.9% of LGBTQI+ children and youth reported poor treatment by the foster care system, compared to 5.8% of non-LGBTQI+ children and youth in foster care.[4] LGBTQI+ children and youth were found to be more than 2.5 times more likely than their non-LGBTQI+ counterparts to be placed in congregate care placements, such as group homes.[5] There is consensus across multiple stakeholders that most children and youth are best served in a family setting. Stays in congregate care should be based on a child or youth's specialized behavioral and mental health needs or clinical disabilities,[6] not on a child or youth's sexual orientation or gender identity.

Additionally, many LGBTQI+ children and youth enter foster care as a result of familial conflict, neglect, exploitation, or hostility about their sexual orientation, gender identity, or gender expression.[7] These youth also experience homelessness at disproportionately high rates, sometimes before entering foster care. These traumatic experiences correlate with increased rates of suicide and depression.[8] This underscores the need for child welfare agencies to work with families of LGBTQI+ children and youth to address family conflict related to sexual orientation and gender identity prior to a crisis that necessitates the need for the child or youth to be removed from the home.

Every child and youth who is unable to live with their parents should be provided a safe, loving, and affirming foster care placement, regardless of the young person's sexual orientation, gender

---

[2] Cooper, K., Katsinas, A., Nezhad, S., & Wilson, B. (2014, August). *Sexual and gender minority youth in foster care: Assessing disproportionality and disparities in Los Angeles*, p. 37. Retrieved from http://williamsinstitute.law.ucla.edu/research/safe-schools-and-youth/lafys-aug-2014/

[3] *Id.* at 11.

[4] *Id.* at 40.

[5] *Id.* at 7.

[6] The Children's Bureau. (2015, May 13). *A national look at the use of congregate care in child welfare*. Retrieved from http://www.acf.hhs.gov/cb/resource/congregate-care-brief

[7] Cooper, K., Kastanis, A., Nezhad, S., & Wilson, B. (2014, August). *Sexual and gender minority youth in foster care: Assessing disproportionality and disparities in Los Angeles*, p. 40. Retrieved from http://williamsinstitute.law.ucla.edu/research/safe-schools-and-youth/lafys-aug-2014/

[8] *Id.*

identity, or gender expression.[9] Evidence is clear that LGBTQI+ children and youth in foster care are most likely to thrive in safe, affirming environments without risk of physical or emotional harm on the basis of their sexual orientation or gender identity, and regardless of the type of placement in which the child lives.

## II. Titles IV-B and IV-E:  Provisions that Support LGBTQI+ Children and Youth

ACF recognizes that several existing federal laws, including title IV-B, title IV-E and their implementing regulations are intended to ensure the safety and well-being of children and youth in foster care, including the LGBTQI+ children and youth that child welfare agencies serve. These laws also provide funds for agencies to provide prevention and support services to families who are struggling to accept that the child or youth is LGBTQI+ or otherwise are not providing a safe environment for the child or youth. Similarly, title IV-E provides agencies with training funds to assist foster parents, kinship caregivers, and agency staff understand issues related to LGBTQI+ identities that are particularly relevant to children and youth in foster care.

This IM describes provisions in title IV-B and IV-E that child welfare agencies can use to support, encourage, and care for LGBTQI+ children and youth across the child welfare continuum. Similarly, this IM describes provisions that agencies can use to educate families, foster caregivers, and caseworkers.

### *A. Title IV-B Prevention and Family Preservation Services*

Title IV-B of the Act provides funding to states and eligible tribes to provide "family preservation services," which are defined as "services for children and families designed to help families (including adoptive and extended families) at risk or in crisis." These services include preventive services, such as intensive family preservation programs that are designed to help children at risk of foster care placement remain safely with their families. Title IV-B funding also can be used to help parents identify where they need to develop or learn additional parenting skills, and to help parents build capacity to effectively parent an LGBTQI+ child or youth. See generally section 431(a)(1) of the Act.

---

[9] *See* ACYF-CB-IM-11-03.  Retrieved from http://www.acf.hhs.gov/cb/resource/im1103

Research is clear that children and youth who are LGBTQI+ enter foster care at disproportionate rates.[10] Agencies should consider how to use family preservation funds and services to support families who are grappling with how to embrace an LGBTQI+ child or youth. For example, an agency could focus on parent education and building skills that will help the parent understand how best to support and parent the child in a safe and affirming manner that does not threaten the child's safety or well-being.

