**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

MAXWELL KADEL, et al.,

               *Plaintiffs*,

           v.                     No. 1:19-cv-00272-LCB-LPA

DALE FOLWELL, et al.,

               *Defendants*.

**SUGGESTION OF SUBSEQUENTLY DECIDED AUTHORITY**

Pursuant to Local Rule 7.3(i), Plaintiffs, by and through undersigned counsel,

hereby submit this suggestion of subsequently decided authority and attach as Exhibit A

hereto a copy of an opinion of the Supreme Court of the United States, *Cummings v.*

*Premier Rehab Keller, P.L.L.C.*, No. 20-219, decided April 28, 2022.

Dated: May 5, 2022                     Respectfully submitted,

*/s/ Amy Richardson*
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HARRIS WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Tara L. Borelli
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Deepika H. Ravi*
Grace H. Wynn*
HARRIS WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534 | Fax: 646-417-7668
dtishyevich@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
500 North Capitol Street, N.W.
Washington, D.C.  20001-1531
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
Ezra Cukor*
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

*Counsel for Plaintiffs*

* Appearing by special appearance pursuant to L.R. 83.1(d).

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all registered users.

Dated:  May 5, 2022

/s/ Amy Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386
Fax: 202-730-1301
arichardson@hwglaw.com

# Exhibit A

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CUMMINGS *v.* PREMIER REHAB KELLER, P.L.L.C.

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–219.   Argued November 30, 2021—Decided April 28, 2022

Jane Cummings, who is deaf and legally blind, sought physical therapy services from Premier Rehab Keller and asked Premier Rehab to provide an American Sign Language interpreter at her sessions. Premier Rehab declined to do so, telling Cummings that the therapist could communicate with her through other means. Cummings later filed a lawsuit seeking damages and other relief against Premier Rehab, alleging that its failure to provide an ASL interpreter constituted discrimination on the basis of disability in violation of the Rehabilitation Act of 1973 and the Affordable Care Act. Premier Rehab is subject to these statutes, which apply to entities that receive federal financial assistance, because it receives reimbursement through Medicare and Medicaid for the provision of some of its services. The District Court determined that the only compensable injuries allegedly caused by Premier Rehab were emotional in nature. It held that damages for emotional harm are not recoverable in private actions brought to enforce either statute. The District Court thus dismissed the complaint, and the Fifth Circuit affirmed.

*Held*: Emotional distress damages are not recoverable in a private action to enforce either the Rehabilitation Act of 1973 or the Affordable Care Act.  Pp. 3–15.

   (a) Congress has broad power under the Spending Clause of the Constitution to "fix the terms on which it shall disburse federal money." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17. Pursuant to that authority, Congress has enacted statutes prohibiting recipients of federal financial assistance from discriminating on the basis of certain protected characteristics. This Court has held that such statutes may be enforced through implied rights of action. *Barnes* v. *Gorman*, 536 U. S. 181, 185. Although it is "beyond dispute that

private individuals may sue" to enforce the antidiscrimination statutes at issue here, "it is less clear what remedies are available in such a suit." *Ibid.*

The Court's cases have clarified that whether a particular remedy is recoverable must be informed by the way Spending Clause "statutes operate": by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 286. Because Spending Clause legislation operates based on consent, the "legitimacy of Congress' power" to enact such laws rests not on its sovereign authority, but on "whether the [recipient] voluntarily and knowingly accepts the terms of th[at] 'contract.'" *Barnes*, 536 U. S., at 186 (quoting *Pennhurst*, 451 U. S., at 17). The Court has regularly applied this contract-law analogy to define the scope of conduct for which funding recipients may be held liable, with an eye toward ensuring that recipients had notice of their obligations. "The same analogy," *Barnes*, 536 U. S., at 187, similarly limits "the scope of available remedies." *Gebser*, 524 U. S., at 287. Thus, a particular remedy is available in a private Spending Clause action "only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Barnes*, 536 U. S., at 187. Pp. 3–5.

(b) To decide whether emotional distress damages are available under the Spending Clause statutes in this case, the Court therefore asks whether a prospective funding recipient deciding whether to accept federal funds would have had "clear notice" regarding that liability. *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 296. Because the statutes at issue are silent as to available remedies, it is not obvious how to decide that question. Confronted with the same dynamic in *Barnes*, which involved the question whether punitive damages are available under the same statutes, the Court followed the contract analogy and concluded that a federal funding recipient may be considered "on notice that it is subject . . . to those remedies traditionally available in suits for breach of contract." 536 U. S., at 187. Given that punitive damages "are generally not available for breach of contract," the Court concluded that funding recipients "have not, merely by accepting funds, implicitly consented to liability for punitive damages." *Id.*, at 187–188.

Crucial here, the Court in *Barnes* considered punitive damages generally unavailable for breach of contract despite the fact that such damages are hardly unheard of in contract cases: Treatises cited in *Barnes* described punitive damages as recoverable in contract where "the conduct constituting the breach is also a tort for which punitive damages are recoverable." Restatement (Second) of Contracts §355, p.

154.  That recognized exception to the general rule, however, was not enough to give funding recipients the requisite notice that they could face such damages.  Under *Barnes*, the Court thus presumes that recipients are aware that they may face the *usual* contract remedies in private suits brought to enforce their Spending Clause "contract" with the Federal Government.  Pp. 5–7.

(c) The above framework produces a straightforward analysis in this case.  Hornbook law states that emotional distress is generally not compensable in contract.  Under *Barnes*, the Court cannot treat federal funding recipients as having consented to be subject to damages for emotional distress, and such damages are accordingly not recoverable.

