# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

    *Plaintiffs*,

v.

DALE FOLWELL, *et al.*,

    *Defendants*.

No. 1:19-cv-00272-LCB-LPA

**EXPERT REBUTTAL DISCLOSURE REPORT OF
GEORGE RICHARD BROWN, M.D., DFAPA**

I, George R. Brown, declare as follows:

1. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2. I have actual knowledge of the matters stated and would so testify if called as a witness. I reserve the right to supplement or amend this report based on any future information that is provided to me, including but not limited to information produced by Defendants in discovery or in response to Defendants' expert disclosures.

3. I previously submitted an expert report that was served on March 1, 2021 setting forth my opinions on: (1) the medical condition known as Gender Dysphoria; (2) the prevailing treatment protocols for a diagnosis of Gender Dysphoria, their efficacy, and the cost-effectiveness of this care; (3) whether there is a legitimate medical basis for the exclusions in the health plans offered by the North Carolina State Health Plan for Teachers

1

following the WPATH Standards of Care (SOC). This is likely because, in my understanding and experience, no such scientifically-reliable literature has been published in at least the last 15 years.

27. Defendants' experts also erroneously generalize about the appropriate course of treatment for Gender Dysphoria in adults or adolescents based on data about pre-pubertal children. This is inappropriate. The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5") recognizes separate criteria for diagnosing Gender Dysphoria in children, on the one hand, and adults and adolescents on the other. The WPATH Standards of Care (SOC) have distinct standards of care for pre-pubertal children, adolescents and adults. As noted in my original report, the WPATH SOC, version 7 (Coleman, et al, 2011), are the nationally and internationally accepted standards of care for the evaluation and treatment of a diagnosis of Gender Dysphoria in adolescents and adults. These standards of care are also specifically followed by the largest healthcare systems in the United States (Department of Veterans Affairs, Kaiser-Permanente) as well as most major insurers of healthcare in the United States, including the corporate policy for Blue Cross and Blue Shield which specifically references these WPATH standards. *See* Blue Cross Blue Shield of North Carolina, Corporate Medical Policy, *Gender Affirmation Surgery and Hormone Therapy* (2021). They are also utilized as standards of care by many Departments of Corrections, the Federal Bureau of Prisons, the National Health Service of the UK, and many other countries as well. Coverage for transgender health care has been considered medically necessary for appropriately diagnosed individuals suffering from

### B. Defendants' Experts Ignore the Fact that Treatment for Gender Dysphoria Has Long Been Accepted as Appropriate and Medically Necessary.

78. Defendants' experts claim that treatments for Gender Dysphoria are experimental and not medically necessary. These opinions are far out of step with mainstream medicine and the standard approaches of most healthcare systems in the United States. There is a wide availability of psychiatric, medical, and surgical treatments for transgender people suffering from Gender Dysphoria. Those treatments have been recognized as medically necessary care by the largest healthcare systems in the United States, and by being covered by the largest third-party insurance companies in the United States. This further underscores that Defendants experts are out of step with the relevant medical community and accepted standards of care for the treatment of Gender Dysphoria in adolescents and adults.

79. Although no medical, surgical, or psychiatric treatments are without risks or side effects, the treatments for adolescents and adults with diagnosed Gender Dysphoria have been found to be generally safe and effective, with favorable outcomes on a variety of outcome measures (Kuper, et al., 2019; Carmichael, et al., 2021; Bustos, et al., 2021; van der Miesen, et al., 2020; Simonsen, et al., 2015; Murad, et al., 2010; Almazan and Keuroghlian, 2021). Defendants' experts criticize my opinions and the opinions of other of Plaintiff's experts for supposedly ignoring relevant scientific literature, but notably, they fail to acknowledge these recent and highly relevant studies. These studies confirm what experts in the field have long known: the widely accepted standard-of-care treatments for

adolescents and adults diagnosed with Gender Dysphoria are medically necessary and associated with a favorable risk/benefit ratio for most patients who are deemed appropriate for these interventions.

80. Defendants' witnesses further situate themselves outside the mainstream of the medical field by rejecting well-accepted treatment protocols recognized by the major medical and mental health professional associations in the United States. As set forth in my original report, the World Professional Association of Transgender Health publishes Standards of Care for treating Gender Dysphoria. WPATH is an internationally recognized association comprising nearly 2,500 medical, surgical, mental health, and other professionals who specialize in the evaluation and treatment of transgender and gender non-conforming people. The WPATH Standards of Care, which are in their seventh revision, represent the evidence-based consensus of experts in the field and have been recognized as the authoritative treatment protocols by the major medical and mental health associations in the United States, including the American Psychiatric Association, the American Medical Association, the American Psychological Association, and the American Academy of Pediatrics.

81. The Veterans Health Administration ("VHA")—the largest integrated health care system in the United States—treats transgender veterans largely based on the guidelines set forth in the current version of the WPATH SOC, and references these standards in their national training programs. I have been directly involved with the

to transition to the male gender role. This is a misinterpretation of that statement, and is an example of Dr. Lappert engaging in the "confirmation bias" that he claims to be present in all of the clinicians' records and in my evaluations of the Plaintiffs. Had Dr. Lappert interviewed C.B., as I did, he would have learned that that comment meant that C.B. was tired of the lengthy process of "being trans" and wanted to get to the point where "trans" no longer identified him and he could just be identified as a "man" and not as a "transgender man." It should also be noted that no fewer than seven clinicians have diagnosed C.B. as having the diagnosis of Gender Dysphoria.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of June, 2021.

_____
George R. Brown, M.D., DFAPA

52