# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

   *Plaintiffs*,

  *v.*

DALE FOLWELL, *in his official capacity as State Treasurer of North Carolina*; DEE JONES, *in her official capacity as Executive Administrator of the North Carolina State Health Plan for Teachers and State Employees*; and THE NORTH CAROLINA STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, *et al.*,

   *Defendants*.

No. 1:19-cv-272-LCB

## MEMORANDUM IN SUPPORT OF MOTION
## FOR STAY OF INJUNCTION PENDING APPEAL

### INTRODUCTION AND STATEMENT OF THE CASE

This Court granted partial summary judgment and in doing so permanently enjoined the North Carolina State Health Plan for Teachers and State Employees, and Dale Folwell and Dee Jones (in their official capacities) by (1) prohibiting them from enforcing *one* of the Plan's coverage exclusions, and (2) mandating that they provide health benefits

coverage "for medically necessary services for the treatment of gender dysphoria" through the State Health Plan. Doc. No. 234 at 72. Pursuant to Federal Rules of Civil Procedure 62(d), Defendants request a stay of this injunction pending appeal because they are likely to succeed on the merits, because they will be irreparably harmed by the injunction, and because a stay would benefit the public interest without substantially harming other parties to the case. *See Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).[1]

## SUMMARY OF ARGUMENT

Defendants have presented "a substantial case on the merits" on three grounds. *See Hilton v. Braunskill*, 481 U.S. 770, 778 (1987). First, this Court's injunction is improperly vague in violation of Rule 65 of the Federal Rules of Civil Procedure. In addition, this Court's equal protection analysis misapplies binding Supreme Court precedent in two distinct ways.

---

[1] The relevant facts are those contained in the Court's Memorandum Opinion and Order and in the parties' summary judgment pleadings.

First, the Federal Rules of Civil Procedure require an injunction to "state its terms specifically" and "describe in reasonable detail"—in the order itself, <u>without</u> reference to any other document—the "act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). This Court may not delegate to Defendants, under penalty of contempt, the obligation to puzzle out the boundaries of what treatments must be provided as "medically necessary services for the treatment of gender dysphoria." Doc. No. 234 at 72. Yet this is what the injunction does. Compounding the ambiguity, this Court has enjoined enforcement of a single exclusion for "[t]reatment or studies leading to or in connection with sex changes or modifications and related care[,]" without addressing two other facially neutral coverage exclusions that exclude a broad spectrum of services, treatments, and prescription, including but not limited to, Plaintiffs' desired surgeries and prescriptions.

Second, this Court's equal protection analysis misapplies binding Supreme Court precedent. This Court held that the Plan's decision not to cover "[t]reatment or studies leading to or in connection with sex changes or modifications and related care" is a facially discriminatory classification. Doc. No. 234 at 41–42. In this Court's view, the Plan

discriminates "between medically necessary treatments that align with the member's sex" and "medically necessary treatments . . . that do not." *Id.* However, the Supreme Court's equal protection caselaw forecloses application of heightened scrutiny to such a case. In *Geduldig v. Aiello*, the Supreme Court held that a state insurance policy that excluded coverage for normal pregnancy (a condition only experienced by women) did not impose a sex-based classification. 417 U.S. 484, 495–97 (1974). *Geduldig* held that an insurance plan's decision whether to provide coverage is only a facially discriminatory classification when the Government distinguishes among individuals because of membership in a protected class. *See also Nguyen v. INS*, 533 U.S. 53, 56–57 (2001) (holding that the statute at issue was facially discriminatory because it imposed "different requirements for the child's acquisition of citizenship depending upon whether the citizen parent is the mother or the father"). In contrast, the decision not to provide a particular benefit, even when that benefit <u>only</u> affects members of a protected class, is facially neutral and subject to rational basis review. *Geduldig*, 417 U.S. at 494.

Here, as in *Geduldig*, the State Health Plan provides coverage to Plaintiffs for the exact same risks as every other Plan member and, just as in *Geduldig*, Plaintiffs' allegations relate only "to the asserted underinclusiveness of the set of risks that the State has selected [to] insure." *Id.* Absent evidence that the insurance scheme is designed with discriminatory intent (which this Court did not find when it granted summary judgment), this federal Court may not usurp Defendants' authority to make coverage decisions for the State Health Plan.

