IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,                    )
                                            )
                        Plaintiffs,         )
                                            )
            v.                              )
                                            )        1:19CV272
DALE FOLWELL, *et al.*,                     )
                                            )
                        Defendants.         )
                                            )

**MEMORANDUM OPINION AND ORDER
(CORRECTED VERSION)**

LORETTA C. BIGGS, District Judge.

Plaintiffs are transgender individuals or the parents of transgender individuals who receive health insurance through the North Carolina State Health Plan for Teachers and State Employees ("NCSHP" or the "Plan"). (ECF No. 75 ¶¶ 1, 7–12.) They allege that the Plan's categorical exclusion of coverage for treatments "leading to or in connection with sex changes or modifications" discriminates against them on the basis of sex and transgender status in violation of the Equal Protection Clause and the Affordable Care Act ("ACA") and seek declaratory, injunctive, and monetary relief. (*Id.* ¶¶ 1, 139–53, 165–74.) Plaintiff Dana Caraway additionally alleges that NCSHP and her employer, the North Carolina Department of Public Safety ("DPS"), discriminated against her on the basis of sex by offering and administering the Plan in violation of Title VII of the Civil Rights Act of 1964. (*Id.* ¶¶ 175–188.) Before the Court are cross motions for summary judgment filed by DPS, NCSHP, and

1

Plaintiffs, (ECF Nos. 132; 136; 178); Plaintiffs' motions to exclude expert testimony, (ECF Nos. 202; 204; 206; 208; 212); and Plaintiffs' motions to seal, (ECF Nos. 182; 210).[1]

For the reasons stated herein, the Court finds that the Plan's exclusion discriminates based on sex and transgender status in violation of the Equal Protection Clause and discriminates because of sex in violation of Title VII. The Court will reserve a ruling on claims alleged under the ACA pending further Order from this Court.

## I.    BACKGROUND

### A.    Plaintiffs' experiences with the Plan

Plaintiff Connor Thonen-Fleck is a 19-year-old man. (ECF No. 179-2 ¶ 2.) He is also transgender. (Id. ¶ 3.) Thonen-Fleck was "designated 'female' at birth" but identifies and lives his life as a man. (Id.) In his words, he "demonstrated stereotypically masculine tendencies and characteristics from a young age," and by 15 years old, "had socially transitioned and was living in [his] authentic male gender identity in all aspects of [his] life." (Id. ¶¶ 5–6.) His male identity is now reflected in his legal name, gender marker, birth certificate, and driver's license. (Id. ¶ 8.)

Before Connor and his family understood what it meant to be transgender, Connor "was in serious and increasing distress" and suffered from depression and suicidal ideation.

---

[1] These include: a Motion for Summary Judgment filed by Defendant North Carolina Department of Public Safety, (ECF No. 132); a Motion for Partial Summary Judgment filed by Defendants Dale Folwell, Dee Jones, and NCSHP, (ECF No. 136); Plaintiffs' Motion for Summary Judgment, (ECF No. 178); Plaintiffs' Motion to Seal Exhibits to Plaintiffs' Motion for Summary Judgment, (ECF No. 182); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie, (ECF No. 202); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul W. Hruz, (ECF No. 204); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul R. McHugh, (ECF No. 206); Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert, (ECF No. 208); Plaintiff's Motion to Seal portions of Dr. Lappert's report, (ECF No. 210); and Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D., (ECF No. 212).

(*Id.* ¶ 5; ECF No. 179-3 ¶ 6.)   His psychiatrist diagnosed him with gender dysphoria.   (ECF No. 185-1 at 40–41; *see* ECF No. 179-2 ¶ 7.)   Gender dysphoria is "a condition that is characterized by clinically significant distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex."   (ECF No. 219 at 10; *see* ECF No. 197 at 13.)   Treatments may include therapy, medications, or surgery to align the patient's physiology with their identity and "allow[ ] the individual to transition from his or her birth assigned sex to the sex associated with his or her gender identity."   (ECF No. 219 at 10.)   In Connor's case, his physicians recommended counseling, hormone therapy beginning in January 2018, and ultimately chest reconstruction surgery in May 2019 "to bring [his] body into better alignment with [his] gender identity and lived experience and further reduce [his] symptoms of gender dysphoria."   (ECF Nos. 179-2 ¶¶ 7, 9–10; 179-3 ¶ 15.)   In his father's words, "it was clear that being a teenage boy without a typically male chest was very painful for [Connor]."   (ECF No. 179-3 ¶ 13.)

Connor has health insurance through his father, who is a state employee at the University of North Carolina, Greensboro and a member of the North Carolina State Health Plan for Teachers and State Employees ("NCSHP" or the "Plan").   (*Id.* ¶¶ 2–4.)   When Connor was prescribed testosterone treatments in 2018, NCSHP denied coverage due to a categorical exception for "[t]reatment or studies to or in connection with sex changes or modifications and related care."   (*Id.* at 22.)   Connor's chest surgery also was not covered.   (*Id.* ¶ 14.)   As a consequence, the family had to delay the surgery, and Connor worked after school to help raise money for his healthcare.   (*Id.* ¶¶ 14–15; ECF No. 179-2 ¶ 14.)   Eventually, the family saved enough to pay out of pocket.   (ECF No. 179-3 ¶ 15.)   Connor and his father testify that

3

the treatments were "life-changing" and "critical for [his] ongoing development and functioning as a young adult." (*Id.* ¶ 16; ECF No. 179-2 ¶ 16.) Connor will need ongoing access to hormone therapy and anticipates requiring additional surgery to continue treatment of his gender dysphoria. (ECF No. 179-2 ¶ 17.)

Connor's experience is typical of remaining Plaintiffs. Plaintiffs are all current or former North Carolina state employees or dependents of state employees who receive health insurance through NCSHP. (ECF Nos. 179-1 ¶¶ 2, 5; 179-4 ¶¶ 2, 8; 179-5 ¶ 19; 179-6 ¶¶ 2, 5; 179-7 ¶¶ 5–6; 179-9 ¶¶ 2, 16.) Plaintiffs or their dependents identify as transgender. (ECF Nos. 179-1 ¶ 2; 179-4 ¶ 2; 179-5 ¶ 4; 179-7 ¶ 2; 179-9 ¶ 3.) These Plaintiffs each formed their gender identities early in childhood, (*see, e.g.,* ECF No. 179-5 ¶ 6 ("Ever since I was a young child, I have known that I am [a] boy.")); *see generally* ECF Nos. 179-1 ¶ 6; 179-4 ¶ 4–5; 179-6 ¶¶ 7–8; 179-9 ¶ 9), and have suffered from anxiety and depression caused by suppression of their gender identities, discrimination and harassment from peers, and living with physical features not typical of the gender with which they identify, (ECF Nos. 179-1 ¶ 8; 179-4 ¶ 4; 179-5 ¶¶ 13, 24; 179-7 ¶ 7; 179-9 ¶ 11). Each has been diagnosed with gender dysphoria. (ECF Nos. 179-1 ¶ 6; 179-4 ¶¶ 4, 5, 9; 179-5 ¶ 14; 179-7 ¶ 8; 179-9 ¶ 19; 185-1 at 31, 34, 37, 40–41, 43, 60.) And each has been denied coverage for procedures prescribed to treat gender dysphoria, to include puberty delaying medication, hormone therapy, mastectomy, mammaplasty, vaginoplasty, and vocal therapy. (ECF Nos. 179-1 ¶¶ 7, 9–15; 179-4 ¶¶ 9–10; 179-5 ¶¶ 20–22; 179-7 ¶¶ 13–17; 179-9 ¶¶ 20–21, 23–26.)

4

## B.     The Exclusion

The basis for NCSHP's denial of coverage is an exclusion that dates back to the 1990s. (ECF No. 137-2 at 16:10-13.)   The North Carolina General Assembly originally formed NCSHP to administer "one or more group health plans that are comprehensive in coverage" and tasked the State Treasurer, NCSHP Executive Administrator, and NCSHP Board of Trustees with certain "duties and responsibilities as fiduciaries for the Plan." N.C. Gen. Stat. § 135-48.2(a).   The Plan is North Carolina's largest insurer with approximately 740,000 members.  (ECF Nos. 137-1 at 35:9-12; 137-2 at 74:1-5.)   Individual members pay a monthly premium with additional funding coming from the state.   (ECF Nos. 137-2 at 102:22-24, 105:22-24; 137-3 at 1.)  From January to August 2018, NCSHP had collected approximately $2.4 billion in revenue and had a cash balance of approximately $1.1 billion.  (ECF No. 184 at 132, 142.)

The Plan only covers "medically necessary" services but does not cover all medically necessary services.  (ECF No. 137-2 at 58:4-7.)  "Medically necessary services or supplies" are defined by North Carolina statute as those services or supplies that are (1) "[p]rovided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease" and "not for experimental, investigational, or cosmetic purposes," (2) "[n]ecessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms," (3) "[w]ithin generally accepted standard of medical care in the community," and (4) "[n]ot solely for the convenience of the insured, the insured's family, or the provider." N.C. Gen. Stat. § 58-3-200(b).

5

Each year, NCSHP adopts and publishes PPO Plan Benefit Booklets that list the healthcare that is and is not covered by the Plan. (*See* ECF No. 184 at 56–104.) The Plan's third-party administrators, Blue Cross/Blue Shield of North Carolina ("Blue Cross") and CVS/Caremark ("CVS"), then implement the booklet using the national billing practices and medical coding system of the healthcare industry. (ECF Nos. 137-1 at 119:9-10; 197-14 ¶ 11.) From the 1990s to 2016, the Plan contained two exclusions relevant to Plaintiffs' causes of actions. The 2016 Plan did not cover:

- Psychological assessment and psychotherapy treatment in conjunction with proposed gender transformation.

- Treatment or studies leading to or in connection with sex changes or modifications and related care.

(ECF No. 184 at 59–60.) According to Defendants, the first exception has never been implemented and is no longer part of the Plan. (*See* ECF Nos. 137 at 13 n.2; 137-4 ¶ 27.) Blue Cross and CVS do give effect to the second exclusion by identifying specific treatments that are not covered. (ECF No. 137-4 ¶¶ 20–21; *see, e.g.*, ECF No. 179-3 at 12–13.) According to Blue Cross, four procedures are not covered by the Plan "regardless of the diagnostic code," to include "Intersex Surgery, Male to Female," "Intersex Surgery, Female to Male," "Vaginoplasty for Intersex State," and "Clitoroplasty for Intersex State." (ECF No. 137-4 ¶ 20.) Two dozen other procedures are not covered when the procedural diagnostic code is for "Transsexualism" or "Personal history of sex reassignment." (*Id.* ¶ 21.) CVS likewise may deny coverage for medication, such as puberty blockers or hormone treatments, due to the exclusion. (*See* ECF No. 179-3 at 13 (denying coverage for testosterone where the associated diagnosis was "Transsexualism").)

6

The Plan did briefly cover "*Medically necessary* services for the treatment of gender dysphoria" in 2017. (ECF No. 184 at 63.) On May 18, 2016, the U.S. Department of Health and Human Services ("HHS") promulgated a final rule prohibiting "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31375, 31471–72 (May 18, 2016). The NCSHP Board of Trustees acted to comply with the regulation and considered "remov[ing] the blanket exclusions that relate to treatment or studies leading to or in connection with sex changes or modifications and related care" and instead covering "medically necessary services for the treatment of gender dysphoria." (ECF No. 185-2 at 34.) At that time, the Board estimated that coverage would cost between $344,013 and $862,292 per year. (ECF No. 184 at 36.) Ultimately, the Board elected to remove the exclusion only for the 2017 year, and it went back into effect in 2018. (ECF No. 185-2 at 35; *see* ECF No. 184 at 66–67.) The total cost to NCSHP of removing the exclusion in 2017 was $404,609.26. (ECF No. 184 at 23.)

## C.     Scientific background

"The health care community's understanding of what it means to be transgender has advanced greatly over the past century." (ECF No. 219 at 2 (Brief of *Amici Curiae* the American Medical Association, *et al.*).) The health care community now understands that being transgender relates to a person's "internal sense" of gender and is not a psychiatric condition. (*Id.* at 7.) "Every person has a gender identity." (*Id.*) A "cisgender" person's internal gender aligns with their physiological, chromosomal, and birth-assigned sex. (*Id.* at 5.) But not all individuals who "depart from stereotypical male and female appearances and

roles" identify as transgender; rather, transgender individuals are those who "consistently, persistently, and insistently" identify as a gender "different from the sex they were assigned at birth." (*Id.* at 8–9.) Being transgender "implies no impairment in a person's judgment, stability, or general social or vocational capabilities." (*Id.* at 2.)

While being transgender is not itself a psychiatric condition, many transgender individuals experience severe anxiety and distress as a result of having physiology or an assigned sex that does not match their "deeply felt, inherent sense of their gender." (*Id.* at 5, 10 (internal quotations omitted).) Like Plaintiffs, many of these transgender individuals have been diagnosed with gender dysphoria. (*Id.* at 10.) Gender dysphoria is "characterized by clinically significant distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." (*Id.*) The Diagnostic and Statistical Manual of Mental Disorders, volume 5 ("DSM" or "DSM-5"), published by the American Psychiatric Association, provides diagnostic criteria for gender dysphoria in adults, to include "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration," plus "clinically significant distress or impairment in social, occupational, or other important areas of functioning." (*Id.* at 10–11 (quoting DSM-5).)

Gender dysphoria "can cause debilitating distress, depression, impairment of function, self-mutilation to alter one's genitals or secondary sex characteristics, other self-injurious behaviors, and suicide." (*Id.* at 11.) It is treated both through counseling and medical and surgical treatments to bring the patient's physiology in line with their gender identity. (*Id.* at 13.) The World Professional Association for Transgender Health ("WPATH") publishes Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming

People.  (*Id.* at 12.)  The current Standards of Care ("WPATH-7") recommended treatments "include[ ] assessment, counseling, and, as appropriate, social transition, hormone therapy, and surgical interventions."  (*Id.* at 13.)  These treatments are recommended on a case-by-case basis, and "each patient requires an individualized treatment plan that accounts for the patient's specific needs."  (*Id.* at 14.)

