# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, et al.,

                        *Plaintiffs*,

            v.

DALE FOLWELL, et al.,

                      *Defendants*.

No. 1:19-cv-00272-LCB-LPA

## RESPONSE TO DEFENDANTS DALE FOLWELL AND DEE JONES' MOTION FOR STAY OF INJUNCTION PENDING APPEAL
## (ECF NO. 256)

Forty-seven days after this Court issued its permanent injunction requiring the reinstatement of coverage for "medically necessary services of treatment for gender dysphoria," Defendants Dale Folwell and Dee Jones (in their official capacities) seek the extraordinary relief of staying this Court's injunction. Defendants have failed to carry their heavy burden of establishing why a stay is required pending appeal, especially as Plaintiffs (and other transgender beneficiaries of the Plan) will be substantially harmed if their healthcare coverage is once again denied during Defendants' appeal.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) allows a court to suspend or modify an injunction "[w]hen an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction." *See also* Fed. R. App. P. 8(a) (requiring that a party, before

seeking a stay in the court of appeals, either move for a stay in the district court or show that moving for such relief would be impracticable). The granting of a stay pending appeal is "an extraordinary remedy," *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 1:04-CV-977, 2007 WL 4262725, at *4 (M.D.N.C. Nov. 30, 2007), and the moving party carries a "heavy burden" to justify this type of equitable relief. *Covington v. North Carolina*, No. 1:15-CV-399, 2018 WL 604732, at *3 (M.D.N.C. Jan. 26, 2018).[1]

When considering the merits of a motion to stay, a district court will consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Defendants' legal argument starts with its citation to these four factors as adopted by the Fourth Circuit in *Long v. Robinson*, 432 F.2d 977 (4th Cir. 1970). ECF 257 at 7.

---

[1] Defendants argue that the relevant appellate standard of review must be considered and is one where the evidence is viewed in the light most favorable to Defendants and all reasonable inferences are drawn in their favor. ECF 257 at 8-9. Defendants rely upon *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562 (4th Cir. 2015) and *Harris v. Pittman*, 927 F.3d 266 (4th Cir. 2019), but neither deal with permanent injunctions. As a permanent injunction is a form of equitable discretion, the Fourth Circuit would review under an abuse of discretion standard, where the district court's legal conclusions are reviewed *de novo*, and any factual findings for clear error. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020); *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) ("We evaluate a district court's decision to grant preliminary injunctions under an abuse of discretion standard."). Regardless, when this Court granted summary judgment and issued the permanent injunction, it applied the proper standard for summary judgment, including citations to *Jacobs* and *Harris*. ECF 234 at 38.

2

However, Defendants' argument that in the Fourth Circuit "a movant for a stay pending appeal need not affirmatively satisfy all four requirements," ECF 257 at 7–8, does not capture the current status of the law.

In the first forty years after *Long*, district courts regularly applied the *Long* factors using a balancing test or sliding scale to evaluate a motion to stay. *Id.* This changed following the Fourth Circuit's decision in *The Real Truth About Obama, Inc. v. FEC*, which modified the analysis for granting a preliminary injunction. 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reissued in relevant part*, 607 F.3d 355 (4th Cir. 2010). The Fourth Circuit recognized that the U.S. Supreme Court in *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ended the balancing test for preliminary injunctions, and now requires the movant to satisfy all four requirements. *The Real Truth,* 575 F.3d at 346–47. The Fourth Circuit held that the moving party must make a "clear showing" on all four requirements before the court may order injunctive relief. *Id.*; *see also CWCapital Asset Mgmt., LLC v. Burcam Cap. II, LLC*, No. 5:13-CV-278-F, 2013 WL 3288092, at *2 (E.D.N.C. June 28, 2013) ("Now, the moving party must independently satisfy all four requirements for a preliminary injunction, and the district court should not balance the four factors.").