### *B. Title IV-B Adoption and Post-Adoption Support Services*

Additionally, title IV-B provides funding to states and eligible tribes for "adoption promotion and support services." Section 431(a)(8) of the Act defines "adoption promotion and support services" as those services "designed to encourage more adoptions out of the foster care system when adoptions promote the best interests of children, including such activities as pre and post adoptive services and activities designed to expedite the adoption process and support adoptive families." Accordingly, title IV-B and IV-E agencies should consider what types of practices and services would best support families who have adopted LGBTQI+ children. These services can and should be intentional and highly personalized to address the needs of each family, child, and youth and can serve to support adoptive families whose adoptions may be at risk of disrupting because a child or youth is LGBTQI+. For example, an agency may assist a family in accessing gender affirming health care for their child or youth; connect the family with local supportive services; or update legal documents to reflect the child or youth's gender identity.

### *C. Title IV-E Reasonable Efforts to Prevent Removal*

When determining whether a child should be removed from home, the title IV-E agency must ensure that it has made reasonable efforts to prevent the need for a child to be removed from home prior to being placed in foster care. Similarly, it must make reasonable efforts to reunify families when a child has been removed. See section 471(a)(15)(B) of the Act. Finally, once a child has been in foster care for 12 months, and every 12 months thereafter while in foster care, the agency must obtain court validation that it has made reasonable efforts to finalize the child's permanency plan. It also must ensure that when it makes reasonable efforts to prevent removal, reunify a family, or finalize the permanency plan, "the child's health and safety shall be the paramount concern." See 45 C.F.R. § 1356.21; section 471(a)(15)(A) of the Act.

---

[10] Cooper, K., Katsinas, A., Nezhad, S., & Wilson, B. (2014, August). *Sexual and gender minority youth in foster care: Assessing disproportionality and disparities in Los Angeles*, p. 37. Retrieved from http://williamsinstitute.law.ucla.edu/research/safe-schools-and-youth/lafys-aug-2014/.

Reasonable efforts are specific to each family's circumstances and needs. In the case of a family who is at risk or whose child or youth has been removed from home as a result of conflicts related to the child or youth being LGBTQI+, these efforts might include, but are not limited to working with a family to provide family preservation services around the issues with which the family is struggling. It might include parent outreach or education. It might include working closely with kinship supports to determine whether a kinship placement might be the most supportive and affirming for the child or youth. Similarly, reasonable efforts to finalize the permanency plan might include the agency's efforts to assist a parent complete longer term or ongoing parent education on parenting a child or youth who is LGBTQI+.

### D. Title IV-E Case Review System

Each title IV-B and IV-E agency must have a case review system, which is a procedure for assuring various protections for each child and youth in foster care, including a case plan for each child and youth. The case plan must be individualized and designed to achieve placement in a "safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child" or youth. See section 475(5)(A) of the Act. In addition, the case plan must address a variety of issues, including the child or youth's safety, services that facilitate reunification, and services that support the child or youth's needs while in foster care. See section 475(1)(A) and (B) of the Act. When developing and implementing the child's case plan, states and tribes must consider all of a child or youth's needs, including those related to their sexual orientation and gender identity. See sections 471(a)(16) and 475(1) of the Act.

The Children's Bureau recognizes that a safe and appropriate placement setting is one in which a child or youth's LGBTQI+ identity is supported and affirmed, and their individualized needs are considered and addressed, including those related to being LGBTQI+. Moreover, Children's Bureau acknowledges that a placement in which so called "conversion therapy," or any other attempt to undermine, suppress, or change the sexual orientation or gender identity of a child or youth in foster care is utilized, is neither safe nor appropriate. As such, there are no circumstances under which an LGBTQI+ child or youth should be subjected to so called "conversion therapy," including a child or youth in foster care. This practice has been widely discredited as both ineffective and harmful by the mental health, psychological, and medical fields. In fact, in 2015, the United States Substance Abuse and Mental Health Services Administration (SAMHSA) published a report that outlined research, clinical expertise, and expert consensus on therapeutic practices related to children's and adolescent's sexual

orientation and gender identity that made clear that so-called "conversion therapy" should not be used among this population.[11]

Additionally, when considering a prospective foster care placement, including one for an LGBTQI+ child or youth, the title IV-E agency must consider whether the prospective environment will be physically and emotionally safe. This includes that the child or youth's whole development will be supported and affirmed in the placement that the agency determines is most appropriate for the child or youth. Similarly, as part of the child or youth's case plan, the title IV-E agency must provide services to facilitate a child or youth's reunification with their parents, if that is the plan for the family. Specifically, the case plan must include how the agency is working to improve the conditions in the family such as any underlying issues or conflicts with the child or the youth's parents that impede reunification, including those that relate to the child or youth's sexual orientation or gender identity/expression.

### *E. Developmentally Appropriate Activities for Children and Youth in Foster Care*

A title IV-E agency must ensure that children and youth in its care have caregivers who are trained in understanding developmentally appropriate activities for such children and youth, including the reasonable and prudent parenting standard. The reasonable and prudent parenting standard is the standard characterized by "careful and sensible parental decisions that maintain the health, safety and best interests of a child, while at the same time encouraging the emotional and developmental growth of the child…when determining whether to allow a child in foster care under the responsibility of the State to participate in extracurricular, enrichment, cultural, and social activities." See sections 471(a)(10)(A) and 475(10) of the Act.