Cummings argues for a different result, maintaining that traditional contract remedies here *do* include damages for emotional distress, because there is an exception—put forth in some contract treatises—under which such damages may be awarded where a contractual breach is particularly likely to result in emotional disturbance.  See, *e.g.,* Restatement (Second) of Contracts §353.  That special rule is met here, Cummings contends, because discrimination is very likely to engender mental anguish.  This approach would treat funding recipients as on notice that they will face not only the general rules, but also "more fine-grained," exceptional rules that "govern[] in the specific context" at hand.  Brief for Petitioner 33–35.  That is inconsistent with both *Barnes* and the Court's larger Spending Clause jurisprudence.  *Barnes* necessarily concluded that the existence of an on-point exception to the general rule against punitive damages was insufficient to put funding recipients on notice of their exposure to that particular remedy.  No adequate explanation has been offered for why the Court—bound by *Barnes*—should reach a different result here.  The approach offered by Cummings pushes the notion of offer and acceptance, central to the Court's Spending Clause cases, past its breaking point.  It is one thing to say that funding recipients will know the basic, general rules.  It is quite another to assume that they will know the contours of every contract doctrine, no matter how idiosyncratic or exceptional.  Cummings would essentially incorporate the law of contract remedies wholesale, but *Barnes* constrains courts to imply only those remedies "that [are] normally available for contract actions."  *Id.*, at 188.  In urging the Court to disregard that restriction, Cummings would have the Court treat statutory silence as a license to freely supply remedies the Court cannot be sure Congress would have chosen.  Such an approach "risks arrogating legislative power," *Hernández* v. *Mesa*, 589 U. S. ___, ___, and is particularly untenable in a context requiring "clear notice regarding the liability at issue," *Arlington*, 548 U. S., at 296.

Even if it were appropriate to treat funding recipients as aware that

they may be subject to "rare" contract-law rules that are "satisfied only in particular settings," Brief for Petitioner 34, funding recipients would still lack the requisite notice that emotional distress damages are available under the statutes at issue. That is because the Restatement's formulation—that such damages are available where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result," §353—does not reflect the consensus rule among American jurisdictions. There is in fact no majority rule on what circumstances, if any, may trigger the exceptional allowance of such damages. For instance, many states reject the broad and generally phrased Restatement exception because they award emotional distress damages only in a narrow and idiosyncratic group of cases in which the breaching conduct would also have been a tort. These cases unsurprisingly mix contract, quasi-contract, and tort principles together, suggesting that they do not establish or evince a rule of *contract* law.

Emotional distress damages are not "traditionally available in suits for breach of contract." *Barnes*, 536 U. S., at 187. There is correspondingly no ground, under the Court's cases, to conclude that federal funding recipients have "clear notice," *Arlington*, 548 U. S., at 296, that they would face such a remedy in private actions brought to enforce the statutes here. Pp. 7–15.

948 F. 3d 673, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. KAVANAUGH, J., filed a concurring opinion, in which GORSUCH, J., joined. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–219

_____

## JANE CUMMINGS, PETITIONER *v.* PREMIER REHAB KELLER, P.L.L.C.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 28, 2022]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). Exercising this authority, Congress has passed a number of statutes prohibiting recipients of federal financial assistance from discriminating based on certain protected characteristics. We have held that these statutes may be enforced through implied rights of action, and that private plaintiffs may secure injunctive or monetary relief in such suits. See *Barnes* v. *Gorman*, 536 U. S. 181, 185, 187 (2002). Punitive damages, on the other hand, are not available. *Id.,* at 189. The question presented in this case is whether another special form of damages—damages for emotional distress—may be recovered.

I

Petitioner Jane Cummings is deaf and legally blind, and communicates primarily in American Sign Language (ASL). In October 2016, she sought physical therapy services from respondent Premier Rehab Keller, a small business in the Dallas-Fort Worth area. Cummings requested that Premier Rehab provide an ASL interpreter at her appointments. Premier Rehab declined to do so, telling Cummings that she could communicate with the therapist using written notes, lip reading, or gesturing. Cummings then sought and obtained care from another provider.

Cummings later filed this lawsuit against Premier Rehab, alleging that its failure to provide an ASL interpreter constituted discrimination on the basis of disability in violation of the Rehabilitation Act of 1973, §504, 87 Stat. 394, as amended, 29 U. S. C. §794(a), and the Patient Protection and Affordable Care Act, §1557, 124 Stat. 260, 42 U. S. C. §18116. Premier Rehab is subject to these statutes, which apply to entities that receive federal financial assistance, because it receives reimbursement through Medicare and Medicaid for the provision of some of its services. In her complaint, Cummings sought declaratory relief, an injunction, and damages.

The District Court dismissed the complaint. It observed that "the only compensable injuries that Cummings alleged Premier caused were 'humiliation, frustration, and emotional distress.'" No. 4:18–CV–649–A (ND Tex., Jan. 16, 2019), 2019 WL 227411, *4. In the District Court's view, "damages for emotional harm" are not recoverable in private actions brought to enforce the Rehabilitation Act or the Affordable Care Act. *Ibid.* The Court of Appeals for the Fifth Circuit affirmed, adopting the same conclusion. 948 F. 3d 673 (2020).

We granted certiorari. 594 U. S. ___ (2021).

## II

## A

Pursuant to its authority to "fix the terms on which it shall disburse federal money," *Pennhurst*, 451 U. S., at 17, Congress has enacted four statutes prohibiting recipients of federal financial assistance from discriminating based on certain protected grounds. Title VI of the Civil Rights Act of 1964 forbids race, color, and national origin discrimination in federally funded programs or activities. 78 Stat. 252, 42 U. S. C. §2000d. Title IX of the Education Amendments of 1972 similarly prohibits sex-based discrimination, 86 Stat. 373, 20 U. S. C. §1681, while the Rehabilitation Act bars funding recipients from discriminating because of disability. 29 U. S. C. §794. Finally, the Affordable Care Act outlaws discrimination on any of the preceding grounds, in addition to age, by healthcare entities receiving federal funds. 42 U. S. C. §18116.

None of these statutes expressly provides victims of discrimination a private right of action to sue the funding recipient in federal court. But as to both Title VI and Title IX, our decision in *Cannon* v. *University of Chicago*, 441 U. S. 677, 703 (1979), "found an *implied* right of action." *Barnes*, 536 U. S., at 185. Congress later "acknowledged this right in amendments" to both statutes, *ibid.*, leading us to conclude that it had "ratified *Cannon*'s holding" that "private individuals may sue to enforce" both statutes. *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001); see also *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 72–73 (1992). As to the Rehabilitation Act and the Affordable Care Act—the two statutes directly at issue in this litigation—each expressly incorporates the rights and remedies provided under Title VI. 29 U. S. C. §794a(a)(2); 42 U. S. C. §18116(a).

Although it is "beyond dispute that private individuals may sue to enforce" the antidiscrimination statutes we consider here, "it is less clear what remedies are available in

such a suit." *Barnes*, 536 U. S., at 185. In *Franklin*, we considered whether monetary damages are available as a remedy for intentional violations of Title IX (and, by extension, the other statutes we discussed). 503 U. S., at 76. We answered yes, *ibid.*, but "did not describe the scope of 'appropriate relief.'" *Barnes*, 536 U. S., at 185.