Third, this Court's equal protection analysis improperly eliminates Plaintiffs' burden to prove that they are "similarly situated" to others who are allegedly privileged by the Plan's benefit design. Plan coverage decisions are based on medical diagnoses, not patient identities because it is logically impossible to determine whether a treatment is "medically necessary" without reference to a medical diagnosis. Failing to appreciate this, the Court's assertion that transgender Plan members are denied coverage for the same medically necessary treatments that are provided to other Plan participants is incorrect. Plaintiffs are simply not "similarly situated" to individuals who seek treatment for different diagnoses. A similarly situated person for purposes of Plaintiffs' equal protection claim

must be a Plan member who is equivalent to Plaintiffs in all material respects and has <u>the same diagnosis</u>.

The remaining factors articulated by the Fourth Circuit also weigh in favor of a stay pending appeal. *See Long*, 432 F.2d at 979. By forcing Defendants to make coverage decisions with limited information and constrained policy authority, the injunction risks restricting coverage for Plan members and irreparably damaging the Plan's effectiveness and accountability. On the other hand, Plaintiffs have already received their desired treatments and will not be substantially harmed by a stay pending appeal. Finally, the public interest strongly counsels in favor of patience and caution given the potential for the inefficient allocation of public funds. Accordingly, Defendants respectfully submit that this Court should promptly stay its injunction pending appeal, pursuant to Fed. R. Civ. P. 62(d).

## **ARGUMENT**

### I.  **Legal Standard**

"[A] federal court can stay the enforcement of a judgment pending the outcome of an appeal." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 10 (1942). Such a stay is "an exercise of judicial discretion,"

however, not "a matter of right, even if irreparable injury might otherwise result to the [movant]." *Virginian Ry. Co. v. U.S.*, 272 U.S. 658, 672–73 (1926). Defendants bear the burden of showing that the circumstances justify an exercise of such discretion. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009).

In support of a stay, Defendants must show "(1) that [they] will likely prevail on the merits of the appeal, (2) that [they] will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). The stay factors contemplate "individualized judgments in each case, [so] the formula cannot be reduced to a set of rigid rules." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987).

District courts in the Fourth Circuit continue to follow *Long*, which holds that a movant for a stay pending appeal need not affirmatively satisfy all four requirements. *See Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 890 F.Supp.2d 688, 692 (S.D. W. Va. 2012) ("[T]he factors are balanced, such that a stronger showing on some of these prongs can make up for a weaker showing on others."); *see also Arkansas*

*Best Corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517, 519 (W.D.N.C. 1999) ("Failure to meet one factor may be excused in light of a particularly strong showing with respect to another factor."). In this case, each condition favors a stay of the injunction.

## II. Defendants have established "a substantial case on the merits" sufficient to justify a stay of the injunction.

The first *Long* factor requires Defendants to show that "[they] will likely prevail on the merits of the appeal." *Long*, 432 F.2d at 979. Subsequent to *Long*, the Supreme Court held that this first requirement is satisfied when a movant demonstrates "a substantial case on the merits." *Hilton*, 481 U.S. at 778. As to each of this Court's three distinct critical errors, Defendants can demonstrate "a substantial case on the merits," *Hilton*, 481 U.S. at 778, upon which they are likely to prevail on appeal.

Significantly, the analysis of Defendants' arguments on the merits must also incorporate the relevant appellate standard of review. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015). Therefore, to the extent that this Court's order relies on specific facts, the

question is not whether it is "more likely than not" that its factual conclusions are correct. Rather, the evidence must be considered "in the light most favorable" to Defendants with "all reasonable inferences" drawn in the Defendants' favor. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). "To the extent that the District Court's injunction relied upon weighing evidence or credibility determinations, then Defendants will prevail on appeal." *Jacobs*, 780 F.3d at 569.