Plaintiffs' experts testify that such medical and surgical treatment for gender dysphoria is "medically necessary treatment" for many individuals with gender dysphoria.  (ECF No. 185-1 at 23, 238, 331, 333.)  They testify that these are "safe and effective treatment[s] for gender dysphoria" that are governed by "well-established community standards."  (*Id.* at 23, 192.)  They report that such treatments are supported by "[d]ecades of methodologically sound and rigorous scientific research," and that "every relevant medical and behavioral health association agrees that gender-confirming care is a medically necessary treatment for individuals with gender dysphoria."  (*Id.* at 238, 333.)  Eight professional medical associations agree in their amicus brief with Plaintiffs' experts' assessment.  (*See generally* ECF No. 219.)

Defendants' experts dispute this testimony.  They testify that medical and surgical treatments have significant medical risks and consequences, and the research supporting such treatments is of "low quality."  (ECF Nos. 215-1 at 49, 52, 53, 56; 215-2 at 10, 13; 215-3 at 7, 52–54; 215-4 at 17–19, 29–39.)  They contest the efficacy of the DSM-5 and WPATH-7 and challenge the credibility and motivations of what they call the "Transgender Treatment Industry."  (ECF Nos. 215-1 at 15, 36–40, 47; 215-2 at 6–9, 10–12; 215-3 at 8, 28–31, 36–39; 215-4 at 6–8, 12.)  Some of Defendants' experts testify that gender dysphoria should be treated by counseling alone and medical or surgical interventions are not medically necessary, (*see, e.g.,*

ECF No. 215-3 at 16–17, 50–52), while one testifies that physicians should proceed cautiously in prescribing medication and surgery on a case-by-case basis, (*see* ECF No. 213-3 at 152:20-25)

### D.  Procedural history

Plaintiffs filed their suit on March 11, 2019, against Defendant Dale Folwell, in his official capacity as State Treasurer of North Carolina, Defendant Dee Jones, in her official capacity as Executive Administrator of NCSHP, and NCSHP (collectively, "Health Plan Defendants"), and three public universities: the University of North Carolina at Chapel Hill, North Carolina State University, and the University of North Carolina, Greensboro (collectively, "University Defendants"). (ECF No. 1.) Plaintiffs initially alleged violations of the Equal Protection Clause, Title IX of the Education Amendments of 1972, and the ACA. (*Id.* ¶¶ 124–157.)

University Defendants moved to dismiss Plaintiffs' claims against them on July 8, 2019, for lack of standing and failure to state a claim under Title IX. (ECF No. 30.) Health Plan Defendants likewise filed a motion to dismiss on the same day, arguing that Plaintiffs failed to state claims under the Equal Protection Clause or the ACA. (ECF No. 32.) On March 10, 2020, the Court denied both motions. (ECF No. 45.) Health Plan Defendants filed an interlocutory appeal of their denial on April 8, 2020. (ECF No. 50.) The Fourth Circuit affirmed this Court's Order on September 1, 2021. (ECF Nos. 113; 114.) Health Plan Defendants filed a petition for certiorari in the U.S. Supreme Court on November 8, 2021, (ECF No. 127), which was denied on January 18, 2022, (ECF No. 195).

In the interim, Plaintiffs filed a motion to amend their complaint on August 3, 2020. (ECF No. 62.) Plaintiffs' motion was granted on March 5, 2021. (ECF No. 74.) Plaintiff's First Amended Complaint (the "Complaint") added Dana Caraway as a Plaintiff, DPS as a Defendant, and a fourth cause of action arising under Title VII against NCSHP, DPS, and University Defendants. (ECF No. 75 ¶¶ 12, 18, 130–37.) University Defendants subsequently settled with Plaintiffs and have been dismissed from this suit. (ECF No. 112.)

DPS and Plan Defendants filed their motions for summary judgment on November 30, 2021. (ECF Nos. 132; 136.) Plaintiffs originally filed two summary judgment motions on the same day. (ECF Nos. 138; 152.) On December 10, 2021, the Court struck Plaintiffs' motions and allowed Plaintiffs to file a single dispositive motion with an accompanying memorandum not to exceed 9,000 words. (ECF No. 176.) Plaintiffs then filed their Motion for Summary Judgment on December 20, 2021. (ECF No. 178.) Plaintiffs simultaneously filed a Motion to Seal certain paragraphs of their expert's testimony that describe in detail Plaintiffs' medical history. (ECF No. 182.) Plaintiffs filed their motions to exclude Defendants' experts' testimony on February 2, 2022, along with a motion to seal portions of one expert's report which likewise details Plaintiffs' medical history. (ECF Nos. 202; 204; 206; 208; 210; 212.)

The American Medical Association ("AMA"), American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American Psychiatric Association ("APA"), Endocrine Society, North American Society for Pediatric and Adolescent Gynecology, National Association of Nurse Practitioners in Women's Health, and Society of

OB/GYN Hospitalists, together filed an amicus brief with leave of the Court on April 11, 2022, in support of Plaintiffs' summary judgment motion. (ECF No. 219.)

Trial is set in this case for July 5, 2022. (ECF No. 115.) The parties have filed a Joint Motion to Specially Set Trial and Allow 8-10 Days for Proceedings. (ECF No. 225.)

## II. MOTIONS TO EXCLUDE TESTIMONY

The Court will first address Plaintiffs' motions to exclude expert testimony. The admissibility of expert opinion is governed by Rule 702 of the Federal Rules of Evidence and the Supreme Court's landmark ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:"

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, expert testimony is admissible only if: (1) the expert is qualified, (2) the testimony is relevant, and (3) the testimony is based on reliable scientific methodology.[2] *See Daubert*, 509 U.S. at 594–95. The Court must find these elements "at the outset, . . . by a preponderance of proof." *Id.* at 592; *id.* n.10.

---

[2] Although *Daubert* interpreted an earlier version of Rule 702, "the standard of review that was established for *Daubert* challenges is still appropriate" to assess the admissibility of expert testimony. *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005); *see In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 789 (N.D. Cal. 2020) ("[N]o obvious conflict arises between [Rule 702] as amended and *Daubert*, at least as relevant to the issues in this case."); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) ("Rule 702 was amended specifically to affirm the trial courts role as gatekeeper." (internal quotations omitted)).

An expert is *qualified* if he or she has "specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue." *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019). A witness' qualifications are "liberally judged by Rule 702," and "a person may qualify to render expert testimony in any one of the five ways listed" by the Rule: "knowledge, skill, experience, training, or education." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *see Cooper v. Lab'y Corp. of Am. Holdings*, 150 F.3d 376, 380 (4th Cir. 1998). However, the expert must be qualified to testify "on the issue for which the opinion is proffered." *Kopf*, 993 F.2d at 377. "[G]eneral knowledge," skill, experience, training, or education is insufficient to qualify an expert, and an expert qualified in one field may be unqualified to testify in others. *Cooper*, 150 F.3d at 380–81 (finding that a witness who had "a general knowledge of chemistry" and "experience with breath alcohol testing" was not an expert in "the field of urine alcohol testing"); *see Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 199 (4th Cir. 2013) (finding that a Ph.D.-holding neuropsychologist and neurotoxicologist was not a medical doctor and therefore was "not qualified to diagnose the cause of [plaintiff's] alleged symptoms"); *see also Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.") (collecting cases).

An expert who is qualified must provide testimony that is relevant. An expert's opinion is *relevant* if it "fit[s]" the facts of the case, meaning it has "a valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92. "This ensures that the expert 'helps the trier of fact to understand the evidence or to determine a fact in issue.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th

13

Cir. 2017)). An outmoded or inapplicable standard that "does not even apply to" the facts at issue "categorically lacks 'a valid scientific connection to the pertinent inquiry'" and is "the touchstone of irrelevancy." *Id.* at 289 (quoting *Daubert*, 509 U.S. at 592). "Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Id.* at 281.

Finally, relevant testimony must also by reliable. An expert's opinion is *reliable* if it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Id.* (emphasis omitted) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). While the subject of scientific testimony must not "be 'known' to a certainty," it must be "derived by the scientific method" and "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Reliability is a "flexible" inquiry that must focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95. In *Daubert*, the Court outlined a non-exhaustive list of factors to guide lower courts in assessing reliability, including: (1) whether the theory can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) its potential rate of error; (4) whether standards exist to control the technique's operation; and (5) the degree of acceptance of the methodology within the relevant scientific community. *Id.* at 593–94. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony," and courts have "broad latitude" in choosing which factors are "reasonable measures of reliability in a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 153 (1999).

"One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted

14

independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments); *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 470 (M.D.N.C. 2006); *see McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1008 (4th Cir. 2020) (Agee, J., concurring in part and dissenting in part). "An 'expert' opinion is considered unreliable and inadmissible under *Daubert* where . . . the expert has developed the opinions expressly for purposes of testifying in the case . . . ." *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158, at *5 (4th Cir. 1998) (unpublished); *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014).

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595. Rule 702 "imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis*, 10 F.4th at 281 (internal quotations omitted). A court cannot "abandon the gatekeeping function" by deferring its responsibility to the jury. *Id.* at 282 (quoting *Kumho*, 526 U.S. at 159 (Scalia, J., concurring)). Ultimately, a district court's Rule 702 analysis "necessarily amount[s] to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Belville v. Ford Motor Co.*, 919 F.3d 224, 233 (4th Cir. 2019).

Although Rule 702 "is not intended to serve as a replacement for the adversary system," *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018), this Court takes seriously its gatekeeping role to protect lay

15

jurors from "powerful and quite misleading" expert testimony, *Daubert*, 509 U.S. at 595. The Court will address each of Plaintiffs' motions to exclude expert testimony in turn.

### A.     Dr. Peter Robie (ECF No. 202)

Dr. Peter Robie is a primary care physician and Assistant Professor and Clinical Associate Professor at the Department of Internal Medicine at Wake Forest School of Medicine. (ECF No. 215-5.) Robie is also a member of the NCSHP Board of Trustees and has provided medical knowledge during the Board's deliberations. (*Id.*) Defendants plan to call Robie only to testify (1) "to the medical knowledge he has shared with other Board members" and (2) that "physicians must know the chromosomal sex of patients" to provide competent medical care. (*Id.*) Robie "does not seek to provide testimony on the efficacy of gender dysphoria treatment or the lack thereof" and has not submitted an expert report. (ECF No. 215 at 15.)

Regarding the medical knowledge Robie shared with other Boards members, Defendants do not plan to elicit Robie's expert opinion; rather, he plans to testify as a fact witness to information he provided to the Board. Rule 702 is therefore inapplicable. The Court expresses no opinion on the admissibility or relevance of the proffered testimony.

Regarding Robie's testimony concerning chromosomal sex, Defendants do not explain why they seek to introduce this opinion. Elsewhere, Defendants have argued that "[h]ealthcare providers must know a patient's sex for *every* medical diagnosis" to rebut a hypothetical argument that "*any* coverage decision is subject to heightened scrutiny if *the healthcare provider* considered the patient's biological sex as part of the diagnostic process." (ECF No. 197 at 32.) However, in Section III.A.i., *infra*, this Court finds that heightened

Case 1:19-cv-00272-LCB-LPA   Document 261   Filed 08/10/22   Page 16 of 73

scrutiny is appropriate in this case because the *Plan* discriminates based on sex on its face, not because Plaintiffs' medical providers considered their sexes. Thus, Robie's testimony is not relevant to any fact at issue. Regardless, Robie's failure to submit an expert report or provide any basis for his opinion other than a vague reference to his years of practice precludes this Court from finding that his expert opinion is based on a reliable methodology under Rule 702.

Accordingly, Plaintiffs' motion to exclude Robie as an expert witness will be granted. This Court expresses no opinion as to whether he may be called as a fact witness.

### B.    Dr. Paul Hruz (ECF No. 204)

Dr. Hruz is a board-certified specialist in pediatric endocrinology, Associate Professor of Pediatrics in the Division of Pediatric Endocrinology and Diabetes and Associate Professor of Cellular Biology and Physiology in the Division of Biology and Biological Sciences at Washington University School of Medicine in St. Louis, Missouri. (ECF No. 215-3 ¶¶ 2–3.) He holds a Ph.D. and M.D. from the Medical College of Wisconsin. (*Id.* at ¶ 2.) He additionally served as chief of the Division of Pediatric Endocrinology and Diabetes at Washington University from 2012–2017 and Director of the Pediatric Endocrinology Fellowship Program from 2008–2016. (*Id.*) He has published 60 scholarly articles over two decades in the fields of metabolism, cardiology, HIV, and ethics. (*Id.* ¶ 4.) He was a founding member of Washington University's multidisciplinary Disorders of Sexual Development program and has participated in the care of hundreds of infants and children, including adolescents, with disorders of sexual development during his career. (*Id.* ¶ 6.)