This modification to the preliminary injunction standard also altered the standard for a stay pending an appeal because these forms of equitable relief are intertwined. *See Does 1-5 v. Cooper*, No. 1:13-CV-711, 2016 WL 10587195, at *1–2 (M.D.N.C. Mar. 2, 2016); *Syngenta Crop Prot., Inc. v. EPA*, 202 F. Supp. 2d 437, 448 (M.D.N.C. 2002) ("The

3

test for granting a stay mirrors that in determining whether to issue a preliminary injunction."); *see also Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 193 (4th Cir. 1977) (The four part test established in *Blackwelder* to grant preliminary injunctions evolved from the same "fourfold equitable rule of thumb" as the one laid out in *Long* for granting a stay pending appeal).

So, while some district courts still apply the *Long* factors "on a sliding-scale and allow a stronger showing on some factors to make up for a weaker showing on others,"[2] many have analyzed the issue and adopted the "more rigid" standard set in *The Real Truth* when considering motions to stay. *Rose v. Logan*, No. BR 12-25471, 2014 WL 3616380, at *1–2 (D. Md. July 21, 2014); *see In re Kaiser Gypsum Co., Inc.*, No. 3:20-CV-537-GCM, 2021 WL 3476138, at *1 (W.D.N.C. Aug. 6, 2021) ("Failure to satisfy any of the four elements warrants denial of the [stay] motion."); *Dale v. Butler*, No. 7:20-CV-184-BR, 2021 WL 1305391, at *2 (E.D.N.C. Apr. 2, 2021) ("The movant must make a clear showing on each factor; the court does not engage in balancing test."); *In re Carolina Park*

---

[2] Defendants cite to *Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Engineers,* 890 F. Supp. 2d 688, 692 (S.D.W. Va. 2012) and *Arkansas Best Corp. v. Carolina Freight Corp.*, 60 F. Supp 2d 517, 519 (W.D.N.C. 1999) to support its position that they "need not affirmatively satisfy all four requirements" under the *Long* test. ECF 257 at 7-8. However, *Arkansas Best* predates *The Real Truth* by a decade and therefore does not shed any light on the current standard for a motion to stay. While *Ohio Valley* does state that "an independent showing on each prong[] does not apply directly to stays pending appeal," the district court seems to contradict itself by stating later in the opinion that movants "do satisfy each of the three other prongs in this case. *Because all four factors must be met*, however, [movants'] failure to meet the first prong is sufficient grounds for concluding that a stay pending appeal should not be granted to [movants]." 890 F. Supp. 2d at 692–93 (emphasis added).

4

*Assocs., LLC*, No. 2:10-CV-1805-DCN, 2010 WL 2756945, at \*2 (D.S.C. July 12, 2010) ("Failure to satisfy any of the four factors is sufficient grounds to deny the requested stay."); *see also CWCapital Asset Mgmt., LLC*, 2013 WL 3288092, at \*2 n.5 ("For purposes of deciding the instant motion, the court assumes the requirements for obtaining a preliminary injunction and the law that has developed around injunctive relief apply in the context of a motion for stay pending appeal. The parties have not provided, and the court has not found, a case holding otherwise."); *Cooper*, 2016 WL 10587195, at \*2 ("Here, the Court need not determine precisely which test is appropriate to apply because, as explained below, Defendants' Motion should be denied even under the most lenient of the tests—the sliding-scale version of the *Long* test.").

As preliminary injunctions and stays pending appeal arise from the same "fourfold equitable rule of thumb," this Court should apply *The Real Truth* standard here and require Defendants to satisfy all four factors. *Blackwelder*, 550 F.2d at 193. Regardless of whether this Court applies *The Real Truth* standard or the "sliding-scale" approach, Defendants' motion for a stay should be denied.

5

## II. DEFENDANTS HAVE FAILED TO DEMONSTRATE A STRONG SHOWING THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS

### A. The Injunction Is Not Improperly Vague

Defendants assert that this Court's injunction is not compliant with Rule 65(d) because it is "impermissibly vague." ECF 257 at 9. The Rule requires an injunction order to "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); *see* 11A Charles Alen Wright & Arthur R. Miller, Federal Practice and Procedure Civ. § 2955 (3d ed. 1998) ("The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.").