For example, as part of its title IV-E plan licensing requirements, the agency must ensure that each child-care institution has an onsite authority who is trained and authorized to apply the reasonable and prudent parenting standard for children and youth who are placed in the child-care institution. See section 471(a)(10) of the Act. Similarly, before placing a child or youth in a foster family home, a title IV-E agency must ensure that the foster parents have been prepared adequately to provide for the child or youth, including appropriate activities, knowledge, and skills relating to the developmental stages of the cognitive, emotional, physical, and behavioral capacities of the child or youth. See section 471(a)(24) of the Act.

---

[11] Substance Abuse and Mental Health Services Administration. (2015, November). *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth.* Also accessible at: http://store.samhsa.gov/shin/content//SMA15-4928/SMA15-4928.pdf

This means, among other things, that an agency should consider a child or youth's sexual orientation and gender identity when determining how to facilitate their "extracurricular, enrichment, cultural, and social activities." See section 471(a)(24) of the Act. In order to ensure that children and youth have the opportunity to engage in age or developmentally appropriate activities, the title IV-E agency must consider the circumstances of each child and youth, which should include their sexual orientation and gender identity or expression. See section 475(11) of the Act. For example, participating in a school-based club could be a "developmentally appropriate" activity.

Each agency should also ensure that it does not prohibit LGBTQI+ children or youth from participating in such activities solely on the basis of the child or youth's sexual orientation or gender identity. Additionally, as appropriate or requested, agencies should help to provide LGBTQI+ children or youth with opportunities to participate in activities such as mentoring programs, peer support groups, or other community activities that affirm and support their identities in an age-appropriate manner. See sections 471(a)(10) and (24) of the Act; see also sections 475(5)(B) and (11)(A) of the Act. For example, if a youth in foster care wanted to participate in a Gender and Sexualities Alliance club within their high school, or attend faith-based youth groups, the title IV-E agency should not deny them the opportunity to do so solely because of their perceived or expressed sexual orientation and gender identity. Similarly, the title IV-E agency should provide individualized, intentional services to assist LGBTQI+ older youth and young adults transition to adulthood, including those related to their sexual orientation or gender identity, and including those related to their religious or spiritual beliefs and faith life.

Each agency should familiarize itself and partner with community and local LGBTQI+ affirming entities that parents, kinship providers, prospective parents, and child-care institution authorities can access to assist them to support and care for an LGBTQI+ child or youth. We also encourage each title IV-E agency to consider how it can ensure that each LGBTQI+ child and youth has the ability to participate in a wide variety of activities, including those that may affirm or support their identity.

***F. John H. Chafee Foster Care Program for Successful Transition to Adulthood (Chafee Program)***

The Chafee program provides funding for services and support to children and youth who have experienced foster care at age 14 or older to transition to self-sufficiency. See section 477 of the Act. These funds are used to assist youth to engage in age or developmentally appropriate activities; positive youth development; and experiential learning that reflects what their peers in intact families experience. See section 477(a)(3) of the Act. It also provides funding for a variety of services and supports to former foster care recipients who are between 18 and 21 years of

age (or 23 years of age, at state option). These services and supports should complement the youth/young adult's own efforts to achieve self-sufficiency and assist young adults to accept responsibility for transitioning from adolescence to adulthood. See section 477(a)(4) of the Act. States and eligible tribes that receive Chafee funds must use objective criteria for determining eligibility for benefits and services under the programs, and for ensuring that Chafee recipients, including those who are LGBTQI+, receive fair and equitable treatment. See section 477(b)(2)(E) of the Act.

### G. Title IV-E Administrative and Training Funds

In accordance with an approved cost allocation plan, a title IV-E agency may use and claim title IV-E training and administrative funds to train agency staff and foster and adoptive parents in competencies related to bolstering protective factors and parenting LGBTQI+ children and youth. The types of training courses that may be allowable include, but are not limited to: courses that address the particular health care needs of LGBTQI+ children and youth; particular child development issues that are common to LGBTQI+ children and youth, such as emotional support or support for trauma related to violence that a child or youth has experienced that is related to sexual orientation or gender identity/expression; resources that are available to support such children within an under-served community; trainings related to uncovering or addressing bias against LGBTQI+ individuals and other such issues.

In addition, an agency may claim title IV-E training funds to support prospective adoptive or foster parents' attendance at conferences that have training components or that include discussions of significant issues covering the needs of LGBTQI+ children and youth in foster care or who have been adopted. See generally section 474(a) of the Act; 45 C.F.R. § 1356.60; Child Welfare Policy Manual (CWPM) at § 8.1H, including Question and Answer (QA) #21. We strongly encourage each title IV-E agency to consider how to use title IV-E administrative and training funds to bolster its capacity and skill to train its foster and adoptive parents and care for LGBTQI+ children and youth.