Our later cases have filled in that gap, clarifying that our consideration of whether a remedy qualifies as appropriate relief must be informed by the way Spending Clause "statutes operate": by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 286 (1998). Unlike ordinary legislation, which "imposes congressional policy" on regulated parties "involuntarily," Spending Clause legislation operates based on consent: "in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst*, 451 U. S., at 16, 17. For that reason, the "legitimacy of Congress' power" to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on "whether the [recipient] voluntarily and knowingly accepts the terms of th[at] 'contract.'" *Barnes*, 536 U. S., at 186 (quoting *Pennhurst*, 451 U. S., at 17).

"We have regularly applied th[is] contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages." *Barnes*, 536 U. S., at 186. Recipients cannot "knowingly accept" the deal with the Federal Government unless they "would clearly understand . . . the obligations" that would come along with doing so. *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 296 (2006). We therefore construe the reach of Spending Clause conditions with an eye toward "ensuring that the receiving entity of federal funds [had]

notice that it will be liable." *Gebser*, 524 U. S., at 287 (internal quotation marks omitted). "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U. S., at 17.

"The same analogy," *Barnes*, 536 U. S., at 187, similarly limits "the scope of available remedies" in actions brought to enforce Spending Clause statutes, *Gebser*, 524 U. S., at 287. After all, when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table. See *Barnes*, 536 U. S., at 188. A particular remedy is thus "appropriate relief" in a private Spending Clause action "only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Id.,* at 187 (emphasis in original). Only then can we be confident that the recipient "exercise[d its] choice knowingly, cognizant of the consequences of [its] participation" in the federal program. *Pennhurst*, 451 U. S., at 17.

B

In order to decide whether emotional distress damages are available under the Spending Clause statutes we consider here, we therefore ask a simple question: Would a prospective funding recipient, at the time it "engaged in the process of deciding whether [to] accept" federal dollars, have been aware that it would face such liability? *Arlington*, 548 U. S., at 296. If yes, then emotional distress damages are available; if no, they are not.

Because the statutes at issue are silent as to available remedies, it is not obvious how to decide whether funding recipients would have had the requisite "clear notice regarding the liability at issue in this case." *Ibid.* We confronted that same dynamic in *Barnes.* There, we considered whether a federal funding recipient would have known,

when taking the money, that it was agreeing to face puni-
tive damages in suits brought under those laws.  We noted
that the statutory text "contains no express remedies."  536
U. S., at 187.  But we explained that, following the contract
analogy set out in our Spending Clause cases, a federal
funding recipient may be considered "on notice that it is
subject not only to those remedies explicitly provided in the
relevant legislation, but also to those remedies traditionally
available in suits for breach of contract."  *Ibid.*  We identi-
fied two such remedies: compensatory damages and injunc-
tions.  By contrast, we explained, punitive damages "are
generally not available for breach of contract."  *Ibid.*  We
thus concluded that funding recipients covered by the stat-
utes at issue "have not, merely by accepting funds, implic-
itly consented to liability for punitive damages."  *Id.,* at 188.

Crucial for this case, we considered punitive damages to
be "generally not available for breach of contract," see *id.,*
at 187, despite the fact that such damages are hardly un-
heard of in contract cases.  Indeed, according to the trea-
tises we cited, punitive damages are recoverable in contract
where "the conduct constituting the breach is also a tort for
which punitive damages are recoverable."  Restatement
(Second) of Contracts §355, p. 154 (1979); see also 3 E.
Farnsworth, Contracts §12.8, pp. 192–201 (2d ed. 1998).
That recognized exception to the general rule, however, was
not enough to give funding recipients the requisite notice
that they could face such damages.

Under *Barnes*, then, we may presume that a funding re-
cipient is aware that, for breaching its Spending Clause
"contract" with the Federal Government, it will be subject
to the *usual* contract remedies in private suits.  That is ap-
parent from the adverbs *Barnes* repeatedly used, requiring
that a remedy be "traditionally available," "generally . . .
available," or "normally available for contract actions."  536
U. S., at 187–188.  And it is confirmed by the Court's hold-

ing: that punitive damages are unavailable in private actions brought under these statutes even though such damages are a familiar feature of contract law.

## C

Under the framework just set out, the analysis here is straightforward. It is hornbook law that "emotional distress is generally not compensable in contract," D. Laycock & R. Hasen, Modern American Remedies 216 (5th ed. 2019), just as "punitive damages . . . are generally not available for breach of contract," *Barnes*, 536 U. S., at 187. See 11 W. Jaeger, Williston on Contracts §1341, p. 214 (3d ed. 1968) ("Mental suffering caused by breach of contract, although it may be a real injury, is not generally allowed as a basis for compensation in contractual actions." (footnote omitted)); E. Farnsworth, Contracts §12.17, p. 894 (1982) (describing rule of "generally denying recovery for emotional disturbance, or 'mental distress,' resulting from breach of contract" as "firmly rooted in tradition"); J. Perillo, Calamari & Perillo on Contracts §14.5, p. 495 (6th ed. 2009) (Calamari & Perillo) ("As a general rule, no damages will be awarded for the mental distress or emotional trauma that may be caused by a breach of contract."); C. McCormick, Law of Damages §145, p. 592 (1935) (McCormick) ("It is often stated as the 'general rule' that, in actions for breach of contract, damages for mental suffering are not allowable."). Under *Barnes*, we therefore cannot treat federal funding recipients as having consented to be subject to damages for emotional distress. It follows that such damages are not recoverable under the Spending Clause statutes we consider here.

In arguing for a different result, Cummings recognizes that "contract law dictates 'the *scope* of damages remedies.'" Brief for Petitioner 30. And she quotes the test set out in *Barnes*: whether a certain remedy is "traditionally

available in suits for breach of contract." Brief for Petitioner 31. But Cummings then argues that, notwithstanding the above authorities, "traditional contract remedies" in fact *do* "include damages for emotional distress." *Ibid.*; see Brief for United States as *Amicus Curiae* 14–20 (making the same argument); *post,* at 7–9 (BREYER, J., dissenting) (same).