## A. This Court's injunction violates Fed. R. Civ. P. 65 because it is impermissibly vague.

Injunctions must not be "founded upon a decree too vague to be understood." *Gunn v. Univ. Comm. to End War in Viet Nam*, 399 U.S. 383, 389 (1970). "Congress [has] responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Id.* "[B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

The Federal Rules of Civil Procedure require all injunctions to specifically state the reasons for an injunction, specifically state the terms of the injunction, and "describe in reasonable detail—and not by

referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). *See*, *e.g.*, *Scott v. Clarke*, 355 F.Supp.3d 472, 477 (W.D. Va. 2019) (holding that because the "detailed settlement agreement" approved by the district court was not itself reproduced in the court's order, the settlement agreement was not enforceable by contempt).

"The specificity provisions of Rule 65(d) are no mere technical requirements." *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 459 (4th Cir. 2000) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)) (internal punctuation omitted). "Compliance is mandatory and [the requirements] must be observed in every instance." *Id.* Without such specificity, "appellate review of an injunctive order is greatly complicated, if not made impossible," and parties face "the possible founding of a contempt citation on a decree too vague to be understood." *Id.* "[A]n order challenged on appeal should be set aside if it fails to comply with the rule." Charles A. Wright *et al.*, 11A FEDERAL PRACTICE AND PROCEDURE § 2955 (3d ed. 2005).

This Court's injunction does not comply with Rule 65(d). The injunction consists of one prohibitive command and one mandatory command. Defendants are (1) permanently enjoined from enforcing *one* of the Plan's coverage exclusions, and (2) ordered to reinstate coverage for "medically necessary services for the treatment of gender dysphoria." Doc. No. 234 at 72. Both aspects of this order are impermissibly vague, but the second requirement is particularly problematic.

The first part of the injunction does not "specifically" identify the coverage exclusion that Defendants cannot enforce. Fed. R. Civ. P. 65(d). *See* Doc. No. 234 at 72–73. Regardless of whether Defendants can infer this Court's intention, the injunction's failure to comply with the "mandatory" obligations of Rule 65(d) renders it invalid and likely to be reversed on appeal. *CPC Int'l*, 214 F.3d at 459.

This Court's second command also runs afoul of Rule 65. The quotation marks around the phrase "medically necessary services for the treatment of gender dysphoria" indicate that this Court is referring to another document. This is impermissible even when the quoted language has a clear citation. Fed. R. Civ. P. 65(d)(1)(C).

Case 1:19-cv-00272-LCB-LPA   Document 257   Filed 07/27/22   Page 11 of 34

More troubling, however, is the uncertainty as to what the second portion of the injunction actually requires. In *Pashby v. Delia*, the Fourth Circuit rejected a similar injunction on this ground. 709 F.3d 307 (4th Cir. 2013). The *Pashby* district court enjoined the North Carolina Department of Health and Human Services from imposing stricter eligibility requirements for in-home personal care services for disabled Medicaid recipients. *Id.* at 313. The injunction prohibited the State from "implementing IHCA Policy 3E" (the challenged policy). *Id.* at 331. When the State undid the entire policy, the district court modified its injunction "to clarify that the injunction simply required the DHHS to continue offering in-home [personal care services] to the plaintiffs who qualified for it before IHCA Policy 3E took effect." *Id.* The Fourth Circuit rejected the injunction under Rule 65(d) and held that these broad terms provided no guidance about whether the injunction also prohibited the State from following other provisions in "ICHA Policy 3E" that had nothing to do with the challenged financial requirements. *Id.* Further, the district court failed to specify what policy requirements would apply to future Medicaid beneficiaries. *Id.*

The second portion of this Court's injunction is impermissibly vague for the same reasons present in *Pashby*. The injunction requires Defendants to provide "medically necessary services for the treatment of gender dysphoria" without any definition of this potentially boundless phrase. Because this command offers no instructions on the precise extent and scope of "medically necessary care for gender dysphoria," it creates multiple unanswered questions: Who decides whether a service is "medically necessary"? Is the Plan required to accept any statement by a physician or licensed social worker that a particular treatment is "medically necessary"? Is the Plan required to adopt the position of its current third-party administrator, or the position of a different third-party administrator with different medical necessity policies in the future? Can the Plan make its own decision? Can the Plan follow North Carolina Medicaid's determinations regarding medical necessity, or can it follow any other State's Medicaid determinations regarding medical necessity? Is the Plan required to defer to the specific medication prescribed for a patient on the basis that it is medically necessary, or can the Plan require a generic substitute?