Hruz offers a wide range of conclusions that fall into five main categories: mental healthcare, medical and surgical care, informed consent, criticism of medical associations, and

political criticisms. First, he offers several opinions on the mental health treatment of gender dysphoria, to include that "[m]ental health care professionals are unreliable human 'lie detectors' [whose diagnoses are] 'often no better than flipping a coin,'" (*id.* ¶ 28); that the DSM is scientifically unreliable; (*see id.* ¶ 13.B); that gender dysphoria is caused by a "social contagion," (*id.* ¶ 41); that "the vast majority of children who report gender dysphoria" will "desist," meaning that "if left untreated, [they will] grow out of the problem . . . and willingly accept their biological sex," (*id.* ¶¶ 8, 53); and that a "watchful waiting" approach whereby mental health providers "neither encourage nor discourage transgender identification" is the most effective form of treatment, (*id.* ¶¶ 52–53). Second, he will testify to the risks associated with hormone treatments and surgery to treat gender dysphoria, particularly in prepubescent children. (*Id.* ¶¶ 57, 58, 60.) Third, he will testify that healthcare providers often fail to obtain informed consent from patients by inaccurately describing the risks associated with hormone therapy or surgery. (*Id.* ¶ 36.) Fourth, he will criticize organizations that support gender affirming care, such as the AMA, WPATH, and the American Psychiatric Association, as unscientific and politically motivated. (*See e.g. id.* ¶ 34.A.) Fifth, he will testify that "Cancel Culture," "transgender and allied political activists," and the "Transgender Treatment Industry" are attempting to "silence open public debate on the risks and benefits of transgender medical procedures and political ideologies." (*Id.* ¶¶ 64–66.)

Plaintiffs have offered evidence that calls Hruz's motivations—and thereby, his reliability—into serious question. Hruz admits a connection to the Alliance Defending Freedom ("ADF"), a political organization with both "moral objections" and scientific objections to the treatments at issue. (ECF Nos. 205-2 at 241:10–242:15; 209-3 at 81:5-13.)

Early in his research of gender dysphoria, Hruz told a fellow doctor that he had "a significant problem with the entire issue" and "whole idea of transgender." (ECF No. 205-10 ¶ 11–13 (testifying that Hruz's concerns about the relevant treatments were not "based on science" but rather were "a matter of [his] faith").) Hruz does not recall making these statements. (ECF No. 205-2 at 249:19–251:6.) Hruz also met with parents of transgender children early in his research "to understand the unique difficulties experienced by this patient population." (ECF No. 215-3 ¶ 7.) One such parent testifies that the conversation had a "religious tone" and was not "based on science," and that Hruz "kept insisting that [her] child was not normal and would never be normal," that "the idea of doing surgeries on transgender people is—is wrong," and in response to her assertion that transgender children without supportive parents are at an increased risk of suicide, that "[s]ome children are born in this world to suffer and die." (ECF No. 205-11 at 27:17-24, 28:20-23, 29:21–30:1, 37:13-19.) Plaintiffs argue that this evidence shows Hruz's "expert" testimony did not grow naturally from his work as an endocrinologist; rather, he manufactured his opinions expressly for purposes of testifying against medical care against which he has moral and political objections.

Based on the preponderance of the evidence, this Court finds the following:

First, Hruz is not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will "desist," or the efficacy of mental health treatments. Hruz is not a psychiatrist, psychologist, or mental healthcare professional. He has never diagnosed a patient with gender dysphoria, treated gender dysphoria, treated a transgender patient, conducted any original research about gender dysphoria diagnosis or its causes, or published any scientific, peer-reviewed literature

19

on gender dysphoria. (ECF Nos. 205-2 at 35:5–36:11, 42:14–49:23, 88:18–90:6; 205-4 at 24:11-14, 25:20-23, 61:17–64:7.) Merely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Second, Hruz is qualified as an endocrinologist to testify to the risks associated with puberty blocking medication and hormone therapy. This testimony is broadly relevant to assessing whether the Plan's exclusion is substantially related to the state's interest in protecting employees and the public from ineffective medical treatments. It also appears sufficiently reliable, as it is based on Hruz's long career treating patients and conducting academic research on the effects of hormone treatments. However, Hruz's testimony that focuses on the risks associated with providing hormone therapy to prepubescent children— children who have not begun puberty—is not relevant. (*See, e.g.*, ECF No. 215-3 ¶ 54.) By his own admission, "no medical and surgical interventions are initiated until after the onset of puberty" under any model of treatment, (ECF No. 205-2 at 125:23–126:5), and Plaintiffs appear to concede that hormone treatment is not medically necessary to treat gender dysphoria in prepubescent children, (ECF No. 205 at 11–12). In this case, the youngest Plaintiff received puberty blocking medication when puberty began around age 12. (*See* ECF No. 179-5 ¶¶ 13– 14.) Thus, a discussion of risks to prepubescent children is irrelevant to this case and would likely serve only to confuse the jury. Additionally, Hruz is not a surgeon and has no experience with surgery for gender dysphoria and, therefore, is not qualified to testify to the risks

20

associated with surgery or the standard of care used by surgeons for obtaining informed consent for surgery.

Third, Hruz provides no scientific basis to his conclusion that "parents are often manipulated and coerced by misinformed political activists or providers who threaten them with dire warnings that the only two options are 'treatment or suicide'" or that endocrinologists generally do not obtain informed consent from their gender dysphoric patients. Hruz is not a statistician and does not discuss in his report how he came to those conclusions, what data he relied upon, or what methodology he applied to that data. This testimony will therefore be excluded as unreliable.

Fourth, it does not appear that Hruz has any experience with the AMA, WPATH, or American Psychological Association upon which to base his criticisms. (*See* ECF No. 215-3 ¶ 34.) He is therefore not qualified to testify about the credibility of those organizations. Moreover, Hruz's criticism of the AMA appears largely based on its historical support of eugenics procedures not at issue in this case, and Hruz has not explained what scientific methodology if any he used to compare and contrast treatment of gender dysphoria with the eugenics movement. (*See id.* ¶ 34.A.) Hruz is not qualified to opine on the deficiencies of the DSM and the American Psychological because he is not a mental health professional. (*See id.* ¶ 34.C.) Given that other of Defendants' experts are intimately familiar with the "consensus building" method employed by WPATH, the AMA, and similar organizations, the Court finds that Hruz has not offered any reliable testimony on this subject that will help the trier of fact.

Finally, it does not appear that his repeated references in his report to a "Gender Transition Industry," "Cancel Culture," and political activists working to "silence open public

debate" has any basis, scientific or otherwise. (*See id.* ¶ 65.) He provides no evidence of such a conspiracy or any reliable methodology supporting his opinion as required by Rule 702. Rather, his conspiratorial intimations and outright accusations sound in political hyperbole and pose a clear risk of inflaming the jury and prejudicing Plaintiffs. It is the Federal Rules of Evidence, not some "Cancel Culture," that excludes this portion of Hruz's testimony. Since these claims are not based in any methodology and will not assist the trier of fact, this testimony is inadmissible.

Accordingly, Plaintiffs' motion will be granted in part and denied in part, and Hruz is limited in his testimony to a discussion of the risks associated with prescribing hormone treatments to adolescents and adults.

### C. Dr. Paul R. McHugh (ECF No. 206)

Dr. Paul R. McHugh is a licensed psychiatrist and Distinguished Service Professor of Psychiatry at Johns Hopkins University School of Medicine with more than fifty years of experience. (ECF No. 215-2 at 1–2.) He holds an M.D. from Harvard Medical School and was qualified in both Psychiatry and Neurology by the American Board of Psychology and Neurology. (*Id.*) He served as director of the Department of Psychiatry and Behavioral Science at Johns Hopkins Medical School and psychiatrist-in-chief at Johns Hopkins Hospital for nearly 30 years and served as Chairman of the Medical Board of Johns Hopkins University Hospital from 1984–1989. (*Id.* at 2.) He has published several books and numerous peer reviewed articles in scientific journals. (*Id.* at 3.) He was elected to the Institute of Medicine of the National Academies of Science in 1992 and is a Distinguished Life Fellow of the American Psychiatric Association. (*Id.* at 4.)

22

McHugh's fifteen-page report offers cursory opinions on a wide range of topics. According to their brief, Defendants primarily seek to elicit from McHugh testimony that the DSM is unreliable and was not scientifically formed, and that no rigorous scientific research proves that medical or surgical treatments for gender dysphoria will improve the wellbeing of patients. (ECF No. 215 at 28–31.) His report also contains several "Summary Opinions" on the causes of gender dysphoria, rates of desistence, and acceptance of treatments within the medical community. (ECF No. 215-2 at 12–14.)

Based on the preponderance of the evidence, the Court finds that McHugh is qualified as an expert in the field of psychiatry by his more than fifty years of experience as a psychiatrist and academic. Further, his general description of the process by which the current edition of the DSM was created and opinion about the scientific limitations of such a process are broadly relevant to rebut Plaintiffs' expert testimony, as Plaintiffs' experts use and rely on the DSM's definition of gender dysphoria. This testimony is based in McHugh's personal knowledge and experience and is sufficiently reliable to be admissible.

However, Defendants have failed to show that McHugh's more specific criticisms of the DSM's approach to gender dysphoria are relevant or based on reliable science. McHugh's primary criticisms of the DSM come from his work on various "Psychiatric Misadventures," to include "lobotomies," "repressed memory therapy," and "multiple personality disorder"— issues that are not relevant to this case. (*See id.* at 5–6, 9–10.) To the extent he offers this testimony to show that treatment for gender dysphoria is "yet another Psychiatric Misadventure," (*id.* at 10–11), his argument-by-analogy does not appear to be based on any

23

reliable scientific methodology. Instead, he simply suggests that, because the DSM was wrong before, it might be wrong again. Such speculation is inadmissible under Rule 702.

Next, he testifies that "national research reviews in England, Sweden, and Finland as well [as] a Chochrane Review and studies by multiple researchers have concluded that the evidentiary base for these experimental treatments [for gender dysphoria] is weak and demonstrates few benefits or actually shows this procedures [sic] can cause more harm than good." (*Id.* at 10.) But his report does not cite to any such reviews or studies, (*id.*), and when questioned about them at deposition, he could not recall if the "national reviews" in England or Finland were peer-reviewed or published in scientific journals, and admitted that the Swedish "national review" was not a national review at all, but rather an academic scientific study by Swedish researchers, (ECF No. 207-3 at 300:19–301:20, 302:20–303:6). The Court therefore finds that McHugh's discussion of such studies is not based on reliable science.

Similarly, he testifies without any definition, explanation, or supportive methodology that "the exponential growth [of gender dysphoria] in patients was indeed predicted and is readily explained by a social contagion theory." (ECF No. 215-2 at 11 ("[S]ocial contagion *seems* more likely." (emphasis added)).) He supports this claim with a citation to his own article coauthored by Hruz and published in *The New Atlantis*, (*id.*), which he admits is neither a peer-reviewed nor a scientific publication, (ECF No. 207-3 at 264:1-19). He readily concedes that the number of gender dysphoric patients who have been influenced by a social contagion is "currently unknown" and that his opinion is "a hypothesis and not a statement of fact"; he fails to address whether his "social contagion" hypothesis has been tested or peer-reviewed, if there is a known error rate, or what standards exist to measure its reliability; and it is clear that

24

his theory has not been accepted by relevant scientific community. (ECF Nos. 207-3 at 299:14–300:5; 215-2 at 13.) Instead, he advocates that research be done on this theory. (*See* ECF No. 215-2 at 12 ("The Transgender Treatment Industry has failed to conduct competent research on the social contagion theory."), 13 ("Detailed psycho-social investigations of such patients [who were manipulated by a source of social contagion] may be necessary.").) Thus, the Court finds that McHugh's speculative opinions on "social contagion" hypotheses are inadmissible.

Finally, he testifies that his views on the DSM "is generally accepted by the relevant scientific community." (*Id.* at 8.) His support for this assertion is based on blog posts and an inaccurate claim that the National Institute of Mental Health ("NIMH") withdrew support from the DSM. (*Id.* at 7–8.) He acknowledged during deposition, however, that "[t]he National Institute of Mental Health has not changed its position on DSM-5" and still considers the DSM to be "the best information currently available for clinical diagnosis of mental disorders." (ECF No. 207-2 at 116:10–117:17, 119:3–122:11.) Further, McHugh gives no explanation or reasoning to support the "summary opinions" tacked on to the end of his report, giving the Court no meaningful way to assess their reliability. Thus, the Court finds that these opinions are likewise unreliable and inadmissible.

Accordingly, Plaintiffs' motion will be granted in part and denied in part, and McHugh is limited to testifying about the process by which the DSM was formed and his opinion about the limited scientific reliability of such a process generally.

25

### D.     Dr. Patrick W. Lappert (ECF No. 208)

Dr. Patrick W. Lappert is a retired plastic and reconstructive surgeon with experience in the United States Navy and Marine Corps, university teaching hospitals, and private practice. (ECF Nos. 215-4 at 1–3; 209-3 at 475:11-19.)  During his 24 years of military service, he served in a number of roles, to include flight surgeon, Chairman of the Department of Plastic and Reconstructive Surgery at the Naval Hospital in Portsmouth, Virginia, and Specialty Leader for Plastic Reconstructive Surgery for the Surgeon General of the Navy. (ECF No. 215-4 at 2–3.)  He also served during this period as Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery.  (*Id.* at 2.)  He has several publications in peer-reviewed medical journals and one medical textbook, the most recent of which was published in 2000.  (*Id.* at 3.)  He retired from the Navy in 2002 and entered private practice as a solo practitioner.  (*Id.* at 3–4; ECF No. 209-3 at 475:11-19.)  He was board certified in surgery from 1992–2002 and in plastic surgery from 1997–2018.  (ECF Nos. 215-4 at 2; 209-3 at 23:10-18.)  He retired from active surgical practice in August 2020.  (ECF No. 209-3 at 24:22–25:11.)  During his career, he treated thousands of patients, performed many of the surgeries at issue in this case to treat ailments other than gender dysphoria, and treated transgender patients during transition and de-transition.  (ECF No. 215-4 at 4.)

Lappert primarily seeks to offer opinions that surgical treatments for gender dysphoria are not supported by rigorous scientific study and pose severe health risks.  (*See id.* at 5–10, 17–20, 29–39.)  He additionally offers opinions on the reliability of the DSM, WPATH, and professional medical organizations; the frequency of desistance or "de-transitioning"; requirements of informed consent; and acceptance of gender dysphoria treatments by the

26

relevant scientific community. (*Id.* at 15–17, 21–25, 40.) Finally, he offers specific opinions about the medical care received by Plaintiffs based on their medical records. (ECF No. 211-2 at 49–57.)