Defendants first argue that this Court failed to "specifically" identify the coverage exclusion at issue. ECF 257 at 11. Put another way, Defendants are claiming they have no idea what is excluded under their own Exclusion. Not only is such a claim farcical on its face, Defendants' own actions show it is simply not true. Two weeks before filing their motion to stay, Defendants issued a press release stating their (belated) intention to come into compliance with the Court's Order, which at that point had already been in effect for a month.[3] In the press release, Defendants clearly understand that this Court's Order requires them to "not enforce the Plan's benefit exclusion regarding treatment or studies

---

[3] Press Release, North Carolina Department of State Treasurer, Federal Judge Orders State Health Plan Board of Trustees to Use Taxpayer Funds to Pay for Sex Transition Operations (July 13, 2022), https://perma.cc/5RYM-3DYH.

leading to or in connection with sex transition or modifications and related care." Further, on the same day, Defendant Folwell stated at the NCSHP Board's regular open meeting that, after he and the NCSHP Board had consulted with counsel, he had determined that as long as the injunction is "in force, I must comply"; that "the Executive Administrator and Plan staff are directed to not enforce the specified benefit exclusion, and to provide benefits in compliance with the court's order"; and that Plan documents would be amended accordingly.[4] Neither in the press release nor during the NCSHP Board Meeting did Defendant Folwell (or any board member) raise any concerns around how the injunction should be understood.

Defendants' feigned ignorance also falls flat as a matter of law. *See Reliance Ins. Co. v. Mast Const. Co*., 159 F.3d 1311, 1316 (10th Cir. 1998) ("Rule 65(d) requires only that the enjoined conduct be described in reasonable, not excessive, detail. . . ."); *Meyer v. Brown & Root Constr. Co*., 661 F.2d 369, 373 (5th Cir. 1981) ("The specificity requirement is not unwieldy . . . . An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited."); *see also Axia NetMedia Corp. v. Massachusetts Tech. Park Corp*., 889 F.3d 1, 13 (1st Cir. 2018) (affirming injunction as parent company did know, or could "readily discern, the precise level of services its affiliates had been providing," especially when responsibilities were identified in a thirty-two-page services agreement).

---

[4] NC State Health Plan, *State Health Plan Board of Trustees Meeting–July 13, 2022*, YouTube (July 13, 2022), https://www.youtube.com/watch?v=FTQS3xmN_t0, at 19:30-25:02.

Defendants next argue that Defendants—who administer and operate the NCSHP—have no concept of what "medically necessary services for the treatment of gender dysphoria" could mean, and instead raise a series of questions in a classic strawman argument to raise doubt over the reasonably detailed scope of the injunction. ECF 257 at 13. This strawman argument is quickly resolved by a simple review of this Court's injunction, which referenced the statute defining "medically necessary" services, which are:

> (1) "[p]rovided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease" and "not for experimental, investigational, or cosmetic purposes," (2) "[n]ecessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms," (3) [w]ithin generally accepted standard of medical care in the community," and (4) "[n]ot solely for the convenience of the insured, the insured's family, or the provider."

ECF 234 at 5 (quoting N.C. Gen. Stat. § 58-3-200(b)). When it lifted the Exclusion in 2017, NCSHP was able to determine and provide "medically necessary services for the treatment of gender dysphoria." *See, e.g.*, ECF 181-2 at 34 (Board removed the Exclusion "resulting in the provision of medically necessary services for the treatment of gender dysphoria"). Defendants plainly do not need more information from this Court to do so again. *See Williams v. United States*, 402 F.2d 47, 48 (10th Cir. 1967) ("[I]t is difficult to term appellant's argument that the injunction is inoperative from lack of specificity as more than self-denying." (footnote omitted)); *see also Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (considering text of order and context of litigation to determine whether order is sufficiently specific).