### III. Enforcement

### A. Fair Hearings

Federal regulations require the agency responsible for the title IV-E and title IV-B programs to provide an opportunity for a fair hearing to any individual whose claim for benefits or services is denied or is not acted upon with reasonable promptness. See section 471(a)(12) of the Act; 45 C.F.R. § 205.10 (through cross reference at 45 C.F.R. § 1355.30). This includes an opportunity

for complainants to have access to the fair hearing process for LGBTQI+ related service disputes, including not providing age or developmentally appropriate services or services identified in the case plan to the youth on the basis of sexual orientation or gender identity. See CWPM §8.4G, QA #1.

Each state or tribal title IV-E agency's fair hearing process differs slightly. However, the hearing process always requires, among other things, that applicants and recipients be advised of their right to a hearing, that they may be represented by an authorized representative, and that there be a timely notice of the date and place of the hearing. See 45 C.F.R. § 1355.30 (p) and § 205.10. To the extent that a state or tribe's fair hearing process does not include appeals for service-related issues for LGBTQI+ children and youth, we strongly encourage the agency to consider ensuring that its fair hearing process can address such issues as needed.

### B. Partial Reviews

The regulations at 45 C.F.R. § 1355.32(d) regarding partial reviews of title IV-E or IV-B plans allow ACF to conduct a partial review appropriate to the nature of the concern if ACF becomes aware of a title IV-B or IV-E compliance issue outside the scope of the Child and Family Services Review (CFSR). As part of the partial review, ACF will conduct an inquiry and require the title IV-E agency to submit additional data as may be necessary. If the inquiry demonstrates that the agency is not in compliance with its title IV-B or IV-E plan, the agency must enter into a program improvement plan (PIP) that is designed to bring the agency into compliance with its plan and relevant requirements. If, after the PIP process, the agency still fails to comply with the applicable requirements, the agency will be subject to a penalty related to the extent of the noncompliance. See 45 C.F.R. § 1355.32(d)(4). The partial review process applies to title IV-B and IV-E plan compliance issues that involve children and youth who are LGBTQI+.

### <u>Conclusion</u>

The Children's Bureau stands solidly in support of LGBTQI+ children and youth who are involved with the child welfare system. Each agency should be intentional about assessing each LGBTQI+ child and youth's individualized needs, including those related to the child or youth being LGBTQI+. LGBTQI+ children and youth experience higher rates of violence prior to and while in foster care than their non-LGBTQI+ peers. Too often, systemic barriers and practices are created to deny such children and youth gender affirming medical care, especially to transgender and gender nonconforming children and youth. The Children's Bureau does not support these barriers and practices, and we are unequivocal that they are counter to children and youth's best interests. As such, each title IV-E agency should be particularly vigilant about placing LGBTQI+ children and youth in homes and child-care institutions where they are supported, safe, and can develop as a whole person. But the agency's responsibility does not stop there: each agency

also should provide LGBTQI+ children and youth with opportunities to participate in activities that further support their identity, resilience, and development, including activities related to being LGBTQI+.

Additionally, we strongly encourage agencies to take advantage of opportunities to work internally to develop the capacity to identify, understand, and address some of the issues that often confront LGBTQI+ children and youth at different points in the child welfare continuum. An agency also should consider whether its data can inform appropriate services to LGBTQI+ children, youth, and families, including when a family is at risk of a child or youth entering foster care, once a child is in foster care, or after the child has been adopted. The agency must be prepared and competent to address trauma-related issues that have occurred as a result of the child or youth facing rejection, discrimination, or harassment because they are LGBTQI+, especially in their family of origin. Children's Bureau also strongly encourages agencies to focus attention on ensuring that each LGBTQI+ child has access to affirming medical care. This includes working with and providing services and training opportunities to parents who are struggling to accept that their child or youth is LGBTQI+ or has a non-conforming gender identity, especially when that is either the cause of the child or youth being removed or a barrier to a safe, healthy reunification.

Finally, the Children's Bureau has resources to help each agency develop the capacity to serve LGBTQI+ children and youth, as well as their foster parents, adoptive parents, and kinship caregivers. Consider partnering with community organizations that can provide additional or specialized support to LGBTQI+ children, youth, and families who are involved with your agency. We also encourage each agency to take advantage of the wide variety of resources accessible on the [Child Welfare Information Gateway](). The [Children's Bureau's Regional Program Managers]() also stand ready to assist each agency to support, affirm, encourage, and lift up the voices and experiences of each LGBTQI+ child and youth in its care.

**INQUIRIES TO:**

**[Children's Bureau Regional Program Managers]()**