That is because, Cummings explains, several contract treatises put forth the special rule that "recovery for emotional disturbance" is allowed in a particular circumstance: where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." Brief for Petitioner 31 (quoting Restatement (Second) of Contracts §353). And, she contends, such a rule "aptly describe[s the] intentional breach of [a] promise to refrain from discrimination," because discrimination frequently engenders mental anguish. Brief for Petitioner 31. This argument suffers from two independently fatal flaws.

*First*, Cummings subtly but crucially transforms the contract-law analogy into a test that is inconsistent with both *Barnes* and our larger Spending Clause jurisprudence. *Barnes*, recall, instructs us to inquire whether a remedy is "traditionally," "generally," or "normally available for contract actions." 536 U. S., at 187–188. Cummings, however, would look not only to those general rules, but also to whether there is a "more fine-grained" or "more directly applicable" rule of contract remedies that, although not generally or normally applicable, "govern[s] in the specific context" or "particular setting[]" of the pertinent Spending Clause provision. Brief for Petitioner 33–35; see also *post,* at 9. In other words, Cummings would treat funding recipients as on notice that they will face not only the *usual* remedies available in contract actions, but also other *unusual*, even "rare" remedies, Brief for Petitioner 34, if those remedies would be recoverable "in suits for breaches of the type of contractual commitments at issue," *id.,* at 35.

Neither petitioner nor the United States attempts to ground this approach in *Barnes*, which, as discussed above, undertook nothing of the sort. Indeed, had *Barnes* analyzed the question as petitioner frames it, the decision would have come out the opposite way. As noted, although the general rule is that punitive damages are not available in contract, they *are* undoubtedly recoverable in cases where the breaching conduct is also "a tort for which punitive damages are recoverable." Restatement (Second) of Contracts §355. Such conduct would presumably include "breaches of the type of contractual commitments at issue here," Brief for Petitioner 35—namely, the commitment not to discriminate. After all, intentional discrimination is frequently a wanton, reprehensible tort. *Barnes* itself involved "tortious conduct," 536 U. S., at 192 (Stevens, J., concurring in judgment), that the jury had found deplorable enough to warrant $1.2 million in punitive damages, *id.,* at 184 (opinion of the Court). Yet *Barnes* necessarily concluded that the existence of this on-point exception to the general rule against punitive damages was insufficient to put funding recipients on notice of their exposure to that particular remedy.

Compare in this regard the Restatement's discussion of emotional distress damages with its discussion of punitive damages:

"**Loss Due to Emotional Disturbance**
"Recovery for emotional disturbance will be excluded *unless* . . . the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." §353 (emphasis added).

"**Punitive Damages**
"Punitive damages are not recoverable for a breach of contract *unless* the conduct constituting the breach is also a tort for which punitive damages are recoverable."

§355 (emphasis added).

It did not matter to the Court in *Barnes* that the second clause of section 355 "aptly describe[s] a funding recipient's intentional breach of its promise to refrain from discrimination." Brief for Petitioner 31. *Barnes* did not even engage in such an inquiry; it simply stopped at the word "unless." See 536 U. S., at 187–188. Neither Cummings nor the United States adequately explains why we—bound by *Barnes*—should do anything different here. Indeed, reflected in the Restatement's similar treatment of emotional distress and punitive damages is the fact that "the line between these two kinds of damages is indistinct and hard to draw." 11 J. Perillo, Corbin on Contracts §59.1, p. 546 (rev. 11th ed. 2005) (Corbin); see also D. Dobbs, Law of Remedies §12.4, p. 819 (1973) (Dobbs).

Beyond *Barnes* itself, petitioner's "more fine-grained" approach, Brief for Petitioner 33, cannot be squared with our contract analogy case law in general. As Cummings sees things, "it makes no difference whether the governing contract rule here is an 'exception,'" *id.*, at 34, because "the governing rule is just that: the governing rule," *id.,* at 35; see also *post*, at 9. But our cases do not treat suits under Spending Clause legislation as literal "suits in contract," *Sossamon* v. *Texas*, 563 U. S. 277, 290 (2011), subjecting funding recipients to whatever "governing rules" some general federal law of contracts would supply.

Rather, as set out above, we employ the contract analogy "only as a potential *limitation* on liability" compared to that which "would exist under nonspending statutes." *Ibid.* We do so to ensure that funding recipients "exercise[d] their choice" to take federal dollars "knowingly, cognizant of the consequences of" doing so. *Pennhurst*, 451 U. S., at 17. Here, the statutes at issue say nothing about what those consequences will be. Nonetheless, consistent with *Barnes*, it is fair to consider recipients aware that, if they violate

their promise to the Government, they will be subject to either damages or a court order to perform. Those are the usual forms of relief for breaching a legally enforceable commitment. No dive through the treatises, 50-state survey, or speculative drawing of analogies is required to anticipate their availability.

The approach offered by Cummings, by contrast, pushes the notion of "offer and acceptance," *Barnes*, 536 U. S., at 186, past its breaking point. It is one thing to say that funding recipients will know the basic, general rules. It is quite another to assume that they will know the contours of every contract doctrine, no matter how idiosyncratic or exceptional. Yet that is the sort of "clear notice" that Cummings necessarily suggests funding recipients would have regarding the availability of emotional distress damages when "engaged in the process of deciding whether" to accept federal funds. *Arlington*, 548 U. S., at 296. Such a diluted conception of knowledge has no place in our Spending Clause jurisprudence.

What is more, by essentially incorporating the law of contract remedies wholesale, Cummings's rendition of the analogy "risks arrogating legislative power." *Hernández* v. *Mesa*, 589 U. S. ___, ___ (2020) (slip op., at 5). Recall that *Barnes* authorized the recovery of "remedies traditionally available in suits for breach of contract" under Spending Clause statutes, like those we consider here, that "mention[ ] no remedies." 536 U. S., at 187. *Barnes* thus permitted federal courts to do something we are usually loath to do: "find[ ] that a [certain] remedy is implied by a provision that makes no reference to that remedy," *Hernández*, 589 U. S., at ___ (slip op., at 5). But *Barnes* also placed a clear limit on that authority, constraining courts to imply only those remedies "that [are] normally available for contract actions." 536 U. S., at 188. In urging us to disregard that restriction, Cummings would have us treat statutory silence as a license to freely supply remedies we cannot be

sure Congress would have chosen to make available. That would be an untenable result in any context, let alone one in which our cases require "clear notice regarding the liability at issue," *Arlington*, 548 U. S., at 296.