Case 1:19-cv-00272-LCB-LPA   Document 257   Filed 07/27/22   Page 13 of 34

This Court's discussion of the rationale for its injunction highlights its disregard of Rule 65(d). In its opinion, this Court dismissed the hardship of its injunction on Defendants, "particularly given that Defendants and their third-party administrators were able to identify and cover medically necessary care in 2017." Doc. No. 234 at 66. Rule 65 forbids the Court from delegating to Defendants the obligation to "identify and cover medically necessary care." *Id.* This was "one of the principal abuses of the pre-federal rules practice," when courts imposed "injunctions that were so vague that [a] defendant was at a loss to determine what he had been restrained from doing." 11A FEDERAL PRACTICE AND PROCEDURE § 2955.

To an extent, this Court's opinion implies that it is simply restoring the "last uncontested status between the parties [that] existed in 2017." Doc. No. 234 at 67. But Plaintiffs contend that "medically necessary services for treatment of gender dysphoria" are not limited to only those procedures that the Plan briefly covered in 2017 (under threat of a now-rescinded federal regulation). For example, one of Plaintiffs' experts stated that medically necessary surgeries "include, but are not limited to": "facial feminization surgery, liposuction, lipofilling, voice surgery,

thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), and hair reconstruction" as well as "pectoral implants" and "various aesthetic procedures." Doc. No. 181-1 at 194–195 (¶¶ 25–26). None of these allegedly "medically necessary" treatments were covered in 2017. *See* Doc. No. 181-2 at 60 (Blue Cross/Blue Shield of North Carolina policy that "[c]osmetic services that may be used for gender confirmation" are not medically necessary). This Court's opinion refers to denial of "vocal therapy," Doc. No. 234 at 4, but there is no evidence the Plan has ever paid for vocal therapy for the treatment of gender dysphoria. Defendants have been left without guidance, short of a contempt hearing, about how to precisely identify the "medically necessary" treatments for which coverage must be provided.

Finally, and most significantly, other facially neutral exclusions currently exist that affect coverage and payments for the treatment of gender dysphoria, as Defendants have informed this Court. Doc. No. 137 at 13-14. The Plan excludes coverage for "surgery for psychological or emotional reasons." *Id*. And the Plan excludes "any medication or device not approved by the Food and Drug Administration (FDA) for the applicable diagnosis or treatment," unless the medication is for cancer

treatment and has been FDA approved to treat a different type of cancer. *Id.* at 14 & n.3. These exclusions make no reference to biological sex, gender, or gender dysphoria, but they still operate to limit coverage for Plaintiffs' desired gender dysphoria treatments and prescriptions. *See* Doc. No. 215-3 at 59–61 (no prescription drugs are FDA-approved for the treatment of gender dysphoria).[2]

This Court's injunction provides no guidance or instruction as to how or whether these facially neutral exclusions can or should be applied. Under the terms of the injunction, Defendants are unable to differentiate between medically necessary treatments that <u>would</u> have been covered if not for the gender dysphoria exclusion, and medically necessary treatments that <u>would not</u> have been covered regardless of the enjoined exclusion. Defendants are therefore without "explicit notice of precisely what conduct is outlawed." *Schmidt*, 414 U.S. at 476. This Court's failure to provide the required detail in its injunction is reversible error, and Defendants will likely prevail on appeal.

---

[2]     One can easily determine which treatments are excluded by these two coverage limitations "without comparing the member's biological sex before the treatment to how it might be impacted by the treatment." *See* Doc. No. 234 at 42.

**B.    This Court's order disregards binding Supreme Court precedent in *Geduldig v. Aiello.***

This Court's injunction also rests on a misapplication of Supreme Court precedent. This Court held that the Plan's decision not to cover "[t]reatment or studies leading to or in connection with sex changes or modifications and related care" is a <u>facially</u> discriminatory classification. In this Court's view, this limitation discriminates "between medically necessary treatments that align with the member's sex" and "medically necessary treatments . . . that do not." Doc. No. 234 at 41–42.

The Supreme Court's equal protection caselaw simply does not permit this Court's application of heightened scrutiny. A facially discriminatory classification must "explicitly classif[y] people based on sex." *Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 199 (1991) (Facial discrimination depends "on the explicit terms of the discrimination.").