As with Hruz, Plaintiffs offer evidence that calls Lappert's bias and reliability into serious question. Like Hruz, Lappert has worked closely with ADF. Lappert attended an ADF-sponsored conference in which a speaker lamented the "poverty of [experts] who are willing to testify" against the treatments at issue in this case, and where attendees "were asked whether they would be willing to participate as expert witnesses." (ECF No. 209-2 at 90:13–91:13.) Prior to attending this conference, he had not been published on gender dysphoria or the risks of hormone blockers or served as an expert witness, although he had spoken publicly about gender dysphoria. (*Id.* at 84:3–85:4.) Since attending, he has "actively lobbied" for laws that would prohibit doctors from offering medical or surgical treatments for gender dysphoria to adolescents in Alabama, Arkansas, Texas, and Utah, and agreed in deposition that doctors offering these treatments should be "criminally prosecute[d]." (*Id.* at 52:4-18, 54:7–55:2, 57:8-15, 61:16–64:20.) And he has stated publicly that parents who "discuss[ ] gender identity issues with children" are "sexualizing them" and "grooming a generation." (*Id.* at 461:1–462:5). As with Dr. Hruz, Plaintiffs argue that Lappert's testimony did not grow naturally from his research, but was instead crafted at ADF's request for purposes of litigation.

Based on the preponderance of the evidence, the Court finds the following:

i.       Qualifications

Lappert is qualified as an expert in plastic surgery. He is thus qualified to opine on the risks associated with surgery used to treat gender dysphoria, the role surgeons play in treating

27

gender dysphoria under the WPATH standards, the standard of care of informed consent among surgeons, the perspective of the relevant plastic surgeon community, and whether the surgeons obtained informed consent in Plaintiffs' specific cases. Plaintiffs argue that he is not qualified because he has not performed any of the procedures at issue in this case within the last three years as required of experts by the Code of Ethics of the American Society of Plastic Surgeons ("ASPS"). (ECF Nos. 209 at 8; 209-5 §§ 2.IV1, VII.F.) Although Lappert's failure to qualify as an expert under the ASPS requirements weighs against his qualification, the preponderance of evidence, including his extensive career and relatively recent retirement, supports that he is qualified to offer expert testimony in the field of plastic surgery.

Lappert is not qualified to render opinions about the diagnosis of gender dysphoria, its possible causes, the efficacy of the DSM, the efficacy of puberty blocking medication or hormone treatments, the appropriate standard of informed consent for mental health professionals or endocrinologists, or any opinion on the non-surgical treatments obtained by Plaintiffs. Lappert is not a psychiatrist, psychologist, or mental health professional, nor has he ever diagnosed a patient with gender dysphoria. He is not an endocrinologist, nor has he ever treated a patient with hormone therapies. By his own admission, he "do[es] not hold [himself] out as an expert in diagnosing mental health conditions outside, potentially, of body dysmorphic disorder" and does not have any "expertise in treating mental health conditions." (ECF No. 209-3 at 75:7-16.)

Lappert is also not qualified to opine on the efficacy of randomized clinical trials, cohort studies, or other longitudinal, epidemiological, or statistical studies of gender dysphoria. He is not a statistician or epidemiologist, and there is no evidence in his report or deposition

that he has any experience, specialized training, or knowledge about crafting a research study, analyzing data, or conducting a clinical trial. (*See generally id.* at 129:13–134:19.) His publications appear to include case reports and opinion essays, and he has not published any original research in two decades. (*Id.*) His brief academic career appears limited to teaching and overseeing clinic practitioners, not conducting research. (ECF No. 215-4 at 2–4.) Just as an epidemiologist or statistician would not be qualified to perform surgery, a surgeon with little to no research experience is not qualified to opine on the veracity of statistical studies.

Last, Lappert is qualified to testify to his personal, anecdotal experience treating patients who sought treatment to, in Lappert's words, "de-transition." He is not qualified, however, to offer expert opinions on the rates of desistance and "de-transitioning" among gender dysphoric patients generally for the reasons above.

        ii.    <u>Relevance</u>

Lappert's testimony concerning surgical risks, the role of the surgeon under WPATH, the plastic surgeon community, and anecdotal experience with "de-transitioning" are all relevant to assessing whether the Plan's exclusion is substantially related to the state's interest in protecting employees and the public from ineffective medical treatments. His testimony concerning informed consent, however, is irrelevant. First, his testimony that Plaintiff Thonen-Fleck was incapable of giving informed consent is based on his age, history with mental illness, and lack of medication. (ECF No. 211-2 at 53–54.) Even if true, Lappert does not dispute that Thonen-Fleck's father was able to (and did) give informed consent. (*See* ECF No. 179-3 ¶ 13 ("Based on medical advice, I understand this surgery to have been medically necessary.").) Lappert's broader discussion of informed consent merely sets up his conclusion

that surgeons are not adhering to that standard of care generally—a speculative conclusion that is not supported by any survey or data, scientific or otherwise. Thus, Lappert's discussion of informed consent is not admissible.

iii.     Reliability

First, Lappert's testimony concerning the risks associated with certain surgeries appears to be based on his professional experience and training and sufficiently reliable to be admitted under Rule 702. Additionally, his anecdotal testimony concerning "de-transitioning" is admissible but is not a reliable basis for any broader opinion about the rates of desistance, the likelihood that gender dysphoric patients will later "de-transition," or the general efficacy of surgical treatment for gender dysphoria.

Second, his testimony concerning the role of the surgeon under the WPATH guidelines, and more specifically his criticism that surgeons are not able or required to verify a gender dysphoria diagnosis, appears to arise from his extensive experience as a plastic surgeon and is admissible. However, his broader criticism of WPATH-7 appears to be unscientific opinion and speculation. (ECF No. 209-3 at 184:3-6, 186:23–187:5, 188:15-18 (conceding that he has "not been involved with the development" of WPATH-7, does not "know what kind of scientific literature [review] the WPATH conducted as part of drafting" WPATH-7, and is "not an expert on how Version 7 of the WPATH was developed").) Likewise, in addition to not being qualified in endocrinology or psychiatry, he has not shown the reliability of his criticisms of the Endocrine Society's Guidelines for Treatment of Gender Dysphoria, (*id.* at 200:12-18 (agreeing that he is "not an expert in how the Endocrine Society developed" its guidelines)); the DSM-5, (*id.* at 193:14-18 (agreeing that he "do[es] not have

expert firsthand knowledge of how the DSM-5 was developed"); the AMA's position on these treatments, (*id.* at 47:13-18 (stating he does not have "personal knowledge" of "how the AMA came to issue [its] consensus statement")); or the American Academy of Pediatrics' position, (*id.* at 48:14-23 (admitting he has no "personal knowledge" of how the position was adopted)). And as with Dr. Hruz and Dr. McHugh, Lappert's analogy of treatments of gender dysphoria to eugenics efforts in the early and mid-twentieth century lack any reference to what scientific methodology he used to compare and contrast the treatments.

Third, Lappert has provided the Court with no data or methodology used to draw his conclusion that surgical treatment for gender dysphoria has "never been generally accepted by the relevant scientific community." (*See* ECF No. 215-4 at 22.) Lappert agrees that "every major expert medical association disagrees with [him]" and have "all taken [the] position that this treatment is in fact medically necessary," (ECF No. 209-2 at 40:15-22), and virtually every major health insurer agrees, (*id.* at 384:21–385:3, 427:4–428:7, 430:12–431:6, 434:17–434:20; *see* ECF Nos. 209-10 at 2; 209-11 at 1–4; 209-12 at 3–8; 209-13 at 2–3)). There is no evidence that he has conducted any surveys that would support his repeated conclusory claims concerning the "<u>relevant scientific communities</u> (biology, genetics, neonatolgy [sic], medicine, psychology, etc.)." (ECF No. 215-4 at 40.) Thus, Defendants have failed to meet their burden to show that this testimony is based on reliable science.

Finally, Lappert makes repeated references in his report to a "Transgender Treatment Industry ('TTI')." (*See id.* at 12.) He opines that "[m]embers of the TTI have a vested interest in believing that science has already justified their existence," asks "[w]ill one day the medical profession look at support for transitioning youth in the same manner the eugenics movement

31

is now regarded?", and hypothesizes that healthcare providers "want the patient to suffer depression and anxiety [because] *such untreated suffering motivates vulnerable patients* to undergo the often painful and damaging experimental 'transitioning' process." (*Id.* at 12, 15.) In his deposition, however, he made clear that he does not "know where [the term TTI] came from" does not "know who originated it," and doesn't "know even if it was me that originated it, actually." (ECF No. 209-3 at 19:19–20:2.) He is not aware of any peer-reviewed scientific article that has used that term. (*Id.* at 20:17-21.) Thus, the Court finds that references to a Transgender or Gender Treatment Industry and related conspiratorial accusations are nothing more than rank speculation designed to distract or inflame the jury and has no business in expert testimony.

Accordingly, Plaintiffs' motion will be granted in part and denied in part, and Lappert is limited to testifying to (1) the risks associated with the surgeries at issue in this case; (2) his anecdotal experience treating patients seeking to "de-transition"; and (3) the WPATH recommended role of the surgeon in treating gender dysphoria as compared to the role of the surgeon in other surgical contexts.

### E. Stephen B. Levine, M.D. (ECF No. 212)

Dr. Stephen B. Levine is a licensed physician and Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine. (ECF No. 215-1 ¶ 1.) He holds an M.D. from Case Western and has received numerous grants for scientific research and program development. (*Id.*) He maintains an active private clinical practice and specializes in treatment of "psychological problems and conditions relating to sexuality and sexual relations including sexual identity issues, therapies for sexual problems, and the relationship between

love and intimate relationships and wider mental health." (*Id.* ¶¶ 1–2.) He is the recipient of the Masters and Johnson Lifetime Achievement Award from the Society of Sex Therapy and Research and is a Distinguished Life Fellow of the American Psychiatric Association. (*Id.* ¶ 2.) He serves as Co-Director of the Gender Diversity Clinic, which he founded at Case Western in 1974. (*Id.* ¶ 3.) He has treated dozens of transgender patients through the clinic and supervised other therapists. (*Id.*) He was an early member of the organization now called WPATH and served as the Chairman of the WPATH Standards of Care Committee that developed WPATH-5. (*Id.*)

Levine's testimony primarily falls into three categories: the risks of medical and surgical treatment to children, the function of WPATH, and the quality of research supporting medical and surgical care for gender dysphoria. First, he testifies that "active affirmation of transgender identity in young children . . . raises ethical and public health concerns." (*Id.* ¶ 8(e).) He testifies that healthcare providers should "delay any transitions [until] after the onset of puberty," that "*encouraging social transition in children remains controversial*," that a majority of prepubescent children diagnosed with gender dysphoria will desist, and that mental health professionals should employ psychotherapy and a "watchful waiting approach" in treating children with gender dysphoria. (*Id.* ¶¶ 29, 38, 54, 62.) Second, he "provide[s] some context concerning" WPATH, which he calls a "private, activist, non-science, organization." (*Id.* ¶¶ 45–53.) Finally, he testifies that the scientific research demonstrating the benefits of medical and surgical treatments of gender dysphoria are of "low quality." (*Id.* ¶ 68(g).)

Notably, Levine does not testify that medical and surgical care for gender dysphoria is categorically inappropriate. (*See, e.g., id.* ¶ 43 ("In my opinion, it is not possible to make a

single, categorical statement about the proper treatment of children presenting with gender dysphoria or other gender-related issues.") Despite his view that only "low quality" evidence supports the efficacy of these treatments, he does not advocate for "denying endocrine treatment or surgical treatment" to all transgender people, a position he calls "draconian," (ECF No. 213-3 at 73:4-7, 84:21–85:11, ("I'm not advocating denying endocrine treatment or surgical treatment."), 152:1-6, 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that.").) He concedes that he does not know how often medical or surgical care helps alleviate symptoms of gender dysphoria and does not offer an opinion as to the portion of these procedures that are necessary and unnecessary. (*Id.* at 67:24–68:3 ("It is not our [clinic's] knowledge base to know who's going to do better and who's going to do worse and who is not going to have any difference at all with hormones or with surgery.").) He testifies that this lack of high-quality evidence should encourage physicians treating gender dysphoria to be "cautious" and that transgender patients "have a right to be more fully informed" about the risks and rewards of such care, but ultimately agrees that "doctor[s] need to decide" when medical and surgical care is necessary on "a case-by-case basis." (*Id.* at 152:20-25; ECF No. 215-1 ¶ 126 ("Science not politics needs to drive trans care.").) In his own practice, Levine adheres to the WPATH Standards of Care and personally provides letters of authorization for medical and surgical treatments for his gender dysphoric patients after advising them on the risks associated with those treatments. (ECF No. 213-3 at 55:13-17, 56:2-5, 112:16-21, 176:8-16, 225:24–226:17.) Levine testifies anecdotally that "[i]n [his] experience," mental health providers "too often encourage or permit decision based on a great deal of patient and professional blind optimism" and fail to adequately inform patients

34

of the inadequacies in the research supporting treatments for gender dysphoria. (ECF No. 215-1 ¶ 105.) He does not offer any quantifiable metrics to identify how many doctors provide informed consent and proceed with caution, and how many do not.

Based on the preponderance of the evidence, the Court finds that Levine is qualified as both a mental health provider and researcher. He is qualified to offer expert testimony on the treatment of gender dysphoria and the efficacy and findings of research studies evaluating gender dysphoria treatments. His personal work treating transgender patients, extensive experience conducting scientific research, review of the relevant literature, and thorough discussion of relevant scientific studies in his report qualify him as an expert witness. The Court additionally finds the following:

First, Levine's testimony concerning the risks of medical and surgical treatment for adolescents is relevant to assessing whether the Plan's exclusion is substantially related to Defendants' governmental interest in protecting employees and the public from ineffective medical treatments. However, Levine's criticism of medical or surgical treatment of gender dysphoria in prepubescent children is not relevant, as Plaintiffs have conceded that such treatments are not medically necessary until the onset of puberty. *See* Section II.B, *supra*. Likewise, Levine's opinions on mental health approaches to social transition are irrelevant as well, as Defendants maintain that the Plan's exclusion of coverage for mental health treatments of gender dysphoria has never been given effect and is no longer part of the Plan. (*See* ECF Nos. 137 n.2; 137-4 ¶ 27.)