8

Nor does Defendants' reliance on *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) support their cause. ECF 257 at 12–13. The *Pashby* plaintiffs challenged stricter eligibility requirements for an in-home personal care services program found in a newly passed piece of legislation referred to in the litigation as Policy 3E. *Pashby*, 709 F.3d at 313. The district court granted a preliminary injunction prohibiting the implementation of Policy 3E. *Id*. However, Policy 3E included a range of provisions unrelated to the eligibility requirements. *Id*. at 331. The Fourth Circuit found the injunction lacked "reasonable detail" because while the district court only focused on the eligibility requirements of Policy 3E, the actual injunction prohibited the complete implementation of Policy 3E, which, as the Fourth Circuit questioned, might include provisions unrelated to the eligibility requirements. *Id*. As a result, while the Fourth Circuit found plaintiffs "established the need for a preliminary injunction," it remanded the case back to the district court to further clarify its injunction order. *Id*. at 332.

The Exclusion, unlike Policy 3E, does not contain multiple provisions unrelated to the specific requirement sought to be enjoined. Instead, the Exclusion is a categorical prohibition of any and all coverage for gender dysphoria. Period. As a result, unlike in *Pashby*, here, the enjoined conduct is identified in reasonable detail, i.e., end the categorical prohibition of medically necessary services for the treatment of gender dysphoria, an act Defendants were able to accomplish in 2017.

Defendants contend that this Court reimposing the 2017 rule where NCSHP removed the Exclusion and provided "medically necessary services for treatment of gender

dysphoria" gives no guidance "short of a contempt hearing" on what is covered by the injunction. ECF 257 at 14–15. As its habit and practice, NCSHP follows the BlueCross BlueShield of North Carolina Corporate Medical Policy for most coverage decisions, including, in 2017, for gender dysphoria. *See, e.g.*, ECF 181-2 at 34 (the removal of the Exclusion "implies that the third-party administrator, Blue Cross and Blue Shield, will utilize the existing approach to administrating this issue"). As detailed in the Court's injunction order, "NCSHP's third-party administrators, Blue Cross and CVS, appear able to distinguish between medically necessary and unnecessary treatments." ECF 234 at 51. Defendants' feigned ignorance of how NCSHP operates in conjunction with its third-party administrators is not credible.

Finally, in another strawman argument, Defendants raise concerns about two other facially neutral exclusions that "affect coverage and payments for the treatment of gender dysphoria." [5] ECF 257 at 15–16. But those exclusions have no relevance to this Court's injunction or even to this case. NCSHP never invoked them in the denials of care issued to Plaintiffs. ECF 188 at 4–5. Moreover, these exclusions remained untouched in 2017, but NCSHP was able to provide "medically necessary services for the treatment of gender dysphoria" without any trouble. *Id.* Importantly, BCBSNC "has never implemented the portion of the Plan's benefit booklets that excludes 'surgery for psychological or

---

[5] Specifically, for "[c]osmetic services . . . and surgery for psychological or emotional reasons," and for experimental medications and medications not approved by the U.S. Food and Drug Administration ("FDA"). ECF No. 137-3 at 3-4.

emotion[al] reasons.'" ECF No. 137-4 ¶ 27. Further, the lack of FDA approval did not prevent NCSHP from covering care during plan year 2017, and Defendant Dee Jones, as NCSHP's Rule 30(b)(6) designee, admitted NCSHP has covered other non-approved applications of medications. *See* ECF 180 at 181, 107:17–19 (the Plan covered COVID care, which was not FDA-approved until many months after). Moreover, as was established in the parties' expert depositions, it has been the FDA's position for at least three decades that physicians may prescribe drugs on an off-label basis. *See*, *e.g.*, ECF 181-1 at 539–48, 223:14–232:6; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001) ("[O]ff-label use is generally accepted.").