*Second*, even if it were appropriate to treat funding recipients as aware that they may be subject to "rare" contract-law rules that are "satisfied only in particular settings," Brief for Petitioner 34, funding recipients would still lack the requisite notice that emotional distress damages are available under the statutes at issue. That is because the Restatement's formulation—that such damages are available where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result," see Restatement (Second) of Contracts §353—does not reflect the consensus rule among American jurisdictions.

Far from it. As one commentator concluded after "[s]urveying all of the cases dealing with emotional distress recovery in contract actions" over a decade after the Restatement's publication, "a majority rule does not exist" on the question. D. Whaley, Paying for the Agony: The Recovery of Emotional Distress Damages in Contract Actions, 26 Suffolk U. L. Rev. 935, 946 (1992); see also J. Chmiel, Damages—Recovery for Mental Suffering From Breach of Contract, 32 Notre Dame Law. 482 (1957) (noting "little uniformity in the decided cases"); Corbin §59.1, at 538, 540 ("Claims for damages for mental pain and suffering have caused much conflict and difference of opinion," and "the law cannot be said to be entirely settled"); Dobbs §12.4, at 819–820 (although a "group of cases have tried to formulate a broader doctrine" akin to the Restatement view, "th[e] principle is a broad and relatively undefined one," and "it is not clear how far [it] is or will be accepted by the courts"). The contrary view of the dissent, see *post,* at 4–7, is more aspirational than descriptive.

To be sure, a number of States follow the Restatement

rule and award emotional distress damages "where the injury entails more than a pecuniary loss, and the duty violated is closely associated with the feelings and emotions of the injured party." Chmiel, 32 Notre Dame Law., at 482. That represents "the most liberal approach," Whaley, 26 Suffolk L. Rev., at 943, taken by a "strong minority" of courts, Corbin §59.1, at 541; see also McCormick §145, at 594–595. On the opposite end of the spectrum, however, several States squarely reject the Restatement, and altogether forbid recovery of emotional distress damages even where the contract relates to nonpecuniary matters. See, *e.g.*, *Tompkins* v. *Eckerd*, Civ. No. 09–2369, 2012 WL 1110069, \*4 (D SC, Apr. 3, 2012); *Contreraz* v. *Michelotti-Sawyers*, 271 Mont. 300, 309, 896 P. 2d 1118, 1123 (1995); *Keltner* v. *Washington County*, 310 Ore. 499, 504–510, 800 P. 2d 752, 754–758 (1990).

Most States reject the Restatement exception in a more nuanced way: by limiting the award of emotional distress damages to a narrow and idiosyncratic group of cases, rather than making them available *in general* wherever a breach would have been likely to inflict emotional harm. Calamari & Perillo §14.5, at 495–496. A good example is New York, which refused to apply the Restatement rule, and denied emotional distress damages, where the defendant hospital breached its contractual duty to return a newborn child to his parents by failing to prevent his abduction. *Johnson* v. *Jamaica Hospital*, 62 N. Y. 2d 523, 528–529, 467 N. E. 2d 502, 504 (1984); see also *id.,* at 536–537, 467 N. E. 2d, at 509 (Meyer, J., dissenting).

These jurisdictions confine recovery for mental anguish where nonpecuniary contracts are at issue in two main ways. First, a number permit recovery only if the breach also qualifies as "unusually evil," with the precise terminology varying from "reckless" and "willful" to "wanton" and "reprehensible." D. Hoffman & A. Radus, Instructing Juries on Noneconomic Contract Damages, 81 Fordham

L. Rev. 1221, 1227 (2012) (emphasis deleted); see Corbin §59.1, at 546–547; Chmiel, 32 Notre Dame Law., at 484–485; see, *e.g.*, *Giampapa* v. *American Family Mut. Ins. Co.*, 64 P. 3d 230, 238–239 (Colo. 2003).

Second, many States limit recovery for mental anguish to only a narrow "class of contracts upon breach of which the injured party may, if he so elect, bring an action sounding in tort." *Smith* v. *Sanborn State Bank*, 147 Iowa 640, 643, 126 N. W. 779, 780 (1910); Corbin §59.1, at 538; see, *e.g.*, *Johnson*, 62 N. Y. 2d, at 528, 467 N. E. 2d, at 504. Such cases most prominently include those "against carriers, telegraph companies, and innkeepers—all of whom are bound by certain duties that are independent of contract, but who usually also have made a contract for the performance of the duty." Corbin §59.1, at 538; Chmiel, 32 Notre Dame Law., at 488. Others involve "contracts for the carriage or proper disposition of dead bodies," Restatement (Second) of Contracts §353, Comment *a*, which similarly might be seen "as tort cases quite apart from the contract, since one who negligently mishandles a body could be liable in tort . . . even if there were no contract at all." Dobbs §12.4, at 819; see also McCormick §145, at 594–595, 597; see, *e.g., Wright* v. *Beardsley*, 46 Wash. 16, 16–20, 89 P. 172, 172–174 (1907).

Many of these cases unsurprisingly mix contract, quasi-contract, and tort principles together. Dobbs, §12.4, at 818, n. 10 ("The carrier who insults his passenger is liable to him in tort . . . but cases often speak of an implied term in the contract as governing this point."); *Knoxville Traction Co.* v. *Lane*, 103 Tenn. 376, 386, 53 S. W. 557, 560 (1899) ("The gravamen of this action is the defendant's breach of its contract of carriage, which includes . . . the duty to protect the passenger from insult or injury."); *Chamberlain* v. *Chandler*, 5 F. Cas. 413, 414 (No. 2,575) (CC Mass. 1823) (opinion of Story, J.) (ship captain violated the carriage contract's

"implied stipulation against general obscenity").*  As such, it makes little sense to treat such cases as establishing or evincing a rule of contract law—a principle with which the United States agrees, Brief for United States as *Amicus Curiae* 31, n. 5 (arguing that cases "based on tort principles" are "not instructive" for purposes of the contract-law analogy).