This Court erroneously concluded that the Plan's coverage was a sex classification because its implementation "cannot be stated or effectuated without referencing sex." Doc. No. 234 at 42. In reaching this conclusion, this Court relied on *Grimm v. Gloucester County School*

*Board*, 972 F.3d 586, 608 (4th Cir. 2020). *See* Doc. No. 234 at 41. *Grimm,* does not rest on this basis. In *Grimm*, the Fourth Circuit considered a policy that expressly distinguished based on sex: "the school district will provide male and female restroom and locker room facilities in its schools." *Id.* "On its face, [this] policy creates sex-based classifications for restrooms." *Id.*

In contrast, the fact that a policy can "only be stated or effectuated [by] referencing sex," Doc. No. 234 at 42, does not trigger heightened scrutiny. The Supreme Court specifically reached this conclusion in *Geduldig v. Aiello*, 417 U.S. 484 (1974), and reaffirmed it a month ago in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). "The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretext designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20).

In a recent case with strikingly similar facts, a different district court summarily recognized that "[w]ith *Geduldig*, 'the Supreme Court has foreclosed'" Plaintiffs' argument—and this Court's conclusion—that

the Plan's exclusion "facially discriminates on the basis of sex." *Lange v. Houston Cnty., Georgia*, 2022 WL 1812306, at \*7–8 (M.D. Ga. June 2, 2022). The *Lange* court correctly set forth *Geduldig* as follows:

> [Plaintiffs here have] the same coverage as other [Plan participants] because the [e]xclusion[s] appl[y] equally to a male seeking to become a woman or a woman seeking to become a man. And even if transgender individuals are entitled to protection under the Equal Protection Clause as a separate and distinct class from that of males and females, the same logic would apply. In other words, the [e]xclusion creates two groups—those that want ["treatments that lead to or are connected to sex changes or modifications" (Doc. No. 234 at 47)] and those that do not. Both groups contain transgender members and non-transgender members, so a "lack of identity" exists between the policy and transgender status. Thus, in the context of the Equal Protection Clause, the Exclusion does not facially discriminate on the basis of sex."

*Lange*, 2022 WL 1812306 at \*8.[3]

When the Government distinguishes among individuals using their membership in a protected class, then it is using a facial classification. *See Nguyen v. INS*, 533 U.S. 53, 56–57 (2001) In contrast, when the Government distinguishes "between medically necessary treatments,"

---

[3]    There is another "lack of identity" in the record. Transgender Plan members are in both the group that want "treatments that lead to or are connected to sex changes or modifications," (Doc. No. 234 at 47), and the group of those Plan members who do not.

Doc. No. 234 at 41, this is subject to rational-basis review even when the excluded benefit is only valuable to members of a protected class. Such a distinction merely "relates to the asserted underinclusiveness of the set of risks that the State has selected [to] insure." *Geduldig*, 417 U.S. at 494. Absent evidence that Defendants <u>intended</u> to harm Plaintiffs based on their transgender identities, the equal protection clause has nothing to say about the actuarial or otherwise discretionary decisions made by the State Health Plan.[4]

To avoid confronting *Geduldig*, this Court created an artificial and inconsequential distinction between "conditions" (such as normal pregnancy in *Geduldig*) and "treatments" requested by Plaintiffs (in connection with the medical *condition* of gender dysphoria). Doc. No. 234 at 46. This misunderstands *Geduldig*'s facts. The insurance plan in *Geduldig* covered "conditions" and not "treatments" because it was a short-term disability plan, not a health benefits plan. *Id.* at 486. The Supreme Court instructed that the relevant point of analysis is whether there is discrimination in "benefit eligibility" among Plan members not

---

[4]     This Court did not find an impermissible intent at the summary judgment stage. Doc. No. 234 at 40 (noting that "[n]o inquiry into legislative purpose is necessary" for facial classifications).

the benefits themselves. 417 U.S. at 496 n.20. The State is entitled to decide "not to create a more comprehensive insurance program" through its "selection of the risks insured by the program." *Id.* at 496. Heightened scrutiny does not apply so long as "[t]here is no risk from which men are protected and women are not," and "there is no risk from which women are protected and men are not." *Id.* at 496–97. The same is true here: there is no equal protection violation because there is no risk from which cisgender plan members are covered and transgender plan members are not, and *vice versa.*