Second, Levine is qualified by his personal experience with WPATH to provide background and critique the WPATH Standards of Care. This testimony is relevant to rebut

35

Plaintiffs' experts who appear to use and rely in part on the WPATH-7 and is reliably based on Levine's expert knowledge and personal experience with the organization.

Third, Levine's analysis of the relevant scientific research supporting gender affirming medical care is relevant to assessing whether the Plan's exclusion is substantially related to Defendants' governmental interest in protecting employees and the public from ineffective medical treatments. Further, his opinion that the available scientific research is of "low quality" appears reliably based on his review of the relevant literature, experience conducting scientific research, and a "widely accepted hierarchy of reliability" that distinguishes between case studies on the "low" end and randomized double-blind clinical trials on the "high" end. (*See* ECF No. 215-1 ¶ 68.) His criticism of the methodology of some of these studies similarly appears reliable.[3] (*Id.* ¶¶ 74–79.)

However, Levine's testimony regarding desistance rates does not appear to be based on reliable methodology. During deposition, Levine was unable to recall many of the studies that purportedly support his conclusion. (ECF No. 213-3 at 191:20-192:14.) His anecdotal testimony concerning adults and adolescents who regret their transitions appears to be based on a misreading of an article that reviewed entries on the website Reddit. (*See* ECF No. 215-1 ¶¶ 35, 56, 98.) He admitted during deposition that the article referred to 16,000 entries— not 60,000, as he repeatedly stated in his report—and that he had no knowledge of the content

---

[3] Contrary to Plaintiffs' characterization, Levine does not testify that medical or surgical treatment of gender dysphoria *increases* a patient's chance of negative mental health outcomes, but rather that, in his view, no reliable studies show that such treatments *reduce* the likelihood of such outcomes. (ECF No. 215-1 ¶¶ 74–79.)

of those entries or whether any of the authors actually de-transitioned or regret their transitions. (*Id.* at 196:3-7, 201:12-25)

Fourth, as discussed, it does not appear that he offers any categorical opinion as to the medical necessity of medical and surgical treatments of gender dysphoria, nor does he testify that healthcare providers are prescribing such treatment without due caution and informed consent beyond his anecdotal "experience." To the extent that Defendants seek to introduce testimony from Levine to that effect, he has not provided the Court with any data or methodology from which such claims could be made. Levine has conducted no research to identify which physicians are proceeding as he does and which do not, rendering any broader opinion about the practice of such healthcare providers pure speculation.

Finally, for the same reasons identified regarding Dr. Lappert, *supra*, Levine's reference to a "Transgender Treatment Industry" does not appear to be based on any science whatsoever and is not admissible.

In sum, Plaintiffs' motion will be granted in part and denied in part, and Levine's testimony will be limited to (1) identifying risks associated with prescribing medication and surgery to adolescents, (2) discussing WPATH, and (3) criticizing the quality of the research on treatments for gender dysphoria.

## III.   MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs argue that they are entitled to summary judgment on their three claims arising under the Equal Protection Clause, Title VII, and the ACA. (ECF No. 179.) DPS argues that it is entitled to summary judgment on Plaintiff Caraway's Title VII claim. (ECF No. 133.)

Plan Defendants argue that NCSHP is entitled to summary judgment on Plaintiff's Title VII and ACA claims. (ECF No. 136.) The Court will address each claim in turn.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*

38

*v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324. Expert testimony must be admissible to create a genuine issue of material fact. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1159 (4th Cir. 1996).

### A. Equal Protection Clause

The Fourteenth Amendment to the U.S. Constitution prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When considering an equal protection claim, a court must determine (1) "what level of scrutiny applies" and (2) "whether the law or policy at issue survives such scrutiny." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir.), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021).

#### i. The Plan facially discriminates based on sex and transgender status

"In determining what level of scrutiny applies to a plaintiff's equal protection claim, we look to the basis of the distinction between the classes of persons." *Id.* (citing *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938)). Generally, a state policy "is presumed to be valid and will be sustained if the classification drawn by the [policy] is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. This general rule "gives way," however, when the policy discriminates based on membership in certain suspect classes. *Id.* In the Fourth Circuit, laws that discriminate based on sex or transgender status receive intermediate

39

scrutiny. *Grimm*, 972 F.3d at 608, 610. Such policies are unconstitutional "unless [they are] substantially related to a sufficiently important governmental interest.'" *Id.* at 608 (quoting *Celburne*, 473 U.S. at 441).

To show that a policy discriminates based on sex or transgender status, a plaintiff must show discriminatory intent and disproportionate impact. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). "No inquiry into legislative purpose is necessary," however, when the suspect classification "appears on the face" of the policy. *Shaw v. Reno*, 509 U.S. 630, 642 (1993). A policy that facially discriminates based on membership in a suspect class is "immediately suspect because, '[a]bsent searching judicial inquiry . . . , there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate'" governmental objectives. *Id.* at 642–43 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion)); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979) ("Classifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination.").

A facial inquiry is what it sounds like: a review of the language of the policy to see whether it is facially neutral or "deal[s] in explicitly racial [or gendered] terms." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982) (citing *Hunter v. Erickson*, 393 U.S. 385 (1969)). A policy that uses racial or gendered terms "falls into an inherently suspect category" even if it creates classifications that are not "obviously pernicious." *Id.* at 485, 487. The "crucial difference" between facially discriminatory and facially neutral laws is that the former "plainly rests on distinctions based on" a suspect classification. *Id.* at 485 (internal quotations omitted).

Case 1:19-cv-00272-LCB-LPA   Document 261   Filed 08/10/22   Page 40 of 73

In *Grimm*, the Fourth Circuit held that a school policy limiting students to use of the restroom and locker room facility that corresponded to their "biological genders" discriminated on its face based on sex. *Grimm*, 972 F.3d at 608–10. First, it reasoned that the policy "necessarily rests on a sex classification" and "cannot be stated without referencing sex." *Id.* at 608. Second, the court found that the policy "subjected [plaintiff] to sex discrimination because he was viewed as failing to conform to the sex stereotype propagated by the Policy." *Id.* at 608. Thus, the Fourth Circuit applied intermediate scrutiny. *Id.* at 609.

Additionally, the court held that the bathroom policy facially discriminated against plaintiff based on his status as a transgender boy. *Id.* at 613. The court identified transgender individuals as a quasi-suspect class consisting of those "who consistently, persistently, and insistently express a gender that, on a binary, we would think of as opposite to their assigned sex." *Id.* at 594, 613 (internal quotations omitted). The court then held that the policy—which provided "alternative appropriate private facilit[ies]" for students "with gender identity issues"— facially discriminated against plaintiff based on his membership in this class. *Id.* at 609, 613.

Here, the Plan excludes "[t]reatment or studies leading to or in connection with *sex* changes or modifications and related care." (ECF No. 184 at 67 (emphasis added).) This exception does not identify any diagnoses or treatments. Instead, the broad language of the Plan distinguishes between medically necessary[4] treatments that align with the member's

---

[4] Defendants dispute that the treatments excluded by the Plan are medically necessary in fact. However, the Plan already limits coverage to treatments that are medically necessary. (ECF No. 137-2 at 58:4-7.) Thus, for purposes of this facial inquiry alone, the exclusion only applies to treatments that are otherwise considered medically necessary.

41

biological sex and medically necessary treatments—often the *same* medically necessary treatments—that do not align with his sex.

These exclusions facially discriminate based on sex and transgender status. First, like in *Grimm*, this exclusion "necessarily rests on a sex classification" because it cannot be stated or effectuated "without referencing sex." *See Grimm*, 972 F.3d at 608; *c.f. Hunter*, 393 U.S. at 391. As reasoned by the U.S. Supreme Court, "try writing out instructions" for which treatments are excluded "without using the words man, woman, or sex (or some synonym). It can't be done." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1746 (2020). It is impossible to determine whether a particular treatment is connected to "sex changes or modifications and related care"—and thus, whether the exclusion applies—without comparing the member's biological sex before the treatment to how it might be impacted by the treatment.

Second, the Plan overtly discriminates against members for "failing to conform to the sex stereotype propagated by the [Plan]." *See Grimm*, 972 F.3d at 608. The Plan expressly limits members to coverage for treatments that align their physiology with their biological sex and prohibits coverage for treatments that "change or modify" physiology to conflict with assigned sex. For example, puberty suppressing medication may be covered if medically necessary. (*See, e.g.*, ECF Nos. 201-1 at 4–22.) But a transgender boy will not receive coverage for such medication—even if medically necessary—because, in the language of the Plan, it would "change or modify" his physiology in a way that does not match his female biological sex. (*See id.*) This is textbook sex discrimination. *Grimm*, 972 F.3d at 608; *see generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion) (holding that employers who "insist[ed] that [individuals] matched the stereotype associated with their group" committed

42

sex discrimination under Title VII); *Bostock*, 140 S. Ct. at 1741 ("[A]n employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in *both* cases the employer fires an individual in part because of sex.").

Third, the Plan also transparently discriminates against its transgender members. As mentioned, the quasi-suspect class identified by the Fourth Circuit is defined as those "who consistently, persistently, and insistently express a gender that, on a binary, we would think of as opposite to their assigned sex." *Grimm*, 972 F.3d at 594. Transgender men are men; transgender women are women. *Id.* at 610 ("[Plaintiff] did not question his gender identity at all; he knew he was a boy."). This holding by the Fourth Circuit is likewise supported by the undisputed evidence in this case. (*See, e.g.*, ECF Nos. 179-2 ¶¶ 2–3 ("I am a 19-year-old man. I am also transgender."); 179-5 ¶¶ 2, 4 ("I am a boy. . . . I am transgender, which means that I was designated 'female' at birth, even though I am and identify as male."); 137-2 at 85:10– 87:22 (stating that NCSHP members may align their sex identification marker in NCSHP's records with their gender identity without proof of their physical anatomy, DNA, or chromosomal make up); *see also* ECF No. 219 at 6 ("A transgender man is a man. A transgender woman is a woman.").) Under the Plan, however, transgender members are classified as seeking to "change or modify" their gender or sex while cisgender members are not. So, a cisgender man who receives medically necessary testosterone is covered, while a transgender man who receives medically necessary testosterone is not. Like in *Grimm*, the Plan "privileges sex-assigned-at-birth over [Plaintiffs'] medically confirmed, persistent and consistent gender identity." *Grimm*, 972 F.3d at 610. Thus, it will receive intermediate scrutiny.

43

Defendants raise four arguments against finding that the Plan discriminates based on sex or transgender status.

First, Defendants argue that the Plan does not discriminate based on sex or transgender status but based on diagnosis. (ECF No. 197 at 28.) Specifically, they characterize the Plan as covering medically necessary treatments for some ailments but not for others, such as gender dysphoria. (*Id.*) Some Plan administrators do consider the exclusions to be "blanket exclusions for the treatment of gender dysphoria." (*See, e.g.*, ECF No. 185-2 at 34.) However, whether a policy is facially discriminatory is determined with reference to the language of the policy, not the underlying intent of its adopters or administrators. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect."). Thus, Defendants' evidence does not create a genuine issue of material fact as to whether the Plan discriminates *on its face*.[5]

Further, even if the Court credited Defendant's characterization of the Plan as applying only to diagnoses of gender dysphoria, it would still receive intermediate scrutiny. Discrimination against individuals suffering from gender dysphoria is also discrimination based on sex and transgender status. As with the Plan's exclusions, one cannot explain gender dysphoria "without referencing sex" or a synonym. *See Grimm*, 972 F.3d at 608. A hypothetical from the Supreme Court is directly on point:

---

[5] Moreover, undisputed evidence shows the exclusions do not simply attach to treatments related to a diagnosis of gender dysphoria in practice. As discussed, preauthorization for some surgeries is denied due to the exclusion "regardless of the diagnostic code," and preauthorization for others is denied if the procedural code accompanying the treatment is "transsexualism" or "personal history of sex reassignment." (ECF No. 197-14 ¶¶ 20–21.)

44

> Suppose an employer asked homosexual or transgender applicants to tick a box on its application form. The employer then had someone else redact any information that could be used to discern sex. The resulting applications would disclose which individuals are homosexual or transgender without revealing whether they also happen to be men or women. Doesn't that possibility indicate that the employer's discrimination against homosexual or transgender persons cannot be sex discrimination?
>
> No, it doesn't. . . . There is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex. To see why, imagine an applicant doesn't know what the words homosexual or transgender mean. Then try writing out instructions for who should check the box without using the words man, woman, or sex (or some synonym). It can't be done.

*Bostock*, 140 S. Ct. at 1746. The same is true here. Even if Plan administrators see only a box checked "gender dysphoria," the diagnostician cannot know whether to check that box without considering sex.[6] Defendants' first argument is unpersuasive.

Second, Defendants argue that Plaintiffs are not similarly situated to members who receive similar treatments for different diagnoses. (ECF No. 197 at 29.) Members who receive hormone therapy, testosterone, or a mastectomy for gender dysphoria, they argue, are not similarly situated to members who seek those same treatments for prostate, testicular, or breast cancer. (*Id.*) This argument, however, is a *justification* for Defendants' facial sex and transgender discrimination, not an argument that the exclusions are facially neutral. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 62–64, 73 (2001) (conducting "similarly situated" analysis of a facially discriminatory law in its application of intermediate scrutiny rather than to determine what level of scrutiny applied). It is sufficient at this stage that those affected and unaffected

---

[6] Defendants argue that "[h]ealthcare providers must know a patient's sex for *every* medical diagnosis," (ECF No. 197 at 32), but this argument misstates the issue. Gender dysphoria cannot be explained at all without reference to sex, while most other diagnoses—even those that are specific to members of only one sex—can be explained neutrally.