As Defendants well know, the injunction does not need to identify a complete list of all relevant treatments and procedures for gender dysphoria. The injunction enjoined the categorical prohibition of any and all coverage for gender dysphoria. NCSHP (and the Defendants) are equipped to "evaluate[] whether the billed medical procedure corresponds to a covered diagnosis." ECF 197 at 20. NCSHP does it on a daily basis for its 740,000 members, and did so for its transgender members in 2017. *See*, *e.g.*, *Kadel v. N.C. State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 428 (4th Cir. 2021) ("The 2017 Plans did not mandate coverage for all gender-confirming care. They simply allowed claims for gender-confirming care to be reviewed under the same criteria and in the same manner as claims for any other medical, mental health, or pharmacy benefits.").

11

### B. The Injunction Does Not Disregard Binding Supreme Court Precedent

Defendants largely repeat their summary judgment argument that the Exclusion cannot be understood as discriminating based on sex under *Geduldig v. Aiello*, 417 U.S. 484 (1974). Defendants are still wrong and therefore lack sufficient grounds for a stay. *In re Wellington*, 631 B.R. 833, 839 (Bankr. M.D.N.C. 2021) ("[A] party does not meet its burden on this factor by simply restating previous arguments from earlier filings."); *New York Life Ins. Co. v. Singh*, No. 14-cv-5726 (NG) (SMG), 2017 WL 10187669, at *2 (E.D.N.Y. July 13, 2017) ("To make out a 'strong showing' of likely success, a party seeking a stay must do more than simply reiterate arguments with which the court has already disagreed.").

First, there is a threshold problem with their argument. Defendants ignore that *Geduldig* has *no* application to the Court's independent ruling that the Exclusion "discriminate[s] based on . . . transgender status." ECF 234 at 42; *see also id.* at 43 (the Exclusion "transparently discriminates against [NCSHP's] transgender members" and therefore must "receive intermediate scrutiny"). *Geduldig* speaks only to sex discrimination and has no effect on this Court's transgender status holding. Defendants' silence, which independently requires heightened scrutiny and summary judgment in Plaintiffs' favor, shows Defendants are unlikely to succeed on the merits and requires that their motion be denied. For the reasons below, however, Defendants' arguments about *Geduldig* and Plaintiffs' sex discrimination claims are equally inapt.

12

Defendants claim that *Geduldig* "does not permit" a finding that the Exclusion facially discriminates, or application of heightened scrutiny.[6] ECF 257 at 17. Not so. *Geduldig* held only that an exclusion of pregnancy from a disability benefits program with no showing of "pretext" is not *per se* "invidious discrimination against the members of one sex." 417 U.S. at 496 n.20; *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (quoting *Geduldig*, 417 U.S. at 496 n.20). Defendants misrepresent *Geduldig* by claiming it "specifically" concluded that exclusions that can "only be stated or effectuated [by] referencing sex" do not constitute sex discrimination. ECF 257 at 18. That is incorrect.

As *Geduldig* held, "[n]ormal pregnancy is an *objectively identifiable* physical condition." 417 U.S. at 496 n.20 (emphasis added). This means pregnancy "can be explained without reference to sex, gender, or transgender status." ECF 234 at 47. *Geduldig* says nothing about an Exclusion like this one that explicitly categorizes based on sex. ECF 234 at 7 (the Exclusion prohibits "treatment or studies leading to or in connection with *sex changes* or modifications and related care" (emphasis added)). For that reason, multiple courts have found that exclusions of gender-affirming care from coverage facially discriminate based on sex. *See, e.g.*, *Toomey v. Arizona*, No. 19-cv-00035, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1027–

---

[6] Defendants confuse two distinct concepts, claiming that the Court cannot apply "heightened scrutiny" because the Exclusion is not "facially discriminatory" based on sex. ECF 257 at 17–18. But heightened scrutiny applies to all sex-based classifications, regardless of whether they are facial or intentional. The Exclusion here is both for the reasons explained in Plaintiffs' summary judgment motion. ECF 201 at 12.