In the end, it is apparent that the closest our legal system comes to a universal rule—or even a widely followed one— regarding the availability of emotional distress damages in contract actions is "the conventional wisdom . . . that [such] damages are for highly unusual contracts, which do not fit into the core of contract law."  Hoffman, 81 Fordham L. Rev., at 1230.  As to which "highly unusual contracts" trigger the exceptional allowance of such damages, the only area of agreement is that there is no agreement.  There is thus no basis in contract law to maintain that emotional distress damages are "traditionally available in suits for breach of contract," *Barnes*, 536 U. S., at 187, and correspondingly no ground, under our cases, to conclude that federal funding recipients have "clear notice," *Arlington*, 548 U. S., at 296, that they would face such a remedy in private actions brought to enforce the statutes at issue.

───────────

*The dissent cites McCormick for the proposition that courts did not "always" rely on "accompanying tortious conduct" when allowing recovery of emotional distress damages in the innkeeper, telegraph, and burial cases.  *Post*, at 9 (quoting McCormick §145, at 593–594).  That misses the point.  As McCormick's next sentence explains, the award of emotional distress damages in such cases was "made easier because usually the action could have been brought as for a tort, in which event the tradition against allowing damages for mental distress would be plainly inapplicable."  *Id.*, §145, at 594.  Put differently, the usual rule barring recovery was not applicable in this idiosyncratic set of cases because, like cases in which punitive damages were awarded, they were "based on contract in name only," Dobbs §12.4, at 818.

\*     \*     \*

For the foregoing reasons, we hold that emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes we consider here. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–219

_____

## JANE CUMMINGS, PETITIONER *v.* PREMIER REHAB KELLER, P.L.L.C.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 28, 2022]

JUSTICE KAVANAUGH, with whom JUSTICE GORSUCH joins, concurring.

In analyzing whether compensatory damages for emotional distress are available under the implied Title VI cause of action, both the Court and the dissent ably employ the contract-law analogy set forth by this Court's precedents. See, *e.g., Barnes* v. *Gorman*, 536 U. S. 181, 186 (2002). The dueling and persuasive opinions illustrate, however, that the contract-law analogy is an imperfect way to determine the remedies for this implied cause of action.

Instead of continuing to rely on that imperfect analogy, I would reorient the inquiry to focus on a background interpretive principle rooted in the Constitution's separation of powers. Congress, not this Court, creates new causes of action. See *Alexander* v. *Sandoval*, 532 U. S. 275, 286–287 (2001). And with respect to existing implied causes of action, Congress, not this Court, should extend those implied causes of action and expand available remedies. Cf. *Hernández* v. *Mesa*, 589 U. S. ___, ___ (2020) (slip op., at 5); see also *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 77–78 (1992) (Scalia, J., concurring in judgment). In my view, that background interpretive principle—more than contract-law analysis—counsels against judicially authorizing compensatory damages for emotional distress in suits under the implied Title VI cause of action.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–219

_____

## JANE CUMMINGS, PETITIONER *v.* PREMIER REHAB KELLER, P.L.L.C.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 28, 2022]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

Using its Spending Clause authority, Congress has enacted four statutes that prohibit recipients of federal funds from discriminating on the basis of certain protected characteristics, including (depending upon the statute) race, color, national origin, sex, disability, or age. See Civil Rights Act of 1964, Title VI, 42 U. S. C. §2000d; Education Amendments Act of 1972, Title IX, 20 U. S. C. §1681; Rehabilitation Act of 1973, §504, 29 U. S. C. §794; Patient Protection and Affordable Care Act (ACA), §1557, 42 U. S. C. §18116. We have held that victims of intentional violations of these statutes may bring lawsuits seeking to recover, among other relief, compensatory damages. *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 76 (1992). Today, the Court holds that the compensatory damages available under these statutes cannot include compensation for emotional suffering.

The Court has asked the right question: "[W]ould a prospective funding recipient, at the time it engaged in the process of deciding whether to accept federal dollars, have been aware that it would face such liability?" *Ante*, at 5 (internal quotation marks and alterations omitted). And it has correctly observed that our precedents instruct us to answer this question by drawing an analogy to contract law. But I

disagree with how the Court has applied that analogy.

The Court looks broadly at all contracts. It says that, most of the time, damages for breach of contract did not include compensation for emotional distress. *Ante*, at 7. And it then holds that emotional distress damages are not available under the Spending Clause statutes at issue here. *Ibid.* But, in my view, contracts analogous to these statutes *did allow* for recovery of emotional distress damages. Emotional distress damages were traditionally available when "the contract or the breach" was "of such a kind that serious emotional disturbance was a particularly likely result." Restatement (Second) of Contracts §353, p. 149 (1979).

The Spending Clause statutes before us prohibit intentional invidious discrimination. That kind of discrimination is particularly likely to cause serious emotional disturbance. Thus, applying our precedents' contract analogy, I would hold that victims of intentional violations of these antidiscrimination statutes can recover compensatory damages for emotional suffering. I respectfully dissent.

                                I

I begin with agreement. First, like the Court, I recognize that "it is 'beyond dispute that private individuals may sue to enforce' the [four] antidiscrimination statutes we consider here." *Ante*, at 3 (quoting *Barnes* v. *Gorman*, 536 U. S. 181, 185 (2002)). Title VI (prohibiting race discrimination) and Title IX (prohibiting sex discrimination) contain implied rights of action that have been ratified by Congress. *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001). The Rehabilitation Act (prohibiting disability discrimination) and the ACA (prohibiting race, sex, disability, and age discrimination) expressly incorporate the rights and remedies available under Title VI. 29 U. S. C. §794a(a)(2); 42 U. S. C. §18116(a). We have treated these statutes as providing "coextensive" remedies. *Barnes*, 536 U. S., at 185. Thus, the

Court's decision today will affect the remedies available under all four of these statutes, impacting victims of race, sex, disability, and age discrimination alike.

Second, like the Court, I also recognize that recipients of federal funding are subject to a particular form of liability only if they are "*on notice*" that, by accepting the funds, they expose themselves to that form of liability. *Id.*, at 187. And a funding recipient is "generally on notice that it is subject . . . to those remedies traditionally available in suits for breach of contract." *Ibid.* Thus, the basic question here is whether damages for emotional suffering were "traditionally available" as remedies "in suits for breach of contract." *Ibid.*

## II

Unlike the Court, though, I believe the answer to that basic question is yes. Damages for emotional suffering have long been available as remedies for suits in breach of contract—at least where the breach was particularly likely to cause suffering of that kind.