Finally, this Court's opinion semantically distinguishes *Geduldig* by suggesting that the status of being pregnant can be described without consideration of one's biological sex. Doc. No. 234 at 47 ("Pregnancy can be described without reference to sex, gender, or transgender status."). This is an attempt to sidestep *Geduldig* rather than obey it. The Supreme Court in *Geduldig* explicitly defined pregnancy with "reference to sex" ("only women can become pregnant"), and then held that this connection does not have constitutional significance: "it does not follow that every legislative classification concerning pregnancy is a sex-based classification." 417 U.S. at 496 n.20. "Absent a showing that distinctions

involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, <u>just as with respect to any other physical condition</u>." *Id.*[5]

The Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), does nothing to reduce the controlling effect of *Geduldig*. Doc. No. 234 at 44–45. *See Dobbs*, 142 S. Ct. at 2245–46 (quoting *Geduldig*, 417 U.S. at 496 n.20). This Court cited *Bostock* in support of its conclusion that a facial classification exists because "one cannot explain gender dysphoria without referencing sex or a synonym." Doc. No. 234 at 44-45. But *Bostock* only applies in the statutory context of Title VII—not in the context of constitutional rights or the interpretation of the Fourteenth amendment. *Bostock* therefore does not affect *Geduldig*. The Supreme Court expressly limited its holding in *Bostock* to Title VII claims involving employers who fired employees because of their gay or transgender status: "An employer who fires an individual merely

---

[5]   Though not alleged in this case, whether a coverage limitation is a pretext "designed to effect an invidious discrimination," 417 U.S. at 496 n.20, is a factual question for the jury.

for being gay or transgender defies the law." 140 S. Ct. at 1754. The *Bostock* Court held that Congress made a policy choice in the Title VII statute when it commanded that "[a]n individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.'" *Id.* at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality)). The Supreme Court did not hold that the framers and ratifiers of the Fourteenth Amendment made the same policy choice.

The Supreme Court has "never held that the constitutional standard for adjudicating claims of invidious racial [or gender] discrimination is identical to the standards applicable under Title VII." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Purposeful discrimination under the Constitution "requires more than intent as volition or intent as awareness of consequences." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Plaintiffs must prove that the Plan has undertaken a course of action "because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* at 677.

This, in turn, requires the inquiry into discriminatory intent that this Court's summary judgment ruling preempted. *See* Doc. No. 234 at 40 (noting that "[n]o inquiry into legislative purpose is necessary" for facial classifications). Accordingly, this Court's equal protection analysis is also likely to be reversed on appeal as an impermissible misapplication of *Geduldig* and *Bostock*, contrary to the language found in those very decisions.

**C.     This Court's order improperly analyzes the requirement that Plaintiffs must prove they are "similarly situated" for purposes of the Equal Protection Clause.**

Defendants have also raised "a substantial case on the merits" because of this Court's erroneous decision to eliminate Plaintiffs' obligation on summary judgment to prove that they are "similarly situated." "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). This is a foundational requirement of equal protection jurisprudence. *See*, *e.g.*, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (The equal protection

clause "is essentially a direction that all persons similarly situated should be treated alike.").

This Court's analysis ignored Plaintiffs' burden of proof on this point. No physician or health benefits plan can determine whether a treatment is "medically necessary" without reference to the specific diagnosis that the physician intends to treat. Failing to appreciate this, the Court's assertion that transgender Plan members are categorically denied coverage for the same medically necessary treatments is incorrect. As discussed above, the disputed exclusion affects only treatments for a specific diagnosis—gender dysphoria. Plan coverage decisions are based on medical diagnoses, not patient identities. Doc. No. 137 at 10. It is error to compare a transgender patient receiving testosterone for purposes of treating gender dysphoria with another (cisgender or transgender) patient receiving testosterone to treat a different diagnosis entirely.