45

by the exclusion are all members of the Plan who seek similar or identical treatments. The factor used by the Plan to distinguish between covered and uncovered treatments is that the later "change or modify" the patient's assigned sex. Other factors not evidenced on the face of the Plan that may distinguish the two groups are not proper for consideration at this stage in the Court's analysis. *See Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group *for purposes of the challenged government action.* . . . [It] depends on what government action the plaintiffs are challenging." (emphasis added)).

Third, Defendants argue that the Plan does in fact cover many over-the-counter pharmaceuticals regardless of transgender status because neither the Plan nor its administrators "*ever know* the reason" for such purchases. (ECF No. 197 at 26.) But a policy that makes coverage turn on sex or transgender status receives heightened scrutiny even if administrators do not actually know members' sex or transgender status in practice. *C.f. Bostock*, 140 S. Ct. at 1746 ("By intentionally setting out a rule that makes hiring turn on [sex], the employer violates the law, whatever he might know or not know about individual applicants."). A facially discriminatory policy likewise receives heightened scrutiny even if it is not applied in all cases. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 579 U.S. 365, 384 (2016) (applying heightened scrutiny to a race-conscious admissions policy even though "race consciousness played a role in only a small portion of admissions decisions").

Fourth, Defendants analogize this case to *Geduldig v. Aiello*, 417 U.S. 484 (1974). In *Geduldig*, the Supreme Court held that a state health program that denied coverage for pregnancy did not discriminate based on sex. *Id.* at 494. The Court reasoned that the program

46

did "not exclude anyone from benefit eligibility because of gender but merely remove[d] one physical condition—pregnancy—from the list of compensable disabilities." *Id.* at 496 n.20. "Normal pregnancy is an objectively identifiable physical condition with unique characteristics," and while "only women can become pregnant," the group of members who are not pregnant "includes members of both sexes." *Id.* But the same cannot be said here. The Plan does not merely exclude one "objectively identifiable physical condition with unique characteristics" from coverage; rather, it excludes *treatments* that lead or are connected to *sex* changes or modifications. Pregnancy can be explained without reference to sex, gender, or transgender status.[7] The same cannot be said of the exclusion at issue here.

In sum, there is no genuine issue of material fact about the language of the Plan: it facially discriminates based on sex and transgender status. The Court will accordingly apply intermediate scrutiny.

ii.    <u>Defendants have not established a genuine issue of material fact as to whether the Plan is substantially related to an important governmental interest</u>

Policies that discriminate based on sex or transgender status are unconstitutional "unless [they are] substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (quoting *Celburne*, 473 U.S. at 441). To survive intermediate scrutiny,

---

[7] *Pregnancy*, Dorland's Illustrated Medical Dictionary (33d ed. 2020) ("[T]he condition of having a developing embryo or fetus in the body, after union of an oocyte and spermatozoon."); *Pregnant*, American Heritage Medical Dictionary (2d ed. rev. 2007) ("Carrying developing offspring within the body); *see Pregnant*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pregnant (last updated May 25, 2022) ("containing a developing embryo, fetus, or unborn offspring within the body"). *But see Pregnancy*, Stedman's Medical Dictionary (28th ed. 2006) ("The state of a female after conception and until the termination of the gestation.").

the state bears the burden to "provide an 'exceedingly persuasive justification' for its classification." *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 534 (1996)).

Defendants raise two justifications for the relevant exclusions. First, they argue that the exclusions limit health care costs. (ECF No. 197 at 40.) Until 2018, North Carolina provided free health insurance to its public employees. (ECF No. 137-2 at 106:2-4.) When the North Carolina General Assembly limited increases in its contribution to the Plan in 2016 to 4% per year, however, NCSHP was unable to keep up with the rapid 7% annual increase in healthcare costs. (*Id.* at 102:22-24.) At Defendant Folwell's direction, NCSHP cut benefits and charged employees premiums for the first time. (*Id.* at 102:19-21, 106:2-4.) Now, "a whole lot of employees have to work one week out of a month just to cover their Health Plan for their family." (*Id.* at 105:22-24.)

While such a justification may be sufficient under the rational basis test, *see Geduldig*, 417 U.S. at 496, a state may not "protect the public fisc by drawing an invidious distinction between classes of its citizens" under heightened scrutiny, *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974). That is especially true here, as the estimated $300,000–$900,000 saved by the exclusion per year pales in comparison to NCSHP's billion-dollar cash balance and saves each of the Plan's 740,000 members about one dollar each. Such a paltry limit on health care costs is not an important governmental interest.

Second, Defendants argue that the relevant treatments excluded by the Plan are not effective. (ECF No. 197 at 11–17.) Viewed in the abstract, the Court finds that withholding Plan funds from ineffective medical treatments serves an important governmental interest. The state has an obvious interest in protecting its employees and their families from ineffective

48

medical treatments and a derivative interest in reducing the prevalence of such treatments generally by cutting them off from access to the Plan's considerable resources. (*See* ECF No. 137-1 at 35:7-12 (stating that the Plan is the largest purchaser of healthcare and pharmaceuticals in North Carolina)). Protecting public health is an important governmental interest. *Eline v. Town of Ocean City*, 7 F.4th 214, 222 n.8 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 1117 (2022).

Thus, the remaining issue is whether the exclusions are substantially related to Defendant's interest in protecting its employees and the public from ineffective medical treatments.[8] Defendants attempt to establish this substantial relationship via their experts' testimony. However, as found in Part II, *supra*, much of this testimony is inadmissible. Inadmissible testimony cannot establish a genuine issue of material fact for purposes of summary judgment. *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991).

Defendants' admissible expert testimony, even when taken in the light most favorable to Defendants, does not support that the Plan's exclusion substantially excludes treatments that are ineffective. First, while Dr. Hruz and Dr. Lappert testify that the medicines and surgeries used to treat gender dysphoria can have serious health risks and consequences, it is

---

[8] Plaintiffs argue "[b]inding circuit precedent recognizes that . . . medical treatments for gender dysphoria 'are safe, effective, and often medically necessary.'" (ECF No. 201 at 3 (quoting *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 428 (4th Cir.), *as amended* (Dec. 2, 2021), *cert. denied sub nom. N.C. Health Plan for Tchrs. & State Emps. v. Kadel*, 142 S. Ct. 861 (2022)).) However, the relevant quote comes from the Fourth Circuit's background discussion of gender dysphoria. *See Kadel*, 12 F.4th at 428. This Court does not read the Fourth Circuit's ruling in *Kadel*—which concerned a jurisdictional issue—to resolve this consequential issue as a matter of fact or law. Thus, the effectiveness of these treatments remains an issue of fact that must be resolved in the first instance.

49

also undisputed that gender dysphoria is a serious diagnosis that, if left untreated, can lead to self-mutilation and suicide. NCSHP covers many of these same treatments for other serious illnesses notwithstanding their risks and side effects. Without evidence that the treatments are ineffective to treat gender dysphoria, Defendants cannot meet their burden to show that the risks substantially outweigh the benefits so as to justify their sex- and transgender-based policy.

Second, Defendants point to Dr. Levine's testimony to argue that these treatments are categorically ineffective. But that is not Levine's testimony. He testifies that the available research is not sufficiently reliable to prove that treatments are effective, but repeatedly and emphatically testifies that this lack of high-level research is *not* reason to justify withholding treatment from all gender dysphoric patients. Rather, he testifies that *doctors and patients*, when fully aware of the risks and elusive benefits of available treatments, should decide if medicine or surgery is necessary *as he does in his own practice*. This is Plaintiffs' request: that they and their doctors, not their sex or transgender status, determine when their treatments are appropriate. Levine does not and cannot reliably testify as to how often doctors prescribe unnecessary treatments or fail to obtain informed consent. Thus, Levine's testimony also does not create a genuine issue of material fact as to whether the Plan's exclusion substantially excludes ineffective treatments.

Finally, anecdotal recounting of individual patient experiences and wholesale criticism of WPATH, the DSM, and various professional associations, even when taken as true, is insufficient to meet Defendants' burden of showing that the Plan's discriminatory exclusion is substantially related to an important governmental interest. At most, this evidence

challenges the credibility of some—but not all—of Plaintiffs' evidence showing that medical and surgical treatments for gender dysphoria are effective.

Moreover, Defendants have a clear, sex- and transgender-neutral alternative to the exclusion. In 2017, the Plan covered "medically necessary services for the treatment of gender dysphoria," and NCSHP's third-party administrators, Blue Cross and CVS, appear able to distinguish between medically necessary and unnecessary treatments. (*See, e.g.*, 185-2 at 89–99 (distinguishing in the Blue Cross Corporate Medical Policy between medically necessary and unnecessary treatments for gender dysphoria). To the extent that Defendants can anecdotally establish that *some* treatments for gender dysphoria are ineffective, they have not offered any admissible evidence to show that the Plan's categorical exclusion better protects members from ineffective treatments than the more narrow exclusion of medically *unnecessary* treatments for gender dysphoria. Thus, Defendants cannot meet their burden under intermediate scrutiny. *See Caban v. Mohammed*, 441 U.S. 380, 392 (1979) (invalidating an adoption law where "the State's interest . . . can be protected by means that do not draw such an inflexible gender-based distinction."); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 650 (1974) (invalidating a maternity policy where a more "narrow method of protecting the school board's interest in teacher fitness" was available); *see also Cleburne*, 473 U.S. at 476 (Marshall, J., concurring in the judgment in part and dissenting in part) ("When statutes rest on impermissibly overbroad generalizations, our cases [applying intermediate scrutiny] have invalidated the presumption on its face.") (collecting cases).

Thus, Plaintiffs are entitled to summary judgment on their Equal Protection Claim.

51

### B. Title VII

The Court next addresses Plaintiff Caraway's Title VII claims against DPS and NCSHP.

It is a violation of Title VII for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Health insurance and other fringe benefits are 'compensation, terms, conditions, or privileges of employment'" under Title VII.[9] *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983).

DPS, NCSHP, and Plaintiffs each move for summary judgement on Plaintiff Caraway's Title VII claims. (ECF Nos. 132; 136; 178.) NCSHP argues it is not Caraway's employer. (ECF No. 137 at 25–33.) DPS argues that Caraway lacks standing and cannot show that DPS caused her injury. (ECF No. 133 at 21–22.) Caraway argues that no genuine issue of material fact exists as to her Title VII claim and she is entitled to judgment as a matter of law as to liability, "reserving issues of damages . . . for trial." (ECF No. 179 at 4, 32–37.) The Court will address these arguments in turn.

#### i. Plaintiff Caraway

Caraway is a transgender woman and corrections officer for DPS. (ECF No. 179-9 ¶¶ 5, 8.) She is required to maintain health insurance by DPS given the nature of her job and is a member of NCSHP. (*Id.* ¶ 16.) She was diagnosed with gender dysphoria and began hormone replacement therapy in mid-2018, and underwent "intersex surgery" and a

---

[9] Whether a benefit is "compensation" under Title VII is a question of federal law, not state law. Defendants' contention that the Plan does not constitute compensation under state law is therefore inapposite.

"mammaplasty" on August 5, 2020. (*Id.* ¶¶ 19–20; *id.* at 13.)  Due to the exclusion, NCSHP has only occasionally covered her hormone therapy and did not cover her surgery. (*Id.* ¶¶ 21, 24, 28; *see id.* at 13.)  She consequently delayed surgery approximately nine months until she could pay the $27,000 bill out of pocket. (*Id.* ¶¶ 23–25.)  Caraway is still employed with DPS. (*Id.* ¶ 6.)  Although the treatment she has received "has helped" relieve symptoms from her gender dysphoria "up to a point," she anticipates requiring continued hormone treatments and additional surgery. (*Id.* ¶¶ 29–33.)

   ii.  <u>NCSHP is not Caraway's employer</u>

  NCSHP argues that it is not liable to Caraway under Title VII because it is not her employer. (ECF No. 137 at 25–28.)  It is undisputed that Caraway is employed by DPS. (*See* ECF No. 179-9 ¶ 5.)  Caraway argues that NCSHP is also her employer—and therefore liable under Title VII—because (1) it is DPS's agent and (2) DPS and NCSHP jointly employ her. (ECF No. 188 at 15–18.)

   1.  NCSHP is not DPS's agent

  Title VII defines "employer" as either "a person engaged in an industry affecting commerce" that employs fifteen or more employees and "any agent of such a person." 42 U.S.C. § 2000e(b).  An "employer," in turn, is prohibited from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" because of her sex. § 2000e-2(a)(1).  "Title VII's purpose [is to] eliminat[e] discrimination in employment based on race, color, religion, sex, or national origin." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 409 (4th Cir. 2015) (internal quotations omitted).  "Title VII should

be liberally construed in light of its remedial purpose . . . [and] such liberal construction is also to be given to the definition of 'employer.'" *Id.* (internal quotations omitted).

Title VII "does not define the term 'agent.'" *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998). In *Lissau*, the Fourth Circuit held that "individual supervisors are not liable under Title VII." *Id.* at 181. Rejecting an argument that an individual supervisor may be held liable as the "agent" of the employer, the court "interpret[ted] the inclusion of agent in Title VII's definition of employer simply to establish a limit on an employer's liability for its employees' actions." *Id.* at 180; *see also Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994) (reading an identical provision in the Age Discrimination in Employment Act to be "an unremarkable expression of respondeat superior—that discriminatory personnel actions taken by an employer's agent may create liability for the employer").