30 (D. Alaska 2020) (holding that exclusion prohibiting treatment "related to changing sex or sexual characteristic" is "facially discriminatory"); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 950 (W.D. Wisc. 2018); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018) (holding that a similar exclusion "on its face treats transgender individuals differently on the basis of sex").[7]

Defendants rely on *Lange v. Houston County, Georgia*, No. 5:19-cv-392, 2022 WL 1812306 (M.D. Ga. June 2, 2022), to support their argument, ECF 257 at 18–19, but this outlier holding by an out-of-circuit district court—not bound by the Fourth Circuit's analysis of facial sex discrimination—fails to persuade. Indeed, after this Court's summary judgment ruling, another district court in *this* circuit similarly found *Geduldig* inapplicable to an exclusion of gender-affirming care, finding instead that such an exclusion facially discriminates based on sex. *See Fain v. Crouch*, No. 3:20-cv-0740, 2022 WL 3051015, at *8 (S.D.W. Va. Aug. 2, 2022) (observing that *Geduldig* "reasoned that pregnancy was a physical condition divorced from gender," and in contrast, the exclusion of gender-affirming care in West Virginia's Medicaid program "precludes a specific treatment that is connected to a person's sex and gender identity" and not just an objectively identifiable physical condition).

---

[7] The Supreme Court has "declined to distinguish between status and conduct in this context." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring).

14

*Dobbs* applies *Geduldig* to abortion—which the Supreme Court also treats as an objectively identifiable physical condition that can be described without reference to sex—and thus does not change the analysis. Notably, *Dobbs* reifies *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), a decision that Defendants conveniently omit from their analysis. As *Bray* recognized, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Id.* at 270. In other words, a "tax on wearing yarmulkes is a tax on Jews." *Id.* So too, here. An Exclusion of healthcare that only transgender people need is an exclusion of transgender people.

Defendants strain to distinguish *Bostock*, claiming it does not inform Equal Protection analysis or alter *Geduldig*'s applicability. ECF 257 at 22. But even if that were true (it is not), this Court is bound by *Grimm v. Gloucester County School Board*, which this Court correctly applied to find facial discrimination. 972 F.3d 586 (4th Cir.) *as amended* (Aug. 28, 2020). *Grimm* held that a policy limiting students to use of the restrooms corresponding to their "biological genders" discriminated on its face based on sex. ECF 234 at 41 (analyzing *Grimm*, 972 F.3d at 608–10). This Court then noted that the Exclusion prohibits care of "*sex* changes or modifications and related care." ECF 234 at 41. Just as a policy referencing "biological genders" facially discriminates based on sex, so too does an exclusion for care based on "sex." Defendants identify nothing suggesting they are likely to succeed in reversing this Court's plain application of *Grimm*.

15

### C. This Court Properly Found Plaintiffs Similarly Situated to the Cisgender Plan Participants Who Receive the Same Care Plaintiffs are Denied

Defendants claim that this Court "eliminate[d] Plaintiffs' obligation on summary judgment to prove that they are 'similarly situated,'" ECF 257 at 24, but their argument amounts to mere disagreement with the Court, not a showing of error. In fact, the Court squarely considered the issue and found Plaintiffs similarly situated because transgender and cisgender participants "are all members of the Plan who seek similar or identical treatments." ECF 234 at 46. Defendants misunderstand the Court's observation that any neutral reasons that a transgender participant might subsequently be denied coverage for a particular treatment are not relevant at this threshold stage, which simply examines whether Defendants can justify a categorical barrier to coverage. *Id.*

Defendants' summary judgment briefing identified no material difference between transgender plan participants and cisgender plan participants, and their stay motion offers nothing new. Defendants insist that instead of comparing the transgender people denied care with the cisgender people who are eligible, the Court must compare their diagnoses, but this is a transparent attempt to rewrite the Exclusion. "Plan coverage decisions are based on medical diagnoses, not patient identities," Defendants reason. ECF 257 at 25. But that is not how the Exclusion operates. Rather, as this Court recognized, the "factor used by the Plan to distinguish between covered and uncovered treatments" is that the latter "'change or modify' the patient's assigned sex." ECF 234 at 46. The Exclusion does not reference diagnosis, only the fact that the care is needed for gender transition. ECF 234 at

16

7 (the Exclusion prohibits "treatment or studies leading to or in connection with sex changes or modifications and related care").