A general, overarching principle of contract remedies is set forth in the Restatement (Second) of Contracts: "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." §347, Comment *a*, at 112; see also 3 E. Farnsworth, Contracts §12.8, p. 188 (2d ed. 1998) (Farnsworth) ("The basic principle for the measurement of those damages is that of compensation based on the injured party's expectation"); 3 S. Williston, Law of Contracts §1338, p. 2392 (1920) (Williston) ("[T]he general purpose of the law is, and should be, to give compensation:—that is, to put the plaintiff in as good a position as he would have been in had the defendant kept his contract").

This simple principle helps explain why compensatory damages are generally available as remedies and punitive damages are not. By definition, compensatory damages serve contract law's "general purpose," namely, to "give compensation." *Ibid.* But punitive damages go beyond "compensat[ing] the injured party for lost expectation" and instead "put [him] in a better position than had the contract been performed." 3 Farnsworth §12.8, at 193.

The same general principle also helps to explain the many cases in which damages for emotional suffering are *not* available. Most contracts are commercial contracts entered for pecuniary gain. Pecuniary remedies are therefore typically sufficient to compensate the injured party for their expected losses. See, *e.g.*, C. McCormick, Law of Damages §145, p. 592 (1935) (McCormick) ("Most contracts which come before the courts are commercial contracts. The pecuniary interest is dominant"); 1 J. Sutherland, Law of Damages 156 (1883) (Sutherland) ("In actions upon contract, the losses sustained do not, by reason of the nature of the transactions which they involve, embrace, ordinarily, any other than pecuniary elements"); 3 Farnsworth §12.17, at 894–895 ("[T]he real basis of this rule is that [recovery for emotional distress] is likely to result in disproportionate compensation"); cf. Restatement (Second) of Contracts §351(1), at 135 ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made").

Finally, and most importantly here, the same general rule also helps to explain the cases in which contract law *did* make available damages for emotional suffering. Contract law treatises make clear that expected losses from the breach of a contract entered for *nonpecuniary* purposes might reasonably include *nonpecuniary* harms. So contract law traditionally does award damages for emotional distress "where other than pecuniary benefits [were] contracted for" or where the breach "was particularly likely to

result in serious emotional disturbance." 3 Williston §1340, at 2396; 3 Farnsworth §12.17, at 895; see also, *e.g.*, Restatement (Second) of Contracts §353, at 149 ("Recovery for emotional disturbance" was allowed where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result"); 1 Sutherland 157–158 (damages should be "appropriate to the objects of the contract"); 1 T. Sedgwick, Measure of Damages §45, p. 61 (8th ed. 1891) (Sedgwick) ("'Where other than pecuniary benefits are contracted for, other than pecuniary standards will be applied to the ascertainment of damages flowing from the breach'").

Examples of contracts that gave rise to emotional distress damages under this rule have included, among others, contracts for marriage, see, *e.g.*, 1 Sutherland 156, and n. 4; contracts by common carriers, innkeepers, or places of public resort or entertainment, see, *e.g.*, McCormick §145, at 593, and nn. 48–50; contracts related to the handling of a body, see, *e.g.*, 1 Sedgwick §45, at 62, and n. a; contracts for delivery of a sensitive telegram message, see, *e.g.*, *id.*, at 62, and n. b; and more. In these cases, emotional distress damages are compensatory because they "'make good the wrong done.'" *Franklin*, 503 U. S., at 66; see also *Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299, 307 (1986).

## III

Does breach of a promise not to discriminate fall into this category? I should think so. The statutes before us seek to eradicate invidious discrimination. That purpose is clearly nonpecuniary. And discrimination based on race, color, national origin, sex, age, or disability is particularly likely to cause serious emotional harm. Often, emotional injury is the primary (sometimes the only) harm caused by discrimination, with pecuniary injury at most secondary. Consider, for example, the plaintiff in *Franklin*—a high school student who was repeatedly sexually assaulted by her

teacher. 503 U. S., at 63–64. Or the plaintiff in *Tennessee* v. *Lane*, 541 U. S. 509 (2004), who used a wheelchair and, because a building lacked wheelchair accessibility, was forced to crawl up two flights of stairs. *Id.*, at 513–514. Or the many historical examples of racial segregation in which Black patrons were made to use separate facilities or services. Regardless of whether financial injuries were present in these cases, the major (and foreseeable) harm was the emotional distress caused by the indignity and humiliation of discrimination itself.

As a Member of this Court noted in respect to the Civil Rights Act of 1964, Congress' antidiscrimination laws seek "the vindication of human dignity and not mere economics." *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 291 (1964) (Goldberg, J., concurring). Quoting the Senate Commerce Committee, Justice Goldberg observed:

> "'Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his race or color. It is equally the inability to explain to a child that regardless of education, civility, courtesy, and morality he will be denied the right to enjoy equal treatment, even though he be a citizen of the United States and may well be called upon to lay down his life to assure this Nation continues.'" *Id.*, at 292 (quoting S. Rep. No. 872, 88th Cong., 2d Sess., 16 (1964)).

It is difficult to believe that prospective funding recipients would be unaware that intentional discrimination based on race, sex, age, or disability is particularly likely to cause emotional suffering. Nor do I believe they would be unaware that, were an analogous contractual breach at issue, they could be held legally liable for causing suffering of that kind. The contract rule allowing emotional distress

damages under such circumstances is neither obscure nor
unsettled, as the Court claims. *Ante*, at 8, 11–12. To the
contrary, it is clearly laid out in the Restatement (Second)
of Contracts: "Recovery for emotional disturbance will be
excluded unless the breach also caused bodily harm *or the
contract or the breach is of such a kind that serious emo-
tional disturbance was a particularly likely result.*" §353,
at 149 (emphasis added). And the Restatement's rule is
well supported by treatise writers, who have described the
law similarly. See, *e.g.*, 3 Farnsworth §12.17, at 895; 1
Sedgwick §45, at 62; 16 J. Murray, Corbin on Contracts
§AG–59.01, p. 855 (2017) ("Emotional damages arising
from racial or other forms of discrimination are clearly fore-
seeable. There should be no question about their recovery
in a contract action where such conduct is proven"). I would
therefore conclude that contract law is sufficiently clear to
put prospective funding recipients on notice that inten-
tional discrimination can expose them to potential liability
for emotional suffering.