A similarly situated person for purposes of Plaintiffs' equal protection claim must be a Plan member who has the same medical diagnosis but receives different treatment because of a protected characteristic. In that light, the relevant comparator becomes clear. For example, both a cisgender and transgender woman with cervical cancer

are eligible for a hysterectomy, irrespective of their gender identities. Likewise, neither individual has coverage for this procedure for the purpose of treating gender dysphoria. Both cisgender and transgender men have coverage for an orchiectomy to treat testicular cancer but neither has coverage for this same procedure to treat gender dysphoria.[6] By using the term "medically necessary" healthcare without any connection to the diagnosis that makes such a conclusion possible, this Court erroneously concludes that Plaintiffs are similarly situated to other Plan members (cisgender or transgender) seeking treatments for totally different medical conditions.

This Court's incorrect substantive analysis allowed it to assume away Plaintiffs' burden of proof at summary judgment. Instead of holding Plaintiffs to this burden, this Court considers this analysis to be relevant only as "a <u>justification</u>" by Defendants for the disparate classification <u>after</u> determining the level of scrutiny to apply. Doc. No. 234 at 45 (emphasis in original). In doing so, this Court incorrectly held that "it is

---

[6]    Neither a hysterectomy nor an orchiectomy can be accurately defined or described without reference to "sex" because both procedures are the removal of a sex organ. Even so, a health insurance plan could decide to cover either, or neither, without violating the Fourteenth Amendment—absent proof of purposeful invidious discrimination.

sufficient at this stage that those affected and unaffected by the exclusion are all members of the plan who seek similar or identical treatments." Doc. No. 234 at 45–46. However, Plaintiffs are simply not "similarly situated" to other Plan participants who seek treatment for <u>different medical diagnoses</u>.

## III. Defendants will suffer irreparable injury if the stay is denied.

The second requirement prescribed in *Long* is that Defendants will "suffer irreparable injury if the stay is denied." *Long*, 432 F.2d at 979. The Fourth Circuit interprets this prong to consider "both the extent of injury and the consequences over the long term," not merely whether the injury "cannot be wholly recompensed or eradicated." *City of Alexandria v. Helms*, 719 F.2d 699, 700 (4th Cir. 1983). In their official capacities, Defendants work with the Plan's Board of Trustees to allocate limited public funds to provide the most effective possible healthcare for Plan beneficiaries. If this Court's injunction is enforced throughout the appeal, it will irreparably damage Defendants' ability to carry out this responsibility in two related ways.

The first injury is structural. The injunction permanently and fundamentally jeopardizes Defendants' ability to make what should be essential policy decisions as stewards of the Plan's state-allocated resources. As discussed above, the scope of treatments for which the injunction mandates coverage is unclear, and the potential total cost of those treatments is unknown and unknowable.[7] Accordingly, the injunction leaves Defendants without sufficient information to prioritize among competing costs, allocate funds to the maximum benefit of North Carolina employees, and generally fulfill their roles as fiduciaries of public funds. The potential cost of this Court's injunction reaches beyond the provision of gender-affirming care, threatening the authority of democratically accountable officials to make policy decisions for the people of North Carolina. By infringing that authority, the injunction indefinitely weakens the effectiveness and accountability of the Plan.

---

[7] The list of medical services Plaintiffs have identified as "gender affirming care" is not a fixed list, and it is not limited to benefits provided by the Plan in 2017. Early cost projections cannot account for the continually expanding class of services or accurately identify or project the number of Plan members desiring such treatments. Accordingly, these rudimentary cost projections are of limited value in assessing the impact of the injunction on the Plan.

Case 1:19-cv-00272-LCB-LPA   Document 257   Filed 07/27/22   Page 28 of 34

The second injury is practical. Defendants have no authority to provide or prescribe healthcare services; instead, the Plan must reimburse its 750,000 beneficiaries for those services using its finite resources. Defendants have repeatedly stated that their "fiduciary responsibility to cover basic health" needs with limited dollars requires that they focus on coverage for illnesses that affect many Plan members (diabetes, rheumatoid arthritis, and cancer), not benefits for small "niche groups" (including not only those seeking prescriptions and surgeries to treat gender dysphoria, but plan members seeking specialized infant formula and acupuncture, *etc.*). Doc. No. 197 at 9.