The Fourth Circuit has not addressed the present situation where a plaintiff alleges that an entity, rather than an individual supervisor, is liable under Title VII by virtue of being an agent. (*See* ECF No. 74 at 22–24.) Other circuits have held "that Title VII plaintiffs may maintain a suit directly against an entity acting as the agent of an employer, but only under certain circumstances." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 668–69 (7th Cir. 2013) (citations omitted). These circuits recognize agency liability where the agent "exercise[s] control over an important aspect of [the plaintiff's] employment," *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 17 (1st Cir. 1994); where the agent "significantly affects access of any individual to employment opportunities*," Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir. 1982), *vacated and remanded on other grounds*, 463 U.S. 1223 (1983); or where "an employer delegates sufficient control of some traditional

54

rights over employees to a third party," *Nealey v. Univ. Health Servs., Inc.*, 114 F. Supp. 2d 1358, 1367 (S.D. Ga. 2000) (quoting *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999)).

Here, even if the Court were to assume that entities may be held liable as agents under Title VII in the Fourth Circuit, Caraway has failed to show that NCSHP operates as DPS's agent.[10]  At common law, "[a]n agent is one who consents to act on behalf on another and subject to the other's control."  *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 996 (6th Cir. 1997) (citing Restatement (Second) of Agency § 1 (1958)); *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (interpreting Title VII's definition of "employer" and use of the term of "agent" against a common law backdrop).  Plaintiffs have submitted no evidence that NCSHP is subject to DPS's control.  On the contrary, it appears undisputed that "state law delegates control over employee health coverage to NCSHP."  (ECF No. 188 at 18 (citing N.C. Gen. Stat. § 135-48.2(a)).)  Although DPS provides the Plan to its employees and assists in its implementation, *see* Section III.B.iii, *infra*, DPS has no legal control over NCSHP or the Plan, *see generally* §§ 135-48.1–48.62, and Carraway has failed to produce any evidence to show that DPS has control over NCSHP in fact.

### 2.    NCSHP is not a joint employer

An individual may have more than one employer within the meaning of Title VII. *Butler*, 793 F.3d at 408.  The "principal guidepost" to observe in determining an employee's

---

[10] In its March 5, 2021, Order, this Court concluded that *Lissau* nor *Birkbeck* control this case, as those cases concern individual supervisors sued in their individual capacities.  (ECF No. 74 at 22–24.) Consequently, the Court held that Caraway's Title VII claims against NCSHP were not futile and allowed Plaintiffs to amend their Complaint.  (*Id.* at 24.)  The Court does not disturb that reasoned conclusion here.  Rather, the Court finds that Plaintiffs have not submitted sufficient evidence at the summary judgment stage to create a genuine issue of material fact as to whether NCSHP is DPS's agent.

55

employers is "'the common-law element of control,' drawn from the law of agency." *Id.* at 409 (quoting *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003)). In *Butler*, the Fourth Circuit adopted a nine-factor test to determine whether a Title VII plaintiff "is jointly employed by two or more entities." *Id.* at 414. These factors are:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* "[N]one of these factors are dispositive and . . . courts can modify the factors to the specific industry context." *Id.* Generally, however, the first three of these factors will be "most important," and the ninth factor will be "of minimal consequence." *Id.* at 414, 414 n.12.

Here, there is no evidence that NCSHP has authority to hire, fire, supervise, or discipline Plaintiff Caraway (factors one and two). (ECF Nos. 137-12 at 101:6–102:11, 104:1-15, 105:20-25; 137-13 at 34:4-18, 39:16-18.) NCSHP does not provide her with any equipment or workplace (factor three), (ECF Nos. 137-12 at 102:9-10, 111:4-19; 137-13 at 45:9-16), or

56

training (factor six), (ECF Nos. 137-12 at 99:10-20; 137-13 at 37:12-16, 48:8-13). Caraway has never been assigned to perform work for NCSHP (factors five and eight), (ECF No. 137-12 at 93:7-16), and as a prison guard, her duties are not akin to duties of NCSHP's employees, which include managing implementation of the Plan (factor seven), (*see, e.g.*, ECF No. 137-2 at 69:23–70:8). There is no evidence NCSHP or Caraway intended to enter into an employment relationship (factor nine). (*See* ECF No. 137-12 at 93:7-16 ("The only employer I worked for in the last 27 years . . . was [DPS].").) Finally, while it is possible that NCSHP possessed some of Caraway's insurance records (factor four), she has failed to identify evidence in the record to support this inference.

Plaintiffs argue that NCSHP is an employer because it exercises "'control' over the health coverage relevant to this case." (ECF No. 188 at 18.) The guidepost identified in *Clackamas* and *Butler*, however, is not control over one aspect of employment, but rather "practical control of the employee." *Butler*, 793 F.3d at 414; *see Clackamas*, 538 U.S. at 448 ("[T]he relevant factors defining the master-servant relationship focus on the master's control *over the servant*." (emphasis added)). A joint employer need not have total control over all aspects of the employment; however, Plaintiffs have cited no legal authority to support that an entity's control over an individual's employment-based health insurance renders it the individual's employer where all nine factors identified in *Butler* weigh against finding joint employment.

Even taking all evidence in the light most favorable to Plaintiffs, they have failed to create a genuine issue of material fact as to whether NCSHP is Plaintiff Caraway's employer.

Accordingly, NCSHP will be granted summary judgment on Caraway's Title VII claim, and Caraway's motion for summary judgment will be denied as to this claim.

      iii.    <u>DPS is liable under Title VII for providing the Plan to Caraway</u>

DPS argues that it is entitled to summary judgment because (1) Caraway does not have standing to sue DPS and (2) Caraway cannot show that DPS caused her injuries under Title VII. (ECF No. 133.)

      1.    Caraway has standing to sue DPS

DPS first argues that Caraway's injuries are not fairly traceable to its conduct as required for standing because, pursuant to state law, DPS has no power to establish or implement the Plan. (ECF No. 133 at 8–22.)

Parties invoking federal jurisdiction bear the burden of establishing that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Traceability requires a causal connection between the defendant's conduct and the plaintiff's injury, such that "there is a genuine nexus" between the two. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). "[T]he 'fairly traceable standard is not equivalent to a requirement of tort causation.'" *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 623 (4th Cir. 2018) (quoting *Friends*, 204 F.3d at 161). At the summary judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

58

On March 10, 2020, this Court found that Plaintiffs had standing at the motion to dismiss stage to sue University Defendants notwithstanding standing arguments similar to those raised by DPS here. (ECF No. 45 at 7–10.) Although University Defendants could not dictate the Plan's terms, benefits, or exclusions under North Carolina law, this Court held that Plaintiffs' allegations that University Defendants hired Plaintiffs, offered the Plan to them, and participate in its availability provided a sufficient nexus between the alleged injuries and University Defendants to establish standing. (*Id.* at 8.) This traceability was "further bolstered" by allegations that University Defendants funded the Plan in part and played an active role in collecting erroneous payments and settling claims regarding health benefits. (*Id.* at 8–9.)

Here, Plaintiffs have submitted evidence that DPS is similarly involved in providing and administering the Plan. First, it appears undisputed that DPS "provides health care coverage to its employees through the NCSHP." (ECF Nos. 75 ¶ 18; 96 ¶ 18; 184 at 205:20-22; *see also* ECF No. 133 at 14 (arguing that DPS was "*require[d]* . . . to offer the [Plan] to [its] current and former employees." (citing § 135-48.42(a)).) Defendants agree that DPS "play[s] a role in getting eligible employees enrolled in the Plan" by providing employees with electronic registration forms and making available a Health Benefit Representative to help the employee enroll. (ECF No. 184 at 178:9–179:18 (NCSHP dep.), 220:7–221:16 (DPS dep.).) DPS then reviews an applicant's eligibility to confirm that she is either a new hire or has become a full-time employee. (*Id.* at 179:1-5.) A DPS employee can make changes to her health insurance benefits by filing a qualifying life event, which DPS must review and approve. (*Id.* at 211:15–212:22.) DPS additionally contributes $521.96 per month per employee to help

59

cover the cost of the Plan. (*Id.* at 54, 205:25–206:3, 207:6-10.) Plaintiff Caraway was made eligible for the Plan by virtue of her employment with DPS. (*Id.* at 177:10-19.) And Plaintiff was required by DPS to have health insurance and received coverage under the Plan as part of her compensation. (ECF Nos. 179-9 ¶ 16; 187-1 at 5–6.)

DPS argues that it "did not make the decision to exclude gender-confirming healthcare coverage" from the Plan nor has "any authority to choose a healthcare coverage option for its employees other than what was offered through the Plan." (ECF No. 133 at 17–18.) It describes the contacts with the Plan outlined above as "ministerial duties," the majority of which "are strictly dictated by statute." (*Id.* at 18.) As Plaintiffs correctly contend, however, there is no "ministerial" exception to the standing doctrine. (ECF No. 187 at 12 (citing *Nelson v. Warner*, 12 F.4th 376, 385 (4th Cir. 2021)).) In *Nelson*, the Fourth Circuit held that candidates who were placed second on election ballots based on party affiliation pursuant to West Virginia law suffered an injury that was fairly traceable to the conduct of state election officials who prepared the ballots in accordance with the statute. *Nelson*, 12 F.4th at 385; *see also Strickland v. Alexander*, 772 F.3d 876, 886 (11th Cir. 2014) ("[T]he fact that '[defendant's] duties are ministerial in nature' [does not] somehow render [plaintiff's] injury not fairly traceable to [defendant]."). Similarly here, DPS administers the Plan by providing it to its employees as part of their compensation, enrolling employees in the Plan, confirming their eligibility, approving qualifying life events, and partially funding the Plan. Thus, Plaintiff's injuries are fairly traceable to DPS's conduct, notwithstanding its contention that its role in administering the Plan is merely ministerial.

60

Additionally, the Court finds that Caraway has submitted sufficient evidence to demonstrate injury and redressability at the summary judgment stage. As this Court previously found with regard to Plaintiffs' Title IX claims, a favorable ruling on Caraway's Title VII claim could redress Caraway's injury through monetary or declaratory relief. (*See* ECF No. 45 at 9–10.) Thus, Caraway has sufficiently established standing to sue DPS.

2.      Caraway was denied coverage because of her sex

To prevail under Title VII, a plaintiff must typically show that "the defendant's conduct did in fact cause the plaintiff's injury," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013), meaning plaintiff's injury "would not have happened 'but for' the purported cause," *Bostock*, 140 S. Ct. at 1739. *But see id.* at 1740 (noting that "liability can sometimes follow even if sex *wasn't* a but-for cause of the employer's challenged decision" under the "motivating factor test"). The but-for test directs courts "to change one thing at a time and see if the outcome changes." *Id.* at 1739. But-for causation "can be a sweeping standard" because "[o]ften, events have multiple but-for causes." *Id.* "[A] defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Id.*

Discrimination against a transgender employee violates Title VII. *Id.* at 1741. The Supreme Court reasoned that an employer who "fires a transgender employee who was identified as a male at birth but now identifies as a female" but "retains an otherwise identical employee who was identified as female at birth . . . intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" in violation of Title VII. *Id.* Like with discrimination based on sexual orientation, "the

61

individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 1741–42.

Here, a straightforward application of the but-for test supports that Caraway's birth-assigned sex was a but-for cause of her injury. Caraway received hormone treatments and surgery that aligned her physiology more closely with that of a stereotypical woman. Because Caraway was identified as a male at birth, the Plan and its administrators considered these treatments to be "leading to or in connection with sex changes or modifications and related care." (ECF No. 179-9 at 13.) If she was not assigned the sex of male of birth, then the treatments would not "change" or "modify" her sex, and they would not fall within the exclusion. Defendants have not submitted any admissible evidence to refute that these treatments were "medically necessary," and it appears both NCSHP and Blue Cross agree that they would have been covered in absence of the exclusion. (ECF Nos. 137-2 at 58:4-23, 72:4-6 (Jones dep.); 185-2 at 89–99; *see also* ECF No. 179-9 at 13 (citing only the exclusion as the reason Caraway's surgery was not covered).) Since the Plan covers some hormone treatments, (*see* ECF No. 197-9), and may cover breast augmentation, vaginal repair, or vaginal construction surgery that is not to treat "transsexualism" or "personal history of sex reassignment," (ECF No. 137-4 ¶ 21), it appears that Caraway would be able to receive the same or similar surgery if she had been identified as female at birth.

DPS does not dispute this straightforward application of the but-for test. Instead, it argues (similar to its standing argument above) that it did not "establish [or] implement" the Plan, and therefore its actions are not a but-for cause of Caraway's injury. (ECF No. 133 at 11.) But as discussed above, it is undisputed that DPS "provided" Plaintiff Caraway with

62

health insurance under the Plan as part of her compensation and performed various tasks to help implement the Plan. The fact that DPS did not create the Plan or decide what it covered is not dispositive. Put simply, if DPS had not provided Caraway with discriminatory health insurance, she would not have been injured. DPS's conduct is therefore a but-for cause of her injury.

DPS counters: but we had no choice! State law required DPS to provide Plaintiff with insurance under the Plan and forbade it from providing other or supplemental health insurance. But compliance with state law is no defense to a federal violation. U.S. Const. art. VI cl. 2; *Arizona v. United States*, 567 U.S. 387, 399 (2012) ("[S]tate laws are pre-empted . . . where compliance with both federal and state regulations is a physical impossibility.") (internal quotations omitted); *see, e.g.*, *Green v. Sch. Bd. of New Kent Cty.*, 391 U.S. 430, 432–33, 435 (1968) (prohibiting school boards from complying with state laws that mandated racial segregation in public schools in conflict with the Fourteenth Amendment). Moreover, the statutes creating the Plan expressly contemplated such a conflict and instructed DPS to eschew state law for federal law. *See* N.C. Gen. Stat. §§ 135-48.4 ("If any provision of this Article is in conflict with applicable federal law, federal law shall control to the extent of the conflict."), 135-48.42(a) ("*Except as otherwise required by applicable federal law*, new employees must be given the opportunity to enroll. . . ." (emphasis added)).