Even accepting Defendants' argument at face value, however, discrimination on the basis of gender dysphoria *is* discrimination against transgender people, and Defendants' argument is nothing more than a "concise expression of an intention to discriminate." *Plyler v. Doe*, 457 U.S. 202, 227 (1982). As the unrebutted expert testimony showed and numerous courts have recognized, "inherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender." *Fain*, 2022 WL 3051015, at *6; *see also Brandt v. Rutledge*, 551 F. Supp. 3d 882, 889 (E.D. Ark. 2021) (gender-affirming care "is only sought by transgender individuals"); *Toomey*, 2019 WL 7172144, at *6 ("[T]ransgender individuals are the only people who would ever seek gender reassignment surgery."); ECF 197–16 at 2, 28:14–16. This Court was thus correct to hold that pointing to gender dysphoria does not identify a relevant difference between transgender and cisgender participants, it simply makes clear that Defendants discriminate "based on sex and transgender status." ECF 234 at 44; *see also Fain*, 2022 WL 3051015, at *6 (an exclusion "aimed specifically at a gender change procedure . . . targets transgender people because they are transgender"); *Boyden*, 341 F. Supp. 3d at 1000.

Defendants' failure to identify a relevant difference between transgender and cisgender plan participants concedes that there is none. Defendants fail to carry their heavy burden for a stay.

## III. DEFENDANTS WILL NOT BE IRREPARABLY INJURED ABSENT A STAY

Defendants claim irreparable injury because it "jeopardizes Defendants' ability to make what should be essential policy decisions as stewards of the Plan's state-allocated resources." ECF 257 at 28. Relatedly, Defendants also claim injury because the injunction is "distorting the Plan's policy determinations on how to allocate finite resources to their most efficient use." ECF 257 at 29.

First, Defendants' financial injury claim—as it was at summary judgment—is pure poppycock. The Defendants don't even believe it. Defendant Dee Jones, who served as NCSHP's Rule 30(b)(6) representative, admitted that "the cost of this benefit is not going to break the Plan, never was, never will." ECF 180 at 182, 104:17–19. Defendant Dale Folwell, who was disclosed as a Rule 26(a)(2)(C) expert to testify about the plan's "unfunded liability," and the general concerns of the Plan's financial feasibility, admitted that he was "not sure there's a direct correlation between the unfunded liability and the exclusion." ECF 180 at 138, 192:9–10. Moreover, the Plan has undertaken initiatives to address its unfunded liability that—in contrast to the minimal cost of gender-affirming care—save in some cases hundreds of millions of dollars. ECF 180 at 174–76, 80:13–82:10. As found by this Court, the estimated savings from maintaining the Exclusion is approximately one dollar for each of the Plan's 740,000 members. ECF 234 at 48. As this Court correctly noted, "[s]uch a paltry limit on health care costs is not an important governmental interest." *Id*. It certainly is not enough to hold up the enforcement of the injunction either.

18

Second, even if legitimate , injuries—even if substantial—"in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough" to establish irreparable injury when seeking a stay. *Virginia Petrol. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958); *Long*, 432 F.2d at 980 (same). Moreover, while NCSHP "has an interest in its preferred policy, that interest cannot outweigh the harm to the many non-gender conforming members of the public for whom discrimination imposes a very concrete cost." *Walker v. Azar*, No. 20-cv-2834, 2020 WL 4749859, at *8 (E.D.N.Y. Aug. 17, 2020) (citation omitted).