## IV

In concluding otherwise, the Court invokes our decision
in *Barnes*. In *Barnes*, we reaffirmed that funding recipients
could be held liable for compensatory damages because
compensatory damages are a "for[m] of relief traditionally
available in suits for breach of contract." 536 U. S., at 187.
But, we held, they are not liable for punitive damages be-
cause punitive damages were "generally not available for
breach of contract." *Ibid.*

The Court today reads *Barnes* to imply that prospective
funding recipients can only be expected to be aware of
"basic, general rules," not exceptions or subsidiary rules
that govern specific circumstances. *Ante*, at 11. How does
the Court derive that restrictive approach from *Barnes*,
which did not purport to announce such a limitation? Be-
cause, the Court says, punitive damages were sometimes

available in suits for breach of contract where the breach was "'also a tort for which punitive damages are recoverable.'" *Ante*, at 9 (quoting Restatement (Second) of Contracts §355). The Court assumes that *Barnes* must have refused to consider any exceptions at all because otherwise it would have relied on this exception to hold that punitive damages *were* available. *Ante*, at 9. The Court believes that damages for emotional suffering are similar: It says they, too, are available only under an exception to the general rule, and that exception is too "'fine-grained'" to put federal funding recipients on notice of their potential exposure to liability. *Ante*, at 8 (quoting Brief for Petitioner 33).

The Court's comparison to punitive damages is, in my view, unpersuasive. Punitive damages are not embraced by *Barnes*' contract-law analogy because they do not serve contract law's central purpose of "compensat[ing] the injured party"; instead, they "punish the party in breach." Restatement (Second) of Contracts §355, Comment *a*, at 154; see also *Barnes*, 536 U. S., at 189 (distinguishing punitive damages, which are unavailable, from compensatory damages, which are available, because the former do not "'make good the wrong done'"). Accordingly, the punitive damages exception cited by the Court does not rely on contract-law principles at all, but rather, on tort law. The Restatement clarifies that, when contract and tort claims may overlap, contract law "does not preclude an award of punitive damages . . . if such an award would be proper *under the law of torts.*" Restatement (Second) of Contracts §355, Comment *b*, at 155 (emphasis added); see also *id.*, at 156 (including Illustrations in which the "right to recover punitive damages is governed by Restatement, Second, Torts §908"). This special feature makes the punitive damages exception an inapt comparator for *Barnes*' *contract*-law analogy.

The same is not true of emotional distress damages. The Restatement does not attribute the availability of emotional

distress damages to tort rather than contract law. See Restatement (Second) of Contracts §353, at 149; see also McCormick §145, at 593–594 ("Sometimes reliance is placed upon accompanying tortious conduct such as assault or defamation . . . but *not always*, *nor do these elements seem essential*" (emphasis added)); *e.g.*, *Aaron* v. *Ward*, 203 N. Y. 351, 354, 96 N. E. 736, 737 (1911) ("The action is for a breach of the defendant's contract and not for a tortious expulsion"). That makes sense because, unlike punitive damages, emotional distress damages can, and do, serve contract law's central purpose of compensating the injured party for their expected losses, at least where the contract secured primarily nonpecuniary benefits and contemplated primarily nonpecuniary injuries. As I said above, in such cases, emotional distress damages are a form of compensatory damages that "'make good the wrong done.'" *Franklin*, 503 U. S., at 66; see also *Memphis Community School Dist.*, 477 U. S., at 306–307, and n. 9.

I have already explained above why I believe federal funding recipients would be aware that intentional invidious discrimination is particularly likely to cause emotional suffering. And I have also explained why, aware of general principles of contract law, they would also be aware that damages for emotional suffering are available for breaches of contract "where other than pecuniary benefits [were] contracted for" or where the breach "was particularly likely to result in serious emotional disturbance." 3 Williston §1340, at 2396; 3 Farnsworth §12.17, at 895; *supra*, at 4–5. Nothing in our opinion in *Barnes* requires us to ignore these "'directly applicable'" contract rules in favor of the less applicable, "general" rule on which the Court relies. *Ante*, at 8 (quoting Brief for Petitioner 35). Indeed, reliance on an analogy only works when we compare things that are actually analogous. Here, the rules that govern analogous breaches of contract tell us that emotional distress damages

can be available for violations of statutes that prohibit intentional discrimination.

## V

Finally, we might recall *why* we look to contract rules at all. The contract-law analogy is a tool for answering the ultimate question whether federal funding recipients can appropriately be held liable for emotional suffering. Cf. *Barnes*, 536 U. S., at 191 (Souter, J., concurring) (warning about the limitations of the contract-law analogy). In answering that question, we must remain mindful of the need to ensure a "sensible remedial scheme that best comports with the statute." *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 284 (1998). The Court's holding today will not help to achieve that result.

Instead, the Court's decision creates an anomaly. Other antidiscrimination statutes, for which Congress has provided an express cause of action, permit recovery of compensatory damages for emotional distress. See 42 U. S. C. §1981a(b)(3) (expressly providing for compensatory damages, including damages for "emotional pain, suffering," and "mental anguish" under Title VII of the Civil Rights Act); *Memphis Community School Dist.*, 477 U. S., at 307 (allowing recovery under Rev. Stat. §1979, 42 U. S. C. §1983, of compensatory damages for "'personal humiliation, and mental anguish and suffering'"). Employees who suffer discrimination at the hands of their employers can recover damages for emotional suffering, as can individuals who suffer discrimination at the hands of state officials. But, until Congress acts to fix this inequity, the Court's decision today means that those same remedies will be denied to students who suffer discrimination at the hands of their teachers, patients who suffer discrimination at the hands of their doctors, and others.

It is difficult to square the Court's holding with the basic purposes that antidiscrimination laws seek to serve. One

such purpose, as I have said, is to vindicate "human dignity and not mere economics." *Heart of Atlanta*, 379 U. S., at 291 (Goldberg, J., concurring). But the Court's decision today allows victims of discrimination to recover damages only if they can prove that they have suffered economic harm, even though the primary harm inflicted by discrimination is rarely economic. Indeed, victims of intentional discrimination may sometimes suffer profound emotional injury without any attendant pecuniary harms. See, *e.g.*, *Franklin*, 503 U. S., at 63–64, 76. The Court's decision today will leave those victims with no remedy at all.

\*     \*     \*

For all of these reasons, I respectfully dissent.