This Court's injunction requires Defendants to provide additional coverage to Plan beneficiaries at a time when the Plan is already experiencing significant financial stress, distorting the Plan's policy determinations on how to allocate finite resources to their most efficient use. Each taxpayer dollar that is diverted to the uncertain costs of gender-affirming healthcare is a dollar that can no longer be directed to medical treatments ranging from major, such as chemotherapy, to mundane, like routine antibiotic prescriptions. These long-term consequences strongly support a stay under the second *Long* factor.

## IV. The interests of other parties and of the public support a stay of the injunction.

To satisfy the third prong identified in *Long*, Defendants must show "that other parties will not be substantially harmed by the stay." *Long*, 432 F.2d at 979. The evidence in the record indicates that Plaintiffs will be unharmed by a stay of the injunction pending appeal. This Court held that Plaintiffs "do not have funds available to pay for treatments and then be reimbursed through monetary damages," Doc No. 234 at 66, but this conclusion is not supported by the record. With the exception of Plaintiff Caraway's intention to seek facial feminization surgeries, Plaintiffs do not identify any planned future surgeries. Doc. Nos. 139-1 at 4-5, 139-2 at 5, 139-4 at 4-5, 139-5 at 4, 140-2 at 8-9, & 153-7 at 4-5. Plaintiffs do not identify the actual costs for ongoing hormone treatment. *Id.* What Plaintiffs primarily seek now is reimbursement even though they have provided no financial statements or other admissible evidence of the costs incurred for these treatments to the Court. This Court cannot conclude that Plaintiffs' <u>need for money</u> is proof that monetary damages are inadequate and that injunctive relief is necessary. Finally, since the challenged exclusion went back into effect in 2018, Plaintiffs have made no attempt to seek a preliminary injunction on the basis that they have

suffered irreparable injury or that they lack an adequate remedy at law. If Plaintiffs are successful on appeal, they will be in the same financial position then as they are now, just as they have been for over four and a half years. The third *Long* factor therefore favors a stay.

The fourth prong of the *Long* analysis requires Defendants to show that "the public interest will be served by granting the stay." 432 F.2d at 979. In its order, this Court stated that "an injunction is likely to cost the public substantially less than awarding damages after-the-fact, since [the Plan] can negotiate lower prices than individual members can negotiate while paying out of pocket." Doc. No. 234 at 66–67. This reasoning disguises a factual assumption as a conclusion without any support in the record. Defendants submit that the public will benefit from the allocation of North Carolina taxpayer dollars by the proper authorities unless and until the validity of the injunction is confirmed on appeal. As discussed with regards to the second *Long* factor above, the public interest is best served by avoiding the potential misapplication of cost constraints and fiscal uncertainty imposed by this Court's injunction.

## CONCLUSION

For the foregoing reasons, Defendants respectfully move this Court to promptly stay its injunction pending the Fourth Circuit's disposition of their appeal.

Respectfully submitted this the 27th day of July, 2022.

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF WORD COUNT

Pursuant to L.R. 7.3(d)(1), the undersigned certifies that this Memorandum complies with the Court's word limit as calculated using the word count feature of the word processing software. Specifically, this Brief contains less than 6,250 words. This count includes the body of the brief and headings, but does not include the caption, signature lines, this certificate, or the certificate of service.

This the 27th day of July, 2022.

*/s/ John G. Knepper*
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

*/s/ Kevin G. Williams*
Kevin G. Williams
N.C. Bar No. 25760

*/s/ Mark A. Jones*
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notification to all counsel of record in this matter.

This the 27th day of July, 2022.


/s/ John G. Knepper
John G. Knepper
Wyo. Bar No. 7-4608
Law Office of John G. Knepper, LLC
1720 Carey Ave. Suite 590
Cheyenne, WY 82001
Telephone: (307) 632-2842
john@knepperllc.com

/s/ Kevin G. Williams
Kevin G. Williams
N.C. Bar No. 25760

/s/ Mark A. Jones
N.C. Bar No. 36215
BELL, DAVIS & PITT, P.A.
100 N. Cherry St. Suite 600
Winston-Salem, NC 27101
Telephone: (336) 722-3700
Facsimile: (336) 722-8153
kwilliams@belldavispitt.com
mjones@belldavispitt.com