Thus, Caraway will be granted summary judgment on her Title VII claim against DPS, and DPS's motion for summary judgment will be denied as to this claim. The remaining issue of damages will be reserved for trial.

63

## C.     ACA

Lastly, NCSHP moves for summary judgment on Plaintiffs' claims arising under the ACA. (ECF No. 136.) Plaintiffs move for partial summary judgment on this claim, reserving the issue of damages for trial. (ECF Nos. 178; 179 at 4.)

The ACA provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 [or] title IX of the Education Amendments of 1972, . . . be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). The ACA explicitly incorporates Title VI and Title IX, and "[t]he Fourth Circuit looks to Title VII . . . to guide the 'evaluation of claims under Title IX.'" *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 590 (D. Md. 2021), *reconsideration denied*, No. CV DKC 20-2088, 2021 WL 4951921 (D. Md. Oct. 25, 2021) (quoting *Grimm*, 972 F.3d at 616). The test announced in *Bostock* is therefore the appropriate test to determine whether a policy discriminates in violation of the ACA. *See id.* Thus, for the reasons identified in Section III.B.ii.2, *supra*, there is no genuine issue of material fact disputing that the Plan discriminated against Caraway on the basis of her sex.

NCSHP argues instead that it is not liable under the ACA because it is not a "health program or activity." (ECF No. 137 at 33–37.) The term is not defined in the statute. The U.S. Department of Health and Human Services ("HHS")—the federal agency tasked with promulgating regulations to implement this prohibition, *see* 42 U.S.C. § 18116(c)—initially interpreted "health program or activity" to include entities "principally engaged in providing or administering . . . health insurance coverage," among others. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31467 (May 18, 2016). In June 2020, however,

64

HHS revised its rules. Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37160, 37244–45 (June 19, 2020) (codified at 45 C.F.R. § 92.3(b), (c)). Its current interpretation expressly excludes "entit[ies] principally or otherwise engaged in the business of providing health insurance" from the definition of "health program or activity." 45 C.F.R. § 92.3(c).

Various litigants have challenged HHS's changed interpretation of the statute as arbitrary and capricious, and the question remains pending in multiple federal courts. *See, e.g., Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 237–39 (D. Mass. 2021). These courts have stayed proceedings as "HHS's efforts to reconsider the 2020 Rule are underway," the Department "intends to issue a Notice of Proposed Rulemaking in early 2022," and its actions "provide every indication that it is preparing to initiate a wholesale revision of the 2020 Rule." *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 20-1630 (JEB), 2021 WL 4033072, at *3 (D.D.C. Sept. 3, 2021).

It appearing to the Court that the agency interpretation at issue may change or be enjoined before trial is set to commence in this case on July 5, 2022; that resolution of this issue in this case could have nation-wide implications; that Plaintiffs will receive the declaratory and injunctive relief they seek by virtue of this Order and will therefore not be prejudiced by a delay in resolving this issue; and that discovery has closed and motion practice has ended, meaning NCSHP will not be prejudiced by a delay in resolving this issue; the Court, therefore, will reserve judgment on this portion of Defendant's motion pending further Order from this Court.

65

### D. Permanent injunction

Plaintiffs seek a permanent injunction. (ECF No. 75 ¶ B.) "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010). Plaintiffs must demonstrate: (1) irreparable injury; (2) inadequacy of available remedies at law, such as monetary damages; (3) an injunction is warranted after "considering the balance of hardships between the plaintiff and defendant"; and (4) "that the public interest would not be disserved by a permanent injunction." *Id.* at 156–57. Permanent injunctions are particularly appropriate in discrimination cases to prevent continued discrimination. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) (noting that the "primary objective" of Title VII "was a prophylactic one" to "remove barriers that have operated in the past").

Here, Plaintiffs have shown that they will require continued medical care to treat their gender dysphoria and that, barring judicial or legislative intervention, NCSHP intends to maintain the exclusion. (ECF No. 185-2 at 83 (Folwell) (vowing to maintain the exclusion "[u]ntil the court system, a legislative body or voters tell us that we 'have to,' 'when to,' and 'how to' spend taxpayers' money on sex change operations").) The exclusion has and will continue to force Plaintiffs and others delay or forgo medically necessary treatments, since most do not have funds available to pay for treatments out of pocket and then be reimbursed through monetary damages. These significant hardships faced by Plaintiffs outweigh the minimal hardship on Defendants, particularly given that Defendants and their third-party administrators were able to identify and cover medically necessary care in 2017. Finally, an injunction is likely to cost the public substantially less than awarding damages after-the-fact,

since NCSHP can negotiate lower prices than individual members can negotiate while paying out of pocket.

Prohibitory injunctions that "aim to maintain the status quo and prevent irreparable harm" are favored over mandatory injunctions that "alter the status quo." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235–36 (4th Cir. 2014) (discussing preliminary injunctions). The status quo is "the last uncontested status between the parties which preceded the controversy." *Id.* at 236 (quoting *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). A plaintiff who seeks to enjoin enforcement of a new policy and "require a party who has recently disturbed the status quo to reverse its actions" seeks a prohibitory injunction, not a mandatory one. *Id.*; *see also Disability Rts. S.C. v. McMaster*, 564 F. Supp. 3d 413, § IV.A (D.S.C. 2021) (finding that the status quo in was "the position of the parties prior to the enactment of" the challenged policy), *vacated in part on other grounds*, 24 F.4th 893 (4th Cir. 2022).

Here, the last uncontested status between the parties existed during 2017, when Defendants covered medically necessary services for the treatment of gender dysphoria. Thus, Plaintiffs' request to enjoin enforcement of the exclusion and reimpose the uncontested 2017 rule seeks a prohibitory injunction. This Court finds that reimposing the 2017 rule is the appropriate remedy.

Accordingly, the Court will permanently enjoin Defendants Folwell and Jones, *in their official capacities*, from enforcing the Plan's exclusion and order them to reinstate coverage for "medically necessary services for the treatment of gender dysphoria."

## IV.    MOTIONS TO SEAL

Finally, Plaintiffs seek to seal portions of expert reports that describe in detail Plaintiffs' experiences with gender dysphoria and transition, to include portions of Dr. George Richard Brown's report, filed in support of their motion for summary judgment, (ECF No. 182), and portions of Dr. Lappert's report, filed in support of their *Daubert* motion to exclude his testimony, (ECF No. 210).

A motion to seal "presents the seeming tension between several legitimate interests." *Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 574 (4th Cir. 2004). On one hand, the public has a right, derived from both common law and the First Amendment, "of public access to documents or materials filed in a district court." *Id.* at 575. On the other hand, individuals have an interest in keeping sensitive medical information private. *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487 (4th Cir. 1992); *Boone v. Bd. of Governors of Univ. of N.C.*, 395 F. Supp. 3d 657, 665 (M.D.N.C. 2019), *aff'd*, 858 F. App'x 622 (4th Cir. 2021). Congress and the State of North Carolina have recognized the significance of an individual's interest in keeping medical information private, *see* 42 U.S.C. § 1320d-6(a); N.C. Gen. Stat. § 58-2-105(a), and the Fourth Circuit has held that such information "should receive scrupulously confidential treatment" when it concerns subject matter that faces public stigma, *Watson*, 974 F.2d at 487.

### A.    Dr. Brown's report (ECF No. 182)

When the subject of the motion to seal is documents attached to a summary judgment motion in a civil case, "the more rigorous First Amendment standard" governs the court's analysis. *Washington Post*, 386 F.3d at 576 (quoting *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). Under this standard, "a district court may restrict access 'only on

the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest.'" *Id.* at 575 (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988)). "Public access serves to promote the trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014). "Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like a fiat and requires rigorous justification." *Id.* Thus, before granting a motion to seal, a court must "(1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) . . . state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives." *Id.* at 272.

Here, Plaintiffs' motion to seal has been publicly docketed since its date of filing on December 20, 2021. (ECF No. 182.) Thus, the public has had ample notice and opportunity to oppose the motion. Plaintiffs seek to seal medical information of the most intimate and sensitive nature concerning their struggles with, and treatment of, gender dysphoria, often during adolescence. (*Id.*) Gender dysphoria and transition remains highly stigmatized, lending greater weight to Plaintiffs' argument that there is a compelling interest to keep this information private. *Watson*, 974 F.2d at 487. The Court is also concerned that denying Plaintiffs' motion could have a chilling effect on future litigants who want to challenge unlawful discrimination but do not want their personal and private medical history put on display. Defendants, who have full access to an unredacted copy of Brown's report, will not be prejudiced by granting Plaintiffs' motion, and no member of the public has requested

69

access. Further, the only piece of evidence relied upon by this Court in this Order which Plaintiffs seek to seal is Brown's testimony that each Plaintiff has been diagnosed with gender dysphoria—a fact that is repeated in Plaintiffs' unredacted declarations, discussed in this Order, and not disputed by Defendants. Thus, the Court finds Plaintiffs' privacy interest outweighs the public's limited interest in learning the private medical details of Plaintiffs' experiences with gender dysphoria. Finally, the Court finds that there are no alternatives to closure, and Plaintiffs' request to seal only small portions of Browns' testimony is narrowly tailored to the compelling interest discussed herein.

Plaintiffs' motion will be granted.

### B.     Dr. Lappert's report (ECF No. 210)

When the motions sought to be sealed are in connection with an evidentiary motion rather than a motion seeking dispositive relief, "the right of access at issue arises under the common law." *Lord Corp. v. S & B Tech. Prods., Inc.*, No. 5:09-CV-205-D, 2012 WL 895947, at *1 (E.D.N.C. Mar. 15, 2012); *see generally Washington Post*, 386 F.3d at 576–77 (holding that the First Amendment attached to dispositive motions in civil cases). "The common law presumes a right of the public to inspect and copy all judicial records and documents." *Washington Post*, 386 F.3d at 575 (internal quotations omitted) (citing *Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 597 (1978)). However, "[t]he distinction between the rights of access afforded by the common law and the First Amendment is 'significant.'" *Id.* (quoting *In re Baltimore Sun Co.*, 886 F.2d 60, 64 (4th Cir. 1989)). The common law "does not afford as much substantive protection to the interests of the press and the public" or "as much access . . . as does the First Amendment." *Id.* Thus, the presumption of access "can be rebutted if countervailing interests heavily

outweigh the public interest in access." *Id.* "[T]he party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption." *Id.* (quoting *Rushford*, 846 F.2d at 253).

Here, the information contained in Lappert's report is marked "CONFIDENTIAL" and is similar to the sensitive medical information discussed by Brown. Lappert does not state any expert opinions in this section that are admissible, *see* Section II.D.ii, *supra*, further reducing the public's right of access. And, as above, no member of the public has requested access, and Defendants have access to an unredacted copy of their own expert's report. Thus, the Court finds that, under the more deferential common law standard, Plaintiffs' interest in privacy heavily outweighs the public's interest in access.

Thus, Plaintiffs motions to seal will be granted.

## CONCLUSION

Issues surrounding transgender healthcare evoke strong emotional and political opinions. *See Grimm*, 972 F.3d at 594 ("[M]any of us carry heavy baggage into any discussion of gender and sex."). But politics and emotion are not admissible as evidence in a court of law. Plaintiffs' doctors, their experts, every major medical association, and Defendants' own third-party administrators all agree that, in certain cases, gender affirming medical and surgical care can be medically necessary to treat gender dysphoria. Defendants attempt to create scientific controversy in this uniform agreement through experts who mix their scientific analysis with hypothetical speculation and political hyperbole. Only science that is relevant, reliable, and offered by a qualified expert is admissible, however, and the admissible portions of Defendants' expert's testimony, even when taken in the light most favorable to Defendants,

71

do not justify the exclusion at issue. Defendants' belief that gender affirming care is ineffective and unnecessary is simply not supported by the record. Consequently, their categorical sex- and transgender-based exclusion of gender affirming treatments from coverage unlawfully discriminates against Plaintiffs in violation of the U.S. Constitution and Title VII.

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that DPS's Motion for Summary Judgment, (ECF No. 132), is **DENIED.**

**IT IS FURTHER ORDERED** that Plan Defendants' Partial Summary Judgment, (ECF No. 136), is **GRANTED** in part and **JUDGMENT IS RESERVED** in part. It is **GRANTED** as to Plaintiff Caraway's claim arising under Title VII against NCSHP. **JUDGMENT IS RESERVED** regarding Plaintiffs' claims arising under the ACA pending further Order from this Court.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment, (ECF No. 178), is **GRANTED** in part, **DENIED** in part, and **JUDGMENT IS RESERVED** in part. It is **GRANTED** with respect to Plaintiffs' claims arising under the Equal Protection Clause and Plaintiff Caraway's claim arising under Title VII against DPS. Defendants Folwell and Jones, *in their official capacities*, are **PERMANENTLY ENJOINED** from enforcing the Plan's exclusion and are **ORDERED** to reinstate coverage for "medically necessary services for the treatment of gender dysphoria." The motion is **DENIED** as to Caraway's Title VII claim against NCSHP. **JUDGMENT IS RESERVED** regarding Plaintiffs' claims arising

under the ACA pending further Order from this Court. The issue of damages is reserved for trial.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Seal Exhibits to Plaintiffs' Motion for Summary Judgment, (ECF No. 182), is **GRANTED**.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Peter Robie, (ECF No. 202), is **GRANTED**.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul W. Hruz, (ECF No. 204), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul R. McHugh, (ECF No. 206), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert, (ECF No. 208), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

      **IT IS FURTHER ORDERED** that Plaintiff's Motion to Seal portions of Dr. Lappert's report, (ECF No. 210), is **GRANTED.**

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Expert Testimony of Stephen B. Levine, M.D., (ECF No. 212), is **GRANTED** in part and **DENIED** in part in accordance with this Memorandum Opinion and Order.

      This, the 10th day of August 2022.

                    /s/ Loretta C. Biggs
                    United States District Judge