## IV. PLAINTIFFS WILL BE SUBSTANTIALLY HARMED BY A STAY.

In a true "through the looking glass" moment, Defendants assert "Plaintiffs will be unharmed by a stay of the injunction pending appeal." ECF 257 at 30. It is truly outrageous that the North Carolina State Treasurer, who is statutorily designated to administer and operate the NCSHP, N.C. Gen. Stat. § 135-48.30, and the Executive Administrator of the NCSHP openly claim that denying claims for "medically necessary" healthcare to transgender individuals does not harm those individuals. ECF 234 at 8 ("Gender dysphoria is characterized by clinically significant distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex."); *Eknes-Tucker v. Marshall*, No. 2:22-cv-184-LCB, 2022 WL 1521889, at *12 (M.D. Ala. May 13, 2022) ("The record shows that, without transitioning medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality."); *see also Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250,

19

265 (1974) (delayed medical care can cause a patient needless deterioration, requiring more expensive future care and possibly causing disability, which can strain state social services).

In disclaiming any harm, Defendants attempt to shift the focus to Plaintiffs' claim for monetary damages due to the NCSHP's past discriminatory behavior. But Defendants miss the point of injunctive relief. First, no amount of monetary damages can restore Plaintiffs to their rightful position of being able to access medical care at the time they need it, or undo the deprivation of equal treatment under law. *See Walker*, 2020 WL 4749859; *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (finding no adequate remedy "for preventable 'life-long diminished well-being and life-functioning'").

Second, Defendants—wrongfully—claim that "Plaintiffs do not identify any planned future surgeries," implying that these individuals do not need future medical care to treat their gender dysphoria. ECF 257 at 30. The absurd nature of this claim is easily refuted by the record. ECF 234 at 66 ("Plaintiffs have shown that they will require continued medical care to treat their gender dysphoria and that, barring judicial or legislative intervention, NCSHP intends to maintain the exclusion.").

Finally, the violation of constitutional rights "for even minimal periods of time unquestionably constitutes irreparable harm." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (*en banc*) (cleaned up). A stay will further extend the constitutional harm suffered by Plaintiffs due to the Exclusion.

## V. THE PUBLIC INTEREST WILL NOT BE SERVED BY A STAY.

Defendants claim a stay will benefit the public through "the allocation of North Carolina taxpayer dollars by the proper authorities unless and until the validity of the injunction is confirmed on appeal." ECF 257 at 31. A stay impacts the public interest when it has "consequences beyond the immediate parties." *In re Wellington*, 631 B.R. at 846 (quoting *In re Revel AC, Inc.*, 802 F.3d 558, 569 (3d Cir. 2015)). Here, the injunction benefits the public by allowing *all* transgender individuals covered under NCSHP to receive "medically necessary services for the treatment of gender dysphoria" during the pendency of the appeal—a benefit that outweighs Defendants' concern over the allocation of taxpayer dollars. *Pashby,* 709 F.3d at 331 ("Although we understand that the North Carolina legislature must make difficult decisions in an imperfect fiscal climate, the public interest in this case lies with safeguarding public health rather than with assuaging North Carolina's budgetary woes."); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("[I]t is well-established that the public interest favors protecting constitutional rights.").

## VI. CONCLUSION

Defendants seek the "extraordinary relief" of staying this Court's injunction, but have failed to carry their "heavy burden" of making a "clear showing" on all four factors required to secure a motion for stay. As a result, this Court should deny Defendants' motion.

Dated: August 17, 2022

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
Lauren E. Snyder
N.C. State Bar No. 54150
HWG LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386
Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
Grace H. Wynn*
HWG LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Phone: 202-730-1300
Fax: 202-730-1301
dravi@hwglaw.com
gwynn@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820
Fax: 312-984-7700
mweaver@mwe.com
asafer@mwe.com

Respectfully submitted,

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org
David Brown*
Ezra Cukor*
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org
ecukor@transgenderlegal.org

Dmitriy G. Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534
Fax: 646-417-7668
dtishyevich@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 202-756-8864
Fax: 202-591-2900
levans@mwe.com

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is in compliance with Local Rule 40.1(c) because the body of this brief, including headings and footnotes, does not exceed 6,250 words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  August 17, 2022

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HWG LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Clerk of

Court using the CM/ECF system which will send notification of such filing to all

registered users.

Dated: August 17, 2022

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HWG LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com